UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| WAYNE BERRY, | ) Case No.  CV 07-00172 SOM LEK |
| Plaintiff, | ) |
| | ) **MEMORANDUM IN SUPPORT OF** |
| vs. | ) **MOTION** |
| | ) |
| DEUTSCHE BANK TRUST | ) |
| COMPANY AMERICAS (FKA | ) |
| BANKERS TRUST COMPANY) AND | ) |
| JP MORGAN CHASE BANK IN THEIR | ) |
| SEPARATE CAPACITIES AND AS | ) |
| AGENTS FOR THE PRE AND POST- | ) |
| PETITION LENDERS OF FLEMING | ) |
| COMPANIES, INC.; DOES 1 TO 200, | ) |
| | ) |
| Defendants. | ) |
| | ) |

# TABLE OF CONTENTS

I.    Introduction.................................................................................................1

II.   Factual and Procedural Background....................................................3

III.  Legal Standard .........................................................................................6

IV.   Argument ....................................................................................................7

      A.    Berry's Unjust Enrichment Claim Must Be Dismissed With
            Prejudice. ...........................................................................................7

      B.    Berry's Copyright Claims Must Be Dismissed With Prejudice.................8

            1.    Berry's copyright claims are barred by the statute of
                  limitations.........................................................................9

            2.    Berry's claims for post-petition infringement are barred
                  by Section 364(e) of the Bankruptcy Code and principles
                  of collateral estoppel. ..................................................11

            3.    Berry has not -- and cannot -- plead a prima facie case for
                  contributory or vicarious infringement during
                  Defendants' two days of potential exposure................17

V.    Conclusion ...............................................................................................24

# TABLE OF AUTHORITIES

FEDERAL CASES

A&M Records v. Napster, 239 F.3d 1004 (9th Cir. 2001                                    20

Artists Music, Inc. v. Reed Pub (USA), Inc., Nos. 93 CIV 3428 (JFK),
    73163, 1994 WL 191643 (S.D.N.Y. May 17, 1994)                          20, 24

Auscape Int'l v. National Geographic Soc'y, 409 F. Supp. 2d 235, 243
    (S.D.N.Y. 2004)                                                            10

Bell Atlantic Corp. v. Twombly, No. 05-1126, 2007 WL 1461066, at *8
    (U.S. May 21, 2007)                                                         6

Blue Nile, Inc. v. Ice.com, Inc., 478 F. Supp. 2d 1240, 1250-51 (W.D.
    Wash. 2007)                                                                 8

Bouchat v. Champion Prods., Inc., 327 F. Supp. 537, 552 (D. Md. 2003            11

Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir.
    2004)                                                                       8

Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 889 (6th
    Cir. 2004)                                                                 19

Conerly v. Westinghouse Elec. Corp., 623 F.2d 117, 120 (9th Cir. 1980)          10

Danjaq LLC v. Sony Corp., 263 F.3d 942, 954 (9th Cir. 2001)                      9

Del Madera Props. v. Rhodes & Gardner, 820 F.2d 973, 977 (9th Cir.
    1987)                                                                       8

DeNardo v. Murphy, 781 F.2d 1345, 1348 (9th Cir. 1986)                          13

Ehat v. Tanner, 780 F.2d 876, 878 (10th Cir. 1985)                              8

Ellison v. Robertson, 357 F.3d 1072, 1078 (9th Cir. 2004)                       19

Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262-63 (9th Cir.
    1996)                                                                      23

Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159,
    1162 (2d Cir. 1971)                                                        18

I. Meyer Pincus & Assoc. P.C. v. Oppenheimer & Co., Inc., 936 F.2d
    759, 762 (2d Cir. 1991)                                                     7

In re Adams Apple, Inc., 829 F.2d 1484, 1488 (9th Cir. 1987)                  13, 14

In re Big Wheel Holding Co., Inc., 214 B.R. 945, 951 (D. Del. 1997)             21

In re DiBerto, 171 B.R. 461, 472 (Bankr. D.N.H. 1994)                           22

K&E 11867961.5

In re Ellingsen MacClean Oil Co., Inc., 834 F.2d 599, 603 (6th Cir.
    1987), cert. denied, 488 U.S. 817 (1988)                12, 14, 16

In re Florida West Gateway, Inc., 147 B.R. 817, 819 (Bankr. S.D. Fla.
    1992)        14, 16

In re Graphic Arts Lithographers, Inc., 71 B.R. 774, 776 (9th Cir. B.A.P.
    1987)        13, 16

In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 269 (3rd Cir. 1991)    13

In re Napster, Inc. Copyright Litigation, No. C MDL-00-1369-MHP,
    2005 WL 289977, at *2 (N.D. Cal. February 3, 2005)    9, 11, 18

In re Western Pac. Airlines, Inc., 224 B.R. 799, 803 (D. Colo. 1998)    13

Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d
    1351, 1355 (7th Cir. 1990)    13, 16

Kourtis v. Cameron, 419 F.3d 989, 995 n.3 (9th Cir. 2005)    7

Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir.
    1986)    6

Meeco Mfg. Co., Inc. v. True Value Co., No. 006-1582RSL, 2007 WL
    1051259, at *2 (W.D. Wash. April 4, 2007)    8

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930
    (2005)    18, 19

Miller v. Meinhard-Commercial Corp., 462 F.2d 358, 360 (5th Cir. 1972)    22

Offshore Sportswear, Inc. v. Vuarnet Intern., B.V., 114 F.3d 848, 850
    (9th Cir. 1997)    16

Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, No. C 04-0371 JW, 2004 WL
    1773349 (N.D. Cal. August 5, 2004    20

Religious Tech. Center v. Netcom On-Line Commc'n, 907 F. Supp. 1361,
    1376 (N.D. Cal. 1995)    24

Schneider v. California Dept. of Corrs., 151 F.3d 1194, 1197 (9th Cir.
    1998)    10

Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)    6

UMG Recordings, Inc. v. Bertelsmann AG, 222 F.R.D. 408, 414 (N.D.
    Cal. 2004    18

Wood v. Santa Barbara Chamber of Commerce, Inc., 507 F. Supp. 1128,
    1135 (D. Nev. 1980)    9

Wyser-Pratte Management Co., Inc. v. Telxon Corp., 413 F.3d 553, 560
    (6th Cir. 2005)    7

K&E 11867961.5

Zito v. Steeplechase Films, Inc., 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003)                    8

STATE CASES

Browning v. Prostok, 165 S.W. 3d 336, 346 (Tex. 2005)                    22

Durette v. Aloha Plastic Recycling, Inc., 100 P.3d 60, 72 (Hawai'i 2004                    7

