# EXHIBIT G

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

'JUN 2 7 2005

at 10 o'clock and 45 min A M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WAYNE BERRY, a Hawaii citizen, | ) | Civ. No. 03-00385 SOM/LEK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART, DENYING IN PART BERRY'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING C&S LOGISTICS OF HAWAII, LLC, C&S WHOLESALE GROCERS, INC., C&S ACQUISITION, LLC, ES3, LLC, AND RICHARD COHEN'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING GUIDANCE SOFTWARE, INC., AND MICHAEL GURZI'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING IN PART, DENYING IN PART REMAINING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| vs. | ) | |
| | ) | |
| HAWAII EXPRESS SERVICE, INC., a California corporation; et al. | ) | |
| | ) | |
| Defendants. | ) | |

ORDER GRANTING IN PART, DENYING IN PART BERRY'S MOTION FOR
SUMMARY JUDGMENT; ORDER GRANTING C&S LOGISTICS OF HAWAII, LLC,
C&S WHOLESALE GROCERS, INC., C&S ACQUISITION, LLC, ES3, LLC, AND
RICHARD COHEN'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING
GUIDANCE SOFTWARE, INC., AND MICHAEL GURZI'S MOTION FOR SUMMARY
JUDGMENT; ORDER GRANTING IN PART, DENYING IN PART REMAINING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

I.    INTRODUCTION.

Plaintiff Wayne Berry is suing multiple defendants for

copyright infringement and related matters.  This court has

previously ruled on several motions in this case.  In this latest

round of what seems to this court to be a never ending stream of

motions, Berry moves for summary judgment against all remaining

Defendants.  Defendant Post Confirmation Trust ("PCT")[1];

Defendants C&S Logistics of Hawaii, LLC, C&S Wholesale Grocers,

---

[1] PCT represents the interests of Defendant Fleming
Companies, Inc. ("Fleming"), during Fleming's bankruptcy.

Inc., C&S Acquisitions, LLC, ES3, LLC, and Richard Cohen
(collectively, "C&S"); Defendants Mark Dillon, Teresa Noa, Melvin
Ponce, Sonia Purdy, Justin Fukumoto, Alfredda Waiolama, and
Jacqueline Rio (collectively, "Employees"); and Defendants
Guidance Software, Inc., and Michael Gurzi (collectively,
"Guidance") have filed counter-motions for summary judgment.[2]
The court grants Berry's motion for summary judgment with respect
to alleged direct infringement by Employees and Fleming between
the dates of March 7, 2003, and June 9, 2003, through the use of
an altered version of FCS. The court denies Berry's motion with
respect to all other claims.

The court denies the counter-motions for summary
judgment of Employees and Fleming with respect to liability on
the part of Employees and Fleming for direct infringement between
the dates of March 7, 2003, and June 9, 2003. The court also
denies Fleming's motion for summary judgment on the vicarious
infringement claim. The court grants the counter-motions for
summary judgment of Employees and Fleming in all other respects.

---

[2] Berry's original Complaint also asserted claims against
Foodland Super Market, Ltd., Hawaii Transfer Company, Hawaiian
Express Service, Inc., H.E.S. Transportation Services, Inc.,
California Pacific Consolidators, Inc., Jeffrey P. Graham, Peter
Schaul, and Patrick Hirayama, and AlixPartners, LLC. In prior
orders, this court granted summary judgment to Defendants
Foodland, Hawaii Transfer Company, Brian Christensen, and
AlixPartners, LLC. Berry has settled his claims with Defendants
Hawaiian Express Service, Inc., H.E.S. Transportation Services,
Inc., California Pacific Consolidators, Inc., Jeffrey P. Graham,
Peter Schaul, and Patrick Hirayama.

The court grants all other Defendants' counter-motions for summary judgment.

II.      BACKGROUND.

         The facts of this case were set forth in orders by this court filed October 8, 2004, January 26, 2005, and April 12, 2005.  The court incorporates by reference the "BACKGROUND" section of those orders.

III.     STANDARD OF REVIEW.

         Summary judgment shall be granted when

         the pleadings, depositions, answers to
         interrogatories and admissions on file, together
         with the affidavits, if any, show that there is
         no genuine issue as to any material fact and that
         the moving party is entitled to a judgment as a
         matter of law.

Fed. R. Civ. P. 56(c); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

         Summary judgment must be granted against a party who fails to demonstrate facts to establish what will be an essential element at trial.  Id. at 322.  The burden initially lies with the moving party to identify for the court "the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)

3

(citing <u>Celotex Corp.</u>, 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth "specific facts showing that there is a genuine issue for trial." <u>Id.</u> At least some "'significant probative evidence tending to support the complaint'" must be produced. <u>Summers v. A. Teichert & Son, Inc.</u>, 127 F.3d 1150, 1152 (9th Cir. 1997) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." <u>Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing <u>Matsushita</u>, 475 U.S. at 587).

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>T. W. Elec. Serv.</u>, 809 F.2d at 631. All evidence and inferences must be construed in the light most favorable to

the nonmoving party.  Id.  Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  Id.

IV.     ANALYSIS.

  A.   Count I: Direct Infringement.

    In the first Count of the Complaint, Berry alleges direct infringement by Employees, Guidance, Fleming, and C&S.  To establish a prima facie case of direct copyright infringement, a plaintiff must show: (1) that the plaintiff owns the copyright; and (2) that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act.  Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004).  A plaintiff may show a violation through direct copying, or through the defendant's access to the infringed work and a substantial similarity between the infringed and infringing works.  Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir. 1991).

    Defendants do not dispute, for purposes of the present motions, that Berry has a valid copyright in his FCS software. The question is whether Defendants violated any of Berry's rights under the Copyright Act.

