# EXHIBIT P

```
<DOCUMENT>
<TYPE>EX-10.1
<SEQUENCE>8
<FILENAME>d97911exv10w1.txt
<DESCRIPTION>CREDIT AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT 10.1

--------------------------------------------------------------------------------

CREDIT AGREEMENT

dated as of

June 18, 2002

among

FLEMING COMPANIES, INC.,

THE LENDERS PARTY HERETO,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent,

JPMORGAN CHASE BANK and CITICORP NORTH AMERICA, INC.,
as Syndication Agents,

LEHMAN COMMERCIAL PAPER INC. and WACHOVIA BANK, NATIONAL ASSOCIATION,
as Documentation Agents,

DEUTSCHE BANK SECURITIES INC. and J.P. MORGAN SECURITIES INC.,
as Joint Book Managers,

and

DEUTSCHE BANK SECURITIES INC.,

J.P. MORGAN SECURITIES INC.,

and

SALOMON SMITH BARNEY INC.,
as Joint Lead Arrangers

--------------------------------------------------------------------------------

FORTIS CAPITAL CORP.,
MANUFACTURERS AND TRADERS TRUST COMPANY,
BNP PARIBAS,
COMERICA BANK
and
TRANSAMERICA BUSINESS CAPITAL CORPORATION
as Senior Managing Agents

```
<PAGE>
```

TABLE OF CONTENTS

```
<TABLE>
<CAPTION>
```

```
<S>
ARTICLE I          DEFINITIONS....................................................
```

```
           SECTION 1.01.  DEFINED TERMS..................................................
           SECTION 1.02.  CLASSIFICATION OF LOANS AND BORROWINGS......................
           SECTION 1.03.  TERMS GENERALLY.............................................
           SECTION 1.04.  ACCOUNTING TERMS; GAAP; FISCAL YEARS.......................
           SECTION 1.05.  CERTAIN PRO FORMA CALCULATIONS.............................
```

```
ARTICLE II         THE CREDITS.....................................................
```

```
           SECTION 2.01.  COMMITMENTS.................................................
           SECTION 2.02.  LOANS AND BORROWINGS.......................................
           SECTION 2.03.  REQUESTS FOR BORROWINGS....................................
           SECTION 2.04.  SWINGLINE LOANS............................................
           SECTION 2.05.  INCREMENTAL TERM LOAN COMMITMENTS.........................
           SECTION 2.06.  LETTERS OF CREDIT..........................................
           SECTION 2.07.  FUNDING OF BORROWINGS......................................
           SECTION 2.08.  INTEREST ELECTIONS.........................................
           SECTION 2.09.  TERMINATION AND REDUCTION OF COMMITMENTS..................
           SECTION 2.10.  REPAYMENT OF LOANS; EVIDENCE OF DEBT......................
           SECTION 2.11.  AMORTIZATION OF TERM LOANS.................................
           SECTION 2.12.  PREPAYMENT OF LOANS........................................
           SECTION 2.13.  FEES.......................................................
           SECTION 2.14.  INTEREST...................................................
           SECTION 2.15.  ALTERNATE RATE OF INTEREST.................................
           SECTION 2.16.  INCREASED COSTS............................................
           SECTION 2.17.  BREAK FUNDING PAYMENTS.....................................
           SECTION 2.18.  TAXES......................................................
           SECTION 2.19.  PAYMENTS GENERALLY; PRO RATA TREATMENT; SHARING OF SET-OFFS.
           SECTION 2.20.  MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS.............
           SECTION 2.21.  ILLEGALITY OR IMPRACTICABILITY OF EURODOLLAR LOANS.........
```

```
ARTICLE III        REPRESENTATIONS AND WARRANTIES..................................
```

```
           SECTION 3.01.  CORPORATE EXISTENCE AND POWER..............................
           SECTION 3.02.  CORPORATE AND GOVERNMENTAL AUTHORIZATION; CONTRAVENTION.....
           SECTION 3.03.  BINDING EFFECT.............................................
           SECTION 3.04.  FINANCIAL INFORMATION......................................
           SECTION 3.05.  LITIGATION.................................................
```

```
</TABLE>
```

```
<PAGE>
<TABLE>
<CAPTION>


<S>
```

```
           SECTION 3.06.  COMPLIANCE WITH ERISA......................................
           SECTION 3.07.  ENVIRONMENTAL MATTERS......................................
           SECTION 3.08.  TAX RETURNS................................................
           SECTION 3.09.  SUBSIDIARIES...............................................
           SECTION 3.10.  NOT AN INVESTMENT COMPANY..................................
           SECTION 3.11.  NO CONFLICTING REQUIREMENTS................................
           SECTION 3.12.  DISCLOSURE.................................................
           SECTION 3.13.  SECURITY DOCUMENTS.........................................
```

SECTION 3.14.   PUBLIC UTILITY HOLDINGS COMPANY...........................
SECTION 3.15.   LABOR RELATIONS...........................................
SECTION 3.16.   INDEBTEDNESS..............................................
SECTION 3.17.   INSURANCE.................................................
SECTION 3.18.   SUBORDINATION; DESIGNATION OF THE LOAN DOCUMENTS AS "SENIOR
                "DESIGNATED SENIOR INDEBTEDNESS"; DESIGNATION OF THIS AGREEM
                AGREEMENT"; JUSTIFICATION OF INDEBTEDNESS INCURRED HEREUNDE
SECTION 3.19.   LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED
                JURISDICTION OF ORGANIZATION; ETC.........................

ARTICLE IV          CONDITIONS...........................................

SECTION 4.01.   EFFECTIVE DATE............................................
SECTION 4.02.   EACH BORROWING............................................
SECTION 4.03.   INCREMENTAL TERM LOANS....................................

ARTICLE V           AFFIRMATIVE COVENANTS................................

SECTION 5.01.   INFORMATION...............................................
SECTION 5.02.   PAYMENT OF OBLIGATIONS....................................
SECTION 5.03.   MAINTENANCE OF PROPERTY; INSURANCE........................
SECTION 5.04.   MAINTENANCE OF EXISTENCE..................................
SECTION 5.05.   COMPLIANCE WITH LAWS......................................
SECTION 5.06.   INSPECTION OF PROPERTY, BOOKS AND RECORDS; COLLATERAL AUDITS
SECTION 5.07.   USE OF PROCEEDS...........................................
SECTION 5.08.   GUARANTEE REQUIREMENT; COLLATERAL REQUIREMENT; FURTHER ASSUR
SECTION 5.09.   CORE-MARK RECEIVABLES FACILITY............................

ARTICLE VI          NEGATIVE COVENANTS...................................

SECTION 6.01.   LIENS.....................................................
SECTION 6.02.   CONSOLIDATION, MERGER, SALE OF ASSETS, ETC................
SECTION 6.03.   INDEBTEDNESS..............................................
SECTION 6.04.   DIVIDENDS.................................................
SECTION 6.05.   TRANSACTIONS WITH AFFILIATES..............................
</TABLE>

(ii)

<PAGE>
<TABLE>
<CAPTION>

<S>
SECTION 6.06.   ACQUISITIONS AND INVESTMENTS..............................
SECTION 6.07.   LIMITATION ON CERTAIN RESTRICTIONS ON SUBSIDIARIES.........
SECTION 6.08.   CAPITAL EXPENDITURES......................................
SECTION 6.09.   CONSOLIDATED FIXED CHARGE COVERAGE RATIO; ADJUSTED CONSOLIDA
                COVERAGE RATIO............................................
SECTION 6.10.   TOTAL LEVERAGE RATIO......................................
SECTION 6.11.   ASSET COVERAGE RATIO......................................
SECTION 6.12.   LIMITATION ON ISSUANCES OF CAPITAL STOCK..................
SECTION 6.13.   LIMITATION ON MODIFICATIONS OF CERTAIN INDEBTEDNESS........
SECTION 6.14.   CHANGE OF LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A R
                JURISDICTION OF ORGANIZATION; ETC.........................
SECTION 6.15.   LIMITATION ON CREATION OF SUBSIDIARIES....................
SECTION 6.16.   CONDUCT OF BUSINESS.......................................
SECTION 6.17.   NO DESIGNATION OF OTHER INDEBTEDNESS AS "DESIGNATED SENIOR I

```
ARTICLE VII          EVENTS OF DEFAULT..............................................

ARTICLE VIII         THE AGENTS.....................................................

         SECTION 8.01.    APPOINTMENT.................................................
         SECTION 8.02.    NATURE OF DUTIES............................................
         SECTION 8.03.    LACK OF RELIANCE ON THE AGENTS.............................
         SECTION 8.04.    CERTAIN RIGHTS OF THE AGENTS...............................
         SECTION 8.05.    RELIANCE....................................................
         SECTION 8.06.    INDEMNIFICATION.............................................
         SECTION 8.07.    EACH AGENT IN ITS INDIVIDUAL CAPACITY......................
         SECTION 8.08.    RESIGNATION.................................................
         SECTION 8.09.    THE JOINT LEAD ARRANGERS, JOINT BOOK MANAGERS, SYNDICATION A
                          DOCUMENTATION AGENTS.......................................

ARTICLE IX           MISCELLANEOUS..................................................

         SECTION 9.01.    NOTICES.....................................................
         SECTION 9.02.    WAIVERS; AMENDMENTS.........................................
         SECTION 9.03.    EXPENSES; INDEMNITY; DAMAGE WAIVER.........................
         SECTION 9.04.    SUCCESSORS AND ASSIGNS......................................
         SECTION 9.05.    SURVIVAL....................................................
         SECTION 9.06.    COUNTERPARTS; INTEGRATION; EFFECTIVENESS...................
         SECTION 9.07.    SEVERABILITY................................................
         SECTION 9.08.    RIGHT OF SETOFF.............................................
         SECTION 9.09.    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS..
```

```
</TABLE>
```

                                      (iii)

```
<PAGE>
<TABLE>
<CAPTION>


<S>
```

```
         SECTION 9.10.    WAIVER OF JURY TRIAL........................................
         SECTION 9.11.    HEADINGS....................................................
         SECTION 9.12.    CONFIDENTIALITY.............................................
         SECTION 9.13.    INTEREST RATE LIMITATION....................................
         SECTION 9.14.    EXCEPTED DEFAULT UNDER THE 10-5/8% SENIOR SUBORDINATED NOTE
```

```
</TABLE>
```

SCHEDULES:

```
Schedule 2.01            Commitments
Schedule 2.06(a)         Rolled-In Letters of Credit
Schedule 3.09            Subsidiaries
Schedule 3.16            Existing Indebtedness
Schedule 3.17            Insurance
Schedule 3.19            Legal Names; Type of Organization; Jurisdiction of
                         Organization
Schedule 6.01            Existing Liens
Schedule 6.02(c)         Additional Asset Sale Basket Amount
Schedule 6.05            Transactions with Affiliates Concerning Real Property
```

EXHIBITS:

