accrual of any and all of the same. Each Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, on a timely basis all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case arising after the Filing Date, and all lawful claims arising after the Filing Date which, if unpaid, might become a lien or charge upon any properties of any Borrower or any of its Subsidiaries; PROVIDED that no Borrower nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.03. MAINTENANCE OF PROPERTY; INSURANCE. (a) The Company will keep, and will cause each of its Subsidiaries to keep, all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b) The Company will, and will cause each of its Subsidiaries to, maintain (either in the name of the Company or in such Subsidiary's own name) with financially sound and responsible insurance companies, insurance on all their respective properties in at least such amounts and against at least such risks (and with such risk retention) as are usually insured against in the same general areas by companies of established repute engaged in the same or a similar business; and will furnish to the Administrative Agent (for distribution to the Post-Petition Lenders), together with each set of financial statements delivered pursuant to Section 5.01(b) and at any other time as Administrative Agent or the Required Lenders shall request, information presented in reasonable detail as to the insurance so carried.

(c) The Company will, and will cause each of its Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Company and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance poli-cies shall not be cancelled without at least 30 days' prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the Secured Creditors, (iv) [with respect to Mortgaged Properties,] shall contain the standard non-contributing mortgage clause endorsement in favor of the Collateral Agent with respect to hazard liability insurance, (v) shall, except in the case of public liability insurance, provide that any losses shall be payable notwithstanding (A) any act or neglect of the Company or any of its Subsidiaries, (B) the occu-pation or use of the properties for purposes more hazardous than those permitted by the terms of the respective policy if such coverage is obtainable at commercially reasonable rates and is of the kind from time to time customarily insured against by Persons owning or using similar property and in such amounts as are customary, (C) with respect to Mortgaged Properties, any foreclosure or other proceeding relating to such properties or (D) any change in the title to or ownership or possession of the insured properties and (vi) shall be deposited with the Collateral Agent.

(d)     If the Company or any of its Subsidiaries shall fail to insure its property and endorse the same to the Collateral Agent in accordance with this Section 5.03, or if the Company or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Collateral Agent shall have the right (but shall be under no obligation), upon 10 Business Days' prior notice to the Company (or such shorter period as may be necessary under the circumstances so that any then existing insurance does not lapse or terminate), to procure such insurance and the Borrowers jointly and severally agree to reimburse the Collateral Agent for all reasonable costs and expenses of procuring such insurance.

SECTION 5.04. MAINTENANCE OF EXISTENCE.    The Company will preserve, renew and keep in full force and effect its, and, except as permitted by Section 6.02, will cause each Subsidiary to preserve, renew and keep in full force and effect its respective corporate (or other organizational) existence and its and their respective rights, privileges and franchises necessary or desirable in the normal conduct of business.

SECTION 5.05. COMPLIANCE WITH LAWS. The Company will comply, and cause each of its Subsidiaries to comply, in all material respects with all applicable laws, ordinances, rules, regulations, and requirements of Governmental Authorities (including, without limitation, ERISA and the rules and regulations thereunder) except where (i) the necessity of compliance therewith or the resultant penalty, fine or cost for non-compliance is contested in good faith by appropriate proceedings and the Company or the respective Subsidiary has maintained adequate reserves as required by GAAP with respect thereto or (ii) the failure to do so would not have a Material Adverse Effect.

SECTION 5.06. INSPECTION OF PROPERTY, BOOKS AND RECORDS. (a) The Company will keep, and will cause each of its Subsidiaries to keep, proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and will permit, and will cause each of its Subsidiaries to permit, representatives of either Joint Lead Arranger (at the Borrowers' expense) or any Post-Petition Lender (at such Post-Petition Lender's expense) to visit and inspect any of their respective properties, to examine and make abstracts from any of their respective books and records and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants, all at such reasonable times and as often as may reasonably be requested; PROVIDED that this Section shall not be construed to require any Borrower to waive or cause to be waived any attorney-client privilege applicable to information in such Borrower's or any of its Subsidiaries' possession. Each Post-Petition Lender agrees to maintain in confidence (in accordance with the provisions of Section 9.12) any information clearly identified in writing by the Company or any Subsidiary as trade secrets or proprietary information which such Post-Petition Lender may obtain as a result of the inspections, examinations and discussions undertaken pursuant to this Section.

(b)     At dates to be mutually agreed upon between the Joint Lead Arrangers and the Company, the Company will, at the request of the Joint Lead Arrangers or the Required Lenders, conduct [quarterly] [monthly] status conference calls with all of the Post-Petition Lenders pursuant to which the Company will update the Post-Petition Lenders as to important operational and financial developments affecting the Company and its Subsidiaries.

(c)     The Borrowers will permit any representatives designated by the Joint Lead Arrangers (including any consultants, accountants, lawyers and appraisers retained by the Joint Lead Arrangers) to conduct evaluations, examinations and appraisals of the Borrowers' computation of the Borrowing Base and the assets included in the Borrowing Base and such other assets and properties of the Company or its Subsidiaries as the Joint Lead Arrangers may require, all at such reasonable times and as often as reasonably requested; it being understood and agreed that, without limiting the effect of the provisions contained above in this sentence, the Company shall cause to be delivered to the Joint Lead Arrangers within __ Business Days following the last day of each fiscal quarter of the Borrower appraisals and collateral reviews of the Inventory and Accounts of the Borrowers, which appraisals and reviews shall be prepared by such appraisers and/or other professionals as are acceptable to the Joint Lead Arrangers.  The Borrowers shall pay the reasonable fees (including reasonable and customary internally allocated fees and expenses of employees of the Joint Lead Arrangers as to which invoices have been furnished) and expenses of any such representatives retained by the Joint Lead Arrangers as to which invoices have been furnished to conduct any such evaluation or appraisal, including the reasonable fees and expenses associated with collateral monitoring services performed by the "Collateral Agent Services Group" of the Collateral Agent.  To the extent required by the Joint Lead Arrangers as a result of any such evaluation, examination appraisal or monitoring, the Borrowers also agree to modify or adjust the computation of the Borrowing Base (which may include maintaining additional reserves, reducing the advance rates or reducing the eligibility criteria for the component definitions of the Borrowing Base).

(d)     In the event that historical accounting practices, systems or reserves relating to the components of the Borrowing Base are modified in a manner that is adverse to the Lenders (as determined by the Joint Lead Arrangers), the Borrowers agree to maintain such additional reserves (for purposes of computing the Borrowing Base) in respect to the components of the Borrowing Base and make such other adjustments to its methodology for including the components of the Borrowing Base as the Joint Lead Arrangers shall require based upon such modifications.

SECTION 5.07.  USE OF PROCEEDS.  (a)  The Cash Collateral and all proceeds of the Post-Petition Loans will be used (i) to fund working capital, Capital Expenditures and general corporate requirements of the Borrowers consistent with the Budget (subject to variances permitted under the Financing Order) (including to pay any interest, fees and expenses due under the Post-Petition Loan Documents), (ii) to make adequate protection payments (including, without limitation, in respect of interest, costs, fees and expenses) to the Pre-Petition Agents and the Pre-Petition Lenders and (iii) to pay professional fees incurred by the Post-Petition Agents, the Post-Petition Lenders and the Pre-Petition Agents.

(b)     No portion of any Post-Petition Loans (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Post-Petition Loan nor the use of the proceeds thereof nor the extension of any other credit pursuant to this Agreement will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

(c)     No portion of any Post-Petition Loans (or the proceeds thereof) will be used, directly or indirectly, to finance any adversary action, suit, arbitration, proceeding or other litigation of any type relating to, or in connection with, the Existing Credit Agreement, any other Pre-Petition Loan Document or any other document or instrument entered into in connection therewith, including, without limitation, any challenge to the claims of the validity, perfection, priority or enforceability of any of the liens securing such claim or payment made thereunder, PROVIDED, HOWEVER, that any statutory committee appointed in the Cases shall not be prevented from undertaking a normal and customary investigation of any liens and security interests.

(d)     No portion of any Post-Petition Loans (or the proceeds thereof) will be used, directly or indirectly, to finance any adversary action, suit, arbitration, proceeding or other litigation of any type relating to, or in connection with, this Agreement, any other Post-Petition Loan Document or any other document or instrument entered into in connection herewith or therewith, including, without limitation, any challenge to the claims of the validity, perfection, priority or enforceability of any of the liens securing such claim or payment made hereunder or thereunder.

SECTION 5.08. FURTHER ASSURANCES.  (a) Each Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to grant, confirm, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.  Such security interests and Liens shall be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance satisfactory to the Collateral Agent, and each Borrower shall deliver or cause to be delivered to the Post-Petition Lenders all such instruments and documents (including legal opinions and lien searches) as the Collateral Agent shall reasonably request to evidence compliance with this paragraph (a).  Each Borrower shall provide from time to time such evidence as the Collateral Agent shall reasonably request as to the perfection and priority status of each such security interest.

(b)     If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any real property of any Borrower constituting Collateral, Borrowers will, at their own expense and within 60 days of any such determination, provide to the Joint Lead Arrangers appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance satisfactory to the Joint Lead Arrangers; it being understood and agreed that with respect to the real property the subject thereof, the appraisals prepared by Hilco pursuant to the Hilco Engagement Letter satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989 as in effect on the Effective Date (although nothing in this clause shall limit the right of the Administrative Agent and the Required Lenders to obtain appraisals with respect to any real property of the Company and its Subsidiaries (including the real property

covered by the Hilco Engagement Letter) as otherwise contemplated in this paragraph (b) that may in the future be required by applicable law or regulation.

SECTION 5.09. WAIVER OF CLAIMS. Except as otherwise provided in the Financing Orders, each Borrower hereby waives any right to investigate, commence or prosecute any defense, action, objection or counterclaim with respect to the claims, liens or security interests of the Pre-Petition Lenders, the Pre-Petition Agents, the Post-Petition Lenders and/or the Post-Petition Agents.

SECTION 5.10. SUBSIDIARY PROCEEDINGS. If a decision is made by any Borrower to cause any of its Subsidiaries to commence a voluntary proceeding under the Bankruptcy Code, such Borrower will cause such proceeding to be commenced before the Bankruptcy Court and in such event such Borrower shall cause such Subsidiary to become a "Borrower" hereunder, and to pledge such Subsidiary's assets in support of the Post-Petition Obligations pursuant to appropriate amendments to this Agreement and other Post-Petition Loan Documents and the approval of the Bankruptcy Court (which shall be satisfactory to the Joint Lead Arrangers).

