1          MR. HOGAN:  Much of why I'm here, Your Honor, is

2    regarding that matter.  And it would seem to be at least

3    something that I thought was going to be addressed prior to the

4    confirmation hearing, Your Honor.

5          THE COURT:  Well, it might have been.  I did not get

6    the debtor's supplemental brief although the debtor says that --

7    say in their amended agenda they filed it.

8          MR. LIEBELER:  Your Honor, I'll make sure we get a copy

9    of that to you right now.  This is Mr. Liebeler for the debtors.

10   But, by the way, Your Honor, as I recall at the end of the last

11   hearing the Court had indicated that there would not be an

12   additional hearing on the motion to lift stay, that the Court

13   would be prepared to rule on the papers rather than take

14   additional argument.

15         THE COURT:  Had I gotten them, July -- your brief, July

16   22nd, I might have been prepared to rule on it.

17         MR. LIEBELER:  That's fine.  I will run down and get

18   you a copy right now.  In fact, may I approach, Your Honor?

19         THE COURT:  Yes.

20         MR. LIEBELER:  I have a copy with me here.

21                   (Pause)

22         MR. LIEBELER:  But, Your Honor, I can see if we can

23   figure out when it was filed and where it was filed because I do

24   believe we filed it on time.  I don't know that.

25         THE COURT:  Well, filing doesn't help me.  It wasn't

31

1  delivered to chambers, so.

2      MR. HOGAN:  Your Honor, as to -- I believe their case

3  is going to be also through depositions, Your Honor.  Those are

4  not live witnesses under the local rules.  I believe we're

5  entitled to have live witnesses in regard to these hearings.

6      THE COURT:  Well, I'm not -- they're just identifying

7  what they're presenting.  I have not admitted anything in

8  relation to the Berry objection.  So.

9      MR. HOGAN:  and I guess the concern is, Your Honor, if

10  we go to confirmation and then go to the other issues, there are

11  issues that are bound up, in feasibility that were raised in the

12  objections to Mr. Berry's claim, particularly the issue of the

13  indemnities, Your Honor, that the debtors have stated unless Your

14  Honor is willing to essentially rule that Mr. Berry has no rights

15  against CNS, that the plan is unconfirmable.

16      THE COURT:  Well, I'll hear those issues.

17      MR. HOGAN:  Yes, Your Honor.

18      THE COURT:  I'm trying to get a feel for how long it

19  will be.

20      MR. HOGAN:  I don't present -- obviously, Your Honor,

21  mine will be rather brief, I think, Your Honor.

22      THE COURT:  Your testimony to the extent they object to

23  your affidavit.

24      MR. HOGAN:  That's correct, Your Honor.

25      THE COURT:  All right.

1        MR. SPRAYREGEN:  Your Honor, I apologize for the snafu

2 with the supplemental brief.  Ms. Jones informs me that we

3 believe it was delivered to your chambers Friday morning, but I

4 know there was a lot of paper going on Friday, so --

5        THE COURT:  I didn't receive it, so I don't know where

6 it went.

7        MR. SPRAYREGEN:  So, Your Honor, we have no problem

8 with actually hearing Berry's confirmation objection in the

9 estimation motion together.  We don't think there needs to be

10 separate processes.  Obviously, they're separate issues, but

11 we're just saying whatever the Rules of Evidence apply are that

12 they should apply here.  We're not --

13        THE COURT:  All right.  Any objection to having them --

14 the estimation and the confirmation heard together?

15        MR. HOGAN:  Well, Your Honor, I guess this would an

16 objection.  The confirmation, I understand, has a separate

17 evidentiary requirement than typical motions that are filed in

18 contested matters.  I don't think the Court is generally

19 requiring people in a contested matter motion to present live

20 testimony in the Court, Your Honor.

21        THE COURT:  Yes, I am.

22        MR. HOGAN:  I apologize, Your Honor.  I was under the

23 impression that most motions are ruled on on the papers.

24        THE COURT:  No, not in this court.

25        MR. HOGAN:  All right.

33

1        THE COURT:  If it's contested, I hear testimony.

2        MR. HOGAN:  Okay, Your Honor.  Well, I -- we'll just go

3   forward as Your Honor thinks best.

4        THE COURT:  All right.  Well, the debtor can proceed

5   then.

6        MR. SPRAYREGEN:  Two items, Your Honor.  One is a

7   matter of efficiency.  There are -- Your Honor, the -- on the

8   agenda post -- the confirmation hearing post 19, there are a

9   number of landlord matters which we understand are all

10  uncontested.  I don't know if anybody's here solely for that

11  issue.  And maybe you'd want to take a couple of minutes and get

12  that out of the way.  We're ready to proceed now.  But if the --

13       THE COURT:  The notices of assumption and assignment?

14       MR. SPRAYREGEN:  Right.  It's a number of agenda items.

15       THE COURT:  We can proceed with that to the extent

16  there are not objections.  And then those parties can leave if

17  they want to.

