Stenger - Direct/Paris                                    60

1  A    Exhibit 190 is a graphic presentation of the projected

2  balance sheet for Core-Mark Newco for the period beginning on

3  July 31st which is kind of the seventh month mark in our year.

4  And then after that, for the years 2004 through 2008, annual as

5  of the end of December.

6  Q    And what is the relationship in trend between assets and

7  liabilities?

8  A    The trend is really obviously the graph line show that.  I

9  think what I really focus on is the difference between the two

10 lines.  And what we see is that the amount of stockholders equity

11 retained earnings is growing each year because our assets are

12 exceeding our liabilities.

13 Q    So, over the next four years, given your analysis and

14 projections and including the impact of any guarantee obligations

15 that arise, do you have a view as to whether Core-Mark Newco will

16 be able to satisfy its liabilities as they come due?

17 A    Yes, I do.  I am very comfortable with the ability of Core-

18 Mark on an ongoing basis to satisfy its obligations as they

19 become due.

20 Q    And based on your analysis and projections, what do you

21 believe about whether Core-Mark Newco will need further financial

22 reorganization or a liquidation?

23 A    I believe that to be very unlikely.

24 Q    And on that basis, what is your view as to whether Core-Mark

25 Newco is feasible?

1  A    I think the company coming out of bankruptcy is -- our plan

2  is very feasible and it will be a well-capitalized company with

3  very good prospects going forward.

4  Q    Mr. Stenger, can I direct your attention once again to the

5  binder that's in front of you and ask you to take a look at

6  Exhibit 1.

7  A    Yes, that's my declaration.

8  Q    Okay.

9  A    Is that correct?

10  Q    And did you -- and -- I'd like to ask you to turn to the

11  last page of that declaration, page 21.

12  A    Yes, sir.

13  Q    Is that your signature?

14  A    Yes, it is.

15  Q    And was this testimony that you prepared in conjunction with

16  this confirmation hearing?

17  A    Yes, it is.

18        MR. PARIS:  Your Honor, that's all I have unless

19  there's an objection to admitting Mr. Stenger's affidavit.

20        MR. HOGAN:  I object, Your Honor, hearsay.  At least,

21  if I could just maybe ask a few questions before we admit

22  everything.  Is there a chance I might be able to ask him --

23        THE COURT:  All right.  We'll reserve your objection to

24  D-1 until conclusion of cross.  All right.  You may proceed with

25  cross.

CROSS-EXAMINATION

1
2  BY MR. HOGAN:

3  Q    Mr. Stenger, this is Timothy Hogan for Mr. Berry.

4  A    Okay.  Hello, Mr. Hogan.

5  Q    Do you know if Core-Mark Newco and Toomes (phonetic) has any

6  ongoing relationship with C&S or any of the C&S affiliates after

7  it emerges from bankruptcy?

8  A    It has -- Core-Mark has none now and it will have none going

9  forward.

10  Q    Now, looking at the, I guess it's Exhibit 3, the board, what

11  is your understanding of where a claim -- assuming the best world

12  for Mr. Berry that his claim survives this proceeding, where

13  would his claim fall in terms of the liabilities?  Would it be a

14  non-TLV claim?  How would you catagorize that?

15  A    Well, it will be a claim that will be satisfied by the post-

16  confirmation trust either as unsecured claim -- whatever the

17  complexion of the claim would be, that's where it would be.

18  Q    Okay.  And do you have any understanding of whether or not

19  the debtor claims to have had license to use Mr. Berry's software

20  during this case?  During the pendency of the bankruptcy?

21  A    I don't think we -- I don't know the term license, whatever.

22  I don't think we've been consciously trying and felt we had

23  stopped using it at one point early in the bankruptcy

24  proceedings.

25  Q    But up to the time you stopped using it, was it your

Stenger - Cross/Hogan                                    63

1  understanding that the debtor was using it with a license to use

2  it?

3  A    I really don't have an understanding as whether there was a

4  license or some other arrangement.

5  Q    Well, for you to be able to tell what the liability for Mr.

6  Berry's claim would be, and to be able to determine feasibility,

7  wouldn't it be important to know whether or not the uses that

8  were being made of his software were likely would be infringing

9  uses?

10  A    Well, actually, I mean, our estimate of Mr. Berry's -- of

11  that claim is based on a settlement offer that was provided to us

12  by either you or Mr. Berry.  That's what we based our estimate

13  on.

14  Q    And is that the settlement offer of $48 million?

15  A    No.

16  Q    now, are you familiar with damages in a copyright case?  Are

17  you familiar how damages are determined, what the rights are of

18  the copyright claimant?

