Dillon - Direct/Liebeler                    90

1  I had to be sure that we retained any files that needed to be

2  restored to the network, any user files, documents users created

3  in the course of their work that they would need to resume their

4  work once the network was reinstalled.  A lot of work involved.

5  I could describe the process, but it took me -- I worked at it on

6  and off for a week and perhaps more.

7       I had to -- we kept all our email on the user's machines and

8  I had to get all that.  And that also included any attachments to

9  email which is kept in their local internet directory.  I felt

10 like I needed to go through those because we had lost files when

11 we did not retain those internet caches before, so I went through

12 all those files.  It would be hundreds for each user.  And they

13 had user files in the server and I had to merge those -- get them

14 all into a single cache of all user files.  And then ascertain

15 that none of Mr. Berry's software was among those.  Lot of work.

16 Q    Were you fully prepared by the time Mr. Gursey arrived?

17 A    Not fully, no.

18 Q    And why is that, sir?

19 A    We had just moved to the spreadsheets at that time.  There

20 were constant fires I had to put out as well as prepare for Mr.

21 Gursey.

22 Q    Now, when Mr. Gursey arrived, did you work directly with

23 him?

24 A    Yes, I did.

25 Q    And did you work with him during regular work hours or

Dillon - Direct/Liebeler                                    91

1  during some other time?

2  A    Mostly -- well, we worked over the Fourth of July weekend,

3  2003.  We had to do most of our work in off hours.

4  Q    Why was that?

5  A    Because we were going to -- well, because we needed to take

6  over users machines and ultimately to remove all software.

7  Q    While you and Mr. Gursey was doing your work with the

8  overall system operational to other users?

9  A    No.

10  Q    Now, after you and Mr. Gursey started working together with

11  respect to -- well, strike that, withdrawn.  What is it that you

12  and Mr. Gursey were trying to achieve?

13  A    Well, ultimately, we wanted to make sure that Mr. Berry's

14  software was not on our network.  The way we went about that was

15  to take an image of every drive, every hard drive in use on the

16  logistics network there.  Then to wipe each of those hard drives.

17  For us to restall under his observation the software required to

18  resume operations and then to restore user files.  Then to take a

19  final image of what was left on the network when he completed his

20  task.  Any spare hard drives and media that we used for backup,

21  CDs or tapes, were given to him to keep in the custody of

22  Guidance Software.

23  Q    Now, you indicated that Mr. Gursey took an image of the

24  drives at the beginning of the process and then one at the end of

25  the process.  What was the point of taking that second image?

Dillon - Direct/Liebeler                                    92

1  A    To keep a record of what was left on the network when Mr.

2  Gursey finished.

3  Q    And what day was that second image taken, sir?

4  A    I'm not sure.  I think it might have been the 7th of July.

5  Q    When did Mr. Gursey leave the facility?

6  A    It was the last day of that holiday weekend.  I'm not sure

7  whether -- that must have either been a Sunday or a Monday.

8  Q    So it's fair to say sometime in the first week of July?

9  First 10 days in July?

10 A    That's correct.

11 Q    Now, you testified a minute ago that you restored some of

12 the software back on the system after Mr. Gursey wiped

13 everything.  You said you did two things, you put on software and

14 then you put on user files.  Let me direct you to the software

15 first.  What do you mean when you say you put the software back

16 on the system?

17 A    Off the shelf applications such as Microsoft Office, Crystal

18 Reports, Adobe Acrobat, those sort of files.

19 Q    And when you restored that software, did you intend to

20 restore any of Mr. Berry's software onto the machines?

21 A    No.

22 Q    Now, when you say user files, it's kind of a technical term.

23 Tell the Court, please, what it is that you mean by user files.

24 A    I mean any document created by users to -- as part of their

25 function within the department that they might need to refer to

Dillon - Direct/Liebeler                              93

1   again.  They would be, for instance, Word documents, Excel

2   spreadsheets.  Sometimes we had exported into Adobe Acrobat.

3   Q    And approximately how many user files needed to be restored

4   to the system?

5   A    Well, including my own, which includes, you know, extensive

6   professional documentation, there was over 20,000 files, I think.

7   Q    And when you restored the user files back onto the system,

8   did you intend to restore any of Mr. Berry's files?

9   A    No.

10  Q    Or Mr. Berry's software?

11  A    Absolutely not.

12  Q    Now, how long did it take you and Mr. Gursey after you and

13  Mr. Gursey to complete the process that you've described?

14  A    We worked over five days I recall, that weekend.

15  Q    And were you working hard or not hard over that period of

16  time?

