120

1          MR. HOGAN:  I don't recall getting designations, Judge.

2   That's for sure.  I get a lot of stuff.  I look at everything I

3   get and I don't have any recollection of (attorney away from

4   mike) -- unless they came while I was traveling, I live in

5   Hawaii, I did not get --

6          MR. LIEBELER:  May I approach, Your Honor?

7          THE COURT:  You may.

8          MR. LIEBELER:  Your Honor, that's an email in which Mr.

9   Capazola (phonetic) of my office sent Mr. Hogan the deposition

10  designations we intended to play and Mr. Hogan, in fact, replied

11  to the email.

12         MR. HOGAN:  I stand corrected, Your Honor.  I do

13  remember them.

14         THE COURT:  All right.  Well, I will allow the

15  deposition testimony.

16         MR. LIEBELER:  We have them cued up on videotape

17  according to what we've designated in the notice, Your Honor.

18         THE COURT:  All right.  You may proceed then.

19         MR. LIEBELER:  Your Honor, there was a reprographic

20  error and the transcript of the deposition is actually not in the

21  Court's binder although it is in the witness box's binder.  May

22  we have permission to get the copy from the witness binder and

23  give it to Your Honor so you can follow along with the

24  transcript?

25         THE COURT:  You can just give me the binder and then.

Mr. Anderson's videotaped deposition                    121

1          MR. HOGAN:  Do I have a copy?

2          MR. LIEBELER:  I believe you do, Mr. Hogan.  It should

3   be in your binder under Anderson.

4          THE COURT:  What tab?

5          MR. LIEBELER:  There's a tab that should be marked

6   Anderson.

7                        (Pause)

8          THE COURT:  Thank you.

9                    (Videotape played)

10          MR. LIEBELER:  That's on the board, Your Honor.

11                  (Videotape continued)

12          MR. LIEBELER:  Your Honor, there's one more designation

13  that we noted, but apparently it didn't make it on the tape.  I

14  would propose that the Court would just read that.  It's about

15  four lines.

16          THE COURT:  And this is the -- still part of the

17  deposition of Mr. Anderson?

18          MR. LIEBELER:  Yes, it is.  It's on page 31 of the

19  transcript and the question is:  "Is it also within MTI's

20  capability as such that if a user tries to delete a file, MTI may

21  be able to go in and recover the file and find out when deletion

22  was attempted?  Answer:  Yes, sir.  We do that all the time."

23  And that's all from Mr. Anderson.

24          THE COURT:  All right.

25          MR. LIEBELER:  Your Honor, we can proceed in one of two

Mr. Anderson's videotaped deposition                    122

1  ways.  I would propose that we have readings from the Berry

2  deposition.  We had thought that Mr. Berry was going to appear

3  live.  And as a consequence of that, I have sections from the

4  deposition that I have marked and we would have to put a reader

5  in the box, we don't have a videotape.  And I wanted to do it in

6  the order in which I, would normally cross-examine.  Under the

7  federal rules, of course, we're allowed to use the deposition of

8  a party opponent for all purposes at any time.

9           THE COURT:  So you're suggesting you're going to mix

10 and match the questions?

11          MR. LIEBELER:  Yeah.  They're going to be full on Qs

12 and As but they're going to be somewhat -- some skipping around

13 and that's only because I wanted to do it in the order I would

14 cross-examine --

15          THE COURT:  All right.

16          MR. LIEBELER:  -- had Mr. Berry been here as I thought

17 he was going to be.

18          THE COURT:  All right.  All right.

19          MR. LIEBELER:  So I know it's slightly irregular and I

20 apologize for that, but --

21          THE COURT:  That's fine.

22          MR. LIEBELER:  -- if I had another hour, I could

23 organize them chronologically, but I don't have that kind of

24 time.

25          THE COURT:  That's fine.

Wayne Berry's Deposition Read                      123

1                          (Pause)

2              MR. LIEBELER:  Your Honor, this is the deposition of

3    Wayne Berry taken on Thursday, July 1st of 2004.

4              THE COURT:  Okay.

5              MR. LIEBELER:  Page 154, lines 5-10.

6              THE COURT:  Do I -- oh, there's -- say it again.

7              MR. LIEBELER:  Page 154, line 5-10.  Actually, may I --

8    let me ask Mr. Bledsoe a question.  We may have an additional

9    copy that mini-scripted and it might be easier to follow along

10   from that.

11             THE COURT:  That's fine.  We'll use this.

12             MR. LIEBELER:  Okay.  154, 5-10 -- 6-10 actually.

13                      (Mr. Berry's deposition read)

14   "Q    In other words, the only admin claim that you have made so

15   far has to do with either transferring or distributing as the

16   case may be the 1993 FCS to C&S, correct?

