Closing Argument/Liebeler                    150

1          Now, Mr. Berry asserts that his claim is liquidated.
2 We don't believe it's liquidated.  We believe it's subject to
3 specific analysis by what the damages should be.  The basis for
4 his liquidation claim is that we somehow accepted his October
5 24th settlement offer by selling it to C&S.  That's what he's
6 alleging in his pleadings and I have an email from Mr. Hogan in
7 here as well asserting that fact.

8          There are a couple problems with that argument.  First
9 of all, there's been no evidence asserted that anyone at Fleming
10 ever called Mr. Berry and said, yeah, we accept your October 24th
11 offer.  No document says it.  No witness from Fleming was asked
12 that question.  There's no evidence from which this Court could
13 find that we accepted that offer explicitly.

14         I think Mr. Hogan's argument is that we accepted that
15 offer implicitly by selling the software to C&S.  Well, as I've
16 already indicated, we certainly didn't intend to transfer the
17 software to C&S.  And to the extent that we did so, and it's not
18 even clearly established that we did so, it was done
19 inadvertently.

20         Even if he had wanted to accept that offer of $48
21 million, however, we can't by its own terms.  The second sentence
22 of the offer itself says, the following settlement offer will be
23 held open until the conclusion of the settlement conference on
24 November 4, 2002.  I think the contention from Mr. Berry is that
25 we accepted that offer by selling the assets to C&S.  That asset

1  sale closed on August 23rd of 2003.  That's some nine or ten

2  months later.  I think it's actually first year of Horn book law

3  that you simply can't accept an offer after it's expired.  This

4  one has an expressed expiration term by its own terms.  We

5  couldn't have accepted it.

6          Now, to the extent the Court this is not a liquidated

7  damage amount that's established somehow by this offer letter, I

8  want to turn to the statutory and other damages that are

9  available under the Copyright laws.  Under the Copyright laws,

10  Berry has a choice.  He can get either the actual damages that he

11  has suffered plus the profits derived from the infringement.  Or

12  he can get statutory damages.

13          With respect to his $48 million administrative claim,

14  neither claim is large.  The first one, which is the actuals plus

15  the profits, if you actually look at his actual damages, the

16  typical measure the courts use is the market value of the

17  software.  And we have evidence with respect to the market value

18  of his 1993 freight control system and the evidence that we've

19  got is that he sent it to Fleming, he gave a free license to

20  Fleming and he never charged anything for it.  He got no license

21  fee whatsoever.  And courts typically will look for what looked

22  to equivalent license fees to try to determine the market value

23  of a particular piece of software.  There's no evidence to the

24  contrary.  The market value of this stuff is exactly zero.

25          If you look at what the profits were from the sale to

Closing Argument/Liebeler                              152

1  C&S of the software to the extent we get all the way down the

2  chain to this point, those profits were zero.  And the reason I

3  say that is that the evidence that we saw from the stand that

4  there was no intent to sell the software to C&S.  So no part of

5  the purchase price that C&S paid to Fleming for the entire

6  complex of assets that was the wholesale division is fairly

7  attributable to Mr. Berry's software.  So in terms of the profits

8  that would be derived from the alleged infringement, those are

9  also zero.

10      Now, if you turn to statutory damages, there's

11  certainly the case that under the Copyright laws there are

12  statutory amounts that I think range from something around 1,000

13  up to $30,000 per infringement.  But that depends upon the intent

14  of the infringer.  What Mr. Dillon testified to once again is

15  that there was no intent to transfer the software.  In fact, he

16  tried to take it off of the servers in Kapolei before the

17  transfer.

18      What the statutory damage provision say that if you can

19  show that the infringer was not aware of the infringement when it

20  took place, you get $200 in damages for infringement.  Mr. Berry

21  is articulated that, at least in his initial pleading, 16 files.

22  16 files times $200 is $3200.  So we would submit that an

23  absolute maximum for the statutory damages on the basis of the

24  record that's in front of the Court is $3,200.

25      Now, that, of course, assumes that the 16 separate

1  copies that show up on the Guidance image are 16 separate works.

2  The Copyright law defines a work in various ways.  That there --

3  there's case law on this point as well, and we would contend that

4  there is one work that may have been infringed 16 times.  But the

5  law says that the number of infringements doesn't matter.  It's

6  actually the number of works.

7       This has been litigated in a number of different

8  factual settings.  There was a piece of litigation in which one

9  particular company basically copied CDs from 15 -- of 1500

10  different songs and the records not entirely clear, but it looks

11  like 15 -- like a number of different recording artists.  It

12  wasn't specified in the record.

13       In that copyright infringement action, the specific

14  number of infringements didn't matter.  It was the specific

15  number of works and the court said each separate song is a

16  different work.  We contend that for purposes of this litigation,

17  Mr. Berry's freight control system is one single work.

18       Another case is a case involving copyrighting

19  infringement of Mickey and Minnie Mouse.  The plaintiffs had

20  alleged that there six different infringements because there were

21  six different incarnations of Mickey and Minnie Mouse that were

22  infringed.  The court said no, that's not six infringements.

