Closing Argument/Sprayregen/Liebeler                180

1  indemnification.

2          MR. LIEBELER:  Starting with 311, near the bottom of

3  311 refers and the indemnity obligation in the side letter is

4  qualified by 13.3G, that you should be entitled to

5  indemnification subject to the limitations of 13.3G.  That's in

6  the side letter.  So you have to go back to 13.3G in the asset

7  purchase agreement which is Exhibit 312, page 74, middle of the

8  page.  And 13.3G says that there's not any obligation to

9  indemnify if C&S in these circumstances takes any identifiable

10 action which directly causes the excluded liabilities to be

11 there.

12         So, to the extent that C&S takes an affirmative

13 identifiable action, there's no indemnity.  That, in fact, the

14 side letter is perfectly consistent with the provisions, with any

15 provision of the APA because it actually refers back to a

16 limitation in the APA on the indemnity.

17         THE COURT:  Tell me what that sentence means again.

18         MR. LIEBELER:  Sure.

19         THE COURT:  Sellers, the debtor, shall have no

20 obligation to indemnify C&S arising out of excluded liabilities.

21 We're assuming that --

22         MR. LIEBELER:  Well, no, it's --

23         THE COURT:  We're assuming that the Berry is an

24 excluded liability.

25         MR. LIEBELER:  That's correct.  But there's some of the

1  language you missed, Your Honor, and that is that C&S takes any
2  identifiable action.

3          THE COURT:  That's after.  I'm not there yet.

4          MR. LIEBELER:  Okay.

5          THE COURT:  Debtor shall have no obligation to
6  indemnify C&S for any losses arising out of excluded liabilities
7  to the extent C&S takes any identifiable action which directly
8  causes the excluded liabilities to be a liability of C&S?

9          MR. LIEBELER:  Correct.  Now, the only inconsistency --

10         THE COURT:  What does that mean?  Does that mean that
11 the debtor agreed to indemnify C&S for everything else?

12         MR. LIEBELER:  Let me address your question in a
13 slightly backwards way and bear with me for a moment.  The only
14 inconsistency that's been alleged between the side letter and the
15 APA is that it goes to Section 12.4 of the APA.  So let me ask
16 you to turn to 12.4 because that's inconsistency that's been
17 alleged.  Okay.  That -- the only argument that anyone has made
18 on inconsistency between the side letter and the APA is that the
19 side letter is inconsistent with 12.4A.

20         THE COURT:  Which specifically says the debtor would
21 have no obligation to indemnify the buyer from damages resulting
22 from any activity post-closing.

23         MR. LIEBELER:  Correct.  And we --

24         THE COURT:  Engaged in by C&S for infringement.

25         MR. LIEBELER:  Correct.  And we contend, Your Honor,

1  that any activity in 12.4 is --

2          THE COURT:  Is not indemnified.

3          MR. LIEBELER:  -- is for all purposes equivalent to the

4  language in 13.3G which is a limitation on the side letter that

5  says that there's no obligation to indemnify to the extent that

6  C&S takes any identifiable action which causes the excluded

7  liabilities to be a liability of the purchaser.  We contend that

8  that language is consistent, 12.4 is entirely consistent with the

9  limitation in 3G.

10         THE COURT:  So that 311 is also subject to 12.4.

11         MR. LIEBELER:  311, Your Honor?

12         THE COURT:  Rule 311.  Exhibit 311.  The side letter.

13         MR. LIEBELER:  Oh, yeah.  I'm sorry, I thought you

14  meant an asset purchase -- you mean Exhibit 311?

15         THE COURT:  Yes.

16         MR. LIEBELER:  Yeah.  Because Exhibit 311 itself calls

17  out that you go back to 13.3G.  It says -- the language is dense,

18  Your Honor, in part because this is drafted by corporate lawyers

19  who don't litigate for a living and have to stand up in court and

20  interpret exhibit -- interpret asset purchase agreements on the

21  fly.

22         THE COURT:  Right, exactly.

23         MR. LIEBELER:  But the main concept here if you look

24  at, I think it's 12.4A and B, are -- and the way we've conceived

25  the asset purchase agreement from an operational perspective is

1  if C&S continues to do what was done up until the closing, then

2  it's going to be the debtor's fault and the indemnity would run

3  back to the debtor for that.

4          If on the other hand, after the closing, C&S did

5  something that was a, you know, deliberate and willful

6  infringement, if Mr. Dillon went back and broke into Mr. Berry's

7  house and stole a piece of software from him and raced back to

8  the server and put it on there and started using it, if that

9  would be an action that took place after closing, then that would

10  not be indemnifiable. That's how we've conceived these

11  provisions to be together. And it's my understanding that that's

12  how -- that's the whole point of the way the asset purchase

13  agreement was put together. We don't think the side letter is in

14  anyway inconsistent with that.

