Folse - Direct/Huber                            210

1  the cash flows of the debtors up to the effective date.  I'm also

2  happy to report that I think as I sit here right now, all but 9

3  million has been paid.  We expect to pay another 8 plus million

4  this week.  And we estimate that there will be less than $800,000

5  left at the effective date.

6  Q    And are you working to get that evidence of payment to the

7  claims agent?

8  A    Yes, we are.

9  Q    The next number is $23.3 million.  Do you see that, Mr.

10 Folse?

11 A    Yes.

12 Q    And can you explain to the Court why it is reasonable to

13 expect that reduction to actually occur.

14 A    These all relate to tax claims where we have surety bonds to

15 cover those tax claims.

16 Q    Very well.  So sitting here today, what is your estimate of

17 filed SAP claims and the ultimate allowed amount of those filed

18 SAP claims?

19 A    Well, sitting here today, it will be a little bit less, but

20 as of the date on this exhibit, it's $31.9 million.

21        MS. HUBER:  Your Honor, at this time, I would just like

22 to explain how that $31 million figure from Exhibit 2 foots to

23 Exhibit 3A to the disclosure statement.

24        THE COURT:  Are you going to ask your witness or you

25 going to tell me?

**J&J COURT TRANSCRIBERS, INC.**

Folse - Direct/Huber                                  211

1    MS. HUBER:  No, I'm just telling you where I'm headed.

2    THE COURT:  Go ahead.

3    MS. HUBER:  Okay.

4  Q    Mr. Folse, if you could turn to Exhibit 1 to your

5  declaration which is known as trial Exhibit 8.  Do you have that

6  in front of you?

7  A    I do.

8  Q    Could you explain to the Court what the first column of this

9  Exhibit 8 means?

10  A    Well, the first column, the 144.6 is the number in the

11  disclosure statement, Exhibit 3A, the liabilities page.

12  Q    And is that your current estimate of ultimate SAP

13  liabilities that are being transferred to the PCT?

14  A    That was the estimate as of the last disclosure statement.

15  Q    What is your current estimate of SAP liabilities being

16  transferred to the PCT?

17  A    My current estimate is the fourth column, which is $139.5

18  million.

19  Q    Could you explain to the Court how you came to that $139

20  estimate?  Million dollar estimate, pardon me.

21  A    Yes.  Well, if you look at the second column, which is the

22  estimated SAP claims filed based on filed SAP claims, that's the

23  31.9 that we discussed from Exhibit 2.  The next column, the

24  third column from the left, the 107.5 are all of the other

25  potential valid claims where a proof of claim wasn't filed in

Folse - Direct/Huber                          212

1  this case.  Through the scrubbing of the books and records, we

2  came up with those numbers.  If you take the 31.9 and the 107.5,

3  you get the 139.5.  If you compare that to the 144.6 in the

4  disclosure statement, you get a difference or a reduction of 5.1

5  as of the date of my declaration.

6  Q    Mr. Folse, do you believe that your $139 million estimate is

7  generous in terms of the ultimate liabilities being transferred

8  to the PCT under the plan?

9  A    I think that we have -- yes.  I think there's cushion in

10 several areas.

11 Q    I would refer you to Exhibit 1, again, to your declaration

12 which is trial Exhibit 8.  And there's a footnote "F" as in Frank

13 there.  Can you explain what that means?

14 A    Yes.  Well, basically, if you look at the priority taxes

15 that were in the disclosure statement at a number of 20.25

16 million, the current estimate is 17.6 million in the fourth

17 column.  Of that 17.6, what the footnote indicates, is that we

18 have built in 2.3 million for interest per the plan.  And that

19 original interest calculation through the modifications that were

20 told to the Court earlier has approximately $500,000 in cushion

21 in that number.  The 4 million for taxes, which was an estimate

22 based in the other potential claims column, are for known and

23 unknown tax audits.  And we feel that that number is very

24 conservative on the high side to cover those tax audits.  And

25 then the 2.8 million for personal property tax audits are for

Folse - Direct/Huber                    213

1  know tax audits at their full face amount that we have not had --

2  we have not factored anything in for winning on any of those

3  personal property tax audits.  It's the fully loaded number.

