# Exhibit 3

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 2 1 2005

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen,<br><br>            Plaintiff,<br><br>      vs.<br><br>HAWAII EXPRESS SERVICE, INC., a California corporation; et al.<br><br>            Defendants. | Civ. No. 03-00385 SOM/LEK<br><br>ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; ORDER AFFIRMING MAGISTRATE JUDGE'S ADOPTION OF DISCOVERY MASTER'S ORDER REGARDING F-1 PROGRAM MATERIALS |

ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT;
ORDER AFFIRMING MAGISTRATE JUDGE'S ADOPTION OF
DISCOVERY MASTER'S ORDER REGARDING F-1 PROGRAM MATERIALS

I.       INTRODUCTION.

This court has previously found Defendant Post Confirmation Trust[1] and Defendants Mark Dillon, Teresa Noa, Melvin Ponce, Sonia Purdy, Justin Fukumoto, Alfredda Waiolama, and Jacqueline Rio (collectively, "Employees")[2] liable to Plaintiff Wayne Berry for direct infringement from April 1, 2003, through June 9, 2003.[3] In the latest of a string of motions,

---

[1] As noted in this court's June 27, 2005, order, Post Confirmation Trust represents the interests of Fleming Companies, Inc., and is therefore referred to as "Fleming."

[2] Employees and Fleming are collectively referred to as "Defendants."

[3] The court amends its earlier finding that direct infringement commenced on March 7, 2003. In a previous hearing, the court had raised the issue of the commencement date, and Defendants had relied on the March 7, 2003, date, which was less advantageous to them than the alternative of April 1, 2003. Defendants now point out that Berry's own Second Amended Verified

Defendants now move for summary judgment regarding damages related to the direct infringement claim.

Defendants argue that Berry is not entitled to an award for actual damages or profits under 17 U.S.C. § 504(b) because he cannot establish a causal connection between such damages or profits and the infringement. Alternatively, Defendants argue that an award under § 504(b) should be limited to $16,800 in actual damages. Fleming additionally asserts that Berry is not entitled to recover Fleming' profits because Fleming was not profitable during the infringement period. Employees, for their part, contend that, because they did not financially benefit from the infringement, they are not liable for any profits.

Defendants argue that, if Berry elects to seek statutory damages under § 504(c), he is limited to, at most, one award of $30,000. Fleming also moves for summary judgment as to Berry's claim for vicarious copyright infringement.

Because Berry establishes a genuine issue of material fact as to the causal connection between actual damages or profits and the infringement, the court denies Defendants' motions for summary judgment. The case will proceed to trial as scheduled regarding: (1) the causal connection between the infringement and Berry's alleged actual damages or Fleming's

---

Complaint uses the April 1 date, and the court now uses April 1, 2003, as the commencement date for such direct infringement by Defendants. See 2d Am. Verified Complaint ¶¶ 16, 57, 66.

alleged profits or benefits; (2) the amount, if any, of Berry's actual damages and Fleming's profits or benefits allegedly attributable to the infringement; and (3) the issue of whether Fleming is liable for vicarious copyright infringement. The court's reference to Fleming's (rather than Defendants') alleged profits or benefits is deliberate. Berry may not proceed with claims against Employees for profits or benefits. Any recovery Berry has against Employees under § 504(b), assuming Berry establishes the requisite causation, is limited to Berry's actual damages.

Also before this court is Berry's Statement of Appeal ("Appeal") from Magistrate Judge Leslie E. Kobayashi's order adopting the Discovery Master's Order Denying Plaintiff's Request for F-1 Program Materials ("Discovery Master's F-1 Order"). Berry contends that Fleming planned to use something called the "F-1" computer program as a replacement for Berry's software. Berry says that he needs the F-1 materials to establish a causal connection between actual damages or profits and the infringing conduct, as required under § 504(b). Because Berry does not establish that the magistrate judge clearly erred in adopting the Discovery Master's F-1 Order, the court affirms the magistrate judge.



II.        APPEAL OF DISCOVERY ORDER.

The court begins by addressing the appeal relating to the Discovery Master's F-1 Order.

Berry brought the discovery dispute before the Discovery Master with a letter arguing that he needed discovery of "the F-1 materials," which Berry said were "directly relevant to the issue of causation regarding Mr. Berry's damages." Ex. 3 at 1 (attached to Appeal). Berry explained:

> To summarize, in the spring of 2001, Fleming engaged the services of Ernst & Young through it [sic] subsidiary CAP Gemini to create a company wide automation system that was referred to as "F-1." Attached as Exhibits "C" and "D" are copies of conference call notes of Ernst & Young that were produced by Guidance Software in the After Images. I have printed the pdf files' internal notation evidencing the author. The email thread, Exhibit "A" at page at page [sic] 2 is a red line comparison of the two versions of these notes. Exhibit "C" appears to be the "Revised" version. I recently discovered that these were not deleted when I scrubbed all but a few of the Guidance After files from my computer on July 20, 2005 as I had so informed Fleming and the Master. <u>These files clearly evidence that Fleming was going to reverse engineer and/or copy Mr. Berry's FCS 1993. Relevant to the present case, this system was going to become a integral part of the Fleming F-1 solution.</u> We have evidence in the Guidance file listings that SAP was running in the Fleming Hawaii freight operations. <u>See</u> Exhibit "E."

Ex. 3 at 1 (attached to Appeal) (emphasis added).

Further correspondence by Fleming and Berry followed, and the Discovery Master ruled:

4

1.   <u>Plaintiff's request is denied because
     the request does not appear to be
     reasonably calculated to lead to the
     discovery of admissible evidence
     relevant to the issue of damages for the
     period April 1, 2003 - June 9, 2003.</u>

2.   The denial is without prejudice, and
     Plaintiff will be permitted to renew his
     request, with additional information
     tending to show (1) that the F-1 project
     was operational, (2) that it was used by
     Fleming during the relevant time period,
     (3) that the Berry Freight Control
     System was incorporated into the F-1
     project, and (4) how the F-1 project is
     relevant to the issue of damages for the
     period from April 1, 2003 - June 9,
     2003.

3.   Plaintiff's request for sanctions is denied.

4.   [Fleming's] request for sanctions is
     granted.  Plaintiff shall, no later than
     September 15, 2005, reimburse [Fleming]
     $1,200.00 for the fees incurred by
     [Fleming] in addressing Plaintiff's
     request, which did not sufficiently
     include the information noted in Order
     No. 2 above.  Such information is
     necessary to address Plaintiff's
     request.  A request absent such
     necessary information, therefore,
     resulted in a waste of time and effort.

Ex. 1 at 3 (attached to Appeal) (emphasis added).

The magistrate judge "decline[d] to review this matter
and instead adopt[ed] the Special Master's Order," <u>see</u> Ex. 2 at 1
(attached to Appeal), and Berry timely filed the present appeal.

