LYLE S. HOSODA & ASSOCIATES, LLC
Lyle S. Hosoda  3964-0
Raina P.B. Gushiken  7329-0
345 Queen Street, Suite 804
Honolulu, Hawai'i 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
E-mail:  lsh@hosodalaw.com

KIRKLAND & ELLIS LLP
Michael E. Baumann (S.B.N. 145830)
Erin N. Brady (S.B.N. 215038)
F. Wade Ackerman (S.B.N. 234747)
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400
Facsimile: 9213) 680-8500
E-mail: ebrady@kirkland.com

Counsel for Defendants


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| WAYNE BERRY, | ) Case No.  CV 07-00172 SOM LEK |
| Plaintiff, | ) |
| | ) Judge Susan Oki Mollway |
| vs. | ) |
| | ) **SUPPLEMENTAL FILING IN** |
| DEUTSCHE BANK TRUST | ) **RESPONSE TO THE COURT'S** |
| COMPANY AMERICAS (FKA | ) **JULY 17, 2007 ORDER;** |
| BANKERS TRUST COMPANY) AND | ) **DECLARATION OF ERIN N.** |
| JP MORGAN CHASE BANK IN THEIR | ) **BRADY IN RESPONSE TO THE** |
| SEPARATE CAPACITIES AND AS | ) **COURT'S JULY 17, 2007 ORDER;** |
| AGENTS FOR THE PRE AND POST- | ) **EXHIIBITS "1" – "7";** |
| PETITION LENDERS OF FLEMING | ) **CERTIFICATE OF COMPLIANCE;** |
| COMPANIES, INC.; DOES 1 TO 200, | ) **CERTIFICATE OF SERVICE** |
| | ) |
| Defendants. | ) Date:      July 23, 2007 |
| | ) Time:     11:15 a.m. |
| | ) Place:     Room C-409 |
| | ) |
| | ) |
| | ) |

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **2**

**PART ONE  - CHRONOLOGY OF FLEMING BANKRUTPCY CASE** . .    **3**

      **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **3**

      **CHRONOLOGY CHART** . . . . . . . . . . . . . . . . . . . . . . . . . .    **6**

**PART TWO - DISCUSSION REGARDING DUPLICATIVE DAMAGES**    **18**

      **INFRINGEMENT BEFORE MARCH 6, 2003** . . . . . . . . . .    **19**

      **INFRINGEMENT AFTER MARCH 6, 2003** . . . . . . . . . . .    **20**

## **INTRODUCTION**

Defendants filed a motion to dismiss Berry's Complaint on June 12, 2007. Berry filed an opposition and countermotion for partial summary judgment on July 5, 2007.  After the briefing closed, the Court requested that the parties provide additional information, including:  (i) a chronology of the Fleming bankruptcy case; (ii) a discussion of whether Berry's prayed-for damages will duplicate those he has already received in other cases; and (iii) documents showing whether any court has or has not found direct infringement for the time period covered by this case -- January 2000 through June 9, 2003.

Part One of this supplemental filing sets forth a brief background of Fleming Companies, Inc. and a chronology of its Chapter 11 case.  Part Two of this filing discusses whether Berry's prayed-for damages are duplicative of damages he has received in other cases.  And the Declaration of Erin Brady (the "Brady Declaration"), filed concurrently herewith, addresses whether any court has or has not found direct infringement for the time period covered during this case.

K&E 11969743.2

**PART ONE**
**Chronology of The Fleming Bankruptcy Case**

## I.    Introduction

Fleming[1] was the nation's largest multi-tier distributor of consumable

packaged goods, supplying products to nearly 45,000 retail locations.  Before its

bankruptcy, Fleming operated 84 distribution centers and 121 retail centers,

employing more than 20,000 employees nationwide.  Fleming also owned 60 real

properties and had 1,500 separate real property leases and subleases (for which it

paid $28 million in monthly rent).  In short, Fleming was a large-scale operation.

