LYLE S. HOSODA & ASSOCIATES, LLC
Lyle S. Hosoda  3964-0
Raina P.B. Gushiken  7329-0
345 Queen Street, Suite 804
Honolulu, Hawai'i 96813
Telephone:  (808) 524-3700
Facsimile:   (808) 524-3838
E-mail:      lsh@hosodalaw.com

Counsel for Defendants

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| WAYNE BERRY,<br><br>    Plaintiff,<br><br>vs.<br><br>DEUTSCHE BANK TRUST COMPANY AMERICAS (FKA BANKERS TRUST COMPANY) AND JP MORGAN CHASE BANK IN THEIR SEPARATE CAPACITIES AND AS AGENTS FOR THE PRE AND POST-PETITION LENDERS OF FLEMING COMPANIES, INC.; DOES 1 TO 200,<br><br>    Defendants. | CASE NO. CV 07-00172 SOM-LEK<br><br>The Hon. Judge Susan Oki Mollway<br><br>**DECLARATION OF ALBERT FISCHETTI IN OPPOSITION TO BERRY'S CROSS- MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## DECLARATION OF ALBERT FISCHETTI IN OPPOSITION TO BERRY'S CROSS-MOTION FOR SUMMARY JUDGMENT

I, Albert Fischetti, declare as follows:

1. I am (and at all relevant times was) a senior credit officer at Deutsche Bank Trust Company Americas ("Deutsche Bank"), one of the Defendants in this action, and am duly authorized to make this declaration in opposition to Berry's Cross-Motion for Partial Summary Judgment in the above-captioned case. I know the following to be true through my association with Deutsche Bank, and if requested could and would competently testify as such.

2. From the period of May 2002 through August 2004, I served as Deutsche Bank's lead credit officer in charge of the Fleming account. During that period, I was an officer in the Credit Risk Management Group at Deutsche Bank.

3. Fleming and a group of lenders that included Deutsche Bank (such lenders are hereafter referred to as the "Pre-Petition Lenders") were parties to that certain Credit Agreement dated as of June 18, 2002 (the "2002 Credit Agreement"). Deutsche Bank and JPMorgan Chase Bank, N.A. ("JPMC") acted as Administrative Agents for the Pre-Petition Lenders.

4. Immediately after Fleming filed for bankruptcy on April 1, 2003, the Pre-Petition Lenders consented to Fleming's emergency use of the proceeds of their cash collateral (principally the proceeds of the inventory and accounts receivable subject to the liens of Pre-Petition Lenders) under the 2002 Credit Agreement (the "Cash Collateral") on the condition that the Bankruptcy Court enter an order approving a stipulation between the Pre-Petition Lenders, Fleming and its affiliates (the "Cash Collateral Order") that, among other things, (i) provided the Pre-Petition Lenders with adequate protection of their interests in the

Cash Collateral, for and to the extent of any diminution in value of the Cash Collateral resulting from (among other things) Fleming's use of the Cash Collateral; (ii) found that the Pre-Petition Lenders did not have control over Fleming on account of their loans or their decision to exercise their rights under the Cash Collateral Order; and (iii) required Fleming to submit budgets (the first of which was attached to the Cash Collateral Order as Exhibit B) and comply with certain reporting requirements (the "Cash Collateral Inducements"). I on behalf of Deutsche Bank and Roger Odell on behalf of JPMC participated in the negotiations leading up to the foregoing agreement. The Cash Collateral Inducements, among other provisions, were critical to induce the Pre-Petition Lenders to allow Fleming's use of the pre-bankruptcy cash collateral on a post-bankruptcy basis.

5. At the same time Mr. Odell and I were negotiating with Fleming regarding its use of Cash Collateral, we were also negotiating with it separate agreements for both a "bridge" debtor-in-possession financing facility and a permanent debtor-in-possession financing facility. These post-petition facilities were extended by Deutsche Bank and JPMC (collectively, the "Post-Petition Lenders"). With respect to both financing facilities, the Post-Petition Lenders required Fleming and its affiliates to obtain court orders that, among other things, (i) provided the Post-Petition Lenders with priming liens and superpriority administrative claim status; (ii) affirmed that the Post-Petition Lenders did not have control over Fleming on account of their loans or their decision to exercise their rights under any financing agreement; and (iii) required Fleming to submit budgets and comply with certain reporting requirements (the "Financing Inducements"). These Financing Inducements, among other provisions, were critical to induce the Post-Petition Lenders to provide Fleming with debtor-in-possession financing.

