too numerous to name are also Berry works that are being infringed by persons under the control of the former Fleming Lenders. All of these works, including any derivatives of these works are Berry authored original works and no license or grant of any interest authorized the use by Core-Mark and/or C&S and the use constitutes acts of willful infringement for financial gain. The money derived from their use that received by GECC constitutes the proceeds of a specified unlawful activity and a violation of RICO.

    20.    FCS 1993 is a software program Plaintiff wrote in Microsoft Access and Visual Basic using both the Visual Development Environment and hand-coding. FCS 1993 is primarily a database designed to control and monitor consolidation and containerization of freight.

    21.    FCS 1993 contains database tables, queries, screens and macros that handle Accounts Receivable, Accounts Payable, Job Costing, Logistic Scheduling and Real-Time Shipment Tracking. The principle unique feature of the database is the ability for a user of this system to control a large number of purchase orders and annotate shipping information to the records for billing and tracking purposes along with planning and scheduling efficiencies that translate directly to lower freight costs. The user can then build containers, which contain these individual Purchase Orders. The user can enter costs for both individual purchase orders and

for entire containers. The system will allocate container costs to the individual purchase orders. Finally, the "Bill To" party can be invoiced for the shipment and a profitability derived from the billed amount less the allocated costs.

## COUNT I
## CONTRIBUTORY AND/OR VICARIOUS INFRINGEMENT

22. During the period beginning in 2000, Fleming Companies, Inc. ("Fleming") infringed plaintiff's work by making illegal derivative copies and causing the use of these unlicensed works in Fleming's wholesale business.

23. On March 6, 2003 a jury in Wayne Berry v. Fleming Companies, Inc. CV 01-00446 SPK LEK found that Berry had a valid copyright in FCS and that Fleming engaged in willful infringement.

24. Starting in the Spring of 2002, Defendants Deutsche Bank Trust Company Americas and JP Morgan Chase Bank in their separate capacities and as agents for the secured lenders of Fleming Companies, Inc. had reason to know that Fleming might be engaged in infringing activities but because the Lenders enjoyed a direct financial benefit from the continued use of the Berry FCS they continued to provide funding and to exercise complete control over Fleming to cause Fleming to continue to infringe plaintiff's work. The infringement of Mr. Berry's work from after the Fall of 2002 when the Lenders were given infringement warning letters and became aware of Mr. Berry's right to be paid for infringing use of his

9

work that continued until the filing of the voluntary Chapter 11 Petition on April 1, 2003, the Lenders received significant sums of money derived from the infringing activities. The knowledge of the infringement is imputed to other Fleming Lender's.

25. The Lenders that responded to the Berry infringement warning letters all denied any infringement. It was not until March 2006 that Mr. Berry learned that these denials were false. Because the denials were made by publically traded and regulated financial institutions regarding whom false statements made regarding willful infringement would amount to misprision of a felony, it was reasonable that Mr. Berry relied on their denials and therefore his discovery of the true extent of their complicity was actively concealed from him.

26. At the time of this jury verdict Fleming's lack of creditworthiness combined with the ongoing Securities and Exchange Commission ("SEC") formal investigation caused certain of the Lenders to be Fleming's only available source of operating capital. Based on the then existing loan covenants and the fact that Fleming had no post-petition financing in place, the Lenders held total control over Fleming's operations and exercised that control to cause Fleming to continue to infringe Plaintiff's works after it filed for Chapter 11 protection.

27. Despite the knowledge that Fleming was an adjudicated willful

10

infringer the Lenders caused Fleming to continue to infringe so that the Lenders could be paid on their loan obligation.

28.  In order to realize the Lenders' objective to sell the Fleming wholesale division it was necessary to keep the infringing Fleming freight operations in operation to preserve the value of the Fleming loans owed to the Lenders that, but for the use of the Berry FCS 1993, could not be repaid.

29.  Because the March 6, 2003 willful infringement jury verdict meant that a permanent injunction might be issued any time, Fleming filed its chapter 11 petition despite the fact that it had no proper Debtor-in-Possession financing in place. The Lenders, though aware that Fleming was going to continue to infringe in the period after the jury verdict or, in the alternative, having knowledge of facts that would have put a reasonable lender on notice of ongoing infringement, directed Fleming to use another derivative of the Berry FCS 1993 as a replacement so that Fleming would continue to have the ability to pay the Lenders' loans from money derived from infringement post-petition.

30.  The Lenders, undeterred by the potential for infringement liability believing that they could secretly control Fleming free from detection, directed Fleming to continue to operate the Fleming Freight logistics business using infringing software.

