BERRY.TXT

12    clients to commit criminal acts of infringements.

13        Q    I'm only asking for who, okay.  Can you just

14    list who you think?

15        A    I don't want to get into a debate with you

16    'cause we'll take off and we'll be here for ten

17    hours.  But you changed the question on me there

18    twice.

19        Q    The question is who owes you money?

20        A    Okay, I told you.  All the people in the

21    litigation and the people in -- I believe the

22    attorneys who have performed badly in the

23    litigations.

24        Q    Okay.

25        A    That's a nice way to put it if you

                                                          40

1    understand me.

2        Q    All I'm asking for is for you to say what

3    you mean by the litigation.

4        A    I'm talking about if we can call Berry One

5    and Berry Two.  First one Berry vs. Fleming.  Second,

6    Berry vs. Hawaiian Express, et al.  And the third one

7    with the lenders that's a whole thing by itself and

8    it's probably going to be -- we'll see what happens

9    with that.

10        Q    Okay.  Other than the lawyers who represent

11    defendants in those cases, is there anybody else that

12    you think owes you money?

13            MR. HOGAN:  I'm going to object.  It's vague

14    if you mean others and you're not including the

15    defendants as well.

16            MR. SMITH:  Fair enough.
                    Page 34

BERRY.TXT

17 Q (By Mr. Smith) Other than everybody you've

18 identified up to now?

19 A Well, probably the largest claim someone

20 owes me money is the United States Government.

21 Q Okay. Anybody else?

22 A No. I think they'll take care of the other

23 people. They'll collect it from others.

24 Q What about do you believe you have any

25 claims against a lawyer other than the lawyers who

41

1 represented the defendants in the litigation that

2 you've already described?

3 A Yes.

4 Q Who?

5 A Well, I can think off the top of my head is

6 probably Roger Fulgrum at Baker Botts.

7 Q Anybody else?

8 A Brad Beuhler but I don't think he's an

9 attorney.

10 Q Brad, what's his last name?

11 A He's your friend. You should know it.

12 Buehler, B-u-e-h-l-e-r or something like that.

13 Q Anybody else?

14 A Probably others but I have to sit and think

15 about it a while.

16 Q As you sit here today, are you able to think

17 of any others that you -- any other lawyers that you

18 think you have claims against other than what I've

19 listed or what you've listed so far?

20 A There's others but I can't remember their

BERRY.TXT

21  names.  I know one is at Sonnenschein who advised the

22  PTC or I guess it was in Fleming, the -- what do they

23  call that when they've got the board of directors

24  and -- audit committee, audit committee.  Advised the

25  audit committee it was okay for him to start wiping

42

1   computer files and records in the phase of the air

2   defense with the FCC.  He's the one that helped

3   Guidance --

4       Q    Alright.  We didn't ask you that question.

5       A    Yes, you did.

6       Q    I think you mentioned Sonnenschein and

7   that's fine.  If you can only name the firm and not

8   the individual lawyer, that's fine.  Any other

9   lawyers or law firms that you believe owe you money

10  other than the ones you've named so far?

11      A    Lynch Ichida, Mr. Hogan's old firm.

12      Q    Any other lawyers or law firms that you

13  believe owe you money other than the ones you've

14  listed so far?

15      A    There may be some but not to a point where I

16  can pursue them yet.

17      Q    Regardless of whether you're going to pursue

18  the claim, what other lawyers or law firms do you

19  believe --

20      A    I can't remember offhand.

21      Q    As you sit here today, you can't think of

22  any others?

23      A    There's others but I can't think of the

24  names.  And you don't like my stories describing it

25  so I don't know what to tell you.

Page 36

BERRY.TXT

43

1      Q    Are they Hawaii law firms or located

2  somewhere else?

3      A    I don't know.

4      Q    Okay.  Item 11 on the list.  Check stubs,

5  have you produced any check stubs?

6      A    I don't have any.

7      Q    Cancelled checks, have you produced any

8  cancelled checks?

9      A    I don't have any.

10     Q    Ledgers, have you produced any ledgers?

11     A    I don't have any.

12     Q    Other documentation illustrating any wage,

13  salary or other forms of compensation you have

14  received in the past five years?

15     A    I produced everything I have.

16     Q    And what is that?  You produced the contract

17  with Hawaiian or with Y. Hata.  Have you produced

18  anything else within the description of number 11 on

19  this list?

20     A    No.  The only thing I can think that could

21  have been in there could have been some 1099 or

22  something like that.  And in moving and shuffling

23  boxes, I've looked, I can't find it.  I know that

24  things were lost moving around so.

25     Q    How does Y. Hata pay you?

44

1      A    By check.

2      Q    They pay you with check?

BERRY.TXT

3      A    Yes.

4      Q    And do they mail that check somewhere?

5      A    Yes.

6      Q    Where do they mail it?

7      A    To addresses in here.  I guess it's not.  I

8  think it's 5500 Military Trail and that's in Jupiter,

9  Florida and I think it's 33468.

10         MR. HOGAN:  I'll state for the record that

11  in the Lynch Ichida withdrawal and substitution that

12  they filed recently in the case, they put that

13  address in and I believe it's in the record in the

14  case.

