# EXHIBIT C

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related to Docket No. 16** |

### BRIDGE FINANCING ORDER

Upon the Motion (the "Motion") of Fleming Companies Inc. (the "Borrower")

and each of its subsidiaries which have filed petitions for relief under Chapter 11 of title 11 of

the United States Code (the "Bankruptcy Code") (each such entity, individually referred to as a

"Debtor", and collectively, the "Debtors"), for the entry of an order (the "Bridge Financing

Order") authorizing the Debtors to borrow money and obtain other financial accommodations

from Deutsche Bank Trust Company Americas ("DBTCA") and JPMorgan Chase Bank

("JPMC") and such other lenders party (the "Pre-Petition Lenders") to that certain Credit

Agreement dated as of June 18, 2002 (as amended, supplemented or otherwise modified prior to

the commencement of these Chapter 11 cases, the "Pre-Petition Loan Agreement"), who so elect

---

[1] The Debtors are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C.; Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

to participate in the financial accommodation hereunder (DBTCA, JPMC and such participating

lenders, collectively referred to as the "Bridge Lenders"), and to give security therefor; the Court

having examined the Motion; and upon completion of a hearing pursuant to Sections 363 and

364 of the Bankruptcy Code, and Bankruptcy Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"); and the Court having determined that the relief requested in

the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-

interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; and

upon the following stipulations of the Debtors and the Bridge Lenders (as defined below):

THE COURT FINDS THAT:

A.      On April 1, 2003 (the "Filing Date"), the Debtors filed voluntary petitions

for reorganization under Chapter 11 of the Bankruptcy Code (the "Petitions"). Pursuant to

Sections 1107 and 1108 of the Bankruptcy Code, the Debtors have retained possession of their

respective assets and are authorized, as debtors-in-possession, to continue the operation and

management of their respective businesses. This Court has jurisdiction to enter this Order

pursuant to 28 U.S.C. §§157(b)(2) and 1334, and consideration of the Motion is a core

proceeding as defined in 28 U.S.C. §§157(b)(2)(A) and (D).

B.      Each Debtor acknowledges, admits and agrees that, as of the Filing Date

and pursuant to the Pre-Petition Loan Agreement and the other loan documents executed in

connection therewith (collectively, the "Pre-Petition Loan Documents"), the Pre-Petition Lenders

made loans and advances to the Borrower, issued or caused to be issued letters of credit on the

Borrower's behalf and incurred obligations in connection with Treasury Services[2] (the "Pre-

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such
terms in the Pre-Petition Loan Agreement.

Petition Indebtedness"). Pursuant to the Pre-Petition Loan Documents, the entities listed on

Exhibit A hereto (the "Guarantors") guaranteed the Pre-Petition Indebtedness and, together with

the Borrower, secured the Pre-Petition Indebtedness with first-priority security interests and liens

on all of the Debtors' then existing and after acquired assets set forth in Section 1.1 of the

Security Agreement and Section 3.1 of the Pledge Agreement, including, without limitation,

accounts receivable, inventory, instruments and chattel paper evidencing accounts receivable or

into which any accounts receivable have been, or hereafter are, converted, securities, limited

liability company interests, partnership interests, security entitlements, financial assets and

investment property, and all proceeds and products of any and all of the foregoing (the "Pre-

Petition Collateral").

      C.    As of the Filing Date, each Debtor acknowledges, admits and agrees that it

was in default under the Pre-Petition Loan Documents and was indebted to the Pre-Petition

Lenders under the Pre-Petition Loan Agreement in the aggregate principal sum of not less than

$604 million (including outstanding letters of credit and fees associated therewith of

approximately $146 million), together with interest accrued thereon, plus costs, fees and

expenses pursuant to Section 9.03 of the Pre-Petition Loan Agreement and obligations incurred

in connection with Treasury Services not to exceed $50 million. Each Debtor acknowledges and

admits (a) the legality, validity and enforceability of the Pre-Petition Indebtedness owing to the

each Pre-Petition Lender and each Agent (as defined in the Cash Collateral Stipulation (as

defined below)) as shown on the books and records of the such Pre-Petition Lender and/or such

Agent, (b) that the security interests and liens held by the Pre-Petition Lenders and the Agents in

and upon the Pre-Petition Collateral (the "Pre-Petition Financing Liens") are duly perfected,

legal, valid, binding and enforceable first-priority liens and security interests on the Pre-Petition

Collateral, not subject to avoidance, defense, objection, action, counterclaim, setoff or

subordination under the Bankruptcy Code or applicable non-bankruptcy law, except to the extent

that such liens and security interests are subject to the Carve-Out (as defined below), (c) the

legality, validity and non-avoidability of all payments made to or on behalf of the Pre-Petition

Lenders and the Agents prior to the Filing Date, (d) that the Pre-Petition Lenders' and the

Agents' pre-petition claims, liens and security interests against the Debtors' estates and their

property are not subject to avoidance, defense, objection, action, counterclaim, setoff or

subordination, (e) that the Debtors do not possess, may not assert and have waived any claim,

objection, action, counterclaim, set-off, right or defense of any kind or nature which could in any

way affect the validity, priority, enforceability and nonavoidability of the Pre-Petition

Indebtedness or the liens and security interests of the Pre-Petition Lenders and the Agents upon

the Pre-Petition Collateral or which would reduce or affect the obligation of the Debtors to pay

the Pre-Petition Indebtedness, and (f) that the Debtors, pursuant to the Cash Collateral

Stipulation (as defined below), released the Pre-Petition Lenders and the Agents, and their agents

and employees, from all claims and causes of action of the Debtors arising out of the Pre-

Petition Loan Documents or any other loan agreement or other relationship with the Debtors.

        D.     Each Debtor further acknowledges, admits and agrees, after due inquiry,

that the Pre-Petition Collateral includes, without limitation, all proceeds of the Pre-Petition

Collateral, whether existing before or after the commencement of the Chapter 11 cases, which

items constitute the Pre-Petition Lenders' and the Agents' cash collateral within the meaning of

Section 363(a) of the Bankruptcy Code (the "Cash Collateral"). The Pre-Petition Lenders and

the Agents are entitled, pursuant to Sections 361 and 363 of the Bankruptcy Code, to adequate

protection of their interests in the Pre-Petition Collateral, including the Cash Collateral, for and

to the extent of any diminution in value of the Pre-Petition Collateral, resulting from, without limitation, the granting of the Carve-Out, the use of the Cash Collateral, the use, sale or lease of the Pre-Petition Collateral (other than the Cash Collateral) and the imposition of the automatic stay.

