Stenger - Direct/Paris                                                51

1       THE COURT:  Okay.

2  A    If I may, is that the Exhibit 3 that's included in the plan

3  disclosure statement document?

4  Q    Yes, it is.

5  A    If you don't mind, and Your Honor, if you don't mind, I'd

6  prefer to use this because it's much smaller.  It's easier --

7       THE COURT:  That's fine.

8  A    -- flip the pages.

9  Q    Okay.  Can you just generally describe Exhibit 3?

10 A    Yes.  Exhibit 3 includes our projections that were prepared

11 for both Core-Mark Newco, the post-confirmation trust, as well as

12 the reclamation creditors trust is included in that Exhibit 3.

13 Q    And was this prepared by your staff under your direction?

14 A    Yes, it was.

15      MR. PARIS:  Your Honor, I'm prepared to offer it into

16 evidence although I know your practice.

17      THE COURT:  Don't -- don't do that till after cross.

18      MR. PARIS:  Very well.

19 Q    Sir, if you could direct your attention to page 240 in that

20 exhibit.

21      MR. PARIS:  And, Your Honor, there are several sets of

22 page numbers on here.  The pages that I'll be referring to are at

23 the upper right and left, so 240 is in the upper left.

24 Q    So focusing on this exhibit, sir, page 240 --

25 A    Yes.

1  Q    -- what have you projected Core-Mark Newco's net income to

2  be over the course of the coming years?

3  A    If you look, the Exhibit 3B is the projected statement of

4  operations.  The very last number presented on that is the net

5  income.  We're projecting that net income will approximate $20

6  million in 2005.  It will subsequently be increasing on an annual

7  basis with the amount in 208 being 40 million.

8  Q    And if you could just flip over to the next page, page 241

9  of trial exhibit 3, what does this show generally?

10  A    This is the projected balance sheets, both as we spoke

11  before.  And this exhibit, which would be as of July 31st of this

12  current year, and then the annual balance sheets for the annual

13  periods ending in December for 2004 through 2008.

14  Q    Focusing your attention on the second to last line of that

15  exhibit, shareholders equity, what happens to shareholder equity

16  from 2005 to 2008?

17  A    Shareholders equity, because of the income statement

18  performance, is growing, moving from a beginning balance of

19  approximately 150 to an ending balance which is approximately

20  280.

21  Q    Thank you, sir.  That's all we have with that binder, so you

22  can put that away.  Mr. Stenger, what does the acronym EBITDA

23  stand for?

24  A    EBITDA stands for Earnings Before Interest, Tax,

25  Depreciation and Amortization.

1  Q    And how is that term used?

2  A    Generally it's a term that is used as a measure to measure a

3  business's ability to generate operating cash flow which could be

4  used for handling debt, making equity distributions or other

5  needs.

6  Q    Have you projected EBITDA for Core-Mark Newco?

7  A    Yes, we have.

8  Q    Over what time period?

9  A    Same time period that the income statement, statement of

10 operations is, which is that first page that you referred me to a

11 few minutes ago.

12 Q    And what do you project Core-Mark Newco's EBITDA to be?

13 A    We projected to move from about 42 million in 205 up to a

14 little north of 80 million by the time we get into '08.

15 Q    And what do those EBITDA numbers say about the financial

16 condition of Core-Mark Newco on a going forward basis?

17 A    That the cash flow both at the inception and in our first

18 year will be strong and it will be growing and strengthening in

19 each of the subsequent years.

20 Q    I'd like to move into a slightly different area and ask you

21 if you have an opinion about the strength of Core-Mark Newco's

22 prospects in the coming years?

23 A    Yes, I think they're very good.

24 Q    And why is that?

25 A    I think the company's coming out with a strong balance

Stenger - Direct/Paris                                     54

1  sheet, as we've talked about before.  But it's also coming out

2  with a good management team, stabilized operations, very high

3  service level rates.  They've had a chance to use this last year

4  to make some changes on the cost side which will bear fruit for

5  them going forward.  And finally, I think that being reorganized

6  will allow them to participate in some growth that will also in

7  order to benefit.

8  Q    Let me ask you a little bit more detail about those reasons

9  you've given for Core-Mark's strong process.  What do you mean by

10 strong management?

11 A    The management team at Core-Mark both at the upper levels,

12 if you will, the executive levels has generally been with the

13 company since before the acquisition by Fleming in 2002.  It was

14 a company that really built the Core-Mark business.  As

15 importantly and perhaps more importantly is the distribution

16 center management teams also have been with the company for a

17 long time.  That is key because we deal with our customers on a

18 decentralized basis in over 22 distribution centers.  So that is

19 really where the customer contact is and that's where we, you

20 know, make or break ourselves in terms of making money.

21 Q    You also mentioned service levels.  Can you explain what

22 that term is?

23 A    Service level, we use a metric to measure it which is

24 basically for our customers submitting orders, how many of them

25 did we feel.  And we measure that as a percentage.

Stenger - Direct/Paris                                    55

1  Q     And how have the service levels been of Core-Mark Newco

2  during the bankruptcy?

3  A      Initially the service levels were suffered substantially and

4  were relatively poor in a comparative sense.  And that would have

5  lasted for April, May and a large part of June of 2003.  Since

6  that point, the management team there has made substantial

7  progress in stabilizing that and, in fact, really for the last

8  six months we've been at the highest levels that the company has

9  ever enjoyed with being consistently over 98.5 percent which is

10  our internal, kind of, goal standards.

11  Q     I believe you also mentioned that there were growth

12  opportunities.  What did you mean by that?

13  A      During the past year, during the bankruptcy, the company has

14  not been able to participate in the acquisition of new major

15  account business largely because being in bankruptcy has, in

16  effect, precluded us from being a qualified bidder if you will.

17  The management team has worked very aggressively to move forward

18  with the number of new opportunities and assuming that we confirm

19  a plan and get out, I think that many of those the company will

20  be able to act upon here over the next 12 months.

21  Q     Finally, I think you mentioned there had been some changes

22  on the cost side.  What did you mean by that?

23  A      During the last year, the distribution network has been

24  rationalized with four of the distribution centers having been

25  closed.  Three of the distribution centers we have during this

1  year finished capital improvement programs for those that have

2  integrated them into the Core-Mark's systems.  Both of those

3  factors will lead to higher profitability in 2005 and going

4  forward.

5  Q    Okay.  I'll move to a different area.  Let's discuss the

6  guarantees between the three entities that are shown on Exhibit

7  189.  First of all, Mr. Stenger, can you just generally describe

8  what these guarantees are?

9  A    Yes.  The three guarantees are there's two guarantees from

10 Core-Mark that go to the reclamation creditors trust.  And those

11 relate to the trade/lien vendors or the TLV guarantee and the

12 non-trade/lien vendors.  The third guarantee is a guarantee from

13 Core-Mark to the post-confirmation trust which relates to certain

14 of the administrative claims that were included and will be

15 included, I should say, in the post-confirmation trust are

16 expected to total about $52 million.  That was our estimate

17 that's included in the disclosure statement.  To the extent that

18 those expenses and administrative costs exceed $56 million, Core-

19 Mark will be obligated to reimburse the PCT for those amounts

20 over $56 million.

21 Q    Let me go back to the guarantees to the reclamation

22 creditors trust.  How does the TLV guarantee work specifically?

23 A    The trade/lien vendor guarantee works to the extent, and

24 there's some points in time, but I'll make this kind of the

25 overview is in December of 207, starts in 206, but I don't think

1 that will be an adequate measurement date.  There's a trigger

2 which would turn out to be -- so we will look in 207 and if the

3 trade/lien vendors' valid claims have not been paid in full, they

4 will then be able to draw on the guarantee.  Core-Mark will be

5 obligated to pay to them the difference between what's

6 established as their valid trade/lien plans less what's actually

7 been paid to them from the reclamation creditors trust will be

8 owed by Core-Mark.

