Dillon - Cross/Hogan                                          102

1  Q    Can you tell me, sir, why you chose to make a replacement

2  for Mr. Berry's software having just been found to have committed

3  infringement in the federal court proceeding?

4            MR. LIEBELER:  Objection, foundation.

5            THE COURT:  Sustained.

6  Q    Mr. Dillon, were you aware that the jury found that the

7  changes you made to Mr. Berry's system violated his copyright?

8  A    Yes.

9  Q    And were you aware that prior to the time that you made the

10 software that is presently running at C&S?

11 A    Yeah.

12 Q    At anytime, sir, did you consider that perhaps you shouldn't

13 be the one to make the replacement software?

14 A    We made those changes under a misunderstanding between Mr.

15 Berry and Mr. Ralph Steecy (phonetic), the president of funding

16 companies, okay.  And --

17 Q    Excuse me.  The question has to do with the changes you made

18 in May --

19           MR. LIEBELER:  Your Honor, I ask Mr. Hogan not to

20 interrupt the witness.

21           THE COURT:  Please --

22           MR. HOGAN:  I --

23           THE WITNESS:  I am trying to explain --

24           MR. HOGAN:  And I'll object as nonresponsive, Your

25 Honor.  The --

Dillon - Cross/Hogan                                                    103

1          THE COURT:  Just answer the question, then you can

2    explain.  Do you want to repeat the question?

3          MR. HOGAN:  Yeah, I'll repeat the question.

4    Q    In May of 2003, you made changes to Mr. Berry's software, is

5    that correct, sir?

6    A    May of 2003.

7    Q    Correct.

8    A    No, I don't recall making changes in May of 2003.

9    Q    At some point, sir, didn't you testify that after the jury

10   trial, you went back and took a copy of Mr. Berry's software and

11   made changes to it?

12   A    I removed a change I had made.

13   Q    You removed a change.  But that made a change, correct, sir?

14   A    Mr. Berry, to my understanding, is that the proper

15   procedure, I got this from counsel I presume, it was something

16   that you --

17          MR. LIEBELER:  I'd ask the witness to stop, I don't

18   want him to reveal anything that he found out from counsel.

19          THE WITNESS:  Pardon.

20          THE COURT:  All right.

21          MR. LIEBELER:  Just as a privilege issue, Your Honor.

22   I don't want a privilege waiver unknowingly.

23          THE COURT:  Fine.

24          THE WITNESS:  Okay.

25          THE COURT:  Don't reveal anything counsel told you or

Dillon - Cross/Hogan                                    104

1  you told counsel.

2  A    We understood that it was -- I understood that the way to

3  respond to the jury's decision, which we wanted to respond to.

4  We admitted from the beginning that we had made those changes.

5  We made them inadvertently due to a misunderstanding.  We thought

6  we had the right to make the changes.  Jury said we didn't.  We

7  wanted to go back -- we wanted to comply with the jury's

8  decision.  We thought this was how to do it.  This is fully in

9  correspondence with a will to be within the law and within -- and

10 to respect Mr. Berry's rights.

11 Q    Did it ever occur to you to respect Mr. Berry's right, you

12 might call him up and ask him to make the changes?

13 A    Ask him to remove what I had added?

14 Q    Correct.

15 A    No, it didn't occur to me.

16 Q    And why is that?

17 A    Well, Mr. Berry had been very hostile to us from the

18 beginning.  And personally, I just didn't see him being very

19 cooperative, but it's hard to say.  I think there were a lot of

20 things that went through my mind.  I basically was doing what I

21 was told to do.

22 Q    And who told you to do that?

23 A    Counsel.  I'm sorry, the counsel was telling me --

24      MR. LIEBELER:  Objection, I don't want the -- again, I

25 don't want a privilege waiver so I'd ask that the cross-

**J&J COURT TRANSCRIBERS, INC.**

Dillon - Cross/Hogan                                    105

1  examination exclude in the questioning what --

2          THE COURT:  He didn't ask what counsel told him, so,

3  overrule.  You've been instructed not to reveal what counsel told

4  you or what you told counsel --

5          MR. HOGAN:  Thank you, Your Honor.

6          THE COURT:  -- in answering your -- any of the

7  questions.

8  Q    Mr. Dillon, isn't it true, sir, that Access is currently

9  running in regard to the spreadsheets you purported to have

10 created?

11 A    I don't understand the question.

12 Q    Are you running Access at the C&S logistics department

13 currently, sir?

14 A    It's part of Microsoft Office.  We have Microsoft Office

15 install.

16 Q    Correct.  But isn't it true, sir, that in order to extract

17 and run queries out of the thing you created, you run Access

18 against it?

19 A    We do run Access because -- I actually not to simply because

20 I knew you would ask this question and the implication is we had

21 something to do with Mr. Berry's former software which also

22 happened to be written in Microsoft Access.  There's hardly any

23 connection, but I guess IT people don't know this.  But -- pardon

24 me, but we've gone through this before, pardon me, Your Honor.

25         THE COURT:  Just answer.

Dillon - Cross/Hogan                                106

1  A    The -- we -- we're not in -- I'm not in IT.  I have hardly

2  any funds.  So the only query engine that I had available to me

3  that would do -- create a query using more than one table and

4  allow outer joins was Microsoft Access.  Otherwise, I'd have to

5  go pay $1,000 or so which I do not have to buy a third-party

6  software to do this.  So I use Microsoft Access to create queries

7  against the spreadsheets, yes, I do.

8  Q    When -- I want to make sure I state it correctly.  You had a

9  copy of Mr. Berry's software after the jury verdict and after the

10 filing of the bankruptcy that was a version that had some of your

11 changes in it.  Is that a fair statement, sir?

12 A    I'm sorry, could you repeat that?

13 Q    Okay.  We're coming up to the time when Fleming -- there was

14 a jury verdict in March 6th.  Fleming files bankruptcy on April

15 1st.  And you have to do something about changing the way they do

16 business with the software.  Is that a fair statement?

17 A    I don't understand.

18 Q    Okay.

19 A    What change do I need to make?

20 Q    Well, I think you testified that you took a version of Mr.

21 Berry's software and removed a few of your changes?

22 A    That's correct.

23 Q    Okay.  And when do you think you did that?

24 A    That would have been end of March 2003.

25 Q    Okay.  Prior to the filing of the bankruptcy?

Dillon - Cross/Hogan                                    107

1   A    Yes.

2   Q    Okay.  And did you contact Mr. Berry to ask him if it was

3   okay to make these changes in his software?

4   A    No, I did not.

5   Q    Okay.  So you made those changes and you came up with what

6   you considered to be the original version of Wayne Berry

7   software?

8   A    Yes.

9   Q    But it's a version that you created, correct?

10  A    Oh, it's that -- I am trying to revert to the version he

11  created.

12  Q    Right.

13  A    That being the issue.

14  Q    By making the changes.

15  A    By removing the change, the feature I had added.

16  Q    Okay.  Now, at some point, you took that version of software

17  and did something to it so that you could populate your

18  spreadsheets.  Is that a fair statement?

19  A    Yes.

20  Q    And what you did is you ran MS Query against it to do that?

21  A    Yes, I did.

22  Q    Okay.  And that created the program that is now operating at

23  C&S?

24  A    Created spreadsheets.

25  Q    And that is the program that is operating at C&S?

**J&J COURT TRANSCRIBERS, INC.**

Dillon - Cross/Hogan                                    108

1   A    Yes.  Microsoft Excel is the program.  The documents are the

2   spreadsheets.

3   Q    Okay.

4   A    The program is Microsoft Excel.  That was -- that's a

5   creation of Microsoft Corporation.  We created some documents

6   within that application, the spreadsheets.

7   Q    Now, Mr. Berry's database is written in Access, correct?

8   A    That's right.

9   Q    And what you've written is in Excel?

10  A    Yes.

11  Q    Okay.  Can you tell me or tell the Court what original work

12  went into your Excel spreadsheets that did not come directly from

13  Mr. Berry's Access database?

14  A    All the data we input into his database.

15  Q    So the data, not the structures, is the part that's the

16  original work?

