1 copies that show up on the Guidance image are 16 separate works.

2 The Copyright law defines a work in various ways.  That there --

3 there's case law on this point as well, and we would contend that

4 there is one work that may have been infringed 16 times.  But the

5 law says that the number of infringements doesn't matter.  It's

6 actually the number of works.

7          This has been litigated in a number of different

8 factual settings.  There was a piece of litigation in which one

9 particular company basically copied CDs from 15 -- of 1500

10 different songs and the records not entirely clear, but it looks

11 like 15 -- like a number of different recording artists.  It

12 wasn't specified in the record.

13          In that copyright infringement action, the specific

14 number of infringements didn't matter.  It was the specific

15 number of works and the court said each separate song is a

16 different work.  We contend that for purposes of this litigation,

17 Mr. Berry's freight control system is one single work.

18          Another case is a case involving copyrighting

19 infringement of Mickey and Minnie Mouse.  The plaintiffs had

20 alleged that there six different infringements because there were

21 six different incarnations of Mickey and Minnie Mouse that were

22 infringed.  The court said no, that's not six infringements.

23 There are only two works, one of which is Minnie Mouse and one of

24 which is Mickey, and you can only get damages on the basis of the

25 number of works.  One being Mickey, one being Minnie.  So we

1 contend that the freight software that's allegedly been infringed

2 here is a single work which would entitle Mr. Berry at a maximum

3 to one statutory damage award, not multiplied by the number of

4 infringements.

5      If, in fact, the Court believes that that that debtor's

6 transferred to the extent it existed of the software to C&S was

7 unintentional, that would be a grand total damage award of $200.

8 One moment, please.

9                    (Pause)

10      MR. LIEBELER:  Two other minor points, Your Honor, and

11 that is that by engaging MTI, we wanted to find out when the

12 files were actually deleted.  That was the point in engaging MTI.

13 That was what Mr. Hogan prevented us from doing when he called

14 them up and either warned them about a RICO action.

15      Last point on the liquidated damage amount in terms of

16 whether or not we could have accepted Mr. Hogan's settlement

17 offer, that would suppose that we had done a $48 million deal,

18 we'd agreed to accept an offer for $48 million without Court

19 approval.  In fact, we never even knew about our acceptance of it

20 when it occurred.  The debtor can't do that.  In order for the

21 debtor to enter into a contract of any magnitude, we have to seek

22 the Court's approval.

23      THE COURT:  Post-petition.

24      MR. LIEBELER:  That is post-petition.  He claims that

25 we accepted the contract when we sold to C&S.  That we accepted

155

1  his pre-petition offer after the petition when we sold to C&S.

2  We just think that can't be the case.

3          Your Honor, we contend that there's simply no sale

4  under the Copyright laws.  And we contend that if the Court does

5  find a sale, there are no damages.  We would contend that the

6  Court should estimate this claim at a diminimus amount.

7          THE COURT:  Thank you.

8          MR. SPRAYREGEN:  Your Honor, before I address Mr. --

9          THE COURT:  Well, why don't we hear the -- do the

10 estimation first.  I thought that was what the suggestion was.

11 And then we can go to confirmation.

12         MR. SPRAYREGEN:  Well, I can do it anyway.  I thought

13 we might hear the -- our entire argument over -- to overrule Mr.

14 Berry's claim and then hear his response to both of that.  But

15 I'm happy to proceed either way.  I will tell the Court the

16 preview that we think once you go through all of the feasibility

17 issues, it's not abundantly clear that it's actually necessary to

18 estimate the claim in a particular number to get the feasibility.

19 So that was one thing I was going to suggest.  But I'm happy to

20 proceed in any fashion the Court desires.

21         THE COURT:  You want to respond to the estimation?

22         MR. HOGAN:  I'd rather do the estimation, Your Honor,

23 myself here.

24         MR. SPRAYREGEN:  Then go.

25         THE COURT:  Thank you.

1  MR. HOGAN'S CLOSING ARGUMENT

2          MR. HOGAN:  Thank you, Your Honor.  May it please the

3  Court, Timothy Hogan on behalf of Wayne Berry.  I'll try to

4  follow with counsel's argument.

5          The question's whether -- and it just occurred to me

6  Your Honor, counsel's end of his argument that Mr. Dillon

7  testified to creating a piece of software, created during the

8  administration of this case and that software had been

9  transferred to C&S.  I don't know of any document or order or

10  anything that aloud that software to be transferred.  And it just

11  occurred to me that whatever it is that Mr. Dillon created, and

12  it's our contention, Your Honor, it's simply Mr. Berry's software

13  with a different name on it, whatever it was was created by the

14  debtor, and given to C&S.  There's no question that that

15  happened.  The question is how did they do that without some

16  order of this Court.  And I frankly don't know, Your Honor.  I

17  think it was just stated that couldn't be done.

18          Mr. Dillon testified to giving no original contribution

19  to the work that went to C&S other than the data that went into

20  it.  I asked the question again, I was stopped as asked and

21  answered, Your Honor, that's all he's done to create the

22  replacement.  I would offer Your Honor as a matter of law what he

23  testified to is a very derivative that is alive and well and

24  operating in Hawaii.  Whatever the number you put on it, Your

25  Honor, at least one thing I'd like to leave this courtroom is

1  with the idea that they created another derivative and sold it to

2  C&S.

3          THE COURT:  Well, it's not for me to determine.  I'm

4  just estimating your claim, if any, against the estate.

5          MR. HOGAN:  And I agree with that, Your Honor.  And I

6  know you've passed on making that determination in favor of the

7  Hawaii court doing so.  But for the purposes of estimation, we

8  come back to the idea of the indemnities.  The indemnities that

9  were, at least, brought up.  I believe they've been submitted as

10  Debtor's 179, I believe that's in evidence -- if someone wants to

11  correct me, but I believe that is in evidence -- 179 is a copy of

12  the indemnity letter that deals with Berry Technology going

13  forward into the future indemnifying for the use of Berry

14  Technology, the estate, presumably the reorganized debtors.

15          What would be the damages for that?  Well, with all due

16  respect, if counsel -- if Mr. Berry gets to determine whether or

17  not he elects statutory damages.

18          THE COURT:  Is that a claim you have against the

19  estate?  No, that's a claim that C&S may have against the estate,

20  so --

21          MR. HOGAN:  And I agree with that, Your Honor.  And --

22  but part of what they were doing in this motion was to have you

23  determine the outer most limits of Mr. Berry's claims against

24  C&S.

25          THE COURT:  No, I'm not deciding that.

Closing Argument/Hogan                                          158

1       MR. HOGAN:  All right.

2       THE COURT:  I'm deciding your claim against the estate.

3       MR. HOGAN:  Then I'll move on, Your Honor.  The issue

4  with MTI, Your Honor.  MTI was going in to make a copy of

5  software.  Noone asked us.  We had non-destruction orders in

6  Hawaii.  There is a state law against non-destruction of evidence

7  during civil proceedings.  And I just leave that as it is, Your

8  Honor.

9       THE COURT:  Well, only address your claim against the

10 debtor.

11      MR. HOGAN:  Mr. Berry's declaration, Your Honor,

12 exhibits -- it's Exhibit 310, 17 to 25, details the manner in

13 which Mr. Berry arrives at what has been stated to be exorbitant

14 numbers.  It has to do with the single thing and if I may, Your

15 Honor, one of their exhibits that went in, I think it's helpful

16 to go back to it, it's Exhibit 303, Your Honor.  And it -- Mr.

17 Berry -- which I believe is in evidence, states as with any

18 custom designed software system, this system is essentially

19 worthless to anyone other than Fleming and API.

20      Now, that's a fairly strong thing when you're

21 estimating a claim.  But to the extent that they sold that one of

22 a kind software to be able to close the deal with their

23 purchaser, Your Honor, I think it deserves note.

24      THE COURT:  What evidence do I have that they sold it?

25      MR. HOGAN:  Mr. Dillon's testimony as to what he

1 actually put on their servers is a derivative of Wayne Berry's

2 system.    That -- the only thing that he added as original work

3 was the data, that he essentially copied it and transferred it.

4 That's undisputed in this record, Your Honor, that --

5          THE COURT:   Well, it's not in the asset purchase

6 agreement and nothing was paid for.

