-40-

<PAGE>
LC Disbursement as provided in Section 2.06(e), by remittance to the applicable Issuing Lender) by 3:00 p.m., New York City time, on the requested date of such Swingline Loan.

        (c)    The Swingline Lender may by written notice given to the Administrative Agent not later than 1:00 p.m., New York City time, on any Business Day require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Revolving Lender, specifying in such notice such Revolving Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Revolving Lender's Applicable Percentage of such Swingline Loan or Loans and the interest accrued and not yet paid thereon. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.07 with respect to Loans made by such Lender (and Section 2.07 shall apply, MUTATIS MUTANDIS, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower of any default in the payment thereof. Notwithstanding anything to the contrary contained in this Section 2.04, the Swingline Lender shall not be obligated to make any Swingline Loans at a time when a Lender Default exists with respect to a Revolving Lender unless the Swingline Lender has entered into arrangements satisfactory to it and the Borrower to eliminate the Swingline Lender's risk with respect to the Defaulting Lender's or Lenders' participation in such Swingline Loans, including by cash collateralizing such Defaulting Lender's or Lenders' Swingline Exposure. In addition, the Swingline Lender shall not make any Swingline Loan after it has received written notice from the Borrower, any other Loan Party, the Administrative Agent or the Required Lenders stating that a Default exists and is continuing, until such time as (A) the Swingline Lender shall have received written notice (i) of rescission of all such notices from the party or parties originally delivering such notice or notices, or (ii) of the waiver of such Default by the Required Lenders or (B) the Administrative Agent in good faith believes that such Default has ceased to exist.

-41-

<PAGE>

SECTION 2.05. INCREMENTAL TERM LOAN COMMITMENTS. (a) The Borrower shall have the right, with the approval of the Administrative Agent, to request at any time and from time to time after the Effective Date and prior to the Incremental Term Loan Commitment Termination Date that one or more Lenders (and/or one or more other Persons which will become Lenders as provided below) provide Incremental Term Loan Commitments of a given Class of Incremental Term Loans as designated in the respective Incremental Term Loan Commitment Agreement and, subject to the terms and conditions contained in this Agreement and in the respective Incremental Term Loan Commitment Agreement, make Incremental Term Loans pursuant thereto, so long as (i) no Default then exists or would exist after giving effect thereto and all of the representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects at such time (unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), (ii) the Borrower and its Subsidiaries will be in compliance with Sections 6.09 and 6.10 on a Post-Test Period Pro Forma Basis after giving effect to each incurrence of Incremental Term Loans and the application of the proceeds therefrom, and (iii) at the time of each incurrence of Incremental Term Loans, the Borrower shall have delivered to the Administrative Agent a certificate of a Financial Officer certifying (with supporting calculations in reasonable detail) as to the matters set forth in preceding clauses (i) and (ii) and in Section 3.18, and, in each case, demonstrating in reasonable detail that the full amount of such Incremental Term Loans may be incurred in accordance with each Existing Note Indenture and the New Senior Note Indenture on the basis contemplated in Section 3.18, and will not violate the provisions of any such Existing Note Indenture or the New Senior Note Indenture.

Furthermore, it is understood and agreed that (i) no Lender shall be obligated to provide an Incremental Term Loan Commitment, and until such time, if any, as a particular Lender has agreed in its sole discretion to provide an Incremental Term Loan Commitment and executed and delivered to the Borrower and the Administrative Agent an Incremental Term Loan Commitment Agreement as provided in clause (b) of this Section 2.05, such Lender shall not be obligated to fund any Incremental Term Loans, (ii) any Lender (or, in the circumstances contemplated by clause (xi) below, any other Person which will qualify as an Eligible Transferee) may so provide an Incremental Term Loan Commitment without the consent of any other Lender (although the consent of the Administrative Agent shall be required as provided above), (iii) the amount of each Class of Incremental Term Loan Commitments shall be in a minimum aggregate amount for all Lenders which provide an Incremental Term Loan Commitment under such Class of Incremental Term Loans (including, in the circumstances contemplated by clause (xi) below, Eligible Transferees who will become Lenders) of at least $50,000,000, (iv) the aggregate amount of all Incremental Term Loan Commitments permitted to be provided pursuant to this Section 2.05 and the aggregate principal amount of all Incremental Term Loans permitted to be made pursuant to this Section 2.05 shall not exceed $250,000,000, (v) the up-front fees and, if applicable, any unutilized commitment fees and/or other fees, payable in respect of each Incremental Term Loan Commitment shall be separately agreed to by the Borrower and each Incremental Term Loan Lender (and with all such fees to be disclosed by the Borrower to the Administrative Agent), (vi) the Applicable Rates, the Incremental Term Loan Maturity Date and the Incremental Term Loan Scheduled Repayments in respect of each Class of Incremental Term Loans shall be reasonably satisfactory to the Administrative Agent and shall be as set forth in the respective Incremental Term Loan Commitment Agreement (provided that each Class of Incremental Term Loans shall have (I) an Incremental Term

-42-

<PAGE>

Loan Maturity Date of no earlier than the B Term Loan Maturity Date and (II) a Weighted Average Life to Maturity of no less than the Weighted Average Life to Maturity as then in effect for the B Term Loans), (vii) the proceeds of all Incremental Term Loans shall be used only for the purposes permitted by Section 5.07, (viii) each Incremental Term Loan Commitment Agreement shall specifically designate, with the approval of the Administrative Agent, the Class of the Incremental Term Loan Commitments being provided thereunder (which Class shall be a new Class (i.e., not the same as any existing Class of Incremental Term Loans, Incremental Term Loan Commitments or other Term Loans) unless the requirements of paragraph (c) of this Section are satisfied); (ix) all Incremental Term Loans (and all interest, fees and other amounts payable thereon) shall be Obligations and shall be secured by the Collateral, and guaranteed under the Guarantee Agreement, on a pari passu basis with all other Loans; (x) each Lender (or, in the circumstances contemplated by clause (xi) below, any other Person which will qualify as an Eligible Transferee) agreeing to provide an Incremental Term Loan Commitment pursuant to an Incremental Term Loan Commitment Agreement shall, subject to the satisfaction of the relevant conditions set forth in this Agreement, make Incremental Term Loans under the Class specified in such Incremental Term Loan Commitment Agreement as provided in Section 2.01(b) and such Loans shall thereafter be deemed to be Incremental Term Loans under such Class for all purposes of this Agreement and other Loan Documents, and (xi) if, within 5 Business Days after the Borrower has requested the then existing Lenders (other than those Lenders that are not then honoring their funding obligations hereunder) to provide Incremental Term Loan Commitments pursuant to this Section 2.05 the Borrower has not received Incremental Term Loan Commitments in an aggregate amount equal to that amount of Incremental Term Loan Commitments which the Borrower desires to obtain pursuant to such request (as set forth in the notice provided by the Borrower as provided below), then the Borrower may, with the approval of the Administrative Agent, request Incremental Term Loan Commitments from Persons which are Eligible Transferees in an aggregate amount equal to such deficiency (and with the fees to be paid to such Eligible Transferees to be no greater than those fees to be paid to (or which were offered to) the then existing Lenders providing (or which were requested to provide) Incremental Term Loan Commitments), and otherwise hereunder.

          (b)     At the time of the provision of Incremental Term Loan Commitments pursuant to this Section 2.05, the Borrower, each other Loan Party, the Administrative Agent and each Lender or Eligible Transferee which agrees to provide an Incremental Term Loan Commitment (each, an "Incremental Term Loan Lender") shall execute and deliver to the Borrower and the Administrative Agent an Incremental Term Loan Commitment Agreement, appropriately completed (with the effectiveness of the Incremental Term Loan Commitment(s) provided therein to occur on the date set forth in such Incremental Term Loan Commitment Agreement upon the payment of any fees (including, without limitation, any fees payable pursuant to clause (II) of the immediately succeeding sentence) required in connection therewith, the satisfaction of the conditions set forth in this Section 2.05 and the satisfaction of any other conditions precedent that may be set forth in such Incremental Term Loan Commitment Agreement). In addition, (x) on or prior to the effective date of the respective Incremental Term Loan Commitment Agreement, (I) the Borrower and its Subsidiaries shall have delivered such technical amendments, modifications and/or supplements to the Security Documents as are reasonably requested by the Administrative Agent to ensure that the additional Obligations to be incurred pursuant to the Incremental Term Loan Commitments are secured by, and entitled to the benefits of, the Security Documents, and each of the Lenders hereby agrees to, and authorizes the

-43-

<PAGE>
Collateral Agent to enter into, any such technical amendments, modifications
and/or supplements, (II) unless waived by the Administrative Agent, the
Administrative Agent shall have received from the respective Incremental Term
Loan Lender (or the Borrower, if so agreed between the Borrower and Incremental
Term Loan Lender) the payment of a non-refundable fee of $3,500 for each
Eligible Transferee which becomes a Lender pursuant to this Section 2.05, (III)
the Administrative Agent shall have received from the president, any vice
president or a Financial Officer of the Borrower a certificate stating that the
conditions set forth in clauses (i) and (ii) of the first sentence of Section
2.05(a) have been satisfied, (IV) the Borrower shall have delivered to the
Administrative Agent an opinion or opinions, in form and substance reasonably
satisfactory to the Administrative Agent, from counsel to the Loan Parties
reasonably satisfactory to the Administrative Agent and dated such effective
date, covering such of the matters set forth in the opinions of counsel
delivered to the Administrative Agent on the Effective Date pursuant to Section
4.01(b) as may be reasonably requested by the Administrative Agent, and such
other matters as the Administrative Agent may reasonably request, (V) the
Borrower and the other Loan Parties shall have delivered to the Administrative
Agent such other officers' certificates, resolutions and evidence of good
standing as the Administrative Agent shall reasonably request, and (VI) to the
extent requested by such Incremental Term Loan Lenders, notes will be issued, at
the Borrower's expense, to such Incremental Term Loan Lenders, to the extent
needed to reflect the Incremental Term Loan Commitments and outstanding
Incremental Term Loans made by such Incremental Term Loan Lenders, and (y) on or
prior to each Incremental Term Loan Borrowing Date, the applicable conditions
precedent set forth in Article IV shall have been satisfied. The Administrative
Agent shall promptly notify each Lender as to the effectiveness of each
Incremental Term Loan Commitment Agreement and, at such time, Schedule I shall
be deemed modified to reflect the Incremental Term Loan Commitments of such
Incremental Term Loan Lenders.

        (c)    Notwithstanding anything to the contrary contained above in
this Section 2.05, the Incremental Term Loan Commitments provided by an
Incremental Term Loan Lender or Incremental Term Loan Lenders, as the case may
be, pursuant to each Incremental Term Loan Commitment Agreement shall constitute
a new Class of Term Loans, which shall be separate and distinct from the
existing Classes of Term Loans under this Agreement (with a designation which
may be made in letters (i.e., A, B, C, etc.), numbers (1, 2, 3, etc.) or a
combination thereof (i.e., A-1, A-2, B-1, B-2, C-1, C-2, etc.), provided that,
with the consent of the Administrative Agent, the parties to a given Incremental
Term Loan Commitment Agreement may specify therein that the respective
Incremental Term Loans made pursuant thereto shall constitute part of, and be
added to, an existing Class of Incremental Term Loans or to the outstanding
Class of B Term Loans, in either case so long as the following requirements are
satisfied:

        (i)    the Incremental Term Loans to be made pursuant to such
Incremental Term Loan Commitment Agreement shall have the same Maturity
Date as the Class of Term Loans to which the new Incremental Term Loans
are being added, and shall have the same Applicable Rates applicable to
such Class;

        (ii)    the new Incremental Term Loans shall have the same Term Loan
Scheduled Repayment dates as then remain with respect to the Class to
which such new Incremental Term Loans are being added (with the amount of
each Term Loan Scheduled Repayment applicable to such new Incremental Term
Loans to be the same (on a

-44-

<PAGE>

proportionate basis) as is theretofore applicable to the Class to which
such new Incremental Term Loans are being added), thereby increasing the
amount of each then remaining Term Loan Scheduled Repayment of the
respective Class proportionately; and

(iii) on the date of the making of such new Incremental Term Loans,
and notwithstanding anything to the contrary set forth in Section 2.08,
such new Incremental Term Loans shall be added to (and form part of) each
Borrowing of outstanding Term Loans of the respective Class on a pro rata
basis (based on the relative sizes of the various outstanding Borrowings),
so that each Lender will participate proportionately in each then
outstanding Borrowing of Term Loans of the respective Class, and so that
the existing Lenders with respect to such Class continue to have the same
participation (by amount) in each Borrowing as they had before the making
of the new Term Loans of such Class.

To the extent the provisions of preceding clause (iii) require that
Lenders making new Incremental Term Loans add same to then outstanding
Borrowings of Eurodollar Loans, it is acknowledged that the effect thereof may
result in such new Incremental Term Loans having short Interest Periods (i.e.,
an Interest Period that began during an Interest Period then applicable to
outstanding Borrowings of Eurodollar Loans to which such new Incremental Term
Loans are being added, and which will end on the last day of such then
applicable Interest Period). In connection therewith, the Borrower may agree, in
the respective Incremental Term Loan Commitment Agreement, to compensate the
Lenders making the new Incremental Term Loans of the respective Class for
funding Eurodollar Loans during an existing Interest Period on such basis as may
be agreed by the Borrower and the respective Lender or Lenders.

