be waived any attorney-client privilege applicable to information in the
Borrower's or a Subsidiary's possession. Each Lender agrees to maintain in
confidence (in accordance with the provisions of Section 9.12) any information
clearly identified in writing by the Borrower or any Subsidiary as trade secrets
or proprietary information which such Lender

                                   -83-

<PAGE>
may obtain as a result of the inspections, examinations and discussions
undertaken pursuant to this Section.

        (b)    Upon the request of any Joint Book Manager or the Required
Lenders (and at the Borrower's expense), which request shall be made no more
than once a year unless a Specified Default exists, an audit of the Collateral,
which audit (including the scope thereof) shall be reasonably acceptable to, and
performed by an auditor satisfactory to, the Joint Book Managers.

        SECTION 5.07. USE OF PROCEEDS. (a) All proceeds of the B Term Loans
will be used by the Borrower to finance, in part, the Transaction and to pay the
fees and expenses related thereto (although no such proceeds shall be used to
finance the redemption of the Core-Mark Bonds).

        (b)    All proceeds of the Revolving Loans and the Swingline Loans
will be used for the working capital, Capital Expenditures and general corporate
purposes of the Borrower and its Subsidiaries; PROVIDED that up to, but no more
than, $200,000,000 of Revolving Loans may be used by the Borrower to finance, in
part, the Transaction and to pay the fees and expenses related to the
Transaction (although no such proceeds shall be used to finance the redemption
of the Core-Mark Bonds).

        (c)    All proceeds of the Incremental Term Loans will be used (i) to
finance Acquisitions, (ii) to repay, redeem or repurchase outstanding
Indebtedness to the extent same are permitted under Section 6.03(b) and to pay
fees and expenses in connection with clauses (i) and (ii), and (iii) to repay
outstanding Revolving Loans.

        (d)    No portion of any Loans (or the proceeds thereof) will be used
to purchase or carry any Margin Stock or to extend credit for the purpose of
purchasing or carrying any Margin Stock. Neither the making of any Loan nor the
use of the proceeds thereof nor the extension of any other credit pursuant to
this Agreement will violate or be inconsistent with the provisions of Regulation
T, U or X of the Board of Governors of the Federal Reserve System.

        SECTION 5.08. GUARANTEE REQUIREMENT; COLLATERAL REQUIREMENT; FURTHER
ASSURANCES. (a) If at any date the Guarantee Requirement is not met, the
Borrower will promptly (and, in any event, within 30 calendar days thereafter)
cause one or more Subsidiaries that are not then Guarantors to become parties to
the Guarantee Agreement so as to cause the Guarantee Requirement to be met;
PROVIDED that if any Subsidiary is required to become a Guarantor pursuant to
the second sentence of the definition of Guarantee Requirement contained herein,
each such Subsidiary shall be required to become party to the Guarantee
Agreement prior to, or concurrently with, its provision of any guarantee which
requires it to become a Guarantor pursuant to the second sentence of the
definition of Guarantee Requirements contained herein.

        (b)    If at any date the Collateral Requirement is not met, the
Borrower will promptly (and, in any event, within 30 calendar days thereafter)
take and cause the Subsidiaries to take all such actions as shall be necessary,
or as the Required Lenders, the Administrative Agent or the Collateral Agent may

reasonably request, to cause the Collateral Requirement to be

-84-

<PAGE>

met; PROVIDED that if the Collateral Requirement would not be met as a result of any transfer of assets to, or investment in, any Subsidiary, the Collateral Requirement shall instead be required to be satisfied on the date of the respective such transfer or investment.

(c)    The Borrower will, and will cause each Subsidiary to (i) cause each landlord in respect of real property (other than landlords in respect of retail locations) leased by the Borrower or such Subsidiary (other than pursuant to assumed or acquired leases) after the Effective Date to enter into a Landlord-Lender Agreement and each mortgagee in respect of any real property owned by the Borrower or such Subsidiary that is subjected to a mortgage (other than assumed or acquired mortgages) after the Effective Date to enter into a Mortgagee Agreement and (ii) use commercially reasonable efforts (which shall not include the payment of any amount other than nominal amounts) to cause each landlord in respect of real property (other than landlords in respect of retail locations) of the Borrower or such Subsidiary leased pursuant to leases entered into prior to the Effective Date (or assumed or acquired after the Effective Date) to enter into a Landlord-Lender Agreement and each mortgagee of any real property owned by the Borrower or such Subsidiary that was subjected to a mortgage prior to the Effective Date (or assumed or acquired after the Effective Date) to enter into a Mortgagee Agreement.

(d)    The Borrower will, and will cause each Subsidiary to, execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to grant, confirm, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents. Such security interests and Liens shall be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance satisfactory to the Collateral Agent, and the Borrower shall deliver or cause to be delivered to the Lenders all such instruments and documents (including legal opinions and lien searches) as the Collateral Agent shall reasonably request to evidence compliance with this paragraph (d). The Borrower shall provide from time to time such evidence as the Collateral Agent shall reasonably request as to the perfection and priority status of each such security interest.

SECTION 5.09. CORE-MARK RECEIVABLES FACILITY. On or prior to the respective date therefor determined in accordance with the elections made by the Borrower as contemplated in Section 4.01(n), all commitments pursuant to the Core-Mark Receivables Facility Documents shall have been terminated and all outstanding loans and other amounts with respect thereto shall have been repaid in full as contemplated in Section 4.01(n). In addition, on or prior to such date, all security interests in and Liens on the assets of CM Capital and each other Loan Party created pursuant to the Core-Mark Receivables Facility Documents shall have been released, and the trustee under the Core-Mark Receivables Facility shall have transferred all such remaining assets to CM Capital, and the Administrative Agent shall have received evidence in form and substance reasonably satisfactory to it, that the matters set forth in this Section 5.09 have been satisfied as of such date.

-85-

<PAGE>

ARTICLE VI

NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full and all Letters of Credit have expired or terminated and all LC Disbursements have been reimbursed, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01. LIENS. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired by it, except:

(a)    Liens created under the Loan Documents;

(b)    Liens existing on the date hereof and described in Schedule 6.01 hereto (without giving effect to any extension or renewal thereof except as permitted under paragraph (g) of this Section); PROVIDED that if Schedule 6.01 provides a date by which any such Lien must be released, the respective Lien shall not be permitted to exist after such date;

(c)    any Lien existing on any asset of any Person at the time (if after the date hereof) such Person becomes a Consolidated Subsidiary and not created in contemplation of such event so long as (x) any Indebtedness secured by such Lien is permitted under Section 6.03(a)(ix) or (x) and (y) such Lien does not extend to any other asset or property of the Borrower or any of its Subsidiaries;

(d)    any Lien on any asset securing Indebtedness incurred or assumed (after the date hereof) for the purpose of financing all or any part of the cost of acquiring or constructing such asset (other than any Lien on Inventory or other Collateral), PROVIDED that such Lien attaches to such asset concurrently with or within 180 days after the acquisition or completion of construction thereof and does not extend to any other asset or property of the Borrower or any of its Subsidiaries;

(e)    any Lien on any asset of any Person existing at the time (if after the date hereof) such Person is merged or consolidated with or into the Borrower or a Consolidated Subsidiary and not created in contemplation of such event so long as (x) any Indebtedness secured by such Lien is permitted under Section 6.03(a)(ix) or (x) and (y) such Lien does not extend to any other asset or property of the Borrower or any of its Subsidiaries;

(f)    any Lien existing on any asset prior to the acquisition thereof (if after the date hereof) by the Borrower or a Consolidated Subsidiary and not created in contemplation of such acquisition so long as any Indebtedness secured by such Lien is permitted under Section 6.03(a)(ix) or (x);

(g)    any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses (b)

-86-

<PAGE>

through (f) of this Section, PROVIDED that such Indebtedness (i) is not

increased above the amount thereof at the time of any such refinancing, extension, renewal or refunding other than by an amount equal to any premium actually paid in connection with such refinancing, extension, renewal or refunding plus any reasonable financing fees, (ii) is not secured by any additional assets and (iii) except as otherwise expressly permitted in clause (E) of the proviso to Section 6.03(a)(xii), is not provided any additional Guarantees or credit support by the Borrower or any Subsidiary;

(h)     Liens arising in the ordinary course of its business (but not inconsistent with the Collateral Requirement) which (i) either (x) do not secure Indebtedness or Hedging Agreements, (y) are statutory Liens or (z) apply to equipment purchased pursuant to a title retention document and (ii) either (x) do not in the aggregate materially detract from the value of the assets of the Borrower or the respective Subsidiary or materially impair the use thereof in the operation of its business or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien;

(i)     Liens (but not inconsistent with the Collateral Requirement) in favor of the Borrower or another Consolidated Subsidiary that is a Guarantor;

(j)     Liens (on the property subject to the respective capital lease) securing Capital Lease Obligations incurred by the Borrower or any Subsidiary to the extent such Capital Lease Obligations are permitted under Section 6.03(a)(viii);

(k)     any Lien on any Financing Note transferred pursuant to a Permitted Note Sale so long as such Lien does not extend to any other assets or property of the Borrower or any of its Subsidiaries;

(l)     Liens arising in connection with, and on the property subject to, Sale-Leaseback Transactions consummated in accordance with the terms set forth in the definition thereof so long as such Lien does not extend to any other asset or property of the Borrower or any of its Subsidiaries;

(m)     Liens existing pursuant to the Core-Mark Receivables Facility Documents, but only until the fifth Business Day after the earlier of (i) the 180th day following the Effective Date and (ii) the date of termination of the Core-Mark Receivables Facility;

(n)     Liens on proceeds from Indebtedness incurred pursuant to Section 6.03(a)(xii) that have been deposited as contemplated in clause (B) of the proviso contained therein, but only for so long as the time period contemplated in such proviso;

(o)     easements, rights-of-way, restrictions, minor defects or irregularities in title and other similar charges or encumbrances not interfering in any material respect with (x) the ordinary conduct of the business of the Borrower or any of its Subsidiaries or (y) the ability of the Collateral Agent to access the Collateral;

(p)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default pursuant to clause (j) of Article VII so long as the

-87-

<PAGE>

aggregate fair market value (as determined in good faith by the Borrower)
of all assets subject to such Liens does not exceed $15,000,000;

(q)    Liens (other than any Lien imposed by ERISA) incurred or
deposits made in the ordinary course of business in connection with
workers' compensation, unemployment insurance and other types of social
security, or to secure the performance of tenders, statutory obligations,
surety and appeal bonds, bids, leases, government contracts, performance
and return-of-money bonds and other similar obligations incurred in the
ordinary course of business (exclusive of obligations in respect of the
payment of borrowed money); PROVIDED that any consensual Liens as
described above (x) shall not apply or attach to any of the Collateral and
(y) shall not be secured at any time by cash, Temporary Cash Investments
and/or other property with an aggregate fair market value in excess of
$15,000,000; and

(r)    Liens (but not inconsistent with the Collateral Requirement)
not otherwise permitted by the foregoing clauses of this Section securing
Indebtedness in an aggregate principal or stated amount at any time
outstanding not in excess of $25,000,000.

