# EXHIBIT T

[Draft: (New York) May 6, 2003]

CREDIT AGREEMENT

dated as of May     , 2003

among

FLEMING COMPANIES, INC. AND CERTAIN OF ITS SUBSIDIARIES PARTY HERETO,
as Borrowers and Debtors-in-Possession,

THE LENDERS PARTY HERETO,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent,

JPMORGAN CHASE BANK,
as Collateral Agent and as Syndication Agent,

and

DEUTSCHE BANK SECURITIES INC. and JPMORGAN CHASE BANK,
as Joint Lead Arrangers and Joint Book Runners

TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS.................................................................4

    SECTION 1.01.    DEFINED TERMS ...................................................4
    SECTION 1.02.    CLASSIFICATION OF POST-PETITION LOANS AND
                  BORROWINGS..............................................................38
    SECTION 1.03.    TERMS GENERALLY ............................................38
    SECTION 1.04.    ACCOUNTING TERMS; GAAP; FISCAL YEARS...................38

ARTICLE II    THE CREDITS ..............................................................39

    SECTION 2.01.    COMMITMENTS; CASH COLLATERAL..................39
    SECTION 2.02.    LOANS AND BORROWINGS................................41
    SECTION 2.03.    REQUESTS FOR BORROWINGS ........................42
    SECTION 2.04.    POST-PETITION LETTERS OF CREDIT................42
    SECTION 2.05.    FUNDING OF BORROWINGS ............................47
    SECTION 2.06.    INTEREST ELECTIONS.....................................48
    SECTION 2.07.    TERMINATION AND REDUCTION OF COMMITMENTS.........49
    SECTION 2.08.    REPAYMENT OF LOANS; EVIDENCE OF DEBT...............50
    SECTION 2.09.    PREPAYMENT OF LOANS .................................51
    SECTION 2.10.    FEES ........................................................52
    SECTION 2.11.    INTEREST...................................................53
    SECTION 2.12.    ALTERNATE RATE OF INTEREST......................54
    SECTION 2.13.    INCREASED COSTS........................................54
    SECTION 2.14.    BREAK FUNDING PAYMENTS ..........................56
    SECTION 2.15.    TAXES.......................................................56
    SECTION 2.16.    PAYMENTS GENERALLY; CASH DOMINION; PRO RATA
                  TREATMENT; SHARING OF SET-OFFS .....................59
    SECTION 2.17.    MITIGATION OF POST-PETITION OBLIGATIONS;
                  REPLACEMENT OF LENDERS ............................62
    SECTION 2.18.    ILLEGALITY OR IMPRACTICABILITY OF EURODOLLAR
                  POST-PETITION LOANS .................................63
    SECTION 2.19.    PRIORITY AND LIENS; ADEQUATE PROTECTION .................64
    SECTION 2.20.    NO DISCHARGE; SURVIVAL OF CLAIMS .................66
    SECTION 2.21.    USE OF CASH COLLATERAL...............................66

ARTICLE III    REPRESENTATIONS AND WARRANTIES..........................66

    SECTION 3.01.    CORPORATE EXISTENCE AND POWER; CORPORATE
                  AND GOVERNMENTAL AUTHORIZATION; DUE
                  EXECUTION; CONTRAVENTION ......................66
    SECTION 3.02.    BINDING EFFECT..........................................67
    SECTION 3.03.    FINANCIAL INFORMATION .............................67
    SECTION 3.04.    LITIGATION..................................................67
    SECTION 3.05.    COMPLIANCE WITH ERISA...............................68

Page

SECTION 3.06.    ENVIRONMENTAL MATTERS .................................69
SECTION 3.07.    TAX RETURNS ...................................................69
SECTION 3.08.    SUBSIDIARIES ...................................................70
SECTION 3.09.    NOT AN INVESTMENT COMPANY ......................70
SECTION 3.10.    NO CONFLICTING REQUIREMENTS ....................70
SECTION 3.11.    DISCLOSURE .....................................................70
SECTION 3.12.    FINANCING ORDERS ..........................................71
SECTION 3.13.    PROPERTIES; LIENS ...........................................71
SECTION 3.14.    PUBLIC UTILITY HOLDINGS COMPANY ...............71
SECTION 3.15.    LABOR RELATIONS .............................................71
SECTION 3.16.    INDEBTEDNESS ..................................................72
SECTION 3.17.    INSURANCE ........................................................72
SECTION 3.18.    LEGAL NAMES; TYPE OF ORGANIZATION (AND
                 WHETHER A REGISTERED ORGANIZATION);
                 JURISDICTION OF ORGANIZATION; ETC. ...........72
SECTION 3.19.    PATENTS, LICENCES, FRANCHISES AND FORMULAS ...........72
SECTION 3.20.    ACCOUNTS ........................................................72
SECTION 3.21.    SENIOR LIENS ....................................................73
SECTION 3.22.    MATERIAL CONTRACTS ......................................73
SECTION 3.23.    SECURITY ..........................................................73

ARTICLE IV    CONDITIONS ...........................................................74

SECTION 4.01.    EFFECTIVE DATE ................................................74
SECTION 4.02.    EACH BORROWING ............................................77
SECTION 4.03.    USE OF CASH COLLATERAL ...............................78

ARTICLE V    AFFIRMATIVE COVENANTS ........................................79

SECTION 5.01.    INFORMATION ....................................................79
SECTION 5.02.    PAYMENT OF OBLIGATIONS ...............................84
SECTION 5.03.    MAINTENANCE OF PROPERTY; INSURANCE .........85
SECTION 5.04.    MAINTENANCE OF EXISTENCE ...........................86
SECTION 5.05.    COMPLIANCE WITH LAWS ...................................86
SECTION 5.06.    INSPECTION OF PROPERTY, BOOKS AND RECORDS ...........86
SECTION 5.07.    USE OF PROCEEDS .............................................87
SECTION 5.08.    FURTHER ASSURANCES .....................................88
SECTION 5.09.    WAIVER OF CLAIMS ............................................89
SECTION 5.10.    SUBSIDIARY PROCEEDINGS ...............................89
SECTION 5.11.    COMPLIANCE WITH ENVIRONMENTAL LAWS .........89
SECTION 5.12.    MORTGAGES ......................................................90
SECTION 5.13.    CHIEF RESTRUCTURING OFFICER .......................91

ARTICLE VI    NEGATIVE COVENANTS ............................................91

SECTION 6.01.    LIENS ................................................................91
SECTION 6.02.    CONSOLIDATION, MERGER, SALE OF ASSETS, ETC. ...........93
SECTION 6.03.    INDEBTEDNESS ..................................................94
SECTION 6.04.    DIVIDENDS .........................................................96

Page

SECTION 6.05.   TRANSACTIONS WITH AFFILIATES .................................96
SECTION 6.06.   ACQUISITIONS AND INVESTMENTS .............................96
SECTION 6.07.   LIMITATION ON CERTAIN RESTRICTIONS ON
                SUBSIDIARIES .................................................................97
SECTION 6.08.   CAPITAL EXPENDITURES ...............................................97
SECTION 6.09.   MINIMUM CONSOLIDATED EBITDA ..............................98
SECTION 6.10.   LIMITATION ON ISSUANCES OF CAPITAL STOCK .................98
SECTION 6.11.   CHANGE OF LEGAL NAMES; TYPE OF ORGANIZATION
                (AND WHETHER A REGISTERED ORGANIZATION);
                JURISDICTION OF ORGANIZATION; ETC. ......................98
SECTION 6.12.   LIMITATION ON CREATION OF SUBSIDIARIES ....................99
SECTION 6.13.   CONDUCT OF BUSINESS ...............................................99
SECTION 6.14.   CHAPTER 11 CLAIMS ...................................................99
SECTION 6.15.   NO OTHER ACCOUNTS ..................................................99
SECTION 6.16.   PLEADINGS IN CHAPTER 11 CASE ...............................99

ARTICLE VII  EVENTS OF DEFAULT ...............................................100

ARTICLE VIII THE AGENTS ...........................................................105

SECTION 8.01.   APPOINTMENT ...........................................................105
SECTION 8.02.   NATURE OF DUTIES ....................................................105
SECTION 8.03.   LACK OF RELIANCE ON THE POST-PETITION AGENTS .......105
SECTION 8.04.   CERTAIN RIGHTS OF THE POST-PETITION AGENTS .............106
SECTION 8.05.   RELIANCE ..................................................................106
SECTION 8.06.   INDEMNIFICATION .......................................................106
SECTION 8.07.   EACH POST-PETITION AGENT IN ITS INDIVIDUAL
                CAPACITY ...................................................................107
SECTION 8.08.   RESIGNATION ..............................................................107
SECTION 8.09.   THE SYNDICATION AGENT .............................................108

ARTICLE IX   MISCELLANEOUS .....................................................108

SECTION 9.01.   NOTICES .....................................................................108
SECTION 9.02.   WAIVERS; AMENDMENTS ..............................................109
SECTION 9.03.   EXPENSES; INDEMNITY; DAMAGE WAIVER ......................111
SECTION 9.04.   SUCCESSORS AND ASSIGNS ..........................................112
SECTION 9.05.   SURVIVAL ...................................................................114
SECTION 9.06.   COUNTERPARTS; INTEGRATION; EFFECTIVENESS .............115
SECTION 9.07.   SEVERABILITY .............................................................115
SECTION 9.08.   RIGHT OF SETOFF ........................................................115
SECTION 9.09.   GOVERNING LAW; JURISDICTION; CONSENT TO
                SERVICE OF PROCESS ...................................................115
SECTION 9.10.   WAIVER OF JURY TRIAL ...............................................116
SECTION 9.11.   HEADINGS ..................................................................116
SECTION 9.12.   CONFIDENTIALITY ........................................................117
SECTION 9.13.   INTEREST RATE LIMITATION ..........................................117

Page

SECTION 9.14.   SPECIAL PROVISIONS REGARDING SECTIONS 6.08 AND
                6.09...................................................................................................117

ARTICLE X    NATURE OF BORROWERS' OBLIGATIONS ...........................................118

SECTION 10.01.  NATURE OF OBLIGATIONS ........................................................118
SECTION 10.02.  INDEPENDENT OBLIGATION .....................................................118
SECTION 10.03.  AUTHORIZATION...........................................................................118
SECTION 10.04.  RELIANCE.........................................................................................119
SECTION 10.05.  CONTRIBUTION; SUBROGATION...............................................119
SECTION 10.06.  WAIVER..............................................................................................119

