reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Post-Petition Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Post-Petition Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"SUBSIDIARY" means, with respect to any Person (the "Parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership or limited liability company, more than 50% of the general partnership or limited liability company (as the case may be) interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the Parent or one or more subsidiaries of the Parent or by the Parent and one or more subsidiaries of the Parent. Unless otherwise specified, "Subsidiary" means a Subsidiary of the Company.

"SUPPORTING OBLIGATION" has the meaning assigned to such term in the Security Agreement.

"SYNDICATION AGENT" means JPMorgan Chase, in its capacity as a syndication agent under this Agreement.

"SYNDICATION DATE" means the date upon which the Joint Lead Arrangers determine in their sole discretion (and notify the Company) that the primary syndication (and resultant addition of Persons as Post-Petition Lenders pursuant to Section 9.04(b)) has been completed.

"SYNTHETIC LEASE OBLIGATION" means the monetary obligation of a Person under (a) a so-called synthetic off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"TAX BENEFIT" has the meaning assigned to such term in Section 2.15(f).

"TAXES" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, withholdings or similar liabilities (together with any interest, penalties or similar liabilities with respect thereto) imposed by any Governmental Authority.

"TEMPORARY CASH INVESTMENTS" means any Investment in (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, (ii) commercial paper rated at least A-2 by S&P and P-2 by Moody's, (iii) time deposits with, including certificates of deposit issued by, any office located in the United States of any bank or trust company which is organized under the laws of the

United States or any state thereof and has capital, surplus and undivided profits aggregating at least $500,000,000, (iv) repurchase agreements with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, (v) short-term tax exempt bonds rated at least AA- by S&P or AA3 by Moody's or (vi) shares in a mutual fund, the investment objectives and policies of which require it to invest substantially all of its assets in short-term tax exempt bonds rated at least AA- by S&P or AA3 by Moody's, PROVIDED that in the case of clauses (i) through (v) above such Investment matures within one year from the date of acquisition thereof by the Company or a Subsidiary thereof.

"TERMINATION DATE" means the earliest to occur of (i) the Maturity Date or an earlier date upon which the total commitments have been terminated, (ii) the "Effective Date" as defined in a Plan of Reorganization and (iii) the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Plan of Reorganization as confirmed pursuant to an order of the Bankruptcy Court in the Cases.

"TEST PERIOD" means (i) at all times on or prior to [April 30], 2004, the period from [May 1], 2003 to the last day of the fiscal month then last ended (in each case taken as one accounting period) and (ii) at all times thereafter, each period of twelve consecutive months of the Company then last ended (in each case taken as one accounting period).

"TOBACCO STAMP GAP AMOUNT" means the amount by which any amounts due and payable to any Government Authority or Foreign Governmental Authority which has issued tobacco tax stamps to any Borrower exceeds the value of surety bonds and/or letters of credit issued for the account of such Borrower and which guarantee the payment of any amounts due and payable by such Borrower to the relevant Government Authority or Foreign Governmental Authority.

"TREASURY SERVICES" means treasury, depositary or cash management services (including, without limitation, overnight overdraft services) from, or any automated clearinghouse transfer of funds to, JPMorgan Chase (or any successor by merger thereto) and/or one or more of its affiliates or another bank reasonably acceptable to the Administrative Agent.

"TREASURY SERVICES AGREEMENT" means any written agreement evidencing a credit arrangement to provide any Borrower with Treasury Services, as same may be amended, modified or supplemented from time to time.

"TRUST PROPERTY" means any cash or other property of any Borrower which is determined by a final order of the Bankruptcy Court (i) to be held by one or more of the Borrowers in actual or constructive trust for a third party, including, without limitation, a PACA Trust Claimant, or a Federal or State taxing authority, or (ii) not to be part of the Estate of any Borrower.

"TYPE", when used in reference to any Post-Petition Loan or Borrowing, refers to whether the rate of interest on such Post-Petition Loan, or on the Post-Petition Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UNAFFIXED STAMPS" means tobacco stamps issued by the relevant Governmental Authority which have not yet been affixed to cigar or cigarette packs.

"UNFUNDED LIABILITIES" means, with respect to any Plan at any time, the amount (if any) by which (i) the value of all benefit liabilities under such Plan, determined on a plan termination basis using the assumptions prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds (ii) the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions), all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of the Company, a Subsidiary of the Company or an ERISA Affiliate to the PBGC or any other Person under Title IV of ERISA.

"WHOLLY-OWNED SUBSIDIARY" means any Subsidiary all of the Equity Interests of which (except directors' qualifying shares) are at the time directly or indirectly owned by the Borrower.

"WITHDRAWAL LIABILITY" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. CLASSIFICATION OF POST-PETITION LOANS AND BORROWINGS. For purposes of this Agreement, Post-Petition Loans may be classified and referred to by Type (e.g., a "Eurodollar Post-Petition Loan"). Borrowings also may be classified and referred to by Type (E.G., a "Eurodollar Borrowing").

SECTION 1.03. TERMS GENERALLY. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. ACCOUNTING TERMS; GAAP; FISCAL YEARS. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; PROVIDED that (i) if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any

provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Administrative Agent or the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and (ii) in the event the Borrower changes its fiscal year end and the Administrative Agent notifies the Borrower that the Administrative Agent or the Required Lenders request an amendment to any provision of Article VI hereof for the purpose of modifying such provision in an appropriate manner to address the effect of the change in the fiscal year end, the Borrower agrees to promptly enter into such amendment.

## ARTICLE II

### THE CREDITS

SECTION 2.01. COMMITMENTS; CASH COLLATERAL. (a) On the Effective Date the loans made by DBTCA and JPMorgan Chase to the Borrowers pursuant to the Interim Order and outstanding on the Effective Date (immediately prior to giving affect thereto) shall be continued, and shall remain outstanding, as Borrowings hereunder.

(b) Subject to the terms and conditions set forth herein each Post-Petition Lender agrees to make Post-Petition Loans to the Borrowers, on a joint and several basis, from time to time during the Availability Period in an aggregate principal amount up to its Commitment, subject to the limitation that such Post-Petition Lender's Exposure shall not exceed the lesser of (x) such Post-Petition Lender's Commitment at such time and (y) such Post-Petition Lender's Applicable Percentage of the Borrowing Base at such time (based on the Borrowing Base Certificate most recently delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined terms used therein). In addition, notwithstanding anything to the contrary contained in this paragraph (b), in no event shall any Post-Petition Loans be made in an amount which, when added to the total Exposure at such time, exceeds the least of (x) the total Commitments at such time, (y) the Borrowing Base at such time (based on the Borrowing Base Certificate most recently delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined terms used therein) and (z) the Authorized Facility Amount at such time. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Post-Petition Loans.

(c) On the Effective Date, Borrowers shall be entitled to use the Cash Collateral subject to terms and conditions set forth herein.

(d) Subject to the introductory clause of paragraph (c) of this Section, the Post-Petition Lenders hereby authorize the Administrative Agent, and so long as the applicable conditions precedent set forth in this Agreement for the incurrence of Post-Petition Loans are

satisfied at such time, the Administrative Agent on behalf of the Post-Petition Lenders may, but shall not be obligated to, make Post-Petition Loans to the Borrowers from time to time during the Availability Period to cover the amount of checks presented for payment against, and other disbursements from, the Disbursement Accounts to the extent that there otherwise are insufficient funds in the Disbursement Accounts. Such Borrowings of Post-Petition Loans (i) shall be ABR Post-Petition Loans only, (ii) shall be made on same day notice so long as such notice is received by the Administrative Agent no later than 12:00 noon (New York City time) on such day and (iii) will at no time exceed the amount available for the Borrowing of Post-Petition Loans under Section 2.01(a) (as determined in good faith by the Administrative Agent). Upon the Company providing the Administrative Agent with written notice that the Borrowers require funds to cover amounts set forth in the first sentence of this paragraph (d), such notice shall be deemed a sufficient Borrowing Request (and for all purposes of this Agreement shall constitute a Notice of Borrowing Request duly presented by the Company pursuant to Section 4.02 and containing the certifications required by Section 4.02) for the purposes of Section 2.03 and the Administrative Agent may, without any liability to any Borrower, any Post-Petition Lender or any other Person, conclusively rely on such notice from the Company in making Post-Petition Loans pursuant to this Section 2.01(d). Any Post-Petition Loans made by the Administrative Agent pursuant to this Section 2.01(d) shall be wired directly to the Designated Disbursement Account no later than 3:30 p.m. (New York City time) on the date such Post-Petition Loans are made.

