respects all liability for taxes of the Company and its Subsidiaries as a whole for the periods covered thereby. The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of taxes or other governmental charges are, in the opinion of the Company, adequate in all material respects. As of the Effective Date, there is no unstayed action, suit, proceeding, investigation, audit, or claim now pending or, to the best knowledge of the Borrowers, threatened by any authority regarding any United States federal or state income taxes relating to the Company or any of its Subsidiaries, except as could not reasonably be expected to result in a material liability of the Company and its Subsidiaries taken as a whole. As of the Effective Date, neither the Company nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of United States federal and state income taxes of the Company or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Company or any of its Subsidiaries not to be subject to the normally applicable statute of limitations, except as could not reasonably be expected to result in a material liability of the Company and its Subsidiaries taken as a whole. None of the Company or any of its Subsidiaries has incurred, or will incur, any material tax liability in connection with this Agreement and the transactions contemplated hereby.

SECTION 3.08. SUBSIDIARIES. On the date hereof, the Company does not have any Subsidiaries other than the Subsidiaries set forth on Schedule 3.08, which sets forth the name of, and the ownership interest of the Company in, each such Subsidiary.

SECTION 3.09. NOT AN INVESTMENT COMPANY. No Borrower is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.10. NO CONFLICTING REQUIREMENTS. No Borrower nor any Subsidiary is in violation of, or in default under, any provision of applicable law, rule or regulation, or of its certificate of incorporation or by-laws (or any equivalent organizational document) or of any agreement, judgment, injunction, order, decree or other instrument binding upon it or any of its properties, which violation or default could reasonably be expected to have consequences that would have a Material Adverse Effect.

SECTION 3.11. DISCLOSURE. The material furnished to the Administrative Agent, the Post-Petition Lenders and the Bankruptcy Court by, or on behalf and with the consent of, the Company and its Subsidiaries in connection with the negotiation, execution and delivery of this Agreement, and the transactions contemplated herein taken as a whole, and as supplemented from time to time prior to the date of this Agreement, does not, and all other written materials hereafter furnished by, or on behalf and with the consent of, any Borrower, will not, contain as of the date so furnished, any untrue statement of a material fact and does not as of the date hereof (and will not as of the date of any materials hereafter furnished) omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made (or are made), not misleading. The projections and any appraisals provided by the Company to the Administrative Agent and the Post-Petition Lenders and to the Bankruptcy Court in connection herewith were prepared in good faith on the basis of information and assumptions that the Company believed to be reasonable as of the date such material was provided, and the Company believes that such assumptions are reasonable as of the date hereof.

SECTION 3.12. FINANCING ORDERS. On the date of the making of any Post-Petition Loans or the issuance of any Post-Petition Letters of Credit hereunder, the Interim Order shall be in full force and effect and not stayed, amended, vacated, reversed or rescinded, except (i) to the extent superseded by the Final Order (in accordance with the requirements of the immediately succeeding sentence) and (ii) as amended in any manner which (x) is satisfactory to the Joint Lead Arrangers and the Required Lenders or (y) is not adverse to the Post-Petition Agents or the Post-Petition Lenders in the determination of the Joint Lead Arrangers. On the Additional Credit Date (or any earlier date upon which the Final Order is entered), the Final Order shall have been entered in form and substance satisfactory to the Joint Lead Arrangers and shall at all times thereafter be in full force and effect and not stayed, reversed, rescinded, vacated or otherwise modified without the consent of the Joint Lead Arrangers and the Required Lenders, except in a manner not adverse to the Post-Petition Agents or the Post-Petition Lenders in the determination of the Joint Lead Arrangers. Upon the maturity (whether by acceleration or otherwise) of any of the obligations of the Borrowers hereunder or under any of the other Post-Petition Loan Documents, the Post-Petition Lenders shall, subject to the provisions of Article VII, be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

SECTION 3.13. PROPERTIES; LIENS. (a) All real property owned or leased by the Company or any of its Subsidiaries as of the Effective Date, and the nature of the interest therein, is correctly set forth in Schedule 3.13. The Company and each of its Subsidiaries have good and marketable title to all real properties owned by them, including all real property reflected in Schedule 3.13 and in the balance sheets referred to in Section 3.03 (except as sold or otherwise disposed of since the date of such balance sheet (i) in the ordinary course of business, (ii) prior to the Effective Date in accordance with the Existing Credit Agreement or (iii) as permitted by the terms of this Agreement).

(b)     Except for Liens permitted pursuant to Section 6.01, there are no Liens on any assets of any of the Company or any of its Subsidiaries. None of the Company or any of its Subsidiaries are parties to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in the creation of a valid and enforceable Lien on any assets of the Company or any of its Subsidiaries (or otherwise result in a violation of this Agreement) other than the Liens granted to the Administrative Agent, the Collateral Agent, the Post-Petition Lenders, the Pre-Petition Agents and the Pre-Petition Lenders, as provided for in this Agreement.

SECTION 3.14. PUBLIC UTILITY HOLDINGS COMPANY. Neither the Company nor any of its Subsidiaries is a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holdings Company Act of 1935, as amended.

SECTION 3.15. LABOR RELATIONS. Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect. There is (i) no unfair labor practice complaint pending against the Company or any of its Subsidiaries or, to any Borrower's Knowledge, threatened against any of them, before the National Labor Relations Board, and no

grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Company or any of its Subsidiaries or, to any Borrower's Knowledge, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Company or any of its Subsidiaries or, to any Borrower's Knowledge, threatened against the Company or any of its Subsidiaries and (iii) no union representation question in existence with respect to the employees of the Company or any of its Subsidiaries, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.16. INDEBTEDNESS. Schedule 3.16 sets forth a true and complete list of all Indebtedness (including Guarantees) of the Company and its Subsidiaries as of the Effective Date (and after giving effect thereto), in each case showing the aggregate principal amount thereof as of the Effective Date and the name of the respective borrower and lender and any Borrower or any of its Subsidiaries which directly or indirectly guarantees such debt.

SECTION 3.17. INSURANCE. Schedule 3.17 sets forth a true and complete listing of all insurance maintained by the Company and its Subsidiaries as of the Effective Date, with the amounts insured (and any deductibles) set forth therein.

SECTION 3.18. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZATION; ETC. Schedule 3.18 attached hereto (as of the Effective Date or, if later, the date of the most recent update to such Schedule pursuant to Section 5.01(g) or 6.11) contains for each Borrower (i) the exact legal name of such Borrower, (ii) the type of organization of such Borrower, (iii) whether or not such Borrower is a registered organization, (iv) the jurisdiction of organization of such Borrower, (v) such Borrower's Location and (vi) the organizational identification number (if any) of such Borrower. To the extent that any Borrower does not have an organizational identification number on the date hereof and later obtains one, such Borrower shall promptly thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted pursuant to this Agreement and the Security Documents fully perfected and in full force and effect.

SECTION 3.19. PATENTS, LICENCES, FRANCHISES AND FORMULAS. Except as could not reasonably be expected to result in a Material Adverse Effect, each of the Company and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, service marks, trade names, domain names, copyrights, licenses, franchises, proprietary information (including but not limited to rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others.

SECTION 3.20. ACCOUNTS. The only checking, savings, deposit, securities and other accounts at any bank or other financial institution where cash or Temporary Cash Investments are deposited or maintained by the Borrowers are the Concentration Account, the Collection Accounts set forth on Schedule 3.20(a), the Disbursement Accounts set forth on Schedule 3.20(b), any such account constituting Trust Property set forth on Schedule 3.20(c),

and such other Collection Accounts and Disbursement Accounts as are opened in accordance with Section 6.15.

SECTION 3.21. SENIOR LIENS. The Borrower shall commence actions seeking to avoid any Senior Lien that is subject to avoidance promptly upon its determination that such Senior Lien is subject to avoidance, and will provide the Joint Lead Arrangers notice of such action.

SECTION 3.22. MATERIAL CONTRACTS. Set forth on Schedule 3.22 hereto is a complete and accurate list of all Material Contracts of the Borrower and each of its Subsidiaries as of the date hereof, showing the parties and subject matter thereof. Each such Material Contract has been duly authorized, executed and delivered by the Company or the respective Subsidiary party thereto and, to the best of each Borrower's Knowledge, has been duly authorized, executed and delivered by the other party or parties thereto, and, as of the date hereof, has not been amended or otherwise modified on or prior to the date hereof except as set forth on Schedule 3.22. As of the date hereof, neither the Company nor any of its Subsidiaries has received any written notices of termination of any of the Material Contracts from any party or parties thereto except as set forth on Schedule 3.22.

SECTION 3.23. SECURITY. (a) The Pledge Agreement, together with the Financing Orders, is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Creditors, a legal, valid and enforceable security interest in that portion of the Collateral covered in the Pledge Agreement, and the Pledge Agreement together with the Financing Orders shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the pledgors thereunder in such Collateral, in each case prior and superior in right to any other Person, subject only to the Carve-Out and any Senior Liens.

