There is no evidence that Fleming and Manugistics are improperly using FCS in trying to replace FCS.

U.    Berry first attempts to demonstrate nefarious conduct by relying on what appears to be the transcript of a message left by Fleming attorney Lex Smith for Berry's attorney. Id.; Berry Ex. Q. Even assuming the transcript were accurate and admissible, it does not support Berry's position. On the tape, Fleming's attorney states that Fleming intends to work with a programmer that has never had any access to Berry's software to create a system that meets Fleming's needs. The attorney notes that he himself should not be part of the process because he has had access to Berry's software through the litigation and could theoretically be accused of passing information to the new programmers, even though, he says, "I don't understand anybody's programming." Berry Ex. Q. The recorded statement supports Fleming's contention that it sought to develop software wholly independent of Berry's program to meet its computer needs. Berry's copyright in FCS does not preclude Fleming, or any other party, from independently developing software to compete with FCS.

V.    Berry next attempts to demonstrate improper reverse-engineering by relying on a letter sent from the attorney for Manugistics to the attorney for Berry. In this letter, Manugistics states that Fleming was licensed to use NetWORKS

15

Exhibit A

Routing, a program developed in the 1980s, not NetWORKS
Transporter. See Berry Ex. R. Berry claims that documents filed
in the Bankruptcy Court show that Fleming was actually a NetWORKS
Transporter user. Mot. at 17; Berry Ex. S. The document relied
on by Berry appears to be an undated form letter sent to a
"Manugistics NetWORKS Transport Client." Berry Ex. S. "Fleming
Companies 39787" is written by hand in the top right corner of
the page, but there is no other information indicating that the
letter was sent to Fleming. Id.

W.    Moreover, Berry has not demonstrated why it
matters whether Fleming was using the Routing software, as stated
by Manugistics's attorney, or the Transport software, as claimed
by Berry. Berry argues that the letter from Manugistics damages
Fleming's credibility and is therefore relevant. However, Berry
admits that Fleming's use of the Transport software does not
demonstrate that Manugistics is reverse-engineering FCS.
Therefore, Berry has not shown how his rights would be infringed
by Fleming's alleged use of the Transport program.

X.    Berry claims that an invoice from Manugistics to
Fleming, filed in the Bankruptcy Court, shows that Manugistics
accessed a file with the prefix "151" while working for Fleming.
Berry alleges that this "is the same prefix as one of the
machines that is operating at Fleming, now C&S." Mot. at 19;
Berry Ex. T; see also Berry Ex. I (Guidance's report showing one

16

Exhibit A

file with the "151" prefix on Fleming's computer).  Berry

contends that this shows reverse-engineering, but the argument

misses the step of establishing what the file with prefix "151"

contains.

       Y.    Berry attempts to demonstrate Fleming's and C&S's

impure intentions by pointing to Noa's actions.  Berry alleges

that Noa "fled to Iowa . . . with a copy of the pirated FCS" to

escape this court's jurisdiction.  Mot. 20-21.  First, there is

no evidence that Noa "fled" the jurisdiction.  She claims that

she moved to Iowa, where her family resides, because of

employment uncertainties resulting from Fleming's bankruptcy.

Noa Aff. ¶ 22.  More importantly, there is no evidence that Noa

had a copy of Berry's software.  Berry claims that Noa's "desire

to continue to use the infringing software is evidenced by" an e-

mail she sent to Dillon in June 2003 when Fleming was struggling

to revert back to the original after the jury found that it had

infringed Berry's copyright.  Id.  In the e-mail, Noa expresses

frustration at the effects of the changes made to comply with the

jury's ruling and asks, "Can't we buy time using the database?"

This e-mail does not support Berry's contention that his

copyright was, and still is, being infringed.  The e-mail merely

shows that one subordinate employee asked whether the company

could return to the earlier program.  There is no evidence that

Fleming in fact reverted to the old system.  The evidence shows

Exhibit A

that Fleming, frustrated with attempts to operate under the unmodified version of Berry's software for which it had a license, decided to turn to a program wholly unrelated to FCS. Hearing Exhibit 102 at 86, Ex. C; Noa Aff. ¶¶ 15-20.