FEDERAL STATUTES

11 U.S.C. § 101                    15

11 U.S.C. § 301(a)                    7, 8

11 U.S.C. § 364                    12, 13, 16

11 U.S.C. § 364(c)                    12

11 U.S.C. § 364(e)                    11, 12, 13, 14

11 U.S.C. § 502(a)                    21

11 U.S.C. § 510(c)                    21

11 U.S.C. § 1144                    22

11 U.S.C. § 1128                    21

17 U.S.C. § 507(b)                    9, 10

FEDERAL RULES

Fed. R. Bankr. P. 2004                    20

Fed. R. Civ. P. 12(b)(6)                    6, 10

OTHER AUTHORITIES

Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.01(B)(1)(g)(2003)                    8

## I.    INTRODUCTION

This is a baseless lawsuit.  Without any genuine basis in fact or law, and indeed, contrary to the record in prior related cases, Wayne Berry is suing Deutsche Bank Trust Company Americas and JP Morgan Chase Bank (collectively, "Defendants") for vicarious copyright infringement, contributory copyright infringement and unjust enrichment.  He claims that Defendants -- two of world's largest banks -- knowingly directed and compelled Fleming Companies, Inc., a wholesale distributor that operated both nationwide and abroad, to use infringing versions of his Freight Control Software ("FCS") in its Hawai'i distribution center so that it could generate the revenues necessary to repay Defendants on certain loans.  Under Berry's theory, if Fleming had not infringed FCS (which was only used in Hawai'i), its nationwide operations would have screeched to a halt and Defendants would not have been repaid for their loans.  This theory is far-fetched to say the least.

This Court is familiar with Berry's propensity to dream up wild, unfounded claims.  Over the past six years, Berry has sued no fewer than 28 individuals and companies for infringing FCS.  Most of these suits have been unsuccessful.  In fact, after his most recent round of litigation, Berry found himself owing the various defendants more money in costs and attorneys' fees than he himself recovered in damages.  In debt and facing the likelihood of enforcement actions, Berry has apparently decided to take another bite at the apple -- and peg Defendants with liability.

His claims, however, are unfounded.  First, his unjust enrichment claim -- which he likely pleads to reach back beyond the Copyright Act's statute of limitations -- is preempted by the Copyright Act.  It must be dismissed.

His copyright claims fare no better.  After applying both the Copyright Act's statute of limitations (giving effect to a tolling agreement that Berry himself does not acknowledge in the Complaint) and this Court's finding that Fleming stopped

K&E 11867961.5

infringing on June 9, 2003, Berry is left with 72 days of potential infringement. Those 72 days are slashed to **two days** by bankruptcy court orders specifically recognizing that Defendants did not control and were not responsible for Fleming's management or operations after April 1, 2003 (negating essential elements of his copyright claims).  The only period at issue, therefore, is March 30 and 31, 2003.

Berry has not and cannot plead a theory under which he could plausibly recover from Defendants for this two-day period.  First, this Court has already found that Fleming's direct infringement during this period was **inadvertent**. Because Fleming itself did not know it was infringing, Defendants -- Fleming's banks -- could not possibly have had this knowledge themselves.  This Court's prior orders relating to the same plaintiff, the same software and the same direct infringer preclude any finding that Defendants knew of Fleming's infringement. Defendants' lack of knowledge serves as a complete bar to a contributory infringement claim.

Berry's vicarious infringement allegations similarly fail to state a claim. Berry alleges that Defendants had a direct financial interest in Fleming's infringement because they were paid out of the proceeds of infringement.  They were not.  Rather, Defendants were paid from the pool of funds in the Fleming bankruptcy estate, **pursuant to bankruptcy court orders**.  Berry, who had the right and opportunity to do so, did not contest these payments.  If Defendants, by receiving a bankruptcy court's distribution of these funds, can be liable for vicarious infringement, that means that the tens of thousands of other creditors who have received bankruptcy court distributions could be liable as well -- particularly as the operative credit agreements in no way tie Defendants' right to payment to Fleming's infringement.  That result is absurd.  It is also a belated and unlawful collateral attack on the bankruptcy court's orders.  Berry's theory is fatally flawed, and the claim must be dismissed.

K&E 11867961.5

## II.    FACTUAL AND PROCEDURAL BACKGROUND

For the Court's convenience, Defendants recount below a brief history of Berry's two prior FCS-related lawsuits and Fleming's Chapter 11 case.  Taken together, it becomes clear that after failing to secure substantial damages in those prior lawsuits (or, in fact, even damages sufficient to recoup his costs), Berry is simply rolling the dice -- yet again -- in the hope that this time he might extort a more favorable settlement.[1]

Berry created FCS, a computer program that can be used to coordinate shipments of goods, in 1993.  *See* Declaration of Erin N. Brady, Ex. A at 2 (1/26/2005 Summary Judgment Order).[2]  Berry gave Fleming a free, nonexclusive license to use FCS in 1999 and, upon doing so, installed copies of FCS on Fleming's computers.  *Id*.  Since that time, FCS has been the subject of nearly continuous litigation between Berry, Fleming and numerous other parties.

Berry filed his first FCS-related lawsuit against Fleming in 2001.  *Id*.  In that suit, he claimed that Fleming infringed his copyright to FCS and two other programs.  *See Berry v. Fleming Companies, Inc. et al.*, Case No. 0100446 (SPK/LEK) (D. Hawai'i).  On March 6, 2003, a jury found that Berry owned the copyrights to the works in question, and that Fleming had a valid license to use each of the works.  Ex. A at 2 (1/26/2005 Summary Judgment Order). Nonetheless, the jury also found that Fleming had made unauthorized changes to the FCS software residing on its computers.  *Id*.  As a result, it awarded Berry $98,250 in damages.  *Id*.

---

[1]    Defendants reference a number of judicial pleadings and publicly available documents in this factual discussion and, in fact, throughout this motion.  The Court is entitled to take judicial notice of these documents (and the facts contained therein).  *See* Part II *supra*.

[2]    All Exhibits cited herein are attached to the Declaration of Erin N. Brady filed concurrently with this motion.