    Berry alleges that Defendants directly infringed in four ways.  First, Berry alleges that between March 7, 2003, and June 9, 2003, Fleming and Employees used an unauthorized altered

version of his FCS software.[3]   Second, Berry alleges that after

June 9, 2003, Fleming, Employees, and C&S used a derivative of

the FCS program.   Third, Berry alleges that Guidance, at

Fleming's direction, made unauthorized copies of his software

that were then retained on Fleming computers.   Fourth, Berry

alleges that Fleming sold illegal copies of FCS to C&S by leaving

the unauthorized copies that Guidance had made on the computers

when C&S took over Fleming's operations.

### 1.   Employees.

The court has already addressed several of Berry's

claims against Employees.   In its January 26, 2005, order, the

court granted summary judgment to Dillon and Noa with respect to

all claims relating to activities outside the period of March 7,

2003, to June 9, 2003.   The court, however, denied Dillon and

Noa's motion for summary judgment with respect to direct

infringement that might have occurred during that time period.

In its April 12, 2005, order, the court denied without prejudice

Ponce, Purdy, Fukumoto, Wailoama, and Rio's motion for summary

judgment on all Counts, and also denied without prejudice Berry's

counter-motion for summary judgment on all Counts.

---

[3] At the June 20, 2005, hearing on the present motions,
Berry said that, in prior orders, the court limited the direct
infringement claim to the period after April 1, 2003.   This
court, however, found no such limitation in its earlier orders in
this case.

a.   Dillon and Noa Infringed on Berry's
     Copyright Between March 7, 2003, and
     June 9, 2003.

The court grants Berry's motion for summary judgment with respect to Dillon and Noa's liability for conduct between March 7, 2003, and June 9, 2003.

In its January 26, 2004, order, this court granted summary judgment to Dillon and Noa with respect to conduct occurring outside the period between March 7, 2003, and June 9, 2003. The court, however, denied Dillon and Noa's motion for summary judgment with respect to infringement allegedly occurring between March 7, 2003, and June 9, 2003. Given Dillon's declaration stating that he had attempted to revert to the original version of FCS following the jury verdict of March 6, 2003, but had inadvertently failed to remove a scratch name field and two label changes, the court concluded that Dillon had used an altered version of FCS. An expert report by Dr. Philip Johnson confirmed that the version of FCS in use by Dillon was not the original licensed version of the software. Because only a copyright holder has the right to prepare and use derivative works, see Downing v. Abercrombie & Fitch, 265 F.3d 994 (9th Cir. 2001), the unauthorized use of the altered version of FCS constituted a copyright violation.

Berry has established that Dillon and Noa used an altered version of the FCS software between March 7, 2003, and

June 9, 2003.  See Ex. L to Hogan Decl.; Ex. P to Hogan Decl.

The unauthorized use of a software derivative constitutes

impermissible "copying."  See MAI Sys. Corp. v. Peak Computer,

Inc., 991 F.2d 511, 517-18 (9th Cir 1993).  The use of the

altered version of FCS therefore violated Berry's copyright.

Dillon and Noa now contend that the changes made to the

software were de minimis and that they therefore cannot be said

to have used an unauthorized derivative.  Dillon and Noa rely on

an expert report by Dr. Martin Walker, stating that there were

only seven differences between the altered version of FCS used by

Employees and Berry's original FCS.  See Ex. C to Hosoda Decl.

¶ 41.  Walker's report also states that the changes made to FCS

either facilitated the exporting of Fleming's data or aided

recovery of lost data.  Id. ¶ 42.  Walker therefore concludes

that the alterations were not part of the normal operation of the

database and that "the two databases are practically identical

from both a numerical perspective and a functional perspective."

Id.

Dillon and Noa cite Apple Computer, Inc. v. Microsoft

Corp., 35 F.3d 1435 (9th Cir. 1994), and Newton v. Diamond, 388

F.3d 1189 (9th Cir. 2004), for the proposition that de minimis

changes do not rise to the level of infringement.  Those cases,

however, do not apply here.  In Apple Computer, the plaintiff

alleged that Microsoft had copied its software by using a

8

graphics interface on Microsoft software that was similar to the
interface employed by Apple computers.  The Ninth Circuit
concluded that the similarities between the two software programs
were de minimis, and that therefore the defendants had not
violated a copyright.  Id. at 1439.  Similarly, the court in
Newton held that de minimis use of a musical composition was
insufficient to sustain a claim of infringement.  388 F.3d at
1196.

This case, by contrast, involves the creation and use
of an impermissible derivative.  The situation in this case thus
arises in a context entirely different from the literal copying
at issue in Apple Computer or the use of an unaltered composition
in Newton.  Dillon and Noa cite no law suggesting that a
derivative is allowed if the changes are small.

Fleming and Employees, citing Melville B Nimmer & David
Nimmer, Nimmer on Copyright § 13.05[D][2] (2005), say that
"[t]rivial changes and inconsequential modifications such as
underlining, highlighting, [and] cropping pages" do not rise to
the level of creating a derivative.  The alterations in this
case, however, extend beyond mere underlining or highlighting.
Underlining and highlighting emphasize particular aspects of a
work.  Here, by contrast, Dillon made alterations to FCS that
changed the content and structure of the program.  These types of

9

alterations, even if they constitute a small percentage of the total code, resulted in a derivative.

Dillon and Noa have admitted that they used an altered version of FCS. The court therefore grants Berry's motion for summary judgment against Dillon and Noa with respect to their liability under Count I, alleging direct infringement, for acts occurring between March 7, 2003, and June 9, 2003.

> b.  Ponce, Purdy, Fukumoto, Waiolama, and Rio Infringed on Berry's Copyright Between March 7, 2003, and June 9, 2003.

In its April 12, 2005, order, this court denied a motion for summary judgment filed by Defendants Ponce, Purdy, Fukumoto, Waiolama, and Rio, noting those persons had admitted to using a computer for various tasks while at Fleming. As these Employees worked for Fleming at some point between March 7, 2003, and June 9, 2003, the court found a genuine issue of material fact as to whether each had used the unauthorized altered version of FCS. The court, however, also denied Berry's counter-motion for summary judgment, noting that Berry had failed to establish that any of the employees had actually used an infringing version of FCS. Berry now renews his motion for summary judgment against the remaining Employees, and the court now grants Berry's motion with respect to their conduct between March 7, 2003, and June 9, 2003.