```
Exhibit A    --    Assignment and Acceptance
Exhibit B    --    Guarantee Agreement
Exhibit C    --    Incremental Term Loan Commitment Agreement
Exhibit D    --    Pledge Agreement
Exhibit E    --    Security Agreement
Exhibit F    --    Notice of Borrowing Request
Exhibit G    --    Letter of Credit Request
Exhibit H    --    Notice of Interest Election Request
Exhibit I    --    Section 2.18(e) Certificate
Exhibit J    --    Opinion of Borrower's Counsel
Exhibit K    --    Solvency Certificate
Exhibit L    --    Subordination Agreement
```

(iv)

<PAGE>

CREDIT AGREEMENT dated as of June 18, 2002 among FLEMING COMPANIES, INC., the LENDERS party hereto, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Administrative Agent, JPMORGAN CHASE BANK and CITICORP NORTH AMERICA, INC., as Syndication Agents, LEHMAN COMMERCIAL PAPER INC. and WACHOVIA BANK, NATIONAL ASSOCIATION, as Documentation Agents, DEUTSCHE BANK SECURITIES INC. and J.P. MORGAN SECURITIES INC., as Joint Book Managers and DEUTSCHE BANK SECURITIES INC., J.P. MORGAN SECURITIES INC. and SALOMON SMITH BARNEY INC., as Joint Lead Arrangers.

The parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01. DEFINED TERMS. As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ACCOUNTS" has the meaning assigned to such term in the Security Agreement.

"ACQUISITION" means each of (i) an investment by the Borrower or any of its Wholly-Owned Subsidiaries in any Person (other than the Borrower or any of its Subsidiaries) pursuant to which such Person shall concurrently become a Wholly-Owned Subsidiary or shall be merged into or consolidated with the Borrower or any of its Wholly-Owned Subsidiaries and (ii) an acquisition by the Borrower or any of its Wholly-Owned Subsidiaries of the property and assets of any Person (other than the Borrower or any of its Subsidiaries) that constitute substantially all of the assets of such Person or of any division or line of business of such Person; PROVIDED, HOWEVER, no such acquisition of property or assets of any Person, or investment in any Person owning any property or assets, constructed in contemplation of such acquisition or investment, as the case may be, shall constitute an "Acquisition" under this definition. Notwithstanding anything to the contrary contained in clause (i) of the immediately preceding sentence, the Borrower or its Wholly-Owned Subsidiaries may effect an Acquisition of 100% of the Equity Interests of a Person by means of a "two-step merger transaction", so long as (x) on the date of the consummation of the initial step of such transaction, the Borrower or its respective Wholly-Owned

Subsidiary shall have acquired sufficient Equity Interests of the Person being acquired so that such Person on such date becomes a Subsidiary and so long as, under applicable law and the organizational documents of the Person being acquired, the Borrower or its respective Wholly-Owned Subsidiary has acquired sufficient Equity Interests to effect the merger described in succeeding clause (y) (without obtaining favorable votes from any other Person) within six months following the date of the consummation of the first step of such Acquisition transaction, (y) within six months after the date of the consummation of the first step of the Acquisition transaction, the Borrower causes the Person to be acquired to be merged with or into a Wholly-Owned Subsidiary into the Borrower or a Wholly-Owned Subsidiary thereof, as
<PAGE>
a result of which (at such time) the Acquisition is effected and meets the requirements of clause (i) of the immediately preceding sentence and (z) in the case of any two-step Acquisition transaction as described in this sentence, the Borrower shall establish that all tests required to be met pursuant to this Agreement (including those financial tests required to be met on a Post-Test Period Pro Forma Basis) would be satisfied on the date of the consummation of the first step of the respective Acquisition transaction calculated both (x) based on the Equity Interests actually acquired on such date and the financing therefor and (y) as if the second-step of the Acquisition transaction were actually effected on such date (giving effect to the acquisition of 100% of the Equity Interests in such case and all financing required therefor).

        "ADDITIONAL ASSET SALE BASKET AMOUNT" has the meaning provided on Part I of Schedule 6.02(c).

        "ADJUSTED CONSOLIDATED FIXED CHARGE COVERAGE RATIO" means, for any period, the ratio of Consolidated EBITDAR to Adjusted Consolidated Fixed Charges for such period.

        "ADJUSTED CONSOLIDATED FIXED CHARGES" for any period, means the sum of (i) Consolidated Interest Expense, (ii) Consolidated Rent Expense, and (iii) Capital Expenditures made pursuant to Section 6.08(a), in each case for or during (as the case may be) such period; PROVIDED that (subject to adjustments which may be required to be made for Significant Acquisitions and Significant Asset Dispositions occurring after the Effective Date, in the case of determinations of Adjusted Consolidated Fixed Charges or the Adjusted Consolidated Fixed Charge Coverage Ratio being made on the Post-Test Period Pro Forma Basis), Adjusted Consolidated Fixed Charges for the Borrower's fiscal quarters ended December 29, 2001, April 20, 2002 and July 13, 2002 shall be deemed to be $145,444,000, $144,631,000 and $115,870,000, respectively.

        "ADJUSTED LIBO RATE" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

        "ADMINISTRATIVE AGENT" means DBTCA, in its capacity as administrative agent for the Lenders hereunder.

        "ADMINISTRATIVE QUESTIONNAIRE" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

        "AFFILIATE" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

        "AGENTS" means the Administrative Agent, the Collateral Agent, each Syndication Agent, each Documentation Agent and, for the purposes of Article

VIII only, the Joint Book Managers and the Joint Lead Arrangers.

-2-

<PAGE>

"AGGREGATE GUARANTEE EXCLUSION AMOUNT" at any time means $50,000,000 less the aggregate fair market value of all assets owned by Persons which at such time are not required to become Guarantors by reason of the provisions of clause (ii) of the proviso to the definition of "Guarantee Requirement" contained herein.

"AGGREGATE SUPERMAJORITY LENDERS" means those Non-Defaulting Lenders which would constitute "Required Lenders" under, and as defined in, this Credit Agreement if the percentage "50%" contained therein were changed to "66-2/3%".

"AGREEMENT" means this Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"ALTERNATE BASE RATE" means, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Rate in effect on such day plus 1/2 of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Rate, respectively.

"ALTERNATE CURRENCY" means, with respect to any Letter of Credit, Canadian Dollars, Pounds Sterling and Euros, and any other currency other than Dollars as may be acceptable to the Administrative Agent and the Issuing Lender with respect thereto in their sole discretion.

"APPLICABLE COMMITMENT FEE PERCENTAGE" means, for each day, the respective percentage per annum set forth below under column entitled "Applicable Commitment Fee Percentage" and opposite the respective row below indicating the total Revolving Exposure on such day as a percentage of the total Revolving Commitments on such day (with such percentage being indicated by the letter "x"):

<TABLE>
<CAPTION>

|  | REVOLVING EXPOSURE ("x")<br>------------------------ | APPLICABLE<br>COMMITMENT FEE<br>PERCENTAGE<br>---------- |
| --- | --- | --- |
| <S> |  | <C> |
|  | 0% < (or equal to) x < (or equal to) 33.3% | 0.750% |
|  | 33.3% < x < (or equal to) 100% | 0.500% |

</TABLE>

"APPLICABLE PERCENTAGE" means, with respect to any Revolving Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment. If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments.

"APPLICABLE RATE" for any day during the respective period means (x) with respect to B Term Loans (i) in the case of Eurodollar Term Loans, 2.25% and (ii) in the case of ABR Term Loans, 1.25%, (y) (i) with respect to Incremental Term Loans added to the B Term Loan Class, the respective percentages per annum as provided above in clause (x) and (ii) with

-3-

<PAGE>
respect to any other Class of Incremental Term Loans, the respective percentages
per annum relating to the respective Type of such Class of Incremental Term
Loans as set forth in the applicable Incremental Term Loan Commitment Agreement
(or, in the case of any one such Class of Incremental Term Loans extended
pursuant to one Incremental Term Loan Commitment Agreement, as may be provided
in the first Incremental Term Loan Commitment Agreement executed and delivered
with respect to such Class) and (z) with respect to Revolving Loans and
Swingline Loans, the respective percentage per annum set forth below under the
appropriate column (determined according to the respective Class of Loans and
the total Revolving Exposure on such day as a percentage of the total Revolving
Commitments on such day (with such percentage being indicated in the table below
by the letter "x")), opposite the respective Level (i.e., Level 1 or Level 2, as
the case may be) of the Total Leverage Ratio indicated to have been achieved in
the respective officer's certificate delivered as required below:

<TABLE>
<CAPTION>

| Level | Total Leverage Ratio | Eurodollar Revolving Loans when 0% < (or equal to) x < (or equal to) 33.3% | Eurodollar Revolving Loans when 33.3% < x < (or equal to) 66.6% | Eurodollar Revolving Loans when 66.6% < x < (or equal to) |
|-------|----------------------|-------------------------------------------------------------------|------------------------------------------------------------|---------------------------------------------------|
| <S> | <C> | <C> | <C> | <C> |
| 2 | Greater than or equal to 3.50:1.00 | 1.75% | 2.00% | 2.25% |
| 1 | Less than 3.50:1.00 | 1.50% | 1.75% | 2.00% |

</TABLE>

<TABLE>
<CAPTION>

| Level | Total Leverage Ratio | ABR Revolving Loans and Swingline Loans when 0% < (or equal to) x < (or equal to) 33.3% | ABR Revolving Loans and Swingline Loans when 33.3% < x < (or equal to) 66.6% | ABR Rev Loans Swing Loans 66.6% < (or equa |
|-------|----------------------|---------------------------------------------------------------------------------|--------------------------------------------------------------------------|--------------------------------------------|
| <S> | <C> | <C> | <C> | <C> |
| 2 | Greater than or equal to 3.50:1.00 | 0.75% | 1.00% | 1.2 |
| 1 | Less than 3.50:1.00 | 0.50% | 0.75% | 1.0 |

</TABLE>

, with the Total Leverage Ratio to be determined based on the delivery of a
certificate of the Borrower by a Financial Officer of the Borrower to the
Administrative Agent (who shall make available to each Lender), within 50 days
of the last day of any fiscal quarter of the Borrower (or 95 days in the case of
the fiscal year end of the Borrower) (the date of each such delivery, the "Start
Date") which certificate shall set forth the calculation of the Total Leverage
Ratio as at the last day of the Test Period ended immediately prior to the
relevant Start Date (or, if any Significant Acquisition or Significant Asset
Disposition has occurred after the last day of such Test Period and prior to the
respective Start Date, with the Total Leverage Ratio to be calculated on a
Post-Test Period Pro Forma Basis as at the date the last such Significant
Acquisition or Significant Asset Disposition was effected, after giving effect
thereto) and the Applicable Rates which shall be thereafter applicable (until
same are changed or cease to apply in accordance with this definition); PROVIDED
that at the time of the consummation of any Significant Acquisition and any
Significant Asset Disposition, a Financial Officer of the Borrower shall deliver
to the Administrative Agent a certificate setting forth the calculation of the
Total Leverage Ratio on a Post-Test Period Pro Forma Basis (with Consolidated
Indebtedness to be determined on the date of the consummation of the respective
such Significant Acquisition or Significant Asset Disposition, and after giving
effect thereto, and with Consolidated EBITDA to be calculated for the Test
Period most recently ended prior to the date on which such Significant
Acquisition or such Significant Asset Disposition, as the case may be, is
consummated for which financial statements have been made available (or were
required to be made available) pursuant to Section

-4-

<PAGE>
5.01(a) or (b), as the case may be), and the date of such consummation shall be
deemed to be a Start Date and the Applicable Rates which shall be thereafter
applicable (until same are changed or cease to apply in accordance with this
definition) shall be based upon the Total Leverage Ratio as so calculated. The
Applicable Rates so determined shall apply, except as set forth in the
succeeding sentence, from the relevant Start Date to the earlier of (x) the date
on which the next certificate is delivered to the Administrative Agent, (y) the
date on which the next Significant Acquisition or the next Significant Asset
Disposition, as the case may be, is consummated or (z) the date which is 50 (or,
in the case of a fiscal year end, 95) days following the last day of the Test
Period in which the previous Start Date occurred (such earliest date, the "End
Date"), at which time, if no certificate has been delivered to the
Administrative Agent indicating an entitlement to new Applicable Rates (and thus
commencing a new Start Date), the Applicable Rates shall be those set forth in
the table above determined as if the Total Leverage Ratio were greater than
3.50:1.00 and utilization exceeded 66.6% (such Applicable Rates as so
determined, the "Highest Applicable Rates"). Notwithstanding anything to the
contrary contained above in this definition, the Applicable Rates with respect