SECTION 5.11. COMPLIANCE WITH ENVIRONMENTAL LAWS. (a) (i) The Company will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of its real property now or hereafter owned, leased or operated by the Company or any of its Subsidiaries, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such real property free and clear of any Liens imposed pursuant to such Environmental Laws and (ii) neither the Company nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any real property now or hereafter owned, leased or operated by the Company or any of its Subsid-iaries, or transport or permit the transportation of Hazardous Materials to or from any such real property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of any such real properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and mainten-ance of the business or operations of the Company or any of its Subsidiaries unless the failure to comply with the requirements specified in clause (i) or (ii) above, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    (i)  After the receipt by the Administrative Agent or any Post-Petition Lender of any notice of the type described in Section 5.01(p), (ii) at any time that the Company or any of its Subsidiaries are not in compliance with Section 5.11(a) or (iii) in the event that the Administrative Agent or the Post-Petition Lenders have exercised any of the remedies pursuant to the last paragraph of Article VII or any Financing Order, the Borrower will (in each case) provide, at the sole expense of the Borrowers and at the request of the Joint Lead Arrangers, an environmental site assessment report concerning (x) in the case of preceding clauses (i) and (ii), the real property owned, leased or operated by the Company or any of its Subsidiaries that is the subject of any notice of the type described in Section 5.01(p) or any noncompliance of the type described in Section 5.11(a), as the case may be, and (y) in the case of preceding clause (iii), any real property owned, leased or operated by the Company or any of its Subsidiaries, in each case

prepared by an environmental consulting firm approved by the Joint Lead Arrangers, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action in connection with such Hazardous Materials on such real property. If the Borrowers fail to provide the same within 30 days after such request was made, the Joint Lead Arranger may order the same, the cost of which shall be borne by the Borrowers, and the Borrowers shall grant and hereby grant to the Joint Lead Arrangers and the Post-Petition Lenders and their respective agents access to such real property and specifically grant the Joint Lead Arrangers and the Post-Petition Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Company, all at the sole expense of the Borrowers.

(c)     In addition, the Borrowers hereby grant the Joint Lead Arrangers access to and the right to inspect all reports, audit and other internal information of the Borrower's relating to environmental matters on reasonable notice, and third party verification of matters relating to compliance with Environmental Laws and regulations requested by the Joint Lead Arrangers at any time and from time to time.

SECTION 5.12.  MORTGAGES.  On or prior to 60 days following the Effective Date, the Company shall have delivered or caused to be delivered to the Administrative Agent:

(i)     fully executed counterparts of Mortgages, which Mortgages shall cover the real property owned or leased by Borrowers and listed on Schedule 5.12, together with evidence that counterparts of each of the Mortgages have been delivered to the title company insuring the Lien of the Mortgages for recording in all places to the extent necessary or desirable, in the judgment of the Collateral Agent, to effectively create a valid and enforceable first priority and subsisting mortgage lien (subject to Permitted Encumbrances relating thereto, the Carve-Out and Senior Liens) on the Mortgaged Properties in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors;

(ii)     a fully paid valid Mortgage Policy relating to each Mortgage on a Mortgaged Property issued by a title insurance company reasonably satisfactory to the Collateral Agent and in amounts satisfactory to the Collateral Agent and assuring the Collateral Agent that each of the Mortgages on such Mortgaged Properties is a valid and enforceable first priority mortgage lien on such Mortgaged Properties, free and clear of all Liens, defects and encumbrances except Permitted Encumbrances, and each such Mortgage Policy shall otherwise be in form and substance reasonably satisfactory to the Collateral Agent and shall include, as appropriate, an endorsement for future advances under this Agreement and for any other matter that the Collateral Agent in its discretion may reasonably request, shall not include an exception for mechanics' liens, and shall provide for affirmative insurance and such reinsurance as the Collateral Agent in its discretion may reasonably request;

(iii)     an American Land Title Association/American Congress on Surveying and Mapping form survey relating to each Mortgaged Property for which all necessary fees have been paid and which is dated a recent date satisfactory to the Joint Lead Arrangers, certified to Collateral Agent and the issuer of the title insurance policy in a

manner satisfactory to the Collateral Agent by a land surveyor duly registered and licensed in the State in which such Mortgaged Property is located and acceptable to the Collateral Agent, and in any event, sufficient for the title insurance company to remove all survey exceptions from each Mortgage Policy and issue a survey endorsement thereto, and shows all buildings and other improvements, any offsite improvements, the location of any easements, parking spaces, rights of way, building setback lines and other dimensional regulations and the absence of encroachments, either by such improvements or on to such property, and other defects, other than encroachments and other defects acceptable to the Collateral Agent;

(iv)    a recent flood certificate, in form and substance satisfactory to the Collateral Agent, covering each Mortgaged Property and stating among other information, whether or not such Mortgaged Property is located in a flood zone;

(v)    local counsel opinions for the Borrowers in States in which the Mortgaged Property is located with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance satisfactory to the Collateral Agent; and

(vi)    estoppel certificates executed by all tenants of the Mortgaged Properties and such other consents, agreements and confirmations of lessors and third parties have been delivered as the Collateral Agent may deem necessary or desirable.

SECTION 5.13.  CHIEF RESTRUCTURING OFFICER.  On or prior to __ days after the Effective Date, the Bankruptcy Court shall have approved the Company's engagement of Mr. Ted Stenger as the initial Chief Restructuring Officer of the Company as contemplated in the Engagement Letter described in Section 4.01(r), and the Joint Lead Arrangers shall have received evidence satisfactory to them of such approval.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Post-Petition Loan and all fees payable hereunder have been paid in full and all Post-Petition Letters of Credit have expired or terminated and all LC Disbursements have been reimbursed, the Borrowers covenant and agree with the Post-Petition Lenders that:

SECTION 6.01.  LIENS.  The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply, or permit any of their Subsidiaries to apply, to Bankruptcy Court for authority to) create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrowers or any of their respective Subsidiaries, whether now owned or hereafter acquired, or enter into any sale-leaseback transaction, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to any Borrower or any Subsidiary thereof), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute, except:

(a)    Liens created under the Post-Petition Loan Documents;

(b)    Liens which were existing on the Filing Date and described in Schedule 6.01(b) hereto (without giving effect to any extension or renewal thereof and then only to the extent of the Indebtedness or obligations secured thereby on the Filing Date, (the "Permitted Existing Liens"), and Pre-Petition Lender Replacement Liens;

(c)    Liens arising in the ordinary course of its business which (i) are statutory Liens and (ii) either (x) do not in the aggregate materially detract from the value of the assets of any Borrower or any Subsidiary thereof or materially impair the use thereof in the operation of its business or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien;

(d)    Liens in favor of any Borrower;

(e)    Liens (on the property subject to the respective capital lease) securing Capital Lease Obligations incurred by any Borrower to the extent such Capital Lease Obligations are permitted under Section 6.03(a)(iv);

(f)    (i) easements, rights-of-way, restrictions, minor defects or irregularities in title and other similar charges or encumbrances and (ii) Permitted Encumbrances, in each case not interfering in any material respect with (x) the ordinary conduct of the business of any Borrower or any Subsidiary thereof or (y) the ability of the Collateral Agent to access the Collateral;

(g)    Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default pursuant to clause (j) of Article VII so long as no cash or property is deposited or delivered to secure the respective judgment or award;

(h)    Liens (other than any Lien imposed by ERISA) incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations incurred in the ordinary course of business (exclusive of obligations in respect of the payment of borrowed money); PROVIDED that any consensual Liens as described above shall not be secured at any time by cash, Temporary Cash Investments and/or other property with an aggregate fair market value in excess of $[5,000,000];

(i)    Liens in favor of trade creditors of the Borrowers in accordance with the Financing Orders;

(j)    any Lien on any asset securing Indebtedness incurred or assumed after the date hereof for the purpose of financing all or any part of the cost of acquiring or constructing such asset (other than any Lien on Inventory), PROVIDED that such Lien attaches to such asset concurrently with or within 180 days after the acquisition or completion of construction thereof and does not extend to any other asset or property of

any Borrower or any of its Subsidiaries and so long as the aggregate fair market value of all assets subject to such Liens does not at any time exceed $1,000,000;

(k)    Liens securing Indebtedness permitted pursuant to Section 6.03(a)(iv) on terms and conditions satisfactory to the Joint Lead Arrangers and the Required Lenders, PROVIDED that, in no event shall any such Lien be more favorable to the holders of such Indebtedness, or less favorable to the Borrowers, the Post-Petition Lenders or the Pre-Petition Lenders, than the Liens permitted to be granted by the Borrowers to certain of their trade creditors pursuant to that certain "Secured Trade Credit Program of Fleming Companies, Inc." as contemplated in the Final Order (as in effect or the date hereof); and

(l)    It is understood that the Liens permitted pursuant to paragraphs (c) through (j) above and this paragraph (k) of this Section 6.01 and Permitted Existing Liens not constituting Senior Liens shall be subordinated in priority to the Liens created under this Agreement and the other Post-Petition Loan Documents and the Pre-Petition Lender Replacement Lien.

SECTION 6.02. CONSOLIDATION, MERGER, SALE OF ASSETS, ETC. Subject to the corporate restructuring decisions to be made as part of the Plan of Reorganization and implementation thereof pursuant to the Cases after the Effective Date, the Borrowers will not, and will not permit any of their respective Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of their respective property or assets, or enter into any sale-leaseback transactions, or apply or permit any of their Subsidiaries to apply, to the Bankruptcy Court to do any of the foregoing, except that:

(a)    each Borrower and its Subsidiaries may make sales of inventory in the ordinary course of business;

(b)    each Borrower and its Subsidiaries may sell obsolete, uneconomic, excess or worn-out equipment, materials or other assets (other than real property) in the ordinary course of business;

(c)    each Borrower may sell assets (other than any Equity Interest of any Borrower unless 100% of the Equity Interests of such Borrower are sold) to the extent permitted by the Bankruptcy Court, so long as (i) each such sale is in an arm's-length transaction and the respective Borrower receives at least fair market value therefor (as determined in good faith by the respective Borrower), (ii) 100% (or, in the case of any Retail Store Sale or any sale of assets in connection with the closure of a distribution center of any Borrower, at least 85% consideration therefor is paid in cash at the time of the closing of such sale (it being understood that the assumption of leases shall be considered cash consideration for the purposes of this clause (ii)), (iii) the Net Proceeds therefrom are applied as required by Section 2.9(b) and (iv) unless consented to in writing by the Joint Lead Arrangers the aggregate Net Proceeds received by the Borrowers from all assets sold pursuant to this paragraph (c) does not exceed $1,000,000 PROVIDED that each Borrower may (x) sell Perishable Inventory and (y) the assets comprising the

Roundy's retail stores, in each case without regard to the dollar limitation contained in clause (iv) of this Section 6.02(c)

(d)    each Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, Accounts arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing or factoring transaction; and

(e)    each Borrower and its Subsidiaries may, in the ordinary course of business, grant licenses, sublicenses or leases or subleases to other Persons not materially interfering with the conduct of the business of such Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto.