18       MR. SPRAYREGEN:  Thank you.  That would go to -- that

19  would start with agenda item 23.

20       MS. HARPER:  Good morning, Your Honor.  Megan Harper of

21  Landis Rath & Cobb for C&S Acquisition.  Your Honor, we have one

22  item for today that's with respect to agenda item No. 24.  Last

23  week -- or, excuse me, Your Honor, the last hearing, we handed in

24  a 24th supplemental order approving assumption and assignment.

25  The order was for contrast, signed and franchise agreements to be

34

1  assumed and assigned to Piggly Wiggly.  That order inadvertently

2  included a contract with Dave Reinhart.  That particular contract

3  is for a franchise agreement that was noticed for assumption and

4  assignment to Super Value.

5       We have amended the order and also circulated that to

6  counsel for Super Value.  So I simply ask that we submit -- be

7  permitted to submit an amended order.

8       THE COURT:  You may.

9       MS. HARPER:  Thank you, Your Honor.

10      THE COURT:  And I'll enter that to correct the error.

11      MS. HARPER:  We have nothing further.

12      THE COURT:  All right.

13      MR. EVANOFF:  Good morning, Your Honor.  Bill Evanoff

14  on behalf of Super Value.

15      THE COURT:  Yes.

16      MR. EVANOFF:  Again, we only have a limited number of

17  matters going forward.  And both of them are already agreed, I

18  believe, and submitted under certification of counsel as

19  reflected on the agenda for today.  For agenda item No. 25, there

20  is a certification of counsel docketed as 8667 that I believe was

21  filed around, approximately July the 6th for which we've --

22      THE COURT:  Give me the docket number again.

23      MR. EVANOFF:  The notice -- I'm sorry, the

24  certification of counsel with proposed order is Docket No. 8667.

25      THE COURT:  Okay.

35

1          MR. EVANOFF:  And if it would assist the Court, I have

2     a copy of the certification of counsel and the proposed form of

3     order if you would like me to hand that up.

4          THE COURT:  You may hand it up.  I don't know if I've

5     entered it or not.

6          MR. EVANOFF:  Your Honor, if I may approach.

7          THE COURT:  You may.

8                         (Pause)

9          THE COURT:  All right.

10          MR. EVANOFF:  Similarly, with respect to agenda item

11     No. 32, there was a certification of counsel filed a week ago

12     with respect to two sets of leases, New York 035 and New York

13     060, reflected as agenda item 32 on the amended agenda as

14     certification of counsel and proposed form of order to which

15     we're requesting an order.  And again I have a form of order that

16     would assist the Court.

17          THE COURT:  You may hand that up.

18                         (Pause)

19          MR. EVANOFF:  And with those matters, Your Honor, I'm

20     pleased to say we are down to three sets of leases in total from

21     our starting position of a few 100 and if we're able to resolve

22     those, they will again be filed under certification of counsel if

23     that is acceptable with Your Honor.

24          THE COURT:  That is fine.

25          MR. EVANOFF:  And with that, I have nothing further.

36

1  Thank you.

2        MS. MELNICK:  Good morning, Your Honor.  Salinda

3  Melnik, Edwards & Angell for AWG Acquisition, Inc. and Associated

4  Wholesale Grocers, Inc.  My co-counsel, Mark Benedict, is on the

5  phone.  Our matters that are listed today are numbers 23, docket

6  numbers and the amended notice of agenda 23, 29 and 38.  We do

7  not have any orders going forward today, Your Honor, but we are

8  hopeful that we will soon be able to submit under certification

9  of counsel several orders resolving some of the matters.

10        THE COURT:  All right.

11        MS. MELNICK:  Thank you.  And there's --

12        THE COURT:  Thank you.

13        MS. MELNICK:  -- one more matter.  Thank you, Your

14  Honor.

15        THE COURT:  Thank you.  Anybody else?

16        MS. JONES:  Your Honor, we had, on the agenda skipped

17  over matters No. 7 and No. 10.  But Mr. Lapowsky, I believe, is

18  on the phone.  Mr. Houston is here.  With respect to those, Your

19  Honor, if I may yield to Mr. Lapowsky to tell Your Honor what the

20  status of that is.

21        THE COURT:  All right.

22        MR. LAPOWSKY:  Thank you, Your Honor.  This is Robert

23  Lapowsky and I apologize for appearing by phone, but I have a

24  hearing at 11:00 in Philadelphia.  This matters 7 and 10 relate

25  to an agreement that was reached between a number of retailers,

37

1  10 or 12 retailers that I represent, C&S and Fleming.  And the

2  motion was filed in early July, the objection deadline was the

3  19th and I think that a certificate of no objection was filed.