19  A    Not in any specifics, no.

20  Q    All right.  Are you aware that the copyright owner is at

21  least entitled by statute to the profits of the infringer?

22  A    I don't know --

23        MR. PARIS:  I object, Your Honor, calls for a legal

24  conclusion and lacks foundation.

25        THE COURT:  Sustained.

1  Q    In regards to your analysis of whether there will be

2  sufficient funds to pay the debts in the reorganized entity, have

3  you made any determination of whether or not the reorganized

4  debtor, the post-confirmation trust, or the reclamation creditors

5  trust would have sufficient funds to pay C&S's profits during the

6  period of time it's infringing?

7  A    No, we've not done that analysis.

8  Q    Are you aware of what C&S's profits are generally?

9  A    No.

10 Q    Are you aware of what the profits were, the gross receipts

11 for the Hawaii division was during the time that Fleming operated

12 it?

13 A    No, I'm not as I sit here today.

14 Q    So is it fair to say, sir, that none of the analysis that

15 you have made in determining whether there's feasibility has even

16 approached the issues of the copyright infringement liability?

17 A    I would say as you posited it, yes, correctly.

18        MR. HOGAN:  Thank you, Your Honor.

19        THE COURT:  Now do you object, then, to the declaration

20 being admitted?

21        MR. HOGAN:  I'll allow it in, Your Honor.

22        THE COURT:  All right.  Any redirect?

23                    REDIRECT EXAMINATION

24 BY MR. PARIS:

25 Q    Mr. Stenger, you mentioned that your analysis that's

1  contained in the post-confirmation trust regarding the estimate

2  of Mr. Berry's claim came from a settlement offer?

3  A    Yes.

4  Q    What was that settlement offer?

5  A    It was just south of $500,000.

6         MR. HOGAN: Your Honor, I object, 408. I object --

7         THE COURT: Wait, don't answer.

8         MR. HOGAN: I object, Your Honor, Rule 408. Perhaps if

9  we had the document, we could look at it and determine whether or

10 not it's something that we'd want to admit. I don't know what

11 they're talking about, Your Honor. But if they're talking about

12 settlement discussions, I believe it's Rule 408.

13        MR. PARIS: Your Honor, he opened the door to it on

14 cross-examination asking what the basis for his estimation was of

15 Mr. Berry's claim.

16        MR. HOGAN: And he answered the question, Your Honor.

17        THE COURT: And he didn't ask him what it was. I think

18 the objection should be sustained.

19        MR. PARIS: Okay.

20 Q    Mr. Stenger, has -- have the debtors taken into account an

21 estimate of the debtors' claim for Mr. Berry's -- I'm sorry, Mr.

22 Berry's claim?

23 A    Yes, we have an estimate included in the administrative

24 claim section for the post-confirmation trust of an

25 administrative claim of $500,000.

Stenger - Cross/Hertzberg                              66

1  Q    Thank you.

2          MR. PARIS:   That's all the questions I have.

3          THE COURT:  Any recross?

4          MR. HOGAN:  No, sir.

5          THE COURT:  Okay.

6          MR. PARIS:  Unless he has further questions -- I would

7  like to offer then into evidence Mr. Stenger's affidavit with the

8  attachments which are also separately marked in this proceeding

9  as trial Exhibit 3 and trial Exhibit 4.

10         MR. HOGAN:  I have no objection.

11         THE COURT:  All right.  They're admitted.

12         MR. HERTZBERG:  Your Honor, I have one question for the

13 witness.

14         THE COURT:  All right.

15                       CROSS-EXAMINATION

16 BY MR. HERTZBERG:

17 Q    Robert Hertzberg for the FEM secured creditors committee.

18 Mr. Stenger, in the event that the administrative claims are

19 greater than $56 million in the PCT, does Core-Mark guarantee an

20 amount above that?

21 A    Yes, for the amounts in excess of $56 million, those would

22 be reimbursed by Core-Mark.  And there's no cap on it.

23 Q    Thank you.

24 A    You're welcome.

25         THE COURT:  Any further questions?

                  J&J COURT TRANSCRIBERS, INC.

1      MR. PARIS:  No, Your Honor.

2      THE COURT:  Thank you, you may step down.

3      THE WITNESS:  Thank you, Your Honor.

4      THE COURT:  Leave everything up there other than your

5  copy of that D-3.

6                    (Witness excused)

7      THE COURT:  Yes.

8                    (Pause)

9      THE COURT:  Do you want to take a break or proceed to

10 the next witness?