17  A    It was -- well, we had an awful lot to do and I counted -- I

18  put in about 75 hours that weekend.

19  Q    And why is it that you were under such a tight deadline?

20  A    We had to have it all done by the time workers came in from

21  the holidays and sit down at their desks and get right into work.

22  Q    Now as you sit here today, do you understand that Mr. Berry

23  alleges that there's 16 copies of a file called Fleming Logistics

24  MDB on the second image that Guidance took and part of which was

25  ultimately produced by Mr. Berry during discovery?

1 A    Yes.

2 Q    And do you know specifically how those files got there?

3 A    No.  I can only surmise that they were retained among the

4 users files.  Those were my files, too.  They were my files for

5 the -- of documentation for the previous lawsuit.  Somehow that

6 I'd missed them and they were among the user files that were

7 retained on the network.

8 Q    Did you ever intentionally put Mr. Berry's files back on the

9 system at anytime?

10 A    No.  The whole point of all that pain was to be sure that

11 his software was not on the network.

12 Q    Now, when is it that you found out that Mr. Berry was

13 claiming that his files were still remaining on the system?

14 A    It was in June of this year.

15 Q    And since that time, have you gone back and looked for those

16 files?

17 A    Yes, I did.

18 Q    And tell us please what it is that you did in order to do

19 that?

20 A    Well, for every computer, for every drive on every computer

21 on the network, I performed a search for any file beginning with

22 FCS and ending with the extension .MDB, which were the -- which

23 would discover any of Mr. Berry's files.  And all the searches

24 came back negative.

25 Q    When you say the searches came back negative, what do you

1  mean, sir?

2  A    I mean, I did not find any of his files on the network.

3  Q    Now, take a look at what's in your binder as Exhibit 302, if

4  you please.  And 302 is a long document and it's part of -- it's

5  a declaration that was written by Wayne Berry and there's an

6  attachment on the end of it.  On the very last page of 302, the

7  last two pages of 302 are all we're going to need.  And Mr.

8  Dillon, I'm going to represent to you that Mr. Berry has told the

9  Court that those pages -- or at least the second to last page,

10 contains a list of the 16 separate files that he has identified

11 from the Guidance image that remain on the servers.  You can see

12 on the right-hand part of the exhibit that there are -- a long

13 column describing what the file names are.  Do you see that?

14 A    Yes.

15 Q    And does that include both path names and file names?

16 A    Yes, it does.

17 Q    And by looking at those path names, what can you tell us

18 about where those files were on the systems in Kapolei?

19 A    They were on my computer.  They were part of my professional

20 documentation.  That is documents and material I keep to -- have

21 to do with my function with maintaining computers and software

22 there on the network.

23 Q    How can you tell from the actual path names that these files

24 were on your computer, sir?

25 A    From the director named fhl136.  Actually, the directory

Dillon - Direct/Liebeler                                            96

1  name is lower case xfhl136.  Fhl136 was the name of my computer.

2  Q    Okay.

3  A    At that time.

4  Q    Now why is it that you would originally put these files in

5  your directory?  For what purpose, sir?

6  A    I'm sorry, which -- oh, these MBD files here?

7  Q    Yes, sir.

8  A    This was -- all these directories are used to keep

9  documentations for the previous lawsuit.  There were collections

10 of documents that I felt were relevant to the lawsuit.

11 Q    And when you say "the lawsuit", which lawsuit do you mean,

12 sir?

13 A    This is the Berry v. Fleming Companies lawsuit that was sent

14 to the jury in March, maybe late February, of 2003.

15 Q    And to what extent have you used these files after the end

16 of that trial, sir?

17 A    We have not used them.  They're not quite in a usable state.

18 They're -- most of the are -- do not have any data in them.  But

19 we don't -- we have not used them.

20           MR. LIEBELER:  No further questions, Your Honor.

21           THE COURT:  Cross?  Is it --

22           MR. HOGAN:  Would you like me to go first, Your Honor?

23           THE COURT:  Yeah.  Does the Committee have any

24 questions?

25           MR. HERTZBERG:  Not at this point, Your Honor.

Dillon - Cross/Hogan                              97

1          THE COURT:  All right.  Cross.

2                    CROSS-EXAMINATION

3   BY MR. HOGAN:

4   Q    Mr. Dillon, Timothy Hogan for Wayne Berry.  Mr. Dillon, you

5   just testified that you were able to run a single wildcard search

6   for the MBD files and to look for these, isn't that correct?  You

7   just testified to that?