17   A     Correct."

18             MR. LIEBELER:  172, 18 to 23.

19   "Q    Now, it has been your view all along that ever since the

20   petition date the copies of the 1993 FCS have remained resident

21   on Fleming's computers and then when they became C&S's computers,

22   C&S's computers, is that right?"

23             THE COURT:  Would you give me that page again?

24             MR. LIEBELER:  Sure, 172, line 18.

25             THE COURT:  Okay.  Go ahead.

Wayne Berry's Deposition Read                124

1  "A    Yes."

2           MR. LIEBELER:  Page 133, 12.

3  "Q    So the data with respect to each file that was resident on

4  the system, when Guidance ended up doing its work, was the file

5  name, some data about when it was written, created, modified,

6  it's size and the path, is that right?

7  A    Yes.  As an example, I think file extension was on there.

8  Q    Okay.  Which is the type of file?

9  A    Right.

10 Q    All right.  But the Guidance CD did not contain a copy of

11 the actual file itself, isn't that right?

12 A    Only directories of the files, correct.

13 Q    So you couldn't actually locate copies of FCS logistics

14 data.MDB and determine that that was actually your software,

15 could you?

16 A    I satisfied myself that it was to my satisfaction, but no, I

17 am not able to open and look in FCS logistics data.MDB run on my

18 computer and show me a splash screen and all that stuff.

19 Q    Right.  Your conclusion that it was there was based on the

20 data on this page and this page only, correct?  By category?

21 A    Yes."

22           MR. LIEBELER:  141, line 24.  And there's an exhibit

23 that goes with this, Your Honor.  It's an exhibit to Mr. Berry's

24 declaration that I asked Mr. Dillon about.  It should be a tab

25 302 in the binder, the last two pages.

1 "Q    Now, it's true, is it not, Mr. Berry, that the report you

2 did in Exhibit C reflects the state of C&S's machines as of July

3 6th, 2003, right?

4 A    I don't know that.

5 Q    I'm sorry, it's Fleming's machines at that point in time,

6 right?

7 A    I don't know that either.

8 Q    Well, what was your understanding of when Guidance took the

9 second image off the machines that they did?

10 A    I'm not sure I remember the exact date or who owns them at

11 that point.  Or even if it was actually pinned down as to the

12 timing for this.  We just had a before and after and it was all

13 around the July 4th weekend.

14 Q    And that's July 4th of 2003, right?

15 A    Yes.

16 Q    So whenever it was around that July 4th weekend, there was a

17 second image taken within a few days of July 4th of '03, is that

18 a fair characterization?

19 A    Sometime there, yes.

20 Q    And that's your understanding, right?

21 A    Yes.

22 Q    But the Guidance CD that you have done the analysis on

23 doesn't show the state of the computers since then, does it?

24 A    No.  I believe after that, after the second acquisition was

25 done, if I understand what happened correctly, as the story goes,

Wayne Berry's Deposition Read                    126

1 Mr. Gursey flew back to California and that was the end of the

2 imaging.

3 Q    Right.  So the state of the computers as they exist today

4 may be quite different from what your Exhibit C shows them to

5 have been in July of 2003, right?

6 A    Possibly.

7 Q    And you don't have any basis to know what's currently on

8 those computers as we're sitting here right now?  Isn't that

9 right?

10 A    That's correct.

11 Q    On the 16 copies of FCS logistics data.MDB that you

12 articulated on the first page of the report of Exhibit C, and --"

13         MR. LIEBELER:  And that's the last two pages of 302,

14 Your Honor.

15 "Q    -- you don't know of your own personal knowledge whether

16 those are still there or not, correct?

17 A    That's correct."

18         MR. LIEBELER:  Page 167, picking up at line 8.

19 "Q    I take it from your prior testimony that you are familiar,

20 at least in some sense, with a company called MTI, right?

21 A    Yes.

22 Q    And I take it you're aware that MTI was retained to look at

23 the computer systems out at Kapolei?

24 A    What I read in the orders on the BMC side was they were on

25 another guidance mission to go make additional illegal copies of

Wayne Berry's Deposition Read                    127

1  my property and teleport them to another out of state location."

2           MR. LIEBELER:   Page 171.

3  "Q     Did you authorize Mr. Hogan to contact MTI on your behalf?

4  A     Yes.

5  Q     And so to the extent that Mr. Hogan contacted MTI, he did so

6  as your agent and not for his own personal self, right?

7  A     Yes."

8           MR. LIEBELER:   And then picking up at the bottom of the

9  page at line 21.

10 "Q     Just so the record is clear, Mr. Berry, with respect to

11 MTI, you wanted Mr. Hogan to contact MTI in order to prevent MTI

12 from making a copy of your software, is that fair?