23  There are only two works, one of which is Minnie Mouse and one of

24  which is Mickey, and you can only get damages on the basis of the

25  number of works.  One being Mickey, one being Minnie.  So we

1 contend that the freight software that's allegedly been infringed

2 here is a single work which would entitle Mr. Berry at a maximum

3 to one statutory damage award, not multiplied by the number of

4 infringements.

5     If, in fact, the Court believes that that that debtor's

6 transferred to the extent it existed of the software to C&S was

7 unintentional, that would be a grand total damage award of $200.

8 One moment, please.

9                    (Pause)

10     MR. LIEBELER:  Two other minor points, Your Honor, and

11 that is that by engaging MTI, we wanted to find out when the

12 files were actually deleted.  That was the point in engaging MTI.

13 That was what Mr. Hogan prevented us from doing when he called

14 them up and either warned them about a RICO action.

15     Last point on the liquidated damage amount in terms of

16 whether or not we could have accepted Mr. Hogan's settlement

17 offer, that would suppose that we had done a $48 million deal,

18 we'd agreed to accept an offer for $48 million without Court

19 approval.  In fact, we never even knew about our acceptance of it

20 when it occurred.  The debtor can't do that.  In order for the

21 debtor to enter into a contract of any magnitude, we have to seek

22 the Court's approval.

23     THE COURT:  Post-petition.

24     MR. LIEBELER:  That is post-petition.  He claims that

25 we accepted the contract when we sold to C&S.  That we accepted

155

1  his pre-petition offer after the petition when we sold to C&S.

2  We just think that can't be the case.

3         Your Honor, we contend that there's simply no sale

4  under the Copyright laws.  And we contend that if the Court does

5  find a sale, there are no damages.  We would contend that the

6  Court should estimate this claim at a diminimus amount.

7         THE COURT:  Thank you.

8         MR. SPRAYREGEN:  Your Honor, before I address Mr. --

9         THE COURT:  Well, why don't we hear the -- do the

10  estimation first.  I thought that was what the suggestion was.

11  And then we can go to confirmation.

12         MR. SPRAYREGEN:  Well, I can do it anyway.  I thought

13  we might hear the -- our entire argument over -- to overrule Mr.

14  Berry's claim and then hear his response to both of that.  But

15  I'm happy to proceed either way.  I will tell the Court the

16  preview that we think once you go through all of the feasibility

17  issues, it's not abundantly clear that it's actually necessary to

18  estimate the claim in a particular number to get the feasibility.

19  So that was one thing I was going to suggest.  But I'm happy to

20  proceed in any fashion the Court desires.

21         THE COURT:  You want to respond to the estimation?

22         MR. HOGAN:  I'd rather do the estimation, Your Honor,

23  myself here.

24         MR. SPRAYREGEN:  Then go.

25         THE COURT:  Thank you.

1          MR. HOGAN'S CLOSING ARGUMENT

2          MR. HOGAN:  Thank you, Your Honor.  May it please the

3   Court, Timothy Hogan on behalf of Wayne Berry.  I'll try to

4   follow with counsel's argument.

5          The question's whether -- and it just occurred to me

6   Your Honor, counsel's end of his argument that Mr. Dillon

7   testified to creating a piece of software, created during the

8   administration of this case and that software had been

9   transferred to C&S.  I don't know of any document or order or

10  anything that aloud that software to be transferred.  And it just

11  occurred to me that whatever it is that Mr. Dillon created, and

12  it's our contention, Your Honor, it's simply Mr. Berry's software

13  with a different name on it, whatever it was was created by the

14  debtor, and given to C&S.  There's no question that that

15  happened.  The question is how did they do that without some

16  order of this Court.  And I frankly don't know, Your Honor.  I

17  think it was just stated that couldn't be done.

18         Mr. Dillon testified to giving no original contribution

19  to the work that went to C&S other than the data that went into

20  it.  I asked the question again, I was stopped as asked and

21  answered, Your Honor, that's all he's done to create the

22  replacement.  I would offer Your Honor as a matter of law what he

23  testified to is a very derivative that is alive and well and

24  operating in Hawaii.  Whatever the number you put on it, Your

25  Honor, at least one thing I'd like to leave this courtroom is

1  with the idea that they created another derivative and sold it to

2  C&S.

3          THE COURT:  Well, it's not for me to determine.  I'm

4  just estimating your claim, if any, against the estate.

5          MR. HOGAN:  And I agree with that, Your Honor.  And I

6  know you've passed on making that determination in favor of the

7  Hawaii court doing so.  But for the purposes of estimation, we

8  come back to the idea of the indemnities.  The indemnities that

9  were, at least, brought up.  I believe they've been submitted as

10 Debtor's 179, I believe that's in evidence -- if someone wants to

11 correct me, but I believe that is in evidence -- 179 is a copy of

12 the indemnity letter that deals with Berry Technology going

13 forward into the future indemnifying for the use of Berry

14 Technology, the estate, presumably the reorganized debtors.

15         What would be the damages for that?  Well, with all due

16 respect, if counsel -- if Mr. Berry gets to determine whether or

17 not he elects statutory damages.