15          THE COURT: Well, the letter seems pretty broad and

16  doesn't seem to end with closing. The indemnification for all

17  past, present and future use of the Berry technology would be

18  considered an excluded liability?

19          MR. LIEBELER: And then that is -- again, that sends us

20  back to 13G which requires an identifiable action that says --

21  13G says that we do not have an indemnity if C&S takes an

22  identifiable action.

23          THE COURT: Tell me what an identifiable action is.

24          MR. LIEBELER: Some -- and action that we can identify,

25  such as, for example, Mr. Dillon breaking into Mr. Berry's house,

1  taking his software and putting it back on the server.  That

2  would absolutely --

3          THE COURT:  How about using the software that's on the

4  server?

5          MR. LIEBELER:  Don't know.  But, to the extent -- that

6  would also be any activities subsequent to the closing date.  And

7  so that provision would be consistent with 12.4.  So 13.3 is

8  consistent with 12.4 and the side letter expressly incorporates

9  13.3.  The only inconsistency --

10          THE COURT:  Wait a minute, this 13.3G only apply post-

11  closing?  Or pre-closing?  Which are you saying is pre-closing

12  and which is post-closing?

13          MR. LIEBELER:  I don't think there's a time limitation

14  in 13.3G.

15          THE COURT:  But there is in 12.4.  12.4 is nothing

16  post-closing.

17          MR. LIEBELER:  Fair point, Your Honor, but I don't

18  think there's been any allegation, at least for purposes of

19  today's argument, that there was any activity prior to the

20  closing that's in issue.

21          THE COURT:  So it's all post-closing, so it's all

22  covered by 12.4.  So there's no indemnity.

23          MR. LIEBELER:  I don't know whether there is an

24  indemnity or not.  I don't think we've reached that position.

25  That's an argument that would -- that may come up between C&S and

1 the debtor at some point in time.  But we're not right to discuss

2 that issue today.  There's no reason to adjudicate that issue.

3 It's not right.  Noone's argued that there is or isn't an

4 effective indemnity.

5         THE COURT:  Well -- sure there is.  Part of the non-

6 feasibility is that we have a gazillion dollar claim against C&S.

7 And the debtors indemnified them.  So even though my

8 administrative claim against the debtor may be limited to --

9 estimated to be $100,000 --

10         MR. LIEBELER:  The way I read --

11         THE COURT:  -- there's a post-petition claim

12         MR. LIEBELER:  Mr. Sprayregen tells me that he is

13 prepared to address that issue.  If I may yield to him, Your

14 Honor?

15         THE COURT:  You may.

16         MR. LIEBELER:  Thank you.

17         MR. SPRAYREGEN:  Your Honor, I was actually going to

18 truncate my feasibility discussion in view of your $100,000

19 ruling.  However, in view of this question, I'll go through what

20 I was going to go through.

21         But before I get there, I will say what you're hearing

22 with respect to that side letter, somebody may argue that it's

23 inconsistent.  The debtor's clear view is that it isn't.  It

24 could be that somebody argues someday that it is.  Again, if

25 we're going to good faith for a confirmation standard, there's no

Closing Argument/Sprayregen/Liebeler                186

1  evidence that the debtor, in responding to a suit against C&S
2  prior to the closing, in order to get the deal closed, doing
3  something that they thought was consistent with the asset
4  purchase agreement, even if they ended up doing something
5  inadvertently inconsistent and we have to deal with that someday,
6  means that this plan is not proposed in good faith or means that
7  it's proposed by some means forbidden by law.

8        We don't think any of that happened, but I just wanted
9  to point that out because the debtor believed it was complying
10 with the Court's order concerning the sale and concerning the
11 asset purchase agreement.

12       Now, I will say with respect to feasibility, Your
13 Honor, we cited in our confirmation brief the standards for
14 feasibility.  And I think it's important because we talk about
15 that the -- and we cited the cases, so I won't go through all the
16 names of them -- but it's a preponderance of the evidence
17 standard.  Clear and convincing evidence has been rejected as the
18 standard.  The standard is that there's a reasonable probability
19 of success.  Cases are legion where they make statements --

20       THE COURT:  I don't need the law.

21       MR. SPRAYREGEN:  Okay.

22       THE COURT:  Just tell -- deal with the facts as
23 alleged.

24       MR. SPRAYREGEN:  Okay.  Okay.  First of all, Your
25 Honor, the -- this claim where there's the --

Closing Argument/Sprayregen/Liebeler                    187

1          THE COURT:  I think it's back there.

2          MR. SPRAYREGEN:  This one, Danny.  With respect to the

3   claim actually you just estimated at $100,000, the trial on that

4   one is set for September 20, '05.  And obviously that's a long

5   way out and I don't know what's going to happen with respect to

6   that.  But timing could be a significant issue.