4  Q    Thank you, Mr. Folse.  I believe you've also testified that

5  the FSA damage claim number which is listed here at 16.156 is

6  fully loaded to use your term.  But do you believe that the FSA

7  liabilities that will ultimately come in will approach that

8  figure?

9  A    No, I don't.  I am currently working on settlement

10 agreements with retailers that would remove approximately $10

11 million out of that number.  And we're working on settlement

12 agreements -- $10 million within the next two to eight weeks.

13 There's another $2 million that we're also working on in a little

14 bit longer of a time horizon.

15 Q    Focusing on the PACA and other line in this Exhibit 1 to

16 your declaration.  There's a figure there of $9.487 million.  Do

17 you think that the PACA liabilities will ultimately come to that

18 number?

19 A    No, I don't.

20 Q    Are you familiar with the June PACA report?

21 A    I am.

22 Q    And does that report show that there's only $9 million of

23 PACA unresolved claims out there?

24 A    I can't remember the exact number on that June report.  But

25 I know as we sit here today, there is $9 million left in

Folse - Direct/Huber                                                 214

1  liabilities under the PACA reserve.

2  Q    Thank you, Mr. Folse.  One other point that I would like to

3  clarify for the Court.  In this Exhibit 1, trial Exhibit 8,

4  there's a category marked as employee related claims.  Do you see

5  that?

6  A    I do.

7  Q    And there's -- the second column talks about estimated SAP

8  liabilities based on filed claims.  Does that title of column two

9  apply directly to the employee related claims?

10 A    This is the one category that is actually over-inclusive and

11 runs into the other potential valid claims category because of

12 the way we analyzed the employee claims.  There were over 3800

13 employee claims filed in this case.  What we did is we reviewed

14 each and every one of those 3800 employee claims to see what they

15 were claiming.  Whether they were claiming, you know, wages,

16 vacations, sick pay.  Based on that analysis of the 3800 claims,

17 we looked at all of the employees that we then thought we may

18 have liabilities based on those issues that were brought out in

19 those claims and recalculated our estimates.  So in other words,

20 the 8.2 million includes both filed and non-filed claims.

21 Q    Of the 3800 employee claims that have been filed, have you

22 settled the majority of them?

23 A    We have settled -- we have orders before this Court that

24 settled 2600 of them and we have settlement agreements in place

25 right now that settle considerably more of them.  I can't -- I'm

Folse - Cross/Hertzberg                    215

1  not sure exactly the exact number.

2  Q    So is it correct to say that the vast majority of the 8.2

3  million listed there in the second column of Exhibit 8 includes

4  potential but unfiled SAP claims by employees?

5  A    Yes.

6  Q    Mr. Folse, do members of your team review the docked in this

7  case on a regular basis to look for motions for administrative

8  claims?

9  A    Yes, they do.

10  Q    And have you resolved most of those motions for

11  administrative claims?

12  A    We have either resolved them or they are included in our

13  claims estimates.

14  Q    Do you have an idea as to generally how many such motions

15  have been filed?

16  A    This is just a guesstimate, but 30, 30 or 40, over the

17  course of the whole case.

18  Q    Out of a total of universe of 7400 claims would you say

19  that's a small amount?

20  A    I would definitely say that that's a small amount.

21         MS. HUBER:  That's all I have, Your Honor.

22         THE COURT:  All right.  Anybody wish to cross-examine

23  the witness?

24                    CROSS-EXAMINATION

25  BY MR. HERTZBERG:

Folse - Cross/Hogan                                216

1  Q    Mr. Folse, are you aware that KPMG is the financial advisor

2  to the Unsecured Creditors Committee?