Under 28 U.S.C. § 636(b)(1) and Local Rule 74.1, a
district court may set aside a magistrate judge's order regarding
any nondispositive pretrial matter (except those motions

delineated in Local Rule 72.4(a)) only if that order is clearly
erroneous or contrary to law. See also Bhan v. NME Hosps., Inc.,
929 F.2d 1404, 1414-15 (9th Cir. 1991). The threshold of the
"clearly erroneous" test is high. United States v. U.S. Gypsum
Co., 333 U.S. 364, 395 (1948) (stating that "[a] finding is
'clearly erroneous' when although there is evidence to support
it, the reviewing court on the entire evidence is left with the
definite and firm conviction that a mistake has been committed");
Thorp v. Kepoo, 100 F. Supp. 2d 1258, 1260 (D. Haw. 2000) (noting
that the clearly erroneous standard is "significantly
deferential, requiring a definite and firm conviction that a
mistake has been committed").

        The "clearly erroneous" standard on appeal applies to
both the discovery ruling and the sanction ruling, as both are
nondispositive matters. Osband v. Woodford, 290 F.3d 1036, 1041
(9th Cir. 2002) (noting that a district court "applies the
'clearly erroneous' standard of review on appeal of a
'non-dispositive pretrial motion such as a discovery motion'"
(quoting Brown v. Wesley's Quaker Maid, Inc., 771 F.2d 952, 954
(6th Cir. 1985)); Bhan, 929 F.2d at 1414 ("[n]ondispositive
issues include discovery sanctions" (citations omitted)); see
also 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a) (noting that
a magistrate judge's determination of nondispositive pretrial
matters are reviewed under the clearly erroneous standard).

                              6

Because the magistrate judge adopted the Discovery Master's F-1 Order without articulating any substantive analysis, Berry challenges the underlying Discovery Master's reasons for denying Berry's request for discovery. Specifically, Berry argues that, contrary to the Discovery Master's conclusion that Berry failed to provide information in four categories, "all of the relevant information was supplied to the Master." Appeal at 6. However, the court affirms the magistrate judge because Berry does not establish that the F-1 materials are relevant to damages or profits attributable to the infringement.

Even if Berry did proffer evidence that the F-1 program was operational, that it was used by Fleming during the relevant time period, and that Berry's software was incorporated into the F-1 program, Berry has not established that the F-1 materials he seeks to discover are likely to contain evidence relevant to the issues of causation and damages for the period in issue (April 1, 2003, to June 9, 2003). Berry speculates that the F-1 materials will explain why Fleming chose to continue its use of the infringing software rather than to use the F-1 program. He further guesses that Fleming continued to use his software because it made Fleming more profitable. However, even if the F-1 materials do show that Fleming chose in 2001 not to replace Berry's software because that software made Fleming more profitable at that time, Berry does not even allege that the F-1

7

materials will reflect how Berry's software made Fleming more profitable in 2003.  Nor does Berry explain how the F-1 materials will otherwise establish a causal nexus between Defendants' infringement in 2003 and damages or profits attributable to that infringement.

This court is well aware that Berry, not having seen the F-1 materials, cannot be precise as to their content.  But Berry does not make even a plausible argument as to how the anticipated content of those materials will somehow relate to the time period in issue here.  He does not meet his burden of showing the relevance of the F-1 materials.  See Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  The magistrate judge did not clearly err in adopting the Discovery Master's F-1 Order denying discovery of the F-1 materials.

With respect to the Discovery Master's sanction of $1200, Rule 53(c) of the Federal Rules of Civil Procedure authorizes discovery masters "to impose upon a party any noncontempt sanction provided by Rule 37 or 45."  Fed. R. Civ. P. 53(c).  In turn, Rule 37(a)(4)(B) provides that, "[i]f the motion [compelling disclosure or discovery] is denied, the court . . . shall, after affording an opportunity to be heard, require

8

the moving party . . . to pay to the [opposing] party . . . the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(4)(B). Because the Discovery Master found Berry's request not substantially justified and an award of sanctions against Berry just, the Discovery Master was authorized to impose sanctions against Berry in the amount of Fleming's reasonable expenses. See Fed. R. Civ. Proc. 37 and 53. The Discovery Master's sanction of $1200, which reflected Fleming's fees incurred in opposing Berry's request, is reasonable in light of the time Fleming was forced to spend disputing Berry's claim to discovery of the F-1 materials. The magistrate judge did not clearly err in adopting the sanction ruling.

Berry asks this court to "enter a final partial judgment and permit Mr. Berry to appeal this issue to the Court of Appeals." Appeal at 12. However, discovery sanctions against parties are interlocutory and thus nonappealable. See Johnny Pflocks, Inc. v. Firestone Tire & Rubber Co., 634 F.2d 1215, 1216 (9th Cir. 1980) ("Discovery orders and sanctions in the nature of civil penalties are normally deemed interlocutory and thus nonappealable by the parties. Courts have created narrow exceptions to this rule for orders dismissing actions, granting

default judgments, and for some orders affecting nonparties."
(citations omitted)); see also Algeran, Inc. v. Advance Ross
Corp., 759 F.2d 1421, 1425 (9th Cir. 1985) (noting that parties
against whom sanctions are imposed "must await final judgment in
order to appeal from such orders." (citing Johnny Pflocks, Inc.,
634 F.2d at 1216)).  To protect Berry from having to pay any
sanction before appellate review, the court modifies the time by
which the sanction must be paid.  The Discovery Master ordered
the sanction to be paid by September 15, 2005.  This court
extends the time by which the sanction must be paid and allows
the sanction to be paid at any time on or before the later of (a)
thirty days from entry of judgment on all matters in this case or
(b) the filing by Berry of a notice of appeal from the judgment
entered in this case.

The affirmance of the magistrate judge's adoption of
the Discovery Master's F-1 Order renders moot Berry's request for
a continuance of the hearing on the summary judgment motions
under Rule 56(f) of the Federal Rules of Civil Procedure.

III.     DAMAGE CLAIMS UNDER § 504(b).

The court turns now to the summary judgment motions
before it.  The court incorporates by reference the legal
standard in its order of June 27, 2005.  The court also
incorporates the factual discussion set forth in its earlier

10

orders, as amended in this order, and supplements that discussion with the facts set forth below.

A copyright infringer is liable, under § 504(b), for "the copyright owner's actual damages and any additional profits of the infringer" resulting from the infringement, or, under § 504(c), for "statutory damages." <u>See</u> 17 U.S.C. § 504. As Berry establishes an issue of fact as to whether Defendants' infringement caused Berry to suffer actual damages or Defendants to receive additional profits, the court denies Defendants' motions for summary judgment. However, the court concludes that, even if the jury finds the requisite causal connection, Berry may not recover profits from Employees and is instead limited, in terms of recovery from Employees, to his own actual damages.

> A.  Berry Raises a Question of Fact as To Whether Defendants' Infringement Is Causally Connected to Berry's Actual Damages or Fleming's Profits or Benefits.

Defendants assert that, because Berry does not establish an issue of fact as to the causal connection between Defendants' infringement and Berry's actual damages or Defendants' profits, Berry is not entitled to monetary relief under § 504(b). The court disagrees.

Section 504(b) provides:

> **Actual Damages and Profits.**--The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the

11

> infringement and are not taken into account
> in computing the actual damages. In
> establishing the infringer's profits, the
> copyright owner is required to present proof
> only of the infringer's gross revenue, and
> the infringer is required to prove his or her
> deductible expenses and the elements of
> profit attributable to factors other than the
> copyrighted work.