As a result, Fleming had substantial revenues.  In 2002, for example,

Fleming had net sales of $17 billion.  It also had substantial debt obligations.  As

of March 31, 2003, Fleming had $604 million of bank debt, as well as sizable

obligations to its bondholders and trade creditors.  The overall structure of

Fleming's debt as of its bankruptcy filing is illustrated on Exhibit 6 to the Brady

Declaration, filed concurrently herewith.

Due to numerous factors, Fleming filed for Chapter 11 protection on April 1,

2003.  Its bankruptcy case -- from filing through confirmation -- ultimately

spanned 16 months (from April 1, 2003 through August 23, 2003).  Given the size

---

[1]    Unless otherwise indicated, "Fleming" as used herein refers to Fleming
Companies, Inc., its affiliates and its subsidiaries.

of its operations, Fleming's bankruptcy estate, which included proceeds from (among other things) multiple asset sales, sublease payments, and substantial accounts receivable collections, disbursed approximately $7.7 billion during this period.  A breakdown of these disbursements, as previously submitted to the Bankruptcy Court, is attached as <u>Exhibit 7</u> to the Brady Declaration.

Ultimately, Fleming's convenience store division, Core-Mark, emerged from the bankruptcy case reorganized with approximately $310 million of new financing.  Fleming's unsecured creditors received stock in Core-Mark as part of their bankruptcy distribution, and have so far received $50 million in cash distributions from the Fleming PCT.[2]

As can be gleaned from even this brief summary, Fleming's case was complex.  As a result, there were more than 9,000 docket entries even before confirmation (and this number has since grown significantly as a result of post-confirmation activities).  Approximately 350 of these entries were motions Fleming filed seeking affirmative relief for any number of reasons (i.e., to sell assets, to approve settlements, to pay creditors or to obtain financing).  Fleming, however, was not the only entity asking for Bankruptcy Court relief.  Third-party

---

[2]    The PCT is the post-confirmation entity that, among other things, administers the Fleming estate's assets.

K&E 11969743.2

creditors and other interested parties filed nearly 500 motions of their own and at least 10 adversary proceedings.  And there was no shortage of objections in this case -- parties filed nearly 1,400 objections before confirmation.

Given the complexity of these cases, Defendants have attempted to isolate in this chronology those events either important to the outcome of Fleming's bankruptcy case or exclusively involving Berry.  If the Court would like additional detail or information on any issue, Defendants will be happy to provide it.

K&E 11969743.2

## II.    Chronology of Fleming's Bankruptcy

| Date | Events |
|---|---|
| April 2003 | <ul><li>4/1/03:    Fleming Companies, Inc. and 28 affiliates (including Core-Mark International, Inc. and its subsidiaries) filed voluntary Chapter 11 bankruptcy petitions.</li><li>4/2/03:    Within the first days of bankruptcy, Fleming filed at least 15 so-called "first day motions" seeking, among other things, to pay its employees' unpaid wages, to maintain its cash management system, to use Defendants' cash collateral and to obtain bridge financing.  The Bankruptcy Court approved most of Fleming's requests.</li><li>4/11/03:    Berry filed a Suggestion of Bankruptcy in his 2001 copyright infringement case against Fleming (Case No. CV01 00446 SPK LEK), where he informed the Hawai'i District Court that Fleming had filed for bankruptcy and that the automatic stay was in place.</li><li>Generally:    When Fleming filed for bankruptcy, it did not have authority to borrow under the Prepetition Credit Agreement (dated June 18, 2002).  It also had no postpetition financing in place.<ul><li>Fleming immediately negotiated a cash collateral stipulation to allow it to borrow money and obtain other financial accommodations from Defendants and the other lenders party to the Prepetition Credit Agreement.  The Bankruptcy Court approved this stipulation on April 3, 2003.  It contained a "no control" provision.</li><li>Fleming also negotiated and documented a bridge financing facility and a permanent $150 million postpetition financing facility with</li></ul></li></ul> |