6. It is my understanding that on April 3, 2003, the Court entered the Cash Collateral Order, *nunc pro tunc* to April 1, 2003 (the date that Fleming filed its Chapter 11 bankruptcy petition). I also understand that the same day, it entered an order approving the proposed bridge financing facility (the "Bridge Financing Order"), which was effective immediately (and before the Post-Petition Lenders disbursed any money to Fleming). Finally, on May 6, 2003, the bankruptcy court entered an order approving the final financing facility and approving, on a final basis, Fleming's use of the Cash Collateral (the "Final Financing and Cash Collateral Order"). The foregoing orders approved the Cash Collateral Inducements and the Financing Inducements.

7. The post-petition financing was asset-based, meaning that as long as Fleming stayed within the budget, had a sufficient borrowing base (calculated principally as a percentage of assets) and was not otherwise in default, it was free to draw on the loans as it deemed necessary. From time to time after these orders were in place, I had discussions with Fleming personnel and its professionals concerning the budgets and the adequacy of Fleming's borrowing base. Because Fleming's Hawai'i operations formed only a small part of the company's overall cash-flow, financial arrangements for those operations were never a subject of particular concern to or review by me or Deutsche Bank.

8. Although Deutsche Bank was concerned with the adequacy of Fleming's overall expenditures and borrowing base, it never sought to become involved in or exercise control over Fleming's operations. Neither I nor any other Deutsche Bank representative sat on Fleming's board of directors, served as an officer or in any way acted as an insider of the company. Our relationship was purely one of a lender and a borrower, and after the bankruptcy, was at all times subject to court supervision.

9. At or about the time that Fleming filed its Chapter 11 bankruptcy petition, Fleming's board of directors retained AlixPartners, a nationally known restructuring firm, to take operational control of Fleming and to lead it through the restructuring process. During Fleming's Chapter 11 case, AlixPartners assumed corporate responsibility for Fleming. The AlixPartners professionals discussed financial matters with the professionals retained to represent the Pre-Petition and Post-Petition Lenders, who in turn reported back to the Lenders. The dealings between Fleming and its professionals (such as AlixPartners) on the one hand, and the dealings between the Lenders and their professionals on the other hand, were fully at arm's length and, given the distinct interests represented by each, at times somewhat adversarial.

10. My review of the budget and other business issues with Fleming focused on major issues affecting the continued financial viability of Fleming (e.g., critical vendor payments, tax issues, reclamation claims and claims made under the Perishable Agricultural Commodities Act); these issues did not include the use by Fleming of particular software programs, such as Mr. Berry's software (about which I learned only later). In particular, with respect to the alleged infringement, it may have been brought to my attention after Mr. Berry's counsel advised Deutsche Bank's counsel during Fleming's Chapter 11 case of Fleming's alleged infringement, but I have no distinct recollection of this. At any rate, the specific allegation that Deutsche Bank was in some way part of the infringement was not conveyed to me until sometime around April 2006, when Deutsche Bank entered into the tolling agreement with Mr. Berry.

11. I have been advised that Mr. Berry has submitted to the Court a May 19, 2003 email concerning the possible retention on behalf of Fleming of a company named Guidance Software to assist Fleming in some respect in avoiding

DECLARATION OF ALBERT FISCHETTI

future infringement. It is possible we were asked to approve some related expense (although I have no recollection that we were), but we would not have been asked to comment on any operational role Guidance Software may have performed. Unless the expenditure was significant, it is doubtful I would even have been asked to comment on or review this expenditure to Guidance Software. In any event, I have no recollection of this matter.

So sworn under penalty of perjury under the laws of the United States of America in New York, New York, on August 3, 2007.

_____
Albert Fischetti