11

31. Starting no later than January 1, 2000 and continuing to no earlier than June 9, 2003, Fleming Companies, Inc. and its employees engaged in thousands of separate act of direct infringement.

32. The Lenders aided, facilitated, and enabled thousands of separate acts of FCS 1993 infringement.

33. The Lenders engaged in substantial participation in the infringing activities including providing finances that were intended to advance the infringement.

34. Even if the Lenders did not have actual knowledge of the infringing activity they had reason to know of the third party's direct infringement and had the power and ability to stop it and are liable for contributory infringement.

35. The Lenders had the power to control the infringement.

36. The Lenders had a direct financial interest in the continuation of Fleming's Hawaii logistics operation as the one asset of value securing the loans.

37. But for the continued infringement the Lenders would have received little or nothing on their secured loans and are liable to Plaintiff as vicarious infringers.

38. Starting in August of 2003, GECC, with full knowledge of the infringement of Berry's works began to support C&S and Core-Mark in their acts

12

of infringement that continue as of this date.

## COUNT II
## UNJUST ENRICHMENT

39. As a separate and distinct claim from the claims under the Copyright Act, starting in 2001, the Lenders knew that Mr. Berry had not licensed the use of any derivative copy of his work. The Lenders knew that if Fleming infringed Berry expected to be paid for the use of his work.

40. In the period after April 1, 2003, the Lenders directed Fleming to risk continued infringement so that the Lender's loans would be paid. But for the use of Plaintiff's work, the Lenders would have received little in the break up of Fleming's wholesale business.

41. Both the Lenders and Berry had an expectation that Berry would receive compensation for any unlicensed use of his works.

42. The Lenders received a substantial financial benefit conferred upon them by Mr. Berry and it would be unconscionable to permit them to retain the full amount of that benefit that was obtained with the knowledge that Berry would have to be paid if Fleming continued to infringe.

43. The Lenders are indebted to Mr. Berry in an amount to be determined at trail based upon the Lenders' implied promise to pay the reasonable value of the material infringed from which they derived a substantial benefit.

## COUNT III
## RICO

44. GECC and C&S are persons as defined by the Racketeering Influenced and Corrupt Organizations Act ("RICO") and as a principals of such enterprise has agreed, participated as a Principal in the operation of an Enterprise, committed overt acts and received money derived from specified unlawful activities in violation of 18 U.S.C. § 1962(a), (c) and (d). The predicate acts that first gave rise to liability in RICO involve acts of Criminal Copyright Infringement in violation of 18 U.S.C. § 2319 (relating to criminal infringement of a copyright) the number of these instances of violations of Title 18 are too numerous to be stated herein but include the daily booting up of computers that load, without any license, pirated copies of Mr. Berry's software each day the infringement continues. Additional predicate acts are derived form violations of the Hobbs Act and other Federal Criminal statutes. These predicate acts continue as of this writing.

45. Money knowingly derived from Criminal Copyright Infringement is then received by GECC in violation of 18 U.S.C. § 1962(a) and is not reported to the United States as money derived from a specified unlawful activity and constitutes money laundering as provided by Title 18 U.S.C. and constitutes additional predicate acts.

14

46. The RICO enterprise operates in interstate commerce and has existed for no less than two years and will continue to exists unless the Court acts to order that it cease existence and commission of acts that constitute RICO predicate acts.

47. Mr. Berry continues to be injured by the RICO enterprise because the market for lawful copies of his original works is destroyed by the pirated copies that C&S and Core-Mark use and he is subject to direct and indirect acts of threat to his person and property by the members of the Enterprise.

48. The Lenders, C&S, their agents, attorneys, including their attorneys in this case, officers and directors have all agreed and committed overt acts in furtherance of the objectives of the RICO Enterprise, including committing acts of physical threat and intimidation against Mr. Berry in violation of the Hobbs Act 18 U.S.C. § 1951 and are co-conspirators in violation of RICO 18 U.S.C. § 1962(d)

49. The Defendants including the RICO person C&S though its attorneys have attempted to induce Mr. Berry to give up his rights to his works through acts of physical threat and threat to his property, the most recent occurring on Monday August 13, 2007. By asking repeated irrelevant questions regarding Mr. Berry's ability to protect himself with licensed firearms, from criminal assault, in a deposition Lex Smith ("Smith") C&S and Fleming's attorney under the direction of Michael Baumann the Deutsche Bank, JP Morgan Chase Bank and Fleming-Core-Mark's attorney, all RICO persons, did induce or attempt to induce Mr.

15