15         MR. SMITH:  Okay.  And is -- do you know if

16  the address he's given is the correct one he's --

17         MR. HOGAN:  Well, Military Trail is what

18  rings a bell.  I don't have it specifically committed

19  to memory.

20      Q    (By Mr. Smith) Okay.  What is 103 East

21  Thatch Palm Circle, Jupiter, Florida?

22      A    That's a house address.

23      Q    And who lives at that house?

24      A    I do.

25      Q    Anybody else?

45

1      A    Sally Apgar.

2      Q    And I take it the Military Trail address is

3  not a house address?

4      A    It's a street address.  It's a UPS store.

5      Q    Okay.  And what do you do with the check

6  from Y. Hata when it arrives?

7      A    I deposit it to the Bank Atlantic normally.

Page 38

BERRY.TXT

8      Q     Okay.  Did Y. Hata pay by a check before you

9    lived in Florida?

10     A     Yes.

11     Q     And where did they mail the check?

12     A     The Hawaii Kai address, the -- my P.O. Box

13   where the guy is no longer in business.

14     Q     And what did you do with the check when you

15   received it there?

16     A     Usually cash it.

17     Q     Where did you go to cash it?

18     A     I think maybe Bank of Hawaii.  That's where

19   Y. Hata's account was and they would cash it for me.

20     Q     The checks were drawn on Y. Hata and you

21   cashed them?

22     A     Yes.

23     Q     You didn't have an account that you

24   deposited them into the way you're doing now that you

25   live in Florida?

                                                        46

1      A     No.

2      Q     And it's your sworn testimony you have no

3    record of any of those payments that you could have

4    produced today?

5      A     Not that I could find, no.

6      Q     How often does Y. Hata pay you?

7      A     Over what period of time?  I mean this last

8    recently?

9      Q     Well, let's say in 2007, do you receive a

10   check once a month or --

11     A     Once a month.  Sometimes they skip a month.

                        Page 39

BERRY.TXT
12   It varies.

13      Q   What about in 2006?

14      A   Same thing.

15      Q   2005?

16      A   Pretty much consistently over the term of

17   the contract they pay monthly or sometime skip a

18   month or two but catch up.

19      Q   The checks come monthly in general at least?

20      A   In general.

21      Q   Number 12.  Pleadings containing the full

22   caption of any lawsuit that you've been a party to.

23   I notice you do have some captions in here.  Have you

24   produced copies of the caption of any suit you've

25   been a party to in the last five years?

47

1       A   All the captions I had, yes.

2       Q   Are there any suits that you have been a

3    party to in the last five years for which you have

4    not produced a caption today?

5       A   Not that I'm aware of.

6       Q   12.  Lease agreements or other contracts

7    providing for payment of any monetary sums.

8       A   That's 13.

9       Q   I'm sorry, 13.  Lease agreements or other

10   contracts providing for payment of any monetary sums

11   to you from any individual or entity.

12      A   I produced the Y. Hata contract.  That's all

13   I could find to be responsive to that.

14      Q   Okay.  Are you aware of anything that's

15   responsive to this that you could not find a copy of?

16      A   No.

Page 40

BERRY.TXT

17    Q    So it's your sworn testimony today that

18  there are no lease agreements or other contracts

19  providing for payments of any monetary sum to you

20  from any individual or entity other than Y. Hata?

21    A    As long as we leave the definition of the

22  term contract does not include anything regarding the

23  lawsuits and all that stuff, yes.

24    Q    14.  Qualified retirement plans in which you

25  have an interest or that have been adopted by your

48

1  employer including but not limited to 401(k) plans

2  profit-sharing plans, pension plans and simplified

3  employee pension plans.

4    A    No.

5    Q    I take it then your answer to 15 is none?

6    A    Correct.

7    Q    Non-qualified deferred compensation plans?

8    A    None.

9    Q    17.  Stock certificates in corporations of

10  which you are a record holder of any stock.

11    A    None.

12    Q    What about Atlantic Pacific International,

13  Inc.?

14    A    I think it's gone.  I wouldn't consider that

15  an active company.

16        MR. HOGAN:  I'll state for the record that

17  the official -- the original shares were given to the

18  U.S. Attorney's office.  I delivered them the weekend

19  before Lokelani's trial and I had delivered them on a

20  Friday.  I dropped a little box and if you want to

Page 41

BERRY.TXT

21    get them, call the FBI.  They have them.

22        Q    (By Mr. Smith) Do you have an understanding

23    whether you are the owner of the shares of Atlantic

24    Pacific International, Inc.?

25        A    I don't know how that works once

                                                        49

1    everything -- company's done and gone.  I don't know

2    if I could answer that one way or another.