        E.      Simultaneously with the submission of the Motion, the Debtors are filing a motion for an order approving a cash collateral stipulation (the "Cash Collateral Stipulation") with the Pre-Petition Lenders, which stipulation is expressly conditioned on entry of the Bridge Financing Order.

        F.      An immediate need exists for the Debtors to obtain additional funds in order to continue the operation of their businesses pending finalization of a longer-term and larger post-petition facility. Without such funds, there would be no reasonable prospect that the Debtors would be able to reorganize successfully in these Chapter 11 cases.

        G.      Pursuant to sections 364(a) and 364(b) of the Bankruptcy Code, the Debtors have attempted, but are unable to obtain either unsecured credit or unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.

        H.      As more fully set forth in the Debtors' Affidavit of Service filed with the Motion, the Debtors have provided such notice of this hearing and the terms of the Motion as was practicable under the circumstances to the Bridge Lenders, to all of the Debtors' secured creditors reflected in the public records (including the Pre-Petition Lenders), the Debtors' twenty largest unsecured creditors and the United States Trustee. Pursuant to Bankruptcy Rule 4001(c), such notice is sufficient and appropriate under the circumstances set forth herein and presented to the Court.

I.    The Bridge Lenders have indicated a willingness to lend money and extend credit to the Debtors, but only under the terms and conditions set forth in this Bridge Financing Order. The Debtors believe that, under the circumstances, the following terms and conditions are a fair and reasonable response to their request for financial assistance.

J.    Entry of this Bridge Financing Order will minimize disruption of the Debtors as a "going concern", will increase the possibility of a successful reorganization, and is in the best interests of their estates and creditors.

K.    The financing arrangements pursuant to which loans will be made and extended to the Debtors have been negotiated at arms-length and in "good faith" (within the meaning of Section 364(e) of the Bankruptcy Code) by and between the Bridge Lenders and the Debtors. Accordingly, the Bridge Lenders, in making advances pursuant to this Bridge Financing Order, are entitled to the protections described in Section 364(e) of the Bankruptcy Code.

IT IS HEREBY ORDERED AND AGREED THAT, *, subject to the agreements made on the record at the April 3, 2003 hearing:*

1.    The Debtors shall be, and hereby are, authorized to borrow money from the Bridge Lenders in the form of a revolving loan facility (which need not be documented other than by this Bridge Financing Order) drawable on the date of entry of this Bridge Financing Order by the Court (the "Closing Date") and thereafter until the earliest of (i) April 18, 2003, (ii) the occurrence of an Event of Default (as hereinafter defined), or (iii) the closing of a subsequent post-petition loan facility (the "Termination Date"), on the terms and conditions set forth herein and in any other documents and instruments executed and delivered in connection herewith (together with this Bridge Financing Order, the "Post-Petition Bridge Loan Documents"):

(a)    Upon satisfaction of the conditions precedent set forth in Paragraph 1(d) hereof, the Bridge Lenders shall make a revolving loan facility available to the Debtors,

jointly and severally, on the Closing Date in the principal amount of FIFTY MILLION DOLLARS ($50,000,000) (the "Bridge Loan"). The obligations of the Debtors under each Bridge Loan, including all accrued interest, fees, reasonable attorneys' fees, costs and expenses, are herein called the "Post-Petition Bridge Indebtedness". The Bridge Lenders' commitment to make each Bridge Loan is herein called the "Post-Petition Bridge Loan Commitment".

(b)    Interest on each Bridge Loan shall be part of the Post-Petition Bridge Indebtedness and shall accrue and be payable on the Termination Date at a rate of two percent (2%) above the greater of (i) the Prime Rate (as defined below) and (ii) the Federal Funds Rate (as defined below) plus fifty (50) basis points per annum, each as in effect from time to time and in each case calculated on a year of 360 days for the actual number of days elapsed, provided, however, that in the event that any principal of any Bridge Loan is not paid when due (whether by acceleration or otherwise), the unpaid principal amount of each Bridge Loan shall be payable in cash on demand and bear interest (also payable on demand) at a rate of four percent (4%) above the greater of (i) the Prime Rate and (ii) the Federal Funds Rate plus fifty (50) basis points per annum, each as in effect from time to time and in each case calculated on a year of 360 days for the actual number of days elapsed. "Prime Rate" means, for any day, the rate of interest per annum publicly announced from time to time by DBTCA as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective. "Federal Funds Rate" means, for any day, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by DBTCA from three Federal funds brokers of recognized standing selected by DBTCA.

(c)    Upon approval of this Bridge Financing Order, the Debtor shall pay (i) to each of DBTCA and JPMC a work fee of $750,000 for services rendered in connection with the arrangement of each Bridge Loan and efforts in connection with the Cash Collateral Stipulation; (ii) a 2% fee calculated on the full amount of the Post-Petition Bridge Loan Commitment, to DBTCA and JPMC as a facility fee; (iii) such other fees at market rates in connection with the syndication of each Bridge Loan; and (iv) promptly upon receipt by the Debtors, any official committee of unsecured creditors appointed in these Chapter 11 cases (a "Committee"), and the Office of the United States Trustee, of invoices relating thereto, and without the necessity of the filing of fee applications or the obtaining of Court approval with respect thereto, all reasonable costs and expenses incurred by either DBTCA and JPMC both before and after the Filing Date, in connection with due diligence negotiation and documentation of each Bridge Loan, including out-of-pocket expenses, reasonable counsel fees and disbursements, filing fees, audit expenses, field examination expenses and reasonable fees and disbursements of accountants and financial advisors. All such amounts shall be part of the Post-Petition Bridge Indebtedness.