9 Q    Are their any intermediate steps between the reclamation

10 creditors trust going against Core-Mark?

11 A    There could -- that deficiency, if you will, that may arise

12 could be paid by the post-confirmation trust also.

13 Q    Prior to Core-Mark having an obligation?

14 A    Prior to Core-Mark actually funding that, correct.

15 Q    Okay.  Let me ask you about the non-trade/lien vendor

16 guarantee.  How does that work?

17 A    The non-trade/lien vendor guarantee is similar in that at a

18 point in time we will measure.  To the extent that the valid non-

19 trade/lien reclamation plans have not been paid in full by the

20 reclamation creditors trust, or as you point out, the post-

21 confirmation trust, they will be able to look to Core-Mark for

22 that deficiency up to an amount equal to $15 million.  To the

23 extent the deficiency exceeds 15 million, that will not be

24 covered.

25 Q    And, sir, what are your projections and analysis suggest

1 about the likelihood that Core-Mark Newco would have to make a

2 payment on the TLV guarantee?

3 A    Our estimates suggest that that is almost virtually

4 impossible.  And the reason I say that is, and you can see just

5 generally looking on the right-hand column there of the

6 reclamation creditors trust, that will be vested with $140

7 million of assets.  While we've estimated the trade reclamation,

8 the TLV claims at 50, if it was 50, 60, 70, there is over two

9 times the amount of assets being vested into the trust.  And I

10 think it's virtually impossible for those not to be turned into

11 at least 60 or $70 million.

12 Q    And you've already discussed the administrative claim

13 guarantee that runs to the post-confirmation trust.  So let me

14 just ask you, if Core-Mark Newco had to make a payment on any of

15 these guarantee obligations, what ability do you think it would

16 have to cover those liabilities?

17 A    Well, obviously a lot depends on timing, but because

18 particularly the guarantee payments relative to the reclamation

19 creditors trust are time-phased.  And based on our projections,

20 wouldn't come in till 207 and 208.  I think that Core-Mark would

21 be in a position at those points in time to very easily cover any

22 level of guarantee deficiency that at least I think might occur.

23 Q    Have you done an estimate of the amount of cash flow that

24 Core-Mark Newco might have to make payment toward those guarantee

25 obligations?

1  A    Yes.  In fact, if you don't mind, I'll flip back to the

2  exhibit.  And I don't recall, Your Honor --

3  Q    Are you referring to trial exhibit --

4  A    Yeah, I guess it's trial exhibit 3 perhaps?

5            THE COURT:  Page 242?

6  A    Yes.  And if you look at page 242, that is our projection of

7  the cash flow to be generated by Core-Mark over the period.  If

8  you look during this period, the cash flow from operating

9  activities, which is basically the first sub-total, indicates

10 that Core-Mark will generate from operations over $100 million --

11 excuse me -- in cash flow, operating cash flow, which in our

12 projections, we use for funding capital expenditures of about 40

13 million.  Then use about 65 for debt payments.  Those could, in

14 fact, not be the uses of that operating cash flow and they can be

15 reserved for other purposes such as making guarantee payments.

16 In addition to that, as I mentioned earlier, there is a revolving

17 credit facility that is being funded at the effective date with

18 General Electric Credit.  Moving forward, Core-Mark will always

19 have at least $50 million of availability under that facility

20 that could be available also to fund guarantee payments.

21 Q    Thank you.  I going to put up another board.  This will be

22 Exhibit 190 and we do have copies.

23                          (Pause)

24 A    Thank you very much.

25 Q    Mr. Stenger, what does Exhibit 190 show?

Stenger - Direct/Paris                                      60

1  A    Exhibit 190 is a graphic presentation of the projected

2  balance sheet for Core-Mark Newco for the period beginning on

3  July 31st which is kind of the seventh month mark in our year.

4  And then after that, for the years 2004 through 2008, annual as

5  of the end of December.

6  Q    And what is the relationship in trend between assets and

7  liabilities?

8  A    The trend is really obviously the graph line show that.   I

9  think what I really focus on is the difference between the two

10 lines.   And what we see is that the amount of stockholders equity

11 retained earnings is growing each year because our assets are

12 exceeding our liabilities.

13 Q    So, over the next four years, given your analysis and

14 projections and including the impact of any guarantee obligations

15 that arise, do you have a view as to whether Core-Mark Newco will

16 be able to satisfy its liabilities as they come due?

17 A    Yes, I do.   I am very comfortable with the ability of Core-

18 Mark on an ongoing basis to satisfy its obligations as they

19 become due.

20 Q    And based on your analysis and projections, what do you

21 believe about whether Core-Mark Newco will need further financial

22 reorganization or a liquidation?

23 A    I believe that to be very unlikely.

24 Q    And on that basis, what is your view as to whether Core-Mark

25 Newco is feasible?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I think the company coming out of bankruptcy is -- our plan

2  is very feasible and it will be a well-capitalized company with

3  very good prospects going forward.

4  Q    Mr. Stenger, can I direct your attention once again to the

5  binder that's in front of you and ask you to take a look at

6  Exhibit 1.

7  A    Yes, that's my declaration.

8  Q    Okay.

9  A    Is that correct?

10 Q    And did you -- and -- I'd like to ask you to turn to the

11 last page of that declaration, page 21.

12 A    Yes, sir.

13 Q    Is that your signature?

14 A    Yes, it is.

15 Q    And was this testimony that you prepared in conjunction with

16 this confirmation hearing?

17 A    Yes, it is.

18         MR. PARIS:  Your Honor, that's all I have unless

19 there's an objection to admitting Mr. Stenger's affidavit.

20         MR. HOGAN:  I object, Your Honor, hearsay.  At least,

21 if I could just maybe ask a few questions before we admit

22 everything.  Is there a chance I might be able to ask him --

23         THE COURT:  All right.  We'll reserve your objection to

24 D-1 until conclusion of cross.  All right.  You may proceed with

25 cross.

Stenger - Cross/Hogan                          62
CROSS-EXAMINATION

1  BY MR. HOGAN:

2  Q    Mr. Stenger, this is Timothy Hogan for Mr. Berry.

3  A    Okay.  Hello, Mr. Hogan.

4  Q    Do you know if Core-Mark Newco and Toomes (phonetic) has any

5  ongoing relationship with C&S or any of the C&S affiliates after

6  it emerges from bankruptcy?

7  A    It has -- Core-Mark has none now and it will have none going

8  forward.

9  Q    Now, looking at the, I guess it's Exhibit 3, the board, what

10 is your understanding of where a claim -- assuming the best world

11 for Mr. Berry that his claim survives this proceeding, where

12 would his claim fall in terms of the liabilities?  Would it be a

13 non-TLV claim?  How would you catagorize that?

14 A    Well, it will be a claim that will be satisfied by the post-

15 confirmation trust either as unsecured claim -- whatever the

16 complexion of the claim would be, that's where it would be.

17 Q    Okay.  And do you have any understanding of whether or not

18 the debtor claims to have had license to use Mr. Berry's software

19 during this case?  During the pendency of the bankruptcy?

20 A    I don't think we -- I don't know the term license, whatever.

21 I don't think we've been consciously trying and felt we had

22 stopped using it at one point early in the bankruptcy

23 proceedings.

24 Q    But up to the time you stopped using it, was it your

Stenger - Cross/Hogan                    63

1  understanding that the debtor was using it with a license to use

2  it?

3  A    I really don't have an understanding as whether there was a

4  license or some other arrangement.

5  Q    Well, for you to be able to tell what the liability for Mr.

6  Berry's claim would be, and to be able to determine feasibility,

7  wouldn't it be important to know whether or not the uses that

8  were being made of his software were likely would be infringing

9  uses?