17  A    We imported the data that we had input into Mr. Berry's

18  database.  We asked for it back and put it in the spreadsheets.

19  Q    So isn't it true, sir, that what you did is you simply said

20  to the Access database, the one the jury had said that you had

21  infringed, it said take the table to Mr. Berry's Access database

22  and populate my spreadsheets with them?  Isn't that essentially

23  what you did?

24  A    No, we used -- we only used portions of Mr. Berry's

25  database.  Out of about 70 tables, we used 11.  And within the

1 two principle tables, we used on one about 45 percent of the

2 fields within that table and the other about 25 percent of the

3 fields.  We're not importing his database and structures

4 wholesale.

5 Q    Okay.  Not wholesale, but at least retail, right, Mr.

6 Dillon?  You took some of his work and incorporated it into the

7 thing that's running at C&S presently?

8 A    I don't know why you say some of his work.  We simply

9 requested the data we had input into it.  It advertises its -- I

10 simply requested the data that we had input into his database so

11 we could use it in another application so as not to infringe on

12 Mr. Berry's rights.

13 Q    But your answer to the question of what your original work

14 was, was there anything besides the data that you contributed to

15 this new software work?

16          MR. LIEBELER:  Objection, asked and answered, Your

17 Honor.

18          THE COURT:  Sustained.

19 Q    Question regarding how things work at Kapolei, which is the

20 C&S facility now.  Do the employees have more than one computer

21 each?

22 A    Yes, they do.

23 Q    And why is that, sir?

24 A    Because of the accusations in the previous lawsuit that we

25 were distributing Mr. Berry's database throughout Fleming

Dillon - Cross/Hogan                                110

1  companies, which is not new.  There was never a connection

2  between our network and the Flemings network.  Several times it

3  was asserted by the plaintiff that there were -- was such a

4  connection.  We even hired people to come in, experts in networks

5  and computer forensics, to come in and document the fact that

6  there was no connection.  Since we had had to do that in the

7  past, once C&S took over operations in the logistics department,

8  we counseled them to -- I counseled them that given my

9  experience, we should not put our computers on their network.  So

10 we retained -- the employees in the logistics department have two

11 computers at each of their desks, one on the C&S network and one

12 on the logistics network.

13 Q    And is the reason for that because you're afraid that there

14 will be a claim of infringement that will transmit to the entire

15 C&S logistics world?

16 A    I think that's the way I'd put it.

17 Q    But, sir, if what you wrote was not infringing, why would

18 they care?

19 A    Well, it's a -- I guess it's a matter of putting a fence,

20 having outer perimeters.  It just simply was to eliminate -- it's

21 not -- I don't believe it's not.  I don't believe that taking our

22 data out of Mr. Berry's database because there's a problem with

23 his database and we want to use some other -- I cannot conceive a

24 copyright law being -- intending us being so restricted.  But I

25 don't know all the legal ins and outs, of the liabilities, our

Dillon - Cross/Hogan                                          111

1  vulnerabilities. I simply believe that it would simplify matters

2  due to my experience from the previous lawsuit if these

3  possibilities could not come up in court because we maintain

4  separate networks.

5  Q    And wasn't that actually one of the reasons that you

6  actually changed some of the names of the fields when you created

7  the new data structures, I'll use that term, that you used

8  different terminologies so it wouldn't look like Wayne Berry's

9  software?

10  A    It was to respect his copyright. He takes exception to our

11  using his names. So, I figured we should change the names

12  insofar as possible, which we did.

13  Q    But when you did that, you had to be aware of what his name

14  was? Fair statement, sir?

15  A    Well, his name is -- his database, Access database, is -- he

16  did not compile it. He created his Access database in such a way

17  that it advertises his contents to various third-party -- well,

18  Microsoft software on -- that's packaged with Windows and

19  Microsoft Office. And so within -- so when I go to request data

20  from Mr. Berry's database, it does advertise his contents and

21  included in that is the column names, yes.

22  Q    Now, you said compile it. Just briefly, sir, what does that

23  mean?

24  A    It means to -- it means to create a form of the -- in this

25  case, a form of the database in binary code that's not accessible

Dillon - Cross/Hogan                                                112

1  except by simply reversing -- where the source code is not

2  accessible.

3  Q    Right.  And the copy that Mr. Berry put on the computers in

4  October/November of '99 was not compiled, is that correct?

5  A    That's correct.

6  Q    And wasn't it true, sir, that Mr. Berry was, at least to

7  your knowledge, expecting to make changes to the database and be

8  paid for that during that time?

9  A    I had no knowledge of that.  We tried to get Mr. Berry to

10  make changes to the database for three to four months after

11  October 1st, 1999.  We had four phone numbers, including his home

12  phone.  We had at least three email addresses.  He never

13  responded to anything.  I never got a thing from him.  In fact, I

14  thought he had lost interest in the whole thing.  I've -- well,

15  leave it at that.

16  Q    When C&S came into the -- when did C&S come into the

17  facilities in Kapolei?  To the best of your recollection?

18  A    When did they come in?

19  Q    Yeah.  When did you first see somebody from C&S on the

20  property?

21  A    I'm not sure.

22  Q    Okay.

23  A    Sometime in, I would -- sometime in 2003.  I don't remember

24  if it was before June or after June.

25  Q    When they came in, did they have any backup requirements for

1 the IT personnel?  Computer backups?

2 A    Backup of data or backup of --

3 Q    Right.  I mean there's a big --

4 A    Functions or --

5 Q    I'm sorry, sir.  There's a big operation there.  They want

6 to protect their data in case there's a hurricane or something.

7 Was there any form you had to fill out that said I backed up my

8 data on this date or anything like that?

9 A    No.

10 Q    No procedures to your knowledge at all about backing it up?

11 A    I'm not in their IT department.  So I'm not informed about

12 those procedures.

13 Q    But are you saying that noone from IT, from C&S has ever

14 accessed these second sets of computers at the Kapolei facility

15 to the best of your knowledge?

16 A    The second set meaning?

17 Q    The ones with your software on it?

18 A    Not that I know of.

19 Q    Is there any -- have you been told any reason why they

20 wouldn't access them?

21 A    No.

22 Q    Have you ever been told by anyone, sir, that, in fact,

23 Fleming was operating after the bankruptcy without a license for

24 Mr. Berry's software?

25 A    No.  I understood we did have a license.

Dillon - Redirect/Liebeler                                      114

1  Q    And how do you understand that, sir?

2  A    From the jury verdict.

3  Q    All right.  From anyone else, anything else other than the

4  jury verdict?

5          MR. LIEBELER:  I take it that accepts statements that

6  his counsel may or may not have made?

7          MR. HOGAN:  Your Honor, if counsel tells a fact, that's

8  generally not privileged.

9          THE COURT:  I'm not sure that's a fact or a legal

10  conclusion.

11          MR. HOGAN:  I agree with that, Your Honor, but --

12          THE COURT:  So I'll sustain the objection.  Other than

13  counsel.

14  Q    Other than counsel.

15  A    No.

16  Q    But it was your understanding that you were using licensed

17  software after the filing of the bankruptcy?

18  A    Definitely.

19          MR. HOGAN:  Thank you, Your Honor.

20          THE COURT:  Redirect.

21                    REDIRECT EXAMINATION

22  BY MR. LIEBELER:

23  Q    Mr. Dillon, turn to 309 in the book, if you please.  That's

24  the jury verdict.  And on page 2 of 309, it reads:  "If Fleming

25  Companies prove by a preponderance of the evidence that it has a

1  valid license for use of the freight control software," and it's

2  checked yes.  Do you see that?

3  A    Yes, I do.

4  Q    Is that in part the basis for your understanding that after

5  the jury verdict Fleming had a license to use the software in its

6  original form?

7  A    Yes.

8  Q    And when you went back after the jury verdict came down and

9  made the change you discussed, what was your intent?