7          MR. HOGAN:   And I don't dispute that although to the

8 extent that it was -- you know, in terms of the large purchase

9 price for the C&S acquisition, Your Honor, I don't know if I've

10 ever seen a breakdown of how it went by asset.   The $75 million

11 that --

12         THE COURT:   It's clear that the asset purchase

13 agreement did not include Mr. Berry's software.

14         MR. HOGAN:   And I don't dispute that it was not listed.

15 I will say, Your Honor, if -- at this point, I have never seen

16 Mr. Berry's software ever mentioned in the schedules or in any

17 document that the debtor has ever created, although there is no

18 doubt from the testimony that it has been operated during the

19 pendency of this case, that it has been reversed engineered by

20 Mr. Dillon --

21         THE COURT:   That's a claim you may have against C&S and

22 against the debtor for post-petition use, but tell me how I

23 estimate the claim against the debtor only.

24         MR. HOGAN:   Okay.

25         THE COURT:   And it can't be based on a sale to C&S, on

1 the asset purchase agreement, or the price paid out of the asset

2 purchase agreement because it's clear from those, is it not, that

3 the software was not included.

4        MR. HOGAN:  And I understand that that is true, Your

5 Honor, but I'm saying that simply because someone did something

6 they shouldn't do doesn't mean they didn't do it.  And the idea

7 that there is -- I believe the evidence is that there is a copy

8 of Wayne Berry's software that was created by the debtors that is

9 resident presently on C&S.

10        THE COURT:  Then you may have a claim against C&S for

11 infringement.

12        MR. HOGAN:  Yes, Your Honor.  I brought that claim.

13        THE COURT:  But --

14        MR. HOGAN:  As to Mr. Berry's administrative claim in

15 this proceeding, his claim would be based on several ways of

16 getting to it.  One of them is usage.  His lost profits, which is

17 what counsel referred to, is a loss of licensing.

18        THE COURT:  But for the debtor's usage, the license

19 provided for no fee.

20        MR. HOGAN:  No fee for the one that Mr. Berry wrote,

21 not for the derivative they ran, Your Honor.

22        THE COURT:  And for the derivative they ran, did not

23 the jury place a value on that of 98,000?

24        MR. HOGAN:  The jury placed -- the statutory damage

25 maximum for willful infringement is $150,000 per work.  I can

1  agree with counsel, per work.  So when he --

2               (Loud speaker announcement)

3          THE COURT:  All right.  You may proceed.

4          MR. HOGAN:  I'm sorry, Your Honor, I've lost my train

5  of thought.

6          THE COURT:  Damages for the debtor's use --

7          MR. HOGAN:  The debtor used the software.  Mr. Berry,

8  if they had come to him for a license, would have asked them to

9  pay what he charges other people to use it.

10         THE COURT:  Well, what evidence do I have, in the

11 record before me, that he got anything from anybody for this

12 software?

13         MR. HOGAN:  The declaration that is, I believe,

14 paragraph 17-25, Your Honor.

15         THE COURT:  Mr. Berry's declaration, Exhibit 310.

16         MR. HOGAN:  That's correct, Your Honor.

17         THE COURT:  Where's the evidence that he received

18 anything?

19         MR. HOGAN:  That he received anything.

20         THE COURT:  For licensing software.

21         MR. HOGAN:  No, Your Honor, I'm not going to

22 misrepresent.  When Mr. Berry licensed Fleming to use the

23 software and we go to the exhibit so -- I'd like to just point it

24 out, that Mr. Berry did grant Fleming a no-charge user license as

25 a temporary measure.  It's on the first page of 304, Your Honor.

Closing Argument/Hogan                           162

1   It says Mr. Stuecy added it, I believe -- or whoever added it,

2   it's in here, the long term goal of our operation is to interface

3   with our company's --

4           THE COURT:  Where are you reading?

5           MR. HOGAN:  I apologize, Your Honor.  Exhibit 304,

6   second page, Bate stamp A004 --

7           THE COURT:  I have it.

8           MR. HOGAN:  -- 50.  The long term goal is to -- the

9   long term goal of our operation is to interface with our

10  company's total inbound logistic system.

11          THE COURT:  So?

12          MR. HOGAN:  This was to be a temporary measure.

13          THE COURT:  Where does it say that?  And where after

14  the debtor bought API did it change from being anything other

15  than a zero license?

16          MR. HOGAN:  Well --

17          THE COURT:  In fact, there was an addendum, but that

18  didn't change the price.

19                              (Pause)

20          MR. HOGAN:  Well, I -- according to the addendum, Your

21  Honor, the idea of reverse engineering changing the software is

22  what was prohibited in the license.

23          THE COURT:  I understand.

24          MR. HOGAN:  Yeah.

25          THE COURT:  But you're going to -- you were going to

Closing Argument/Hogan                          163

1  tell me what the value, or market value of the changed version

2  would have been.  But there's no evidence that any version was

3  licensed by Mr. Berry for any money.

4          MR. HOGAN:  Well, it is in the record, Your Honor, that

5  there was a $2 million licensee/damage clause, last page of

6  Exhibit 3004, this is the license that Fleming has offered.

7          THE COURT:  Which exhibit?  304?

8          MR. HOGAN:  304, Your Honor, the last page, paragraph

9  10.  That included a liquidating damage clause.

10          THE COURT:  Well, it doesn't not say that that's the

11  amount of damages.  It simply says that the licensor will use

12  that as a basis for calculating damages.

13          MR. HOGAN:  That -- it says what it says, Your Honor.

14  I -- if I misrepresented it, I apologize.

15          THE COURT:  What other evidence is there of any value?

16          MR. HOGAN:  Well, I guess -- how do you value, I guess,

17  a piece of unique software.

18                  (Loud speaker announcement)

19          THE COURT:  I apologize.

20                          (Pause)

21          THE COURT:  I apologize, you may proceed.

22                          (Pause)

23          THE COURT:  All right.  You may proceed.

24          MR. HOGAN:  Thank you, Your Honor.  I guess, Your

25  Honor, we're talking about what Mr. Berry's claim would be

1 against the estate for the manner in which his software was

2 handled during the administration of the estate if we're dealing

3 with an administrative claim. I believe that to be the outer

4 limits of what Mr. Berry could claim.

5       And I would say, Your Honor, by transferring a copy,

6 although that may be a separate issue, by giving it to the one

7 entity, which in 303 it's -- he -- Mr. Berry admits that it's --

8 really only one person can use this, it's custom made. It would

9 be like taking the software out of one of these buildings and

10 carrying it to another building, it may not operate the

11 elevators. But whoever built that building, it has an intrinsic

12 value.

13       How do we arrive at that, Your Honor? Do we need to

14 arrive at that at this point in this proceeding in order to get

15 the confirmation? That I don't know. I --

16       THE COURT: Well, I think the answer is yes. We have

17 to put some estimate on your claim if you're using your claim as

18 a means to prove that the plan is not feasible because the

19 administrative claims can't be paid.

20       MR. HOGAN: My -- if I may, Your Honor, my argument on

21 confirmation was primarily that I was objecting to the fact that

22 the plan was being used as a sort of a facto compli to transfer

23 my client's software to C&S, that it was under the idea that a

24 plan must be done through a lawful means argument. The

25 estimation is still there, Your Honor. The fact that it is a

1 large claim that has to be dealt with. When taken in light of

2 the indemnities that are out there, Mr. Berry's claim is

3 potentially a serious claim for the estate because as the Court

4 has indicated, C&S's liabilities are going to go forward, then it

5 is -- we have the people from Fleming, the CFO --

6          THE COURT: But to prove your case you have to give me

7 more than just argument.

8          MR. HOGAN: I understand that.

9          THE COURT: It's a serious claim. Give me a number.

10 If it's $100,000, they're feasible even if you win.

11          MR. HOGAN: That is correct. But what I'm saying, Your

12 Honor, is his claim --

13          THE COURT: If it's $2 million, they're feasible even

14 if you're correct.