SECTION 2.06. LETTERS OF CREDIT. (a) GENERAL. Subject to the terms
and conditions set forth herein, the Borrower may request the issuance of
Letters of Credit for its own account and for the benefit of any holder (or any
trustee, agent or other similar representative for any such holders) of LC
Supportable Obligations and sellers of goods to the Borrower and its
Subsidiaries, in a form reasonably acceptable to the Administrative Agent and
the applicable Issuing Lenders, at any time and from time to time from and after
the Effective Date until 30 days prior to the Revolving Maturity Date. All
Letters of Credit shall be denominated in Dollars or an Alternate Currency and
shall be issued on a sight basis only. It is acknowledged and agreed that (i)
each of the letters of credit which were issued under the Existing Credit
Agreements prior to the Effective Date and, in each case which remain
outstanding on the Effective Date and are set forth on Schedule 2.06(a) (each
such letter of credit, a "Rolled-In Letter of Credit" and, collectively, the
"Rolled-In Letters of Credit") shall, from and after the Effective Date,
constitute a Letter of Credit issued for the account of the Borrower (regardless
of whether any such letter of credit was in fact originally issued for the
account of a Subsidiary of the Borrower) for all purposes of this Agreement and
shall, for purposes of paragraph (d) of this Section and Section 2.13(b), be
deemed issued on the Effective Date. The stated amount of each Rolled-In Letter
of Credit and the expiry date therefor is set forth on Schedule 2.06(a).

(b)    NOTICE OF ISSUANCE, AMENDMENT, RENEWAL, EXTENSION; CERTAIN
CONDITIONS. Whenever the Borrower requires the issuance of a Letter of Credit
(or the amendment, renewal or extension of an outstanding Letter of Credit), it
shall give the

-45-

<PAGE>
Administrative Agent (i) written notice in the form of Exhibit G (a "Letter of Credit Request") and (ii) to the extent requested by the respective Issuing Lender, an application for such Letter of Credit (it being understood that in the case of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreements submitted by the Borrower to, or entered into by the Borrower with, the respective Issuing Lender relating to any Letter of Credit, the terms and conditions of this Agreement shall control). Such Letter of Credit Request may be delivered by facsimile (or transmitted by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Lender). Upon receipt by the Administrative Agent of a written Letter of Credit Request pursuant to this paragraph (b) requesting the issuance of a Letter of Credit, in the event the Administrative Agent elects to issue such Letter of Credit, the Administrative Agent shall promptly so notify the Borrower thereof, and the Administrative Agent shall be the Issuing Lender with respect thereto. In the event that the Administrative Agent elects not to issue such Letter of Credit, the Administrative Agent shall promptly so notify the Borrower, whereupon the Borrower may request any other Issuing Lender to issue such Letter of Credit on the terms and conditions provided in this Section 2.06 by delivering to such Issuing Lender a copy of the applicable written Notice of Letter of Credit Request. Except with respect to trade letters of credit, in the event that all other Issuing Lenders shall have declined to issue such Letter of Credit, notwithstanding the prior election of Administrative Agent not to issue such Letter of Credit, the Administrative Agent shall, subject to compliance with the provisions of this Section 2.06, be obligated to issue such Letter of Credit and shall be the Issuing Lender with respect thereto; PROVIDED that in the circumstances described above with respect to trade Letters of Credit JPMorgan Chase agrees to be the Issuing Lender with respect thereto, subject to compliance with the provisions of Section 2.06. Any Letter of Credit Request requesting the amendment, renewal or extension of an outstanding Letter of Credit shall identify the Letter of Credit to be amended, renewed or extended and such other information as shall be necessary to amend, renew or extend the respective Letter of Credit. All Letter of Credit Requests must be delivered to the Administrative Agent and the applicable Issuing Lender at least five Business Days in advance (or such shorter period as may be acceptable to the respective Issuing Lender) of the requested date the Letter of Credit is to be issued, amended, renewed or extended. The transmittal by the Borrower of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower that (A) each of the conditions precedent as set forth in Section 4.02 have been satisfied and (B) after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed $225,000,000 and (ii) the total Revolving Exposures shall not exceed the total Revolving Commitments. The applicable Issuing Lender (if other than the Administrative Agent) shall not issue, amend, renew or extend any Letter of Credit unless it has obtained written approval to do so from the Administrative Agent. Upon the issuance of or amendment to any standby Letter of Credit, the applicable Issuing Lender shall notify the Borrower and the Administrative Agent, in writing of such issuance or amendment and the notice shall be accompanied by a copy of the issuance or amendment. Upon receipt of such notice, the Administrative Agent shall promptly notify the Lenders, in writing, of such issuance or amendment and if requested to do so by any Lender the Administrative Agent shall furnish such Lender with copies of such issuance or amendment. In the case of trade Letters of Credit, the applicable Issuing Lender shall provide the Administrative Agent, by facsimile on the first Business Day of each week, with a report detailing the daily aggregate outstanding trade Letters of Credit issued by such Issuing Lender for the previous calendar week.

-46-

<PAGE>

(c)    EXPIRATION DATE. Each Letter of Credit shall expire at or
prior to the close of business on the earlier of (i) in the case of standby
Letters of Credit (x) the date one year after the date of the issuance of such
Letter of Credit (or, in the case of any renewal or extension thereof, one year
after such renewal or extension); PROVIDED that certain Rolled-in Letters of
Credit may have expiry dates beyond the one year anniversary of the issuance
thereof as set forth in Schedule 2.06(a) and (y) the date that is 10 Business
Days prior to the Revolving Maturity Date and (ii) in the case of trade Letters
of Credit (x) the date 180 days after the date of the issuance of such Letter of
Credit and (y) the date that is 30 Business Days prior to the Revolving Maturity
Date.

(d)    PARTICIPATIONS. By the issuance of a Letter of Credit (or an
amendment to a Letter of Credit increasing the amount thereof) and without any
further action on the part of the applicable Issuing Lender, the applicable
Issuing Lender hereby grants to each Revolving Lender, and each Revolving Lender
hereby acquires from the applicable Issuing Lender, a participation in such
Letter of Credit equal to such Lender's Applicable Percentage from time to time
of the aggregate amount (taking the Dollar Equivalent thereof in the case of a
Letter of Credit denominated in an Alternate Currency) available to be drawn
under such Letter of Credit. In consideration and in furtherance of the
foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to
pay to the Administrative Agent, for the account of the applicable Issuing
Lender, such Lender's Applicable Percentage of each LC Disbursement (taking the
Dollar Equivalent thereof in the case of a Letter of Credit denominated in an
Alternate Currency) made by the applicable Issuing Lender and not reimbursed by
the Borrower on the date due as provided in paragraph (e) of this Section, or of
any reimbursement payment required to be refunded to the Borrower for any
reason. Each Lender acknowledges and agrees that its obligation to acquire
participations pursuant to this paragraph in respect of Letters of Credit is
absolute and unconditional and shall not be affected by any circumstance
whatsoever, including any amendment, renewal or extension of any Letter of
Credit or the occurrence and continuance of a Default or reduction or
termination of the Commitments, and that each such payment shall be made without
any offset, abatement, withholding or reduction whatsoever.

(e)    REIMBURSEMENT. If the applicable Issuing Lender shall make any
LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse
such LC Disbursement by paying to the Administrative Agent an amount equal to
such LC Disbursement (or the Dollar Equivalent thereof in the case of any LC
Disbursement with respect to a Letter of Credit denominated in an Alternate
Currency) not later than 12:00 noon, New York City time, on the date that such
LC Disbursement is made, if the Borrower shall have received notice of such LC
Disbursement provided in paragraph (g) of this Section prior to 10:00 a.m., New
York City time, on such date, or, if such notice has not been received by the
Borrower prior to such time on such date, then not later than 12:00 noon, New
York City time, on the Business Day immediately following the day that the
Borrower receives such notice; PROVIDED that the Borrower may, subject to the
conditions to borrowing set forth herein, request in accordance with Section
2.03 or 2.04 that such payment be financed with an ABR Revolving Borrowing or
Swingline Loan in an amount equal to such LC Disbursement (or the Dollar
Equivalent thereof in the case of any LC Disbursement with respect to a Letter
of Credit denominated in an Alternate Currency) and, to the extent so financed,
the Borrower's obligation to make such payment shall be discharged and replaced
by the resulting ABR Revolving Borrowing or Swingline Loan. If the Borrower
fails to make such payment when due, the Administrative Agent shall notify each
Revolving

-47-

<PAGE>
Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.07 with respect to Loans made by such Lender (and Section 2.07 shall apply, MUTATIS MUTANDIS, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Lender the amounts so received by it from the Revolving Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Lender or, to the extent that Revolving Lenders have made payments pursuant to this paragraph to reimburse such Issuing Lender, then to such Revolving Lenders and such Issuing Lender as their interests may appear. Any payment made by a Revolving Lender pursuant to this paragraph to reimburse the applicable Issuing Lender for any LC Disbursement (other than the funding of ABR Revolving Loans or a Swingline Loan as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

    (f)    OBLIGATIONS ABSOLUTE. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by any Issuing Lender under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. None of the Agents, the Lenders or the Issuing Lenders, or any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Lenders; PROVIDED that the foregoing shall not be construed to excuse any Issuing Lender from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Lender's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the respective Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision), such Issuing Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance

-48-

<PAGE>

with the terms of a Letter of Credit, the applicable Issuing Lender may, in its
sole discretion, either accept and make payment upon such documents without
responsibility for further investigation, regardless of any notice or
information to the contrary, or refuse to accept and make payment upon such
documents if such documents are not in strict compliance with the terms of such
Letter of Credit.

        (g)    DISBURSEMENT PROCEDURES. The applicable Issuing Lender shall,
promptly following its receipt thereof, examine all documents purporting to
represent a demand for payment under a Letter of Credit. The applicable Issuing
Lender shall promptly notify the Administrative Agent and the Borrower by
telephone (confirmed by telecopy) of such demand for payment and whether such
Issuing Lender has made or will make an LC Disbursement thereunder; PROVIDED
that any failure to give or delay in giving such notice shall not relieve the
Borrower of its obligation to reimburse such Issuing Lender and the Revolving
Lenders with respect to any such LC Disbursement.

        (h)    INTERIM INTEREST. If any Issuing Lender shall make any LC
Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in
full on the date such LC Disbursement is made, the unpaid amount thereof (or the
Dollar Equivalent of such unpaid amount in the case of an LC Disbursement in
respect of any Letter of Credit denominated in an Alternate Currency) shall bear
interest, for each day from and including the date such LC Disbursement is made
to but excluding the date that the Borrower reimburses such LC Disbursement, at
the rate per annum then applicable to ABR Revolving Loans; PROVIDED that, if the
Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph
(e) of this Section, then Section 2.14(c) shall apply. Interest accrued pursuant
to this paragraph shall be for the account of the applicable Issuing Lender,
except that interest accrued on and after the date of payment by any Revolving
Lender pursuant to paragraph (e) of this Section to reimburse the applicable
Issuing Lender shall be for the account of such Revolving Lender to the extent
of such payment.

        (i)    REPLACEMENT OF AN ISSUING LENDER. An Issuing Lender may be
replaced at any time by written agreement among the Borrower, the Administrative
Agent, the replaced Issuing Lender and the successor Issuing Lender. The
Administrative Agent shall notify the Lenders of any such replacement of an
Issuing Lender. At the time any such replacement shall become effective, the
Borrower shall pay all unpaid fees accrued for the account of the replaced
Issuing Lender pursuant to Section 2.13(b). From and after the effective date of
any such replacement, (i) the successor Issuing Lender shall have all the rights
and obligations of the replaced Issuing Lender under this Agreement with respect
to Letters of Credit to be issued thereafter and (ii) references herein to the
term "Issuing Lender" shall be deemed to include such successor or any previous
Issuing Lender, or such successor and all previous Issuing Lenders, as the
context shall require. After the replacement of an Issuing Lender hereunder, the
replaced Issuing Lender shall remain a party hereto and shall continue to have
all the rights and obligations of an Issuing Lender under this Agreement with
respect to Letters of Credit issued by it prior to such replacement, but shall
not be required to issue additional Letters of Credit.

        (j)    CASH COLLATERALIZATION. If any Event of Default shall occur
and be continuing, on the Business Day that the Borrower receives notice from
the Administrative

-49-

<PAGE>

Agent or the Required Lenders (or, if the maturity of the Loans has been
accelerated, Revolving Lenders with LC Exposures representing greater than 50%
of the total LC Exposure) demanding the deposit of cash collateral pursuant to
this paragraph, the Borrower shall deposit in an account with the Administrative
Agent, in the name of the Administrative Agent and for the benefit of the
Lenders, an amount in Dollars in cash up to 100% of the LC Exposure (as
requested by the Administrative Agent or relevant Lenders, as the case may be)
as of such date plus any accrued and unpaid interest thereon; PROVIDED that the
obligation to deposit such cash collateral (in an amount equal to 100% of the LC
Exposure as of such date and any accrued and unpaid interest thereon) shall
become effective immediately, and such deposit shall become immediately due and
payable, without demand or other notice of any kind, upon the occurrence of any
Event of Default with respect to the Borrower described in clause (g) or (h) of
Article VII. Each such deposit shall be held by the Administrative Agent as
collateral for the payment and performance of the obligations of the Borrower
under this Agreement. The Administrative Agent shall have exclusive dominion and
control, including the exclusive right of withdrawal, over such account. Other
than any interest earned on the investment of such deposits, which investments
shall be made at the discretion of the Administrative Agent and at the
Borrower's risk and expense, such deposits shall not bear interest. Interest or
profits, if any, on such investments shall accumulate in such account. Moneys in
such account shall be applied by the Administrative Agent to reimburse the
applicable Issuing Lender for LC Disbursements for which it has not been
reimbursed and, to the extent not so applied, shall be held for the satisfaction
of the reimbursement obligations of the Borrower for the LC Exposure at such
time or, if the maturity of the Loans has been accelerated (but subject to the
consent of Revolving Lenders with LC Exposure representing greater than 50% of
the total LC Exposure), be applied to satisfy other obligations of the Borrower
under this Agreement. If the Borrower is required to provide an amount of cash
collateral hereunder as a result of the occurrence of an Event of Default, such
amount (to the extent not applied as aforesaid) shall be returned to the
Borrower within three Business Days after all Events of Default have been cured
or waived.