SECTION 6.02. CONSOLIDATION, MERGER, SALE OF ASSETS, ETC. The
Borrower will not, and will not permit any of its Subsidiaries to, wind up,
liquidate or dissolve its affairs or enter into any transaction of merger or
consolidation, or convey, sell, lease or otherwise dispose of all or any part of
its property or assets, or enter into any sale-leaseback transactions, of any
Person, except that:

(a)    each of the Borrower and its Subsidiaries may make sales of
inventory in the ordinary course of business;

(b)    each of the Borrower and its Subsidiaries may sell obsolete,
uneconomic, excess or worn-out equipment, materials or other assets (other
than real property) in the ordinary course of business;

(c)    the Borrower and its Subsidiaries may sell assets (including
the Equity Interests of any Subsidiary but only if 100% of the Equity
Interests of such Subsidiary held by the Borrower and its other
Subsidiaries are sold, but excluding Indebtedness or other obligations
(other than real property leases) owed by the Borrower or any Subsidiary),
so long as (i) in the event that the fair market value (as determined in
good faith by the Borrower) of the assets the subject of such sale exceed
$25,000,000, the Borrower is in compliance with Sections 6.09, 6.10 and
6.11 on a Pro Forma Basis after giving effect thereto, (ii) each such sale
is in an arm's-length transaction and the Borrower or the respective
Subsidiary receives at least fair market value therefor (as determined in
good faith by the Borrower or such Subsidiary, as the case may be), (iv)
the total consideration (taking the amount of cash and Temporary Cash
Investments, and the fair market value (as determined by the Borrower in
good faith) of all other consideration received by the Borrower or such
Subsidiary) is at least 75% cash and is paid at the time of the closing of
such sale, (v) the Net Proceeds therefrom are applied and/or reinvested as
(and to the extent) required by Section 2.12(b) and (vi) the aggregate
amount of the proceeds (taking the amount of cash and Temporary Cash
Investments, and

-88-

<PAGE>

the fair market value (as determined by the Borrower in good faith) of all other consideration) received from all assets sold pursuant to this clause (c) in any fiscal year of the Borrower shall not exceed $50,000,000; PROVIDED that the Borrower shall have an additional aggregate basket (for the period from the Effective Date until the termination of the covenants contained in this Article VI in accordance with the introductory paragraph hereof) for asset sales as described above (determining the aggregate proceeds therefrom as calculated above but net of amounts described in clause (iii) of the definition of Net Proceeds) in an amount equal to the Additional Asset Sale Basket Amount, which may be used by the Borrower so long as (w) at the time of any asset sale which utilizes, in whole or in part, the Additional Asset Sale Basket Amount (and immediately after giving effect thereto), no Default shall be in existence, (x) the Borrower notifies the Administrative Agent in writing, at the time of the consummation of any asset sale which will utilize the Additional Asset Sale Basket Amount of its election to justify same under the Additional Asset Sale Basket Amount (and showing in reasonable detail the required repayments pursuant to Section 2.12(b)), (y) the only assets sold pursuant to this proviso (and which utilize the Additional Asset Sale Basket Amount) shall be of the type set forth on Part II of Schedule 6.02(c) and (z) all repayments of Loans required pursuant to Section 2.12(b) are made at the time of any utilization of the Additional Asset Sale Basket Amount;

(d)    the Borrower and its Subsidiaries may sell real property and/or equipment the subject of Sale-Leaseback Transactions, in each case on the terms set forth in the definition thereof;

(e)    the Borrower and its Subsidiaries may sell Financing Notes in connection with Permitted Note Sales; PROVIDED that any residual liability incurred by the Borrower or any Subsidiary in connection therewith shall be permitted under Section 6.06(vi);

(f)    each of the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, Accounts arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing or factoring transaction;

(g)    each of the Borrower and its Subsidiaries may, in the ordinary course of business, grant licenses, sublicenses or leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto;

(h)    (i) any Subsidiary of the Borrower may transfer assets to the Borrower or to any Wholly-Owned Domestic Subsidiary which is a Guarantor, so long as the security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer) and (ii) any Subsidiary of the Borrower that is not a Guarantor may transfer assets to another Subsidiary of the Borrower that is not a Guarantor;

-89-

<PAGE>
(i)    any Subsidiary of the Borrower may merge with and into, or be dissolved or liquidated into, the Borrower or any Wholly-Owned Domestic

Subsidiary which is a Guarantor so long as (i) in the case of any such merger, dissolution or liquidation involving the Borrower, the Borrower is the surviving corporation of any such merger, dissolution or liquidation (it being understood and agreed that the Borrower may not be liquidated or dissolved), (ii) in all other cases, the respective Guarantor is the surviving corporation of any such merger, dissolution or liquidation and (iii) in all cases, the security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of such Subsidiary shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, dissolution or liquidation);

    (j)   until the earlier of (i) the 180th day following the Effective Date and (ii) the termination of the Core-Mark Receivables Facility as contemplated in Section 4.01(n), sales, contributions and other transfers pursuant to the terms of the Core-Mark Receivables Facility Documents shall be permitted;

    (k)   upon not less than 10 days' prior written notice to the Administrative Agent, the Borrower may merge into a newly-formed corporation that has no assets (other than de minimis cash and assets of de minimis value contributed to such corporation in connection with its initial capitalization) or liabilities and is organized under the State of Delaware or another State of the United States of America reasonably acceptable to the Administrative Agent solely for the purposes of reincorporating the Borrower in such State (any such merger consummated pursuant to this clause (k), the "Reincorporation Merger"); PROVIDED that (i) the security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of the Borrower shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger) and (ii) the Borrower shall have taken all actions (including without limitation (x) providing the Administrative Agent with updated information to make Schedule 3.19 true and correct after giving effect to the Reincorporation Merger and (y) the filing of appropriate UCC-1 Financing Statements (or amendments to any existing Financing Statements)) required by law or reasonably requested by the Administrative Agent such that all such assets remain subject to the perfected security interests described in preceding clause (i);

    (l)   the Borrower and its Subsidiaries may exchange assets with other Persons so long as (i) the Borrower or the respective Subsidiary acquires replacement assets having substantially the same fair market value (as determined in good faith by the Borrower) of the assets disposed in connection with such exchange and (ii) the aggregate fair market value (as determined in good faith by the Borrower) of all assets disposed of pursuant to such exchanges pursuant to this clause (l) does not exceed $50,000,000;

    (m)   any Subsidiary of the Borrower having assets with the fair market value (as determined in good faith by the Borrower) of less than $50,000 may be liquidated so long as all residual assets remaining upon such liquidation (i.e., all assets remaining after satisfaction of the obligations owing by such Subsidiary to its creditors) are forthwith distributed by Dividends paid in accordance with Section 6.04(a) or (b); and

-90-

<PAGE>

(n)  the Borrower and its Subsidiaries may effect Acquisitions in accordance with the requirements of Section 6.06(iii) and (vii).

Notwithstanding anything to the contrary contained above, so long as any of the Specified Restrictive Provisions remain in effect, the provisions of this Section 6.02 shall not be violated by reason of (i) any sale, lease, transfer or other disposition (for purposes of this sentence, each a "transfer") of property by the Borrower or any Restricted Subsidiary to the Borrower or any Restricted Subsidiary which is a Wholly Owned Subsidiary (as defined in the Fleming Existing Credit Agreement), (ii) any transfer by any Restricted Subsidiary which is not a Designated Subsidiary (as defined in the Fleming Existing Credit Agreement) of any of its property to the Borrower or any Restricted Subsidiary, (iii) any transfer by the Borrower or any Designated Subsidiary (as defined in the Fleming Existing Credit Agreement) to a Restricted Subsidiary which is not a Wholly Owned Subsidiary (as defined in the Fleming Existing Credit Agreement) of (x) property in a transaction which does not involve a "substantial part" of the property of the Borrower and its Subsidiaries (as defined in the Fleming Existing Credit Agreement), it being understood and agreed that for purposes of this clause (x) a transfer of the property of the Borrower or a Subsidiary shall be deemed to be a "substantial part" of such property if the amount of property proposed to be disposed of when added to the amount of all other property transferred (other than in the ordinary course of business and other than as permitted by following clause (y)) during any one fiscal year of the Borrower contributed more than 30% of EBITDAR (as defined in the Fleming Existing Credit Agreement) for any one of the immediately preceding three fiscal years of the Borrower, and (y) the Borrower or any Restricted Subsidiary may sell, lease, transfer or otherwise dispose of one or more warehouse facilities to the Borrower or a Restricted Subsidiary (in transactions not meeting any tests in the foregoing provisions of this sentence), PROVIDED that (i) such transactions do not in the aggregate involve all or substantially all of the property of the Borrower and its Subsidiaries (as defined in the Fleming Existing Credit Agreement) and (ii) the Borrower or any Subsidiary (as defined in the Fleming Existing Credit Agreement) retains the right to receive at least 85% of the revenue derived from such warehouse facilities, notwithstanding the sale thereof.