SCHEDULES:

| | |
|---|---|
| Schedule 2.01 | Commitments |
| Schedule 3.08 | Subsidiaries |
| Schedule 3.13 | Real Property |
| Schedule 3.16 | Existing Indebtedness |
| Schedule 3.17 | Insurance |
| Schedule 3.18 | Legal Names; Type of Organization; Jurisdiction of Organization |
| Schedule 3.20(a) | Collection Accounts |
| Schedule 3.20(b) | Disbursement Accounts |
| Schedule 3.20(c) | Accounts Constituting Trust Property |
| Schedule 3.22 | Material Contracts |
| Schedule 5.01(s) | Mortgaged Property |
| Schedule 6.01(b) | Existing Liens |
| Schedule 6.06(iv) | Investments |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | -- | Assignment and Acceptance |
| Exhibit B | -- | Control Agreement |
| Exhibit C | -- | Pledge Agreement |
| Exhibit D | -- | Security Agreement |
| Exhibit E | -- | Notice of Borrowing Request |
| Exhibit F | -- | Letter of Credit Request |
| Exhibit G | -- | Notice of Interest Election Request |
| Exhibit H | -- | Section 2.15(e) Certificate |
| Exhibit I | -- | Opinion of Kirkland & Ellis, Borrower's Special Counsel |
| Exhibit J | -- | Final Order |
| Exhibit K | -- | Borrowing Base Certificate |

CREDIT AGREEMENT, dated as of May __, 2003, among FLEMING COMPANIES, INC., an Oklahoma corporation (the "Company"), the undersigned Subsidiaries of the Company, as Borrowers and debtors-in-possession in cases pending under Chapter 11 of the Bankruptcy Code (the "Cases"), the LENDERS party hereto, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Administrative Agent, JPMORGAN CHASE BANK, as Collateral Agent and Syndication Agent, and DEUTSCHE BANK SECURITIES INC. and JPMORGAN CHASE BANK, as Joint Lead Arrangers and Joint Book Runners.

## INTRODUCTORY STATEMENT

On April 1, 2003 (the "Filing Date"), the Borrowers filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Company, JPMorgan Chase Bank and Citicorp North America, Inc., as syndication agents, Lehman Commercial Paper Inc. and Wachovia Bank, National Association, as documentation agents, DBSI and JPMSI, as joint book managers, DBSI, JPMSI and Salomon Smith Barney Inc., as joint lead arrangers and DBTCA, as administrative agent, and the various lenders from time to time parties thereto (collectively, the "Pre-Petition Lenders") are parties to that certain Credit Agreement dated as of June 18, 2002 (as heretofore amended, supplemented or modified, the "Existing Credit Agreement"), pursuant to which the Company was indebted to the Pre-Petition Lenders on the Filing Date, in an aggregate principal amount of $604,000,000 of outstanding revolving loans and term loans (the "Pre-Petition Loans") and $151,000,000 of outstanding letters of credit thereunder (collectively, the "Pre-Petition Letters of Credit") plus interest, fees and other amounts owing thereunder.

Pursuant to a Guarantee Agreement, dated as of June 18, 2002 (as heretofore amended, supplemented or modified, the "Existing Guarantee"), certain Wholly-Owned Subsidiaries of the Company party thereto guaranteed all obligations of the Company under the Existing Credit Agreement.

The Pre-Petition Lenders believe and, based on their review of the results of the searches of the Uniform Commercial Code filings conducted pursuant to Section 5.01(h), the Borrowers believe that on the Filing Date, the Pre-Petition Obligations are secured by valid, perfected, enforceable and non-voidable senior security interests in and liens upon all Accounts and Inventory of the Company and each Subsidiary which is a party to the Existing Guarantee, all Instruments and all Chattel Paper of the Company and each Subsidiary which is a party to the Existing Guarantee, in each case evidencing any such Accounts, and all Instruments and Chattel Paper into which any such Accounts have been, or are hereafter, converted, all Documents and all Supporting Obligations relating to any and all of the foregoing, all Equity Interests of the Company and each Subsidiary which is a party to the Existing Guarantee and all Proceeds thereof (collectively, the "Pre-Petition Collateral" and all such foregoing liens securing the Pre-Petition Collateral, the "Pre-Petition Financing Liens").

As a result of the occurrence of an Event of Default under, and as defined in, the Existing Credit Agreement, all loans and other extensions of credit made under the Existing Credit Agreement are now due and payable.

The Borrowers must promptly borrow money and otherwise obtain credit to meet their payroll and otherwise to pay their continuing obligations incurred in the operation of their businesses in order to maximize recoveries to their creditors and avoid irreparable harm to their Estates.

The Borrowers have requested that the Post-Petition Lenders make available to the Borrowers a revolving credit and letter of credit facility, in an aggregate principal amount not to exceed $150,000,000, subject to the approval of the Bankruptcy Court pursuant to the Interim Order and, if applicable, the Final Order.

The Borrowers have requested that the Pre-Petition Lenders consent to the use of Cash Collateral and the granting of a lien priming the Pre-Petition Financing Liens pursuant to Section 364(d)(1) of the Bankruptcy Code.

The proceeds of the Post-Petition Loans and other extensions of credit made hereunder will be used to provide working capital for, and for other general corporate purposes of, the Borrowers (including the payment of fees and other amounts payable hereunder), in all cases subject to the terms of this Agreement and the Financing Orders.

In order to permit the continuation of their businesses prior to the Effective Date, the Borrowers obtained an interim revolving loan facility in a principal amount up to $50,000,000 pursuant to the terms and conditions of the Bridge Loan Order, entered by the Bankruptcy Court on April 3, 2003 which order was extended through April 22, 2003 (the "Bridge Loan Order").

In order to grant adequate protection to the Pre-Petition Lenders for any diminution in the value of the Pre-Petition Collateral (the "Diminution Claim") resulting from, INTER ALIA, the granting of the Liens and the carve-out provided for in the Bridge Loan Order, the priming of the Pre-Petition Financing Liens, the imposition of the automatic stay, and from the use, sale or lease or other disposition of the Pre-Petition Collateral, the Borrowers entered into the Interim Stipulation and Order Authorizing (A) the Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (B) the Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 Nunc Pro Tunc to the Filing Date, which was approved by order of the Bankruptcy Court, which Stipulation and Order has been extended through April 22, 2003 (the "Cash Collateral Order").

To assure repayment of the Post-Petition Loans and the payment of the other Post-Petition Obligations of the Borrowers hereunder and under the other Post-Petition Loan Documents, the Borrowers shall provide to the Joint Lead Arrangers, the Post-Petition Agents and the Post-Petition Lenders, pursuant to this Agreement, the other Post-Petition Loan Documents and the Financing Orders, INTER ALIA, the following (each as more fully described herein):

(1)     with respect to all Post-Petition Obligations, an allowed administrative expense claim in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code having

-2-

priority over any and all administrative expenses of the kind specified in or incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) or 726 of the Bankruptcy Code as well as any other priority claims and which at all times is senior to the rights of the Borrowers or any trustee in any Case or any superseding case under Chapter 7 of the Bankruptcy Code, whether such administrative expenses are incurred or arise before, on or after the entry of the Interim Order or before or after a conversion of any such Chapter 11 Case pursuant to Section 1112 of the Bankruptcy Code or otherwise, subject only to the Carve-Out (the "Post-Petition Lender Super-Priority Claims");

(2)    with respect to all Post-Petition Obligations, a perfected first priority Lien pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code upon all assets of the Borrowers and their Estates (other than Trust Property and Restricted Leasehold Interest but) including, in accordance with the Financing Orders, proceeds of all Restricted Leasehold Interests and of property recovered by any Borrower pursuant to the provisions of Section 544, 547, 548 or 550 of the Bankruptcy Code (the "Avoidance Recovery Property")), which Lien shall prime the Pre-Petition Financing Liens, subject only to the Carve-Out, and any valid, enforceable, unavoidable and perfected Liens thereon (other than the Pre-Petition Financing Liens) in existence on the Filing Date which, as of such date, were senior to the Pre-Petition Financing Liens (the "Senior Liens"); and

(3)    with respect to all Post-Petition Obligations, a perfected junior lien pursuant to Section 364(c)(3) of the Bankruptcy Code upon all property of the Borrowers that is encumbered by the Senior Liens and junior and subordinate to such Senior Liens, subject only to the Carve-Out (all such foregoing liens securing the Post-Petition Obligations as described in preceding clause (2) and this clause (3), the "Facility Liens").

To provide adequate protection to the Pre-Petition Agents and the Pre-Petition Lenders for any Diminution Claim resulting from, INTER ALIA, the granting of the Carve-Out and the Facility Liens, the priming of the Pre-Petition Financing Liens, the imposition of the automatic stay and the use, sale or lease or other disposition of the Pre-Petition Collateral, the Borrowers shall provide to the Pre-Petition Agents and the Pre-Petition Lenders, pursuant to the Financing Orders, INTER ALIA, the following (each as more fully described herein):

(1)    with respect to the Diminution Claim, an allowed administrative expense claim in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any and all administrative expenses of the kind specified in or incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c) or 726 of the Bankruptcy Code as well as any other priority claims and which at all times is senior to the rights of the Borrowers or any trustee in any Case or any superseding case under Chapter 7 of the Bankruptcy Code, whether such administrative expenses are incurred or arise before, on or after the entry of the Interim Order or before or after a conversion of any such Chapter 11 Case pursuant to Section 1112 of the Bankruptcy Code or otherwise, subject to the Post-Petition Lender Super-Priority Claim and the Carve-Out (such administrative expense claim the "Pre-Petition Lender Super-Priority Claim"); and

(2)     with respect to the Diminution Claim, a perfected first priority Lien (the "Pre-Petition Lenders' Replacement Liens") pursuant to Sections 361 and 363 of the Bankruptcy Code upon all assets of each Borrower and its respective Estate (other than Trust Property and Restricted Leasehold Property but including the proceeds of Avoidance Recovery Property and of all Restricted Leasehold Interests), subject only to the Carve-Out, the Senior Liens and the Facility Liens.

All of the claims and liens granted hereunder in the Cases to the Pre-Petition Agents, the Post-Petition Agents, the Pre-Petition Lenders and the Post-Petition Lenders shall be subject to the Carve-Out.

## ARTICLE I

## DEFINITIONS

SECTION 1.01.  DEFINED TERMS.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Post-Petition Loan or Borrowing, refers to whether such Post-Petition Loan, or the Post-Petition Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ACCOUNT DEBTOR" means any Person who may become obligated to any Borrower under, with respect to, or on account of, an Account.