(e)     Unless the Required Lenders have instructed the Administrative Agent to the contrary, the Administrative Agent on behalf of the Post-Petition Lenders may, but shall not be obligated to, make ABR Post-Petition Loans under preceding clause (d) and this clause (e), from time to time during the Availability Period, without prior notice of the proposed Borrowing to the Post-Petition Lenders as follows:

(i)     The amount of each Post-Petition Lender's Applicable Percentage of Post-Petition Loans shall be computed weekly (or more frequently in the Administrative Agent's sole discretion) and shall be adjusted upward or downward on the basis of the amount of outstanding Post-Petition Loans as of 5:00 p.m. (New York City time) on the last Business Day of each week, or such other period specified by the Administrative Agent (each such date, a "Settlement Date"). The Post-Petition Lenders shall transfer to the Administrative Agent, or the Administrative Agent shall transfer to the Post-Petition Lenders, such amounts as are necessary so that (after giving effect to all such transfers) the amount of Post-Petition Loans made by each Post-Petition Lender shall be equal to such Post-Petition Lender's Applicable Percentage of the aggregate amount of Post-Petition Loans outstanding as of such Settlement Date. If a notice from the Administrative Agent of any such necessary transfer is received by a Post-Petition Lender on or prior to 12:00 noon (New York City time) on any Business Day, then such Post-Petition Lender shall make transfers described above in immediately available funds no later than 3:00 p.m. (New York City time) on the day such notice was received; and if such notice is received by a Post-Petition Lender after 12:00 noon (New York City time) on any Business Day, such Post-Petition Lender shall make such transfers no later than 1:00 p.m. (New York City time) on the next succeeding Business Day. The obligation of each of the Post-Petition Lenders to transfer such funds shall be irrevocable and unconditional and without recourse to, or without representation or warranty by, the Administrative Agent. Each of the Administrative Agent and the Post-Petition Lenders agree to mark

their respective books and records on each Settlement Date to show at all times the dollar amount of their respective Applicable Percentage of the outstanding Post-Petition Loans on such date.

(ii)     To the extent that the settlement described in preceding clause (i) shall not yet have occurred with respect to any particular Settlement Date, upon any repayment of Post-Petition Loans by the Borrowers prior to such settlement, the Administrative Agent may apply such amounts repaid directly to the amounts that would otherwise be made available by the Administrative Agent pursuant to this paragraph (d).

(iii)     Because the Administrative Agent on behalf of the Post-Petition Lenders may be advancing and/or may be repaid Post-Petition Loans prior to the time when the Post-Petition Lenders will actually advance and/or be repaid Post-Petition Loans, interest with respect to Post-Petition Loans shall be allocated by the Administrative Agent to each Post-Petition Lender and the Administrative Agent in accordance with the amount of Post-Petition Loans actually advanced by and repaid to each Post-Petition Lender and the Administrative Agent and shall accrue from and including the date such Post-Petition Loans are so advanced to but excluding the date such Post-Petition Loans are either repaid by the Borrowers in accordance with the terms of this Agreement or actually settled by the Administrative Agent or the applicable Post-Petition Lender as described in this Section 2.01(d).

SECTION 2.02. LOANS AND BORROWINGS.  (a) Each Post-Petition Loan shall be made as part of a Borrowing consisting of Post-Petition Loans of the same Type and, subject to Sections 2.01(c) and (d), made by the Post-Petition Lenders ratably in accordance with their respective Commitments.  The failure of any Post-Petition Lender to make any Post-Petition Loan required to be made by it shall not relieve any other Post-Petition Lender of its obligations hereunder; PROVIDED that the Commitments of the Post-Petition Lenders are several and no Post-Petition Lender shall be responsible for any other Post-Petition Lender's failure to make Post-Petition Loans as required.

(b)     Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Post-Petition Loans or Eurodollar Post-Petition Loans as the Borrower may request in accordance herewith.  Each Post-Petition Lender at its option may make any Eurodollar Post-Petition Loan by causing any domestic or foreign branch or Affiliate of such Post-Petition Lender to make such Post-Petition Loan; PROVIDED that any exercise of such option shall not affect the joint and several obligations of the Borrowers to repay such Post-Petition Loan in accordance with the terms of this Agreement.

(c)     At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $10,000,000.  Borrowings of more than one Type may be outstanding at the same time; PROVIDED that there shall not at any time be more than a total of ten Eurodollar Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Company shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(e)    Each Eurodollar Borrowing occurring prior to the earlier of (i) the 90th day after the Effective Date and (ii) the Syndication Date shall be subject to the provisions of Section 2.06(f).

SECTION 2.03.  REQUESTS FOR BORROWINGS.  To request a Borrowing to be made by the Post-Petition Lenders to the Borrowers pursuant hereto, the Company shall notify the Administrative Agent of such request in writing (a) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, on the date of the proposed Borrowing.  Each such written notice (each a "Notice of Borrowing Request") shall be irrevocable (except to the extent rescission thereof is permitted under Section 2.18) and shall be signed and delivered by the Company to the Administrative Agent in the form of Exhibit E appropriately completed to specify the following information in compliance with Section 2.02:

(i)    the aggregate amount of such Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)    the location and number of the Borrowers' account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Notice of Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Post-Petition Lender of the details thereof and of the amount of such Post-Petition Lender's Post-Petition Loan to be made as part of the requested Borrowing.

SECTION 2.04.  POST-PETITION LETTERS OF CREDIT.  (a) GENERAL.  Subject to the terms and conditions set forth herein, the Company may request the issuance of Post-Petition Letters of Credit for its own and any other Borrower's account and for the benefit of any holder (or any trustee, agent or other similar representative for any such holders) of LC Supportable Obligations and sellers of goods to the Borrowers, in a form reasonably acceptable to the Administrative Agent and the applicable Issuing Lenders, at any time and from time to time from and after the Effective Date until 30 days prior to the Maturity Date.  All Post-Petition

Letters of Credit shall be denominated in Dollars or an Alternate Currency and shall be issued on a sight basis only.

　　　　(b)　　NOTICE OF ISSUANCE, AMENDMENT, RENEWAL, EXTENSION; CERTAIN CONDITIONS.  Whenever any Borrower requires the issuance of a Post-Petition Letter of Credit (or the amendment, renewal or extension of an outstanding Post-Petition Letter of Credit), the Company shall give the Administrative Agent (i) written notice substantially in the form of Exhibit F (a "Letter of Credit Request") and (ii) to the extent requested by the respective Issuing Lender, an application for such Post-Petition Letter of Credit (it being understood that in the case of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreements submitted by the Company, or any other Borrower, to, or entered into by the Company, or any other Borrower, with, the respective Issuing Lender relating to any Post-Petition Letter of Credit, the terms and conditions of this Agreement shall control).  Such Letter of Credit Request may be delivered by facsimile (or transmitted by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Lender).  Upon receipt by the Administrative Agent of a written Letter of Credit Request pursuant to this paragraph (b) requesting the issuance of a Post-Petition Letter of Credit, in the event the Administrative Agent elects to issue such Post-Petition Letter of Credit, the Administrative Agent shall promptly so notify the Company thereof, and the Administrative Agent shall be the Issuing Lender with respect thereto.  In the event that the Administrative Agent elects not to issue such Post-Petition Letter of Credit, the Administrative Agent shall promptly so notify the Company, whereupon the Company may request any other Issuing Lender to issue such Post-Petition Letter of Credit on the terms and conditions provided in this Section 2.04 by delivering to such Issuing Lender a copy of the applicable written Letter of Credit Request.  Except with respect to trade letters of credit, in the event that all other Issuing Lenders shall have declined to issue such Post-Petition Letter of Credit, notwithstanding the prior election of Administrative Agent not to issue such Post-Petition Letter of Credit, the Administrative Agent shall, subject to compliance with the provisions of this Section 2.04, be obligated to issue such Post-Petition Letter of Credit and shall be the Issuing Lender with respect thereto; PROVIDED that in the circumstances described above with respect to trade Post-Petition Letters of Credit JPMorgan Chase agrees to be the Issuing Lender with respect thereto, subject to compliance with the provisions of this Section 2.04.  Any Letter of Credit Request requesting the amendment, renewal or extension of an outstanding Post-Petition Letter of Credit shall identify the Post-Petition Letter of Credit to be amended, renewed or extended and such other information as shall be necessary to amend, renew or extend the respective Post-Petition Letter of Credit. All Letter of Credit Requests must be delivered to the Administrative Agent and the applicable Issuing Lender at least five Business Days in advance (or such shorter period as may be acceptable to the respective Issuing Lender) of the requested date the Post-Petition Letter of Credit is to be issued, amended, renewed or extended.  The transmittal by the Company of each Letter of Credit Request shall be deemed to be a representation and warranty by the Company that (A) each of the conditions precedent as set forth in Section 4.02 have been satisfied and (B) after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed $40,000,000, (ii) the total Exposures shall not exceed the least of (x) total Commitments, (y) the Borrowing Base at such time (based on the Borrowing Base Certificate most recently delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined terms used therein) and (z) the Authorized Facility Amount at such time.  The applicable Issuing Lender (if other than the

Administrative Agent) shall not issue, amend, renew or extend any Post-Petition Letter of Credit unless it has obtained written approval to do so from the Administrative Agent. Upon the issuance of or amendment to any standby Post-Petition Letter of Credit, the applicable Issuing Lender shall notify the Company and the Administrative Agent, in writing of such issuance or amendment and the notice shall be accompanied by a copy of the issuance or amendment. Upon receipt of such notice, the Administrative Agent shall promptly notify the Post-Petition Lenders, in writing, of such issuance or amendment and if requested to do so by any Post-Petition Lender the Administrative Agent shall furnish such Post-Petition Lender with copies of such issuance or amendment. In the case of trade Post-Petition Letters of Credit, the applicable Issuing Lender shall provide the Administrative Agent, by facsimile on the first Business Day of each week, with a report detailing the daily aggregate outstanding trade Post-Petition Letters of Credit issued by such Issuing Lender for the previous calendar week.