(b) The Security Agreement, together with the Financing Orders, is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Creditors, a legal, valid and enforceable security interest in that portion of the Collateral covered in the Security Agreement and the Security Agreement together with the Financing Orders shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Borrowers in such Collateral, in each case prior and superior in right to any other Person, other than with respect to Liens on the Collateral expressly permitted by Section 6.01 and the Security Agreement, subject only to the Carve-Out and any Senior Liens.

(c) Each Mortgage, together with the Financing Orders creates, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest and mortgage lien created on such Mortgaged Property may be subject to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Liens on the Mortgaged Property expressly permitted by Section 6.01 and the respective Mortgage related thereto), subject only to the Carve-Out and any Senior Liens.

ARTICLE IV

CONDITIONS

SECTION 4.01. EFFECTIVE DATE.   The obligations of the Post-Petition Lenders to make Post-Petition Loans and of the Issuing Lenders to issue Post-Petition Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)   The Administrative Agent (or its counsel) shall have received from each Borrower and each Post-Petition Lender party hereto either (i) a counterpart of this Agreement signed on behalf of such parties or (ii), written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)   The Administrative Agent shall have received a favorable written opinion (addressed to the Joint Lead Arrangers, the Post-Petition Agents and the Post-Petition Lenders and dated the Effective Date) of Kirkland & Ellis, special counsel for the Borrower, substantially in the form of Exhibit I.

(c)   The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Borrower and the authorization of the transactions contemplated hereby, all in form and substance satisfactory to the Joint Lead Arrangers and their counsel.

(d)   The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Company, confirming compliance with the conditions set forth in paragraphs (a), (b) and (c) of Section 4.02.

(e)   The Joint Lead Arrangers and the Post-Petition Agents shall have received all invoiced fees and other amounts due and payable on or prior to the Effective Date, including reimbursement or payment or all out-of-pocket expenses required to be reimbursed or paid by any Borrower hereunder or under any other Post-Petition Loan Documents.

(f)   As additional adequate protection, the Borrowers shall have paid (i) all invoiced costs, fees and expenses (including, without limitation, reasonable attorneys' and other professional fees) owing to the Pre-Petition Agents, and (ii) past-due interest, letters of credit fees and any other fees owed to the Pre-Petition Agents and the Pre-Petition Lenders under the Existing Credit Agreement.

(g)   The Administrative Agent shall have received counterparts of the Pledge Agreement signed on behalf of each Borrower, together with stock certificates or other instruments (if any) representing all the Equity Interests pledged thereunder and stock powers or other instruments of transfer, endorsed in blank, with respect to such stock certificates and other equity interests.

(h)    The Administrative Agent shall have received counterparts of the Security Agreement signed on behalf of each Borrower, together with:

(i)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Security Agreement; and

(ii)    results of a recent search of the Uniform Commercial Code (or equivalent) filings made with respect to the Borrowers in the jurisdictions contemplated in clause (i) above and in such other jurisdictions in which Collateral is located on the Effective Date which may be reasonably requested by the Administrative Agent, and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.01 and the Security Agreement or have been released.

(i)    On the Effective Date, the Administrative Agent shall have received the initial Borrowing Base Certificate meeting the requirements of Section 5.01(m), which Borrowing Base Certificate shall indicate (in a manner satisfactory to the Joint Lead Arrangers) that on such date the Borrowing Base Deficiency Amount shall not exceed $_____.

(j)    [On or prior to the Effective Date], (i) each Borrower, the Collateral Agent and the applicable Collection Banks shall have entered into one or more Control Agreements with respect to each Collection Account listed on Schedule 3.20(a) and designated thereon to be entered into on or prior to such date and, (ii) each Borrower, the Collateral Agent and the applicable Disbursement Banks shall have entered into one or more Control Agreements with the applicable Disbursement Banks with respect to each Disbursement Account listed on Schedule 3.20(b) and designated thereon to be entered into on or prior to such date.

(k)    All necessary governmental (domestic and foreign) and material third party approvals and/or consents in connection with this Agreement, the other transactions contemplated hereby and the granting of Liens under the Post-Petition Loan Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the transactions contemplated hereby.  On the Effective Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the transactions contemplated hereby.

(l)    On the Effective Date, there shall be no actions, suits or proceedings pending or, to any Borrower's Knowledge, threatened in writing with respect to this Agreement or any other Post-Petition Loan Document or that is unstayed and which the

Joint Lead Arrangers or the Required Lenders shall determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(m)   The Administrative Agent shall have received certificates of insurance complying with the requirements of Section 5.03 for the business and properties of the Company and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent and naming the Collateral Agent as an additional insured and/or as loss payee, and stating that such insurance shall not be canceled without at least 30 days' prior written notice by the insurer to the Collateral Agent.

(n)   The Interim Order shall have been entered by the Bankruptcy Court after notice given and a hearing conducted in accordance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and (ii) shall be in full force and effect and not have been stayed, reversed, vacated, rescinded or otherwise modified in a manner adverse (as determined by the Joint Lead Arrangers) to the Post-Petition Agents or the Post-Petition Lenders without the prior written consent of the Joint Lead Arrangers and the Required Lenders.

(o)   The Joint Lead Arrangers and the Post-Petition Lenders shall have received from (and shall have had the opportunity to discuss with) the Borrower a cash flow statement detailing the Borrowers' anticipated receipts and disbursements on a weekly basis for the 16-week period following the Effective Date (such statement, as the same may be updated in accordance with Section 5.01(f), the "Budget").

(p)   The Joint Lead Arrangers shall have received a schedule of Material Contracts setting forth (i) any material defaults (or notices received by any Borrower alleging a material default from the other party or parties thereto) in respect of any Borrower's or any of its Subsidiaries' performance or service obligations under a Material Contract or (ii) any other default under a Material Contract which could reasonably be expected to have a material adverse effect on the benefits of such Material Contract to the Company or any of its Subsidiaries.

(q)   The Borrowers shall have waived any claims to surcharge any Joint Lead Arranger's, any Post-Petition Agent's or any Post-Petition Lender's collateral under Section 506(c) of the Bankruptcy Code until the occurrence of an Event of Default, and the Joint Lead Arrangers shall have received evidence satisfactory to them such waiver.

(r)   The Company shall have executed an engagement letter with Alix Partners satisfactory to the Joint Lead Arrangers.

(s)   The Joint Lead Arrangers shall be satisfied with the Company's surety arrangements and the Company's arrangements with respect to its trade creditors.

(t)   (i) The Joint Lead Arrangers shall have received that certain appraisal of the fixed assets of the Company and its Subsidiaries from Hilco and such appraisal shall be in form and substance satisfactory to the Joint Lead Arrangers and (ii) JP Morgan Chase shall have completed its field examination of the Accounts and Inventory of the

Borrowers and the Joint Lead Arrangers shall be satisfied with the results of such field examination.

Notwithstanding the foregoing, the obligations of the Post-Petition Lenders to make Post-Petition Loans and of the Issuing Lenders to issue Post-Petition Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) on or prior to 12:00 noon, New York City time on or prior to the earlier of (x) May __, 2003 and (y) the 45th day following the entry of the Interim Order.

SECTION 4.02. EACH BORROWING. The obligation of each Post-Petition Lender to make a Post-Petition Loan on the occasion of any Borrowing (other than any conversion or continuation of a Borrowing), and of the Issuing Lenders to issue, renew, extend or amend so as to increase the stated amount of any Post-Petition Letter of Credit, is subject to the receipt of an appropriate Borrowing Request under Section 2.03 or request for issuance, renewal, extension or amendment of a Post-Petition Letter of Credit under Section 2.04, as the case may be, and to the satisfaction of each of the following conditions:

(a) The representations and warranties of the Borrowers set forth in this Agreement shall be true and correct in all material respects, and the representations and warranties of the Borrowers set forth in the other Post-Petition Loan Documents shall be true and correct in all material respects, on and as of the date of such Borrowing or the date of such issuance, amendment, renewal or extension of such Post-Petition Letter of Credit, as applicable.

(b) At the time of and immediately after giving effect to such Borrowing or such issuance, amendment, renewal or extension of such Post-Petition Letter of Credit, as applicable, no Default shall have occurred and be continuing.