Z.    Berry claims Noa's intent to infringe on his copyright is further demonstrated by her creation of a website, earthlogistics.com, which Berry claims C&S and Fleming "more likely than not . . . concocted as another scheme to continue their endless infringement." There is no evidence supporting this contention. Noa states that she purchased the website when she was considering opening a consulting business and that she "did not use or attempt to use" Berry's software on her website. Noa Aff. ¶ 23. Berry has presented no evidence casting any doubt on this assertion.

AA.    Berry further claims that he has "smoking gun evidence" of an intent by Fleming and C&S to commit future infringement. He claims that they signed a "contract to commit future criminal infringement." Reply to Fleming at 7. This argument is meritless. The supposedly incriminating contract is a letter from Fleming to C&S at the time of the asset purchase, acknowledging that Fleming has been sued by Berry and that any liability arising from any "past, present or *future* use of the Berry Technology" is an excluded liability under the asset purchase agreement. (Italics added.) Berry Reply Ex. C.

18

Exhibit A

Contrary to Berry's assertion that this letter demonstrates an intent, and even a contractual obligation, to commit future infringement, this language is merely meant to protect C&S in connection with any infringement committed by Fleming.[5]

BB.    Dillon further testified that the C&S facility in Hawaii maintained a network separate from Fleming's to avoid any possibility, or the appearance of a possibility, that Berry's software would be transferred from Fleming to C&S. Id. at 110. Berry in turn contends that creating this separation is "proof of the willful infringement." Reply at 9. Berry, however, has presented no evidence to counter Fleming's testimony that it maintained separate networks in good faith to avoid even the appearance of impropriety.

CC.    In sum, the court finds that Berry has failed to show that the infringement, if any, was willful. The court finds that Berry has failed to show that the alleged infringement had any effect on the market for Berry's product. Berry has not shown that his software was used or accessed by Defendants and has not shown that it was used to develop a derivative work. Therefore, on these facts, the court finds that there is no risk of future infringement.

---

[5] Berry goes so far as to argue that the letter "is evidence sufficient to invoke the grand jury." Reply at 7. The court disagrees.

19

Exhibit A

DD.   In contrast to Berry, who has not shown that he will be harmed if Defendants are allowed to use the programs they are presently using, Defendants will be greatly harmed by the requested injunction.   While Berry seeks to enjoin Defendants' use of spreadsheets that he says are derivatives of FCS, Dillon testified that it would be difficult or impossible to run the logistics program at C&S without using the spreadsheets.   Dillon Live Testimony.   The balance of hardships before the court thus tips sharply in favor of Defendants.

IV.       CONCLUSIONS OF LAW.

A.   To prevail on a claim of copyright infringement, Berry must establish that 1) he owns the copyright at issue, and 2) Defendants violated one of Berry's exclusive rights under 17 U.S.C. § 106.   See Feist Publ'n, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361-63 (1991).

B.   A copyright owner has the exclusive right to make copies of his work.   17 U.S.C. § 106(1).   A copyright owner has the exclusive right to make derivative works based on his work. 17 U.S.C. § 106(2).   See also Pickett v. Prince, 207 F.3d 402, 405-06 (7th Cir. 2000) (included among "uncited authorities" referred to by Berry at the hearing on the present motion). A copyright owner has the exclusive right to distribute his work. 17 U.S.C. § 106(3).

20

Exhibit A

C.    Notwithstanding § 106, certain uses of copyrighted works are considered "fair use" and do not infringe on the owner's copyright. See 17 U.S.C. § 107. Factors to be considered in a fair use analysis include: 1) the purpose and character of the use; 2) the nature of the copyrighted work; 3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; 4) and the effect of the use upon the potential market for or value of the copyrighted work. Id. A fair use inquiry "calls for case-by-case analysis" of the four factors "in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78 (1994). In considering the final factor, a court must consider the impact on the market not only for the original work, but also for any derivative work. Id. at 590.