After the March 2003 jury verdict, Fleming attempted to comply with Berry's copyright by reverting to the version of FCS that Berry had licensed to it -- dated from 1999. *Id.* The earliest version that Fleming could locate, however, was from June 2000. *Id.* The June 2000 version was identical to the 1999 version with the exception of three minor changes. *Id.* at 2-3. Specifically, the 2000 version contained a Y2K feature, a field scratch name and two label changes. *Id.* at 3. Fleming's network administrator, Mark Dillon, recognized that the 2000 version contained the Y2K feature and removed that feature before Fleming began using the program. *Id.* He did not, however, recall that Fleming had added the field scratch name or made the two label changes. *Id.* Accordingly, he did not know to reverse these changes. *Id.*

By May 2003, Fleming recognized that the original (or what it thought was the original) FCS version was inadequate for its needs. *Id.* Accordingly, Fleming decided to "get away completely" from FCS by taking Fleming's data out of the FCS program and putting it into Excel spreadsheets, which spreadsheets it planned to use to manage its freight operations. *Id.* Fleming began operating with the Excel spreadsheets -- and stopped using FCS -- on June 9, 2003. *Id.*

In the interim, Fleming filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. *See In re Fleming Companies, Inc.*, Case No. 03-10945 (MFW) (Bankr. D. Del. April 1, 2003). Within a matter of weeks, the Court entered multiple orders finding that Defendants did not have control of Fleming's operations or management on account of their financial support. *See generally* Exs. B (Cash Collateral Order), C (Bridge Financing Order), and D (Final Financing and Cash Collateral Order). And within a matter of months, in August of 2003, Fleming consummated a court-approved sale of substantially all of its assets to C&S Wholesale Grocers, Inc. and C&S Acquisition LLC (collectively, "C&S"). Ex. E (Order Approving Sale to C&S). At that point, Fleming ceased its wholesale distribution operations.

4

This did not, however, stop Berry's pursuit of Fleming and those with whom it did business. Berry filed another lawsuit in July 2003. *See Wayne Berry v. Hawaii Express Service, Inc., et al.*, Case No. 03-00385 (SOM-LEK) (D. Hawai'i). In this lawsuit, he sued a myriad of defendants, including (but not limited to) Fleming and certain Fleming employees (the "Employees"). After twice amending his claims, he asserted two claims whose resolution is relevant to this litigation. ***First***, Berry alleged that Fleming and the Employees directly infringed by using a derivative of FCS. Ex. F (Second Amended Verified Complaint). ***Second***, Berry alleged that Fleming and certain Employees contributory infringed by knowingly directing other Employees to use FCS. *Id.* The District Court disposed of these claims on summary judgment.

In doing so, the Court found that Fleming and the Employees were liable for direct infringement of FCS for the period between ***March 7, 2003 and June 9, 2003***, leaving the calculation of damages for a jury. Ex. G at 25, 39-40 (6/27/2005 Summary Judgment Order). Notably, the Court found that this infringement was ***inadvertent*** because neither Fleming nor the Employees knew that they were using an infringing version of the software during this period; rather, both thought Fleming was using a cleaned-up version of FCS identical to the original licensed version. *Id.* at 28.

The Court also found that Fleming and the Employees were not liable for contributory infringement. Specifically, the Court found that Fleming did not induce or encourage the Employees to use an infringing version of FCS because, although the Employees used an unauthorized derivative, nobody knew that they were doing so at the time of the infringement. *Id.* Instead, the Court found that the Employees (and Fleming) thought that they were using the original, licensed version of FCS. *Id.* As a result, the Court found that Berry could not establish that any Defendant had induced or encouraged any Employee to infringe.

K&E 11867961.5

Ultimately, a jury awarded Berry $57,534 for Fleming and two Employees' direct infringement of FCS. Ex. H (3/9/2006 Judgment). This amount is a far cry from the hundreds of millions of dollars Berry claimed during the course of the litigation. Ex. I (3/23/2006 Declaration of Damian Capozzola). It also pales in comparison to the nearly $235,000 in costs and attorneys' fees Berry must now pay to those whom he baselessly sued. Ex. J (Order For Attorneys' Fees and Costs). It seems Berry is now looking for a new target for his seemingly relentless litigation -- and perhaps someone to fund his recent losses -- and has decided that Defendants fit the bill.

## III.   LEGAL STANDARD

A defendant may seek dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court recently clarified the specificity with which a plaintiff must plead its complaint in order to survive a motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, No. 05-1126, 2007 WL 1461066, at *8 (U.S. May 21, 2007). In doing so, the Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires ***more than labels and conclusions***, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at *6 (internal citations omitted); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (finding a court need not consider or accept as true conclusory allegations (legal or otherwise), unwarranted deductions of fact or unreasonable inferences).

In ruling on a motion to dismiss, a court may look beyond the plaintiff's complaint to ***matters of public record*** without converting the motion into one for summary judgment (i.e., it may take judicial notice). *See Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds* (finding that the district court's consideration of state administrative records to determine whether an agency decision had a collateral estoppel effect on the

plaintiff's claim did not convert defendant's 12(b)(6) motion to one for summary judgment); *Kourtis v. Cameron*, 419 F.3d 989, 995 n.3 (9th Cir. 2005) (taking judicial notice of a prior lawsuit in determining whether an issue litigated in the earlier lawsuit was identical to one raised in the case at bar); *I. Meyer Pincus & Assoc. P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991) (finding that a court can consider the full text of SEC filings, prospectuses, analyst's reports and statements integral to the complaint without converting a motion to dismiss into a motion for summary judgment); *Wyser-Pratte Management Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (finding that when ruling on a motion to dismiss, a "court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice").

## IV. ARGUMENT

### A. Berry's Unjust Enrichment Claim Must Be Dismissed With Prejudice.

Berry claims that Defendants were unjustly enriched because Fleming repaid Defendants' secured loans with money generated by its infringement of FCS.[3]  He therefore attempts to recover, as damages, the benefit that Defendants allegedly received from the infringing use of his works (i.e., the profits of Defendants' alleged infringement).  Because Berry's unjust enrichment claim does not allege any rights or subject matter other than or different from the rights and subject matter protected by the Copyright Act, federal copyright law expressly preempts this claim.  *See* 11 U.S.C. § 301(a).  The Court should dismiss it summarily.

Courts and commentators consistently have acknowledged that when a state law unjust enrichment claim applies to copyrighted subject matter, the Copyright

---

[3]  Unjust enrichment is a state law claim.  Under Hawai'i law, one is liable for unjust enrichment when (i) a plaintiff has conferred a benefit upon a defendant and (ii) that defendant's retention of that benefit would be unjust.  *See Durette v. Aloha Plastic Recycling, Inc.*, 100 P.3d 60, 72 (Hawai'i 2004).

K&E 11867961.5

Act preempts the unjust enrichment claim.  *See, e.g., Del Madera Props. v. Rhodes & Gardner*, 820 F.2d 973, 977 (9th Cir. 1987), *overruled on other grounds* (preempting unjust enrichment claim); *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003) (same); *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (same); *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985) (same); *Meeco Mfg. Co., Inc. v. True Value Co.*, No. 006-1582RSL, 2007 WL 1051259, at *2 (W.D. Wash. April 4, 2007) (same); *Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1250-51 (W.D. Wash. 2007) (dismissing unjust enrichment claim on motion to dismiss); MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01(B)(1)(g) (2003) ("[A] state law cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and hence, pre-empted insofar as it applies to copyright subject matter."); *see also* 11 U.S.C. § 301(a) (indicating when the Copyright Act preempts state law).  There are no facts here that compel a different result.  Berry's unjust enrichment claim should be dismissed with prejudice.