The evidence now establishes that Ponce, Purdy,
Fukumoto, Waiolama, and Rio used the same unauthorized derivative
of Berry's FCS software as Dillon and Noa between March 7, 2003,
and June 9, 2003.  An affidavit by Teresa Noa states that Fleming
"went back to the original" version of FCS after the March 6,
2003, jury verdict.  Ex. E to Hogan Decl.  What Noa believed to
be the "original" FCS, however, was actually the modified version
of FCS created by Dillon on March 7, 2003.  Employees offer no
evidence to contradict Noa's statement, and each admits to using
a computer to track shipments or enter data relating to freight
orders between March 7, 2003, and June 9, 2003.  See Ex. J to
Hosoda Decl.; Ex. K to Hosoda Decl.; Ex. L to Hosoda Decl.; Ex. M
to Hosoda Decl.; Ex. N to Hosoda Decl.  Employees, therefore, do
not raise any triable issue of fact, and the court grants Berry's
motion for summary judgment with respect to Ponce, Purdy,
Fukumoto, Waiolama, and Rio's liability for acts between March 7,
2003, and June 9, 2003.  The court denies these Employees'
counter-motion for summary judgment with respect to infringement
during this period.

> c.  Any Infringement by Employees Between
>     March 7, 2003, and June 9, 2003, was Not
>     Willful.

In its January 26, 2003, order, this court held that
"any infringement [by Dillon and Noa] during the period of March
7, 2003, to June 9, 2003, was not willful."  This determination

was based on the inadvertence of Dillon's failure to remove all infringing elements from the version of FCS in use between March 7, 2003, and June 9, 2003.

The court now similarly concludes that any infringement by the other Employees was not willful. Employees were not aware that they were using an infringing version of FCS; they were merely using the software given to them by their supervisors, Dillon and Noa. Neither Dillon nor Noa was aware that the version of FCS in use between March 7, 2003, and June 9, 2003, was not the original licensed version, and there is no evidence that Employees had any reason to believe that they were not allowed to use the software. Employees have established that their infringement was not willful.

        d.    **Employees Did Not Infringe By Using the Excel Spreadsheets After June 9, 2003.**

Employees claim that, after June 9, 2003, they "got away" from FCS and began using Microsoft Excel spreadsheets to track freight. Employees claim that they extracted raw data that had been entered into FCS and transferred that data into Excel spreadsheets. Berry, however, contends that Employees extracted not only data, but also the structures of his software to create spreadsheets that were really an unauthorized derivative of FCS. In its January 26, 2005, order, this court granted summary judgment to Dillon and Noa with respect to this claim. The court now grants summary judgment to the remaining Employees.

While alleging that Employees directly infringed by copying elements of FCS into the Microsoft Excel spreadsheets, Berry fails to establish that Employees copied any protectable elements of the FCS structure in creating the Excel spreadsheets. Berry therefore fails to establish the existence of any triable issue of fact with respect to the alleged infringement by Employees after June 9, 2003.  See Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 46 (D.D.C. 1999) ("plaintiff must show that defendants' works are substantially similar to elements of plaintiff's work that are copyrightable or protected by the copyright"); see also Nimmer on Copyright § 13.03[B][2][a] ("When similar works resemble each other only in those unprotected aspects, then defendant prevails.").

The Ninth Circuit has articulated a procedure for determining whether protectable elements of a work have been copied in software cases.  See Apple Computer, 35 F.3d at 1443. That procedure requires the following:

> (1)  The plaintiff must identify the source(s) of the alleged similarity between his work and the defendant's work.

> (2)  Using analytic dissection, and, if necessary, expert testimony, the court must determine whether any of the allegedly similar features are protected by copyright [and] unprotectable ideas must be separated from potentially protectable expression . . . .

> (3)  Having dissected the alleged similarities and considered the range of possible expression, the court must define the scope of

the plaintiff's copyright--that is, decide
whether the work is entitled to "broad" or
"thin" protection. Depending on the degree of
protection, the court must set the appropriate
standard for a subjective comparison of the
works to determine whether, as a whole, they
are sufficiently similar to support a finding
of illicit copying.

Id.

At the preliminary injunction stage of litigation,
Berry presented a list of 41 elements common to FCS and the Excel
Spreadsheets. The court analyzes these elements to determine
whether they are protected by copyright and whether the Excel
spreadsheets infringe on any of the protected elements.

As evidence that the Excel spreadsheets are, indeed, an
infringing work, Berry presents the expert report of Dr. Philip
Johnson. See Ex. C to Berry Decl. In his report, Johnson opines
that "Fleming extracted both structure as well as the data from
the Berry database, and thus are [sic] using a derived work."
Id. Johnson, however, does not present the analysis leading to
his opinion. His six-page report consists mainly of an
explanation of the differences between "data" and "structure" in
a database. Johnson says only, "My opinion is based on the

14

following: Exhibits 7 through 18[4] from Wayne Berry's affidavit

show the use of 'ID' fields present in the Berry database."  <u>Id.</u>

    Johnson's report does not identify specific ID fields

from FCS present in the Excel spreadsheets.  Nor does Johnson

state whether or how these fields are protected.  His report

fails to separate "unprotectable ideas" from "potentially

protectable expression" or to establish "whether any of the

allegedly similar features are protected by copyright."  <u>See</u>

<u>Apple Computer</u>, 35 F.3d at 1443.  Even assuming the truth of

Johnson's statement that ID fields present in the Berry database

are used in the Excel spreadsheets, the report does not establish

that this presence constitutes infringement of protected

expressions.