to Revolving Loans and Swingline Loans shall be (x) at all times prior to the
date of delivery of the financial statements pursuant to Section 5.01(b) for the
fiscal quarter ending closest to September 30, 2002, (i) 2.00% in the case of
Eurodollar Revolving Loans and (ii) 1.00% in the case of ABR Revolving Loans and
Swingline Loans and (y) at any time when an Event of Default exists, the Highest
Applicable Rates.

        "ASSET COVERAGE RATIO" means, at any time, the ratio of (i) (x) the
consolidated net trade accounts receivable (excluding any such trade accounts
receivable sold or transferred to CM Capital pursuant to the Core-Mark
Receivables Facility Documents prior to the termination thereof and the
repayment of all outstanding amounts thereunder and net of allowances for
doubtful accounts) of the Borrower and the Guarantors plus (y) the consolidated

net inventory of the Borrower and the Guarantors at such time (valued on a First-in First-out (FIFO) basis), in each case only to the extent the Collateral Agent has a first priority perfected security interest therein (subject to no other Lien other than any statutory Lien on such inventory permitted pursuant to Section 6.01(h), but only if such Lien would not affect in any material respect the value of such inventory or the ability of the Collateral Agent to exercise its rights against such inventory pursuant to the Security Agreement), to (ii) the sum of (x) the aggregate amount of all principal of Loans outstanding at such time plus (y) the total LC Exposure at such time. Notwithstanding anything to the contrary contained in this definition, for the purposes of making determinations of the Asset Coverage Ratio at any time, the Collateral Agent shall not be considered to have a first priority perfected security interest in any Inventory of the Borrower or any Guarantor which is located on real property (i) that the Borrower or the respective Guarantor leases (other than pursuant to an acquired or assumed lease) from a Person (other than the Borrower or any of its Subsidiaries) pursuant to a lease entered into after the Effective Date unless the lessor of such real property has executed and delivered to the Collateral Agent a Landlord-Lender Agreement or (ii) owned by the Borrower or one of its Subsidiaries that is subject to a mortgage (other than an acquired or assumed mortgage) entered into after the Effective Date in favor of a Person (other than the Borrower or any Subsidiary thereof) unless the mortgagee in respect thereof shall have executed and delivered to the Collateral Agent a Mortgagee Agreement.

"ASSET DISPOSITION" means (a) any sale, issuance, transfer or other disposition of any Equity Interest of any Subsidiary to any Person other than the Borrower or any

-5-

<PAGE>

Wholly Owned Subsidiary (including, without limitation, through the merger of any Subsidiary with or into any Person other than the Borrower or any Wholly Owned Subsidiary), (b) any sale, transfer or other disposition of any other property or asset of the Borrower or any Subsidiary to any Person other than the Borrower or any Wholly Owned Subsidiary, other than any sale, transfer or other disposition of: (i) any current asset in the ordinary course of business; (ii) any property or assets the subject of a Sale-Leaseback Transaction; (iii) Financing Notes sold in connection with a Permitted Note Sale; (iv) sales pursuant to the Core-Mark Receivables Facility Documents (but only until the date when the trust relating to the Core-Mark Receivables Facility is required to be terminated pursuant to Section 5.09); (v) any property or assets within 180 days after the acquisition, or completion of construction, thereof, to a Person other than the Borrower or a Subsidiary who then leases such property to the Borrower or a Subsidiary; (vi) existing property or assets in consideration (in whole or in part) for the acquisition of new property or assets of a similar character in the ordinary course of business; (vii) inventory in the ordinary course of business; and (viii) any other property or assets in the ordinary course of business if the total consideration received by the Borrower and its Subsidiaries in respect thereof and any property or assets sold concurrently or in a related transaction or series of transactions does not exceed $1,000,000, or (c) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, properties or assets of the Borrower or any Subsidiary where the total consideration received by the Borrower and its Subsidiaries in respect of such event or proceeding, or series of events or proceedings, exceeds $1,000,000.

"ASSIGNMENT AND ACCEPTANCE" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent,

in the form of Exhibit A or any other form approved by the Administrative Agent.

"B TERM LOAN" means a Loan made pursuant to paragraph (a) of Section 2.01.

"B TERM LOAN COMMITMENT" means, with respect to each Lender, the commitment, if any, of such Lender to make a B Term Loan hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the B Term Loan to be made by such Lender hereunder, as such commitment may be reduced pursuant to Section 2.09. The initial amount of each Lender's Term Loan Commitment is set forth on Schedule 2.01. The initial aggregate amount of the Lenders' Term Loan Commitments is $425,000,000.

"B TERM LOAN MATURITY DATE" means June 18, 2008.

"B TERM LOAN SCHEDULED REPAYMENT" has the meaning provided in Section 2.11(a).

"BENEFIT ARRANGEMENT" means at any time an employee benefit plan within the meaning of Section 3(3) of ERISA which is not a Plan or a Multiemployer Plan and which is maintained or otherwise contributed to by the Borrower, any of its Subsidiaries or any ERISA Affiliate.

-6-

<PAGE>

"BOARD" means the Board of Governors of the Federal Reserve System of the United States of America.

"BORROWER" means Fleming Companies, Inc., an Oklahoma corporation and, after any consummation thereof, the survivor of any Reincorporation Merger.

"BORROWER'S KNOWLEDGE" means the knowledge of any executive officer of the Borrower, any other employee of the Borrower charged with the responsibility of administering this Agreement, or any Financial Officer, the General Counsel of the Borrower or any assistant treasurer, associate general counsel or similar officer of the Borrower.

"BORROWING" means (a) any group of Loans of the same Class and Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, or (b) a Swingline Loan.

"BORROWING REQUEST" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"BUSINESS DAY" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"CAPITAL EXPENDITURES" means, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capital Lease Obligations incurred by such Person. For purposes of determining compliance with Section 6.08(a), the Borrower and its Subsidiaries shall be deemed to have made Capital Expenditures pursuant to Section 6.08(a) during the Borrower's fiscal quarters ended December 29, 2001, April 20, 2002 and July 13, 2002 in the amounts of $73,712,000, $62,233,000, and $54,846,000, respectively.

"CAPITAL LEASE OBLIGATIONS" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"CFC SUBSIDIARY" means any Foreign Subsidiary that is a "controlled foreign corporation" as defined in Section 957(a) of the Code.

"CHANGE IN CONTROL" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) of shares representing 35% or more of the aggregate ordinary voting power represented by the issued and outstanding capital stock (or equivalent equity interests) of the Borrower; (b) the occupation at any time of a majority of the seats (other than vacant seats)

-7-

<PAGE>
on the board of directors of the Borrower by Persons who were neither (i) nominated by the board of directors of the Borrower (determined on the Effective Date) nor (ii) appointed by directors so nominated; or (c) any "change of control" or similar event shall occur under any of the Existing Note Documents, the New Senior Notes or any agreement or instrument evidencing or relating to any Indebtedness in an aggregate principal amount in excess of $25,000,000.

"CHANGE IN LAW" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or any Issuing Lender (or, for purposes of Section 2.16(b), by any lending office of such Lender or by such Lender's or such Issuing Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"CHOUTEAU" means Chouteau Development Company LLC, an Oklahoma limited liability company.

"CITI" means Citicorp North America, Inc., in its individual capacity.

"CLASS", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, B Term Loans, Swingline Loans or, after the extension of any Incremental Term Loans, one or more additional classes of Term Loans as designated pursuant to the relevant Incremental Term Loan Commitment Agreement in accordance with Section 2.05 and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving Commitment, a B Term Loan Commitment or, after the extension of any Incremental Term Loan Commitments, the respective class of Incremental Term Loan Commitments as designated pursuant to the relevant Incremental Term Loan Commitment Agreement in accordance with Section 2.05.

"CM CAPITAL" means CM Capital Corporation, a Delaware corporation.

"CODE" means the Internal Revenue Code of 1986, as amended from time to time.

"COLLATERAL" means any and all "Collateral", as defined in the Security Documents.

"COLLATERAL AGENT" has the meaning ascribed to it in the Security Agreement.

"COLLATERAL REQUIREMENT" means at any date that (a) the Pledge Agreement creates in favor of the Collateral Agent, for the benefit of the Lenders, first priority perfected pledges of and security interests in all Equity Interests owned by the Borrower or any Guarantor, and (b) the Security Agreement (together with all Uniform Commercial Code financing statements actually filed) creates in favor of the Collateral Agent, for the benefit of the Secured Creditors, first priority perfected security interests in Inventory and accounts receivable (and Related Collateral and Proceeds as required by, and defined in, the Security Agreement) of the Borrower and each Guarantor representing at least 95% of the consolidated Inventory and

-8-

&lt;PAGE&gt;

accounts receivable of the Borrower and its Subsidiaries; PROVIDED, that (i) the Borrower and the Subsidiaries will not be required at any time prior to the fifth Business Day after the termination of the Core-Mark Receivables Facility (which shall occur within the time frame contemplated in Section 4.01(n)), in order to satisfy the Collateral Requirement, to subject to the Lien of the Security Agreement Inventory, accounts receivable or related assets transferred to CM Capital pursuant to the Core-Mark Receivables Facility and/or subject to the security interests created pursuant to the Core-Mark Receivables Facility, (ii) the Borrower and the Guarantors shall not be required to pledge Equity Interests of entities in which they collectively hold a 50% or less equity interest so long as the fair market value of any and all such Equity Interests not pledged pursuant to this clause (ii) does not exceed $10 million in the aggregate, (iii) unless there has been a Change of Law as a result of which the granting of the pledge of more than 66-2/3% of the voting Equity Interest of a Foreign Subsidiary will not give rise to adverse "deemed dividend" tax consequences to the Borrower under Section 956 of the Code, then not more than 65% of the outstanding voting Equity Interests (plus 100% of the non-voting Equity Interests) of any CFC Subsidiary held directly by the Borrower or any Domestic Subsidiary shall be required to be pledged to the Collateral Agent pursuant to the Pledge Agreement and (iv) the Borrower and its Subsidiaries shall not be required to pledge any of the Equity Interests of Chouteau so long as Chouteau is not treated as a Subsidiary pursuant to the proviso contained in the first sentence of the definition thereof. For the purposes of making determinations as to whether the Collateral Requirement has been met at any time, the Collateral Agent shall not be considered to have a first priority perfected security interest in any Inventory of the Borrower or any Guarantor which is located on real property (i) that the Borrower or the respective Guarantor leases (other than pursuant to an acquired or assumed lease) from a Person (other than the Borrower or any of its Subsidiaries or a landlord in respect of a retail location) pursuant to a lease entered into after the Effective Date unless the lessor of such real property has executed and delivered to the Collateral Agent a Landlord-Lender Agreement or (ii) owned by the Borrower or one of its Subsidiaries that is subject to a mortgage (other than an acquired or assumed mortgage) entered into after the Effective Date in favor of a Person (other than the Borrower or any Subsidiary thereof) unless the mortgagee in respect thereof shall have executed and delivered to the Collateral Agent a Mortgagee Agreement.

"COMMITMENT" means a Revolving Commitment, B Term Loan Commitment or Incremental Term Loan Commitment or any combination thereof (as the context requires).

"COMMON EQUITY FINANCING" has the meaning provided in Section 4.01(k).

"COMMON EQUITY FINANCING DOCUMENTS" means each of the documents and agreements entered into in connection with the consummation of the Common Equity Financing.

"CONSOLIDATED EBITDA" means, for any period, Consolidated Net Income for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) federal, state, local and foreign income, value added and similar tax expense, (b) Consolidated Interest Expense, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, and amortization and/or impairment charges with respect to

-9-

<PAGE>