To the extent the Required Lenders waive the provisions of this Section 6.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.02 (other than to a Borrower or a Subsidiary thereof) such Collateral shall be sold free and clear of the Liens created by the Post-Petition Loan Documents, and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 6.03.  INDEBTEDNESS.    (a) The Borrowers will not, and will not permit any of their respective Subsidiaries to, contract, create, incur, assume or substitute any Indebtedness, or apply, or permit any of their Subsidiaries to apply to the Bankruptcy Court for authority to do so, except:

(i)    Indebtedness outstanding under the Post-Petition Loan Documents;

(ii)    Indebtedness of the Borrowers and their Subsidiaries incurred prior to, and outstanding on, the Filing Date (including Indebtedness arising from reimbursement obligations for letter of credit drawings occurring after the Filing Date under letters of credit issued prior to, and outstanding on, the Filing Date) to the extent such Indebtedness is listed on Schedule 3.16 hereto ("Permitted Existing Indebtedness"), without giving effect to any extensions, renewals or refinancings thereof;

(iii)    Indebtedness of any Borrower owing to another Borrower;

(iv)    Indebtedness of any Borrower in an aggregate principal amount not to exceed $100,000,000 at any time, PROVIDED that (1) all terms and conditions of the documentation evidencing such Indebtedness is satisfactory to the Joint Lead Arrangers and the Required Lenders hereunder and the "Required Lenders" under, and as defined in, the Existing Credit Agreement, (2) any Lien securing any such Indebtedness is permitted under Section 6.01(k), (3) the maturity for such Indebtedness shall not be earlier than one year following the Maturity Date, (4) the documentation evidencing such Indebtedness shall include no amortization or scheduled commitment reductions, (5) the terms of the documentation of such Indebtedness shall require no mandatory repayments or commitment reductions to be made with Asset Disposition proceeds, Indebtedness proceeds or tax fund refund proceeds, (6) the incurrence of such Indebtedness and the terms and conditions for the documentation therefor shall have been approved by the

Bankruptcy Court and (7) at the time of the initial incurrence of Indebtedness pursuant to this clause (iv) no Default shall exist and be continuing;

(v)    surety bonds issued for the benefit of any Borrower in the ordinary course of their businesses so long as the aggregate obligations of the Borrowers in respect of such surety bonds do not at any time exceed $30,000,000;

(vi)    Indebtedness of any Borrower arising in the ordinary course of operations in connection with Treasury Services provided pursuant to uncommitted lines of credit, which Indebtedness may be secured by the Security Documents; and

(vii)    purchase money Indebtedness of any Borrower described in Section 6.01(j), PROVIDED that in no event shall the aggregate principal amount of all such purchase money Indebtedness permitted by this clause (vii) exceed $1,000,000 at any time outstanding.

(b)    Except as set forth in the First Day Orders approved on or prior to the Effective Date, the Borrowers will not, and will not permit any of their respective Subsidiaries to, make any prepayment (or make any offer to make any prepayment) of the principal of, or repurchase, redeem, defease or otherwise retire (including in each case, without limitation, by way of depositing with the trustee with respect thereto or any other Person, monies or securities before due for the purpose of paying when due) prior to its stated maturity (whether by reason of asset sales, a change of control, or otherwise), any Indebtedness or other obligations of any Borrower or any Subsidiary thereof incurred or created prior to the Filing Date, or apply to the Bankruptcy Court for authority to do any of the foregoing, except:

(i)    Indebtedness created under the Post-Petition Loan Documents;

(ii)    trade payables owing to trade creditors of the Borrowers and their respective Subsidiaries and other claims authorized to be paid on terms satisfactory to the Joint Lead Arrangers as approved by the Bankruptcy Court;

(iii)    the payments set forth in the Cash Collateral Order;

(iv)    payments of scheduled lease payments under capitalized leases of the Borrower existing on the Filing Date to the extent such leases are not rejected by the Borrowers or any of their Subsidiaries in the Cases and other payments in connection with the assumption of executory contracts and unexpired leases;

(v)    claims authorized to be paid by the First Day Orders, orders entered into in respect of motions filed on the Filing Date or, subject to the satisfaction of the Joint Lead Arrangers, any subsequent order of the Bankruptcy Court;

(vi)    payments of Indebtedness secured by assets the subject of an Asset Disposition (I) consummated in accordance with Section 6.02(b) or (c) or (II) of the type described in clause (c) of the definition of Asset Disposition to the extent such payments are required as a consequence of the respective such Asset Disposition pursuant to the terms of the documentation evidencing such Indebtedness;

(vii)    Indebtedness of any Borrower owing to another Borrower; and

(viii)   the payments set forth in the Financing Orders.

SECTION 6.04. DIVIDENDS. The Borrowers will not, and will not permit any of their respective Subsidiaries to, authorize, declare or pay any Dividends, or apply or permit any of their Subsidiaries to apply to the Bankruptcy Court for authority to do so, except that any Subsidiary of any Borrower may declare and pay cash Dividends to such Borrower.

SECTION 6.05. TRANSACTIONS WITH AFFILIATES. The Borrowers will not, and will not permit any of their respective Subsidiaries to, directly or indirectly, pay any funds to or for the account of, make any investment (whether by acquisition of stock or indebtedness, by loan, advance, transfer of property, guarantee or other agreement to pay, purchase or service, directly or indirectly, any Indebtedness, or otherwise) in, lease, sell, transfer or otherwise dispose of any assets, tangible or intangible, to, or participate in, or effect any transaction in connection with any joint enterprise or other joint arrangement with, any Affiliate, or apply to the Bankruptcy Court for authority to do any of the foregoing; PROVIDED, HOWEVER, that the foregoing provisions of this Section shall not prohibit any Borrower from (a) declaring or paying any lawful dividend in accordance with Section 6.04, (b) making loans or other investments to, and consummating other transactions with, any other Borrower to the extent permitted by Sections 6.02 or 6.03(a) or (c) making sales to, or purchases from, any other Borrower and, in connection therewith, extending credit or making payments, or from making payments for services rendered by any other Borrower, if such sales or purchases are made or such services are rendered in the ordinary course of business, making payments of reasonable compensation, fees and expenses to their respective directors and executive officers for services rendered to the board of directors of the Borrower or any committee of any thereof to the extent such payments are approved by the Bankruptcy Court.

SECTION 6.06. ACQUISITIONS AND INVESTMENTS. The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply, or permit any of their Subsidiaries to apply, to the Bankruptcy Court for authority to), directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire (in one or a series of related transactions) any part of the property or assets of any other Persons (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business), or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract or hold any cash or Temporary Cash Investments (each of the foregoing an "Investment" and, collectively, "Investments"), except:

(i)    the Borrowers may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(ii)   Investments by the Borrowers and their Subsidiaries made prior to the Filing Date, and in existence on the Effective Date and set forth on Schedule 6.06(iv);

(iii)    the Borrower and its Subsidiaries may lease (as lessee) real or personal property in the ordinary course of business so long as any such lease does not create a Capitalized Lease Obligation except to the extent permitted by Section 6.03(a)(iv);

(iv)    Investments received in connection with the bankruptcy or reorganization of or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business investments;

(v)    the Borrowers may acquire and hold cash and Temporary Cash Investments, provided that at all times prior to such date when each Disbursement Account and each Collection Account is subject to a Control Agreement, the aggregate amount of cash and Temporary Cash Investments permitted to be held by the Borrowers at any time when any Post-Petition Loans are outstanding shall not exceed $10,000,000, PROVIDED that for purposes of calculating the amount of cash and Temporary Cash Investments held by the Borrowers for the purposes of compliance with this paragraph, all Restricted Cash shall be excluded therefrom; and

(vi)    Investments arising from non-cash consideration received by a Borrower in connection with sales consummated in accordance with Section 6.02(c).

SECTION 6.07. LIMITATION    ON    CERTAIN    RESTRICTIONS    ON SUBSIDIARIES.    The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply, or permit any of their Subsidiaries to apply, to the Bankruptcy Court for authority to), directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Company or any of its Subsidiaries, or pay any Indebtedness owed to the Company or any of its Subsidiaries, (b) make loans or advances to the Company or any of its Subsidiaries or (c) transfer any of its properties or assets to the Company or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Loan Documents, (iii) restrictions in effect on the Filing Date, (iv) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Company or any of its Subsidiaries, (v) customary provisions restricting assignment of any licensing agreement (in which the Company or any of its Subsidiaries is the licensee) or other contract entered into by the Company or any of its Subsidiaries in the ordinary course of business, (vi) restrictions on the transfer of any asset pending the close of the sale of such asset, and (vii) restrictions on the transfer of any asset subject to a Lien permitted by Section 6.01(c), (e) or (h).

SECTION 6.08. CAPITAL EXPENDITURES. The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply or permit any of their Subsidiaries to apply to the Bankruptcy Court for authority to), make any Capital Expenditures, except that (x) during any Test Period ending from and after the date of the effectiveness of an amendment to this Agreement entered into as contemplated by Section 9.14, the Borrowers may make Capital Expenditures in accordance with such amendment and the Budget and (y) from the Effective Date to, but excluding the date of the effectiveness of any such amendment, the

Borrowers may make Capital Expenditures in an aggregate amount not to exceed $_____ in accordance with the Budget.

SECTION 6.09. MINIMUM CONSOLIDATED EBITDA. The Borrowers will not permit Consolidated EBITDA for any Test Period ending from and after the date of the effectiveness of an amendment to this Agreement entered into as contemplated by Section 9.14:

| December 31, 2003 | $ |
| January 31, 2004 | $ |
| February 28, 2004 | $ |
| March 31, 2004 | $ |
| April 30, 2004 | $ |
| May 31, 2004 | $ |
| June 30, 2004 | $ |
| July 31, 2004 | $ |
| August 31, 2004 | $ |
| September 30, 2004 | $ |
| October 31, 2004 | $ |

SECTION 6.10. LIMITATION ON ISSUANCES OF CAPITAL STOCK. (a) The Borrowers will not permit any of their respective Subsidiaries to issue any Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, Equity Interests, or apply to the Bankruptcy Court to do any of the foregoing, except (i) for transfers and replacements of then outstanding shares of Equity Interests, (ii) for stock splits, stock dividends and issuances which do not decrease the percentage ownership of the Company or any of its Subsidiaries in any class of the Equity Interests of such Subsidiary or (iii) to qualify directors to the extent required by applicable law.

(b)    The Company will not issue any capital stock which is not common stock.

SECTION 6.11. CHANGE OF LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZA-TION; ETC. No Borrower shall change its legal name, its type of organization, its status as a registered organization (in the case of a registered organization), its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Security Documents and so long as same do not involve (x) a registered organization ceasing to constitute same or (y) any Borrower changing its jurisdiction of organization or location from the United States or a State thereof to a jurisdiction of organization or location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent not less than 10 days' prior written notice of each change to the information listed on Schedule 3.18 (as

-98-

adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Schedule 3.18 which shall correct all information contained therein for the respective Borrower, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral intended to be granted hereby pursuant to the Security Documents at all times fully perfected and in full force and effect.

SECTION 6.12.  LIMITATION  ON  CREATION  OF  SUBSIDIARIES.    The Borrowers will not, and will not permit any of their respective Subsidiaries to, establish, create or acquire after the Effective Date any Subsidiary, or apply to the Bankruptcy Court to do so.