4       But we discovered a mistake in the agreement after the

5  -- actually after the objection deadline had past that required

6  one change to address that mistake.  And what I would like to do

7  with your permission is to describe to you what we were trying to

8  correct.  Mr. Houston has a blackline of the agreement that shows

9  the change from what was filed, and then see if we can't get this

10  approved today.

11       THE COURT:  All right.  Do you have a blackline?

12       MR. HOUSTON:  Your Honor, if I may approach, I have the

13  blackline that Mr. Lapowsky is going to refer to as I have it

14  under seal to leave with the Court.

15       THE COURT:  All right.  You may hand it up.  I assume

16  the changes are for the parts that are not to be kept under seal?

17       MR. LAPOWSKY:  That's correct.

18       THE COURT:  All right.

19       MR. LAPOWSKY:  There's only one portion that is under

20  seal and that is the consideration being paid for the notes, the

21  C&S, and that doesn't change.

22       THE COURT:  All right.

23       MR. LAPOWSKY:  Judge, the agreement, these retailers

24  all had supply agreements with Fleming.  A number of them had a

25  notes, either forgiveness or promissory.  Some of them had

38

1  accounts receivable that they owed to Fleming and some of them

2  had granted security interests to Fleming to cover various

3  things.

4           The agreement that was reached involved the payment of

5  a dollar amount to C&S for the assignment of the notes to another

6  client of mine, Affiliated Foods.  The payment of a compromised

7  amount for the accounts receivable, the rejection of the supply

8  agreements and releases all around between all the different

9  parties to the agreement, including releases of security

10 interests.

11          The mistake that we discovered was that one of the

12 retailers, a retailer by the name of Something More, was unique

13 in that all the other retailers were dealing only with C&S.  That

14 is C&S had their designation rights.  C&S had been assigned their

15 notes, whether they be promissory or forgiveness.  And AWG was

16 not involved at all.

17          The difference with Something More is that the

18 Something More supply agreement was designated to AWG and not to

19 C&S.  And Something More executed two notes, one was promissory,

20 the other was forgiveness.  The promissory note did go to C&S,

21 but the forgiveness note didn't.  It went to AWG.  So the

22 agreement as drafted and as put out for approval was too broad as

23 it related to Something More because it would have affected the

24 rejection of the supply agreement which C&S didn't have the right

25 to do.  It would have affected the release of security interests

39

1  that related to the forgiveness note which nobody had a right to

2  do other than AWG.

3          When we discovered that, we went back into the document

4  and made three changes.  And if you have the document there in

5  front of you, I can show you where they are.

6          THE COURT:  I have it.

7          MR. LAPOWSKY:  In -- on the first page of the

8  blackline, you should have a whereas clause at the very bottom of

9  the page that's blacklined.

10         THE COURT:  Yes, I have it.

11         MR. LAPOWSKY:  What that does is that it takes the

12  defined term, FSA, which is the supply agreements, and it carves

13  out of the defined term the supply agreement with Something More

14  so that through the rest of the document, whether it references

15  to the FSA, for instance to them being rejected, it won't impact

16  the FSA that is designated for assignment to AWG.

17         THE COURT:  Okay.

18         MR. LAPOWSKY:  So that was the first change.  The

19  second change was on the next page in Section 1B.  The retailers

20  that I represent, Judge, had all filed an omnibus objection to

21  the assignment of the supply agreements and a request for the

22  termination of the sale of the note should be voided because

23  there were executory integrated with the supply agreements.

24         In 1B, we had said that all the retailers would

25  withdraw that objection, but we can't do that for Something More.

40

1    Something More needs to keep theirs alive.  We do have a pending

2    settlement with Something More that will be noticed up

3    separately, but as of right now, Something More needs to retain

4    its position in that omnibus objection.  So that's what happens

5    in 1B.

6            THE COURT:  All right.

7            MR. LAPOWSKY:  Then, the next change, Judge, is in 8F.

8    And all this does is carves Something More out of all the

9    releases that are given in the agreement so Something More

10   doesn't get releases, it doesn't give releases and it preserves

11   the -- any security interests which were granted to secure the

12   forgiveness note or preserve under 8F.

13           THE COURT:  Okay.

14           MR. LAPOWSKY:  And Judge, that's all the changes that

15   were made to the document that was circulated.  We believe that

16   the changes don't negatively impact anyone other than Something

17   More.  And Something More is obviously negatively impacted

18   because they're getting a reduction in the scope of the release

19   that they had gotten, but they were never entitled to that

20   release to begin with.  And I represent Something More and

21   they've consented to it.

22           And I believe that this -- these changes have been

23   reviewed by Mr. Benedict on behalf of AWG, and I believe that he

24   agrees that they get us where we need to be.  And I believe

25   they've also been reviewed by C&S although I'm not certain of

41

1 that. But again, I don't think any of the changes that we've
2 made negatively impact C&S.

3          MR. BENEDICT: May it please the Court, Your Honor,
4 Mark Benedict for AWG. Mr. Lapowsky's correct, AWG has reviewed
5 that and those terms are now acceptable to AWG.