11     MR. PARIS:  Your Honor, we would call Mr. Michael

12 Scott.

13     THE COURT:  Thank you.

14     THE CLERK:  Place your hand on the Bible.  Please state

15 your full name and spell your last name for the Court.

16     THE WITNESS:  Michael Kenneth Scott, S-C-O-T-T.

17         MICHAEL SCOTT, DEBTOR'S WITNESS, SWORN

18                  DIRECT EXAMINATION

19 BY MR. PARIS:

20 Q   Mr. Scott, you've testified here several times before, so

21 I'll just ask you, sort of briefly to remind us of your position

22 and role in this bankruptcy.

23 A   Yes.  I am a principle with Alex Partners and with respect

24 to Fleming, I am serving as treasurer for the company, for

25 Fleming Companies, Inc.  And I've served as treasurer since

Scott - Direct/Paris                                    68

1  approximately May of last year.

2  Q    And did you prepare an affidavit in connection with the

3  confirmation hearing?

4  A    Yes, I did.

5  Q    Can you open the binder that's in front of you to Exhibit 6?

6  A    Yes, I have that in front of me.

7  Q    And is that your affidavit, sir?

8  A    Oh, I don't have that in front of me.  Just one minute.

9  Q    I apologize, it's Exhibit 5.

10 A    I do have that in front of me and that is my declaration.

11 Q    Okay.  And can you take a look at the last page of Exhibit

12 5?

13 A    Yes.

14 Q    Okay.  And is that your signature?

15 A    Yes, it is.

16         MR. PARIS:  Your Honor, we have a direct that goes

17 through this -- the substance of the testimony and the affidavit.

18 However, in the interest of saving time, since Mr. Stenger's

19 affidavit was admitted without objection, we would offer it.  And

20 if there is no objection, we can go directly to cross.

21         MR. HOGAN:  That's fine with me, Your Honor.

22         THE COURT:  All right.

23         MR. HOGAN:  No objection.

24         THE COURT:  Then it will be admitted.

25                      CROSS-EXAMINATION

1  BY MR. HOGAN:

2  Q    Mr. Scott, Timothy Hogan for Mr. Berry.  Mr. Scott, you

3  actually authorized the Guidance Software people to go in and

4  visit the Fleming facilities in Kapolei, isn't that correct, sir?

5  A    I approved the engagement letter for the retention of

6  Guidance, yes.

7  Q    Have you, prior to doing that, spoken at all to I believe a

8  Fleming officer by the name of Ronald Griffin regarding the

9  software issue at the Fleming Kapolei facility?

10  A    I don't recall whether or not I talked to Mr. Griffin about

11  that.

12  Q    Right.  Have you ever spoken to Mr. Griffin?

13  A    If I recall right, is Mr. Griffin the -- he was the chief

14  information officer of the company?

15  Q    That is my understanding, sir.

16  A    Yes, I had conversations with him.

17  Q    Did you ever speak about Mr. Berry and his software with Mr.

18  Griffin?

19  A    I don't recall that specifically, right.

20  Q    Did you ever discuss Mr. Berry's software with any other

21  officers of Fleming?

22  A    Not that I'm -- well, I may have provided updates to our CEO

23  along the way about Berry software issues.

24  Q    Who -- when you say "our CEO", who are you referring to,

25  sir?

1  A    Pete Wilmont would have been the CEO at one point and then

2  Archie Dice (phonetic) at another point.

3  Q    In terms of -- I'm just trying to understand.  In terms of,

4  I believe Mr. Dice was non-executive CEO, is that --

5  A    I don't believe that's correct.  I believe as of the

6  September time frame, he would have been and executive CEO.

7  Q    Now, when you made the decision to allow Guidance to go in,

8  did it ever occur to you to contact the chief information officer

9  and get his input regarding how to proceed regarding the

10 intellectual property issues?

11 A    As I mentioned, I don't recall whether or not I had a

12 conversation with Mr. Griffin about that.

13 Q    Did you ever -- did it ever occur to you, sir, that you

14 should contact him?

15 A    I -- no, it didn't.

16 Q    Okay.  And would you normally -- Alex Partners is a

17 turnaround company?  Is that what you refer to them as?

18 A    Yes.

19 Q    In your work in that turnaround industry, don't you usually

20 defer to the actual management in the departments that they're

21 operating in terms of the decision making regarding their

22 departments?

23 A    I did defer -- I reported to the person -- Mr. Stenger is

24 who I report to and I had a discussion with him about it.

25 Q    Right, but Mr. Stenger is not the chief information officer,

1  is he?