8   A    Yes.

9   Q    Why didn't you and Mr. Gursey do that the first time?

10  A    I don't recall how we went -- how I went about removing

11  those -- any files of Mr. Berry.  I think the reason I might have

12  missed these files is because they're in a place where I normally

13  do not keep software.  They're in my documentation that I keep

14  for keeping records of how I troubleshoot various problems, that

15  sort of thing.  And I happened to keep my file documents there as

16  well.  That might be why I missed them.

17  Q    Well, let me ask you this, when Mr. Gursey came in, how did

18  he know which ones were Wayne Berry's software and which ones

19  weren't?  To your knowledge.

20  A    Among the files we were to retain on the network?

21  Q    No, I mean, I think you testified that Mr. Gursey came into

22  town to come in and scrub off Wayne Berry's intellectual

23  property, is that a fair characterization, sir?

24  A    Yes.  With my cooperation.

25  Q    With your cooperation.  How is he to know which ones were

Dillon - Cross/Hogan                                    98

1 Wayne Berry's and which ones weren't?

2 A    Well, I think it's my part to determine which were Wayne

3 Berry's and which ones were not.  He was to simply take an image,

4 make sure there was, then wipe every drive and monitor my

5 reinstallation of the software.  I was the one that was to go

6 through the files and make sure Mr. Berry's software did not

7 remain on the network.

8 Q    To the best of your knowledge, sir, was Mr. Gursey aware

9 that a jury had found that you had made infringing changes to Mr.

10 Berry's software in March of 2003?

11 A    Okay.  Would you repeat the question, please?

12 Q    When Mr. Gursey was there, to your knowledge, was he aware

13 that you had been found to have made infringing copies of

14 software in a federal court proceeding that a jury handed down a

15 verdict on March 6th, 2003?

16 A    I don't recall --

17       MR. LAPOWSKY:  Objection, good faith basis for the

18 question, Your Honor.

19       THE COURT:  Overruled.

20 A    I don't recall my conversation with Mr. Gursey about the

21 events leading up to his employment.  I'm -- you know, I imagine

22 we may have discussed some things.  I just don't recall what they

23 were.

24 Q    Okay.  Now are there other software files that were created

25 by Wayne Berry that exist on the Fleming Kapolei computers as we

Dillon - Cross/Hogan                                      99

1  sit here today?  The C&S computers?

2  A    None that I know.

3  Q    And no Crystal reports programs that he originally authored?

4  A    None that I know of.

5  Q    And how do you know that?

6  A    I simply went through all our user files and I had to open

7  each of the Crystal reports.  This is one of the things that took

8  so long.  And ascertained by the internal creation date when that

9  report was created.  If it was created previous to Fleming, to

10 the transition of Fleming ownership of API assets, I assumed it

11 was created by Mr. Berry, all -- with the exception of a few

12 reports that I created.  And deleted those from among the user

13 files.

14 Q    At anytime, sir, prior to your creating the version of the

15 software, whatever you want to call it, that they're operating

16 now, was there ever a consideration that you might actually go

17 out and license the actual copy from Mr. Berry, to your

18 knowledge?

19 A    That wasn't discussed with me.

20 Q    Never?

21 A    No.

22          MR. HOGAN:  May I approach, Your Honor?

23          THE COURT:  You may.

24          MR. HOGAN:  I'd like this to be marked, if I may, Your

25 Honor, as Mr. Berry's 1.

Dillon - Cross/Hogan                                    100

1        THE COURT:  You may.  Can I have a copy?

2        MR. HOGAN:  Yes, Your Honor.

3        THE COURT:  Thank you.

4   Q    Take a look at that, Mr. Dillon.

5                        (Pause)

6   A    Is there anything in particular you want?

7   Q    Have you had a chance to read it, sir?

8   A    Well, the entire document?

9   Q    Why don't you -- I'm going to ask you questions regarding

10  the whole document, but I'll start with the back page.  I believe

11  it's an email that's served -- a thread, I think, is the term

12  that's used.  First, I'm going to ask you a question, Mr. Dillon,

13  you recognize this email?

14  A    Yes, I do now.

15  Q    And was this an email that you turned over to me or to Mr.

16  Berry in discovery?

17  A    I presume so.

18  Q    You presume so.  Do you recall that we discussed this in

19  your deposition, sir?

20  A    No, I don't.

21  Q    Are you able to identify this as a copy of an email from

22  your system?

23  A    Yes.

24  Q    Okay.  And does it appear unchanged from the time that it

25  was created and turned over to us in discovery?