13 A     I think that's a fair characterization, yes."

14          MR. LIEBELER:   Back to page 69, line 11.

15          THE COURT:   Page 69?

16          MR. LIEBELER:   6 9, yes, Your Honor.  And then that

17 refers to an exhibit that is in the exhibit binders as Exhibit

18 304, Your Honor.  And in the deposition, I refer to it as

19 Debtor's 2.

20 "Q     Let's have marked as Debtor's 2 several pages together and

21 I will describe each of them specifically in a moment.  But go

22 ahead and take a look at Debtor's 2, Mr. Berry, and when you're

23 done looking at it, let me know.

24 A     All right.

25 Q     You've had a chance to look through Debtor's 2, Mr. Berry?

Wayne Berry's Deposition Read                    128

1  A    Yes, I just leafed through the pages."

2        MR. LIEBELER:  There's an objection that Mr. Hogan and

3  I think we may be resolving at the deposition about how the

4  document was stapled together.  Going down to line 12 on page 70.

5  "Q    The top two pages of Debtor's 2 are a letter to you from

6  Mr. Ralph Stuecy (phonetic) dated November 24th, 1999, is that

7  right?

8  A    It's a memo, yes.

9  Q    And at the bottom of the second page of the November 24th

10 memo lies your signature, is that right?

11 A    Yes.

12 Q    And you signed that of your own free will?

13 A    Yes.

14 Q    Nobody forced you to sign it, did they?

15 A    Not that I can recall.

16 Q    And how would you describe, just for nomenclature purposes,

17 what would you describe this document as being, the first two

18 pages of Debtor's 2?

19 A    This is the second addendum to the end user license

20 agreement attached behind it.

21 Q    Very good.  And the remainder of Debtor's 2 consists of five

22 pages that are sequentially marked 1 of 5, 2 of 5, 3 of 5, 4 of 5

23 and 5 of 5, is that right?

24 A    Yes.

25 Q    And of those five pages, the first three are end user

1 license agreement, is that right?

2 A    Yes.

3 Q    And then the last two, in other words, pages 4 and 5 are an

4 addendum to the end user license agreement, correct?

5 A    Correct.

6 Q    And the addendum to the end user license agreement modifies

7 the end use license agreement that's also in Debtor's 2, is that

8 right?

9 A    Yes.   That's the way I constructed the ULA to begin with.

10 Q    Just so we're clear, you drafted the five-page document that

11 is an end user license agreement and the first addendum to it, is

12 that right?

13 A    Yes, I did.

14 Q    And this is an accurate copy of it?   This looks like the

15 original that you drafted?

16 A    It does look like mine, yes."

17         MR. LIEBELER:  And on page 77, picking up at line 22.

18 "Q    All right.  When you signed the second addendum --"

19         MR. LIEBELER:  Well, strike that, withdrawn.  Let's do

20 it this way.  Apologize, Your Honor.

21 "Q    The second addendum suggests at the beginning of the second

22 full paragraph that you, Mr. Berry, had some desire to market

23 your software commercially, correct?

24 A    Yes.

25 Q    And the software that this addendum refers to is the three

1 separate pieces that you articulated in the complaint you filed

2 before the petition, right?

3 A    Includes those three, but the software we are discussing

4 here is thousands of program files.

5 Q    That's why I said includes.

6 A    Yes.

7 Q    For nomenclature purposes, what should I call that group of

8 software, that group of programs and that software that you're

9 referring to in the -- strike that.  That the second addendum

10 refers to?  Your freight control system?  I don't want to use

11 that as a term of art because that's a separate term of art on

12 the complaint.  What nomenclature should I use to describe the

13 software that you intended to market?

14 A    The entire collection, I have referred to it as FCS1993."

15        MR. LIEBELER:  Page 81, line 3.

16 "Q    And under the EULA and the first addendum and the second

17 addendum, Fleming did not pay you any money to license the

18 FCS1993 either, did it?

19 A    No, they did not."

20        MR. LIEBELER:  Page 44, line 20.

21 "Q    Now, you first sued Fleming in, when was it, September of

22 2001?

23 A    Seems more like it was July of 2001.  I am sure there are

24 some documents around.  You can double check it.

25 Q    I may have the first amended complaint which was in

Wayne Berry's Deposition Read                131

1  September.  There may have been an initial complaint before that,

2  but that's fine.  Is it fair to say it was in the summer or fall

3  of 2001?  That way we've kind of covered both times.

4  A    To the best of my recollection right now, that seems

5  accurate.

6  Q    In that complaint, you alleged that Fleming had infringed

7  one or more of your copyrights, is that correct?

8  A    One or more, correct."

9        MR. LIEBELER:  88, and that's a document that's in the

10 exhibit book, Your Honor, as Exhibit 306 which is a letter from

11 Mr. Hogan of October 24th of 2002.

12 "Q    Turning to the last page of Debtor's 3 at the bottom, it

13 says, 'the offer will be good for the period in which we are in

14 settlement negotiations, but will not be available at time of

15 trial.'  Do you see that?