18         THE COURT:  Is that a claim you have against the

19 estate?  No, that's a claim that C&S may have against the estate,

20 so --

21         MR. HOGAN:  And I agree with that, Your Honor.  And --

22 but part of what they were doing in this motion was to have you

23 determine the outer most limits of Mr. Berry's claims against

24 C&S.

25         THE COURT:  No, I'm not deciding that.

Closing Argument/Hogan                                      158

1          MR. HOGAN:  All right.

2          THE COURT:  I'm deciding your claim against the estate.

3          MR. HOGAN:  Then I'll move on, Your Honor.  The issue

4  with MTI, Your Honor.  MTI was going in to make a copy of

5  software.  Noone asked us.  We had non-destruction orders in

6  Hawaii.  There is a state law against non-destruction of evidence

7  during civil proceedings.  And I just leave that as it is, Your

8  Honor.

9          THE COURT:  Well, only address your claim against the

10 debtor.

11         MR. HOGAN:  Mr. Berry's declaration, Your Honor,

12 exhibits -- it's Exhibit 310, 17 to 25, details the manner in

13 which Mr. Berry arrives at what has been stated to be exorbitant

14 numbers.  It has to do with the single thing and if I may, Your

15 Honor, one of their exhibits that went in, I think it's helpful

16 to go back to it, it's Exhibit 303, Your Honor.  And it -- Mr.

17 Berry -- which I believe is in evidence, states as with any

18 custom designed software system, this system is essentially

19 worthless to anyone other than Fleming and API.

20         Now, that's a fairly strong thing when you're

21 estimating a claim.  But to the extent that they sold that one of

22 a kind software to be able to close the deal with their

23 purchaser, Your Honor, I think it deserves note.

24         THE COURT:  What evidence do I have that they sold it?

25         MR. HOGAN:  Mr. Dillon's testimony as to what he

Closing Argument/Hogan                                    159

1    actually put on their servers is a derivative of Wayne Berry's

2    system.    That -- the only thing that he added as original work

3    was the data, that he essentially copied it and transferred it.

4    That's undisputed in this record, Your Honor, that --

5             THE COURT:    Well, it's not in the asset purchase

6    agreement and nothing was paid for.

7             MR. HOGAN:    And I don't dispute that although to the

8    extent that it was -- you know, in terms of the large purchase

9    price for the C&S acquisition, Your Honor, I don't know if I've

10   ever seen a breakdown of how it went by asset.    The $75 million

11   that --

12            THE COURT:    It's clear that the asset purchase

13   agreement did not include Mr. Berry's software.

14            MR. HOGAN:    And I don't dispute that it was not listed.

15   I will say, Your Honor, if -- at this point, I have never seen

16   Mr. Berry's software ever mentioned in the schedules or in any

17   document that the debtor has ever created, although there is no

18   doubt from the testimony that it has been operated during the

19   pendency of this case, that it has been reversed engineered by

20   Mr. Dillon --

21            THE COURT:    That's a claim you may have against C&S and

22   against the debtor for post-petition use, but tell me how I

23   estimate the claim against the debtor only.

24            MR. HOGAN:    Okay.

25            THE COURT:    And it can't be based on a sale to C&S, on

Closing Argument/Hogan                                    160

1  the asset purchase agreement, or the price paid out of the asset

2  purchase agreement because it's clear from those, is it not, that

3  the software was not included.

4         MR. HOGAN:  And I understand that that is true, Your

5  Honor, but I'm saying that simply because someone did something

6  they shouldn't do doesn't mean they didn't do it.  And the idea

7  that there is -- I believe the evidence is that there is a copy

8  of Wayne Berry's software that was created by the debtors that is

9  resident presently on C&S.

10         THE COURT:  Then you may have a claim against C&S for

11  infringement.

12         MR. HOGAN:  Yes, Your Honor.  I brought that claim.

13         THE COURT:  But --

14         MR. HOGAN:  As to Mr. Berry's administrative claim in

15  this proceeding, his claim would be based on several ways of

16  getting to it.  One of them is usage.  His lost profits, which is

17  what counsel referred to, is a loss of licensing.

18         THE COURT:  But for the debtor's usage, the license

19  provided for no fee.

20         MR. HOGAN:  No fee for the one that Mr. Berry wrote,

21  not for the derivative they ran, Your Honor.

22         THE COURT:  And for the derivative they ran, did not

23  the jury place a value on that of 98,000?

24         MR. HOGAN:  The jury placed -- the statutory damage

25  maximum for willful infringement is $150,000 per work.  I can

Closing Argument/Hogan                    161

1    agree with counsel, per work.  So when he --

2                    (Loud speaker announcement)

3                THE COURT:  All right.  You may proceed.

4                MR. HOGAN:  I'm sorry, Your Honor, I've lost my train

5    of thought.