7          With respect to what the Court stated about this C&S

8   indemnity, obviously, before we ever get there, you need a

9   judgment, it needs to apply and recall that Mr. Scott's testimony

10  was that the indemnity was actually funded by an indemnity escrow

11  of $10 million that's already sitting there.

12         The -- we're also presuming, if it ever happened and

13  the Court pointed out an argument that I was going to make, that

14  C&S is not objecting to feasibility.  And they potentially

15  someday may have a claim against the debtors, but I think it

16  speaks volumes that they're not here objecting to feasibility.

17  And that actually makes a lot of sense, even to the extent we

18  jump through those three hoops and they ultimately have an

19  indemnity claim, or believe they have an indemnity claim to

20  assert against the debtors, it presumes that that's somehow not

21  resolved either procedurally or substantively, that that creates

22  a problem for the debtor being able to pay it, that the C&S

23  doesn't agree to even if it's a large number, take the payment

24  over time.  There's all sorts of potential resolutions of that.

25         And I had Exhibit 189 put back on the board over here

Closing Argument/Sprayregen/Liebeler                    188

1  because I think it's quite important.  This is one of the debtors

2  that's exiting with a capital structure and with the two trust

3  structures, as Mr. Stenger testified, with a very strong capital

4  structure to the debtor itself, Core-Mark, and these two trusts.

5  And I think again, the Stenger, Scott and Folse affidavits,

6  again, there's no dispute as to the estimates of the assets and

7  liabilities say for the Berry claim and say for, let's say this

8  C&S potential indemnity, for now --

9          THE COURT:  Well, except that the testimony was that

10 these were book value.  What does that have to do with market

11 value?

12         MR. SPRAYREGEN:  Your Honor, Mr. Stenger testified as

13 to the book value, the assets and liabilities.

14         THE COURT:  Yeah.

15         MR. SPRAYREGEN:  Well, there was further testimony,

16 let's go through it because I noted that.  Book value was a

17 common way of looking at a balance sheet of a company.  We have

18 to look at it in some way.  There is a valuation in the plan of

19 reorganization.  And in fact, we get to the valuation through the

20 assets and liabilities of about $150 million in equity value.

21 Again, that's --

22         THE COURT:  Where is that?

23         MR. SPRAYREGEN:  Well, that's partly the result of this

24 -- subtracting the liabilities from the assets.

25         THE COURT:  Yes, and he testified those were book

1  values, not fair market values.

2          MR. SPRAYREGEN:  Okay.  In the plan -- excuse me, in

3  the disclosure statement itself, there's a black stone valuation

4  of --

5          THE COURT:  How does it --

6          MR. SPRAYREGEN:  I believe approximately --

7          THE COURT:  -- value Core-Mark?

8          MR. SPRAYREGEN:  -- 300 million.  I'll check that.

9          THE COURT:  300?

10          MR. SPRAYREGEN:  290 million, Your Honor.  And if

11  necessary, we can put on more of that.  That --

12          THE COURT:  And the liabilities are 320?

13          MR. SPRAYREGEN:  No, no, no.  This would be 290 net of

14  the liabilities.

15          THE COURT:  Where is it?

16          MR. SPRAYREGEN:  In the disclosure statement.

17          THE COURT:  Where?

18          MR. SPRAYREGEN:  Let me get the cite.  We're pulling

19  out the citation in the disclosure statement.  Just to clarify

20  while they're finding that, it actually is consistent with this

21  number in the sense that it's about 155 million of equity value.

22  But Mr. Huffer was correcting for me, it's 290 million of total

23  equity value.  Let me go through the other numbers while we get

24  the citation to the valuation because I think it's important.

25          Again, we cite that the reclamation trust is over-

Closing Argument/Sprayregen/Liebeler                    190

1  funded by approximately 20 million.  And the affidavits say that

2  by the time it runs down, it will be over-funded by approximately

3  12 million.  The PCT is over-funded by approximately $30 million.

4         THE COURT:  Based on an estimate that you can reduce

5  the current administrative claims of now 500 million to 144

6  million.

7         MR. SPRAYREGEN:  That is correct, Your Honor.  And

8  that --

9         THE COURT:  Isn't that a big leap of faith?

10        MR. SPRAYREGEN:  Absolutely not, Your Honor.  And

11 again, that's why we went to the trouble of the extensive

12 affidavits we provided from Mr. Folse, Mr. Scott and Mr. Stenger.

13 And we went through in detail as to the categories of claims that

14 get us from the number of the asserted claims to the number of

15 the estimated claims.  It's not the least bit unusual, Your

16 Honor, and I know you've seen it in many cases to have claims in

17 cases that asserted wildly higher amounts than their estimate,

18 then their actual amounts they turn out to be.  And part of our

19 job, obviously, has been to determine in good faith some estimate

20 for that with some room to miss.