3  A    Yes, I am.

4  Q    Have you met with KPMG and reviewed these numbers that

5  appear on Exhibit 8 and 9?

6  A    I met with them and reviewed similar numbers, it wasn't

7  exactly in this format, but yes.

8  Q    But you reviewed these SAP claims with KPMG personnel, is

9  that correct?

10  A    That's correct.

11  Q    Did you also meet with KPMG Pepper Hamilton in Milbank, in

12  New York on or about June 20th, 2004?

13  A    Yes.

14  Q    And what took place at that meeting?

15  A    We basically went through this whole process that I've

16  testified here today with -- the process of how we came up with

17  these estimates.

18  Q    Did you provide backup information to support that?  Those

19  numbers?

20  A    I believe at that time we had detailed reports that we gave

21  to everyone there.

22  Q    Thank you.

23                    CROSS-EXAMINATION

24  BY MR. HOGAN:

25  Q    Mr. Folse, are you aware that C&S has filed a request for an

217

1  administrative claim?

2  A    Yes.

3  Q    And is it customary that the purchaser, free and clear, will

4  file such a claim in a bankruptcy just prior to confirmation?

5  A    I couldn't comment on whether that's customary.  I don't

6  know if I've ever been in that situation before.

7  Q    Have you ever seen it before?

8  A    Not personally, no.

9  Q    Are you familiar with the indemnities related to C&S and Mr.

10  Berry?  Have you --

11  A    I am not familiar with those indemnities.

12  Q    Are the numbers that you've been giving here today, do they

13  consider any of the alleged right of indemnity that C&S may have

14  back toward the estates and the trusts, et cetera, of the

15  reorganized entity?  Are you considering any of those liabilities

16  in your numbers?

17  A    No, I'm not.

18  Q    Has anyone asked you to even take a look at it so that you

19  could testify today here what the potential exposure could be for

20  these entities?

21  A    No.

22         MR. HOGAN:  That's all.

23         THE COURT:  Okay.  Anything else?  Thank you.  You may

24  step down.

25               (Witness excused)

218

1          MR. HERTZBERG:  Your Honor, briefly and I believe we're
2    done with the witnesses now.  And I'd like to make brief comments
3    on some of the issues that were raised.

4          THE COURT:  Well, is the debtor done with its argument?
5    Since I rudely interrupted.

6          MR. SPRAYREGEN:  I hope you found that helpful so no
7    interruption apology necessary.  Your Honor, the -- I think I was
8    close to being done.  I was going to argue but I think it's maybe
9    very amply illustrated by the witnesses that, you know, these are
10   not numbers that we pulled out of the air.  There has been a
11   tremendous amount of work done by not only the debtors, the
12   debtors' professionals, but in close consultation with the
13   creditors committee and the creditors' professionals as to these.
14   Obviously, these were large numbers when we started with.
15   They're still somewhat large, but they've gone down a lot.  And I
16   hope the Court can see that there -- that the conclusions reached
17   are based upon hard detailed -- hard work and detailed analysis
18   of those claims.

19          And you know, I was going to note, I think somebody --
20   best evidence as to feasibility is the support of the plan by
21   numerous parties.  The -- obviously, it's our independent burden
22   to prove up feasibility and the fact that other parties support
23   us does not in and of itself demonstrate it, but you have many
24   parties here that would not really have much of an interest in
25   signing on to a claim that ultimately is not going to work.  And

1  a lot of people have studied whether this plan works and will

2  work for the long term in deciding whether they want to be part

3  of this capital structure going forward.  That includes our exit

4  financiers, it includes the current general unsecured creditors

5  who's position is being converted to the new equity of Core-Mark.

6  And obviously includes the RTC, who have been quite active, they

7  are constituents in this case, implicitly concluding, maybe

8  explicitly concluding that the assets and liabilities that go

9  into that trust are reasonably construed.  Otherwise, we wouldn't

10  have had the support for the plan that we do.  And the same thing

11  with respect to the various people who are going to be covered by

12  the PCT assets once they all run through.