17 U.S.C. § 504(b). In § 504(b), "Congress explicitly provides

for two distinct monetary remedies--actual damages and recovery

of wrongful profits." Polar Bear Prods., Inc. v. Timex Corp.,

384 F.3d 700, 707-08 (9th Cir. 2004). "These remedies are two

sides of the damages coin--the copyright holder's losses and the

infringer's gains." Id. at 708.

"Under § 504(b), actual damages must be suffered 'as a

result of the infringement,' and recoverable profits must be

'attributable to the infringement.'" Id. Therefore, the Ninth

Circuit says that "a causal link between the infringement and the

monetary remedy sought is a predicate to recovery of both actual

damages and profits." Id. This causal nexus may not be based on

undue speculation. Id. at 709-10; see also Mackie v. Reiser, 296

F.3d 909, 914 (9th Cir. 2002) (noting that "a district court

could preclude 'recovery of a defendant's profits if they are

only remotely or speculatively attributable to the

infringement'").

Berry says he is entitled to go to trial to establish

causation based on evidence that Fleming's operations would not

12

have survived without Defendants' use of the infringing software
and evidence that, because the only software used by Defendants
during the relevant time period was the infringing software, the
infringement necessarily caused all of Berry's damages and
Fleming's profits.

As an initial matter, Fleming asserts that Berry must
"demonstrate that any Fleming Hawaii profits stemmed from the
infringing modifications to his software, not just from the
software itself." Fleming Reply at 2. Fleming relies on Mackie,
296 F.3d at 916, for this proposition. Fleming Reply at 3-4. In
that case, Bonnie Rieser incorporated scanned images of Jack
Mackie's artwork into a collage featured on the twelfth page of a
twenty-four-page promotional brochure for the Seattle Symphony
Orchestra Public Benefit Corporation ("Symphony"). Mackie, 296
F.3d at 912. Mackie sued the Symphony and Reiser for copyright
infringement, and the district court granted summary judgment
against Mackie on the issue of indirect profits. The district
court reasoned that Mackie had failed to demonstrate a tangible
nexus between the infringing use of Mackie's artwork and the
Symphony's revenues, and, alternatively, that any computation of
damages was too speculative to survive a summary judgment motion.
Id. at 911.

On appeal, the Ninth Circuit affirmed, noting that it
agreed with Mackie's own expert, who stated that it was

13

impossible to establish a causal link between the infringing use of Mackie's artwork and the Symphony's revenues generated through the inclusion of Reiser's collage in the brochure. Id. at 916. The Ninth Circuit stated that any causal link would be difficult to establish because it would be necessary to "determine how many [people] subscribed because of Reiser's work . . . [, which was] but one page in a multi-page brochure that advertised a series of concerts that were unrelated to the artwork itself." Id. (emphasis in original). Therefore, the court concluded that Mackie did not "proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement." See id. at 916.

Under Mackie, Berry must show a causal link "between the infringement and the profits generated indirectly from [that] infringement." See id. Because Defendants' infringement was the use of the infringing software as a whole, Berry need only show a causal nexus between Defendants' use of the infringing software and Fleming's indirect profits. See Polar Bear, 384 F.3d at 703 (reiterating the principle that "a plaintiff in a copyright infringement action must establish a sufficient causal connection between the infringement and the infringer's profits it seeks to recover."). Mackie does not suggest that Berry must, as argued by Fleming, show a causal relationship between Fleming's profits

14

and Defendants' use of the few infringing modifications made to Berry's copyrighted software.

In arguing that there are triable issues as to causation, Berry refers in particular to the following six items of evidence: (1) testimony by Dillon, which Berry construes as an admission that, "without the use of freight tracking software, the Logistics Department would be out of business," Opp. to Fleming Mem. at 11, 34 (citing attached Ex. 7); Opp. to Employees Mem. at 9, 23 (citing attached Ex. 7); (2) an opinion by Berry's damage expert, Thomas T. Ueno, "that the Berry system was an integral part of the Fleming operations, such that it could not have remained a viable business without it," Opp. to Fleming Mem. at 10-11 (citing Ex. B (attached to Fleming Mem.)); Opp. to Employees Mem. at 8; (3) an alleged admission by Noa to Berry that, "without the Berry FCS, Fleming would be forced to . . . fire all its logistics department employees," Opp. to Fleming Mem. at 17, 34 (citing Berry Decl. ¶¶ 3-9, 11); Opp. to Employees Mem. at 23 (citing Berry Decl. ¶ 11); (4) Fleming's alleged belief that it had no option "other than to use the Berry system," Opp. to Fleming Mem. at 12 (citing attached Ex. 4); (5) statements by Ernst & Young that Berry construes as an admission on behalf of Fleming "that the Berry system was so critical [sic] component of the Fleming profitability that its 'functionality . . . must be reproduced by F-1,'" Opp. to Fleming Mem. at 12, 15

15

(citing attached Exs. 8-9); and (6) Fleming's lack "during the
relevant period" of any "freight tracking software" other than
"Mr. Berry's work in the form of an unlicensed derivative," Opp.
to Fleming Mem. at 11-12 (citing attached Exs. 4-5, 14).

The court addresses each of Berry's arguments in turn.

1.    Dillon's Prior Testimony.

Berry says that, during the hearing before this court
on September 28, 2004, on Berry's motion for preliminary
injunction, Dillon testified that, "without the use of freight
tracking software, the Logistics Department would be out of
business." Opp. to Fleming Mem. at 11, 34 (citing attached Ex.
7); Opp. to Employees Mem. at 23 (citing attached Ex. 7).  Berry
says that, because Dillon admitted that the infringing software
was necessary to Fleming's existence, damages and profits must be
directly attributable to Defendants' infringement.

On redirect examination, Dillon testified:

Q    If you were ordered, Mr. Dillon, to stop
     using spreadsheets, what impact would
     that have on the operations out at
     Kapolei?
A    I don't see how we could work.  It
     wouldn't be possible from what I -- we
     have to have something to handle that
     volume of data.  I just don't know what
     else we could use.
Q    Is it fair to say, sir, if you're
     ordered to stop using the spreadsheets,
     that running the logistics operation out
     at Kapolei would become much more
     difficult?
A    Much more --
Q    Difficult.  Difficult, sir.

16

> A    I'd say impossible.  But, yeah, I can't conceive of it.  I don't know how we would carry on.

Ex. 7 (emphases added); Opp. to Fleming Mem. at 11; Opp. to Employees Mem. at 23.

Dillon's testimony was that "spreadsheets" were essential to Fleming's logistics operations.  As spreadsheets were part of both the infringing software as well as noninfringing replacement software, see Transcript of Proceedings 9/28/2005 at 105-09, Dillon's reference to "spreadsheets" was not a statement that Fleming could not operate without the infringing software.  Dillon's testimony does not, by itself, suggest a causal link between Defendants' use of infringing software and damages or profits.