K&E 11969743.2

| Date | Events |
|------|--------|
| | Defendants.  The Bankruptcy Court entered the Bridge Financing Order on April 3, 2003, and **entered the Final Financing and Cash Collateral Order on May 6, 2003**.  Both contained "no control" provisions. |
| | • Generally:  Fleming also negotiated with the Official Creditors' Committee regarding its need to pay or provide a junior lien to critical trade vendors, who were demanding cash in advance that Fleming did not have, in exchange for the trade creditors' agreement to return to customary trade terms.  The parties reached an agreement, and the Court authorized Fleming to pay critical vendors up to $100 million on May 6, 2003. |
| May/June 2003 | • May '03:  Fleming began to sell certain assets.<br><br>•    With Bankruptcy Court approval, it sold nine California stores to Save-Mart for $27 million plus inventory.<br><br>•    With Bankruptcy Court approval, it sold 31 Rainbow Food Stores for $44 million.<br><br>•    The Court also entered an order setting procedures for the sale of Fleming's assets (including excess inventory and going out of business) on May 22, 2003.<br><br>• May '03:  Parties who had contracts with Fleming also began filing motions asking the Court to permit them to terminate their contracts with Fleming. Fleming opposed these motions (some of which resulted in mini-trials with experts and fact witnesses).  These issues were ultimately resolved. |

7

| Date | Events |
|---|---|
| | • 6/13/03: Berry's counsel, Timothy Hogan, filed a notice of appearance as counsel for Berry in Fleming's bankruptcy case and requested copies of all notices and pleadings in the case. |
| July/August 2003 | • 7/7/03: In July 2003, Fleming began to solicit parties interested in purchasing its wholesale distribution business. C&S Acquisition, LLC emerged as the "stalking horse" bidder. Fleming filed a motion to approve the proposed sale to C&S (subject to higher or better offers) on July 7, 2003.<br><br>• Berry objected to the C&S sale on *August 1, 2003*, on the basis that Fleming could not sell C&S his FCS or any rights Fleming had therein.<br><br>• The Court approved the sale to C&S on *August 15, 2003* after three days of hearings.<br><br>• The transaction closed on *August 23, 2003*.<br><br>• The C&S sale brought in approximately $255 million in cash to the estates, **3.25%** of the $7.7 billion in disbursements.<br><br>• 7/23/03 The Court approved Fleming's request to pay employees up to $12 million in retention bonuses.<br><br>• 8/1/03: Fleming filed a complaint against Berry for declaratory relief and an injunction prohibiting harassment. (Adv. Pro. 03-54809 MFW). The complaint was later dismissed. |

8

| Date | Events |
|---|---|
| September/October 2003 | • 9/12/03: Fleming filed a motion asking to hold an auction and sell certain real property (the Court approved this motion on October 23, 2003).<br><br>  • Fleming ultimately held the requested auction and sold $6.6 million of real property.<br><br>• 10/10/03: Fleming filed a motion to pay Defendants $325 million of their $609 million of secured prepetition claims.  The Court approved Fleming's request on December 5, 2003.<br><br>• 10/31/03: Fleming filed distress termination applications with the Pension Benefit Guaranty Corporation ("PBGC") to terminate five pension plans on October 31, 2003.  Thereafter, the PBGC filed $58 million in administrative priority claims and $374 million in unsecured claims.<br><br>• Generally: Fleming began negotiating with its constituents regarding a plan of reorganization, and also began to explore the sale of its convenience business (which remained intact after the C&S sale). |
| November/December 2003 | • 11/23/03: Fleming filed a motion for authority to pay fees incurred in investigating possible replacement lenders for Defendants.<br><br>• 11/25/03: Fleming filed its Reclamation Report and a request that the Court determine that approximately 600 reclamation claims were unsecured.<br><br>• 12/4/03: The Court entered an order setting January 15, 2004 as the deadline for creditors holding post-bankruptcy claims arising between April 1, 2003 and October 31, 2003 to file administrative claims. |