3        Q    Okay.

4        A    I was at one time.

5        Q    Does Atlantic Pacific International, Inc.

6    have any assets at the present time to your

7    knowledge?

8        A    Not that I'm aware of.

9        Q    You were a president and sole shareholder of

10    Atlantic Pacific International, Inc. at one time,

11    right?

12        A    Yes.

13        Q    Did anybody succeed you as president of

14    Atlantic Pacific International, Inc.?

15        A    Not that I'm aware of.

16        Q    18.  Balance sheets, income and expense

17    statements and other corporate documents of the

18    corporation in which you hold stock.  I take it the

19    answer is no?

20        A    Correct.

21        Q    All -- 19.  All documents indicating any

22    interest in which you way have or evidence of

23    ownership of any individual retirement account?

24        A    None.

25        Q    20.  Trust documents by which you have

                        Page 42

BERRY.TXT

50

1    transferred money or property to any trust within the

2    last five years.

3        A    None.

4        Q    Have you transferred any property to a trust

5    in the last five years?

6        A    No.

7        Q    Do you have any individual retirement

8    accounts?

9        A    No.

10       Q    Did I -- do you have any deferred

11   compensation plans?

12       A    No.

13       Q    Do you have any 401(k) plans, pension plans

14   or simplified employee pension plans?

15       A    No.

16       Q    Are you a beneficiary of any trust?

17       A    I don't think so.

18       Q    Are there any -- are you aware of any trusts

19   that you might be a beneficiary of?

20       A    The only reason I said I don't think so is I

21   know my father had a trust set up.  He's passed away.

22   And there was the last documents I saw in the '90s I

23   was the executor and sole beneficiary.  But I think

24   he probably changed that.  I never saw the change.

25       Q    Your father had a judgment against you at

51

1    one time, right?

2        A    Yes.

BERRY.TXT

3      Q     What is the status of that judgment?

4      A     Expired.

5      Q     Since your father passed away, who became

6   the owner of that judgment?

7      A     I have no idea.

8            MR. HOGAN:  For what it's worth, it probably

9   could be him.

10           THE WITNESS:  I may still be the trustee and

11  executor and sole beneficiary for all I know.  No

12  one's told me.

13     Q     (By Mr. Smith) You haven't heard anything

14  from the estate of your father after he passed away?

15           MR. HOGAN:  That wasn't renewed within ten

16  years.

17           THE WITNESS:  I've heard absolutely nothing.

18  No one notified me, nothing.

19     Q     (By Mr. Smith) I'm not limiting the question

20  to the judgment now.  I'm asking more generally

21  whether you heard anything from anyone on behalf of

22  your father's estate after he passed away.

23     A     I've heard from no one regarding my father.

24  I had to find a death record on my own.

25     Q     Other than your father's estate, are you

                                                    52

1   aware of any other trusts in which you may have an

2   interest?

3      A     I'm not aware of any, no.

4      Q     Number 21.  Documents reflecting transfer of

5   title of any assets by you in the last five years.

6      A     To me or from me?

7      Q     Question 21 is asking about transfers made

                        Page 44

BERRY.TXT

8  from you to someone else.

9      A    From me to someone else.  No.

10     Q    Okay.  What about transfers of assets to you

11  from someone else?

12     A    Is that one of the questions?

13     Q    That's my question.

14     A    Okay.  You got the document too.  The second

15  EULA addendum which I've filed with the United States

16  Copyright Office where Fleming transferred anything

17  they wrote regarding that freight control system to

18  me and I'm . . .

19     Q    Okay.

20          MR. HOGAN:  It's all the software your

21  client is using out there at Kapolei.

22          THE WITNESS:  Right.

23     Q    (By Mr. Smith) Okay.  So that's a transfer

24  to you from somebody else?

25     A    Yes.


                                                      53

1      Q    Is a Second EULA Addendum.  Says the

2  document is entitled Second EULA Addendum so I'll

3  have no trouble finding it?

4      A    Oh, I'm sure you can find it.  It's -- we

5  jockey back and forth about the title but that's what

6  it is.

7      Q    Okay.  I think I know what you're talking

8  about.  So that is the document that your testimony

9  is that transferred assets to you.  Are you aware of

10  any other transfer of assets to you over the last

11  five years?

                        Page 45

BERRY.TXT

12      A      No, I didn't say it was transferred to me

13   over the last five years.  That's a transfer to me of

14   1999 continuing to this day.  And all I said was I

15   am -- I filed it.  I don't know if it's recorded yet

16   with the United States Copyright Office just to be

17   clear.

18      Q      Okay.  My question is are you aware of any

19   other transfers of assets to you from somebody else

20   other than what you just described?

21      A      No.

22      Q      Where did you purchase -- well, we discussed

23   some firearms that you own, right?