(d)     The Bridge Lenders' obligation to make each Bridge Loan shall be subject to the following conditions precedent:

(i)     the Bridge Lenders shall have received the following on or prior to the Closing Date:

(a)     a certified copy of this Bridge Financing Order, which shall be in full force and effect and shall not have been vacated, reversed, modified or amended;

(b)     all financing statements and other security documents (if any) reasonably requested by the Bridge Lenders; and

(c)     such other documents as the Bridge Lenders may reasonably request;

(ii)     no Event of Default shall have occurred and be continuing or shall be caused by the making of any Bridge Loan;

(iii)     other than in connection with the Cash Collateral Stipulation, this Court shall not have entered any order in these cases in favor of a third party authorizing postpetition financing secured by superpriority liens pursuant to Sections 364(c) or (d) of the Bankruptcy Code or granting a third party adequate protection under Sections 361 through 364 of the Bankruptcy Code;

(iv)     the Cash Collateral Stipulation shall have been entered by this Court; and

(v)     at the time of each such Bridge Loan and immediately after giving effect thereto the Debtors shall not hold unrestricted cash and cash equivalents in an aggregate amount (after giving effect to the incurrence of such Bridge Loan and the application of proceeds therefrom and any other unrestricted cash or cash equivalents) on hand (to the extent such proceeds and/or other cash or cash equivalents are actually utilized by the Debtors on the respective date of incurrence of the respective Bridge Loan for a purpose permitted under this Bridge Financing Order other than an investment in cash equivalents) in excess of $10 million.

(e)     By their signature on this Bridge Financing Order, the Debtors agree that they shall:

(i)     use proceeds of each Bridge Loan only as described in paragraph 7 hereof; and

(ii)     not permit to exist any lien, security interest, encumbrance or claim against any Debtor in their Chapter 11 cases that is pari passu or senior to the claims and liens of the Bridge Lenders (except for valid, enforceable and perfected liens and security interests which were properly perfected prior to the

Filing Date and except for the Carve-Out) and none of the Debtors shall pay any Pre-Petition Indebtedness or other liabilities incurred prior to the Filing Date except as approved by this Court .

(f)     Each of the following shall constitute an "Event of Default":

        (i)     any of the Chapter 11 cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or a Chapter 11 trustee, or an examiner with expanded powers, shall be appointed in any of the Chapter 11 cases; or

        (ii)     the Bankruptcy Court or any other court shall enter an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest (other than the security interests of the Bridge Lenders to the extent granted in this Bridge Financing Order) in any assets of any Debtor allowing such holder or holders to foreclose or otherwise realize upon any such security interests which assets have an aggregate value in excess of $100,000; or

        (iii)     an order of the Bankruptcy Court or any other court shall be entered amending, supplementing, staying, vacating, reversing, revoking, rescinding or otherwise modifying this Bridge Financing Order; provided that no Event of Default shall occur under this clause (iv) to the extent that any such amendment, supplement or other modification is not adverse, in the judgment of the Bridge Lenders, to the rights and interests of the Bridge Lenders under this Bridge Financing Order; or

        (iv)     an order of the Bankruptcy Court or any other court shall be entered granting any lien or security interest in any property of the Debtors in favor of any party other than the Bridge Lenders pursuant to this Bridge Financing Order (other than the Carve-Out and any lien granted in connection with the Cash Collateral Stipulation) or granting a claim (other than the Carve-Out and any super-priority claim granted in connection with the Cash Collateral Stipulation) to any party other than the Bridge Lenders that is pari passu with or senior to the superpriority claims granted to the Bridge Lenders pursuant to this Bridge Financing Order; or

        (v)     any Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other Person's motion as to, any of the matters set forth in paragraphs (i) through (v) above, or the Court shall grant any such motion filed by any other Person; or

        (vi)     this Bridge Financing Order shall cease to be in full force and effect, or the Debtors' authority to borrow funds hereunder shall have otherwise terminated; or

        (vii)     any Debtor shall make any payment (including "adequate protection" payments) on or in respect of any pre-Filing Date indebtedness or obliga-

tions other than (i) the obligations owed to the Agents and the Pre-Petition Lenders, (ii) as permitted under this Bridge Financing Order or by another order of the Court as agreed to by DBTCA and JPMC in their sole discretion, (iii) sales taxes and employee withholding taxes which have been collected by such Debtor but not yet paid, and (iv) as required under Section 365(b) of the Bankruptcy Code in connection with the assumption of leases and contracts, provided that the Bridge Lenders consent to such assumption; or

(viii)    any Debtor shall fail to comply with the terms of this Bridge Financing Order; or

(ix)    the Debtors' cash expenditures exceed those permitted in accordance with the Budget; or

(x)    this Court shall abstain from hearing any Chapter 11 case, or any Debtor shall so move or support any motion brought by any third party seeking such relief; or

(xi)    any Debtor shall seek to, or shall support (in any such case by way of, inter alia, any motion or other pleading filed with this Court or any other writing to another party-in-interest executed by or on behalf of a Debtor) any other person's motion to, disallow or subordinate in whole or in part any Bridge Lender's claims in respect of the Post-Petition Bridge Indebtedness or the obligations owed to such Bridge Lender or to challenge the validity, enforceability, perfection or priority of the liens in favor of any Bridge Lender (including, without limitation, the Liens securing the obligations owed to such Bridge Lender); or

(xii)    except to the extent specifically provided for herein, the filing of any motion to obtain credit from any party other than the Bridge Lenders unless the terms of any such facility, or any motion and/or order to approve such facility, are acceptable to the Bridge Lenders in all respects, or, in connection therewith, all the obligations owed to the Bridge Lenders shall first be paid indefeasibly in full in cash; or

(xiii)    any affiliate of any Debtor shall file for bankruptcy under Chapter 7 or Chapter 11 (or an order for relief shall be issued in connection with an involuntary case commenced against any affiliate of any Debtor) and shall fail to become a party to this Bridge Financing Order within five (5) business days from the date of the entry of an order for relief with respect to such affiliate; or

(xiv)    any order shall be entered limiting or otherwise impairing the Bridge Lenders' rights under Section 552 of the Bankruptcy Code, or any Debtor shall file a pleading seeking to modify such rights, or any Debtor shall fail to object or shall in any way acquiesce to any pleading seeking to limit such rights filed by any other party; or

(xv)    the occurrence of a termination event under the Cash Collateral Stipulation; or

(xvi)    failure to pay, when due, the principal of, or interest on, each Bridge Loan, or any fees or expenses payable by the Debtors under this Bridge Financing Order or any other Post-Petition Loan Document; or

(xvii)    failure of any material provision of any Post-Petition Loan Document other than this Bridge Financing Order to be valid and binding on the Debtors or a breach of any material provision of any Post-Petition Loan Document by any Debtor.

2.    In consideration for the Bridge Lenders' performance hereunder, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code shall not be imposed upon the Bridge Lenders or their collateral.