10 A    Well, actually, I mean, our estimate of Mr. Berry's -- of

11 that claim is based on a settlement offer that was provided to us

12 by either you or Mr. Berry.  That's what we based our estimate

13 on.

14 Q    And is that the settlement offer of $48 million?

15 A    No.

16 Q    now, are you familiar with damages in a copyright case?  Are

17 you familiar how damages are determined, what the rights are of

18 the copyright claimant?

19 A    Not in any specifics, no.

20 Q    All right.  Are you aware that the copyright owner is at

21 least entitled by statute to the profits of the infringer?

22 A    I don't know --

23        MR. PARIS:  I object, Your Honor, calls for a legal

24 conclusion and lacks foundation.

25        THE COURT:  Sustained.

1  Q    In regards to your analysis of whether there will be

2  sufficient funds to pay the debts in the reorganized entity, have

3  you made any determination of whether or not the reorganized

4  debtor, the post-confirmation trust, or the reclamation creditors

5  trust would have sufficient funds to pay C&S's profits during the

6  period of time it's infringing?

7  A    No, we've not done that analysis.

8  Q    Are you aware of what C&S's profits are generally?

9  A    No.

10  Q    Are you aware of what the profits were, the gross receipts

11  for the Hawaii division was during the time that Fleming operated

12  it?

13  A    No, I'm not as I sit here today.

14  Q    So is it fair to say, sir, that none of the analysis that

15  you have made in determining whether there's feasibility has even

16  approached the issues of the copyright infringement liability?

17  A    I would say as you posited it, yes, correctly.

18        MR. HOGAN:  Thank you, Your Honor.

19        THE COURT:  Now do you object, then, to the declaration

20  being admitted?

21        MR. HOGAN:  I'll allow it in, Your Honor.

22        THE COURT:  All right.  Any redirect?

23                    REDIRECT EXAMINATION

24  BY MR. PARIS:

25  Q    Mr. Stenger, you mentioned that your analysis that's

**J&J COURT TRANSCRIBERS, INC.**

Stenger – Redirect/Paris                                65

1 contained in the post-confirmation trust regarding the estimate

2 of Mr. Berry's claim came from a settlement offer?

3 A    Yes.

4 Q    What was that settlement offer?

5 A    It was just south of $500,000.

6          MR. HOGAN:  Your Honor, I object, 408.  I object --

7          THE COURT:  Wait, don't answer.

8          MR. HOGAN:  I object, Your Honor, Rule 408.  Perhaps if

9 we had the document, we could look at it and determine whether or

10 not it's something that we'd want to admit.  I don't know what

11 they're talking about, Your Honor.  But if they're talking about

12 settlement discussions, I believe it's Rule 408.

13          MR. PARIS:  Your Honor, he opened the door to it on

14 cross-examination asking what the basis for his estimation was of

15 Mr. Berry's claim.

16          MR. HOGAN:  And he answered the question, Your Honor.

17          THE COURT:  And he didn't ask him what it was.  I think

18 the objection should be sustained.

19          MR. PARIS:  Okay.

20 Q    Mr. Stenger, has -- have the debtors taken into account an

21 estimate of the debtors' claim for Mr. Berry's -- I'm sorry, Mr.

22 Berry's claim?

23 A    Yes, we have an estimate included in the administrative

24 claim section for the post-confirmation trust of an

25 administrative claim of $500,000.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Thank you.

2          MR. PARIS:  That's all the questions I have.

3          THE COURT:  Any recross?

4          MR. HOGAN:  No, sir.

5          THE COURT:  Okay.

6          MR. PARIS:  Unless he has further questions -- I would

7  like to offer then into evidence Mr. Stenger's affidavit with the

8  attachments which are also separately marked in this proceeding

9  as trial Exhibit 3 and trial Exhibit 4.

10         MR. HOGAN:  I have no objection.

11         THE COURT:  All right.  They're admitted.

12         MR. HERTZBERG:  Your Honor, I have one question for the

13  witness.

14         THE COURT:  All right.

15                    CROSS-EXAMINATION

16  BY MR. HERTZBERG:

17  Q    Robert Hertzberg for the FEM secured creditors committee.

18  Mr. Stenger, in the event that the administrative claims are

19  greater than $56 million in the PCT, does Core-Mark guarantee an

20  amount above that?

21  A    Yes, for the amounts in excess of $56 million, those would

22  be reimbursed by Core-Mark.  And there's no cap on it.

23  Q    Thank you.

24  A    You're welcome.

25         THE COURT:  Any further questions?

Scott - Direct/Paris                                    67

1       MR. PARIS:  No, Your Honor.

2       THE COURT:  Thank you, you may step down.

3       THE WITNESS:  Thank you, Your Honor.

4       THE COURT:  Leave everything up there other than your

5   copy of that D-3.

6                     (Witness excused)

7       THE COURT:  Yes.

8                     (Pause)

9       THE COURT:  Do you want to take a break or proceed to

10  the next witness?

11      MR. PARIS:  Your Honor, we would call Mr. Michael

12  Scott.

13      THE COURT:  Thank you.

14      THE CLERK:  Place your hand on the Bible.  Please state

15  your full name and spell your last name for the Court.

16      THE WITNESS:  Michael Kenneth Scott, S-C-O-T-T.

17           MICHAEL SCOTT, DEBTOR'S WITNESS, SWORN

18                   DIRECT EXAMINATION

19  BY MR. PARIS:

20  Q   Mr. Scott, you've testified here several times before, so

21  I'll just ask you, sort of briefly to remind us of your position

22  and role in this bankruptcy.

23  A   Yes.  I am a principle with Alex Partners and with respect

24  to Fleming, I am serving as treasurer for the company, for

25  Fleming Companies, Inc.  And I've served as treasurer since

1  approximately May of last year.

2  Q    And did you prepare an affidavit in connection with the

3  confirmation hearing?

4  A    Yes, I did.

5  Q    Can you open the binder that's in front of you to Exhibit 6?

6  A    Yes, I have that in front of me.

7  Q    And is that your affidavit, sir?

8  A    Oh, I don't have that in front of me.  Just one minute.

9  Q    I apologize, it's Exhibit 5.

10 A    I do have that in front of me and that is my declaration.

11 Q    Okay.  And can you take a look at the last page of Exhibit

12 5?

13 A    Yes.

14 Q    Okay.  And is that your signature?

15 A    Yes, it is.

16      MR. PARIS:  Your Honor, we have a direct that goes

17 through this -- the substance of the testimony and the affidavit.

18 However, in the interest of saving time, since Mr. Stenger's

19 affidavit was admitted without objection, we would offer it.  And

20 if there is no objection, we can go directly to cross.

21      MR. HOGAN:  That's fine with me, Your Honor.

22      THE COURT:  All right.

23      MR. HOGAN:  No objection.

24      THE COURT:  Then it will be admitted.

25                    CROSS-EXAMINATION

Scott - Cross/Hogan                                    69

1  BY MR. HOGAN:

2  Q    Mr. Scott, Timothy Hogan for Mr. Berry.  Mr. Scott, you

3  actually authorized the Guidance Software people to go in and

4  visit the Fleming facilities in Kapolei, isn't that correct, sir?

5  A    I approved the engagement letter for the retention of

6  Guidance, yes.

7  Q    Have you, prior to doing that, spoken at all to I believe a

8  Fleming officer by the name of Ronald Griffin regarding the

9  software issue at the Fleming Kapolei facility?

10 A    I don't recall whether or not I talked to Mr. Griffin about

11 that.

12 Q    Right.  Have you ever spoken to Mr. Griffin?

13 A    If I recall right, is Mr. Griffin the -- he was the chief

14 information officer of the company?

15 Q    That is my understanding, sir.

16 A    Yes, I had conversations with him.

17 Q    Did you ever speak about Mr. Berry and his software with Mr.

18 Griffin?

19 A    I don't recall that specifically, right.

20 Q    Did you ever discuss Mr. Berry's software with any other

21 officers of Fleming?