10  A    To comply with the jury's decision.

11  Q    And after you made your change, what form was the software

12  in?

13  A    In it's original form as licensed by Mr. Berry.

14  Q    Now, when you created your spreadsheets, sir, did you take

15  Mr. Berry's work on the one hand, or on the other, did you simply

16  input the underlying data into your creation?

17        MR. HOGAN:  Objection, compound.

18        THE COURT:  Overrule.

19  A    I simply requested data from his database.

20  Q    And then did what with that data?

21  A    I pulled it in the spreadsheet.

22  Q    And who created that spreadsheet, sir, you on the one hand

23  or Mr. Berry on the other?

24  A    I did.

25  Q    Is that spreadsheet include any part of Mr. Berry's work?

Dillon - Redirect/Liebeler                116

1  A    No.

2  Q    And, sir, do you view what's currently on the system as a

3  modification of Mr. Berry's software?

4  A    No, I don't.

5  Q    Now, Mr. Hogan asked you some questions about why it is that

6  you did or didn't try to contact Mr. Berry in order to have him

7  make modifications.  Do you recall those questions?

8  A    Yes, I do.

9  Q    All right.  Take a look at Berry Exhibit 1 which Mr. Hogan

10 gave you.  And let me direct your attention to the first page of

11 that in the fifth paragraph.  And that's an email that you wrote,

12 correct, sir?

13 A    That's right.

14 Q    And in that paragraph, you've written "he", referring to Mr.

15 Berry, would likely continue what he has done from the start

16 which is to entrap Fleming and seek to extort monies from the

17 company.  It's your language, sir?

18 A    I'm sorry, am I looking at the right document here?

19 Q    Sure.  It starts Option 2 on the first page of Berry 1.

20 A    Oh, okay.

21 Q    In the third and fourth lines, beginning with he would

22 likely.

23 A    Yes.

24 Q    Why was it, sir, that you didn't call Mr. Berry and ask him

25 to either make modifications or assist you in so doing so?

1  A    You know, Mr. Berry is very hostile with Fleming.  There's a

2  long history.  I have a lot of -- there were many conversations I

3  had with Mr. Berry.  Or at least several conversations I had with

4  Mr. Berry where his hostility was evident.  And he had a personal

5  vendetta.  It just seemed unwise to have anything more to do with

6  Mr. Berry.  Also, he was a very litigious person.  He had been in

7  numerous lawsuits previously and he had spoken to me about those

8  lawsuits.  And it just seemed like we would get -- more of the

9  same would transpire if we were to continue and develop a

10 licensing relationship with Mr. Berry.

11        MR. LIEBELER:  Nothing further at this time, Your

12 Honor.

13        MR. HOGAN:  With your permission, Your Honor, I'd like

14 the witness to look at that.  The Debtor's 304.

15                    RECROSS EXAMINATION

16 BY MR. HOGAN:

17 Q    It purports to be a memorandum, first page, November 24,

18 1999.

19 A    Yes, I see it.

20 Q    Okay.  If you go to the back of the addendum which is page 4

21 of 5 to the end user license agreement.

22        MR. LIEBELER:  Your Honor, this is outside the scope of

23 redirect.

24        MR. HOGAN:  Your Honor, he has opened the door to Mr.

25 Berry's vendetta.  I think I'm allowed to --

118

1       THE COURT:  All right.  I'll allow.  I'll allow some
2  leeway.

3  Q    Do you see that, Mr. Dillon, the end user addendum?

4  A    Page 4 of 5, yes.

5  Q    If you look at the first paragraph, sir.

6  A    Yes.

7  Q    Do you see it?

8  A    Yes.

9  Q    Isn't it true, sir, that what Mr. Berry got out of the deal
10  with Fleming was for you to get a job for one year?

11      MR. LIEBELER:  Objection, argumentative, Your Honor.

12      THE COURT:  Overrule.

13  A    Among other things, yes.

14  Q    Thank you.

15      THE COURT:  Any redirect?

16      MR. LIEBELER:  No, thanks.

17      THE COURT:  All right.  Thank you.  You may step down.

18      THE WITNESS:  Thank you.

19              (Witness excused)

20      MR. LIEBELER:  Your Honor, may I have a moment to
21  confer with other counsel?

22      THE COURT:  About what?

23      MR. LIEBELER:  The next witness we're going to do, we
24  want -- I want to talk about the next witness.

25      THE COURT:  Well, you'll have more than a minute.  I'm

**J&J COURT TRANSCRIBERS, INC.**

119

1  going to break for lunch.

2          MR. LIEBELER:  Works for me, Your Honor.

3          THE COURT:  All right.  Let's come back at 1:30.

4                    (Luncheon recess)

5          THE CLERK:  Please rise.  You may be seated.

6          THE COURT:  You may proceed.

7          MR. LIEBELER:  Thank you, Your Honor.  We would like to

8  proceed by playing the deposition designations from a gentleman

9  for Mr. Anderson.

10          THE COURT:  Anderson.  All right.

11          MR. HOGAN:  Your Honor, I object.  We were told --

12  earlier on, I tried to do things that would have live witnesses.

13  They objected to that, Your Honor.  So at least I'm going to make

14  an objection to anything but live witness testimony today, Your

15  Honor.

16          MR. LIEBELER:  We simply indicated that that trial has

17  to conform with the rules of trial under the federal rules.  We

18  took Mr. Anderson's deposition.  Mr. Hogan was there.  The man

19  lives in Portland, Oregon.  He's not available.  He's a third-

20  party witness.  We're committed to play his designations.

21          THE COURT:  I think that's --

22          MR. LIEBELER:  By the way, on the designations

23  themselves, we gave those to Mr. Hogan, I believe it was a week

24  ago.  We haven't gotten counter-designations and he sent us no

25  objection.

120

1        MR. HOGAN:  I don't recall getting designations, Judge.
2 That's for sure.  I get a lot of stuff.  I look at everything I
3 get and I don't have any recollection of (attorney away from
4 mike) -- unless they came while I was traveling, I live in
5 Hawaii, I did not get --
6        MR. LIEBELER:  May I approach, Your Honor?
7        THE COURT:  You may.
8        MR. LIEBELER:  Your Honor, that's an email in which Mr.
9 Capazola (phonetic) of my office sent Mr. Hogan the deposition
10 designations we intended to play and Mr. Hogan, in fact, replied
11 to the email.
12        MR. HOGAN:  I stand corrected, Your Honor.  I do
13 remember them.
14        THE COURT:  All right.  Well, I will allow the
15 deposition testimony.
16        MR. LIEBELER:  We have them cued up on videotape
17 according to what we've designated in the notice, Your Honor.
18        THE COURT:  All right.  You may proceed then.
19        MR. LIEBELER:  Your Honor, there was a reprographic
20 error and the transcript of the deposition is actually not in the
21 Court's binder although it is in the witness box's binder.  May
22 we have permission to get the copy from the witness binder and
23 give it to Your Honor so you can follow along with the
24 transcript?
25        THE COURT:  You can just give me the binder and then.

Mr. Anderson's videotaped deposition                    121

1       MR. HOGAN:  Do I have a copy?

2       MR. LIEBELER:  I believe you do, Mr. Hogan.  It should

3  be in your binder under Anderson.

4       THE COURT:  What tab?

5       MR. LIEBELER:  There's a tab that should be marked

6  Anderson.

7                          (Pause)

8       THE COURT:  Thank you.

9                     (Videotape played)

10       MR. LIEBELER:  That's on the board, Your Honor.

11                   (Videotape continued)

12       MR. LIEBELER:  Your Honor, there's one more designation

13  that we noted, but apparently it didn't make it on the tape.  I

14  would propose that the Court would just read that.  It's about

15  four lines.

16       THE COURT:  And this is the -- still part of the

17  deposition of Mr. Anderson?

18       MR. LIEBELER:  Yes, it is.  It's on page 31 of the

19  transcript and the question is:  "Is it also within MTI's

20  capability as such that if a user tries to delete a file, MTI may

21  be able to go in and recover the file and find out when deletion

22  was attempted?  Answer:  Yes, sir.  We do that all the time."