15          MR. HOGAN: Then I would stand with this claim, Your

16 Honor. It's $48 million if they want to sell it to C&S.

17          THE COURT: How? How can I determine or estimate your

18 claim at that? That's what you were willing to settle? They

19 said no, that's not their value apparently because they --

20          MR. HOGAN: But then they shouldn't --

21          THE COURT: -- did not accept it.

22          MR. HOGAN: I apologize. They shouldn't have

23 transferred it, Your Honor. They should have -- when the case --

24          THE COURT: Well, whether or not they did or not, let

25 me assume they did everything wrong. How do I calculate that

Closing Argument/Hogan                              166

1 amount?  They might have transferred it to C&S and yet they think

2 it's not worth $48 million, so they didn't settle with you

3 thinking you'll get $200,000 if you win.  You've got to -- I need

4 evidence to estimate your claim to determine whether or not

5 you're an impediment to confirmation.

6           THE COURT:  Well, I would refer the Court to Mr.

7 Berry's declaration in which he details the manner in which this

8 software was employed to make money for Fleming, API and

9 presumably now C&S.

10          THE COURT:  How does that translate into a damages

11 award?

12          MR. HOGAN:  Because it would determine what an arms-

13 length licensing fee would be were they to come to Mr. Berry --

14          THE COURT:  How?  How can I come to an arms-length

15 licensing fee?  The only licensing fee that I know of was zero to

16 the debtor to whom it was the most valuable according to Mr.

17 Berry's statement.  I mean if it's zero for one person that can

18 really use it, how can I calculate it's value as anything other

19 than zero?

20          MR. HOGAN:  Well, I guess the easy way would be why

21 didn't -- I think the Court can infer from what's happened in

22 this case that it would have been a lot easier if it was

23 worthless software to simply walk away from it and end it and be

24 done with Mr. Berry.

25          THE COURT:  They -- well, the evidence was they tried.

1    MR. HOGAN:  And I -- and -- well, the evidence was they

2  tried by creating a derivative.

3    THE COURT:  And you may be correct.  And I'm assuming

4  you're correct for purposes of today.

5    MR. HOGAN:  Basically, Mr. Berry has cited what Fleming

6  charges logistics fees for K-Mart in here from the K-Mart

7  contracts.  K-Mart is the only -- the only place that K-Mart

8  still does business with Fleming and now C&S that I know of is in

9  Hawaii.

10    THE COURT:  But that was the --

11    MR. LIEBELER:  Your Honor, I object.  That's not on the

12  basis of evidence --

13    THE COURT:  Please.  That's what the debtor got as a

14  result of it.  It's not what Mr. Berry was entitled to.

15  Regardless of how the debtor used it in its business and how the

16  debtor generated revenues perhaps is a result of it.  It's not

17  what Mr. Berry was entitled to.  Mr. Berry was entitled to no

18  license fee.

19    MR. HOGAN:  And up to a point, Your Honor, I would

20  concede.  Had the debtor gone into bankruptcy without any

21  infringement, nothing happening, and used the software up until

22  the point that they're ready to emerge from bankruptcy or sell

23  their software, I would concede to this Court Mr. Berry isn't

24  owed a dime.  I'll concede that point.

25    But we're not talking about that.  What we're talking

Closing Argument/Hogan                                    168

1 about is when the debtor doesn't operate the system the same way,

2 doesn't say, okay, it's at the end of the day, here's your

3 software back, Mr. Developer, thank you very much.  But where the

4 debtor uses a very concerted action to transfer it to a third-

5 party.  The only third-party, Your Honor, by the evidence who

6 could buy it.  Essentially wiping out his market.  And I can see

7 the Court's problem, what was that market worth.

8          THE COURT:  Exactly.

9          MR. HOGAN:  And from the Copyright Act, Your Honor,

10 allows damages for loss -- for actual damages which I take to

11 mean lost license revenues.

12          THE COURT:  You were getting zero for the license fee.

13          MR. HOGAN:  Exactly.

14          THE COURT:  So that's zero.

15          MR. HOGAN:  Exactly.

16          THE COURT:  All right.

17          MR. HOGAN:  And then the profits of the infringer.  I

18 asked a question, does anybody know how much C&S makes in a

19 profit on the Hawaii division?  Does anybody know what the Hawaii

20 division makes?

21          THE COURT:  Well, it's not clear to me that the

22 Copyright Act would give you all of their profits.

23          MR. HOGAN:  And it is -- and I don't -- I'm not saying

24 it would be.  But it would be the profits derived from the

25 infringement, Your Honor.

Closing Argument/Hogan                                    169

1           THE COURT:  Right.

2           MR. HOGAN:  And see --

3           THE COURT:  So how am I to calculate that?

4           MR. HOGAN:  And that is what is in Mr. Berry's

5  declaration, Your Honor.  And it is a way to calculate how much

6  the system makes.  And moreover, Your Honor, how much it will

7  lose if it is taken away.

8           THE COURT:  Well, even accepting Mr. Berry's testimony,

9  can I conclude that the revenues that the debtor received for its

10 shipping are related solely to your software?  I don't think I

11 can conclude that.

12          MR. HOGAN:  I would say, Your Honor, that based on Mr.

13 Ron Griffin's, that's Berry 1, it's Mr. Berry's Exhibit 1, his

14 admission that there was no replacement software at all.  And

15 that they had -- his advice was is to pay a licensing fee

16 indicates --

17          THE COURT:  Well, that was one option.

18          MR. HOGAN:  That was his conclusion, Your Honor, I

19 believe.

20          THE COURT:  Define some of --

21          MR. HOGAN:  That however distasteful, I think he

22 said --

23          THE COURT:  Define some accommodation.  It doesn't say

24 pay the licensing fee.

25          MR. HOGAN:  It's pay a licensing fee.  What I'm saying

J&J COURT TRANSCRIBERS, INC.

1  is, Your Honor, there wasn't a replacement. It was one of a

2  kind. What does something that is unique worth in the world?

3  How do you pick a value for it?

4          Under the Copyright Act, you would say, well, what did

5  it make you but for that piece of software. I think that's --

6          THE COURT: I think there's no evidence that they could

7  not have operated without this software. What evidence of that

8  is there?

9          MR. HOGAN: No, and I agree, Your Honor. I'm not going

10 to say they couldn't -- they could stop operating tomorrow

11 without it.

12         THE COURT: No, they could operate without the

13 software.

14         MR. HOGAN: That's --

15         THE COURT: Perhaps they won't be able to print a

16 report, but they can operate without the software.

17         MR. HOGAN: I think -- well, they could operate, Your

18 Honor.

19         THE COURT: They operated before they had the software.

20         MR. HOGAN: That's correct. And the food got to

21 Hawaii. And it didn't come in through Fleming is all. And that,

22 I believe, is what Mr. Berry's declaration deals with is that it

23 was -- allowed Fleming to be a freight consolidator. And to the

24 extent that it --

25         THE COURT: It's not the only thing that allows Fleming

1  to be a freight consolidator.  There's a lot more than just Mr.

2  Berry's software involved in being a freight consolidator.  There

3  are employees.  There're stevedores that you deal with.

4          MR. HOGAN:  That's -- that is true.

5          THE COURT:  There's shippers you deal with.  There's a

6  lot involved in the business.  I can't simply conclude that all

7  the revenues received by Fleming or by C&S at this Hawaii

8  location would be the measure of damages for wrongful

9  infringement.  Based on the evidence I have.  Even assuming Mr.

10  Berry's declaration is accurate.

11          MR. HOGAN:  Basically, Your Honor, what Mr. Berry's

12  declaration, if there's one thing that his system does is it will

13  reach a savings through the use of the software.  A -- an

14  efficiency of $1763 a container.  The --

15          THE COURT:  Well, that's not what he's --

16          MR. HOGAN:  Paragraph 18.

17          THE COURT:  Well, there's no -- nothing in this that

18  tells me how much -- how many containers they did, in fact,

19  handle.  There's no basis for his statement that he believes they

20  could have handled no more than 20 containers a week.

21          MR. HOGAN:  Your Honor, there -- it actually does parse

22  the gross sales tax receipts on page -- on paragraph 21 to arrive

23  at a container number.  Based on the Hawaii gross -- we have a

24  gross sales tax that he reversed out and arrived at a number of

25  containers per year which would be 35,871 containers a year.

N

1    THE COURT:  But tell me the basis in paragraph 18 for

2  his belief that API would have been limited to 20 containers per

3  week without his software.

4    MR. HOGAN:  Yeah, it's in the other part of his

5  declaration, Your Honor, in the story of API.  And I don't want

6  to go into it because it's not in the record.  But it's -- Mr.