          SECTION 2.07. FUNDING OF BORROWINGS. (a) Each Lender shall make each
Loan (other than any Swingline Loan) to be made by it hereunder on the proposed
date thereof by wire transfer of immediately available funds by 12:30 p.m., New
York City time, to the account of the Administrative Agent most recently
designated by it for such purpose by notice to the Lenders; PROVIDED that
Swingline Loans shall be made as provided in Section 2.04. The Administrative
Agent will make such Loans available to the Borrower by promptly crediting the
amounts so received, in like funds, to an account of the Borrower maintained
with the Administrative Agent in New York City and designated by the Borrower in
the applicable Notice of Borrowing Request; PROVIDED that ABR Revolving Loans
made to finance the reimbursement of an LC Disbursement as provided in Section
2.06(e) shall be remitted by the Administrative Agent to the applicable Issuing
Lender.

          (b)     Unless the Administrative Agent shall have received notice
from a Lender prior to the proposed date of any Borrowing that such Lender will
not make available to the Administrative Agent such Lender's share of such
Borrowing, the Administrative Agent may assume that such Lender has made such
share available on such date in accordance with paragraph (a) of this Section
and may, in reliance upon such assumption, make available to the Borrower a
corresponding amount. In such event, if a Lender has not in fact made its share
of the applicable Borrowing available to the Administrative Agent, then the
applicable Lender and

-50-

<PAGE>
the Borrower severally agree to pay to the Administrative Agent forthwith on
demand such corresponding amount with interest thereon, for each day from and
including the date such amount is made available to the Borrower to but
excluding the date of payment to the Administrative Agent, at (i) in the case of
such Lender, the greater of the Federal Funds Rate and a rate determined by the
Administrative Agent in accordance with banking industry rules on interbank
compensation, in each case for the first three days and at the interest rate
otherwise applicable to ABR Loans for each day thereafter or (ii) in the case of
the Borrower, the interest rate applicable to ABR Loans. If such Lender pays
such amount to the Administrative Agent, then such amount shall constitute such
Lender's Loan included in such Borrowing.

     SECTION 2.08.  INTEREST ELECTIONS. (a) Each Revolving Borrowing and
Term Borrowing initially shall be of the Type and Class specified in the
applicable Notice of Borrowing Request and, in the case of a Eurodollar
Borrowing, shall have an initial Interest Period as specified in such Notice of
Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing
to a different Type or to continue such Borrowing and, in the case of a
Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in
this Section. The Borrower may elect different options with respect to different
portions of the affected Borrowing, in which case each such portion shall be
allocated ratably among the Lenders holding the Loans comprising such Borrowing,
and the Loans comprising each such portion shall be considered a separate
Borrowing. This Section shall not apply to Swingline Borrowings, which may not
be converted or continued.

     (b)     To make an election pursuant to this Section, the Borrower
shall notify the Administrative Agent of such election in writing (or by
telephone promptly confirmed in writing) by the time that a Notice of Borrowing
Request would be required under Section 2.03 if the Borrower were requesting a
Borrowing of the Type resulting from such election to be made on the effective
date of such election. Each such notification shall be irrevocable and shall be
in writing (or by telephone promptly confirmed in writing) signed by the
Borrower, in substantially the form of Exhibit H (the "Notice of Interest
Election Request").

     (c)     Each Notice of Interest Election Request shall specify the
following information, which shall be consistent with the requirements of
Section 2.02 and paragraphs (f) and (g) of this Section:

        (i)     the Borrowing to which such Notice of Interest Election
     Request applies and, if different options are being elected with respect
     to different portions thereof, the portions thereof to be allocated to
     each resulting Borrowing (in which case the information to be specified
     pursuant to clauses (iii) and (iv) below shall be specified for each
     resulting Borrowing);

        (ii)    the effective date of the election made pursuant to such
     Notice of Interest Election Request, which shall be a Business Day;

        (iii)   whether the resulting Borrowing is to be an ABR Borrowing or a
     Eurodollar Borrowing; and

-51-

<PAGE>
        (iv)    if the resulting Borrowing is a Eurodollar Borrowing, the

Case 1:07-cv-07634-WHP    Document 32-25    Filed 01/25/2008    Page 12 of 42
Case 1:07-cv-00172-SOM-LEK    Document 17-21    Filed 06/12/2007    Page 46 of 90
Page 55 of 22

Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Notice of Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

   (d)    Promptly following receipt of a Notice of Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

   (e)    If the Borrower fails to deliver a timely Notice of Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an 'ABR Borrowing at the end of the Interest Period applicable thereto.

   (f)    A Borrowing of any Class may not be converted to or continued as a Eurodollar Borrowing if after giving effect thereto (i) the Interest Period therefor would commence before and end after a date on which any principal of the Loans of such Class is scheduled to be repaid and (ii) the sum of the aggregate principal amount of outstanding Eurodollar Borrowings of such Class with Interest Periods ending on or prior to such scheduled repayment date plus the aggregate principal amount of outstanding ABR Borrowings of such Class would be less than the aggregate principal amount of Loans of such Class required to be repaid on such scheduled repayment date.

   (g)    No Eurodollar Borrowings may be incurred prior to the fifth day following the Effective Date. Thereafter until the earlier of (i) the 90th day after the Effective Date and (ii) the Syndication Date, Interest Periods in respect of Eurodollar Borrowings shall be limited to one month Interest Periods, all of which shall begin and end on the same date (although Eurodollar Revolving Borrowings with one week Interest Periods may be incurred as otherwise permitted hereunder during any such one month Interest Period so long as the end of each such one week Interest Period ends on the last day as the relevant one month Interest Period for all Eurodollar Borrowings then in effect).

   SECTION 2.09. TERMINATION AND REDUCTION OF COMMITMENTS. (a) Unless previously terminated, (i) all of the B Term Loan Commitments shall terminate upon the earlier of (x) the incurrence of the B Term Loans hereunder on the Effective Date and (y) 5:00 p.m., New York City time, on the Effective Date, (ii) all of the Commitments shall terminate on September 18, 2002 if the Effective Date and initial borrowing hereunder shall not have occurred on or prior to such date and (iii) unless the Required Lenders otherwise agree in

-52-

<PAGE>
writing (in their sole discretion), all of the Commitments shall terminate upon the occurrence of a Change of Control.

   (b)    The Total Incremental Term Loan Commitment of a given Class shall (i) be permanently reduced (x) on each Incremental Term Loan Borrowing

Date in respect of such Class in an amount equal to the aggregate principal amount of Incremental Term Loans of such Class incurred on each such date, (ii) terminate in its entirety (to the extent not theretofore terminated) on the respective Incremental Term Loan Commitment Termination Date (after giving effect to any Incremental Term Loans to be made on such date) and (iii) prior to the termination of the Total Incremental Term Loan Commitment in respect of such Class, be permanently reduced from time to time to the extent required by Section 2.12(g).

(c)    The Revolving Commitments shall terminate in their entirety on the Revolving Maturity Date.

(d)    The Borrower may at any time terminate, or from time to time reduce, the then outstanding Commitments of any Class; PROVIDED that (i) each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $1,000,000 and not less than $10,000,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.12, the sum of the Revolving Exposures would exceed the total Revolving Commitments.

(e)    The Borrower shall notify the Administrative Agent in writing of any election to terminate or reduce the Commitments under paragraph (d) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; PROVIDED that a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(f)    Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

SECTION 2.10. REPAYMENT OF LOANS; EVIDENCE OF DEBT. (a) The Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan of such Lender on the Revolving Maturity Date, (ii) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.11 and (iii) to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the seventh Business Day after the date on which such Swingline Loan is made or, if earlier, the fifth day prior to the Revolving Maturity Date.

-53-

<PAGE>

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type

thereof and the Interest Period applicable thereto, (ii) the amount of any
principal or interest due and payable or to become due and payable from the
Borrower to each Lender hereunder and (iii) the amount of any sum received by
the Administrative Agent hereunder for the account of the Lenders and each
Lender's share thereof.

        (d)    The entries made in the accounts maintained pursuant to
paragraph (b) or (c) of this Section shall be PRIMA FACIE evidence of the
existence and amounts of the obligations recorded therein (although in the case
of any conflict between determinations made pursuant to paragraphs (b) and (c),
determinations made pursuant to paragraph (c) shall control); PROVIDED that the
failure of any Lender or the Administrative Agent to maintain such accounts or
any error therein shall not in any manner affect the obligation of the Borrower
to repay the Loans in accordance with the terms of this Agreement.

        (e)    Any Lender may request that Loans of any Class made by it be
evidenced by a promissory note. In such event, the Borrower shall prepare,
execute and deliver to such Lender a promissory note payable to the order of
such Lender (or, if requested by such Lender, to such Lender and its registered
assigns) and in a form approved by the Administrative Agent. Thereafter, the
Loans evidenced by such promissory note and interest thereon shall at all times
(including after assignment pursuant to Section 9.04) be represented by one or
more promissory notes in such form payable to the order of the payee named
therein (or, if such promissory note is a registered note, to such payee and its
registered assigns).

        SECTION 2.11. AMORTIZATION OF TERM LOANS. (a) Subject to adjustment
pursuant to paragraph (c) of this Section, the Borrower shall repay B Term
Borrowings on each date set forth below in the aggregate principal amount set
forth opposite such date (each such repayment, as the same may be reduced as
provided in Sections 2.12(a) and 2.12(g), a "B Term Loan Scheduled Repayment"):

```
<TABLE>
<CAPTION>
            Date                                    Amount
            ----                                    ------
<S>                                             <C>
            September 30, 2002                   $    1,062,500
            December 31, 2002                    $    1,062,500
            March 31, 2003                       $    1,062,500
            June 30, 2003                        $    1,062,500
            September 30, 2003                   $    1,062,500
            December 31, 2003                    $    1,062,500
            March 31, 2004                       $    1,062,500
            June 30, 2004                        $    1,062,500
            September 30, 2004                   $    1,062,500
            December 31, 2004                    $    1,062,500
</TABLE>
```

-54-

```
<PAGE>
<TABLE>
<CAPTION>
            Date                                    Amount
            ----                                    ------
<S>                                             <C>
            March 31, 2005                       $    1,062,500
            June 30, 2005                        $    1,062,500
            September 30, 2005                   $    1,062,500
```

| | | |
|---|---|---|
| December 31, 2005 | $ | 1,062,500 |
| March 31, 2006 | $ | 1,062,500 |
| June 30, 2006 | $ | 1,062,500 |
| September 30, 2006 | $ | 1,062,500 |
| December 31, 2006 | $ | 1,062,500 |
| March 31, 2007 | $ | 1,062,500 |
| June 30, 2007 | $ | 1,062,500 |
| September 30, 2007 | $ | 100,937,500 |
| December 31, 2007 | $ | 100,937,500 |
| March 31, 2008 | $ | 100,937,500 |
| B Term Loan Maturity Date | $ | 100,937,500 |

</TABLE>

          (b)    The Borrower shall be required to make, with respect to each
Class of Incremental Term Loans, to the extent then outstanding, scheduled
amortization payments of such Class of Incremental Term Loans on the dates and
in the principal amounts set forth in the respective Incremental Term Loan
Commitment Agreement (each such repayment, as the same may be reduced as
provided in Sections 2.12(a) and 2.12(g), an "Incremental Term Loan Scheduled
Repayment" and, together with the B Term Loan Scheduled Repayments, the "Term
Loan Scheduled Repayments"); PROVIDED that, if any Incremental Term Loans are
incurred which will be added to (and form part of) an existing Class of Term
Loans, the amount of the then remaining Term Loan Scheduled Repayments of the
respective Class shall be proportionally increased (with the aggregate amount of
increases to the then remaining Term Loan Scheduled Repayments of such Class to
equal the aggregate principal amount of such new Incremental Term Loans then
being incurred) in accordance with the requirements of clause (ii) of Section
2.05(c).

          (c)    To the extent not previously paid, all Term Loans shall be due
and payable on the Maturity Date therefor.

          SECTION 2.12. PREPAYMENT OF LOANS. (a) The Borrower shall have the
right at any time and from time to time to prepay any Borrowing in whole or in
part, subject to the requirements of this Section and payment of any related
amounts owing pursuant to Section 2.17.