To the extent the Required Lenders waive the provisions of this Section 6.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.02 (other than to the Borrower or a Subsidiary thereof) such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 6.03. INDEBTEDNESS. (a) The Borrower will not, and will not permit any Subsidiary to, incur or at any time be liable with respect to any Indebtedness except:

(i)        Indebtedness outstanding under the Loan Documents;

(ii)       Permitted Existing Indebtedness, but no extensions or renewals thereof, except to the extent permitted under paragraph (xii) of this Section 6.03(a);

(iii)      (a) unsecured Indebtedness of the Borrower and any Subsidiary, as guarantor, incurred under the 10-1/8% Senior Notes and the other 10-1/8% Senior Note Documents in an aggregate principal amount not to exceed $355,000,000 less the amount

-91-

<PAGE>

of any repayments of principal thereof after the Effective Date; (b)
unsecured senior subordinated Indebtedness of the Borrower and any
Subsidiary, as guarantor, incurred under the 10-5/8% Senior Subordinated
Notes and the other 10-5/8% Senior Subordinated Note Documents in an
aggregate principal amount not to exceed $400,000,000 less the amount of
any repayments of principal thereof after the Effective Date; (c)
unsecured senior subordinated Indebtedness of the Borrower and any
Subsidiary, as guarantor, incurred under the 9-7/8% Senior Subordinated
Notes and the other 9-7/8% Senior Subordinated Note Documents in an
aggregate principal amount not to exceed $260,000,000 less the amount of
any repayments of principal thereof after the Effective Date; (d)
unsecured senior subordinated Indebtedness of the Borrower and any
Guarantor, as guarantor, incurred under the 5-1/4% Convertible Senior
Subordinated Notes and the other 5-1/4% Convertible Senior Subordinated
Note Documents in an aggregate principal amount not to exceed $150,000,000
less the amount of any repayments of principal thereof after the Effective
Date; and (e) unsecured Indebtedness of the Borrower and any Guarantor, as
guarantor, incurred under the New Senior Notes and the other New Senior
Note Documents in an aggregate principal amount not to exceed $200,000,000
less the amount of any repayments of principal thereof after the Effective
Date;

        (iv)        so long as (x) no Default then exists or would exist
immediately after giving effect to the incurrence thereof and (y) the
Borrower is in compliance with Sections 6.09 and 6.10 on a Post-Test
Period Pro Forma Basis after giving effect to the incurrence thereof,
Later Maturing Indebtedness that is subordinated to the Obligations on
terms not less favorable to the Lenders than the terms applicable to the
Subordinated Notes, and subordinated Guarantees thereof by Guarantors (so
long as the respective such Person remains a Guarantor) so long as the
subordination of such Guarantees is on terms not less favorable to the
Lenders than the terms applicable to the subordinated Guarantees of the
Subordinated Notes;

        (v)        so long as (x) no Default then exists or would exist
immediately after giving effect to the incurrence thereof, (y) the
Borrower is in compliance with Sections 6.09 and 6.10 on a Post-Test
Period Pro Forma Basis after giving effect to the incurrence thereof and
(z) the Total Senior Leverage Ratio after giving effect to the incurrence
thereof is less than 3.00:1.00, other Later Maturing Indebtedness, and
Guarantees thereof by one or more Guarantors (so long as the respective
such Person remains a Guarantor);

        (vi)        Indebtedness of the Borrower owing to a Wholly-Owned
Subsidiary or of a Consolidated Subsidiary owing to the Borrower or a
Wholly-Owned Subsidiary or Indebtedness of the Borrower owing to a
Subsidiary that is not a Wholly-Owned Subsidiary, PROVIDED that any such
Indebtedness of the Borrower owing to any such non-Wholly-Owned Subsidiary
(x) arises out of the Borrower's cash management activities in the
ordinary course of business or (y) is subordinated to the Obligations
pursuant to a subordination agreement in the form of Exhibit L;

        (vii)        Guarantees made by the Borrower or any Subsidiary
constituting Customer Support so long as all such Guarantees are permitted
under Section 6.06(vi);

-92-

<PAGE>

(viii)    obligations of the Borrower or its Subsidiaries as lessee under capital leases the aggregate capitalized amount of which does not exceed $450,000,000 at any time outstanding, and any Guarantees of such obligations;

(ix)    Indebtedness assumed by the Borrower or any Subsidiary in connection with an Acquisition (if after the date hereof) and not created in contemplation of such Acquisition, PROVIDED that (x) such Indebtedness is not outstanding under any working capital facility or a bank or similar loan agreement and (y) all Capital Lease Obligations assumed pursuant to this clause (ix) shall be deemed to constitute a utilization of (and must be incurred in compliance with) the basket contained in clause (viii) of this Section and all other Indebtedness incurred pursuant to this clause (ix) shall be deemed to constitute a utilization of the basket(s) contained in clause (xiv) and/or clause (xv) of this Section; PROVIDED that to the extent any such Indebtedness is deemed to constitute a utilization of the basket contained in clause (xiv) hereof, the Borrower shall be required to establish that the Total Senior Leverage Ratio after giving effect to the incurrence of such Indebtedness is less than 3.00:1.00;

(x)    Indebtedness of any corporation outstanding at the time (if after the date hereof) such corporation, limited liability company or partnership becomes a Consolidated Subsidiary and not created in contemplation of such event so long as (x) such Indebtedness is not outstanding under any working capital facility or a bank or similar loan agreement and (y) all Capital Lease Obligations assumed pursuant to this clause (x) shall be deemed to constitute a utilization of (and must be incurred in compliance with) the basket contained in clause (viii) of this Section and all other Indebtedness incurred pursuant to this clause (x) shall be deemed to constitute a utilization of the basket(s) contained in clause (xiv) and/or clause (xv) of this Section; PROVIDED that to the extent any such Indebtedness is deemed to constitute a utilization of the basket contained in clause (xiv) hereof, the Borrower shall be required to establish that the Total Senior Leverage Ratio after giving effect to the incurrence of such Indebtedness is less than 3.00:1.00;

(xi)    Hedging Agreements entered into in the ordinary course of business to hedge or mitigate risks the Borrower or any Subsidiary is exposed to in the conduct of its business or management of its liabilities, and not for speculative purposes;

(xii)    Indebtedness the proceeds of which are used to refinance Indebtedness permitted by clauses (iii), (iv), (v), (ix), (x) or (xiv) of this Section 6.03(a); PROVIDED that (A) the principal amount of such Indebtedness does not exceed that of the Indebtedness outstanding at the time of any such refinancing (plus the amount of any premium actually paid on the Indebtedness so refinanced and the amount of any expenses incurred in connection with such refinancing), (B) all net proceeds of the Indebtedness incurred pursuant to this clause (xii) are substantially concurrently applied to permanently repay the Indebtedness being refinanced, except to the extent the proceeds of such refinancing Indebtedness (in an amount equal to the amount required to repay all such Indebtedness plus any accrued interest to the date of the respective refinancing plus any applicable premium) are deposited with the trustee in respect of such Indebtedness to be refinanced and thereafter applied to permanently repay such Indebtedness to be

-93-

<PAGE>

refinanced within 60 days after the incurrence of such refinancing Indebtedness, (C) such Indebtedness does not have a final maturity or Weighted Average Life to Maturity shorter than that of the Indebtedness so refinanced, (D) the terms of such Indebtedness (including any applicable subordination terms) are no less favorable to the Borrower or the Lenders than the terms of the Indebtedness so refinanced, (E) the obligor on such Indebtedness is the same as the obligor on the Indebtedness so refinanced (except, with respect to Indebtedness incurred pursuant to clauses (ix) or (x) of Section 6.03(a), the refinancing Indebtedness may be incurred by the Borrower and Guaranteed by one or more Guarantors), (F) the Liens, Guarantees or other credit support for such Indebtedness are no more favorable to the obligee of such Indebtedness than such credit support for the Indebtedness being refinanced and (G) intercompany Indebtedness may only be so refinanced with other intercompany Indebtedness;

          (xiii)     Indebtedness of the Borrower and its Subsidiaries arising in the ordinary course of operations in connection with Treasury Services provided pursuant to uncommitted lines of credit, which Indebtedness may be secured pursuant to the Security Documents; PROVIDED that the maximum amount of Indebtedness at any time outstanding pursuant to this clause (xiii) shall not exceed the greater of (a) $50,000,000 and (b) that amount which, when added to the total Revolving Exposures of all the Revolving Lenders at such time, equals the total Revolving Commitments of all the Revolving Lenders as then in effect;

          (xiv)     so long as (x) no Default then exists or would exist immediately after giving effect thereto and (y) the Total Senior Leverage Ratio after giving effect to the incurrence of such Indebtedness is less than 3.00:1.00, Indebtedness secured by Liens described in Section 6.01(d) and incurred to finance all or any part of the cost of acquiring or constructing the respective asset or assets (other than Inventory or other Collateral) subject to such Liens; PROVIDED that (a) the aggregate principal amount of all Indebtedness incurred pursuant to this clause (xiv) shall not exceed $250,000,000, (b) the aggregate principal amount of all Indebtedness incurred pursuant to this clause (xiv) in any fiscal year of the Borrower shall not exceed $50,000,000 and (c) if any Indebtedness incurred pursuant to this clause (xiv) is secured by a mortgage on real property on which (or in which) Inventory shall or is expected to be located, the respective mortgagee shall have entered into a Mortgagee Agreement;

          (xv)     Indebtedness of the Borrower and its Subsidiaries, in addition to other Indebtedness permitted under clauses (i) through (xiv) above and clause (xvi) below, in an aggregate principal amount not to exceed $25,000,000 at any time outstanding;

          (xvi)     surety bonds issued for the benefit of the Borrower and its Subsidiaries in the ordinary course of their businesses; and

          (xvii)     Indebtedness existing pursuant to the Core-Mark Receivables Facility Documents but only until the fifth Business Day after the earlier of (i) the 180th day following the Effective Date and (ii) the date of the termination of the Core-Mark Receivables Facility, PROVIDED that no extensions or renewals thereof shall be permitted pursuant to this clause (xvii).

-94-

<PAGE>

        (b)    The Borrower will not, and will not permit any Subsidiary to,
make any prepayment (or make any offer to make any prepayment) of the principal
of, or repurchase, redeem, defease or otherwise retire (including in each case,
without limitation, by way of depositing with the trustee with respect thereto
or any other Person, monies or securities before due for the purpose of paying
when due) prior to its stated maturity (whether by reason of asset sales, a
change of control, or otherwise), any Indebtedness for borrowed money, except:

        (i)    Indebtedness created under the Loan Documents;

        (ii)   Indebtedness outstanding on the date hereof that is repaid on
the Effective Date (or that is designated to be repaid within a specific
period after the Effective Date on Schedule 3.16) with the proceeds of
Loans made under this Agreement or the proceeds of the Common Equity
Financing or the issuance of the New Senior Notes;

        (iii)  Indebtedness under the Core-Mark Receivables Facility that is
repaid or redeemed as contemplated in Section 5.09 with the proceeds of
assets transferred to the trust established pursuant to the terms of the
Core-Mark Receivables Facility Documents and/or with the proceeds of Loans
made under this Agreement or proceeds of the Common Equity Financing or
the issuance of the New Senior Notes;

        (iv)   Indebtedness of the Borrower to a Consolidated Subsidiary or
of a Consolidated Subsidiary to the Borrower or another Consolidated
Subsidiary;

        (v)    Indebtedness of the character described in clauses (viii),
(ix), (x), (xi), (xiii) and (xv) of Section 6.03(a);

        (vi)   Later Maturing Indebtedness in an aggregate principal amount
not in excess of $10,000,000;

        (vii)  in connection with (and to the extent of) the refinancing of
such Indebtedness where such refinancing is expressly permitted by Section
6.03(a)(xii);

        (viii) Indebtedness of the Borrower or any Subsidiary which is
outstanding as of the Effective Date so long as the aggregate principal
amount of Indebtedness prepaid, repurchased, redeemed or pursuant to this
clause (viii) does not exceed $1,000,000; and

        (ix)   other Indebtedness so long as (x) no Default then exists or
would exist immediately after giving effect to any such repurchase,
redemption, defeasance or retirement, (y) the Total Leverage Ratio after
giving effect to any such repurchase, redemption, defeasance or retirement
is less than 3.50:1.00 and (z) the Total Senior Leverage Ratio after
giving effect to any such repurchase, redemption, defeasance or retirement
is less than 3.00:1.00.