"ACCOUNTS" has the meaning assigned to such term in the Security Agreement.

"ADDITIONAL CREDIT DATE" has the meaning assigned such term in Section 4.02(c).

"ADDITIONAL INVENTORY RESERVES" means, with respect to (i) Eligible Convenience Inventory or (ii) Eligible Full-Line and GMD Inventory, as the case may be, an amount of reserves against such category of Eligible Inventory equal to the sum of the following:

(a)     to the extent the Tobacco Stamp Gap Amount is greater than the Inventory Value of Unaffixed Stamps, a reserve (determined separately for each jurisdiction) equal to the remainder of (i) the Tobacco Stamp Gap Amount, less (ii) the Inventory Value of Unaffixed Stamps; plus

(b)     the PACA Liability Reserve.

"ADJUSTED LIBO RATE" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"ADMINISTRATIVE AGENT" means DBTCA, in its capacity as Administrative Agent for the Post-Petition Lenders hereunder.

"ADMINISTRATIVE QUESTIONNAIRE" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"AFFILIATE" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"AGGREGATE DILUTION RESERVES" equals, at any date, the aggregate amount of Dilution Reserves applicable each Business on such date.

"AGREEMENT" means this Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"ALTERNATE BASE RATE" means, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Rate in effect on such day plus 1/2 of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Rate, respectively.

"ALTERNATE CURRENCY" means, with respect to any Post-Petition Letter of Credit, Canadian Dollars, Pounds Sterling and Euros, and any other currency other than Dollars as may be acceptable to the Administrative Agent and the Issuing Lender with respect thereto in their sole discretion.

"APPLICABLE PERCENTAGE" means, with respect to any Post-Petition Lender, the percentage of the total Commitments represented by such Post-Petition Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"APPLICABLE RATE" for any day during the respective period means (i) in the case of Eurodollar Post-Petition Loans, 3.00% and (ii) in the case of ABR Post-Petition Loans, 2.00%.

"ASSET DISPOSITION" means (a) any sale, issuance, transfer or other disposition of any Equity Interest of any Subsidiary to any Person other than a Borrower (including, without limitation, through the merger of any Subsidiary with or into any Person other than a Borrower); (b) any sale, transfer or other disposition of any other property or asset of the Borrower or any Subsidiary to any Person other than a Borrower, other than any sale, transfer or other disposition of (i) any inventory in the ordinary course of business or (ii) any Perishable Inventory; or (c) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, properties or assets of the Borrower or any Subsidiary.

"ASSIGNMENT AND ACCEPTANCE" means an assignment and acceptance entered into by a Post-Petition Lender and an assignee (with the consent of the Administrative Agent to the extent required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"AUTHORIZED FACILITY AMOUNT" means (x) prior to the earlier of the Additional Credit Date and the issuance of the Final Order, the amount of credit authorized by the Interim Order and (y) thereafter, the amount of credit authorized by the Final Order, which shall in no event exceed $150,000,000, PROVIDED that in the event that the Final Order is not entered into within 45 days after the Effective Date, the Authorized Facility Amount shall mean $0.

"AVAILABILITY PERIOD" means the period from and including the later of (i) the Effective Date and (ii) the first Business Day following the delivery by the Company to the Joint Lead Arrangers of a Borrowing Base Certificate indicating that no Borrowing Base Deficiency exists to but excluding the earlier of the Termination Date and the date of termination of the Commitments.

"AVAILABLE ACCOUNTS RECEIVABLE" means 85% of the remainder of (i) Eligible Accounts Receivable less (ii) the Aggregate Dilution Reserves.

"AVAILABLE CONVENIENCE INVENTORY" means, at any time, an amount equal to the lesser of (i) the remainder of (a) the sum, without duplication, of (1) 80% of the Eligible Convenience Inventory consisting of Cigarette and Stamps Inventory, plus (2) 70% of the Eligible Convenience Inventory consisting of Cigar and Tobacco Inventory, plus (3) 60% of the Eligible Convenience Inventory consisting of Other Inventory less (b) all Additional Inventory Reserves against Eligible Convenience Inventory, and (ii) the remainder of (a) 85% of the Net Recovery Rate applicable to Eligible Convenience Inventory multiplied by the amount of Eligible Convenience Inventory at such time less (b) any applicable Additional Inventory Reserves against the Eligible Convenience Inventory.

"AVAILABLE FIXED ASSETS" means an amount equal to the least of (i) the sum, without duplication, of (a) __% of the liquidation value as determined by an appraisal (or update thereof) delivered to and acceptable to the Joint Lead Arrangers of the machinery and equipment the subject of such appraisal plus (b) 50% of the market value, as determined by an appraisal (or update thereof) delivered to and acceptable to the Joint Lead Arrangers, of the Mortgaged Properties, (ii) $150,000,000 and (iii) 20% of the sum of (x) Available Accounts Receivable plus (y) Available Full-Line and GMD Inventory plus (z) Available Convenience Inventory and (B); provided that at all times after the 60th day following the Effective Date, unless the Company has complied with each of the covenants contained in Section 5.12 Available Fixed Assets shall instead mean $0.

"AVAILABLE FULL-LINE AND GMD INVENTORY" means, at any time, an amount equal to the lesser of (i) the remainder of (a) 65% of Eligible Full-Line and GMD Inventory less (b) any Additional Inventory Reserves against Eligible Full-Line and GMD Inventory, and (ii) the remainder of (a) 85% of the Net Recovery Rate applicable to Eligible Full-Line and GMD Inventory multiplied by the amount of Eligible Full-Line and GMD

Inventory at such time less (b) any Additional Inventory Reserves against the Eligible Full-Line and GMD Inventory.

"AVAILABLE RETAIL INVENTORY" means, at any time, an amount equal to the lesser of (i) 50% of Eligible Retail Inventory and (ii) (A) 10% of the sum, without duplication, of (1) Available Full-Line and GMD Inventory plus (2) Available Convenience Inventory divided by (B) 90%.

"AVOIDANCE RECOVERY PROPERTY" has the meaning assigned to such term in the Introduction.

"BANKRUPTCY CODE" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"BANKRUPTCY COURT" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"BENEFIT ARRANGEMENT" means at any time an employee benefit plan within the meaning of Section 3(3) of ERISA which is not a Plan or a Multiemployer Plan and which is maintained or otherwise contributed to by the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"BOARD" means the Board of Governors of the Federal Reserve System of the United States of America.

"BORROWER" means and includes each of the Company, Core-Mark International Inc., ABCO Food Group, Inc., ABCO Markets, Inc., ABCO Realty Corp., C/M Products, Inc., Core-Mark Interrelated Companies, Inc., Core-Mark Mid-Continent, Inc., Dunigan Fuels, Inc., Favar Concepts, Ltd., Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P., Fleming International, Ltd., Fleming Supermarkets of Florida, Inc., Fleming Transportation Service, Inc., Food 4 Less Beverage Company, Inc., Fuelserv, Inc., General Acceptance Corporation, Head Distributing Company, Minter-Weisman Co., Piggly Wiggly Company, Progressive Realty, Inc., Rainbow Food Group, Inc., Retail Investments, Inc., Retail Supermarkets, Inc., RFS Marketing Services, Inc., and Richmar Foods, Inc.

"BORROWER'S KNOWLEDGE" means, with respect to any Borrower, the knowledge of any executive officer of such Borrower, any other employee of such Borrower charged with the responsibility of administering this Agreement, any Financial Officer, the general counsel of the Company or any assistant treasurer, associate general counsel or similar officer of the Company.

"BORROWING" means any group of Post-Petition Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"BORROWING BASE" means, at any time, an amount equal to the remainder of (A) the sum, without duplication, of (v) Available Accounts Receivable at such time plus (w) Available Full-Line and GMD Inventory at such time plus (x) Available Retail Inventory at such

time plus (y) Available Convenience Inventory at such time plus (z) at all times after the Hilco Appraisal Acceptance Date, the Available Fixed Assets at such time less (B) the sum of (i) the Carve-Out Reserve Amount plus (ii) the amount of the Environmental Reserve at such time plus (iii) the aggregate principal amount of Pre-Petition Loans outstanding at such time plus (iv) the aggregate stated amount of all outstanding Pre-Petition Letters of Credit at such time plus (v) the aggregate principal amount of all unreimbursed obligations with respect to Pre-Petition Letters of Credit at such time. Notwithstanding anything to the contrary contained within this definition or the component definitions of this definition, eligibility, reserves and advance rates of, and the various definitions related to, the Borrowing Base may be revised and adjusted from time to time by the Joint Lead Arrangers in their sole discretion.

"BORROWING BASE CERTIFICATE" has the meaning ascribed to such term in Section 5.01(m).

"BORROWING BASE DEFICIENCY" means that the Borrowing Base Deficiency Amount exceeds $0.

"BORROWING BASE DEFICIENCY AMOUNT" means, at any time, an amount equal to the positive difference of (i) the sum of amounts described in clause (A) of the definition of Borrowing Base at such time (calculated based on the Borrowing Base Certificate most recently delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined terms used herein) less (ii) the sum of (x) the total Exposure plus (y) the amounts described in clause (B) of the definition of Borrowing Base at such time (calculated based on the Borrowing Base Certificate most recently delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined term used herein). .

"BORROWING REQUEST" means a request by the Company for a Borrowing in accordance with Section 2.03.

"BRIDGE LOAN ORDER" has the meaning assigned to such term in the Introduction.

"BUDGET" has the meaning ascribed to such term in Section 4.01(o).

"BUSINESS" means and includes each of the Full-Line and GMD Business, the Convenience Business and the Retail Business.

"BUSINESS DAY" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; PROVIDED that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"CAPITAL EXPENDITURES" means, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capital Lease Obligations incurred by such Person.

"CAPITAL LEASE OBLIGATIONS" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"CARVE-OUT" shall mean a carve-out for (i) in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Borrowers and any statutory committee appointed in the Cases in an aggregate amount not in excess of $4,000,000 (plus all unpaid professional fees and disbursements incurred prior to the occurrence and continuance of such Event of Default strictly in accordance with the Budget (subject to variances permitted under the Final Order) and to the extent allowed by the Bankruptcy Court) and (ii) the payment of all fees required to be paid pursuant to 28 U.S.C. Section 1930(a)(6) and all unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; PROVIDED, HOWEVER, the Carve-Out shall not include professional fees and disbursements incurred in connection with the assertion of any claims or causes of action against the Pre-Petition Lenders, the Pre-Petition Agents, the Post-Petition Lenders or the Post-Petition Agents and/or challenging or raising any defense, objection or counterclaim to any of the obligations of the Borrowers under the Existing Credit Agreement or any Pre-Petition Loan Document or this Agreement or any other Post-Petition Loan Document or any claim, lien or security interest of the Pre-Petition Agents, the Pre-Petition Lenders, the Post-Petition Agents and/or the Post-Petition Lenders.