(c)    EXPIRATION DATE. Each Post-Petition Letter of Credit shall expire at or prior to the close of business on (i) in the case of standby Post-Petition Letters of Credit, the earlier of (x) the date one year after the date of the issuance of such Post-Petition Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (y) the date that is 10 Business Days prior to the Maturity Date and (ii) in the case of trade Post-Petition Letters of Credit, the earlier of (x) the date 180 days after the date of the issuance of such Post-Petition Letter of Credit and (y) the date that is 30 Business Days prior to the Maturity Date.

(d)    PARTICIPATIONS. By the issuance of a Post-Petition Letter of Credit (or an amendment to a Post-Petition Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Lender, the applicable Issuing Lender hereby grants to each Post-Petition Lender, and each Post-Petition Lender hereby acquires from the applicable Issuing Lender, a participation in such Post-Petition Letter of Credit equal to such Post-Petition Lender's Applicable Percentage from time to time of the aggregate amount (taking the Dollar Equivalent thereof in the case of a Post-Petition Letter of Credit denominated in an Alternate Currency) available to be drawn under such Post-Petition Letter of Credit. In consideration and in furtherance of the foregoing, each Post-Petition Lender hereby absolutely and unconditionally agrees (as provided in paragraph (c) of this Section) to pay to the Administrative Agent, for the account of the applicable Issuing Lender, such Post-Petition Lender's Applicable Percentage of each LC Disbursement (taking the Dollar Equivalent thereof in the case of a Post-Petition Letter of Credit denominated in an Alternate Currency) made by the applicable Issuing Lender. Each Post-Petition Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Post-Petition Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Post-Petition Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    REIMBURSEMENT. If the applicable Issuing Lender shall make any LC Disbursement in respect of a Post-Petition Letter of Credit, such Issuing Lender shall promptly notify the Administrative Agent of such LC Disbursement who shall, in turn, notify each Post-Petition Lender of such LC Disbursement. Promptly following each Post-Petition Lender's receipt of such notice of any LC Disbursement from the Administrative Agent as provided in the

immediately preceding sentence, each such Post-Petition Lender shall pay to the Administrative Agent (A) its Applicable Percentage of the amount of the respective LC Disbursement (or the Dollar Equivalent thereof in the case of any LC Disbursement with respect to a Post-Petition Letter of Credit denominated in an Alternate Currency) in the same manner as provided in Section 2.05 with respect to Post-Petition Loans made by such Post-Petition Lender (and Section 2.05 shall apply, MUTATIS MUTANDIS, to the payment obligations of the Post-Petition Lenders) and (B) unless the respective LC Disbursement is reimbursed in full on the date such LC Disbursement is made, interest on the amount of the respective LC Disbursement (or the Dollar Equivalent thereof in the case of any LC Disbursement with respect to a Post-Petition Letter of Credit denominated in an Alternate Currency) accrued from the date of the respective LC Disbursement to but excluding the date of the payment by such Post-Petition Lender of the amounts in preceding clause (A) at the rate provided in Section 2.04(h), and the Administrative Agent shall promptly pay to the applicable Issuing Lender the amounts so received by it from the Post-Petition Lenders, PROVIDED, HOWEVER, if a Post-Petition Lender does not pay any amount required to be paid pursuant to this Section 2.04(e) to the Administrative Agent or the applicable Issuing Lender, such Issuing Lender may require that such amounts be paid by the Borrower. Any funding made by a Post-Petition Lender pursuant to this paragraph to reimburse the applicable Issuing Lender for any LC Disbursement shall be deemed to constitute an ABR Post-Petition Loan (without regard to the conditions contained in Sections 4.01, 4.02 and 4.03, such conditions deemed to be waived for the purposes of this Section 2.04(e) only) made on the date of the respective LC Disbursement in respect of which the Borrowers shall be jointly and severally obligated to repay as otherwise provided in this Agreement (it being understood that nothing herein shall in any way abrogate the Borrowers' joint and several obligation to reimburse LC Disbursements made by Issuing Lenders hereunder).

(f)     OBLIGATIONS ABSOLUTE. The Borrowers' obligation to reimburse LC Disbursements as provided in paragraph (c) of this Section shall be joint and several, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Post-Petition Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Post-Petition Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by any Issuing Lender under a Post-Petition Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Post-Petition Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, any Borrower's obligations hereunder. None of the Post-Petition Agents, the Post-Petition Lenders or the Issuing Lenders, or any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Post-Petition Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Post-Petition Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Lenders; PROVIDED that the foregoing shall not be construed to excuse any Issuing Lender from liability to any Borrower to the extent of any direct damages (as opposed to conse-

quential damages, claims in respect of which are hereby waived by each Borrower to the extent permitted by applicable law) suffered by such Borrower that are caused by such Issuing Lender's failure to exercise care when determining whether drafts and other documents presented under a Post-Petition Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the respective Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision), such Issuing Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Post-Petition Letter of Credit, the applicable Issuing Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Post-Petition Letter of Credit.

(g)    DISBURSEMENT PROCEDURES.  The applicable Issuing Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Post-Petition Letter of Credit.  The applicable Issuing Lender shall promptly notify the Administrative Agent and the Company by telephone (confirmed by telecopy) of such demand for payment and whether such Issuing Lender has made or will make an LC Disbursement thereunder; PROVIDED that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse such Issuing Lender and the Post-Petition Lenders with respect to any such LC Disbursement.

(h)    INTERIM INTEREST.  If any Issuing Lender shall make any LC Disbursement, then, unless such LC Disbursement is reimbursed in full on the date such LC Disbursement is made as contemplated in paragraph (e) of this Section, the unpaid amount thereof (or the Dollar Equivalent of such unpaid amount in the case of a LC Disbursement in respect of any Post-Petition Letter of Credit denominated in an Alternate Currency) shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that such LC Disbursement is reimbursed, at the rate per annum then applicable to ABR Post-Petition Loans; PROVIDED that, if such LC Disbursement is not reimbursed when due pursuant to paragraph (e) of this Section, then Section 2.11(c) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Lender, except that interest accrued on and after the date of payment by any Post-Petition Lender pursuant to paragraph (e) of this Section to reimburse the applicable Issuing Lender shall be for the account of such Post-Petition Lender to the extent of such payment.

(i)    REPLACEMENT OF AN ISSUING LENDER.  An Issuing Lender may be replaced at any time by written agreement among the Company, the Administrative Agent, the replaced Issuing Lender and the successor Issuing Lender.  The Administrative Agent shall notify the Post-Petition Lenders of any such replacement of an Issuing Lender.  At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Lender pursuant to Section 2.10(b). From and after the effective date of any such replacement, (i) the successor Issuing Lender shall have all the rights and obligations of the replaced Issuing Lender under this Agreement with respect to Post-Petition Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Lender"

shall be deemed to include such successor or any previous Issuing Lender, or such successor and all previous Issuing Lenders, as the context shall require. After the replacement of an Issuing Lender hereunder, the replaced Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Lender under this Agreement with respect to Post-Petition Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Post-Petition Letters of Credit.

(j)    CASH COLLATERALIZATION. (i) If any Event of Default shall occur and be continuing, on the Business Day that the Company receives notice from the Administrative Agent or the Required Lenders demanding the deposit of cash collateral pursuant to this paragraph, (ii) on each date that LC Exposure is required to be cash collateralized in accordance with Section 2.09(b), (c), (d), (e) or 2.16(h) and (iii) on the Termination Date, in any such case the Borrowers shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Post-Petition Lenders, an amount in Dollars in cash equal to 105% of the LC Exposure as of such date plus any accrued and unpaid interest thereon. Each such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrowers under this Agreement. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the discretion of the Administrative Agent and at the Borrowers' risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the applicable Issuing Lender for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the LC Exposure at such time or, if the maturity of the Post-Petition Loans has been accelerated, be applied to satisfy other obligations of the Borrowers under this Agreement. If the Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Company within three Business Days after all Events of Default have been cured or waived.

SECTION 2.05. FUNDING OF BORROWINGS. (a) Each Post-Petition Lender shall make each Post-Petition Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:30 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Post-Petition Lenders. The Administrative Agent will make such Post-Petition Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent in New York City and designated by the Borrower in the applicable Notice of Borrowing Request; PROVIDED that ABR Post-Petition Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.04(e) shall be remitted by the Administrative Agent to the applicable Issuing Lender.

(b)    Unless the Administrative Agent shall have received notice from a Post-Petition Lender prior to the proposed date of any Borrowing that such Post-Petition Lender will not make available to the Administrative Agent such Post-Petition Lender's share of such Borrowing, the Administrative Agent may assume that such Post-Petition Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in

reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Post-Petition Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Post-Petition Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Post-Petition Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, in each case for the first three days and at the interest rate otherwise applicable to ABR Post-Petition Loans for each day thereafter or (ii) in the case of the Borrower, the interest rate applicable to ABR Post-Petition Loans.  If such Post-Petition Lender pays such amount to the Administrative Agent, then such amount shall constitute such Post-Petition Lender's Post-Petition Loan included in such Borrowing.