(c) The Interim Order shall have been entered by the Bankruptcy Court and be in full force and effect and shall not have been modified or amended in any respect adverse (as determined by the Joint Lead Arrangers) to the Post-Petition Agents and the Post-Petition Lenders (other than (i) modifications thereto increasing the amount (not to exceed the total Commitments) available to the Borrowers pursuant to this Agreement (with such availability to remain subject to the requirements with respect thereto contained herein) and (ii) modifications acceptable to the Joint Lead Arrangers and the Required Lenders, PROVIDED that upon the date (the "Additional Credit Date") which is the earlier of (i) the date which is the 45th day following the Effective Date and (ii) the date of the making of any Post-Petition Loan the aggregate amount of which, when added to the sum of the principal amount of all Post-Petition Loans then outstanding plus the LC Exposure at such time would exceed the Authorized Facility Amount set forth in the Interim Order, the Joint Lead Arrangers and each of the Post-Petition Lender shall have received a filed copy of an order entered by the Bankruptcy Court in form and substance satisfactory to the Joint Lead Arrangers in the form of Exhibit J (the "Final Order") and at the time of any Post-Petition Loan occurring on and after the Additional Credit Date the Final Order shall be in full force and effect, and shall not have been modified or amended in any respect adverse (as determined by the Joint Lead Arrangers) to the Post-Petition Agents or the Post-Petition Lenders (other than modifications acceptable to the Joint

Lead Arranger and the Required Lenders). Additionally, if either Financing Order is the subject of a pending appeal in any respect, neither the making of the Post-Petition Loans nor the performance by the Borrowers of their obligations under any of the Post-Petition Loan Documents (including providing the Liens and administrative priorities described herein and therein) shall be the subject of a presently effective stay pending appeal.

(d)     The Borrowers shall have paid to the Joint Lead Arrangers the then unpaid balance of all accrued and unpaid fees then due and payable on or prior to the Additional Credit Date and shall have paid to the Pre-Petition Lenders and the Pre-Petition Agents, as applicable, all invoiced costs, fees and expenses (including, without limitation, attorneys and other professional fees) owing to the Pre-Petition Agents and past due interest, letter of credit fees and any other fees owed to the Pre-Petition Agents and the Pre-Petition Lenders under the Existing Credit Agreement.

(e)     The Administrative Agent shall have received a Borrowing Base Certificate dated no more than twelve days prior to each Borrowing or the issuance of each Post-Petition Letter of Credit, as the case may be.

(f)     At the time of the making of a request for a Borrowing consisting of Post-Petition Loans (but not prior to the issuance of a Post-Petition Letter of Credit), (x) the Borrowers shall have insufficient Cash Collateral (other than Restricted Cash) to make payments described in the Budget as being made at, or within three Business Days after, such time and (y) the principal amount of Borrowings requested at such time shall not exceed the amount by which such Cash Collateral is insufficient to make the payments described in preceding clause (x).

Each Borrowing (other than any conversion or continuation of such Borrowing) and each such issuance, amendment, renewal or extension of a Post-Petition Letter of Credit shall constitute a representation and warranty by each Borrower on the date thereof as to the matters specified in this Section 4.02.

SECTION 4.03.  USE OF CASH COLLATERAL.  The Borrowers' use of the Cash Collateral on any date is subject to the satisfaction of each of the following conditions precedent on such date:

(a)     (i) No Default under paragraph (a) or (b) of Section 7 shall have occurred and be continuing, (ii) the total Commitments shall not have been terminated by the Post-Petition Lenders and (iii) the Post-Petition Lenders shall not have accelerated the Post-Petition Loans in accordance with this Agreement.

(b)     Each of the conditions set forth in Section 4.02(c) shall have been satisfied.

(c)     The Borrowers shall have paid to the Joint Lead Arrangers the then unpaid balance of all accrued and unpaid fees then due and payable pursuant to this Agreement on or prior to any use of the Cash Collateral.

(d)    The Administrative Agent shall have received the timely delivery of the most recent Borrowing Base Certificate dated no more than twelve calendar days prior to the granting of access to the Cash Collateral hereunder.

(e)    Each proposed use of Cash Collateral does not exceed the amounts of the payments described in the Budget as being made at, or within three Business Days after, such time.

(f)    After giving effect to the use of Cash Collateral on such date, there shall not be a Borrowing Base Deficiency, PROVIDED that if on such date the amount of the total Exposure equals $0 (calculated exclusive of the stated amount of any Letters of Credit that have been cash collateralized in accordance with Section 2.04(j)), then after giving effect to the use of Cash Collateral on such date, the aggregate amount of Cash Collateral of the Borrowers remaining in the Concentration Account shall equal or exceed the Borrowing Base Deficiency Amount.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Post-Petition Loan and all fees payable hereunder shall have been paid in full and all Post-Petition Letters of Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, each Borrower covenants and agrees with the Post-Petition Lenders that:

SECTION 5.01. INFORMATION.    The Company will deliver to the Administrative Agent (who will promptly make available to each of the Post-Petition Lenders):

(a)    commencing with the Company's fiscal year ending closest to December 31, 2002, as soon as available and in any event within 90 days after the end of each fiscal year of the Company (or by July 31, 2003 with respect to the financial statements to be delivered pursuant to this paragraph (a) in respect of the Company's fiscal year ending December 29, 2002), a consolidated balance sheet of the Company and its Consolidated Subsidiaries as of the end of such fiscal year and the related consolidated statements of earnings and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by Deloitte & Touche or other independent public accountants of nationally recognized standing, which certification shall not be subject to any qualification or exception (other than with respect to the Cases or a "going concern" qualification);

(b)    commencing with the Company's fiscal quarter ending closest to March 31, 2003, as soon as available and in any event within 45 days after the end of each fiscal quarter of the Company (or by July 31, 2003 in the case of the financial statements to be delivered pursuant to this paragraph (b) in respect of the Company's fiscal quarter ending closest to March 31, 2003), (i) a consolidated balance sheet of the Company and its Consolidated Subsidiaries as of the end of such quarter setting forth in

comparative form the figures for the corresponding fiscal quarter of the Borrower's previous fiscal year and (ii) the related consolidated statement of earnings and cash flows of the Company and its Consolidated Subsidiaries for such quarter and for the portion of the Company's fiscal year ended at the end of such quarter setting forth in comparative form the figures for the related periods in the previous fiscal year, all certified (subject to normal year-end adjustments) as to fairness of presentation, generally accepted accounting principles (except for the omission of substantially all footnote disclosure as permitted by Regulation S-X promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended) and consistency by the chief financial officer or the chief accounting officer of the Company;

(c)     as soon as available and in any event within 10 days after the end of each fiscal month of the Company, (i) a consolidated balance sheet of the Company and its Consolidated Subsidiaries as of the end of such month setting forth in comparative form the figures for the corresponding fiscal month of the Company's previous fiscal year and (ii) the related consolidated statement of earnings and cash flows of the Company and its Consolidated Subsidiaries for such month and for the portion of the Company's fiscal year ended at the end of such month setting forth in comparative form the figures for the related periods in the previous fiscal year, all certified (subject to normal year-end adjustments) as to fairness of presentation, generally accepted accounting principles (except for the omission of substantially all footnote disclosure as permitted by Regulation S-X promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended) and consistency by the chief financial officer or the chief accounting officer of the Company;

(d)    (I)    simultaneously with the delivery of each set of financial statements referred to in paragraphs (a) and (b) above, a certificate of the chief financial officer or the chief accounting officer (i) setting forth in reasonable detail the calculations required to establish whether the Borrowers were in compliance with the requirements of Sections 6.01, 6.02, 6.03, 6.06, 6.08 and 6.09 on the date of such financial statements, (ii) stating whether any Default exists on the date of such certificate and, if any Default then exists, setting forth the details thereof and the action which the Borrowers are taking or proposes to take with respect thereto and (iii) setting forth (x) each Plan that has an Unfunded Liability (other than any such Plan which was previously disclosed on the Borrower's most recently filed Form 10-K) and (y) any material increase in the Unfunded Liabilities of any Plan previously disclosed on the Borrower's most recently filed Form 10-K and any Plan disclosed by the Borrower pursuant to preceding clause (x) and (II) simultaneously with the delivery of the financial statements referred to in paragraph (c) above, a certificate of the chief financial officer or the chief accounting officer setting forth in reasonable detail the calculations to establish whether the Borrowers were in compliance with the requirements of Section 6.09;

(e)    simultaneously with the delivery of each set of financial statements referred to in paragraph (a) above, a statement of the firm of independent public accountants that audited such statements, which audit shall be in accordance with generally accepted auditing standards, (i) stating whether anything has come to their attention to cause them to believe that any Default existed on the date of such statements and

(ii) confirming the calculations establishing whether the Borrower was in compliance with Sections 6.08 and 6.09 set forth in the officer's certificate delivered simultaneously therewith pursuant to paragraph (d) above;

(f)    (I) on the first or second Business Day of each week, [an update to the then current Budget in form and substance satisfactory to the Joint Lead Arrangers, each of which updates shall include (A) a variance report reflecting on a "summary line-item" basis the variance of actual cash receipts and disbursements for the preceding week and for the portion of the fiscal year ended at the end of such preceding week both on a numerical and percentage basis against the cash receipts and disbursements reflected in the Budget (x) for the preceding week and (y) for the portion of the fiscal year ended at the end of such preceding week and (B) information required to be included therein (as contemplated in Section 4.01(o) for the then succeeding 16-week period (i.e., so that the Budget is revised to cover the immediately succeeding 16-week period),] (II) within ___ days of each Asset Disposition generating gross proceeds in excess of $3,000,000, an update to each of the Budget and the Forecast reflecting the effects of such Asset Disposition, (III) on or prior to 2:00 p.m. (New York time) on each Business Day a daily flash report in form and substance substantially similar to those delivered to the Joint Lead Arrangers prior to the Effective Date and (IV) on the first or second Business Day of each week, updates to the consolidated statements of earnings and cash flows required to be delivered pursuant to Section 5.01(c) in form satisfactory to the Joint Lead Arrangers;