D.    Showing a reasonable likelihood of success on the merits on a copyright infringement claim raises a presumption of irreparable harm. Johnson Controls, Inc. v. Phoenix Control Sys., Inc., 886 F.2d 1173, 1174 (9th Cir. 1989). However, this presumption can be rebutted. An injunction is improper when a defendant has in good faith abandoned the infringing conduct and there is little evidence it will be resumed. Volkswagenwerk Aktiengellschaft v. Church, 411 F.2d 350, 352 (9th Cir. 1969); see also Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc., 821 F.2d 800, 807 (D.C. 1987) ("When defendant has ceased

21

Exhibit A

its infringing conduct and shows no inclination to repeat the offense, an injunction is not warranted."), overruled on other grounds by Fogarty v. Fantasy, Inc., 510 U.S. 517, 521 (1994). When the infringement was innocent and there is no indication of an intent to infringe in the future, neither the public nor the plaintiff needs the protection of an injunction. In re Circuit Breaker Litig., 860 F. Supp. 1453, 1456 (C.D. Cal. 1994), aff'd by, Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc., 106 F.3d 894 (9th Cir. 1997).[6] Moreover, when there is no longer a market for the infringed product, there is no need for an injunction. See Marisa Christina, Inc. v. Bernard Chaus, Inc., 808 F. Supp. 356, 359 (S.D.N.Y. 1992).

      E.  No presumption of irreparable harm attaches here. Even if Berry could show a likelihood of success on his infringement claim, Defendants show that any infringement was innocent and no longer continuing. Dillon explained that, after the jury's verdict in the earlier case, he made a good faith

---

[6] Berry relies on Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824 (9th Cir. 1997), for the proposition that an injunction is warranted. Cadence is distinguishable from the present case. In Cadence, the district judge erred by denying an injunction solely on the ground that there was no irreparable harm because only money damages would be suffered. Id. at 829. The Ninth Circuit specifically noted that Cadence did not involve innocent infringement, infringement that did not affect market value, or a product that no longer has market value. Id. at 828-29. These factors and others, such as Berry's actions preventing Defendants from developing evidence through NTI, are present here.

effort to rid Fleming's computers of the offending files. Even if he did not succeed in that effort, the failure appears to have been due to an oversight. More critically, while Berry has made sweeping assertions that Fleming and C&S continue to use FCS, he does so without supporting evidence. The evidence shows that Defendants have not used Berry's software since the summer of 2003. Defendants say they are currently using Excel and Crystal Reports, for which Microsoft owns the copyrights. Berry has presented no evidence showing that the software now used is actually a derivative of FCS. Furthermore, Berry does not show that Defendants have any intention of resuming their use of FCS, a program Berry concedes is outdated.

        F.    Without the presumption, Berry cannot establish irreparable harm. Defendants have shown that there is no market for FCS, which mitigates against the need for an injunction. Berry created FCS in 1993. As Berry never received any money for FCS, there may never have been a substantial market for the product. Certainly there is no evidence of such a market today. By now, of course, Berry has updated the program. FCS 2003 is, by Berry's own admission, "radically different in many ways and much improved" over FCS 1993. There is simply no evidence to support a finding of irreparable harm in the absence of the presumption, which has been rebutted.

23

Exhibit A

G.   Even if the court applies the "balance of hardships" test instead of examining irreparable harm, Berry fails.  Far from tipping sharply in Berry's favor, the balance of hardships tips in Defendants' favor.  Berry's potential hardships are nonexistent or slight, given the absence of a market for FCS 1993.  By contrast, as noted earlier, C&S would face great difficulty in conducting its operations if an injunction were entered.

H.   Even assuming Berry could show actual harm, an injunction would not be warranted because Berry does not show a likelihood of success on the merits.  And, of course, without showing such a likelihood, Berry would not be entitled to the presumption of irreparable harm.