### B.    Berry's Copyright Claims Must Be Dismissed With Prejudice.

Berry cannot state cognizable claims for contributory or vicarious infringement.  If Berry's claims are not entirely barred by the statute of limitations (which they may well be because Berry failed to plead the existence of his tolling agreement with Defendants), they are nonetheless barred for any period of time before March 30, 2003 (three years from the date of the tolling agreement).  They are also barred for the period of time after April 1, 2003 on account of two bankruptcy court orders that explicitly find that Defendants did not control and were not responsible for Fleming's operations or management on account of their post-bankruptcy loans.

This leaves Berry with two days of potential infringement  -- March 30 and 31, 2003.  In light of prior rulings by both this Court and the Delaware Bankruptcy

Court, Berry cannot plead a cognizable theory for contributory or vicarious infringement during this (or any other) period. His copyright claims, therefore, should be dismissed in their entirety.

>    **1.    Berry's copyright claims are barred by the statute of limitations.**

A plaintiff must file an action for copyright infringement "within three years after the claim accrued." 17 U.S.C. § 507(b). In the Ninth Circuit, a claim for copyright infringement accrues on the date that a reasonable investigation would have put the copyright holder on notice that potentially infringing activity has occurred. *See Wood v. Santa Barbara Chamber of Commerce, Inc.*, 507 F. Supp. 1128, 1135 (D. Nev. 1980), *aff'd as modified*, 705 F.2d 1515 (9th Cir. 1983) (noting that a copyright holder has a "duty of diligence" to investigate whether a copyright infringement has accrued); *see also In re Napster, Inc. Copyright Litigation*, No. C MDL-00-1369-MHP, 2005 WL 289977, at *2 (N.D. Cal. February 3, 2005) (same); *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 954 (9th Cir. 2001) (recognizing that laches may bar an otherwise timely claim where delay and prejudice result from a plaintiff's failure to investigate and pursue its claim). A cursory investigation of potential infringement is not enough. "[I]f a prudent person would have become suspicious from knowledge obtained through the initial prudent inquiry and would have investigated further, a plaintiff will be deemed to have knowledge of facts which would have been disclosed in a more extensive investigation." *Wood*, 507 F. Supp. at 1135. In a case of continuing copyright infringement, an action may be brought for all acts that accrued within the three years before the plaintiff filed its complaint. *Id.*

Berry alleges that Defendants vicariously and contributorily infringed by, among other things, knowingly directing and financially benefiting from Fleming's direct infringement of his works. This Court, however, has already found that Fleming stopped directly infringing Berry's works no later than June 9, 2003. Ex.

K&E 11867961.5

G at 27 (6/27/2005 Summary Judgment Order).  Accordingly, because vicarious and contributory infringement require an underlying direct infringement, after June 9, 2003, there exists no predicate act (by Fleming) to support such claims against Defendants.  And although the Complaint alleges that Defendants were warned of their alleged infringement in the fall of 2002, Berry did not file the instant lawsuit until nearly *five years later*, on March 29, 2007.  *See* Compl. ¶ 27.  His claim, on its face, is barred by the statute of limitations.  *See* 17 U.S.C. § 507(b); *see also Auscape Int'l v. National Geographic Soc'y*, 409 F. Supp. 2d 235, 243 (S.D.N.Y. 2004) (citing *TRW, Inc. v. Andrews*, 534 U.S. 19 (2001)) (holding that copyright claim was barred if not commenced within three-year period after the claim first *could have been commenced*, regardless of whether the plaintiff had knowledge at the time).

What Berry fails to plead in his Complaint -- and what this Court, as a result, need not consider -- is that Berry and Defendants entered into a tolling agreement on March 30, 2006.  *See Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir. 1980) (finding that the burden of alleging facts which would give rise to tolling falls upon the plaintiff); *see also Schneider v. California Dept. of Corrs.*, 151 F.3d 1194, 1197 (9th Cir. 1998) (for the purposes of Rule 12(b)(6), a district court cannot consider "new" facts alleged in a plaintiff's opposition papers to a motion to dismiss, as such facts are irrelevant to a Rule 12(b)(6) analysis).  If this tolling agreement is given effect, only those claims that accrued after March 30, 2003 (three years before the parties entered into the tolling agreement) would remain viable under the Copyright Act's three-year limitations period. [4]  The tolling

---

[4]   Berry's Complaint suggests that he may argue that his cause of action did not accrue until he learned of Defendants' infringement in March 2006.  It is difficult to understand, however, how Berry could have been oblivious to the allegedly rampant contributory and vicarious infringement until that point -- particularly when he took discovery *directly on the issue of who directed Fleming's employees to use FCS* during the previous litigation.  *See* Ex. K at 22:7-24:8 (Depo. of Brian Christensen taken on December 6, 2004); *see also In* (Continued…)

agreement did not revive claims that accrued before March 30, 2003, and were thus already barred by the statute of limitations.[5]  And on the other end, Berry's claims are limited to the period ending on June 9, 2003 -- the day that this Court found Fleming to have stopped any infringement.  Ex. G at 27 (6/27/2005 Summary Judgment Order).  This leaves at issue only the period from March 30, 2003 through June 9, 2003.  And as discussed in the remainder of this brief, his claims during this period cannot survive dismissal.

    **2.**    **Berry's claims for post-petition infringement are barred by Section 364(e) of the Bankruptcy Code and principles of collateral estoppel.**

Berry's allegations that Defendants controlled or otherwise had the power to direct Fleming to infringe his software on or after its bankruptcy are barred by Section 364(e) of the Bankruptcy Code and principles of collateral estoppel.  And without this necessary element, his claims for infringement on or after Fleming's April 1, 2003 bankruptcy filing must be dismissed summarily.

---

*re Napster, Inc. Copyright Litigation*, 2005 WL 289977, at *3 (finding that resolution of a claim that plaintiff lacked knowledge of infringement was appropriate for resolution on a motion to dismiss when no reasonable finder of fact could conclude that plaintiffs' asserted lack of knowledge was reasonable under the circumstances).  Without knowing when, why or how Berry suddenly came to "learn" of the infringement in March 2006 -- when he apparently was unable to learn of it throughout the six years of prior litigation -- the mere allegation has no import.