    Berry contends that it is unnecessary to dissect

protectable from unprotectable elements here because Dillon has

admitted to copying FCS.  As evidence, Berry points to Dillon's

deposition statement that "I used the queries to query the

database, to extract the data from the database and put them in

Excel spreadsheets.  Spreadsheets already existed.  We were

_____

    [4] Exhibits 7 through 18 do not appear in the many hundreds
of pages that accompany both parties' filings on the present
motions.  It appears that these Exhibits refer to the "Dillon
Queries," which were searches that Dillon ran when extracting
data from FCS in creating the Excel spreadsheets.  The Exhibits
were submitted in connection with earlier motions.  <u>See</u> Ex. E to
Hogan Decl., filed in Berry's Response to Dillon, Christensen,
and Noa's Concise Statement, filed Dec. 20, 2004.

merely extracting data and bringing it into the spreadsheets."
Ex. M to Hogan Decl.  This statement, however, does not support
Berry's position.  Rather, Dillon's statement shows that he
copied data from FCS, not any structure.  See Feist Publ'ns, Inc.
v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991) (copying
of factual data is not copyright infringement).  Neither Berry
himself nor his expert witness shows that queries necessarily
result in copying of protectable elements.

Finally, Berry argues that, under the "Inverse Ratio
Rule," a lesser showing of similarity is required when a high
degree of access is demonstrated.  Berry contends that, because
Dillon had complete access to FCS, only a minimal showing of
similarity is required.  But even if this is so, the minimal
showing of similarity must contain protected elements.  See
Aliotti v. R. Dakin & Co., 831 F.2d 898, 902 (9th Cir. 1987)
(because no similarity of protected expression existed, "no
amount of proof of access will suffice to show copying").
Dillon's access to FCS is insufficient to prove infringement
without a showing that Dillon copied protectable elements.  Berry
does not establish a prima facie case that the Excel spreadsheets
are an infringing FCS derivative.

Even if Berry could be said to have made a prima facie
showing, Defendants would be entitled to judgment as a matter of
law on this claim.

Defendants rely on the expert report of Dr. Martin Walker. See Ex. C to Hosoda Decl. Styling his analysis an "Analytic Dissection of Elements from the Berry Database," Walker analyzes the 41 structural elements that Berry claims were copied from FCS into the Excel spreadsheets. See id. Following the procedure laid out in Apple Computer, Walker then determines whether or not the elements are protected, and whether any protected elements have been copied.

Berry attacks Walker's qualifications to make determinations of what is an "industry standard" for database operators. It is undisputed, however, that Walker has had "substantial experience creating, designing, running, and maintaining numerous complex databases." Ex. C to Hosoda Decl. The evidence before this court is therefore that Walker is qualified to identify those elements of FCS and the Excel spreadsheets that are "industry standards."

Walker concludes that, of the 41 FCS elements that Berry claims have been copied into the Excel spreadsheets, 36 of the elements are not protectable, or are subject only to "thin" protections. See Ex. L to Hosoda Decl.

The elements that Walker determined were not protectable include database fields such as "Company.ID," which contains identification numbers for companies, and "Company Name," which contains the names of companies. Id. Walker

17

concludes that any database storing information about individual
companies would contain fields such as these, and that the
elements were therefore "functional" and not protectable. See
Satava v. Lowry, 323 F.3d 805, 810 (9th Cir. 2003) (copyright
protection does not extend to ideas, procedures, processes,
systems, methods of operation, concepts, principles, or
discoveries); Sega Enter. Ltd. v. Accolade, Inc., 977 F.2d 1510,
1524 (9th Cir. 1992) (elements of computer programs containing
logical and structural elements dictated by the function to be
performed may be "ideas" and therefore not protected by copyright
law).

In his declaration, Berry says that Walker is
incorrect, as these elements are actually Berry's own, original
expression. See June 8, 2005 Berry Decl. at 18. Berry contends,
for example, that there are many different ways to express the
structural relationship among purchase orders. As an example, he
states that his new software does not use the field "Job ID," and
instead replaces that field "with the cosignee['s] name plus
purchase order number." Id. at 19. Berry does not, however,
explain how this change demonstrates the "expressive," and
therefore protectable, nature of the database field. Whether
styled as "Job ID" or "Cosignee plus purchase order number," the
field serves to identify the order in the database. The use of a
number to accomplish this task is not protectable.

18

Walker says elements subject only to "thin" protection are database fields for which only a limited number of alternative names or expressions are available.  For example, FCS includes fields called "Container.Inspected by Tag," which identifies whether a container has been inspected by tariff authorities, and "Container.OriginStartDate," which indicates the date a container is ready to be picked up at Honolulu Harbor. The names of these fields in the Excel spreadsheets are "Containers.Tagged" and "Containers.Pickup Date," respectively. These names, Walker says, are driven by "external or industry terminology."  "Tag," for example, refers to the "The Adherence Group," a tariff authority.  With respect to "Container.OriginStartDate," the date of pick-up is an external business requirement.  "Thin" protection is given to expressions using these external terms and requirements because only a limited number of expressions of these requirements is possible.

The use of similar fields is allowed under these circumstances, provided the expressions are not identical.  In Apple Computer, the Ninth Circuit said, "When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity." 35 F.3d at 1442.  The Excel spreadsheet categories that Walker identifies as subject to "thin" protection are necessary to any

19

freight database.  Under the circumstances, the use of different names for these fields is sufficient to avoid "virtual identity."

Next, addressing the five remaining FCS elements that Berry claims were copied, Walker finds none present in the Excel spreadsheets.  In each case, Walker finds that the elements in the Excel spreadsheets "evidence different structure than the identified counterparts in the Berry database."  Ex. L to Hosoda Decl.  In each of the five cases, the Excel spreadsheets use one table to store the relevant data, whereas the FCS database uses two tables.  Because of the differences in the structures of the elements, Walker says that the elements were not copied.  Id.