goodwill and other intangible assets, and (e) any extraordinary, unusual or non-recurring expenses or losses except for the amount of cash payments made in respect of such expenses or losses in the respective period in which such charge was taken, and minus, to the extent included in the statement of such Consolidated Net Income for such period, the sum of (a) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period), (b) any net gains on sales of assets (other than (x) sales of inventory and worn-out or obsolete equipment, in each case made in the ordinary course of business and (y) sales of other assets made in the ordinary course of business; PROVIDED that the aggregate amount of gains excluded pursuant to clause (y) of this parenthetical for any Test Period shall not exceed 2% of Consolidated EBITDA (determined without giving effect to any exclusions pursuant to this clause (y)) for such Test Period), (c) any other non-cash income (other than accruals made in the ordinary course of business), all as determined on a consolidated basis and (d) any cash payment made during such period associated with any non-cash charge, or any extraordinary, unusual or non-recurring expense or loss, in each case taken in a prior period to the extent such non-cash charge, or extraordinary, unusual or non-recurring expense or loss, was added back to the calculation of Consolidated EBITDA in such prior period; PROVIDED that (subject to adjustments which may be required to be made for Significant Acquisitions and Significant Asset Dispositions occurring after the Effective Date, in the case of determinations of Consolidated EBITDA being made on a Pro Forma Basis or Post-Test Period Pro Forma Basis), Consolidated EBITDA for the Borrower's fiscal quarters ended December 29, 2001, April 20, 2002 and July 13, 2002 shall be deemed to be $148,600,000, $158,200,000 and $153,600,000, respectively.

"CONSOLIDATED EBITDAR" means, for any period, Consolidated EBITDA for such period plus, to the extent deducted in determining such Consolidated EBITDA (i.e., deducted in determining Consolidated Net Income for such period and not added back pursuant to the definition of Consolidated EBITDA), Consolidated Rent Expense for such period; PROVIDED that (subject to adjustments which may be required to be made for Significant Acquisitions and Significant Asset Dispositions occurring after the Effective Date, in the case of determinations of Consolidated EBITDAR, the Consolidated Fixed Charge Coverage

Ratio or the Adjusted Consolidated Fixed Charge Coverage Ratio being made on a Post-Test Period Pro Forma Basis), Consolidated EBITDAR for the Borrower's fiscal quarters ended December 29, 2001, April 20, 2002 and July 13, 2002 shall be deemed to be $175,800,000, $181,100,000 and $170,000,000, respectively.

"CONSOLIDATED FIXED CHARGE COVERAGE RATIO" means for any period, the ratio of Consolidated EBITDAR to Consolidated Fixed Charges for such period.

"CONSOLIDATED FIXED CHARGES" for any period, means, the sum of (i) Consolidated Interest Expense and (ii) Consolidated Rent Expense in each case for such period; PROVIDED that (subject to adjustments which may be required to be made for Significant Acquisitions and Significant Asset Dispositions occurring after the Effective Date, in the case of determinations of Consolidated Fixed Charges or the Consolidated Fixed Charge Coverage Ratio being made on a Post-Test Period Pro Forma Basis), Consolidated Fixed Charges for the Borrower's fiscal quarters ended December 29, 2001, April 20, 2002 and July 13, 2002 shall be deemed to be $71,732,000, $82,398,000 and $61,024,000, respectively.

-10-

<PAGE>

"CONSOLIDATED INDEBTEDNESS" means, at any time, the sum of (without duplication) (x) all Indebtedness of the Borrower and its Subsidiaries as would be required to be reflected on the liability side of a balance sheet of such Person at such time in accordance with GAAP as determined on a consolidated basis and (y) all Indebtedness of the Borrower and its Subsidiaries of the type described in clauses (ii) (other than arising from surety bonds), (iv) and (vii) of the definition of Indebtedness contained herein; provided that for purposes of this definition (i) the amount of Indebtedness in respect of Hedging Agreements shall be at any time the unrealized net loss position, if any, of the Borrower and/or its Subsidiaries thereunder on a marked-to-market basis determined no more than 45 days prior to such time, (ii) the amount of Indebtedness in respect of any Synthetic Lease Obligation shall be the amount thereof which would have been reflected if same were structured as balance sheet Indebtedness and (iii) the amount of Indebtedness in respect of letters of credit, bankers' acceptances and similar obligations shall be limited to the aggregate amount of all funded letters of credit, bankers' acceptances and similar obligations issued or extended for the account of the Borrower or any of its Subsidiaries that have not been reimbursed by the Borrower or any of its Subsidiaries.

"CONSOLIDATED INTEREST EXPENSE" means, for any period, the gross interest expense of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

"CONSOLIDATED NET INCOME" means, for any period, the net income or loss of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, PROVIDED that (i) the net income of any other Person which is not a Subsidiary of the Borrower or is accounted for by the Borrower by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Borrower or a Subsidiary thereof during such period, (ii) the net income of any Subsidiary of the Borrower shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary and (iii) to the extent Consolidated Net Income reflects amounts attributable to minority interests in Subsidiaries, Consolidated Net Income shall be reduced by the amounts attributable to such minority interests and (iv)

there shall be excluded the income (or loss) of any Person accrued prior to the
date it becomes a Subsidiary or is merged into or consolidated with the Borrower
or any of the Subsidiaries or the date that Person's assets are acquired by the
Borrower or any of the Subsidiaries.

        "CONSOLIDATED RENT EXPENSE" means, for any period, the rent expense
(net of sub-lease income) of the Borrower and its Subsidiaries for such period
for leases of real and personal property, determined on a consolidated basis in
accordance with GAAP (excluding any such expense that is included in
Consolidated Interest Expense for such period).

        "CONSOLIDATED SENIOR INDEBTEDNESS" means, at any time the remainder
of (x) Consolidated Indebtedness at such time less (y) the sum of (i) the
aggregate principal amount of Subordinated Notes outstanding at such time, (ii)
all Later Maturing Indebtedness incurred pursuant to Section 6.03(a)(iv) (in
each case, to the extent same are reflected in Consolidated Indebtedness at such
time), (iii) all Later Maturing Indebtedness, which is subordinated
Indebtedness, incurred pursuant to Section 6.03(a)(xii) to refinance theretofore

                                      -11-

<PAGE>
outstanding Indebtedness as described in this clause (y) and (iv) other
unsecured subordinated Indebtedness of the Borrower (which may be Guaranteed on
a subordinated basis by the Guarantors) consented to by (and the terms of which
(including, without limitation, the subordination provisions) are satisfactory
to) the Administrative Agent.

        "CONSOLIDATED SUBSIDIARY" means at any date any Subsidiary or other
entity the accounts of which would be consolidated with those of the Borrower in
its consolidated financial statements as of such date.

        "CONTROL" means the possession, directly or indirectly, of the power
to direct or cause the direction of the management or policies of a Person,
whether through the ability to exercise voting power, by contract or otherwise.
A Person shall be deemed to "Control" another Person if such Person directly or
directly owns more than 15% of any class of capital stock (or equivalent equity
interests) in such Person or such Person is a director, executive officer or
general partner of such Person. "CONTROLLING" and "CONTROLLED" have meanings
correlative thereto.

        "CORE-MARK" means Core-Mark International, Inc., a Delaware
corporation.

        "CORE-MARK BOND INDENTURE" means the Indenture, dated as of
September 27, 1996, between Core-Mark and Bankers Trust Company, as Trustee, as
in effect on Effective Date.

        "CORE-MARK BONDS" means the 11-3/8% Senior Subordinated Notes due
2003 of Core-Mark.

        "CORE-MARK EXISTING CREDIT AGREEMENT" means the Amended and Restated
Credit Agreement among Core-Mark, the several lenders from time to time parties
thereto and The Chase Manhattan Bank (now known as JPMorgan Chase Bank), as
Administrative Agent, dated as of April 1, 1998.

        "CORE-MARK RECEIVABLES FACILITY" means that certain receivables
facility and trust evidenced by the Core-Mark Receivables Master Trust Pooling
Agreement, dated as of April 1, 1998, among CM Capital, Core-Mark, and The Chase
Manhattan Bank (now known as JPMorgan Chase Bank), as Trustee on behalf of the

holders of the certificates referred to therein.

"CORE-MARK RECEIVABLES FACILITY DOCUMENTS" means each of the documents evidencing or relating to the Core-Mark Receivables Facility.

"CUSTOMER SUPPORT" means Investments made by the Borrower and its Subsidiaries in the ordinary course of business consistent with past practices in the form of (i) purchases of outstanding Equity Interests of, or capital contributions to, customers of the Borrower and its Subsidiaries, (ii) loans (including without limitation Financing Notes and Forgiveness Notes) and advances to, and unsecured Guarantees supporting obligations of, such customers and (iii) leases entered into by the Borrower and its Subsidiaries on behalf of, or for the purpose of subletting to, any such customers (it being understood that leases or sub-leases to customers of property not acquired or leased by the Borrower or its Subsidiaries in

-12-

<PAGE>
contemplation of leasing or sub-leasing same to customers shall not constitute Customer Support), (iv) conversions of accounts receivable of the Borrower and its Subsidiaries into notes receivables or other long term payment obligations and (v) any residual liability of the Borrower and any of its Subsidiaries in connection with any Permitted Note Sale.

"DBSI" means Deutsche Bank Securities Inc., in its individual capacity.

"DBTCA" means Deutsche Bank Trust Company Americas, in its individual capacity.

"DEFAULT" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DEFAULTING LENDER" means any Lender with respect to which a Lender Default is in effect.

"DEPARTING LENDER" has the meaning provided in Section 2.20(b).

"DIVIDEND" means, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common equity or Qualified Preferred Stock of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any Equity Interests outstanding on or after the Effective Date (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any Equity Interests of such Person outstanding on or after the Effective Date (including any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, stock appreciation plans, equity incentive or equity achievement plans or any similar plans or setting aside of any funds for the foregoing purposes, except that such payments shall not constitute Dividends to the extent, and only to the extent, the respective such payment has actually reduced Consolidated Net Income.

"DOCUMENTATION AGENT" means each of Lehman and Wachovia, each in its capacity as documentation agents under this Agreement.

"DOLLAR EQUIVALENT" of an amount denominated in an Alternate Currency means, at any time for the determination thereof, the amount of Dollars which could be purchased with the amount of the Alternate Currency involved in such computation at the spot exchange rate therefor as quoted by the Administrative Agent as of 11:00 a.m. (New York time) on the date two Business Days prior to the date of any determination thereof for purchase on such date, PROVIDED that the Dollar Equivalent of any unpaid drawing under a Letter of Credit expressed in an Alternate Currency shall be determined at the time the drawing under the related Letter of Credit was paid or disbursed by the Issuing Lender, PROVIDED FURTHER, that for purposes of (x) determining compliance with Sections 2.01(c), 2.06(b) and 2.12(h) and (y)

-13-

<PAGE>
calculating fees pursuant to Section 2.13(b), the Dollar Equivalent of any amounts denominated in an Alternate Currency shall be revalued on a monthly basis using the spot exchange rates therefor as shown in The Wall Street Journal (or, if same does not provide such exchange rates, on such other basis as is satisfactory to the Administrative Agent) on the last Business Day of each calendar month, PROVIDED, HOWEVER, that at any time during a calendar month, if the Revolving Exposure (for the purposes of the determination thereof, using the Dollar Equivalent as recalculated based on the spot exchange rate therefor as shown in The Wall Street Journal (or, if same does not provide such exchange rates, on such other basis as is satisfactory to the Administrative Agent) on the respective date of determination pursuant to this exception) would exceed 85% of the total Revolving Commitments or if any Specified Default is in existence, then at the discretion of the Administrative Agent or at the request of the Required Lenders, the Dollar Equivalent shall be reset based upon the spot exchange rates on such date as shown in The Wall Street Journal (or, if same does not provide such exchange rates, on such other basis as is satisfactory to the Administrative Agent), which rates shall remain in effect until the first Business Day of the then immediately succeeding calendar month or such earlier date, if any, as the rate is reset pursuant to this proviso.

"DOMESTIC SUBSIDIARY" means, as to any Person, any Subsidiary of such Person that is incorporated under the laws of the United States of America, any State thereof, the District of Columbia, the United States Virgin Islands or Puerto Rico.