SECTION 6.13.  CONDUCT OF BUSINESS.  The Borrowers will not, and will not permit any of their respective Subsidiaries to, engage (directly or indirectly) in any business other than the same general type of business conducted by the Borrower and its Subsidiaries (taken as a whole) on the Effective Date and reasonably related extensions thereof.

SECTION 6.14.  CHAPTER 11 CLAIMS.  (a)  The Borrowers will not incur, create, assume, suffer to exist or permit any other Super-Priority Claim or Lien which is PARI PASSU with or senior to the claims or the Liens of the Joint Lead Arrangers, the Post-Petition Agents and the Post-Petition Lenders against the Borrowers hereunder, except for the Carve-Out and the Senior Liens.

(b)  The Borrowers will not, and will not permit any of their respective Subsidiaries to, incur, create, assume, suffer to exist or permit any other Super-Priority Claim or Lien which is PARI PASSU with or senior to the claims or the Pre-Petition Liens or Pre-Petition Lender Replacement Liens of the Pre-Petition Agents or the Pre-Petition Lenders against the Borrowers, except for the Carve-Out, the Facility Liens and the Senior Liens.

SECTION 6.15.  NO OTHER ACCOUNTS.  The Borrowers will not directly or indirectly, open, maintain or otherwise have any checking, savings, deposit, securities or other accounts at any bank or other financial institution where cash or Temporary Cash Investments are or may be deposited or maintained with any Person, other than (i) the Concentration Account, the Collection Accounts set forth on Schedule 3.20(a), the Disbursement Accounts set forth on Schedule 3.20(b), and any such other account constituting Trust Property, PROVIDED that any Borrowers or any of their Subsidiaries may open a new Collection Account or a new Disbursement Account not set forth in such Schedule 3.20(a) or 3.20(b), respectively, so long as prior to opening any such account (i) the Collateral Agent has consented in writing to such opening and (ii) the financial institution with which such account is opened has executed and delivered to the Collateral Agent a Control Agreement.

SECTION 6.16.  PLEADINGS IN CHAPTER 11 CASE.  No Borrower shall file any motion, application, objection, plan, response, adversary complaint or similar pleading in the Cases in any manner inconsistent with the Financing Orders.

## ARTICLE VII

### EVENTS OF DEFAULT

If any of the following events ("EVENTS OF DEFAULT") shall occur:

(a)    the Borrowers shall fail to pay any principal of any Post-Petition Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for pre-payment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Post-Petition Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Post-Petition Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two or more Business Days;

(c)    any representation, warranty, certification or statement made by any Borrower in this Agreement or any other Post-Petition Loan Document or in any certifi-cate, financial statement or other document delivered pursuant to this Agreement or any other Post-Petition Loan Document shall prove to have been incorrect or misleading in any material respect when made (or deemed made);

(d)    any Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, Section 5.04 (insofar as it relates to the corporate existence of the Company), Section 5.07, Section 5.08, Section 5.10, Section 5.12, Section 5.13 or Article VI;

(e)    any Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Post-Petition Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of ten days after notice thereof from the Administrative Agent or the Required Lenders to the Company;

(f)    any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Borrower shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or an application shall be filed by any Borrower for the approval of any other super-priority claim (other than the Carve-Out and the PACA Liens) in any of the Cases which is PARI PASSU with or senior to the claims of the Post-Petition Agents and the Post-Petition Lenders against the Borrowers

hereunder, or there shall arise or be granted any such PARI PASSU or senior super-priority claim;

    (g)   the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest (other than the security interests of the Collateral Agent or the Post-Petition Lenders to the extent granted under the Post-Petition Loan Documents) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Borrower which have a value in excess of $1,000,000 in the aggregate;

    (h)   any Borrower shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other Person's motion as to, any of the matters set forth in paragraphs (f) and (g) above and (r) below or fail to timely object to any such pleading filed by any third party;

    (i)   the Interim Order shall cease to be in full force and effect and the Final Order shall not have been entered or deemed to have been entered prior to such cessation, or the entry of the Final Order shall not have occurred within 45 days after the Effective Date (or such Final Order shall not be in the form of Exhibit J, with such changes as may be acceptable to the Joint Lead Arrangers) or the Final Order shall cease to be in full force and effect, or any Borrower's authority to borrow funds or use Cash Collateral hereunder or under the Financing Orders shall have otherwise terminated;

    (j)   any Borrower shall fail to comply with the terms of the Financing Orders (other than with respect to the terms of any lien granted to trade vendors of such Borrower which non-compliance is not adverse (as determined by the Joint Lead Arrangers) to the Post-Petition Agents or the Post-Petition Lenders);

    (k)   the Bankruptcy Court shall abstain, pursuant to Section 305 of the Bankruptcy Code, from hearing any Case, or any Borrower shall so move or support any motion brought by any third party seeking such relief;

    (l)   except as expressly permitted under the Financing Orders, any Borrower shall seek to, or shall support (in any such case by way of, INTER ALIA, any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of any Borrower) any other Person's motion to, disallow or subordinate in whole or in part any Post-Petition Lender's claim in respect of the Pre-Petition Obligations or the Post-Petition Obligations or to challenge the validity, enforceability, perfection or priority of the Liens in favor of the Collateral Agent or any Post-Petition Lender or in favor of the Pre-Petition Agents and the Pre-Petition Lenders;

    (m)   the filing of any motion to obtain credit except as permitted by Section 6.03 from any party other than the Post-Petition Agents and the Post-Petition Lenders unless in connection therewith, all Commitments shall terminate and all the Post-Petition Obligations (other than indemnities described in Section 9.03 which are not then due and payable) shall first be paid indefeasibly in full in cash (including the cash collateralization of Post-Petition Letters of Credit in accordance with the terms hereof);

(n)    any Borrower shall file any plan of reorganization which fails to provide for the payment in full in cash of all the Pre-Petition Obligations (other than indemnities described in the Pre-Petition Loan Documents which are not then due and payable) upon the effective date thereof (such plan, a "Cram-Down Plan"), any Borrower shall fail to timely object to any Cram-Down Plan filed by any other party-in-interest in any of the Cases, or the Bankruptcy Court shall approve a disclosure statement in respect of any Cram-Down Plan;

(o)    the Bankruptcy Court shall grant a motion with respect to any pleading set forth in paragraph (h) above;

(p)    (i) there shall occur a material disruption in the senior management of the Company and such event shall continue unremedied for 20 days or (ii) the Chief Restructuring Officer shall fail to be employed by the Company for a period of more than 30 days;

(q)    the Company shall fail to deliver a certified Borrowing Base Certificate when due and such default shall continue unremedied for more than three Business Days;

(r)    an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period in excess of ten days, vacating or otherwise modifying in a manner adverse (as determined by the Joint Lead Arrangers) to the Post-Petition Agents or the Post-Petition Lenders, the Interim Order or the Final Order without the prior written consent of the Joint Lead Arrangers and the Required Lenders;

(s)    any non-monetary judgment or order with respect to a post-petition event shall be rendered against any Borrower or any of its Subsidiaries which has or would reasonably be expected to have a Material Adverse Effect;

(t)    except as permitted by the Final Order, any Borrower shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court;

(u)    failure to file a Plan acceptable to the Required Lenders within 360 days following the Filing Date, to obtain approval of a disclosure statement with respect thereto within 420 days following the Filing Date, to obtain the confirmation of a Plan within 510 days following the Filing Date, or to consummate such Plan within 540 days following the Filing Date;

(v)    one or more judgments for a post-petition liability (to the extent not paid or covered by a reputable and solvent insurance company) in an aggregate amount in excess of $[5,000,000] shall be rendered against the Company or any of its Subsidiaries and the same shall remain undischarged for a period of [60] days during which execution shall not be effectively stayed, or any judgment creditor shall legally take possession of or sell any assets of the Company or any of its Subsidiaries to enforce any such judgment;

(w)    (i) any ERISA Affiliate shall fail to pay when due an amount or amounts aggregating in excess of $[_____] which it shall have become liable to pay under Title IV of ERISA; (ii) or notice of intent to terminate a Material Plan shall be filed under

Title IV of ERISA by the Company, any Subsidiary of the Company or any ERISA Affiliate, any plan administrator or any combination of the foregoing; (iii) or the PBGC shall institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer any Material Plan; (iv) or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated; (v) or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA (a "4219 Default"), with respect to, one or more Multiemployer Plans which could cause the Company or one or more Subsidiaries of the Company or ERISA Affiliates to incur a current payment obligation in excess of $[_____]; or (vi) any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA, a Reportable Event (other than with respect to the Cases) shall have occurred, the Company or any Subsidiary of the Company or any ERISA Affiliate has incurred or is likely to incur any liability to or on account of a Plan or Multiemployer Plan under Sections 409, 502(i), 502(l), 515, 4069 or 4212 of ERISA or Section 4971 or 4975 of the Code, the Company or any Subsidiary of the Company has incurred or is likely to incur any liability to or on account of a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code, and/or the Company or any Subsidiary of the Company has incurred or is likely to incur liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans, which, individually or in the aggregate, could cause the Company or any of the Subsidiary of the Company or ERISA Affiliate to incur a liability in excess of $[_____];

(x)    any Lien purported to be created under this Agreement, any Security Document or any Financing Order shall cease to be, or shall be asserted by any Borrower not to be, a valid and perfected Lien on any Collateral, with the priority required by this Agreement, the applicable Security Document or the respective Financing Order, as the case may be, except as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Post-Petition Loan Documents;

(y)    any Post-Petition Loan Document or any material provision thereof shall cease to be in full force, or any Borrower or any Person acting for or on behalf of such Borrower shall deny or disaffirm such Borrower's obligations under any Post-Petition Loan Document;

(z)    any surety bonds of the Company or any of its Subsidiaries shall be cancelled or not renewed, and the cancellation or non-renewal of any such surety bonds (either individually or in the aggregate) results in the inability or material impairment of the Company and its Subsidiaries to conduct their businesses substantially in the manner conducted prior to any such cancellation or non-renewal;