6          THE COURT: All right. Anybody else? I take it that
7 all other parties then are agreeable. All right.

8          MR. LAPOWSKY: Judge, just before we leave these
9 matters, we will need in connection with this agreement an order
10 rejecting one of the -- a lease, an Adrian's (phonetic) lease.
11 I'm not sure whether the Fleming representatives are prepared
12 today to address that. There is a pending motion. I don't think
13 it's on the agenda for today, but I think we will have to provide
14 you with an order rejecting that lease as of the closing date
15 under this agreement. Is there anyone from Fleming that can
16 speak to that?

17          MS. JONES: Your Honor, we're going to need to take
18 care of that offline and provide it under certificate of counsel
19 if necessary.

20          THE COURT: All right. You can submit it under
21 certification of counsel. Do you have a form of order on the --
22 to approve the amended agreement?

23          MS. JONES: I do, Your Honor. The form of order does
24 not change actually, it's what Mr. Lapowsky has informed me,
25 because this settlement agreement itself reflects the one change.

42

1  Or the changes that he outlined.  Your Honor, we also have a

2  proposed form of order with respect to the under seal motion as

3  well.

4          THE COURT:  All right.  You may hand those up.

5          MS. JONES:  Thank you.

6          MR. LAPOWSKY:  Judge, I'm not -- if it's the same order

7  that's being handed up to approve the agreement that was attached

8  to the original motion, maybe we should just interlineate that

9  it's approved in the agreement as modified on the record today.

10         THE COURT:  I --

11         MR. LAPOWSKY:  I think it makes reference to the

12 agreement that was attached to the motion to approve.

13         THE COURT:  Well, it simply says the motion is granted.

14         MR. LAPOWSKY:  I don't have it in front of me.

15         MS. JONES:  Your Honor, we'll be glad to provide any

16 words -- motion as modified on the record at today's hearing.

17         THE COURT:  All right.  Why don't you add those.

18         MR. SPRAYREGEN:  Your Honor, a couple of --

19         THE COURT:  Before we go further, is the reference

20 number on the order to seal should reference both of the

21 settlement agreements that you filed under seal.  It only has one

22 reference number.  I assume the later one.

23         MR. SPRAYREGEN:  We'll address that.

24         MR. LLUHLIER:  Your Honor, Chris Lluhlier.  The

25 settlement agreement that was handed up today actually hasn't

43

1  been filed with the Court yet.  It's not on the docket.  It's

2  being presented to Your Honor.

3          THE COURT:  Well, are you going to file it?

4          MR. LLUHLIER:  Sure.  We certainly can.

5          THE COURT:  I think you should.

6          MR. LLUHLIER:  Okay.

7          THE COURT:  Do you need it back?

8          MR. BENEDICT:  Yeah, that blackline you would need to

9  black out the purchase price for the note because it -- that's

10 the redacted item and that is in the blackline.

11         THE COURT:  I have that, but they handed up the

12 unredacted copy which will be filed under seal.

13         MR. BENEDICT:  Good.

14         THE COURT:  In accordance with our procedures then.

15         MS. JONES:  (Attorney away from mike)

16         THE COURT:  You may hand it up.  And I'll enter the

17 order approving the settlement agreement as modified on the

18 record.  And I'll look for the form of order on the -- sealing

19 the complete settlement agreement.

20         MS. JONES:  Your Honor, we'll submit that as soon as we

21 get it --

22         MR. SPRAYREGEN:  Your Honor, that gets us back to

23 agenda item 19, the plain copy.

24         MR. LAPOWSKY:  Your Honor, may I be excused?

25         THE COURT:  You may.

44

1          MR. LAPOWSKY:  Thank you.

2          MR. SPRAYREGEN:  Then we've got -- for clarity that

3    would be the only remaining item on the agenda other than the

4    Sanctity agreement approval which is fairly long with the

5    confirmation.  Your Honor -- I'm going through the resolutions of

6    objections.  They're all contained in the proposed amendments to

7    the plan and confirmation order and if we get that far, we -- I

8    can go through.  And we passed them out to everybody here before

9    the hearing.

10          With the exception of two stipulations I mentioned, one

11   with Jackson and one with CHEP, and I have those if the Court

12   wants them or we can wait till later.  I didn't know if you --

13          THE COURT:  Well, let's do it now.

14          MR. SPRAYREGEN:  Okay.  Let me -- we're not asking for

15   them to be signed because they don't have to be signed in

16   connection with the confirmation.

17          THE COURT:  All right.

18          MR. SPRAYREGEN:  The other small housekeeping matter,

19   Your Honor, is we did have a number of witnesses that were here

20   solely for the prospect that they would need to testify in

21   connection with substantive consolidation matters.  Due to the

22   amount of objection there in the admission in evidence of their

23   affidavits, we don't see the necessity of that, but before we

24   release them, some of them have various places to go, I just

25   wanted to confirm that it would be alright for them to be

45

1  released.