2  A    No, he's not.

3  Q    And Mr. Griffin was the chief information officer at the

4  time, correct?

5  A    That's my understanding.

6  Q    And do you know, -- did anyone inform you that there was a

7  reason not to contact Mr. Griffin?

8  A    I really have -- I don't recall any discussion related to

9  Mr. Griffin.

10 Q    All right.  When you decided to do the Guidance thing, who

11 were you discussing it with at Fleming?

12 A    I remember discussing it with our counsel and I remember

13 discussing it at one point with management in Hawaii.

14 Q    Okay.  And when you say "our counsel", who are you referring

15 to, sir?

16 A    Kirkland Ellis.

17 Q    And who specifically at Kirkland Ellis?

18 A    I know I've talked with Danny Capitola about the issue.

19 Q    Okay.  Anyone else?

20 A    Perhaps Mr. Liebeler at one point.

21 Q    Okay.  And anyone else?

22 A    Those are the two principle contacts that I had on this

23 matter.

24 Q    At anytime were you -- and you say you talked to management

25 in Hawaii.  Who -- do you recall who the management was in

1  Hawaii?

2  A    I don't recall who I've talked to.  I just recall that I had

3  a -- it was one conference call with the Hawaii management team.

4  Q    Now, at some point, there was a decision to use an

5  individual by the name of Mark Dillon to create a replacement

6  program for the Berry system.  Were you aware of that?

7  A    I wasn't aware specifically of who was going to develop the

8  replacement software.

9  Q    Did you do any investigation to determine whether or not the

10  manner in which that was going to be developed would be

11  appropriate for the circumstances?

12  A    We had discussions with management in terms of whether or

13  not they could utilize other software other than Mr. Berry's

14  software to perform the same function.  And in those discussions,

15  they indicated to me that they could use other software and that

16  they would go forward and implement something that doesn't use

17  Mr. Berry's software.

18  Q    And who was that that told you that?

19  A    As I said, this came up in the conversation with the

20  management team in Hawaii.  It was more than a year ago and I

21  don't recall who was on the conference call.

22  Q    But your testimony was that at no time anyone chose to

23  contact Ron Griffin to ask his opinion?

24        MR. PARIS:  Objection, asked and answered.

25        THE COURT:  Sustained.

Scott - Cross/Hogan                                    73

1  Q    Do you have an idea, and you're the chief financial officer,

2  sir?

3  A    I'm not.

4  Q    What is your title?

5  A    I'm the treasurer.

6  Q    Treasurer.  Do you have any understanding of the total

7  amount of revenue that is earned by the freight logistics system

8  operating at Fleming Kapolei?

9  A    I do not.

10 Q    Do you know who would?

11 A    I do not.

12 Q    Do you know where the records would be kept that would have

13 that information?

14 A    You're asking for the revenues of -- ask again which company

15 you're talking about the revenues for?

16 Q    Well, now, you understand -- what is your understanding of

17 what kind of operation Fleming ran in Hawaii?  Start slowly.

18 A    My understanding is it was a grocery distribution company.

19 Q    Okay.  Were you aware that they were running a

20 transportation company as well?

21 A    I'm not sure I specifically knew that, no.

22 Q    Were you aware that they were running what was called

23 Fleming Logistics at that facility?

24 A    I was not aware that was a separate business unit.

25 Q    Now, in terms of the feasibility, at anytime when you were

1 determining matters relating to feasibility, did you make any

2 analysis at all of the liability that C&S might incur for the use

3 of software that they're currently operating?

4 A    I did not evaluate the liability from C&S's use of the

5 software, no.

6 Q    Right.  And at anytime did you do an analysis of what the

7 potential damages for copyright infringement would be in the

8 proceeding for infringement either in this court or in the Hawaii

9 court?

10 A    Not beyond what Mr. Stenger testified to.

11 Q    All right.  Thank you.

12                    REDIRECT EXAMINATION

13 BY MR. PARIS:

14 Q    Mr. Scott, does the relationship between C&S and Fleming, is

15 that memorialized in a document?

16 A    Yes.  I understand among other documents, it would be

17 included in the asset purchase agreement between Fleming and C&S.

18 Q    Does the asset purchase agreement contain any indemnity

19 provisions whereby Fleming would reimburse C&S for expenses

20 incurred as a result of the sale?

21 A    My understanding is there is an indemnity provision in the

22 APA.

23 Q    Do you know the amount of that indemnity provision?

24 A    I don't believe there's any cap on that amount.

25 Q    Mr. Scott, have the debtors funded any amounts toward an

Scott - Recross/Hertzberg                               75

1  escrow for that indemnity obligation?