**J&J COURT TRANSCRIBERS, INC.**

Dillon - Cross/Hogan                                        101

1  A    Would you repeat the question?

2  Q    Does it appear to be altered in anyway, sir?  Does it seem

3  to be a true and correct copy of your email?

4  A    Yes, it appears to be true and correct.

5         MR. HOGAN:  Your Honor, I guess I'll wait till

6  admission at the end.

7         THE COURT:  Yes.

8         MR. HOGAN:  Thank you, Your Honor.

9  Q    Go to the second page, Mr. Dillon, if you would.  This page

10 purports to be an email from an individual with an email address

11 of ron.griffin@fleming.com.  Do you see that, sir, about middle

12 of the page?

13 A    Yes, I do.

14 Q    Do you know who Ron Griffin is?

15 A    No, I don't.

16 Q    Have you ever know who Ron Griffin is?

17 A    No, I haven't.

18 Q    Okay.  Do you recall getting this email?

19 A    Vaguely, yes.

20 Q    Okay.  And in this email, sir, is it correct that it gives

21 four options to deal with Mr. Berry's software issues?

22 A    Yes.

23 Q    Okay.  Would you show me where in those options it says that

24 Mark Dillon should make a replacement copy?

25 A    I don't see that.

Dillon - Cross/Hogan                                    102

1  Q    Can you tell me, sir, why you chose to make a replacement

2  for Mr. Berry's software having just been found to have committed

3  infringement in the federal court proceeding?

4          MR. LIEBELER:  Objection, foundation.

5          THE COURT:  Sustained.

6  Q    Mr. Dillon, were you aware that the jury found that the

7  changes you made to Mr. Berry's system violated his copyright?

8  A    Yes.

9  Q    And were you aware that prior to the time that you made the

10 software that is presently running at C&S?

11 A    Yeah.

12 Q    At anytime, sir, did you consider that perhaps you shouldn't

13 be the one to make the replacement software?

14 A    We made those changes under a misunderstanding between Mr.

15 Berry and Mr. Ralph Steecy (phonetic), the president of funding

16 companies, okay.  And --

17 Q    Excuse me.  The question has to do with the changes you made

18 in May --

19         MR. LIEBELER:  Your Honor, I ask Mr. Hogan not to

20 interrupt the witness.

21         THE COURT:  Please --

22         MR. HOGAN:  I --

23         THE WITNESS:  I am trying to explain --

24         MR. HOGAN:  And I'll object as nonresponsive, Your

25 Honor.  The --

Dillon - Cross/Hogan                                103

1      THE COURT:  Just answer the question, then you can
2  explain.  Do you want to repeat the question?
3      MR. HOGAN:  Yeah, I'll repeat the question.
4  Q    In May of 2003, you made changes to Mr. Berry's software, is
5  that correct, sir?
6  A    May of 2003.
7  Q    Correct.
8  A    No, I don't recall making changes in May of 2003.
9  Q    At some point, sir, didn't you testify that after the jury
10  trial, you went back and took a copy of Mr. Berry's software and
11  made changes to it?
12  A    I removed a change I had made.
13  Q    You removed a change.  But that made a change, correct, sir?
14  A    Mr. Berry, to my understanding, is that the proper
15  procedure, I got this from counsel I presume, it was something
16  that you --
17      MR. LIEBELER:  I'd ask the witness to stop, I don't
18  want him to reveal anything that he found out from counsel.
19      THE WITNESS:  Pardon.
20      THE COURT:  All right.
21      MR. LIEBELER:  Just as a privilege issue, Your Honor.
22  I don't want a privilege waiver unknowingly.
23      THE COURT:  Fine.
24      THE WITNESS:  Okay.
25      THE COURT:  Don't reveal anything counsel told you or

1   you told counsel.

2   A    We understood that it was -- I understood that the way to

3   respond to the jury's decision, which we wanted to respond to.

4   We admitted from the beginning that we had made those changes.

5   We made them inadvertently due to a misunderstanding.  We thought

6   we had the right to make the changes.  Jury said we didn't.  We

7   wanted to go back -- we wanted to comply with the jury's

8   decision.  We thought this was how to do it.  This is fully in

9   correspondence with a will to be within the law and within -- and

10  to respect Mr. Berry's rights.

11  Q    Did it ever occur to you to respect Mr. Berry's right, you

12  might call him up and ask him to make the changes?

13  A    Ask him to remove what I had added?

14  Q    Correct.

15  A    No, it didn't occur to me.

16  Q    And why is that?

17  A    Well, Mr. Berry had been very hostile to us from the

18  beginning.  And personally, I just didn't see him being very

19  cooperative, but it's hard to say.  I think there were a lot of

20  things that went through my mind.  I basically was doing what I

21  was told to do.