16 A    Yes.

17 Q    And by time of trial, that means trial in the pre-petition

18 infringement acts, correct?

19 A    Yes.  The one that was held in late February 2003.

20 Q    So this offer was not available as of over a year ago,

21 correct?

22 A    Correct.  I think it was only referenced because it did set

23 a sticker price for you."

24        MR. LIEBELER:  85, page 85 which is the same --

25 examination on the same exhibit.

Wayne Berry's Deposition Read                    132

1           THE COURT:  Page 85?

2           MR. LIEBELER:  Page 85 of the deposition, yes, Your

3    Honor.  It's on the same that's Exhibit 306 in the binder.

4    "Q     What is Debtor's 3, Mr. Berry?

5    A     This is a settlement letter, offers that were sent out on

6    October 4th, 2002 in the first copyright infringement case."

7    Q     Do you mean 24th?

8    A     October 24th.

9    Q     You said -- I thought you said 4.

10   A     Oh, I'm sorry.  "October 24th, 2002 in the first copyright

11   infringement case.

12   Q     And that was sent out on your behalf and with your approval,

13   correct?

14   A     Yes."

15          MR. LIEBELER:  Page 89, line 2.  And that's referring

16   to the exhibit, Your Honor, that is the jury verdict which is 309

17   in the binder.

18   "Q     Take a look at Debtor's 4, Mr. Berry, and when you're done,

19   let me know.

20   A     All right.

21   Q     Debtor's 4 is the jury verdict form from the pre-petition

22   infringement trial, isn't that right?

23   A     Yes.

24   Q     And in that trial, the jury found that you deserved an award

25   of $98,250, is that right?

1  A    That was the damage that they awarded, correct.

2  Q    And that verdict was rendered on March 6th of 2003, isn't

3  that right?

4  A    That's the date on page 5.  I believe that's correct.

5  Q    And that's consistent with your recollection, is it not?

6  A    Yes."

7          MR. LIEBELER:  Page 40, line 7.

8  "Q    At some point prior to October of 1999, you wrote freight

9  control software, is that correct?

10 A    Correct.

11 Q    And the documents that we have talked about loosely as being

12 end user license agreement more or less describe that freight

13 control software in October 1999, right?

14 A    Yes.

15 Q    When did you make modifications to that software to make it

16 radically different and much improved?

17 A    I did not modify it.  I think I stated that it had some

18 roots in some of the ideas and some of the design, but it was --

19 what exists today was written from scratch."

20         MR. LIEBELER:  And then picking up on page 41, line 10.

21 "Q    The rewritten version, where the current model is --"

22         MR. LIEBELER:  And I'm responding actually to an

23 objection of Mr. Hogan here.

24 "Q    -- and I just need a nomenclature for deposition purposes

25 so we know what to call it.

Wayne Berry's Deposition Read                    134

1  A    In my mind, I basically refer to the one in the admin claim

2  as the 1993 version, FCS1993.  And the current one as FCS2003."

3            MR. LIEBELER:  Page 28, line 12.

4  "Q    Have you licensed any software that you own to Wiihata

5  (phonetic)?"

6            MR. LIEBELER:  It's a company in Hawaii.

7  "A    Yes, I have.

8  Q    And what is the subject of that written license agreement

9  and how would you describe the software that you have licensed to

10  Wiihata?

11  A    It is a freight control system.

12  Q    Is it the same or a different freight control system than

13  the one at issue in your claim against the estate?

14  A    By same or different, are you talking functionality, code,

15  design, structures?  Help me a little bit.

16  Q    Sure.  On any basis that you're comfortable asking the

17  question, on the assumption that you're explaining it to a lawyer

18  who's not a software expert.

19  A    Some of the elements are similar.  Some expressions are

20  similar, but it's radically different in many ways and much

21  improved than the one that was left with Fleming in October of

22  1999.

23  Q    Does Wiihata pay you a license fee for the use of the

24  freight control system?

25  A    Yes.

Wayne Berry's Deposition Read                    135

1  Q    And how much is that license fee?

2  A    I think I would consider that confidential information at

3  this point.  I would like to -- I think I would like to get their

4  permission for me to repeat that.

5  Q    I don't believe that's the basis for not answering in this

6  deposition, sir.  And it would be my contention that that would

7  be relevant testimony for the purposes of what we're doing here

8  now.  So I would ask you to answer that question, sir.

9  A    You may be correct in that, but I don't want to violate a

10  non-disclosure.

11  Q    Are you refusing to answer my question, sir?

12  A    At this point."

13        MR. LIEBELER:  And then page 36, line 12.

14  "Q    Without giving me a specific number, but rather in the form

15  of a general estimate, would you tell me please what license fees

16  you have been paid by Wiihata for the freight control system that

17  you license to them?