6                THE COURT:  Damages for the debtor's use --

7                MR. HOGAN:  The debtor used the software.  Mr. Berry,

8    if they had come to him for a license, would have asked them to

9    pay what he charges other people to use it.

10               THE COURT:  Well, what evidence do I have, in the

11   record before me, that he got anything from anybody for this

12   software?

13               MR. HOGAN:  The declaration that is, I believe,

14   paragraph 17-25, Your Honor.

15               THE COURT:  Mr. Berry's declaration, Exhibit 310.

16               MR. HOGAN:  That's correct, Your Honor.

17               THE COURT:  Where's the evidence that he received

18   anything?

19               MR. HOGAN:  That he received anything.

20               THE COURT:  For licensing software.

21               MR. HOGAN:  No, Your Honor, I'm not going to

22   misrepresent.  When Mr. Berry licensed Fleming to use the

23   software and we go to the exhibit so -- I'd like to just point it

24   out, that Mr. Berry did grant Fleming a no-charge user license as

25   a temporary measure.  It's on the first page of 304, Your Honor.

Closing Argument/Hogan                                    162

1  It says Mr. Stuecy added it, I believe -- or whoever added it,

2  it's in here, the long term goal of our operation is to interface

3  with our company's --

4        THE COURT:  Where are you reading?

5        MR. HOGAN:  I apologize, Your Honor.  Exhibit 304,

6  second page, Bate stamp A004 --

7        THE COURT:  I have it.

8        MR. HOGAN:  -- 50.  The long term goal is to -- the

9  long term goal of our operation is to interface with our

10 company's total inbound logistic system.

11       THE COURT:  So?

12       MR. HOGAN:  This was to be a temporary measure.

13       THE COURT:  Where does it say that?  And where after

14 the debtor bought API did it change from being anything other

15 than a zero license?

16       MR. HOGAN:  Well --

17       THE COURT:  In fact, there was an addendum, but that

18 didn't change the price.

19                       (Pause)

20       MR. HOGAN:  Well, I -- according to the addendum, Your

21 Honor, the idea of reverse engineering changing the software is

22 what was prohibited in the license.

23       THE COURT:  I understand.

24       MR. HOGAN:  Yeah.

25       THE COURT:  But you're going to -- you were going to

1  tell me what the value, or market value of the changed version

2  would have been.  But there's no evidence that any version was

3  licensed by Mr. Berry for any money.

4          MR. HOGAN:  Well, it is in the record, Your Honor, that

5  there was a $2 million licensee/damage clause, last page of

6  Exhibit 3004, this is the license that Fleming has offered.

7          THE COURT:  Which exhibit?  304?

8          MR. HOGAN:  304, Your Honor, the last page, paragraph

9  10.  That included a liquidating damage clause.

10          THE COURT:  Well, it doesn't not say that that's the

11  amount of damages.  It simply says that the licensor will use

12  that as a basis for calculating damages.

13          MR. HOGAN:  That -- it says what it says, Your Honor.

14  I -- if I misrepresented it, I apologize.

15          THE COURT:  What other evidence is there of any value?

16          MR. HOGAN:  Well, I guess -- how do you value, I guess,

17  a piece of unique software.

18                   (Loud speaker announcement)

19          THE COURT:  I apologize.

20                         (Pause)

21          THE COURT:  I apologize, you may proceed.

22                         (Pause)

23          THE COURT:  All right.  You may proceed.

24          MR. HOGAN:  Thank you, Your Honor.  I guess, Your

25  Honor, we're talking about what Mr. Berry's claim would be

1  against the estate for the manner in which his software was

2  handled during the administration of the estate if we're dealing

3  with an administrative claim.  I believe that to be the outer

4  limits of what Mr. Berry could claim.

5         And I would say, Your Honor, by transferring a copy,

6  although that may be a separate issue, by giving it to the one

7  entity, which in 303 it's -- he -- Mr. Berry admits that it's --

8  really only one person can use this, it's custom made.  It would

9  be like taking the software out of one of these buildings and

10 carrying it to another building, it may not operate the

11 elevators.  But whoever built that building, it has an intrinsic

12 value.

13        How do we arrive at that, Your Honor?  Do we need to

14 arrive at that at this point in this proceeding in order to get

15 the confirmation?  That I don't know.  I --

16        THE COURT:  Well, I think the answer is yes.  We have

17 to put some estimate on your claim if you're using your claim as

18 a means to prove that the plan is not feasible because the

19 administrative claims can't be paid.

20        MR. HOGAN:  My -- if I may, Your Honor, my argument on

21 confirmation was primarily that I was objecting to the fact that

22 the plan was being used as a sort of a facto compli to transfer

23 my client's software to C&S, that it was under the idea that a

24 plan must be done through a lawful means argument.  The

25 estimation is still there, Your Honor.  The fact that it is a

Closing Argument/Hogan                                    165

1  large claim that has to be dealt with.  When taken in light of

2  the indemnities that are out there, Mr. Berry's claim is

3  potentially a serious claim for the estate because as the Court

4  has indicated, C&S's liabilities are going to go forward, then it

5  is -- we have the people from Fleming, the CFO --

6          THE COURT:  But to prove your case you have to give me

7  more than just argument.