21        THE COURT:  But there is a difference.

22        MR. SPRAYREGEN:  Between --

23        THE COURT:  In the other cases, the estimates we're

24 talking about are general unsecured claims.  And I'm not being

25 called on to make a determination, which I am today required to

1  make a determination that these estates can pay 100 percent of

2  the administrative claims, or the plan cannot be confirmed.

3        MR. SPRAYREGEN:  I guess I would beg to differ, Your

4  Honor.  In every case we need to demonstrate that we can satisfy

5  the confirmation standard concerning payment of administrative

6  expenses.  And in most --

7        THE COURT:  And I don't have cases where you're asking

8  me to make a leap of faith that administrative expenses are 144

9  million against 2.1 billion and filed.

10       MR. SPRAYREGEN:  Your Honor --

11       THE COURT:  Now, I accept that they've been reduced now

12 to approximately $500 million given the estimation I just made.

13 But --

14       THE COURT:  Well, Your Honor, I think that's quite

15 indicative of how far they've come down and what we think is

16 left.  But Your Honor, what we did in this case, actually, to be

17 even safer than in most cases, the reason you don't usually have

18 that is cause it's not all that common to have administrative

19 expenses bar date prior to confirmation hearing.  And so you

20 don't actually -- all you have is the debtor's estimate.  You

21 don't have the other side's assertion.

22       THE COURT:  No, I also have the debtor's statement that

23 they have paid administrative expenses as they come due during

24 the case.  And that the balance of the accounts payable is X

25 dollars.

1       MR. SPRAYREGEN:  That --

2       THE COURT:  And that it can be paid in the ordinary

3  course of business out of cash flow as we have in the last three

4  years.  This is a different case.

5       MR. SPRAYREGEN:  It's different in the sense that, and

6  let's be clear, we actually believe all of the claims that have

7  arisen in the ordinary course of business from the filing of the

8  case actually have been paid.  This is not some case where we

9  held payments on a whole bunch of ordinary course due

10 administrative expense claims because the estate didn't have the

11 money.  And now we're faced with on exit with a mountain.

12      That's not this case at all.  We've been paying all of

13 Core-Mark's ordinary course expenses.  In fact, we had -- again,

14 the best evidence of that was a couple of the objections where

15 Core-Mark's creditors whose administrative expenses hadn't been

16 paid.  We went and looked at those, found out there was some

17 snafu with a couple of them and got them paid.  But in the main,

18 the ongoing business is paying all of its administrative expenses

19 as they come due.

20      The target of administrative expenses that we have here

21 are really a function of the fact that we took a $17 billion

22 business, sold off a huge piece of it in the middle of the case

23 and are left with a business the third of its size and we have

24 that two-thirds out there that in essence some sort of

25 termination liability, lots of disputes about that.

1          THE COURT:  It is now the obligation of the remaining

2    third.

3          MR. SPRAYREGEN:  Correct.

4          THE COURT:  And I have to determine that it can pay all

5    of those expenses in full.

6          MR. SPRAYREGEN:  Absolutely.  And that's what I was

7    starting to walk through and I'm happy to go through it in any

8    level of detail the Court desires because we spent a lot of time

9    on this and we feel very comfortable that this plan is a feasible

10   plan and that we can cover all of those expenses in full.

11         Let me go through the numbers, then I'll come back to

12   the valuation because I think the valuation is important.  As I

13   noted, Your Honor, the -- we have what we regard as excess value

14   in both the RCT and the PCT equivalent to about $60 million.

15   Again, that's not for sure, but those are our projections.  We'll

16   see how they end up.

17         We also heard Mr. Stenger's testimony that, you know,

18   in the four years from '04 to '08, Core-Mark was going to produce

19   cash flow of about $107 million.  That's not cash that's called

20   on for these administrative expenses.  In fact, 43 million of it

21   is supposed to go to CAPEX and 64 million to pay down debt.  And

22   Mr. Stenger testified that it, if necessary, it didn't need to be

23   used for that, obviously, not every penny, but some percentage of

24   that could be available to satisfied a, he called it a miss on

25   administrative expense claims.

Closing Argument/Sprayregen/Liebeler                194

1       Mr. Stenger also testified that we have a $50 million
2   credit line.  Now, again, we're not going to use every penny of
3   that to fund administrative expenses, but that's another, what
4   I'll call a backup liquidity protector to the extent these
5   administrative claims end up being larger than we thing.  Again,
6   we don't think that's going to occur, but we're not saying we
7   just make it by $1.  We're saying we make it by a lot.
8       I also note, and this is where we get into the
9   valuation which is at page 101 of the disclosure state.  Mr.
10  Liebeler has the disclosure statement, I can hand it up.
11          THE COURT:  Why don't you hand it up.
12          MR. SPRAYREGEN:  Okay.  May I approach?
13          THE COURT:  Unless you can tell me what exhibit it is.
14                          (Pause)
15          THE COURT:  Well, since I don't have witnesses and
16  really evidences it, who prepared the --
17          MR. SPRAYREGEN:  Your Honor, we have Mr. Huffard here
18  and we're happy to put him on.  The valuation wasn't actually
19  raised by any party, so we didn't put him on, but we had him here
20  just in case there was an issue concerning that and we're happy
21  to do it.
22      The other thing I was going to suggest, if it would be
23  helpful, part of the function of actually having agreed, and we
24  appreciate Mr. Hogan's agreement, but agreed on putting on -- or
25  putting in the affidavits was we actually didn't hear some of the