13          So, I would ask the Court to take notice of that.  I

14  understand that's not dispositive, but I think it's quite

15  important because there's lots of people here throughout this

16  case that if they disagree with the debtors' conclusions on these

17  issues have not been shy about articulating those views.

18          So, Your Honor, with that, I would ask the Court to

19  confirm the plan.  I believe we've proved up each and every

20  element necessary to confirmation, in particular, the two issues

21  put in issue by Mr. Hogan of good faith and feasibility.

22  Obviously, I remain available to answer any further questions of

23  the Court.

24          THE COURT:  All right.  Thank you.  Let me hear from

25  the Committee.

1       MR. HERTZBERG:  Your Honor, I don't want to -- I want

2   to be brief.  The hour is getting late.  I just want to indicate

3   to the Court that as Mr. Sprayregen indicated, once this plan

4   goes effective, the unsecured creditors become the owner of Core-

5   Mark Newco.

6       As part of that process, we were concerned about the

7   same issues that you raised in regard to Exhibit 8 and 9.  Not

8   only do KPMG, Pepper Hamilton in Milbank were co-counsel to the

9   committee, met on several occasions with the debtor, reviewed

10  this information, had phone calls to go over it, and we are

11  satisfied that this plan is feasible.  And we would ask the Court

12  to confirm the plan.

13      It's been a very complicated case.  There's been

14  numerous factions involved with different issues that have been

15  settled over the past 16 months.  This was a very large company

16  that is hopefully going to be under a confirmed plan within 16

17  months of this filing with a healthy Core-Mark Newco coming out.

18  Thank you, Your Honor.

19      MR. HOGAN:  The Court's first question directed to Mr.

20  Riebeler, I still don't know what the answer was as to the effect

21  of the indemnities and the asset purchase agreement.  I went back

22  through the sections, Your Honor, and I still believe that 12.4

23  of the APA puts the burden, presently, not on the debtor, but on

24  C&S for any litigation going forward.

25      It's very clear in the subparagraph B of 12.4 regarding

Closing Argument/Hogan                            221

1  infringement.  The letter that has been put into evidence at 179,

2  and I believe it's in another document as well, that August

3  23rd --

4          THE COURT:  311.

5          MR. HOGAN:  311, thank you, Your Honor.  That letter,

6  to me is completely opposite to what's in the asset purchase

7  agreement.  It was stated, and I must admit, Your Honor, going

8  through the pieces of the APA, particularly the paragraph 13.3G,

9  Your Honor, I read it over and over again and I frankly don't get

10  it.  And that's maybe my problem, but I just don't think it's --

11  it can be harmonized.  The letter is giving the debtor an open-

12  ended responsibility, seemingly going on forever, regarding the

13  use -- future use of Mr. Berry's technology.

14          Jumping to the good faith issue, Your Honor, and the

15  idea that the plan is being proposed for -- by a means forbidden

16  by law, this contemplates ongoing infringement for money, at

17  least it's going to pay someone to do it.  And I'd say, Your

18  Honor, that is --

19          THE COURT:  How is that in the plan?

20          MR. HOGAN:  Well, this document, Your Honor, which is

21  311, is now becoming an operative document in this proceeding in

22  which is going to apply to the obligations of the reorganized

23  entity going forward that Mr. Berry is a pre-petition creditor,

24  an administrative creditor, is going to be fighting a battle

25  conceivably for the rest of his life to protect his intellectual

Closing Argument/Hogan                                222

1 property that is now being funded through the reorganized entity.

2            THE COURT:  No if it's not an indemnified claim.

3            MR. HOGAN:  But it appears that this letter would say

4 that it is indemnified.  And that's --

5            THE COURT:  The debtor has stated that it's not

6 inconsistent with the asset purchase agreement.