2.  Ueno's Expert Report.

Next, Berry relies on Ueno's "opinion that the Berry system was an integral part of the Fleming operations, such that it could not have remained a viable business without it."  Opp. to Fleming Mem. at 10-11 (citing Ex. B (attached to Fleming Mem.)); Opp. to Employees Mem. at 8.  Berry appears to believe that, because Ueno says that Berry's software was essential to Fleming's existence, all actual damages and profits were causally connected to Defendants' infringement.

17

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony. <u>United States v. Finley</u>, 301 F.3d 1000, 1007 (9th Cir. 2002). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has "charged trial judges with the responsibility of acting as gate-keepers to 'ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable.'" <u>Id.</u> at 1007-08 (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993); <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999)). With respect to determining the reliability of an expert's opinion, the Ninth Circuit has stated that a "trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." <u>Hangarter v. Provident Life & Accident Ins. Co.</u>, 373 F.3d 998, 1017 (9th Cir. 2004) (citing <u>Mukhtar v. Cal. State Univ., Hayward</u>, 299 F.3d 1053, 1064 (9th Cir. 2002)). Expert testimony may not be based on unsupported speculation and

18

subjective beliefs.  See Guidroz-Brault v. Miss. Pac. R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001).

In his March 21, 2005, report, Ueno opines that "Berry's freight control system" was a cornerstone of Fleming's logistics business.[4]  Ex. E at 4 (attached to Fleming Mem.). Ueno's report explains his opinion as follows:

> Berry's freight control system became a cornerstone of Fleming's logistics business in Hawaii.  It became an essential foundation block of Fleming's operations without which Fleming would be unable to handle the increased volume of containers.  Mark Dillon of Fleming (and C&S) stated it would be impossible for Fleming to operate without it:
>
> > Q:  Is it fair to say, sir, if you're ordered to stop using the spreadsheets, that running the logistics operation out of Kapolei would become much more difficult?
> > A:  Much more –
> > Q:  Difficult.  Difficult, sir.
> > A:  I'd say impossible.  But, yeah, I can't conceive of it.  I don't know how we would carry on.

Ex. 7 at 4 (attached to Fleming Mem.) (emphasis added).

---

[4] It is unclear whether Ueno's opinion regarding "Berry's freight control system" refers to the copyrighted version of Berry's program or the infringing version.  However, because Berry offers Ueno's opinion as evidence of a causal link between damages or profits and the infringement (i.e., Defendant's use of the infringing software), Berry appears to be under the impression that Ueno's opinion concerns the infringing software.  Without deciding whether Ueno's opinion in fact refers to the infringing software, the court assumes, for purposes of the present motions, that it does.

Ueno's deposition testimony further explains the basis for his opinion:

> Q    Okay.  And what are the facts on which you based your opinion that the software is an integral part for the company to operate?
> A    Okay.  The first thing is that the software is feature rich.  Okay.  And I guess the second thing is that Fleming won't give it up.
> Q    What is the basis for your statement that Fleming won't give it up?
> A    Because as I understand it, it's still being used.
> Q    Other than your understanding that the software authored by Wayne Berry is still being used, do you have any other reason or basis for your statement that Fleming won't give it up?
> A    No.

Ex. C at 118-19 (attached to Fleming Mem.).  In sum, Ueno's opinion that Berry's system was integral to Fleming is based on Dillon's testimony, the "feature rich" nature of the software, and Fleming's alleged refusal to "give it up."  None of these is a legitimate basis for Ueno's opinion.

First, as noted above, Dillon's testimony referred to the use of "spreadsheets" in general, not to the infringing software in particular.  Dillon's testimony provided no basis for any opinion that the infringing software was integral to Fleming's survival.  See Fed. R. Evid. 702; see also Guidroz-Brault, 254 F.3d at 830-31 (concluding that "[the expert's] opinion was properly excluded because it was not sufficiently founded on facts").

20

Second, even assuming the accuracy of Ueno's description of Berry's software as "feature rich," that description does not necessarily establish that Berry's software was integral to Fleming's operations or necessary for Fleming's survival.  Indeed, a feature rich software program could reasonably play an insignificant role in the operation of a company.

Third, Ueno opines that Berry's system was integral to Fleming because "Fleming won't give it up."  Ex. C at 119 (attached to Fleming Mem.).  At Ueno's deposition, Ueno stated that the basis for his belief that Fleming would not give up Berry's software was because "it's still being used."  Ex. C at 119.  However, this court has already found that Fleming and Employees stopped using any form of Berry's software as of June 9, 2003.  Therefore, Ueno's assumption that Fleming was "still" using the software program at the time he issued his report (March 21, 2005) or was deposed (July 22, 2005) was incorrect, as a matter of law of the case.

Because Ueno's opinion that Berry's software was integral to Fleming's operations is unsupported by the facts or based on erroneous assumptions, Ueno's expert opinion does not, by itself, provide a basis for sending the damage issues to trial.  See Fed. R. Evid. 702; see also Guidroz-Brault, 254 F.3d at 830-31.

21

3.    Noa's Statements to Berry.

Berry also points to his September 13, 2005, declaration as evidence of a causal nexus between his actual damages or Defendants' profits and the infringement.  Opp. to Fleming Mem. at 17 (citing Berry Decl. ¶¶ 3-9, 11); Opp. to Employees Mem. at 23.  Berry specifically refers to comments allegedly made to him in 1999 by Noa, Fleming's employee at the time.  Berry believes that Noa's comments establish that, "without the Berry FCS, Fleming would be forced to . . . fire all its logistics department employees."  Opp. to Fleming Mem. at 17 (citing Berry Decl. ¶¶ 3-9, 11); Opp. to Employees Mem. at 23.

In his declaration, Berry recalls that Fleming had outsourced its logistics department to Atlantic Pacific International, Inc. ("API"), until 1999.  Berry Decl. ¶ 10.  Both API and Fleming used Berry's software program.  Berry Decl. ¶ 9.  When Fleming ceased doing business with API in October 1999, Fleming decided it would stop using Berry's software and switch to Manugistics software instead.  Berry Decl. ¶ 10.  However, because the Manugistics software was not ready to be implemented, Fleming asked Berry if it could use his software in the interim.  Berry Decl. ¶ 10.

According to Berry, while contemplating whether to allow Fleming to use his program, he had several conversations with Noa, who had recently transferred from API to Fleming.

22

Berry Decl. ¶ 11.  Berry says that Noa pleaded with him to allow Fleming to continue using his software because she and the other former API employees were familiar with the software and would be "more marketable to Fleming" if Fleming used that software. Berry Decl. ¶ 11.  Berry alleges:

> Noa pleaded with me to somehow provide a license to Fleming.  She made a very reasonable argument that even though people with knowledge of the Hawaii freight industry are a "dime a dozen", she and the other former API employees had the unique knowledge of how to use my FCS software and that made them more marketable to Fleming.  So rather than compete with other equal or more knowledgeable freight professionals for the future job of running a system that no one had seen or used yet, Noa told me that she felt that she and the other former API employees' best hope for keeping their jobs was if Fleming used my FCS at least until the new software arrived.  Noa reasoned that they would have at least six months seniority with Fleming and that would also aid them being chosen for the transition to the new software rather than Fleming hiring others.