K&E 11969743.2

| Date | Events |
|---|---|
| | • 12/19/03: Fleming filed its disclosure statement and proposed plan of reorganization, whereby it proposed to reorganize around Core-Mark International, Inc., its convenience division. |
| January/February 2004 | • 1/15/04: Berry filed his limited objection to the proposed plan and disclosure statement.<br><br>• 1/15/04: The administrative bar date passed. At this point, creditors had filed more than $2.1 billion of secured, administrative and priority claims.<br><br>• 1/31/04 - 2/1/04: Fleming filed 576 adversary actions seeking to find that reclamation claims should be treated as unsecured claims.<br><br>• 2/13/04: At the request of reclamation creditors, the Court appointed an Official Reclamation Committee.<br><br>• 2/17/04: The Court approved a $50 million payment to Defendants on their secured claims. |
| March/April 2004 | • 3/12/04: Fleming filed a motion for summary judgment in the 576 adversary cases it filed in January 2004 to determine that reclamation claims were unsecured.<br><br>• Generally: Fleming also negotiated with the Official Reclamation Committee and the Official Creditors' Committee regarding a settlement of reclamation claims.<br><br>• Generally: In preparation for plan confirmation, Fleming engaged in an intensive review of the $2.1 billion of secured, administrative and priority claims that creditors had (at the time) filed against the estates ($1.5 billion of these |

| Date | Events |
|------|--------|
| | claims were disallowed or withdrawn by the plan's effective date). Resolution of these claims was critical to demonstrate the proposed plan's feasibility. |
| | • Generally:  Fleming also began analyzing the $29 billion of general unsecured claims that creditors had (at the time) filed against Fleming's estate ($21 billion of which were disallowed or withdrawn before the plan's effective date). |
| May/June 2004 | • 5/3/04:  Fleming, the Official Reclamation Committee and the Official Creditors' Committee reached a settlement of the reclamation issues in the case. They agreed that reclamation claims (which had been asserted as administrative or priority claims in the amount of $280 million) would be capped at $150 million, with an additional litigation discount of $13 million for non-trade lien vendor reclamation claims. The Court approved the agreement on May 25, 2004.

• 5/26/04:  Fleming resolved 63 objections to its disclosure statement, and the Court approved the disclosure statement.

• 5/27/04:  Fleming began the plan solicitation process, whereby it sent all creditors a copy of the disclosure statement, proposed plan and other documents and asked them to vote on the proposed plan.

• 6/1/04:  The Court approved an agreement between Fleming and the PBGC whereby (i) Fleming would terminate its pension plan in exchange for an allowed administrative claim of $2 million and an allowed unsecured claim in the amount of $200 million; and (ii) Core-Mark (the "parent" of the convenience division) would assume the remaining pension plans. |

K&E 11969743.2

| Date | Events |
|---|---|
|  | • 6/9/04:      Berry filed administrative claim number 18428 in the amount of $48 million against Fleming.<br><br>• 6/18/04      Berry filed a motion for relief from the stay or, in the alternative, relief from the discharge and permanent injunction provisions of the plan.<br><br>• 6/21/04:      The Debtors noticed Berry's deposition on issues raised in his relief from stay motion.<br><br>• 6/26/04:      Fleming filed a non-substantive objection to Berry's $48 million administrative claim on the basis that it was filed five months after the established January 15, 2004 bar date (i.e., it was late).<br><br>• 6/26/04:      Fleming also filed a motion for an order estimating Berry's $48 million administrative claim at $0 or some other reasonable amount based on the damages the jury awarded in the 2001 Hawai'i copyright litigation before Judge King.<br><br>• 6/30/04:      Berry filed an objection to the Debtors' proposed plan. |
| July 2004 | • Generally:      Fleming resolved 42 of 43 objections to its proposed plan in anticipation of its July 26, 2004 confirmation hearing.  The only outstanding objection at the time of confirmation was Berry's.<br><br>• 7/1/04:      Berry gave his deposition, wherein he stated that he reviewed the bankruptcy court docket daily.<br><br>• 7/7/04:      Fleming objected to Berry's relief from stay motion. |