24      A      Yes.

25      Q      Where did you acquire them?

                                                        54

1       A      In Hawaii.

2       Q      And can you be more specific about where in

3    Hawaii you acquired them?

4       A      I can't remember the gun store.

5       Q      Where was it located?

6       A      It seems like it was over in the Mapunapuna

7    area.

8       Q      Okay.  Do you have any records relating to

9    those weapons?

10      A      I'm sure I do.  And the other one was

11   acquired at a gun store.  It used to be close to

12   Fisher.  I think they went out of business.

13      Q      How many firearms do you own?

14      A      Three.

15      Q      Can you list them please?

16      A      A Benelli M90 and two H & K USP 45s.

                        Page 46

BERRY.TXT

17        MR. HOGAN:  Did your friends find another

18   trail to Mr. Berry's house, Lex?

19        Q    (By Mr. Smith) The first one, does that

20   start with a B, Benelli?

21        A    Yes.

22        Q    How much did you pay for it?

23        A    I don't recall.

24        Q    What was the source of the money that you

25   used to pay for it?

                                                         55

1         MR. HOGAN:  I'm going to state for the

2    record that this has very little to do with a proper

3    judgment debtor examination.

4         I'll state for the record that there is a

5    series of time records where on a weekend in which

6    Mr. Berry's brother-in-law was assaulted in his house

7    in which we believe persons carrying firearms,

8    entered the State of Hawaii on a private jet and Mr.

9    Smith met with them and that he has time records were

10   excised in the first case for approximately $4,000 of

11   time for the very days that these gentlemen were

12   here.

13        I believe these questions are being asked

14   for the purpose of advancing racketeering activities

15   that has occurred and will occur again in the State

16   of Hawaii.  I believe it violates the Fair Debt

17   Collections Practices Act as well as the RICO Act.

18   And you can answer the question.  And it's meant to

19   intimidate the witness.

20        Q    (By Mr. Smith) The question was what was the

                           Page 47

BERRY.TXT

21   source of the money you used to pay for the Benelli?

22       A    I guess it's money I earned at API.

23       Q    When did you buy the Benelli?

24       A    Mid '90s somewhere.

25       Q    Then you identified two H & K firearms.

56

1    What was the date that you acquired those?

2        A    I think it was shortly after you sent the

3    goons to my house.  So what was that?  You should

4    know.

5        Q    Let me just state for the record that I deny

6    all of the accusations about me sending goons to your

7    house.

8        A    Can we get your time records for these ten

9    days?

10       Q    Just so that it's clear, I state for the

11   record that this is a bunch of hogwash --

12       A    Can we get your missing --

13       Q    Now, I ask the questions here.  And the

14   question is when did you buy the H & K weapons?

15       A    Shortly after -- I told you.  Shortly after

16   that was November 2001.  I don't remember exactly

17   when.  Sometime after that.

18       Q    And what was the source of the funds for

19   those weapons?

20       A    I don't recall.

21       Q    You said that the United States Government

22   owes you a lot of money.  Could you please explain

23   what the government owes you money for?

24       A    For using the freight control system that

25   you and Mr. Fulgrum got the copy from the United

BERRY.TXT

57

1    States Copyright Office without permission and used

2    it to verify KBR's LOGCAP contract in 2002.

3        Q    Anything else?

4        A    I think that's enough.

5        Q    I'm not asking whether you think it's

6    enough.  I'm asking whether there's any other basis

7    on which you think the U.S. Government owes you

8    money?

9        A    I'm sure it goes into other departments and

10   other things but, you know, government auditors can't

11   even get a look at some of this stuff from KBR so I

12   guess it's just going to be -- just got to file a

13   claim and see where it goes.  And I guess that will

14   kind of detail it and figure it out.

15       Q    Now, what -- does KBR stand for something?

16       A    Kellogg Brown & Root.

17       Q    And you said something about log caps,

18   correct?

19       A    Yes.

20       Q    What does that mean?

21       A    That's the logistics contract that KBR won

22   in December of 2001 right after the 9/11 incident to

23   supply the military with logistic support for various

24   products, food, restaurant supplies, gasoline, things

25   like that in areas of operations.

58

1        Q    Okay.  And you believe the U.S. Government

2    is using something that you authored in order to

Page 49

BERRY.TXT

3    perform that contract?

4        A    Yes.

5        Q    Or that Kellogg Brown & Root is using

6    something you authored to perform their contract?

7        A    I'm not sure how that would work.  Kellogg

8    Brown & Root charged the government a large amount of

9    money for an access database produced to the United

10   States Government they claim to be proprietary and

11   secretive.  So they'll sort it out somehow I'm sure.

12       Q    Okay.  Is this a lawsuit that you're

13   planning on filing soon?

14       A    Yes.

15       Q    Are you planning on filing it in Hawaii?

16       A    No.  It will be in the U.S. Court of Claims.

17       Q    Okay.  22.  Document reflecting transfers of

18   real property by you within the last five years.