3.    All Post-Petition Bridge Indebtedness which may from time to time hereafter be owing by the Debtors to the Bridge Lenders, shall be and hereby is secured, pursuant to Section 364(d)(1) of the Bankruptcy Code, by (effective immediately without the necessity of the execution by the Debtors of mortgages, security agreements, financing statements or any other documentation or the making of any filing or the possession or control of any property or assets of the Debtor) first, paramount and perfected liens upon, and security interests in, all property of the Debtors, wheresoever located and whether now existing or hereafter arising or acquired by the Debtors, which liens shall prime the Pre-Petition Financing Liens (but shall not prime valid, enforceable, unavoidable and perfected liens and security interests held by parties-in-interest other than the Agents and the Pre-Petition Lenders which were properly perfected prior to the Filing Date and shall be subject to the Carve-Out), including, without limitation, the following property of the Debtors (collectively, the "Post-Petition Bridge Collateral"): all pre-petition and post-petition real and personal property of the Debtors, including, without limitation, all accounts, contract rights, chattel paper, instruments (including, without limitation, intercompany notes payable to any Debtor and certificated securities), deposit accounts,

documents, goods (including, without limitation, machinery, equipment, fixtures and inventory), general intangibles (including, without limitation, rights to tax refunds), investment property, real property (including, without limitation, owned real property and leasehold interests) and other rights to payment, causes of action and chooses in action, insurance policies and claims or rights to payment thereunder, uncertificated securities, and all additions and accessions thereto and all proceeds thereof, whether direct or indirect, realized from the sale, transfer, assignment, release, termination or other disposition or collection of any or all of the foregoing. Notwithstanding anything to the contrary in this paragraph 3, the Post-Petition Bridge Collateral shall not attach to any actions commenced pursuant to Sections 544, 547, 548 and 550 of the Bankruptcy Code.

4.     Upon entry of this Bridge Financing Order, the security interests and liens granted to the Bridge Lenders by virtue of this Bridge Financing Order shall be first, valid and perfected as against all third parties, including the Agents and the Pre-Petition Lenders (but shall not prime valid, enforceable, unavoidable and perfected liens and security interests held by parties-in-interest other than the Agents and the Pre-Petition Lenders which were properly perfected prior to the Filing Date and shall be subject to the Carve-Out), without regard to applicable federal, state or local filing and recording statutes, as of the Filing Date and without further action of any party, including the Bridge Lenders, provided, that the Bridge Lenders may, but need not, take such steps as they deem desirable and applicable to comply with such statutes, and all financing statements which are filed listing the Debtors as "debtor" respectively and the Bridge Lenders as "secured party," all mortgages or similar instruments which are filed granting to the Bridge Lenders liens upon and security interests in, real property, and all certificates of title for motor vehicles issued and evidencing liens and security interests in favor of the Bridge

Lenders, shall be deemed to have been filed and the security interests and liens evidenced thereby shall be deemed perfected nunc pro tunc as of the time and date of the filing of the Filing Date. Notwithstanding anything herein to the contrary, the security interests and liens granted to the Bridge Lenders in this Bridge Financing Order shall not be deemed to extend to any indebtedness owed to the Bridge Lenders prior to the Filing Date.

5.    All Post-Petition Indebtedness owing by the Debtors to the Bridge Lenders, and the liens and security interests of the Bridge Lenders in the Post-Petition Bridge Collateral, shall have priority under the provisions of Sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code over all administrative expenses incurred in these Chapter 11 cases of the kind specified in Sections 503(b), 507(b) and 726(b) of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors in this proceeding under the Bankruptcy Code and shall have priority over any and all secured, unsecured and priority claims or costs and expenses in this case, except that, the security interests and liens held by the Bridge Lenders in the Post-Petition Bridge Collateral and the superpriority claims granted to the Bridge Lenders pursuant to this Bridge Financing Order shall be subordinate in priority to and subject to a carve-out for (x) in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committee appointed in the Chapter 11 cases in an aggregate amount not in excess of $1 million (plus all unpaid professional fees and disbursements incurred prior to the occurrence of an Event of Default to the extent allowed by the Bankruptcy Court at any time) and (y) the payment of all unpaid fees payable pursuant to 28 U.S.C. § 1930(a)(6) and all unpaid fees payable to the Clerk of this Court or the United States Trustee (collectively, the "Carve-Out").

6.    If, in the course of these Chapter 11 cases, and contrary to the above provisions, this Court grants liens or security interests to others pursuant to Section 364(d) or any other provision of the Bankruptcy Code, which liens or security interests are senior or equal to the liens or security interests of the Bridge Lenders described above, then any proceeds of loans or extensions of credit secured by such senior or equal liens or security interests shall be applied first to payment of the Post-Petition Bridge Indebtedness, including all accrued interest, fees, reasonable attorneys' fees, costs and expenses, and the Bridge Lenders shall retain all liens and security interests held by it until all of the Post-Petition Bridge Indebtedness is paid in full.

7.    The Debtors are authorized to use each Bridge Loan in accordance with the Budget (as defined below) and as further set forth in paragraph 14 below. The Debtors are authorized to use each Bridge Loan in the operation of their businesses; provided that the proposed use of each Bridge Loan is consistent with the terms of this Bridge Financing Order and the Budget. Notwithstanding anything herein to the contrary, the Debtors shall not use the proceeds of any Bridge Loan to pay fees and disbursements incurred by the Debtors or for which the Debtors may be liable in connection with any proceeding commenced or investigation conducted to contest (a) any claims or rights asserted by the Bridge Lenders based on its equity interests in and/or claims against any Debtor or any Debtor's affiliate which arose prior to the Filing Date or (b) the validity or enforceability of this Bridge Financing Order or any other Post-Petition Bridge Loan Documents; provided, however, that nothing herein will prevent the Committee from undertaking a normal and customary investigation of any such liens or security interests.

8.    The signature of any persons authorized by the Debtors' corporate resolutions whether by letter to the Bridge Lenders or appearing on any one or more of the Post-Petition Bridge Loan Documents, shall bind the Debtors from and after the Filing Date.