22 A    Not that I'm -- well, I may have provided updates to our CEO

23 along the way about Berry software issues.

24 Q    Who -- when you say "our CEO", who are you referring to,

25 sir?

1  A    Pete Wilmont would have been the CEO at one point and then

2  Archie Dice (phonetic) at another point.

3  Q    In terms of -- I'm just trying to understand.  In terms of,

4  I believe Mr. Dice was non-executive CEO, is that --

5  A    I don't believe that's correct.  I believe as of the

6  September time frame, he would have been and executive CEO.

7  Q    Now, when you made the decision to allow Guidance to go in,

8  did it ever occur to you to contact the chief information officer

9  and get his input regarding how to proceed regarding the

10 intellectual property issues?

11 A    As I mentioned, I don't recall whether or not I had a

12 conversation with Mr. Griffin about that.

13 Q    Did you ever -- did it ever occur to you, sir, that you

14 should contact him?

15 A    I -- no, it didn't.

16 Q    Okay.  And would you normally -- Alex Partners is a

17 turnaround company?  Is that what you refer to them as?

18 A    Yes.

19 Q    In your work in that turnaround industry, don't you usually

20 defer to the actual management in the departments that they're

21 operating in terms of the decision making regarding their

22 departments?

23 A    I did defer -- I reported to the person -- Mr. Stenger is

24 who I report to and I had a discussion with him about it.

25 Q    Right, but Mr. Stenger is not the chief information officer,

1  is he?

2  A    No, he's not.

3  Q    And Mr. Griffin was the chief information officer at the

4  time, correct?

5  A    That's my understanding.

6  Q    And do you know, -- did anyone inform you that there was a

7  reason not to contact Mr. Griffin?

8  A    I really have -- I don't recall any discussion related to

9  Mr. Griffin.

10 Q    All right.  When you decided to do the Guidance thing, who

11 were you discussing it with at Fleming?

12 A    I remember discussing it with our counsel and I remember

13 discussing it at one point with management in Hawaii.

14 Q    Okay.  And when you say "our counsel", who are you referring

15 to, sir?

16 A    Kirkland Ellis.

17 Q    And who specifically at Kirkland Ellis?

18 A    I know I've talked with Danny Capitola about the issue.

19 Q    Okay.  Anyone else?

20 A    Perhaps Mr. Liebeler at one point.

21 Q    Okay.  And anyone else?

22 A    Those are the two principle contacts that I had on this

23 matter.

24 Q    At anytime were you -- and you say you talked to management

25 in Hawaii.  Who -- do you recall who the management was in

Scott - Cross/Hogan                                72

1  Hawaii?

2  A    I don't recall who I've talked to.  I just recall that I had

3  a -- it was one conference call with the Hawaii management team.

4  Q    Now, at some point, there was a decision to use an

5  individual by the name of Mark Dillon to create a replacement

6  program for the Berry system.  Were you aware of that?

7  A    I wasn't aware specifically of who was going to develop the

8  replacement software.

9  Q    Did you do any investigation to determine whether or not the

10 manner in which that was going to be developed would be

11 appropriate for the circumstances?

12 A    We had discussions with management in terms of whether or

13 not they could utilize other software other than Mr. Berry's

14 software to perform the same function.  And in those discussions,

15 they indicated to me that they could use other software and that

16 they would go forward and implement something that doesn't use

17 Mr. Berry's software.

18 Q    And who was that that told you that?

19 A    As I said, this came up in the conversation with the

20 management team in Hawaii.  It was more than a year ago and I

21 don't recall who was on the conference call.

22 Q    But your testimony was that at no time anyone chose to

23 contact Ron Griffin to ask his opinion?

24         MR. PARIS:  Objection, asked and answered.

25         THE COURT:  Sustained.

Scott - Cross/Hogan                                73

1  Q     Do you have an idea, and you're the chief financial officer,

2  sir?

3  A     I'm not.

4  Q     What is your title?

5  A     I'm the treasurer.

6  Q     Treasurer.  Do you have any understanding of the total

7  amount of revenue that is earned by the freight logistics system

8  operating at Fleming Kapolei?

9  A     I do not.

10  Q     Do you know who would?

11  A     I do not.

12  Q     Do you know where the records would be kept that would have

13  that information?

14  A     You're asking for the revenues of -- ask again which company

15  you're talking about the revenues for?

16  Q     Well, now, you understand -- what is your understanding of

17  what kind of operation Fleming ran in Hawaii?  Start slowly.

18  A     My understanding is it was a grocery distribution company.

19  Q     Okay.  Were you aware that they were running a

20  transportation company as well?

21  A     I'm not sure I specifically knew that, no.

22  Q     Were you aware that they were running what was called

23  Fleming Logistics at that facility?

24  A     I was not aware that was a separate business unit.

25  Q     Now, in terms of the feasibility, at anytime when you were

Scott - Redirect/Paris                                    74

1  determining matters relating to feasibility, did you make any

2  analysis at all of the liability that C&S might incur for the use

3  of software that they're currently operating?

4  A    I did not evaluate the liability from C&S's use of the

5  software, no.

6  Q    Right.  And at anytime did you do an analysis of what the

7  potential damages for copyright infringement would be in the

8  proceeding for infringement either in this court or in the Hawaii

9  court?

10 A    Not beyond what Mr. Stenger testified to.

11 Q    All right.  Thank you.

12                    REDIRECT EXAMINATION

13 BY MR. PARIS:

14 Q    Mr. Scott, does the relationship between C&S and Fleming, is

15 that memorialized in a document?

16 A    Yes.  I understand among other documents, it would be

17 included in the asset purchase agreement between Fleming and C&S.

18 Q    Does the asset purchase agreement contain any indemnity

19 provisions whereby Fleming would reimburse C&S for expenses

20 incurred as a result of the sale?

21 A    My understanding is there is an indemnity provision in the

22 APA.

23 Q    Do you know the amount of that indemnity provision?

24 A    I don't believe there's any cap on that amount.

25 Q    Mr. Scott, have the debtors funded any amounts toward an

Scott - Recross/Hertzberg                    75

1  escrow for that indemnity obligation?

2  A    Yes, the debtors have funded slightly over $10 million into

3  an indemnity escrow that will be for the benefit of C&S to the

4  extent that they have claims under the indemnity.

5  Q    Thank you.

6                        RECROSS EXAMINATION

7  BY MR. HERTZBERG:

8  Q    Mr. Scott, have you done an analysis of how much excess

9  assets above liabilities will be in the post-confirmation trust

10 when it is completed?

11 A    I have and it's included as Exhibit 3 to the disclosure

12 statement.

13 Q    And what did you estimate that amount at?

14 A    As this chart demonstrates, the post-confirmation -- I'm

15 sorry, the post-confirmation trust is expected to have

16 approximately $40 million of assets in excess of liabilities.

17 Q    And that's after payment of all administrative claims,

18 correct?

19 A    That's correct.

20 Q    Did you employ Guidance Software on behalf of Fleming?

21 A    I did.

22 Q    For what purpose did you employ them?

23 A    My understanding was that there were challenges to the use

24 of the software of the Hawaii division and in an abundance of

25 caution, we wanted to hire somebody to, first of all, help us to

1  insure we were no longer using the software and remove it from

2  our systems.

3  Q    What did you instruct Guidance Software to do on behalf of

4  Fleming?

5  A    A couple of things.  The principle things we asked them to

6  do was, number one, to take a snapshot, if you will, of the hard

7  drives that were at the company to understand what software

8  existed on the systems when they first arrived on site.  And then

9  second, to go in and remove any software related to -- that was

10 developed by Wayne Berry and that was the principle issues that

11 we asked them to cover for us.