23  And that's all from Mr. Anderson.

24       THE COURT:  All right.

25       MR. LIEBELER:  Your Honor, we can proceed in one of two

Mr. Anderson's videotaped deposition                    122

1 ways.  I would propose that we have readings from the Berry

2 deposition.  We had thought that Mr. Berry was going to appear

3 live.  And as a consequence of that, I have sections from the

4 deposition that I have marked and we would have to put a reader

5 in the box, we don't have a videotape.  And I wanted to do it in

6 the order in which I, would normally cross-examine.  Under the

7 federal rules, of course, we're allowed to use the deposition of

8 a party opponent for all purposes at any time.

9        THE COURT:  So you're suggesting you're going to mix

10 and match the questions?

11        MR. LIEBELER:  Yeah.  They're going to be full on Qs

12 and As but they're going to be somewhat -- some skipping around

13 and that's only because I wanted to do it in the order I would

14 cross-examine --

15        THE COURT:  All right.

16        MR. LIEBELER:  -- had Mr. Berry been here as I thought

17 he was going to be.

18        THE COURT:  All right.  All right.

19        MR. LIEBELER:  So I know it's slightly irregular and I

20 apologize for that, but --

21        THE COURT:  That's fine.

22        MR. LIEBELER:  -- if I had another hour, I could

23 organize them chronologically, but I don't have that kind of

24 time.

25        THE COURT:  That's fine.

Wayne Berry's Deposition Read                    123

1              (Pause)

2          MR. LIEBELER:  Your Honor, this is the deposition of

3   Wayne Berry taken on Thursday, July 1st of 2004.

4          THE COURT:  Okay.

5          MR. LIEBELER:  Page 154, lines 5-10.

6          THE COURT:  Do I -- oh, there's -- say it again.

7          MR. LIEBELER:  Page 154, line 5-10.  Actually, may I --

8   let me ask Mr. Bledsoe a question.  We may have an additional

9   copy that mini-scripted and it might be easier to follow along

10  from that.

11         THE COURT:  That's fine.  We'll use this.

12         MR. LIEBELER:  Okay.  154, 5-10 -- 6-10 actually.

13              (Mr. Berry's deposition read)

14  "Q    In other words, the only admin claim that you have made so

15  far has to do with either transferring or distributing as the

16  case may be the 1993 FCS to C&S, correct?

17  A    Correct."

18         MR. LIEBELER:  172, 18 to 23.

19  "Q    Now, it has been your view all along that ever since the

20  petition date the copies of the 1993 FCS have remained resident

21  on Fleming's computers and then when they became C&S's computers,

22  C&S's computers, is that right?"

23         THE COURT:  Would you give me that page again?

24         MR. LIEBELER:  Sure, 172, line 18.

25         THE COURT:  Okay.  Go ahead.

Wayne Berry's Deposition Read                    124

1  "A    Yes."

2         MR. LIEBELER:  Page 133, 12.

3  "Q    So the data with respect to each file that was resident on

4  the system, when Guidance ended up doing its work, was the file

5  name, some data about when it was written, created, modified,

6  it's size and the path, is that right?

7  A    Yes.  As an example, I think file extension was on there.

8  Q    Okay.  Which is the type of file?

9  A    Right.

10 Q    All right.  But the Guidance CD did not contain a copy of

11 the actual file itself, isn't that right?

12 A    Only directories of the files, correct.

13 Q    So you couldn't actually locate copies of FCS logistics

14 data.MDB and determine that that was actually your software,

15 could you?

16 A    I satisfied myself that it was to my satisfaction, but no, I

17 am not able to open and look in FCS logistics data.MDB run on my

18 computer and show me a splash screen and all that stuff.

19 Q    Right.  Your conclusion that it was there was based on the

20 data on this page and this page only, correct?  By category?

21 A    Yes."

22        MR. LIEBELER:  141, line 24.  And there's an exhibit

23 that goes with this, Your Honor.  It's an exhibit to Mr. Berry's

24 declaration that I asked Mr. Dillon about.  It should be a tab

25 302 in the binder, the last two pages.

**J&J COURT TRANSCRIBERS, INC.**

Wayne Berry's Deposition Read                125

1  "Q    Now, it's true, is it not, Mr. Berry, that the report you

2  did in Exhibit C reflects the state of C&S's machines as of July

3  6th, 2003, right?

4  A    I don't know that.

5  Q    I'm sorry, it's Fleming's machines at that point in time,

6  right?

7  A    I don't know that either.

8  Q    Well, what was your understanding of when Guidance took the

9  second image off the machines that they did?

10 A    I'm not sure I remember the exact date or who owns them at

11 that point.  Or even if it was actually pinned down as to the

12 timing for this.  We just had a before and after and it was all

13 around the July 4th weekend.

14 Q    And that's July 4th of 2003, right?

15 A    Yes.

16 Q    So whenever it was around that July 4th weekend, there was a

17 second image taken within a few days of July 4th of '03, is that

18 a fair characterization?

19 A    Sometime there, yes.

20 Q    And that's your understanding, right?

21 A    Yes.

22 Q    But the Guidance CD that you have done the analysis on

23 doesn't show the state of the computers since then, does it?

24 A    No.  I believe after that, after the second acquisition was

25 done, if I understand what happened correctly, as the story goes,

**J&J COURT TRANSCRIBERS, INC.**

1  Mr. Gursey flew back to California and that was the end of the

2  imaging.

3  Q   Right.  So the state of the computers as they exist today

4  may be quite different from what your Exhibit C shows them to

5  have been in July of 2003, right?

6  A   Possibly.

7  Q   And you don't have any basis to know what's currently on

8  those computers as we're sitting here right now?  Isn't that

9  right?

10 A   That's correct.

11 Q   On the 16 copies of FCS logistics data.MDB that you

12 articulated on the first page of the report of Exhibit C, and --"

13      MR. LIEBELER:  And that's the last two pages of 302,

14 Your Honor.

15 "Q   -- you don't know of your own personal knowledge whether

16 those are still there or not, correct?

17 A   That's correct."

18      MR. LIEBELER:  Page 167, picking up at line 8.

19 "Q   I take it from your prior testimony that you are familiar,

20 at least in some sense, with a company called MTI, right?

21 A   Yes.

22 Q   And I take it you're aware that MTI was retained to look at

23 the computer systems out at Kapolei?

24 A   What I read in the orders on the BMC side was they were on

25 another guidance mission to go make additional illegal copies of

1 my property and teleport them to another out of state location."

2      MR. LIEBELER:  Page 171.

3 "Q    Did you authorize Mr. Hogan to contact MTI on your behalf?

4 A    Yes.

5 Q    And so to the extent that Mr. Hogan contacted MTI, he did so

6 as your agent and not for his own personal self, right?

7 A    Yes."

8      MR. LIEBELER:  And then picking up at the bottom of the

9 page at line 21.

10 "Q    Just so the record is clear, Mr. Berry, with respect to

11 MTI, you wanted Mr. Hogan to contact MTI in order to prevent MTI

12 from making a copy of your software, is that fair?

13 A    I think that's a fair characterization, yes."

14      MR. LIEBELER:  Back to page 69, line 11.

15      THE COURT:  Page 69?

16      MR. LIEBELER:  6 9, yes, Your Honor.  And then that

17 refers to an exhibit that is in the exhibit binders as Exhibit

18 304, Your Honor.  And in the deposition, I refer to it as

19 Debtor's 2.

20 "Q    Let's have marked as Debtor's 2 several pages together and

21 I will describe each of them specifically in a moment.  But go

22 ahead and take a look at Debtor's 2, Mr. Berry, and when you're

23 done looking at it, let me know.

24 A    All right.

25 Q    You've had a chance to look through Debtor's 2, Mr. Berry?

Wayne Berry's Deposition Read                    128

1  A    Yes, I just leafed through the pages."

2        MR. LIEBELER:  There's an objection that Mr. Hogan and

3  I think we may be resolving at the deposition about how the

4  document was stapled together.  Going down to line 12 on page 70.