7  Berry, I think it was testified, was the president of API, came

8  in and helped run the company.  And his -- it isn't -- it's

9  knowledge of the person who would know these facts.  That -- the

10  intrinsic value of selling a unique piece of software to someone

11  is going to be difficult for anyone to establish, Your Honor.

12    THE COURT:  Yeah, but isn't the best evidence what you

13  were actually getting from Fleming?  Which was zero.

14    MR. HOGAN:  Well, no, I don't think that -- Your Honor,

15  I understand that Mr. Berry allowed Fleming to use his software

16  and I believe Mr. Stuecy's statements in that memorandum as an

17  interim measure.  And as we had Mr. Dillon discussing, one of the

18  reasons Mr. Berry did that is so he could employ his former

19  employees as the company was being put out of business.

20    Now, it may not seem like a good business deal for most

21  people, but I don't think it should be construed as him waiving

22  his rights as a copyright owner.  To protect --

23    THE COURT:  I'm not suggesting his waiving his rights,

24  but he's suggesting he's put a value on those rights.  And

25  there's nothing in the exhibits to suggest it was a temporary

173

1  measure only.

2          MR. HOGAN:  Only the exhibit that I referred to, Your

3  Honor, the EULA, the first page of the EULA that was the

4  memorandum.

5          THE COURT:  Yeah, but even your statement, the long

6  term goal of our operation is to interface with our company's

7  total inbound logistics system.  What does that mean?

8          MR. HOGAN:  It's, I believe, to get rid of Mr. Berry.

9  That's what I believe it meant.  Which is -- he's almost gone,

10 Your Honor, so --

11                     (Laughter)

12         MR. HOGAN:  But now he's C&S's problem.

13                     (Laughter)

14         THE COURT:  Yes, he will.

15         MR. HOGAN:  Let's say I have nothing else, Your Honor.

16         THE COURT:  All right.  What other evidence?

17         MR. HOGAN:  I think that's it, Your Honor.

18         THE COURT:  All right.

19         MR. LIEBELER:  Nothing further on estimation, Your

20 Honor.  I would yield to Mr. Sprayregen with respect to the

21 overall confirmation issues.

22         THE COURT:  All right.  Well, let me make a ruling on

23 the estimation so we can proceed more orderly.  I think that --

24 and again, for purposes of this proceeding, I must assume there

25 is some claim that Mr. Berry has against the debtor that would

174

1  qualify as an administrative expense.  And I'm prepared to

2  estimate the administrative expense at $100,000.

3         The only evidence really before me that it has any

4  value, the license agreement provides that the debtor may use it

5  for no licensing fee.  So that is not evidence of any value for

6  the debtor's use that would constitute the administrative

7  expense.  There is the jury verdict that found that the debtor

8  had made improper changes to and was using the changed version

9  which constituted infringement and the jury awarded damages of

10  approximately $98,000.  So that is some evidence of a value that

11  can be attributed to any claim for infringement.  That is, change

12  of the original version of the software.

13         With respect to any alleged damages for a sale to C&S,

14  there is no evidence of a sale to C&S.  The asset purchase

15  agreement specifically does not include the software.  My ruling

16  at the hearing on approval of the asset purchase agreement made

17  it clear that there was no sale of Mr. Berry's software.  So

18  nothing can be attributed to any value the debtor received as a

19  result of any sale of the software.  So I would estimate the

20  Berry administrative claim against the debtor at $100,000.

21         MR. SPRAYREGEN:  Thank you, Your Honor.  With respect

22  to confirmation, and obviously in my confirmation argument, I'll

23  take this ruling in account with respect to the feasibility

24  objection, I think in the first instance there was one party that

25  I had reported was resolved, Mr. Block.  And they stepped up and

J&J COURT TRANSCRIBERS, INC.

1  it was a little bit unclear whether there was still a

2  confirmation objection or whether he was just agreeing that it

3  was close to being resolved but it wasn't resolved yet.  I can

4  report and I believe Mr. Block's counsel is still in the

5  courtroom, that that is now settled and the documentation is in

6  process and the settlement of that claim we would intend to

7  submit under a certification of counsel to the extent the court

8  order will confirm the plan.

9          MR. HOUSTON:  Good afternoon, Your Honor.  Joseph

10 Houston of Stevens Lee and Dunn.  That is correct.  We have

11 reached an agreement.  It's simply a matter now of actually

12 signing an agreement and on that basis we withdraw the objection.

13         THE COURT:  All right.  Thank you.

14         MR. HOUSTON:  Thank you.

15            MR. SPRAYREGEN'S CLOSING ARGUMENT

16         MR. SPRAYREGEN:  So, Your Honor, we're back to where I

17 thought we started which is with the one objection.  And the

18 basis of the objection is both feasibility and lack of good faith

19 that we proposed a plan by means of forbidden by law.  I would in

20 the first instance state that we believe all of the other

21 evidence we've put in satisfies all of the other confirmation

22 standards and I'm happy to go through those because it is our

23 burden, but I think they're well in the evidence unless the Court

24 desires them.

25         THE COURT:  That's fine.  I think it's stated in the

1 evidence that is presented and the memorandum of all submitted.

2      MR. SPRAYREGEN:  Your Honor, there's obviously the

3 allegation that we have not proceeded in good faith, but that

4 we're proceeding by means forbidden by law.  I think that's

5 second part is basically addressed by the Court's ruling that the

6 software was not transferred and couldn't have been transferred

7 because of your order at the sale.

8      THE COURT:  I didn't say it wasn't transferred.  I said

9 it wasn't sold.

10      MR. SPRAYREGEN:  I'm sorry, wasn't sold.  And that

11 being the case, the basis for the lack of good faith objection is

12 that we did sell it and, in fact, sold it inconsistent with your

13 order at the sale hearing.  Your Honor, even with those

14 allegations, I think that we don't look at the good faith issue

15 solely with respect to one objection.  We look at the proposed

16 plan and is it overall proposed in good faith and not by any

17 means forbidden by law.  I'm not -- I don't see any means

18 forbidden by law allegation any longer with respect because of

19 the no transfer -- excuse me, no sale ruling.

20      And with respect to the balance of the good faith

21 issue, that's always a strange confirmation standard to try to

22 prove in that insomuch you're trying to prove a negative.  But

23 Mr. Stenger did testify as to the debtor's good faith in the

24 proposal of the plan.  And I think the most persuasive evidence

25 of the debtor's good faith is the support, overwhelming support

1 for the plan through the votes in support of the plan by every

2 class and by the support of the plan by the two official

3 committees, by the Exit financing lenders support of the plan.

4    And I don't think I would add anything more generally

5 with respect to good faith.  With respect to Mr. Berry's specific

6 allegations, I think the testimony of Mr. Dillon is directly to

7 the contrary that if anything was transferred, even if it wasn't

8 sold, it, one, wasn't used, and two, it was inadvertent.  And

9 that there were strenuous efforts by the debtor and that was --

10 came in through multiple parts of the evidence to eliminate any

11 issue with respect to Mr. Berry whether that was successful or

12 not can be decided another day in another court.

13    THE COURT:  What about the allegation that the -- that

14 debtor has agreed to indemnify C&S for this issue contrary to the

15 asset purchase agreement?  Is it contrary?

16    MR. SPRAYREGEN:  No, it isn't, Your Honor.  The --

17 again, the asset purchase agreement is approved by a court order,

18 the sale order.  The sale order authorizes the debtor to enter

19 into the asset purchase agreement, and in essence, not quote such

20 other agreements consistent with the closing, I think the word's

21 supplemental agreements consistent with the asset purchase

22 agreement.

23    THE COURT:  How is that consistent with the asset

24 purchase agreement?

25    MR. SPRAYREGEN:  We have indemnity provisions in the

Closing Argument/Sprayregen                    178

1   asset purchase agreement already.  Your Honor, my understanding

2   of what happened, and I wasn't there, is between the time the

3   asset purchase agreement was approved and the time of closing,

4   Mr. Berry sued C&S, this was prior to closing.  So not

5   surprisingly, C&S sought some confirmation that the

6   indemnification obligations in the asset purchase agreement would

7   be picked up in some way given that, in essence, a allegedly

8   potentially indemnifiable claim has actually arisen before we

9   even closed.

10          THE COURT:  Well, is it indemnifiable under the asset

11  purchase agreement?  Run me through the asset purchase agreement.