          (b)    In the event and on each occasion that any Net Proceeds are
received by or on behalf of the Borrower or any Subsidiary in respect of any
Asset Disposition, the Borrower shall, within 10 Business Days after such Net
Proceeds are received, (x) in the case of any Asset Disposition which utilizes,
and to the extent same utilizes, the Additional Asset Sale Basket Amount, apply
an amount equal to 100% of the Net Proceeds therefrom (i) first, to repay
outstanding principal of Revolving Loans (with no corresponding reduction to the
Revolving Commitments) (although, for all repayments made after the Effective
Date pursuant to this clause (x), not more than $100 million in the aggregate
may be applied pursuant to this subclause

-55-

<PAGE>
(i)), (ii) second, to repay principal of then outstanding Term Loans and (iii)
third, to repay any other then outstanding Revolving Loans and Swingline Loans
(with no corresponding reduction to the Revolving Commitments), or (y) in the
case of any Asset Disposition to the extent not covered by preceding clause (x),
prepay outstanding Term Loans in an aggregate amount equal to 100% of such Net
Proceeds; PROVIDED that (i) if a Specified Default then exists or will exist
immediately after giving effect to the respective Asset Disposition, the
Borrower shall make the prepayments required by clause (x) or (y) above, as the
case may be, immediately after receipt of any such Net Proceeds, (ii) so long as

no Specified Default then exists, with respect to no more than $25,000,000 of cash proceeds in any fiscal year of the Borrower which would otherwise be required to be applied to the repayment of Loans pursuant to preceding clause (y), the Borrower shall not be subject to the obligation to make the prepayments otherwise required pursuant to clause (y) above if within 350 days after the receipt thereof, the Borrower reinvests such Net Proceeds in capital assets and (iii) in the case of any Asset Disposition of the type described in clause (c) of the definition thereof, so long as no Specified Default then exists the Borrower shall not be subject to the obligation to make the prepayments otherwise required pursuant to clause (y) above if within such 10 Business Days the Borrower notifies the Administrative Agent that it intends to use such Net Proceeds to replace or restore the assets subject to the events described in clause (c) in the definition of Asset Disposition within 350 days after the receipt thereof, and within such 350-day period the Borrower delivers to the Administrative Agent a notice certifying that such Net Proceeds have in fact been so applied to restore or replace such assets. If the Borrower gives a notice pursuant to clause (ii) or (iii) of the proviso contained in the preceding sentence and the respective Net Proceeds are not reinvested within the 350-day period referred to in such clause, the Borrower shall forthwith apply such Net Proceeds to prepay outstanding Term Loans in accordance with Section 2.12(g). Without limiting the foregoing provisions of this paragraph (b), if any Asset Disposition, Asset Sale (as defined in any Existing Note Indenture or the New Senior Note Indenture) or similar event occurs and as a result thereof (after giving effect to any reinvestment by the Borrower of the proceeds of any such event) any obligation would arise on the part of the Borrower or any Subsidiary to offer to purchase any Existing Notes, any New Senior Notes or any Indebtedness issued pursuant to Section 6.03(a)(iv) or (v) (or any permitted refinancing of any of the foregoing), then before any such obligation arises, the Borrower shall prepay then outstanding Term Loans and, after all outstanding Term Loans have been repaid in full, permanently reduce the total Revolving Commitments (and repay corresponding outstandings) in such amount as is necessary so that no obligation to make any such offer to purchase at any time arises.

        (c)   In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Subsidiary in respect of property or assets sold or otherwise disposed of in connection with a Permitted Note Sale or a Sale-Leaseback Transaction, the Borrower shall, within 10 days after such Net Proceeds are received, prepay Revolving Loans (with no corresponding reduction to the Revolving Commitments) in an amount equal to 100% of such Net Proceeds.

        (d)   In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Subsidiary in respect of any incurrence of Indebtedness (other than Indebtedness permitted to be incurred under clauses (i)-(iii), inclusive, and clauses (vi) through (xvi), inclusive, of Section 6.03(a) as same is in effect on the Effective Date), the Borrower shall, on the date such Net Proceeds are received, apply an amount equal to such Net

-56-

<PAGE>
Proceeds (i) first, to prepay the principal of outstanding Term Loans (to the extent then outstanding) and (ii) second, to the extent in excess thereof, to prepay principal of outstanding Revolving Loans and/or Swingline Loans to the extent then outstanding (with no corresponding reduction to the Revolving Commitments); PROVIDED that to the extent any Net Proceeds are received from any issuance of Indebtedness pursuant to Section 6.03(a)(iv) and/or (v) which are to be used (substantially concurrently with the receipt thereof) to finance or to

pay the purchase consideration in connection with an Acquisition identified in
writing by the Borrower to the Administrative Agent, the Net Proceeds to be
applied for such purpose may be so applied and, to such extent, no repayment
will be required pursuant to this Section 2.12(d) as a result of the receipt of
such Net Proceeds.

(e)     Prior to any optional or mandatory prepayment of Borrowings
hereunder, the Borrower shall select the Borrowing or Borrowings of the
respective Class to be prepaid and shall specify such selection in the notice of
such prepayment pursuant to paragraph (f) of this Section.

(f)     The Borrower shall notify the Administrative Agent (and, in
the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone
(confirmed by telecopy) of any prepayment hereunder (i) in the case of
prepayment of a Eurodollar Revolving Borrowing, not later than 12:00 noon, New
York City time, three Business Days before the date of prepayment, (ii) in the
case of prepayment of an ABR Revolving Borrowing, not later than 12:00 noon, New
York City time, on the Business Day before the date of prepayment or (iii) in
the case of prepayment of a Swingline Loan, not later than 1:00 p.m., New York
City time, on the date of prepayment. Each such notice shall be irrevocable and
shall specify the prepayment date, the principal amount of each Borrowing or
portion thereof to be prepaid and, in the case of a mandatory prepayment
required by reason of any Asset Disposition or series of related Asset
Dispositions for Net Proceeds in excess of $25,000,000, a reasonably detailed
calculation of the amount of such prepayment; PROVIDED that, if a notice of
optional prepayment is given in connection with a conditional notice of
termination of the Revolving Commitments as contemplated by Section 2.09, then
such notice of prepayment may be revoked if such notice of termination is
revoked in accordance with Section 2.09. Each repayment or prepayment of a
Borrowing shall be applied ratably to the Loans included in the repaid
Borrowing. Promptly following receipt of any such notice (other than a notice
relating solely to Swingline Loans), the Administrative Agent shall advise the
Lenders of the contents thereof. Each partial prepayment of any Borrowing shall
be in an amount that would be permitted in the case of an advance of a Borrowing
of the same Type as provided in Section 2.02, except as necessary to apply fully
the required amount of a mandatory prepayment. Prepayments shall be accompanied
by accrued interest to the extent required by Section 2.14.

(g)     Any amount required to be applied pursuant to Section 2.12(b)
or (d) shall be applied as mandatory repayments of Term Loans and/or Revolving
Loans and Swingline Loans (with no corresponding reduction to the Revolving
Commitments) as provided in the respective such Section, with any proceeds in
excess of amounts required to be applied pursuant to the respective such Section
to be retained by the Borrower. The amount to be applied to repay principal of
outstanding Term Loans shall, whether pursuant to a voluntary prepayment under
paragraph (a) of this Section or a mandatory repayment under paragraphs (b) or
(d) of this Section, be allocated among each of the Classes of the then
outstanding Term Loans on a pro rata

-57-

<PAGE>
basis (based upon the relative outstanding principal amounts of such Classes of
Term Loans), and with the amount allocated to each such Class of Term Loans to
be applied to reduce the then remaining Term Loan Scheduled Repayments of each
such Class of Term Loans on a pro rata basis (based upon the then remaining
principal amounts of such Term Loan Scheduled Repayments of such Class of Term
Loans after giving effect to all prior reductions thereto).

(h)     On any day on which the total Revolving Exposure (calculated

taking the Dollar Equivalent of any then outstanding Letters of Credit
denominated in an Alternate Currency) exceeds the total Revolving Commitments,
the Borrower shall prepay on such date the principal of Swingline Loans and,
after all Swingline Loans have been repaid in full or if no Swingline Loans are
outstanding, Revolving Loans in an amount equal to such excess. If, after giving
effect to the prepayment of all outstanding Swingline Loans and Revolving Loans,
the total LC Exposure exceeds the total Revolving Commitments at such time, the
Borrower shall pay to the Administrative Agent on such day an amount of cash
and/or Temporary Cash Investments equal to the amount of such excess up to a
maximum amount equal to the total LC Exposure at such time, with such cash
and/or Temporary Cash Investments to be held as security for the obligations of
the Borrower to the Issuing Lenders and the Lenders hereunder in a cash
collateral account to be established by the Administrative Agent on terms
reasonably satisfactory to it.

        SECTION 2.13. FEES. (a) The Borrower agrees to pay to the
Administrative Agent for the account of each Revolving Lender (other than a
Defaulting Lender) a commitment fee, which shall accrue at the Applicable
Commitment Fee Percentage on the daily unused amount of each Commitment of such
Revolving Lender during the period from and including the date hereof to but
excluding the date on which such Revolving Commitment terminates. Accrued
commitment fees shall be payable in arrears on the last Business Day of March,
June, September and December of each year and on the date on which the Revolving
Commitments terminate, commencing on the last Business Day in September 2002.
All commitment fees shall be computed on the basis of a year of 360 days and
shall be payable for the actual number of days elapsed (including the first day
but excluding the last day). For purposes of determining the unused portion of
the Revolving Commitments, the Revolving Commitment of a Revolving Lender shall
be deemed to be used to the extent of the outstanding Revolving Loans and LC
Exposure of such Revolving Lender (and the Swingline Exposure of such Revolving
Lender shall be disregarded for such purpose).

        (b)    The Borrower agrees to pay (i) to the Administrative Agent for
the account of each Revolving Lender a participation fee with respect to its
participations in Letters of Credit, which shall accrue at the Applicable Rate
for Eurodollar Revolving Loans on the daily amount of such Revolving Lender's LC
Exposure (excluding any portion thereof attributable to unreimbursed LC
Disbursements) during the period from and including the Effective Date to but
excluding the later of the date on which such Revolving Lender's Revolving
Commitment terminates and the date on which such Revolving Lender ceases to have
any LC Exposure, and (ii) to each Issuing Lender a fronting fee, which shall
accrue at the rate of 1/8 of 1% per annum on the daily amount of the LC Exposure
(excluding any portion thereof attributable to unreimbursed LC Disbursements)
during the period from and including the Effective Date to but excluding the
later of the date of termination of the Revolving Commitments and the date on
which there ceases to be any LC Exposure, PROVIDED that in no event shall the
minimum

                                    -58-
<PAGE>
amount of fronting fees payable in any twelve-month period for any Letter of
Credit be less than $500 (it being agreed that, on the day of issuance of any
Letter of Credit and on each anniversary thereof prior to the termination or
expiration of such Letter of Credit, if $500 will exceed the amount of fronting
fees that will accrue with respect to such Letter of Credit for the immediately
succeeding twelve-month period, the full $500 shall be payable on the date of
issuance of such Letter of Credit and on each such anniversary thereof) and
(iii) each Issuing Lender such Issuing Lender's standard fees with respect to
the issuance, amendment, renewal or extension of any Letter of Credit or

processing of drawings thereunder. Except as otherwise provided in the proviso to clause (ii) of the preceding sentence, participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after September 30, 2002; PROVIDED that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand. Any other fees payable to an Issuing Lender pursuant to this paragraph shall be payable within five days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    The Borrower agrees to pay to each Joint Lead Arranger, Joint Book Manager and Agent, for its respective account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the respective Joint Lead Arranger, Joint Book Manager and Agent.

(d)    The Borrower agrees to pay to the Incremental Term Loan Lenders, for their own account, such fees as may be separately agreed to with such Incremental Term Loan Lenders pursuant to the relevant Incremental Term Loan Commitment Agreement and in accordance with this Agreement.

(e)    All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to each Issuing Lender, Joint Lead Arranger, Joint Book Manager and other Agent, in the case of fees payable to such Person) for distribution, in the case of commitment fees and participation fees, to the Lenders entitled thereto. Fees paid shall not be refundable.

SECTION 2.14. INTEREST. (a) The Loans comprising each ABR Borrowing (including each Swingline Loan) shall bear interest at the Alternate Base Rate plus the Applicable Rate, each as in effect from time to time.

(b)    The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate in effect from time to time.

(c)    Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any

-59-

<PAGE>

Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Revolving Loans as provided in paragraph (a) of this Section.

(d)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments; PROVIDED that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Revolving Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the

event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate (as in effect from time to time) and applicable Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.15. ALTERNATE RATE OF INTEREST. If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)    the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing; PROVIDED that if the circumstances giving rise to such notice affect only one Type of Borrowings, then the other Type of Borrowings shall be permitted.

SECTION 2.16. INCREASED COSTS. (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or any Issuing Lender; or

-60-

<PAGE>

(ii)    impose on any Lender, any Issuing Lender, the London interbank market or other relevant interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Lender of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or Issuing Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Lender, as the case may be, for such additional costs incurred or reduction suffered;

PROVIDED, that no Lender or Issuing Lender shall be entitled under this paragraph to receive compensation for any Excluded Taxes paid by it. The preceding sentence shall not apply to increased costs with respect to Taxes which are addressed in Section 2.18.

(b)    If any Lender or Issuing Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Lender's capital or on the capital of such Lender's or the Issuing Lender's holding company, if any, as a consequence of this Agreement or the Loans made by, or the Commitments of, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Lender, to a level below that which such Lender or the Issuing Lender or such Lender's or Issuing Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuing Lender's policies and the policies of such Lender's or Issuing Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Lender or such Lender's or Issuing Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender or Issuing Lender setting forth the amount or amounts necessary to compensate such Lender or Issuing Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender or Issuing Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of any Lender or Issuing Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Lender's right to demand such compensation; PROVIDED that the Borrower shall not be required to compensate a Lender or Issuing Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or Issuing Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Lender's intention to claim compensation therefor; PROVIDED FURTHER that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

-61-

<PAGE>

SECTION 2.17.  BREAK FUNDING PAYMENTS. In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Revolving Loan or Term Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.20, then, in any such event, the Borrower shall compensate each Lender for the economic loss, cost and expense (but not for loss of profits) attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred at the Adjusted LIBO Rate that would have been

applicable to such Loan, for the period from the date of such event to the last
day of the then current Interest Period therefor (or, in the case of a failure
to borrow, convert or continue, for the period that would have been the Interest
Period for such Loan), over (ii) the amount of interest which would accrue on
such principal amount for such period at the interest rate which such Lender
would bid were it to bid, at the commencement of such period, for dollar
deposits of a comparable amount and period from other banks in the Eurodollar
market. A certificate of any Lender setting forth any amount or amounts that
such Lender is entitled to receive pursuant to this Section shall be delivered
to the Borrower and shall be conclusive absent manifest error. The Borrower
shall pay such Lender the amount shown as due on any such certificate within 10
days after receipt thereof.