        SECTION 6.04. DIVIDENDS. The Borrower will not, and will not permit
any of its Subsidiaries to, authorize, declare or pay any Dividends with respect
to the Borrower or any of its Subsidiaries, except that:

                                    -95-

<PAGE>

        (a)    any Subsidiary of the Borrower may declare and pay cash
Dividends to the Borrower or to any Subsidiary of the Borrower;

(b)    any non-Wholly-Owned Subsidiary of the Borrower may declare and pay cash Dividends to its shareholders generally so long as the Borrower or its respective Subsidiary which owns the equity interest in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based upon its relative holding of the equity interest in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of equity interests of such Subsidiary);

(c)    the Borrower may repurchase (from the respective officers, directors or employees, or their families or estates) outstanding shares of its common stock (or options to purchase such common stock) following the death, disability or termination of employment of officers, directors or employees of the Borrower or any of its Subsidiaries, PROVIDED that (i) the aggregate amount paid by the Borrower in respect of all such repurchases shall not at any time exceed $25,000,000 (with no more than $10,000,000 of such repurchases in the aggregate to be made during the period from the Effective Date until the second anniversary thereof) and (ii) at the time of, and immediately after giving effect to, any repurchase or payment permitted to be made pursuant to this paragraph (c), no Default shall then exist;

(d)    (i) so long as no Default then exists or would exist immediately after giving effect thereto (and so long as the Borrower reasonably believes that no Default will exist at the time of the respective payment thereof), the Borrower may declare Dividends (in any event payable within 60 days after the date of declaration) to its shareholders generally on its common stock in an amount not to exceed $.08 per share (adjusted in an equitable manner in the event of any stock split or similar event) per fiscal quarter of the Borrower and (ii) so long as the requirements of preceding clause (i) were satisfied on the date of declaration, the Borrower may pay such Dividends within 60 days after the date of such declaration;

(e)    non Wholly-Owned Subsidiaries may repurchase their outstanding Equity Interests held by Persons other than the Borrower and its Subsidiaries; PROVIDED that any and all such repurchases shall be deemed to constitute Investments and shall be required to be independently justified under Section 6.06(x); and

(f)    the Borrower may repurchase additional shares of its outstanding common stock so long as (i) the Total Leverage Ratio after giving effect to any such repurchase is less than 3.50:1.00 and (ii) the aggregate amount paid by the Borrower with respect to all such repurchases shall not exceed $25,000,000.

SECTION 6.05. TRANSACTIONS WITH AFFILIATES. The Borrower will not, and will not permit any Subsidiary to, directly or indirectly, pay any funds to or for the account of, make any investment (whether by acquisition of stock or indebtedness, by loan, advance, transfer of property, guarantee or other agreement to pay, purchase or service, directly or indirectly, any Indebtedness, or otherwise) in, lease, sell, transfer or otherwise dispose of any assets, tangible or intangible, to, or participate in, or effect any transaction in connection with

-96-

<PAGE>
any joint enterprise or other joint arrangement with, any Affiliate; PROVIDED

HOWEVER, that the foregoing provisions of this Section shall not prohibit (a)
the Borrower or any Subsidiary from declaring or paying any lawful dividend in
accordance with Section 6.04, (b) the Borrower or any Subsidiary from making
sales to or purchases from any Affiliate and, in connection therewith, extending
credit or making payments, or from making payments for services rendered by any
Affiliate, if such sales or purchases are made or such services are rendered in
the ordinary course of business and on terms and conditions at least as
favorable to the Borrower or such Subsidiary as the terms and conditions which
would apply in a similar transaction with a Person not an Affiliate, (c) loans
to officers of the Borrower or any of its Subsidiaries permitted under Section
6.06(viii), (d) the Borrower or any Subsidiary from making payments of
principal, interest and premium on any Indebtedness of the Borrower or such
Subsidiary held by an Affiliate if the terms of such Indebtedness are
substantially as favorable to the Borrower or such Subsidiary as the terms which
could have been obtained at the time of the creation of such Indebtedness from a
lender which was not an Affiliate, (e) the Borrower or any Subsidiary from
participating in, or effecting any transaction in connection with, any joint
enterprise or other joint arrangement with any Affiliate if the Borrower or such
Subsidiary participates in the ordinary course of its business and on a basis no
less advantageous than the basis on which such Affiliate participates, (f) the
Borrower or any Subsidiary from making payments of reasonable compensation, fees
and expenses to their respective directors and executive officers for services
rendered to the board of directors of the Borrower or any Subsidiary or any
committee of any thereof, (g) the Borrower or any Subsidiary from performing its
obligations under certain real property leases listed on Schedule 6.05 or other
leases or obligations entered or undertaken by a Person before it becomes a
Subsidiary of the Borrower as permitted hereunder and (h) other transactions
approved by a majority of the disinterested members of the Board of Directors of
the Borrower so long as such transactions are at least as fair to the Borrower
as to the respective Affiliate that is a party to such transaction and, in the
case any such transaction involves a consideration equal to or in excess of
$10,000,000, the Borrower shall have delivered to the Administrative Agent an
opinion as to the fairness of such transaction to the Borrower or the respective
Subsidiary from a financial point of view issued by an investment banking firm
of national standing with total assets in excess of $1,000,000,000.

     SECTION 6.06. ACQUISITIONS AND INVESTMENTS. Neither the Borrower nor
any Subsidiary will make any acquisition of all or substantially all of the
Equity Interest, or property or assets, of any Person, make any Investment or
hold any cash or Temporary Cash Investments except:

     (i)     The Borrower and its Subsidiaries may acquire and hold cash
and Temporary Cash Investments, PROVIDED that the aggregate amount of cash
and Temporary Cash Investments permitted to be held by the Borrower at any
time when Revolving Loans or Swingline Loans are outstanding shall not
exceed $100,000,000, PROVIDED that for the purposes of calculating the
amount of cash and Temporary Cash Investments held by the Borrower and its
Subsidiaries for the purposes of compliance with this paragraph all
Restricted Cash shall be excluded therefrom;

     (ii)    Investments by the Borrower in any Wholly-Owned Subsidiary and
Investments by any Wholly-Owned Subsidiary in the Borrower or in any other
Wholly-Owned Subsidiary;

                                   -97-

<PAGE>
     (iii) any Acquisition or Investment not constituting Customer
Support, to the extent the consideration therefor consists of Equity
Interests of the Borrower;

(iv)  the reclassification of any Investment originally made in the
form of Indebtedness as an Investment by way of capital contribution or
share purchase or the reclassification of any Investment originally made
by way of capital contribution or share purchase as an Investment in the
form of Indebtedness so long as any additional amounts paid or
contributions made in respect of such reclassification are independently
justified under another paragraph of this Section 6.06;

(v)    Investments deemed to exist as a result of (x) Indebtedness
extended as contemplated by Section 6.03(a)(vi) and (y) Guarantees
permitted under Section 6.03(a);

(vi)  Customer Support during any Test Period in an aggregate amount
not to exceed 1.75% of the Borrower's Net Sales during such Test Period
(determined without any write-downs or write-offs of any such Customer
Support occurring on or after the Effective Date but giving effect to any
release of any Guarantees constituting Customer Support); PROVIDED that
(i) Customer Support of the type described in clause (iv) of the
definition thereof shall not be permitted pursuant to this clause (vi) at
any time when a Default then exists and (ii) Customer Support to any one
customer (also determined without any write-downs or write-offs of any
such Customer Support to such customer occurring on or after the Effective
Date but giving effect to any release of any Guarantees constituting
Customer Support to such customer) shall not at any time exceed
$25,000,000 in the aggregate;

(vii) other Acquisitions so long as (a) no Specified Default exists
at the time of and immediately after giving effect to such Acquisition,
(b) in the case of each Significant Acquisitions (except any Significant
Acquisition, where all consideration therefor consists of Equity Interests
of the Borrower), calculations are made by the Borrower showing compliance
with the financial covenants contained in Sections 6.09 and 6.10 for the
Test Period most recently ended on a Post-Test Period Pro Forma Basis as
if the respective Significant Acquisition, as well as all other
Significant Acquisitions and all Significant Asset Dispositions
theretofore consummated after the first day of such Test Period had
occurred on the first day of such Test Period, (c) immediately after
giving effect to each Acquisition (and all payments to be made in
connection therewith, including for this purpose (as if paid on the date
of the consummation of the respective Acquisition) the aggregate amount
paid or reasonably expected to be paid (based on good faith projections
prepared by Borrower) on or within one year after the date of the
consummation of the Acquisition pursuant to any earn-out, non-compete,
consulting or deferred compensation or purchase price adjustment or
similar arrangements with respect to such Acquisition as well as any prior
Acquisitions) the unused Revolving Commitments shall equal or exceed the
sum of the Relevant Amount plus the aggregate amount of all payments not
theretofore made with respect to Acquisitions but which are required to be
taken into account in accordance with the provisions of the immediately
preceding parenthetical (the "Minimum Required Commitment Amount"), and
the Borrower shall further be required to establish that if additional
Revolving Loans were incurred on such date in an amount equal to the
Minimum Required Commitment

-98-

<PAGE>
Amount, the Borrower would remain in compliance with the requirements of
Section 6.11 and would comply on a Post-Test Period Pro Forma Basis with

Sections 6.09 and 6.10, and (d) the aggregate consideration (other than
consideration in the form of common stock of the Borrower) paid in
connection with such Acquisition (determined in a manner consistent with
the definition of Significant Acquisition) does not exceed $400,000,000;

(viii)    loans to officers of the Borrower and its Subsidiaries
pursuant to the Borrower's officers' stock ownership plan in an aggregate
principal amount not to exceed $10,000,000 (without giving effect to any
write-downs or write-offs thereof);

(ix)    Investments arising from the receipt by the Borrower or the
respective Subsidiary of non-cash consideration to the extent permitted
under Sections 6.02(c) and (d); and

(x)    Investments not otherwise permitted under clauses (i)
through (ix) above so long as the aggregate amount of Investments at any
time outstanding (determined without regard to any write-downs or
write-offs) pursuant to this clause (x) does not exceed $25,000,000.