"CARVE-OUT RESERVE AMOUNT" means, at any time, an amount equal to the sum of (i) $4,000,000 plus (ii) the maximum amount of the Borrowers' incurred and unpaid professional fees and disbursements at such time as indicated by the most recent estimate therefor delivered by the Company to the Joint Lead Arrangers pursuant to Section 5.01(v) or, in the event the Company has not complied with Section 5.01(r), as estimated by the Joint Lead Arrangers from time to time.

"CASES" has the meaning assigned to such term in the first paragraph of this Agreement.

"CASH COLLATERAL" has the meaning assigned to such term in Section 363(a) of the Bankruptcy Code.

"CASH COLLATERAL ORDER" has the meaning assigned to such term in the Introduction.

"CHANGE IN CONTROL" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) of shares representing 35% or more of the aggregate ordinary voting power represented by the issued and outstanding capital stock (or equivalent equity interests) of the Company; (b) the occupation at any time of a majority of the seats (other than vacant seats) on the board of directors of the Company by Persons who were neither (i) nominated by the

NY-WY(MK 1021967 v12 (3K)

board of directors of the Company (determined on the Effective Date) nor (ii) appointed by directors so nominated; or (c) any "change of control" or similar event shall occur under any agreement or instrument evidencing or relating to any Permitted Existing Indebtedness.

"CHANGE IN LAW" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Post-Petition Lender or any Issuing Lender (or, for purposes of Section 2.15(b), by any lending office of such Post-Petition Lender or by such Post-Petition Lender's or such Issuing Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"CHATTEL PAPER" has the meaning assigned to such term in the Security Agreement.

"CHIEF RESTRUCTURING OFFICER" shall mean Mr. Ted Stenger (as long as he is the chief restructuring officer of the Company) or any other chief restructuring officer appointed by the Company and satisfactory to the Joint Lead Arrangers.

"CIGAR AND TOBACCO INVENTORY" means all Inventory of the Borrowers consisting of cigars and tobacco but, in any event, excluding Cigarette and Stamps Inventory.

"CIGARETTE AND STAMPS INVENTORY" means all Inventory of the Borrowers consisting of cigarettes and Unaffixed Stamps but, in any event, excluding Cigar and Tobacco Inventory.

"CODE" means the Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"COIN AND CURRENCY AGENT" means an agent which delivers coins and paper currency to various retail stores operated by the Borrowers.

"COLLATERAL" means any and all "Collateral" as defined in the Security Documents.

"COLLATERAL AGENT" has the meaning assigned to such term in the Security Agreement.

"COLLECTION ACCOUNT" means each account (other than any Excluded Account) established and maintained by a financial institution for any Borrower into which payments from Account Debtors of such Borrower (or from any other source) are remitted or otherwise deposited into such account by such respective financial institution.

"COLLECTION BANKS" means those certain financial institutions with whom the Borrowers enter into and maintain Control Agreements.

"COMMITMENT" means, with respect to each Post-Petition Lender, the commitment, if any, of such Post-Petition Lender to make Post-Petition Loans and to acquire participations in Post-Petition Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Post-Petition Lender's Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Post-Petition Lender pursuant to Section 9.04. The initial amount of each Post-Petition Lender's Commitment is set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Post-Petition Lender shall have assumed its Commitment, as applicable. The aggregate amount of the Post-Petition Lenders' Commitments on the Effective Date is $150,000,000.

"COMPANY" has the meaning assigned to such term in the first paragraph of this Agreement.

"CONCENTRATION ACCOUNT" means the account with JPMorgan Chase Bank established pursuant to a Control Agreement entered into among the Borrower, its Subsidiaries, the Collateral Agent and JPMorgan Chase.

"CONSOLIDATED EBITDA" means, for any period, Consolidated Net Income for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) federal, state, local and foreign income, value added and similar tax expense, (b) Consolidated Interest Expense, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, and amortization and/or impairment charges with respect to goodwill and other intangible assets, (e) "Chapter 11 expenses" (or "administrative costs reflecting Chapter 11 expenses") as shown on the Company's consolidated statement of income for such period, (f) any extraordinary, unusual or non-recurring expenses or losses except for the amount of cash payments made in respect of such expenses or losses in the respective period in which such charge was taken and (g) any non-cash losses for write-downs of Inventory and Accounts taken in connection with losses on sales or changes in GAAP that are effective after the Effective Date, and minus (to the extent included in the statement of such Consolidated Net Income for such period in the case of clauses (a), (b) and (c) below) the sum of (a) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period), (b) any net gains on sales of assets (other than sales of inventory made in the ordinary course of business), (c) any other non-cash income (other than accruals made in the ordinary course of business), all as determined on a consolidated basis and (d) any cash payment made during such period associated with any non-cash charge, or any extraordinary, unusual or non-recurring expense or loss, in each case taken in a prior period to the extent such non-cash charge, or extraordinary, unusual or non-recurring expense or loss was added back to the calculation of Consolidated EBITDA in such prior period.

"CONSOLIDATED INTEREST EXPENSE" means, for any period, the gross interest expense of the Company and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

"CONSOLIDATED NET INCOME" means, for any period, the net income or loss of the Company and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, PROVIDED that (i) the net income of any other Person which is not a Subsidiary of the Company or is accounted for by the Company by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Company or a Subsidiary thereof during such period, (ii) the net income of any Subsidiary of the Company shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary, (iii) to the extent Consolidated Net Income reflects amounts attributable to minority interests in Subsidiaries, Consolidated Net Income shall be reduced by the amounts attributable to such minority interests and (iv) there shall be excluded the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Company or any of the Subsidiaries or the date that Person's assets are acquired by the Company or any of the Subsidiaries.

"CONSOLIDATED SUBSIDIARY" means, at any date, any Subsidiary or other entity the accounts of which would be consolidated with those of the Company in its consolidated financial statements as of such date.

"CONTROL" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. A Person shall be deemed to "Control" another Person if such Person directly or directly owns more than 15% of any class of capital stock (or equivalent equity interests) in such Person or such Person is a director, executive officer or general partner of such Person. "CONTROLLING" and "CONTROLLED" have meanings correlative thereto.

"CONTROL AGREEMENT" means a control agreement in the form of Exhibit B (appropriately completed), with such changes thereto as may be agreed to by the Joint Lead Arrangers.

"CONVENIENCE BUSINESS" means the Borrowers' and their Subsidiaries' convenience business as historically defined by the Company. [Company to provide additional language for this definition.]

"DBSI" means Deutsche Bank Securities Inc., in its individual capacity.

"DBTCA" means Deutsche Bank Trust Company Americas, in its individual capacity.

"DEFAULT" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DEFAULTING LENDER" means any Post-Petition Lender with respect to which a Lender Default is in effect.

"DENVER DISTRIBUTION CENTER" means the distribution center owned by the Company or one of its Subsidiaries located at __ _____ _____, Colorado, which distribution center was the subject of certain casualty and other insured damage events prior to the Effective Date.

"DENVER DISTRIBUTION CENTER RECOVERY PROCEEDS" means the Net Proceeds received by the Company and its Subsidiaries from any casualty or other insured damage to the Denver Distribution Center or any assets of the Company and its Subsidiaries located therein.

"DEPARTING LENDER" has the meaning assigned to such term in Section 2.17(b).

"DESIGNATED CANADIAN ACCOUNT" means the deposit account no. _____ ____ maintained at _ _____ .

"DESIGNATED DISBURSEMENT ACCOUNT" means the Disbursement Account No. _____ _____ maintained at [JPMorgan Chase].

"DESIGNATED RETAIL ACCOUNTS" means those Disbursement Accounts from which payments are made to the Coin and Currency Agent as contemplated in Section 2.16(g).

"DILUTION FACTORS" means, without duplication, with respect to any period, the aggregate amount of all deductions, credit memos, returns, adjustments, allowances, bad debt write-offs and other non-cash credits which are recorded to reduce Accounts in a manner consistent with current and historical accounting practices of the Borrowers.

"DILUTION RATIO" means, at any date and determined separately for each of the Full-Line and GMD Business, Convenience Business and Retail Business, the amount (expressed as a percentage) equal to the quotient of (i) the aggregate amount of the applicable Dilution Factors for the twelve (12) most recently ended fiscal months divided by (ii) total gross sales for the twelve (12) most recently ended fiscal months.

"DILUTION RESERVE" means, at any date with respect to the Full-Line and GMD Business, the Convenience Business and the Retail Business, as the case may be, (x) if the Dilution Ratio for the Respective Business exceeds 2.5%, the product of (i) the excess of Dilution Ratio above 2.5% multiplied by (ii) the amount of Eligible Accounts Receivable attributable to such Business on such date and (y) if the Dilution Ratio for the respective Business is less than or equal to 2.5%, $0.

"DIMINUTION CLAIM" has the meaning assigned to such term in the Introduction.

"DISBURSEMENT ACCOUNTS" means those certain checking and/or disbursement accounts established by the Borrowers with certain financial institutions for the Borrowers' general corporate purposes, including for the purpose of paying the Borrowers' trade payables and other operating expenses.

"DISBURSEMENT BANKS" means those certain financial institutions with which the Borrowers have established Disbursement Accounts.

"DIVIDEND" means, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common equity of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any Equity Interests outstanding on or after the Effective Date (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any Equity Interests of such Person outstanding on or after the Effective Date (including any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, stock appreciation plans, equity incentive or equity achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"DOCUMENTS" has the meaning assigned to such term in the Security Agreement.