SECTION 2.06.  INTEREST ELECTIONS.  (a) Each Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Notice of Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of Eurodollar Borrowing, may elect the Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Post-Petition Lenders, and the Post-Petition Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by the time that a Notice of Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such notification shall be irrevocable and shall be in writing signed by the Company, in substantially the form of Exhibit G (the "Notice of Interest Election Request").

(c)     Each Notice of Interest Election Request shall specify the following information, which shall be consistent with the requirements of Section 2.02:

(i)     the Borrowing to which such Notice of Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Notice of Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

(d)    Promptly following receipt of a Notice of Interest Election Request, the Administrative Agent shall advise each Post-Petition Lender of the details thereof and of such Post-Petition Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Notice of Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if a Default has occurred and is continuing, then, so long as a Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

(f)    No Eurodollar Borrowings may be incurred prior to the fourth Business Day following the Effective Date. Thereafter until the earlier of (i) the 90th day after the Effective Date and (ii) the Syndication Date, Interest Periods in respect of all outstanding Eurodollar Borrowings shall begin and end on the same date.

SECTION 2.07. TERMINATION AND REDUCTION OF COMMITMENTS. (a) Upon the Termination Date, the total Commitments shall be terminated in full and the Borrowers shall repay in full all outstanding Post-Petition Loans and, if any Post-Petition Letter of Credit remains outstanding, comply with Section 2.04(j).

(b)    The Commitments shall be permanently reduced on each date upon which Net Proceeds are required to be applied pursuant to Sections 2.09(b), (c) or (d) in an amount equal to 100% of the Net Proceeds required to be applied pursuant to such respective Section (including, for this purpose, any portion of such Net Proceeds which the Borrowers are permitted to use by operation of the proviso contained in Section 2.16(h)), PROVIDED that the first $80,000,000 of Net Proceeds in the aggregate received by the Company and its Subsidiaries after the Effective Date from Asset Dispositions (other than from Asset Dispositions of the type described in clause (c) of the definition thereof with respect to the Denver Distribution Center unless the proceeds from such Asset Dispositions are used by the Borrowers to make purchases of Inventory) shall not give rise to a permanent reduction of Commitments pursuant to this paragraph (b).

(c)    The Company may at any time terminate, or from time to time reduce, the then outstanding Commitments; PROVIDED that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Company shall not terminate or reduce the Commitments if, after giving effect to any concurrent prepayment of the Post-Petition Loans in accordance with Section 2.09, the sum of the Exposures would exceed the total Commitments.

(d)     The Borrower shall notify the Administrative Agent in writing of any election to terminate or reduce the Commitments under paragraph (c) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Post-Petition Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable.

(e)     Any termination or reduction of the Commitments shall be permanent. Each reduction of the total Commitments shall be made ratably among the Post-Petition Lenders in accordance with their respective Commitments.

SECTION 2.08. REPAYMENT OF LOANS; EVIDENCE OF DEBT.  (a)  The Borrowers hereby jointly and severally unconditionally promise to pay to the Administrative Agent for the account of each Post-Petition Lender the then unpaid principal amount of each Post-Petition Loan of such Post-Petition Lender on the Termination Date.

(b)     Each Post-Petition Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Post-Petition Lender resulting from each Post-Petition Loan made by such Post-Petition Lender, including the amounts of principal and interest payable and paid to such Post-Petition Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Post-Petition Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Post-Petition Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Post-Petition Lenders and each Post-Petition Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be PRIMA FACIE evidence of the existence and amounts of the obligations recorded therein (although in the case of any conflict between determinations made pursuant to such paragraphs (b) and (c), determinations made pursuant to such paragraph (c) shall control); PROVIDED that the failure of any Post-Petition Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Post-Petition Loans in accordance with the terms of this Agreement.

(e)     Any Post-Petition Lender may request that Post-Petition Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall prepare, execute and deliver to such Post-Petition Lender a promissory note payable to the order of such Post-Petition Lender (or, if requested by such Post-Petition Lender, to such Post-Petition Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Post-Petition Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.09.  PREPAYMENT OF LOANS.  (a)  The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to the requirements of this Section and payment of any related amounts owing pursuant to Section 2.14.

(b)    In the event and on each occasion that any Net Proceeds are received by the Company or any of its Subsidiaries from any Asset Disposition, the Company or the respective Subsidiary, as the case may be, shall on the date such Net Proceeds are received, transfer 100% of such Net Proceeds to the Concentration Account and the Collateral Agent shall apply 100% of such Net Proceeds as provided in Section 2.16(h), PROVIDED that with respect to no more than $500,000 of Net Proceeds in the aggregate from Asset Dispositions of the type described in clause (c) of the definition thereof, so long as no Default then exists the Borrowers shall not be subject to the obligation to make the prepayments otherwise required pursuant to this paragraph (b) if within such five Business Days of the receipt of such Net Proceeds, the Company notifies the Administrative Agent that it intends to use such Net Proceeds to replace or restore the assets subject to the events described in clause (c) of the definition of Asset Disposition within 270 days after the receipt thereof, and within 180 days following the receipt of such Net Proceeds the Company delivers the Administrative Agent a certificate that it has contractually committed to reinvest (or has actually reinvested) such Net Proceeds to restore or replace such assets and within 270 days following the receipt of such Net Proceeds the Company delivers to the Administrative Agent a notice certifying that such Net Proceeds have in fact been so applied to restore or replace such assets.  If the respective Net Proceeds are not contractually committed to be reinvested within 180 days (or are not actually reinvested within 270 days) following the receipt of such Net Proceeds, the Borrower shall forthwith apply such Net Proceeds as otherwise provided above in this paragraph (b).  Notwithstanding anything to the contrary contained above in this Section 2.09(b), in the event and on each and every occasion that any Denver Distribution Center Recovery Proceeds are received by the Company or any of its Subsidiaries, the Company or the respective Subsidiary, as the case may be, shall on the date such Denver Distribution Center Recovery Proceeds are received, transfer 100% of such Denver Distribution Center Recovery Proceeds to the Concentration Account and the Collateral Agent shall apply 100% of such Denver Distribution Center Recovery Proceeds as provided in Section 2.16(h).

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Company or any of its Subsidiaries from the incurrence of Indebtedness (other than Indebtedness permitted to be incurred under clauses (i), (iii), (vi) and (vii) of Section 6.03(a) as same is in effect on the Effective Date), the Company, or the respective Subsidiary, as the case may be, shall, on the date such Net Proceeds are received, transfer 100% of Net Proceeds to the Concentration Account and the Collateral Agent shall apply 100% of such Net Proceeds as provided in Section 2.16(h).

(d)    In the event and on each occasion that any cash proceeds are received by the Company or any of its Subsidiaries from any tax refund received from any Governmental Authority, the Company or the respective Subsidiary, as the case may be, shall transfer 100% of such cash proceeds to the Concentration Account and the Collateral Agent shall apply 100% of such cash proceeds as provided in Section 2.16(h).

(e)    On any day on which the total Exposure exceeds the least of (i) the total Commitments at such time, (ii) from and after the commencement of the Availability Period, the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined terms used therein), and (iii) the Authorized Facility Amount at such time, the Borrowers shall prepay on such date the principal of Post-Petition Loans in an amount equal to such excess. If, after giving effect to the prepayment of all outstanding Post-Petition Loans, the total LC Exposure exceeds the least of (i) the total Commitments at such time, (ii) from and after the commencement of the Availability Period, the Borrowing Base at such time (based on the Borrowing Base Certificate last delivered, subject to any adjustments made by the Joint Lead Arrangers in accordance with the definition of Borrowing Base or the component defined terms used therein) and (iii) the Authorized Facility Amount at such time, the Borrowers shall pay to the Administrative Agent on such day an amount of cash and/or Temporary Cash Investments equal to the amount of such excess up to a maximum amount equal to 105% of the total LC Exposure at such time, with such cash and/or Temporary Cash Investments to be held as security for the obligations of the Borrowers to the Issuing Lenders and the Post-Petition Lenders hereunder in a cash collateral account to be established by the Administrative Agent on terms reasonably satisfactory to it.

(f)    Prior to any optional or mandatory prepayment of Borrowings hereunder, the Company shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section.

(g)    The Company shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 noon, New York City time, on the Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid. Each repayment or prepayment of a Borrowing shall be applied ratably to the Post-Petition Loans included in the repaid Borrowing. Promptly following receipt of any such notice, the Administrative Agent shall advise the Post-Petition Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.11.

SECTION 2.10. FEES. (a) The Borrowers jointly and severally agree to pay to the Administrative Agent for the account of each Post-Petition Lender (other than a Defaulting Lender) a commitment fee, which shall accrue at a rate per annum equal to 0.50% of the daily unused amount of each Commitment of such Post-Petition Lender during the Availability Period. Accrued commitment fees shall be payable in arrears on the last Business Day of each month and on the date on which the Commitments terminate, commencing on the last Business Day in [May], 2003. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). For purposes of determining the unused portion of the Commitments, the Commitment

of a Post-Petition Lender shall be deemed to be used to the extent of the outstanding Exposure of such Post-Petition Lender.