(g)    simultaneously with the delivery of each set of financial statements referred to in paragraphs (a), (b) and (c) above, a certificate either (i) certifying that no changes are required to be made to Schedules 3.08 and 3.18, Annexes A and C of the Security Agreement or Annexes A and G of the Pledge Agreement, in each case so as to make the information set forth therein accurate and complete as of the date of such certificate or (ii) to the extent such information is no longer accurate and complete as of such date, (x) setting forth in reasonable detail all information necessary to make all such Schedules and Annexes accurate and complete (at which time such Schedules and/or such Annexes, as the case may be, shall be deemed to be modified to reflect such information) and (y) certifying that all action required to be taken pursuant to the Security Agreement and the Pledge Agreement as a consequence of the changes giving rise to the update of said Schedules and/or Annexes as provided above has been taken;

(h)    within five Business Days after the obtaining of any Borrower's Knowledge of any Default, a certificate of the chief financial officer, treasurer or the chief accounting officer of the Company setting forth the details thereof and the action which the Borrowers are taking or propose to take with respect thereto;

(i)    promptly upon the mailing thereof to the shareholders of the Company generally, copies of all financial statements, reports and proxy statements so mailed;

(j)    promptly upon the filing thereof, copies of all registration statements (other than the exhibits thereto and any registration statements on Form S-8 or its equiv-

alent) and reports on Forms 10-K, 10-Q and 8-K (or their equivalents) that the Company shall have filed with the Securities and Exchange Commission;

(k)     if and when the Company, any Subsidiary or any ERISA Affiliate (i) gives or is required to give notice to the PBGC of any Reportable Event (other than with respect to the Cases), or knows that the plan administrator of any Plan has given or is required to give notice of any such Reportable Event, a copy of the notice of such Reportable Event given or required to be given to the PBGC; (ii) receives notice of complete or partial withdrawal liability under Title IV of ERISA or notice that any Multiemployer Plan is in reorganization, is insolvent or has been terminated, a copy of such notice; (iii) receives notice from the PBGC under Title IV of ERISA of an intent to terminate, impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or appoint a trustee to administer any Plan, a copy of such notice; (iv) applies for a waiver of the minimum funding standing under Section 412 of the Internal Revenue Code, a copy of such application; (v) gives notice of intent to terminate any Plan under Section 4041(c) of ERISA, a copy of such notice and other information filed with the PBGC; (vi) gives notice of withdrawal from any Plan pursuant to Section 4063 of ERISA, a copy of such notice; (vii) receives notice that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan or Multiemployer Plan, a copy of such notice; (viii) incurs any liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan or Multiemployer Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409, 502(i) or 502(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; (ix) incurs any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan; or (x) fails to make any payment or contribution to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement, or makes any amendment to any Plan or Benefit Arrangement, which has resulted or could result in the imposition of a Lien or the posting of a bond or other security, a certificate of the chief financial officer, treasurer or the chief accounting officer of the Company setting forth details as to such occurrence and action, if any, which the Company, the applicable Subsidiary or applicable ERISA Affiliate is required or proposes to take;

(l)     promptly, and in any event within ___ Business Days, after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any of the Company or any of its Subsidiaries with the Bankruptcy Court in the Cases, or distributed by or on behalf of any of the Company or any of its Subsidiaries to any official committee appointed in the Cases, providing copies of same to counsel for the Joint Lead Arrangers;

(m)     (i) on the Effective Date prepared as of [May] __, 2003, (ii) not later than 3:00 p.m. (New York City time) on the third Business Day of each week thereafter, prepared as of the close of business on the last day of the immediately preceding one week period, (iii) not later than 3:00 p.m. (New York City time) on the 10th day follow-

ing the immediately preceding fiscal month ended, prepared as of the close of business on the last day of such fiscal month, (iv) as soon as reasonably available but in no event later than three Business Days after any request by the Joint Lead Arrangers at any other time when the Joint Lead Arrangers reasonably believe that the last Borrowing Base Certificate is materially inaccurate, prepared as of the date of the then existing Borrowing Base Certificate delivered pursuant to clause (ii) or clause (iii), as the case may be, (v) at the time of any Asset Disposition (other than sales of assets in the ordinary course of business or sales of assets that are not included in calculating the Borrowing Base or have a Net Book Value of less than $500,000), prepared as of the date of the respective Asset Disposition (after giving effect thereto), and (vi) at any other time requested by the Joint Lead Arrangers during the existence and continuance of an Event of Default, prepared as of a date designated by the Joint Lead Arrangers to the Company, a completed Borrowing Base Certificate in the form of Exhibit K (each, a "Borrowing Base Certificate"), each of which Borrowing Base Certificates shall be certified by a Financial Officer of the Company. In addition, each Borrowing Base Certificate shall have attached to it such additional schedules and supporting documentation and/or other information as the Joint Lead Arrangers may reasonable request;

(n)    promptly, and in any event within ten Business Days, after (i) the Borrower or any of its Subsidiaries obtains knowledge of (x) a material default (or shall have received notice alleging a material default from the other party or parties thereto) in respect of the Company's or any of its Subsidiaries' performance or service obligations under a Material Contract or (y) any other default thereunder which could reasonably be expected to have a material adverse effect on the benefits of such Material Contract to the Borrower or any of its Subsidiaries, (ii) any Material Contract is terminated or amended in a manner that is materially adverse to the Company or any of its Subsidiaries, or (iii) any new Material Contract is entered into by the Company or any of its Subsidiaries, a written statement describing such event;

(o)    on or prior to June 30, 2003, (i) an 18-month cash flow forecast for the Company and its Subsidiaries in form and substance satisfactory to the Joint Lead Arrangers (such forecast as same may be updated from time to time in accordance with Section 5.01(f), the "Forecast") and (ii) a written program detailing anticipated Asset Dispositions to be consummated by the Company and its Subsidiaries during the 18-month period following the Effective Date, which program shall be in form and substance satisfactory to the Joint Lead Arrangers;

(p)    promptly after any Borrower's Knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)    any pending or threatened Environmental Claim against the Company or any of its Subsidiaries or any real property owned, leased or operated by the Company or any of its Subsidiaries;

(ii)     any condition or occurrence on or arising from any real property owned, leased or operated by the Company or any of its Subsidiaries that (a) results in noncompliance by the Company or any of its Subsidiaries with any applicable Environmental Law or (b) could reasonably be expected to form the basis of an Environmental Claim against the Company or any of its Subsidiaries or any such real property;

(iii)     any condition or occurrence on any real property owned, leased or operated by the Company or any of its Subsidiaries that could reasonably be expected to cause such real property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Company or any of its Subsidiaries of such real property under any Environmental Law; and

(iv)     the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any real property owned, leased or operated by the Company or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; PROVIDED that in any event the Company shall deliver to each Post-Petition Lender all notices received by the Company or any of its Subsidiaries from any government or governmental agency under, or pursuant to, CERCLA which identify the Company or any of its Subsidiaries as potentially responsible parties for remediation costs or which otherwise notify the Company or any of its Subsidiaries of potential liability under CERCLA;

all such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Company's or such Subsidiary's response thereto;

(q)     within     Business Days following the sale of any Perishable Inventory generating gross cash proceeds in excess of $_____, written notice of such sale detailing the Inventory the subject thereof and the aggregate gross cash proceeds received by the Company or its Subsidiaries in connection therewith;

(r)     simultaneously with the delivery of each update to the Budget pursuant to Section 5.01(f), or written estimate of the Borrowers' incurred and unpaid professional fees and disbursements; and

(s)     from time to time such additional information regarding the condition (financial or otherwise), business or affairs of the Borrower as the Administrative Agent, at the request of any Post-Petition Lender, may reasonably request.

SECTION 5.02. PAYMENT OF OBLIGATIONS. Each Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, at or before maturity, all its obligations and liabilities arising after the Filing Date, except where the same (i) may be contested in good faith by appropriate proceedings or (ii) could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will maintain, and will cause each of its Subsidiaries to maintain, in accordance with GAAP, appropriate reserves for the

accrual of any and all of the same. Each Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, on a timely basis all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case arising after the Filing Date, and all lawful claims arising after the Filing Date which, if unpaid, might become a lien or charge upon any properties of any Borrower or any of its Subsidiaries; PROVIDED that no Borrower nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.03. MAINTENANCE OF PROPERTY; INSURANCE.    (a) The Company will keep, and will cause each of its Subsidiaries to keep, all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)     The Company will, and will cause each of its Subsidiaries to, maintain (either in the name of the Company or in such Subsidiary's own name) with financially sound and responsible insurance companies, insurance on all their respective properties in at least such amounts and against at least such risks (and with such risk retention) as are usually insured against in the same general areas by companies of established repute engaged in the same or a similar business; and will furnish to the Administrative Agent (for distribution to the Post-Petition Lenders), together with each set of financial statements delivered pursuant to Section 5.01(b) and at any other time as Administrative Agent or the Required Lenders shall request, information presented in reasonable detail as to the insurance so carried.