I.   In examining the likelihood of success on the merits, the court recognizes that Fleming is challenging the validity of Berry's alleged copyright.  If Berry does not own FCS's copyright, then his rights could not have been violated by Fleming's alleged use of FCS.  Berry urges this court to give collateral estoppel effect to the finding by the jury in the prior action that Berry owns the FCS copyright.  The court will give collateral estoppel effect to that finding only if it is a final judgment.  "A 'final judgment' for purposes of collateral estoppel can be any prior adjudication of an issue in another action that is determined to be 'sufficiently firm' to be

24

Exhibit A

accorded conclusive effect." <u>Luban Indus., Inc. v. United</u>
<u>States</u>, 707 F.2d 1037, 1040 (9th Cir. 1983). Factors to consider
include: 1) whether the parties were fully heard; 2) whether the
court supported its decision with a reasoned opinion; and 3)
whether the decision was subject to appeal or in fact was
reviewed on appeal. <u>Id.</u>

     J.  The jury's ruling is not presently entitled to
collateral estoppel effect. Judge King has not ruled on
Fleming's post-trial motions. Clearly, Fleming cannot seek
appellate review before Judge King rules. At least at present,
this court does not give collateral estoppel effect to the jury's
determination that Berry owns the copyright to FCS.

     K.  However, the jury's ruling certainly does create a
likelihood that Berry will prevail on his claim of ownership.
Verdicts may be vacated, and trial court rulings may be reversed,
but Berry has in hand a trial victory that makes it likely he
will succeed in establishing his copyright ownership of FCS. The
court therefore proceeds on this motion assuming that Berry owns
the copyright to FCS.

     L.  Berry alleges that numerous actions taken by
Fleming and C&S violated his copyright. First, Berry claims that
Fleming's admitted use of FCS until June 2003 was improper
because the jury's finding of infringement terminated the license
that Fleming previously had to use FCS. Second, Berry alleges

25

Exhibit A

that, even if the original license was not terminated, Fleming
did not have a copy of the original program, for which it had a
license, and it therefore used a modified version of FCS that
violated Berry's copyright.  Similarly, Berry contends that the
act of transforming the altered and infringing copy into the
original was itself infringement.  Third, Berry claims that
Defendants violated his copyright by having Guidance copy his
software in making a record of Fleming's entire hard drive.
Fourth, Berry claims that his copyright was violated when
Guidance restored sixteen files containing FCS to Fleming's hard
drive.  Fifth, Berry claims that his copyright was infringed when
Defendants extracted data from FCS, so that the data could be
imported into the Excel program.  Sixth, Berry claims his
copyright has been infringed by reverse-engineering done by
Fleming and/or C&S in concert with Manugistics.  These
contentions will be addressed in turn.

      M.    Berry has not established a likelihood of success
on his claim that Fleming's admitted use of FCS until June 2003
violated his copyright because the original license terminated
with the jury's finding of infringement.  The license agreement
does not contain a provision stating that it will be terminated
if Fleming is found to have infringed.  See Fleming Ex. A.  Berry
cites no law for his contention that a license automatically
expires when the licensee is found to have infringed by making

26

Exhibit A

unauthorized changes to the copyrighted work.[7]  Fleming was

entitled to revert to using the original version of FCS that

Berry had licensed Fleming to use.

N.    Nor has Berry shown a likelihood of

success on the merits of his claim that his copyright was

violated by the process Fleming used to revert to the original

version of FCS.  Dillon concedes that Fleming no longer had a

copy of the original FCS that was licensed to Fleming in 1999.

However, he stated that he had a copy that was identical to the

original, except that Dillon had added a feature to deal with the

Y2K problem, and had made a few other technical changes.   Dillon

then removed the Y2K feature, thinking he was thereby returning

FCS to its original version, which Fleming had a license to use.

O.    Berry argues that the act of altering the

infringing version (by removing the Y2K feature) was itself an

act of copyright infringement.  Reply to Fleming at 10-11.  Berry

contends that Dillon created "another derivative, to suit

Fleming's business needs," when he altered the infringing

version.  Id. at 11.  The act of removing the infringing element

---

[7] Berry's claim that the license was no longer valid because
Fleming failed to assume the license, and therefore rejected it,
in the bankruptcy proceeding is without merit.  Fleming, as
debtor, had no need to assume the license because Fleming owed no
outstanding payments to Berry for the license.  Fleming received
the license free of charge and had no obligation to make future
payments for the license.  Accordingly, there was no need to
assume the license in the bankruptcy proceeding.