[5]    Even if the statute of limitations did not bar claims against Defendants that accrued before March 30, 2003, Berry's damages for this period would nonetheless be capped at $98,250 (Berry's statutory award in his first lawsuit), for which Defendants and Fleming would be jointly and severally liable.  Ex. A at 2 (1/26/2005 Summary Judgment Order) (noting that Berry elected statutory damages in his first lawsuit against Fleming); *see also Bouchat v. Champion Prods., Inc.*, 327 F. Supp. 537, 552 (D. Md. 2003) ("[T]he Court concludes that for statutory damage purposes, there is only one 'action.'  The Court would try all statutory damage claims in all pending cases in a single consolidated trial . . . [and] construes 'the action' as including all claims that could have been brought in a single case.  Otherwise, a Plaintiff could multiply statutory damage awards through the device of filing separate lawsuits against joint infringers.").

#### a. Section 364(e) necessitates a finding that Defendants did not direct or control Fleming after its bankruptcy.

After Fleming filed for bankruptcy, Fleming and Defendants entered into two separate financing agreements.  As an inducement for each, Defendants required Fleming to obtain bankruptcy court orders recognizing that they did not have control over Fleming solely by reason of the credit they extended under the financing agreements (or their exercise of any rights thereunder).  *See* Ex. C at 23 ¶ 26 (Bridge Financing Order); Ex. D at 45 ¶ 52 (Final Financing and Cash Collateral Order).[6]  Fleming did just that, and the bankruptcy court entered two orders, both of which invoked Section 364(e) of the Bankruptcy Code, acknowledging that Defendants did not control Fleming's operations.  *See id.*  Pursuant to Rule 364(e), these orders are binding on all creditors -- including Berry -- regardless of whether the orders are factually or legally erroneous, and preclude any finding that Defendants controlled or directed Fleming's infringement after Fleming's April 1, 2003 bankruptcy filing.

Section 364 of the Bankruptcy Code provides bankruptcy courts with the power to authorize post-petition financing for a Chapter 11 debtor-in-possession.  *See* 11 U.S.C. § 364.  Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed Section 364 to allow the bankruptcy court to approve incentives for good faith lenders to extend post-petition credit.  *See* 11 U.S.C. § 364(c); *see also In re Ellingsen MacClean Oil Co., Inc.*, 834 F.2d 599, 603 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988).  Where a good faith lender extends credit in reliance on a financing order approving such

---

[6]    The Bankruptcy Court also entered an order approving Fleming's use of Defendants' cash collateral.  This order contained language finding that Defendants' did not have control over Fleming's operations or management on account of their lending.  Ex. B at 25 ¶ 31 (Cash Collateral Order).  As the order does not specifically provide protection under Section 364(e) of the Bankruptcy Code, it is not included in this discussion.  It is included, however, in the collateral estoppel discussion below.

K&E 11867961.5

inducements, it is entitled to the benefits of that order -- even if it turns out to be legally or factually erroneous. *See* 11 U.S.C. § 364(e) ("The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred . . ."); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990); *In re Graphic Arts Lithographers, Inc.*, 71 B.R. 774, 776 (9th Cir. B.A.P. 1987) (finding that the purpose of Section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority"). This fundamental bankruptcy rule recognizes that once a loan is consummated, certain legal and financial ramifications cannot be undone.

Accordingly, courts have applied Section 364 to prohibit both a bankruptcy court's modification of its own order as well as an appellate court's modification or reversal of an order on appeal. *See In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 269 (3rd Cir. 1991); *In re Western Pac. Airlines, Inc.*, 224 B.R. 799, 803 (D. Colo. 1998) (recognizing that while Section 364(e) only technically applies to modifications of postpetition financing orders on appeal, it stands for the principle that bankruptcy judges may make binding commitments for a lender's benefit). The protections afforded by this rule must also apply to prohibit a collateral attack on the financing order in another jurisdiction. *See DeNardo v. Murphy*, 781 F.2d 1345, 1348 (9th Cir. 1986) (finding "collateral estoppel and res judicata ordinarily provide adequate assurance that one court's resolution of a controversy will be respected by other courts."); *see also In re Adams Apple, Inc.*, 829 F.2d 1484, 1488 (9th Cir. 1987) (construing Section 364(e) broadly to protect lenders). Otherwise, parties could simply attack the provisions of a loan agreement in outside

jurisdictions and undermine the import of a Section 364 finding -- just as Berry attempts to do here.

Section 364(c) enumerates various incentives that a court may grant to lenders to induce them to lend. The list, however, is by no means exhaustive. *Id.*; *see also In re Florida West Gateway, Inc.*, 147 B.R. 817, 819 (Bankr. S.D. Fla. 1992). In fact, bankruptcy courts frequently enter financing orders authorizing the use of inducements not specified in the statute where a more traditional arrangement (i.e., priority over other lenders) may not suffice. *See Ellingsen*, 834 F.2d at 603.

For example, in *In re Ellingsen MacLean Oil Co., Inc.*, a debtor agreed to release any claims it had against its lenders concerning the validity of certain pre-bankruptcy loans as an inducement for the same lenders to make post-bankruptcy loans. The debtor then sought approval of this agreement. The bankruptcy court found (i) that the lender was a good faith lender; and (ii) that the concession was necessary to induce the lender to make the loan. *Id.* Accordingly, the Court found that the provision of the financing order approving the concession -- as well as the rest of the financing order -- was entitled to the protection of Section 364(e). *Id.* The Sixth Circuit affirmed this finding on appeal.

Similarly, in *In re Florida West Gateway, Inc.*, a debtor agreed that as an incentive for the extension of credit, it would execute an agreement whereby it acknowledged that certain pre-bankruptcy obligations between the estate and the proposed lender had been cancelled before the bankruptcy (thereby releasing a potential asset of the estate). *See In re Florida West*, 147 B.R. at 818-820. The bankruptcy court found (i) that the lender was a good faith lender; and (ii) that the concession was necessary to induce the lender to make the loan. *Id.* Accordingly, the Court found that the provision of the financing order approving the concession -- as well as the rest of the financing order -- was entitled to the protection of Section 364(e). *Id.* The district court affirmed this finding on appeal.

K&E 11867961.5

As previously discussed, the bankruptcy court entered two orders approving financing agreements between Fleming and Defendants.  Each of these orders contained unequivocal findings that (i) the lenders did not have control over Fleming on account of the loan documents or the financing provided for therein (the "No-Control Provision");[7] (ii) Fleming and the lenders had entered into the various loan agreements in good faith;[8] and (iii) notice of the proposed financing was adequate, making the terms of the orders binding on all of Fleming's creditors.[9]  Each order also specifically acknowledged that the lenders would not permit the disbursement of funds absent approval of, among other things, the No-Control Provision.[10]  Finally, each order was effective before any funds were disbursed.[11]

---

[7]    Ex. C at 23 ¶ 26 (Bridge Financing Order ) ("No Bridge Lender shall be deemed to be *in 'control' of the operations of any Debtor, or to be acting as a 'responsible person' or 'owner' or 'operator' with respect to the operation or management of any Debtor* (as such terms or similar terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any similar federal statute), *solely by reason of any credit extended to the Debtors hereunder,* or the grant to and/or exercise by any Bridge Lender of any rights or remedies hereunder.") (emphasis added); Ex. D at 45 ¶ 52 (Final Financing and Cash Collateral Order).