Berry accuses Walker of using a "jury-rigged" version of FCS, which was the derivative in use by Employees from March 7, 2003, to June 9, 2003.  Berry, however, does not explain how he knows this.  Further, even assuming Walker performed his analysis on the altered version of FCS, Berry fails to explain how the slight alterations in that version of the software adversely affected Walker's analysis of the perceived similarities between FCS and the Excel spreadsheets.  Walker's analysis was limited to the 41 fields in FCS identified by Berry as "copied" into the Excel spreadsheets and did not extend to the alterations made by Dillon.

Berry does not produce any evidence to contradict the Walker Report.  Indeed, the findings of the Johnson Report that

Berry relies on are consistent with the findings of the Walker Report.  Both reports acknowledge similarities between the FCS and the Excel spreadsheets.  The Johnson Report, however, goes no further than noting these similarities, while the Walker Report analyzes the similar elements as to protectability.  Because the only similarities between the programs occur in nonprotectable elements, Berry does not establish any infringement.  See Apple Computer, 35 F.3d at 1443.  The burden is on Berry in this regard, and Berry fails to show how he would meet this burden at trial.

Employees' motion for summary judgment is granted with respect to their use of an FCS derivative after June 9, 2003.  Berry's motion for summary judgment for the same acts is denied.

2.    Guidance and Gurzi.

Berry alleges that Guidance, through its employee Michael Gurzi, directly infringed on the FCS copyright by making unauthorized copies of FCS.  This court is unpersuaded, as Guidance's copying of FCS was protected by the Fair Use doctrine.  The court denies Berry's motion for summary judgment with respect to any direct infringement by Guidance, and grants Guidance's counter-motion for summary judgment on the direct infringement claims.

In early July 2003, Fleming hired Guidance to remove any software created by Berry from Fleming's computer system.

Guidance assigned Gurzi to perform this work.  Before beginning

the removal, Gurzi made an image of each computer to preserve the

original data and hold it as evidence in the pending litigation

between Berry and Fleming.  Gurzi then wiped the computers clean

of all programs and data.  Gurzi next re-installed software that

was not owned by Berry.  At Dillon's direction, Gurzi also

restored approximately 20,000 user files to the system.  Gurzi

then made a second image of each drive as a record of the

reconstructed data.

Berry alleges that the second image produced by Gurzi

shows that 16 FCS files remained on the system after the attempt

to purge the computers of Berry's software.  Berry contends that

these files establish that Guidance made unauthorized copies of

FCS, both in the initial (pre-removal) imaging of the drives and

in the restoration of the FCS copies to the system.  Dillon says

that he created the 16 FCS files at issue in connection with

Berry's original lawsuit.  See Ex. G to Hosoda Decl. ¶¶ 25-26.

Not all copying constitutes copyright infringement.

See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340,

348 (1991).  Certain uses of copyrighted works are "fair use" and

do not infringe on the owner's copyright.  See 17 U.S.C. § 107.

Factors to be considered in a fair use analysis include: 1) the

purpose and character of the use; 2) the nature of the

copyrighted work; 3) the amount and substantiality of the portion

used in relation to the copyrighted work as a whole; and 4) the effect of the use on the potential market for or value of the copyrighted work. Id. A fair use inquiry "calls for case-by-case analysis" of the four factors "in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78 (1994). In considering the final factor, a court must consider the impact on the market not only for the original work, but also for any derivative work. Id. at 590.

The copying of computer files and programs for the purpose of preserving evidence is a fair use. See Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 (9th Cir. 1992); Jartech, Inc. v. Clancy, 666 F.2d 403, 407 (9th Cir. 1982).

In this case, the initial copy of the hard drive was created for the purpose of preserving evidence for litigation. See Gurzi Decl. ¶ 3. Further, the 16 FCS files allegedly retained on the system (and copied by the second image) were also retained for litigation purposes. See Ex. G to Hosoda Decl. ¶ 22. Accordingly, the creation of these copies was a fair use of FCS and was not a copyright violation.

Berry argues that the true purpose of the copying was to "trick the Delaware Bankruptcy Court to cause it to approve the sale to C&S"[5] and "trap Mr. Berry in new litigation in

---

[5] Citing to Ex. J to the Hogan Decl., Berry contends that "Fleming now admits" to this nefarious scheme. Careful review of the cited document, however, reveals no such admission.

23

Delaware while his software was being transferred to a third party C&S [sic]." Berry Opp. at 6. Berry, however, presents no evidence of such a scheme. The pendency of bankruptcy proceedings in Delaware while Guidance was performing its work does not prove that Guidance was attempting to infringe. To the contrary, the existence of proceedings in both Delaware and Hawaii explains why Guidance was making a record of its actions.

Because any copies that Guidance made of FCS files were protected by the fair use doctrine, Berry's motion for summary judgment with respect to direct infringement by Guidance is denied. Guidance's counter-motion for summary judgment on the direct infringement claim is granted.

The court acknowledges Berry's concern that Guidance has not yet produced all documents required by Berry. It is theoretically possible that some of those documents might raise questions of fact with respect to Berry's direct infringement claims against Guidance and Gurzi. Berry, however, makes no showing sufficient to justify a continuance under Rule 56(f) of the motions concerning those claims. If the documents ultimately do go to these claims, Berry may seek reconsideration based on newly discovered evidence. The court extends the time in which Berry may file a reconsideration motion with respect to direct infringement by Guidance and Gurzi to the later of 10 working

days after Berry receives any new evidence justifying such a motion or 10 working days from the date of this order.