"EFFECTIVE DATE" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"ELIGIBLE TRANSFEREE" means and includes a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act of 1933, as amended) other than an individual Person, but in any event excludes the Borrower and its Subsidiaries.

"ENVIRONMENTAL LAWS" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"ENVIRONMENTAL LIABILITY" means any liability, contingent or

otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

        "EQUITY INTERESTS" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however

                                      -14-

<PAGE>
designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

        "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

        "ERISA AFFILIATE" means any trade or business (whether or not incorporated) that, together with the Borrower or any of its Subsidiaries, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

        "EURODOLLAR" means, with respect to any Loan or Borrowing, any Loan or Borrowing that bears interest at a rate determined by reference to the Adjusted LIBO Rate.

        "EVENT OF DEFAULT" has the meaning provided in Article VII.

        "EXCEPTED DEFAULT" means any Default or Event of Default under, and as defined in, the 10-5/8% Senior Subordinated Note Indentures arising solely as a result of outstanding Indebtedness of Core-Mark under the Core-Mark Receivables Facility Documents; PROVIDED no such Default or Event of Default shall constitute an Excepted Default hereunder at any time after the earlier of (x) the 45th day following the Effective Date and (y) the date when the Trustee under either 10-5/8% Senior Subordinated Note Indenture or holders of 10-5/8% Senior Subordinated Notes accelerate any amounts payable in respect of the 10-5/8% Senior Subordinated Notes or otherwise take any enforcement action in respect of the 10-5/8% Senior Subordinated Notes or under either 10-5/8% Senior Subordinated Note Indenture.

        "EXCLUDED TAXES" means, with respect to the Administrative Agent, any Lender, any Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) the Administrative Agent, any Lender, any Issuing Lender or any other recipient's, as the case may be, net income by (i) the jurisdiction (or any political subdivision thereof), in each case, under the laws of which such recipient is organized or (ii) the jurisdiction (or any political subdivision thereof), in each case in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign

Lender (other than an assignee pursuant to a request by the Borrower under Section 2.20(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) to the extent such Foreign Lender fails to provide the forms required to be provided by Section 2.18(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled solely on account of a change, after the date on which such Foreign Lender became a party to this Agreement, in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such withholding tax to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.18(a), at the time of designation of a new lending office (or assignment).

-15-

<PAGE>

   "EXISTING CREDIT AGREEMENTS" means each of the Core-Mark Existing Credit Agreement and the Fleming Existing Credit Agreement.

   "EXISTING NOTE DOCUMENTS" means the (i) 5-1/4% Convertible Senior Subordinated Note Documents, (ii) 9-7/8% Senior Subordinated Note Documents, (iii) 10-5/8% Senior Subordinated Note Documents and (iv) 10-1/8% Senior Note Documents.

   "Existing Note Indentures" means (i) the 5-1/4% Convertible Senior Subordinated Note Indenture, (ii) the 9-7/8% Senior Subordinated Note Indenture, (iii) the 10-5/8% Senior Subordinated Note Indentures and (iv) the 10-1/8% Senior Note Indenture.

   "EXISTING NOTES" means the (i) 5-1/4% Convertible Senior Subordinated Notes, (ii) 9-7/8% Senior Subordinated Notes, (iii) 10-5/8% Senior Subordinated Notes and (iv) 10-1/8% Senior Notes.

   "FEDERAL FUNDS RATE" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

   "FINANCIAL OFFICER" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

   "FINANCING NOTES" means notes receivable arising from investments in retailer notes or chattel paper (other than any retailer note or chattel paper received by the Borrower and its Subsidiaries in exchange or substitution for or in payment or other satisfaction of any Account).

   "5-1/4% CONVERTIBLE SENIOR SUBORDINATED NOTE DOCUMENTS" means the 5-1/4% Convertible Senior Subordinated Note Indenture, the 5-1/4% Convertible Senior Subordinated Notes and any guarantees thereof executed and delivered with respect to the 5-1/4% Convertible Senior Subordinated Notes and the 5-1/4% Convertible Senior Subordinated Note Indenture, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

   "5-1/4% CONVERTIBLE SENIOR SUBORDINATED NOTE INDENTURE" means the

Indenture, dated as of March 15, 2001, among the Borrower, the Subsidiary Guarantors named therein and Bank One, N.A., as Trustee, as in effect on the Effective Date and as thereafter amended, modified or supplemented from time to time.

"5-1/4% CONVERTIBLE SENIOR SUBORDINATED NOTES" means the Borrower's 5-1/4% Convertible Senior Subordinated Notes due 2009, issued pursuant to the 5-1/4% Convertible Senior Subordinated Note Indenture.

-16-

<PAGE>

"FLEMING EXISTING CREDIT AGREEMENT" means the Credit Agreement dated as of July 25, 1997 among the Borrower, the lenders party thereto, BancAmerica Securities, Inc., as Syndication Agent, Societe Generale, as Documentation Agent and The Chase Manhattan Bank (now known as JPMorgan Chase Bank), as Administrative Agent, as in effect on the Effective Date and immediately prior to the termination thereof.

"FOREIGN LENDER" means any Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code).

"FOREIGN SUBSIDIARY" means, as to any Person, any Subsidiary of such Person which is not a Domestic Subsidiary.

"FORGIVENESS NOTES" means promissory notes received by the Borrower or any Subsidiary from customers, with the expectation that all or portions of such promissory note shall be forgiven over time based upon the volume of purchases actually made by the respective customer.

"GAAP" means generally accepted accounting principles in the United States of America.

"GOVERNMENTAL AUTHORITY" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GRANTOR" means the Borrower and each Subsidiary that is, or is required by Section 5.08 to be, a party to the Pledge Agreement or the Security Agreement.

"GUARANTEE" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), PROVIDED that the term Guarantee shall not include (a) endorsements for collection or deposit in the ordinary course of business or (b) agreements entered into in the ordinary course of business to purchase inventory or retail store fixtures of another Person at a price not greater than the market value thereof. The term "Guarantee" used as a verb has a corresponding meaning.

        "GUARANTEE AGREEMENT" means a Guarantee Agreement in substantially
the form of Exhibit B hereto among the Guarantors and the Administrative Agent
acting on behalf of the Lenders, as the same may be amended, modified or
supplemented from time to time in accordance with the provisions hereof.

                                     -17-

<PAGE>

        "GUARANTEE REQUIREMENT" means at any date that (a) all Wholly Owned
Subsidiaries are Guarantors and (b) the assets of the Guarantors, together with
the assets of the Borrower, constitute as of the last day of the most recently
ended fiscal quarter of the Borrower at least 95% of the consolidated total
assets of the Borrower and its Subsidiaries; PROVIDED that (i) CM Capital shall
not be required to be a Guarantor, so long as CM Capital's activities are
limited to those incident to the Core-Mark Receivables Facility, until five
Business Days after the earlier of (x) the 180th day following the Effective
Date and (y) the date of termination of the Core-Mark Receivables Facility and
repayment of outstanding amounts thereunder, (ii) no CFC Subsidiary of the
Borrower or of any of its Subsidiaries shall be required to be a Guarantor
unless there has been a Change of Law as a result of which the execution and
delivery by it of the Guarantee Agreement will not give rise to adverse "deemed
dividend" tax consequences to the Borrower under Section 956 of the Code and
(iii) other Subsidiaries of the Borrower that own assets (including without
limitation any amounts owed to it by the Borrower and its other Subsidiaries)
with an aggregate fair market value (or, if greater, the face amount of any
amounts owed to it by the Borrower and its other Subsidiaries) which is equal to
or less than the Aggregate Guarantee Exclusion Amount at such time shall not be
required to be Guarantors unless the aggregate fair market value (or, if
greater, the face amount of any amounts owed to it by the Borrower and its other
Subsidiaries) of all assets (including without limitation any amounts owed to it
by the Borrower and its other Subsidiaries) of all such Subsidiaries exceeds the
Aggregate Guarantee Exclusion Amount at such time, in which case one or more
such Subsidiaries shall be required to become Guarantors so that such threshold
is not exceeded. For the avoidance of doubt, it is understood that the assets of
Subsidiaries which are not required to become Guarantors by reason of the
proviso (excluding clause (i)) to the immediately preceding sentence shall
nonetheless be included in determining the consolidated total assets of the
Borrower and its Subsidiaries for purposes of determining whether Subsidiaries
other than those expressly excluded pursuant to said proviso must become
Guarantors pursuant to clause (b) of the immediately preceding sentence.
Notwithstanding anything to the contrary contained above in this definition, all
Subsidiaries of the Borrower that have provided, or are required to provide, a
guarantee of any Indebtedness under any of the Existing Note Documents, the New
Senior Note Documents, any Indebtedness incurred pursuant to Sections
6.03(a)(iv) and (a)(v) or any refinancing (or successive refinancing) of any of
the foregoing shall be required, on or prior to the date such guarantee of such
other Indebtedness is provided, to be a Guarantor hereunder. Except as expressly
provided otherwise, for purposes of this definition, assets shall be taken at
their net book value.

        "GUARANTORS" means the Subsidiaries listed on Schedule 3.09 hereto
and each other Subsidiary that becomes party to the Guarantee Agreement pursuant
to Section 5.08 or otherwise (in each case, unless and until released as a
Guarantor from the Guarantee Agreement), PROVIDED, that for purposes of the
definition of "Guarantee Requirement", a Subsidiary that is an indirect
Subsidiary of the Borrower shall not be considered a Guarantor unless each
intermediate Subsidiary is also a Guarantor.

        "HAZARDOUS MATERIALS" means all explosive or radioactive substances

or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

-18-

<PAGE>

"HEDGING AGREEMENT" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement. The "principal amount" or "termination value" of the obligations of the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"INCREMENTAL TERM LOAN" means a Loan made pursuant to clause (b) of Section 2.01.

"INCREMENTAL TERM LOAN BORROWING DATE" means, with respect to each class of Incremental Term Loans, each date on which Incremental Term Loans of such class are incurred pursuant to Section 2.01(b) and the relevant Incremental Term Loan Commitment Agreement.

"INCREMENTAL TERM LOAN COMMITMENT" means, for each Lender, any commitment to make Incremental Term Loans provided by such Lender pursuant to this Agreement, in such amount as agreed to by such Lender in the respective Incremental Term Loan Commitment Agreement and as set forth opposite such Lender's name in Schedule 2.01 directly below the column entitled "Incremental Term Loan Commitment", as the same may be (x) reduced from time to time or terminated pursuant to Sections 2.09 and/or Article VII or (y) adjusted from time to time as a result of assignments to and from such Lender pursuant to Section 9.04.

"INCREMENTAL TERM LOAN COMMITMENT AGREEMENT" means each Incremental Term Loan Commitment Agreement in the form of Exhibit C executed in accordance with Section 2.05.

"INCREMENTAL TERM LOAN COMMITMENT TERMINATION DATE" means, with respect to any class of Incremental Term Loans, the last date by which Incremental Term Loans under such class may be incurred under this Agreement, which date shall be set forth in the respective Incremental Term Loan Commitment Agreement but may be no later than the Revolving Loan Maturity Date.

"INCREMENTAL TERM LOAN LENDER" has the meaning provided in Section 2.05(b).

"INCREMENTAL TERM LOAN MATURITY DATE" means, for any class of Incremental Term Loans, the final maturity date set forth for such class of Incremental Term Loans in the respective Incremental Term Loan Commitment Agreement relating thereto, provided that the final maturity date for all Incremental Term Loans of a given class shall be the same date.

"INCREMENTAL TERM LOAN SCHEDULED REPAYMENT" has the meaning provided in Section 2.11(b).

-19-

<PAGE>

          "INDEBTEDNESS" means, as to any Person, without duplication, (i) all
indebtedness (including principal, interest, fees and charges) of such Person
for borrowed money and all obligations of such Person for the deferred purchase
price of property or services, (ii) the maximum amount available to be drawn
under all surety bonds, letters of credit, bankers' acceptances and similar
obligations issued for the account of such Person and all unpaid drawings or
unreimbursed payments in respect of such surety bonds, letters of credit,
bankers' acceptances and similar obligations, (iii) all Indebtedness of the
types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition
secured by any Lien on any property owned by such Person, whether or not such
Indebtedness has been assumed by such Person (provided that, if the Person has
not assumed or otherwise become liable in respect of such Indebtedness, such
Indebtedness shall be deemed to be in an amount equal to the lesser of the
aggregate amount of such Indebtedness and the fair market value of the property
to which such Lien relates as determined in good faith by such Person), (iv) all
Capital Lease Obligations and Synthetic Lease Obligations of such Person, (v)
all obligations of such Person to pay a specified purchase price for goods or
services even if such goods or services are not delivered or accepted, i.e.
take-or-pay and similar obligations, (vi) all Guarantees of such Person and
(vii) all obligations under any Hedging Agreement or under any similar type of
agreement. Notwithstanding the foregoing, Indebtedness shall not include trade
payables and accrued expenses incurred by any Person in accordance with
customary practices and in the ordinary course of business of such Person.

          "INDEMNIFIED TAXES" means Taxes other than Excluded Taxes.

          "INTEREST PAYMENT DATE" means (a) with respect to any ABR Loan
(other than a Swingline Loan), the last day of each March, June, September and
December, (b) with respect to any Eurodollar Loan, the last day of the Interest
Period applicable to the Borrowing of which such Loan is a part and, in the case
of a Eurodollar Borrowing with an Interest Period of more than three months'
duration, each day of such Interest Period that occurs at intervals of three
months' duration after the first day of such Interest Period, and (c) with
respect to any Swingline Loan, the day that such Loan is required to be repaid.

          "INTEREST PERIOD" means (a) except with respect to one week Interest
Periods, the period commencing on the date of such Borrowing and ending on the
numerically corresponding day in the calendar month that is one, two, three or
six months (or, if each Lender shall make interest periods of such duration
available, nine or twelve months) thereafter, as the Borrower may elect and (b)
with respect to any one week Interest Period, the period commencing on the date
of such Borrowing and ending on the corresponding day on the following calendar
week; PROVIDED, that (i) if any Interest Period would end on a day other than a
Business Day, such Interest Period shall be extended to the next succeeding
Business Day unless such next succeeding Business Day would fall in the next
calendar month, in which case such Interest Period shall end on the next
preceding Business Day and (ii) (except in the case of Eurodollar Borrowings
with one-week interest periods), any Interest Period that commences on the last
Business Day of a calendar month (or on a day for which there is no numerically
corresponding day in the last calendar month of such Interest Period) shall end
on the last Business Day of the last calendar month of such Interest Period. For
purposes hereof, the date of a Borrowing initially shall be the date on which
such Borrowing is made and thereafter shall be the effective date of the most
recent conversion or continuation of such Borrowing.

                                    -20-

<PAGE>

          "INVENTORY" has the meaning assigned to such term in the Security

Agreement.

"INVESTMENT" means any investment in any Person, whether by means of share purchase, capital contribution, loan, Guarantee, time deposit or otherwise; PROVIDED that Accounts arising in the ordinary course of business do not constitute Investments.

"ISSUING LENDERS" means each of (i) DBTCA, JPMorgan Chase and Citi in their respective capacity as issuers of Letters of Credit hereunder, (ii) with respect to any Rolled-In Letters of Credit, the respective Lender that is the issuer thereof and (iii) any other Lender reasonably acceptable to the Administrative Agent which agrees to issue Letters of Credit hereunder and, in each case, their respective successors in such capacity as provided in Section 2.06(i); PROVIDED that as of the Effective Date and until such time as it agrees otherwise, DBTCA shall not be the Issuing Lender with respect to any trade Letter of Credit. Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by one or more Affiliates of such Issuing Lender, PROVIDED, in each case, that the Borrower does not reasonably object based on such Affiliate's creditworthiness, and the term "Issuing Lender" shall include any such Affiliate with respect to Letters of Credit issued by it.

"JOINT BOOK MANAGERS" means DBSI and JPMSI in their capacity as such hereunder.

"JOINT LEAD ARRANGERS" means DBSI, JPMSI and SSBI in their capacity as such hereunder.

"JPMORGAN CHASE" means JPMorgan Chase Bank, in its individual capacity. "JPMSI" means J.P. Morgan Securities Inc., in its individual capacity.

"LANDLORD-LENDER AGREEMENT" means an agreement whereby a lessor of real property (i) waives any and all statutory and all other Liens it may have against any Inventory located at such real property and (ii) grants access rights to such real property to the Collateral Agent and its designees to inspect or remove any Inventory located at such real property in connection with the exercise of any of its rights pursuant to the Security Agreement or protecting the Inventory located on such real property.

"LATER MATURING INDEBTEDNESS" means unsecured Indebtedness of the Borrower incurred after the date hereof that (i) has a final maturity at least six months after the latest Maturity Date then in effect and no portion of which is subject to any scheduled principal payments or any mandatory repayment or repurchase at the option of the holders thereof or otherwise prior to such time (other than required offers to purchase (x) as a result of a change in control (in no event to be defined any way which is more expansive than the definition of "Change in Control" contained in the New Senior Note Indenture) of the Borrower or (y) as a result of asset sales, pursuant to asset sale and offer to purchase provisions which are no more expansive than those contained in the New Senior Note Indenture) and (ii) contains no defaults or covenants more restrictive to the Borrower or any Subsidiary in any material respect than those contained in the New Senior Note Documents, except to the extent acceptable to the

-21-

<PAGE>
Administrative Agent and reflective of then prevailing market conditions for public issuances of senior or subordinated debt securities, as the case may be.

"LC DISBURSEMENT" means a payment made by any Issuing Lender

pursuant to a Letter of Credit.

"LC EXPOSURE" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time (calculated taking the Dollar Equivalent of any then outstanding Letter of Credit denominated in an Alternate Currency) plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Revolving Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"LC SUPPORTABLE OBLIGATIONS" means (i) obligations of the Borrower and its Subsidiaries with respect to workers compensation, surety bonds and other similar obligations and (ii) such other obligations of the Borrower or any of its Subsidiaries as are incurred in the ordinary course of business (but in any event not any obligations under the Existing Note Documents, the New Senior Note Documents or any Later Maturing Indebtedness).

"LEHMAN" means Lehman Commercial Paper Inc., in its individual capacity.

"LENDER DEFAULT" means (i) the wrongful refusal (which has not been cured) of a Lender to make available its portion of any Borrowing or to fund its portion of any unreimbursed payment under Section 2.06(e) or (ii) a Lender having notified (and not retracted) in writing the Borrower and/or the Administrative Agent that such Lender does not intend to comply with its obligations under Section 2 in circumstances where such non-compliance would constitute a breach of such Lender's obligations under such Section.

"LENDERS" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance. Unless the context otherwise requires, the term "Lenders" includes the Swingline Lender.

"LETTER OF CREDIT" means any letter of credit issued pursuant to this Agreement (including any Rolled-In Letter of Credit).

"LETTER OF CREDIT REQUEST" has the meaning provided in Section 2.06(b).

"LIBO RATE" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate (rounded upwards, if necessary, to the next 1/16% of 1%) appearing on the LIBO Page of the Reuters Information Service (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at

-22-

<PAGE>
such time for any reason, then the "LIBO RATE" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate (rounded upwards, if necessary, to the next 1/16% of 1%) at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the

London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LIEN" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"LOAN DOCUMENTS" means this Agreement, the Guarantee Agreement and the Security Documents.

"LOAN PARTIES" means the Borrower and the Guarantors.

"LOANS" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"LOCATION" of any Person means such Person's "location" as determined pursuant to Section 9-307 of the Uniform Commercial Code of the State of New York.

"MAJORITY LENDERS" of any Class means those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations of the other Classes under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"MARGIN STOCK" has the meaning provided in Regulation U.

"MATERIAL ADVERSE EFFECT" means a material adverse effect on (a) the business, properties, assets, operations, liabilities, prospects or condition (financial or otherwise) of the Borrower and the Subsidiaries taken as a whole, (b) the ability of any Loan Party to perform its obligations under any Loan Document or (c) the rights of or benefits available to the Lenders under any Loan Document. It is understood and agreed that Kmart Corporation's filing under Chapter 11 of the United States Code entitled "Bankruptcy" as disclosed in the Borrower's Form 10-K for its fiscal year ended December 29, 2001 does not, in and of itself, constitute a Material Adverse Effect, although any adverse change or effect after the Effective Date resulting therefrom will be considered in determining whether a Material Adverse Effect has occurred.

"MATERIAL PLAN" means at any time a Plan or Plans having aggregate Unfunded Liabilities in excess of $15,000,000.

"MATURITY DATE" means the Term Loan Maturity Date, each Incremental Term Loan Maturity Date or the Revolving Maturity Date, as the case may be.

-23-

<PAGE>

"MERGER" means the merger of Platform Corporation into Core-Mark with Core-Mark being the Survivor as a wholly-owned direct Subsidiary of the Borrower, all in accordance with the Merger Agreement.

"MERGER AGREEMENT" means that certain Agreement and Plan of Merger made and entered into as of April 23, 2002 by and among Core-Mark, the Borrower and Platform Corporation, a Delaware corporation and Wholly Owned Subsidiary of

the Borrower.

"MERGER DOCUMENTS" means the Merger Agreement and all other documents relating to the Merger.

"MINIMUM REQUIRED COMMITMENT AMOUNT" has the meaning provided in Section 6.06.

"MOODY'S" means Moody's Investors Service, Inc.

"MORTGAGEE AGREEMENT" means an agreement whereby a mortgagee of real property (i) waives any and all statutory and other Liens it may have against any Inventory located at such real property and (ii) grants access rights to such real property to the Collateral Agent and its designees to inspect or remove any Inventory located at such real property in connection with the exercise of any of its rights pursuant to the Security Agreement or protecting the Inventory located on such real property.

"MULTIEMPLOYER PLAN" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"NET PROCEEDS" means, with respect to any event (a) the cash proceeds received by the Borrower and the Subsidiaries in respect of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid by the Borrower and the Subsidiaries to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to be made by the Borrower and the Subsidiaries as a result of such event to repay Indebtedness (other than Loans) secured by such asset and (iii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation event), the marginal increase in income taxes paid (or reasonably estimated to be payable) by the Borrower's consolidated group with respect to the fiscal year in which such sale or other disposition occurs that are directly attributable to such sale or other disposition (as determined reasonably and in good faith by the chief financial officer or another Financial Officer of the Borrower).

"NET SALES" means, for any period, sales of merchandise and services by the Borrower and its Subsidiaries to their respective third party customers, as reported in the Borrower's Form 10-K and/or 10-Q's filed with the Securities and Exchange Commission covering such period; PROVIDED, that Net Sales for the Borrower's fiscal quarters ended December 29, 2001, April 20, 2002 and July 13, 2002 shall be deemed to be $4,870,500,000, $5,875,200,000 and $4,684,500,000, respectively.

-24-

<PAGE>

"NEW SENIOR NOTE DOCUMENTS" means the New Senior Note Indenture, the New Senior Notes and any guarantees thereof executed and delivered with respect to the New Senior Notes and the New Senior Note Indenture, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"NEW SENIOR NOTE INDENTURE" means the Indenture, dated as of June 18, 2002, between the Borrower and Manufacturers and Traders Trust Company, as Trustee, as supplemented by the Supplemental Indenture dated as of June 18, 2002

among the Borrower, the Subsidiary Guarantors named therein and the Trustee, all as in effect on the Effective Date and as thereafter amended, modified or supplemented from time to time.

"NEW SENIOR NOTES" means the Borrower's Senior Notes due 2010 issued pursuant to the New Senior Note Indenture.