(aa)    a Change in Control shall occur; or

(ab) (i) the Borrowing Base Deficiency Amount (if any) as of May 4, 2003 shall exceed $15,000,000 or (ii) there shall exist a Borrowing Base Deficiency as of May 11, 2003;

then, and in every such event and at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court or further modification to the automatic stay pursuant to Section 362 of the Bankruptcy Code, the Borrowers' right to use the Cash Collateral will automatically terminate, and the Administrative Agent may, and at the request of the Required Lenders shall, take all or more of the following actions, at the same or different times: (a) terminate the Commitments and thereupon the Commitments shall terminate immediately and require the cash collateralization of letters of credit; (b) declare the Post-Petition Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Post-Petition Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; (c) require the Borrowers upon demand to forthwith deposit in the Concentration Account cash as required in accordance with Section 2.04(j); (d) freeze any funds in the Concentration Account, any Disbursement Account, any Collection Account or any other accounts, (other than Excluded Accounts), maintained with the Collateral Agent; (e) set-off or seize amounts contained in the Concentration Account, any Disbursement Account, any Collection Account or any other accounts, (other than Excluded Accounts), maintained with the Collateral Agent and apply such amounts to the obligations of the Borrowers hereunder; or (f) take any other action or exercise any other right or remedy permitted to the Administrative Agent, the Collateral Agent and/or the Post-Petition Lenders under the Post-Petition Loan Documents, the Financing Orders, or by applicable law, subject to the Carve-Out to the extent applicable. PROVIDED that with respect to the enforcement of loans or other remedies pursuant to clause (f) from and after the third Business Day after the date that the Administrative Agent has provided the Company (with a copy to counsel for any statutory creditors' committee appointed in the cases and to the United States Trustee for the District of Delaware) three days prior written notice thereof, unless the ability of the Administrative Agent and the Lenders to exercise their rights and remedies as provided in clause (f) of this paragraph has been stayed as provided in the Financing Orders, (i) the Administrative Agent may, and at the request of the Required Lenders shall, exercise their rights and remedies specified in clause (f) of this paragraph without further order of or application to the Bankruptcy Court or further modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code (which is hereby deemed and shall be modified and vacated to the extent necessary to permit such orderly liquidation) and (ii) the Borrowers shall fully cooperate with the Administrative Agent in the exercise by the Administrative Agent the rights and remedies specified in clause (f) of this paragraph, and if requested by the Administrative Agent, the Borrowers shall commence an orderly liquidation of their assets and properties (or any portion thereof so requested by the Administrative Agent) in order to generate proceeds sufficient to repay in full in cash all the Pre-Petition Obligations and the Post-Petition Obligations and to undertake and perform all other actions reasonably necessary, or reasonably requested by the Administrative Agent and/or the Required Lenders, to implement such orderly liquidation in a commercially reasonable manner, in each case without further order of or application to the

Bankruptcy Court or further modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code.

## ARTICLE VIII

## THE AGENTS

SECTION 8.01. APPOINTMENT. Each of the Post-Petition Lenders and the Issuing Lenders hereby designates DBTCA as Administrative Agent to act as specified herein and in the other Post-Petition Loan Documents. Each of the Post-Petition Lenders and the Issuing Lenders hereby designates JPMorgan Chase as Collateral Agent and as Syndication Agent to act as specified herein and in the other Post-Petition Loan Documents. Each of the Post-Petition Lenders and the Issuing Lenders hereby designate DBSI and JPMSI as Joint Lead Arrangers to act as specified herein and in the other Post-Petition Loan Documents. Each Post-Petition Lender and each Issuing Lender hereby irrevocably authorizes each Post-Petition Agent to take such action on its behalf under the provisions of this Agreement, the other Post-Petition Loan Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of such Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. Each Post-Petition Agent may perform any of its duties hereunder by or through its respective officers, directors, agents, employees or affiliates.

SECTION 8.02. NATURE OF DUTIES. No Post-Petition Agent shall have any duties or responsibilities except those expressly set forth in this Agreement and in the other Post-Petition Loan Documents. No Post-Petition Agent, nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Post-Petition Loan Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined in a final and non-appealable decision by a court of competent jurisdiction). The duties of the Post-Petition Agents shall be mechanical and administrative in nature; no Post-Petition Agent shall have by reason of this Agreement or any other Post-Petition Loan Document a fiduciary relationship in respect of any Post-Petition Lender; and nothing in this Agreement or any other Post-Petition Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of this Agreement or any other Post-Petition Loan Document except as expressly set forth herein or therein.

SECTION 8.03. LACK OF RELIANCE ON THE POST-PETITION AGENTS. Independently and without reliance upon any Post-Petition Agent, each Post-Petition Lender and each Issuing Lender, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrowers and each of their respective Subsidiaries in connection with the making and the continuance of the Post-Petition Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrowers and each of their respective Subsidiaries and, except as expressly provided in this Agreement, no Post-Petition Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Post-Petition Lender with any credit or other information with respect thereto, whether coming into its possession

before the making of the Post-Petition Loans or at any time or times thereafter. No Post-Petition Agent shall be responsible to any Post-Petition Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Post-Petition Loan Document or the financial condition of the Borrowers or any of their respective Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Post-Petition Loan Document, or the financial condition of the Borrowers or any of their respective Subsidiaries or the existence or possible existence of any Default.

SECTION 8.04. CERTAIN RIGHTS OF THE POST-PETITION AGENTS. If any Post-Petition Agent shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Post-Petition Loan Document, such Post-Petition Agent shall be entitled to refrain from such act or taking such action unless and until such Post-Petition Agent shall have received instructions from the Required Lenders; and no Post-Petition Agent shall incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Post-Petition Lender shall have any right of action whatsoever against any Post-Petition Agent as a result of such Agent acting or refraining from acting hereunder or under any other Post-Petition Loan Document in accordance with the instructions of the Required Lenders.

SECTION 8.05. RELIANCE. Each Post-Petition Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that such Post-Petition Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Post-Petition Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent.

SECTION 8.06. INDEMNIFICATION. To the extent any Post-Petition Agent is not reimbursed and indemnified by the Borrowers, the Post-Petition Lenders will reimburse and indemnify the Administrative Agent or such Post-Petition Agent, in proportion to their respective "pro rata shares" (determined based upon their respective shares of the total Exposures and unused Commitments at such time or, if terminated, determined immediately prior to such termination) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Post-Petition Agent in performing its duties hereunder or under any other Post-Petition Loan Document, or in any way relating to or arising out of this Agreement or any other Post-Petition Loan Document; PROVIDED that to the extent that the respective Post-Petition Agent is reimbursed by the Borrowers for amounts paid by the Post-Petition Lenders pursuant to this Section 8.06, such Post-Petition Agent shall reimburse the Post-Petition Lenders for such amounts; PROVIDED FURTHER, that no Post-Petition Lender shall be liable to any Post-Petition Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Post-Petition Agent's gross negligence or willful misconduct (as determined in a final and non-appealable decision by a court of competent jurisdiction).

SECTION 8.07. EACH POST-PETITION AGENT IN ITS INDIVIDUAL CAPACITY. With respect to its obligation to make Post-Petition Loans, or issue or participate in Post-Petition Letters of Credit, under this Agreement, each Post-Petition Agent shall have the rights and powers specified herein for a "Post-Petition Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Post-Petition Lenders", "Required Lenders", or any similar terms shall, unless the context clearly otherwise indicates, include each Post-Petition Agent in its individual capacity. Each Post-Petition Agent may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to, any Borrower or any Affiliate of any Borrower (or any Person engaged in a similar business with any Borrower or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Borrower or any Affiliate of any Borrower for services in connection with this Agreement and otherwise without having to account for the same to the Post-Petition Lenders.

SECTION 8.08. RESIGNATION. (a) Either the Administrative Agent or the Collateral Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Post-Petition Loan Documents at any time, in each case by giving 15 Business Days' prior written notice to the Post-Petition Lenders and the Company. Any such resignation by such Post-Petition Agent hereunder shall also constitute its resignation as an Issuing Lender (to the extent such Post-Petition Agent is an Issuing Lender at the time of such resignation), in which case such resigning Agent (x) shall not be required to issue any further Post-Petition Letters of Credit and (y) shall maintain all of its rights as Issuing Lender, with respect to any Post-Petition Letters of Credit issued by it prior to the date of such resignation. Such resignation shall take effect upon the appointment of a successor Administrative Agent or Collateral Agent, as the case may be, pursuant to clauses (b) and (c) below or as otherwise provided below.

(b) Upon any such notice of resignation by (i) the Administrative Agent, JPMorgan Chase shall be designated as Administrative Agent or (ii) the Collateral Agent, DBTCA shall be designated as Collateral Agent, PROVIDED that if either JPMorgan Chase or DBTCA refuses such designation, in either case, the Required Lenders shall appoint a successor Administrative Agent or Collateral Agent, as the case may be, hereunder or thereunder who shall be a commercial bank or trust company having net assets of at least $250,000,000.

(c) If a successor Administrative Agent or Collateral Agent, as the case may be, shall not have been so appointed within such 15 Business Day period, then such Post-Petition Agent shall then appoint a successor Administrative Agent or Collateral Agent, as the case may be, who shall serve as Administrative Agent or Collateral Agent, as the case may be, hereunder or thereunder (who shall be a commercial bank or trust company having assets of at least $250,000,000)until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent, as the case may be, as provided above.

(d) If no successor Administrative Agent or Collateral Agent, as the case may be, has been appointed pursuant to clause (b) or (c) above by the 30th Business Day after the date such notice of resignation was given by the respective Post-Petition Agent, the respective

Post-Petition Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent or the Collateral Agent, as the case may be, hereunder and/or under any other Post-Petition Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent, as the case may be, as provided above.

(e)    The Syndication Agent may resign from the performance of all its functions and duties hereunder by giving five Business Days' notice to the Administrative Agent. Any resignation pursuant to the immediately preceding sentence shall become effective on the fifth Business Day after the respective notice is given to the Administrative Agent.

(f)    Upon a resignation of any Agent pursuant to this Section 8.08, such Post-Petition Agent shall remain indemnified to the extent provided in this Agreement and the other Post-Petition Loan Documents and the provisions of this Article VIII shall continue in effect for the benefit of such Post-Petition Agent for all of its actions and inactions while serving as a Post-Petition Agent.

SECTION 8.09. THE SYNDICATION AGENT.  Notwithstanding any other provision of this Agreement or any provision of any other Post-Petition Loan Document, the Syndication Agent is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Post-Petition Loan Documents or the transactions contemplated hereby; it being understood and agreed that the Syndication Agent shall be entitled to all indemnification and reimbursement rights in favor of "Post-Petition Agents" as provided for under Sections 8.06 and 9.03.  Without limitation of the foregoing, the Syndication Agent shall not, solely by reason of this Agreement or any other Post-Petition Loan Document, have any fiduciary relationship in respect of any Post-Petition Lender or any other Person.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01. NOTICES.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to any Borrower, to Fleming Companies, Inc. at 1945 Lakepointe Drive, Lewisville, TX 75057, Attention:  Treasurer (Telephone No. (972) 906-8000; Telecopy No. (972) 906-1530) with a copy to Legal Department and to the committee for unsecured creditors of the Borrowers established in connection with the Cases at _____ , PROVIDED, HOWEVER, any failure to give notice to such committee shall not otherwise render invalid any notice otherwise made in compliance with this Agreement or effect the rights or remedies of the Post-Petition Agents, the Joint Lead Arrangers, the Issuing Lenders or the Post-Petition Lenders hereunder or under any other Post-Petition Loan Document;

(b)    if to the Administrative Agent, (i) for credit notices, to DBTCA, 222 South Riverside Plaza, Chicago, Illinois 60606, Attention of Steven Friedlander (Telephone No. (312) 537-1847; Telecopy No. (312) 537-1327) and (ii) for operational notices, to DBTCA, 90 Hudson Street, 5th Floor, Jersey City, NJ 07302, Attention of Margaret Richards (Telephone No. (201) 593-2217; Telecopy No. (201) 593-2311);