2          THE COURT:  Anybody object?  All right.  Since your

3  affidavit's been admitted into the record, they may be released.

4          MR. SPRAYREGEN:  Your Honor, with that, we're prepared

5  to get into addressing the Berry objection.  And in mean, Mr.

6  Liebeler is going to handle that.  He has been the Kirkland Ellis

7  lawyer handling that process for quite some time.

8          I would note though preliminarily and he'll handle the

9  witnesses and the factual presentation and most of the argument,

10  but to the extent of some of the pure bankruptcy arguments, I

11  would step up.  So I wanted to say that in advance.  And I

12  thought we ought to start and it seems to me that before we get

13  into all of the evidentiary presentation, if we just look at the

14  plan confirmation objection, it really is based on --

15          THE COURT:  Well, let's save argument.

16          MR. SPRAYREGEN:  Okay.  We'll start with the evidence.

17          THE COURT:  Let me hear the evidence.  Somebody want to

18  give Mr. Hogan a space at the table.

19          MR. SPRAYREGEN:  Your Honor, I mentioned Mr. Liebeler

20  was going to handle the Berry specific items.  The -- Mr. Stenger

21  and Mr. Scott will be presented by Mr. Paris and then Mr. Folse

22  will be presented by Ms. Huber.  And then we'll move on to the

23  Berry specific items.

24          MR. PARIS:  Good morning, Your Honor.  Andrew Paris for

25  the debtors and Kirkland & Ellis.  If you just give me a moment,

46

1   I'll set the courtroom up for the testimony.

2                      (Pause)

3        MR. SPRAYREGEN:  Your Honor, also just to clarify as a

4   reminder, while we have these witnesses to be presented to be

5   presented in connection with the Berry objection, their testimony

6   obviously goes to support plan confirmation in general.  We had

7   submitted affidavits of theirs, but Mr. -- and those were -- I

8   went through on the exhibit list, but --

9        THE COURT:  They've been admitted, yeah.

10       MR. SPRAYREGEN:  No, no, no, those weren't admitted

11  because Mr. Hogan asked for live testimony with respect to these

12  three witnesses.  So these are the ones they -- that I asked not

13  -- that I didn't ask to be admitted right now.

14       THE COURT:  I understand that.  The only ones that

15  you're talking about, that I just released, have been admitted.

16       MR. SPRAYREGEN:  Those have been admitted.

17       THE COURT:  All right.

18       MR. HOGAN:  Your Honor, I don't want to slow things

19  down.  As far as the Exhibits 1-9, Your Honor, I don't have a

20  problem with having those admitted, Your Honor.  Those are Mr.

21  Stenger --

22       THE COURT:  And Mr. Scott?

23       MR. SPRAYREGEN:  They are here, they're ready to

24  testify.  If Mr. Hogan is reserving cross-examination right, I'm

25  not sure if he is, if he is, well, that would be helpful to

1  present them for that.  If he's not, we could just have the

2  affidavits admitted.

3          MR. HOGAN:  I would like to cross them, Your Honor, so

4  however counsel would like to proceed.

5          THE COURT:  All right.  You may proceed as you wish.

6          MR. SPRAYREGEN:  Thank you.

7          MR. PARIS:  Your Honor, we call Mr. Ted Stenger.

8          THE COURT:  Good morning.

9          THE CLERK:  Place your hand on the Bible.  Please state

10  your full name and spell your last name for the Court.

11          THE WITNESS:  Edward Ted Stenger, S-T-E-N-G-E-R.

12          EDWARD TED STENGER, DEBTOR'S WITNESS, SWORN

13                       DIRECT EXAMINATION

14  BY MR. PARIS:

15  Q    Mr. Stenger, you've testified a number of times in this

16  Court, so just very briefly, can you summarize your position and

17  your role on this bankruptcy.

18  A    Yes.  I'm employed by Alex Partner Services.  My firm has

19  been retained to work for Fleming.  I am working a full-time

20  basis for approximately the last year as the chief restructuring

21  officer of the Fleming companies.

22  Q    What was your role in the drafting of the plan of the

23  organization, the disclosure statement and the exhibits thereto?

24  A    The personnel from the Fleming companies as well as from

25  Alex Partner Services that were involved in preparing that

1  generally reported up through me.  So, I was intimately involved

2  in the development both initially and in the final drafts of

3  those documents.

4  Q    Did you have any role in the exhibits to the disclosure

5  statement?

6  A    Yes.  The exhibits specifically 3 -- Exhibits 3 and 4 were

7  prepared by the staff of Fleming as augmented by temporary

8  employees from Alex Partners.  That process and those individuals

9  reported directly to me.

10  Q    And, sir, I'd like to direct your attention to this board

11  over here on the right that we have marked as Exhibit 189.