2  A    Yes, the debtors have funded slightly over $10 million into

3  an indemnity escrow that will be for the benefit of C&S to the

4  extent that they have claims under the indemnity.

5  Q    Thank you.

6                    RECROSS EXAMINATION

7  BY MR. HERTZBERG:

8  Q    Mr. Scott, have you done an analysis of how much excess

9  assets above liabilities will be in the post-confirmation trust

10 when it is completed?

11 A    I have and it's included as Exhibit 3 to the disclosure

12 statement.

13 Q    And what did you estimate that amount at?

14 A    As this chart demonstrates, the post-confirmation -- I'm

15 sorry, the post-confirmation trust is expected to have

16 approximately $40 million of assets in excess of liabilities.

17 Q    And that's after payment of all administrative claims,

18 correct?

19 A    That's correct.

20 Q    Did you employ Guidance Software on behalf of Fleming?

21 A    I did.

22 Q    For what purpose did you employ them?

23 A    My understanding was that there were challenges to the use

24 of the software of the Hawaii division and in an abundance of

25 caution, we wanted to hire somebody to, first of all, help us to

1 insure we were no longer using the software and remove it from

2 our systems.

3 Q    What did you instruct Guidance Software to do on behalf of

4 Fleming?

5 A    A couple of things.  The principle things we asked them to

6 do was, number one, to take a snapshot, if you will, of the hard

7 drives that were at the company to understand what software

8 existed on the systems when they first arrived on site.  And then

9 second, to go in and remove any software related to -- that was

10 developed by Wayne Berry and that was the principle issues that

11 we asked them to cover for us.

12          MR. HERTZBERG:  One moment, Your Honor, please.

13                    (Pause)

14 Q    Mr. Scott, please turn to proposed Exhibit 178.

15 A    May I have that.  I'm sorry, which exhibit?

16 Q    178, please.

17 A    This entitled exhibit list regarding confirmation hearing?

18 Q    No --

19 A    Oh, I'm sorry.

20 Q    -- underneath it.

21 A    UN Volume 4 of 6.

22 Q    5 of 6, Mr. Scott, please.

23          THE COURT:  No, 4 of 6 is the beginning of it.

24 A    I think 5 of 6 is the -- is 179.

25 Q    You're correct, Mr. Scott, I'm sorry, 4 of 6.

1  A    Okay.  And which tab?

2  Q    Underneath Tab 178.

3  A    Okay.

4  Q    Spend a minute and look at that document.

5  A    Okay.

6  Q    Do you recognize that document?

7  A    Again, this is the exhibit list regarding confirmation

8  hearing?

9  Q    No, underneath Tab 178 is a document entitled Fleming Asset

10  Purchase Agreement.

11  A    Oh, okay.

12  Q    Do you see that now?

13  A    Yes, I see that later in the agreement, yes.

14  Q    Okay.

15  A    Yes, I do recognize that.

16  Q    And what is that document?

17  A    It looks to be the cover for the asset purchase agreement

18  that was entered into between Fleming Companies and C&S and also

19  includes an index of what is in that asset purchase agreement.

20  Q    And what documents are underneath that?

21  A    There is an index of the exhibits to the asset purchase

22  agreement.

23  Q    And have you seen those exhibits before?

24  A    I believe I -- yes, I have.

25  Q    And did you participate on behalf of Fleming in the sale of

1 the assets of the wholesale division to C&S?

2 A    My involvement in that was fairly limited.

3         MR. HERTZBERG:  I have no further questions.

4         THE COURT:  Recross?

5                    RECROSS EXAMINATION

6 BY MR. HOGAN:

7 Q    Mr. Scott, the large two volume set, one of the things it

8 has in that first one is IP agreement.  If you'd look at it, it's

9 Volume 5 of 6, right after the -- there's the number tab, then

10 there's a -- mine has blank tab that says defined terms?

11 A    Yes.

12 Q    And if you go down there, sir, there's IP agreements.  Do

13 you see the 4.19B?  I guess it's 4.19A and B deals with

14 intellectual property.

15 A    Right.

16 Q    Are you able to -- I'm trying to do this and I just wonder,

17 are you familiar enough with this to be able to find where those

18 are in these binders?  And I'll tell you why I'm asking is I just

19 want to know if Mr. Berry's property is listed in either of those

20 two.

21 A    My -- I don't know.  I suggest you look.

22 Q    Are you familiar enough -- I mean, you don't know the binder

23 either.