22  Q    And who told you to do that?

23  A    Counsel.  I'm sorry, the counsel was telling me --

24          MR. LIEBELER:  Objection, I don't want the -- again, I

25  don't want a privilege waiver so I'd ask that the cross-

Dillon - Cross/Hogan                                        105

1 examination exclude in the questioning what --

2         THE COURT:  He didn't ask what counsel told him, so,

3 overrule.  You've been instructed not to reveal what counsel told

4 you or what you told counsel --

5         MR. HOGAN:  Thank you, Your Honor.

6         THE COURT:  -- in answering your -- any of the

7 questions.

8 Q    Mr. Dillon, isn't it true, sir, that Access is currently

9 running in regard to the spreadsheets you purported to have

10 created?

11 A    I don't understand the question.

12 Q    Are you running Access at the C&S logistics department

13 currently, sir?

14 A    It's part of Microsoft Office.  We have Microsoft Office

15 install.

16 Q    Correct.  But isn't it true, sir, that in order to extract

17 and run queries out of the thing you created, you run Access

18 against it?

19 A    We do run Access because -- I actually not to simply because

20 I knew you would ask this question and the implication is we had

21 something to do with Mr. Berry's former software which also

22 happened to be written in Microsoft Access.  There's hardly any

23 connection, but I guess IT people don't know this.  But -- pardon

24 me, but we've gone through this before, pardon me, Your Honor.

25         THE COURT:  Just answer.

1  A    The -- we -- we're not in -- I'm not in IT.  I have hardly

2  any funds.  So the only query engine that I had available to me

3  that would do -- create a query using more than one table and

4  allow outer joins was Microsoft Access.  Otherwise, I'd have to

5  go pay $1,000 or so which I do not have to buy a third-party

6  software to do this.  So I use Microsoft Access to create queries

7  against the spreadsheets, yes, I do.

8  Q    When -- I want to make sure I state it correctly.  You had a

9  copy of Mr. Berry's software after the jury verdict and after the

10 filing of the bankruptcy that was a version that had some of your

11 changes in it.  Is that a fair statement, sir?

12 A    I'm sorry, could you repeat that?

13 Q    Okay.  We're coming up to the time when Fleming -- there was

14 a jury verdict in March 6th.  Fleming files bankruptcy on April

15 1st.  And you have to do something about changing the way they do

16 business with the software.  Is that a fair statement?

17 A    I don't understand.

18 Q    Okay.

19 A    What change do I need to make?

20 Q    Well, I think you testified that you took a version of Mr.

21 Berry's software and removed a few of your changes?

22 A    That's correct.

23 Q    Okay.  And when do you think you did that?

24 A    That would have been end of March 2003.

25 Q    Okay.  Prior to the filing of the bankruptcy?

Dillon - Cross/Hogan                                                107

1  A    Yes.

2  Q    Okay.  And did you contact Mr. Berry to ask him if it was

3  okay to make these changes in his software?

4  A    No, I did not.

5  Q    Okay.  So you made those changes and you came up with what

6  you considered to be the original version of Wayne Berry

7  software?

8  A    Yes.

9  Q    But it's a version that you created, correct?

10 A    Oh, it's that -- I am trying to revert to the version he

11 created.

12 Q    Right.

13 A    That being the issue.

14 Q    By making the changes.

15 A    By removing the change, the feature I had added.

16 Q    Okay.  Now, at some point, you took that version of software

17 and did something to it so that you could populate your

18 spreadsheets.  Is that a fair statement?

19 A    Yes.

20 Q    And what you did is you ran MS Query against it to do that?

21 A    Yes, I did.

22 Q    Okay.  And that created the program that is now operating at

23 C&S?

24 A    Created spreadsheets.

25 Q    And that is the program that is operating at C&S?

1  A    Yes.  Microsoft Excel is the program.  The documents are the

2  spreadsheets.

3  Q    Okay.

4  A    The program is Microsoft Excel.  That was -- that's a

5  creation of Microsoft Corporation.  We created some documents

6  within that application, the spreadsheets.

7  Q    Now, Mr. Berry's database is written in Access, correct?

8  A    That's right.

9  Q    And what you've written is in Excel?

10  A    Yes.

11  Q    Okay.  Can you tell me or tell the Court what original work

12  went into your Excel spreadsheets that did not come directly from

13  Mr. Berry's Access database?

14  A    All the data we input into his database.

15  Q    So the data, not the structures, is the part that's the

16  original work?

17  A    We imported the data that we had input into Mr. Berry's

18  database.  We asked for it back and put it in the spreadsheets.