18  A    No.  I don't want to give you an estimate.

19  Q    Is it more than $10,000?

20  A    I don't want to comment on that area.

21  Q    Is it more than a million dollars?

22  A    As I said, I don't want to comment on that area.

23  Q    Foundationally, and again, this is yes or no, do you know

24  how much you've been paid by Wiihata in license fees?

25  A    Yes."

136

1        MR. LIEBELER:  And then page 42.

2   "Q    When in 2003 did you reach a point where you believed that

3   the FCS2003 was usable, sir?

4   A    I believe when I began testing with live data.  I can't

5   remember the exact date.  It was sometime between April and

6   August of 2003."

7        MR. LIEBELER:  I think that's all we need from the

8   Berry deposition, Your Honor.  Your Honor, during the break, I

9   asked Mr. Hogan if he would agree to let some exhibits in, some

10  of which were authored by him, some of which are trial

11  transcripts from the prior trial in which he participated.  He

12  said that -- well, I'll let him make his position, but we didn't

13  come to an agreement as to what should come in of the exhibits.

14  I think Mr. Hogan can authenticate some of these exhibits if I

15  put him on the stand and I'm prepared to do that.

16        In the alternative, we might take a short break to see

17  if we can try to agree on what specific exhibits that might come

18  in.  Some of them are letters, for example, that Mr. Hogan wrote.

19        THE COURT:  Did you try to reach an agreement as to

20  what could come in?

21        MR. LIEBELER:  Yes, Your Honor, I did.

22        THE COURT:  And you haven't yet?

23        MR. LIEBELER:  That is correct.

24        THE COURT:  But you think if we take a break, you can?

25        MR. LIEBELER:  I don't know.

137

1      THE COURT:  Mr. Hogan?

2      MR. HOGAN:  Your Honor, I -- we've been trying to work

3  out issues with the exhibits and I've been cooperating.  It's

4  just that we get these right before we started.  I'm sitting,

5  trying to read things to see what I'm agreeing to.  I think if I

6  had a little chance, I can look at them again and we can agree.

7  I can't say that that will happen.  (Attorney away from mike)

8      MR. LIEBELER:  Well, then let's try to walk through the

9  exhibits and do them right now.

10     THE COURT:  Well, can we let the witness leave?

11     MR. LIEBELER:  Yes.

12     THE COURT:  Thank you.

13                     (Witness excused)

14     THE COURT:  Well, I don't want to waste our time.  How

15 long do you need to look at these?  How many exhibits?  Is this

16 your last witness?

17     MR. LIEBELER:  Yes.  To the extent -- all I need is to

18 get the exhibits in and then I'm ready for argument.  And we --

19 and I -- we can proceed however the Court desires.  We can walk

20 the exhibits one by one.  I can take two minutes and try to

21 confer with Mr. Hogan.

22     THE COURT:  Let's take five minutes and you see if you

23 can reach an agreement.  All right.

24                     (Recess)

25     THE CLERK:  Please rise.  Please be seated.

138

1          MR. LIEBELER:  Your Honor, we have agreed on most of
2    the exhibits.  We haven't agreed on all of them.  Starting with
3    one actually that's not in the exhibit books.  The -- I have the
4    second amended complaint that Mr. Hogan filed in the Hawaii
5    litigation.  I want it limited -- I want it admitted for the
6    limited purpose of establishing what it is that Mr. Hogan alleged
7    in that litigation.

8          THE COURT:  Okay.

9          MR. LIEBELER:  Mr. Hogan said, no, it's got to be in
10   for all purposes and not admit the truth of the allegations in
11   it.  I don't think that's a fair response.  I want it, you know,
12   on a limited basis only.  And I'd be happy to give the Court a
13   copy if you want.

14         MR. HOGAN:  (Attorney away from mike) My objection is
15   more relevant, Your Honor. You know, you're going to take --
16   usually something like this is considered irrelevant.  It's not
17   going to prove anything.  The Court -- to the extent that the
18   Court wants it in the record -- I'm not even sure it hasn't
19   actually been put in the record in these proceedings by somebody
20   by now.

21         MR. LIEBELER:  The relevance, Your Honor, is --

22         THE COURT:  Well, I don't know.  It's not part of the
23   record unless its --

24         MR. HOGAN:  In this proceeding.

25         THE COURT:  -- in this proceeding unless it's moved.

139

1  And the relevance is what was alleged.

2           MR. HOGAN:  Okay.  That's fine, Your Honor.

3           THE COURT:  I'll admit it.

4           MR. LIEBELER:  Specifically -- okay.  Specifically that

5  he alleged RICO against Guidance.

6           THE COURT:  Does it have an exhibit number?  210, is

7  that what you're saying it is?