8          MR. HOGAN:  I understand that.

9          THE COURT:  It's a serious claim.  Give me a number.

10 If it's $100,000, they're feasible even if you win.

11         MR. HOGAN:  That is correct.  But what I'm saying, Your

12 Honor, is his claim --

13         THE COURT:  If it's $2 million, they're feasible even

14 if you're correct.

15         MR. HOGAN:  Then I would stand with this claim, Your

16 Honor.  It's $48 million if they want to sell it to C&S.

17         THE COURT:  How?  How can I determine or estimate your

18 claim at that?  That's what you were willing to settle?  They

19 said no, that's not their value apparently because they --

20         MR. HOGAN:  But then they shouldn't --

21         THE COURT:  -- did not accept it.

22         MR. HOGAN:  I apologize.  They shouldn't have

23 transferred it, Your Honor.  They should have -- when the case --

24         THE COURT:  Well, whether or not they did or not, let

25 me assume they did everything wrong.  How do I calculate that

Closing Argument/Hogan                    166

1  amount?  They might have transferred it to C&S and yet they think

2  it's not worth $48 million, so they didn't settle with you

3  thinking you'll get $200,000 if you win.  You've got to -- I need

4  evidence to estimate your claim to determine whether or not

5  you're an impediment to confirmation.

6          THE COURT:  Well, I would refer the Court to Mr.

7  Berry's declaration in which he details the manner in which this

8  software was employed to make money for Fleming, API and

9  presumably now C&S.

10          THE COURT:  How does that translate into a damages

11  award?

12          MR. HOGAN:  Because it would determine what an arms-

13  length licensing fee would be were they to come to Mr. Berry --

14          THE COURT:  How?  How can I come to an arms-length

15  licensing fee?  The only licensing fee that I know of was zero to

16  the debtor to whom it was the most valuable according to Mr.

17  Berry's statement.  I mean if it's zero for one person that can

18  really use it, how can I calculate it's value as anything other

19  than zero?

20          MR. HOGAN:  Well, I guess the easy way would be why

21  didn't -- I think the Court can infer from what's happened in

22  this case that it would have been a lot easier if it was

23  worthless software to simply walk away from it and end it and be

24  done with Mr. Berry.

25          THE COURT:  They -- well, the evidence was they tried.

1          MR. HOGAN:  And I -- and -- well, the evidence was they

2    tried by creating a derivative.

3          THE COURT:  And you may be correct.  And I'm assuming

4    you're correct for purposes of today.

5          MR. HOGAN:  Basically, Mr. Berry has cited what Fleming

6    charges logistics fees for K-Mart in here from the K-Mart

7    contracts.  K-Mart is the only -- the only place that K-Mart

8    still does business with Fleming and now C&S that I know of is in

9    Hawaii.

10         THE COURT:  But that was the --

11         MR. LIEBELER:  Your Honor, I object.  That's not on the

12   basis of evidence --

13         THE COURT:  Please.  That's what the debtor got as a

14   result of it.  It's not what Mr. Berry was entitled to.

15   Regardless of how the debtor used it in its business and how the

16   debtor generated revenues perhaps is a result of it.  It's not

17   what Mr. Berry was entitled to.  Mr. Berry was entitled to no

18   license fee.

19         MR. HOGAN:  And up to a point, Your Honor, I would

20   concede.  Had the debtor gone into bankruptcy without any

21   infringement, nothing happening, and used the software up until

22   the point that they're ready to emerge from bankruptcy or sell

23   their software, I would concede to this Court Mr. Berry isn't

24   owed a dime.  I'll concede that point.

25         But we're not talking about that.  What we're talking

Closing Argument/Hogan                    168

1  about is when the debtor doesn't operate the system the same way,

2  doesn't say, okay, it's at the end of the day, here's your

3  software back, Mr. Developer, thank you very much.  But where the

4  debtor uses a very concerted action to transfer it to a third-

5  party.  The only third-party, Your Honor, by the evidence who

6  could buy it.  Essentially wiping out his market.  And I can see

7  the Court's problem, what was that market worth.

8          THE COURT:  Exactly.

9          MR. HOGAN:  And from the Copyright Act, Your Honor,

10  allows damages for loss -- for actual damages which I take to

11  mean lost license revenues.

12          THE COURT:  You were getting zero for the license fee.

13          MR. HOGAN:  Exactly.

14          THE COURT:  So that's zero.

15          MR. HOGAN:  Exactly.

16          THE COURT:  All right.

17          MR. HOGAN:  And then the profits of the infringer.  I

18  asked a question, does anybody know how much C&S makes in a

19  profit on the Hawaii division?  Does anybody know what the Hawaii

20  division makes?