1  explanation of why we think it's imminently reasonable, the

2  estimates we came to.  We don't think we've been aggressive, we

3  think we've been very conservative.  And I could, if the Court

4  would permit, Anne Huber who was going to put on Mr. Folse, could

5  just walk you through in less than five minutes how the claims

6  get from that number to --

7           THE COURT:  I read the declaration.

8           MR. SPRAYREGEN:  Okay.

9           THE COURT:  But I think you do need to proffer some

10  testimony in support of an enterprise value of Core-Mark.  And I

11  don't know whether your witness would be prepared to say that all

12  of the analyses that are contained in pages 101 through 105, I

13  think, of the disclosure statement are true today.

14           MR. SPRAYREGEN:  If I could take one moment, I think we

15  can address that momentarily.

16                     (Pause)

17           MR. SPRAYREGEN:  Your Honor, the witness is prepared to

18  say that, but we have a very short direct from him and we can

19  just put it on.

20           THE COURT:  All right.

21           MR. SPRAYREGEN:  Thank you.

22           THE CLERK:  (Away from mike)

23           THE WITNESS:  My name is Paul Huffard.  My last name is

24  spelled H-U-F-F-A-R-D.

25           PAUL HUFFARD, DEBTOR'S WITNESS, SWORN

1    MR. BLEDSOE:  Steve Bledsoe for Kirkland & Ellis LLP,

2  Your Honor.

3  BY MR. BLEDSOE

4  Q    Mr. Huffard, I know you've testified before in this court,

5  but can you very briefly tell us your educational background?

6  A    Sure.  I have an undergraduate degree in economics from

7  Harvard College and I have a graduate degree in business from

8  North Western University.

9  Q    And what year did you graduate with your MBA from North

10  Western?

11  A    1992.

12  Q    Can you tell us your work history since that time?

13  A    Since that time, I have worked in --

14        THE COURT:  I don't think we need that.

15  Q    Mr. Huffard, what --

16        THE COURT:  Thank you.

17        MR. BLEDSOE:  Your Honor, if you want --

18        THE COURT:  We can incorporate his prior testimony on

19  his qualifications.

20  Q    Have you any experience determining the value of businesses?

21  A    Yes, I have.

22  Q    What experience have you had valuing businesses?

23  A    Valuing businesses is the mainstay of the work that I do day

24  in and day out at the Blackstone Group where we provide financial

25  advisory services to companies and creditor groups in situations

Huffard - Direct/Bledsoe                    197

1  involving financial restructurings.

2  Q    Have you been certified as a valuation expert in other

3  bankruptcy cases?

4  A    Yes, I have.

5  Q    What cases are those?

6  A    In Levitz Furniture and Loeman's, Inc. (phonetic).

7  Q    Have you had the opportunity to analyze the reorganized

8  enterprise value of Core-Mark Newco?

9  A    Yes.  We were asked by the debtors to provide a valuation in

10 connection with this confirmation hearing and the disclosure

11 statement.  So we did do that.

12 Q    Just so we know exactly what you're talking about, what is

13 Core-Mark Newco comprised of?

14 A    Core-Mark Newco is comprised of the convenience store

15 distribution business of Fleming Companies.

16 Q    Now, I'm going to walk through your methodologies in a

17 moment, but, first I want to have a look at what the value you've

18 reached is.  Have you reached any conclusions about what the

19 reorganized enterprise value of Core-Mark Newco is?

20 A    Yes, we have.

21 Q    Okay.  What is the enterprise value of Core-Mark Newco?

22 A    We have established a range of values from 265 million to

23 315 million with a mid-point value of 290 million as -- all of

24 those numbers are for enterprise value.

25 Q    Okay.  What valuation methodologies did you use to arrive at

1  that range?

2  A    We used a number of commonly accepted valuation

3  methodologies including comparable transaction multiples

4  methodology as well as a discounted cash flow approach.

5  Q    Okay.  On the comparable multiples, is that where you've

6  referred to in your affidavit as the precedent transaction

7  analysis?

8  A    That is correct.

9  Q    You mentioned that those were commonly accepted

10 methodologies.  Are there any other valuation methodologies which

11 you considered, but did not use?

12 A    Another valuation approach which is commonly used is a

13 public company trading multiples approach.  We did consider that

14 and determined that it was not applicable to this situation.