7            MR. HOGAN:  Well, I'm just saying for the record, Your

8 Honor, I disagree with the debtor and I believe that the

9 documents speak for themselves.  I won't go into it any further.

10           THE COURT:  All right.

11           MR. HOGAN:  As to whether the plan has been proposed in

12 good faith, Your Honor, I remember when this case started reading

13 a lot of cases about intellectual property, particularly cases

14 out of this Court in which it was fairly clear that you couldn't

15 transfer intellectual property rights of a debtor, by a debtor of

16 an owner of copyrights without their consent.

17           And I would say, Your Honor, that I -- unfortunately, I

18 look at the plan as having done that although I believe that

19 there is --

20           THE COURT:  You say the plan.  The plan didn't do it.

21           MR. HOGAN:  Well, it will be --

22           THE COURT:  Where in the plan does it say that the

23 debtor is transferring any intellectual property rights of you or

24 anybody else against the consent of the owner?

25           MR. HOGAN:  Well, Your Honor, I'll just say that I

Closing Argument/Hogan                     223

1  think it will be over for Mr. Berry one way or another with
2  Fleming and that they would have been able to transfer, not sell,
3  Your Honor, and I think -- I understand that we're splitting
4  words here, but the copyright --
5          THE COURT:  I'm referring to the plan.  The plan does
6  not provide for any transfer of the software either.
7          MR. HOGAN:  But to the extent that this obligation, the
8  obligation that is -- to C&S to continue to essentially assist
9  them in defending themselves from Mr. Berry will be both a -- it
10 will be a liability of the reorganized entities going forward.
11 They will be a managing litigation --
12         THE COURT:  I understand that argument, but you're
13 saying the plan provides for a transfer of intellectual property
14 contrary to Third Circuit law, Western Electronics and other
15 cases.
16         MR. HOGAN:  No.  Well, I'm saying the effect of the
17 plan, Your Honor, whether it's in the document or otherwise.
18 That the plan will have made it a completed act.  And I -- it is
19 true, Your Honor, that noone --
20         THE COURT:  That's what I'm --
21         MR. HOGAN:  -- noone has written down, we intend to
22 commit criminal infringement.  It's not here, Your Honor.  But to
23 look through the substance of this rather than the form of what
24 is being done.
25         THE COURT:  If they do, you have a claim.

224

1          MR. HOGAN:  Yes, I'm aware of that, Your Honor.  And

2   that I've had the claim for years.  And I would have hoped that

3   it would have ended in the bankruptcy court, but it isn't going

4   to end here, Your Honor.  I'd ask, at least, if the Court's going

5   to rule on the stay, at least before entering the order of

6   confirmation as some of the terms of the plan to be effective,

7   that it would be necessary to do.  Thank you, Your Honor.

8          THE COURT:  All right.

9          MR. FRIEDMAN:  Your Honor, Mark Friedman, Piper Rurnick

10  on behalf of the Official Committee of Reclamation Creditors.

11  The OCRC supports confirmation of the plan as the plan

12  incorporates the so-called revised term sheet which is the

13  agreement for the treatment of reclamation claims that was

14  negotiated by the debtors, the Unsecured Creditors Committee and

15  the OCRC on behalf of reclamation claimants and I think the

16  support by reclamation claimants has been echoed through their

17  balloting.  So again, we support confirmation.

18         THE COURT:  Okay.  Anybody else?  Thank you.  All

19  right.  Well, I am prepared based on the testimony and other

20  evidence presented by the debtor to confirm the plan.  I am now

21  satisfied that it is feasible based on the additional testimony

22  regarding the estimation of the administrative and other priority

23  claims that must be paid under the provisions of Section 1129.

24         I accept the debtor's statement that the

25  indemnification letter with C&S did not modify the asset purchase

1  agreement and therefore I'm satisfied that the plan is feasible

2  not withstanding that side letter.