Berry Decl. ¶ 11.

Read in context, Berry's declaration does not support his assertion that, "without the Berry FCS, Fleming would be forced to . . . fire all its logistics department employees." Opp. to Fleming Mem. at 17 (citing Berry Decl. ¶¶ 3-9, 11); Opp. to Employees Mem. at 23.  Rather, Berry's declaration indicates that Noa and other former API employees wanted Berry to allow Fleming to use the program because their knowledge of Berry's

program "ma[d]e them more marketable to Fleming." Berry Decl. ¶ 11.

Even if Berry's declaration supports his contention that, in 1999, Fleming would have had to fire its logistics employees without the use of Berry's software, the declaration does not show any causal connection between the infringing use of Berry's software in 2003 and Berry's damages or Defendants' profits.

### 4. Email from Griffin to Christensen.

Berry additionally posits that an email dated May 5, 2003, from Ron Griffin to Brian Christensen, former Fleming employees, "shows a direct causal link between the revenue of Fleming's Hawaii wholesale division in the period after 4/1/03 and before it ceased the use of the software on 6/09/03." Opp. to Fleming Mem. at 24. Berry believes the email "shows that Fleming did not believe that it had any option other than to use the Berry system." Opp. to Fleming Mem. at 12, 33 (citing attached Ex. 4).

The email from Griffin to Christensen set forth various ways Fleming could comply with the March 6, 2003, jury verdict in a previous case finding that Fleming had infringed on Berry's copyright:

> In summary, as we see it, there are four options:
> 1) Pay [Berry's] license and continue using it as is[.]
> 2) Pay his license and get him to customize, building into his base product. You provide

24

the intellectual capital and provide him the
rights to include your mods [sic] into his
product.
3) We've reviewed our portfolio here and
there is no software to provide the function.
Given the travel for specs [sic], etc., it is
impractical for us to develop something. (It
could take well in excess of $100,000). In
fact, under the current scenario, every spare
nickel we have for the next year will go
toward a conversion to get us on a much lower
cost platform.
4) Find someone new to totally write it from
scratch without looking at any existing work
products.

Ex. 4 (attached to Opp. to Fleming Mem.).

The email does not "show[] a direct causal link between

the revenue of Fleming's Hawaii wholesale division in the period

after 4/1/03 and before it ceased the use of the software on

6/09/03." Further, contrary to Berry's belief that the email

establishes that "Fleming did not believe that it had any option

other than to use the Berry system," the email clearly shows that

Fleming had other options and was not limited to using Berry's

program. The email does not, by itself, create an issue of fact

as to causation.

5.    Profit/Loss Report and Teleconference Notes.

Berry additionally asserts that "the Fleming Logistics

Department's Profit Loss Report, an excerpt of which is attached

[as Exhibit 8], along with the Ernst & Young Teleconference Notes

[attached as Exhibit 9,] were all relevant evidence of

causation." Opp. to Fleming Mem. at 12 (citing attached

25

Exs. 8-9).  Although Berry does not discuss the relevance of
Exhibit 8, Berry asserts that Exhibit 9 contains "admissions of
Fleming's agent Ernst & Young that the Berry system was so
critical [sic] component of the Fleming profitability that its
'functionality . . . must be reproduced by F1.'"  Opp. to Fleming
Mem. at 15 (citing attached Ex. 9).

Exhibit 8 is called "Freight Profit/Loss Report" and is
a "two page excerpt copy extracted from the voluminous 400 page
report '2002 freight profit loss.rpt.'"  Hogan Decl. ¶ 8; Ex. 8
(attached to Opp. to Fleming Mem.).  Although the report sets
forth "actual cost" and "profit/loss" amounts for April 15, 2003,
it does not refer to the infringing software and, thus, does not
show any causal nexus between the "actual cost" or "profit/loss"
and Defendants' infringement.

Exhibit 9 is called "Hawaii Informational Conference
Call Notes."  Ex. 9 (attached to Opp. to Fleming Mem.).  Berry
underscores the following statement:  "The functionality of this
DB must be matched or improved in the F1 solution."  Ex. 9 at 1
(attached to Opp. to Fleming Mem.).  Assuming "DB" refers to the
database in Berry's software, this statement merely establishes
that the F-1 program, which was intended to replace Berry's
software, was expected to be at least as functional as Berry's
program.  This statement does not show any causal link between

26



actual damages incurred by Berry or Defendants' profits and the infringing conduct.

> 6.    Fleming's Use of Only the Infringing Software
>        During the Relevant Period.

Lastly, Berry attempts to draw a causal connection between actual damages or profits and the infringement by asserting that, "during the relevant period the only freight tracking software that Fleming had was Mr. Berry's work in the form of an unlicensed derivative." Opp. to Fleming Mem. at 11-12 (citing attached Exs. 4-5, 14). Defendants do not suggest that they used any freight tracking software other than the infringing software between April 1, 2003, and June 9, 2003. Damages and profits could thus have reasonably resulted from Fleming's use of the infringing software during that period. This undisputed fact alone creates a genuine issue of material fact with respect to a causal nexus between damages or profits and Defendants' infringement. The court therefore denies Defendants' motions for summary judgment regarding monetary relief under § 504(b).

> B.    Berry Raises a Question of Fact as To the Amount
>        of Actual Damages Suffered as a Result of
>        Defendants' Infringement.

As noted above, § 504(b) provides for recovery of either Fleming's profits or Berry's actual damages. Defendants assert that any recovery by Berry of actual damages should be capped at $16,800. Defendants say that is the most Berry would have earned if "Fleming had paid Berry to make the changes to FCS

27

instead of making the changes itself." Fleming Mem. at 14
(citing attached Ex. B ¶ 41); Employees Mem. at 14. Berry
counters that he is entitled to the value of the reasonable
license fee, estimated to be $1772 per container, that Berry
would have charged Fleming for using the infringing software.
Opp. to Fleming Mem. at 3-5 (citing Ex. E (attached to Fleming
Mem.)). At the very least, Berry believes that the End-User
License Agreement, which governed Defendants' use of Berry's
copyrighted software, "establishes [that] the <u>minimum</u> actual
damages for any violation of Mr. Berry's rights is $2.0 million."
Opp. to Fleming Mem. at 2-3 (citing Ex. H at 7 (attached to
Fleming Mem.)) (emphasis in original). The court concludes that
Berry establishes an issue of fact as to the amount of actual
damages he suffered.

        The Ninth Circuit has "defined the phrase 'actual
damages' as 'the extent to which the market value of a
copyrighted work has been injured or destroyed by an
infringement.'" <u>Mackie</u>, 296 F.3d at 914 (citing <u>Frank</u>, 772 F.2d
at 512). Actual damages "are usually determined by the loss in
the fair market value of the copyright, measured by the profits
lost due to the infringement or by the value of the use of the
copyrighted work to the infringer.'" <u>Polar Bear</u>, 384 F.3d at
708-10 (recognizing that a plaintiff may recover actual damages
in the form of unpaid license fees and lost profits). To

28

determine the work's "market value" at the time of the infringement, the Ninth Circuit has "endorsed a hypothetical approach: 'what a willing buyer would have been reasonably required to pay to a willing seller for the owner's work.'" Mackie, 296 F.3d at 914 (citing Sid & Mary Krofft Tel. Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1174 (9th Cir. 1977)).