12

| Date | Events |
|------|--------|
| | • 7/9/04: The Court held a hearing on Berry's relief from stay motion, wherein Timothy J. Hogan appeared for Berry. At the conclusion of that hearing, the Court asked for supplemental briefing on the issue of whether Berry should be allowed to proceed on both his prepetition and postpetition Hawai'i litigation after confirmation.<br><br>• 7/13/04: The Bankruptcy Court admitted Mr. Hogan, Berry's counsel, pro hac vice.<br><br>• 7/15/04: Berry filed his supplemental brief in support of his relief from stay motion.<br><br>• 7/16/04: Fleming filed its proposed confirmation order, its memorandum of law in support of confirmation and seven affidavits in support of confirmation.<br><br>• 7/16/04: Fleming filed its plan supplement with the Exhibit Facility Agreement (i.e., post-bankruptcy secured financing for the reorganized Core-Mark), Tranche B Agreement and Management Incentive Plan.<br><br>• 7/16/04: Fleming filed its response to Berry's objection to confirmation.<br><br>• 7/19/04: Berry filed his response to Fleming's objection to his $48 million administrative claim.<br><br>• 7/19/04: Berry also filed his response to Fleming's motion to estimate his $48 million administrative claim.<br><br>• 7/22/04: Fleming filed its supplemental brief in opposition to Berry's relief from stay motion.<br><br>• 7/26/04: The Bankruptcy Court gave Berry relief from stay to continue his two |

13

| Date | Events |
|------|--------|
| | ongoing Hawai'i litigations. |
| | • 7/26/04: The Bankruptcy Court estimated Berry's $48 million administrative claim at $100,000 for purposes of plan feasibility. |
| | • 7/26/04: The Bankruptcy Court approved Fleming's plan of reorganization (via the confirmation order). |
| August 2004 | • 8/9/04: Berry filed a notice of appeal of the confirmation order. |
| | • 8/13/04: Berry filed a notice of appeal from the Bankruptcy Court's order estimating his $48 million administrative claim at $100,000. |
| | • 8/13/04: The Bankruptcy Court entered an order clarifying that Berry did not receive an exemption from discharge as part of his relief from stay to liquidate his claims pending in the Hawai'i courts. |
| | • 8/19/04: Berry withdrew his notice of appeal of the confirmation order. |
| | • 8/19/04: Berry filed his appellate designations on his August 13, 2004 appeal. |
| | • 8/23/04: Fleming's plan became effective.  Attached as Exhibit B to the Brady Declaration is a chart of the disbursements from the Fleming estate from April 1, 2003 to August 23, 2004 (the period Fleming was in bankruptcy). |
| October 2004 | • 10/6/04: Berry filed seven administrative claims, each in the amount of $201.7 million, against Fleming Companies, Inc. and certain other debtors. |
| November | • 11/15/04: The PCT, which was appointed to administer the assets of Fleming's estate |

| Date | Events |
|---|---|
| /December 2004 | after the Plan was confirmed, objected to Berry's June 9, 2003, $48 million administrative claim on the basis that it was amended by the claims he filed on October 6, 2004.<br><br>• 12/3/04:     Berry responded to the PCT's objection.<br><br>• 12/30/04:     The PCT filed a motion seeking 2004 discovery regarding Berry's claims. |
| January 2005 | • 1/12/05:     Berry responded to the PCT's discovery motion.<br><br>• 1/17/05:     Berry filed a motion for a protective order.<br><br>• 1/19/05:     The Bankruptcy Court approved a stipulation between Berry and the PCT whereby the parties resolved the PCT's objection to Berry's duplicative administrative claims.  A number of duplicative claims were expunged, and Berry's June 9, 2004 administrative claim and claim number 18704 were allowed to stand, subject to the PCT's right to further object. |
| February 2005 | • 2/4/05:     Berry filed a motion asking the Court to allow him to execute on his Hawai'i verdict (from the 2001 case) on the basis that the Court's relief from stay order also gave him an exemption from discharge.<br><br>• 2/17/05:     Berry withdrew his motion for a protective order.<br><br>• 2/22/05:     The Bankruptcy Court denied Berry's motion to execute on his Hawai'i verdict (from 2001), finding that Berry did not have an exemption from discharge, but simply relief from stay to liquidate his pending claims in the Hawai'i courts. |