19       A    If I understand the definition of real

20   property, I don't believe there are -- I had any to

21   transfer.  There's no transfers.

22       Q    So you have made no transfers of real

23   property in the last five years?

24       A    Not that I'm aware of.

25       Q    Do you own any real property today?


                                                          59

1        A    Not that I'm aware.

2        Q    23.  Gift tax returns for the last five

3    years.

4        A    I don't have any.

5        Q    Have you made any gifts to anyone in the

6    last five years?

7        A    Not that I'm aware of.

                        Page 50

BERRY.TXT

8        Q     You made any loans to anyone in the last

9    five years?

10       A     Not that I can recall.

11       Q     All partnership agreements in which you are

12   either a general partner or limited partner.

13       A     I don't believe I've entered into any

14   partnership agreements.

15       Q     So as far as you know, you're not a party to

16   any partnership agreement today?

17       A     I don't think so.

18       Q     What about with Alan Sinesky?

19       A     There's no partnership agreements.

20       Q     Do you have any co-venture arrangements with

21   Mr. Sinesky at all?

22             MR. HOGAN:  Objection, vague as to the term

23   co-venture.  Calls for a legal conclusion.

24       Q     (By Mr. Smith) You may answer to the extent

25   you understand.


                                                        60

1        A     There's no co-venture agreements of any kind

2    between him and me.

3        Q     25.  Any contracts between you and anyone

4    else including but not limited to the government for

5    any works performed by you under which you are owed

6    any money?

7        A     I don't think there are any.

8        Q     There are none other than Y. Hata?

9        A     I don't believe so.  That's correct.

10       Q     Number 26.  All contracts between you and

11   any other person including but not limited to the

Page 51

BERRY.TXT

12    government for any work that you are currently

13    performing?

14        A    There are none.

15        Q    Now, you have, in the past, worked on a lot

16    of different software projects, right?

17        A    Over my lifetime, yes.

18        Q    Right.  And sometimes it's on your shoulders

19    to create something and then demonstrate the project

20    and get a sale for it, right?

21        A    Yes.

22        Q    That's how you made your living, right?

23        A    Yes.

24        Q    Is that still how you make your living?

25        A    Yes.

61

1        Q    Okay.  So what projects have you worked on

2    like that in the last five years?

3        A    Nothing -- for a demonstration purpose?  The

4    only ones I can think of is I've done variance of the

5    freight control system like with Horizon Lines on

6    some of the EDI stuff.  Some has worked, some hasn't.

7    They're not quite up to speed on certain things.  I

8    was looking at that and talking to some of the food

9    vendors as a variant of the freight control system to

10    work for them for placing direction orders.

11        Q    Okay.  So you have made some kind of a

12    proposal to Horizon Lines within the last five years?

13        A    No, no, nothing that formal.  I've worked

14    with their EDI by sorting out different transaction

15    sets that they were bringing on-line because they've

16    been going through a lot of rewrites and changes.

Page 52

BERRY.TXT

17    Q    Okay.  I'm not asking about whether it was

18  formal or not.  Have you approached Horizon Lines

19  about the possibility of your doing business with

20  them?

21         MR. HOGAN:  I'm going to just make a

22  statement.  I'm putting this under the protective

23  order sealed.  He'll tell you how to do it.  I

24  believe this is -- you have every right to find out

25  if you can collect your judgment.  I believe this is

                                                    62

1   intentionally intended to harm a competitor of your

2   client and I'm going to just impose an objection.

3          Go ahead.

4          THE WITNESS:  Not so much to do business

5   with them.  It's more -- well, it would have been --

6   some of these things that didn't quite come together

7   would have been nice for Y. Hata's benefit.  And it

8   would have been no a charge thing for them.  But

9   these EDI transactions that's -- Horizon has been

10  changing roughly would mean for them doing this

11  stuff -- kind of thing.

12         Anyway, I saw it as if I could work with

13  them, finish some of these things, then I could do

14  what you're talking about.  Not necessarily a

15  proposal to Horizon but more with a proposal like

16  going back to one of the food vendors or something.

17    Q    (By Mr. Smith) Okay.  So you haven't made

18  any proposal to Horizon to do business with them?

19    A    No.  It was more of a preliminary working

20  with them on things in anticipation of making

                           Page 53

BERRY.TXT

21    proposals to other people.

22        Q    And Horizon has never made any offers to you

23    to license any product or buy any product from you?

24        A    They don't need my stuff.

25        Q    Okay.  So but the answer to my question is

                                                        63

1    correct, they've never made such an offer, right?

2        A    No.

3        Q    Now, you've mentioned various food vendors.

4    Have any food vendors other than Y. Hata been

5    approached by you in the last five years regarding

6    doing business with you?

7        A    I think Foodland falls in that time frame.

8        Q    Okay.  Any others?

9        A    Approached me or approached them or either?

10        Q    Either.

11        A    There were a couple.  I just can't remember

12    their names.