9.    Upon the occurrence of any Event of Default, and at all times thereafter, the Debtors' right to borrow funds hereunder will automatically terminate, and the Bridge Lenders holding 51% or more of the Post-Petition Bridge Loan Commitment (the "Required Bridge Lenders") may, at their absolute and sole discretion and option, exercise all rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code (which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate all further advances or financial accommodations hereunder; (b) declare the principal of and accrued interest on the Post-Petition Bridge Indebtedness, together with all fees and other liabilities constituting the obligations owed to the Bridge Lenders, to be immediately due and payable; (c) set off or seize and apply to the obligations owed to the Bridge Lenders under the Post-Petition Bridge Indebtedness amounts contained in any Collection Account (as defined below) or any other account maintained with or under the control of the Bridge Lenders; and/or (d) take any other action or exercise any other right or remedy permitted to the Bridge Lenders under this Bridge Financing Order or by applicable law.  If all the obligations owed to the Bridge Lenders are not repaid in cash on the date that such obligations become due and payable (whether by acceleration, upon the Termination Date, an Event of Default or otherwise), the Bridge Lenders may immediately exercise their rights and remedies specified in clauses (a), (b) and (c) of this paragraph 9 and, commencing on the third (3rd) Business Day after the date that such obligations

owed to the Bridge Lenders become due and payable (whether by acceleration, upon the Termination Date, an Event of Default or otherwise), unless the ability of the Bridge Lenders to exercise their rights and remedies as provided in clause (d) of this paragraph 9 has been stayed as provided in paragraph 10 hereof, (i) the Bridge Lenders may exercise their rights and remedies specified in clause (d) of this paragraph 9 without further order of or application to this Court or further modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code (which is hereby deemed and shall be modified and vacated to the extent necessary to permit such orderly liquidation) and (ii) the Debtors are directed to fully cooperate with the Bridge Lenders in the exercise by the Bridge Lenders of their rights and remedies specified in clause (d) of this paragraph 9. All of the rights and remedies set forth in this paragraph 9 shall be senior to the rights of the Agents and the Pre-Petition Lenders under the Cash Collateral Stipulation.

10.    Upon the occurrence of any Event of Default, the Bridge Lenders shall, prior to exercising any of the rights and remedies specified in clause (d) of paragraph 9 on account thereof, give no less than three (3) Business Days' written notice thereof to the Debtors and their counsel, counsel to any statutory creditors' committee established in the Chapter 11 cases, counsel to the Pre-Petition Lenders and to the Office of the United States Trustee for the District of Delaware. The Debtors, any statutory creditors' committee, the Pre-Petition Lenders and/or the Office of the United States Trustee for the District of Delaware may, during the three (3) Business Day period following the giving of such notice, seek an order from this Court enjoining, staying or otherwise modifying the Bridge Lenders' exercise of their rights and remedies specified in clause (d) of paragraph 9. Unless the exercise by the Bridge Lenders of such rights and remedies has been stayed by this Court as provided in this paragraph 10, each Debtor shall cooperate fully with the Bridge Lenders and shall not take any steps or actions to

contest or otherwise challenge the exercise by the Bridge Lenders of each and all of the remedies permitted in this Bridge Financing Order or under applicable law. Except as otherwise provided in this paragraph 10, each Debtor is hereby irrevocably deemed to waive all of their rights to question or oppose the Bridge Lenders' exercise of their rights and remedies permitted in this Bridge Financing Order or under applicable law upon the occurrence of an Event of Default. The Debtors and other parties in interest may only seek a determination whether or not any Debtor is in default under the terms of this Bridge Financing Order, or whether such default exists or has been cured; no Debtor shall seek relief under Section 105 of the Bankruptcy Code, Bankruptcy Rule 7065, or pursuant to Rule 60(b) of the Federal Rules of Civil Procedure (as applied pursuant to Bankruptcy Rule 9024), or request in any way that the general equitable powers of this Court or any other court be invoked to enjoin the Bridge Lenders in pursuit of their rights and remedies under this Bridge Financing Order, the Bankruptcy Code, and/or applicable non-bankruptcy law.

11.    The Debtors are directed to remit any payments for goods and services provided by the Debtors or for inventory or other property of the estates of the Debtors sold by the Debtors to a cash collection account or accounts previously established with JPMC (each, a "Collection Account").

12.    Each Debtor shall remit to JPMC, and as directed by JPMC, for deposit in any Collection Account, all funds and other property in its possession or payable to such Debtor (other than advances of Cash Collateral made pursuant to the Cash Collateral Stipulation and proceeds of loans made to the Debtor pursuant to this Bridge Financing Order), from and after the Filing Date, representing the proceeds of any and all of the Post-Petition Bridge Collateral.

13.     Any and all payments or proceeds remitted, or deemed to be remitted, to JPMC pursuant to this Bridge Financing Order shall be received free and clear of any claim, charge, assessment or other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, Section 552(b) of the Bankruptcy Code, all of which are hereby waived by the Debtors.

14.     The Cash Collateral provided by the Agents and the Pre-Petition Lenders to the Debtors under the Cash Collateral Stipulation and any Bridge Loans extended to the Debtors hereunder shall be used by the Debtors through and including the Termination Date, for the purposes and in amounts not to exceed those set forth in the budget and forecast entered into evidence at the preliminary hearing to approve this Bridge Financing Order and annexed as Exhibit B hereto (the "Budget") as such Budget may be amended, extended and supplemented from time to time with the express written consent of DBTCA and JPMC, to pay the Debtors' operating and working capital and for any other budgeted expenses in accordance with the terms and conditions of this Bridge Financing Order. So long as the Debtors shall have the right to use each Bridge Loans pursuant to this Bridge Financing Order, the Debtors may expend funds in accordance with the Budget.

15.     Subject to the limitations provided in this paragraph 15, the Debtors are directed to remit, at the conclusion of each business day, any and all unrestricted cash and cash equivalents on hand in excess of $10 million (the "Excess Cash Payments") to JPMC for the benefit of the Bridge Lenders and to reduce any outstanding under the Bridge Loan (without a corresponding reduction in the Post-Petition Bridge Loan Commitment). All Excess Cash Payments shall be applied in the sole discretion of the Bridge Lenders, including, without

limitation, to principal, interest and costs and expenses, including, without limitation, fees and disbursements of counsel and other professionals.