12            MR. HERTZBERG:  One moment, Your Honor, please.

13                         (Pause)

14 Q    Mr. Scott, please turn to proposed Exhibit 178.

15 A    May I have that.  I'm sorry, which exhibit?

16 Q    178, please.

17 A    This entitled exhibit list regarding confirmation hearing?

18 Q    No --

19 A    Oh, I'm sorry.

20 Q    -- underneath it.

21 A    UN Volume 4 of 6.

22 Q    5 of 6, Mr. Scott, please.

23            THE COURT:  No, 4 of 6 is the beginning of it.

24 A    I think 5 of 6 is the -- is 179.

25 Q    You're correct, Mr. Scott, I'm sorry, 4 of 6.

Scott - Recross/Hertzberg                                      77

1  A    Okay.  And which tab?

2  Q    Underneath Tab 178.

3  A    Okay.

4  Q    Spend a minute and look at that document.

5  A    Okay.

6  Q    Do you recognize that document?

7  A    Again, this is the exhibit list regarding confirmation

8  hearing?

9  Q    No, underneath Tab 178 is a document entitled Fleming Asset

10 Purchase Agreement.

11 A    Oh, okay.

12 Q    Do you see that now?

13 A    Yes, I see that later in the agreement, yes.

14 Q    Okay.

15 A    Yes, I do recognize that.

16 Q    And what is that document?

17 A    It looks to be the cover for the asset purchase agreement

18 that was entered into between Fleming Companies and C&S and also

19 includes an index of what is in that asset purchase agreement.

20 Q    And what documents are underneath that?

21 A    There is an index of the exhibits to the asset purchase

22 agreement.

23 Q    And have you seen those exhibits before?

24 A    I believe I -- yes, I have.

25 Q    And did you participate on behalf of Fleming in the sale of

Scott - Recross/Hogan                    78

1 the assets of the wholesale division to C&S?

2 A    My involvement in that was fairly limited.

3         MR. HERTZBERG:  I have no further questions.

4         THE COURT:  Recross?

5                   RECROSS EXAMINATION

6 BY MR. HOGAN:

7 Q    Mr. Scott, the large two volume set, one of the things it

8 has in that first one is IP agreement.  If you'd look at it, it's

9 Volume 5 of 6, right after the -- there's the number tab, then

10 there's a -- mine has blank tab that says defined terms?

11 A    Yes.

12 Q    And if you go down there, sir, there's IP agreements.  Do

13 you see the 4.19B?  I guess it's 4.19A and B deals with

14 intellectual property.

15 A    Right.

16 Q    Are you able to -- I'm trying to do this and I just wonder,

17 are you familiar enough with this to be able to find where those

18 are in these binders?  And I'll tell you why I'm asking is I just

19 want to know if Mr. Berry's property is listed in either of those

20 two.

21 A    My -- I don't know.  I suggest you look.

22 Q    Are you familiar enough -- I mean, you don't know the binder

23 either.

24 A    Well, I don't know what this is.  I guess I'd want to refer

25 to that exhibit and no, I'm not familiar with the way this is put

79

1  together to be able to find that quickly.

2  Q    Okay.  That's -- thank you.

3           THE COURT:  Any recross?  Excuse me, redirect --

4           MR. PARIS:  No recross, Your Honor.

5           THE COURT:  -- redirect.

6           MR. PARIS:  No redirect.  We would offer Exhibit 178

7  and Mr. Stenger's affidavit which was Exhibit 5 with the exhibits

8  thereto.  Mr. Scott, I apologize.  And I also neglected to offer

9  the boards that we have used with Mr. Stenger, Exhibits 189 and

10  190.

11          THE COURT:  I thought you had moved their admission.

12          MR. HOGAN:  Your Honor, I'm going to object on lack of

13  foundation --

14          THE COURT:  Object to which?

15          MR. HOGAN:  Of 178, Your Honor.  He can't even find

16  things in the document.  So I'm going to object that he can't

17  authenticate this and lack of foundation.

18          MR. PARIS:  But the witness did testify that he

19  recognized the document.  His inability to, on the fly, find one

20  particular schedule --

21          THE COURT:  He said his involvement was relatively

22  limited.  And he didn't understand the document.  I'm not sure --

23  I will sustain the objection.  I don't think this witness is the

24  one.  You may step down.

25                    (Witness excused)

80

1          THE COURT:  All right.  Any objection to D-5?

2          MR. HOGAN:  No, not at all, Your Honor.

3          THE COURT:  All right.  It's admitted.

4                        (Pause)

5          THE COURT:  Let's take a five-minute break.

6                        (Recess)

7          THE CLERK:  Please rise.  You may be seated.

8          MR. SPRAYREGEN:  Your Honor, I appreciate the break.

9   Actually, we were able to use the break to have some discussions

10  with Mr. Hogan.  And actually what we've agreed on is that the --

11  all of the exhibits that relate to the Berry objection that are

12  the debtor's exhibits that have not yet been admitted into

13  evidence, Mr. Hogan is allowing to be entered into evidence

14  without objection at this point, so we can try to save some time

15  and be efficient.  We appreciate that accommodation, so to be

16  clear --

17          THE COURT:  That includes D-178?

18          MR. SPRAYREGEN:  Yes.

19          THE COURT:  Okay.

20          MR. SPRAYREGEN:  So to be clear, I can summarize that

21  the -- some of these have already been admitted based on the

22  first two witnesses, but it would be 1-9, 177-179, 189-192.  And

23  to make it even easier, with all of that, it actually means the

24  entire list that I handed to the Court would be admitted into

25  evidence.

81

1    Mr. Hogan, so it's clear, had requested that we extend
2  the same accommodation with respect to his affidavits.  And we've
3  conferred and the difficulty we have with that, and we're not
4  looking to be inefficient or waste anybody's time, is that
5  they're really interrelated with Mr. Berry's affidavit who is not
6  here.  And as a result, depending on what Mr. Hogan wants to
7  present, we thing that does need to be done by oral testimony so
8  we can purse through what's the hearsay and what's not.
9            THE COURT:  All right.
10           MR. SPRAYREGEN:  So with that, that would be the rest
11 of our exhibits.
12           THE COURT:  And do you rest?
13           MR. SPRAYREGEN:  Your Honor, that would be all of our
14 evidence in support of the confirmation hearing.  There is,
15 obviously, our motion to estimate Mr. Berry's claim and we have,
16 as I noted before, up to four witnesses, two of which are by
17 deposition.  And so, I'm not sure -- it would seem to me, I would
18 suggest to the Court that we handle that together --
19           THE COURT:  Agreed.
20           MR. SPRAYREGEN:  -- and proceed forward on that.
21           THE COURT:  All right.  We'll proceed with their
22 witnesses and then hear your testimony.
23           MR. HOGAN:  Thank you, Judge.
24           THE COURT:  All right.
25           MR. SPRAYREGEN:  Mr. Liebeler will (attorney away from

Dillon - Direct/Liebeler                                82

1  mike) --

2          MR. LIEBELER:  Eric Liebeler for the debtor.  We'll

3  call Mark Dillon.

4          THE COURT:  Please remain standing so you can be sworn.

5          THE CLERK:  Place your hand on the Bible.  Please state

6  your full name and spell your last name for the Court.

7          THE WITNESS:  My name is Mark Dillon, D-I-L-L-O-N.

8              MARK DILLON, DEBTOR'S WITNESS, SWORN

9                      DIRECT EXAMINATION

10 BY MR. LIEBELER:

11 Q     Mr. Dillon, where do you work?

12 A     I work for C&S Wholesale Grocers, Hawaii Division in

13 Kapolei, Hawaii.

14 Q     And what is your job title, sir?

15 A     I'm a network administrator there for the logistics

16 department.

17 Q     And describe your job, please, as a network administrator

18 for the logistics department?

19 A     I install and maintain all hardware and software on that

20 network.  I maintain our data and I do any required programing.