5  "Q    The top two pages of Debtor's 2 are a letter to you from

6  Mr. Ralph Stuecy (phonetic) dated November 24th, 1999, is that

7  right?

8  A    It's a memo, yes.

9  Q    And at the bottom of the second page of the November 24th

10 memo lies your signature, is that right?

11 A    Yes.

12 Q    And you signed that of your own free will?

13 A    Yes.

14 Q    Nobody forced you to sign it, did they?

15 A    Not that I can recall.

16 Q    And how would you describe, just for nomenclature purposes,

17 what would you describe this document as being, the first two

18 pages of Debtor's 2?

19 A    This is the second addendum to the end user license

20 agreement attached behind it.

21 Q    Very good.  And the remainder of Debtor's 2 consists of five

22 pages that are sequentially marked 1 of 5, 2 of 5, 3 of 5, 4 of 5

23 and 5 of 5, is that right?

24 A    Yes.

25 Q    And of those five pages, the first three are end user

1  license agreement, is that right?

2  A    Yes.

3  Q    And then the last two, in other words, pages 4 and 5 are an

4  addendum to the end user license agreement, correct?

5  A    Correct.

6  Q    And the addendum to the end user license agreement modifies

7  the end use license agreement that's also in Debtor's 2, is that

8  right?

9  A    Yes.  That's the way I constructed the ULA to begin with.

10  Q    Just so we're clear, you drafted the five-page document that

11  is an end user license agreement and the first addendum to it, is

12  that right?

13  A    Yes, I did.

14  Q    And this is an accurate copy of it?  This looks like the

15  original that you drafted?

16  A    It does look like mine, yes."

17        MR. LIEBELER:  And on page 77, picking up at line 22.

18  "Q    All right.  When you signed the second addendum --"

19        MR. LIEBELER:  Well, strike that, withdrawn.  Let's do

20  it this way.  Apologize, Your Honor.

21  "Q    The second addendum suggests at the beginning of the second

22  full paragraph that you, Mr. Berry, had some desire to market

23  your software commercially, correct?

24  A    Yes.

25  Q    And the software that this addendum refers to is the three

Wayne Berry's Deposition Read                    130

1 separate pieces that you articulated in the complaint you filed

2 before the petition, right?

3 A     Includes those three, but the software we are discussing

4 here is thousands of program files.

5 Q     That's why I said includes.

6 A     Yes.

7 Q     For nomenclature purposes, what should I call that group of

8 software, that group of programs and that software that you're

9 referring to in the -- strike that.  That the second addendum

10 refers to?  Your freight control system?  I don't want to use

11 that as a term of art because that's a separate term of art on

12 the complaint.  What nomenclature should I use to describe the

13 software that you intended to market?

14 A     The entire collection, I have referred to it as FCS1993."

15        MR. LIEBELER:  Page 81, line 3.

16 "Q     And under the EULA and the first addendum and the second

17 addendum, Fleming did not pay you any money to license the

18 FCS1993 either, did it?

19 A     No, they did not."

20        MR. LIEBELER:  Page 44, line 20.

21 "Q     Now, you first sued Fleming in, when was it, September of

22 2001?

23 A     Seems more like it was July of 2001.  I am sure there are

24 some documents around.  You can double check it.

25 Q     I may have the first amended complaint which was in

**J&J COURT TRANSCRIBERS, INC.**

Wayne Berry's Deposition Read                      131

1  September.  There may have been an initial complaint before that,

2  but that's fine.  Is it fair to say it was in the summer or fall

3  of 2001?  That way we've kind of covered both times.

4  A    To the best of my recollection right now, that seems

5  accurate.

6  Q    In that complaint, you alleged that Fleming had infringed

7  one or more of your copyrights, is that correct?

8  A    One or more, correct."

9         MR. LIEBELER:  88, and that's a document that's in the

10  exhibit book, Your Honor, as Exhibit 306 which is a letter from

11  Mr. Hogan of October 24th of 2002.

12  "Q    Turning to the last page of Debtor's 3 at the bottom, it

13  says, 'the offer will be good for the period in which we are in

14  settlement negotiations, but will not be available at time of

15  trial.'  Do you see that?

16  A    Yes.

17  Q    And by time of trial, that means trial in the pre-petition

18  infringement acts, correct?

19  A    Yes.  The one that was held in late February 2003.

20  Q    So this offer was not available as of over a year ago,

21  correct?

22  A    Correct.  I think it was only referenced because it did set

23  a sticker price for you."

24         MR. LIEBELER:  85, page 85 which is the same --

25  examination on the same exhibit.

Wayne Berry's Deposition Read                           132

1    THE COURT:  Page 85?

2        MR. LIEBELER:  Page 85 of the deposition, yes, Your

3  Honor.  It's on the same that's Exhibit 306 in the binder.

4  "Q    What is Debtor's 3, Mr. Berry?

5  A    This is a settlement letter, offers that were sent out on

6  October 4th, 2002 in the first copyright infringement case."

7  Q    Do you mean 24th?

8  A    October 24th.

9  Q    You said -- I thought you said 4.

10  A    Oh, I'm sorry.  "October 24th, 2002 in the first copyright

11  infringement case.

12  Q    And that was sent out on your behalf and with your approval,

13  correct?

14  A    Yes."

15        MR. LIEBELER:  Page 89, line 2.  And that's referring

16  to the exhibit, Your Honor, that is the jury verdict which is 309

17  in the binder.

18  "Q    Take a look at Debtor's 4, Mr. Berry, and when you're done,

19  let me know.

20  A    All right.

21  Q    Debtor's 4 is the jury verdict form from the pre-petition

22  infringement trial, isn't that right?

23  A    Yes.

24  Q    And in that trial, the jury found that you deserved an award

25  of $98,250, is that right?

Wayne Berry's Deposition Read                     133

1  A     That was the damage that they awarded, correct.

2  Q     And that verdict was rendered on March 6th of 2003, isn't

3  that right?

4  A     That's the date on page 5.  I believe that's correct.

5  Q     And that's consistent with your recollection, is it not?

6  A     Yes."

7         MR. LIEBELER:  Page 40, line 7.

8  "Q     At some point prior to October of 1999, you wrote freight

9  control software, is that correct?

10 A     Correct.

11 Q     And the documents that we have talked about loosely as being

12 end user license agreement more or less describe that freight

13 control software in October 1999, right?

14 A     Yes.

15 Q     When did you make modifications to that software to make it

16 radically different and much improved?

17 A     I did not modify it.  I think I stated that it had some

18 roots in some of the ideas and some of the design, but it was --

19 what exists today was written from scratch."

20        MR. LIEBELER:  And then picking up on page 41, line 10.

21 "Q     The rewritten version, where the current model is --"

22        MR. LIEBELER:  And I'm responding actually to an

23 objection of Mr. Hogan here.

24 "Q     -- and I just need a nomenclature for deposition purposes

25 so we know what to call it.

1  A    In my mind, I basically refer to the one in the admin claim

2  as the 1993 version, FCS1993.  And the current one as FCS2003."

3         MR. LIEBELER:  Page 28, line 12.

4  "Q    Have you licensed any software that you own to Wiihata

5  (phonetic)?"

6         MR. LIEBELER:  It's a company in Hawaii.

7  "A    Yes, I have.

8  Q    And what is the subject of that written license agreement

9  and how would you describe the software that you have licensed to

10 Wiihata?

11 A    It is a freight control system.

12 Q    Is it the same or a different freight control system than

13 the one at issue in your claim against the estate?

14 A    By same or different, are you talking functionality, code,

15 design, structures?  Help me a little bit.

16 Q    Sure.  On any basis that you're comfortable asking the

17 question, on the assumption that you're explaining it to a lawyer

18 who's not a software expert.

19 A    Some of the elements are similar.  Some expressions are

20 similar, but it's radically different in many ways and much

21 improved than the one that was left with Fleming in October of

22 1999.