12          MR. SPRAYREGEN:  Well, first of all, I'm going to ask

13  Mr. Liebeler to get up and address that.  But I think more

14  importantly, the issue of whether it is I think will be

15  ultimately an issue for another day.  What we have done thus far

16  because of what joint counsel in Hawaii is, we have covered the

17  attorneys' fees, we'd have to bear that expense.  In any event --

18          THE COURT:  Why?

19          MR. SPRAYREGEN:  Because we've been sued also.

20          THE COURT:  You've -- but you would have to cover C&S's

21  attorney expenses?

22          MR. SPRAYREGEN:  No, we have the same counsel.  They're

23  going to have counsel, too, but we have our own counsel and

24  they're using them also.  So, it's not as if it's an additional

25  expense.  But it's not unusual in a situation where you have an

1  allegation of an indemnifiable liability and there may or may not

2  ultimately be a dispute as to whether it is indemnifiable for the

3  parties to proceed with -- on an interim basis with covering

4  attorneys' fees in the hopes that ultimately the claim goes away

5  and we don't have to get into a larger fight over a $48 million

6  issue as distinct from a $100,000 issue which would be a much

7  different type of thing to resolve and we never really have to

8  get in a large dispute.

9           But no, we don't think there's anything inconsistent

10 about the indemnity agreement from the indemnities approved in

11 the asset purchase agreement.

12          THE COURT:  Well, let me hear why.

13          MR. LIEBELER:  Your Honor, the reason that there's no

14 inconsistency between the indemnity agreement which we have

15 actually, I think, is 211 in the binder, is because the indemnity

16 agreement, which we've called the side letter, itself refers back

17 to Section 13.3G and is qualified by Section 13.3G of the asset

18 purchase agreement.

19          THE COURT:  Tell me the exhibit, No. 178, is it?

20          MR. LIEBELER:  Actually, I've got it in two places,

21 Your Honor.  The easiest one I've got it in the Berry binder as

22 312.

23          THE COURT:  Yes.

24          MR. LIEBELER:  And the side letter is 311, Your Honor.

25          THE COURT:  Show me where on 312 is the

Closing Argument/Sprayregen/Liebeler          180

1  indemnification.

2          MR. LIEBELER:  Starting with 311, near the bottom of

3  311 refers and the indemnity obligation in the side letter is

4  qualified by 13.3G, that you should be entitled to

5  indemnification subject to the limitations of 13.3G.  That's in

6  the side letter.  So you have to go back to 13.3G in the asset

7  purchase agreement which is Exhibit 312, page 74, middle of the

8  page.  And 13.3G says that there's not any obligation to

9  indemnify if C&S in these circumstances takes any identifiable

10 action which directly causes the excluded liabilities to be

11 there.

12          So, to the extent that C&S takes an affirmative

13 identifiable action, there's no indemnity.  That, in fact, the

14 side letter is perfectly consistent with the provisions, with any

15 provision of the APA because it actually refers back to a

16 limitation in the APA on the indemnity.

17          THE COURT:  Tell me what that sentence means again.

18          MR. LIEBELER:  Sure.

19          THE COURT:  Sellers, the debtor, shall have no

20 obligation to indemnify C&S arising out of excluded liabilities.

21 We're assuming that --

22          MR. LIEBELER:  Well, no, it's --

23          THE COURT:  We're assuming that the Berry is an

24 excluded liability.

25          MR. LIEBELER:  That's correct.  But there's some of the

**J&J COURT TRANSCRIBERS, INC.**

1  language you missed, Your Honor, and that is that C&S takes any

2  identifiable action.

3          THE COURT:  That's after.  I'm not there yet.

4          MR. LIEBELER:  Okay.

5          THE COURT:  Debtor shall have no obligation to

6  indemnify C&S for any losses arising out of excluded liabilities

7  to the extent C&S takes any identifiable action which directly

8  causes the excluded liabilities to be a liability of C&S?

9          MR. LIEBELER:  Correct.  Now, the only inconsistency --

10         THE COURT:  What does that mean?  Does that mean that

11  the debtor agreed to indemnify C&S for everything else?

12         MR. LIEBELER:  Let me address your question in a

13  slightly backwards way and bear with me for a moment.  The only

14  inconsistency that's been alleged between the side letter and the

15  APA is that it goes to Section 12.4 of the APA.  So let me ask

16  you to turn to 12.4 because that's inconsistency that's been

17  alleged.  Okay.  That -- the only argument that anyone has made

18  on inconsistency between the side letter and the APA is that the

19  side letter is inconsistent with 12.4A.

20         THE COURT:  Which specifically says the debtor would

21  have no obligation to indemnify the buyer from damages resulting

22  from any activity post-closing.

23         MR. LIEBELER:  Correct.  And we --

24         THE COURT:  Engaged in by C&S for infringement.

25         MR. LIEBELER:  Correct.  And we contend, Your Honor,

Closing Argument/Sprayregen/Liebeler                182

1   that any activity in 12.4 is --

2           THE COURT:  Is not indemnified.

3           MR. LIEBELER:  -- is for all purposes equivalent to the

4   language in 13.3G which is a limitation on the side letter that

5   says that there's no obligation to indemnify to the extent that

6   C&S takes any identifiable action which causes the excluded

7   liabilities to be a liability of the purchaser.  We contend that

8   that language is consistent, 12.4 is entirely consistent with the

9   limitation in 3G.

10          THE COURT:  So that 311 is also subject to 12.4.

11          MR. LIEBELER:  311, Your Honor?

12          THE COURT:  Rule 311.  Exhibit 311.  The side letter.

13          MR. LIEBELER:  Oh, yeah.  I'm sorry, I thought you

14  meant an asset purchase -- you mean Exhibit 311?

15          THE COURT:  Yes.

16          MR. LIEBELER:  Yeah.  Because Exhibit 311 itself calls

17  out that you go back to 13.3G.  It says -- the language is dense,

18  Your Honor, in part because this is drafted by corporate lawyers

19  who don't litigate for a living and have to stand up in court and

20  interpret exhibit -- interpret asset purchase agreements on the

21  fly.

22          THE COURT:  Right, exactly.

23          MR. LIEBELER:  But the main concept here if you look

24  at, I think it's 12.4A and B, are -- and the way we've conceived

25  the asset purchase agreement from an operational perspective is

1  if C&S continues to do what was done up until the closing, then

2  it's going to be the debtor's fault and the indemnity would run

3  back to the debtor for that.

4          If on the other hand, after the closing, C&S did

5  something that was a, you know, deliberate and willful

6  infringement, if Mr. Dillon went back and broke into Mr. Berry's

7  house and stole a piece of software from him and raced back to

8  the server and put it on there and started using it, if that

9  would be an action that took place after closing, then that would

10  not be indemnifiable.  That's how we've conceived these

11  provisions to be together.  And it's my understanding that that's

12  how -- that's the whole point of the way the asset purchase

13  agreement was put together.  We don't think the side letter is in

14  anyway inconsistent with that.

15          THE COURT:  Well, the letter seems pretty broad and

16  doesn't seem to end with closing.  The indemnification for all

17  past, present and future use of the Berry technology would be

18  considered an excluded liability?

19          MR. LIEBELER:  And then that is -- again, that sends us

20  back to 13G which requires an identifiable action that says --

21  13G says that we do not have an indemnity if C&S takes an

22  identifiable action.

23          THE COURT:  Tell me what an identifiable action is.

24          MR. LIEBELER:  Some -- and action that we can identify,

25  such as, for example, Mr. Dillon breaking into Mr. Berry's house,

1 taking his software and putting it back on the server.  That

2 would absolutely --

3          THE COURT:  How about using the software that's on the

4 server?

5          MR. LIEBELER:  Don't know.  But, to the extent -- that

6 would also be any activities subsequent to the closing date.  And

7 so that provision would be consistent with 12.4.  So 13.3 is

8 consistent with 12.4 and the side letter expressly incorporates

9 13.3.  The only inconsistency --

10          THE COURT:  Wait a minute, this 13.3G only apply post-

11 closing?  Or pre-closing?  Which are you saying is pre-closing

12 and which is post-closing?

13          MR. LIEBELER:  I don't think there's a time limitation

14 in 13.3G.