         SECTION 2.18.  TAXES.  (a)  Any and all payments by or on account of
any obligation of the Borrower hereunder or under any other Loan Document shall
be made free and clear of and without deduction for any Indemnified Taxes or
Other Taxes; provided that if the Borrower shall be required to deduct any
Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable
shall be increased as necessary so that after making all required deductions
(including deductions applicable to additional sums payable under this Section)
the Administrative Agent, Lender or Issuing Lender (as the case may be) receives
an amount equal to the sum it would have received had no such deductions been
made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall
pay the full amount deducted to the relevant Governmental Authority in
accordance with applicable law. If any amounts are payable in respect of
Indemnified Taxes or Other Taxes pursuant to the preceding sentence, then the
Borrower shall be obligated to reimburse the Administrative Agent or the
respective Lender or Issuing Lender (as the case may be), within ten (10) days
after the written request of the Administrative Agent, or such respective Lender
or Issuing Lender (as the case may be), for taxes imposed on or measured by the
net income of the Administrative Agent or such respective Lender or Issuing
Lender (as the case may be) pursuant to the laws of the jurisdiction in which
the Administrative Agent or such respective Lender or Issuing Lender (as the
case may be) is organized or in which the principal office or applicable lending
office of the Administrative Agent or such respective Lender or Issuing Lender
(as the case may be) is located or under the laws of any political subdivision
or taxing authority thereof or therein and for any withholding of taxes as the
Administrative Agent or such respective Lender or Issuing Lender shall determine
are payable by, or withheld from, the Administrative Agent or such respective
Lender or Issuing Lender (as the case may be) in respect of such amounts which
are attributable to the increase in the sum payable as described in clause (i)
of the preceding sentence so paid to or on behalf of the

                                   -62-

<PAGE>
Administrative Agent or such respective Lender or Issuing Lender (as the case
may be) pursuant to clause (i) of the preceding sentence and in respect of any
amounts paid to or on behalf of the Administrative Agent or such respective
Lender or Issuing Lender (as the case may be), pursuant to this sentence.

         (b)   In addition, the Borrower shall pay any Other Taxes to the
relevant Governmental Authority in accordance with applicable law.

         (c)   The Borrower shall indemnify the Administrative Agent, each
Lender and each Issuing Lender, within 10 days after written demand therefor,
for the full amount of any Indemnified Taxes or Other Taxes paid by the
Administrative Agent, such Lender or such Issuing Lender, as the case may be, on
or with respect to any payment by or on account of any obligation of the
Borrower hereunder or under any other Loan Document (including Indemnified Taxes

or Other Taxes imposed or asserted on or attributable to amounts payable under
this Section) and any penalties, interest and reasonable expenses arising
therefrom or with respect thereto, whether or not such Indemnified Taxes or
Other Taxes were correctly or legally imposed or asserted by the relevant
Governmental Authority. A certificate, receipt or other document as to the
amount of such payment or liability delivered to the Borrower by a Lender or
Issuing Lender, or by the Administrative Agent on its own behalf or on behalf of
a Lender or Issuing Lender, shall be conclusive absent manifest error.

(d)     Within 45 days after any payment of Indemnified Taxes or Other
Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to
the Administrative Agent the original or a certified copy of a receipt issued by
such Governmental Authority evidencing such payment, a copy of the return
reporting such payment or other evidence of such payment reasonably satisfactory
to the Administrative Agent.

(e)     Each Foreign Lender agrees to deliver to the Borrower and the
Administrative Agent on or prior to the Effective Date, or in the case of a
Foreign Lender that is an assignee or transferee of an interest under this
Agreement pursuant to Section 9.04 (unless the respective Foreign Lender was
already a Foreign Lender hereunder immediately prior to such assignment or
transfer), on the date of such assignment or transfer to such Foreign Lender,
(i) two accurate and complete original signed copies of Internal Revenue Service
Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income
tax treaty) (or successor forms) certifying to such Foreign Lender's entitlement
as of such date to a complete exemption from United States withholding tax with
respect to payments to be made under this Agreement, or (ii) if the Foreign
Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code
and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN
(with respect to a complete exemption under an income tax treaty) pursuant to
clause (i) above, (x) a certificate substantially in the form of Exhibit I (any
such certificate, a "Section 2.18(e) Certificate") and (y) two accurate and
complete original signed copies of Internal Revenue Service Form W-8BEN (with
respect to the portfolio interest exemption) (or successor form) certifying to
such Foreign Lender's entitlement as of such date to a complete exemption from
United States withholding tax with respect to payments of interest to be made
under this Agreement. In addition, each Foreign Lender agrees that from time to
time after the Effective Date, when a lapse in time or change in circumstances
renders the previous certification obsolete or inaccurate in any material
respect, it will deliver to the Borrower or the

-63-

<PAGE>
Administrative Agent two new accurate and complete original signed copies of
Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits
of any income tax treaty), or Form W-8BEN (with respect to the portfolio
interest exemption) and a Section 2.18(e) Certificate, as the case may be, and
such other forms as may be required in order to confirm or establish the
entitlement of such Foreign Lender to a continued exemption from or reduction in
United States withholding tax with respect to payments under this Agreement, or
it shall immediately notify the Borrower and the Agent of its inability to
deliver any such Form or Certificate. If a Foreign Lender is unable to deliver
any such Form or Certificate described in the immediately preceding sentence
solely because a change, subsequent to the date on which such Foreign Lender
becomes a party to this Agreement, in any applicable law, treaty, governmental
rule, regulation, guideline or order, or in the interpretation thereof, relating
to the deducting or withholding of Indemnified Taxes causes such Foreign Lender
to be legally unable to deliver such Form or Certificate, such Foreign Lender
shall not be required to deliver any such Form or Certificate pursuant to this

Case 1:07-cv-07634-WHP    Document 32-25    Filed 01/25/2008    Page 24 of 42
Case 1:07-cv-00172-SOM-LEK    Document 17-21    Filed 06/12/2007    Page 26 of 40
Page 67 of 122

Section 2.18(e) during such period that such change causes such Foreign Lender to be legally unable to deliver such Form or Certificate. Notwithstanding anything to the contrary contained in this Section 2.18, the Borrower agrees to pay additional amounts and to indemnify each Foreign Lender in the manner set forth in Section 2.18(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any Indemnified Taxes deducted or withheld by it as a result of any changes after the Effective Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of income or similar taxes.

          (f)   If the Borrower pays any additional amount under this Section 2.18 to or on behalf of the Administrative Agent, Lender or Issuing Lender and such Administrative Agent, Lender or Issuing Lender determines in its sole discretion that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Administrative Agent, Lender or Issuing Lender shall pay to the Borrower an amount that the Administrative Agent, Lender or Issuing Lender shall, in its sole discretion, determine is equal to the net benefit, after tax, which was obtained by the Administrative Agent, Lender or Issuing Lender in such year as a consequence of such Tax Benefit; PROVIDED, HOWEVER, that (i) any Administrative Agent, Lender or Issuing Lender may determine, in its sole discretion consistent with the policies of such Administrative Agent, Lender or Issuing Lender, whether to seek a Tax Benefit; (ii) any Taxes that are imposed on an Administrative Agent, Lender or Issuing Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such Administrative Agent, Lender or Issuing Lender that otherwise would not have expired) of any Tax Benefit with respect to which such Administrative Agent, Lender or Issuing Lender has made a payment to the Borrower pursuant to this Section 2.18(f) shall be treated as a Tax for which the Borrower is obligated to indemnify such Administrative Agent, Lender or Issuing Lender pursuant to this Section 2.18 without any exclusions or defenses; (iii) nothing in this Section 2.18(f) shall require Administrative Agent, Lender or Issuing the Lender to disclose any confidential information to the Borrower (including, without limitation, its tax returns); and (iv) no Administrative Agent, Lender or Issuing Lender shall be required to pay any amounts pursuant to this Section 2.18(f) at any time during which a Default exists.

                              -64-

<PAGE>
          SECTION 2.19. PAYMENTS GENERALLY; PRO RATA TREATMENT; SHARING OF SET-OFFS. (a) The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.16, 2.17 or 2.18, or otherwise, where time of payment has not been specified) prior to 12:30 p.m., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 90 Hudson Street, Fifth Floor, Jersey City, New Jersey 07302, except payments to be made directly to the applicable Issuing Lender as expressly provided herein and except that payments pursuant to Sections 2.16, 2.17, 2.18 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day

that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in Dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans, Term Loans or participations in LC Disbursements or Swingline Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans, Term Loans and participations in LC Disbursements and Swingline Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Loans, Term Loans and participations in LC Disbursements and Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Loans, Term Loans and participations in LC Disbursements and Swingline Loans; PROVIDED that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary

-65-

<PAGE>
or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or an Issuing Lender hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuing Lender, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or Issuing Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such

Lender or Issuing Lender with interest thereon, for each day from and including
the date such amount is distributed to it to but excluding the date of payment
to the Administrative Agent, at the greater of the Federal Funds Rate and a rate
determined by the Administrative Agent in accordance with banking industry rules
on interbank compensation.

        (e)    If any Lender shall fail to make any payment required to be
made by it pursuant to Section 2.04(c), 2.06(d) or (e), 2.07(b), 2.19(d), 8.06
or 9.03(c), then the Administrative Agent may, in its discretion
(notwithstanding any contrary provision hereof), apply any amounts thereafter
received by the Administrative Agent pursuant to the Loan Documents for the
account of such Lender to satisfy such Lender's obligations under such Sections
until all such unsatisfied obligations are fully paid.

        SECTION 2.20. MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS. (a) If
any Lender requests compensation under Section 2.16, or if the Borrower is
required to pay any additional amount to any Lender or any Governmental
Authority for the account of any Lender pursuant to Section 2.18, then such
Lender shall use reasonable efforts to designate a different lending office for
funding or booking its Loans hereunder or to assign its rights and obligations
hereunder to another of its offices, branches or affiliates if, in the judgment
of such Lender, such designation or assignment (i) would eliminate or reduce
amounts payable pursuant to Section 2.16 or 2.18, as the case may be, in the
future and (ii) would not subject such Lender to any unreimbursed cost or
expense and would not otherwise be disadvantageous to such Lender. The Borrower
hereby agrees to pay all reasonable costs and expenses incurred by any Lender in
connection with any such designation or assignment.

        (b)    The Borrower may upon notice to any Lender and the
Administrative Agent, require such Lender (the "Departing Lender") to assign and
delegate, without recourse (in accordance with and subject to the restrictions
contained in Section 9.04), all its interests, rights and obligations under this
Agreement to an assignee that shall assume such obligations (which assignee may
be another Lender, if a Lender accepts such assignment) (i) if the Departing
Lender has requested compensation under Section 2.16, or the Borrower is
required to pay any additional amount to such Lender or any Governmental
Authority for the account of such Lender pursuant to Section 2.18, or such
Lender has given a notice (which has not been rescinded) pursuant to Section
2.21, or such Lender is a Defaulting Lender or was at any time a Defaulting

                                    -66-

<PAGE>
Lender as a result of such Lender providing a notice described in clause (ii) of
the definition of Lender Default which such Lender subsequently retracted; or
(ii) if the Required Lenders consent to such required assignment and delegation;
PROVIDED that (x) the Borrower shall have received the prior written consent of
the Administrative Agent (and, if a Revolving Commitment is being assigned, each
Issuing Lender and the Swingline Lender), which consent shall not unreasonably
be withheld, (y) such Lender shall have received payment of an amount equal to
the outstanding principal of its Loans and participations in LC Disbursements
and Swingline Loans, accrued interest thereon, accrued fees and all other
amounts payable to it hereunder, from the assignee (to the extent of such
outstanding principal and accrued interest and fees) or the Borrower (in the
case of all other amounts) and (z) in the case of any such assignment resulting
from a claim for compensation under Section 2.16 or payments required to be made
pursuant to Section 2.18, such assignment will result in a reduction in such
compensation or payments. A Lender shall not be required to make any assignment
and delegation under clause (i) of this paragraph (b) if, prior thereto, as a
result of a waiver by such Lender or otherwise, the circumstances entitling the

Borrower to require such assignment and delegation cease to apply.

SECTION 2.21. ILLEGALITY OR IMPRACTICABILITY OF EURODOLLAR LOANS. In the event that on any date any Lender shall have determined (which determination shall be conclusive and binding upon all parties hereto) that the making, maintaining or continuation of its Eurodollar Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order enacted after the date hereof or (ii) has become impracticable, or would cause such Lender material hardship, in either such case as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the interbank Eurodollar market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "Affected Lender" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Loan then being requested by the Borrower pursuant to a Notice of Borrowing Request or a Notice of Interest Election Request, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) an Alternate Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Loans (the "Affected Loans") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into Alternate Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Loan then being requested by the Borrower pursuant to a Notice of Borrowing Request or a Notice of Interest Election Request, the Borrower shall have the option to rescind such Notice of Borrowing Request or Notice of Interest Election Request as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.21 shall

-67-

<PAGE>
affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Loans in accordance with the terms of this Agreement. In the event that the circumstances described in the first sentence of this Section 2.21 giving rise to the limitation on incurrences of, or conversions into, Eurodollar Loans ceases to be in existence, the respective Lender shall notify the Borrower and the Agent of the same and the Borrower shall again be entitled to incur (including pursuant to conversions) from such Lender, Eurodollar Loans as otherwise provided in this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

SECTION 3.01. CORPORATE EXISTENCE AND POWER. The Borrower is a corporation duly incorporated, validly existing and in good standing under the

laws of Oklahoma, and the Borrower has all corporate powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.

SECTION 3.02. CORPORATE AND GOVERNMENTAL AUTHORIZATION; CONTRAVENTION. The execution, delivery and performance by the Borrower of this Agreement and the other Transaction Documents to which it is a party are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any Governmental Authority and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the certificate of incorporation or by-laws of the Borrower or of any judgment, injunction, order or decree or any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement or material instrument binding upon the Borrower or any of its Subsidiaries or result in the creation or imposition of any Lien (other than those contemplated by the Security Documents) on any asset of the Borrower or any of its Subsidiaries.