SECTION 6.07. LIMITATION ON CERTAIN RESTRICTIONS ON SUBSIDIARIES.
The Borrower will not, and will not permit any of its Subsidiaries to, directly
or indirectly, create or otherwise cause or suffer to exist or become effective
any encumbrance or restriction on the ability of any such Subsidiary to (a) pay
dividends or make any other distributions on its capital stock or any other
interest or participation in its profits owned by the Borrower or any of its
Subsidiaries, or pay any Indebtedness owed to the Borrower or any of its
Subsidiaries, (b) make loans or advances to the Borrower or any of its
Subsidiaries or (c) transfer any of its properties or assets to the Borrower or
any of its Subsidiaries, except for such encumbrances or restrictions existing
under or by reason of (i) applicable law, (ii) this Agreement, (iii) the other
Loan Documents, (iv) the Existing Note Documents and documentation evidencing
Indebtedness incurred to refinance Indebtedness evidenced by any of the Existing
Note Documents in compliance with Section 6.03(a)(xii) so long as such
restrictions contained in the documentation evidencing such refinancing
Indebtedness are no less favorable to the Borrower or the Lenders than the
restrictions set forth in the respective Existing Note Document immediately
prior to such refinancing, (v) the New Senior Note Indenture as in effect on the
date hereof, and restrictions contained in other Indebtedness so long as same
are no less favorable to the Borrower or the Lenders than those contained in the
New Senior Note Indenture (as in effect on the date hereof), (vi) prior to the
earlier of (x) 180th day after the Effective Date and (y) the termination of the
Core-Mark Receivables Facility as contemplated in Section 4.01(n), the
provisions applicable to CM Capital and the sellers of receivables contained in
the Core-Mark Receivables Facility Documents, (vii) customary provisions
restricting subletting or assignment of any lease governing any leasehold
interest of the Borrower or any of its Subsidiaries, (viii) customary provisions
restricting assignment of any licensing agreement (in which the Borrower or any
of its Subsidiaries is the licensee) or other contract entered into by the
Borrower or any of its Subsidiaries in the ordinary course of business, (ix)
restrictions on the transfer of any asset pending the close of the sale of such
asset, and (x) restrictions on the

-99-

<PAGE>
transfer of any asset subject to a Lien permitted by Section 6.01(b), (c), (d),
(e), (f), (g), (h), (j), (k), (l), (n), (q) or (r).

SECTION 6.08. CAPITAL EXPENDITURES. (a) The Borrower will not, and
will not permit any of its Subsidiaries to, make any Capital Expenditures (other

than Capital Expenditures otherwise permitted under clauses (b) and (c), below),
except that during any Test Period ending on or after the Borrower's fiscal
quarter ending closest to September 30, 2002, the Borrower and its Subsidiaries
may make Capital Expenditures in an aggregate amount during any such Test Period
not to exceed 1.50% of the Borrower's Net Sales during such Test Period for such
Test Period.

        (b)    In addition to the foregoing, the Borrower and its
Subsidiaries may make Capital Expenditures with the amount of Net Proceeds
received by the Borrower or any of its Subsidiaries from any Asset Disposition
(excluding any Asset Disposition made pursuant to the proviso to Section
6.02(c)) so long as such Net Proceeds are reinvested within 350 days following
the date of such Asset Disposition, but only to the extent that such Net
Proceeds are not otherwise required to be applied to repay Term Loans or reduce
Commitments pursuant to Section 2.12(b).

        (c)    In addition to the foregoing, the Borrower and its
Subsidiaries may (x) consummate Acquisitions in accordance with the requirements
of Sections 6.06(iii) and (vii) and (y) make additional Capital Expenditures
with Net Proceeds received by the Borrower from its issuance of Equity Interests
after the Effective Date so long as (and to the extent that) such Net Proceeds
are not used to effect (or justify) Acquisitions made pursuant to Section 6.06.

        SECTION 6.09. CONSOLIDATED FIXED CHARGE COVERAGE RATIO; ADJUSTED
CONSOLIDATED FIXED CHARGE COVERAGE RATIO. The Borrower will not permit (a) the
Consolidated Fixed Charge Coverage Ratio for any Test Period ending (i) after
the Effective Date and on or prior to the Borrower's fiscal quarter ending
closest to September 30, 2003, to be less than 1.80:1.00 or (ii) thereafter, to
be less than 2.00:1.00 and (b) the Adjusted Consolidated Fixed Charge Coverage
Ratio for any Test Period ending after the Effective Date to be less than
1.00:1.00. Except as may be required for purposes of determining compliance with
other Sections of this Agreement (e.g., Sections 2.05, 6.03 and 6.06),
calculations pursuant to this Section 6.09 shall not be made on a Pro Forma
Basis or Post-Test Period Pro Forma Basis.

        SECTION 6.10. TOTAL LEVERAGE RATIO. The Borrower will not permit the
Total Leverage Ratio at any time during any period set forth below to exceed the
respective ratio set forth opposite such period below (subject to adjustment as
described in the immediately succeeding sentence at any time when same is
applicable in accordance with its terms):

```
<TABLE>
<CAPTION>
                                Period                              Ratio
                                ------                              -----
<S>                                                                 <C>
        From the Effective Date to, but not including,             4.25:1.00
        the last day of the Borrower's fiscal year
        ending closest to December 31, 2003
</TABLE>
```

                                    -100-

```
<PAGE>
<TABLE>
<S>                                                                 <C>
        Thereafter to, but not including, the last day            4.00:1.00
        of the Borrower's fiscal year ending closest
        to December 31, 2004
```

| | |
|---|---|
| Thereafter to, but not including, the last day of the Borrower's fiscal year ending closest to December 31, 2005 | 3.75:1.00 |
| Thereafter | 3.50:1:00 |

</TABLE>

Notwithstanding anything to the contrary contained in the table set forth above, at any time from September 1 to and including December 15 of each year (beginning with the year 2003) the required Total Leverage Ratio as otherwise set forth in the table above for the applicable period shall be adjusted by increasing the numerator by 0.25 (for example, for the period from September 1, 2003 to and including December 15, 2003, the required Total Leverage Ratio would be increased from 4.25:1.00 to 4.50:1.00).

        SECTION 6.11. ASSET COVERAGE RATIO. The Borrower will not permit the Asset Coverage Ratio to be less than 2.25:1.00 at any time.

        SECTION 6.12. LIMITATION ON ISSUANCES OF CAPITAL STOCK. (a) The Borrower will not permit any of its Subsidiaries to issue any Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, Equity Interests, except (i) for transfers and replacements of then outstanding shares of Equity Interests, (ii) for stock splits, stock dividends and issuances which do not decrease the percentage ownership of the Borrower or any of its Subsidiaries in any class of the Equity Interests of such Subsidiary, (iii) to qualify directors to the extent required by applicable law, or (iv) for issuances by newly created or acquired Subsidiaries in accordance with the terms of this Agreement.

        (b)    The Borrower will not issue any capital stock which is not common stock or Qualified Preferred Stock.

        SECTION 6.13. LIMITATION ON MODIFICATIONS OF CERTAIN INDEBTEDNESS. The Borrower will not, and will not permit any of its Subsidiaries to amend or modify, or permit the amendment or modification of, any provision of (i) any Existing Note Document or any New Senior Note Document, except, in any such case, any amendment or modification which is not adverse to the Lenders in any respect, or (ii) any Later Maturing Indebtedness incurred under Section 6.03(a)(iv) or (v) or any Indebtedness incurred pursuant to Section 6.03(a)(xii), in each case except to the extent that after giving effect to any such amendment or modification such Indebtedness continues to comply with the terms initially applicable thereto as set forth in Section 6.03(a)(iv), 6.03(a)(v) or 6.03(a)(xii), respectively, or such amendment or modification is not adverse to the Lenders in any respect.

        SECTION 6.14. CHANGE OF LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF

                                    -101-

<PAGE>
ORGANIZATION; ETC. Neither the Borrower nor any Guarantor shall change its legal name, its type of organization, its status as a registered organization (in the case of a registered organization), its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Security Documents and so long as same do not involve (x) a registered organization ceasing to constitute same or (y) the Borrower or any Guarantor changing its jurisdiction of organization or location from the United States or a State thereof to a jurisdiction of organization or location, as the

case may be, outside the United States or a State thereof) if (i) it shall be given to the Collateral Agent not less than 10 days' prior written notice of each change to the information listed on Schedule 3.19 (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Schedule 3.19 which shall correct all information contained therein for the Borrower or the respective Guarantor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral intended to be granted hereby pursuant to the Security Documents at all times fully perfected and in full force and effect. Nothing in this Section 6.14 shall be construed to prohibit the Reincorporation Merger so long as same is consummated in accordance with the provisions of 6.02(k).

SECTION 6.15. LIMITATION ON CREATION OF SUBSIDIARIES. The Borrower will not, and will not permit any of its Subsidiaries to, establish, create or acquire after the Effective Date any Subsidiary, PROVIDED that the Borrower and its Wholly-Owned Subsidiaries shall be permitted to (A) establish, create and, to the extent permitted by this Agreement, acquire Wholly-Owned Subsidiaries so long as (i) the Equity Interests of each such new Wholly-Owned Subsidiary are pledged pursuant to, and to the extent required by, the Pledge Agreement, (ii) promptly following the establishment, creation or acquisition thereof each such new Wholly-Owned Domestic Subsidiary (and, to the extent required by Section 5.08, each such new Wholly-Owned Foreign Subsidiary) executes a counterpart of the Guarantee Agreement, the Pledge Agreement and the Security Agreement, and (iii) each such new Wholly-Owned Domestic Subsidiary (and, to the extent required by Section 5.08, each such new Wholly-Owned Foreign Subsidiary), to the extent requested by the Administrative Agent or the Required Lenders, takes all actions required pursuant to Section 5.08(c) and (B) establish, create and acquire non-Wholly-Owned Subsidiaries in each case to the extent permitted under Section 6.06 so long as the equity interests of each such non-Wholly-Owned Subsidiary is pledged pursuant to, and to the extent required by, the Pledge Agreement and, if required by Section 5.08, becomes a Guarantor and takes all action described in preceding clause (A). In addition, each such new Subsidiary which is required to become a Loan Party shall execute and deliver, or cause to be executed and delivered, all other relevant documentation of the type described in Article IV as such new Subsidiary would have had to deliver if such new Wholly-Owned Subsidiary were a Credit Party on the Effective Date.

SECTION 6.16. CONDUCT OF BUSINESS. The Borrower will not, and will not permit any of its Subsidiaries to, engage (directly or indirectly) in any business other than the same general type of business conducted by the Borrower and its Subsidiaries (taken as a whole) on the Effective Date and reasonably related extensions thereof.