"DOLLAR EQUIVALENT" of an amount denominated in an Alternate Currency means, at any time for the determination thereof, the amount of Dollars which could be purchased with the amount of the Alternate Currency involved in such computation at the spot exchange rate therefor as quoted by the Administrative Agent as of 11:00 a.m. (New York City time) on the date two Business Days prior to the date of any determination thereof for purchase on such date, PROVIDED that the Dollar Equivalent of any unpaid drawing under a Post-Petition Letter of Credit expressed in an Alternate Currency shall be determined at the time the drawing under the related Post-Petition Letter of Credit was paid or disbursed by the Issuing Lender, PROVIDED FURTHER, that for purposes of (x) determining compliance with Sections 2.01(a), 2.04(b) and 2.09(g) and (y) calculating fees pursuant to Section 2.10(b), the Dollar Equivalent of any amounts denominated in an Alternate Currency shall be revalued on a monthly basis using the spot exchange rates therefor as shown in The Wall Street Journal (or, if same does not provide such exchange rates, on such other basis as is satisfactory to the Administrative Agent) on the last Business Day of each calendar month, PROVIDED, HOWEVER, that at any time during a calendar month, if the Exposure (for the purposes of the determination thereof, using the Dollar Equivalent as recalculated based on the spot exchange rate therefor as shown in The Wall Street Journal (or, if same does not provide such exchange rates, on such other basis as is satisfactory to the Administrative Agent) on the respective date of determination pursuant to this exception) would exceed 85% of the Commitments or if any Default is in existence, then at the discretion of the Administrative Agent or at the request of the Required Lenders, the Dollar Equivalent shall be reset based upon the spot exchange rates on such date as shown in The Wall Street Journal (or, if same does not provide such exchange rates, on such other basis as is satisfactory to the Administrative Agent), which rates shall remain in effect until the first Business Day of the then immediately succeeding calendar month or such earlier date, if any, as such rate is reset pursuant to this proviso.

"DOLLARS" and the sign "$" each means lawful money of the United States.

"EFFECTIVE DATE" has the meaning ascribed to such term in Section 9.06.

"ELIGIBLE ACCOUNTS RECEIVABLE" means at the time of any determination thereof, each Account that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been invoiced to, and represents the bona fide amounts payable to the respective Borrower from, the purchaser of goods or services, in each case originated in the ordinary course of business of the respective Borrower and (ii) is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (v) below or otherwise deemed by the Joint Lead Arrangers in their sole discretion to be ineligible for inclusion in the calculation of the Borrowing Base as described below. Without limiting the foregoing, to qualify as Eligible Accounts Receivable, an Account shall indicate no person other than the respective Borrower as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced (without duplication and to the extent not reflected in such face amount) by (i) the amount of all accrued and actual discounts, claims, credits or credits pending, returns, customer rebates, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the respective Borrower, as applicable, may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)), (ii) amounts determined by the Joint Lead Arrangers for Accounts that the Joint Lead Arrangers believe may be determined to be Trust Property in accordance with the terms of the definition thereof, (iii) the aggregate amount of all limits and deductions provided for in this definition and elsewhere in this Agreement and (iv) the aggregate amount of all cash received in respect of such Account but not yet applied by the respective Borrower to reduce the amount of such Account. Standards of eligibility may be fixed from time to time solely by the Joint Lead Arrangers in the exercise of their sole discretion, with any changes in such standards to be effective two Business Days after delivery of notice thereof to the Company. Unless otherwise approved from time to time in writing by the Joint Lead Arrangers, no Account shall be an Eligible Account Receivable if, without duplication:

    (a)    the account constitutes Trust Property or the respective Borrower does not have sole lawful and absolute title to such Account; or

    (b)    (i) in the case of any Account originated from the Full-Line and GMD Business, the Account is unpaid on the date which is 21 days after the date on which the original invoice provides that such payment is due, (ii) in the case of any Account of the Convenience Business, it is unpaid on the date which is 30 days after the date on which the original invoice provides that such payment is due, or (iii) the Account has been written off the books of the Borrower or has been otherwise designated on such books as uncollectible. In determining the aggregate amount of Accounts that are not considered Eligible Accounts Receivable for any Account Debtor pursuant to this clause (b), there shall be excluded the amount of any net credit balances relating to Accounts for such Account Debtor; or

(c)     the Account is a non-trade Account arising out of a sale made to an Affiliate or classified as an intercompany Account by the respective Borrower, or relates to payments for interest; or

(d)     the Account (i) is an extended terms account which provides for payment more than 14 days after the date of the original invoice or (ii) a special terms account, including, but not limited to, Accounts due and payable according to seasonal terms or business initiation terms; or

(e)     the Account is from the same Account Debtor (or any Subsidiary or parent company thereof) and 25% or more, in face amount, of all Accounts from such Account Debtor (or any Subsidiary or parent company thereof) are ineligible pursuant to clause (b) above; or

(f)     the Account, when aggregated with all other Accounts of such Account Debtor (and any Subsidiary or parent company thereof), exceeds (i) in the case of an Account Debtor whose corporate credit rating published by Moody's or S&P is at least Baa1 or BBB1, respectively, 10% and (ii) in the case of all other Account Debtors whose corporation credit rating is below such aforementioned levels or is not rated by either Moody's or S&P, 20%, in each case in face value of all Accounts of the Borrowers whose Accounts are included in the Borrowing Base then outstanding, to the extent of such excess; or

(g)     (i) the Account Debtor is also a creditor and/or vendor of any Borrower or any of its Subsidiaries (other than Account Debtors which have provided to the Collateral Agent a "no-offset" letter in form and substance satisfactory to the Joint Lead Arrangers), (ii) the Account Debtor has disputed its liability (whether by chargeback or otherwise), or the Account Debtor has made any claim, with respect to such Account or any other Account due from such Account Debtor to any Borrower, which has not been resolved or (iii) the Account otherwise is or may become subject to any right of setoff by the Account Debtor; or

(h)     the Account Debtor has commenced a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or if a decree or order for relief has been entered by a court having jurisdiction over the Account Debtor in an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or if any other petition or other application for relief under the federal bankruptcy laws has been filed by or against the Account Debtor, or if the Account Debtor has filed a certificate of dissolution under applicable state law or shall be liquidated, dissolved or wound up, or shall authorize or commence any action or proceeding for dissolution, winding-up or liquidation, or if the Account Debtor has failed, suspended business, declared itself to be insolvent, is generally not paying its debts as they become due or has consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs, unless (i) the payment of Accounts from such Account Debtor is secured in a manner satisfactory to the Joint Lead Arrangers, (ii) with respect to a voluntary or involuntary bankruptcy or similar proceeding, the court presiding over such proceeding

has authorized such Account Debtor to pay such Account to the respective Borrower or (iii) if the Account from such Account Debtor arises subsequent to a decree or order for relief with respect to such Account Debtor under the federal bankruptcy laws, as now or hereafter in effect, the Joint Lead Arrangers shall have determined that the timely payment and collection of such Account will not be impaired; or

(i)    the Account is not payable in Dollars or the Account Debtor is either (x) not organized under the laws of the United States of America, any state thereof, or the District of Columbia or (y) located outside or has its principal place of business or substantially all of its assets located outside the United States; or

(j)    with respect to Accounts arising from a sale, the sale to the Account Debtor is on a bill-and-hold, guaranteed sale, sale-and-return, ship-and-return, sale on approval or consignment or other similar basis or made pursuant to any other written agreement providing for repurchase or return (other than pursuant to ordinary course of business warranties); or

(k)    the Joint Lead Arrangers determine in their sole discretion that such Account may not be paid by reason of the Account Debtor's financial inability to pay; or

(l)    the Account Debtor is a Governmental Authority unless (x) the respective Borrower duly assigns its rights to payment of such Account to the Collateral Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq.) and (y) the respective Account (and the underlying documentation relating thereto) has no restriction or prohibition on (or which by its terms, or the terms of any applicable governmental rule or regulation related thereto, would restrict or prohibit) the granting of a security interest therein as provided in this Agreement and in the Security Agreement, except to the extent that the respective Borrower has obtained from the applicable Governmental Authority an effective waiver of the respective restriction and/or prohibition or an effective consent to such a grant of security interest in each such respective Account; or

(m)    the Account does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including, without limitation, the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board; or

(n)    the Collateral Agent does not have a valid and perfected first priority security interest in or Lien on such Account, subject only to Liens permitted under Section 6.01, or the Account does not otherwise conform in all material respects to the representations and warranties contained in this Agreement or the other Post-Petition Loan Documents, PROVIDED that the value of any Account shall be reduced by the amount of any obligations secured by Liens permitted under Section 6.01 which are prior to the Lien in favor of the Collateral Agent; or

(o)    the Account is subject to any customer deposit, adverse security deposit (to the extent received from the applicable Account Debtor), progress payment, retainage

or other similar advance made by or for the benefit of the applicable Account Debtor, in each case to the extent thereof; or

(p)   the Account was invoiced (i) in advance of goods or services provided, or (ii) twice, or (iii) the associated income has not been earned; or

(q)   the goods giving rise to such Account have not been shipped and title has not been transferred to the Account Debtor, or the Account represents a progress-billing or otherwise does not represent a complete sale; for purposes hereof, "progress-billing" means any invoice for goods sold or leased or services rendered under a contract or agreement pursuant to which the Account Debtor's obligation to pay such invoice is conditioned upon the respective Borrower's completion of any further performance under the contract or agreement; or

(r)   it arises out of a sale made by any Borrower to an employee, officer, agent, director, stockholder, or Affiliate of such Borrower; or

(s)   the Account was not paid in full, and the Borrower created a new receivable for the unpaid portion of the Account, and other Accounts constituting chargebacks, debit memos and other adjustments for unauthorized deductions; or

(t)   the Account arose under vendor military supply contracts and are due from a vendor or creditor of any Borrower, whereby the respective Borrower distributes products to a governmental military entity on behalf of such vendor or creditor; or

(u)   as to all or any part of the Account, a check, promissory note, draft, trade acceptance or other Instrument for the payment of money has been received, presented for payment and returned uncollected for any reason; or

(v)   the Account is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates that any Person other than a Borrower has or has had or has purported to have or have had an ownership interest in such goods;

(w)   the Account is created on cash on delivery terms; or

(v)   the Account is owned by, or the payee or remittance party with respect thereto is, Dunigan Fuels, Inc.

"ELIGIBLE CONVENIENCE INVENTORY" means all Eligible Inventory of the Borrowers located at facilities constituting a part of the Convenience Business. No Inventory shall be included in more than one category of Eligible Inventory (e.g., included as both Eligible Convenience Inventory and Eligible Full-Line and GMD Inventory); it being understood that any uncertainty as to the category in which any Eligible Inventory should be included shall be resolved to the satisfaction of the Joint Lead Arrangers.