(b)     The Borrowers jointly and severally agree to pay (i) to the Administrative Agent for the account of each Post-Petition Lender a participation fee with respect to its participations in Post-Petition Letters of Credit, which shall accrue at the Applicable Rate for Eurodollar Loans on the daily amount of such Post-Petition Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which such Post-Petition Lender's Commitment terminates and the date on which such Post-Petition Lender ceases to have any LC Exposure, and (ii) to each Issuing Lender a fronting fee, which shall accrue at the rate of 0.25% per annum on the daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, and (iii) each Issuing Lender such Issuing Lender's standard fees with respect to the issuance, amendment, renewal or extension of any Post-Petition Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of each month shall be payable on the third Business Day following such last day, commencing on the first such date to occur after [May], 2003; PROVIDED that all such fees shall be payable on the date on which the Commitments terminate and any such fees accruing after the date on which the Commitments terminate shall be payable on demand.  Any other fees payable to an Issuing Lender pursuant to this paragraph shall be payable within five days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     The Borrowers jointly and severally agree to pay to each Joint Lead Arranger and each Post-Petition Agent, for its respective account, fees payable in the amounts and at the times separately agreed to in writing between the Company and the respective Joint Lead Arranger and Post-Petition Agent.

(d)     All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to each Issuing Lender, Joint Lead Arranger and Post-Petition Agent, in the case of fees payable to such Person) for distribution, in the case of commitment fees and participation fees, to the Post-Petition Lenders entitled thereto.  Fees paid shall not be refundable.  All invoices in respect of any fees shall be delivered to the Company in accordance with the provisions of Section 9.01(a).

SECTION 2.11.  INTEREST.  (a)  The Post-Petition Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate, each as in effect from time to time.

(b)     The Post-Petition Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate in effect from time to time.

(c)     Notwithstanding the foregoing, if any principal of or interest on any Post-Petition Loan or any fee or other amount payable by the Borrowers hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate applicable to ABR Post-Petition Loans as provided in paragraph (a) of this Section.

(d)     Accrued interest on each Post-Petition Loan shall be payable in arrears on each Interest Payment Date for such Post-Petition Loan and upon termination of the Commitments; PROVIDED that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Eurodollar Post-Petition Loan at any time and any ABR Post-Petition Loan at the end of the Availability Period, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Post-Petition Loan prior to the end of the current Interest Period therefor, accrued interest on such Post-Petition Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate (as in effect from time to time) and applicable Adjusted LIBO Rate shall be determined by the Administrative Agent, and each such determination shall be conclusive absent manifest error.

SECTION 2.12.  ALTERNATE RATE OF INTEREST.    If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Post-Petition Lenders (or Post-Petition Lender) of making or maintaining their Post-Petition Loans (or its Post-Petition Loan) included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Company and the Post-Petition Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Company and the Post-Petition Lenders that the circumstances giving rise to such notice no longer exist, (i) any Notice of Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

SECTION 2.13.  INCREASED COSTS.  (a)  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by,

any Post-Petition Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or any Issuing Lender; or

(ii)    impose on any Post-Petition Lender, any Issuing Lender, the London interbank market or other relevant interbank market any other condition affecting this Agreement or Eurodollar Post-Petition Loans made by such Post-Petition Lender or any Post-Petition Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Post-Petition Lender of making or maintaining any Eurodollar Post-Petition Loan (or of maintaining its obligation to make any such Post-Petition Loan) or to increase the cost to such Post-Petition Lender or Issuing Lender of participating in, issuing or maintaining any Post-Petition Letter of Credit or to reduce the amount of any sum received or receivable by such Post-Petition Lender or Issuing Lender hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Post-Petition Lender or Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Post-Petition Lender or Issuing Lender, as the case may be, for such additional costs incurred or reduction suffered; PROVIDED, that no Post-Petition Lender or Issuing Lender shall be entitled under this paragraph to receive compensation for any Excluded Taxes paid by it. The preceding sentence shall not apply to increased costs with respect to Taxes which are addressed in Section 2.15.

(b)    If any Post-Petition Lender or Issuing Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Post-Petition Lender's or the Issuing Lender's capital or on the capital of such Post-Petition Lender's or the Issuing Lender's holding company, if any, as a consequence of this Agreement or the Post-Petition Loans made by, or the Commitments of, or participations in Post-Petition Letters of Credit held by, such Post-Petition Lender, or the Post-Petition Letters of Credit issued by the Issuing Lender, to a level below that which such Post-Petition Lender or the Issuing Lender or such Post-Petition Lender's or Issuing Lender's holding company could have achieved but for such Change in Law (taking into consideration such Post-Petition Lender's or Issuing Lender's policies and the policies of such Post-Petition Lender's or Issuing Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Post-Petition Lender or Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Post-Petition Lender or Issuing Lender or such Post-Petition Lender's or Issuing Lender's holding company for any such reduction suffered.

(c)    A certificate of a Post-Petition Lender or Issuing Lender setting forth the amount or amounts necessary to compensate such Post-Petition Lender or Issuing Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Company and shall be conclusive absent manifest error.  The Borrowers shall pay such Post-Petition Lender or Issuing Lender, as the case may be, the amount shown as due on any such certificate within five Business Days after receipt thereof.

(d)    Failure or delay on the part of any Post-Petition Lender or Issuing Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Post-Petition Lender's or Issuing Lender's right to demand such compensation.

SECTION 2.14.  BREAK FUNDING PAYMENTS.  In the event of (a) the payment of any principal of any Eurodollar Post-Petition Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Post-Petition Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Post-Petition Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Post-Petition Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Company pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Post-Petition Lender for the economic loss, cost and expense (but not for loss of profits) attributable to such event.  In the case of a Eurodollar Post-Petition Loan, such loss, cost or expense to any Post-Petition Lender shall be deemed to include an amount determined by such Post-Petition Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Post-Petition Loan had such event not occurred at the Adjusted LIBO Rate that would have been applicable to such Post-Petition Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Post-Petition Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Post-Petition Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Post-Petition Lender setting forth any amount or amounts that such Post-Petition Lender is entitled to receive pursuant to this Section shall be delivered to the Company and shall be conclusive absent manifest error.  The Borrowers shall pay such Post-Petition Lender the amount shown as due on any such certificate within five Business Days after receipt thereof.

SECTION 2.15.  TAXES.  (a)  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Post-Petition Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; PROVIDED that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Post-Petition Lender or Issuing Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law. If any amounts are payable in respect of Indemnified Taxes or Other Taxes pursuant to the preceding sentence, then the Borrowers shall be obligated to reimburse the Administrative Agent or the respective Post-Petition Lender or Issuing Lender (as the case may be), within five Business Days after the written request of the Administrative Agent, or such respective Post-Petition Lender or Issuing Lender (as the case may be), for taxes imposed on or measured by the net income of the Administrative Agent or such respective Post-Petition Lender or Issuing Lender (as the case may be) pursuant to the laws of the jurisdiction in which the Administrative Agent or such respective Post-Petition Lender or Issuing Lender (as the case may be) is organized or in which the principal office or applicable lending office of the Administrative Agent or such respective Post-Petition Lender or Issuing Lender (as the case may be) is located or under the laws of any political subdivision or taxing authority thereof or therein and for any

withholding of taxes as the Administrative Agent or such respective Post-Petition Lender or Issuing Lender are payable by, or withheld from, the Administrative Agent or such respective Post-Petition Lender or Issuing Lender (as the case may be) in respect of such amounts which are attributable to the increase in the sum payable as described in clause (i) of the preceding sentence so paid to or on behalf of the Administrative Agent or such respective Post-Petition Lender or Issuing Lender (as the case may be) pursuant to clause (i) of the preceding sentence and in respect of any amounts paid to or on behalf of the Administrative Agent or such respective Post-Petition Lender or Issuing Lender (as the case may be), pursuant to this sentence.

(b)     In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrowers shall indemnify the Administrative Agent, each Post-Petition Lender and each Issuing Lender, within five Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Post-Petition Lender or such Issuing Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrowers hereunder or under any other Post-Petition Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate, receipt or other document as to the amount of such payment or liability delivered to the Company by a Post-Petition Lender or Issuing Lender, or by the Administrative Agent on its own behalf or on behalf of a Post-Petition Lender or Issuing Lender, shall be conclusive absent manifest error.

(d)     Within 45 days after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, the Company shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Each Foreign Lender agrees to deliver to the Company and the Administrative Agent on or prior to the  Effective Date, or in the case of a Foreign Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 9.04 (unless the respective Foreign Lender was already a Foreign Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Foreign Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or successor forms) certifying to such Foreign Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement, or (ii) if the Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit H (any such certificate, a "Section 2.15(e) Certificate") and (y) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (with respect to the portfolio interest exemption) (or

successor form) certifying to such Foreign Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement. In addition, each Foreign Lender agrees that from time to time after the Effective Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, it will deliver to the Company and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN (with respect to the portfolio interest exemption) and a Section 2.15(e) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Foreign Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement, or it shall immediately notify the Company and the Administrative Agent of its inability to deliver any such Form or Certificate. If a Foreign Lender is unable to deliver any such Form or Certificate described in the immediately preceding sentence solely because a change, subsequent to the date on which such Foreign Lender becomes a party to this Agreement, in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of Indemnified Taxes causes such Foreign Lender to be legally unable to deliver such Form or Certificate, such Foreign Lender shall not be required to deliver any such Form or Certificate pursuant to this Section 2.15(e) during such period that such change causes such Foreign Lender to be legally unable to deliver such Form or Certificate. Notwithstanding anything to the contrary contained in this Section 2.15, the Borrowers jointly and severally agree to pay additional amounts and to indemnify each Foreign Lender in the manner set forth in Section 2.15(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any Indemnified Taxes deducted or withheld by it as a result of any changes after the Effective Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of income or similar taxes.