(c)     The Company will, and will cause each of its Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Company and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be cancelled without at least 30 days' prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the Secured Creditors, (iv) [with respect to Mortgaged Properties,] shall contain the standard non-contributing mortgage clause endorsement in favor of the Collateral Agent with respect to hazard liability insurance, (v) shall, except in the case of public liability insurance, provide that any losses shall be payable notwithstanding (A) any act or neglect of the Company or any of its Subsidiaries, (B) the occupation or use of the properties for purposes more hazardous than those permitted by the terms of the respective policy if such coverage is obtainable at commercially reasonable rates and is of the kind from time to time customarily insured against by Persons owning or using similar property and in such amounts as are customary, (C) with respect to Mortgaged Properties, any foreclosure or other proceeding relating to such properties or (D) any change in the title to or ownership or possession of the insured properties and (vi) shall be deposited with the Collateral Agent.

(d)    If the Company or any of its Subsidiaries shall fail to insure its property and endorse the same to the Collateral Agent in accordance with this Section 5.03, or if the Company or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Collateral Agent shall have the right (but shall be under no obligation), upon 10 Business Days' prior notice to the Company (or such shorter period as may be necessary under the circumstances so that any then existing insurance does not lapse or terminate), to procure such insurance and the Borrowers jointly and severally agree to reimburse the Collateral Agent for all reasonable costs and expenses of procuring such insurance.

SECTION 5.04. MAINTENANCE OF EXISTENCE.    The Company will preserve, renew and keep in full force and effect its, and, except as permitted by Section 6.02, will cause each Subsidiary to preserve, renew and keep in full force and effect its respective corporate (or other organizational) existence and its and their respective rights, privileges and franchises necessary or desirable in the normal conduct of business.

SECTION 5.05. COMPLIANCE WITH LAWS. The Company will comply, and cause each of its Subsidiaries to comply, in all material respects with all applicable laws, ordinances, rules, regulations, and requirements of Governmental Authorities (including, without limitation, ERISA and the rules and regulations thereunder) except where (i) the necessity of compliance therewith or the resultant penalty, fine or cost for non-compliance is contested in good faith by appropriate proceedings and the Company or the respective Subsidiary has maintained adequate reserves as required by GAAP with respect thereto or (ii) the failure to do so would not have a Material Adverse Effect.

SECTION 5.06. INSPECTION OF PROPERTY, BOOKS AND RECORDS. (a) The Company will keep, and will cause each of its Subsidiaries to keep, proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and will permit, and will cause each of its Subsidiaries to permit, representatives of either Joint Lead Arranger (at the Borrowers' expense) or any Post-Petition Lender (at such Post-Petition Lender's expense) to visit and inspect any of their respective properties, to examine and make abstracts from any of their respective books and records and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants, all at such reasonable times and as often as may reasonably be requested; PROVIDED that this Section shall not be construed to require any Borrower to waive or cause to be waived any attorney-client privilege applicable to information in such Borrower's or any of its Subsidiaries' possession. Each Post-Petition Lender agrees to maintain in confidence (in accordance with the provisions of Section 9.12) any information clearly identified in writing by the Company or any Subsidiary as trade secrets or proprietary information which such Post-Petition Lender may obtain as a result of the inspections, examinations and discussions undertaken pursuant to this Section.

(b)    At dates to be mutually agreed upon between the Joint Lead Arrangers and the Company, the Company will, at the request of the Joint Lead Arrangers or the Required Lenders, conduct [quarterly] [monthly] status conference calls with all of the Post-Petition Lenders pursuant to which the Company will update the Post-Petition Lenders as to important operational and financial developments affecting the Company and its Subsidiaries.

(c)    The Borrowers will permit any representatives designated by the Joint Lead Arrangers (including any consultants, accountants, lawyers and appraisers retained by the Joint Lead Arrangers) to conduct evaluations, examinations and appraisals of the Borrowers' computation of the Borrowing Base and the assets included in the Borrowing Base and such other assets and properties of the Company or its Subsidiaries as the Joint Lead Arrangers may require, all at such reasonable times and as often as reasonably requested; it being understood and agreed that, without limiting the effect of the provisions contained above in this sentence, the Company shall cause to be delivered to the Joint Lead Arrangers within __ Business Days following the last day of each fiscal quarter of the Borrower appraisals and collateral reviews of the Inventory and Accounts of the Borrowers, which appraisals and reviews shall be prepared by such appraisers and/or other professionals as are acceptable to the Joint Lead Arrangers. The Borrowers shall pay the reasonable fees (including reasonable and customary internally allocated fees and expenses of employees of the Joint Lead Arrangers as to which invoices have been furnished) and expenses of any such representatives retained by the Joint Lead Arrangers as to which invoices have been furnished to conduct any such evaluation or appraisal, including the reasonable fees and expenses associated with collateral monitoring services performed by the "Collateral Agent Services Group" of the Collateral Agent. To the extent required by the Joint Lead Arrangers as a result of any such evaluation, examination appraisal or monitoring, the Borrowers also agree to modify or adjust the computation of the Borrowing Base (which may include maintaining additional reserves, reducing the advance rates or reducing the eligibility criteria for the component definitions of the Borrowing Base).

(d)    In the event that historical accounting practices, systems or reserves relating to the components of the Borrowing Base are modified in a manner that is adverse to the Lenders (as determined by the Joint Lead Arrangers), the Borrowers agree to maintain such additional reserves (for purposes of computing the Borrowing Base) in respect to the components of the Borrowing Base and make such other adjustments to its methodology for including the components of the Borrowing Base as the Joint Lead Arrangers shall require based upon such modifications.

SECTION 5.07.  USE OF PROCEEDS. (a) The Cash Collateral and all proceeds of the Post-Petition Loans will be used (i) to fund working capital, Capital Expenditures and general corporate requirements of the Borrowers consistent with the Budget (subject to variances permitted under the Financing Order) (including to pay any interest, fees and expenses due under the Post-Petition Loan Documents), (ii) to make adequate protection payments (including, without limitation, in respect of interest, costs, fees and expenses) to the Pre-Petition Agents and the Pre-Petition Lenders and (iii) to pay professional fees incurred by the Post-Petition Agents, the Post-Petition Lenders and the Pre-Petition Agents.

(b)    No portion of any Post-Petition Loans (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Post-Petition Loan nor the use of the proceeds thereof nor the extension of any other credit pursuant to this Agreement will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

(c)     No portion of any Post-Petition Loans (or the proceeds thereof) will be used, directly or indirectly, to finance any adversary action, suit, arbitration, proceeding or other litigation of any type relating to, or in connection with, the Existing Credit Agreement, any other Pre-Petition Loan Document or any other document or instrument entered into in connection therewith, including, without limitation, any challenge to the claims of the validity, perfection, priority or enforceability of any of the liens securing such claim or payment made thereunder, PROVIDED, HOWEVER, that any statutory committee appointed in the Cases shall not be prevented from undertaking a normal and customary investigation of any liens and security interests.

(d)     No portion of any Post-Petition Loans (or the proceeds thereof) will be used, directly or indirectly, to finance any adversary action, suit, arbitration, proceeding or other litigation of any type relating to, or in connection with, this Agreement, any other Post-Petition Loan Document or any other document or instrument entered into in connection herewith or therewith, including, without limitation, any challenge to the claims of the validity, perfection, priority or enforceability of any of the liens securing such claim or payment made hereunder or thereunder.

SECTION 5.08.  FURTHER ASSURANCES.  (a) Each Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to grant, confirm, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.  Such security interests and Liens shall be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance satisfactory to the Collateral Agent, and each Borrower shall deliver or cause to be delivered to the Post-Petition Lenders all such instruments and documents (including legal opinions and lien searches) as the Collateral Agent shall reasonably request to evidence compliance with this paragraph (a).  Each Borrower shall provide from time to time such evidence as the Collateral Agent shall reasonably request as to the perfection and priority status of each such security interest.

(b)     If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any real property of any Borrower constituting Collateral, Borrowers will, at their own expense and within 60 days of any such determination, provide to the Joint Lead Arrangers appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance satisfactory to the Joint Lead Arrangers; it being understood and agreed that with respect to the real property the subject thereof, the appraisals prepared by Hilco pursuant to the Hilco Engagement Letter satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989 as in effect on the Effective Date (although nothing in this clause shall limit the right of the Administrative Agent and the Required Lenders to obtain appraisals with respect to any real property of the Company and its Subsidiaries (including the real property

covered by the Hilco Engagement Letter) as otherwise contemplated in this paragraph (b) that may in the future be required by applicable law or regulation.