27

Exhibit A

A

of a work is not itself the creation of a derivative work.[8]  Even

if a derivative were created, it was done innocently and in good

faith, without causing any harm to Berry.[9]

     P.   The court further concludes that it was "fair use"

for Guidance to copy Fleming's hard drives, including Berry's

software, to preserve a record of what was on the computer before

the scrubbing intended to remove FCS.  Reproduction of a

copyrighted work to maintain a record for use in the course of

litigation is fair use.  See Religious Tech. Ctr. v. Wollersheim,

971 F.2d 364, 367 (9th Cir. 1991); see also Nimmer on Copyright

§ 13.05[D][2], p. 13-223 (2003) (works are customarily reproduced

in various types of judicial proceedings . . . and it seems

inconceivable that any court would hold such reproduction to

constitute infringement").[10]  Moreover, Guidance's use was

_____

    [8] A clothing manufacturer, for example, might infringe a
photographer's copyright by putting a photograph on a t-shirt,
thereby creating a derivative work of the original photo.
Removing the offending photograph would not constitute the
creation of another derivative work, and the manufacturer would
not be precluded from selling the shirt once the offending
material was removed.  If Fleming removed the offending additions
to FCS, Fleming would not thereby create a derivative work.
Fleming was free to use FCS, subject to the license, assuming the
additions were removed.

    [9] No harm has occurred because the program created by
removing the Y2K feature did not, in fact, meet Fleming's
business needs.  Shortly thereafter, Fleming abandoned the use of
FCS altogether.

    [10] Berry contends that Guidance's claim of fair use "is
rebutted by the fact that Guidance, at the time, was in violation
of a court order that prohibited the destruction of any evidence

28

Exhibit A

· , ·  •

"neither commercially exploitative of the copyright, nor commercially exploitative of the copyright holder's market." Jartech, Inc. v. Clancy, 666 F.2d 403, 407 (9th Cir. 1991).

      Q.   Berry's claim that his copyright was violated when Guidance copied sixteen files containing FCS has greater merit. A literal copy of Berry's work was made when these files were returned to Fleming's network.  These files were not necessary for record-keeping related to the litigation.  Therefore, Berry has shown a likelihood of success on the merits on this one claim.  Fleming, however, has rebutted any presumption of irreparable harm based on this past violation.  Any FCS files on Fleming's computers after June 2003 were there inadvertently and were not used to track freight.  Noa Aff. ¶ 21.  Even if FCS was retained in Fleming's system at the time of the transfer to C&S, this retention was innocent and unknowing.

      R.   Furthermore, Berry has not shown a likelihood of success on the merits of his claim that his copyright was violated when Fleming extracted its data from FCS.  Berry claims that Dillon extracted pieces of his program when he extracted data, but cannot show that Dillon's later creation violated his copyright.  Berry points to Dillon's alleged copying of the FCS

_____

. . . [and that] Guidance stole in the night without notice to the Court or Mr. Berry."  Reply to Fleming at 11-12.  Berry makes a serious accusation, but presents no evidence to support it. Moreover, it is unclear how the making of an allegedly illegal copy of FCS amounted to destruction of evidence.

29

Exhibit A

sequential numbering system, but sequential numbering is a time-honored practice, and there is no evidence that the portion of the FCS system that automatically numbers items is unique. What Berry is complaining about appears to the court to be obvious functional elements that any spreadsheet set up to track freight would have to have. Even if Dillon copied those features from FCS, Berry may no more claim copyright infringement with respect to those features than he could claim copyright infringement if Dillon copied a typeface that FCS used.