[8]    Ex. C at 6 ¶ K (Bridge Financing Order); Ex. D at 30 ¶ 28 (Final Financing and Cash Collateral Order) ("The Post-Petition Financing and proposed use of the Cash Collateral have been negotiated in good faith and at arms' length between the Debtors, the Lenders and the Agents . . . and any credit extended and loans made to the Debtors pursuant to . . . this Order shall be deemed to have been extended or made, as the case may be, in good faith . . .).

[9]    Ex. C at 5 ¶ H, 23-24 ¶ 28 (Bridge Financing Order); Ex. D at 12 ¶ O, 45-46 ¶ 54 (Final Financing and Cash Collateral Order).  Berry, having asserted unpaid, prepetition claims against Fleming, was a creditor of Fleming's estate. *See* 11 U.S.C. § 101(10) (defining the term "creditor" for purposes of the Bankruptcy Code).  Notably, Berry was *very active in Fleming's bankruptcy case*.  *See* Ex. L (List of Berry Filings in Fleming Bankruptcy Case); *see also* n.14 *supra*.

[10]   *See e.g.,* Ex. D at 11 ¶ L (Final Financing and Cash Collateral Order) ("[t]he Post-Petition Lenders will not provide financing and the Pre-Petition Lenders will not permit the continued use of the Cash Collateral, respectively, absent the approval of the terms and conditions set forth herein and in the Post-Petition Loan Documents . . . ); Ex. C at 6 ¶ I (Bridge Financing Order).

[11]   Ex. C at 6 ¶ I (Bridge Financing Order); Ex. D at 14 ¶¶ 1-2 (Final Financing and Cash Collateral Order).

Defendants, having made their loans in good faith, are now entitled to rely, unconditionally and as a matter of law, on the provisions and protections of these orders, including the finding that Defendants did not control or otherwise direct Fleming's operations. *See* 11 U.S.C. § 364; *see also Ellingsen*, 834 F.2d at 600-601; *Florida West*, 147 B.R. at 820. This provision is not subject to reversal or modification, even if it is found to be legally or factually incorrect. *See Kham & Nate's Shoes No. 2*, 908 F.2d at 1355; *In re Graphic Arts Lithographers, Inc.*, 71 B.R. at 776. Accordingly, this Court must dismiss, as a matter of law, any and all of Berry's claims that require a showing that Defendants controlled or directed Fleming's management or operations after the bankruptcy.

> **b.    Principles of collateral estoppel necessitate a finding that Defendants did not direct or control Fleming after April 1, 2003.**

Principals of collateral estoppel further compel dismissal of all post-bankruptcy infringement claims. The doctrine of collateral estoppel bars a party from litigating an issue that was already decided in a prior action. It applies when (i) the issue necessarily decided in the previous proceeding is identical to the one that a party seeks to relitigate; (ii) the first proceeding ended with a final order on the merits; and (iii) the party against whom is estoppel is asserted had a full and fair opportunity to litigate in the prior proceeding. *See, e.g., Offshore Sportswear, Inc. v. Vuarnet Intern., B.V.,* 114 F.3d 848, 850 (9th Cir. 1997) (barring a party's attempt to relitigate a claim on collateral estoppel grounds).

Berry alleges that Defendants are liable for vicarious and/or contributory infringement because the various post-bankruptcy financing agreements gave Defendants the right and ability to control Fleming and direct it to infringe his works. As set forth above, however, the bankruptcy court specifically found that Defendants did not control or direct Fleming's operations on account of their agreement to lend Fleming money under the post-bankruptcy financing agreements. *See* n.7 *infra*; *see also* Ex. B at 25 ¶ 31 (Cash Collateral Order). The

bankruptcy court's findings were a necessary condition to each of these orders -- none of which were appealed and all of which are long since final. In fact, the bankruptcy court acknowledges that had it not made these findings, Defendants would not have entered into the financing arrangements necessary to further Fleming's attempts to reorganize. *See* n.10 *infra*; *see also* Ex. B at 6 ¶ I (Cash Collateral Order).

Additionally, Berry -- and every one of Fleming's former creditors -- had an opportunity to litigate this issue in the bankruptcy court. The bankruptcy court found that all necessary parties received adequate notice of the proceedings to consider the financing orders. *See* n.9 *infra*; *see also* Ex. B at 7 ¶ K, 26 ¶ 34 (Cash Collateral Order). In fact, Fleming's bankruptcy was highly publicized, and news outlets published a plethora of articles regarding Fleming's bankruptcy. Ex. M (Pacific Business News (Honolulu) April 18, 2003); Ex. N (New York Times April 5, 2003); Ex. O (BusinessWeek April 14, 2003). Accordingly, under the circumstances, the bankruptcy court's finding that Defendants did not have the right or ability to control or direct Fleming's operations on account of its post-bankruptcy financing should be afforded collateral estoppel effect. Berry's claims of post-bankruptcy vicarious and contributory infringement -- which rely on these very facts -- must be dismissed.

### 3. Berry has not -- and cannot -- plead a prima facie case for contributory or vicarious infringement during Defendants' two days of potential exposure.

After applying the statute of limitations and giving due consideration to the bankruptcy court's financing orders, Berry is left with at most two days of potential infringement -- March 30 and March 31, 2003. And particularly given the facts already established after years of litigation, Berry's Complaint does not even begin to set forth any cognizable theory under which he could establish that Defendants contributorily or vicariously infringed during this two-day period, or indeed during any other conceivable period.

K&E 11867961.5

### a. Defendants are not liable for contributory infringement during the two-day period because Fleming itself did not know that it was infringing.