3.  <u>Fleming.</u>

Berry alleges that Fleming directly infringed on his software in three ways.  First, Berry alleges that Fleming is liable for using altered FCS software between March 7, 2003, and June 9, 2003.  Second, Berry alleges that Fleming distributed 16 copies of FCS to C&S, in violation of Berry's exclusive right of distribution.  Third, Berry alleges that Fleming directly infringed on FCS by creating the Excel spreadsheets that Berry claims are an illegal derivative of FCS.

a.  Fleming Infringed By Using An Altered
Version of Berry's Software from March
<u>7, 2003, to June 9, 2003.</u>

As discussed earlier, Employees used an unauthorized altered version of FCS from March 7, 2003, to June 9, 2003, while working for Fleming.  Fleming is liable for the infringement during this time.  Berry's motion for summary judgment is granted with respect to Fleming's liability for direct infringement through the use of an altered version of FCS from March 7, 2003, to June 9, 2003.  Fleming's counter-motion for summary judgment is denied with respect to these acts.

b.  Fleming's "Distribution" of 16 Copies of
    FCS to C&S Was Protected by the Fair Use
    Doctrine.

As noted above, Berry alleges that Fleming
impermissibly retained 16 copies of FCS on its computers after
claiming it had purged the software from its system.  Berry
further alleges that these copies were retained on the computers
when the computers were sold to C&S, constituting an improper
sale of his software to C&S.  The court grants Fleming's motion
for summary judgment with respect to this claim.

Fleming had a right to retain the 16 FCS files for
litigation purposes under the fair use doctrine.  The transfer of
the computers containing these files, as well as all other user
files for Dillon, Noa, and the other Employees, was also
permissible under the fair use doctrine, as Employees had a right
to retain the files for their own litigation purposes.

There is no evidence that C&S paid any premium for the
files or that Fleming otherwise stood to benefit from the alleged
scheme to defraud the Bankruptcy Court.  In fact, the record
establishes that, even though Employees had a right to retain the
files for litigation, the retention was inadvertent.  See Ex. G
to Hosoda Decl ¶ 30; Ex. K to Hogan Decl. at 156-57.  Given
Berry's failure to show that there is any issue of material fact
with respect to Fleming's transfer of the files, the court grants
Fleming's motion for summary judgment with respect to this claim.

26

c.    The Creation of the Excel Spreadsheets.

As Berry raises no material issues of fact regarding his claim that the Excel spreadsheets are a derivative of FCS, Berry's motion for summary judgment with respect to direct infringement by Fleming after June 9, 2003, is denied for the same reasons that the court rejects Berry's similar claim against Employees.  Fleming's motion for summary judgment on this claim is granted.

4.    C&S.

Berry's only claim against C&S for direct infringement arises out of Berry's allegation that the Excel spreadsheets used by C&S are actually an FCS derivative.  As explained earlier, however, no material issues of fact exist with respect to whether the Excel spreadsheets are an FCS derivative.  Berry's motion for summary judgment on his claim of direct infringement against C&S is denied, and C&S's counter-motion for summary judgment on this claim is granted.

Berry also claims that C&S destroyed evidence by "scrubb[ing] the relevant computer immediately after this court directed that a special master investigate the software on the server at C&S."  Berry relies on correspondence from C&S's attorney notifying Berry that C&S had been using a trial version of Microsoft's Windows 2003 Server software and would soon be installing the full version of the same software.  Berry does

27

not, however, provide any evidence that the installation of server software resulted in the destruction of any evidence.

B.    Count II: Contributory and Vicarious Infringement.

1.    No Material Issue of Fact Remains With Respect to Berry's Claim of Contributory Infringement.

One infringes contributorily by intentionally inducing or encouraging direct infringement. <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. __, slip op. at 12 (June 27, 2005).

As noted above, the only direct infringement in this case was the use of an altered version of FCS from March 7, 2003, to June 9, 2003. Berry has not established that any Defendant knew that the version of FCS in use at that time was infringing. In fact, the evidence shows that the infringement was not willful, and that Employees believed that they were using the original licensed version of FCS. Berry thus fails to establish any inducement or encouragement of the infringement by any Defendant. In light of the inadvertent nature of the infringement, Berry also fails to prove that any Defendant's action was "intentional." Berry therefore does not make out a prima facie case of contributory infringement.

2.    A Material Issue of Fact Remains With Respect
to Berry's Claim of Vicarious Infringement By
Fleming.

One infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit the infringement. Id. A defendant's lack of knowledge of the infringement is not a defense. Id. at 12 n.9.

As noted above, the direct infringement in this case occurred between March 7, 2003, and June 9, 2003, when Fleming and Employees inadvertently used an altered version of FCS. Fleming clearly had the right and ability to stop or limit Dillon, Noa, and the other Employees' use of the infringing software during this period. It is unclear, however, whether Fleming realized any profit through use of the altered version of FCS.

Fleming and Employees had a license to use the original Berry software during this time and attempted to revert to the original version of the software. They were unaware of their use of an altered version of FCS. While Berry fails to raise any factual issue as to whether any Defendant other than Fleming directly benefitted from infringement between March 7, 2003, and June 9, 2003, the court leaves for another day the question of whether Fleming directly benefitted from the infringement.

Berry's and Fleming's motions for summary judgment on Count II are denied, and the counter-motions filed by Defendants

other than Fleming on that Count are granted.  The issue of
Fleming's alleged vicarious infringement may be raised in later
motions, as noted later in this order.

    C.    <u>Count III: Conspiracy to Infringe.</u>

    A cause of action for civil conspiracy to infringe a
copyright is not created by the Copyright Act and instead falls
under state tort law.  <u>See</u> <u>Schuchart v. Solo Serve Corp.</u>, 540 F.
Supp. 928, 937 (W.D. Tex. 1982).  A conspiracy is "a combination
of two or more persons or entities by concerted action to
accomplish a criminal or unlawful purpose, or to accomplish some
purpose . . . by criminal or unlawful means." <u>Robert's Haw. Sch.</u>
<u>Bus, Inc. v. Laupahoehoe Transp. Co., Inc.</u>, 91 Haw. 224, 252
n.28; 982 P.2d 853, 881 (1999).  To be actionable, the conspiracy
must result in overt acts, done in furtherance of the conspiracy,
that are both the cause in fact and the proximate cause of the
plaintiff's injuries.  <u>Sanchez v. City of Santa Ana</u>, 936 F.2d
1027, 1039 (9th Cir. 1990).