"9-7/8% SENIOR SUBORDINATED NOTE DOCUMENTS" means the 9-7/8% Senior Subordinated Note Indenture, the 9-7/8% Senior Subordinated Notes and any guarantees thereof executed and delivered with respect to the 9-7/8% Senior Subordinated Notes and the 9-7/8% Senior Subordinated Note Indenture, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"9-7/8% SENIOR SUBORDINATED NOTE INDENTURE" means the Indenture, dated as of April 15, 2002, among the Borrower, the Subsidiary Guarantors named therein and Manufacturers and Traders Trust Company, as Trustee, as in effect on the Effective Date and as thereafter amended, modified or supplemented from time to time.

"9-7/8% SENIOR SUBORDINATED NOTES" means the Borrower's 9-7/8% Senior Subordinated Notes due 2012, issued pursuant to the 9-7/8% Senior Subordinated Note Indenture.

"NON-DEFAULTING LENDER" means and includes each Lender other than a Defaulting Lender.

"NOTICE OF BORROWING REQUEST" has the meaning provided in Section 2.03(b).

"NOTICE OF INTEREST ELECTION REQUEST" has the meaning provided in Section 2.08(b).

"OBLIGATIONS" means all amounts owing by any or all of the Loan Parties to each Joint Book Manager, each Joint Lead Arranger, each Agent, each Issuing Lender, the Swingline Lender or any Lender pursuant to the terms of this Agreement or any other Loan Document.

"OTHER TAXES" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment

-25-

<PAGE>
made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"PERMITTED EXISTING INDEBTEDNESS" means (x) all Indebtedness of the Borrower and its Subsidiaries set forth on Schedule 3.16 and (y) other Indebtedness of the Borrower and its Subsidiaries which is to remain outstanding after the Effective Date in an aggregate principal amount not to exceed $25,000,000; PROVIDED that in no event shall Permitted Existing Indebtedness include any of the Existing Notes, the New Senior Notes, the Core-Mark Bonds, Indebtedness under the Core-Mark Receivables Facility, the Loans, Letters of Credit, any Hedging Agreements (or obligations relating thereto) or any surety bonds or Capital Lease Obligations of, or Guaranteed by, the Borrower or any of

its Subsidiaries.

"PERMITTED NOTE SALE" means any transaction involving the sale by the Borrower or any of its Subsidiaries of Financing Notes to any other Person, PROVIDED that (i) each such sale is in an arms-length transaction and the Borrower or the respective Subsidiary receives at least fair market value therefor (as determined in good faith by the Borrower) and (ii) the consideration therefor paid to the Borrower or the respective Subsidiary is 100% in cash and paid at the time of the closing of the respective transaction.

"PERSON" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PLAN" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower, any of its Subsidiaries or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, or is contributing to (or is obligated to contribute to), or has contributed to (or had an obligation to contribute to) in the last six years.

"PLEDGE AGREEMENT" means the Pledge Agreement substantially in the form of Exhibit D hereto among the Borrower, the Guarantors and the Collateral Agent acting on behalf of the Secured Creditors, as the same may be amended, modified or supplemented from time to time in accordance with the provisions hereof.

"POST-TEST PERIOD PRO FORMA BASIS" means the making of calculations on a pro forma basis (for the Test Period most recently ended in the case of determinations of compliance with Section 6.09, and with calculations of Consolidated EBITDA to be based on the Test Period most recently ended in the case of determinations of compliance with Section 6.10) in accordance with, and to the extent required by, the provisions of Section 1.05, taking into account certain events occurring after the end of the respective Test Period and on or prior to the date of determination, in accordance with the provisions of Section 1.05 with respect to determinations to be made on a Post-Test Period Pro Forma Basis.

"PRIME RATE" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in

-26-

<PAGE>
New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"PRO FORMA BASIS" means, with respect to any Test Period, the making of calculations on a pro forma basis for certain events (including Significant Acquisitions and Significant Asset Dispositions) in accordance with, and to the extent required by, the provisions of Section 1.05 hereof, but without making adjustments for events which occurred after the end of the respective Test Period.

"PROCEEDS" has the meaning assigned to such term in the Security Agreement.

"PROJECTIONS" means the projections contained in the Confidential Information Memorandum, dated May 2002, which were prepared by or on behalf of the Borrower in connection with this Agreement and delivered to the Administrative Agent and the Lenders prior to the Effective Date.

"QUALIFIED PREFERRED STOCK" means any preferred equity interests of the Borrower so long as the terms of any such preferred equity interests (w) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision prior to the date occurring six months following the latest Maturity Date then in effect, (x) do not require the cash payment of dividends or distributions at any time that such cash payment would result in a Default hereunder, (y) do not contain any covenants (other than reporting or information covenants), and (z) do not grant the holders thereof any voting rights except for (I) voting rights required to be granted to such holders under applicable law and (II) limited customary voting rights on fundamental matters such as mergers, consolidations, sales of all or substantially all of the assets of the Borrower and its Subsidiaries, or liquidations involving the Borrower.

"REGISTER" has the meaning provided in Section 9.04(d).

"REGULATION D" means Regulation D of the Board as from time to time in effect and any successor to all or a portion thereof.

"REGULATION T" means Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof.

"REGULATION U" means Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof.

"REGULATION X" means Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof.

"REINCORPORATION MERGER" has the meaning provided in Section 6.02(k).

"RELATED COLLATERAL" means, with respect to all Inventory and Accounts in which the Borrower or any Guarantor has granted a security interest to the Collateral Agent for the benefit of the Lenders, all Supporting Obligations relating to any such Accounts or Inventory and all Proceeds of any such Inventory, Accounts or Supporting Obligations.

-27-

<PAGE>

"RELATED PARTIES" means, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"RELEVANT AMOUNT" means, during any year, (i) $150,000,000 at any time from January 1 through August 14 of such year and (ii) $100,000,000 at any time from August 15 through December 31 of such year.

"REPORTABLE EVENT" means an event described in Section 4043(c) of ERISA with respect to a Plan other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27, or .28 of PBGC Regulation Section 4043.

"REQUIRED LENDERS" means, at any time, Lenders having Revolving Exposures, Term Loans and unused Commitments representing more than 50% of the sum of the total Revolving Exposures, outstanding Term Loans and unused

Commitments at such time.

"RESTRICTED CASH" means, without duplication, (i) any cash or Temporary Cash Investments irrevocably deposited with a Person other than the Borrower or one of its Subsidiaries, and (ii) until the termination thereof and the repayment of all outstandings thereunder, any cash held in an account with the Trustee or with CM Capital thereunder pursuant to the Core-Mark Receivables Facility and (iii) any cash which has been credited to one of the Borrower's or any of its Subsidiaries' deposit accounts, which cash is not actually available to the Borrower or such Subsidiary at such time because the amounts so "credited" have not then "cleared".

"RESTRICTED SUBSIDIARY" at any time means any Person which constitutes a "Restricted Subsidiary" at such time under, and as defined in, any of the Specified Existing Note Indentures.

"RETURNS" has the meaning provided in Section 3.08.

"REVOLVING AVAILABILITY PERIOD" means the period from and including the Effective Date to but excluding the earlier of the Revolving Maturity Date and the date of termination of the Revolving Commitments.

"REVOLVING COMMITMENT" means, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans and to acquire participations in Letters of Credit and Swingline Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Revolving Commitment is set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable. The initial aggregate amount of the Lenders' Revolving Commitments is $550,000,000.

-28-

<PAGE>

"REVOLVING EXPOSURE" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Revolving Loans and its LC Exposure and Swingline Exposure at such time.

"REVOLVING LENDER" means a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"REVOLVING LOAN" means a Loan made pursuant to clause (c) of Section 2.01.

"REVOLVING MATURITY DATE" means June 18, 2007.

"ROLLED-IN LETTERS OF CREDIT" has the meaning provided in Section 2.06(a).

"SALE-LEASEBACK TRANSACTION" means the sale and leaseback by the Borrower or a Subsidiary of its real property and/or equipment, PROVIDED that (i) each such sale-leaseback transaction is an arm's length transaction and the Borrower or the respective Subsidiary receives at least fair market value (as determined in good faith by the Borrower) for the sale of the real property and/or equipment, (ii) the total consideration received by the Borrower is cash and at least 95% of such consideration is paid at the time of the closing of

such sale, (iii) on or prior to the consummation of each such Sale-Leaseback
Transaction involving real property at which Inventory is or is expected to be
located, the Borrower or the respective Subsidiary shall have entered into with
the lessor of any real property the subject of any such Sale-Leaseback
Transaction a Landlord-Lender Agreement, (iv) the Net Proceeds therefrom are
applied as required by Section 2.12(c), (v) to the extent that any such
sale-leaseback transaction results in a Capital Lease Obligation, such Capital
Lease Obligations are permitted under Section 6.03(a)(viii), and (vi) the
aggregate fair market value of, and the gross cash proceeds received from, all
such real property and/or equipment pursuant to Sale-Lease Back Transactions
shall not exceed $200,000,000.

        "S&P" means Standard & Poor's Rating Group.

        "SECTION 2.18(E) CERTIFICATE" has the meaning provided in Section
2.18(e).

        "SECURED CREDITORS" has the meaning assigned to such term in the
Security Agreement.

        "SECURITY AGREEMENT" means the Security Agreement substantially in
the form of Exhibit E hereto among the Borrower, the applicable Subsidiaries and
the Collateral Agent acting on behalf of the Secured Creditors, as the same may
be amended, modified or supplemented from time to time in accordance with the
provisions hereof.

        "SECURITY DOCUMENTS" means the Security Agreement, the Pledge
Agreement and each other security agreement or other instrument or document
executed and delivered pursuant to Section 4.01 or 5.08 in satisfaction of the
Collateral Requirement.

                                    -29-

<PAGE>

        "SIGNIFICANT ACQUISITION" means any Acquisition the aggregate
consideration (taking the amount of cash and Temporary Cash Investments, the
aggregate amount expected to be paid on or after the date of the respective
Acquisition pursuant to any earn-out, non-compete, consulting or deferred
compensation or purchase price adjustment or similar arrangements, the fair
market value (as determined in good faith by the Borrower) of all other non-cash
consideration and the aggregate amount of assumed Indebtedness) for which
exceeds $25,000,000.

        "SIGNIFICANT ASSET DISPOSITION" means any Asset Disposition the
aggregate consideration (taking the amount of cash and Temporary Cash
Investments, the aggregate amount expected to be paid on or after the date of
the respective Acquisition pursuant to any earn-out, non-compete, consulting or
deferred compensation or purchase price adjustment or similar arrangements, the
fair market value (as determined in good faith by the Borrower) of all other
non-cash consideration and the aggregate amount of assumed Indebtedness) for
which exceeds $25,000,000.

        "SPECIFIED DEFAULT" means (i) any Default under paragraphs (a), (b),
(g) or (h) of Article VII and (ii) any Event of Default.

        "SPECIFIED EXISTING NOTE INDENTURES" means (i) the 9-7/8% Senior
Subordinated Note Indenture, (ii) the 10-5/8% Senior Subordinated Note
Indentures and (iii) the 10-1/8% Senior Note Indenture.

        "SPECIFIED RESTRICTIVE PROVISIONS" means and includes (i) Section

4.08 of the 9-7/8% Senior Subordinated Note Indenture, (ii) Section 10.15 of the 10-5/8% Senior Subordinated Note Indentures and (iii) Section 4.08 of the 10-1/8% Senior Note Indenture.

"SSBI" means Salomon Smith Barney Inc. in its individual capacity.

"STATUTORY RESERVE RATE" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"SUBORDINATED NOTE DOCUMENTS" means the (i) 5-1/4% Convertible Senior Subordinated Note Documents, (ii) the 9-7/8% Senior Subordinated Note Documents and (iii) 10-5/8% Senior Subordinated Note Documents.

-30-

<PAGE>

"SUBORDINATED NOTE INDENTURES" means (i) the 5-1/4% Convertible Subordinated Note Indenture, (ii) the 9-7/8% Senior Subordinated Note Indenture and (iii) the 10-5/8% Senior Subordinated Note Indentures.

"SUBORDINATED NOTES" means (i) the 5-1/4% Convertible Senior Subordinated Notes, (ii) the 9-7/8% Senior Subordinated Notes and (iii) the 10-5/8% Senior Subordinated Notes.