(c)    if to the Collateral Agent to JPMorgan Chase, 270 Park Avenue, New York, NY 10017, Attention of ____ (Telephone No. _____; Telecopy No. _____);

(d)    if to the Issuing Lenders, to them at (i) DBTCA, 31 West 52nd Street, New York, NY 10019, Attention of Marco Orlando (Telephone No. (212) 602-1132; Telecopy No. (212) 797-0403); and (ii) JPMorgan Chase, 270 Park Avenue, New York, NY 10017, [Attention of Mabelyn Vera (Telephone No. (813) 432-0352; Telecopy No. (813) 432-5161)];

(e)    if to any other Post-Petition Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02. WAIVERS; AMENDMENTS. (a) No failure or delay by any Post-Petition Agent, any Joint Lead Arranger, any Issuing Lender or any Post-Petition Lender in exercising any right or power hereunder or under any other Post-Petition Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Post-Petition Agents, the Joint Lead Arrangers, the Issuing Lenders and the Post-Petition Lenders hereunder and under the other Post-Petition Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Post-Petition Loan Document or consent to any departure by any Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Post-Petition Loan or issuance of a Post-Petition Letter of Credit shall not be construed as a waiver of any Default or any condition precedent to any such extension of credit, regardless of whether any Post-Petition Agent, any Joint Lead Arranger, any Post-Petition Lender or any Issuing Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Post-Petition Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by each Borrower party thereto and the Required Lenders, PROVIDED that no such change, waiver, discharge or termination shall, without the consent of each Post-Petition Lender (other than a Defaulting Lender) (with Post-Petition Obligations being directly modified in the case of following clause (i)), (i) extend the

Maturity Date of any Post-Petition Loan, or extend the stated expiration date of any Post-Petition Letter of Credit beyond the Maturity Date, or reduce the rate, or extend the time of payment, of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates), or reduce the principal amount thereof (except to the extent repaid in cash), (ii) release all or any material portion of the Collateral (except as expressly provided in the Post-Petition Loan Documents (x) in connection with the termination of commitments hereunder and repayment in full of amounts owing pursuant hereto and (y) with respect to permitted sales or dispositions of property) under all the Security Documents, (iii) amend, modify or waive any provision of this Section 9.02(b) (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the deter-mination of Required Lenders on substantially the same basis as the extension of Post-Petition Loans and Commitments are included on the Effective Date), (iv) reduce the respective percentage specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Post-Petition Loans and Commitments are included on the Effective Date), (v) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement, (vi) amend, modify or waive any provisions of Section 2.16(b) or (c) providing for payments to be made to, or shared in, ratably by the Post-Petition Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in determining the ratable shares of payments to which the Post-Petition Lenders are entitled and adjustments to Section 2.16 may be made consistent therewith), (vii) amend, modify or waive any provisions of Section 2.02(a), 2.04(d), 2.04(c) or 8.06 providing for Post-Petition Loans to be made, participations to be acquired, reimbursement payments to be made and/or indemnity payments to be made ratably by the Post-Petition Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in determining any ratable share pursuant to such Sections and adjustments to any such Section may be made consistent therewith or (viii) increase any percentage specified in the definition of Borrowing Base, Relevant Eligible Fixed Assets Amount or Relevant Eligible Inventory Amount, in any such case above the respective percentages set forth in any such definition on the Effective Date); PROVIDED FURTHER, that no such change, waiver, discharge or termination shall (1) increase the Commitment of any Post-Petition Lender over the amount thereof then in effect without the consent of such Post-Petition Lender (it being understood that waivers or modifications of condi-tions precedent, covenants or Defaults or of a mandatory reduction in the Commitments shall not constitute an increase of the Commitment of any Post-Petition Lender, and that an increase in the available portion of any Commitment of any Post-Petition Lender shall not constitute an increase in the Commitment of such Post-Petition Lender), (2) without the consent of each Issuing Lender, amend, modify or waive any provision of Section 2.04 or alter its rights or obligations with respect to Post-Petition Letters of Credit, (3) without the consent of the Administrative Agent, the Collateral Agent and each Joint Lead Arranger and the Syndication Agent, amend, modify or waive any provision of Article VIII as same applies to any such Person or any other provision as same relates to the rights or obligations of any such Person or (4) without the consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent.

SECTION 9.03. EXPENSES; INDEMNITY; DAMAGE WAIVER.    (a) The Borrowers shall pay (i) all Expenses incurred by the Post-Petition Agents, the Joint Lead Arrangers and their respective Affiliates, including the reasonable fees, charges and disbursements of one counsel (plus any local counsel deemed reasonably necessary or desirable by the Administrative Agent) and any internal or third party appraisers, consultants and auditors for the Post-Petition Agents and the Joint Lead Arrangers, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of the Post-Petition Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Issuing Lenders in connection with the issuance, amendment, renewal or extension of any Post-Petition Letter of Credit or any demand for payment thereunder, (iii) all out-of-pocket expenses incurred by the Post-Petition Agents, the Joint Lead Arrangers or any Issuing Lender, including the reasonable fees, charges and disbursements of any counsel for the Post-Petition Agents, the Joint Lead Arrangers or any Issuing Lender, in connection with periodic field audits, monitoring of assets (including reasonable and customary internal collateral monitoring fees), and, in connection with monitoring of and participation in the Cases, in connection with the enforcement or protection of its rights in connection with the Post-Petition Loan Documents, including its rights under this Section, or in connection with the Post-Petition Loans made or Post-Petition Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Post-Petition Loans or Post-Petition Letters of Credit.

(b)    The Borrowers shall indemnify each Post-Petition Agent, each Joint Lead Arranger, each Issuing Lender and each Post-Petition Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "INDEMNITEE") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Post-Petition Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Post-Petition Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated hereby, (ii) any Post-Petition Loan or Post-Petition Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Lender to honor a demand for payment under a Post-Petition Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Post-Petition Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Company or any of its Subsidiaries, or any Environmental Liability related in any way to the Company or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; PROVIDED that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee (as determined in a non-appealable final decision made by a court of competent jurisdiction).

(c)    To the extent permitted by applicable law, no party to this Agreement shall assert, and each party to this Agreement hereby waives, any claim against any Indemnitee,

on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby, any Post-Petition Loan or Post-Petition Letter of Credit or the use of the proceeds thereof.

(d)    All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.  SUCCESSORS AND ASSIGNS.  (a)  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; PROVIDED, HOWEVER, that no Borrower may assign or transfer any of its rights, obligations or interest hereunder or under any other Post-Petition Loan Document without the prior written consent of all of the Post-Petition Lenders and, PROVIDED FURTHER, that although any Post-Petition Lender may transfer, assign or grant participations in its rights hereunder, such Post-Petition Lender shall remain a "Post-Petition Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitment hereunder except as provided in Section 9.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Post-Petition Lender" hereunder and, PROVIDED FURTHER, that no Post-Petition Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Post-Petition Loan Document except to the extent such amendment or waiver would (i) extend the Maturity Date of any Post-Petition Loan or extend the expiry date of any Post-Petition Letter of Credit beyond the Maturity Date, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or of a mandatory reduction in the total Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof) or (ii) consent to the assignment or transfer by any Borrower of any of its rights and obligations under this Agreement.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Post-Petition Loan Documents (the participant's rights against such Post-Petition Lender in respect of such participation to be those set forth in the agreement executed by such Post-Petition Lender in favor of the participant relating thereto) and all amounts payable by the Borrowers hereunder shall be determined as if such Post-Petition Lender had not sold such participation.

(b)    Notwithstanding the foregoing, any Post-Petition Lender (or any Post-Petition Lender together with one or more other Post-Petition Lenders) may (x) assign all or a portion of its Commitment and related outstanding Post-Petition Obligations hereunder (or, if the Commitments have terminated, its outstanding Post-Petition Obligations) to (i) its parent company and/or any affiliate of such Post-Petition Lender which is at least 50% owned by such Post-Petition Lender or its parent company or to one or more other Post-Petition Lenders or (ii) in the case of any Post-Petition Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed by the same investment advisor of any Post-Petition Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion

equal to at least $1,000,000 in the aggregate for the assigning Post-Petition Lender or assigning Post-Petition Lenders, of such Commitments and related outstanding Obligations hereunder (or, if the Commitments have terminated, its outstanding Post-Petition Obligations) to one or more Eligible Transferees (treating any fund that invests in bank loans and any other fund that invests in bank loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Post-Petition Lender by execution of an Assignment and Acceptance (it being understood that an assignment pursuant to this clause (y) by any Post-Petition Lender described in preceding clause (x)(ii) must meet the $1,000,000 minimum described above unless the respective assignment is of all the Commitments and related outstanding Post-Petition Obligations held by such Post-Petition Lender and any other fund that invests in bank loans and is managed by the same investment advisor of any Post-Petition Lender or by an Affiliate of such investment advisor), PROVIDED that (i) at such time Schedule 2.01 shall be deemed modified to reflect the Commitment and/or outstanding Post-Petition Loans, as the case may be, of such new Post-Petition Lender and of the existing Post-Petition Lenders, (ii) at the request of the assignee Post-Petition Lender, and upon surrender of the relevant notes or the provision of a customary lost note indemnification agreement from the assignor or assignee Post-Petition Lender, as the case may be, new promissory notes (in a form approved by the Administrative Agent) will be issued, at the Borrowers' expense, to such new Post-Petition Lender and to the assigning Post-Petition Lender, to the extent needed to reflect the revised Commitments and/or outstanding Post-Petition Loans, as the case may be, (iii) the consent of the Administrative Agent shall be required in connection with any such assignment pursuant to clause (y) above which consent shall not be unreasonably withheld or delayed), (iv) in the case of any assignment of Commitments or relating outstanding Post-Petition Obligations, the consent of each Issuing Lender shall be required (which consent shall not be unreasonably withheld or delayed) and (v) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Post-Petition Lender, the payment of a non-refundable assignment fee of $3,500. To the extent of any assignment pursuant to this paragraph (b), the assigning Post-Petition Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and/or outstanding Post-Petition Loans, as the case may be.  As provided by Section 2.15(e), at the time of each assignment pursuant to this paragraph (b) to a Person which is not already a Post-Petition Lender hereunder and which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for Federal income tax purposes, the respective assignee Post-Petition Lender shall provide to the Borrower and the Administrative Agent the appropriate Internal Revenue Service Forms (and, if applicable a Section 2.15(e) Certificate) described in Section 2.15(e). To the extent that an assignment of all or any portion of a Post-Petition Lender's Commitments (and related outstanding Post-Petition Obligations) pursuant to Section 2.17(b) or this paragraph (b) would, at the time of such assignment, result in increased costs under Section 2.13 or 2.15 greater than those being charged by the respective assigning Post-Petition Lender prior to such assignment, then the Borrower shall not be obligated to pay such greater increased costs (although the Borrower shall be obligated as provided in Sections 2.13 and 2.15 to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)    Nothing in this Agreement shall prevent or prohibit any Post-Petition Lender from pledging its Post-Petition Loans or any promissory notes evidencing such Loans to a Federal Reserve Bank in support of borrowings made by such Post-Petition Lender from such

Federal Reserve Bank and, with prior notice to the Administrative Agent, any Lender which is a fund may pledge all or any portion of such promissory notes held by it or Post-Petition Loans to its trustee, to a collateral agent or to another creditor providing credit or credit support to such Post-Petition Lender in support of its obligations to its trustee or such collateral agent, as the case may be. No pledge pursuant to this paragraph (c) shall release the transferor Post-Petition Lender from any of its obligations hereunder.