12        MR. PARIS:  And Your Honor, if I may approach, we have

13  copies for you.

14        THE COURT:  You may.  And I assume for Mr. Hogan and

15  anybody else who may be interested.

16        MR. PARIS:  Yes, we do.

17  A    Can I get one?  Thank you.

18  Q    Mr. Stenger, what does Exhibit 189 show?

19  A    Exhibit 189 is the summary that was prepared based on

20  information that's in Exhibit 3 of the disclosure statement with

21  some adjustments that were put in that are included in Mr.

22  Folse's declaration.

23  Q    What are the three entities that are shown on that board?

24  A    The three entities are the three entities that come -- are

25  included in -- come out of our plan of reorganization.  And that

Stenger - Direct/Paris                                    49

1  would be Core-Mark Newco which is the reorganized convenience

2  business; the post-confirmation trust; and the reclamation

3  creditors trust.

4  Q    And of these three, which will you be discussing today in

5  your testimony?

6  A    I'll be discussing Core-Mark Newco.

7  Q    Okay.  Mr. Stenger, what businesses will go into Core-Mark

8  Newco after confirmation?

9  A    All of the business that was formerly referred to as the

10  Fleming Convenience Store business will be included in Core-Mark

11  Newco.

12  Q    And have you and your staff done an analysis of Core-Mark

13  Newco's assets and liabilities?

14  A    Yes, we have.

15  Q    And based on that analysis, what is the estimated value of

16  Core-Mark's assets as of July 31st, 2004?

17  A    We're estimating that the assets would have a book value of

18  about $468 million which is the last number under the total on

19  the left-hand side here for Core-Mark Newco.

20  Q    And what would be the value of Core-Mark's liabilities as of

21  the same date?

22  A    The liabilities are expected have a book value of about $320

23  million.

24  Q    At inception, what is the estimated value of Core-Mark

25  Newco's shareholder equity?

1  A    It would be about 140 million, basically the subtraction of

2  the liabilities from the assets.

3  Q    And based on your projections as of July 31st, 2004, how are

4  the current assets compared to the current liabilities?

5  A    Current assets would be over twice the level of current

6  liabilities.

7  Q    So, sir, how would you characterize Core-Mark's financial

8  strength at inception?

9  A    I think it will be very strong.  It's coming out with a

10 nicely capitalized balance sheet with lots of working capital

11 available to it.  And a Exit facility that provides for adequate

12 liquidating both at closing and going forward.

13 Q    Have you also projected the level of Core-Mark's assets and

14 liabilities on a going forward basis?

15 A    Yes.  We've made projections to the end of calendar year

16 2008.

17 Q    I'd like to direct your attention to the binder that's in

18 front of you.  Within that binder at Tab 3 should be Exhibit 3.

19           THE COURT:  What binder are we talking about?

20           MR. PARIS:  This binder which I -- may I approach?

21           THE COURT:  You may.

22 Q    Sir, do you recognize Exhibit 3?

23           THE COURT:  For the record, can -- has this been marked

24 as a debtor's exhibit?

25           MR. PARIS:  Yes.  This is Debtor's Exhibit 3.

Stenger - Direct/Paris                                    51

1        THE COURT:  Okay.

2   A    If I may, is that the Exhibit 3 that's included in the plan

3   disclosure statement document?

4   Q    Yes, it is.

5   A    If you don't mind, and Your Honor, if you don't mind, I'd

6   prefer to use this because it's much smaller.  It's easier --

7        THE COURT:  That's fine.

8   A    -- flip the pages.

9   Q    Okay.  Can you just generally describe Exhibit 3?

10  A    Yes.  Exhibit 3 includes our projections that were prepared

11  for both Core-Mark Newco, the post-confirmation trust, as well as

12  the reclamation creditors trust is included in that Exhibit 3.

13  Q    And was this prepared by your staff under your direction?

14  A    Yes, it was.

15       MR. PARIS:  Your Honor, I'm prepared to offer it into

16  evidence although I know your practice.

17       THE COURT:  Don't -- don't do that till after cross.

18       MR. PARIS:  Very well.

19  Q    Sir, if you could direct your attention to page 240 in that

20  exhibit.

21       MR. PARIS:  And, Your Honor, there are several sets of

22  page numbers on here.  The pages that I'll be referring to are at

23  the upper right and left, so 240 is in the upper left.