24 A    Well, I don't know what this is.  I guess I'd want to refer

25 to that exhibit and no, I'm not familiar with the way this is put

79

1 together to be able to find that quickly.

2 Q    Okay.  That's -- thank you.

3           THE COURT:  Any recross?  Excuse me, redirect --

4           MR. PARIS:  No recross, Your Honor.

5           THE COURT:  -- redirect.

6           MR. PARIS:  No redirect.  We would offer Exhibit 178

7 and Mr. Stenger's affidavit which was Exhibit 5 with the exhibits

8 thereto.  Mr. Scott, I apologize.  And I also neglected to offer

9 the boards that we have used with Mr. Stenger, Exhibits 189 and

10 190.

11           THE COURT:  I thought you had moved their admission.

12           MR. HOGAN:  Your Honor, I'm going to object on lack of

13 foundation --

14           THE COURT:  Object to which?

15           MR. HOGAN:  Of 178, Your Honor.  He can't even find

16 things in the document.  So I'm going to object that he can't

17 authenticate this and lack of foundation.

18           MR. PARIS:  But the witness did testify that he

19 recognized the document.  His inability to, on the fly, find one

20 particular schedule --

21           THE COURT:  He said his involvement was relatively

22 limited.  And he didn't understand the document.  I'm not sure --

23 I will sustain the objection.  I don't think this witness is the

24 one.  You may step down.

25                     (Witness excused)

80

1     THE COURT:  All right.  Any objection to D-5?

2     MR. HOGAN:  No, not at all, Your Honor.

3     THE COURT:  All right.  It's admitted.

4              (Pause)

5     THE COURT:  Let's take a five-minute break.

6              (Recess)

7     THE CLERK:  Please rise.  You may be seated.

8     MR. SPRAYREGEN:  Your Honor, I appreciate the break.

9  Actually, we were able to use the break to have some discussions

10  with Mr. Hogan.  And actually what we've agreed on is that the --

11  all of the exhibits that relate to the Berry objection that are

12  the debtor's exhibits that have not yet been admitted into

13  evidence, Mr. Hogan is allowing to be entered into evidence

14  without objection at this point, so we can try to save some time

15  and be efficient.  We appreciate that accommodation, so to be

16  clear --

17     THE COURT:  That includes D-178?

18     MR. SPRAYREGEN:  Yes.

19     THE COURT:  Okay.

20     MR. SPRAYREGEN:  So to be clear, I can summarize that

21  the -- some of these have already been admitted based on the

22  first two witnesses, but it would be 1-9, 177-179, 189-192.  And

23  to make it even easier, with all of that, it actually means the

24  entire list that I handed to the Court would be admitted into

25  evidence.

81

1          Mr. Hogan, so it's clear, had requested that we extend

2   the same accommodation with respect to his affidavits.  And we've

3   conferred and the difficulty we have with that, and we're not

4   looking to be inefficient or waste anybody's time, is that

5   they're really interrelated with Mr. Berry's affidavit who is not

6   here.  And as a result, depending on what Mr. Hogan wants to

7   present, we thing that does need to be done by oral testimony so

8   we can purse through what's the hearsay and what's not.

9          THE COURT:  All right.

10         MR. SPRAYREGEN:  So with that, that would be the rest

11  of our exhibits.

12         THE COURT:  And do you rest?

13         MR. SPRAYREGEN:  Your Honor, that would be all of our

14  evidence in support of the confirmation hearing.  There is,

15  obviously, our motion to estimate Mr. Berry's claim and we have,

16  as I noted before, up to four witnesses, two of which are by

17  deposition.  And so, I'm not sure -- it would seem to me, I would

18  suggest to the Court that we handle that together --

19         THE COURT:  Agreed.

20         MR. SPRAYREGEN:  -- and proceed forward on that.

21         THE COURT:  All right.  We'll proceed with their

22  witnesses and then hear your testimony.

23         MR. HOGAN:  Thank you, Judge.

24         THE COURT:  All right.

25         MR. SPRAYREGEN:  Mr. Liebeler will (attorney away from

Dillon - Direct/Liebeler                                82

1  mike) --

2          MR. LIEBELER:  Eric Liebeler for the debtor.  We'll

3  call Mark Dillon.

4          THE COURT:  Please remain standing so you can be sworn.

5          THE CLERK:  Place your hand on the Bible.  Please state

6  your full name and spell your last name for the Court.