19  Q    So isn't it true, sir, that what you did is you simply said

20  to the Access database, the one the jury had said that you had

21  infringed, it said take the table to Mr. Berry's Access database

22  and populate my spreadsheets with them?  Isn't that essentially

23  what you did?

24  A    No, we used -- we only used portions of Mr. Berry's

25  database.  Out of about 70 tables, we used 11.  And within the

1 two principle tables, we used on one about 45 percent of the

2 fields within that table and the other about 25 percent of the

3 fields.  We're not importing his database and structures

4 wholesale.

5 Q    Okay.  Not wholesale, but at least retail, right, Mr.

6 Dillon?  You took some of his work and incorporated it into the

7 thing that's running at C&S presently?

8 A    I don't know why you say some of his work.  We simply

9 requested the data we had input into it.  It advertises its -- I

10 simply requested the data that we had input into his database so

11 we could use it in another application so as not to infringe on

12 Mr. Berry's rights.

13 Q    But your answer to the question of what your original work

14 was, was there anything besides the data that you contributed to

15 this new software work?

16          MR. LIEBELER:  Objection, asked and answered, Your

17 Honor.

18          THE COURT:  Sustained.

19 Q    Question regarding how things work at Kapolei, which is the

20 C&S facility now.  Do the employees have more than one computer

21 each?

22 A    Yes, they do.

23 Q    And why is that, sir?

24 A    Because of the accusations in the previous lawsuit that we

25 were distributing Mr. Berry's database throughout Fleming

1  companies, which is not new.  There was never a connection

2  between our network and the Flemings network.  Several times it

3  was asserted by the plaintiff that there were -- was such a

4  connection.  We even hired people to come in, experts in networks

5  and computer forensics, to come in and document the fact that

6  there was no connection.  Since we had had to do that in the

7  past, once C&S took over operations in the logistics department,

8  we counseled them to -- I counseled them that given my

9  experience, we should not put our computers on their network.  So

10  we retained -- the employees in the logistics department have two

11  computers at each of their desks, one on the C&S network and one

12  on the logistics network.

13  Q    And is the reason for that because you're afraid that there

14  will be a claim of infringement that will transmit to the entire

15  C&S logistics world?

16  A    I think that's the way I'd put it.

17  Q    But, sir, if what you wrote was not infringing, why would

18  they care?

19  A    Well, it's a -- I guess it's a matter of putting a fence,

20  having outer perimeters.  It just simply was to eliminate -- it's

21  not -- I don't believe it's not.  I don't believe that taking our

22  data out of Mr. Berry's database because there's a problem with

23  his database and we want to use some other -- I cannot conceive a

24  copyright law being -- intending us being so restricted.  But I

25  don't know all the legal ins and outs, of the liabilities, our

Dillon - Cross/Hogan                    111

1  vulnerabilities.  I simply believe that it would simplify matters

2  due to my experience from the previous lawsuit if these

3  possibilities could not come up in court because we maintain

4  separate networks.

5  Q    And wasn't that actually one of the reasons that you

6  actually changed some of the names of the fields when you created

7  the new data structures, I'll use that term, that you used

8  different terminologies so it wouldn't look like Wayne Berry's

9  software?

10 A    It was to respect his copyright.  He takes exception to our

11 using his names.  So, I figured we should change the names

12 insofar as possible, which we did.

13 Q    But when you did that, you had to be aware of what his name

14 was?  Fair statement, sir?

15 A    Well, his name is -- his database, Access database, is -- he

16 did not compile it.  He created his Access database in such a way

17 that it advertises his contents to various third-party -- well,

18 Microsoft software on -- that's packaged with Windows and

19 Microsoft Office.  And so within -- so when I go to request data

20 from Mr. Berry's database, it does advertise his contents and

21 included in that is the column names, yes.

22 Q    Now, you said compile it.  Just briefly, sir, what does that

23 mean?

24 A    It means to -- it means to create a form of the -- in this

25 case, a form of the database in binary code that's not accessible

Dillon - Cross/Hogan                                    112

1  except by simply reversing -- where the source code is not

2  accessible.

3  Q     Right.  And the copy that Mr. Berry put on the computers in

4  October/November of '99 was not compiled, is that correct?

5  A     That's correct.

6  Q     And wasn't it true, sir, that Mr. Berry was, at least to

7  your knowledge, expecting to make changes to the database and be

8  paid for that during that time?