8           MR. LIEBELER:  It's the second amended complaint.

9           THE COURT:  Or is that 210.

10          MR. LIEBELER:  Let's make it 317?  317.

11          MR. HOGAN:  Okay.

12                           (Pause)

13          MR. LIEBELER:  And then, Your Honor, there's a

14  declaration from Mr. Berry, Exhibit 310.  I want limited portions

15  of the declaration in on the basis that they are an admission.

16  That is the declaration that Mr. Hogan has submitted to Court.

17  For purposes of this proceeding, I only want in paragraphs 22, 24

18  and 25.  Mr. Hogan has said -- well, I'll let him articulate his

19  position.

20          MR. HOGAN:  Your Honor, you know, when someone prepares

21  a declaration, it refers to things admitted.  I'd ask just under

22  the doctrine of completeness, if it's going to be admitted, they

23  can preserve the hearsay objection to things in it, but at least

24  allow the whole thing to come in.

25          THE COURT:  Well, let me see the paragraphs that are at

140

1  issue here.

2          MR. LIEBELER:  On page 9, 22.  24 is on page 10.  And

3  then 25 is on page 11.

4                          (Pause)

5          THE COURT:  Well, what paragraphs do you think in the

6  declaration --

7          MR. HOGAN:  Well, I think that as to the --

8          THE COURT:  -- do I need to consider?

9          MR. HOGAN:  Well, I think as to the issues that counsel

10 has focused on, it seems to flow better if you start at paragraph

11 -- around -- I think it's actually paragraph 18, I believe.

12 Sorry, Your Honor, 17 to the end of the ones that he's dealing

13 with are the ones in which he's discussing those issues about how

14 these numbers which I know they think are quite exorbitant, at

15 least what the basis of it is.  And rather than to just pluck

16 some part of his declaration out of it into --

17         THE COURT:  Okay.  I understand your argument.

18         MR. LIEBELER:  If I have him on the stand, Your Honor,

19 I can actually ask Mr. Berry a rifle-shot question about the fact

20 that he thinks his new software is worth one-fifteenth of his old

21 software and pick out admissions from a declaration that is

22 otherwise Mr. Hogan's.  Mr. Hogan can't admit that stuff and it's

23 not -- I'm admitting this on the basis --

24         THE COURT:  Well, if Mr. Berry were on the stand, he

25 could.

141

1          MR. LIEBELER:  Except for the fact that then I have

2    hearsay objections and foundation objections to almost the entire

3    remainder of --

4          THE COURT:  What hearsay objection to paragraph 17?  Or

5    18?

6          MR. LIEBELER:  I think 17 may be a relevance objection.

7    I don't think in terms of what API has done is relevant to his

8    damage claims now.  He's not suing API.

9          THE COURT:  Well, I'm going to admit 17-25 just for

10   completeness.

11         MR. LIEBELER:  I don't want that construed --

12         THE COURT:  To the extent it explains why.

13         MR. LIEBELER:  Fine.  I don't want that construed later

14   on as an admission that I agree that what's in those statements

15   are true, Your Honor.

16         THE COURT:  Fine.

17         MR. LIEBELER:  Because I think that may be Mr. Hogan's

18   argument in another proceeding that he's going to go out to

19   Hawaii and say that we have somehow admitted that those

20   paragraphs are necessarily true on admissions on our part and I

21   don't think that's the case.

22         THE COURT:  You've made your point on the record.

23         MR. LIEBELER:  And so what's in from Exhibit 310 are

24   paragraphs 17-25 as I understand the Court's ruling.  Is that

25   correct?

Closing Argument/Liebeler                    142

1        THE COURT:  Yes.

2        MR. LIEBELER:  Nothing further, Your Honor.

3        THE COURT:  All right.  Do you have any evidence to

4   submit?

5        MR. HOGAN:  I think it's all in, Your Honor.

6        THE COURT:  All right.  Ready for argument?

7        MR. SPRAYREGEN:  Yes, we are, Your Honor.  What I would

8   suggest for the rest of the proceeding, since we took the

9   estimation motion and the confirmation evidence all at the same

10  time, I think the best order would be for Mr. Liebeler to address

11  the estimation part and then I'll address all the confirmation

12  issues that go to that.

13       THE COURT:  All right.

14            MR. LIEBELER'S CLOSING ARGUMENT

15       MR. LIEBELER:  Your Honor, the administrative claim

16  that Mr. Berry has asserted in this case is solely for a

17  violation of the Copyright Act and that's 17 USC 106, subsection

18  3.  That statute says that a copyright holder has the exclusive

19  right to distribute copies of his copyrighted material to the

20  public or other transfer of -- by sale or other transfer of

21  ownership.