21          THE COURT:  Well, it's not clear to me that the

22  Copyright Act would give you all of their profits.

23          MR. HOGAN:  And it is -- and I don't -- I'm not saying

24  it would be.  But it would be the profits derived from the

25  infringement, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

Closing Argument/Hogan                                    169

1        THE COURT:  Right.

2        MR. HOGAN:  And see --

3        THE COURT:  So how am I to calculate that?

4        MR. HOGAN:  And that is what is in Mr. Berry's

5   declaration, Your Honor.  And it is a way to calculate how much

6   the system makes.  And moreover, Your Honor, how much it will

7   lose if it is taken away.

8        THE COURT:  Well, even accepting Mr. Berry's testimony,

9   can I conclude that the revenues that the debtor received for its

10  shipping are related solely to your software?  I don't think I

11  can conclude that.

12       MR. HOGAN:  I would say, Your Honor, that based on Mr.

13  Ron Griffin's, that's Berry 1, it's Mr. Berry's Exhibit 1, his

14  admission that there was no replacement software at all.  And

15  that they had -- his advice was is to pay a licensing fee

16  indicates --

17       THE COURT:  Well, that was one option.

18       MR. HOGAN:  That was his conclusion, Your Honor, I

19  believe.

20       THE COURT:  Define some of --

21       MR. HOGAN:  That however distasteful, I think he

22  said --

23       THE COURT:  Define some accommodation.  It doesn't say

24  pay the licensing fee.

25       MR. HOGAN:  It's pay a licensing fee.  What I'm saying

1  is, Your Honor, there wasn't a replacement.  It was one of a

2  kind.  What does something that is unique worth in the world?

3  How do you pick a value for it?

4          Under the Copyright Act, you would say, well, what did

5  it make you but for that piece of software.  I think that's --

6          THE COURT:  I think there's no evidence that they could

7  not have operated without this software.  What evidence of that

8  is there?

9          MR. HOGAN:  No, and I agree, Your Honor.  I'm not going

10 to say they couldn't -- they could stop operating tomorrow

11 without it.

12         THE COURT:  No, they could operate without the

13 software.

14         MR. HOGAN:  That's --

15         THE COURT:  Perhaps they won't be able to print a

16 report, but they can operate without the software.

17         MR. HOGAN:  I think -- well, they could operate, Your

18 Honor.

19         THE COURT:  They operated before they had the software.

20         MR. HOGAN:  That's correct.  And the food got to

21 Hawaii.  And it didn't come in through Fleming is all.  And that,

22 I believe, is what Mr. Berry's declaration deals with is that it

23 was -- allowed Fleming to be a freight consolidator.  And to the

24 extent that it --

25         THE COURT:  It's not the only thing that allows Fleming

1  to be a freight consolidator.  There's a lot more than just Mr.

2  Berry's software involved in being a freight consolidator.  There

3  are employees.  There're stevedores that you deal with.

4          MR. HOGAN:  That's -- that is true.

5          THE COURT:  There's shippers you deal with.  There's a

6  lot involved in the business.  I can't simply conclude that all

7  the revenues received by Fleming or by C&S at this Hawaii

8  location would be the measure of damages for wrongful

9  infringement.  Based on the evidence I have.  Even assuming Mr.

10  Berry's declaration is accurate.

11          MR. HOGAN:  Basically, Your Honor, what Mr. Berry's

12  declaration, if there's one thing that his system does is it will

13  reach a savings through the use of the software.  A -- an

14  efficiency of $1763 a container.  The --

15          THE COURT:  Well, that's not what he's --

16          MR. HOGAN:  Paragraph 18.

17          THE COURT:  Well, there's no -- nothing in this that

18  tells me how much -- how many containers they did, in fact,

19  handle.  There's no basis for his statement that he believes they

20  could have handled no more than 20 containers a week.

21          MR. HOGAN:  Your Honor, there -- it actually does parse

22  the gross sales tax receipts on page -- on paragraph 21 to arrive

23  at a container number.  Based on the Hawaii gross -- we have a

24  gross sales tax that he reversed out and arrived at a number of

25  containers per year which would be 35,871 containers a year.

1          THE COURT:  But tell me the basis in paragraph 18 for

2    his belief that API would have been limited to 20 containers per

3    week without his software.

4          MR. HOGAN:  Yeah, it's in the other part of his

5    declaration, Your Honor, in the story of API.  And I don't want

6    to go into it because it's not in the record.  But it's -- Mr.

7    Berry, I think it was testified, was the president of API, came

8    in and helped run the company.  And his -- it isn't -- it's

9    knowledge of the person who would know these facts.  That -- the

10   intrinsic value of selling a unique piece of software to someone

11   is going to be difficult for anyone to establish, Your Honor.

12         THE COURT:  Yeah, but isn't the best evidence what you

13   were actually getting from Fleming?  Which was zero.