15 Q    Now, why did you determine that that third valuation

16 methodology was not applicable in this matter?

17 A    In order to apply that method, you need to be able to

18 identify a universe of publicly traded companies that are in

19 comparable lines of business.  In the instance of Core-Mark

20 Newco, there are no publically traded convenience store

21 distribution businesses.  The other closest companies, whether

22 they be just wholesale distribution businesses or other sorts of

23 distribution businesses, our view was not sufficiently comparable

24 to provide meaningful data.

25 Q    Okay.  Now, I want to go back and talk about the two

1 methodologies that you did use.  First, let's talk about the

2 precedent transaction analysis.  Can you explain how that works

3 generally?

4 A    Yes.  In that approach, you identify a number of acquisition

5 transactions that are of businesses in similar lines of business.

6 You examine the value that was paid for those businesses and

7 compare that to various financial measures.  Typically, you would

8 compare that to either revenue or EBITDA or some other measure of

9 profitability.

10 Q    Okay.  Can you tell us how you applied the precedent

11 transaction analysis to your valuation of Core-Mark Newco in this

12 matter?

13 A    Yes.  We developed a list of comparable transactions.  These

14 were acquisitions of other convenience store distribution

15 businesses.  We examined the ratios that I've described for those

16 different transactions.  We've evaluated which of those

17 transactions were most similar and relevant to Core-Mark Newco

18 and based on examining those, we came up with a range of

19 valuation multiples based both on revenue as well as EBITDA that

20 we thought were appropriate in this case.

21 Q    Now, what is a valuation multiple?

22 A    It is, as I mentioned earlier, comparing the transaction

23 value, which would be the numerator, to a specific financial

24 performance measure, whether it be EBITDA or revenue, that would

25 be the denominator.  And the ratio of that numerator and

Huffard - Direct/Bledsoe                              200

1  denominator is the so-called multiple.

2  Q     What financial data from Core-Mark Newco did you use in your

3  analysis?

4  A     We used a combination of both historical actual financial

5  data as well as projected financial data, the projections that

6  were prepared by Core-Mark management with the assistance of the

7  Alex Partners team.

8  Q     And what basis do you have to believe that those numbers are

9  valid and provide a valid basis for your analysis?

10  A     Well, we have reviewed those numbers in detail ourselves.

11  And I think it's fair to say that Core-Mark's actual performance,

12  as you look back over the recent past, has been entirely

13  consistent, slightly above the projected performance in those

14  periods.  So that gives us a degree of confidence that the

15  projections are reasonable.

16  Q     Okay.  I want to talk now about the second methodology, the

17  discounted cash flow analysis.  How does that work?

18  A     That approach examines Core-Mark's -- a company's, let me

19  talk about it more generally, a company's projected cash flows

20  over a projection period, typically a four or five-year period is

21  used.  And a -- what's called a weighted average cost of capital

22  or a discount rate is used to discount those projected cash flows

23  back into the present.  We also look at the estimated value of

24  the company at the end of that forecast period which is called

25  the terminal value and you similarly discount that terminal value

Huffard - Direct/Bledsoe                      201

1  back to the present.  The sum of the interim cash flow's the

2  present value of the interim cash flows along with the present

3  value of the terminal value is the total enterprise value of the

4  business.

5  Q    Now, you've talked about how the methodology works

6  generally, at least the discounted cash flow methodology.  Can

7  you describe how you applied that methodology to Core-Mark Newco

8  in this matter?

9  A    Sure.  We also used in this approach the projections that

10  management and Alex Partners had prepared.  We calculated the

11  series of cash flows on an annual basis for the periods from the

12  remainder of 2004 and then from 2005 through 2008.  We discounted

13  those back to the present at a discount rate.  We calculated a

14  weighted average cost of capital in a range of 15 to 20 percent.

15  And we used that to discount the cash flows back to the present.

16  We also then calculated as I mentioned earlier a terminal value

17  based on using the 2008 EBITDA and we used the EBITDA multiple

18  approach to establish the terminal value in 2008.

19  Q    Was the value you arrived at, your discounted cash analysis,

20  consistent with the value you arrived at in your precedent

21  transaction analysis?

22  A    They were generally consistent.  It's rare that you get two

23  valuation methodologies give you the exact same numbers, but they

24  were generally consistent and they were as consistent as you

25  would normally expect these two approaches to be.

202

1  Q    I just want to wrap up.  You testified that according to

2  your valuation, the low range was 265, the high range was 315 and

3  the mid-range was $290 million, is that correct?

4  A    That is correct.

5  Q    Do you consider your -- that valuation to be aggressive?

6  A    No, I do not.

7          MR. BLEDSOE:  Nothing further, Your Honor.

8          THE CLERK:  Excuse me, Your Honor, could counsel

9  restate his name for the record?