3         I think with respect to the allegations of lack of good

4  faith, the only objection is that of Mr. Berry and I don't find a

5  lack of good faith here.  I find, as I stated earlier, that there

6  was no transfer of the software authorized, approved under the

7  asset purchase agreement.  And the plan does not itself provide

8  for any transfer of the intellectual property contrary to Third

9  Circuit law.

10        That said, I think that the issue, as I said

11  previously, of any claim that Mr. Berry may have against --

12  certainly against C&S is not within my jurisdiction, but as

13  against the debtor, I am satisfied to let another court decide

14  that issue.  And notwithstanding any injunction provisions of the

15  plan to permit the post-petition infringement action to proceed

16  in the court in which it was filed.

17        With respect to the pre-petition, I did review the

18  debtor's supplemental brief, but I'm still not satisfied that

19  there's any reason why I should not grant relief from the stay to

20  permit that case to conclude to the extent it's simply to enter

21  final judgment and will have liquidated the pre-petition claim to

22  the extent it sought an injunction.  I'm not satisfied it's

23  contrary to -- certainly not contrary to the plan.  And I don't

24  see any reason why that should not proceed.  I really think it's

25  -- it may or may not be encompassed by the second complaint, but

226

1  I will allow the state court -- excuse me, the courts in Hawaii

2  to decide that.

3          So I will grant relief from the stay as to both the

4  pre-petition claim and reconfirm that under Title 28 Section 959

5  the post-petition action may proceed and will specifically

6  exclude that from any injunction in the plan to the extent it

7  seeks to stop any action based on pre-confirmation post-petition

8  activity.  I think it should be resolved by the whatever amended

9  complaint we're up to filed by Mr. Berry.

10         MR. LIEBELER:  Just to clarify the ruling, Your Honor,

11  if you're lifting the stay in the pre-petition litigation --

12         THE COURT:  Yes.

13         MR. LIEBELER:  -- to let it proceed from where it was

14  because there were post-trial motions in play at that time.

15         THE COURT:  Yes.

16         MR. LIEBELER:  I want to make sure that record's clear.

17         THE COURT:  Yes.  Just so it's clear, the debtor's also

18  permitted to proceed with any post-trial proceedings.

19         MR. LIEBELER:  Thank you, Your Honor.

20         THE COURT:  Since the stay does not affect the debtor.

21         MR. SPRAYREGEN:  Your Honor, as I noted at the outset,

22  at the right time, we did have two stipulations that went with

23  proposed confirmation; one from CHEP and one from Jackson Capital

24  that I had handed up earlier.  And then I do have, and I'm not

25  sure if the Court wants to go through this now or how you want to

227

1  proceed.  I do have redlined pages only of --

2          THE COURT:  Give me the names of the two stipulations

3  you handed up so I don't lose them.

4          MR. SPRAYREGEN:  CHEP, C-H-E-P and Jackson Capital.

5  And there's those two things.  There's the proposed estimation

6  order was attached to the motion, or we can hand one up.  It

7  obviously needs a number filled in.  And then there's the

8  proposed confirmation order.  And I have, if the Court would like

9  me to approach, I can show you just the redlined pages from the

10 plan that was attached to the disclosure statement from May 28th,

11 the changes that really encompass everything we've talked about

12 today.  And then the changes to the confirmation order from the

13 one that was filed on July 16th.  If I may approach.

14         THE COURT:  You may.

15         MR. SPRAYREGEN:  Your Honor, the senior secured

16 creditors, the current ones, asked me to clarify something, too.

17 There had been some of the vestige from previous activities in

18 the case, some language concerning potential assignment of their

19 liens to the new exit lenders.

20         THE COURT:  Yes.

21         MR. SPRAYREGEN:  As distinct from a termination of the

22 liens.  I think all the parties have conferred and agreed that

23 the consignment concept is kind of an anachronism and that's been

24 deleted and we're talking about termination on full payment of

25 the current senior lenders and new liens for new loans by the

228

1  exit lenders.