In light of Mackie and Polar Bear, Berry may recover his lost profits, as urged by Defendants, and/or the unpaid license fee, as urged by Berry. However, his lost profits and/or the license fee must be measured by the amount a willing buyer would have been reasonably required to pay a willing seller. See id. Berry and Defendants propose differing values for the market value of Defendants' infringement and question the reasonableness of each other's proposed actual damages. On the present motion, there is an issue of fact as to what a willing buyer would have been reasonably required to pay a willing seller. Therefore, the amount of Berry's actual damages must proceed to trial. See Feltner v. Columbia Pictures Tel., Inc., 523 U.S. 340, 348-55 (1998) (noting that "[i]t has long been recognized that 'by the law the jury are judges of the damages" and recounting the "clear and direct historical evidence that juries, both as a general matter and in copyright cases, set the amount of damages awarded to a successful plaintiff").

29

C.   If Berry Establishes Causation at Trial, Berry's
Right to Recover Profits Under § 504(b) Is Not
Nullified by Fleming's Insolvency.

Fleming argues that, even if Berry establishes causation under § 504(b), Berry may not recover profits because "Fleming did not profit" during the infringement period.  If Fleming is right, then any recovery by Berry against Fleming under § 504(b) will be limited to Berry's actual damages from April 1, 2003, to June 9, 2003.  Fleming says that, as "Fleming lost over $800,000," "there are no profits to disgorge."  Fleming Mem. at 8.

The Ninth Circuit has noted that a copyright owner's recovery of "any profits of the infringer" is essentially recovery of "the infringer's gains."  Polar Bear, 384 F.3d at 708.  Therefore, a copyright owner may recover any financial gain attributable to the infringement, regardless of whether the infringer's business was ultimately profitable.  Stated differently, "[t]he defendant may not claim the absence of profits merely because the profits attributable to the infringing items were not sufficient to offset the losses sustained by the defendant from other aspects of his business."  Melville B Nimmer & David Nimmer, Nimmer on Copyright § 14.03[C][1] (2005) [hereinafter, Nimmer] (citing Wilkie v. Santly Bros., 139 F.2d 264, 265 (2d Cir. 1943)).

Moreover, § 504(b) does not require the copyright owner to show that the infringer profited from the infringement. Rather, the copyright owner is "required to present proof only of the infringer's gross revenue." 17 U.S.C. § 504(b). The burden is on the infringer "to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." <u>Id.</u> Accordingly, at trial, if Berry establishes, for example, that the only freight tracking system used by Fleming during the relevant period was the infringing software, and that the use of Berry's software caused Fleming to receive revenue, then the issue of Fleming's offsetting expenses will go to the amount of damages that Berry can recover under § 504(b), not to Berry's entitlement to a damage award. In that event, Berry need show only Fleming's gross revenues, and the burden will fall on Fleming, not Berry, to prove offsetting expenses. In short, at this stage of the case, Fleming's nonprofitability does not defeat Berry's claim that Fleming profited from the infringement and does not limit the amount of Berry's recovery.

D.   Even if Berry Establishes Causation at Trial,
     <u>Berry May Not Recover Profits From Employees.</u>

Employees argue that, because they earned salaries or hourly wages during the infringement period and received no bonuses or additional compensation for their infringing conduct,

they cannot be liable for profits under § 504(b).  The court agrees.

In Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 509-10 (9th Cir. 1985), a copyright holder brought an infringement action against various defendants, including MGM Grand Hotel and its employee, Don Arden.  The district court entered judgment against all defendants in the amount of $22,000, holding each defendant jointly and severally liable.  Id. at 519. On appeal, the Ninth Circuit noted that, "[w]hen a copyright is infringed, all infringers are jointly and severally liable for plaintiffs' actual damages, but each defendant is severally liable for his or its own illegal profit; one defendant is not liable for the profit made by another."  Id. (emphases in original) (citations omitted).

The Ninth Circuit noted, "The rule of several liability for profits applies, at least, where defendants do not act as partners, or 'practically partners.'"  Id. at 519 (citations omitted).  Thus, the Ninth Circuit remanded the case for a determination of whether Arden acted as a partner or practically as a partner of MGM Grand Hotel, rather than as an employee or independent contractor.  Id.  The court also noted that "Arden may be liable for profits he earned in connection with the [infringement], but amounts paid to him as salary are not to be considered as profits."  Id. (citation omitted).  See generally

32

Wilden Pump & Eng'g Co. v. Pressed & Welded Prods. Co., 655 F.2d 984, 990 (9th Cir. 1981) (stating that individual salaried, nonmanagerial employees were not liable for patent infringement, but not addressing the nature of damages recoverable from an individual employee who has been found liable for affirmative acts of infringement).

The Second Circuit uses the same rationale as the Ninth Circuit used in Frank Music Corp. In MCA, Inc. v. Wilson, 677 F.2d 180, 186 (2d Cir. 1981), the Second Circuit said:

> Because infringement of copyright is considered a tort, the general statement often is made that all defendants concerned in the infringement are jointly and severally liable. However, this rule applies only to the defendants['] liability for damages. Insofar as there is liability for illegal profit, the liability is several; one defendant is not liable for the profit made by another.

Id. (citations omitted).

Berry presents no evidence that Employees profited or otherwise financially benefitted from their infringing conduct. Rather, each Employee earned a salary or hourly pay while working for Fleming during the period of infringement, and no Employee received any additional compensation for the development of any computer software while at Fleming. Exs. G-M (attached to Employees Reply). Employees are therefore not liable for profits under § 504(b). See Frank Music Corp., 772 F.2d at 519; Wilden Pump & Eng'g Co., 655 F.2d at 990; see also MCA, 677 F.2d at 186.

33

Any recovery against Employees under § 504(b) must be based instead on Berry's actual damages.

E.    Summary of § 504(b) Recovery.

Berry establishes an issue of fact with respect to the causal connection between actual damages or profits and Defendants' infringement.  At trial, the parties may present evidence concerning causation, Berry's actual damages, and Fleming's profits.  However, even if Berry establishes causation, he may recover only actual damages, not profits, from Employees.

Although the court concludes that most of the items of evidence proffered by Berry do not individually establish issues of fact as to causation, the court is not here ruling that such evidence is inadmissible at trial.  It may be that, in combination with other evidence, the items will tend to show causation.  In so noting, the court is not indicating that all such evidence is indeed admissible.  The court has particular concerns about the admissibility of Ueno's opinion.  For the purposes of the present motions, the court has disregarded Ueno's opinion, for the reasons set forth above.  Whether Ueno's opinion should not be admitted at trial is best addressed in the context of evidentiary objections, and the court defers that determination as unnecessary to the present rulings.