K&E 11969743.2

| Date | Events |
|---|---|
| September 2005 | • 9/21/05: The PCT objected to Berry's administrative claims on substantive grounds. |
| October 2005 | • 10/18/05: Berry responded to the PCT's objection to his administrative claims.<br><br>• 10/29/05: The Court held a hearing regarding the PCT's objection, deferring the matter until after the Hawai'i litigation concluded. |
| April 2006 | • 4/6/06: The Hawai'i litigation having concluded, the PCT renewed its objection to Berry's administrative claims.<br><br>• Generally: Berry sought discovery in the bankruptcy case on issues involving the Rule Against Perpetuities, the non-existence of the PCT as a trust and the PCT's control of C&S, among other things. |
| July 2006 | • Generally: Berry served additional discovery on the PCT. |
| August 2006 | • 8/2/06: Berry filed his opposition to the PCT's renewed objection to his administrative claims.<br><br>• 8/23/06: The PCT filed its reply in support of its objection.<br><br>• 8/28/06: The Bankruptcy Court deferred the PCT's objection until after Berry's appeal is resolved. |
| December 2006/January 2007 | • 12/4/06: The PCT filed a motion to distribute more than $50 million in excess cash to Fleming's unsecured creditors.<br><br>• 12/14/06: Berry objected to the PCT's motion on the basis that the PCT must reserve |

K&E 11969743.2

| Date | Events |
|------|--------|
|      | that money to pay him if he prevails on appeal.<br><br>• 12/25/06:    The Court granted the PCT's motion to make a cash distribution to unsecured creditors over Berry's objection. |

## Part Two
## Discussion Regarding Duplicative Damages

Since January 2000, Berry has sued Fleming twice for direct infringement of FCS:  once for the period spanning from October 1999 through March 6, 2003, and again for the period spanning March 7, 2003 through June 9, 2003.[3]  In the first case, Berry received a statutory damages award of $98,250.  And in the second case, he received damages amounting to $54,534.

Berry now sues Defendants -- Fleming's banks -- for contributory and vicarious infringement for the period spanning January 2000 through June 9, 2003.  He claims that Defendants' alleged infringement was derivative of Fleming's during this period (despite the fact that Defendants did not even begin lending to Fleming until June 2002).  Simply put, Berry -- after having already recovered from Fleming and its employees -- is now suing Defendants for the ***same infringement***, during the ***same time period*** and for the ***same damages***.  He is not entitled to duplicative damages awards, and his claims should be dismissed as a matter of law.

---

[3]  As filed, the second lawsuit alleged a longer span of infringement.  By the time the case went to the jury, however, the Court had found that Fleming stopped all infringement on June 9, 2004.  Brady Decl., Ex. 3 at 27 (Summary Judgment Order).

K&E 11969743.2

**A.    Berry Was Awarded Statutory Damages For Infringement Before March 6, 2003.**

Berry elected and received statutory damages (in lieu of actual damages or profits) at the conclusion of his first case against Fleming.  17 U.S.C. § 504(c)(1). The jury awarded him $98,250.  Brady Decl., Ex. 1 at 2 (03/06/2003 Special Verdict Form).  Having already elected statutory damages, Berry cannot now seek actual damages and profits from Defendants -- who as alleged derivative infringers are, at most, jointly and severally liable with Fleming -- for the same acts of infringement during the same time period for which he has already been awarded statutory damages.  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("In other words, the common law doctrine that one who knowingly participates in or furthers a tortious act is **jointly and severally liable** with the prime tortfeasor, is applicable under copyright law") (internal citations omitted) (emphasis added).  Nor can he recover "another round" of statutory damages.