13        Q    Okay.  In Foodland's case, there was never

14    any agreement reached to do business between you and

15    Foodland, is that right?

16        A    We never did business.

17        Q    Okay.  And regarding a couple of other food

18    vendors that you talked to, you never did business

19    with them either?

20        A    No.

21        Q    Have you had any discussion with anybody

22    else regarding the possibility of you doing business

23    with them over the past five years?

24        A    There's always discussion.  I can't remember

25    all of them.  More recently there's -- as an example,

                         Page 54

BERRY.TXT

64

1    there's some consultants from U.S. Customs and Border

2    Patrol that contract out that a freight control

3    system might fit in.  There were some discussions

4    there.

5            There's been some discussions regarding some

6    stuff regarding Sarbanes-Oxley compliance on

7    transferring EDI employee data for large companies

8    between HMOs.  Gets a little out of my league.  The

9    EDI stuff I could do pretty easily.  They want to do

10   business talks or -- there's always interest and

11   inquiries on a fairly regular basis.  Could be as

12   high as 20 or 30 a month for that kind of stuff.

13   Most of them don't go anywhere.  They -- sometimes

14   they have some interest but haven't so far.

15       Q    So you get 20 to 30 inquiries per month from

16   people interested in the possibility of doing

17   business with you?

18       A    Since I've been in Florida, yes.

19       Q    That's only since you've been in Florida?

20       A    Yes.

21       Q    To what do you attribute -- is this an

22   increase over the number of inquiries you received

23   when you were in Hawaii?

24       A    Oh, yes.

25       Q    To what do you attribute the increase?

65

1        A    You're not there.  How's that?

2        Q    It's that I am not in Florida?

Page 55

BERRY.TXT

3      A     I think that's a nice way of saying it, yes.

4            MR. HOGAN:  Not yet.

5      Q     (By Mr. Smith) Okay.  And so this -- and

6      this 20 to 30 per month goes over the past 12 months

7      or so?

8      A     On and off, it goes up and down, you know.

9      Just --

10     Q     And despite all of those inquiries -- so

11     that's over a course of a year that's several hundred

12     inquiries, right?

13     A     Easily, yes.

14     Q     And how -- is it correct that none of those

15     inquiries has resulted in any business being done

16     between you and the parties that inquired?

17     A     That's true.  And it's mostly my fault in

18     that area.

19     Q     And why is it your fault?

20     A     There's been medical issues regarding

21     Sally's parents and she just got out of the hospital

22     and things like that.  So most of these inquiries

23     come anywhere from like New York through Dallas up

24     through Chicago, State of Washington, in Florida,

25     Virginia, North Carolina, all over the place.

                                                      66

1            This is contract type work.  Anywhere from

2      three months to six months.  Short term, high pay, do

3      certain specialized things and then you get out.  And

4      it takes money to go do it.  I have to travel doing

5      initial one or two-week deal, come home, finish my

6      work, return, do an installation.  And I just haven't

7      had that kind of time where I could be away during

                          Page 56

BERRY.TXT

8    this year so far.  But it looks very good for the

9    future.

10        Q    Okay.  So have you been offered work?

11        A    Yes.

12        Q    Okay.  And who has offered you work over the

13    last year?

14        A    Like I say, these inquiries now.  Out of the

15    20 or 30 in a month, I might respond to maybe only

16    three or four because, you know, look at them, check

17    the companies out, see what they're doing and respond

18    to them it looks good.  And, you know, it's just

19    something I haven't been able to, for my own personal

20    time, do anything.

21        Q    Do you have an understanding of the

22    difference between an inquiry and an offer?

23        A    Obviously not from where you're going with

24    this but go ahead.

25        Q    Okay.  Well, I guess when you say inquiry,

                                                          67

1    it sounds like there's some preliminary discussion

2    where an offer would be or someone is actually

3    telling you they're prepared to pay you for doing

4    certain things.

5        A    Well, in a contract program especially in

6    high end stuff when you're doing EDI, Biztalk, things

7    like that for customers, specifically you want to put

8    a cog to make a big machine work a different way.

9    It's very different.

10            Offer and acceptances, customers will have a

11    budget.  And they'll say hey, we got 30 grand, we

                          Page 57

BERRY.TXT

12    need this done in 90 days.  Can you do it?  And you

13    go look at the company, figure it out, come back and

14    say either you think you can or you think you can't.

15    There's not a lot of discussion.

16        Q    Alright.  So have you responded to anybody

17    telling them that you think you can do what they want

18    to?

19        A    No.  Basically for the reasons I've told

20    you.  I've said I could do it but I'm not in a

21    position to commit that kind of time and resources

22    and travel right now.

23        Q    So you haven't responded with willingness to

24    do any of the work that anybody has approached you?

25        A    Yes, I have.  I'm going to go back and talk

68

1    to them again when I am free and clear to do it.