16.     During the term of this Bridge Financing Order, the Debtors shall submit to DBTCA and JPMC by 12:00 p.m. of each Thursday, commencing Thursday, April 10, 2003, a report in a form satisfactory to DBTCA and JPMC, which report shall include (i) a cash flow summary of receipts and disbursements during the previous week; (ii) a report on collections of any amounts received as a result of asset sales outside of the ordinary course of the Debtors' businesses, (iii) an accounts payable analysis, (iv) any non-privileged information in the Debtors' possession or within their control regarding the operation of their business and the Post-Petition Bridge Collateral, as  DBTCA and JPMC shall reasonably request, (v) a reconciliation of individual receipts and disbursements by line item to the Budget and (vi) a certificate of an authorized officer of each Debtor, in form and substance satisfactory to the  DBTCA and JPMC, certifying that such Debtor is in full compliance with the provisions of this Bridge Financing Order.

17.     Upon entry of this Bridge Financing Order by the Court, the provisions of this Bridge Financing Order shall be binding upon and inure to the benefit of the Bridge Lenders and the Debtors, and their respective successors and assigns, including, but not limited to, any Chapter 7 or Chapter 11 trustee hereinafter appointed as a representative of any estate herein.

18.     The Bridge Lenders, in making advances pursuant to this Bridge Financing Order, are entitled to the protections described in Section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Bridge Financing Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such modification, vacation or stay shall not affect the validity of (a) any indebtedness to the Bridge Lenders incurred pursuant

to this Bridge Financing Order prior to the effective date of such modification, vacation or stay, or (b) the validity and enforceability or any security interest or lien or priority claim authorized hereby with respect to the Post-Petition Bridge Indebtedness. Moreover, notwithstanding such modification, vacation or stay, any advances of funds, made pursuant to this Bridge Financing Order by the Bridge Lenders prior to the effective date of such modification, vacation or stay, to or for the benefit of the Debtors shall be governed in all respects by the original provisions of this Bridge Financing Order and the Bridge Lenders shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests, liens and priorities granted herein, with respect to all such advances.

19.     The Post-Petition Bridge Loan Commitment shall expire and all of the Post-Petition Bridge Indebtedness shall be immediately due and payable on April 18, 2003, unless this Bridge Financing Order is extended by further order of the Court upon the agreement of the Bridge Lenders and the Debtors.

20.     To further evidence the Post-Petition Bridge Indebtedness, the creation of the Bridge Lenders' security interests in and liens upon the Post-Petition Bridge Collateral and the other terms and conditions of the financing arrangement contemplated hereby, the Debtors are authorized to (but at the Bridge Lenders' option need not) execute and deliver to the Bridge Lenders the following Post-Petition Bridge Loan Documents, in form and substance reasonably satisfactory to the Bridge Lenders:

(a)     All such financing statements, notices, schedules, security agreements, mortgages, assignments, consents, agreements, instruments and documents necessary or required to evidence loans, to consummate the terms and provisions of this Bridge Financing Order and the other Post-Petition Bridge Loan Documents and to perfect the liens and security interests to be given to the Bridge Lenders pursuant hereto and thereto as the Bridge Lenders may reasonably request;

(b)     A copy of the resolutions of the Board of Directors of all Debtors authorizing the execution, delivery and performance of the Motion of the Debtors from

which this Bridge Financing Order is entered, the Post-Petition Bridge Loan Documents, and the other matters contemplated hereby, certified by the Secretary of the Debtors together with such other corporate action as the Bridge Lenders may reasonably request; and

(c)    Such other agreements, instruments and documents from the Debtors or third parties as the Bridge Lenders or their counsel shall reasonably require.

21.    The provisions of this Bridge Financing Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any plan of reorganization in any of the Chapter 11 cases (and the obligations owed to the Bridge Lenders and the Post-Petition Bridge Indebtedness shall not be discharged by the entry of any such order or pursuant to Section 1141 of the Bankruptcy Code, the Debtors having hereby waived such discharge), (b) converting any of the Chapter 11 cases to a Chapter 7 case, or (c) dismissing any of the Chapter 11 cases or pursuant to which this Court abstains from hearing any of the Chapter 11 cases, and the terms and provisions of this Bridge Financing Order as well as the Carve-Out, and the Bridge Lenders' claims, liens and security interests granted pursuant to this Bridge Financing Order and the Post-Petition Bridge Loan Documents shall continue in full force and effect notwithstanding the entry of any such order, and the Carve-Out and the Bridge Lenders' liens, security interests and superpriority claims shall maintain their priority as provided by this Bridge Financing Order and the Post-Petition Bridge Loan Documents until all of the obligations owed to the Bridge Lenders and the Post-Petition Bridge Indebtedness are indefeasibly paid in full in cash.

22.    DBTCA and JPMC shall have the right, upon reasonable telephonic notice to the Debtors, at any time during normal business hours, to inspect, audit, examine, check and make copies of, and extract non-privileged information from, the Debtors' records, and to obtain company information from the Debtors' management, and each Debtor shall make its records and management available to DBTCA and JPMC for such purposes. Each Debtor shall timely file and serve upon DBTCA and JPMC and their counsel all pleadings and other documents filed

by such Debtor in such Debtor's Chapter 11 case, including the financial reports required by the United States Trustee's office, and shall continue to supply such reports as are requested by DBTCA and JPMC.

23.     Except as otherwise specifically provided herein, entry of this Bridge Financing Order shall be without prejudice to any and all rights, remedies, claims and causes of action which any Bridge Lender may have against any Debtor or any third parties, and without prejudice to the right of any Bridge Lender to seek relief from the automatic stay in effect pursuant to Section 362 of the Bankruptcy Code, or any other relief under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right of the Bridge Lenders to (i) seek additional relief from the Court in respect of its interests in the Post-Petition Bridge Collateral or relief from or modification of the automatic stay under Section 362 of the Bankruptcy Code, (ii) request conversion of the Chapter 11 cases to Chapter 7 of the Bankruptcy Code and (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan.

24.     The Debtors shall provide DBTCA and JPMC with copies of all documents provided to any official committee of unsecured creditors, as well as copies of all non-privileged consultants' reports, appraisals, business plans, and similar documents as they become available to the Debtors, including, without limitation, any and all audits and other non-privileged reports prepared by the Debtors' accountants. The Debtors shall provide DBTCA and JPMC with a description of all documents withheld as privileged and shall give the basis for such assertion of privilege.

25. The Debtors shall deliver to DBTCA evidence satisfactory to DBTCA that the Post-Petition Bridge Collateral is adequately insured under insurance policies acceptable to the DBTCA under which DBTCA is named as loss payee.