21 Q     And how long have you had that job, sir?

22 A     Well, I've performed those functions since October 1st, 1999

23 originally for Fleming.

24 Q     And then you started working for C&S after C&S purchased

25 that portion of Fleming?

Dillon - Direct/Liebeler                    83

1   A    That's correct.

2   Q    And as a result of that change in ownership, did your job

3   responsibilities change in anyway?

4   A    No, they did not.

5   Q    Now, stepping back a little bit in time, prior to working

6   for Fleming, who did you work for?

7   A    I worked for Atlantic Pacific International, API.

8   Q    And what was the relationship between API and Fleming?

9   A    API provided -- arranged for the transportation of Fleming

10  purchase orders coming from the mainland to Hawaii.

11  Q    And what happened as between Fleming and API ultimately?

12  A    Ultimately Fleming purchased API's assets and operations.

13  Q    And when did that occur?

14  A    In the months just up to October 1st, just prior to October

15  1st, 1999.

16  Q    At some point, did you come to know a gentleman by the name

17  of Wayne Berry?

18  A    Yes, I did.

19  Q    And what was your professional relationship with Mr. Berry?

20  What was your professional relationship with Mr. Berry?

21  A    He was my supervisor when I first came to API.

22  Q    And at that time, what was Mr. Berry's title there?

23  A    I just knew him as head of IP -- of API.

24  Q    Now, to the best of your understanding, what software did

25  Mr. Berry claim to have written at API used in its work with

J&J COURT TRANSCRIBERS, INC.

Dillon – Direct/Liebeler                    84

1  Fleming?

2  A    It was an access database in which API kept all it's data

3  except some accounting data.  And there were officially reports

4  that published the data in that database.  Later on, sometime in

5  1998, Mr. Berry created a program to update his access database

6  with Fleming purchase order data that he received at EDI.  Or in

7  EDI format.

8  Q    Did API use Mr. Berry's software while API was handling

9  Fleming's freight logistics operations?

10  A    I'm sorry, could you repeat the question?

11  Q    Certainly.  Did API use Mr. Berry's software while API was

12  working with Fleming on the logistics operations?

13  A    Yes.

14  Q    And then when Fleming bought API, did Fleming start to use

15  that software as well?

16  A    Yes, it did.

17  Q    And to your understanding, did Fleming have permission to

18  use that software?

19  A    Yes.

20  Q    And how is it that you know that, sir?

21  A    Well, I think there were a number of times where we were

22  instructed to, in preparation of transition to employment by

23  Fleming, about how we were to carry out our duties.  There was a

24  meeting in August of 1999 where Mr. Berry stood up in front of

25  the members of the -- of API who were going to become Fleming

Dillon - Direct/Liebeler                                    85

1  employees, and certain Fleming officers at the Hawaii division,

2  and detailed what their operations were going to be, what the

3  operations of the logistics department were going to be in the

4  future.  And he described the -- our operations as -- precisely

5  as they were under API operation.  So we were going to continue

6  to do exactly the same thing.

7  Q    Now, at some point, there was a trial between Mr. Berry on

8  the one hand and Fleming on the other.  Do you recall that?

9  A    Yes.

10  Q    And that took place in federal district court out in Hawaii

11  in the first quarter of last year?

12  A    That's correct.

13  Q    Were you involved in that trial, sir?

14  A    Yes, I was.

15  Q    In what way?

16  A    I was a witness.

17  Q    And are you aware of the jury verdict from that trial?

18  A    Yes, I am.

19        MR. LIEBELER:  Your Honor, may I approach?  I have some

20  exhibit books that I'm using with some of the witnesses?

21        THE COURT:  Yes.

22        MR. LIEBELER:  Okay.

23  Q    And take a look in that book under what's been marked as

24  Exhibit 309, please.  Can you identify Exhibit 309, please, Mr.

25  Dillon?

Dillon - Direct/Liebeler                        86

1  A    This is -- this is the jury verdict from the Fleming/Berry

2  lawsuit.

3  Q    Now, as a result of that jury verdict, sir, did Fleming make

4  any changes to the software that was being used in the logistics

5  department at Kapolei?

6  A    Yes.  We went back to the Berry database in its original

7  form, the form under which it was licensed to us in October 1999.

8  Q    And who was it at Fleming who was responsible for making

9  changes to the software in light of the verdict?

10  A    I was.

11  Q    And when you did that, sir, did you have a copy of Mr.

12  Berry's software in unmodified form available to you?

13  A    No, I did not.  We, due to some inadvertency, had deleted

14  our copy, our archived copy of his original licensed database.

15  We had a copy from June of 2000 that had only one added feature,

16  a feature added to compensate for a Y2K failure in Mr. Berry's

17  update program.  And so, I removed that added feature and had Mr.

18  Berry's database in it's original form which we used at that

19  point.

20  Q    And how long did it take you, sir, to make that change to

21  the software?

22  A    Not very long to actually remove the added feature.  It

23  would have been about an hour, a little less than that.

24  Q    And after you had made that change to the software, what

25  impact did that have on the ability of Fleming personnel to use

Dillon - Direct/Liebeler                              87

1  the logistics software?

2  A    Well, it was very difficult.  Our operations had changed a

3  lot and Mr. Berry's database no longer had a place for a lot of

4  the data items we used.  We had to squeeze them in in places in

5  his database where data items we did not use were represented and

6  we used those places, mislabeled, sometimes with the wrong data

7  type, all over the page, not in the right tab order.  So it was

8  very inconvenient just from the standpoint of data entry.  The

9  access database was also very slow.  Access 97 does not run well

10 on Windows 2000.  We've tried to fix that in a number of ways,

11 but weren't able to get it to speed up adequately.

12 Q    How long was it, sir, that Fleming continued to use the

13 Berry software in its original unmodified form?

14 A    We used it from end of March 2003 until June 9th, 2003.

15 Q    And what changes were made at that time, sir?

16 A    In June 9th?

17 Q    Yes, sir.

18 A    We transferred the date that we had input into Mr. Berry's

19 database into Excel spreadsheets and began simply inputting our

20 date into spreadsheets.

21 Q    And did Fleming's use of the spreadsheets permit Fleming to

22 conduct its logistics operations in Hawaii without the use of Mr.

23 Berry's software?

24 A    Yes, it did.

25 Q    And what kind of difficulty did that cause to the operations

Dillon - Direct/Liebeler                    88

1  at that facility?

2  A    It caused great difficulty for both me and all my co-

3  workers.

4  Q    And without getting too technical, sir, why was that?

5  A    There were many reasons.  You couldn't see all of the data

6  having to do with a single record on a page.  You had to scroll

7  50 columns or whatever it was to the right or the left.  The

8  spreadsheets do not manage your data like a database.  If you

9  want to use a record, you have to tell everybody else you're

10 going to use that record or they will -- they may use the same

11 record and you'll override each others data.  So we had to do

12 that through phone calls and email.  There are numerous other

13 difficulties.  Spreadsheets don't maintain data types that cause

14 data all of a sudden to disappear from reports.  The data type

15 was input incorrectly.

16 Q    Now, in your current role as network administrator for C&S

17 at that same facility, do you generally know what software that

18 facility is using to conduct C&S's logistics operations?

19 A    I'm sorry, could you repeat the question?

20 Q    Sure.  In your current role, because you're working for C&S

21 as network administrator in that same facility --

22 A    Yes, sir.

23 Q    -- do you know, as you're sitting here right now, what

24 software C&S personnel are using to conduct C&S's logistics

25 operations?

**J&J COURT TRANSCRIBERS, INC.**

Dillon - Direct/Liebeler                                89

1  A    Yes, I do.

2  Q    And what software is that?

3  A    The spreadsheets I've been speaking of.

4  Q    And have you worked at the Kapolei facility continuously

5  since June 9th of 2003?