23 Q    Does Wiihata pay you a license fee for the use of the

24 freight control system?

25 A    Yes.

Wayne Berry's Deposition Read                    135

1  Q    And how much is that license fee?

2  A    I think I would consider that confidential information at

3  this point.  I would like to -- I think I would like to get their

4  permission for me to repeat that.

5  Q    I don't believe that's the basis for not answering in this

6  deposition, sir.  And it would be my contention that that would

7  be relevant testimony for the purposes of what we're doing here

8  now.  So I would ask you to answer that question, sir.

9  A    You may be correct in that, but I don't want to violate a

10 non-disclosure.

11 Q    Are you refusing to answer my question, sir?

12 A    At this point."

13        MR. LIEBELER:  And then page 36, line 12.

14 "Q    Without giving me a specific number, but rather in the form

15 of a general estimate, would you tell me please what license fees

16 you have been paid by Wiihata for the freight control system that

17 you license to them?

18 A    No.  I don't want to give you an estimate.

19 Q    Is it more than $10,000?

20 A    I don't want to comment on that area.

21 Q    Is it more than a million dollars?

22 A    As I said, I don't want to comment on that area.

23 Q    Foundationally, and again, this is yes or no, do you know

24 how much you've been paid by Wiihata in license fees?

25 A    Yes."

J&J COURT TRANSCRIBERS, INC.

136

1        MR. LIEBELER:  And then page 42.

2    "Q   When in 2003 did you reach a point where you believed that

3    the FCS2003 was usable, sir?

4    A   I believe when I began testing with live data.  I can't

5    remember the exact date.  It was sometime between April and

6    August of 2003."

7        MR. LIEBELER:  I think that's all we need from the

8    Berry deposition, Your Honor.  Your Honor, during the break, I

9    asked Mr. Hogan if he would agree to let some exhibits in, some

10   of which were authored by him, some of which are trial

11   transcripts from the prior trial in which he participated.  He

12   said that -- well, I'll let him make his position, but we didn't

13   come to an agreement as to what should come in of the exhibits.

14   I think Mr. Hogan can authenticate some of these exhibits if I

15   put him on the stand and I'm prepared to do that.

16        In the alternative, we might take a short break to see

17   if we can try to agree on what specific exhibits that might come

18   in.  Some of them are letters, for example, that Mr. Hogan wrote.

19        THE COURT:  Did you try to reach an agreement as to

20   what could come in?

21        MR. LIEBELER:  Yes, Your Honor, I did.

22        THE COURT:  And you haven't yet?

23        MR. LIEBELER:  That is correct.

24        THE COURT:  But you think if we take a break, you can?

25        MR. LIEBELER:  I don't know.

137

1          THE COURT: Mr. Hogan?

2          MR. HOGAN: Your Honor, I -- we've been trying to work

3     out issues with the exhibits and I've been cooperating.  It's

4     just that we get these right before we started.  I'm sitting,

5     trying to read things to see what I'm agreeing to.  I think if I

6     had a little chance, I can look at them again and we can agree.

7     I can't say that that will happen.  (Attorney away from mike)

8          MR. LIEBELER: Well, then let's try to walk through the

9     exhibits and do them right now.

10         THE COURT: Well, can we let the witness leave?

11         MR. LIEBELER: Yes.

12         THE COURT: Thank you.

13                    (Witness excused)

14         THE COURT: Well, I don't want to waste our time.  How

15    long do you need to look at these?  How many exhibits?  Is this

16    your last witness?

17         MR. LIEBELER: Yes.  To the extent -- all I need is to

18    get the exhibits in and then I'm ready for argument.  And we --

19    and I -- we can proceed however the Court desires.  We can walk

20    the exhibits one by one.  I can take two minutes and try to

21    confer with Mr. Hogan.

22         THE COURT: Let's take five minutes and you see if you

23    can reach an agreement.  All right.

24                    (Recess)

25         THE CLERK: Please rise.  Please be seated.

138

1          MR. LIEBELER:  Your Honor, we have agreed on most of
2    the exhibits.  We haven't agreed on all of them.  Starting with
3    one actually that's not in the exhibit books.  The -- I have the
4    second amended complaint that Mr. Hogan filed in the Hawaii
5    litigation.  I want it limited -- I want it admitted for the
6    limited purpose of establishing what it is that Mr. Hogan alleged
7    in that litigation.

8          THE COURT:  Okay.

9          MR. LIEBELER:  Mr. Hogan said, no, it's got to be in
10   for all purposes and not admit the truth of the allegations in
11   it.  I don't think that's a fair response.  I want it, you know,
12   on a limited basis only.  And I'd be happy to give the Court a
13   copy if you want.

14         MR. HOGAN:  (Attorney away from mike) My objection is
15   more relevant, Your Honor. You know, you're going to take --
16   usually something like this is considered irrelevant.  It's not
17   going to prove anything.  The Court -- to the extent that the
18   Court wants it in the record -- I'm not even sure it hasn't
19   actually been put in the record in these proceedings by somebody
20   by now.

21         MR. LIEBELER:  The relevance, Your Honor, is --

22         THE COURT:  Well, I don't know.  It's not part of the
23   record unless its --

24         MR. HOGAN:  In this proceeding.

25         THE COURT:  -- in this proceeding unless it's moved.

139

1  And the relevance is what was alleged.

2        MR. HOGAN:  Okay.  That's fine, Your Honor.

3        THE COURT:  I'll admit it.

4        MR. LIEBELER:  Specifically -- okay.  Specifically that

5  he alleged RICO against Guidance.

6        THE COURT:  Does it have an exhibit number?  210, is

7  that what you're saying it is?

8        MR. LIEBELER:  It's the second amended complaint.

9        THE COURT:  Or is that 210.

10       MR. LIEBELER:  Let's make it 317?  317.

11       MR. HOGAN:  Okay.

12            (Pause)

13       MR. LIEBELER:  And then, Your Honor, there's a

14  declaration from Mr. Berry, Exhibit 310.  I want limited portions

15  of the declaration in on the basis that they are an admission.

16  That is the declaration that Mr. Hogan has submitted to Court.

17  For purposes of this proceeding, I only want in paragraphs 22, 24

18  and 25.  Mr. Hogan has said -- well, I'll let him articulate his

19  position.

20       MR. HOGAN:  Your Honor, you know, when someone prepares

21  a declaration, it refers to things admitted.  I'd ask just under

22  the doctrine of completeness, if it's going to be admitted, they

23  can preserve the hearsay objection to things in it, but at least

24  allow the whole thing to come in.

25       THE COURT:  Well, let me see the paragraphs that are at

140

1  issue here.

2       MR. LIEBELER:  On page 9, 22.  24 is on page 10.  And

3  then 25 is on page 11.

4                    (Pause)

5       THE COURT:  Well, what paragraphs do you think in the

6  declaration --

7       MR. HOGAN:  Well, I think that as to the --

8       THE COURT:  -- do I need to consider?

9       MR. HOGAN:  Well, I think as to the issues that counsel

10  has focused on, it seems to flow better if you start at paragraph

11  -- around -- I think it's actually paragraph 18, I believe.

12  Sorry, Your Honor, 17 to the end of the ones that he's dealing

13  with are the ones in which he's discussing those issues about how

14  these numbers which I know they think are quite exorbitant, at

15  least what the basis of it is.  And rather than to just pluck

16  some part of his declaration out of it into --

17       THE COURT:  Okay.  I understand your argument.

18       MR. LIEBELER:  If I have him on the stand, Your Honor,

19  I can actually ask Mr. Berry a rifle-shot question about the fact

20  that he thinks his new software is worth one-fifteenth of his old

21  software and pick out admissions from a declaration that is

22  otherwise Mr. Hogan's.  Mr. Hogan can't admit that stuff and it's

23  not -- I'm admitting this on the basis --

24       THE COURT:  Well, if Mr. Berry were on the stand, he

25  could.