15          THE COURT:  But there is in 12.4.  12.4 is nothing

16 post-closing.

17          MR. LIEBELER:  Fair point, Your Honor, but I don't

18 think there's been any allegation, at least for purposes of

19 today's argument, that there was any activity prior to the

20 closing that's in issue.

21          THE COURT:  So it's all post-closing, so it's all

22 covered by 12.4.  So there's no indemnity.

23          MR. LIEBELER:  I don't know whether there is an

24 indemnity or not.  I don't think we've reached that position.

25 That's an argument that would -- that may come up between C&S and

1  the debtor at some point in time.  But we're not right to discuss

2  that issue today.  There's no reason to adjudicate that issue.

3  It's not right.  Noone's argued that there is or isn't an

4  effective indemnity.

5          THE COURT:  Well -- sure there is.  Part of the non-

6  feasibility is that we have a gazillion dollar claim against C&S.

7  And the debtors indemnified them.  So even though my

8  administrative claim against the debtor may be limited to --

9  estimated to be $100,000 --

10          MR. LIEBELER:  The way I read --

11          THE COURT:  -- there's a post-petition claim

12          MR. LIEBELER:  Mr. Sprayregen tells me that he is

13  prepared to address that issue.  If I may yield to him, Your

14  Honor?

15          THE COURT:  You may.

16          MR. LIEBELER:  Thank you.

17          MR. SPRAYREGEN:  Your Honor, I was actually going to

18  truncate my feasibility discussion in view of your $100,000

19  ruling.  However, in view of this question, I'll go through what

20  I was going to go through.

21          But before I get there, I will say what you're hearing

22  with respect to that side letter, somebody may argue that it's

23  inconsistent.  The debtor's clear view is that it isn't.  It

24  could be that somebody argues someday that it is.  Again, if

25  we're going to good faith for a confirmation standard, there's no

Closing Argument/Sprayregen/Liebeler                186

1   evidence that the debtor, in responding to a suit against C&S

2   prior to the closing, in order to get the deal closed, doing

3   something that they thought was consistent with the asset

4   purchase agreement, even if they ended up doing something

5   inadvertently inconsistent and we have to deal with that someday,

6   means that this plan is not proposed in good faith or means that

7   it's proposed by some means forbidden by law.

8          We don't think any of that happened, but I just wanted

9   to point that out because the debtor believed it was complying

10  with the Court's order concerning the sale and concerning the

11  asset purchase agreement.

12         Now, I will say with respect to feasibility, Your

13  Honor, we cited in our confirmation brief the standards for

14  feasibility.  And I think it's important because we talk about

15  that the -- and we cited the cases, so I won't go through all the

16  names of them -- but it's a preponderance of the evidence

17  standard.  Clear and convincing evidence has been rejected as the

18  standard.  The standard is that there's a reasonable probability

19  of success.  Cases are legion where they make statements --

20         THE COURT:  I don't need the law.

21         MR. SPRAYREGEN:  Okay.

22         THE COURT:  Just tell -- deal with the facts as

23  alleged.

24         MR. SPRAYREGEN:  Okay.  Okay.  First of all, Your

25  Honor, the -- this claim where there's the --

Closing Argument/Sprayregen/Liebeler                187

1    THE COURT:  I think it's back there.

2        MR. SPRAYREGEN:  This one, Danny.  With respect to the

3   claim actually you just estimated at $100,000, the trial on that

4   one is set for September 20, '05.  And obviously that's a long

5   way out and I don't know what's going to happen with respect to

6   that.  But timing could be a significant issue.

7        With respect to what the Court stated about this C&S

8   indemnity, obviously, before we ever get there, you need a

9   judgment, it needs to apply and recall that Mr. Scott's testimony

10  was that the indemnity was actually funded by an indemnity escrow

11  of $10 million that's already sitting there.

12        The -- we're also presuming, if it ever happened and

13  the Court pointed out an argument that I was going to make, that

14  C&S is not objecting to feasibility.  And they potentially

15  someday may have a claim against the debtors, but I think it

16  speaks volumes that they're not here objecting to feasibility.

17  And that actually makes a lot of sense, even to the extent we

18  jump through those three hoops and they ultimately have an

19  indemnity claim, or believe they have an indemnity claim to

20  assert against the debtors, it presumes that that's somehow not

21  resolved either procedurally or substantively, that that creates

22  a problem for the debtor being able to pay it, that the C&S

23  doesn't agree to even if it's a large number, take the payment

24  over time.  There's all sorts of potential resolutions of that.

25        And I had Exhibit 189 put back on the board over here

Closing Argument/Sprayregen/Liebeler                188

1  because I think it's quite important.  This is one of the debtors

2  that's exiting with a capital structure and with the two trust

3  structures, as Mr. Stenger testified, with a very strong capital

4  structure to the debtor itself, Core-Mark, and these two trusts.

5  And I think again, the Stenger, Scott and Folse affidavits,

6  again, there's no dispute as to the estimates of the assets and

7  liabilities say for the Berry claim and say for, let's say this

8  C&S potential indemnity, for now --

9        THE COURT:  Well, except that the testimony was that

10 these were book value.  What does that have to do with market

11 value?

12       MR. SPRAYREGEN:  Your Honor, Mr. Stenger testified as

13 to the book value, the assets and liabilities.

14       THE COURT:  Yeah.

15       MR. SPRAYREGEN:  Well, there was further testimony,

16 let's go through it because I noted that.  Book value was a

17 common way of looking at a balance sheet of a company.  We have

18 to look at it in some way.  There is a valuation in the plan of

19 reorganization.  And in fact, we get to the valuation through the

20 assets and liabilities of about $150 million in equity value.

21 Again, that's --

22       THE COURT:  Where is that?

23       MR. SPRAYREGEN:  Well, that's partly the result of this

24 -- subtracting the liabilities from the assets.

25       THE COURT:  Yes, and he testified those were book

Closing Argument/Sprayregen/Liebeler                    189

1    values, not fair market values.

2            MR. SPRAYREGEN:  Okay.  In the plan -- excuse me, in

3    the disclosure statement itself, there's a black stone valuation

4    of --

5            THE COURT:  How does it --

6            MR. SPRAYREGEN:  I believe approximately --

7            THE COURT:  -- value Core-Mark?

8            MR. SPRAYREGEN:  -- 300 million.  I'll check that.

9            THE COURT:  300?

10           MR. SPRAYREGEN:  290 million, Your Honor.  And if

11   necessary, we can put on more of that.  That --

12           THE COURT:  And the liabilities are 320?

13           MR. SPRAYREGEN:  No, no, no.  This would be 290 net of

14   the liabilities.

15           THE COURT:  Where is it?

16           MR. SPRAYREGEN:  In the disclosure statement.

17           THE COURT:  Where?

18           MR. SPRAYREGEN:  Let me get the cite.  We're pulling

19   out the citation in the disclosure statement.  Just to clarify

20   while they're finding that, it actually is consistent with this

21   number in the sense that it's about 155 million of equity value.

22   But Mr. Huffer was correcting for me, it's 290 million of total

23   equity value.  Let me go through the other numbers while we get

24   the citation to the valuation because I think it's important.

25           Again, we cite that the reclamation trust is over-

1  funded by approximately 20 million.  And the affidavits say that

2  by the time it runs down, it will be over-funded by approximately

3  12 million.   The PCT is over-funded by approximately $30 million.

4          THE COURT:  Based on an estimate that you can reduce

5  the current administrative claims of now 500 million to 144

6  million.

7          MR. SPRAYREGEN:  That is correct, Your Honor.  And

8  that --

9          THE COURT:  Isn't that a big leap of faith?

10         MR. SPRAYREGEN:  Absolutely not, Your Honor.  And

11  again, that's why we went to the trouble of the extensive

12  affidavits we provided from Mr. Folse, Mr. Scott and Mr. Stenger.

13  And we went through in detail as to the categories of claims that

14  get us from the number of the asserted claims to the number of

15  the estimated claims.  It's not the least bit unusual, Your

16  Honor, and I know you've seen it in many cases to have claims in

17  cases that asserted wildly higher amounts than their estimate,

18  then their actual amounts they turn out to be.  And part of our

19  job, obviously, has been to determine in good faith some estimate

20  for that with some room to miss.