SECTION 3.03. BINDING EFFECT. Each Loan Party has duly executed and delivered each of the Loan Documents to which it is party, and each such Loan Document constitutes each such Loan Party's legal, valid and binding obligation enforceable in accordance with its terms.

SECTION 3.04. FINANCIAL INFORMATION. (a) The consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of December 29, 2001, and the related consolidated statement of earnings and statement of cash flows for the fiscal year then ended, audited by Deloitte & Touche and set forth in the Borrower's annual report to the Securities and Exchange Commission on Form 10-K for such fiscal year, a copy of which has been delivered to each of the Lenders and the Administrative Agent, fairly present, in conformity with GAAP, the financial position of the Borrower and its Subsidiaries as of such date and their results or operations and cash flows for such fiscal year.

(b)    The unaudited condensed consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of April 20, 2002, and the related unaudited consolidated

-68-

<PAGE>
statement of earnings and condensed consolidated statement of cash flows for the 16 weeks then ended, set forth in the Borrower's quarterly report to the Securities and Exchange Commission on Form 10-Q for the fiscal quarter ended April 20, 2002, a copy of which has been delivered to each of the Lenders and the Administrative Agent, fairly present, in conformity with GAAP applied on a basis consistent with the financial statements referred to in paragraph (a) of this Section (except for the omission of substantially all footnote disclosure as permitted by Regulation S-X promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended), the financial position of the Borrower and its Consolidated Subsidiaries as of such date and their results of operations and cash flows for such 16-week period (subject to normal year-end adjustments).

(c)    The pro forma consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of April 20, 2002 (after giving effect to the Transaction and the financing therefor) and the related pro forma consolidated statement of income of the Borrower for the 52-week period ended April 20, 2002 (after giving effect to the Transaction and the financing therefor), in each case as filed with the Securities Exchange Commission in the Borrower's Form 8-K dated June 12, 2002, copies of which have been furnished to the Lenders prior to

the Effective Date, presents fairly in all material respects the pro forma consolidated financial position of the Borrower as of April 20, 2002 and the pro forma consolidated results of the operations of the Borrower for the period covered thereby. All of the foregoing pro forma financial statements have been prepared on a basis consistent with the historical financial statements of the Borrower referred to in paragraph (a) of this Section.

(d)    Since December 29, 2001, there has been no Material Adverse Effect.

SECTION 3.05. LITIGATION. There is no action, suit or proceeding pending against, or to the knowledge of the Borrower threatened against or affecting, the Borrower or any of its Subsidiaries before any court or arbitrator or any Governmental Authority that draws into question the validity of any Loan Document or in which there is a reasonable possibility of an adverse decision that would be reasonably likely to result in a material adverse effect on the creditworthiness of the Borrower and its Subsidiaries taken as a whole (it being understood that disclosure of any action, suit or proceeding in any filing with the Securities and Exchange Commission will not, in and of itself, be deemed to establish a breach of this representation).

SECTION 3.06. COMPLIANCE WITH ERISA. The Borrower, each Subsidiary and each ERISA Affiliate has fulfilled its obligations under the minimum funding standards of ERISA and the Code with respect to each Plan and is in compliance in all material respects with its terms and all applicable law, including without limitation, the presently applicable provisions of ERISA and the Code, with respect to each Plan. Neither the Borrower nor any Subsidiary nor any ERISA Affiliate has (i) sought a currently outstanding waiver of the minimum funding standard under Section 412 of the Code or Section 303 or 304 of ERISA in respect of any Plan, (ii) failed to make any contribution or payment to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement, or made any amendment to any such Plan or Benefit Arrangement, which has resulted or could result in the imposition of a Lien or the posting of a bond or other security under ERISA or the Code or (iii) incurred any liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. No Reportable Event has occurred. No Multiemployer Plan (as defined in Section 4001(a)(3) of ERISA) is insolvent

-69-

<PAGE>
or in reorganization. No Plan has Unfunded Liabilities which, individually or when aggregated with the Unfunded Liabilities with respect to all other Plans, could reasonably be expected to have a Material Adverse Effect. Using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the withdrawal liability of the Borrower and its Subsidiaries and its ERISA Affiliates as of the close of the most recent fiscal year of each such Multiemployer Plan ended prior to the date of the most recent extension of credit made pursuant to this Agreement, would not exceed $25,000,000. Except to the extent that any of the following, either individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the ability of the Borrower to perform its obligations under this Agreement, the Borrower and its Subsidiaries do not maintain or contribute to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or have any liabilities under any Plan.

SECTION 3.07. ENVIRONMENTAL MATTERS. In the ordinary course of its business, the Borrower reviews the effect of Environmental Laws which could reasonably be expected to have any material effect, individually or in the

aggregate, on the business, property, assets, operations, liabilities, condition
(financial or otherwise) or prospects of the Borrower and its Subsidiaries, in
the course of which it evaluates associated liabilities and costs which it has
identified (including, without limitation, any capital or operating expenditures
required for clean-up or closure of properties presently or previously owned,
any capital or operating expenditures required to achieve or maintain compliance
with environmental protection standards imposed by Environmental Laws or as a
condition of any license, permit or contract, any related constraints on
operating activities, including any periodic or permanent shutdown of any
facility or reduction in the level of or change in the nature of operations
conducted thereat, any costs or liabilities in connection with off-site disposal
of wastes or Hazardous Materials, and any actual or potential liabilities to
third parties, including employees, and any related costs and expenses). On the
basis of this review, the Borrower has reasonably concluded that such associated
liabilities and costs, including the costs of compliance with Environmental
Laws, are unlikely to have a Material Adverse Effect.

            SECTION 3.08. TAX RETURNS. The Borrower and its Subsidiaries have
filed all United States federal income tax returns and all other material Tax
returns that are required to be filed by them (the "Returns") and have paid all
Taxes shown to be due and payable on such returns or pursuant to any assessment
received by the Borrower or any Subsidiary, except such Taxes, if any, as are
being contested in good faith and as to which adequate reserves have been
provided in accordance with GAAP. The Returns accurately reflect in all material
respects all liability for taxes of the Borrower and its Subsidiaries as a whole
for the periods covered thereby. The charges, accruals and reserves on the books
of the Borrower and its Subsidiaries in respect of taxes or other governmental
charges are, in the opinion of the Borrower, adequate in all material respects.
As of the Effective Date, there is no action, suit, proceeding, investigation,
audit, or claim now pending or, to the best knowledge of the Borrower or any of
its Subsidiaries, threatened by any authority regarding any United States
federal or state income taxes relating to the Borrower or any of its
Subsidiaries, except as could not reasonably be expected to result in a material
liability of the Borrower and its Subsidiaries taken as a whole. As of the
Effective Date, neither the Borrower nor any of its Subsidiaries has entered
into an agreement or waiver or been requested to enter into an agreement or
waiver extending any statute of limitations relating to the

                                    -70-

<PAGE>
payment or collection of United States federal and state income taxes of the
Borrower or any of its Subsidiaries, or is aware of any circumstances that would
cause the taxable years or other taxable periods of the Borrower or any of its
Subsidiaries not to be subject to the normally applicable statute of
limitations, except as could not reasonably be expected to result in a material
liability of the Borrower and its Subsidiaries taken as a whole. None of the
Borrower or any of its Subsidiaries has incurred, or will incur, any material
tax liability in connection with the Transaction (it being understood that the
representation contained in this sentence is not made as to any future tax
liabilities of the Borrower or any of its Subsidiaries arising as a result of
the operation of their businesses in the ordinary course of business, and is not
made as to any tax liability that may be allocated to the Borrower or any of its
Subsidiaries pursuant to Section 11.5 of the Merger Agreement).

            SECTION 3.09. SUBSIDIARIES. (a) Each of the Guarantors, and each
Subsidiary that is a Grantor, is a corporation or other business entity duly
incorporated or organized (as the case may be), validly existing and in good
standing under the laws of its jurisdiction of incorporation or organization (as
the case may be), and has all corporate or other relevant organizational powers

and all material licenses, authorizations, consents and approvals of Governmental Authorities required to carry on its business as now conducted. The execution, delivery and performance by each Guarantor of the Transaction Documents to which it is party are within such Guarantor's corporate or other relevant organizational powers, have been duly authorized by all corporate or other organizational action, require no action by or in respect of, or filing with, any Governmental Authority and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the certificate of incorporation or by-laws (or equivalent organizational documents) of any such Guarantor or of any judgment, injunction, order or decree or any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement or material instrument binding upon the Borrower or any of its Subsidiaries, and will not result in the creation or imposition of any Lien (other than those contemplated by the Security Documents) on any asset of the Borrower or any of its Subsidiaries.

        (b)    On the date hereof, the Borrower does not have any Subsidiaries other than the Subsidiaries set forth on Schedule 3.09, which sets forth the name of, and the ownership interest of the Borrower in, each Subsidiary and identifies each Subsidiary that is a Guarantor or Grantor, in each case as of the date hereof.

        SECTION 3.10. NOT AN INVESTMENT COMPANY. Neither the Borrower nor any Guarantor is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

        SECTION 3.11. NO CONFLICTING REQUIREMENTS. Neither the Borrower nor any Subsidiary is in violation of, or in default under, any provision of applicable law, rule or regulation, or of its certificate of incorporation or by-laws (or any equivalent organizational document) or of any agreement, judgment, injunction, order, decree or other instrument binding upon it or any of its properties, which violation or default could reasonably be expected to have consequences that would have a Material Adverse Effect.

-71-

<PAGE>
        SECTION 3.12. DISCLOSURE. The material furnished to the Administrative Agent and the Lenders by, or on behalf and with the consent of, the Borrower and its Subsidiaries in connection with the negotiation, execution and delivery of this Agreement, and the transactions contemplated herein taken as a whole, and as supplemented from time to time prior to the date of this Agreement, does not, and all other written materials hereafter furnished by, or on behalf and with the consent of, the Borrower, will not, contain as of the date hereof, any untrue statement of a material fact and does not as of the date hereof (and will not as of the date of any materials hereafter furnished) omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made (or are made), not misleading. The projections and any appraisals provided by the Borrower to the Administrative Agent and the Lenders in connection herewith were prepared in good faith on the basis of information and assumptions that the Borrower believed to be reasonable as of the date such material was provided, and the Borrower believes that such assumptions are reasonable as of the date hereof.

        SECTION 3.13. SECURITY DOCUMENTS. (a) The Pledge Agreement is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Creditors, a legal, valid and enforceable security interest in that portion of the Collateral covered in the Pledge Agreement and, upon the filing of UCC-1 Financing Statements in the required jurisdictions (which filings have been made or, if this representation and warranty is made on any date occurring

prior to the tenth Business Day following the Effective Date will be made within
ten Business Days following the Effective Date), the Pledge Agreement shall
constitute a fully perfected first priority Lien on, and security interest in,
all right, title and interest of the pledgors thereunder in such Collateral, in
each case prior and superior in right to any other Person.

(b)    The Security Agreement is effective to create in favor of the
Collateral Agent, for the ratable benefit of the Secured Creditors, a legal,
valid and enforceable security interest in that portion of the Collateral
covered in the Security Agreement and, upon the filing of UCC-1 Financing
Statements in the required jurisdictions (which filings have been made or, if
this representation and warranty is being made on any date occurring prior to
the tenth Business Day following the Effective Date, will be made within 10
Business Days following the Effective Date), the Security Agreement shall
constitute a fully perfected Lien on, and security interest in, all right, title
and interest of the Grantors thereunder in such Collateral, in each case prior
and superior in right to any other Person, other than with respect to Liens on
the Collateral expressly permitted by Section 6.01 and the Security Agreement.

SECTION 3.14. PUBLIC UTILITY HOLDINGS COMPANY. Neither the Borrower
nor any of its Subsidiaries is a "holding company," or a "subsidiary company" of
a "holding company," or an "affiliate" of a "holding company" or of a
"subsidiary company" of a "holding company" within the meaning of the Public
Utility Holdings Company Act of 1935, as amended.

SECTION 3.15. LABOR RELATIONS. Neither the Borrower nor any of its
Subsidiaries is engaged in any unfair labor practice that could reasonably be
expected, either individually or in the aggregate, to have a Material Adverse
Effect. There is (i) no unfair labor practice complaint pending against the
Borrower or any of its Subsidiaries, or, to the Borrower's

-72-

<PAGE>
Knowledge, threatened against any of them, before the National Labor Relations
Board, and no grievance or arbitration proceeding arising out of or under any
collective bargaining agreement is so pending against the Borrower or any of its
Subsidiaries or, to the Borrower's Knowledge, threatened against any of them,
(ii) no strike, labor dispute, slowdown or stoppage pending against the Borrower
or any of its Subsidiaries or, to the Borrower's Knowledge, threatened against
the Borrower or any of its Subsidiaries and (iii) no union representation
question in existence with respect to the employees of the Borrower or any of
its Subsidiaries, except (with respect to any matter specified in clause (i),
(ii) or (iii) above, either individually or in the aggregate) such as could not
reasonably be expected to have a Material Adverse Effect.

SECTION 3.16. INDEBTEDNESS. Schedule 3.16 sets forth a true and
complete list of all Indebtedness (including Guarantees but excluding surety
bonds and Capital Lease Obligations and other individual items of Indebtedness
in a principal amount less than $5,000,000) of the Borrower and its Subsidiaries
as of the Effective Date and which is to remain outstanding after the
transactions contemplated hereby, in each case showing the aggregate principal
amount thereof as of the date set forth in such Schedule 3.16 and the name of
the respective borrower and lender and any Loan Party or any of its Subsidiaries
which directly or indirectly guarantees such debt.