-102-

<PAGE>

SECTION 6.17. NO DESIGNATION OF OTHER INDEBTEDNESS AS "DESIGNATED SENIOR INDEBTEDNESS". The Borrower will not, and will not permit any of its Subsidiaries to, designate any Indebtedness (other than the Obligations) of the Borrower or any such Subsidiary as "Designated Senior Indebtedness" for the purposes of any Subordinated Note Documents, any Later Maturity Indebtedness incurred pursuant to Section 6.03(a)(iv) or any refinancing (or successive refinancings) of any of the foregoing pursuant to Section 6.03(a)(xii); PROVIDED that this Section 6.17 shall not be violated to the extent that, prior to the Effective Date, the Indebtedness of the Borrower and the Guarantors pursuant to the 10-1/8% Senior Note Indenture has been designated as "Designated Senior Indebtedness" for purposes of any outstanding Subordinated Note Documents.

ARTICLE VII

EVENTS OF DEFAULT

If any of the following events ("EVENTS OF DEFAULT") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)    any representation, warranty, certification or statement made by the Borrower or any other Loan Party in this Agreement or any other Loan Document or in any certificate, financial statement or other document delivered pursuant to this Agreement or any other Loan Document shall prove to have been incorrect or misleading in any material respect when made (or deemed made);

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01(g), 5.04 (insofar as it relates to the corporate existence of the Borrower), Section 5.07, Section 5.08 or Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent or the Required Lenders to the Borrower;

(f)    (i) the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Indebtedness, when and as the same shall become due and payable or within any applicable grace period or (ii) any event or condition occurs that results in any Indebtedness becoming due

-103-

<PAGE>

prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Indebtedness or any trustee or agent on its or their behalf to cause any Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (other than as a result of a voluntary sale or transfer of the property or assets securing the respective such Indebtedness); PROVIDED that it shall not be a Default under this paragraph (f) unless the aggregate principal amount of all Indebtedness described in preceding clauses (i) and (ii) is at least $25,000,000;

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Guarantor or Grantor or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or

hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Guarantor or Grantor or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    the Borrower or any Guarantor or Grantor shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Guarantor or Grantor or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any corporate, limited liability company or partnership action for the purpose of effecting any of the foregoing;

(i)    the Borrower or any Guarantor or Grantor shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)    one or more judgments for the payment of money (to the extent not paid or covered by a reputable and solvent insurance company) in an aggregate amount in excess of $15,000,000 shall be rendered against the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 60 days during which execution shall not be effectively stayed, or any judgment creditor shall legally take possession of or sell any significant assets of the Borrower or any Subsidiary to enforce any such judgment;

(k)    (i) any ERISA Affiliate shall fail to pay when due an amount or amounts aggregating in excess of $15,000,000 which it shall have become liable to pay under Title IV of ERISA; (ii) or notice of intent to terminate a Material Plan shall be filed under Title IV of ERISA by the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate, any plan administrator or any combination of the foregoing; (iii) or the PBGC shall

-104-

<PAGE>

institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer any Material Plan; (iv) or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated; (v) or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA (a "4219 Default"), with respect to, one or more Multiemployer Plans which could cause the Borrower or one or more Subsidiaries of the Borrower or ERISA Affiliates to incur a current payment obligation in excess of $25,000,000; or (vi) any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA, a Reportable Event shall have

Case 1:07-cv-07634-WHP    Document 32-26    Filed 01/25/2008    Page 22 of 37
Page 107 of 122
Case 1:07-cv-00172-SOM-LEK    Document 17-22    Filed 06/12/2007    Page 28 of 93

occurred, the Borrower or any Subsidiary of the Borrower or any ERISA
Affiliate has incurred or is likely to incur any liability to or on
account of a Plan or Multiemployer Plan under Section 4069 or 4212 of
ERISA or Section 4971 or 4975 of the Code, which, individually or in the
aggregate, could cause the Borrower or any of the Subsidiary of the
Borrower or ERISA Affiliate to incur a liability in excess of $25,000,000;

     (l)    any Lien purported to be created under any Security Document
shall cease to be, or shall be asserted by any Loan Party not to be, a
valid and perfected Lien on any Collateral, with the priority required by
the applicable Security Document, except as a result of the sale or other
disposition of the applicable Collateral in a transaction permitted under
the Loan Documents;

     (m)    the Guarantee Agreement or any material provision thereof
(including in any event the guarantee provisions contained therein) shall
cease to be in full force or effect as to any Guarantor, or any Guarantor
or any Person acting for or on behalf of such Guarantor shall deny or
disaffirm such Guarantor's obligations under the Guarantee Agreement or
any Guarantor shall default in the due performance or observance of any
term, covenant or agreement on its part to be performed or observed
pursuant to the Guarantee Agreement; or

     (n)    a Change in Control shall occur;

then, and in every such event (other than an event with respect to the Borrower
described in clause (g) or (h) of this Article), and at any time thereafter
during the continuance of such event, the Administrative Agent may, and at the
request of the Required Lenders shall, by notice to the Borrower, take either or
both of the following actions, at the same or different times: (i) terminate the
Commitments, and thereupon the Commitments shall terminate immediately, and (ii)
declare the Loans then outstanding to be due and payable in whole (or in part,
in which case any principal not so declared to be due and payable may thereafter
be declared to be due and payable), and thereupon the principal of the Loans so
declared to be due and payable, together with accrued interest thereon and all
fees and other obligations of the Borrower accrued hereunder, shall become due
and payable immediately, without presentment, demand, protest or other notice of
any kind, all of which are hereby waived by the Borrower; and in case of any
event with respect to the Borrower described in clause (g) or (h) of this
Article, the

-105-

<PAGE>
Commitments shall automatically terminate and the principal of the Loans then
outstanding, together with accrued interest thereon and all fees and other
obligations of the Borrower accrued hereunder, shall automatically become due
and payable, without presentment, demand, protest or other notice of any kind,
all of which are hereby waived by the Borrower.

ARTICLE VIII

THE AGENTS

     SECTION 8.01. APPOINTMENT. Each of the Lenders and the Issuing
Lenders hereby designates DBTCA as Administrative Agent (for purposes of this
Article VIII and Section 9.01, the term "Administrative Agent" shall include
DBTCA in its capacity as Collateral Agent pursuant to the Security Documents) to
act as specified herein and in the other Loan Documents. Each of the Lenders and
the Issuing Lenders hereby designate JPMorgan Chase and Citi each as a

Syndication Agent to act as specified herein and in the other Loan Documents. Each of the Lenders and the Issuing Lenders hereby designate Lehman and Wachovia, each as a Documentation Agent to act as specified herein and in the other Loan Documents. Each of the Lenders and the Issuing Lenders hereby designate DBSI, JPMSI and SSBI as Joint Lead Arrangers to act as specified herein and in the other Loan Documents. Each of the Lenders and the Issuing Lenders hereby designate DBSI and JPMSI as Joint Book Managers to act as specified herein and in the other Loan Documents. Each Lender and each Issuing Lender hereby irrevocably authorizes the Administrative Agent and each other Agent to take such action on its behalf under the provisions of this Agreement, the other Loan Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent or each other Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. The Administrative Agent and each other Agent may perform any of its duties hereunder by or through its respective officers, directors, agents, employees or affiliates.

SECTION 8.02. NATURE OF DUTIES. No Agent shall have any duties or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents. No Agent, nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Loan Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined in a final and non-appealable decision by a court of competent jurisdiction). The duties of the Agents shall be mechanical and administrative in nature; no Agent shall have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

SECTION 8.03. LACK OF RELIANCE ON THE AGENTS. Independently and without reliance upon any Agent, each Lender and each Issuing Lender, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and each of its Subsidiaries in connection with

-106-

<PAGE>
the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and each of its Subsidiaries and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. No Agent shall be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Loan Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default.

SECTION 8.04. CERTAIN RIGHTS OF THE AGENTS. If any Agent shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and no Agent shall incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders.

SECTION 8.05. RELIANCE. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that such Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent.

SECTION 8.06. INDEMNIFICATION. To the extent any Agent is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent or such Agent, in proportion to their respective "pro rata shares" (determined based upon their respective shares of the total Revolving Exposures, outstanding Term Loans and unused Commitments at such time or if repaid in full or terminated, as the case may be, determined immediately prior to such repayment or termination, as the case may be) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agent in performing its duties hereunder or under any other Loan Document, or in any way relating to or arising out of this Agreement or any other Loan Document; PROVIDED that to the extent that the respective Agent is reimbursed by the Borrower for amounts paid by the Lenders pursuant to this Section 8.06, such Agent shall reimburse the Lenders for such amounts; PROVIDED FURTHER, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or the

-107-

<PAGE>
respective Agent's gross negligence or willful misconduct (as determined in a final and non-appealable decision by a court of competent jurisdiction).

SECTION 8.07. EACH AGENT IN ITS INDIVIDUAL CAPACITY. With respect to its obligation to make Loans, or issue or participate in Letters of Credit, under this Agreement, each Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lenders," "Required Lenders," "Majority Lenders," "Supermajority Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Each Agent may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to, any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from the Borrower or any other Loan Party or any Affiliate of any Loan Party for services in connection

with this Agreement and otherwise without having to account for the same to the Lenders.

       SECTION 8.08. RESIGNATION. (a) The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Lenders and the Borrower (provided that no such notice shall be required to be given to the Borrower if a Default of the type described in paragraphs (g) and (h) of Article VII exists with respect to the Borrower). Any such resignation by an Administrative Agent hereunder shall also constitute its resignation as an Issuing Lender and the Swingline Lender, in which case the resigning Administrative Agent (x) shall not be required to issue any further Letters of Credit or make any additional Swingline Loans hereunder and (y) shall maintain all of its rights as Issuing Lender or Swingline Lender, as the case may be, with respect to any Letters of Credit issued by it, or Swingline Loans made by it, prior to the date of such resignation. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

       (b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower (it being understood and agreed that (i) the Borrower's acceptance of a successor Administrative Agent pursuant to this paragraph (b) shall not be unreasonably withheld, (ii) so long as a Default exists at such time such successor Administrative Agent shall not be required to be reasonably satisfactory to the Borrower and (iii) any Lender is deemed to be acceptable to the Borrower).

       (c)    If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed but shall not be required at any time when a Default exists and is continuing), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

<div align="center">-108-</div>

&lt;PAGE&gt;

       (d)    If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 30th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

       (e)    Each of the other Agents may resign from the performance of all their respective functions and duties hereunder by giving five Business Days' notice to the Administrative Agent. Any resignation pursuant to the immediately preceding sentence shall become effective on the 5th Business Day after the respective notice is given to the Administrative Agent.

       (f)    Upon a resignation of any Agent pursuant to this Section 8.08, such Agent shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Article VIII shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as an Agent.