"ELIGIBLE FULL-LINE AND GMD INVENTORY" means all Eligible Inventory of the Borrowers located at facilities constituting a part of the Full-Line and GMD

Business. No Inventory shall be included in more than one category of Eligible Inventory (e.g., included as both Eligible Convenience Inventory and Eligible Full-Line and GMD Inventory); it being understood that any uncertainty as to the category in which any Eligible Inventory should be included shall be resolved to the satisfaction of the Joint Lead Arrangers

"ELIGIBLE INVENTORY" means, at the time of any determination thereof, without duplication, the Inventory Value of all Inventory of the Borrowers held for sale in the ordinary course of business that is not ineligible for conclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (s) below and that is not otherwise deemed by the Joint Lead Arrangers acting in their sole discretion (after at least two Business Days' prior notice to the respective Borrower by the Joint Lead Arrangers) to be ineligible for inclusion in the calculation of the Borrowing Base. In determining the amount to be so included, such Inventory shall be valued on a net book value basis consistent with the Company's and its Subsidiaries consolidated month-end balance sheet but net of Inventory Reserves. Unless otherwise approved in writing by the Joint Lead Arrangers, no Inventory shall be deemed Eligible Inventory if:

(a)      the Inventory (i) is not owned solely by a Borrower or with respect to which the respective Borrower does not have good, valid, marketable and unencumbered title, or (ii) is held by a third party for sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval or consignment basis; or

(b)      the Inventory is not stored on property that is either (i) owned or leased by a Borrower or (ii) owned or leased by a warehouseman that has contracted with a Borrower to store Inventory on such warehouseman's property, PROVIDED that, with respect to Inventory stored on property leased by a Borrower, (1) the Company shall have delivered in favor of the Collateral Agent a Landlord-Lender Agreement executed by the lessor of such property, and, with respect to Inventory stored on property owned or leased by a warehouseman, the Borrower shall have delivered to the Collateral Agent a Landlord-Lender Agreement executed by such warehouseman or (2) the Bankruptcy Court shall have approved the "going out of business" procedures contained in the Interim Order with Respect to the leased property where such Inventory is located; or

(c)      the Inventory is not subject to a perfected first priority Lien in favor of the Collateral Agent except, (i) with respect to Eligible Inventory stored at sites described in clause (b) above, for Liens for normal and customary warehouseman charges and landlord liens and (ii) to the extent subject only to Liens permitted under Section 6.01, PROVIDED that the value of any Inventory shall be reduced by the amount of any obligations secured by such Liens which are prior to the Lien in favor of the Collateral Agent; or

(d)      the Inventory is not located in the United States; or

(e)      the Inventory does not conform in all material respects to the representations and warranties contained in this Agreement or the other Post-Petition Loan Documents; or

(f)     whether or not located on property owned or leased by a Borrower, it is not segregated or otherwise separately identifiable from goods of others, if any, stored on the same premises as such Inventory; or

(g)     the Inventory is seconds, thirds, stale, or obsolete, unmerchantable, discontinued or slow moving or is identified as overstock or excess by the respective Borrower; or

(h)     the Inventory is held in trust for the benefit of a Person other than a Borrower; or

(i)     the Inventory constitutes Trust Property; or

(j)     the Inventory is used as a sample or prototype, displays or display items, equipment, novelty items, not first quality or non-saleable in the ordinary course of business or it has been returned by a customer; or

(k)     any portion of the Inventory Value of the Inventory is attributable to intercompany profit among the Borrowers and their Subsidiaries; or

(l)     the Inventory is damaged, returned or marked for return to vendor; or

(m)     the Inventory is held for sale to a specific customer, to the extent that the customer is not contractually obligated to take possession of such Inventory and/or make the respective Borrower whole for such Inventory according to such Borrower's customary sales terms and rates for such customer for such Inventory; or

(n)     the Inventory (other that Other Inventory) is Perishable Inventory; or

(o)     the Inventory consists of goods categorized by the respective Borrower consistent with past practices as gasoline and/or fuel or exclusive inventory in such Borrower's general ledger and/or perpetual records; or

(p)     the Inventory is not in good condition, does not meet all material standards imposed by any Governmental Authority having regulatory authority over it, is repair or replacement parts for machinery and equipment, is rejected, defective or undergoing quality review; or

(q)     in the case of Inventory held at or relating to the retail stores of the Borrowers, to the extent same exceeds __% of the aggregate amount of Eligible Inventory;

(r)     the Inventory is held for or related to any businesses of the Borrowers whose operations have been discontinued; or

(s)     the Inventory is owned by Dunigan Fuels, Inc., or is located on property owned or leased by another Person.

"ELIGIBLE RETAIL INVENTORY" means all Eligible Inventory of the Borrowers located at facilities constituting a part of the Retail Business. No Inventory shall be included in more than one category of Eligible Inventory (e.g., included as both Eligible Convenience Inventory and Eligible Full-Line and GMD Inventory); it being understood that any uncertainty as to the category in which any Eligible Inventory should be included shall be resolved to the satisfaction of the Joint Lead Arrangers.

"ELIGIBLE TRANSFEREE" means and includes a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act of 1933, as amended) other than an individual Person, but in any event excludes the Company and its Subsidiaries.

"ENVIRONMENTAL CLAIMS" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"ENVIRONMENTAL LAWS" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"ENVIRONMENTAL LIABILITY" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ENVIRONMENTAL RESERVE" means a reserve determined by the Joint Lead Arrangers in their sole discretion for costs associated with (a) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (b) exposure to any Hazardous Material or (c) any Release.

"EQUITY INTERESTS" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however

designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA AFFILIATE" means any trade or business (whether or not incorporated) that, together with the Company or any of its Subsidiaries, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Sections 412, 4971 and 4977 of the Code, is treated as a single employer under Section 414 of the Code.

"ESTATE" means, as to any Borrower, the estate created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Cases.

"EURODOLLAR" means, with respect to any Post-Petition Loan or Borrowing, any Post-Petition Loan or Borrowing that bears interest at a rate determined by reference to the Adjusted LIBO Rate.

"EVENT OF DEFAULT" has the meaning assigned to such term in Article VII.

"EXCLUDED ACCOUNTS" means those Collection Accounts into which cash or other property constituting Trust Property has been deposited, PROVIDED that, to the extent any cash or other property that does not constitute Trust Property has been deposited into any such Collection Account, such Collection Account shall not constitute an "Excluded Account."

"EXCLUDED TAXES" means, with respect to the Administrative Agent, any Post-Petition Lender, any Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) the Administrative Agent, any Post-Petition Lender, any Issuing Lender or any other recipient's, as the case may be, net income by (i) the jurisdiction (or any political subdivision thereof), in each case, under the laws of which such recipient is organized or (ii) the jurisdiction (or any political subdivision thereof), in each case in which its principal office is located or, in the case of any Post-Petition Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Company under Section 2.17(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) to the extent such Foreign Lender fails to provide the forms required to be provided by Section 2.15(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled solely on account of a change, after the date on which such Foreign Lender became a party to this Agreement, in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such withholding tax to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.15(a), at the time of designation of a new lending office (or assignment).

"EXISTING CREDIT AGREEMENT" has the meaning assigned to such term in the Introduction.

"EXISTING GUARANTEE" has the meaning assigned to such term in the Introduction.

"EXPENSES" means all present and future expenses incurred by or on behalf of the Administrative Agent, the Collateral Agent or any Issuing Lender in connection with this Agreement, any other Post-Petition Loan Document or otherwise in its capacity as the Administrative Agent or Collateral Agent, as the case may be, under this Agreement or any Security Document, whether incurred heretofore or hereafter, which expenses shall include, without limitation, the cost of record searches, the reasonable fees and expenses of attorneys and paralegals, all costs and expenses incurred by the Administrative Agent and the Collateral Agent in opening bank accounts, depositing checks, electronically or otherwise receiving and transferring funds, and any other charges imposed on the Administrative Agent and the Collateral Agent due to insufficient funds of deposited checks and the standard fees of the Administrative Agent and the Collateral Agent relating thereto, reasonable collateral examination fees and expenses, reasonable fees and expenses of accountants, appraisers or other consultants, experts or advisors employed or retained by the Joint Lead Arrangers, the Administrative Agent or the Collateral Agent, fees and taxes related to the filing of financing statements, costs of preparing and recording any other Post-Petition Loan Documents, all expenses, costs and fees set forth in this Agreement and the other Post-Petition Loan Documents, all other fees and expenses required to be paid pursuant to any other letter agreement and all fees and expenses incurred in connection with releasing Collateral and the amendment or termination of any of the Post-Petition Loan Documents.

"EXPOSURE" means, with respect to any Post-Petition Lender at any time, the sum of the outstanding principal amount of such Post-Petition Lender's Post-Petition Loans (including any loans outstanding hereunder pursuant to Section 2.01(a)) and its LC Exposure at such time.

"FACILITY LIENS" has the meaning assigned to such term in the Introduction.

"FEDERAL FUNDS RATE" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"FILING DATE" has the meaning assigned to such term in the Introduction.

"FINAL ORDER" has the meaning assigned to such term in Section 4.02(c).

"FINANCIAL OFFICER" means the chief financial officer, principal accounting officer, treasurer or controller of the Company.

"FINANCING ORDERS" means the Interim Order and the Final Order.

"FIRST DAY ORDERS" means all orders entered by the Bankruptcy Court on or within five days of the Filing Date.

"FORECAST" has the meaning assigned such term in the Section 5.01(p).

"FOREIGN GOVERNMENTAL AUTHORITY" means the government of any nation other than the United States of America, or any political subdivision thereof, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"FOREIGN LENDER" means any Post-Petition Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code).

"FULL-LINE AND GMD BUSINESS" means the Borrowers' full-line distribution and general merchandise operating units and related operations as historically defined by the Company. [Company to provide additional language for this definition].

"GAAP" means generally accepted accounting principles in the United States of America.

"GOVERNMENTAL AUTHORITY" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GUARANTEE" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), PROVIDED that the term Guarantee shall not include (a) endorsements for collection or deposit in the ordinary course of business or (b) agreements entered into in the ordinary course of business to purchase inventory or retail store fixtures of another Person at a price not greater than the market value thereof. The term "Guarantee" used as a verb has a corresponding meaning.

"HAZARDOUS MATERIALS" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"HEDGING AGREEMENT" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement. The "principal amount" or "termination value" of the obligations of the Company or any Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Company or such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"HILCO APPRAISAL ACCEPTANCE DATE" means the date upon which Hilco Real Estate, LLC and/or Hilco Appraisal Services, LLC (collectively, "Hilco") has delivered those certain appraisals of the fixed assets (including owned real property) of the Company and its Subsidiaries as contemplated in that certain letter agreement (as amended) from Hilco to counsel for the Joint Lead Arrangers and the Joint Lead Arrangers have notified the Company in writing that such appraisals are satisfactory to the Joint Lead Arrangers.