(f)     If the Borrowers pay any additional amount under this Section 2.15 to or on behalf of the Administrative Agent, any Post-Petition Lender or any Issuing Lender and such Administrative Agent, Post-Petition Lender or Issuing Lender determines in its sole discretion that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), the Administrative Agent or such respective Post-Petition Lender or Issuing Lender shall pay to the Company an amount that the Administrative Agent or such respective Post-Petition Lender or Issuing Lender shall, in its sole discretion, determine is equal to the net benefit, after tax, which was obtained by the Administrative Agent or such respective Post-Petition Lender or Issuing Lender in such year as a consequence of such Tax Benefit; PROVIDED, HOWEVER, that (i) the Administrative Agent or such respective Post-Petition Lender or Issuing Lender, as the case may be, may determine, in its sole discretion consistent with the policies of the Administrative Agent or such respective Post-Petition Lender or Issuing Lender, whether to seek a Tax Benefit; (ii) any Taxes that are imposed on the Administrative Agent or such respective Post-Petition Lender or Issuing Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carry-back of the Administrative Agent or such respective Post-Petition Lender or Issuing Lender that otherwise would not have expired) of any Tax Benefit with respect to which the Administrative Agent or such respective Post-Petition Lender or Issuing Lender has made a payment to the

Company pursuant to this paragraph (f) shall be treated as a Tax for which the Borrowers are jointly and severally obligated to indemnify the Administrative Agent or such respective Post-Petition Lender or Issuing Lender pursuant to this Section 2.15 without any exclusions or defenses; (iii) nothing in this paragraph (f) shall require the Administrative Agent or such respective Post-Petition Lender or Issuing Lender to disclose any confidential information to the Company or any of its Subsidiaries (including, without limitation, its tax returns); and (iv) none of the Administrative Agent, any Post-Petition Lender or the Issuing Lender shall be required to pay any amounts pursuant to this paragraph (f) at any time during which a Default exists.

SECTION 2.16. PAYMENTS GENERALLY; CASH DOMINION; PRO RATA TREATMENT; SHARING OF SET-OFFS. (a) The Borrowers shall make each payment required to be made by it hereunder or under any other Post-Petition Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.13, 2.14 or 2.15, or otherwise, where time of payment has not been specified) prior to 12:30 p.m., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 90 Hudson Street, Fifth Floor, Jersey City, New Jersey 07302, except payments to be made directly to the applicable Issuing Lender as expressly provided herein and except that (i) payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto, (ii) payments made pursuant to paragraph (h) of this Section 2.16 shall be made as provided in such paragraph and (iii) payments pursuant to other Post-Petition Loan Documents shall be made to the Persons specified therein. Nothing in the succeeding paragraphs of this Section 2.16 shall affect or alter the Borrowers' joint and several obligations to the Administrative Agent, the Collateral Agent, the Issuing Lender and the Post-Petition Lenders with respect to all payments otherwise required to be made by the Borrowers in accordance with the terms of this Agreement and the other Post-Petition Loan Documents. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Post-Petition Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Post-Petition Loan Document shall be made in Dollars.

(b) If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c) If any Post-Petition Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Post-Petition Loans or participations in LC Disbursements resulting in such Post-Petition Lender

receiving payment of a greater proportion of the aggregate amount of its Post-Petition Loans, and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Post-Petition Lender, then the Post-Petition Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Post-Petition Loans, and participations in LC Disbursements of other Post-Petition Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Post-Petition Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Post-Petition Loans, and participations in LC Disbursements; PROVIDED that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Post-Petition Lender as consideration for the assignment of or sale of a participation in any of its Post-Petition Loans or participations in LC Disbursements to any assignee or participant, other than to the Company or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrowers consent to the foregoing and agree, to the extent it may effectively do so under applicable law, that any Post-Petition Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Company prior to the date on which any payment is due to the Administrative Agent for the account of the Post-Petition Lenders or an Issuing Lender hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Post-Petition Lenders or the applicable Issuing Lender, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Post-Petition Lenders or Issuing Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Post-Petition Lender or Issuing Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation for the first three days and at the interest rate otherwise applicable to ABR Post-Petition Loans for each day thereafter.

(e)    If any Post-Petition Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(d) or (e), 2.05(a), 2.16(d) or 8.06, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent pursuant to the Post-Petition Loan Documents for the account of such Post-Petition Lender to satisfy such Post-Petition Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)    Each Borrower shall, along with the Collateral Agent and each Collection Bank, maintain a separate Control Agreement covering each of the Collection Accounts with such Collection Bank. Each Borrower shall instruct all Account Debtors of such Borrower to

remit all payments of such Account Debtors owing to such Borrower to the applicable "P.O. Boxes" or "Lockbox Addresses" of the applicable Collection Bank with respect to the Accounts of such Account Debtor, which remittances shall be collected by the applicable Collection Bank and deposited in the applicable Collection Account. All amounts received by such Borrower and any Collection Bank in respect of any Account, in addition to all other cash received from any other source, shall upon receipt be deposited into a Collection Account or directly into the Concentration Account.

(g)    Upon the terms and subject to the conditions set forth in the respective Control Agreement (and each Collection Bank and Disbursement Bank that is a Post-Petition Lender hereunder hereby agrees that) all collected amounts (other than Restricted Cash) held in all of the Collection Accounts and the Disbursements Accounts shall be wired upon the opening of business on each Business Day into the Concentration Account PROVIDED, HOWEVER, so long as no Default or Event of Default then exists, (i) a balance of up to [$300,000] in the aggregate shall be permitted to be maintained in the Designated Retail Accounts so long as no amounts may be withdrawn therefrom except by the respective Disbursement Bank to make payments owing to the respective Coin and Currency Agent and (ii) a balance of up to $_____ in the aggregate shall be permitted to be maintained in the Designated Canadian Account. Except for Restricted Cash and as, and to the extent, provided in the proviso to the immediately preceding sentence, all of the Collection Accounts and Disbursement Accounts shall be "zero" balance accounts.

(h)    All collected amounts held in the Concentration Account shall be distributed and applied on a daily basis in the following order (in each case, to the extent the Administrative Agent has actual knowledge of the amounts owing or outstanding as described below): (1) first, to the payment of any outstanding Expenses actually due and payable to the Administrative Agent and/or the Collateral Agent under any of the Post-Petition Loan Documents and to repay or prepay outstanding Post-Petition Loans (with no corresponding commitment reductions except as provided in Section 2.07(b)) advanced by the Administrative Agent on behalf of the Post-Petition Lenders pursuant to Section 2.01(d); (2) second, to the extent all amounts referred to in preceding clause (1) have been paid in full, to pay (on a ratable basis) all accrued and unpaid interest actually due and payable on the Post-Petition Loans and all accrued and unpaid fees actually due and payable to the Administrative Agent, the Issuing Lenders and the Post-Petition Lenders under any of the Post-Petition Loan Documents; (3) third, to the extent all amounts referred to in preceding clauses (1) and (2) have been paid in full, to pay all outstanding Expenses actually due and payable to each Issuing Lender under any of the Post-Petition Loan Documents and to repay all unreimbursed LC Disbursements and interest thereon; (4) fourth, to the extent all amounts referred to in preceding clauses (1) through (3) have been paid in full, to repay outstanding Post-Petition Loans (whether or not then due and payable but with no corresponding commitment reductions except as provided in Section 2.07(b)); (5) fifth to the extent all amounts referred to in preceding clauses (1) through (4) have been paid in full, to repay all outstanding Indebtedness arising from Treasury Services (whether or not then due and payable), (6) sixth, to the extent all amounts referred to in preceding clauses (1) through (5), inclusive, have been paid in full, to cash collateralize LC Exposure in accordance with Section 2.04(j); and (7) seventh, to the extent all amounts referred to in preceding clauses (1) through (6), inclusive, have been paid in full, to pay (on a ratable basis) all other outstanding Post-Petition Obligations due to the Administrative Agent, the Collateral Agent and the Post-Petition Lenders

under any of the Post-Petition Loan Documents; PROVIDED, HOWEVER, to the extent all amounts referred to in preceding clauses (1) through (7) inclusive, have been paid in full, the Borrowers are permitted to use any excess amounts in accordance with Sections 4.03 and 5.07.

(i)     Without limiting the provisions set forth in Section 9.04(d), the Administrative Agent shall maintain an account on its books in the name of the Borrowers in which the Borrowers will be charged with all loans and advances made by the Post-Petition Lenders to the Borrowers for the Borrowers' account, including the Post-Petition Loans, the LC Exposure, and the fees, Expenses and any other Post-Petition Obligations relating thereto. The Borrowers will be credited, in accordance with this Section 2.16, with all amounts received by the Post-Petition Lenders from the Borrowers or from others for their account, including, as set forth above, all amounts received by the Administrative Agent and applied to the Post-Petition Obligations. In no event shall prior recourse to any Accounts or other Collateral be a prerequisite to the Administrative Agent's right to demand payment of any Post-Petition Obligation upon the Termination Date. Further, the Administrative Agent shall have no obligation whatsoever to perform in any respect any of the Borrowers' or any of their respective Subsidiaries' contracts or obligations relating to the Accounts.