SECTION 5.09.  WAIVER OF CLAIMS.  Except as otherwise provided in the Financing Orders, each Borrower hereby waives any right to investigate, commence or prosecute any defense, action, objection or counterclaim with respect to the claims, liens or security interests of the Pre-Petition Lenders, the Pre-Petition Agents, the Post-Petition Lenders and/or the Post-Petition Agents.

SECTION 5.10.  SUBSIDIARY PROCEEDINGS.  If a decision is made by any Borrower to cause any of its Subsidiaries to commence a voluntary proceeding under the Bankruptcy Code, such Borrower will cause such proceeding to be commenced before the Bankruptcy Court and in such event such Borrower shall cause such Subsidiary to become a "Borrower" hereunder, and to pledge such Subsidiary's assets in support of the Post-Petition Obligations pursuant to appropriate amendments to this Agreement and other Post-Petition Loan Documents and the approval of the Bankruptcy Court (which shall be satisfactory to the Joint Lead Arrangers).

SECTION 5.11.  COMPLIANCE WITH ENVIRONMENTAL LAWS.  (a)  (i) The Company will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of its real property now or hereafter owned, leased or operated by the Company or any of its Subsidiaries, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such real property free and clear of any Liens imposed pursuant to such Environmental Laws and (ii) neither the Company nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any real property now or hereafter owned, leased or operated by the Company or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such real property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of any such real properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of the Company or any of its Subsidiaries unless the failure to comply with the requirements specified in clause (i) or (ii) above, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)  (i)  After the receipt by the Administrative Agent or any Post-Petition Lender of any notice of the type described in Section 5.01(p), (ii) at any time that the Company or any of its Subsidiaries are not in compliance with Section 5.11(a) or (iii) in the event that the Administrative Agent or the Post-Petition Lenders have exercised any of the remedies pursuant to the last paragraph of Article VII or any Financing Order, the Borrower will (in each case) provide, at the sole expense of the Borrowers and at the request of the Joint Lead Arrangers, an environmental site assessment report concerning (x) in the case of preceding clauses (i) and (ii), the real property owned, leased or operated by the Company or any of its Subsidiaries that is the subject of any notice of the type described in Section 5.01(p) or any noncompliance of the type described in Section 5.11(a), as the case may be, and (y) in the case of preceding clause (iii), any real property owned, leased or operated by the Company or any of its Subsidiaries, in each case

prepared by an environmental consulting firm approved by the Joint Lead Arrangers, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action in connection with such Hazardous Materials on such real property. If the Borrowers fail to provide the same within 30 days after such request was made, the Joint Lead Arranger may order the same, the cost of which shall be borne by the Borrowers, and the Borrowers shall grant and hereby grant to the Joint Lead Arrangers and the Post-Petition Lenders and their respective agents access to such real property and specifically grant the Joint Lead Arrangers and the Post-Petition Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Company, all at the sole expense of the Borrowers.

(c)    In addition, the Borrowers hereby grant the Joint Lead Arrangers access to and the right to inspect all reports, audit and other internal information of the Borrower's relating to environmental matters on reasonable notice, and third party verification of matters relating to compliance with Environmental Laws and regulations requested by the Joint Lead Arrangers at any time and from time to time.

SECTION 5.12.  MORTGAGES.  On or prior to 60 days following the Effective Date, the Company shall have delivered or caused to be delivered to the Administrative Agent:

(i)    fully executed counterparts of Mortgages, which Mortgages shall cover the real property owned or leased by Borrowers and listed on Schedule 5.12, together with evidence that counterparts of each of the Mortgages have been delivered to the title company insuring the Lien of the Mortgages for recording in all places to the extent necessary or desirable, in the judgment of the Collateral Agent, to effectively create a valid and enforceable first priority and subsisting mortgage lien (subject to Permitted Encumbrances relating thereto, the Carve-Out and Senior Liens) on the Mortgaged Properties in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors;

(ii)    a fully paid valid Mortgage Policy relating to each Mortgage on a Mortgaged Property issued by a title insurance company reasonably satisfactory to the Collateral Agent and in amounts satisfactory to the Collateral Agent and assuring the Collateral Agent that each of the Mortgages on such Mortgaged Properties is a valid and enforceable first priority mortgage lien on such Mortgaged Properties, free and clear of all Liens, defects and encumbrances except Permitted Encumbrances, and each such Mortgage Policy shall otherwise be in form and substance reasonably satisfactory to the Collateral Agent and shall include, as appropriate, an endorsement for future advances under this Agreement and for any other matter that the Collateral Agent in its discretion may reasonably request, shall not include an exception for mechanics' liens, and shall provide for affirmative insurance and such reinsurance as the Collateral Agent in its discretion may reasonably request;

(iii)    an American Land Title Association/American Congress on Surveying and Mapping form survey relating to each Mortgaged Property for which all necessary fees have been paid and which is dated a recent date satisfactory to the Joint Lead Arrangers, certified to Collateral Agent and the issuer of the title insurance policy in a

manner satisfactory to the Collateral Agent by a land surveyor duly registered and licensed in the State in which such Mortgaged Property is located and acceptable to the Collateral Agent, and in any event, sufficient for the title insurance company to remove all survey exceptions from each Mortgage Policy and issue a survey endorsement thereto, and shows all buildings and other improvements, any offsite improvements, the location of any easements, parking spaces, rights of way, building setback lines and other dimensional regulations and the absence of encroachments, either by such improvements or on to such property, and other defects, other than encroachments and other defects acceptable to the Collateral Agent;

(iv)    a recent flood certificate, in form and substance satisfactory to the Collateral Agent, covering each Mortgaged Property and stating among other information, whether or not such Mortgaged Property is located in a flood zone;

(v)    local counsel opinions for the Borrowers in States in which the Mortgaged Property is located with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance satisfactory to the Collateral Agent; and

(vi)    estoppel certificates executed by all tenants of the Mortgaged Properties and such other consents, agreements and confirmations of lessors and third parties have been delivered as the Collateral Agent may deem necessary or desirable.

SECTION 5.13. CHIEF RESTRUCTURING OFFICER. On or prior to __ days after the Effective Date, the Bankruptcy Court shall have approved the Company's engagement of Mr. Ted Stenger as the initial Chief Restructuring Officer of the Company as contemplated in the Engagement Letter described in Section 4.01(r), and the Joint Lead Arrangers shall have received evidence satisfactory to them of such approval.

ARTICLE VI

NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Post-Petition Loan and all fees payable hereunder have been paid in full and all Post-Petition Letters of Credit have expired or terminated and all LC Disbursements have been reimbursed, the Borrowers covenant and agree with the Post-Petition Lenders that:

SECTION 6.01. LIENS. The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply, or permit any of their Subsidiaries to apply, to Bankruptcy Court for authority to) create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrowers or any of their respective Subsidiaries, whether now owned or hereafter acquired, or enter into any sale-leaseback transaction, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to any Borrower or any Subsidiary thereof), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute, except:

(a)    Liens created under the Post-Petition Loan Documents;

(b)    Liens which were existing on the Filing Date and described in Schedule 6.01(b) hereto (without giving effect to any extension or renewal thereof and then only to the extent of the Indebtedness or obligations secured thereby on the Filing Date, (the "Permitted Existing Liens"), and Pre-Petition Lender Replacement Liens;

(c)    Liens arising in the ordinary course of its business which (i) are statutory Liens and (ii) either (x) do not in the aggregate materially detract from the value of the assets of any Borrower or any Subsidiary thereof or materially impair the use thereof in the operation of its business or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien;

(d)    Liens in favor of any Borrower;

(e)    Liens (on the property subject to the respective capital lease) securing Capital Lease Obligations incurred by any Borrower to the extent such Capital Lease Obligations are permitted under Section 6.03(a)(iv);

(f)    (i) easements, rights-of-way, restrictions, minor defects or irregularities in title and other similar charges or encumbrances and (ii) Permitted Encumbrances, in each case not interfering in any material respect with (x) the ordinary conduct of the business of any Borrower or any Subsidiary thereof or (y) the ability of the Collateral Agent to access the Collateral;

(g)    Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default pursuant to clause (j) of Article VII so long as no cash or property is deposited or delivered to secure the respective judgment or award;

(h)    Liens (other than any Lien imposed by ERISA) incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations incurred in the ordinary course of business (exclusive of obligations in respect of the payment of borrowed money); PROVIDED that any consensual Liens as described above shall not be secured at any time by cash, Temporary Cash Investments and/or other property with an aggregate fair market value in excess of $[5,000,000];

(i)    Liens in favor of trade creditors of the Borrowers in accordance with the Financing Orders;

(j)    any Lien on any asset securing Indebtedness incurred or assumed after the date hereof for the purpose of financing all or any part of the cost of acquiring or constructing such asset (other than any Lien on Inventory), PROVIDED that such Lien attaches to such asset concurrently with or within 180 days after the acquisition or completion of construction thereof and does not extend to any other asset or property of

any Borrower or any of its Subsidiaries and so long as the aggregate fair market value of all assets subject to such Liens does not at any time exceed $1,000,000;

(k)    Liens securing Indebtedness permitted pursuant to Section 6.03(a)(iv) on terms and conditions satisfactory to the Joint Lead Arrangers and the Required Lenders, PROVIDED that, in no event shall any such Lien be more favorable to the holders of such Indebtedness, or less favorable to the Borrowers, the Post-Petition Lenders or the Pre-Petition Lenders, than the Liens permitted to be granted by the Borrowers to certain of their trade creditors pursuant to that certain "Secured Trade Credit Program of Fleming Companies, Inc." as contemplated in the Final Order (as in effect or the date hereof); and

(l)    It is understood that the Liens permitted pursuant to paragraphs (c) through (j) above and this paragraph (k) of this Section 6.01 and Permitted Existing Liens not constituting Senior Liens shall be subordinated in priority to the Liens created under this Agreement and the other Post-Petition Loan Documents and the Pre-Petition Lender Replacement Lien.