    S.    Berry's reliance on Assessment Technologies of Wisconsin v. Wiredata, 350 F.3d 640 (7th Cir. 2003), is misplaced. In that case, the court found that the extraction of raw data from a copyrighted database did not constitute a copyright violation. See id. at 644. Further, the court held that such an extraction would not violate a copyright on software "even if the raw data were so entangled with [the software] that they could not be extracted without making a copy of the program." Id.

    T.    Similarly misplaced is Berry's reliance on Dun & Bradstreet Software Services, Inc. v. GEAC Computer Systems, Inc., 307 F.3d 197 (3d Cir. 2002). In that case, the defendant admitted that he could not have written his program without copying critical elements of source code from the plaintiff's software. Id. at 207. The court found that the defendant had

Exhibit A

infringed upon the plaintiff's software, despite the fact that
the copied portion had been relatively small. <u>Id.</u> Berry has not
shown anything comparable. At most, he has presented evidence
that Dillon copied features of FCS that were in wide use long
before FCS was created.

U. Berry does not support his contention that C&S, in
conjunction with Manugistics, reverse-engineered his software to
develop a competing program. Berry has merely shown that C&S
hired Manugistics. It is not clear whether C&S is using existing
Manugistics software or if it is developing new software to meet
its needs. Assuming the latter, Berry fails to show that FCS is
being used to develop that software. A copyright in FCS does not
allow Berry to prevent a competitor from independently developing
a program that serves the same customer's needs.

V. Finally, Berry's accusations regarding Noa's
"flight" to Iowa and her website "earthlogistics.com" are
similarly devoid of any factual support.

V. <u>REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE</u>

The parties ask the court to take judicial notice of
various filings made before the Bankruptcy Court. The court
takes judicial notice only as to the fact that such filings were
made, but not as to the truth of the various allegations and
factual assertions made by the parties in those filings.

31

Exhibit A

The court was asked to strike certain declarations, but the parties subsequently agreed to this court's consideration of all declarations and exhibits attached to the briefs.

VI.      CONCLUSION.

For the foregoing reasons, Berry's motion for a preliminary injunction is DENIED.  The court takes the judicial notice noted above, and denies Fleming's request that declarations be stricken.


IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 8, 2004.


SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

**Berry v. Hawaiian Express Service, Inc., et al.**, Civ. No. 03-0385 SOM/LEK; ORDER DENYING PLAINTIFF WAYNE BERRY'S MOTION FOR PRELIMINARY INJUNCTION.

32

Exhibit A

MAR-06-2003  15:15      U.S. COURTS HAWAII                    808 541 1303   P.02/06

ORIGINAL

DISTRICT OF HAWAII

MAR 6  2002

at 3 o'clock and 40 min M

WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, | ) CIVIL NO. 01 00446 SPK LEK |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| FLEMING COMPANIES, INC., aka | ) SPECIAL VERDICT FORM |
| FLEMING FOODS, INC., aka | ) |
| FLEMING, | ) |
| DOE INDIVIDUALS 1-50 AND | ) |
| DOE PARTNERSHIPS, | ) |
| CORPORATIONS AND OTHER | ) |
| ENTITIES 1-20, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

SPECIAL VERDICT FORM

A.    FREIGHT CONTROL SYSTEM SOFTWARE

1.    Has Plaintiff Wayne Berry proven by a preponderance of the evidence that he is the owner of the copyright to the Freight Control software attached to Exhibit 221?

Yes  X                    No _____

If "YES" go to next question.
If "NO", skip to section B.

1

Exhibit B

2.    Did Fleming Companies, Inc. prove by a preponderance of the evidence that it has a valid license for the use of the Freight Control software.

Yes  X̷̶        No _____

If "YES" go to next question.
If "NO" go to question 4.

3.    Did Wayne Berry prove by a preponderance of the evidence that Fleming made unauthorized changes to the Freight Control software.

Yes  X̷        No _____

If "NO" skip to section B.
If "YES" go to next question.

4.    Was the infringement of the Freight Control software copyright willful?

Yes  X̷        No _____

Go to the next question.

5.    What amount of damages is Wayne Berry entitled to for the infringement of Freight Control System software?

__$ 98,250.00__

2

Exhibit B