Berry claims that Defendants are liable for contributory infringement because they knowingly directed Fleming to use an infringing version of FCS. A party contributorily infringes when it intentionally induces or encourages direct infringement. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Liability under this theory requires substantial participation in a specific act of infringement. *See In re Napster*, 2005 WL 289977, at *2 (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Thus, a prima facie case for contributory infringement requires (i) a third party's direct infringement, (ii) the defendant's actual or constructive knowledge of the direct infringement and (iii) the defendant's substantial participation in the infringing activities. *Id.* Because Berry has not and cannot present any theory under which the Court could find that Defendants had actual or constructive knowledge of Fleming's infringement during the operative period, his claim must be dismissed.[12]

Berry alleges that after the March 6, 2003 jury verdict, the Lenders, with knowledge that Fleming was going to continue to infringe, directed Fleming to use "another derivative" of FCS. Compl. ¶ 26. This allegation is absurd in light of the fact that ***Fleming itself did not know that it was infringing***. Ex. G at 28 (6/27/2005 Summary Judgment Order) (finding that "the evidence shows that the infringement was not willful, and that Employees believed that they were using the original licensed version of FCS."). Rather, Fleming (and its employees) believed

---

[12] If put to task, Berry could not show substantial participation during the two-day period. *See UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408, 414 (N.D. Cal. 2004) (finding that plaintiff pled a viable claim for contributory infringement when it alleged facts that, if true, would show that defendants -- strategic investors -- did more than just loan Napster money; instead, they had ***full operational control*** of Napster's operations and used that control to ***order*** the infringement in question).

that it had reverted back to and was properly using the original, licensed version that it had received from Berry in 1999. Ex. A at 28 (1/26/2005 Summary Judgment Order). Accordingly, Berry cannot maintain a claim that Defendants knew or had reason to know of Fleming's infringement when even Fleming did not. *See Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004) ("Contributory infringement occurs when one, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.") (internal citations omitted) (emphasis added); *see also* Ex. G at 28 (6/27/2005 Summary Judgment Order) (finding that "[i]n light of the inadvertent nature of the infringement, Berry also fails to prove that any Defendant's action was 'intentional' . . . [and] therefore does not make out a prima facie case of contributory infringement"). In short, this Court's prior orders relating to the **same plaintiff**, the **same software** and the **same direct infringer** preclude any plausible finding that Defendants knew of Fleming's infringement.

> **b.    Defendants are not liable for vicarious infringement because the only payments they received were pursuant to a bankruptcy court order.**

Berry also claims that Defendants vicariously infringed Berry's FCS. One infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit the infringement. *See Grokster*, 545 U.S. at 931 n.9. Thus, a prima facie case for vicarious infringement requires a plaintiff to allege (i) direct infringement, (ii) the defendant's right and ability to supervise the infringing activity and (iii) the defendant's direct financial interest in the infringing activity. *Id.*; *see also Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004). Berry presents no viable theory under which he could show that Defendants obtained a direct financial benefit from the infringement and, as a result, his claim should be dismissed. [13]

---

[13]    Berry would also be unable to prove that Defendants had the right to (Continued…)

The crux of Berry's vicarious infringement claim is that Fleming repaid Defendants' loans with money derived from its infringement -- giving Defendants a direct financial interest in the infringing activity. What Berry fails to recognize, however, is that Defendants were not paid from earnings coming out of Hawai'i, but rather were ***paid out of the Fleming bankruptcy estate*** pursuant to (among other things) a bankruptcy court order confirming Fleming's plan of reorganization. Ex. R (Confirmation Order); Ex. S (Plan of Reorganization). Moreover, Defendants' rights to payment, as specified in their contracts with Fleming, were not tied in any way to the infringing conduct. These key details change everything.

Stepping back, bankruptcy proceedings themselves are designed to adjudicate the rights of all creditors, vis-à-vis other creditors, to be paid on their alleged claims. Because the process necessarily affects creditor claims, the Bankruptcy Code and applicable case law provide creditors with ample opportunity to investigate and contest claims asserted by other creditors. For example, if a creditor has doubt as to whether another creditor's claim is proper, it can take discovery -- even without instituting any formal action -- by filing a motion pursuant to Bankruptcy Rule 2004. *See* FED. R. BANKR. P. 2004 (allowing

---

supervise or control Fleming's infringement. *See* Part IV.B.2 *infra* (Discussion of Section 364 and Collateral Estoppel); *see also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, No. C 04-0371 JW, 2004 WL 1773349 (N.D. Cal. August 5, 2004) (dismissing claim for vicarious infringement when third party could have used other service providers to continue infringing and defendants had no contractual right to control third parties); *Artists Music, Inc. v. Reed Pub (USA), Inc.*, Nos. 93 CIV 3428(JFK), 73163, 1994 WL 191643, at *6 (S.D.N.Y. May 17, 1994) (finding that the "[m]ere fact that [defendants] could have policed the exhibitors at great expense is insufficient to impose vicarious infringement"); *A&M Records v. Napster*, 239 F.3d 1004 (9th Cir. 2001) (finding that a defendant who directly controlled whether users of software could see and therefore download an infringing file by maintaining an index of available files could have prevented the distribution of copyrighted materials by simply removing the index and was, therefore, liable for vicarious infringement); *see also* Ex. P at Art. V, VI (Prepetition Credit Agreement) and Ex. Q at Art. V, VI (Postpetition Credit Agreement) (neither of which contain loan covenants giving Defendants the right to control Fleming's infringement).

any party in interest to take discovery of any entity). A creditor can also (either before or without taking Rule 2004 discovery) formally object to another's claim, asking the bankruptcy court to adjudicate whether the debtor may pay it. *See* 11 U.S.C. § 502(a) (permitting parties in interest, including creditors, to object to claims). Additionally, where appropriate, a creditor can institute a proceeding to equitably subordinate another creditor's claim, arguing the claim arose on account of that creditor's wrongdoing. 11 U.S.C. § 510(c); *In re Big Wheel Holding Co., Inc.*, 214 B.R. 945, 951 (D. Del. 1997) (recognizing that a party can make a claim for equitable subordination if it can show inequitable conduct, unfair advantage to a particular creditor, and that subordination would not be inconsistent with the Bankruptcy Code). And once a party has proposed a plan of reorganization, a creditor can object to the payments contemplated under that plan -- and appeal an adverse result. *See* 11 U.S.C. §§ 1128, 1144. In short, creditors have no shortage of mechanisms by which to stop another creditor from improperly receiving payment on a claim.

Despite this myriad of options, Berry never once contested Defendants' claims. *See* Ex. L (List of Berry Filings in Fleming Bankruptcy Case). Berry did not take any discovery regarding Defendants in the bankruptcy case (even though he alleges in his Complaint that Defendants were warned of the infringement as early as the fall of 2002), nor did he object to Defendants' claims, seek to have Defendants' claims equitably subordinated or object to Defendants' proposed payments under the reorganization plan. *See* Compl. ¶ 21 (alleging that the lenders "were given infringement warning letters" in the fall of 2002). He simply did nothing with respect to Defendants **--** for almost five years -- until he filed the Complaint.[14] And now that a bankruptcy court has long since approved

---

[14] That is not to say that Berry was not actively involved in Fleming's bankruptcy case. He was. Berry filed no fewer than 33 papers in Fleming's bankruptcy case. *See* Ex. L (List of Berry Filings in Fleming Bankruptcy (Continued…)