    As any infringement of Berry's software was
inadvertent, there could not have been an agreement to infringe.
Berry's motion for summary judgment is denied with respect to
Count III, and Defendants' counter-motions for summary judgment
are granted with respect to this Count.

D.    Count IV: Misappropriation of Trade Secrets.

Berry sues Fleming, C&S, and Guidance for misappropriation of trade secrets.

Hawaii's Trade Secret Act, Haw. Rev. Stat. § 482B, follows the Uniform Trade Secrets Act. Merrill Lynch v. McClafferty, 287 F. Supp. 2d 1244, 1249 (D. Haw. 2003). To succeed on a claim for misappropriation of trade secrets, a plaintiff must establish (1) the existence of a trade secret; and (2) the misappropriation of the trade secret. See Haw. Rev. Stat. § 482B. A "trade secret" is any information that (1) "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means"; and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Id. The statute defines "misappropriation" as follows:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > (A) Used improper means to acquire knowledge of the trade secret; or
> >
> > (B) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
> >
> > > (i) Derived from or through a person who had utilized improper means to acquire it;

31

(ii)   Acquired   under   circumstances
giving rise to a duty to maintain its
secrecy or limit its use; or

(iii) Derived from or through a person
who owed a duty to the person seeking
relief  to  maintain  its  secrecy  or
limit its use; or

(C) Before a material change of the person's
position, knew or has reason to know that it
was a trade secret and that knowledge of it
had been acquired by accident or mistake.

Haw. Rev. Stat. § 482B-2.

Berry does not identify the theory under which he seeks
relief, but alleges generally that "no less than 30 of the other
programs created by Mr. Berry remained on the Fleming server when
it was sold to C&S." SAVC at 33. Berry further alleges, "This
transfer was made by 'improper means' including theft, bribery,
misrepresentation, breach or inducement of a breach of a duty to
maintain secrecy, or espionage through electronic means." Id.

As an initial matter, Berry does not show that any
files that were on the computers qualify as his trade secrets.
Berry has not presented any evidence that those files had any
independent economic value resulting from not being generally
known.  In fact, Berry initially gave FCS to Fleming for free.
Further, Berry has not yet identified the "30 of the other
programs" that he alleges were transferred.

With respect to the alleged "misappropriation," Berry
argues that Fleming, Guidance, and C&S misled the Bankruptcy

Court by claiming that no copies of Berry's software remained on the Fleming computers when they were sold to C&S.  See Ex. K to Hogan Decl.  This, according to Berry, allowed C&S to obtain the programs "by improper means."

Guidance explains that any misstatement to the Bankruptcy Court was inadvertent and caused by Dillon's use of a different name for the files.  See Ex. G to Hosoda Decl. ¶ 32 (Dillon's copies of 16 FCS files were accidentally retained because "they were located in a place where I do not usually keep software files").  Berry presents only argument, not evidence, in response to Guidance's explanation.

There is no evidence that Guidance tried to mislead the court.  On the present record, Guidance cannot be said to have used any "improper means" to effect the transfer of any Berry files to C&S.  As Guidance's statement to the Bankruptcy court appears to be the only "improper means" that Berry alleges as a basis for his trade secret claims, Berry does not establish any material issue of fact for trial with respect to his trade secret claims.  Summary judgment is granted to Defendants on this Count.

E.    Count V: Violations of the Sherman Act.

In Count V, Berry alleges violations of the Sherman Act, 15 U.S.C. §§ 1-2.  Berry seeks damages under the Clayton Act, 15 U.S.C. § 15.  Berry, however, lacks "antitrust standing" to bring a claim for damages under the Clayton Act.

Only those who meet the requirements for "antitrust standing" may pursue a claim under the Clayton Act.  To have "antitrust standing," a plaintiff must adequately allege and eventually prove "antitrust injury."  See Glen Holly Entm't, Inc. v. Tektronix Inc., 343 F.3d 1000, 1007 (9th Cir. 2003).  An antitrust injury is not any injury caused by an antitrust violation, but is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc. 429 U.S. 477, 489 (1977)).  "A plaintiff must prove that his loss flows from an *anticompetitive* aspect of the defendant's behavior.  If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se."  Glen Holly, 343 F.3d at 1008 (emphasis in original) (quoting Pool Water Prods. v. Olin Corp., 258 F.3d 1024 (9th Cir. 2001)).

Berry alleges copyright infringement arising out of Defendants' use of unauthorized copies and derivatives of FCS. This is neither the type of injury that the antitrust laws were intended to prevent, nor an injury that flows from anticompetitive conduct.  There is no evidence that Defendant's infringing conduct diminished competition.  Accordingly, the court grants summary judgment to all Defendants on Berry's claims

under the Sherman Act.  See Assoc'd Gen. Contractors of Cal.,

Inc. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983).

      F.    Count VI: RICO Violations.

In Count VI, Berry alleges violations of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)

and 1962(d).  Section 1962(c) prohibits:

> any person employed by or associated with any
> enterprise engaged in . . . interstate or
> foreign commerce [] to conduct or participate,
> directly or indirectly, in the conduct of such
> enterprise's affairs though a pattern of
> racketeering activity or collection of
> unlawful debts.

18 U.S.C. § 1962(c).  Section 1962(d) prohibits conspiracy to

violate RICO provisions.

A viable cause of action under RICO requires a showing

of (1) conduct, (2) of an enterprise, (3) through a pattern of

(4) racketeering.  Sedima, S.P.R.L. v. Imrex Co. Inc., 473 U.S.

479, 489-87 (1985).  Liability under § 1962(c) for substantive

violations of RICO is limited to "those who participate in the

operation or management of an enterprise through a pattern of

racketeering activity."  Reves v. Ernst & Young, 507 U.S. 170,

184 (1993).