"SUBSIDIARY" means, with respect to any Person (the "Parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership or limited liability company, more than 50% of the general partnership or limited liability company (as the case may be) interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the Parent or one or more subsidiaries of the Parent or by the Parent and one or more subsidiaries of the Parent; PROVIDED that, except for the purposes of the definition of the Guarantee Requirement (and to the extent Chouteau becomes a Guarantor hereunder, the purposes of the Collateral Requirement), Chouteau shall not be treated as a Subsidiary for the purposes of this Agreement and the other Loan Documents so long as no more than $17,500,000 of Investments are made therein (whether directly or indirectly) by the Borrower and its Subsidiaries. Unless otherwise specified, "Subsidiary" means a Subsidiary of the Borrower.

"SUPERMAJORITY LENDERS" of any Class means those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if (x) all outstanding Obligations of the other Classes under

this Agreement were repaid in full and all Commitments with respect thereto were terminated and (y) the percentage "50%" contained therein were changed to "66-2/3%".

"SUPPORTING OBLIGATION" has the meaning assigned to such term in the Security Agreement.

"SWINGLINE EXPOSURE" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

"SWINGLINE LENDER" means DBTCA, in its capacity as the lender of Swingline Loans hereunder.

"SWINGLINE LOAN" means a Loan made pursuant to Section 2.04.

"SYNDICATION AGENTS" means each of JPMorgan Chase Bank and Citicorp North America, Inc., each in its capacity as syndication agents under this Agreement.

-31-

<PAGE>

"SYNDICATION DATE" means the date upon which the Joint Lead Arrangers determine in their sole discretion (and notify the Borrower) that the primary syndication (and resultant addition of Persons as Lenders pursuant to Section 9.04(b)) has been completed.

"SYNTHETIC LEASE OBLIGATION" means the monetary obligation of a Person under (a) a so-called synthetic off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"TAX BENEFIT" has the meaning provided in Section 2.18(f).

"TAXES" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, withholdings or similar liabilities (together with any interest, penalties or similar liabilities with respect thereto) imposed by any Governmental Authority.

"TEMPORARY CASH INVESTMENTS" means any Investment in (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, (ii) commercial paper rated at least A-2 by S&P and P-2 by Moody's, (iii) time deposits with, including certificates of deposit issued by, any office located in the United States of any bank or trust company which is organized under the laws of the United States or any state thereof and has capital, surplus and undivided profits aggregating at least $500,000,000, (iv) repurchase agreements with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, (v) short-term tax exempt bonds rated at least AA- by S&P or AA3 by Moody's or (vi) shares in a mutual fund, the investment objectives and policies of which require it to invest substantially all of its assets in short-term tax exempt bonds rated at least AA- by S&P or AA3 by Moody's, PROVIDED that in the case of clauses (i) through (v) above such Investment matures within one year from the date of acquisition thereof by the Borrower or a Subsidiary.

"10-1/8% SENIOR NOTE DOCUMENTS" means the 10-1/8% Senior Note Indenture, the 10-1/8% Senior Notes and any guarantees thereof executed and delivered with respect to the 10-1/8% Senior Notes and the 10-1/8% Senior Note Indenture, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"10-1/8% SENIOR NOTE INDENTURE" means the Indenture, dated as of March 15, 2001, among the Borrower, the Subsidiary Guarantors named therein and Bankers Trust Company, as Trustee, as in effect on the Effective Date and as thereafter amended, modified or supplemented from time to time.

"10-1/8% SENIOR NOTES" means the Borrower's 10-1/8% Senior Notes due 2008, issued pursuant to the 10-1/8% Senior Note Indenture.

"10-5/8% SENIOR SUBORDINATED NOTE DOCUMENTS" means the 10-5/8% Senior Subordinated Note Indentures, the 10-5/8% Senior Subordinated Notes and any guarantees thereof executed and delivered with respect to the 10-5/8% Senior Subordinated Notes and the 10-5/8% Senior Subordinated

-32-

<PAGE>
Note Indentures, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"10-5/8% SENIOR SUBORDINATED NOTE INDENTURES" means the Indentures, dated as of July 25, 1997 and October 15, 2001, among the Borrower, the Subsidiary Guarantors named therein and Manufacturers and Traders Trust Company, as Trustee, as in effect on the Effective Date and as thereafter amended, modified or supplemented from time to time.

"10-5/8% SENIOR SUBORDINATED NOTES" means the Borrower's 10-5/8% Senior Subordinated Notes due 2007, issued pursuant to the 10-5/8% Senior Subordinated Note Indentures.

"TERM LENDER" means a Lender with a Term Loan Commitment or an outstanding Term Loan.

"TERM LOAN" means each B Term Loan and each Incremental Term Loan.

"TERM LOAN COMMITMENT" means, each B Term Loan Commitment and each Incremental Term Loan Commitment.

"TERM LOAN MATURITY DATE" means (i) in the case of B Term Loans, the B Term Loan Maturity Date and (ii) in the case of any Class of Incremental Term Loans, the maturity date for such Class of Incremental Term Loans set forth in the Incremental Term Loan Commitment Agreement relating thereto, PROVIDED that the Term Loan Maturity Date for all Incremental Term Loans of a given Class shall be the same date.

"TERM LOAN SCHEDULED REPAYMENTS" has the meaning provided in Section 2.11(b).

"TEST PERIOD" means each period of four consecutive fiscal quarters of the Borrower (in each case taken as one accounting period) ended after the Effective Date (beginning with the period of four consecutive fiscal quarters ended on the last day of the third fiscal quarter of the Borrower occurring in its fiscal year ended closest to December 31, 2002).

        "TOTAL INCREMENTAL TERM LOAN COMMITMENT" means at any time and for
any class of Incremental Term Loans, the sum of the Incremental Term Loan
Commitments of such class of each of the Lenders at such time.

        "TOTAL LEVERAGE RATIO" means, at any time, the ratio of Consolidated
Indebtedness at such time to Consolidated EBITDA for the Test Period then most
recently ended; PROVIDED that (x) in the case of any determination of the Total
Leverage Ratio being made on the last day of a Test Period, Consolidated
Indebtedness shall be determined based on the actual amount of Consolidated
Indebtedness outstanding on the last day of the respective Test Period in
accordance with the provisions of Section 1.05(b) and Consolidated EBITDA shall
be determined on a Pro Forma Basis (in accordance with Section 1.05(a)) to give
effect to all Significant Acquisitions and Significant Asset Dispositions (in
each case, if any) made after the

                                    -33-

<PAGE>
Effective Date and during the respective Test Period and (y) in the case of any
determination of Total Leverage Ratio being made on (or as at) any date other
than the last date of a Test Period, Consolidated Indebtedness shall be
determined on the actual amount outstanding on the date of determination in
accordance with the provisions of Section 1.05(b) and Consolidated EBITDA shall
be determined on a Post-Test Period Pro Forma Basis to give effect to all
Significant Acquisitions and Significant Asset Dispositions (in each case, if
any) actually made after the Effective Date and during the respective Test
Period or thereafter and on or prior to the date of the required determination
thereof (in the case of any determinations pursuant to Section 2.05, 6.03 or
6.06, after giving effect to the respective events which require the
determination to be made on a Post-Test Period Pro Forma Basis).

        "TOTAL SENIOR LEVERAGE RATIO" means at any time, the ratio of
Consolidated Senior Indebtedness at such time to Consolidated EBITDA for the
Test Period then most recently ended; PROVIDED that (x) in the case of any
determination of the Total Senior Leverage Ratio being made on the last day of a
Test Period, Consolidated Senior Indebtedness shall be determined based on the
actual amount of Consolidated Senior Indebtedness outstanding on the last day of
the respective Test Period in accordance with the provisions of Section 1.05(b)
and Consolidated EBITDA shall be determined on a Pro Forma Basis (in accordance
with Section 1.05(a)) to give effect to all Significant Acquisitions and
Significant Asset Dispositions (in each case, if any) made after the Effective
Date and during the respective Test Period and (y) in the case of any
determination of Total Senior Leverage Ratio being made on (or as at) any date
other than the last date of a Test Period, Consolidated Senior Indebtedness
shall be determined on the actual amount outstanding on the date of
determination in accordance with the provisions of Section 1.05(b) and
Consolidated EBITDA shall be determined on a Post-Test Period Pro Forma Basis to
give effect to all Significant Acquisitions and Significant Asset Dispositions
(in each case, if any) actually made after the Effective Date and during the
respective Test Period or thereafter and on or prior to the date of the required
determination thereof (in the case of any determinations pursuant to Section
2.05, 6.03 or 6.06, after giving effect to the respective events which require
the determination to be made on a Post-Test Period Pro Forma Basis).

        "TRANSACTION" means, collectively, (i) the Merger, (ii) the Common
Equity Financing, (iii) the issuance of the New Senior Notes, (iv) the
refinancing of all outstanding amounts under the Existing Credit Agreements and
the termination of all commitments thereunder, (v) the discharge of the
Core-Mark Bond Indenture as contemplated in Section 4.01(o), (vi) the incurrence

of Loans hereunder on the Effective Date and (vii) the payment of all fees and expenses in connection with the foregoing.

"TRANSACTION DOCUMENTS" means (i) the Loan Documents, (ii) the Merger Documents, (iii) the Common Equity Financing Documents and (iv) the New Senior Note Documents.

"TREASURY SERVICES" means treasury, depositary or cash management services (including, without limitation, overnight overdraft services) from, or any automated clearinghouse transfer of funds to, JPMorgan Chase (or any successor by merger thereto) and/or one or more of its affiliates or another bank reasonably acceptable to the Administrative Agent.

-34-

<PAGE>

"TYPE", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UNFUNDED LIABILITIES" means, with respect to any Plan at any time, the amount (if any) by which (i) the value of all benefit liabilities under such Plan, determined on a plan termination basis using the assumptions prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds (ii) the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions), all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of the Borrower, a Subsidiary of the Borrower or an ERISA Affiliate to the PBGC or any other Person under Title IV of ERISA.

"WACHOVIA" means Wachovia Bank, National Association, in its individual capacity.

"WEIGHTED AVERAGE LIFE TO MATURITY" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (i) the then outstanding principal amount of such Indebtedness into (ii) the product obtained by multiplying (x) the amount of each then remaining installment or other required scheduled payments of principal, including payment at final maturity, in respect thereof, by (y) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such remaining installment or other required scheduled payment.

"WHOLLY-OWNED DOMESTIC SUBSIDIARY" shall mean each Domestic Subsidiary of the Borrower that is also a Wholly-Owned Subsidiary of the Borrower.

"WHOLLY-OWNED FOREIGN SUBSIDIARY" shall mean each Foreign Subsidiary of the Borrower that is also a Wholly-Owned Subsidiary of the Borrower.

"WHOLLY-OWNED SUBSIDIARY" means any Subsidiary all of the shares of capital stock or other ownership interests of which (except directors' qualifying shares) are at the time directly or indirectly owned by the Borrower.

"WITHDRAWAL LIABILITY" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. CLASSIFICATION OF LOANS AND BORROWINGS. For purposes

of this Agreement, Loans may be classified and referred to by Class (E.G., a "Revolving Loan") or by Type (E.G., a "Eurodollar Loan") or by Class and Type (E.G., a "Eurodollar Revolving Loan"). Borrowings also may be classified and referred to by Class (E.G., a "Revolving Borrowing") or by Type (E.G., a "Eurodollar Borrowing") or by Class and Type (E.G., a "Eurodollar Revolving Borrowing").

SECTION 1.03. TERMS GENERALLY. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The

-35-

<PAGE>
words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. ACCOUNTING TERMS; GAAP; FISCAL YEARS. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; PROVIDED that (i) if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Administrative Agent or the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and (ii) in the event the Borrower changes its fiscal year end and the Administrative Agent notifies the Borrower that the Administrative Agent or the Required Lenders request an amendment to any provision of Article VII hereof for the purpose of modifying such provision in an appropriate manner to address the effect of the change in the fiscal year end, the Borrower agrees to promptly enter into such amendment.

SECTION 1.05. CERTAIN PRO FORMA CALCULATIONS. (a) For purposes of calculating Consolidated EBITDA for any Test Period on a Pro Forma Basis or a Post-Test Period Pro Forma Basis for purposes of this Agreement, the following rules shall apply:

(i)    if at any time after the Effective Date and during the respective Test Period (and, in the case of determinations being made on a