(d)      The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Post-Petition Lenders, and the Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Post-Petition Lender pursuant to the terms hereof from time to time (the "Register"). The entries made in the Register shall be conclusive, and the Borrowers, the Administrative Agent, the Issuing Lenders and the Post-Petition Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Post-Petition Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Company, any Issuing Lenders and any Post-Petition Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)      Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Post-Petition Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Post-Petition Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

SECTION 9.05. SURVIVAL. All covenants, agreements, representations and warranties made by the Borrowers in the Post-Petition Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Post-Petition Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Post-Petition Loan Documents and the making of any Post-Petition Loans and issuance of any Post-Petition Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Post-Petition Agent, any Joint Lead Arranger, any Issuing Lender or any Post-Petition Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Post-Petition Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Post-Petition Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.13, 2.14, 2.15 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Post-Petition Loans, the expiration or termination of the Post-Petition Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. COUNTERPARTS; INTEGRATION; EFFECTIVENESS. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Post-Petition Loan Document and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective on the date ("Effective Date") when (i) it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each Borrower and each of the other parties hereto and (ii) each of the conditions precedent set forth in Section 4.01 have been met to the reasonable satisfaction of the Administrative Agent and the Required Lenders, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Unless the Administrative Agent has received actual notice from any Post-Petition Lender that the conditions contained in Section 4.01 have not been met to its reasonable satisfaction, upon the satisfaction of the condition described in clause (i) of the immediately preceding sentence and upon the Administrative Agent's good faith determination that the conditions described in clause (ii) of the immediately preceding sentence have been met, then the Effective Date shall have been deemed to have occurred, regardless of any subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the Effective Date shall not release the Borrowers from any liability for failure to satisfy one or more of the applicable conditions contained in Section 4.01). Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07. SEVERABILITY. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08. RIGHT OF SETOFF. If an Event of Default shall have occurred and be continuing, each Post-Petition Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Post-Petition Lender or Affiliate to or for the credit or the account of any Borrower against any of and all the obligations of the Borrowers now or hereafter existing under this Agreement held by such Post-Petition Lender, irrespective of whether or not such Post-Petition Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Post-Petition Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Post-Petition Lender may have.

SECTION 9.09. GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York and the Bankruptcy Code.

(b)    Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, of the United States District Court of the Southern District of New York and of the United States Bankruptcy Court for the District of Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Post-Petition Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Post-Petition Loan Document shall affect any right that any Administrative Agent, any Joint Lead Arranger, any Issuing Lender or any Post-Petition Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Post-Petition Loan Document against the Borrowers or its properties in the courts of any jurisdiction.

(c)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Post-Petition Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Post-Petition Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.  WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER POST-PETITION LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTA-TIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.  HEADINGS.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12. CONFIDENTIALITY. Each Post-Petition Agent, each Joint Lead Arranger, each Issuing Lender and each Post-Petition Lender agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Post-Petition Loan Document or the enforcement of rights hereunder or thereunder, (f) to any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement so long as such assignee or participant, as the case may be, agrees to treat such Information as provided in this Section, (g) with the consent of the Company or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach by it of this Section or (ii) becomes available to it on a nonconfidential basis from a source other than the Company. For the purposes of this Section, "Information" means all information received from the Company and relating to the business and affairs of Company or any Subsidiary, other than any such information that is available to any Agent, any Joint Lead Arranger, any Issuing Lender or any Post-Petition Lender on a nonconfidential basis prior to disclosure by the Company or any Subsidiary; PROVIDED that, in the case of information received from the Company or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.13. INTEREST RATE LIMITATION. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Post-Petition Loan, together with all fees, charges and other amounts which are treated as interest on such Post-Petition Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Post-Petition Lender holding such Post-Petition Loan in accordance with applicable law, the rate of interest payable in respect of such Post-Petition Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Post-Petition Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Post-Petition Lender in respect of other Post-Petition Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by such Post-Petition Lender.

SECTION 9.14. SPECIAL PROVISIONS REGARDING SECTIONS 6.08 AND 6.09. The Borrowers and Lenders hereby acknowledge that until the Forecast has been delivered pursuant to Section 5.01(a), the compliance levels for Section 6.08 and 6.09 cannot be agreed upon by the parties hereto. The Borrowers and the Lenders hereby agree to negotiate in good faith to enter into an amendment to this Agreement within 15 days following the delivery of the

Forecast to the Lenders pursuant to Section 5.01(o), which amendment shall designate the compliance levels for each such Section and make any other technical amendments or modifications to this Agreement necessary in connection therewith.

## ARTICLE X

## NATURE OF BORROWERS' OBLIGATIONS

SECTION 10.01. NATURE OF OBLIGATIONS.  Notwithstanding anything to the contrary contained elsewhere in this Agreement, it is understood and agreed by the various parties to this Agreement that all Post-Petition Obligations to repay principal of, interest on, and all other amounts with respect to, all Post-Petition Loans and LC Disbursements and all other Post-Petition Obligations pursuant to this Agreement (including, without limitation, all fees, Expenses, indemnities, taxes and other Post-Petition Obligations in connection therewith or in connection with the related Commitments) shall constitute the joint and several obligations of the Borrowers.

SECTION 10.02. INDEPENDENT OBLIGATION.  The obligations of each Borrower with respect to the Post-Petition Obligations are independent of the obligations of the other Borrowers, and a separate action or actions may be brought and prosecuted against each Borrower, whether or not any other Borrower is joined in any such action or actions. Each Borrower waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by any Borrower or other circumstance which operates to toll any statute of limitations as to any Borrower shall, to the fullest extent permitted by law, operate to toll the statute of limitations as to each Borrower.

SECTION 10.03. AUTHORIZATION.  Each of the Borrowers authorizes the Joint Lead Arrangers, the Post-Petition Agents and the Post-Petition Lenders without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)    exercise or refrain from exercising any rights against any other Borrower or any guarantor or others or otherwise act or refrain from acting;

(b)    release or substitute any other Borrower, endorsers, guarantors or other obligors;

(c)    settle or compromise any of the Post-Petition Obligations of any other Borrower, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Borrower to its creditors other than the Post-Petition Lenders;

(d)    apply any sums paid by any other Borrower or any other Person, howsoever realized to any liability or liabilities of such other Borrower or other Person regardless of what liability or liabilities of such other Borrower or other Person remain unpaid; and/or

(c)    consent to or waive any breach of, or act, omission or default under, this Agreement or any of the instruments or agreements referred to herein, or otherwise, by any other Borrower or any other Person.

SECTION 10.04.  RELIANCE.  It is not necessary for the Administrative Agent or any other Post-Petition Lender to inquire into the capacity or powers of any Borrower or any of its Subsidiaries or the officers, directors, members, partners or agents acting or purporting to act on its behalf, and any Post-Petition Obligations made or created in reliance upon the professed exercise of such powers shall constitute the joint and several obligations of the Borrowers hereunder.

SECTION 10.05.  CONTRIBUTION; SUBROGATION.  No Borrower shall have any rights of contribution or subrogation with respect to any other Borrower as a result of payments made by it hereunder, in each case unless and until the total Commitments and all Post-Petition Letters of Credit have been terminated and all Post-Petition Obligations have been paid in full in cash.

SECTION 10.06.  WAIVER.  Each Borrower waives any right to require the Administrative Agent or the other Post-Petition Lenders to (i) proceed against any other Borrower, any guarantor or any other party, (ii) proceed against or exhaust any security held from any Borrower, any guarantor or any other party or (iii) pursue any other remedy in any Joint Lead Arranger's, any Post-Petition Agent's or any Post-Petition Lender's power whatsoever.  Each Borrower waives any defense based on or arising out of suretyship or any impairment of security held from any Borrower, any guarantor or any other party or on or arising out of any defense of any other Borrower, any guarantor or any other party other than payment in full in cash of the Post-Petition Obligations, including, without limitation, any defense based on or arising out of the disability of any other Borrower, any guarantor or any other party, or the unenforceability of the Post-Petition Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Borrower, in each case other than as a result of the payment in full in cash of the Post-Petition Obligations.

*        *        *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FLEMING COMPANIES, INC.

By:_____
    Name:
    Title:

ABCO FOOD GROUP, INC.

By:_____
    Name:
    Title:

ABCO MARKETS INC.

By:_____
    Name:
    Title:

ABCO REALTY CORP.

By:_____
    Name:
    Title:

DUNIGAN FUELS, INC.

By:_____
    Name:
    Title:

FAVAR CONCEPTS, LTD.

By:_____
    Name:
    Title:


FLEMING FOODS MANAGEMENT CO.,
    L.L.C.

By:_____
    Name:
    Title:

FLEMING FOODS OF TEXAS, L.P.

By:_____
    Name:
    Title:


FLEMING INTERNATIONAL LTD.

By:_____
    Name:
    Title:


FLEMING SUPERMARKETS OF FLORIDA,
    INC.

By:_____
    Name:
    Title:

FLEMING TRANSPORTATION SERVICE, INC.

By:_____
     Name:
     Title:


FOOD 4 LESS BEVERAGE COMPANY, INC.

By:_____
     Name:
     Title:


FUELSERV, INC.

By:_____
     Name:
     Title:


HEAD DISTRIBUTING COMPANY

By:_____
     Name:
     Title:


MINTER-WEISMAN CO.

By:_____
     Name:
     Title:


PIGGLY WIGGLY COMPANY

By:_____
     Name:
     Title:

PROGRESSIVE REALTY, INC.

By:_____
    Name:
    Title:


RAINBOW FOOD GROUP, INC.

By:_____
    Name:
    Title:


RETAIL INVESTMENTS, INC.

By:_____
    Name:
    Title:


RETAIL SUPERMARKETS, INC.

By:_____
    Name:
    Title:


RFS MARKETING SERVICES, INC.

By:_____
    Name:
    Title:


RICHMAR FOODS, INC.

By:_____
    Name:
    Title:

CORE-MARK INTERNATIONAL, INC.

By:_____   _____   _____
    Name:
    Title:


CORE-MARK INTERRELATED
  COMPANIES, INC.

By:_____   _____   _____
    Name:
    Title:


CORE-MARK MIDCONTINENT, INC.

By:____   _____   _____
    Name:
    Title:


C/M PRODUCTS, INC.