24  Q    So focusing on this exhibit, sir, page 240 --

25  A    Yes.

1  Q    -- what have you projected Core-Mark Newco's net income to
2  be over the course of the coming years?
3  A    If you look, the Exhibit 3B is the projected statement of
4  operations.  The very last number presented on that is the net
5  income.  We're projecting that net income will approximate $20
6  million in 2005.  It will subsequently be increasing on an annual
7  basis with the amount in 208 being 40 million.
8  Q    And if you could just flip over to the next page, page 241
9  of trial exhibit 3, what does this show generally?
10 A    This is the projected balance sheets, both as we spoke
11 before.  And this exhibit, which would be as of July 31st of this
12 current year, and then the annual balance sheets for the annual
13 periods ending in December for 2004 through 2008.
14 Q    Focusing your attention on the second to last line of that
15 exhibit, shareholders equity, what happens to shareholder equity
16 from 2005 to 2008?
17 A    Shareholders equity, because of the income statement
18 performance, is growing, moving from a beginning balance of
19 approximately 150 to an ending balance which is approximately
20 280.
21 Q    Thank you, sir.  That's all we have with that binder, so you
22 can put that away.  Mr. Stenger, what does the acronym EBITDA
23 stand for?
24 A    EBITDA stands for Earnings Before Interest, Tax,
25 Depreciation and Amortization.

1  Q    And how is that term used?

2  A    Generally it's a term that is used as a measure to measure a

3  business's ability to generate operating cash flow which could be

4  used for handling debt, making equity distributions or other

5  needs.

6  Q    Have you projected EBITDA for Core-Mark Newco?

7  A    Yes, we have.

8  Q    Over what time period?

9  A    Same time period that the income statement, statement of

10 operations is, which is that first page that you referred me to a

11 few minutes ago.

12 Q    And what do you project Core-Mark Newco's EBITDA to be?

13 A    We projected to move from about 42 million in 205 up to a

14 little north of 80 million by the time we get into '08.

15 Q    And what do those EBITDA numbers say about the financial

16 condition of Core-Mark Newco on a going forward basis?

17 A    That the cash flow both at the inception and in our first

18 year will be strong and it will be growing and strengthening in

19 each of the subsequent years.

20 Q    I'd like to move into a slightly different area and ask you

21 if you have an opinion about the strength of Core-Mark Newco's

22 prospects in the coming years?

23 A    Yes, I think they're very good.

24 Q    And why is that?

25 A    I think the company's coming out with a strong balance

1  sheet, as we've talked about before.  But it's also coming out

2  with a good management team, stabilized operations, very high

3  service level rates.  They've had a chance to use this last year

4  to make some changes on the cost side which will bear fruit for

5  them going forward.  And finally, I think that being reorganized

6  will allow them to participate in some growth that will also in

7  order to benefit.

8  Q    Let me ask you a little bit more detail about those reasons

9  you've given for Core-Mark's strong process.  What do you mean by

10 strong management?

11 A    The management team at Core-Mark both at the upper levels,

12 if you will, the executive levels has generally been with the

13 company since before the acquisition by Fleming in 2002.  It was

14 a company that really built the Core-Mark business.  As

15 importantly and perhaps more importantly is the distribution

16 center management teams also have been with the company for a

17 long time.  That is key because we deal with our customers on a

18 decentralized basis in over 22 distribution centers.  So that is

19 really where the customer contact is and that's where we, you

20 know, make or break ourselves in terms of making money.

21 Q    You also mentioned service levels.  Can you explain what

22 that term is?

23 A    Service level, we use a metric to measure it which is

24 basically for our customers submitting orders, how many of them

25 did we feel.  And we measure that as a percentage.

1  Q    And how have the service levels been of Core-Mark Newco

2  during the bankruptcy?

3  A    Initially the service levels were suffered substantially and

4  were relatively poor in a comparative sense.  And that would have

5  lasted for April, May and a large part of June of 2003.  Since

6  that point, the management team there has made substantial

7  progress in stabilizing that and, in fact, really for the last

8  six months we've been at the highest levels that the company has

9  ever enjoyed with being consistently over 98.5 percent which is

10 our internal, kind of, goal standards.

11 Q    I believe you also mentioned that there were growth

12 opportunities.  What did you mean by that?

13 A    During the past year, during the bankruptcy, the company has

14 not been able to participate in the acquisition of new major

15 account business largely because being in bankruptcy has, in

16 effect, precluded us from being a qualified bidder if you will.

17 The management team has worked very aggressively to move forward

18 with the number of new opportunities and assuming that we confirm

19 a plan and get out, I think that many of those the company will

20 be able to act upon here over the next 12 months.

21 Q    Finally, I think you mentioned there had been some changes

22 on the cost side.  What did you mean by that?

23 A    During the last year, the distribution network has been

24 rationalized with four of the distribution centers having been

25 closed.  Three of the distribution centers we have during this

1 year finished capital improvement programs for those that have

2 integrated them into the Core-Mark's systems.  Both of those

3 factors will lead to higher profitability in 2005 and going

4 forward.

5 Q    Okay.  I'll move to a different area.  Let's discuss the

6 guarantees between the three entities that are shown on Exhibit

7 189.  First of all, Mr. Stenger, can you just generally describe

8 what these guarantees are?