7          THE WITNESS:  My name is Mark Dillon, D-I-L-L-O-N.

8              MARK DILLON, DEBTOR'S WITNESS, SWORN

9                      DIRECT EXAMINATION

10 BY MR. LIEBELER:

11 Q    Mr. Dillon, where do you work?

12 A    I work for C&S Wholesale Grocers, Hawaii Division in

13 Kapolei, Hawaii.

14 Q    And what is your job title, sir?

15 A    I'm a network administrator there for the logistics

16 department.

17 Q    And describe your job, please, as a network administrator

18 for the logistics department?

19 A    I install and maintain all hardware and software on that

20 network.  I maintain our data and I do any required programing.

21 Q    And how long have you had that job, sir?

22 A    Well, I've performed those functions since October 1st, 1999

23 originally for Fleming.

24 Q    And then you started working for C&S after C&S purchased

25 that portion of Fleming?

Dillon - Direct/Liebeler                                83

1  A    That's correct.

2  Q    And as a result of that change in ownership, did your job

3  responsibilities change in anyway?

4  A    No, they did not.

5  Q    Now, stepping back a little bit in time, prior to working

6  for Fleming, who did you work for?

7  A    I worked for Atlantic Pacific International, API.

8  Q    And what was the relationship between API and Fleming?

9  A    API provided -- arranged for the transportation of Fleming

10  purchase orders coming from the mainland to Hawaii.

11  Q    And what happened as between Fleming and API ultimately?

12  A    Ultimately Fleming purchased API's assets and operations.

13  Q    And when did that occur?

14  A    In the months just up to October 1st, just prior to October

15  1st, 1999.

16  Q    At some point, did you come to know a gentleman by the name

17  of Wayne Berry?

18  A    Yes, I did.

19  Q    And what was your professional relationship with Mr. Berry?

20  What was your professional relationship with Mr. Berry?

21  A    He was my supervisor when I first came to API.

22  Q    And at that time, what was Mr. Berry's title there?

23  A    I just knew him as head of IP -- of API.

24  Q    Now, to the best of your understanding, what software did

25  Mr. Berry claim to have written at API used in its work with

Dillon - Direct/Liebeler                                    84

1  Fleming?

2  A    It was an access database in which API kept all it's data

3  except some accounting data.  And there were officially reports

4  that published the data in that database.  Later on, sometime in

5  1998, Mr. Berry created a program to update his access database

6  with Fleming purchase order data that he received at EDI.  Or in

7  EDI format.

8  Q    Did API use Mr. Berry's software while API was handling

9  Fleming's freight logistics operations?

10 A    I'm sorry, could you repeat the question?

11 Q    Certainly.  Did API use Mr. Berry's software while API was

12 working with Fleming on the logistics operations?

13 A    Yes.

14 Q    And then when Fleming bought API, did Fleming start to use

15 that software as well?

16 A    Yes, it did.

17 Q    And to your understanding, did Fleming have permission to

18 use that software?

19 A    Yes.

20 Q    And how is it that you know that, sir?

21 A    Well, I think there were a number of times where we were

22 instructed to, in preparation of transition to employment by

23 Fleming, about how we were to carry out our duties.  There was a

24 meeting in August of 1999 where Mr. Berry stood up in front of

25 the members of the -- of API who were going to become Fleming

1 employees, and certain Fleming officers at the Hawaii division,

2 and detailed what their operations were going to be, what the

3 operations of the logistics department were going to be in the

4 future.  And he described the -- our operations as -- precisely

5 as they were under API operation.  So we were going to continue

6 to do exactly the same thing.

7 Q   Now, at some point, there was a trial between Mr. Berry on

8 the one hand and Fleming on the other.  Do you recall that?

9 A   Yes.

10 Q   And that took place in federal district court out in Hawaii

11 in the first quarter of last year?

12 A   That's correct.

13 Q   Were you involved in that trial, sir?

14 A   Yes, I was.

15 Q   In what way?

16 A   I was a witness.

17 Q   And are you aware of the jury verdict from that trial?

18 A   Yes, I am.

19     MR. LIEBELER:  Your Honor, may I approach?  I have some

20 exhibit books that I'm using with some of the witnesses?

21     THE COURT:  Yes.

22     MR. LIEBELER:  Okay.

23 Q   And take a look in that book under what's been marked as

24 Exhibit 309, please.  Can you identify Exhibit 309, please, Mr.

25 Dillon?

1  A    This is -- this is the jury verdict from the Fleming/Berry

2  lawsuit.

3  Q    Now, as a result of that jury verdict, sir, did Fleming make

4  any changes to the software that was being used in the logistics

5  department at Kapolei?

6  A    Yes.  We went back to the Berry database in its original

7  form, the form under which it was licensed to us in October 1999.