9  A     I had no knowledge of that.  We tried to get Mr. Berry to

10 make changes to the database for three to four months after

11 October 1st, 1999.  We had four phone numbers, including his home

12 phone.  We had at least three email addresses.  He never

13 responded to anything.  I never got a thing from him.  In fact, I

14 thought he had lost interest in the whole thing.  I've -- well,

15 leave it at that.

16 Q     When C&S came into the -- when did C&S come into the

17 facilities in Kapolei?  To the best of your recollection?

18 A     When did they come in?

19 Q     Yeah.  When did you first see somebody from C&S on the

20 property?

21 A     I'm not sure.

22 Q     Okay.

23 A     Sometime in, I would -- sometime in 2003.  I don't remember

24 if it was before June or after June.

25 Q     When they came in, did they have any backup requirements for

Dillon - Cross/Hogan                                    113

1  the IT personnel?  Computer backups?

2  A     Backup of data or backup of --

3  Q     Right.  I mean there's a big --

4  A     Functions or --

5  Q     I'm sorry, sir.  There's a big operation there.  They want

6  to protect their data in case there's a hurricane or something.

7  Was there any form you had to fill out that said I backed up my

8  data on this date or anything like that?

9  A     No.

10 Q     No procedures to your knowledge at all about backing it up?

11 A     I'm not in their IT department.  So I'm not informed about

12 those procedures.

13 Q     But are you saying that noone from IT, from C&S has ever

14 accessed these second sets of computers at the Kapolei facility

15 to the best of your knowledge?

16 A     The second set meaning?

17 Q     The ones with your software on it?

18 A     Not that I know of.

19 Q     Is there any -- have you been told any reason why they

20 wouldn't access them?

21 A     No.

22 Q     Have you ever been told by anyone, sir, that, in fact,

23 Fleming was operating after the bankruptcy without a license for

24 Mr. Berry's software?

25 A     No.  I understood we did have a license.

Dillon - Redirect/Liebeler                                    114

1  Q    And how do you understand that, sir?

2  A    From the jury verdict.

3  Q    All right.  From anyone else, anything else other than the

4  jury verdict?

5         MR. LIEBELER:  I take it that accepts statements that

6  his counsel may or may not have made?

7         MR. HOGAN:  Your Honor, if counsel tells a fact, that's

8  generally not privileged.

9         THE COURT:  I'm not sure that's a fact or a legal

10  conclusion.

11        MR. HOGAN:  I agree with that, Your Honor, but --

12        THE COURT:  So I'll sustain the objection.  Other than

13  counsel.

14  Q    Other than counsel.

15  A    No.

16  Q    But it was your understanding that you were using licensed

17  software after the filing of the bankruptcy?

18  A    Definitely.

19        MR. HOGAN:  Thank you, Your Honor.

20        THE COURT:  Redirect.

21                    REDIRECT EXAMINATION

22  BY MR. LIEBELER:

23  Q    Mr. Dillon, turn to 309 in the book, if you please.  That's

24  the jury verdict.  And on page 2 of 309, it reads: "If Fleming

25  Companies prove by a preponderance of the evidence that it has a

Dillon - Redirect/Liebeler                                115

1  valid license for use of the freight control software," and it's

2  checked yes. Do you see that?

3  A    Yes, I do.

4  Q    Is that in part the basis for your understanding that after

5  the jury verdict Fleming had a license to use the software in its

6  original form?

7  A    Yes.

8  Q    And when you went back after the jury verdict came down and

9  made the change you discussed, what was your intent?

10 A    To comply with the jury's decision.

11 Q    And after you made your change, what form was the software

12 in?

13 A    In it's original form as licensed by Mr. Berry.

14 Q    Now, when you created your spreadsheets, sir, did you take

15 Mr. Berry's work on the one hand, or on the other, did you simply

16 input the underlying data into your creation?

17         MR. HOGAN:  Objection, compound.

18         THE COURT:  Overrule.

19 A    I simply requested data from his database.

20 Q    And then did what with that data?

21 A    I pulled it in the spreadsheet.

22 Q    And who created that spreadsheet, sir, you on the one hand

23 or Mr. Berry on the other?

24 A    I did.

25 Q    Is that spreadsheet include any part of Mr. Berry's work?

1  A    No.

2  Q    And, sir, do you view what's currently on the system as a

3  modification of Mr. Berry's software?

4  A    No, I don't.

5  Q    Now, Mr. Hogan asked you some questions about why it is that

6  you did or didn't try to contact Mr. Berry in order to have him

7  make modifications.  Do you recall those questions?