22       We contend that in this case, Your Honor, there was no

23  sale or other transfer of ownership for purposes of the Copyright

24  Act.  And in fact, this Court has indicated that from the bench

25  that at the sale hearing on August 4th, 2003, which is Exhibit

1  313 in the binder, that was a proceeding in this Court.  And in

2  that proceeding, the Court was considering approving a sale of

3  all of the assets for the wholesale division from Fleming to C&S.

4  And C&S had indicated in open court that C&S was not buying Mr.

5  Berry's software, that Mr. Berry had objected to the sale, Mr.

6  Hogan was on the telephone from Hawaii.  C&S said, on the record,

7  in those proceedings that they were not buying the software.  And

8  the Court said, and I quote the transcript, Exhibit 313 on page,

9  I think, 157 of the transcript, I'm not giving any order assuming

10 it, assigning it by this sale order.  And the Court overruled Mr.

11 Berry's objection.

12         So the Court has essentially already ruled that there

13 isn't a sale of Mr. Berry's software in the asset sale because

14 Mr. Berry objected on the basis that the software would be

15 transferred.  So I think, in the standing light there, the Court

16 has essentially already ruled there is no sale.  If there is no

17 sale, then there is no violation of 1063 under the Copyright Act.

18         If you actually go to the underlying documents within

19 the APA which defines the terms of the sale, the APA is entirely

20 consistent with the notation that we didn't sell Mr. Berry's

21 software to C&S.  Several sections of the APA bear on that.  2.1F

22 in the APA indicates what software was actually purchased.  It

23 sends you to Schedule 811, which is just a schedule on the APA

24 listing the software and that lists the specific software that's

25 being sold.  Mr. Berry's software doesn't appear anywhere on that

Closing Argument/Liebeler                    144

1  list.  So if you actually look at the physical APA document, it's

2  not an asset that's being transferred.

3          Moreover, the APA says the all software that isn't

4  transferrable is an excluded asset and excluded assets aren't

5  sold.  So the prior proceedings in this Court, both the APA that

6  this Court approved, and the Court's own words, indicated that

7  there wasn't a sale of Mr. Berry's property.  If no sale, no

8  violation of the Copyright Act.

9          But the common law says so, too.  That if you look at

10  actually what the testimony was, Mr. Dillon testified about what

11  he and Guidance did and he testified that they intended to take

12  the 16 copies of Mr. Berry's software that Mr. Berry has

13  specifically alleged were sold, he said that they intended to

14  take them off the system.  And he said that when he was done with

15  that, he wasn't aware that they were there.  That the first time

16  that he became that they were there -- sorry, strike that.  The

17  first time he once again became aware that they were there was

18  after Mr. Berry had alleged that in June or May of this year.

19          What that means is that there was no actual intent to

20  sell that software.  There are cases that are all over the books

21  on this point.  There's the old case in which a woman purchases a

22  box of old clothes from an estate.  She pulls out a bathrobe from

23  the box of old clothes.  She pays 9.50 for the clothes, $9.50.

24  She pulls out a bathrobe and finds a ring that's worth $2500.

25          The estate then comes around and sues her and says,

1  look, we want the ring back.  She says no, I get to keep it, I

2  bought it, I paid 9.50 for it, it's mine.  And the court ruled

3  that there was no intent on the part of the buyer to buy a ring.

4  There was no intent on the part of the seller to sell the ring.

5  And the physical transfer of possession didn't really have much

6  to do with who owns it.

7        And the court, in fact, ruled that the ring has to come

8  back to the estate.  There's no contract.  There's no meeting of

9  the minds and there's no sale.  And we contend that for purposes

10  of Mr. Berry's 1063 claim, there was not a sale.  There couldn't

11  have been.  And if there wasn't a sale, there's simply no

12  liability under 106.3 and his claim should be estimated at zero.

13        Now, there's another reason, even if we get over that

14  point that the Court shouldn't find a sale of transfer of

15  ownership.  What the evidence shows is that there was 16 copies

16  of a file called FCS Logistics data.MPB on this image that

17  Guidance Software on about July 7th of 2003.  That's the evidence

18  that's there and Mr. Berry has claimed that it is that image that

19  determines that the software went to C&S.

20        The trouble is that the sell from the debtors to C&S

21  didn't take place until August 22 which is 45 or 46 days later.

22  Of the same year.  So it's a 45-day gap.  The Guidance CD shows

23  what was on the computer as of July 7th, but it doesn't show what

24  was there as of August 22nd when the transfer actually took

25  place.

1        Now, that, at first glance, seems like a fairly

2   technical argument.  And I understand that issue.  It's not

3   technical for two reasons.  First of all, Mr. Dillon testified

4   that when he went back to look for the files in June of this

5   year, they weren't there.  So we don't know when they were there

6   and when they weren't there.