14         MR. HOGAN:  Well, no, I don't think that -- Your Honor,

15   I understand that Mr. Berry allowed Fleming to use his software

16   and I believe Mr. Stuecy's statements in that memorandum as an

17   interim measure.  And as we had Mr. Dillon discussing, one of the

18   reasons Mr. Berry did that is so he could employ his former

19   employees as the company was being put out of business.

20         Now, it may not seem like a good business deal for most

21   people, but I don't think it should be construed as him waiving

22   his rights as a copyright owner.  To protect --

23         THE COURT:  I'm not suggesting his waiving his rights,

24   but he's suggesting he's put a value on those rights.  And

25   there's nothing in the exhibits to suggest it was a temporary

173

1  measure only.

2       MR. HOGAN:  Only the exhibit that I referred to, Your

3  Honor, the EULA, the first page of the EULA that was the

4  memorandum.

5       THE COURT:  Yeah, but even your statement, the long

6  term goal of our operation is to interface with our company's

7  total inbound logistics system.  What does that mean?

8       MR. HOGAN:  It's, I believe, to get rid of Mr. Berry.

9  That's what I believe it meant.  Which is -- he's almost gone,

10  Your Honor, so --

11                    (Laughter)

12       MR. HOGAN:  But now he's C&S's problem.

13                    (Laughter)

14       THE COURT:  Yes, he will.

15       MR. HOGAN:  Let's say I have nothing else, Your Honor.

16       THE COURT:  All right.  What other evidence?

17       MR. HOGAN:  I think that's it, Your Honor.

18       THE COURT:  All right.

19       MR. LIEBELER:  Nothing further on estimation, Your

20  Honor.  I would yield to Mr. Sprayregen with respect to the

21  overall confirmation issues.

22       THE COURT:  All right.  Well, let me make a ruling on

23  the estimation so we can proceed more orderly.  I think that --

24  and again, for purposes of this proceeding, I must assume there

25  is some claim that Mr. Berry has against the debtor that would

174

1  qualify as an administrative expense.  And I'm prepared to

2  estimate the administrative expense at $100,000.

3        The only evidence really before me that it has any

4  value, the license agreement provides that the debtor may use it

5  for no licensing fee.  So that is not evidence of any value for

6  the debtor's use that would constitute the administrative

7  expense.  There is the jury verdict that found that the debtor

8  had made improper changes to and was using the changed version

9  which constituted infringement and the jury awarded damages of

10  approximately $98,000.  So that is some evidence of a value that

11  can be attributed to any claim for infringement.  That is, change

12  of the original version of the software.

13        With respect to any alleged damages for a sale to C&S,

14  there is no evidence of a sale to C&S.  The asset purchase

15  agreement specifically does not include the software.  My ruling

16  at the hearing on approval of the asset purchase agreement made

17  it clear that there was no sale of Mr. Berry's software.  So

18  nothing can be attributed to any value the debtor received as a

19  result of any sale of the software.  So I would estimate the

20  Berry administrative claim against the debtor at $100,000.

21        MR. SPRAYREGEN:  Thank you, Your Honor.  With respect

22  to confirmation, and obviously in my confirmation argument, I'll

23  take this ruling in account with respect to the feasibility

24  objection, I think in the first instance there was one party that

25  I had reported was resolved, Mr. Block.  And they stepped up and

1  it was a little bit unclear whether there was still a

2  confirmation objection or whether he was just agreeing that it

3  was close to being resolved but it wasn't resolved yet.  I can

4  report and I believe Mr. Block's counsel is still in the

5  courtroom, that that is now settled and the documentation is in

6  process and the settlement of that claim we would intend to

7  submit under a certification of counsel to the extent the court

8  order will confirm the plan.

9          MR. HOUSTON:  Good afternoon, Your Honor.  Joseph

10  Houston of Stevens Lee and Dunn.  That is correct.  We have

11  reached an agreement.  It's simply a matter now of actually

12  signing an agreement and on that basis we withdraw the objection.

13          THE COURT:  All right.  Thank you.

14          MR. HOUSTON:  Thank you.

15              MR. SPRAYREGEN'S CLOSING ARGUMENT

16          MR. SPRAYREGEN:  So, Your Honor, we're back to where I

17  thought we started which is with the one objection.  And the

18  basis of the objection is both feasibility and lack of good faith

19  that we proposed a plan by means of forbidden by law.  I would in

20  the first instance state that we believe all of the other

21  evidence we've put in satisfies all of the other confirmation

22  standards and I'm happy to go through those because it is our

23  burden, but I think they're well in the evidence unless the Court

24  desires them.

25          THE COURT:  That's fine.  I think it's stated in the

1 evidence that is presented and the memorandum of all submitted.

2      MR. SPRAYREGEN:  Your Honor, there's obviously the

3 allegation that we have not proceeded in good faith, but that

4 we're proceeding by means forbidden by law.  I think that's

5 second part is basically addressed by the Court's ruling that the

6 software was not transferred and couldn't have been transferred

7 because of your order at the sale.

8      THE COURT:  I didn't say it wasn't transferred.  I said

9 it wasn't sold.