10         MR. BLEDSOE:  Steven Bledsoe of Kirkland Ellis LLP.

11 Q    And is your valuation consistent with what the company is

12 worth today, or at the end of what we expect to be the

13 confirmation in August?

14 A    The valuation date was as of July 31st of 2004.

15 Q    Thank you.

16         MR. BLEDSOE:  Nothing further, Your Honor.

17         THE COURT:  All right.  Anybody wish to cross-examine

18 the witness?  All right.  Thank you.  Thank you.  You may step

19 down.

20                   (Witness excused)

21         MR. SPRAYREGEN:  Your Honor, I -- we do think,

22 reflecting on the Court's questions, that it may be useful to

23 take five or ten minutes to just put Mr. Folse on to elaborate a

24 little bit on his affidavit if the Court believes it's necessary.

25         THE COURT:  Well, does he have anything to add to the

1  affidavit?

2          MR. SPRAYREGEN:  I don't think it's additive.  It's

3  more explanatory of the affidavit.  So --

4          THE COURT:  I'll hear five minutes of him.

5          MR. SPRAYREGEN:  Okay.  Thank you.

6          THE CLERK:  Please remain standing.

7          THE CLERK:  Place your hand on the Bible.  Please state

8  your full name and spell your last name for the Court.

9          THE WITNESS:  Barry J. Folse, F-O-L-S-E.

10         BARRY J. FOLSE, DEBTOR'S WITNESS, SWORN

11         MS. HUBER:  Good afternoon, Your Honor.  Anne Huber

12  appearing on behalf of the debtors.  I have been involved in the

13  claims processing and that's why counsel has asked me to address

14  this particular question.  I'm going to be addressing Exhibits 8

15  and 9 which have previously been admitted, if I could just hand

16  up larger copies for Your Honor and the witness.

17         THE COURT:  All right.

18                   DIRECT EXAMINATION

19  BY MS. HUBER:

20  Q   Mr. Folse, could you please state your name for the record?

21  A   Barry J. Folse.

22  Q   And what is your role in these cases?

23  A   I have headed up the claims resolution team at Fleming.

24  Q   And you are an employee of AP Services which is an affiliate

25  of Alex Partners, is that correct?

Folse - Direct/Huber                                204

1  A    Yes.

2  Q    Now, Mr. Folse, did you sign a declaration in connection

3  with this confirmation hearing?

4  A    Yes, I did.

5  Q    And that document has been admitted into evidence.  I have

6  two documents in front of you.  They're marked as trial Exhibits

7  8 and 9.  Do they look familiar to you?

8  A    Yes.  They are Exhibit 1 and 2 to my declaration.

9  Q    Your declaration refers to SAP claims.  Can you define that

10  term for the Court?

11  A    Secured Admin and Priority claims.  Those are filed proof of

12  claims that were filed in the bankruptcy.

13  Q    And do you have an opinion as to the amount of SAP claims

14  that will ultimately be allowed in these cases?

15  A    Yes.  The estimate as of July 16th, when I filed my

16  declaration, is the 139.5 listed in the fourth column on Exhibit

17  1.

18  Q    When you say Exhibit 1, do you mean trial Exhibit 9?

19  A    I'm sorry, Exhibit 1 to my declaration.

20       MS. HUBER:  Excuse me, trial Exhibit 8, Your Honor.

21  A    Yes.

22  Q    I would like you to focus a moment on trial Exhibit 9 which

23  is Exhibit 2 to your declaration.  Do you have that in front of

24  you, Mr. Folse?

25  A    I do.

Folse - Direct/Huber                                           205

1  Q    Can you explain to the Court the significance of the far

2  right-hand column of Exhibit 2 to your declaration, also known as

3  trial Exhibit 9?

4  A    Yes.  The far right-hand column are the totals -- if you

5  look in the first row of the far right-hand column, you'll see

6  the first number, the 2.1 billion, is the total asserted SAP

7  amounts filed in the case.  And the bottom, the 31.9, is my

8  current estimate of the filed SAP components.

9  Q    And to get to that number, Mr. Folse, have you been working

10  with the claims team provided by AP services?

11  A    Yes.  We have about -- we have 10 Alex Partners personnel

12  that head up various claims resolution teams that have looked at

13  all 7400 of the filed SAP claims.

14  Q    And have you been working with employees of the debtors as

15  well?

16  A    Yes.  Just about everybody that's remaining with the

17  wholesale operation of the debtors have in one way or the other

18  for the last six months been involved in the claims resolution

19  process.  That probably represents over 200 different

20  individuals.

21  Q    And you have a ballpark estimate of the numbers of hours

22  that both the claims team as well as the debtors employees have

23  been presiding on this process?

24  A    Thousands, thousands.

25  Q    And have the claims team members reviewed each and every of

Folse - Direct/Huber                                    206

1  those 7400 claims?