2         THE COURT:  Good.

3         MR. SPRAYREGEN:  I'm happy to go through the changes

4  although they're fairly self-evident.  There are not that many.

5  So we only attached the actual pages, whatever changes.  I'm not

6  sure how the Court would want to proceed, if you want to thumb

7  through it or if you want me to explain the changes?

8         THE COURT:  On the plan you mean?

9         MR. SPRAYREGEN:  Yes.

10        THE COURT:  Well, to the extent they're resolving

11 specific objections, I don't need you to do that.  Are there any

12 other changes?

13        MR. SPRAYREGEN:  The only changes went to resolving

14 specific objections.  None of them were done without a party's

15 agreement and none of those changes would affect in a detrimental

16 way any other party that's not party to the deal.

17        THE COURT:  Okay.

18        MR. SPRAYREGEN:  For that particular resolution, I'm

19 sorry.  I'm just thumbing through myself to see if there's

20 anything in particular to point out to the Court.

21                     (Pause)

22        THE COURT:  Does the exculpation clauses amended now

23 conform with the Bruno's exculpation?

24        MR. SPRAYREGEN:  Yes.  We discussed that with the U.S.

25 Trustee and there was added a carve-out for gross negligence and

229

1  willful misconduct.  Or willful misconduct, actually, not and.

2          THE COURT:  All right.  Does anybody else wish to be

3  heard with respect to the modifications to the plan or the order

4  -- proposed order confirming the plan?

5          MR. HOGAN:  Judge, just -- Timothy Hogan just briefly,

6  Your Honor.  The plan -- I appreciate the Court's ruling on the

7  stay lift, but just a question of whether the Court needs to

8  enter the order prior to confirming the plan.  Under the terms of

9  the plan, it seems to say that.  I don't know if that timing is

10 that important to anyone?  I don't -- but it would be important

11 to us if it were raised later that it wasn't signed.

12         MR. LIEBELER:  I actually have a copy of the summation

13 order.  I don't think it's quite right and I wanted to do it

14 under cert of counsel and we could have it in tomorrow.

15         THE COURT:  I think he's talking about the relief from

16 stay order.

17         MR. HOGAN:  I'm just talking about the stay.

18         MR. LIEBELER:  Oh, that one.

19         MR. HOGAN:  That one can, as far as I'm concerned, can,

20 you know, whenever it is submitted is fine.  It's the stay one,

21 Your Honor.  I --

22         THE COURT:  Well, to the extent I need to, I can so

23 order the record on that.

24         MR. HOGAN:  Thank you, Your Honor.

25         THE COURT:  And then --

230

1        MR. LIEBELER:  Judge, we don't have any objection to
2   timing.  If Mr. Hogan wants to tee up the motion in Hawaii
3   tomorrow, we'll deal with it then.  I mean, that's fine.  We
4   don't have an issue with him proceeding as soon as he can.

5        THE COURT:  I don't think he actually teed up any
6   motion.

7        MR. HOGAN:  But there's --

8        THE COURT:  Just present the form of order.

9        MR. HOGAN:  There was an order submitted with the
10  motion, Your Honor.  If the parties would rather submit a revised
11  form, I can do that.  I've got a copy of it.

12       THE COURT:  Do you have a copy of it?  Show it to
13  counsel and --

14       MR. SPRAYREGEN:  Your Honor, while he's looking at
15  that, I can probably take care of a couple of points.  The -- in
16  looking at the estimation order, given the passage of time,
17  there's a few things that may have changed.  So if we could
18  submit that under certificate of counsel, I think we can clean it
19  up.