IV.     <u>VICARIOUS COPYRIGHT INFRINGEMENT.</u>

With respect to Berry's claim for vicarious copyright infringement against Fleming, Fleming contends that summary judgment should be entered in its favor because Berry cannot establish a causal nexus between Fleming's profits and the infringement. Fleming Mem. at 6-7, 15. As this court has identified issues of fact regarding causation, the court denies Fleming's motion as to Berry's vicarious infringement claim.

"A defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from another's infringing activity and 'has the right and ability to supervise' the infringing activity.'" <u>Ellison v. Robertson</u>, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing <u>A&M Records v. Napster, Inc.</u>, 239 F.3d 1004, 1022 (9th Cir. 2001)). Fleming clearly had the right and ability to stop or limit Employees' use of the infringing software between April 1, 2003, and June 9, 2003. Therefore, the issue before this court is whether Fleming enjoyed a direct financial benefit from Employees' infringing conduct.

The Ninth Circuit has noted that "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." <u>Ellison</u>, 357 F.3d at 1079. In addressing Fleming's

35

motion for summary judgment, this court must determine "whether there is a triable issue of material fact regarding whether [Fleming] received a direct financial benefit from the copyright infringement." See id. For the same reasons that the issue of damages flowing from the direct infringement may be tried, the vicarious liability issues may be tried.

V.        TRIAL PROCEDURES AND RESERVED ISSUES.

Berry has not elected to recover an award of statutory damages. Opp. to Fleming Mem. at 27. Nevertheless, Defendants argue that, if Berry so elects, statutory damages must be limited to $30,000, for which Defendants must be held jointly and severally liable. Fleming Mem. at 14-15; Employees Mem. at 14-15. This court need not here resolve all issues going to statutory damages, as Berry has not elected to seek them. However, for the sake of efficiency, this court here informs the parties of the procedure this court will follow with respect to all damage issues. The court also alerts the parties about issues that are reserved for resolution during trial.

First, as noted above, if Berry proceeds to a jury trial on actual damages and profits, that trial will address (1) the causal connection between the infringement and Berry's actual damages or Fleming's profits; (2) the amount of Berry's actual damages and Fleming's (not Employees') profits allegedly

36

attributable to the infringement; and (3) Fleming's alleged liability for vicarious copyright infringement.

In the trial on actual damages or profits, the court limits Berry to a total of six hours for all witness examinations, including direct examination, cross-examination, and redirect examination. Defendants must share among themselves a total of six hours for all their witness examinations. This court has by now had extensive involvement with the issues to be tried and relies on that involvement in setting these time limits. However, if any party objects to the fact or extent of the limitation, that party must file its written objection no later than ten working days from the date this order is filed. Any such objection must explain the basis of the objection and include citations to the record of this case and to such law as may be applicable. Arguments outside of the hearing of the jury will not be counted against the ten hours. Time will be kept by the court.

If Berry elects to seek statutory damages, he is entitled to trial by jury on that matter. Although the language of § 504(c) indicates that Congress intended statutory damages to be addressed by a judge, not by a jury, that congressional intent is overridden by the constitutional guarantee of a trial by jury. "[T]he Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c)

37

of the Copyright Act, including the amount itself." <u>Feltner</u>, 523
U.S. at 355; <u>see</u> <u>also</u> <u>Columbia Pictures Tel., Inc. v. Krypton</u>
<u>Broad. of Birmingham, Inc.</u>, 259 F.3d 1186, 1191 (9th Cir. 2001)
[hereinafter, <u>Krypton II</u>].

> Section 504(c) provides:
>
> (1)  Except as provided by clause (2) of this
> subsection, the copyright owner may elect, at
> any time before final judgment is rendered,
> to recover, instead of actual damages and
> profits, an award of statutory damages for
> all infringements involved in the action,
> with respect to any one work, for which any
> one infringer is liable individually, or for
> which any two or more infringers are liable
> jointly and severally, in a sum of not less
> than $750 or more than $30,000 as the court
> considers just.  For the purposes of this
> subsection, all the parts of a compilation or
> derivative work constitute one work.
>
> (2)  . . . In a case where the infringer
> sustains the burden of proving, and the court
> finds, that such infringer was not aware and
> had no reason to believe that his or her acts
> constituted an infringement of copyright, the
> court in its discretion may reduce the award
> of statutory damages to a sum of not less
> than $200 . . . .

Thus, Berry may elect to seek statutory damages "at any time
before final judgment is rendered."  It is conceivable that Berry
will seek actual damages or profits in a jury trial and then,
only if disappointed by the verdict, elect statutory damages.[5]

---

[5] In reviewing the intent of Congress, the Supreme
Court noted that it is "unlikely that Congress intended that a
jury, having already made a determination of actual damages,
should be reconvened to make a determination of statutory
damages." <u>Feltner</u>, 523 U.S. at 347 n.5.  Notwithstanding the

Therefore, the court will bifurcate the trial as discussed below. See Fed. R. Civ. P. 42(b) (authorizing the court to order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy").

This court will not discharge the jury upon its return of a verdict on actual damages or profits as Berry may claim under § 504(b). Instead, immediately after publishing such a verdict in open court, the court will inquire, out of the hearing of the jury, whether Berry elects to seek statutory damages. If Berry does not so elect at the time, judgment will be entered forthwith based on the jury's verdict on actual damages or profits. If Berry elects to seek statutory damages, the court will allow the presentation of evidence to the jury on statutory damages, will instruct the jury on statutory damages, and will permit additional argument. The same jury that deliberated on actual damages and profits will then deliberate on statutory damages.[6] Bifurcation of the trial in this manner will ensure

---

absence of congressional intent on this issue, that is precisely what the Seventh Amendment requires if meaning is to be given to statutory language permitting a plaintiff to elect statutory damages at any time before final judgment is rendered (that is, even after a jury has rendered a verdict on actual damages or profits).

[6] Berry has agreed to this procedure. See Plaintiff Wayne Berry's Supplement Memorandum Regarding the Timing of an Election of Statutory Damages (Oct. 19, 2005) at 5 ("The Court has indicated that it might consider a short interlude after the

39

that irrelevant evidence is not presented to and considered by the jury, that the parties' and the court's resources as well as the juror's valuable time are conserved, and that Berry's right to a jury trial on statutory damages is protected.[7] <u>See</u> <u>Hangarter v. Provident Life & Accident Ins. Co.</u>, 373 F.3d 998, 1021 (9th Cir. 2004) (noting that Rule 42(b) "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings"); <u>see</u> <u>also</u> Fed. R. Civ. P. 42(b).

The court recognizes that any election by Berry may affect his right to appeal the actual damage or profit verdict. <u>See</u> <u>Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.</u>, 996 F.2d 1366, 1380 (2d Cir. 1993) ("Once a plaintiff has elected statutory damages, it has given up the right to seek actual damages and may not renew that right on appeal by cross-appealing to seek an increase in the actual damages."); <u>cf.</u> <u>Nintendo of</u>

---

jury determines actual damages and profits from infringement for Mr. Berry to make his election and then have the issue of statutory damages presented to the jury. Mr. Berry agrees."). Any "interlude" will be a matter of minutes.