Instead, it is black letter law that an award of statutory damages covers ***all*** acts of infringement of a particular work during the period litigated:

> [T]he copyright holder may elect, at any time before final judgment, to recover, **instead of actual damages and profits**, an award of statutory damages **for all infringements** involved in the action, with respect to **any one work**, for which any one infringer is liable individually, or for which **any two or more infringers are liable jointly and severally** . . .

19

17 U.S.C. § 504(c)(1) (emphasis added). Once a party elects statutory damages, it cannot later request actual damages or profits from the direct infringer. Nor can it sue derivative or "co-infringers" for such damages. *See Bouchat v. Champion Prods., Inc.*, 327 F. Supp. 2d 537, 552 (D. Md. 2003) ("The Court construes 'the action' as including all claims that could have been brought in a single case. Otherwise, a Plaintiff could multiply statutory damage awards through the device of filing **separate lawsuits against joint infringers**.") (emphasis added).

This is exactly what Berry seeks to do here. Berry has been awarded all of the damages he is entitled to for the period spanning October 1999 through March 6, 2003. His claims against Defendants -- seeking the same damages for the same infringement -- should be dismissed.

### B.    Berry Was Awarded Damages For Infringement After March 6, 2003.

Berry's second lawsuit covered the period from March 7, 2003 until June 9, 2003. In that lawsuit, Berry sought actual damages and profits, just as he does here. The case went to trial, and the jury was asked to determine the amount of his damages against the direct infringers, namely Fleming and seven of its employees. After deliberations, the jury awarded him $54,534 to compensate him in full for the direct infringement. Brady Decl., Ex. 4 at 3 (03/07/2006 Special Verdict Form).

Berry is now suing Defendants for the exact same acts of infringement. As Berry has already been awarded all damages to which he was entitled for the direct

infringement, he cannot now relitigate his damages and seek an additional award from Defendants.  *See Bouchat*, 327 F. Supp. 2d at 552 ("Issue preclusion, or collateral estoppel, precludes relitigation of issues of fact or law which have been actually determined and necessarily decided in prior litigation in which a party against whom collateral estoppel is asserted had a full and fair opportunity to litigate.") (internal citations omitted).  Any recovery against Defendants -- who as alleged contributory and vicarious infringers are, at most, jointly and severally liable with the direct infringers -- would be duplicative and should be barred.  *See Fonovisa, Inc.*, 76 F.3d at 264; *see also* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 14.04[E][2](e) (2007) ("In two or more persons are jointly and severally liable for one or more infringements, whether or not only a single copyrighted work has been thereby infringed, then even if such persons are sued in separate actions, a satisfaction of the judgment in the first action will constitute a defense to the second and succeeding actions.").  The Court should dismiss Berry's claims accordingly.

21

DATED:  Honolulu, Hawai'i, July 19, 2007

LYLE S. HOSODA & ASSOCIATES, LLC

By: /s/ Raina P.B. Gushiken

Lyle S. Hosoda  3964-0
Raina P.B. Gushiken  7329-0
345 Queen Street, Suite 804
Honolulu, Hawai'i 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
E-mail:  lsh@hosodalaw.com

KIRKLAND & ELLIS LLP
Michael E. Baumann (S.B.N. 145830)
Erin N. Brady (S.B.N. 215038)
F. Wade Ackerman (S.B.N. 234747)
777 South Figueroa Street
Los Angeles, California  90017
Telephone:  (213) 680-8400
Facsimile:   (213) 680-8500
E-mail:  ebrady@kirkland.com

Counsel for Defendants

WHITE & CASE LLP
Andrew DeNatale (ADN 2429)
Jonathan Moskin (Bar No. 1949031)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113
E-mail:  adenatale@ny.whitecase.com

Of Counsel for Defendants