2        Q    Who are the parties that you have

3    responded --

4        A    I don't know.  They're written down in a

5    note pad or in an e-mail.

6        Q    Please state to the best of your

7    recollection the names of the parties that you have

8    responded favorably to.

9        A    I don't know because they're -- a lot of

10    them, they're headhunter type people where, you know,

11    companies pay them and contract them to go find

12    people.  I can't recall the names off the top of my

13    head.

14        Q    You're not able to identify a single one of

15    those parties as you sit here today?

16        A    No, no.

Page 58

BERRY.TXT

17    Q    And you have not produced any documents from

18    any of those parties as you sit here today?

19         MR. HOGAN:  Objection, he's not asked to

20    produce.

21    Q    (By Mr. Smith) I'm not trying to get into a

22    debate over that.  I just want to know is anything

23    from any of those parties contained in what you

24    produced today?

25    A    No.


                                                    69

1          MR. SMITH:  Okay.  Let's take five minutes.

2    My three hours are running fast.

3          (Recess taken.)

4    Q    (By Mr. Smith) I would like to go back to

5    the bank statement you provided from the bank in

6    Florida.  Your testimony again is that you produced

7    all the records that you had from Bank Atlantic,

8    right?

9    A    Yes.

10   Q    So if we look at page 31 on the right hand

11   side, it says page 1 enclosures 2.  what are the

12   enclosures that are referred to there?

13   A    I don't know.  I usually don't keep the

14   first page.

15   Q    You threw the rest of the statement out?

16   A    Yes.

17   Q    As well as any enclosures?

18   A    Yes.

19   Q    Was there more than one statement or one

20   page of this statement?

                        Page 59

BERRY.TXT

21     A    I don't know.  I'm usually after this thing

22  where it's got the summaries and balances like I can

23  see what all that is.

24     Q    So you started with a balance of $64,147.95,

25  correct?

70

1     A    Okay.

2     Q    As of April 17, right?

3     A    Where do you see the April 17?  At the top

4  there, okay.

5     Q    And then it says debits of $25,295.19?

6     A    Okay.

7     Q    Where is the portion of the statement that

8  identifies the debits?

9     A    I don't know.

10     Q    You don't know so you don't have it in your

11  possession?

12     A    This is -- no.  This is all I had in the

13  stack of papers.

14     Q    Is it your testimony you threw out the rest

15  of the statement that identified what the debits you

16  had made?

17     A    I most likely did, yes.  I didn't find it,

18  produce it.  Or else I would have scanned it in too.

19     Q    Okay.  And page 32 is again page 1

20  enclosures 2.  And my question again is where are the

21  enclosures?

22     A    I don't know.  This is the only page I had.

23     Q    What are the debits?  Can you just tell me

24  what were the amounts that came out of this account

25  of $25,820?  That's in the month for May 17 to June

Page 60

BERRY.TXT

71

1    17, 2007.  Where did that money go?

2        A    I don't know.

3        Q    You're not able to say what happened to any

4    of that $25,870?

5        A    Not offhand, no.

6        Q    What about the 25,295 that was expended from

7    April 17 to May 17 out of this account?

8        A    I don't know.

9        Q    What are the enclosures that come with your

10   bank statements?

11       A    I don't know.

12       Q    Okay.

13       A    I don't look at them.

14       Q    You don't look at them and you don't know

15   what you spent your money on during those two months?

16       A    Not as we sit here, no.

17       Q    Do you have any records that would reflect

18   what you spent your money on?

19       A    No.  I would have produced them.

20       Q    Does Bank Atlantic provide your cancelled

21   checks with your statements?

22       A    No.  I think most banks hold those now.

23       Q    I'm not asking about what most banks do.

24       A    I don't -- they don't send them to me so I

25   assume they have them.

72

1            MR. HOGAN:  They shred them.

2        Q    (By Mr. Smith) So -- but your testimony is

Page 61

BERRY.TXT

3    that Bank Atlantic does not provide your cancelled

4    checks to you?

5        A    I haven't seen any.  So no, I don't think

6    they do.

7        Q    Okay.  Same question regarding what you've

8    produced that's numbered page 33.

9        A    That would be the same set of answers for

10   the previous two pages.

11       Q    You've got total debits of $20,269?

12       A    Right.

13       Q    Where did that money go?

14       A    I don't know.

15       Q    Where are the records that reflect where

16   that money went?

17       A    I don't have them.  I'd imagine they'd be at

18   the bank.

19       Q    And what did you do with the rest of the

20   paper that came with this page that's numbered 33?

21       A    Wasn't with this page I copied.  So I would

22   assume I threw it out.

23       Q    And your testimony is the same regarding the

24   page that's numbered 34?

25       A    You skipped a page, yes.


                                                 73

1        Q    I think I did ask -- I think I was asking

2    about 33.