26. No Bridge Lender shall be deemed to be in "control" of the operations of any Debtor, or to be acting as a "responsible person" or "owner" or "operator" with respect to the operation or management of any Debtor (as such terms or similar terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any similar federal or state statute), solely by reason of any credit extended to the Debtors hereunder, or the grant to and/or exercise by any Bridge Lender of any rights or remedies hereunder.

27. No rights are intended to be created hereunder for the benefit of any third party or creditor or any direct or indirect incidental beneficiary except as specifically provided herein. The Carve-Out shall not be available to any party other than those specifically authorized to receive payment therefrom as provided in paragraph 5 hereof.

28. This Bridge Financing Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the occurrence of the conditions set forth in paragraph 1(f) hereof. Except as otherwise provided herein, the terms of this Bridge Financing Order shall be valid and binding upon the Debtors, all creditors of the Debtors, any statutory committee appointed in these cases and all other parties in interest who have requested notice in the Chapter 11 cases from and after the execution of this Bridge Financing Order by this Court. The Bridge Lenders reserve the right to seek (a) the Debtors' waiver to assert a claim under Section 506(c) of the Bankruptcy Code and (b) that the Post-Petition Bridge Collateral shall attach to the proceeds of any actions commenced pursuant

to Sections 544, 547, 548 and 550 of the Bankruptcy Code at the final hearing to approve this
Bridge Financing Order.

29.     No waiver, modification, or amendment of any of the provisions hereof
shall be effective unless it is set forth in writing, signed by the parties hereto and approved by
this Court.

30.     To the extent there exists any conflict between the terms of this Bridge
Financing Order or any other Post-Petition Bridge Loan Documents, the Motion or any other
agreements, this Bridge Financing Order shall govern.

31.     The Debtors shall, within three (3) business days following entry of this
Bridge Financing Order, mail copies thereof, to the United States Trustee for the District of
Delaware, counsel to the Bridge Lenders, counsel to the Agents (as defined in the Cash
Collateral Stipulation) and the Pre-Petition Lenders, all parties who appeared or otherwise
responded to the relief requested herein, any other party which has filed a request for notices
with this Court and served such notice upon the Debtors' counsel, counsel for Committee and to
the entities listed on the each Debtor's list of its twenty (20) largest non-insider unsecured
creditors. The notice of approval of this Bridge Financing Order shall state that any party in
interest objecting to this Bridge Financing Order as a final order shall file written objections with
the United States Bankruptcy Court for the District of Delaware no later than five (5) business
days prior to the date set for the final hearing on this matter, which objections shall be served so
that the same are received on or before 4:00 p.m. (Prevailing Eastern Time) of such date by: (a)
counsel to the Debtors, Kirkland & Ellis, 777 South Figueroa Street, 37th Floor, Los Angeles, CA
90012, Attn.: Richard L. Wynne, Esq. and Pachulski, Stang, Ziehl, Young, Jones & Weintraub,
919 N. Market Street, 16th Floor, Wilmington, DE 19899-8705, Attn.: Laura Davis Jones, Esq.,

(b) counsel to the Agents, White & Case LLP, 1155 Avenue of the Americas, New York, New

York 10036, Attn.: Andrew DeNatale, Esq. and Greenberg Traurig, The Brandywine Building,

1000 West Street, Suite 1540, Wilmington, DE 19801, Attn.: Scott D. Cousins, Esq. and (c) the

Office of the United States Trustee for the District of Delaware.

　　　　32.　　A hearing to consider the entry of this Bridge Financing Order on a final

basis will be held on ~~April~~ 2↓, 2003 at 2:30 m.

　　　　33.　　The Court shall retain jurisdiction to enforce the provisions of this Bridge

Financing Order.

Dated:　　~~April~~ 3, 2003
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　UNITED STATES BANKRUPTCY JUDGE


Agreed as to form and content:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
AS ADMINISTRATIVE AGENT and JPMORGAN CHASE
BANK, AS COLLATERAL AGENT, PROVIDER OF
TREASURY SERVICES AND SYNDICATION AGENT


By:_____
　　Scott D. Cousins, Esq. (3079)
　　William E. Chipman, Jr., Esq. (3818)
　　GREENBERG TRAURIG, LLP
　　The Brandywine Building
　　Suite 1540
　　Wilmington, Delaware 19801
　　(302) 661-7371

　　Counsel to the Agents

FLEMING COMPANIES, INC., *et al.*

By: _Laura Davis Jones_

Laura Davis Jones, Esq.
PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB
919 N. Market Street, 16th Floor
Wilmington, DE 19899-8705

Counsel to the Debtors and Debtors-in Possession

# EXHIBIT A

# LIST OF GUARANTORS

## EXHIBIT A

### Guarantors

Core-Mark International, Inc.  
ABCO Markets, Inc.  
ASI Office Automation, Inc.  
Core-Mark Interrelated Companies, Inc.  
Dunigan Fuels, Inc.  
Fleming Foods Management Co., L.L.C.  
Fleming International, Ltd.  
Fleming Transportation Service, Inc.  
Fuelserv, Inc.  
Head Distributing Company  
Minter-Weisman Co.  
Progressive Realty, Inc.  
Retail Investments, Inc.  
RFS Marketing Service, Inc.  

ABCO Food Group, Inc.  
ABCO Realty Corp.  
C/M Products, Inc.  
Core-Mark Mid-Continent, Inc.  
Favor Concepts, Ltd.  
Fleming Foods of Texas, L.P.  
Fleming Supermarkets of Florida, Inc.  
Food 4 Less Beverage Company, Inc.  
General Acceptance Corporation  
Marquise Ventures Company, Inc.  
Piggly Wiggly Company  
Rainbow Food Group, Inc.  
Retail Supermarkets, Inc.  
Richmar Foods, Inc.