6  A    Yes.

7  Q    And since June 9th of 2003, has the Kapolei facility used

8  Mr. Berry's software?

9  A    No.

10  Q    And since June 9th of 2003, have you personally used Mr.

11  Berry's software?

12  A    No, I have not.

13  Q    Do you know a gentleman by the name of Mike Gursey

14  (phonetic)?

15  A    Yes, I do.

16  Q    And who is Mr. Gursey, sir?

17  A    He is an employee of Guidance Software from I believe

18  Pasadena, California.

19  Q    And how is it that you came to know Mr. Gursey?

20  A    He was employed to -- by Fleming, I believe, to come out to

21  our network in Kapolei and remove Mr. Berry's software from our

22  network.

23  Q    And before Mr. Gursey arrived, what if anything did you have

24  to do in order to prepare for his arrival?

25  A    Well, he was going to wipe our network clean and that meant

**J&J COURT TRANSCRIBERS, INC.**

Dillon - Direct/Liebeler                                  90

1  I had to be sure that we retained any files that needed to be

2  restored to the network, any user files, documents users created

3  in the course of their work that they would need to resume their

4  work once the network was reinstalled.  A lot of work involved.

5  I could describe the process, but it took me -- I worked at it on

6  and off for a week and perhaps more.

7          I had to -- we kept all our email on the user's machines and

8  I had to get all that.  And that also included any attachments to

9  email which is kept in their local internet directory.  I felt

10 like I needed to go through those because we had lost files when

11 we did not retain those internet caches before, so I went through

12 all those files.  It would be hundreds for each user.  And they

13 had user files in the server and I had to merge those -- get them

14 all into a single cache of all user files.  And then ascertain

15 that none of Mr. Berry's software was among those.  Lot of work.

16 Q    Were you fully prepared by the time Mr. Gursey arrived?

17 A    Not fully, no.

18 Q    And why is that, sir?

19 A    We had just moved to the spreadsheets at that time.  There

20 were constant fires I had to put out as well as prepare for Mr.

21 Gursey.

22 Q    Now, when Mr. Gursey arrived, did you work directly with

23 him?

24 A    Yes, I did.

25 Q    And did you work with him during regular work hours or

1  during some other time?

2  A    Mostly -- well, we worked over the Fourth of July weekend,

3  2003.  We had to do most of our work in off hours.

4  Q    Why was that?

5  A    Because we were going to -- well, because we needed to take

6  over users machines and ultimately to remove all software.

7  Q    While you and Mr. Gursey was doing your work with the

8  overall system operational to other users?

9  A    No.

10  Q    Now, after you and Mr. Gursey started working together with

11  respect to -- well, strike that, withdrawn.  What is it that you

12  and Mr. Gursey were trying to achieve?

13  A    Well, ultimately, we wanted to make sure that Mr. Berry's

14  software was not on our network.  The way we went about that was

15  to take an image of every drive, every hard drive in use on the

16  logistics network there.  Then to wipe each of those hard drives.

17  For us to restall under his observation the software required to

18  resume operations and then to restore user files.  Then to take a

19  final image of what was left on the network when he completed his

20  task.  Any spare hard drives and media that we used for backup,

21  CDs or tapes, were given to him to keep in the custody of

22  Guidance Software.

23  Q    Now, you indicated that Mr. Gursey took an image of the

24  drives at the beginning of the process and then one at the end of

25  the process.  What was the point of taking that second image?

Dillon - Direct/Liebeler                                    92

1   A     To keep a record of what was left on the network when Mr.

2   Gursey finished.

3   Q     And what day was that second image taken, sir?

4   A     I'm not sure.  I think it might have been the 7th of July.

5   Q     When did Mr. Gursey leave the facility?

6   A     It was the last day of that holiday weekend.  I'm not sure

7   whether -- that must have either been a Sunday or a Monday.

8   Q     So it's fair to say sometime in the first week of July?

9   First 10 days in July?

10  A     That's correct.

11  Q     Now, you testified a minute ago that you restored some of

12  the software back on the system after Mr. Gursey wiped

13  everything.  You said you did two things, you put on software and

14  then you put on user files.  Let me direct you to the software

15  first.  What do you mean when you say you put the software back

16  on the system?

17  A     Off the shelf applications such as Microsoft Office, Crystal

18  Reports, Adobe Acrobat, those sort of files.

19  Q     And when you restored that software, did you intend to

20  restore any of Mr. Berry's software onto the machines?

21  A     No.

22  Q     Now, when you say user files, it's kind of a technical term.

23  Tell the Court, please, what it is that you mean by user files.

24  A     I mean any document created by users to -- as part of their

25  function within the department that they might need to refer to

Dillon - Direct/Liebeler                                93

1  again.  They would be, for instance, Word documents, Excel

2  spreadsheets.  Sometimes we had exported into Adobe Acrobat.

3  Q    And approximately how many user files needed to be restored

4  to the system?

5  A    Well, including my own, which includes, you know, extensive

6  professional documentation, there was over 20,000 files, I think.

7  Q    And when you restored the user files back onto the system,

8  did you intend to restore any of Mr. Berry's files?

9  A    No.

10 Q    Or Mr. Berry's software?

11 A    Absolutely not.

12 Q    Now, how long did it take you and Mr. Gursey after you and

13 Mr. Gursey to complete the process that you've described?

14 A    We worked over five days I recall, that weekend.

15 Q    And were you working hard or not hard over that period of

16 time?

17 A    It was -- well, we had an awful lot to do and I counted -- I

18 put in about 75 hours that weekend.

19 Q    And why is it that you were under such a tight deadline?

20 A    We had to have it all done by the time workers came in from

21 the holidays and sit down at their desks and get right into work.

22 Q    Now as you sit here today, do you understand that Mr. Berry

23 alleges that there's 16 copies of a file called Fleming Logistics

24 MDB on the second image that Guidance took and part of which was

25 ultimately produced by Mr. Berry during discovery?

Dillon - Direct/Liebeler                           94

1  A    Yes.

2  Q    And do you know specifically how those files got there?

3  A    No.  I can only surmise that they were retained among the

4  users files.  Those were my files, too.  They were my files for

5  the -- of documentation for the previous lawsuit.  Somehow that

6  I'd missed them and they were among the user files that were

7  retained on the network.

8  Q    Did you ever intentionally put Mr. Berry's files back on the

9  system at anytime?

10 A    No.  The whole point of all that pain was to be sure that

11 his software was not on the network.

12 Q    Now, when is it that you found out that Mr. Berry was

13 claiming that his files were still remaining on the system?

14 A    It was in June of this year.

15 Q    And since that time, have you gone back and looked for those

16 files?

17 A    Yes, I did.

18 Q    And tell us please what it is that you did in order to do

19 that?

20 A    Well, for every computer, for every drive on every computer

21 on the network, I performed a search for any file beginning with

22 FCS and ending with the extension .MDB, which were the -- which

23 would discover any of Mr. Berry's files.  And all the searches

24 came back negative.

25 Q    When you say the searches came back negative, what do you

Dillon - Direct/Liebeler                                95

1  mean, sir?

2  A    I mean, I did not find any of his files on the network.

3  Q    Now, take a look at what's in your binder as Exhibit 302, if

4  you please.  And 302 is a long document and it's part of -- it's

5  a declaration that was written by Wayne Berry and there's an

6  attachment on the end of it.  On the very last page of 302, the

7  last two pages of 302 are all we're going to need.  And Mr.

8  Dillon, I'm going to represent to you that Mr. Berry has told the

9  Court that those pages -- or at least the second to last page,

10 contains a list of the 16 separate files that he has identified

11 from the Guidance image that remain on the servers.  You can see

12 on the right-hand part of the exhibit that there are -- a long

13 column describing what the file names are.  Do you see that?

14 A    Yes.

15 Q    And does that include both path names and file names?

16 A    Yes, it does.

17 Q    And by looking at those path names, what can you tell us

18 about where those files were on the systems in Kapolei?