141

1    MR. LIEBELER:  Except for the fact that then I have

2  hearsay objections and foundation objections to almost the entire

3  remainder of --

4    THE COURT:  What hearsay objection to paragraph 17?  Or

5  18?

6    MR. LIEBELER:  I think 17 may be a relevance objection.

7  I don't think in terms of what API has done is relevant to his

8  damage claims now.  He's not suing API.

9    THE COURT:  Well, I'm going to admit 17-25 just for

10  completeness.

11    MR. LIEBELER:  I don't want that construed --

12    THE COURT:  To the extent it explains why.

13    MR. LIEBELER:  Fine.  I don't want that construed later

14  on as an admission that I agree that what's in those statements

15  are true, Your Honor.

16    THE COURT:  Fine.

17    MR. LIEBELER:  Because I think that may be Mr. Hogan's

18  argument in another proceeding that he's going to go out to

19  Hawaii and say that we have somehow admitted that those

20  paragraphs are necessarily true on admissions on our part and I

21  don't think that's the case.

22    THE COURT:  You've made your point on the record.

23    MR. LIEBELER:  And so what's in from Exhibit 310 are

24  paragraphs 17-25 as I understand the Court's ruling.  Is that

25  correct?

1          THE COURT:  Yes.

2          MR. LIEBELER:  Nothing further, Your Honor.

3          THE COURT:  All right.  Do you have any evidence to

4     submit?

5          MR. HOGAN:  I think it's all in, Your Honor.

6          THE COURT:  All right.  Ready for argument?

7          MR. SPRAYREGEN:  Yes, we are, Your Honor.  What I would

8     suggest for the rest of the proceeding, since we took the

9     estimation motion and the confirmation evidence all at the same

10    time, I think the best order would be for Mr. Liebeler to address

11    the estimation part and then I'll address all the confirmation

12    issues that go to that.

13         THE COURT:  All right.

14              MR. LIEBELER'S CLOSING ARGUMENT

15         MR. LIEBELER:  Your Honor, the administrative claim

16    that Mr. Berry has asserted in this case is solely for a

17    violation of the Copyright Act and that's 17 USC 106, subsection

18    3.  That statute says that a copyright holder has the exclusive

19    right to distribute copies of his copyrighted material to the

20    public or other transfer of -- by sale or other transfer of

21    ownership.

22         We contend that in this case, Your Honor, there was no

23    sale or other transfer of ownership for purposes of the Copyright

24    Act.  And in fact, this Court has indicated that from the bench

25    that at the sale hearing on August 4th, 2003, which is Exhibit

1  313 in the binder, that was a proceeding in this Court. And in

2  that proceeding, the Court was considering approving a sale of

3  all of the assets for the wholesale division from Fleming to C&S.

4  And C&S had indicated in open court that C&S was not buying Mr.

5  Berry's software, that Mr. Berry had objected to the sale, Mr.

6  Hogan was on the telephone from Hawaii. C&S said, on the record,

7  in those proceedings that they were not buying the software. And

8  the Court said, and I quote the transcript, Exhibit 313 on page,

9  I think, 157 of the transcript, I'm not giving any order assuming

10 it, assigning it by this sale order. And the Court overruled Mr.

11 Berry's objection.

12          So the Court has essentially already ruled that there

13 isn't a sale of Mr. Berry's software in the asset sale because

14 Mr. Berry objected on the basis that the software would be

15 transferred. So I think, in the standing light there, the Court

16 has essentially already ruled there is no sale. If there is no

17 sale, then there is no violation of 1063 under the Copyright Act.

18          If you actually go to the underlying documents within

19 the APA which defines the terms of the sale, the APA is entirely

20 consistent with the notation that we didn't sell Mr. Berry's

21 software to C&S. Several sections of the APA bear on that. 2.1F

22 in the APA indicates what software was actually purchased. It

23 sends you to Schedule 811, which is just a schedule on the APA

24 listing the software and that lists the specific software that's

25 being sold. Mr. Berry's software doesn't appear anywhere on that

1  list.  So if you actually look at the physical APA document, it's

2  not an asset that's being transferred.

3          Moreover, the APA says the all software that isn't

4  transferrable is an excluded asset and excluded assets aren't

5  sold.  So the prior proceedings in this Court, both the APA that

6  this Court approved, and the Court's own words, indicated that

7  there wasn't a sale of Mr. Berry's property.  If no sale, no

8  violation of the Copyright Act.

9          But the common law says so, too.  That if you look at

10 actually what the testimony was, Mr. Dillon testified about what

11 he and Guidance did and he testified that they intended to take

12 the 16 copies of Mr. Berry's software that Mr. Berry has

13 specifically alleged were sold, he said that they intended to

14 take them off the system.  And he said that when he was done with

15 that, he wasn't aware that they were there.  That the first time

16 that he became that they were there -- sorry, strike that.  The

17 first time he once again became aware that they were there was

18 after Mr. Berry had alleged that in June or May of this year.

19         What that means is that there was no actual intent to

20 sell that software.  There are cases that are all over the books

21 on this point.  There's the old case in which a woman purchases a

22 box of old clothes from an estate.  She pulls out a bathrobe from

23 the box of old clothes.  She pays 9.50 for the clothes, $9.50.

24 She pulls out a bathrobe and finds a ring that's worth $2500.

25         The estate then comes around and sues her and says,

1  look, we want the ring back.  She says no, I get to keep it, I

2  bought it, I paid 9.50 for it, it's mine.  And the court ruled

3  that there was no intent on the part of the buyer to buy a ring.

4  There was no intent on the part of the seller to sell the ring.

5  And the physical transfer of possession didn't really have much

6  to do with who owns it.

7            And the court, in fact, ruled that the ring has to come

8  back to the estate.  There's no contract.  There's no meeting of

9  the minds and there's no sale.  And we contend that for purposes

10 of Mr. Berry's 1063 claim, there was not a sale.  There couldn't

11 have been.  And if there wasn't a sale, there's simply no

12 liability under 106.3 and his claim should be estimated at zero.

13           Now, there's another reason, even if we get over that

14 point that the Court shouldn't find a sale of transfer of

15 ownership.  What the evidence shows is that there was 16 copies

16 of a file called FCS Logistics data.MPB on this image that

17 Guidance Software on about July 7th of 2003.  That's the evidence

18 that's there and Mr. Berry has claimed that it is that image that

19 determines that the software went to C&S.

20           The trouble is that the sell from the debtors to C&S

21 didn't take place until August 22 which is 45 or 46 days later.

22 Of the same year.  So it's a 45-day gap.  The Guidance CD shows

23 what was on the computer as of July 7th, but it doesn't show what

24 was there as of August 22nd when the transfer actually took

25 place.

1       Now, that, at first glance, seems like a fairly

2   technical argument.  And I understand that issue.  It's not

3   technical for two reasons.  First of all, Mr. Dillon testified

4   that when he went back to look for the files in June of this

5   year, they weren't there.  So we don't know when they were there

6   and when they weren't there.

7       And so what we did when we found that out, when we

8   found that Mr. Berry had alleged they were there, is we went to

9   try to hire this company called MTI which is a forensic software

10  company.  We asked MTI to go out to the facility and take a

11  picture and see what's there for purposes of trying to find out

12  for litigation purposes.  That's when Mr. Hogan called up MTI and

13  said, I sued Guidance, the prior forensic guys, on a RICO claim.

14  And you saw the deposition designations where, as a result of Mr.

15  Hogan's telephone call to the expert that we were trying to

16  retain, that expert backed out of the engagement.  Brought their

17  guy back from Hawaii and, in fact, were not able to conclude that

18  engagement.

19      As a result of that, Mr. Hogan has prevented us from

20  developing the evidence as to whether or not those files were

21  still on the server.  And we contend on that equitable basis that

22  regardless of who's burden it is today to go forward on what the

23  state of the server is, we tried to do that, he's prevented us

24  from doing so.