21         THE COURT:  But there is a difference.

22         MR. SPRAYREGEN:  Between --

23         THE COURT:  In the other cases, the estimates we're

24  talking about are general unsecured claims.  And I'm not being

25  called on to make a determination, which I am today required to

Closing Argument/Sprayregen/Liebeler                    191

1  make a determination that these estates can pay 100 percent of

2  the administrative claims, or the plan cannot be confirmed.

3          MR. SPRAYREGEN:  I guess I would beg to differ, Your

4  Honor.  In every case we need to demonstrate that we can satisfy

5  the confirmation standard concerning payment of administrative

6  expenses.  And in most --

7          THE COURT:  And I don't have cases where you're asking

8  me to make a leap of faith that administrative expenses are 144

9  million against 2.1 billion and filed.

10         MR. SPRAYREGEN:  Your Honor --

11         THE COURT:  Now, I accept that they've been reduced now

12 to approximately $500 million given the estimation I just made.

13 But --

14         THE COURT:  Well, Your Honor, I think that's quite

15 indicative of how far they've come down and what we think is

16 left.  But Your Honor, what we did in this case, actually, to be

17 even safer than in most cases, the reason you don't usually have

18 that is cause it's not all that common to have administrative

19 expenses bar date prior to confirmation hearing.  And so you

20 don't actually -- all you have is the debtor's estimate.  You

21 don't have the other side's assertion.

22         THE COURT:  No, I also have the debtor's statement that

23 they have paid administrative expenses as they come due during

24 the case.  And that the balance of the accounts payable is X

25 dollars.

1    MR. SPRAYREGEN:  That --

2    THE COURT:  And that it can be paid in the ordinary

3    course of business out of cash flow as we have in the last three

4    years.  This is a different case.

5    MR. SPRAYREGEN:  It's different in the sense that, and

6    let's be clear, we actually believe all of the claims that have

7    arisen in the ordinary course of business from the filing of the

8    case actually have been paid.  This is not some case where we

9    held payments on a whole bunch of ordinary course due

10    administrative expense claims because the estate didn't have the

11    money.  And now we're faced with on exit with a mountain.

12    That's not this case at all.  We've been paying all of

13    Core-Mark's ordinary course expenses.  In fact, we had -- again,

14    the best evidence of that was a couple of the objections where

15    Core-Mark's creditors whose administrative expenses hadn't been

16    paid.  We went and looked at those, found out there was some

17    snafu with a couple of them and got them paid.  But in the main,

18    the ongoing business is paying all of its administrative expenses

19    as they come due.

20    The target of administrative expenses that we have here

21    are really a function of the fact that we took a $17 billion

22    business, sold off a huge piece of it in the middle of the case

23    and are left with a business the third of its size and we have

24    that two-thirds out there that in essence some sort of

25    termination liability, lots of disputes about that.

1          THE COURT:  It is now the obligation of the remaining

2  third.

3          MR. SPRAYREGEN:  Correct.

4          THE COURT:  And I have to determine that it can pay all

5  of those expenses in full.

6          MR. SPRAYREGEN:  Absolutely.  And that's what I was

7  starting to walk through and I'm happy to go through it in any

8  level of detail the Court desires because we spent a lot of time

9  on this and we feel very comfortable that this plan is a feasible

10 plan and that we can cover all of those expenses in full.

11          Let me go through the numbers, then I'll come back to

12 the valuation because I think the valuation is important.  As I

13 noted, Your Honor, the -- we have what we regard as excess value

14 in both the RCT and the PCT equivalent to about $60 million.

15 Again, that's not for sure, but those are our projections.  We'll

16 see how they end up.

17          We also heard Mr. Stenger's testimony that, you know,

18 in the four years from '04 to '08, Core-Mark was going to produce

19 cash flow of about $107 million.  That's not cash that's called

20 on for these administrative expenses.  In fact, 43 million of it

21 is supposed to go to CAPEX and 64 million to pay down debt.  And

22 Mr. Stenger testified that it, if necessary, it didn't need to be

23 used for that, obviously, not every penny, but some percentage of

24 that could be available to satisfied a, he called it a miss on

25 administrative expense claims.

1    Mr. Stenger also testified that we have a $50 million
2  credit line.  Now, again, we're not going to use every penny of
3  that to fund administrative expenses, but that's another, what
4  I'll call a backup liquidity protector to the extent these
5  administrative claims end up being larger than we thing.  Again,
6  we don't think that's going to occur, but we're not saying we
7  just make it by $1.  We're saying we make it by a lot.

8    I also note, and this is where we get into the
9  valuation which is at page 101 of the disclosure state.  Mr.
10  Liebeler has the disclosure statement, I can hand it up.

11    THE COURT:  Why don't you hand it up.

12    MR. SPRAYREGEN:  Okay.  May I approach?

13    THE COURT:  Unless you can tell me what exhibit it is.

14              (Pause)

15    THE COURT:  Well, since I don't have witnesses and
16  really evidences it, who prepared the --

17    MR. SPRAYREGEN:  Your Honor, we have Mr. Huffard here
18  and we're happy to put him on.  The valuation wasn't actually
19  raised by any party, so we didn't put him on, but we had him here
20  just in case there was an issue concerning that and we're happy
21  to do it.

22    The other thing I was going to suggest, if it would be
23  helpful, part of the function of actually having agreed, and we
24  appreciate Mr. Hogan's agreement, but agreed on putting on -- or
25  putting in the affidavits was we actually didn't hear some of the

1  explanation of why we think it's imminently reasonable, the

2  estimates we came to.  We don't think we've been aggressive, we

3  think we've been very conservative.  And I could, if the Court

4  would permit, Anne Huber who was going to put on Mr. Folse, could

5  just walk you through in less than five minutes how the claims

6  get from that number to --

7          THE COURT:  I read the declaration.

8          MR. SPRAYREGEN:  Okay.

9          THE COURT:  But I think you do need to proffer some

10  testimony in support of an enterprise value of Core-Mark.  And I

11  don't know whether your witness would be prepared to say that all

12  of the analyses that are contained in pages 101 through 105, I

13  think, of the disclosure statement are true today.

14          MR. SPRAYREGEN:  If I could take one moment, I think we

15  can address that momentarily.

16                    (Pause)

17          MR. SPRAYREGEN:  Your Honor, the witness is prepared to

18  say that, but we have a very short direct from him and we can

19  just put it on.

20          THE COURT:  All right.

21          MR. SPRAYREGEN:  Thank you.

22          THE CLERK:  (Away from mike)

23          THE WITNESS:  My name is Paul Huffard.  My last name is

24  spelled H-U-F-F-A-R-D.

25          PAUL HUFFARD, DEBTOR'S WITNESS, SWORN

1          MR. BLEDSOE:  Steve Bledsoe for Kirkland & Ellis LLP,

2 Your Honor.

3 BY MR. BLEDSOE

4 Q    Mr. Huffard, I know you've testified before in this court,

5 but can you very briefly tell us your educational background?

6 A    Sure.  I have an undergraduate degree in economics from

7 Harvard College and I have a graduate degree in business from

8 North Western University.

9 Q    And what year did you graduate with your MBA from North

10 Western?

11 A    1992.

12 Q    Can you tell us your work history since that time?

13 A    Since that time, I have worked in --

14          THE COURT:  I don't think we need that.

15 Q    Mr. Huffard, what --

16          THE COURT:  Thank you.

17          MR. BLEDSOE:  Your Honor, if you want --

18          THE COURT:  We can incorporate his prior testimony on

19 his qualifications.

20 Q    Have you any experience determining the value of businesses?

21 A    Yes, I have.

22 Q    What experience have you had valuing businesses?

23 A    Valuing businesses is the mainstay of the work that I do day

24 in and day out at the Blackstone Group where we provide financial

25 advisory services to companies and creditor groups in situations

1 involving financial restructurings.

2 Q    Have you been certified as a valuation expert in other

3 bankruptcy cases?

4 A    Yes, I have.

5 Q    What cases are those?

6 A    In Levitz Furniture and Loeman's, Inc. (phonetic).

7 Q    Have you had the opportunity to analyze the reorganized

8 enterprise value of Core-Mark Newco?

9 A    Yes.  We were asked by the debtors to provide a valuation in

10 connection with this confirmation hearing and the disclosure

11 statement.  So we did do that.