SECTION 3.17. INSURANCE. Schedule 3.17 sets forth a true and
complete listing of all insurance maintained by the Borrower and its
Subsidiaries as of the Effective Date, with the amounts insured (and any
deductibles) set forth therein.

SECTION 3.18. SUBORDINATION; DESIGNATION OF THE LOAN DOCUMENTS AS "SENIOR INDEBTEDNESS" AND "DESIGNATED SENIOR INDEBTEDNESS"; DESIGNATION OF THIS AGREEMENT AS THE "CREDIT AGREEMENT"; JUSTIFICATION OF INDEBTEDNESS INCURRED HEREUNDER; ETC. (a) The subordination provisions contained in the Subordinated Note Documents are enforceable against the Borrower, the Guarantors and the holders of the Subordinated Notes, and all Indebtedness of the Borrower or any Guarantor hereunder and under any Loan Document, including, without limitation, obligations to pay principal, interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law), premium, if any, reimbursement obligations under letters of credit, fees, expenses and indemnities, and all obligations under Hedging Agreements with respect hereto at any time outstanding is within the definition of "Senior Indebtedness" contained in each of the Subordinated Note Indentures, and each of the Subordinated Note Indentures define "Designated Senior Indebtedness" to include "Senior Indebtedness" under this Agreement.

(b)    This Agreement is and, at all times prior to the date on which all Obligations shall have been repaid in full and the total Commitments have been terminated (and no further Commitments may be provided hereunder), will be, the only "Credit Agreement" under and as defined in each of the Existing Note Indentures and the New Senior Note Indenture.

(c)    On the Effective Date, the amount of indebtedness permitted to be incurred pursuant to (i) clause (a)(i) of the definition of "Permitted Indebtedness" contained in the 10-1/8% Senior Note Indenture is $1,000,000,000, (ii) clause (i)(x) of the definition of

-73-

&lt;PAGE&gt;
"Permitted Indebtedness" contained in the 10-5/8% Senior Subordinated Note Indentures is $821,605,975 and (iii) clause (a)(i) of the definition of "Permitted Indebtedness" contained in the 9-7/8% Senior Subordinated Note Indenture is $1,000,000,000.

(d)    (i) On the Effective Date, all Loans incurred on such date will be incurred pursuant to (A) the Consolidated Fixed Charge Coverage Ratio (as defined therein) test contained in Section 10.10 of the 10-5/8% Senior Subordinated Note Indentures and (B) the Consolidated Fixed Charge Coverage Ratio (as defined therein) test contained in Section 4.09 of the 9-7/8% Senior Subordinated Note Indenture and (ii) all Loans made and Letters of Credit issued hereunder shall be permitted pursuant to such Section 10.10 and 4.09 of the 10-5/8% Senior Subordinated Note Indenture and the 9-7/8% Senior Subordinated Note Indenture, respectively.

(e)    All Indebtedness incurred hereunder shall be permitted under (i) the 10-1/8% Senior Note Indenture pursuant to the clause (a) of the definition of "Permitted Indebtedness" contained therein and (ii) the New Senior Note Indenture pursuant to clause (a) of the definition of "Permitted Indebtedness" contained therein, and upon the incurrence of any Loan or the issuance of any Letter of Credit, the Borrower shall make such calculations necessary to confirm that any and all such Indebtedness may be incurred pursuant to each such aforementioned clauses. The provisions of this clause (e) shall not prevent the Borrower or any of the Guarantors from classifying or reclassifying any indebtedness (other than the Loans made, and Letters of Credit issued, hereunder) pursuant to any other clause of the definition of Permitted Indebtedness under the 10-1/8% Senior Note Indenture or the New Senior Note Indenture in accordance with the last paragraph of the definition of Permitted

Indebtedness contained therein.

(f)    All incurrences of Loans and the issuance of all Letters of Credit as permitted under this Agreement are, and when incurred or issued will be, permitted under each of (and shall give rise to no breach or violation of any of) the Existing Note Indentures, the New Senior Note Documents and all documentation evidencing Later Maturing Indebtedness incurred pursuant to Sections 6.03(a)(iv), (v) and (xii).

SECTION 3.19. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZATION; ETC. Schedule 3.19 attached hereto (as of the Effective Date or, if later, the date of the most recent update to such Schedule pursuant to Section 5.01(f) or 6.14) contains (i) the exact legal name of the Borrower and each Guarantor, (ii) the type of organization of the Borrower and each Guarantor, (iii) whether or not the Borrower and each Guarantor is a registered organization, (iv) the jurisdiction of organization of the Borrower and each Guarantor, (v) the Borrower's and each Guarantor's Location and (vi) the organizational identification number (if any) of the Borrower and each Guarantor. To the extent that the Borrower or any Guarantor does not have an organizational identification number on the date hereof and later obtains one, the Borrower or such Subsidiary Guarantor shall promptly thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted pursuant to the Security Documents fully perfected and in full force and effect.

-74-

<PAGE>

ARTICLE IV

CONDITIONS

SECTION 4.01. EFFECTIVE DATE. The obligations of the Lenders to make Loans and of the Issuing Lenders to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received a favorable written opinion (addressed to the Agents and the Lenders and dated the Effective Date) of each of (i) Latham & Watkins, counsel for the Borrower, substantially in the form of Exhibit J, and (ii) such local counsel as may be requested by the Administrative Agent, which opinion shall cover matters as the Required Lenders or the Administrative Agent shall reasonably request.

(c)    The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each of the Borrower and the Guarantors and the authorization of the transactions contemplated hereby, all in form and substance satisfactory to the Agents and their counsel.

(d)    The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in paragraph (i) of this Section 4.01 and paragraphs (a), (b) and (c) of Section 4.02.

(e)    The Agents shall have received all fees and other amounts due and payable on or prior to the Effective Date, including in the case of the Agents, to the extent invoiced, reimbursement or payment or all out-of-pocket expenses required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Documents.

(f)    The Administrative Agent shall have received counterparts of the Pledge Agreement signed on behalf of the Borrower and each Subsidiary party thereto, together with stock certificates or other instruments (if any) representing all the Equity Interests pledged thereunder and stock powers or other instruments of transfer, endorsed in blank, with respect to such stock certificates and other equity interests.

(g)    The Administrative Agent shall have received counterparts of the Security Agreement signed on behalf of the Borrower and each Subsidiary party thereto, together with:

-75-

<PAGE>

(i)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Security Agreement; and

(ii)    results of a recent search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated in clause (i) above and in such other jurisdictions in which Collateral is located on the Effective Date which may be reasonably requested by the Administrative Agent, and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.01 and the Security Agreement or have been released.

(h)    The Administrative Agent shall have received counterparts of the Guarantee Agreement signed on behalf of the Borrower and each Subsidiary party thereto.

(i)    The Collateral Requirement and the Guarantee Requirement shall have been satisfied as of the Effective Date.

(j)    There shall have been delivered to the Administrative Agent true and correct copies of the Merger Documents, and all of the terms and conditions of the Merger Documents shall be in form and substance reasonably satisfactory to the Agents. All of the conditions precedent to the consummation of the Merger as set forth in the Merger Agreement shall have been satisfied (and not waived, unless consented to by the Agents) to the reasonable satisfaction of the Agents. The Merger shall have been consummated in accordance with the terms and conditions of the Merger Documents and all applicable laws. In addition, all assets acquired by the Borrower pursuant to the Merger shall be free and clear of any liens other than Liens permitted by Section 6.01 and the

Security Agreement.

(k)    (i) The Borrower shall have received gross cash proceeds
(calculated before underwriting fees) of at least $150,000,000 from the issuance
of common equity securities (the "Common Equity Financing") PROVIDED that to the
extent such gross cash proceeds are less than $250,000,000 the Borrower shall
have issued sufficient New Senior Notes such that the gross cash proceeds
(calculated before underwriting fees) received therefrom, together with the
gross cash proceeds (calculated before underwriting fees) received from the
Common Equity Financing is at least $350,000,000, and (ii) the Borrower shall
have used the entire amount of such gross cash proceeds to make payments owing
in connection with the Transaction prior to utilizing any proceeds of Loans for
such purpose. There shall have been delivered to the Lenders true and correct
copies of the Common Equity Financing Documents, and all of the terms and
conditions of the Common Equity Financing Documents shall be reasonably
satisfactory to the Agents and the Required Lenders.

-76-

<PAGE>
(l)    (i) The Borrower shall have received gross cash proceeds
(calculated before underwriting fees) of at least $100,000,000 from the issuance
of the New Senior Notes, PROVIDED that to the extent that the Borrower has
received less than $250,000,000 of gross cash proceeds (calculated before
underwriting fees) from the Common Equity Financing, the Borrower shall have
issued sufficient New Senior Notes such that the gross cash proceeds (calculated
before underwriting fees) received therefrom, together with the gross cash
proceeds (calculated before underwriting fees) received from the Common Equity
Financing is at least $350,000,000, and (ii) the Borrower shall have used the
entire amount of such gross cash proceeds to make payments owing in connection
with the Transaction prior to utilizing any proceeds of Loans for such purpose.
There shall have been delivered to the Lenders true and correct copies of the
New Senior Note Documents, and all the terms and conditions of the New Senior
Note Documents shall be reasonably satisfactory to the Agents and the Required
Lenders.

(m)    The total commitments pursuant to each Existing Credit
Agreement shall have been terminated, and all loans and notes with respect
thereto shall have been repaid in full (together with interest thereon), all
letters of credit issued thereunder shall have been terminated (or either
incorporated as Letters of Credit hereunder or fully supported with Letters of
Credit issued hereunder) and all other amounts (including premiums) owing
pursuant to each Existing Credit Agreement shall have been repaid in full. The
creditors (or the respective agent on behalf of such creditors) in respect of
each Existing Credit Agreement shall have concurrently terminated and released
all security interests in and Liens on the assets of the Borrower and its
Subsidiaries created pursuant to the security documentation relating to each
Existing Credit Agreement, and such creditors shall have returned all such
assets to the Borrower or such Subsidiary, and the Administrative Agent shall
have received evidence, in form and substance reasonably satisfactory to it,
that the matters set forth in this paragraph (m) have been satisfied as of the
Effective Date.

(n)    With respect to each series of certificates under the
Core-Mark Receivables Facility, the Borrower shall have either (i) delivered to
the Trustee and the Servicer under the Core-Mark Receivables Facility a notice
of the redemption of all such outstanding certificates and deposited with the
Trustee funds sufficient to redeem on the redemption date all outstanding
certificates, with such redemption to be consummated within 90 days following
the Effective Date or (ii) delivered a notice terminating the revolving credit

facility thereunder, with all outstanding amounts thereunder to be repaid from
the proceeds of accounts receivables securing the Core-Mark Receivables Facility
within 180 days after the Effective Date.

      (o)    The Borrower shall have (i) delivered an irrevocable notice of
the redemption of all outstanding Core-Mark Bonds to the holders thereof and
(ii) shall have deposited with the Trustee under the Core-Mark Bond Indenture
proceeds received from the Common Equity Financing sufficient to pay all
outstanding principal of, and interest due on, the Core-Mark Bonds on the date
of the redemption of the Core-Mark Bonds as the term pursuant to the Core-Mark
Bond Indenture (which date shall be no later than the 60th day following the
Effective Date). The Core-Mark Bond Indenture (and all

<div align="center">-77-</div>

&lt;PAGE&gt;
obligations of Core-Mark thereunder) shall have been discharged in accordance
with the provisions of Section 8.01(a) thereof. The Agents and the Required
Lenders shall have received copies of an officer's certificate of the Borrower,
an opinion of counsel and such other evidence reasonably requested by the
Administrative Agent that the conditions set forth in this Section 4.01(o) have
been satisfied.

      (p)    Nothing shall have occurred (and no Agent nor the Required
Lenders shall have become aware of any facts or conditions not previously known)
which such Agent or the Required Lenders shall determine has had, or could
reasonably be expected to have, a material adverse effect on the business,
properties, assets, operations, liabilities, prospects or conditions (financial
or otherwise) of Core-Mark and its Subsidiaries taken as a whole or of the
Borrower and its Subsidiaries taken as a whole.

      (q)    All necessary governmental (domestic and foreign) and material
third party approvals and/or consents in connection with the Transaction, the
other transactions contemplated hereby and the granting of Liens under the Loan
Documents shall have been obtained and remain in effect, and all applicable
waiting periods with respect thereto shall have expired without any action being
taken by any competent authority which restrains, prevents or imposes materially
adverse conditions upon the consummation of the Transaction or the other
transactions contemplated by the Transaction Documents or otherwise referred to
herein or therein. On the Effective Date, there shall not exist any judgment,
order, injunction or other restraint issued or filed or a hearing seeking
injunctive relief or other restraint pending or notified prohibiting or imposing
materially adverse conditions upon the Transaction or the other transactions
contemplated by the Transaction Documents or otherwise referred to herein or
therein.

      (r)    On the Effective Date, there shall be no actions, suits or
proceedings pending or, to the Borrower's Knowledge, threatened with respect to
the Transaction, this Agreement or any other Transaction Document or which the
Agents or the Required Lenders shall determine has had, or could reasonably be
expected to have, a Material Adverse Effect.

      (s)    The Administrative Agent shall have received:

           (i)    a solvency certificate, dated the Effective Date, from
the chief financial officer of the Borrower, in the form of Exhibit
K; and

           (ii)    except with respect to insurance where the respective
coverage is less than $5,000,000, certificates of insurance

complying with the requirements of Section 5.03 for the business and properties of the Borrower and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent and naming the Collateral Agent as an additional insured and/or as loss payee with respect to the Collateral, and stating that such insurance shall not be canceled without at least 30 days' prior written notice by the insurer to the Collateral Agent.