SECTION 8.09. THE JOINT LEAD ARRANGERS, JOINT BOOK MANAGERS, SYNDICATION AGENTS AND DOCUMENTATION AGENTS. Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, each of the Joint Lead Arrangers, Joint Book Managers, Syndication Agents and Documentation Agents are named as such for recognition purposes only, and in their respective capacities as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Joint Lead Arrangers, the Joint Book Managers, the Syndication Agent and the Documentation Agent shall be entitled to all indemnification and reimbursement rights in favor of "Agents" as provided for under Sections 8.06 and 9.03. Without limitation of the foregoing, none of the Joint Lead Arrangers, Joint Book Managers, Syndication Agents or Documentation Agents shall, solely by reason of this Agreement or any other Loan Documents, have any fiduciary relationship in respect of any Lender or any other Person.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01. NOTICES. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)     if to the Borrower, to Fleming Companies, Inc. at 1945 Lakepointe Drive, Lewisville, TX 75057, Attention: Treasurer (Telephone No. (972) 906-8000; Telecopy No. (972) 906-1530) with a copy to Legal Department;

-109-

<PAGE>

(b)     if to the Administrative Agent, (i) for credit notices, to DBTCA, 31 West 52nd Street, 7th Floor, New York, NY 10019, Attention of Marguerite Sutton, (Telephone No. (646) 324-2206; Telecopy No. (646) 324-7456) and (ii) for operational notices, to DBTCA, 90 Hudson Street, 5th Floor, Jersey City, NJ 07302, Attention of Helaine Griffin-Williams (Telephone No. (201) 593-2712; Telecopy No. (201) 593-2310);

(c)     if to the Issuing Lenders, to them at (i) DBTCA, 31 West 52nd Street, New York, NY 10019, Attention of Mr. Marco Orlando (Telephone No. (212) 602-1132; Telecopy No. (212) 797-0403); (ii) JPMorgan Chase, 270 Park Avenue, New York, NY 10017, Attention of Mabelyn Vera (Telephone No. (813) 432-0352; Telecopy No. (813) 432-5161) and (iii) Citi, 2 Penns Way, Suite 200, Newcastle, Delaware 19720, Attention of Hilda Zambrano (Telephone No. (302) 894-6047; (Telecopy No. (302) 894-6120);

(d)     if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02. WAIVERS; AMENDMENTS. (a) No failure or delay by any Agent, any Joint Book Manager, any Joint Lead Arranger, any Issuing Lender or any Lender in exercising any right or power hereunder or under any other Loan

Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents, the Joint Book Managers, the Joint Lead Arrangers, the Issuing Lenders and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Agent, any Joint Book Manager, any Joint Lead Arranger, any Lender or any Issuing Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Loan Parties party thereto and the Required Lenders, PROVIDED that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly modified in the case of following clause (i)), (i) extend the Maturity Date of any Loan, or extend the stated expiration date of any Letter of Credit beyond the Revolving Maturity Date, or reduce the rate, or extend the time of payment, of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates), or reduce

-110-

<PAGE>
the principal amount thereof (except to the extent repaid in cash), (ii) release all or substantially all of the Collateral (except as expressly provided in the Loan Documents (x) in connection with the termination of commitments hereunder and repayment in full of amounts owing pursuant hereto and (y) with respect to permitted sales or dispositions of property) under all the Security Documents, or release all or substantially all of the Guarantors from the Guarantee Agreement (except as expressly provided in the Guarantee Agreement in connection with permitted sales or dispositions of Equity Interests in the respective Guarantor or Guarantors being released), (iii) amend, modify or waive any provision of this Section 9.02(b) (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of Required Lenders on substantially the same basis as the extension of Loans and Commitments are included on the Effective Date), (iv) reduce the respective percentage specified in the definition of Required Lenders or Aggregate Supermajority Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders or Aggregate Supermajority Lenders, as the case may be, on substantially the same basis as the extensions of Loans and Commitments are included on the Effective Date), (v) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement (other than a Reincorporation Merger consummated in accordance with Section 6.02(k)), (vi) amend, modify or waive any provisions of Section 2.19(b) or (c) providing for payments to be made to, or shared in, ratably by the Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in determining the ratable shares of payments to which the Lenders are entitled and adjustments to Section 2.19 may be made consistent therewith) or (vii) amend, modify or waive any

provisions of Section 2.02(a), 2.06(d), 2.06(e) or 8.06 providing for Loans to
be made, participations to be acquired, reimbursement payments to be made and/or
indemnity payments to be made ratably by the Lenders (or Lenders of the
respective Class, as the case may be) (it being understood that, with the
consent of the Required Lenders, additional extensions of credit pursuant to
this Agreement may be included in determining any ratable share pursuant to such
Sections and adjustments to any such Section may be made consistent therewith);
PROVIDED FURTHER, that no such change, waiver, discharge or termination shall
(1) increase the Commitment of any Lender over the amount thereof then in effect
without the consent of such Lender (it being understood that waivers or
modifications of conditions precedent, covenants or Defaults or of a mandatory
reduction in the Commitments shall not constitute an increase of the Commitment
of any Lender, and that an increase in the available portion of any Commitment
of any Lender shall not constitute an increase in the Commitment of such
Lender), (2) without the consent of each Issuing Lender, amend, modify or waive
any provision of Section 2.06 or alter its rights or obligations with respect to
Letters of Credit, (3) without the consent of the Administrative Agent, each
Joint Lead Arranger and each Joint Book Manager, amend, modify or waive any
provision of Article VIII as same applies to any such Person or any other
provision as same relates to the rights or obligations of any such Person, (4)
without the consent of the Collateral Agent, amend, modify or waive any
provision relating to the rights or obligations of the Collateral Agent, (5)
without the consent of the Swingline Lender, alter the Swingline Lender's rights
or obligations with respect to Swingline Loans, (6) without the consent of the
Aggregate Supermajority Lenders, modify Section 6.11 or modify the Collateral
Requirement (except the last sentence thereof) or the Guarantee Requirement (or,
in each case, release Collateral under the Security Documents or

                                   -111-

<PAGE>
one or more Guarantors under the Guarantee Agreement as a result of which the
Collateral Requirement or the Guarantee Requirement, as the case may be, is no
longer met, except as expressly provided in the parentheticals contained in
clause (ii) above), (7) except in cases where additional extensions of loans are
being afforded substantially the same treatment afforded to the Loans pursuant
to this Agreement as originally in effect, without the consent of the Majority
Lenders of each Class which is being allocated a lesser prepayment, repayment or
commitment reduction as a result of the actions described below (or without the
consent of the Majority Lenders of each Class in the case of an amendment to the
definition of Majority Lenders), amend the definition of Majority Lenders or
alter the required application of any prepayments or repayments (or commitment
reduction), as between the various Classes, pursuant to Section 2.12 (although
the Required Lenders may waive, in whole or in part, any such prepayment,
repayment or commitment reduction, so long as the application, as among the
various Classes, of any such prepayment, repayment or commitment reduction which
is still required to be made is not altered), (8) without the consent of the
Supermajority Lenders of the respective Class, reduce the amount of, or extend
the date of, any Term Loan Scheduled Repayment, or amend the definition of
Supermajority Lenders (it being understood that, with the consent of the
Required Lenders, additional extensions of credit pursuant to this Agreement may
be included in the determination of the Supermajority Lenders on substantially
the same basis as the extensions of Loans are included on the Effective Date),
(9) in cases where any Class of Incremental Term Loans is being provided
pursuant to Section 2.05, without the consent of the Supermajority Lenders of
the respective Class (determined before giving effect to the additions to such
Class), alter any of the requirements contained in Section 2.05(a), and (10)
without the consent of the Majority Lenders of each Class of Term Loans and the
Supermajority Lenders of the Class consisting of the Revolving Commitment (and
the extensions of credit pursuant thereto), amend or modify the provisions of

the proviso appearing in clause (vi) of the second paragraph of Section 2.05(a).

      SECTION 9.03. EXPENSES; INDEMNITY; DAMAGE WAIVER. (a) The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Agents, the Joint Book Managers and the Joint Lead Arrangers and their respective Affiliates, including the reasonable fees, charges and disbursements of one counsel (plus any local counsel deemed reasonably necessary or desirable by the Administrative Agent) for the Agents, the Joint Book Managers and the Joint Lead Arrangers, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Issuing Lenders in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out-of-pocket expenses incurred upon any Specified Default by the Agents, the Joint Book Managers, the Joint Lead Arrangers or any Issuing Lender, including the fees, charges and disbursements of any counsel for the Agents, the Joint Book Managers and the Joint Lead Arrangers or any Issuing Lender, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

      (b)   The Borrower shall indemnify each Agent, each Joint Book Manager, each Joint Lead Arranger, each Issuing Lender and each Lender, and each Related Party of any of the

-112-

<PAGE>
foregoing Persons (each such Person being called an "INDEMNITEE") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; PROVIDED that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee (as determined in a non-appealable final decision made by a court of competent jurisdiction).

      (c)   To the extent permitted by applicable law, no party to this Agreement shall assert, and each party to this Agreement hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages)

arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby, any Loan or Letter of Credit or the use of the proceeds thereof.

(d)     All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04. SUCCESSORS AND ASSIGNS. (a) This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; PROVIDED, HOWEVER, that except pursuant to any Reincorporation Merger effected in accordance with Section 6.02(k), the Borrower may not assign or transfer any of its rights, obligations or interest hereunder or under any other Loan Document without the prior written consent of all of the Lenders and, PROVIDED FURTHER, that although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitment hereunder except as provided in Section 9.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, PROVIDED FURTHER, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Loan Document except to the extent such amendment or waiver would (i) extend the Maturity Date of any Loan or extend the expiry date of any Letter of Credit beyond the Revolving Maturity Date, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's

-113-

<PAGE>
participation over the amount thereof then in effect (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or of a mandatory reduction in the total Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof) or (ii) consent to the assignment or transfer by the Borrower of any of their rights and obligations under this Agreement. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Loan Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitment and related outstanding Obligations hereunder (or, if the Commitments with respect to the relevant Class have terminated, its outstanding Obligations) and/or its outstanding Term Loans to (i) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or to one or more other Lenders or (ii) in the case of any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations hereunder (or, if the Commitments with respect to the relevant Class have terminated, its outstanding Obligations) to one or more Eligible Transferees (treating any fund that invests

in bank loans and any other fund that invests in bank loans and is managed or
advised by the same investment advisor of such fund or by an Affiliate of such
investment advisor as a single Eligible Transferee), each of which assignees
shall become a party to this Agreement as a Lender by execution of an Assignment
and Assumption Agreement (it being understood that an assignment pursuant to
this clause (y) by any Lender described in preceding clause (x)(ii) must meet
the $1,000,000 minimum described above unless the respective assignment is of
all the Commitments and related outstanding Obligations held by such Lender and
any other fund that invests in bank loans and is managed by the same investment
advisor of any Lender or by an Affiliate of such investment advisor), provided
that (i) at such time Schedule 2.01 shall be deemed modified to reflect the
Commitment and/or outstanding Loans, as the case may be, of such new Lender and
of the existing Lenders, (ii) at the request of the assignee Lender, and upon
surrender of the relevant notes or the provision of a customary lost note
indemnification agreement from the assignor or assignee Lender, as the case may
be, new promissory notes (in a form approved by the Administrative Agent) will
be issued, at the Borrowers' expense, to such new Lender and to the assigning
Lender, to the extent needed to reflect the revised Commitments and/or
outstanding Loans, as the case may be, (iii) the consent of the Administrative
Agent and, at any time after the Syndication Date when no Specified Default is
in existence, the Borrower shall be required in connection with any such
assignment pursuant to clause (y) above (each of which consents shall not be
unreasonably withheld or delayed), (iv) in the case of any assignment of
Revolving Commitments and relating outstanding Obligations, the consent of each
Issuing Lender shall be required (which consent shall not be unreasonably
withheld or delayed) and (v) the Administrative Agent shall receive at the time
of each such assignment, from the assigning or assignee Lender, the payment of a
non-refundable assignment fee of $3,500. To the extent of