"INDEBTEDNESS" means, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money and all obligations of such Person for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all surety bonds, letters of credit, bankers' acceptances and similar obligations issued for the account of such Person and all unpaid drawings or unreimbursed payments in respect of such surety bonds, letters of credit, bankers' acceptances and similar obligations, (iii) all Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (PROVIDED that, if the Person has not assumed or otherwise become liable in respect of such Indebtedness, such Indebtedness shall be deemed to be in an amount equal to the lesser of the aggregate amount of such Indebtedness and the fair market value of the property to which such Lien relates as determined in good faith by such Person), (iv) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services even if such goods or services are not delivered or accepted, i.e. take-or-pay and similar obligations, (vi) all Guarantees of such Person and (vii) all obligations under any Hedging Agreement or under any similar type of agreement. Notwithstanding the foregoing, Indebtedness shall not include trade payables and accrued expenses incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person.

"INDEMNIFIED TAXES" means Taxes other than Excluded Taxes.

"INSTRUMENT" has the meaning assigned to such term in the Security Agreement.

"INTEREST PAYMENT DATE" means (a) with respect to any ABR Post-Petition Loan, the last Business Day of each calendar month, commencing May 30, 2003 and (b) with respect to any Eurodollar Post-Petition Loan, the last day of the Interest Period applicable to the Borrowing of which such Post-Petition Loan is a part.

"INTEREST PERIOD" means (a) except with respect to two week Interest Periods, the period commencing on the date of such Borrowing and ending on the numerically

corresponding day in the calendar month that is one month thereafter and (b) with respect to any two week Interest Period, the period commencing on the date of such Borrowing and ending on the corresponding day on the second succeeding calendar week; PROVIDED, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preced-ing Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"INTERIM ORDER" means that certain Interim Order Authorizing (I) Post-Petition Financing Pursuant to 11 U.S.C. § 364 and Bankruptcy Rule 4001(c); (II) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Bankruptcy Rules 4001(b) and (d); (III) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363; and (IV) Approving Secured Inventory Trade Credit Program and Granting Subordinate Liens, Pursuant to 11 U.S.C. §§ 105 and 364(c)(3) and Rule 4001(c) entered by the Bankruptcy Court in the Cases on April 24, 2003.

"INTRODUCTION" means the Introductory Statement to this Agreement.

"INVENTORY" has the meaning assigned to such term in the Security Agreement.

"INVENTORY RESERVES" means and includes any of the following reserves against Eligible Inventory (in each case, unless otherwise specified below, with such reserves to be in such amounts as may be determined by the j the Joint Lead Arrangers in their sole discretion):

(a)    a reserve for shrink, or discrepancies relating to inventory quantities on hand between any Borrower's perpetual accounting system and physical counts of the inventory, as determined according to such Borrower's current and historical accounting practices for determining such reserve; and

(b)    a reserve equal to 50% of all Inventory other than Cigarette and Stamps Inventory that is on-hand for at least 180 days, but no more than 360 days; and

(c)    a reserve equal to 100% of all Inventory other than Cigarette and Stamps Inventory that is on hand 360 days or longer; and

(d)    in the case of cigarette and Stamps Inventory, a reserve equal to 25% of all Cigarette and Stamps Inventory that is on-hand 180 days or longer; and

(e)    in the case of Eligible Convenience Inventory, a reserve equal to the lesser of (i) the Tobacco Stamp Gap Amount, or (ii) the Inventory Value of Unaffixed Stamps; and

(f)     a reserve equal to 50% of the Inventory Value of Inventory located at the Borrowers' [Bowling Green, KY facility]; and

(g)     a reserve for vendor income and/or merchandise incentive program income that has been earned and/or accrued and recorded in any Borrower's Inventory Value per the general ledger and/or perpetual records (as applicable); and

(h)     in the case of Other Inventory, a reserve for Perishable Inventory equal to $500,000, or an amount reasonably determined by the Joint Lead Arrangers in their sole discretion;

(i)     in the case of Eligible Full-Line and GMD Inventory, (to the extent the Inventory Value per the general ledger is greater than the Inventory Value per the perpetual records) a reserve equal to the difference between the Inventory Value per the general ledger and the Inventory Value per the perpetual records; and

(j)     a reserve for Inventory that the Joint Lead Arrangers believe may be determined to be Trust Property in accordance with the terms of the definition thereof.

"INVENTORY VALUE" means, at any date of determination and in each case in Dollars, (i) with respect to any Eligible Full-Line and GMD Inventory or Eligible Retail Inventory, the value of such Inventory valued at cost on a basis consistent with the respective Borrower's current and historical accounting practice per the general ledger, and (ii) with respect to any Eligible Convenience Inventory, the value of such Inventory valued at cost on a basis consistent with the respective Borrower's current and historical accounting practice per the perpetual records, and in each case without giving effect to LIFO reserves and general ledger reserves for discontinued inventory, markdowns, intercompany profit, rebates and discounts, any cut off adjustments, revaluation adjustments, purchase price adjustments or adjustments with respect to the capitalization of buying, occupancy, distribution and other overhead costs reflected on the balance sheet of such Borrower in respect of Inventory. The value of the Inventory as set forth above will, without duplication for any Inventory Reserves, be calculated net of the reserve established by the respective Borrower on a basis consistent with such Borrower's current and historical practice in respect of lost, misplaced or stolen Inventory at such time.

"INVESTMENT" has the meaning assigned to such term in Section 6.06.

"ISSUING LENDERS" means each of (i) DBTCA and JPMorgan Chase in their respective capacity as issuers of Letters of Credit hereunder and (ii) any other Post-Petition Lender reasonably acceptable to the Administrative Agent which agrees to issue Post-Petition Letters of Credit hereunder and, in each case, their respective successors in such capacity as provided in Section 2.04(i); PROVIDED that as of the Effective Date and until such time as it agrees otherwise, DBTCA shall not be the Issuing Lender with respect to any trade Post-Petition Letter of Credit. Any Issuing Lender may, in its discretion, arrange for one or more Post-Petition Letters of Credit to be issued by one or more Affiliates of such Issuing Lender, PROVIDED, in each case, that the Borrower does not reasonably object based on such Affiliate's creditworthiness, and the term "Issuing Lender" shall include any such Affiliate with respect to Post-Petition Letters of Credit issued by it.

"JOINT LEAD ARRANGERS" means DBSI and JPMorgan Chase Bank in their capacity as such hereunder.

"JPMORGAN CHASE" means JPMorgan Chase Bank, in its individual capacity.

"LANDLORD-LENDER AGREEMENT" means an agreement whereby a lessor of real property (i) waives any and all statutory and all other Liens it may have against any Inventory located at such real property and (ii) grants access rights to such real property to the Collateral Agent, in each case on terms and conditions satisfactory to the Joint Lead Arrangers.

"LC DISBURSEMENT" means a payment made by any Issuing Lender pursuant to a Post-Petition Letter of Credit.

"LC EXPOSURE" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Post-Petition Letters of Credit at such time (calculated taking the Dollar Equivalent of undrawn amounts under any then outstanding Post-Petition Letter of Credit denominated in an Alternate Currency) plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time (calculated taking the Dollar Equivalent of the amount of any such unreimbursed LC Disbursements pursuant to a Post-Petition Letter of Credit denominated in an Alternate Currency). The LC Exposure of any Post-Petition Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"LC SUPPORTABLE OBLIGATIONS" means (i) obligations of the Borrowers with respect to workers compensation, surety bonds and other similar obligations and (ii) such other obligations of the Borrowers as are incurred in the ordinary course of business (but in any event not any obligations under any Permitted Existing Indebtedness).

"LENDER DEFAULT" means (i) the wrongful refusal (which has not been cured) of a Post-Petition Lender to make available its portion of any Borrowing or to fund its portion of any unreimbursed payment under Section 2.04(e) or (ii) a Post-Petition Lender having notified (and not retracted) in writing the Company and/or the Administrative Agent that such Post-Petition Lender does not intend to comply with its obligations under Section 2 in circumstances where such non-compliance would constitute a breach of such Post-Petition Lender's obligations under such Section.

"LETTER OF CREDIT REQUEST" has the meaning assigned to such term in Section 2.04(b).

"LIBO RATE" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate (rounded upwards, if necessary, to the next 1/16% of 1%) appearing on the LIBO Page of the Reuters Information Service (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at

such time for any reason, then the "LIBO RATE" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate (rounded upwards, if necessary, to the next 1/16% of 1%) at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LIEN" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"LOCATION" of any Person means such Person's "location" as determined pursuant to Section 9-307 of the Uniform Commercial Code of the State of New York.

"MARGIN STOCK" has the meaning provided in Regulation U.

"MATERIAL ADVERSE EFFECT" means a material adverse effect on (a) the business, properties, assets, operations, liabilities, prospects or condition (financial or otherwise) of the Company and its Subsidiaries taken as a whole, (b) the ability of any Borrower to perform its obligations under any Post-Petition Loan Document or (c) the rights of or benefits available to the Post-Petition Lenders under any Post-Petition Loan Document.

"MATERIAL CONTRACTS" means each contract to which the Company or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person of $31,000,000 or more in any fiscal year of the Company.

"MATERIAL PLAN" means at any time a Plan or Plans having aggregate Unfunded Liabilities in excess of $_____.

"MATURITY DATE" means October 1, 2004.

"MOODY'S" means Moody's Investors Service, Inc.

"MORTGAGE" means each mortgage, deed to secure debt or deed of trust pursuant to which any Borrower shall have granted, in each case, to the Collateral Agent a mortgage lien on such Borrower's Mortgaged Property.

"MORTGAGE POLICY" means a mortgage title insurance policy or a binding commitment with respect thereto.

"MORTGAGED PROPERTY" means each parcel of real property owned or leased, in each case, by any Borrower listed on Schedule 5.01(s) and designated as a "Mortgaged Property" therein.

"MORTGAGEE AGREEMENT" means an agreement whereby a mortgagee of real property (i) waives any and all statutory and other Liens it may have against any Inventory located at such real property and (ii) grants access rights to such real property to the Collateral Agent on terms and conditions satisfactory to the Joint Lead Arrangers.

"MULTIEMPLOYER PLAN" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"NET BOOK VALUE" means, with respect to any asset, the net book value thereof determined (i) in accordance with GAAP and (ii) consistently with the Company's accounting practices.