(j)     After the end of each month, the Administrative Agent shall send the Company and each Post-Petition Lender a statement accounting for the charges, loans, advances and other transactions occurring among and between the Administrative Agent, the Post-Petition Lenders, the Issuing Lenders and the Borrowers during that month. The monthly statements shall, absent manifest error, be final, conclusive and binding on the Borrowers and the Post-Petition Lenders.

SECTION 2.17. MITIGATION    OF    POST-PETITION    OBLIGATIONS; REPLACEMENT OF LENDERS. (a) If any Post-Petition Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any additional amount to any Post-Petition Lender or any Governmental Authority for the account of any Post-Petition Lender pursuant to Section 2.15, then such Post-Petition Lender shall use reasonable efforts to designate a different lending office for funding or booking its Post-Petition Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates if, in the judgment of such Post-Petition Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Post-Petition Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Post-Petition Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Post-Petition Lender in connection with any such designation or assignment.

(b)     The Company may upon notice to any Post-Petition Lender and the Administrative Agent, require such Post-Petition Lender (the "Departing Lender") to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Post-Petition Lender, if a Post-Petition Lender accepts such assignment) (i) if the Departing Lender has requested compensation under Section 2.13, or the Borrowers are required to pay any additional amount to such Post-Petition Lender or any Governmental Authority for the account of such Post-Petition Lender pursuant to

Section 2.15, or such Post-Petition Lender has given a notice (which has not been rescinded) pursuant to Section 2.18, or such Post-Petition Lender is a Defaulting Lender or was at any time a Defaulting Lender as a result of such Post-Petition Lender providing a notice described in clause (ii) of the definition of Lender Default which such Post-Petition Lender subsequently retracted; or (ii) if the Required Lenders consent to such required assignment and delegation; . PROVIDED that (x) the Company shall have received the prior written consent of the Administrative Agent and each Issuing Lender, each of which consents shall not unreasonably be withheld, (y) such Post-Petition Lender shall have received payment of an amount equal to the outstanding principal of its Post-Petition Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (z) in the case of any such assignment resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments. A Post-Petition Lender shall not be required to make any assignment and delegation under clause (i) of this paragraph (b) if, prior thereto, as a result of a waiver by such Post-Petition Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

SECTION 2.18. ILLEGALITY OR IMPRACTICABILITY OF EURODOLLAR POST-PETITION LOANS. In the event that on any date any Post-Petition Lender shall have determined (which determination shall be conclusive and binding upon all parties hereto) that the making, maintaining or continuation of its Eurodollar Post-Petition Loans (i) has become unlawful as a result of compliance by such Post-Petition Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order enacted after the date hereof or (ii) has become impracticable, or would cause such Post-Petition Lender material hardship, in either such case as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the interbank Eurodollar market or the position of such Post-Petition Lender in that market, then, and in any such event, such Post-Petition Lender shall be an "Affected Lender" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to the Company and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Post-Petition Lender). Thereafter (a) the obligation of the Affected Lender to make Post-Petition Loans as, or to convert Post-Petition Loans to, Eurodollar Post-Petition Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Post-Petition Loan then being requested by the Company pursuant to a Notice of Borrowing Request or a Notice of Interest Election Request, the Affected Lender shall make such Post-Petition Loan as (or convert such Post-Petition Loan to, as the case may be) an ABR Post-Petition Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Loans (the "Affected Loans") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into ABR Post-Petition Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Post-Petition Loan then being requested by the Borrower pursuant to a Notice of Borrowing Request or a Notice of Interest Election Request, the Company shall have the option to rescind such Notice of Borrowing Request or Notice of Interest Election Request as to all Post-Petition Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on

which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Post-Petition Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.18 shall affect the obligation of any Post-Petition Lender other than an Affected Lender to make or maintain Post-Petition Loans as, or to convert Post-Petition Loans to, Eurodollar Post-Petition Loans in accordance with the terms of this Agreement. In the event that the circumstances described in the first sentence of this Section 2.18 giving rise to the limitation on incurrences of, or conversions into, Eurodollar Post-Petition Loans cease to be in existence, the respective Post-Petition Lender shall notify the Company and the Administrative Agent of the same and the Borrowers shall again be entitled to incur (including pursuant to conversions) from such Post-Petition Lender, Eurodollar Post-Petition Loans as otherwise provided in this Agreement.

SECTION 2.19. PRIORITY AND LIENS; ADEQUATE PROTECTION. (a) Each Borrower hereby covenants, represents and warrants that all Post-Petition Obligations shall at all times:

(i)    constitute a Post-Petition Lender Super-Priority Claim subject only to the Carve-Out;

(ii)    be secured by a perfected first priority Lien pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code upon all assets of each Borrower and its Estate (excluding Trust Property and Restricted Leasehold Interests but including the proceeds of any Avoidance Recovery Property and of all Restricted Leasehold Interests), which Lien shall be valid, existing and perfected (without the entering into of any security document and without the recordation of any mortgages, financing statements or instruments of assignment) pursuant to the Financing Orders, subject only to the Carve-Out, the PACA Liens and any Senior Liens; and

(iii)    be secured by a perfected junior lien pursuant to Section 364(c)(3) of the Bankruptcy Code upon all property of each Borrower that is encumbered by the Senior Liens, which Lien shall be valid, existing and perfected (without the entering into of any security document and without the recordation of any mortgages, financing statements or instruments of assignment) pursuant to the Financing Orders, subject to the Carve-Out.

(b)    each Borrower hereby covenants, represents, and warrants that:

(i)    to the extent of the Diminution Claim, all Pre-Petition Obligations shall constitute a Pre-Petition Lender Super-Priority Claim, subject to the Carve-Out; and

(ii)    to the extent of the Diminution Claim, all Pre-Petition Obligations shall be secured by a perfected first priority Lien pursuant to Section 361 and 363 of the Bankruptcy Code upon all assets of each Borrower and its Estate (excluding the Trust Property and Restricted Leasehold Interests but including the proceeds of the Avoidance Recovery Property and of all Restricted Leasehold Interests), which Lien shall be valid, existing and perfected (without the entering into of any security document and without the recordation of any mortgages, financing statements or instruments of assignment)

pursuant to the Financing Orders, subject only to the Carve-Out, the PACA Liens, the Senior Liens and the Facility Liens.

The Post-Petition Lenders agree that so long as no Default shall have occurred and be continuing, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and any allowed compensation and expenses previously paid, or accrued but unpaid, prior to the occurrence of an Event of Default shall not reduce the Carve-Out.

(c)    As to all real property the title to which is held by a Borrower, or the possession of which is held by a Borrower pursuant to leasehold interest, such Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Collateral Agent on behalf of the Post-Petition Lenders all of the right, title and interest of such Borrower in all of such owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of such Borrower in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, PROVIDED that with respect to Restricted Leasehold Interests, such security interest shall be limited to the proceeds of such Restricted Leasehold Interests. Each Borrower acknowledges that, pursuant to the Final Order, the Liens in favor of the Collateral Agent for the benefit of the Secured Creditors in all of such real property and leasehold instruments shall be valid, existing and perfected (without the entering into of any mortgage or other security document and without the recordation of any instruments of mortgage or assignment or any Financing Statements). Notwithstanding the foregoing, each Borrower further agrees that, upon the request of the Collateral Agent, each such Borrower shall enter into separate fee and leasehold mortgages in recordable form and pay for any recordation of same, with respect to such properties on terms satisfactory to the Collateral Agent.

(d)    As to all personal property of each Borrower, such Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Collateral Agent on behalf of the Post-Petition Lenders all of the right, title and interest of such Borrower in all of such personal property (including all personal property located at Restricted Leasehold Interests and all personal property purportedly pledged to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Agreement and the Pledge Agreement) and all proceeds thereof. Each Borrower acknowledges that, pursuant to the Financing Orders, the Liens in favor of the Collateral Agent for the benefit of the Secured Creditors in all of such personal property shall be valid, existing and perfected without the entering into of any security document and without the recordation of any financing statements or instruments of assignment.

(c)    Each Borrower acknowledges and agrees that, as adequate protection (a) for the use of their collateral, the granting of the Carve-Out and the Facility Liens, the Pre-Petition Lenders shall receive (i) payment of all costs, fees and expenses (including, without limitation, reasonable attorneys' and other professional fees) owing to the Pre-Petition Agents, which costs, fees and expenses shall be paid on the Effective Date, (ii) payment of all past due interest, letter of credit fees and any other fees owed to the Pre-Petition Agents and the Pre-Petition Lenders under the Existing Credit Agreement, which interest, letter of credit fees and other fees shall be paid on the Effective Date and (iii) payment of all current interest payments

and letter of credit fees in respect of the Pre-Petition Loans and Pre-Petition Letters of Credit at the non-default rate in effect under the Existing Credit Agreement on the Filing Date, which interest and letter of credit fees shall be paid on the last Business Day of each month occurring after the Effective Date (or, in the case of interest, if earlier, at the end of each interest period relating to each "Eurodollar Post Petition Loan" thereunder ending after the Effective Date) and (b) to the extent of the Diminution Claim, the Pre-Petition Agents shall receive the Pre-Petition Lenders Super-Priority Claim.