SECTION 6.02. CONSOLIDATION, MERGER, SALE OF ASSETS, ETC. Subject to the corporate restructuring decisions to be made as part of the Plan of Reorganization and implementation thereof pursuant to the Cases after the Effective Date, the Borrowers will not, and will not permit any of their respective Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of their respective property or assets, or enter into any sale-leaseback transactions, or apply or permit any of their Subsidiaries to apply, to the Bankruptcy Court to do any of the foregoing, except that:

(a)    each Borrower and its Subsidiaries may make sales of inventory in the ordinary course of business;

(b)    each Borrower and its Subsidiaries may sell obsolete, uneconomic, excess or worn-out equipment, materials or other assets (other than real property) in the ordinary course of business;

(c)    each Borrower may sell assets (other than any Equity Interest of any Borrower unless 100% of the Equity Interests of such Borrower are sold) to the extent permitted by the Bankruptcy Court, so long as (i) each such sale is in an arm's-length transaction and the respective Borrower receives at least fair market value therefor (as determined in good faith by the respective Borrower), (ii) 100% (or, in the case of any Retail Store Sale or any sale of assets in connection with the closure of a distribution center of any Borrower, at least 85% consideration therefor is paid in cash at the time of the closing of such sale (it being understood that the assumption of leases shall be considered cash consideration for the purposes of this clause (ii)), (iii) the Net Proceeds therefrom are applied as required by Section 2.9(b) and (iv) unless consented to in writing by the Joint Lead Arrangers the aggregate Net Proceeds received by the Borrowers from all assets sold pursuant to this paragraph (c) does not exceed $1,000,000 PROVIDED that each Borrower may (x) sell Perishable Inventory and (y) the assets comprising the

Roundy's retail stores, in each case without regard to the dollar limitation contained in clause (iv) of this Section 6.02(c)

(d)    each Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, Accounts arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing or factoring transaction; and

(e)    each Borrower and its Subsidiaries may, in the ordinary course of business, grant licenses, sublicenses or leases or subleases to other Persons not materially interfering with the conduct of the business of such Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto.

To the extent the Required Lenders waive the provisions of this Section 6.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.02 (other than to a Borrower or a Subsidiary thereof) such Collateral shall be sold free and clear of the Liens created by the Post-Petition Loan Documents, and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 6.03.  INDEBTEDNESS.    (a)  The Borrowers will not, and will not permit any of their respective Subsidiaries to, contract, create, incur, assume or substitute any Indebtedness, or apply, or permit any of their Subsidiaries to apply to the Bankruptcy Court for authority to do so, except:

(i)    Indebtedness outstanding under the Post-Petition Loan Documents;

(ii)   Indebtedness of the Borrowers and their Subsidiaries incurred prior to, and outstanding on, the Filing Date (including Indebtedness arising from reimbursement obligations for letter of credit drawings occurring after the Filing Date under letters of credit issued prior to, and outstanding on, the Filing Date) to the extent such Indebtedness is listed on Schedule 3.16 hereto ("Permitted Existing Indebtedness"), without giving effect to any extensions, renewals or refinancings thereof;

(iii)  Indebtedness of any Borrower owing to another Borrower;

(iv)   Indebtedness of any Borrower in an aggregate principal amount not to exceed $100,000,000 at any time, PROVIDED that (1) all terms and conditions of the documentation evidencing such Indebtedness is satisfactory to the Joint Lead Arrangers and the Required Lenders hereunder and the "Required Lenders" under, and as defined in, the Existing Credit Agreement, (2) any Lien securing any such Indebtedness is permitted under Section 6.01(k), (3) the maturity for such Indebtedness shall not be earlier than one year following the Maturity Date, (4) the documentation evidencing such Indebtedness shall include no amortization or scheduled commitment reductions, (5) the terms of the documentation of such Indebtedness shall require no mandatory repayments or commitment reductions to be made with Asset Disposition proceeds, Indebtedness proceeds or tax fund refund proceeds, (6) the incurrence of such Indebtedness and the terms and conditions for the documentation therefor shall have been approved by the

Bankruptcy Court and (7) at the time of the initial incurrence of Indebtedness pursuant to this clause (iv) no Default shall exist and be continuing;

(v)    surety bonds issued for the benefit of any Borrower in the ordinary course of their businesses so long as the aggregate obligations of the Borrowers in respect of such surety bonds do not at any time exceed $30,000,000;

(vi)    Indebtedness of any Borrower arising in the ordinary course of operations in connection with Treasury Services provided pursuant to uncommitted lines of credit, which Indebtedness may be secured by the Security Documents; and

(vii)    purchase money Indebtedness of any Borrower described in Section 6.01(j), PROVIDED that in no event shall the aggregate principal amount of all such purchase money Indebtedness permitted by this clause (vii) exceed $1,000,000 at any time outstanding.

(b)    Except as set forth in the First Day Orders approved on or prior to the Effective Date, the Borrowers will not, and will not permit any of their respective Subsidiaries to, make any prepayment (or make any offer to make any prepayment) of the principal of, or repurchase, redeem, defease or otherwise retire (including in each case, without limitation, by way of depositing with the trustee with respect thereto or any other Person, monies or securities before due for the purpose of paying when due) prior to its stated maturity (whether by reason of asset sales, a change of control, or otherwise), any Indebtedness or other obligations of any Borrower or any Subsidiary thereof incurred or created prior to the Filing Date, or apply to the Bankruptcy Court for authority to do any of the foregoing, except:

(i)    Indebtedness created under the Post-Petition Loan Documents;

(ii)    trade payables owing to trade creditors of the Borrowers and their respective Subsidiaries and other claims authorized to be paid on terms satisfactory to the Joint Lead Arrangers as approved by the Bankruptcy Court;

(iii)    the payments set forth in the Cash Collateral Order;

(iv)    payments of scheduled lease payments under capitalized leases of the Borrower existing on the Filing Date to the extent such leases are not rejected by the Borrowers or any of their Subsidiaries in the Cases and other payments in connection with the assumption of executory contracts and unexpired leases;

(v)    claims authorized to be paid by the First Day Orders, orders entered into in respect of motions filed on the Filing Date or, subject to the satisfaction of the Joint Lead Arrangers, any subsequent order of the Bankruptcy Court;

(vi)    payments of Indebtedness secured by assets the subject of an Asset Disposition (I) consummated in accordance with Section 6.02(b) or (c) or (II) of the type described in clause (c) of the definition of Asset Disposition to the extent such payments are required as a consequence of the respective such Asset Disposition pursuant to the terms of the documentation evidencing such Indebtedness;

(vii)    Indebtedness of any Borrower owing to another Borrower; and

(viii)   the payments set forth in the Financing Orders.

SECTION 6.04. DIVIDENDS. The Borrowers will not, and will not permit any of their respective Subsidiaries to, authorize, declare or pay any Dividends, or apply or permit any of their Subsidiaries to apply to the Bankruptcy Court for authority to do so, except that any Subsidiary of any Borrower may declare and pay cash Dividends to such Borrower.

SECTION 6.05. TRANSACTIONS WITH AFFILIATES. The Borrowers will not, and will not permit any of their respective Subsidiaries to, directly or indirectly, pay any funds to or for the account of, make any investment (whether by acquisition of stock or indebtedness, by loan, advance, transfer of property, guarantee or other agreement to pay, purchase or service, directly or indirectly, any Indebtedness, or otherwise) in, lease, sell, transfer or otherwise dispose of any assets, tangible or intangible, to, or participate in, or effect any transaction in connection with any joint enterprise or other joint arrangement with, any Affiliate, or apply to the Bankruptcy Court for authority to do any of the foregoing; PROVIDED, HOWEVER, that the foregoing provisions of this Section shall not prohibit any Borrower from (a) declaring or paying any lawful dividend in accordance with Section 6.04, (b) making loans or other investments to, and consummating other transactions with, any other Borrower to the extent permitted by Sections 6.02 or 6.03(a) or (c) making sales to, or purchases from, any other Borrower and, in connection therewith, extending credit or making payments, or from making payments for services rendered by any other Borrower, if such sales or purchases are made or such services are rendered in the ordinary course of business, making payments of reasonable compensation, fees and expenses to their respective directors and executive officers for services rendered to the board of directors of the Borrower or any committee of any thereof to the extent such payments are approved by the Bankruptcy Court.