K&E 11867961.5

Defendants' payments from the entire pool of Fleming assets (notably, not from the assets coming out of Hawai'i or any other distinct division), Berry cannot plausibly argue (and the Complaint does not suggest) that the payments came as a direct result of the infringement.[15]  They came as a direct result of a bankruptcy court's orders, including the confirmation order, which must now be respected. *See In re DiBerto*, 171 B.R. 461, 472 (Bankr. D.N.H. 1994) ("[W]hen a creditor has notice and a full opportunity to make its views and objections known during the reorganization and confirmation process, the creditor is bound by the terms of the reorganization plan upon the entry of the confirmation order. . . .  Application of the doctrine of res judicata to the confirmation order supports the strong policy of finality in the reorganization process.") (internal citations omitted); 11 U.S.C. § 1144 (providing the exclusive means to attack a confirmation order, which may only be done within 180 days of confirmation and only in the instance of fraud); *Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) (holding an unsecured creditor's post-arrangement suit against a secured creditor for fraudulent misrepresentation at a creditors' meeting constituted a collateral attack on the confirmation order); *Browning v. Prostok*, 165 S.W. 3d 336, 346 (Tex. 2005) (recognizing that a confirmation order issued by a bankruptcy court has the effect of a judgment rendered by a district court).

---

Case).  He objected to the plan of reorganization (although not to Defendants' distribution as set forth in the Plan), and cross-examined the witnesses Fleming presented in support of confirmation of the plan.  *Id.*; Ex. T at Index (Confirmation Hr'g Transcript).  At the conclusion of that proceeding, the Bankruptcy Court overruled Berry's objection, entering an order confirming Fleming's plan and authorizing the payments to Defendants proposed therein.  Ex. T (Confirmation Hr'g Transcript); Ex. R (Confirmation Order).  Berry then appealed that order, only to withdraw his appeal days later.  Ex. L (List of Berry Filings in Fleming Bankruptcy Case).  That order is now final -- and has been for nearly three years.

[15]  If Defendants' distribution came as a result of the infringement, that means that the distributions received by thousands of other Fleming creditors did as well.  It is absurd to think that Berry has potential infringement claims against thousands of creditors.  That makes his claim against Defendants equally absurd.

K&E 11867961.5

But even putting aside the intervening bankruptcy court order, the Complaint presents no theory under which Defendants ever had the necessary financial interest in Fleming's infringement to make them vicarious infringers.  First, Defendants were in no way dependent on Fleming's infringement -- or even the repayment of Fleming's loans -- for their success or survival.  For example, in 2003 JPMorgan Chase reported a net income of $6.719 billion.  *See* Ex. U (JPMorgan Chase 2003 Annual Report, publicly available on its website)  And in that same period, Deutsche Bank reported a net income of $1.714 billion.[16]  *See* Ex. V (Deutsche Bank 2003 Annual Report, publicly available on its website).  While Defendants were obviously pleased that they ultimately received payment on Fleming's loans, had they not, they certainly would not have been faced with financial ruin.  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-63 (9th Cir. 1996) (finding a direct financial interest where the success of the business enterprise depended on the infringing activities).

Moreover, under the loan agreements, Fleming paid Defendants a fixed periodic fee -- consisting of principle and interest -- for the term of the loan (*i.e.*, until it was repaid).  *See generally* Ex. P (Prepetition Credit Agreement); Ex. Q (Postpetition Credit Agreement).  This fixed fee was in no way dependent on the profits gained or losses suffered by any of Fleming's 50 distribution centers -- including its Hawai'i center.  In other words, even if Fleming had made additional profits on account of its infringement of Berry's works in Hawai'i, Defendants were not entitled to any additional payments or revenues on account of such profits.  *See Ellison*, 357 F.3d at 1078 (finding that plaintiff did not show that defendant's revenues -- derived from one-time set up fees and fixed periodic fees -- were at all dependent on the infringement); *see also Religious Tech. Center v.*

---

[16]  1,365,000,000 Euros (as found in Exhibit V) equaled 1,714,030,500 U.S. Dollars on December 31, 2003.

*Netcom On-Line Commc'n*, 907 F. Supp. 1361, 1376 (N.D. Cal. 1995) (noting that "where a defendant rents space or services on a fixed rental fee that does not depend on the nature of the activity of the lessee, courts usually find no vicarious liability because there is no direct financial benefit from the infringement"); *Artists Music*, 1994 WL 191643, at *6 (finding that a trade show organizer who charged a fixed rental fee and received an admission fee from attendees did not have a direct financial interest in infringement by 4 of 134 vendors because the limited infringement did not affect gate receipts at the show).

In short, Berry cannot possibly show that Defendants received a direct financial benefit from Fleming's infringement. The only payments they received were those authorized by bankruptcy court order. They never stood to directly gain from the infringement.[17]  Berry's claim must be dismissed.

## V.    CONCLUSION

Defendants request that the Court dismiss Berry's complaint with prejudice and without leave to amend because (i) Berry's unjust enrichment claim is preempted by the Copyright Act, (ii) Berry's copyright claims are barred by the statute of limitations, (iii) Berry's post-petition infringement claims are barred by Section 364 of the Bankruptcy Code and principles of collateral estoppel and (iv) Berry has not and cannot plead a cognizable theory under which he could recover for contributory or vicarious infringement.

---

[17]  Notably, Defendants' loans were secured -- and far over-secured at that. Not only did the bankruptcy court authorize Fleming to pay Defendants in full, but it also authorized Fleming to pay hundreds of millions of dollars to its priority claimants, tax claimants, PACA claimants, administrative claimants, other secured claimants and certain qualifying reclamation claimants at the conclusion of its bankruptcy case. Ex. S (Plan of Reorganization). The Post Confirmation Trust, which is now responsible for resolving claims against Fleming, has also made sizable distributions to Fleming's unsecured creditors. Ex. W (6/7/2006 Status Report). In short, there was plenty of collateral in the Fleming estate with which to pay Defendants' claims.

DATED:  Honolulu, Hawai'i, June 12, 2007 /s/ Lyle S. Hosoda

LYLE S. HOSODA & ASSOCIATES, LLC

Lyle S. Hosoda  3964-0
Raina P.B. Gushiken  7329-0
345 Queen Street, Suite 804
Honolulu, Hawai'i 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
E-mail:  lsh@hosodalaw.com
                and
KIRKLAND & ELLIS LLP
Michael E. Baumann (S.B.N. 145830)
Erin N. Brady (S.B.N. 215038)
F. Wade Ackerman (S.B.N. 234747)
777 South Figueroa Street
Los Angeles, California  90017
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500
E-mail:  ebrady@kirkland.com

Counsel for Defendants

WHITE & CASE LLP
Andrew DeNatale (ADN 2429)
Jonathan Moskin (Bar No. 1949031)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:   (212) 819-8200
Facsimile:    (212) 354-8113
E-mail:  adenatale@ny.whitecase.com

Of Counsel for Defendants

K&E 11867961.5