Berry alleges that Defendants engaged in a pattern of

racketeering activity by committing the following predicate acts:

(1) criminal copyright infringement, through the unlicensed and

unauthorized use of FCS in the form of "daily boot ups of the

Berry system"; (2) bankruptcy fraud in the form of false declarations; and (3) money laundering by engaging in monetary transactions with money derived from the infringing use of FCS. See Berry RICO Statement at 17-18; see also Turner v. Cook, 362 F.3d 1219 (9th Cir. 2004) (predicate acts of racketeering activity required for RICO violation).

Berry does not establish criminal copyright infringement. Criminal infringement involves the "willful" infringement of a copyright. See 17 U.S.C. § 506(a). There is no evidence of any willful copyright infringement.

With respect to Berry's allegation of bankruptcy fraud, Berry does not establish any triable issue of fact. Berry presents no evidence of any fraud committed on the Bankruptcy Court. Berry does cite to a statement by a Mr. Ziman, who apparently represented C&S, that, "I do not believe that this software license is on any list to be assumed and assigned, and if - to the extent that we can't assume it and assign it under 365, we won't, and we're certainly not going to infringe." Ex. K to Hogan Decl. at 156. This statement, however, does not establish any fraud. Ziman says only that FCS does not appear on any list to be assumed and assigned and that it is not C&S's intention to use FCS or infringe on Berry's copyright. This is consistent with Dillon's statement that he and Gurzi both believed that the FCS files were no longer on any computer.

36

Finally, Berry presents no evidence of laundering of "money derived from the infringing use of FCS." Berry's accountant's expert report, see Ex. I to Hogan Decl., does not address whether money was actually derived from infringement of FCS. Even if Defendants did profit from infringement, Berry presents no evidence that Defendants laundered these profits.

Because Berry fails to raise a question of material fact with respect to any predicate RICO act, his claim under 18 U.S.C. § 1962(c) fails. Defendants' motions for summary judgment on this claim are granted.

Berry further alleges that Defendants conspired to commit racketeering activity, in violation of 18 U.S.C. § 1962(d). "A defendant is guilty of conspiracy to violate [RICO] if evidence establishes that she knowingly agreed to facilitate a scheme with includes the operation or management of a RICO enterprise." United States v. Fernandez, 388 F.3d 1199, 1230 (9th Cir. 2004). Berry, however, presents no evidence of any conspiracy to commit any of the alleged predicate RICO acts.

The court denies Berry's motion for summary judgment on Count VI and grants Defendants' counter-motions for summary judgment on Count VI.

G.   Damages.

The granting of Berry's motion for summary judgment with respect to the liability of Fleming and Employees for direct

infringement between the dates of March 7, 2003, and June 9, 2003, leaves for further adjudication the issue of damages. Berry has not elected to receive statutory damages for that infringement and is presently seeking Defendants' profits during the period of infringement.

Under 17 U.S.C. § 504(b),

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

The Ninth Circuit has interpreted this provision as requiring a copyright owner to present evidence establishing a legally sufficient causal link between the infringement and subsequent indirect profits.[6]  See Mackie v. Rieser, 296 F.3d 909, 915-16 (9th Cir. 2002), cert denied, 537 U.S. 1189 (2003); see also On Davis v. The Gap, Inc., 246 F.3d 152 (2d Cir. 2001); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 520 (4th Cir. 2003).

---

[6] The court in Mackie distinguishes between "direct profits," which are generated by selling an infringing product, and "indirect profits," which are generated through a more attenuated nexus to the infringement.  296 F.3d at 914.  The profits sought by Berry in this case are indirect profits.

Berry sets forth Fleming's profits in the expert report of Thomas Ueno, C.P.A. <u>See</u> Ex. I to Hogan Decl. Ueno's report calculates an "unpaid license fee" of $1772 per container shipped, based on Fleming's payments to API and Ueno's estimate of Fleming's gross profits. <u>See id.</u> at 6. Ueno, however, says nothing about any connection between these claimed profits and any infringement. As noted throughout this order, the only infringement that Berry has proven occurred through Fleming's and Employees' use of a slightly altered version of FCS during a three-month period. Berry provides no evidence that the profits he seeks are attributable to this limited direct infringement.

While the court therefore considered whether it could, on the present motions, rule on the issue of actual damages relating to direct infringement, the court has decided to allow the parties to conduct further discovery as to damage issues and then to brief those issues fully. This further discovery may include discovery on any direct benefit to Fleming with respect to alleged vicarious infringement.

V.        <u>CONCLUSION.</u>

Berry's motion for summary judgment is granted with respect to liability on the part of Fleming and Employees for direct infringement between March 7, 2003 and June 9, 2003, in the form of use of an altered version of FCS. The court leaves for future proceedings the issue of damages for this direct

39

infringement and the issue of any direct benefit to Fleming for alleged vicarious infringement. Motions for summary judgment on damages or on Fleming's alleged vicarious infringement may be filed on or before the dispositive motions cutoff. Berry's motion for summary judgment is denied in all other respects.

Employees' motion for summary judgment is denied with respect to liability for direct infringement between March 7, 2003, and June 9, 2003, and for vicarious infringement. Employees' motion for summary judgment is granted in all other respects.

Fleming's motion for summary judgment is denied with respect to liability for direct infringement between March 7, 2003, and June 9, 2003, and with respect to vicarious infringement. Fleming's motion for summary judgment is granted in all other respects.

All other Defendants' motions for summary judgment are granted. The tentatively reserved hearing date of August 9, 2005, is vacated with respect to Guidance and Gurzi.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 27, 2005.

SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

Berry v. Hawaiian Express Service, Inc., et al., Civ. No. 03-00385 SOM/LEK, ORDER GRANTING IN PART, DENYING IN PART BERRY'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING C&S LOGISTICS OF HAWAII, LLC, C&S WHOLESALE GROCERS, INC., C&S ACQUISITION, LLC, ES3, LLC, AND RICHARD COHEN'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING GUIDANCE SOFTWARE, INC., AND MICHAEL GURZI'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING IN PART, DENYING IN PART REMAINING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

40