By:.   _____   _____
    Name:
    Title:


GENERAL ACCEPTANCE CORPORATION

By:_____   _____   _____
    Name:
    Title:


JPMORGAN CHASE BANK, Individually, as
Collateral Agent and as Syndication Agent

By:_____   _____   _____
    Name:
    Title:

[OTHER LENDERS]

## TERMS OF TRADE CREDITOR LIEN

In consideration for the agreement of each vendor (individually, a "Vendor" and collectively, "Vendors") that executes the Trade Credit Program Letter Agreement to participate in the Trade Credit Program of Fleming Companies, Inc. ("Fleming") and its subsidiaries currently debtors in possession in those certain Chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware, Case Nos. 03-10944 (MFW) through 03-10973 (MFW) (collectively with Fleming, the "Debtors"), on the terms and conditions contained in the Statement of Qualifications of the Debtors (the "Statement of Qualifications")[1], the Debtors grant to each Vendor, for as long as such Vendor becomes and remains an Approved Trade Creditor (except as otherwise set forth in paragraph 5 hereof), a junior security interest subordinated to the holders of the Senior Obligations (as defined below) in the assets of the Debtors that secure the Senior Obligations, and all proceeds resulting from the sale or disposition of such assets (collectively, the "Vendor Collateral"), to secure the obligations of the Debtors to the Vendor described in the Statement of Qualifications (the "Secured Vendor Claims"), in all cases subject to the following terms and conditions:

1.     The security interest granted hereby shall be subject and subordinate to the following (collectively, the "Senior Obligations"):

(a)     any and all liens granted under or pursuant to (i) that certain Credit Agreement dated as of May 6, 2003 among Fleming Companies, Inc., the other Debtors and the financial institutions party thereto, as the same may be amended, modified, supplemented or restated from time to time (including, without limitation, any modifications that may increase the principal amount of loans or any other obligations able to be incurred thereunder) (the "DIP Credit Agreement"), (ii) each and every credit facility that may directly or indirectly refinance, in whole or part, or that may be entered into in addition to, the DIP Credit Agreement, as the same may be amended, modified, supplemented or restated from time to time (including, without limitation, any modifications that may increase the principal amount of loans or any other obligations incurred thereunder), (iii) any document, instrument or agreement executed by the Debtors in connection with any of the facilities or agreements referred to in clauses (i) and/or (ii) above, from time to time as the same may be amended, modified, supplemented or restated from time to time, and/or (iv) any order relating to any of the facilities or agreements referred to in clauses (i), (ii) or (iii) above entered into by the Bankruptcy Court from time to time;

(b)     any and all liens granted by the Debtors in favor of any financial institutions to secure cash management or letter of credit obligations owed by the Debtors to any such institutions from time to time;

---

[1]     Capitalized terms used and not defined herein shall have the respective meanings ascribed to such terms in the Statement of Qualifications.

(c)     any and all liens granted to the lenders under and pursuant to (i) the Credit Agreement, dated as of June 18, 2002 among the Debtors, the lenders party thereto (the "Prepetition Lenders") and DBTCA and JPMorgan Chase Bank, as agents (the "Prepetition Credit Agreement"), including liens granted prior to the Petition Date and any replacement liens provided to Prepetition Lenders as adequate protection for the use of cash collateral, (ii) any document, instrument or agreement executed by the Debtors in connection with the facilities or agreements referred to in clause (i) above, from time to time as the same may be amended, modified, supplemented or restated from time to time, and/or (iii) any order relating to any of the facilities or agreements referred to in clauses (i) or (ii) above entered into by the Bankruptcy Court from time to time; and

(d)     (x) any and all other liens and claims that are prior in right or superior to those granted pursuant to any of the documents, instruments, agreements or orders referenced in clauses (a), (b) or (c), above, and (y) any fees and expenses of the professionals retained by the Debtors or any statutory committee in the Debtors' bankruptcy cases approved by the Bankruptcy Court; it being understood that prior to any distribution on account of any Secured Vendor Claims, but after satisfaction in full in cash of the Senior Obligations set forth in clauses (a), (b) and (c) above, an amount equal to $6 million shall be funded into a segregated account for payment of any amounts owing under this clause (d)(y) at any time following satisfaction (in whole or in part) of the Secured Vendor Claims; provided, however, that all fees and expenses owing by the Debtors under this clause (d)(y) shall continue to be prior in right and superior to the Trade Creditor Lien (and the Secured Vendor Claims), and, as to any amounts owing under this clause (d)(y) in excess of the "Carve-Out" (as defined in the DIP Credit Agreement), junior in right to the Senior Obligations set forth in clauses (a), (b) and (c) above, notwithstanding the funding of such segregated account and the satisfaction of any Secured Vendor Claims.

2.     The security interest granted to each Vendor shall be *pari passu* to, and equal and ratable with, all liens on the Vendor Collateral granted by the Debtors in favor of other Vendors.    The security interest of each Vendor in any assets of the Debtors shall automatically be released and discharged upon the sale or other disposition of such assets by the Debtors or by or on behalf of any holder of any Senior Obligations or any release of such lien by the holders of a majority of the Senior Obligations or any representative acting on their behalf; provided, that Vendors shall retain their security interest in the proceeds of such assets to the extent that such proceeds constitute Vendor Collateral, subject to the prior payment in full in cash of the Senior Obligations.

3.     Until and unless the Senior Obligations shall have been paid in full in cash, and no financial institution or other holder of the Senior Obligations shall have any commitment to provide the Debtors with any loan, letter of credit or other financial accommodation that would constitute Senior Obligations, each Vendor agrees that it shall not be permitted to exercise any rights or remedies with respect to the Vendor Collateral, including any rights to foreclose or otherwise move or take action against the Vendor Collateral, and it shall not have any right to direct any holder of any Senior Obligation (or

2

any representative thereof) with respect to any matters in connection therewith. Once the Senior Obligations have been paid in full in cash and none of the letters of credit issued under the Prepetition Credit Agreement or the DIP Credit Agreement remain outstanding, and provided there exists no commitment of any financial institution or other holder of any of the Senior Obligations to provide the Debtors with any loan, letter of credit or other financial accommodation that would constitute Senior Obligations, Vendors holding a majority of the obligations secured by liens in the Vendor Collateral granted pursuant to the terms of the Trade Creditor Lien may exercise such rights with respect to the Vendor Collateral as the Bankruptcy Court may approve. If a claim is ever made upon any holder of Senior Obligations for repayment or recovery of any amount or amounts received in payment or on account of any of the Senior Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including each of the Debtors) then and in such event each Debtor and each Approved Trade Creditor agrees that the Debtors shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent, and on the same priority, as if such amount had never originally been received by any such payee.

4.      The holders of the Senior Obligations may at any time and from time to time without the consent of or notice to Vendors and without incurring liability to Vendors, exercise any of their rights or remedies with respect to their collateral or increase the amount of the Senior Obligations, change the manner or place of payment or extend the time of payment of or renew or otherwise alter any Senior Obligations, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to any of the Senior Obligations, including, without limitation, in respect of borrowing base, advance rates or any reserves. The holders of the Senior Obligations shall have no obligation to marshal any assets in favor of Vendors.

5.      The security interest granted hereby shall terminate with respect to each Vendor upon such Vendor ceasing to be an Approved Trade Creditor (other than with respect to Secured Vendor Claims outstanding on the date of such cessation), and with respect to all Vendors upon the consummation of a plan of reorganization of the Debtors. In addition, the security interest granted hereby and the terms and conditions applicable thereto may also be modified or terminated from time to time by the Debtors by notice to Vendors; provided, that no such modification or termination that adversely affects Vendors in any material respect shall be effective as to any Secured Vendor Claims outstanding, or Vendor Collateral existing, at the time of such notice.

6.      Vendors may not assign their rights and/or duties hereunder without the prior written consent of the Debtors given at the Debtors' sole discretion; provided that Vendors may assign their rights under the Trade Creditor Lien to (i) any factor or other entity that finances or insures such Vendor's receivables or (ii) a successor entity of such Vendor in connection with the sale of all or substantially all of the Vendor's business to such entity, it being understood that any such assignee's rights with respect to the Trade Creditor Lien shall be limited as set forth herein and, in the case of an assignment under

3

item (ii) above, such assignee shall also be obligated to perform in accordance with the Statement of Qualifications and the terms of the relevant Trade Credit Program Letter Agreement. Any other attempted assignment shall be void and shall void such Vendor's participation in the Trade Creditor Lien in accordance with the terms of the Statement of Qualifications. This Agreement shall be interpreted under and in accordance with the laws of the State of New York. Each Vendor agrees that any dispute arising directly or indirectly out of or that in any way relates to this Agreement shall be resolved by the United States Bankruptcy Court for the District of Delaware and such Vendor hereby consents to the jurisdiction of such Court.

Exhibit C

## GOB GUIDELINES

1.  Business shall be conducted so that the Leasehold Properties remain open during the normal hours of operation provided for in the respective leases for the Leasehold Properties.

2.  The Liquidation Sales shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Liquidation Sales shall be conducted on a Sunday.

3.  The Agents shall not distribute handbills, leaflets or other written materials to customers outside any Leasehold Property's premises, but may solicit customers within the Leasehold Properties themselves. The Agents shall not use flashing lights or any type of amplified sound to advertise the Liquidation Sales or solicit customers.

4.  At the conclusion of each Liquidation Sale, the Agents shall vacate the respective Leasehold Property in broom-clean condition, except for the removal of furniture, fixtures, equipment and remaining supplies, and shall leave the Leasehold Property in the same condition as on the commencement of the Liquidation Sale, ordinary wear and tear expected. Any merchandise or furniture, fixtures and equipment ("FF&E") left in the store premises after the Surrender Date shall be deemed abandoned.

5.  After the commencement of a Liquidation Sale, the Agents shall not augment or otherwise bring any new merchandise into the Leasehold Properties, other than the Debtors' inventory ordered by the Debtors prior to such Liquidation Sale for purposes of consolidating merchandise currently located at the Leasehold Properties.

6.  All display and hanging signs used in connection with a Liquidation Sale shall be professionally lettered, and all hanging signs shall be hung in a professional manner.

7.  With respect to the advertising of the Liquidation Sales, the Agents may use the terms "Going-Out-Of-Business Sale," "Store Closing Sale" or "Total Liquidation Sale."

8.  If sales are to be considered "final" conspicuous signs shall be posted in each of the affected stores to the effect that all sales are "final" and the Agents shall provide a named representative with a telephone number that customers can contact with any questions or complaints.

9.  The Agents shall not make any alterations to the Leasehold Properties (excluding the removal of store signs, in the Agents' discretion unless such removal is prohibited by the leases). If removal is permitted by the leases, then such removal will be in accordance with the terms of the leases.

10. The Agents shall not make any alterations to interior or exterior Leasehold Property lighting.

Exhibit C

11.  The Agents shall keep the Leasehold Property premises and surrounding area clean and orderly consistent with present practices and consistent with terms of the leases.

12.  The landlords of the Leasehold Property shall have reasonable access to the Leasehold Property premises upon conclusion of a Liquidation Sale solely for the purpose of dressing the Leasehold Property windows to minimize the appearance of a dark store.

13.  The Agents shall not auction any FF&E.

14.  The Agents shall provide at least three (3) business day written advance notice to the landlords and the Debtors of the conclusion of each Liquidation Sale.