9 A    Yes.  The three guarantees are there's two guarantees from

10 Core-Mark that go to the reclamation creditors trust.  And those

11 relate to the trade/lien vendors or the TLV guarantee and the

12 non-trade/lien vendors.  The third guarantee is a guarantee from

13 Core-Mark to the post-confirmation trust which relates to certain

14 of the administrative claims that were included and will be

15 included, I should say, in the post-confirmation trust are

16 expected to total about $52 million.  That was our estimate

17 that's included in the disclosure statement.  To the extent that

18 those expenses and administrative costs exceed $56 million, Core-

19 Mark will be obligated to reimburse the PCT for those amounts

20 over $56 million.

21 Q    Let me go back to the guarantees to the reclamation

22 creditors trust.  How does the TLV guarantee work specifically?

23 A    The trade/lien vendor guarantee works to the extent, and

24 there's some points in time, but I'll make this kind of the

25 overview is in December of 207, starts in 206, but I don't think

1  that will be an adequate measurement date.  There's a trigger

2  which would turn out to be -- so we will look in 207 and if the

3  trade/lien vendors' valid claims have not been paid in full, they

4  will then be able to draw on the guarantee.  Core-Mark will be

5  obligated to pay to them the difference between what's

6  established as their valid trade/lien plans less what's actually

7  been paid to them from the reclamation creditors trust will be

8  owed by Core-Mark.

9  Q    Are their any intermediate steps between the reclamation

10 creditors trust going against Core-Mark?

11 A    There could -- that deficiency, if you will, that may arise

12 could be paid by the post-confirmation trust also.

13 Q    Prior to Core-Mark having an obligation?

14 A    Prior to Core-Mark actually funding that, correct.

15 Q    Okay.  Let me ask you about the non-trade/lien vendor

16 guarantee.  How does that work?

17 A    The non-trade/lien vendor guarantee is similar in that at a

18 point in time we will measure.  To the extent that the valid non-

19 trade/lien reclamation plans have not been paid in full by the

20 reclamation creditors trust, or as you point out, the post-

21 confirmation trust, they will be able to look to Core-Mark for

22 that deficiency up to an amount equal to $15 million.  To the

23 extent the deficiency exceeds 15 million, that will not be

24 covered.

25 Q    And, sir, what are your projections and analysis suggest

1  about the likelihood that Core-Mark Newco would have to make a

2  payment on the TLV guarantee?

3  A    Our estimates suggest that that is almost virtually

4  impossible.  And the reason I say that is, and you can see just

5  generally looking on the right-hand column there of the

6  reclamation creditors trust, that will be vested with $140

7  million of assets.  While we've estimated the trade reclamation,

8  the TLV claims at 50, if it was 50, 60, 70, there is over two

9  times the amount of assets being vested into the trust.  And I

10 think it's virtually impossible for those not to be turned into

11 at least 60 or $70 million.

12 Q    And you've already discussed the administrative claim

13 guarantee that runs to the post-confirmation trust.  So let me

14 just ask you, if Core-Mark Newco had to make a payment on any of

15 these guarantee obligations, what ability do you think it would

16 have to cover those liabilities?

17 A    Well, obviously a lot depends on timing, but because

18 particularly the guarantee payments relative to the reclamation

19 creditors trust are time-phased.  And based on our projections,

20 wouldn't come in till 207 and 208.  I think that Core-Mark would

21 be in a position at those points in time to very easily cover any

22 level of guarantee deficiency that at least I think might occur.

23 Q    Have you done an estimate of the amount of cash flow that

24 Core-Mark Newco might have to make payment toward those guarantee

25 obligations?

1  A    Yes.  In fact, if you don't mind, I'll flip back to the

2  exhibit.  And I don't recall, Your Honor --

3  Q    Are you referring to trial exhibit --

4  A    Yeah, I guess it's trial exhibit 3 perhaps?

5           THE COURT:   Page 242?

6  A    Yes.  And if you look at page 242, that is our projection of

7  the cash flow to be generated by Core-Mark over the period.  If

8  you look during this period, the cash flow from operating

9  activities, which is basically the first sub-total, indicates

10 that Core-Mark will generate from operations over $100 million --

11 excuse me -- in cash flow, operating cash flow, which in our

12 projections, we use for funding capital expenditures of about 40

13 million.  Then use about 65 for debt payments.  Those could, in

14 fact, not be the uses of that operating cash flow and they can be

15 reserved for other purposes such as making guarantee payments.

16 In addition to that, as I mentioned earlier, there is a revolving

17 credit facility that is being funded at the effective date with

18 General Electric Credit.  Moving forward, Core-Mark will always

19 have at least $50 million of availability under that facility

20 that could be available also to fund guarantee payments.

21 Q    Thank you.  I going to put up another board.  This will be

22 Exhibit 190 and we do have copies.

23                          (Pause)

24 A    Thank you very much.

25 Q    Mr. Stenger, what does Exhibit 190 show?