8  Q    And who was it at Fleming who was responsible for making

9  changes to the software in light of the verdict?

10  A    I was.

11  Q    And when you did that, sir, did you have a copy of Mr.

12  Berry's software in unmodified form available to you?

13  A    No, I did not.  We, due to some inadvertency, had deleted

14  our copy, our archived copy of his original licensed database.

15  We had a copy from June of 2000 that had only one added feature,

16  a feature added to compensate for a Y2K failure in Mr. Berry's

17  update program.  And so, I removed that added feature and had Mr.

18  Berry's database in it's original form which we used at that

19  point.

20  Q    And how long did it take you, sir, to make that change to

21  the software?

22  A    Not very long to actually remove the added feature.  It

23  would have been about an hour, a little less than that.

24  Q    And after you had made that change to the software, what

25  impact did that have on the ability of Fleming personnel to use

Dillon - Direct/Liebeler                                87

1  the logistics software?

2  A    Well, it was very difficult.  Our operations had changed a

3  lot and Mr. Berry's database no longer had a place for a lot of

4  the data items we used.  We had to squeeze them in in places in

5  his database where data items we did not use were represented and

6  we used those places, mislabeled, sometimes with the wrong data

7  type, all over the page, not in the right tab order.  So it was

8  very inconvenient just from the standpoint of data entry.  The

9  access database was also very slow.  Access 97 does not run well

10 on Windows 2000.  We've tried to fix that in a number of ways,

11 but weren't able to get it to speed up adequately.

12 Q    How long was it, sir, that Fleming continued to use the

13 Berry software in its original unmodified form?

14 A    We used it from end of March 2003 until June 9th, 2003.

15 Q    And what changes were made at that time, sir?

16 A    In June 9th?

17 Q    Yes, sir.

18 A    We transferred the date that we had input into Mr. Berry's

19 database into Excel spreadsheets and began simply inputting our

20 date into spreadsheets.

21 Q    And did Fleming's use of the spreadsheets permit Fleming to

22 conduct its logistics operations in Hawaii without the use of Mr.

23 Berry's software?

24 A    Yes, it did.

25 Q    And what kind of difficulty did that cause to the operations

J&J COURT TRANSCRIBERS, INC.

Dillon - Direct/Liebeler                                    88

1  at that facility?

2  A    It caused great difficulty for both me and all my co-

3  workers.

4  Q    And without getting too technical, sir, why was that?

5  A    There were many reasons.  You couldn't see all of the data

6  having to do with a single record on a page.  You had to scroll

7  50 columns or whatever it was to the right or the left.  The

8  spreadsheets do not manage your data like a database.  If you

9  want to use a record, you have to tell everybody else you're

10  going to use that record or they will -- they may use the same

11  record and you'll override each others data.  So we had to do

12  that through phone calls and email.  There are numerous other

13  difficulties.  Spreadsheets don't maintain data types that cause

14  data all of a sudden to disappear from reports.  The data type

15  was input incorrectly.

16  Q    Now, in your current role as network administrator for C&S

17  at that same facility, do you generally know what software that

18  facility is using to conduct C&S's logistics operations?

19  A    I'm sorry, could you repeat the question?

20  Q    Sure.  In your current role, because you're working for C&S

21  as network administrator in that same facility --

22  A    Yes, sir.

23  Q    -- do you know, as you're sitting here right now, what

24  software C&S personnel are using to conduct C&S's logistics

25  operations?

J&J COURT TRANSCRIBERS, INC.

Dillon - Direct/Liebeler                    89

1  A    Yes, I do.

2  Q    And what software is that?

3  A    The spreadsheets I've been speaking of.

4  Q    And have you worked at the Kapolei facility continuously

5  since June 9th of 2003?

6  A    Yes.

7  Q    And since June 9th of 2003, has the Kapolei facility used

8  Mr. Berry's software?

9  A    No.

10  Q    And since June 9th of 2003, have you personally used Mr.

11  Berry's software?

12  A    No, I have not.

13  Q    Do you know a gentleman by the name of Mike Gursey

14  (phonetic)?

15  A    Yes, I do.

16  Q    And who is Mr. Gursey, sir?

17  A    He is an employee of Guidance Software from I believe

18  Pasadena, California.

19  Q    And how is it that you came to know Mr. Gursey?

20  A    He was employed to -- by Fleming, I believe, to come out to

21  our network in Kapolei and remove Mr. Berry's software from our

22  network.

23  Q    And before Mr. Gursey arrived, what if anything did you have

24  to do in order to prepare for his arrival?

25  A    Well, he was going to wipe our network clean and that meant