8  A    Yes, I do.

9  Q    All right.  Take a look at Berry Exhibit 1 which Mr. Hogan

10 gave you.  And let me direct your attention to the first page of

11 that in the fifth paragraph.  And that's an email that you wrote,

12 correct, sir?

13 A    That's right.

14 Q    And in that paragraph, you've written "he", referring to Mr.

15 Berry, would likely continue what he has done from the start

16 which is to entrap Fleming and seek to extort monies from the

17 company.  It's your language, sir?

18 A    I'm sorry, am I looking at the right document here?

19 Q    Sure.  It starts Option 2 on the first page of Berry 1.

20 A    Oh, okay.

21 Q    In the third and fourth lines, beginning with he would

22 likely.

23 A    Yes.

24 Q    Why was it, sir, that you didn't call Mr. Berry and ask him

25 to either make modifications or assist you in so doing so?

Dillon - Recross/Hogan                                      117

1  A    You know, Mr. Berry is very hostile with Fleming.  There's a

2  long history.  I have a lot of -- there were many conversations I

3  had with Mr. Berry.  Or at least several conversations I had with

4  Mr. Berry where his hostility was evident.  And he had a personal

5  vendetta.  It just seemed unwise to have anything more to do with

6  Mr. Berry.  Also, he was a very litigious person.  He had been in

7  numerous lawsuits previously and he had spoken to me about those

8  lawsuits.  And it just seemed like we would get -- more of the

9  same would transpire if we were to continue and develop a

10  licensing relationship with Mr. Berry.

11         MR. LIEBELER:  Nothing further at this time, Your

12  Honor.

13         MR. HOGAN:  With your permission, Your Honor, I'd like

14  the witness to look at that.  The Debtor's 304.

15                    RECROSS EXAMINATION

16  BY MR. HOGAN:

17  Q    It purports to be a memorandum, first page, November 24,

18  1999.

19  A    Yes, I see it.

20  Q    Okay.  If you go to the back of the addendum which is page 4

21  of 5 to the end user license agreement.

22         MR. LIEBELER:  Your Honor, this is outside the scope of

23  redirect.

24         MR. HOGAN:  Your Honor, he has opened the door to Mr.

25  Berry's vendetta.  I think I'm allowed to --

118

1          THE COURT: All right.  I'll allow.  I'll allow some
2   leeway.
3   Q     Do you see that, Mr. Dillon, the end user addendum?
4   A     Page 4 of 5, yes.
5   Q     If you look at the first paragraph, sir.
6   A     Yes.
7   Q     Do you see it?
8   A     Yes.
9   Q     Isn't it true, sir, that what Mr. Berry got out of the deal
10  with Fleming was for you to get a job for one year?
11          MR. LIEBELER:  Objection, argumentative, Your Honor.
12          THE COURT:  Overrule.
13  A     Among other things, yes.
14  Q     Thank you.
15          THE COURT:  Any redirect?
16          MR. LIEBELER:  No, thanks.
17          THE COURT:  All right.  Thank you.  You may step down.
18          THE WITNESS:  Thank you.
19                    (Witness excused)
20          MR. LIEBELER:  Your Honor, may I have a moment to
21  confer with other counsel?
22          THE COURT:  About what?
23          MR. LIEBELER:  The next witness we're going to do, we
24  want -- I want to talk about the next witness.
25          THE COURT:  Well, you'll have more than a minute.  I'm

119

1  going to break for lunch.

2            MR. LIEBELER:  Works for me, Your Honor.

3            THE COURT:  All right.  Let's come back at 1:30.

4                      (Luncheon recess)

5            THE CLERK:  Please rise.  You may be seated.

6            THE COURT:  You may proceed.

7            MR. LIEBELER:  Thank you, Your Honor.  We would like to

8  proceed by playing the deposition designations from a gentleman

9  for Mr. Anderson.

10           THE COURT:  Anderson.  All right.

11           MR. HOGAN:  Your Honor, I object.  We were told --

12 earlier on, I tried to do things that would have live witnesses.

13 They objected to that, Your Honor.  So at least I'm going to make

14 an objection to anything but live witness testimony today, Your

15 Honor.

16           MR. LIEBELER:  We simply indicated that that trial has

17 to conform with the rules of trial under the federal rules.  We

18 took Mr. Anderson's deposition.  Mr. Hogan was there.  The man

19 lives in Portland, Oregon.  He's not available.  He's a third-

20 party witness.  We're committed to play his designations.

21           THE COURT:  I think that's --

22           MR. LIEBELER:  By the way, on the designations

23 themselves, we gave those to Mr. Hogan, I believe it was a week

24 ago.  We haven't gotten counter-designations and he sent us no

25 objection.