7        And so what we did when we found that out, when we

8   found that Mr. Berry had alleged they were there, is we went to

9   try to hire this company called MTI which is a forensic software

10  company.  We asked MTI to go out to the facility and take a

11  picture and see what's there for purposes of trying to find out

12  for litigation purposes.  That's when Mr. Hogan called up MTI and

13  said, I sued Guidance, the prior forensic guys, on a RICO claim.

14  And you saw the deposition designations where, as a result of Mr.

15  Hogan's telephone call to the expert that we were trying to

16  retain, that expert backed out of the engagement.  Brought their

17  guy back from Hawaii and, in fact, were not able to conclude that

18  engagement.

19       As a result of that, Mr. Hogan has prevented us from

20  developing the evidence as to whether or not those files were

21  still on the server.  And we contend on that equitable basis that

22  regardless of who's burden it is today to go forward on what the

23  state of the server is, we tried to do that, he's prevented us

24  from doing so.

25       So on that basis, because there's a gap in the evidence

1 that he can show what was there on July 7th, but he can't show

2 what was there on August 22nd, that the Court should rule that he

3 has failed to show that the actual 16 copies were there as of the

4 time the assets were actually transferred to C&S.

5          Now, with respect to the -- and then we sort of want to

6 move from liability into damages.  And I'm going to have to walk

7 through some of the exhibits in detail.  Normally I would have

8 done it on cross-examination where we've cross-examined the

9 witnesses on the actual damage documents.  But because Mr. Berry

10 was not here, we're going to have to walk through the documents

11 specifically.

12          And I want to start with what's been, in your binder,

13 Your Honor, is Exhibit 303.  That's the letter that Mr. Berry

14 wrote to API's chief executive in September of 1999.  Mr. Berry

15 writes that his letter pertains to the matter of his custom

16 software and computer system currently being used by API and

17 Fleming Foods.  It's the same software that's at issue in the

18 pre-petition litigation and the same software that Mr. Berry

19 concludes -- accuses C&S of now infringing on some derivative out

20 in Hawaii.

21          On the second page of that letter, Mr. Berry writes:

22 "Therefore, I would like to offer the system for sale to API

23 and/or Fleming for $300,000 payable by September 15th, 1999."

24 And for that $300,000, Your Honor, Mr. Berry offered to transfer

25 complete ownership and rights to that product as well as whatever

1 hardware was there.  So back in September of '99, Mr. Berry said,

2 for $300,000, you've got an outright sale, you get all the rights

3 from my software.  And if that had taken place, we wouldn't be

4 here today.  He would have no more rights in it, no infringement,

5 nothing.

6          A little bit later on, in Exhibit 304, and 304 is

7 actually several documents.  They may or may not go together and

8 the parties have been disputing that, so I don't want to over

9 characterize it, but the last page of that exhibit is a document

10 that Mr. Berry grafted that he calls an addendum to his end user

11 license agreement.  And on the last page, what Mr. Berry wrote

12 was, quote, licensee understands the original contract value of

13 this software is $2 million.

14          So Mr. Berry has admitted that the original contract

15 value of his software is two million.  That's one-twenty fourth

16 of the value he's asserted in his administrative claim.  Just one

17 month after he asserted that the original contract value of the

18 software was two million, we turn to the front page of that

19 exhibit and we find that there's a letter from a friendly

20 executive named Ralph Stuecy to Mr. Berry.  Mr. Berry signed the

21 letter.  And that letter says, and I quote, this is Stuecy

22 writing to Berry, we, Fleming, understand that you, Mr. Berry,

23 will grant us a no-charge user license for the software you have

24 developed for API and that you, Mr. Berry, wish to market it

25 commercially.

1      So Mr. Berry gave, and I mean gave literally, a license

2  to Fleming to use the software that's at issue in this case and

3  he did it for free.  And now he alleges that instead he deserves

4  a $48 million liquidated admin claim on the basis of the same

5  software.

6      We turn to October of 2002 and that's Exhibit 3000 --

7  let's see, 305, sorry, 306.  My apologies.  We then turn to a

8  period to time after Mr. Berry started his litigation against

9  Fleming out in Hawaii.  And that letter is been asserted by Mr.

10 Hogan as a basis for the administrative claim, the liquidated

11 damage amount, of $48 million.  But in any event, that settlement

12 letter which he sent on October the 24th indicated to Fleming

13 that Fleming could buy the software for $48 million.  So after he

14 starts litigating against Fleming, the value of the software goes

15 up from 300,000 originally to two million as the original

16 contract value.  All of a sudden to once he starts litigating, to

17 $48 million.

18     If you actually look at what he is alleging now, he's

19 alleging now $200 million in use damage in the claims out in

20 Hawaii and $48 million in his admin claim directly against the

21 debtor in this court for this proceeding today.  So what he's

22 asserted ultimately is that his original software which he

23 originally offered for $300,000 has somehow in the interim become

24 worth a quarter of a billion dollars.  We think that's just

25 wildly exaggerated.