10     MR. SPRAYREGEN:  I'm sorry, wasn't sold.  And that

11 being the case, the basis for the lack of good faith objection is

12 that we did sell it and, in fact, sold it inconsistent with your

13 order at the sale hearing.  Your Honor, even with those

14 allegations, I think that we don't look at the good faith issue

15 solely with respect to one objection.  We look at the proposed

16 plan and is it overall proposed in good faith and not by any

17 means forbidden by law.  I'm not -- I don't see any means

18 forbidden by law allegation any longer with respect because of

19 the no transfer -- excuse me, no sale ruling.

20     And with respect to the balance of the good faith

21 issue, that's always a strange confirmation standard to try to

22 prove in that insomuch you're trying to prove a negative.  But

23 Mr. Stenger did testify as to the debtor's good faith in the

24 proposal of the plan.  And I think the most persuasive evidence

25 of the debtor's good faith is the support, overwhelming support

1  for the plan through the votes in support of the plan by every

2  class and by the support of the plan by the two official

3  committees, by the Exit financing lenders support of the plan.

4         And I don't think I would add anything more generally

5  with respect to good faith.  With respect to Mr. Berry's specific

6  allegations, I think the testimony of Mr. Dillon is directly to

7  the contrary that if anything was transferred, even if it wasn't

8  sold, it, one, wasn't used, and two, it was inadvertent.  And

9  that there were strenuous efforts by the debtor and that was --

10  came in through multiple parts of the evidence to eliminate any

11  issue with respect to Mr. Berry whether that was successful or

12  not can be decided another day in another court.

13         THE COURT:  What about the allegation that the -- that

14  debtor has agreed to indemnify C&S for this issue contrary to the

15  asset purchase agreement?  Is it contrary?

16         MR. SPRAYREGEN:  No, it isn't, Your Honor.  The --

17  again, the asset purchase agreement is approved by a court order,

18  the sale order.  The sale order authorizes the debtor to enter

19  into the asset purchase agreement, and in essence, not quote such

20  other agreements consistent with the closing, I think the word's

21  supplemental agreements consistent with the asset purchase

22  agreement.

23         THE COURT:  How is that consistent with the asset

24  purchase agreement?

25         MR. SPRAYREGEN:  We have indemnity provisions in the

1  asset purchase agreement already.  Your Honor, my understanding

2  of what happened, and I wasn't there, is between the time the

3  asset purchase agreement was approved and the time of closing,

4  Mr. Berry sued C&S, this was prior to closing.  So not

5  surprisingly, C&S sought some confirmation that the

6  indemnification obligations in the asset purchase agreement would

7  be picked up in some way given that, in essence, a allegedly

8  potentially indemnifiable claim has actually arisen before we

9  even closed.

10       THE COURT:  Well, is it indemnifiable under the asset

11 purchase agreement?  Run me through the asset purchase agreement.

12       MR. SPRAYREGEN:  Well, first of all, I'm going to ask

13 Mr. Liebeler to get up and address that.  But I think more

14 importantly, the issue of whether it is I think will be

15 ultimately an issue for another day.  What we have done thus far

16 because of what joint counsel in Hawaii is, we have covered the

17 attorneys' fees, we'd have to bear that expense.  In any event --

18       THE COURT:  Why?

19       MR. SPRAYREGEN:  Because we've been sued also.

20       THE COURT:  You've -- but you would have to cover C&S's

21 attorney expenses?

22       MR. SPRAYREGEN:  No, we have the same counsel.  They're

23 going to have counsel, too, but we have our own counsel and

24 they're using them also.  So, it's not as if it's an additional

25 expense.  But it's not unusual in a situation where you have an

Closing Argument/Sprayregen/Liebeler                    179

1 allegation of an indemnifiable liability and there may or may not
2 ultimately be a dispute as to whether it is indemnifiable for the
3 parties to proceed with -- on an interim basis with covering
4 attorneys' fees in the hopes that ultimately the claim goes away
5 and we don't have to get into a larger fight over a $48 million
6 issue as distinct from a $100,000 issue which would be a much
7 different type of thing to resolve and we never really have to
8 get in a large dispute.

9          But no, we don't think there's anything inconsistent
10 about the indemnity agreement from the indemnities approved in
11 the asset purchase agreement.

12          THE COURT:  Well, let me hear why.

13          MR. LIEBELER:  Your Honor, the reason that there's no
14 inconsistency between the indemnity agreement which we have
15 actually, I think, is 211 in the binder, is because the indemnity
16 agreement, which we've called the side letter, itself refers back
17 to Section 13.3G and is qualified by Section 13.3G of the asset
18 purchase agreement.

19          THE COURT:  Tell me the exhibit, No. 178, is it?

20          MR. LIEBELER:  Actually, I've got it in two places,
21 Your Honor.  The easiest one I've got it in the Berry binder as
22 312.

23          THE COURT:  Yes.

24          MR. LIEBELER:  And the side letter is 311, Your Honor.

25          THE COURT:  Show me where on 312 is the