2  A    Yes.  Of the filed SAP claims.

3  Q    All right.  Then returning to Exhibit 2 to your declaration

4  marked as trial Exhibit 9, we started with 2.1 billion, I believe

5  you testified.

6  A    That's correct.

7  Q    And of that amount, how many have been withdrawn?

8  A    How many claims?

9  Q    The aggregate amount of the claims, excuse me?

10 A    500 -- $1.58 billion have been -- I'm sorry, withdrawn?

11 Q    Correct.

12        THE COURT:  We don't need to go through every line

13 item.

14        MS. HUBER:  Very well, then.

15        THE COURT:  Just elaborate on -- I've read the

16 affidavit.  I've read the exhibits.

17        MS. HUBER:  Okay.  We'll move then, Your Honor, to the

18 $556 million figure.

19 Q    The question I think we're all trying to get an answer to is

20 how can we possibly go from 556 million down to 31 million.  So

21 we need your help, Mr. Folse, in explaining how we can come down

22 from there.

23 A    Sure.

24 Q    Starting with the 556, it appears that you're averring that

25 there will be a reduction of 173 million.  Why do you think

Folse - Direct/Huber                                    207

1  that's going to happen?

2  A    The 173 not transferred to the PCT all relates to claims of

3  reclamation claimants that through the plan of reorganization

4  will get handled by the RCT and as not a liability of the PCT.

5  Q    Are the claims that issued there, are those reclamation

6  claims?

7  A    They're reclamation claims and any other SAP claims filed by

8  reclamation claimants that per the plan are the liability of the

9  RCT.

10  Q    The next number is 37.4 million.  And that appears to relate

11  to satisfy by escrow funds.  What do you mean by that?

12  A    That is namely the PACA escrow and the FSA reserve escrow.

13  And in my opinion, there are adequate funds in both of those

14  escrows to pay any remaining claimants against those two escrows.

15  Q    Is the claims resolution team working on actually reducing

16  both of those reserves?

17  A    Yes.

18  Q    I believe you were in the courtroom earlier when there was

19  agenda Item 10 discussed before the Court.  It was addressed by a

20  gentleman on the phone.  And can you just provide some context as

21  for that settlement and how that's going to reduce that FSA

22  reserve?

23  A    I believe you're talking about the affiliated settlement?

24  Q    That is correct.

25  A    Once that settlement goes to closing, that will give us

Folse - Direct/Huber                                    208

1   approximately five and a half million dollars, I believe, out of

2   the FSA reserve.

3   Q    Moving then to the next item on Exhibit 2 to your

4   declaration, also identified as trial Exhibit 9, there's a number

5   of 170 million there.

6   A    Right.  Those are claims that based on the books and records

7   of the debtors, the debtors either feel -- believed that we have

8   no liability for that claim in the entirety.  Or we believe that

9   the SAP liability is significantly less and this 170 shows that

10  reduction.

11  Q    Does the $170 million figure also include the Wayne Berry

12  claim that the Judge has already indicated is estimated at

13  100,000?

14  A    Yes.  If you'll look under the estimated books and records

15  under the column entitled other administrative claims, there's an

16  $81.4 million number.  Of that $81.4 million reduction, 47.5

17  relates to the Wayne Berry reduction because we had it estimated

18  at a $500,000 claim.

19  Q    And the remainder of the $170 million that is summarized

20  here on the exhibit, is that premised on a claim-by-claim review?

21  A    Yes.  It's -- again, each of these 10 claims resolution

22  teams have reviewed each and every claim.  They reviewed the

23  actual proof of claim.  They reviewed the debtor's books and

24  records.  And for various reasons, we have not objected to these

25  claims.  The biggest reason is that a lot of these claims contain

Folse - Direct/Huber                                    209

1  an unsecured component.  And at this time, we're not ready to

2  object to that piece of the claim.  And per the local rules, we

3  need to bring all of those objections at one time.

4  Q    The next figure on Exhibit 2 is $60.8 million approximately.

5  Do you see that, Mr. Folse?

6  A    I do.

7  Q    And does that $60.8 million figure include claims that have

8  been asserted by surety bonds, assert priority status that would

9  otherwise apply to taxing authorities?

10 A    Yes.  I mean, that category in general is where we don't

11 believe that the creditors have any secured admin or priority

12 components of their claim.  There may be an unsecured component

13 to that claim.  The biggest piece of that is with the 37.6 you

14 see under the priority and property tax component that was

15 asserted by surety bonds.

16 Q    So, the claims team has taken into consideration Section

17 507(d) of the Code which prohibits subrogation of the taxing

18 authorities priority?

19 A    That's correct.

20 Q    Let's skip the next number and move down to the $56 million

21 figure.  Can you explain to the Court what that reduction relates

22 to?

23 A    Yes.  That reduction relates to claims -- this is the face

24 value of the claims that will be settled by cash payments prior

25 to the effective date.  And those cash payments have all be in