20        THE COURT:  That's fine.

21       MR. SPRAYREGEN:  Also, I was asked to clarify for C&S
22  that there's -- Exhibit B to the proposed confirmation order,
23  which I'll hand up in a moment, that Exhibit B is the assumption
24  schedule and it had a provision in it concerning which contracts
25  are assumed and -- I'm just looking at the note, so excuse me for

231

1  a moment --

2         THE COURT:  Maybe counsel for C&S can assist?

3         MR. COBB:  Your Honor, Richard Cobb on behalf of C&S,

4  Your Honor.  Very briefly.  There appears -- there maybe some

5  confusion with respect to just a few of the assumed contracts.

6  C&S has taken the position that some of those contracts may have

7  been sold to C&S, the designation rights sold.  Debtors, I

8  believe, think differently.  There's a -- we're going to try to

9  work that out.  And if we can't work it out, we'll talk to Your

10 Honor at the next omnibus hearing.  But there's a provision in

11 the plan that we -- we're comfortable that the debtors and C&S

12 have the ability to either work it out or agree to disagree and

13 we'll come back and talk about on the 17th.  It's just a few

14 contracts.

15        THE COURT:  Is there going to be any schedule attached

16 to the proposed order?

17        MR. COBB:  Yes, Your Honor.

18        THE COURT:  And that may or may not be the ones you

19 agree to?  Or is that the ones that you agree to and the ones you

20 don't agree to are not --

21        MR. COBB:  Included in that schedule, Your Honor, there

22 are a few contracts that are up in the air at this point.

23 They're listed on our list of contracts that are acquired assets.

24        MR. SPRAYREGEN:  I think what we're saying, Your Honor,

25 is for the debtor, we think the list is correct.  C&S has some

232

1  views that it may not be.  To the extent you enter the order and

2  we confirm good faith and decide there needs to be a change, we

3  would ask for a side amendment.  We don't know if that will be

4  necessary or not.

5          THE COURT:  All right.

6          MR. SPRAYREGEN:  So --

7          THE COURT:  Okay.

8          MR. SPRAYREGEN:  The other item, Your Honor, is we do

9  have a pending motion concerning the timeliness of Mr. Berry's

10 administrative claim.  We don't see any reason to deal with that

11 right now.  We've not waiving that point, but we can deal with

12 some other day and continue that motion.

13         And I also wanted to remind the Court that the Sanctity

14 PUT agreement is -- was also on the agenda, but that's contained

15 in the -- the approval's --

16         THE COURT:  It's in the confirmation order.

17         MR. SPRAYREGEN:  Correct.  So if I might approach.

18         THE COURT:  You may.  All right.  Then I will enter the

19 order confirming the third amended revised plan.

20         MR. SPRAYREGEN:  Thank you, Your Honor.

21         THE COURT:  You have your relief from stay order?

22         MR. HOGAN:  Yes, I do.  May I approach, Your Honor?

23         THE COURT:  What is the docket number of the motion?

24         MR. HOGAN:  I have 8471 --

25         THE COURT:  I'll assume that's correct.  And I'll enter

233

1  that order as well.

2          MR. SPRAYREGEN:  Your Honor, I would like to stress my

3  appreciation on behalf of the debtors and the professionals for

4  the Court's and the Court's personnel's attention to this case

5  the last 16 months.  I know it's been a difficult case.  And

6  pleased to be here at confirmation today and we appreciate all of

7  the Court's attention to it.

8          THE COURT:  No more pleased than I am.

9                      (Laughter)

10         MR. SPRAYREGEN:  Thank you, Your Honor.

11         THE COURT:  Thank you.  We'll stand adjourn.  Thank

12  you.

13         (Whereupon, the proceedings in the

14         above-entitled matter were adjourned.)

15                      --o0o--

16

17

18

19

20

21

22

23

24

25

234

CERTIFICATE

1
2
3          I certify that the foregoing is a correct transcript,
4   from the electronic sound recording of the proceedings in the
5   above-entitled matter.
6
7
8   _Susan Holcomb_ _____ August 3, 2004
9   Susan Holcomb, Transcriber
10  AAERT Cert. No. D-273