[7] Fleming seeks to present evidence as to statutory damages to the jury before Berry elects to recover such damages. <u>See</u> <u>generally</u> Defendant PCT's Supplemental and Responsive Memorandum Regarding the Timing and Election of Statutory Damages (Oct. 20, 2005); <u>see</u> <u>also</u> <u>Nimmer</u> § 14.04[A] n.6.5. ("One expedient might be to instruct the jury on both statutory and actual damages, and allow plaintiff to elect the greater figure following return on the verdict." ). However, the court concludes that bifurcating the trial makes more sense in this case.

Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1010 (9th Cir.

1994) ("[O]nce a copyright owner elects to recover statutory

damages, he may not recover actual damages as well under the

Copyright Act." (citations omitted)).

The parties dispute the maximum that Berry can recover

if he does elect statutory damages. Berry disagrees with

Defendants' argument that he is limited to, at most, recovery of

a single award of $30,000 in statutory damages against

Defendants, jointly and severally. According to Berry, "Fleming

can be jointly liable with each of its employees, individually,

while each of its employees are severally liable for their own

infringement." Opp. to Fleming Mem. at 36-37.

The Ninth Circuit reads § 504(c)(1) as providing that

"'each work infringed may form the basis of one award.'"

Krypton II, 259 F.3d at 1193 (quoting Columbia Pictures Tel. v.

Krypton Broadcasting of Birmingham, Inc., 106 F.3d 284, 294 (9th

Cir. 1997) [hereinafter, Krypton I], reversed on other grounds,

Feltner, 523 U.S. at 342, 355) (emphasis in original). "Although

the Copyright Act does not define the term 'work,' every circuit

to address the issue has held that 'separate copyrights are not

distinct works unless they can 'live their own copyright life.'"

Id. Berry claims that there were multiple infringements here.

He says, "Each act of the infringement was the daily booting up

of a copy of Mr. Berry's software on each of the computers."

41

Opp. to Fleming Mem. at 28-29; Opp. to Employees Mem. at 17.
Even with multiple infringements, however, there was only one
copyrighted work, Berry's original unaltered software program,
that was infringed.  Therefore, for purposes of § 504(c), it
appears that only one work may have been infringed in this case,
although the court does not rule on that issue here.

The issue of whether statutory awards against the
individual Employees can be stacked also remains to be resolved.
Berry claims that he is entitled to up to $30,000 in statutory
damages from each Employee.  He says that, as there are seven
Employees sued, he is entitled to a total award of up to $210,000
in statutory damages against them, with Fleming jointly liable
with each Employee for that Employee's statutory damage award.

The closest Ninth Circuit case that this court has
found on the issue of stacking is a case that has been reversed
on other grounds.  In Krypton I, 106 F.3d at 288, the Ninth
Circuit was faced with a situation in which C. Elvin Feltner, the
owner of Krypton International Corporation ("Krypton"), which in
turn owned three television stations, was found vicariously and
contributorily liable with the stations for copyright
infringement that occurred when the stations played copyrighted
episodes without authorization.  Id. at 288, 294.  After finding
that each airing of the same episode by a different station
constituted a separate act of infringement, the district court

42

entered separate awards against Feltner for each station's airing

of the same episode. Id. at 294; see also Krypton II, 259 F.3d

at 1190. In so doing, the district court impliedly found that

the individual stations were not joint tortfeasors with respect

to the broadcasting of the same episode. Krypton I, 106 F.3d at

294. On appeal, Feltner argued that the district court should

have found the stations jointly liable and should have entered

one award per episode, regardless of how many stations had aired

it. Id.

> The Ninth Circuit said:
>
>> [W]hen statutory damages are assessed against
>> one defendant or a group of defendants held
>> to be jointly and severally liable, each work
>> infringed may form the basis of only one
>> award, regardless of the number of separate
>> infringements of that work. See Mason v.
>> Montgomery Data, Inc., 967 F.2d 135, 143-44
>> (5th Cir. 1992). However, "where separate
>> infringements for which two or more
>> defendants are not jointly liable are joined
>> in the same action, separate awards of
>> statutory damages would be appropriate."
>> H.R. Rep. No. 94-1476, 94th Cong., 2d Sess.,
>> at 192, reprinted in 1976 U.S. Code Cong. And
>> Admin. News 5778; Mason, 967 F.2d at 144.

Id. at 294. Berry argues that Krypton I remains good law for the

proposition that stacked statutory damages are recoverable if all

Employees are not jointly liable for each other's damages.

In essence, Berry is contending that Employees are not

joint tortfeasors. Opp. to Employees Mem. at 25; cf. Mackie, 296

F.3d at 915 (noting that "copyright law is often analogized [to

43

tort law]"). Under Haw. Rev. Stat. § 663-11, "'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." "A party is liable within the meaning of section 663-11 if the injured person could have recovered damages in a direct action against that party, had the injured person chosen to pursue such an action." Velazquez v. Nat'l Presto Indus., 884 F.2d 492, 495 (9th Cir. 1989) (citations omitted).

Each Employee has been found liable for his or her own use of the infringing software between April 1, 2003, and June 9, 2003. Berry says that he "could have recovered damages in a direct action against [each Employee], had [he] chosen to pursue such an action." See id. Consequently, he argues, each Employee is severally liable for statutory damages resulting from his or her own conduct. However, he says, because Fleming's liability for direct infringement was based solely on Employees' infringing conduct, Fleming is jointly liable with each Employee for his or her direct infringement.

Employees do not appear to be arguing that several Employees were acting in concert such that several Employees are jointly and severally liable for statutory damages assessed against one or each Employee.

44

The court leaves the stacking issue for another day. While the parties have briefed the issue of statutory damages, the court, having determined that Berry is entitled to a trial of his claims for actual damages or profits, views summary judgment on the issue of statutory damages, which have not been elected, as inappropriate. This issue may be the subject of discussion when jury instructions are settled, but there is no reason they should be resolved in the context of a summary judgment motion, given the present posture of the case.

VI.    CONCLUSION.

Having determined that there are triable issues going to actual damages or profits, the court denies Defendants' motions for summary judgment. The court does, however, conclude that, if Employees are liable under § 504(b), Berry's recovery against them may only be for actual damages, not their profits, as they had no profits. This case will proceed to trial as scheduled.

The court affirms the magistrate judge's adoption of the Discovery Master's F-1 Order, but the court extends the time in which Berry must pay the sanction of $1200, as set forth in this order.[8]

_____

[8] On October 18, 2005, Berry filed a Statement of Appeal Re: Magistrate Judge's Sua Sponte Adoption of Special Master's Order Regarding Production of Guidance Software Materials. This appeal has been rendered moot by the magistrate judge's withdrawal of that adoption. The Clerk of Court is

45

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 21, 2005.

_____
SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

Berry v. Hawaiian Express Service, Inc., et al., Civ. No. 03-00385 SOM/LEK; ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; ORDER AFFIRMING MAGISTRATE JUDGE'S ADOPTION OF DISCOVERY MASTER'S ORDER REGARDING F-1 PROGRAM MATERIALS.

---

directed to terminate the appeal, and Berry must return to the magistrate judge for relief pending the magistrate judge's adoption, rejection, or modification of the Discovery Master's ruling on the Guidance software materials.