3        A    Okay.  It would be the same for all four of

4    those --

5             MR. SMITH:  Well, let me just add to my

6    statement earlier that the records are incomplete.

7    That each of these bank statements that's been

                       Page 62

BERRY.TXT

8   produced is incomplete also and my rights are

9   reserved for the same purpose.

10        MR. HOGAN:  Well, let me put on the record

11  that he has produced the documents in his possession.

12  That is all he's required to do.  If you want to go

13  and get the bank records, why don't you get on your

14  little horse and go get the bank to give them to you

15  instead of sitting here trying to further prejudice a

16  guy who has traveled 5,000 miles to be with you

17  today.  I think you've now crossed into the world of

18  judgment debtor harassment for the second time.

19        Q    (By Mr. Smith) Mr. Berry, you have produced

20  a copy of a 2003 agreement with Y. Hata, is that

21  correct?

22        A    Yes.

23        Q    Now, has that been amended?

24        A    Not that I'm aware of.

25        Q    What is the agreement that is currently in

74

1   force between you and Y. Hata?  Just summarize the

2   terms please.

3         A    I don't know.

4         Q    What do you agree to do and what do they

5   agree to do?

6         A    I think this is the agreement basically

7   right here.

8         Q    I'm just asking you to summarize what you do

9   for them and what they do for you.

10        MR. HOGAN:  Objection, the document speaks

11  for itself.

Page 63

BERRY.TXT

12    Q    (By Mr. Smith) You may answer.

13    A    I wrote a new freight control system that

14 was being used to manage their freight.

15    Q    I understand that.  Do they have a license

16 to use your -- you granted them a license to use

17 software that you created, right?

18    A    Yes.

19    Q    Is there anything else that -- any other

20 agreement or arrangement between you and Y. Hata

21 besides their holding a license that entitled them to

22 use software you created?

23    A    Only in the form of advising them or

24 answering questions to them regarding freight or --

25    Q    Anything else that you do for Y. Hata

                                                    75

1 besides advise them and answer questions?

2    A    No.  And the freight software.  That's about

3 it.

4    Q    Well, you said and the freight software.

5 Is -- when you say the freight software, is there

6 anything to that agreement other than you're giving

7 them permission to use the software?

8    A    That's a standard license agreement.

9    Q    So they're licensed to use it and you give

10 them advice and you answer their questions, correct?

11    A    Yes.

12    Q    Anything else that you do for Y. Hata?

13    A    I think that's it.

14    Q    Okay.  How many hours a day do you spend

15 advising Y. Hata?

16    A    Viewing stuff, looking at things, a couple.

                         Page 64

BERRY.TXT

17    Q    About two hours a day?

18    A    About.

19    Q    Is -- does that include the time you also

20    spend answering questions?

21    A    Probably.

22    Q    How many days a week?

23    A    I'd say typically five.

24    Q    Monday through Friday typically?

25    A    As far as interacting with them or anyone.


76

1    Q    Okay.  I'd like to make this exhibit the

2    next exhibit in order.  We'll take care of that in a

3    minute.

4         MS. BRONSTER:  I just want to know which

5    number this was in.

6    Q    (By Mr. Smith) Do you recognize the Exhibit

7    B which has been put in front of you?

8    A    I think I've seen this, yes.

9    Q    Did you see it before it was signed and

10   sent?

11   A    I think I did.

12   Q    And did you approve of its contents?

13   A    Yes.

14   Q    So I'm interested in the paragraph at the

15   bottom of page 2.

16   A    Okay.

17   Q    It says that you provide freight logistic

18   services to Y. Hata, Ltd. and have no staff and

19   therefore need to be engaged Monday through Saturday.

20   A    Right.

BERRY.TXT

21    Q    Is that true?

22    A    Yes.

23    Q    Now, do you need to be engaged for only two

24    hours a day or do you need to be available all day to

25    provide advice and answer questions?

77

1    A    I try to be available 24 hours a day, seven

2    days a week and sometimes they take advantage of it

3    too.

4    Q    In order to meet your obligation to Y. Hata,

5    what hours do you need to be available to them?

6    A    As I would anybody I do business with, I

7    need to be available to them, you know, when they

8    need me and they usually operate on Monday through

9    Saturday.

10    Q    Okay.  So you agree that you would not be

11    able to appear for a deposition because of your

12    obligation to Y. Hata?

13    A    Oh, yeah.  Today was very, very difficult.

14    Q    Okay.  See I'm just trying to understand

15    whether -- how the two hours a day fits with the

16    testimony you're giving.

17    A    You're always getting into this nonsense

18    about nit-picking this thing 'cause you don't even

19    keep your time records right.  You hide them when you

20    send the goons out.  But you have to understand

21    there's more to it than that.  When you're working on

22    programs, you implement changes.  Sometimes you have

23    to sit there and you got to baby-sit changes for

24    three weeks before you know it's going to work.

25    Q    All I want to know is do you need to be

Page 66