# EXHIBIT  B

## 2-WEEK BUDGET

# Fleming Companies
## 2 Week Cash Forecast
### Cash Collateral

**Fleming Companies**
**Daily Cash Flow Forecast**
**Through Week Ending April 19, 2003**

| | Tuesday 4/1/2003 | Wednesday 4/2/2003 | Thursday 4/3/2003 | Friday 4/4/2003 | Weekly Total 4/6/2003 |
|---|---|---|---|---|---|
| **Cash Receipts** | | | | | |
| Wholesale Receipts | $ 34,713,917 | $ 18,808,222 | $ 14,365,965 | $ 16,019,531 | $ 83,897,634 |
| Convenience Receipts | 24,778,259 | - | - | 41,744,392 | 66,522,651 |
| Retail Receipts | 8,407,824 | - | - | 15,092,810 | 23,500,634 |
| Other Receipts | - | - | 28,000,000 | - | 28,000,000 |
| *Total Receipts* | $ 67,900,000 | $ 18,808,222 | $ 42,355,965 | $ 72,856,733 | $ 201,920,920 |
| | | | | | |
| **Cash Disbursements From Operations** | | | | | |
| Wholesale Purchases/Retail (excluding payroll) | $ (32,959,911) | $ (10,986,637) | $ (27,466,593) | $ (37,354,566) | $ (108,767,708) |
| Convenience Purchases (excluding payroll) | (20,168,931) | (6,722,977) | (16,807,442) | (22,858,122) | (66,557,472) |
| Payroll & Related | (7,674,898) | (1,346,406) | (3,366,014) | (5,152,867) | (17,540,184) |
| Tax Disbursements-cigarettes | - | - | - | - | - |
| Tax Disbursements-other | - | - | - | (189,225) | (189,225) |
| Rent | - | - | - | - | |
| Lease | - | - | - | - | |
| Operational Disbursements | - | - | - | (13,136,485) | (13,136,485) |
| *Total Cash Disbursements From Operations* | $ (60,803,740) | $ (19,056,020) | $ (47,640,049) | $ (78,691,265) | $ (206,191,074) |
| | | | | | |
| **Cash Disbursements From Non Operations** | | | | | |
| Vendor Deposits | $ - | $ - | $ - | $ - | $ - |
| Capital Expenditures | - | - | - | - | - |
| Restructuring Disbursements | - | - | - | - | - |
| Professional Fees | - | - | - | - | - |
| Interest and Financing Costs | (35,486) | (57,665) | (48,793) | (31,050) | (172,995) |
| Operating Other | - | - | - | - | - |
| *Total Cash Disbursements From Non Operations* | $ (35,486) | $ (57,665) | $ (48,793) | $ (31,050) | $ (172,995) |
| | | | | | |
| *Total Disbursements* | $ (60,839,226) | $ (19,113,685) | $ (47,688,843) | $ (78,722,315) | $ (206,364,069) |
| | | | | | |
| Cash Excess/(Deficit) | $ 7,060,774 | $ (305,463) | $ (5,332,878) | $ (5,865,582) | $ (4,443,149) |
| Beginning Cash Balance | 4,443,149 | 11,503,923 | 11,198,460 | 5,865,582 | 4,443,149 |
| Ending Cash Balance | $ 11,503,923 | $ 11,198,460 | $ 5,865,582 | $ - | $ - |

DISCLAIMER: This presentation is provided only as a general guideline to the estimated performance of the Co and cannot be relied upon to reflect actual circumstances or results. It is based upon historical data and manage assumptions. It is provided for the internal use of the Company.

**Fleming Companies**
**2 Week Cash Forecast**
**Cash Collateral**

Fleming Companies
Daily Cash Flow Forecast
Through Week Ending April 19, 200

| | Monday 4/7/2003 | Tuesday 4/8/2003 | Wednesday 4/9/2003 | Thursday 4/10/2003 | Friday 4/11/2003 | Weekly Total 4/13/2003 |
|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | |
| Wholesale Receipts | $ 28,602,129 | $ 40,309,034 | $ 20,164,964 | $ 16,244,154 | $ 17,505,439 | $ 122,825,720 |
| Convenience Receipts | 20,415,759 | 28,771,968 | 14,393,441 | 11,594,827 | 12,640,517 | 87,816,512 |
| Retail Receipts | 6,927,529 | 9,762,980 | 4,884,020 | 3,934,387 | 4,289,214 | 29,798,130 |
| Other Receipts | - | - | - | - | - | - |
| *Total Receipts* | $ 55,945,417 | $ 78,843,981 | $ 39,442,425 | $ 31,773,368 | $ 34,435,170 | $ 240,440,362 |
| | | | | | | |
| **Cash Disbursements From Operations** | | | | | | |
| Wholesale Purchases/Retail (excluding payroll) | $ (30,609,912) | $ (23,447,213) | $ (29,883,094) | $ (25,738,580) | $ (19,239,989) | $ (128,918,788) |
| Convenience Purchases (excluding payroll) | (19,904,750) | (15,208,417) | (18,820,283) | (16,352,772) | (11,805,470) | (82,091,692) |
| Payroll & Related | - | (2,800,000) | - | - | (2,070,000) | (4,870,000) |
| Tax Disbursements-cigarettes | (1,911,000) | - | (100,000) | (200,000) | - | (2,211,000) |
| Tax Disbursements-other | - | - | - | - | (1,112,811) | (1,112,811) |
| Rent | - | - | - | - | - | - |
| Lease | - | (11,397,485) | - | - | - | (11,397,485) |
| Operational Disbursements | (3,454,756) | (2,500,147) | (1,651,268) | (1,817,515) | (175,900) | (9,599,586) |
| *Total Cash Disbursements From Operations* | $ (55,880,418) | $ (55,353,262) | $ (50,454,645) | $ (44,108,868) | $ (34,404,169) | $ (240,201,362) |
| | | | | | | |
| **Cash Disbursements From Non Operations** | | | | | | |
| Vendor Deposits | $ - | $ - | $ - | $ - | $ - | - |
| Capital Expenditures | - | - | - | - | - | - |
| Restructuring Disbursements | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - |
| Interest and Financing Costs | (65,000) | (36,000) | (58,000) | (49,000) | (31,000) | (239,000) |
| Operating Other | - | - | - | - | - | - |
| *Total Cash Disbursements From Non Operation* | $ (65,000) | $ (36,000) | $ (58,000) | $ (49,000) | $ (31,000) | (239,000) |
| | | | | | | |
| *Total Disbursements* | $ (55,945,418) | $ (55,389,262) | $ (50,512,645) | $ (44,157,868) | $ (34,435,169) | $ (240,440,362) |
| | | | | | | |
| Cash Excess/(Deficit) | $ - | $ 23,454,719 | $ (11,070,220) | $ (12,384,499) | $ - | $ - |
| Beginning Cash Balance | - | - | 23,454,719 | 12,384,499 | - | - |
| Ending Cash Balance | $ - | $ 23,454,719 | $ 12,384,499 | $ - | $ - | $ - |

mpany
ment's