19 A    They were on my computer.  They were part of my professional

20 documentation.  That is documents and material I keep to -- have

21 to do with my function with maintaining computers and software

22 there on the network.

23 Q    How can you tell from the actual path names that these files

24 were on your computer, sir?

25 A    From the director named fh1136.  Actually, the directory

J&J COURT TRANSCRIBERS, INC.

Dillon - Direct/Liebeler                                    96

1  name is lower case xfhl136.  Fhl136 was the name of my computer.

2  Q    Okay.

3  A    At that time.

4  Q    Now why is it that you would originally put these files in

5  your directory?  For what purpose, sir?

6  A    I'm sorry, which -- oh, these MBD files here?

7  Q    Yes, sir.

8  A    This was -- all these directories are used to keep

9  documentations for the previous lawsuit.  There were collections

10 of documents that I felt were relevant to the lawsuit.

11 Q    And when you say "the lawsuit", which lawsuit do you mean,

12 sir?

13 A    This is the Berry v. Fleming Companies lawsuit that was sent

14 to the jury in March, maybe late February, of 2003.

15 Q    And to what extent have you used these files after the end

16 of that trial, sir?

17 A    We have not used them.  They're not quite in a usable state.

18 They're -- most of the are -- do not have any data in them.  But

19 we don't -- we have not used them.

20         MR. LIEBELER:  No further questions, Your Honor.

21         THE COURT:  Cross?  Is it --

22         MR. HOGAN:  Would you like me to go first, Your Honor?

23         THE COURT:  Yeah.  Does the Committee have any

24 questions?

25         MR. HERTZBERG:  Not at this point, Your Honor.

Dillon - Cross/Hogan                          97

1      THE COURT:  All right.  Cross.

2                       CROSS-EXAMINATION

3  BY MR. HOGAN:

4  Q    Mr. Dillon, Timothy Hogan for Wayne Berry.  Mr. Dillon, you

5  just testified that you were able to run a single wildcard search

6  for the MBD files and to look for these, isn't that correct?  You

7  just testified to that?

8  A    Yes.

9  Q    Why didn't you and Mr. Gursey do that the first time?

10 A    I don't recall how we went -- how I went about removing

11 those -- any files of Mr. Berry.  I think the reason I might have

12 missed these files is because they're in a place where I normally

13 do not keep software.  They're in my documentation that I keep

14 for keeping records of how I troubleshot various problems, that

15 sort of thing.  And I happened to keep my file documents there as

16 well.  That might be why I missed them.

17 Q    Well, let me ask you this, when Mr. Gursey came in, how did

18 he know which ones were Wayne Berry's software and which ones

19 weren't?  To your knowledge.

20 A    Among the files we were to retain on the network?

21 Q    No, I mean, I think you testified that Mr. Gursey came into

22 town to come in and scrub off Wayne Berry's intellectual

23 property, is that a fair characterization, sir?

24 A    Yes.  With my cooperation.

25 Q    With your cooperation.  How is he to know which ones were

Dillon - Cross/Hogan                                98

1  Wayne Berry's and which ones weren't?

2  A    Well, I think it's my part to determine which were Wayne

3  Berry's and which ones were not.  He was to simply take an image,

4  make sure there was, then wipe every drive and monitor my

5  reinstallation of the software.  I was the one that was to go

6  through the files and make sure Mr. Berry's software did not

7  remain on the network.

8  Q    To the best of your knowledge, sir, was Mr. Gursey aware

9  that a jury had found that you had made infringing changes to Mr.

10 Berry's software in March of 2003?

11 A    Okay.  Would you repeat the question, please?

12 Q    When Mr. Gursey was there, to your knowledge, was he aware

13 that you had been found to have made infringing copies of

14 software in a federal court proceeding that a jury handed down a

15 verdict on March 6th, 2003?

16 A    I don't recall --

17       MR. LAPOWSKY:  Objection, good faith basis for the

18 question, Your Honor.

19       THE COURT:  Overruled.

20 A    I don't recall my conversation with Mr. Gursey about the

21 events leading up to his employment.  I'm -- you know, I imagine

22 we may have discussed some things.  I just don't recall what they

23 were.

24 Q    Okay.  Now are there other software files that were created

25 by Wayne Berry that exist on the Fleming Kapolei computers as we

Dillon - Cross/Hogan                                    99

1  sit here today?   The C&S computers?

2  A     None that I know.

3  Q     And no Crystal reports programs that he originally authored?

4  A     None that I know of.

5  Q     And how do you know that?

6  A     I simply went through all our user files and I had to open

7  each of the Crystal reports.   This is one of the things that took

8  so long.   And ascertained by the internal creation date when that

9  report was created.   If it was created previous to Fleming, to

10  the transition of Fleming ownership of API assets, I assumed it

11  was created by Mr. Berry, all -- with the exception of a few

12  reports that I created.   And deleted those from among the user

13  files.

14  Q     At anytime, sir, prior to your creating the version of the

15  software, whatever you want to call it, that they're operating

16  now, was there ever a consideration that you might actually go

17  out and license the actual copy from Mr. Berry, to your

18  knowledge?

19  A     That wasn't discussed with me.

20  Q     Never?

21  A     No.

22        MR. HOGAN:   May I approach, Your Honor?

23        THE COURT:   You may.

24        MR. HOGAN:   I'd like this to be marked, if I may, Your

25  Honor, as Mr. Berry's 1.

Dillon - Cross/Hogan                    100

1    THE COURT:  You may.  Can I have a copy?

2    MR. HOGAN:  Yes, Your Honor.

3    THE COURT:  Thank you.

4  Q    Take a look at that, Mr. Dillon.

5                    (Pause)

6  A    Is there anything in particular you want?

7  Q    Have you had a chance to read it, sir?

8  A    Well, the entire document?

9  Q    Why don't you -- I'm going to ask you questions regarding

10 the whole document, but I'll start with the back page.  I believe

11 it's an email that's served -- a thread, I think, is the term

12 that's used.  First, I'm going to ask you a question, Mr. Dillon,

13 you recognize this email?

14 A    Yes, I do now.

15 Q    And was this an email that you turned over to me or to Mr.

16 Berry in discovery?

17 A    I presume so.

18 Q    You presume so.  Do you recall that we discussed this in

19 your deposition, sir?

20 A    No, I don't.

21 Q    Are you able to identify this as a copy of an email from

22 your system?

23 A    Yes.

24 Q    Okay.  And does it appear unchanged from the time that it

25 was created and turned over to us in discovery?

**J&J COURT TRANSCRIBERS, INC.**

                              Dillon - Cross/Hogan                      101

1  A    Would you repeat the question?

2  Q    Does it appear to be altered in anyway, sir?  Does it seem

3  to be a true and correct copy of your email?

4  A    Yes, it appears to be true and correct.

5        MR. HOGAN:  Your Honor, I guess I'll wait till

6  admission at the end.

7        THE COURT:  Yes.

8        MR. HOGAN:  Thank you, Your Honor.

9  Q    Go to the second page, Mr. Dillon, if you would.  This page

10 purports to be an email from an individual with an email address

11 of ron.griffin@fleming.com.  Do you see that, sir, about middle

12 of the page?

13 A    Yes, I do.

14 Q    Do you know who Ron Griffin is?

15 A    No, I don't.

16 Q    Have you ever know who Ron Griffin is?

17 A    No, I haven't.

18 Q    Okay.  Do you recall getting this email?

19 A    Vaguely, yes.

20 Q    Okay.  And in this email, sir, is it correct that it gives

21 four options to deal with Mr. Berry's software issues?

22 A    Yes.

23 Q    Okay.  Would you show me where in those options it says that

24 Mark Dillon should make a replacement copy?

25 A    I don't see that.


                    J&J COURT TRANSCRIBERS, INC.