25      So on that basis, because there's a gap in the evidence

Closing Argument/Liebeler                147

1  that he can show what was there on July 7th, but he can't show

2  what was there on August 22nd, that the Court should rule that he

3  has failed to show that the actual 16 copies were there as of the

4  time the assets were actually transferred to C&S.

5            Now, with respect to the -- and then we sort of want to

6  move from liability into damages.  And I'm going to have to walk

7  through some of the exhibits in detail.  Normally I would have

8  done it on cross-examination where we've cross-examined the

9  witnesses on the actual damage documents.  But because Mr. Berry

10  was not here, we're going to have to walk through the documents

11  specifically.

12           And I want to start with what's been, in your binder,

13  Your Honor, is Exhibit 303.  That's the letter that Mr. Berry

14  wrote to API's chief executive in September of 1999.  Mr. Berry

15  writes that his letter pertains to the matter of his custom

16  software and computer system currently being used by API and

17  Fleming Foods.  It's the same software that's at issue in the

18  pre-petition litigation and the same software that Mr. Berry

19  concludes -- accuses C&S of now infringing on some derivative out

20  in Hawaii.

21           On the second page of that letter, Mr. Berry writes:

22  "Therefore, I would like to offer the system for sale to API

23  and/or Fleming for $300,000 payable by September 15th, 1999."

24  And for that $300,000, Your Honor, Mr. Berry offered to transfer

25  complete ownership and rights to that product as well as whatever

J&J COURT TRANSCRIBERS, INC.

1 hardware was there.  So back in September of '99, Mr. Berry said,

2 for $300,000, you've got an outright sale, you get all the rights

3 from my software.  And if that had taken place, we wouldn't be

4 here today.  He would have no more rights in it, no infringement,

5 nothing.

6        A little bit later on, in Exhibit 304, and 304 is

7 actually several documents.  They may or may not go together and

8 the parties have been disputing that, so I don't want to over

9 characterize it, but the last page of that exhibit is a document

10 that Mr. Berry grafted that he calls an addendum to his end user

11 license agreement.  And on the last page, what Mr. Berry wrote

12 was, quote, licensee understands the original contract value of

13 this software is $2 million.

14        So Mr. Berry has admitted that the original contract

15 value of his software is two million.  That's one-twenty fourth

16 of the value he's asserted in his administrative claim.  Just one

17 month after he asserted that the original contract value of the

18 software was two million, we turn to the front page of that

19 exhibit and we find that there's a letter from a friendly

20 executive named Ralph Stuecy to Mr. Berry.  Mr. Berry signed the

21 letter.  And that letter says, and I quote, this is Stuecy

22 writing to Berry, we, Fleming, understand that you, Mr. Berry,

23 will grant us a no-charge user license for the software you have

24 developed for API and that you, Mr. Berry, wish to market it

25 commercially.

Closing Argument/Liebeler                         149

1      So Mr. Berry gave, and I mean gave literally, a license
2  to Fleming to use the software that's at issue in this case and
3  he did it for free.  And now he alleges that instead he deserves
4  a $48 million liquidated admin claim on the basis of the same
5  software.

6      We turn to October of 2002 and that's Exhibit 3000 --
7  let's see, 305, sorry, 306.  My apologies.  We then turn to a
8  period to time after Mr. Berry started his litigation against
9  Fleming out in Hawaii.  And that letter is been asserted by Mr.
10  Hogan as a basis for the administrative claim, the liquidated
11  damage amount, of $48 million.  But in any event, that settlement
12  letter which he sent on October the 24th indicated to Fleming
13  that Fleming could buy the software for $48 million.  So after he
14  starts litigating against Fleming, the value of the software goes
15  up from 300,000 originally to two million as the original
16  contract value.  All of a sudden to once he starts litigating, to
17  $48 million.

18      If you actually look at what he is alleging now, he's
19  alleging now $200 million in use damage in the claims out in
20  Hawaii and $48 million in his admin claim directly against the
21  debtor in this court for this proceeding today.  So what he's
22  asserted ultimately is that his original software which he
23  originally offered for $300,000 has somehow in the interim become
24  worth a quarter of a billion dollars.  We think that's just
25  wildly exaggerated.

J&J COURT TRANSCRIBERS, INC.

1        Now, Mr. Berry asserts that his claim is liquidated.
2   We don't believe it's liquidated.  We believe it's subject to
3   specific analysis by what the damages should be.  The basis for
4   his liquidation claim is that we somehow accepted his October
5   24th settlement offer by selling it to C&S.  That's what he's
6   alleging in his pleadings and I have an email from Mr. Hogan in
7   here as well asserting that fact.

8        There are a couple problems with that argument.  First
9   of all, there's been no evidence asserted that anyone at Fleming
10  ever called Mr. Berry and said, yeah, we accept your October 24th
11  offer.  No document says it.  No witness from Fleming was asked
12  that question.  There's no evidence from which this Court could
13  find that we accepted that offer explicitly.

14       I think Mr. Hogan's argument is that we accepted that
15  offer implicitly by selling the software to C&S.  Well, as I've
16  already indicated, we certainly didn't intend to transfer the
17  software to C&S.  And to the extent that we did so, and it's not
18  even clearly established that we did so, it was done
19  inadvertently.

20       Even if he had wanted to accept that offer of $48
21  million, however, we can't by its own terms.  The second sentence
22  of the offer itself says, the following settlement offer will be
23  held open until the conclusion of the settlement conference on
24  November 4, 2002.  I think the contention from Mr. Berry is that
25  we accepted that offer by selling the assets to C&S.  That asset

Closing Argument/Liebeler                    151

1  sale closed on August 23rd of 2003.  That's some nine or ten
2  months later.  I think it's actually first year of Horn book law
3  that you simply can't accept an offer after it's expired.  This
4  one has an expressed expiration term by its own terms.  We
5  couldn't have accepted it.
6        Now, to the extent the Court this a not a liquidated
7  damage amount that's established somehow by this offer letter, I
8  want to turn to the statutory and other damages that are
9  available under the Copyright laws.  Under the Copyright laws,
10 Berry has a choice.  He can get either the actual damages that he
11 has suffered plus the profits derived from the infringement.  Or
12 he can get statutory damages.
13       With respect to his $48 million administrative claim,
14 neither claim is large.  The first one, which is the actuals plus
15 the profits, if you actually look at his actual damages, the
16 typical measure the courts use is the market value of the
17 software.  And we have evidence with respect to the market value
18 of his 1993 freight control system and the evidence that we've
19 got is that he sent it to Fleming, he gave a free license to
20 Fleming and he never charged anything for it.  He got no license
21 fee whatsoever.  And courts typically will look for what looked
22 to equivalent license fees to try to determine the market value
23 of a particular piece of software.  There's no evidence to the
24 contrary.  The market value of this stuff is exactly zero.
25       If you look at what the profits were from the sale to

Closing Argument/Liebeler                    152

1  C&S of the software to the extent we get all the way down the
2  chain to this point, those profits were zero. And the reason I
3  say that is that the evidence that we saw from the stand that
4  there was no intent to sell the software to C&S. So no part of
5  the purchase price that C&S paid to Fleming for the entire
6  complex of assets that was the wholesale division is fairly
7  attributable to Mr. Berry's software. So in terms of the profits
8  that would be derived from the alleged infringement, those are
9  also zero.

10        Now, if you turn to statutory damages, there's
11 certainly the case that under the Copyright laws there are
12 statutory amounts that I think range from something around 1,000
13 up to $30,000 per infringement. But that depends upon the intent
14 of the infringer. What Mr. Dillon testified to once again is
15 that there was no intent to transfer the software. In fact, he
16 tried to take it off of the servers in Kapolei before the
17 transfer.

18        What the statutory damage provision say that if you can
19 show that the infringer was not aware of the infringement when it
20 took place, you get $200 in damages for infringement. Mr. Berry
21 is articulated that, at least in his initial pleading, 16 files.
22 16 files times $200 is $3200. So we would submit that an
23 absolute maximum for the statutory damages on the basis of the
24 record that's in front of the Court is $3,200.

25        Now, that, of course, assumes that the 16 separate