12 Q    Just so we know exactly what you're talking about, what is

13 Core-Mark Newco comprised of?

14 A    Core-Mark Newco is comprised of the convenience store

15 distribution business of Fleming Companies.

16 Q    Now, I'm going to walk through your methodologies in a

17 moment, but, first I want to have a look at what the value you've

18 reached is.  Have you reached any conclusions about what the

19 reorganized enterprise value of Core-Mark Newco is?

20 A    Yes, we have.

21 Q    Okay.  What is the enterprise value of Core-Mark Newco?

22 A    We have established a range of values from 265 million to

23 315 million with a mid-point value of 290 million as -- all of

24 those numbers are for enterprise value.

25 Q    Okay.  What valuation methodologies did you use to arrive at

Huffard - Direct/Bledsoe                              198

1  that range?

2  A    We used a number of commonly accepted valuation

3  methodologies including comparable transaction multiples

4  methodology as well as a discounted cash flow approach.

5  Q    Okay.  On the comparable multiples, is that where you've

6  referred to in your affidavit as the precedent transaction

7  analysis?

8  A    That is correct.

9  Q    You mentioned that those were commonly accepted

10 methodologies.  Are there any other valuation methodologies which

11 you considered, but did not use?

12 A    Another valuation approach which is commonly used is a

13 public company trading multiples approach.  We did consider that

14 and determined that it was not applicable to this situation.

15 Q    Now, why did you determine that that third valuation

16 methodology was not applicable in this matter?

17 A    In order to apply that method, you need to be able to

18 identify a universe of publicly traded companies that are in

19 comparable lines of business.  In the instance of Core-Mark

20 Newco, there are no publically traded convenience store

21 distribution businesses.  The other closest companies, whether

22 they be just wholesale distribution businesses or other sorts of

23 distribution businesses, our view was not sufficiently comparable

24 to provide meaningful data.

25 Q    Okay.  Now, I want to go back and talk about the two

1   methodologies that you did use.  First, let's talk about the

2   precedent transaction analysis.  Can you explain how that works

3   generally?

4   A    Yes.  In that approach, you identify a number of acquisition

5   transactions that are of businesses in similar lines of business.

6   You examine the value that was paid for those businesses and

7   compare that to various financial measures.  Typically, you would

8   compare that to either revenue or EBITDA or some other measure of

9   profitability.

10  Q    Okay.  Can you tell us how you applied the precedent

11  transaction analysis to your valuation of Core-Mark Newco in this

12  matter?

13  A    Yes.  We developed a list of comparable transactions.  These

14  were acquisitions of other convenience store distribution

15  businesses.  We examined the ratios that I've described for those

16  different transactions.  We've evaluated which of those

17  transactions were most similar and relevant to Core-Mark Newco

18  and based on examining those, we came up with a range of

19  valuation multiples based both on revenue as well as EBITDA that

20  we thought were appropriate in this case.

21  Q    Now, what is a valuation multiple?

22  A    It is, as I mentioned earlier, comparing the transaction

23  value, which would be the numerator, to a specific financial

24  performance measure, whether it be EBITDA or revenue, that would

25  be the denominator.  And the ratio of that numerator and

Huffard - Direct/Bledsoe                                    200

1  denominator is the so-called multiple.

2  Q    What financial data from Core-Mark Newco did you use in your

3  analysis?

4  A    We used a combination of both historical actual financial

5  data as well as projected financial data, the projections that

6  were prepared by Core-Mark management with the assistance of the

7  Alex Partners team.

8  Q    And what basis do you have to believe that those numbers are

9  valid and provide a valid basis for your analysis?

10  A    Well, we have reviewed those numbers in detail ourselves.

11  And I think it's fair to say that Core-Mark's actual performance,

12  as you look back over the recent past, has been entirely

13  consistent, slightly above the projected performance in those

14  periods.  So that gives us a degree of confidence that the

15  projections are reasonable.

16  Q    Okay.  I want to talk now about the second methodology, the

17  discounted cash flow analysis.  How does that work?

18  A    That approach examines Core-Mark's -- a company's, let me

19  talk about it more generally, a company's projected cash flows

20  over a projection period, typically a four or five-year period is

21  used.  And a -- what's called a weighted average cost of capital

22  or a discount rate is used to discount those projected cash flows

23  back into the present.  We also look at the estimated value of

24  the company at the end of that forecast period which is called

25  the terminal value and you similarly discount that terminal value

Huffard - Direct/Bledsoe                                    201

1  back to the present.  The sum of the interim cash flow's the
2  present value of the interim cash flows along with the present
3  value of the terminal value is the total enterprise value of the
4  business.
5  Q   Now, you've talked about how the methodology works
6  generally, at least the discounted cash flow methodology.  Can
7  you describe how you applied that methodology to Core-Mark Newco
8  in this matter?
9  A   Sure.  We also used in this approach the projections that
10 management and Alex Partners had prepared.  We calculated the
11 series of cash flows on an annual basis for the periods from the
12 remainder of 2004 and then from 2005 through 2008.  We discounted
13 those back to the present at a discount rate.  We calculated a
14 weighted average cost of capital in a range of 15 to 20 percent.
15 And we used that to discount the cash flows back to the present.
16 We also then calculated as I mentioned earlier a terminal value
17 based on using the 2008 EBITDA and we used the EBITDA multiple
18 approach to establish the terminal value in 2008.
19 Q   Was the value you arrived at, your discounted cash analysis,
20 consistent with the value you arrived at in your precedent
21 transaction analysis?
22 A   They were generally consistent.  It's rare that you get two
23 valuation methodologies give you the exact same numbers, but they
24 were generally consistent and they were as consistent as you
25 would normally expect these two approaches to be.

202

1  Q    I just want to wrap up.  You testified that according to

2  your valuation, the low range was 265, the high range was 315 and

3  the mid-range was $290 million, is that correct?

4  A    That is correct.

5  Q    Do you consider your -- that valuation to be aggressive?

6  A    No, I do not.

7           MR. BLEDSOE:  Nothing further, Your Honor.

8           THE CLERK:  Excuse me, Your Honor, could counsel

9  restate his name for the record?

10           MR. BLEDSOE:  Steven Bledsoe of Kirkland Ellis LLP.

11  Q    And is your valuation consistent with what the company is

12  worth today, or at the end of what we expect to be the

13  confirmation in August?

14  A    The valuation date was as of July 31st of 2004.

15  Q    Thank you.

16           MR. BLEDSOE:  Nothing further, Your Honor.

17           THE COURT:  All right.  Anybody wish to cross-examine

18  the witness?  All right.  Thank you.  Thank you.  You may step

19  down.

20              (Witness excused)

21           MR. SPRAYREGEN:  Your Honor, I -- we do think,

22  reflecting on the Court's questions, that it may be useful to

23  take five or ten minutes to just put Mr. Folse on to elaborate a

24  little bit on his affidavit if the Court believes it's necessary.

25           THE COURT:  Well, does he have anything to add to the

Folse - Direct/Huber                    203

1  affidavit?

2          MR. SPRAYREGEN:  I don't think it's additive.  It's

3  more explanatory of the affidavit.  So --

4          THE COURT:  I'll hear five minutes of him.

5          MR. SPRAYREGEN:  Okay.  Thank you.

6          THE CLERK:  Please remain standing.

7          THE CLERK:  Place your hand on the Bible.  Please state

8  your full name and spell your last name for the Court.

9          THE WITNESS:  Barry J. Folse, F-O-L-S-E.

10          BARRY J. FOLSE, DEBTOR'S WITNESS, SWORN

11      MS. HUBER:  Good afternoon, Your Honor.  Anne Huber

12  appearing on behalf of the debtors.  I have been involved in the

13  claims processing and that's why counsel has asked me to address

14  this particular question.  I'm going to be addressing Exhibits 8

15  and 9 which have previously been admitted, if I could just hand

16  up larger copies for Your Honor and the witness.

17          THE COURT:  All right.

18                  DIRECT EXAMINATION

19  BY MS. HUBER:

20  Q   Mr. Folse, could you please state your name for the record?

21  A   Barry J. Folse.

22  Q   And what is your role in these cases?

23  A   I have headed up the claims resolution team at Fleming.

24  Q   And you are an employee of AP Services which is an affiliate

25  of Alex Partners, is that correct?

J&J COURT TRANSCRIBERS, INC.