-78-

<PAGE>

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lenders to make Loans and of the Issuing Lenders to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 12:00 noon, New York City time, on September 18, 2002 (and, in the event all such conditions are not so satisfied or waived, the Commitments of each Lender and the commitment of each Issuing Lender to issue Letters of Credit hereunder shall terminate at such time).

SECTION 4.02. EACH BORROWING. The obligation of each Lender to make a Loan on the occasion of any Borrowing (other than any conversion or continuation of such Borrowing), and of the Issuing Lenders to issue, renew, extend or amend so as to increase the stated amount of any Letter of Credit, is subject to the receipt of an appropriate Borrowing Request under Section 2.03 or request for issuance, renewal, extension or amendment of a Letter of Credit under Section 2.06, as the case may be, and to the satisfaction of the following conditions:

(a)    The representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects, and the representations and warranties of the Borrower and the other Loan Parties set forth in the other Loan Documents shall be true and correct in all material respects, on and as of the date of such Borrowing or the date of such issuance, amendment, renewal or extension of such Letter of Credit, as applicable.

(b)    At the time of and immediately after giving effect to such Borrowing or such issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default shall have occurred and be continuing.

(c)    The obligation of each Lender with a Revolving Commitment to make Revolving Loans and the Obligation of the Swingline Lender to make Swingline Loans shall be subject to the satisfaction of the condition that at the time of each such extension of credit and immediately after giving effect thereto the Borrower and its Subsidiaries shall not hold cash and Temporary Cash Investments in an aggregate amount (after giving effect to the incurrence of such extension of credit and the application of proceeds therefrom and any other cash or Temporary Cash Investments) on hand (to the extent such proceeds and/or other cash or Temporary Cash Investments are actually utilized by the Borrower and/or any Subsidiary on the respective date of incurrence of the respective extension of credit for a permitted purpose other than an investment in Temporary Cash Investments) in excess of $100,000,000; PROVIDED that for the purposes of determinations made pursuant to this paragraph (c) cash and Temporary Cash Investments will not include Restricted Cash.

SECTION 4.03. INCREMENTAL TERM LOANS. The obligation of each

Incremental Term Loan Lender to make Incremental Term Loans pursuant to Section
2.01(b) is subject to the satisfaction of all of the applicable conditions set
forth in Sections 2.05 and 4.02.

-79-

<PAGE>
Each Borrowing (other than any conversion or continuation of such Borrowing) and
each such issuance, amendment, renewal or extension of a Letter of Credit shall
be deemed to constitute a representation and warranty by the Borrower on the
date thereof as to the matters specified in paragraphs (a), (b) and (c) and, in
the case of Incremental Term Loan Borrowings, (d) of this Section.

ARTICLE V

AFFIRMATIVE COVENANTS

          Until the Commitments have expired or been terminated and the
principal of and interest on each Loan and all fees payable hereunder shall have
been paid in full and all Letters of Credit shall have expired or terminated and
all LC Disbursements shall have been reimbursed, the Borrower covenants and
agrees with the Lenders that:

          SECTION 5.01. INFORMATION. The Borrower will deliver to the
Administrative Agent (who will promptly make available to each of the Lenders):

          (a)    as soon as available and in any event within 95 days after the
end of each fiscal year of the Borrower, a consolidated balance sheet of
the Borrower and its Consolidated Subsidiaries as of the end of such
fiscal year and the related consolidated statements of earnings and cash
flows for such fiscal year, setting forth in each case in comparative form
the figures for the previous fiscal year, all certified by Deloitte &
Touche or other independent public accountants of nationally recognized
standing, which certification shall not be subject to any "going concern"
or like qualification or exception or any qualification or exception as to
the scope of such audit;

          (b)    as soon as available and in any event within 50 days after the
end of each of the first three quarters of each fiscal year of the
Borrower, (i) a consolidated balance sheet of the Borrower and its
Consolidated Subsidiaries as of the end of such quarter setting forth in
comparative form the figures for the corresponding fiscal quarter of the
Borrower's previous fiscal year and (ii) the related consolidated
statement of earnings and cash flows of the Borrower and its Consolidated
Subsidiaries for such quarter and for the portion of the Borrower's fiscal
year ended at the end of such quarter setting forth in comparative form
the figures for the related periods in the previous fiscal year, all
certified (subject to normal year-end adjustments) as to fairness of
presentation, generally accepted accounting principles (except for the
omission of substantially all footnote disclosure as permitted by
Regulation S-X promulgated by the Securities and Exchange Commission under
the Securities Act of 1933, as amended) and consistency by the chief
financial officer or the chief accounting officer of the Borrower;

          (c)    simultaneously with the delivery of each set of financial
statements referred to in paragraphs (a) and (b) above, a certificate of a
Financial Officer (i) setting forth in reasonable detail the calculations
required to establish whether the Borrower was in compliance with the
requirements of Sections 5.08, 6.02, 6.03, 6.04, 6.06, 6.08, 6.09, 6.10
and 6.11 on the date of such financial statements, (ii) setting forth in

reasonable detail the calculations establishing that all Loans and Letters of Credit incurred hereunder

-80-

<PAGE>

were incurred in accordance with the requirements of the Existing Note Indentures and the New Senior Note Indenture, in each case in a manner consistent with the representations and warranties made pursuant to clauses (d), (e) and (f) of Section 3.18, (iii) stating whether any Default exists on the date of such certificate and, if any Default then exists, setting forth the details thereof and the action which the Borrower is taking or proposes to take with respect thereto and (iv) setting forth (x) each Plan that has an Unfunded Liability (other than any such Plan which was previously disclosed on the Borrower's most recently filed Form 10-K) and (y) any material increase in the Unfunded Liabilities of any Plan previously disclosed on the Borrower's most recently filed Form 10-K and any Plan disclosed by the Borrower pursuant to preceding clause (x);

(d)    simultaneously with the delivery of each set of financial statements referred to in paragraph (a) above, a statement of the firm of independent public accountants that audited such statements, which audit shall be in accordance with generally accepted auditing standards, (i) stating whether anything has come to their attention to cause them to believe that any Default existed on the date of such statements and (ii) confirming the calculations establishing whether the Borrower was in compliance with Sections 6.08 through 6.11, inclusive, set forth in the officer's certificate delivered simultaneously therewith pursuant to paragraph (c) above;

(e)    no later than 60 days following the first day of each fiscal year of the Borrower (commencing with its fiscal year commencing in 2003), a budget in form reasonably satisfactory to the Administrative Agent (including budgeted statements of income, sources and uses of cash and balance sheets for the Borrower and its Subsidiaries on a consolidated basis prepared by the Borrower (i) for each quarter of such fiscal year prepared in detail and (ii) for each immediately succeeding fiscal year through and including the fiscal year in which the then latest Maturity Date occurs, prepared in summary form, in each case setting forth, with appropriate discussion, the principal assumptions upon which such budgets are based;

(f)    simultaneously with the delivery of each set of financial statements referred to in paragraphs (a) and (b) above, a certificate either (i) certifying that no changes are required to be made to Schedules 3.09 and 3.19, Annex C of the Security Agreement or Annexes A through F of the Pledge Agreement, in each case so as to make the information set forth therein accurate and complete as of the date of such certificate or (ii) to the extent such information is no longer accurate and complete as of such date, (x) setting forth in reasonable detail all information necessary to make all such Schedules and Annexes accurate and complete (at which time such Schedules and/or such Annexes, as the case may be, shall be deemed to be modified to reflect such information) and (y) certifying that all action required to be taken pursuant to the Security Agreement and the Pledge Agreement as a consequence of the changes giving rise to the update of said Schedules and/or Annexes as provided above has been taken;

(g)    within five Business Days after the obtaining of the

Borrower's Knowledge of any Default, a certificate of the chief financial
officer, treasurer or the chief accounting officer of the Borrower setting
forth the details thereof and the action which the Borrower is taking or
proposes to take with respect thereto;

-81-

<PAGE>
        (h)    promptly upon the mailing thereof to the shareholders of the
Borrower generally, copies of all financial statements, reports and proxy
statements so mailed;

        (i)    promptly upon the filing thereof, copies of all registration
statements (other than the exhibits thereto and any registration
statements on Form S-8 or its equivalent) and reports on Forms 10-K, 10-Q
and 8-K (or their equivalents) that the Borrower shall have filed with the
Securities and Exchange Commission;

        (j)    if and when the Borrower, any Subsidiary or any ERISA
Affiliate (i) gives or is required to give notice to the PBGC of any
Reportable Event, or knows that the plan administrator of any Plan has
given or is required to give notice of any such Reportable Event, a copy
of the notice of such Reportable Event given or required to be given to
the PBGC; (ii) receives notice of complete or partial withdrawal liability
under Title IV of ERISA or notice that any Multiemployer Plan is in
reorganization, is insolvent or has been terminated, a copy of such
notice; (iii) receives notice from the PBGC under Title IV of ERISA of an
intent to terminate, impose liability (other than for premiums under
Section 4007 of ERISA) in respect of, or appoint a trustee to administer
any Plan, a copy of such notice; (iv) applies for a waiver of the minimum
funding standing under Section 412 of the Internal Revenue Code, a copy of
such application; (v) gives notice of intent to terminate any Plan under
Section 4041(c) of ERISA, a copy of such notice and other information
filed with the PBGC; (vi) gives notice of withdrawal from any Plan
pursuant to Section 4063 of ERISA, a copy of such notice; (vii) receives
notice that a proceeding has been instituted pursuant to Section 515 of
ERISA to collect a delinquent contribution to a Plan or Multiemployer
Plan, a copy of such notice; or (viii) fails to make any payment or
contribution to any Plan or Multiemployer Plan or in respect of any
Benefit Arrangement, or makes any amendment to any Plan or Benefit
Arrangement, which has resulted in or could result in the imposition of a
Lien or the posting of a bond or other security, a certificate of the
chief financial officer, treasurer or the chief accounting officer of the
Borrower setting forth details as to such occurrence and action, if any,
which the Borrower, the applicable Subsidiary or applicable ERISA
Affiliate is required or proposes to take; and

        (k)    from time to time such additional information regarding the
condition (financial or otherwise), business or affairs of the Borrower as
the Administrative Agent, at the request of any Lender, may reasonably
request.

        SECTION 5.02. PAYMENT OF OBLIGATIONS. The Borrower will pay and
discharge, and will cause each Subsidiary to pay and discharge, at or before
maturity, all their respective obligations and liabilities except where the
same may be contested in good faith by appropriate proceedings or where the failure
to do so would not result in a Material Adverse Effect, and will maintain, and
will cause each Subsidiary to maintain, in accordance with GAAP, appropriate
reserves for the accrual of any and all of the same. The Borrower will pay and
discharge, and will cause each of its Subsidiaries to pay and discharge, all

taxes, assessments and governmental charges or levies imposed upon it or upon
its income or profits, or upon any properties belonging to it, in each case on a
timely basis, and all lawful claims which, if unpaid, might become a lien or
charge upon any properties of the Borrower or any of its Subsidiaries; PROVIDED
that neither the Borrower nor any of its Subsidiaries shall be required to pay
any

                                   -82-

<PAGE>
such tax, assessment, charge, levy or claim which is being contested in good
faith and by proper proceedings if it has maintained adequate reserves with
respect thereto in accordance with GAAP.

        SECTION 5.03. MAINTENANCE OF PROPERTY; INSURANCE. (a) The Borrower
will keep, and will cause each Subsidiary to keep, all property useful and
necessary in its business in good working order and condition, ordinary wear and
tear excepted, except where the failure to do so would not have a Material
Adverse Effect.

        (b)    The Borrower will, and will cause each of its Subsidiaries to,
maintain (either in the name of the Borrower or in such Subsidiary's own name)
with financially sound and responsible insurance companies, insurance on all
their respective properties in at least such amounts and against at least such
risks (and with such risk retention) as are usually insured against in the same
general areas by companies of established repute engaged in the same or a
similar business; and will furnish to the Administrative Agent upon its request
(for distribution to the Lenders), information presented in reasonable detail as
to the insurance so carried.

        SECTION 5.04. MAINTENANCE OF EXISTENCE. The Borrower will preserve,
renew and keep in full force and effect, and, except as permitted by Section
6.02, will cause each Subsidiary to preserve, renew and keep in full force and
effect their respective corporate existence and their respective rights,
privileges and franchises necessary or desirable in the normal conduct of
business; PROVIDED that a Reincorporation Merger shall be permitted in
accordance with the provisions of Section 6.02(k).

        SECTION 5.05. COMPLIANCE WITH LAWS. The Borrower will comply, and
cause each Subsidiary to comply, in all material respects with all applicable
laws, ordinances, rules, regulations, and requirements of Governmental
Authorities (including, without limitation, Environmental Laws and ERISA and the
rules and regulations thereunder) except where (i) the necessity of compliance
therewith or the resultant penalty, fine or cost for non-compliance is contested
in good faith by appropriate proceedings and the Borrower or the respective
Subsidiary has maintained adequate reserves as required by GAAP with respect
thereto or (ii) the failure to do so would not have a Material Adverse Effect.

        SECTION 5.06. INSPECTION OF PROPERTY, BOOKS AND RECORDS; COLLATERAL
AUDITS. (a) The Borrower will keep, and will cause each of its Subsidiaries to
keep, proper books of record and account in which full, true and correct entries
shall be made of all dealings and transactions in relation to its business and
activities; and will permit, and will cause each Subsidiary to permit,
representatives of the Administrative Agent (at the Borrower's expense) or any
Lender (at such Lender's expense) to visit and inspect any of their respective
properties, to examine and make abstracts from any of their respective books and
records and to discuss their respective affairs, finances and accounts with
their respective officers, employees and independent public accountants, all at
such reasonable times and as often as may reasonably be requested; PROVIDED that
this section shall not be construed to require the Borrower to waive or cause to