                                    -114-

<PAGE>
any assignment pursuant to this paragraph (b), the assigning Lender shall be
relieved of its obligations hereunder with respect to its assigned Commitments
and/or outstanding Loans, as the case may be. As provided by Section 2.18(e), at
the time of each assignment pursuant to this paragraph (b) to a Person which is
not already a Lender hereunder and which is not a United States person (as such
term is defined in Section 7701(a)(30) of the Code) for Federal income tax
purposes, the respective assignee Lender shall provide to the Borrower and the
Administrative Agent the appropriate Internal Revenue Service Forms (and, if
applicable a Section 2.18(e) Certificate) described in Section 2.18(e). To the
extent that an assignment of all or any portion of a Lender's Commitments (and
related outstanding Obligations) and/or outstanding Term Loans pursuant to
Section 2.20 or this paragraph (b) would, at the time of such assignment, result
in increased costs under Section 2.16 or 2.18 greater than those being charged
by the respective assigning Lender prior to such assignment, then the Borrower
shall not be obligated to pay such greater increased costs (although the
Borrower shall be obligated as provided in Sections 2.16 and 2.18 to pay any
other increased costs of the type described above resulting from changes after
the date of the respective assignment).

          (c)    Nothing in this Agreement shall prevent or prohibit any Lender
from pledging its Loans or any promissory notes evidencing such Loans to a
Federal Reserve Bank in support of borrowings made by such Lender from such
Federal Reserve Bank and, with prior notice to the Administrative Agent, any
Lender which is a fund may pledge all or any portion of such promissory notes
held by it or Loans to its trustee, in support of its obligations to another creditor
providing credit or credit support to such Lender in support of its obligations
to its trustee or such collateral agent, as the case may be. No pledge pursuant
to this paragraph (c) shall release the transferor Lender from any of its

obligations hereunder.

(d)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries made in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuing Lenders and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Issuing Lenders and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

-115-

<PAGE>
SECTION 9.05. SURVIVAL. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent, any Joint Book Manager, any Joint Lead Arranger, any Issuing Lender or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.16, 2.17, 2.18 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. COUNTERPARTS; INTEGRATION; EFFECTIVENESS. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Document and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when

taken together, bear the signatures of each of the other parties hereto, and
thereafter shall be binding upon and inure to the benefit of the parties hereto
and their respective successors and assigns. Delivery of an executed counterpart
of a signature page of this Agreement by telecopy shall be effective as delivery
of a manually executed counterpart of this Agreement.

      SECTION 9.07. SEVERABILITY. Any provision of this Agreement held to
be invalid, illegal or unenforceable in any jurisdiction shall, as to such
jurisdiction, be ineffective to the extent of such invalidity, illegality or
unenforceability without affecting the validity, legality and enforceability of
the remaining provisions hereof; and the invalidity of a particular provision in
a particular jurisdiction shall not invalidate such provision in any other
jurisdiction.

      SECTION 9.08. RIGHT OF SETOFF. If an Event of Default shall have
occurred and be continuing, each Lender and each of its Affiliates is hereby
authorized at any time and from time to time, to the fullest extent permitted by
law, to set off and apply any and all deposits (general or special, time or
demand, provisional or final) at any time held and other obligations at any time
owing by such Lender or Affiliate to or for the credit or the account of the
Borrower against any of and all the obligations of the Borrower now or hereafter
existing under this Agreement held by such Lender, irrespective of whether or
not such Lender shall have made any demand under this Agreement and although
such obligations may be unmatured. The rights of

           -116-

&lt;PAGE&gt;
each Lender under this Section are in addition to other rights and remedies
(including other rights of setoff) which such Lender may have.

      SECTION 9.09. GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
PROCESS. (a) This Agreement shall be construed in accordance with and governed
by the law of the State of New York.

      (b)    Each party to this Agreement hereby irrevocably and
unconditionally submits, for itself and its property, to the nonexclusive
jurisdiction of the Supreme Court of the State of New York sitting in New York
County and of the United States District Court of the Southern District of New
York, and any appellate court from any thereof, in any action or proceeding
arising out of or relating to any Loan Document, or for recognition or
enforcement of any judgment, and each of the parties hereto hereby irrevocably
and unconditionally agrees that all claims in respect of any such action or
proceeding may be heard and determined in such New York State or, to the extent
permitted by law, in such Federal court. Each of the parties hereto agrees that
a final judgment in any such action or proceeding shall be conclusive and may be
enforced in other jurisdictions by suit on the judgment or in any other manner
provided by law. Nothing in this Agreement or any other Loan Document shall
affect any right that any Administrative Agent, any Joint Book Manager, any
Joint Lead Arranger, any Issuing Lender or any Lender may otherwise have to
bring any action or proceeding relating to this Agreement or any other Loan
Document against the Borrower or its properties in the courts of any
jurisdiction.

      (c)    Each party to this Agreement hereby irrevocably and
unconditionally waives, to the fullest extent it may legally and effectively do
so, any objection which it may now or hereafter have to the laying of venue of
any suit, action or proceeding arising out of or relating to this Agreement or
any other Loan Document in any court referred to in paragraph (b) of this
Section. Each of the parties hereto hereby irrevocably waives, to the fullest

extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

       (d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

       SECTION 9.10. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,

<div align="center">-117-</div>

<PAGE>
AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

       SECTION 9.11. HEADINGS. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

       SECTION 9.12. CONFIDENTIALITY. Each Agent, each Joint Book Manager, each Joint Lead Arranger, each Issuing Lender and each Lender agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) to any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement so long as such assignee or participant, as the case may be, agrees to treat such Information as provided in this Section, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach by it of this Section or (ii) becomes available to it on a nonconfidential basis from a source other than the Borrower. For the purposes of this Section, "Information" means all information received from the Borrower and relating to the business and affairs of Borrower or any Subsidiary, other than any such information that is available to any Agent, any Joint Book Manager, any Joint Lead Arranger, any Issuing Lender or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary; PROVIDED that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own

confidential information. The provisions of this Section shall supersede and
replace any confidentiality agreement heretofore delivered to the Borrower by
any Agent, any Joint Book Manager, any Joint Lead Arranger, any Issuing Lender
or any Lender.

        SECTION 9.13. INTEREST RATE LIMITATION. Notwithstanding anything
herein to the contrary, if at any time the interest rate applicable to any Loan,
together with all fees, charges and other amounts which are treated as interest
on such Loan under applicable law (collectively the "Charges"), shall exceed the
maximum lawful rate (the "Maximum Rate") which may be contracted for, charged,
taken, received or reserved by the Lender holding such Loan in accordance with
applicable law, the rate of interest payable in respect of such Loan hereunder,
together with all Charges payable in respect thereof, shall be limited to the
Maximum Rate and, to the extent lawful, the interest and Charges that would have
been payable in respect of such Loan but were not payable as a result of the
operation of this Section shall be cumulated and the interest and Charges
payable to such Lender in respect of other Loans or periods shall be

                                    -118-

<PAGE>
increased (but not above the Maximum Rate therefor) until such cumulated amount,
together with interest thereon at the Federal Funds Rate to the date of
repayment, shall have been received by such Lender.

        SECTION 9.14. EXCEPTED DEFAULT UNDER THE 10-5/8% SENIOR SUBORDINATED
NOTE INDENTURES. Notwithstanding anything to the contrary contained in this
Agreement, the occurrence of an Excepted Default (for so long as same remains an
Excepted Default) shall not result in, or be deemed to be, a breach of any of
the representations or warranties contained in this Agreement or constitute
Default under this Agreement.

                                    -119-

<PAGE>
        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to
be duly executed by their respective authorized officers as of the day and year
first above written.

                        FLEMING COMPANIES, INC.


                        By  /s/ Carlos M. Hernandez
                            ------------------------------------------
                            Name:  Carlos M. Hernandez
                            Title: Senior Vice President and Secretary


                        DEUTSCHE BANK TRUST COMPANY AMERICAS, Individually
                            and as Administrative Agent


                        By  /s/ Marguerite Sutton
                            ------------------------------------------
                            Name:  Marguerite Sutton
                            Title: Vice President


                        JPMORGAN CHASE BANK, Individually and as a
                            Syndication Agent

```
                    By  /s/ Teri Streusand
                       ------------------------------------------------
                       Name:   Teri Streusand
                       Title:  Vice President


                    CITICORP NORTH AMERICA, INC., Individually and as
                      a Syndication Agent


                    By  /s/ Andrew Robinson
                       ------------------------------------------------
                       Name:   Andrew Robinson
                       Title:  Vice President


                            -120-
<PAGE>
                    LEHMAN COMMERCIAL PAPER INC., Individually and as a
                      Documentation Agent


                    By  /s/ Francis J. Chang
                       ------------------------------------------------
                       Name:   Francis J. Chang
                       Title:  Authorized Signatory


                    WACHOVIA BANK, NATIONAL ASSOCIATION, Individually
                      and as a Documentation Agent


                    By  /s/ T.M. Molitor
                       ------------------------------------------------
                       Name:   T.M. Molitor
                       Title:  Director
<PAGE>
                    DEUTSCHE BANK SECURITIES INC., as a Joint Book
                      Manager and a Joint Lead Arranger


                    By  /s/ Sharon Stern
                       ------------------------------------------------
                       Name:   Sharon Stern
                       Title:  Director


                    J.P. MORGAN SECURITIES INC., as a Joint Book
                      Manager and a Joint Lead Arranger


                    By  /s/ Lisa Kopft
                       ------------------------------------------------
                       Name:   Lisa Kopft
                       Title:  Vice President


                    SALOMON SMITH BARNEY INC., as a Joint Lead Arranger
```

```
By   /s/ Barbara Matas
     --------------------------------------------
     Name:   Barbara Matas
     Title:  Managing Director
```

                         -2-

```
</TEXT>
</DOCUMENT>
```