"NET PROCEEDS" means, with respect to any event (a) the cash proceeds received by the Company and its Subsidiaries in respect of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, (iii) in the case of a condemnation or similar event, condemnation awards and similar payments in each case, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid by the Company and the Subsidiaries to third parties (other than Affiliates) in connection with such event and (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), (I) the amount of all payments required to be made by the Borrowers as a result of such event to repay Indebtedness, secured Senior Liens attaching on the respective assets sold or otherwise disposed and (II) the amount of payments of transfer or other similar taxes (but not income taxes) that are required to be made by the Borrowers as a result of such event.

"NET RECOVERY RATE" means with respect to (i) Eligible Convenience Inventory, (ii) Eligible Full-Line and GMD Inventory and (iii) Eligible Retail Inventory, as the case may be, (x) the estimated net recovery of the respective category of Inventory of the Borrowers stated in Dollars as determined on a net orderly liquidation basis by the most recent analysis conducted by an outside inventory consulting/appraisal firm retained or approved by the Joint Lead Arrangers divided by (y) the Inventory Value of such category of Inventory of the Borrowers as of the date of such most recent analysis.

"NOTICE OF BORROWING REQUEST" has the meaning provided in Section 2.03.

"NOTICE OF INTEREST ELECTION REQUEST" has the meaning provided in Section 2.06(b).

"OTHER INVENTORY" means all Eligible Convenience Inventory other than Cigarettes and Stamps Inventory and Cigar and Tobacco Inventory.

"OTHER TAXES" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Post-Petition Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Post-Petition Loan Document.

"PACA" means and includes the Perishable Agricultural Commodities Act, as amended, 7 U.S.C. § 499e(c), the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181 et seq. or any other statute of similar import.

"PACA LIABILITY RESERVE" means, at any time, the amount determined by the Joint Lead Arrangers at such time as a reserve for liabilities of the Borrowers to their respective vendors pursuant to PACA.

"PACA LIEN" means any Lien on any property held by any Borrower existing pursuant to PACA.

"PACA TRUST CLAIMANT" means any third party holding PACA Liens.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"PERISHABLE INVENTORY" means Inventory consisting of packaged baked goods, baked goods, meat, sliced meat and deli, dairy, produce and vegetables, seafood, floral, and restaurant (as defined by the Borrowers in good faith).

"PERMITTED ENCUMBRANCE" means, with respect to any Mortgaged Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, all of which exceptions must be acceptable to the Administrative Agent in its reasonable discretion.

"PERMITTED EXISTING INDEBTEDNESS" means all Indebtedness of the Company and its Subsidiaries set forth on Schedule 3.16, PROVIDED that in no event shall Permitted Existing Indebtedness include any of the Post-Petition Loans, the Post-Petition Letters of Credit or any surety bonds of, or guaranteed by, the Company or any of its Subsidiaries.

"PERMITTED EXISTING LIENS" has the meaning assigned to such term in Section 6.01(b).

"PERSON" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PLAN" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Company, any of its Subsidiaries or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, or is contributing to (or is obligated to contribute to), or has contributed to (or had an obligation to contribute to) in the last six years.

"PLAN OF REORGANIZATION" means a plan of reorganization in any of the Cases.

"PLEDGE AGREEMENT" means the Pledge Agreement substantially in the form of Exhibit C hereto among the Borrowers and the Collateral Agent acting on behalf of the

Secured Creditors, as the same may be amended, modified, or supplemented from time to time in accordance with the provisions thereof.

"POST-PETITION AGENTS" means the Administrative Agent, the Collateral Agent, the Syndication Agent, and, for the purposes of Article VIII only, each Joint Lead Arranger.

"POST-PETITION LENDER SUPER-PRIORITY CLAIM" has the meaning assigned to such term in the Introduction.

"POST-PETITION LENDERS" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"POST-PETITION LETTER OF CREDIT" means any letter of credit issued pursuant to this Agreement.

"POST-PETITION LOAN DOCUMENTS" means this Agreement, the Security Documents and any Treasury Service Agreement.

"POST-PETITION LOANS" means the loans made by the Post-Petition Lenders to the Borrowers pursuant to this Agreement.

"POST-PETITION OBLIGATIONS" means all amounts owing by any or all of the Borrowers to each Joint Lead Arranger, each Agent, each Issuing Lender or any Post-Petition Lender pursuant to the terms of this Agreement or any other Post-Petition Loan Document.

"PRE-PETITION AGENT" means each Agent under, and as defined in, the Existing Credit Agreement, including, for this purpose, each Joint Book Manager and each Joint Lead Arranger, in each case under, and as defined in, the Existing Credit Agreement.

"PRE-PETITION COLLATERAL" has the meaning assigned to such term in the Introduction.

"PRE-PETITION FINANCING LIENS" has the meaning assigned to such term in the Introduction.

"PRE-PETITION LENDER" has the meaning assigned to such term in the Introduction.

"PRE-PETITION LENDER REPLACEMENT LIENS" has the meaning assigned to such term in the Introduction.

"PRE-PETITION LENDER SUPER-PRIORITY CLAIM" has the meaning assigned to such term in the Introduction.

"PRE-PETITION LETTERS OF CREDIT" has the meaning assigned to such term in the Introduction.

"PRE-PETITION LOAN DOCUMENTS" means the Existing Credit Agreement, the Existing Guarantee, the security agreement entered into pursuant to the Existing Credit Agreement, the pledge agreement entered into pursuant to the Existing Credit Agreement, the Pre-Petition Letters of Credit, promissory notes executed pursuant to the Existing Credit Agreement and each other "Loan Document" as defined in the Existing Credit Agreement.

"PRE-PETITION LOANS" has the meaning assigned to such term in the Introduction.

"PRE-PETITION OBLIGATIONS" means all loans, advances, liabilities, obligations, covenants, duties, and debts arising or incurred under or in respect of the Existing Credit Agreement or arising under the other Pre-Petition Loan Documents prior to the Filing Date and owing by any Borrower to the Pre-Petition Agents or any Pre-Petition Lender, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including, without limitation, all interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to such Borrower under the Pre-Petition Credit Agreement or chargeable to such Borrower prior to the Filing Date under another Pre-Petition Loan Document, including, without limitation, in each case, interest and all other amounts referred to above accruing after the Filing Date. Pre-Petition Obligations shall include all obligations with respect to Pre-Petition Loans and Pre-Petition Letters of Credit (including (x) any increase in such obligations as a result of an increase in the stated amount of any such Pre-Petition Letter of Credit occurring after the Effective Date pursuant to the terms thereof (as of the Filing Date) and (y) reimbursement obligations under such Pre-Petition Letters of Credit).

"PRE-PETITION PAYMENT" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Borrower, including, without limitation, reclamation claims, but excluding refunds or credits to customers in the ordinary course of business.

"PRIME RATE" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"PROCEEDS" has the meaning assigned to such term in the Security Agreement.

"REGISTER" has the meaning assigned to such term in Section 9.04(d).

"REGULATION D" means Regulation D of the Board as from time to time in effect and any successor to all or a portion thereof.

"REGULATION T" means Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof.

"REGULATION U" means Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof.

"REGULATION X" means Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof.

"RELATED PARTIES" means, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"RELEASE" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"REPORTABLE EVENT" means an event described in Section 4043(c) of ERISA with respect to a Plan other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27, or .28 of PBGC Regulation Section 4043.

"REQUIRED LENDERS" means, at any time, Post-Petition Lenders having Exposures and unused Commitments representing more than 50% of the sum of the total Exposures and unused Commitments at such time.

"RESTATEMENT" means the restatement of the Company's annual consolidated financial statement for the Company's fiscal year ended December 29, 2001 as required by the Securities and Exchange Commission and announced by the Company in a press release dated April 17, 2003.

"RESTRICTED CASH" means, without duplication, (i) cash and Temporary Cash Investments contained in the Excluded Accounts, (ii) any cash which has been credited to one of the Company's or any of its Subsidiaries' deposit accounts, which cash is not actually available to the Company or such Subsidiary at such time because the amounts so "credited" have not then "cleared" and (iii) any amounts in the Company's or any of its Subsidiaries' deposit accounts that are deposited in such account (x) to cover checks written against such account that have been delivered but not yet been paid or (y) to fund scheduled wire transfers for payroll, insurance and other similar payments that the Company or any of its Subsidiaries funds in advance in the ordinary course of business consistent with past practices and which will be transferred out of such account within two Business Days of such advance funding).

"RESTRICTED LEASEHOLD INTEREST" means any leasehold interest (but excluding the proceeds thereof) of a Borrower where the respective underlying lease prohibits the Borrower party thereto from granting a security interest in such leasehold interest.

"RETAIL BUSINESS" means the Borrowers' and their Subsidiaries' retail stores and related operations as historically defined by the Company. [Company to provide additional language for this definition.]

"RETAIL STORE SALES" means the sale or other disposition by the Company or any of its Subsidiaries of retail stores (and the related inventory, equipment and similar assets located therein and related assets (as reasonably determined by the Company in good faith)) of the Company and its Subsidiaries, or the Equity Interests of one or more Subsidiaries substantially all of whose assets consist of retail stores (and the related inventory, equipment and similar property located therein and related assets (as reasonably determined by the Company in good faith)), in any such case in accordance with the Budget (subject to permitted variances set forth in the Final Order).

"RETURNS" has the meaning provided in Section 3.07.

"S&P" means Standard & Poor's Rating Group.

"SEC INVESTIGATION" means the formal investigation of the Securities and Exchange Commission into the Company's and its Subsidiaries' business practices commencing on or about _____   .

"SECTION 2.15(E) CERTIFICATE" has the meaning assigned to such term in Section 2.15(e).

"SECURED CREDITORS" has the meaning assigned to such term in the Security Agreement.

"SECURITY AGREEMENT" means the Security Agreement substantially in the form of Exhibit D hereto among the Borrowers and the Collateral Agent acting on behalf of the Secured Creditors, as the same may be amended, modified or supplemented from time to time in accordance with the provisions thereof.

"SECURITY DOCUMENTS" means the Security Agreement, the Pledge Agreement, each Control Agreement, after the execution and delivery thereof, each Mortgage and each other security agreement or other instrument or document executed and delivered pursuant to Section 4.01.

"SENIOR LIENS" has the meaning assigned to such term in the Introduction.

"SETTLEMENT DATE" has the meaning assigned to such term in Section 2.01(d)(i).

"STATUTORY RESERVE RATE" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such