SECTION 2.20.  NO DISCHARGE; SURVIVAL OF CLAIMS.  Each Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and each Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Post-Petition Lender Super-Priority Claim and the Pre-Petition Lender Super-Priority Claim granted pursuant to the Financing Orders and described in Section 2.19 shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

SECTION 2.21.  USE OF CASH COLLATERAL.  Notwithstanding anything to the contrary contained herein, the Borrowers shall not be permitted to incur any Borrowing hereunder at any time unless the Borrowers shall have insufficient Cash Collateral (other than Restricted Cash) to make payments described in the Budget as being made at, or within three Business Days after, such time.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Post-Petition Lenders that:

SECTION 3.01.  CORPORATE EXISTENCE AND POWER; CORPORATE AND GOVERNMENTAL AUTHORIZATION; DUE EXECUTION; CONTRAVENTION. Each Borrower (i) is a corporation or other business entity duly incorporated or organized (as the case may be), validly existing and in good standing under the laws of its jurisdiction of incorporation or organization (as the case may be), (ii) subject to the entry by the Bankruptcy Court of the Final Order, has all necessary corporate or other relevant organizational powers and all material licenses, authorizations, consents and approvals of Governmental Authorities required to carry on its business as now conducted.  The execution, delivery and performance by each Borrower of the Post-Petition Loan Documents to which it is party is, subject to the entry by the Bankruptcy Court of the Final Order, within such Borrower's corporate or other relevant organizational powers, have been duly authorized by all corporate or other organizational action, require no action by or in respect of, or filing with, any Governmental Authority other than the entry of the Final Order and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the certificate of incorporation or by-laws (or equivalent organizational documents) of such Borrower or of any judgment, injunction, order or decree or any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement or material instrument entered into after the Filing Date binding upon the Borrower or any of its Subsidiaries, and will not result in the creation or imposition of any Lien (other than

those contemplated by this Agreement or any other Post-Petition Loan Document) on any asset of any Borrower or any of its Subsidiaries. Except for the entry of the Final Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for the perfection of the security interests or, subject to Section 7 hereof, the exercise by the Administrative Agent or the Post-Petition Lenders of their respective rights and remedies under the Post-Petition Loan Documents.

SECTION 3.02. BINDING EFFECT. Each Borrower has duly executed and delivered each of the Post-Petition Loan Documents to which it is party, and, upon the entry by the Bankruptcy Court of the Final Order, each such Post-Petition Loan Document constitutes each such Borrower's legal, valid and binding obligation enforceable in accordance with its terms.

SECTION 3.03. FINANCIAL INFORMATION. (a) The consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of December 29, 2001, and the related consolidated statement of earnings and statement of cash flows for the fiscal year then ended, audited by Deloitte & Touche and set forth in the Company's annual report to the Securities and Exchange Commission on Form 10-K for such fiscal year, a copy of which has been delivered to each of the Post-Petition Lenders and the Administrative Agent, fairly present, in conformity with GAAP, the financial position of the Company and its Subsidiaries as of such date and their results of operations and cash flows for such fiscal year (subject to adjustments made as required by (i) the Securities and Exchange Commission in connection with the SEC Investigation and (ii) the Restatement).

(b)      The unaudited condensed consolidated balance sheet of the Company and its Consolidated Subsidiaries as of October 5, 2002, and the related unaudited consolidated statement of earnings and condensed consolidated statement of cash flows for the 40 weeks then ended, set forth in the Company's quarterly report to the Securities and Exchange Commission on Form 10-Q for the fiscal quarter ended October 5, 2002, a copy of which has been delivered to each of the Post-Petition Lenders and the Administrative Agent, fairly present, in conformity with GAAP applied on a basis consistent with the financial statements referred to in paragraph (a) of this Section (except for the omission of substantially all footnote disclosure as permitted by Regulation S-X promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended), the financial position of the Borrower and its Consolidated Subsidiaries as of such date and their results of operations and cash flows for such 40-week period (subject to normal year-end adjustments and adjustments made as required by (i) the Securities and Exchange Commission and adjustments in connection with the SEC Investigation and (ii) the Restatement).

(c)      Since the Effective Date, no events, changes, circumstances or conditions have occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 3.04. LITIGATION. There is no action, suit or proceeding pending against, or to the knowledge of any Borrower threatened against or affecting, any Borrower or any of its Subsidiaries before any court or arbitrator or any Governmental Authority that draws into question the validity of any Post-Petition Loan Document or that is unstayed and in which there is a reasonable possibility of an adverse decision that would be reasonably likely to result

in a material adverse effect on the creditworthiness of the Company and its Subsidiaries taken as a whole (it being understood that disclosure of any action, suit or proceeding in any filing with the Securities and Exchange Commission will not, in and of itself, be deemed to establish a breach of this representation).

SECTION 3.05. COMPLIANCE WITH ERISA.   The Company, each of its Subsidiaries and each ERISA Affiliate has fulfilled its obligations under the minimum funding standards of ERISA and the Code with respect to each Plan and is in compliance in all material respects with its terms and all applicable law, including without limitation, the presently applicable provisions of ERISA and the Code, with respect to each Plan.  Each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code (or has submitted, or is within the remedial amendment period for submitting, an application for a determination letter with the Internal Revenue Service, and is awaiting receipt of a response).   No Borrower nor any Subsidiary thereof nor any ERISA Affiliate has (i) sought a currently outstanding waiver of the minimum funding standard under Section 412 of the Code or Section 303 or 304 of ERISA in respect of any Plan, (ii) failed to make any contribution or payment to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement, or made any amendment to any such Plan or Benefit Arrangement, which has resulted or could result in the imposition of a Lien or the posting of a bond or other security under ERISA or the Code or (iii) incurred any liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA.  Except with respect to the Cases, no Reportable Event has occurred.  No Multiemployer Plan (as defined in Section 4001(a)(3) of ERISA) is insolvent or in reorganization.  No Plan has Unfunded Liabilities which, individually or when aggregated with the Unfunded Liabilities with respect to all other Plans, could reasonably be expected to have a Material Adverse Effect.  Using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the Withdrawal Liability of the Company and its Subsidiaries and its ERISA Affiliates as of the close of the most recent fiscal year of each such Multiemployer Plan ended prior to the date of the most recent extension of credit made pursuant to this Agreement (or, at all times prior to the first extension of credit pursuant to this Agreement, the Effective Date), would not exceed $25,000,000.  No Borrower nor any Subsidiary thereof nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan or Multiemployer Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan or Multiemployer Plan.  No condition exists which presents a material risk to any Borrower or any Subsidiary thereof or any ERISA Affiliate of incurring a liability to or on account of a Plan or Multiemployer Plan pursuant to the foregoing provisions of ERISA and the Code.  No proceedings have been instituted to terminate or appoint a trustee to administer any Plan.  No action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or threatened.  Except to the extent that any of the following, either individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the ability of the Borrowers to perform their obligations under this Agreement, the Company and its Subsidiaries do not maintain or contribute to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides benefits to retired employees or other former employees

(other than as required by Section 601 of ERISA) or have any liabilities under any Plan. Each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Company, any Subsidiary of the Company, or any ERISA Affiliate has at all times been operated in compliance with the provisions of Part 6 of subtitle B of Title 1 of ERISA and Section 4980B of the Code.

SECTION 3.06. ENVIRONMENTAL MATTERS. (a) Each of the Company and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws. There are no pending or, to any Borrower's Knowledge, threatened Environmental Claims against the Company or any of its Subsidiaries or any real property owned, leased or operated by the Company or any of its Subsidiaries (including any such claim arising out of the ownership, lease or operation by the Company or any of its Subsidiaries of any real property formerly owned, leased or operated by the Company or any of its Subsidiaries but no longer owned, leased or operated by the Company or any of its Subsidiaries). There are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Company or any of its Subsidiaries, or any real property owned, leased or operated by the Company or any of its Subsidiaries (including any real property formerly owned, leased or operated by the Company or any of its Subsidiaries but no longer owned, leased or operated by the Company or any of its Subsidiaries) or, to any Borrower's Knowledge, any property adjoining or adjacent to any such real property that could be reasonably expected (i) to form the basis of an Environmental Claim against the Company or any of its Subsidiaries or any real property owned, leased or operated by the Company or any of its Subsidiaries or (ii) to cause any real property owned, leased or operated by the Company or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such real property by the Company or any of its Subsidiaries under any applicable Environmental Law.

(b)    Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any real property owned, leased or operated by the Company or any of its Subsidiaries or, to any Borrower's Knowledge, any property adjoining or adjacent to any real property, where such generation, use, treatment, storage, transportation or Release has violated or could be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim.

(c)    Notwithstanding anything to the contrary in this Section 3.06, the representations and warranties made in this Section 3.06 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliances of the types described above could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.07. TAX RETURNS. The Company and its Subsidiaries have filed all United States federal income tax returns and all other material Tax returns that are required to be filed by them (the "Returns") and have paid all Taxes shown to be due and payable on such returns or pursuant to any assessment received by the Company or any of its Subsidiaries, except such Taxes, if any, as are being contested in good faith and as to which adequate reserves have been provided in accordance with GAAP and except to the extent any such requirement to file Returns has been stayed by the Bankruptcy Court. The Returns accurately reflect in all material