SECTION 6.06. ACQUISITIONS AND INVESTMENTS. The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply, or permit any of their Subsidiaries to apply, to the Bankruptcy Court for authority to), directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire (in one or a series of related transactions) any part of the property or assets of any other Persons (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business), or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract or hold any cash or Temporary Cash Investments (each of the foregoing an "Investment" and, collectively, "Investments"), except:

(i)     the Borrowers may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(ii)    Investments by the Borrowers and their Subsidiaries made prior to the Filing Date, and in existence on the Effective Date and set forth on Schedule 6.06(iv);

(iii)   the Borrower and its Subsidiaries may lease (as lessee) real or personal property in the ordinary course of business so long as any such lease does not create a Capitalized Lease Obligation except to the extent permitted by Section 6.03(a)(iv);

(iv)   Investments received in connection with the bankruptcy or reorganization of or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business investments;

(v)   the Borrowers may acquire and hold cash and Temporary Cash Investments, provided that at all times prior to such date when each Disbursement Account and each Collection Account is subject to a Control Agreement, the aggregate amount of cash and Temporary Cash Investments permitted to be held by the Borrowers at any time when any Post-Petition Loans are outstanding shall not exceed $10,000,000, PROVIDED that for purposes of calculating the amount of cash and Temporary Cash Investments held by the Borrowers for the purposes of compliance with this paragraph, all Restricted Cash shall be excluded therefrom; and

(vi)   Investments arising from non-cash consideration received by a Borrower in connection with sales consummated in accordance with Section 6.02(c).

SECTION 6.07. LIMITATION  ON  CERTAIN  RESTRICTIONS  ON SUBSIDIARIES.  The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply, or permit any of their Subsidiaries to apply, to the Bankruptcy Court for authority to), directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Company or any of its Subsidiaries, or pay any Indebtedness owed to the Company or any of its Subsidiaries, (b) make loans or advances to the Company or any of its Subsidiaries or (c) transfer any of its properties or assets to the Company or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Loan Documents, (iii) restrictions in effect on the Filing Date, (iv) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Company or any of its Subsidiaries, (v) customary provisions restricting assignment of any licensing agreement (in which the Company or any of its Subsidiaries is the licensee) or other contract entered into by the Company or any of its Subsidiaries in the ordinary course of business, (vi) restrictions on the transfer of any asset pending the close of the sale of such asset, and (vii) restrictions on the transfer of any asset subject to a Lien permitted by Section 6.01(c), (e) or (h).

SECTION 6.08. CAPITAL EXPENDITURES. The Borrowers will not, and will not permit any of their respective Subsidiaries to (and will not apply or permit any of their Subsidiaries to apply to the Bankruptcy Court for authority to), make any Capital Expenditures, except that (x) during any Test Period ending from and after the date of the effectiveness of an amendment to this Agreement entered into as contemplated by Section 9.14, the Borrowers may make Capital Expenditures in accordance with such amendment and the Budget and (y) from the Effective Date to, but excluding the date of the effectiveness of any such amendment, the

Borrowers may make Capital Expenditures in an aggregate amount not to exceed $_____ in accordance with the Budget.

SECTION 6.09.  MINIMUM CONSOLIDATED EBITDA.  The Borrowers will not permit Consolidated EBITDA for any Test Period ending from and after the date of the effectiveness of an amendment to this Agreement entered into as contemplated by Section 9.14:

| | |
|---|---|
| December 31, 2003 | $ |
| January 31, 2004 | $ |
| February 28, 2004 | $ |
| March 31, 2004 | $ |
| April 30, 2004 | $ |
| May 31, 2004 | $ |
| June 30, 2004 | $ |
| July 31, 2004 | $ |
| August 31, 2004 | $ |
| September 30, 2004 | $ |
| October 31, 2004 | $ |

SECTION 6.10.  LIMITATION ON ISSUANCES OF CAPITAL STOCK. (a) The Borrowers will not permit any of their respective Subsidiaries to issue any Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, Equity Interests, or apply to the Bankruptcy Court to do any of the foregoing, except (i) for transfers and replacements of then outstanding shares of Equity Interests, (ii) for stock splits, stock dividends and issuances which do not decrease the percentage ownership of the Company or any of its Subsidiaries in any class of the Equity Interests of such Subsidiary or (iii) to qualify directors to the extent required by applicable law.

(b)    The Company will not issue any capital stock which is not common stock.

SECTION 6.11.  CHANGE OF LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZA-TION; ETC.  No Borrower shall change its legal name, its type of organization, its status as a registered organization (in the case of a registered organization), its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Security Documents and so long as same do not involve (x) a registered organization ceasing to constitute same or (y) any Borrower changing its jurisdiction of organization or location from the United States or a State thereof to a jurisdiction of organization or location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent not less than 10 days' prior written notice of each change to the information listed on Schedule 3.18 (as

adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Schedule 3.18 which shall correct all information contained therein for the respective Borrower, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral intended to be granted hereby pursuant to the Security Documents at all times fully perfected and in full force and effect.

SECTION 6.12. LIMITATION ON CREATION OF SUBSIDIARIES. The Borrowers will not, and will not permit any of their respective Subsidiaries to, establish, create or acquire after the Effective Date any Subsidiary, or apply to the Bankruptcy Court to do so.

SECTION 6.13. CONDUCT OF BUSINESS. The Borrowers will not, and will not permit any of their respective Subsidiaries to, engage (directly or indirectly) in any business other than the same general type of business conducted by the Borrower and its Subsidiaries (taken as a whole) on the Effective Date and reasonably related extensions thereof.

SECTION 6.14. CHAPTER 11 CLAIMS. (a) The Borrowers will not incur, create, assume, suffer to exist or permit any other Super-Priority Claim or Lien which is PARI PASSU with or senior to the claims or the Liens of the Joint Lead Arrangers, the Post-Petition Agents and the Post-Petition Lenders against the Borrowers hereunder, except for the Carve-Out and the Senior Liens.

(b) The Borrowers will not, and will not permit any of their respective Subsidiaries to, incur, create, assume, suffer to exist or permit any other Super-Priority Claim or Lien which is PARI PASSU with or senior to the claims or the Pre-Petition Liens or Pre-Petition Lender Replacement Liens of the Pre-Petition Agents or the Pre-Petition Lenders against the Borrowers, except for the Carve-Out, the Facility Liens and the Senior Liens.

SECTION 6.15. NO OTHER ACCOUNTS. The Borrowers will not directly or indirectly, open, maintain or otherwise have any checking, savings, deposit, securities or other accounts at any bank or other financial institution where cash or Temporary Cash Investments are or may be deposited or maintained with any Person, other than (i) the Concentration Account, the Collection Accounts set forth on Schedule 3.20(a), the Disbursement Accounts set forth on Schedule 3.20(b), and any such other account constituting Trust Property, PROVIDED that any Borrowers or any of their Subsidiaries may open a new Collection Account or a new Disbursement Account not set forth in such Schedule 3.20(a) or 3.20(b), respectively, so long as prior to opening any such account (i) the Collateral Agent has consented in writing to such opening and (ii) the financial institution with which such account is opened has executed and delivered to the Collateral Agent a Control Agreement.

SECTION 6.16. PLEADINGS IN CHAPTER 11 CASE. No Borrower shall file any motion, application, objection, plan, response, adversary complaint or similar pleading in the Cases in any manner inconsistent with the Financing Orders.

ARTICLE VII

EVENTS OF DEFAULT

If any of the following events ("EVENTS OF DEFAULT") shall occur:

(a)    the Borrowers shall fail to pay any principal of any Post-Petition Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Post-Petition Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Post-Petition Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two or more Business Days;

(c)    any representation, warranty, certification or statement made by any Borrower in this Agreement or any other Post-Petition Loan Document or in any certificate, financial statement or other document delivered pursuant to this Agreement or any other Post-Petition Loan Document shall prove to have been incorrect or misleading in any material respect when made (or deemed made);

(d)    any Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, Section 5.04 (insofar as it relates to the corporate existence of the Company), Section 5.07, Section 5.08, Section 5.10, Section 5.12, Section 5.13 or Article VI;

(e)    any Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Post-Petition Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of ten days after notice thereof from the Administrative Agent or the Required Lenders to the Company;

(f)    any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Borrower shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or an application shall be filed by any Borrower for the approval of any other super-priority claim (other than the Carve-Out and the PACA Liens) in any of the Cases which is PARI PASSU with or senior to the claims of the Post-Petition Agents and the Post-Petition Lenders against the Borrowers