MAR-06-2003 15:15    U.S.COURTS HAWAII    808 541 1303    P.04/06

B.    CRYSTAL REPORTS SOFTWARE

1.    Has Plaintiff Wayne Berry proven by a preponderance of the evidence that he is the owner of the copyright to the Crystal Reports software attached to Exhibit 222?

Yes _X_    No _____

If "NO", skip to section C.
If "YES" go to next question.

2.    Did Fleming Companies, Inc. prove by a preponderance of the evidence that it has a valid license for the use of the Crystal Reports software.

Yes _X_    No _____

If "YES" go to next question.
If "NO" go to question 4.

3.    Did Wayne Berry prove by a preponderance of the evidence that Fleming made unauthorized changes to the Crystal Reports software.

Yes _____    No _X_

If "NO" skip to section C.
If "YES" go to next question.

4.    Was the infringement of the Crystal Reports software copyright willful?

Yes _____    No _____

Go to the next question.

3

Exhibit B

5.    What amount of damages is Wayne Berry entitled to for the infringement of Crystal Reports software?

_____

C.    FLEMINGPO.EXE SOFTWARE

1.    Has Plaintiff Wayne Berry proven by a preponderance of the evidence that he is the owner of the copyright to the FlemingPO.exe software attached to Exhibit 223?

Yes __✗__                    No _____

If "YES" go to next question.
If "NO", skip to the end.

2.    Did Fleming Companies, Inc. prove by a preponderance of the evidence that it has a valid license for the use of the FlemingPO.exe software.

Yes __✗__                    No _____

If "YES" go to next question.
If "NO" go to question 4.

3.    Did Wayne Berry prove by a preponderance of the evidence that Fleming made unauthorized changes to the FlemingPO.exe software.

Yes _____                    No __✗__

If "NO" skip to the end.
If "YES" go to next question.

4

Exhibit B

MAR-06-2003  15:15        U.S.COURTS HAWAII                808 541 1303    P.06/06

4.  Was the infringement of the FlemingPO.exe software copyright willful?

Yes _____                    No _____

Go to the next question.

5.  What amount of damages is Wayne Berry entitled to for the infringement of FlemingPO.exe software?

_____

Please sign and date this Special Verdict Form.

Jury Foreperson

Date

2/6/03

5

Exhibit B

TOTAL P.06

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

---

**DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD AMENDED AND REVISED JOINT PLAN OF REORGANIZATION OF FLEMING COMPANIES, INC. AND ITS FILING SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

---

KIRKLAND & ELLIS LLP
James H. M. Sprayregen, P.C.
Richard L. Wynne
Janet S. Baer
Geoffrey A. Richards
200 East Randolph Drive
Chicago, IL 60601-6436
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Laura Davis Jones
Ira D. Kharasch
919 North Market Street, Sixteenth Floor, P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier No. 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

MILBANK TWEED HADLEY & McCLOY LLP
Paul S. Aronzon
Dennis F. Dunne
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

and

PEPPER HAMILTON LLP
I. William Cohen
Robert S. Hertzberg
Dennis S. Kayes
100 Renaissance Center
Suite 3600
Detroit, MI 48243-1157
(313) 259-7110

Co-Counsel for the Official Committee of Unsecured Creditors

Dated: May 25, 2004

---

[1] The Debtors are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C.; Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

::ODMA\PCDOCS\DOCS_DE\94593\1
DOCS_DB:94593.1

Exhibit C

139.    "Professional Fee Escrow Account" means the account established by the Reorganized Debtors on the Effective Date, solely for the purpose of paying all accrued and anticipated Professional Fees through the Effective Date.

140.    "Professional Fees" means all fees and expenses (including, but not limited to, success fees, if any) for services rendered by all Professionals in the Chapter 11 Cases through the Effective Date that the Bankruptcy Court has not denied by Final Order, regardless of whether a fee application has been filed for such fees.

141.    "PMSI" means a purchase money security interest as defined in Section 9-312 of the Uniform Commercial Code.

142.    "Ratable Proportion" means the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims in the Class.

143.    "RCT" means that trust that shall be created pursuant to the Plan and the RCT Agreement for the purposes of carrying out certain provisions of the Plan.

144.    "RCT Agreement" means that agreement, a draft of which is attached to the Disclosure Statement as Exhibit 12, that shall be entered into by the Debtors, the OCRC and the RCT Representative on or before the Effective Date and which shall govern the RCT.

145.    "RCT Assets" means deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the Reclamation Creditors, other than the post-petition deductions and post-petition overwires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco.

146.    "RCT Representative" means the representative selected to administer the RCT.

147.    "Reclamation Claims" means TLV Reclamation Claims and Non-TLV Reclamation Claims.

148.    "Reclamation Creditor" means any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code and also those identified on the Reclamation Claim Summary by Claimant of the Debtors dated November 21, 2003.

149.    "Reclamation Liabilities" means any and all claims asserted against the Debtors by the Reclamation Creditors, including Administrative Claims (other than Administrative Claims against Fleming Convenience), Priority Claims, TLV Reclamation Claims and Non-TLV Reclamation Claims, but not including any PACA/PASA Claims, DSD Trust Claims or General Unsecured Claims held by Reclamation Creditors.

150.    "Record Date" means May 25, 2004.

151.    "Releasees" means each of the Debtors, the Reorganized Debtors, Core-Mark Newco, each of the Pre-Petition Lenders, the Agents, the Pre-Petition Agents, the Old Notes Trustees, the Post-Petition Lenders, the Tranche B Lenders, the Committee, the OCRC, each member of the Committee and the OCRC, the PCT, the PCT Representative, the PCT Advisory Board, the RCT, the RCT Representative and the RCT Advisory Board, and the affiliates, agents and professionals of each of the foregoing, including, without limitation, professionals acting as officers of the Debtors, each in their capacity as such; provided however that Excluded Releasees shall not be Releasees.

152.    "Remaining Pension Plans" means, collectively, the Pension Plan of S.M. Flickinger Co., Inc., the Godfrey Company subsidiaries Pension Plan, the ABComarkets, Inc. Retirement Plan for Arizona Warehouse and Distribution Employees and Core-Mark International, Inc. Non-Bargaining Employees Pension Plan.

153.    "Reorganized Debtors" means collectively Core-Mark Newco, and Core-Mark International, Inc., Core-Mark Mid-Continent, Inc., General Acceptance Inc., C/M Products, Inc., ASI Office Automation, Inc., E.A. Morris Distributors, Inc., Head Distributing Company, Marquise Ventures Company, Inc. and Minter-Weisman Co. or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

Exhibit C

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Voting Classes*

Each Holder of an Allowed Claim in Classes 1(B), 3(B), 3(C), 5, 6(A), 6(B) and 7 shall be entitled to vote to accept or reject the Plan.

B.    *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

C.    *Presumed Acceptance of Plan*

Classes 1(A), 2, 3(A) and 4 are unimpaired under the Plan and, therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

D.    *Presumed Rejection of Plan*

Classes 8, 9 and 10 are impaired and shall receive no distributions and, therefore, are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

E.    *Non-Consensual Confirmation*

The Debtors and the Committee will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable based on the deemed rejection by Classes 8, 9 and 10 and if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code. The Debtors and the Committee reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with section XIV.D. hereof.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Substantive Consolidation*

This Plan is premised upon the limited substantive consolidation of the Debtors solely for purposes of actions associated with the Confirmation of this Plan and occurrence of the Effective Date, including, but not limited to, voting, confirmation and distribution. As a result of this limited substantive consolidation, a Holder of Claims against one or more of the Debtors arising from or relating to the same underlying debt that would otherwise constitute Allowed Claims against two or more Debtors, including, without limitation, Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall have only one Allowed Claim on account of such Claims. This Plan does not contemplate the merger or dissolution of any Debtor which is currently operating or which currently owns operating assets or the transfer or further commingling of any asset of any Debtor, except that the assets of Fleming and certain Filing Subsidiaries already being used by Fleming Convenience in its operations shall be formally vested in Core-Mark Newco, or one of the Reorganized Debtors and except to accomplish the distributions under this Plan. Such limited substantive consolidation shall not affect (other than for Plan voting, treatment, and/or distribution purposes) (i) the legal and corporate structures of the Reorganized Debtors or (ii) Equity Interests in the Filing Subsidiaries.

This Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases, as described herein. Unless an objection to substantive consolidation is made in writing by any creditor affected by this Plan as herein provided on or before 10 days prior to the date that is fixed by the Bankruptcy Court

22

Exhibit C

as the last date on which acceptances to this Plan may be received, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

B.     *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors*

Each Reorganized Debtor shall continue to exist after the Effective Date as a separate legal entity, each with all the powers of a corporation or partnership, as applicable, under the laws of its respective jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law. Except as otherwise provided in the Plan, on and after the Effective Date all property of the Estate and any property acquired by the Reorganized Debtors under the Plan shall vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may operate their respective businesses and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

C.     *Cancellation of Old Notes, Old Stock and Other Equity Interests*

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates, and other documents evidencing (a) the Old Notes, (b) the Old Stock and (c) any stock options, warrants or other rights to purchase Old Stock shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including, without limitation, the Indentures, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder, except for the obligation to indemnify the Old Notes Trustees, shall be discharged; *provided that* the indentures that govern the rights of the Holder of a Claim and that are administered by the Old Notes Trustees, an agent or servicer shall continue in effect solely for the purposes of (y) allowing the Old Notes Trustees, agent or servicer to make the distributions to be made on account of such Claims under the Plan and to perform such other necessary administrative functions with respect thereto and (z) permitting the Old Notes Trustees, agent or servicer to maintain any rights or liens it may have for fees, costs and expenses under such Indenture or other agreement. Any reasonable compensation, fees, expenses or disbursements due to any of the Old Notes Trustees, agent or servicer pursuant to the Indentures and the Plan, including, without limitation, attorneys' and agents' fees, expenses and disbursements incurred by the Old Notes Trustees and their predecessors, shall be paid directly to the Old Note Trustees by the Debtors and shall not be deducted from any distributions to the Holders of Claims and Equity Interests.

D.     *Issuance of New Securities; Execution of Related Documents*

On or as soon as practicable after the Effective Date, Core-Mark Newco shall issue all securities, notes, instruments, certificates and other documents of Core-Mark Newco required to be issued pursuant hereto, including, without limitation, the New Common Stock, which shall be distributed as provided herein. Core-Mark Newco shall execute and deliver such other agreements, documents and instruments, as is necessary to effectuate the Plan.

E.     *Restructuring Transactions*

On or before the Effective Date, Fleming intends to (i) dissolve all other of its direct or indirectly wholly owned Debtor subsidiaries other than (a) Core-Mark International, Inc.; (b) Core-Mark Mid Continent, Inc.; (c) General Acceptance Corporation; (d) Core-Mark Interrelated Companies, Inc.; (e) CM Products, Inc.; (f) ASI Office Automation, Inc.; (g) E.A. Morris Distributors Limited; (h) Head Distributing Company; (i) Marquise Ventures Company, Inc.; and (j) Minter-Weisman Co. and (ii) transfer the convenience store assets that are part of its Leitchfield, Kentucky Division to either Core-Mark International, Inc. or one of the Reorganized Debtors. The specific recipient of these assets will be determined prior to the Confirmation Date.

On or before the Effective Date, Core-Mark Newco, a Delaware corporation, shall be formed by certain of the Debtors' creditors or a nominee on their behalf. Core-Mark Newco shall then form two wholly-owned subsidiaries, Core-Mark Holdings I and Core-Mark Holdings II, both Delaware corporations, and make a capital

Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    Chapter 11

FLEMING COMPANIES, INC.,          Case No. 03-10945 (MFW)
et al.,                                   Jointly Administered

        Debtors.                          Re: Docket No. 8491

ORDER GRANTING
MOTION OF WAYNE BERRY FOR AN ORDER
GRANTING RELIEF FROM THE AUTOMATIC STAY OR,
IN THE ALTERNATIVE, RELIEF FROM THE DISCHARGE AND
PERMANENT INJUNCTION PROVISIONS OF DEBTORS' AND
OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD
AMENDED AND REVISED JOINT PLAN OF
REORGANIZATION OF FLEMING COMPANIES, INC. AND
ITS FILING SUBSIDIARIES UNDER CHAPTER 11 OF
THE UNITED STATES BANKRUPTCY CODE

Upon consideration of the Motion of Wayne Berry For An Order

Granting Relief From The Automatic Stay Or, In The Alternative, Relief

From the Discharge and Permanent Injunction Provisions of Debtors' and

Official Committee of Unsecured Creditors' Third Amended and Revised

Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing

Subsidiaries Under Chapter 11 of the United States Bankruptcy Code (the

"Motion"), and any responses thereto, and testimony adduced at any

hearings concerning the Motion, if any, the

Exhibit D

Court finds that under section 362(d)(1) of the Bankruptcy Code, cause exists to modify the automatic stay as applied to all of the debtors ("Debtors") and that the discharge injunction of section 524 or the injunction contemplated by Debtors' and Official Committee of Unsecured Creditors' Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code (the "Plan of Reorganization") shall not apply to the claims that were the subject of the Motion, and that Wayne Berry ("Movant") be to allowed to take any actions or to invoke any judicial processes against or involving any of the Debtors that Movant deems necessary or appropriate to protect his interests in certain lawsuits that are pending in Hawaii federal courts. Accordingly, it is hereby

ORDERED that the Motion is GRANTED; and it is further ORDERED that the automatic stay as applied to all of the Debtors is MODIFIED to allow Movant take any actions or to invoke any judicial processes against or involving any of the Debtors that Movant deems necessary or appropriate to protect his interests in the lawsuits described in the Motion. This includes permitting Movant to take discovery from or involving any of the Debtors; prosecute and bring to final judgment,

2

# Exhibit D

injunction, settlement, or otherwise resolve such claims, cross-claims, third-party claims, and setoff claims against any of the Debtors as the Movant may have; prosecute appeals and post judgment reviews, if any, in connection with the lawsuits; and exercise any rights of setoff against the Debtors that may exist under applicable law.

IT IS FURTHER ORDERED, that Movant's claims as set forth in the motion shall be exempted from the operation of any discharge and discharge injunction as contemplated by Bankruptcy Code Section 524 and/or the Plan of Reorganization.

DATED: _____July 26_____ 2004.


_____
Mary F. Walrath
Chief United States Bankruptcy Judge

3

Exhibit D



FCS 1993 - Tables : Total = 69

EXHIBIT 04

Berry v Hawaiian Express Plaintiff Exhibit 83

Exhibit E



Microsoft Access - [ORIGINAL LOGISTICS DATA : Database (Access 97 file format)]

File  Edit  View  Insert  Tools  Window  Help

Type a question for help

Open  Design  New

Objects
- Tables
- Queries
- Forms
- Reports
- Pages
- Macros
- Modules

Groups
- Favorites

APInvoices
APInvoicesDistribution
APPayments
APPaymentsDistribution
ARDistribution Orphan Records
ARInvoices
ARInvoicesDistribution
ARPayments
APPayments
APPaymentsDistribution
APPaymentsDeductions
ATM
Cost - Container
Cost - Job
Ctn Revenue
DeductionControl
Deduction
Events
EventsCtn
EventsJob
FlemingVendors
G50
G66
G68
G69
G76
HAWFENDX
HES Batch 0332
HES Batch 0333
HES Batch 0334
Item - Booking

Item - Booking Container Linkage
Item - Container
Item - Dock Receipt
Item - Job
Item - Job Cost Detail
Item - Job1
Item Job Manual PO's - Original DB
Job Revenue
MSysACEs
MSysAccessObjects
MSysObjects
MSysQueries
MSysRelationships
MSysModules
MSysModules2
Name - Company
NI
NotesCtn
NotesJob
NotesTable
Obsolete Containers
Obsolete Jobs - All
Obsolete Jobs - By Association
Obsolete Jobs - Other
Obsolete Jobs - Temp
PeriodDates
Place - Locations
Prepaid Backhaul
Price List - Rates
QAllowance
QRates

QtyControl
QVendor
ReceiptPOs
Summary
Switchboard Items
TBookingLink
TCostCtn
TCostCtnFull
TCostJob
TCostJobFull
TCtn
TCtnJob
TJob
TNotesCtn
TNotesPT
TNotesTrucker
VatePayments
VoteSequencer
XClaimHeaderTable
XClaimLineItemTable
YAPBRecLine
YAPBRecHead
YBLRecLine
YBLRecHead
YCnJob
YEventDates
YFTPRecHead
YFTPRecLine
YPORecHead
YPORecLine
Z Summary

Z Target
Z1
Z2
Z3
ZCost

Ready

NUM

Berry v Hawiian Express Plaintiff Exhibit 82

Exhibit F

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10

### GENERAL FORM FOR REGISTRATION OF SECURITIES
**Pursuant to Section 12(b) or (g) of The Securities Exchange Act of 1934**

# CORE-MARK HOLDING COMPANY, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **20-1489747**<br>(I.R.S. Employer Identification No.) |
| **395 Oyster Point Boulevard, Suite 415**<br>**South San Francisco, California 94080**<br>(Address of Principal Executive Offices, including Zip Code) | **(650) 589-9445**<br>(Registrant's Telephone Number, Including Area Code) |

**Securities to be Registered Pursuant to Section 12(b) of the Act:**

| Title of each class<br>to be so registered | Name of each exchange on which<br>each class is to be registered: |
|---|---|
| None | None |

**Securities to be Registered Pursuant to Section 12(g) of the Act:**

**Common Stock, par value $0.01 per share**
(Title of class)

**Common Stock Warrants**
(Title of class)

Exhibt H

# BUSINESS

## Company Overview

Core-Mark is one of the largest wholesale distributors to the convenience store industry in North America, providing sales and marketing, distribution and logistics services to customer locations across the United States and Canada.

Although Core-Mark Holding Company, Inc. was incorporated in Delaware in August 2004, the business conducted by Core-Mark dates back to 1888 when Glaser Bros., a family-owned-and-operated candy and tobacco distribution business, was founded in San Francisco. In June 2002, Fleming acquired Core-Mark International. At the time of the acquisition, Core-Mark International distributed products to convenience stores and other retailers in the Western United States and Canada from a network of 20 distribution centers. In addition to Fleming's other national retail and wholesale grocery operations, Fleming owned and operated seven convenience store distribution centers in the Eastern and Midwestern United States. After the acquisition of Core-Mark International by Fleming, Core-Mark International's management continued to operate Core-Mark International's distribution business and began integrating Fleming's convenience store distribution centers into Core-Mark International's operations. In connection with Fleming's bankruptcy, as described below, four of the seven Fleming convenience distribution centers were closed in 2003. The three continuing Fleming convenience distribution centers were fully integrated into Core-Mark International's operations by April 2004.

On April 1, 2003, Fleming filed for protection under Chapter 11 of the U.S. Bankruptcy Code. The debtor-in-possession entities comprising Core-Mark International and its subsidiaries were included in the Chapter 11 proceedings as a result of Core-Mark's guarantee of Fleming's debt.

On July 27, 2004, the United States Bankruptcy Court for the District of Delaware confirmed Fleming's Plan of Reorganization (the Plan) which became effective on August 23, 2004. The Plan provided for the reorganization of the Debtors around CMI. Pursuant to the Plan, Core-Mark Holding, Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc. and Core-Mark Holdings III, Inc. were formed. Core-Mark Holdings I, Inc. and Core-Mark Holdings II, Inc. each own 50% of Core-Mark Holdings III, Inc. On August 23, 2004 the Plan was declared effective by the bankruptcy court and Core-Mark emerged from bankruptcy. Upon emergence, Fleming transferred its interest in CMI to Core-Mark Holdings III, Inc., making CMI a wholly owned subsidiary of Core-Mark Holdings III, Inc., and transferred all of the remaining assets of one of its convenience store distribution centers to a subsidiary of CMI.

A summary organizational chart depicting our current corporate structure after giving effect to the completion of the reorganization is set forth below.



We operate a network of 24 distribution centers in the United States and Canada, including two distribution centers that we operate as a third party logistics provider. One of these third party distribution centers is located

Exhibt H

### Our Strategy and Competitive Strengths

Our objective is to be the premier distributor to the retail convenience industry in North America. Our ability to successfully compete in our marketplace is founded upon:

- The integration of marketing, logistics and information systems while maintaining a culture with a strong customer service focus.

- The continuity, experience and proven ability of our management team.

- The dedication, commitment and hard work of the approximately 3,650 employees who comprise the Core-Mark family.

- Successfully balancing a centralized strategy with a decentralized execution.

- Leveraging economies of scale in operational efficiencies, purchasing power and lower overhead expenses.

Our three primary strategies to sustain our growth and gain customers are:

*Grow our Customers' Sales Profitably.* Our success has been and will continue to be attributed to helping our customers grow their business in a profitable manner. We accomplish this mission primarily through investing in the development and execution of strategic marketing programs which seek to align current consumer demands with the latest in new products, promotion and marketing concepts. Our marketing professionals are constantly working to create and/or discover goods and services which will strengthen our customers' offerings to the public. By providing product evaluations, recommendations, and other similar services, we enhance our customer's opportunity for increased profitability.

*Make it Easy for our Customers to do Business with Us.* Through a carefully crafted framework of customer service personnel, field sales personnel, merchandising representatives, account managers, account directors and executive representatives, we ensure that our customers requirements—large and small—are addressed in a timely and professional manner. Our people are complemented with customer service tools and web based tools designed to make doing business with Core-Mark easy and cost effective. We operate a centralized proprietary information system that provides our customers with reliable and consistent access to our services across all regions. We also offer a broad range of customized services including comprehensive product category management consultation and coordination. Our business has been built on our unique commitment to flexibility and customization in addressing the needs of each of our customers.

*Do the Fundamentals Well.* We have created and invested in systems, procedures, standards and a culture that ensures our customers consistently receive industry leading order fulfillment rates, on-time deliveries, pricing accuracy and integrity. Our proprietary logistics system coupled with our experience in integrating hardware and software enables us to deliver high volumes of product efficiently and accurately. We believe that the decentralized management of our distribution centers, together with our high standards of service, should enable us to outperform our competition in customer satisfaction.

### Company Background

Our origins date back to 1888, when Glaser Bros., a family-owned-and-operated candy and tobacco distribution business, was founded in San Francisco. In August 1996, we completed a recapitalization resulting in Jupiter Partners, L.P. and senior management owning 75% and 25% of the Company equity, respectively. In June 2002, Fleming Companies, Inc., or Fleming, acquired Core-Mark International, Inc., our operating subsidiary. On April 1, 2003, Fleming filed for protection under Chapter 11 of the U.S. Bankruptcy Code. The debtor-in-possession entities comprising Core-Mark were included in the Chapter 11 proceedings. Fleming's plan of reorganization, or the Plan, which became effective on August 23, 2004, provided for the reorganization of certain of Fleming's convenience operations and subsidiaries around Core-Mark International. Fleming's other assets and liabilities were transferred to two special-purpose trusts and are being liquidated.

2

Exhibt H

in Phoenix, Arizona, which we refer to as the Arizona Distribution Center, or ADC, and is dedicated solely to supporting the logistics and management requirements of one of our major customers, Circle K. In April 2005, we began operating a second third party logistics distribution facility located in San Antonio, Texas, which we refer to as the Retail Distribution Center, or RDC, and is dedicated solely to supporting Valero.

We distribute a diverse line of national and private label convenience store products to over 20,000 customer locations. The products we distribute include cigarettes, tobacco, candy, snacks, fast food, grocery products, non-alcoholic beverages, general merchandise and health and beauty care products. For the twelve months ended December 31, 2004, approximately 72% of our net sales came from the cigarette category and approximately 28% of our net sales came from the remaining non-cigarette categories. However, during the same twelve month period, approximately 36% of our gross profit was generated from cigarette categories while approximately 64% of our gross profit was generated from the non-cigarette categories.

We also provide sales and marketing, distribution and logistics services to our customer locations which include a variety of store formats, including traditional convenience retail stores, mass merchandise stores, grocery stores, drug stores, liquor stores, gift shops, specialty stores and other stores that carry convenience products. We distribute approximately 38,000 SKUs of packaged consumable goods to our customers, and also provide an array of information and data services that enable our customers to better manage retail product sales and marketing functions.

Our management team is led by J. Michael Walsh, our President and Chief Executive Officer, who has been with Core-Mark since April 1991. He leads a team of 14 senior managers who have largely overseen the operations of Core-Mark since 1991. Our management has expertise in all of the critical functional areas including logistics, sales and marketing, purchasing, information technology, finance and retail store support.

**Industry Overview**

Wholesale distributors provide valuable services to both manufacturers of consumer products and convenience retailers. Manufacturers benefit from wholesale distributors' broad retail coverage, inventory management and efficient processing of small orders. Wholesale distributors provide convenience retailers access to a broad product line, the ability to place small quantity orders, inventory management and access to trade credit. In addition, large full-service wholesale distributors, such as Core-Mark, offer retailers the ability to participate in manufacturer and Company sponsored marketing programs, merchandising and product category management services, as well as the use of information systems that are focused on minimizing retailers' investment in inventory, while seeking to maximize their sales.

The wholesale distribution industry is highly fragmented and historically has consisted of a large number of small, privately-owned businesses and a small number of large, full-service wholesale distributors serving multiple geographic regions. Relative to smaller competitors, large distributors such as Core-Mark benefit from several competitive advantages including: increased purchasing power, the ability to service chain accounts, economies of scale in sales and operations, the ability to spread fixed corporate costs over a larger revenue base and the resources to invest in information technology and other productivity enhancing technology.

Convenience in-store merchandise includes candy, snacks, fast food, dairy products, beer, non-alcoholic packaged beverages, frozen items, general merchandise, health and beauty care products, other grocery products, cigarettes, cigars and other tobacco products. Aggregate U.S. wholesale sales of convenience store merchandise include wholesale product sales to traditional convenience stores and sales to a variety of alternative convenience retailers, which we refer to as alternative outlets. Alternative outlets include drug stores, mass merchandisers, grocery stores, liquor stores, cigarette and tobacco shops, hotel gift shops, correctional facilities, military exchanges, college bookstores, casinos, video rental stores, hardware stores, airport concessions and movie theatres, and others.

17

Exhibt H

According to the 2005 NACS State of the Industry Report, during 2004, aggregate U.S. traditional convenience retail in-store sales were approximately $132 billion. We estimate that of the products that these stores sell, 45% to 55% of the products are supplied by wholesale distributors such as Core-Mark. The convenience store retail industry gross profit for in-store sales was approximately $39 billion in 2004 which represents an increase of 9.5% over 2003. Over the ten years from 1994 through 2004, convenience in-store sales increased by a compounded annual growth rate of 6.9%. Two of the factors influencing this growth were a 9.9% compounded annual growth rate in cigarette sales and a 3.5% compounded annual growth rate in the number of stores.

The traditional convenience store sector is divided into two principal categories: (1) corporates, defined as corporate-owned and operated chains with a national or multi-region footprint, such as Circle K, Petro-Canada and Valero; and (2) independents and smaller chains, including franchisees, dealers and individually operated locations. Based on the 2005 NACS State of the Industry Report, we estimate independents and smaller chains, those comprising 50 stores or less, represent approximately 76% of traditional convenience store sales in the United States while corporates represented 24%. Conversely, Canadian convenience store sales are dominated by corporates.

We estimate that, as of December 31, 2004, there were over 400 wholesale distributors to traditional convenience store retailers in the United States, approximately 30 of which are broad-line distributors similar to Core-Mark. We believe that Core-Mark and McLane Company, Inc., a subsidiary of Berkshire Hathaway, Inc., are the two largest companies, measured by annual sales, in North America. There are also companies that provide products to specific regions of the country, such as The H.T. Hackney Company in the Southeast, Eby-Brown Company in the Midwest, Mid-Atlantic and Southeast and GSC Enterprises, Inc. in Texas and surrounding states, and several hundred local distributors serving small regional chains and independent convenience stores. In Canada, there are fewer wholesale suppliers as compared to the United States. We believe that Core-Mark is one of the largest wholesale distributors to convenience stores in Canada in terms of annual sales.

### Strategy and Competitive Strengths

Our objective is to be the premier broad line supplier to the retail convenience industry in North America. Our ability to successfully compete in our marketplace is founded upon:

- The integration of marketing, logistics and information systems while maintaining a culture with a strong customer service focus.

- The continuity, experience and proven ability of our management team.

- The dedication, commitment and hard work of the 3,650 employees who comprise the Core-Mark family.

- Successfully balancing a centralized strategy with a decentralized execution.

- Leveraging economies of scale in operational efficiencies, purchasing power and lower overhead expenses.

Our three primary strategies to sustain our growth and gain customers are:

***Grow our Customers' Sales Profitably***.    We believe that our success has been and will continue to be attributed to helping our customers grow their business in a profitable manner. We accomplish this mission primarily through investing in the development and execution of strategic marketing programs which seek to align current consumer demands with the latest in new products, promotion and marketing concepts. Our marketing professionals work to create and/or discover goods and services which will strengthen our customers' offerings to the public. By providing product evaluations, recommendations, and other similar services, we enhance our customer's opportunity for increased profitability.

18

Exhibt H

***Make it Easy for our Customers to do Business with Us.***   Through a carefully crafted framework of customer service personnel, field sales personnel, merchandising representatives, account managers, account directors and executive representatives, we assure that our customers requirements—large and small—are addressed in a timely and professional manner. We complement our personnel with customer service tools such as 1-800 help and support services. Customers can use the internet to access their purchasing history, search an easy-to-use product catalog, manage store pricing online, streamline item purchasing authorization and search a customized account product database. For the more technologically sophisticated customers, we provide computer assisted ordering and other ordering tools designed to make the ordering process as convenient to our customers as possible. We operate a centralized proprietary information system that provides our customers with a reliable and consistent means of accessing and using our services across all regions. We also offer a broad range of customized services including placing merchandise in the store, ordering, rotating and stocking the product on the store shelves, accommodating special delivery schedules and providing comprehensive product category management consultation and coordination. Our business has been built on our unique commitment to flexibility and customization to address the needs of each of our customers.

***Execute on the Fundamentals.***   We have created and invested in systems, procedures, standards and a culture that ensures our customers consistently receive industry leading order fulfillment rates, on-time deliveries, pricing accuracy and integrity. Our proprietary logistics system coupled with our experience in the integration of hardware and software enables us to deliver high volumes at a very high level of efficiency and accuracy. We believe that the decentralized management of our distribution centers, along with our high standards of service enables us to consistently outperform our competition in customer satisfaction.

In order to execute on these strategies, we leverage the following competitive strengths:

*Diversified Product Offerings.*   We supply approximately 38,000 SKUs to our customers including cigarettes, tobacco, candy, snacks, fast food, grocery products, non-alcoholic beverages, general merchandise and health and beauty care products. We maintain a diverse and expansive product offering, which allows us to supply the products required by our diverse customer base. By carrying the appropriate product mix and quantities, we have achieved an order fulfillment rate of in excess of 98.5%.

*Strong Merchandising Orientation.*   We offer leading merchandising initiatives and full-service programs that allow our customers to receive key categories or products through high quality management with weekly in-store merchandising services to drive their sales. We have product merchandisers that are assigned to each participating customer to consult the store on a weekly basis. These merchandisers order, rotate, price, write credits and assist our customers in driving their store sales and profits. In contrast, many of our competitors place the full burden of any merchandising services directly on the customer. Our merchandising expertise results in higher order fulfillment, quality invoicing, product supply integrity and competitive pricing for our customers and increased sales.

*Balanced Distribution Network.*   We operate a centralized information system that provides our customers with a reliable and consistent means of accessing and using our services across our decentralized distribution center network. Our distribution centers operate on a common information system platform and user procedures that allow a multi-regional customer to conduct business in the same manner across all regions. Our decentralized distribution center network provides the flexibility to meet our customers' unique product requirements and a targeted on-time delivery rate of 95%. In addition, each distribution center carries the products required by the convenience stores in the particular region in which the distribution center is located. We believe that a key to our long term success is to understand our customers' business and to meet our customers' unique requirements. Our decentralized distribution center network enables our distribution center management teams and merchandisers to maintain close relationships with our customers resulting in a greater understanding of their businesses and the ability to meet our customer's unique requirements.

Exhibt H

*Systems Suite.*   We maintain a high level of operating efficiency by investing in information systems technology, including computerization of buying and financial control functions. The convenience store industry does not have a standard IT platform, therefore actively integrating our customers into our IT platform is a priority. Our Distribution Center Management System, or DCMS, platform provides our distribution centers with the flexibility to adapt to our customers' IT requirements. Once a customer is integrated into our IT platform, the customer can utilize the decision support services that we provide through eBusiness Exchange, our internet based computer assisted ordering and decision support system. Our eBusiness Exchange enables our customers to access their purchasing history, search an easy to use product catalog, manage store retail pricing online, streamline item authorization and search a customized account product database. These functions enable our customers to leverage our superior information technology to make real time business decisions intelligently. We believe that our eBusiness Exchange helps to solidify our relationships with our customers and drives sales with our customers.

## Customers and Marketing

We service approximately 20,000 customer locations in 37 U.S. states and five Canadian provinces. We service traditional convenience stores as well as alternative outlets selling convenience store products. Our traditional convenience store customers include many of the major national and super-regional convenience store operators as well as thousands of multi- and single-store customers. Some of our largest traditional convenience store customers include Alimentation Couche-Tard (the parent company of Circle K stores in the U.S. and Mac's stores in Canada), Arco am/pm franchisees, ConocoPhillips, Esso Convenience, Kroger (convenience), Maverik Country Stores, Petro-Canada, RaceTrac and Valero. For the year ended December 31, 2004, traditional convenience store customers accounted for approximately 68% of our sales. Our alternative outlet customers comprise a variety of store formats, including drug stores, mass merchandisers, grocery stores, liquor stores, cigarette and tobacco shops, hotel gift shops, correctional facilities, military exchanges, college bookstores, casinos, video rental stores, hardware stores and airport concessions. Some of our other alternative outlet customers include Hudson News, London Drugs, MGM Grand Hotel and Shoppers Drug Mart. Our top ten customers accounted for approximately 28% of our sales in 2004, while our largest customer accounted for less than 7% of our total sales in 2004.

We believe our strength is as a sales and marketing company focused on maximizing our customers' sales and profits. As of June 30, 2005, approximately one third of our workforce was dedicated to sales and marketing and to directly serving our customers' merchandising needs. Our sales personnel focus on growing customer profitability, selling marketing programs and obtaining new business. We also have national sales representatives with cross-divisional territorial responsibility that target large chain customers.

Our sales representatives accept and process orders, review account balances and assist with current and new product information. They are responsible for ensuring that customers have an adequate supply of product in their stores and that our customers' orders are promptly and efficiently processed. Our sales representatives report to our distribution center management teams.

Our merchandisers, working in coordination with our sales representatives, assist in maximizing the amount of product on our customers' shelves given the limited space available. They oversee marketing programs and identify incremental sales opportunities to be implemented. They are also trained to organize our customer's stores to maximize our customer's sales through SmartSet™, our category management program. Our product specialists and category managers provide the merchandisers, along with the sales representatives, information on merchandising strategies relating to our products, promotions and programs.

We have designed and developed several merchandising programs to meet our customers' needs and increase our customers' sales and profits, including the following:

- *Arcadia Bay*®.   A premium branding and sales program providing packaging, equipment and Sara Lee® Arabaca coffee products.

20

Exhibt H

- *Boondoggles®.*   A proprietary fast food program serving such items as deli sandwiches, wraps, fried chicken, pizza and bakery items.

- *Candy Endcap.*   A racked sales program focused on best selling candy, gum and mints which is strategically located for impulse sales.

- *Cooler Door.*   A retailer beverage program that fills cooler space with top brand-name products and new items.

- *Promo Power.*   A monthly offering of multiple promotional items including new items and special prices.

- *SmartSet™.*   A program which offers custom designed product displays including such categories as frozen food, bag candy and deli products.

- *SmartStock®.*   A sales program which designs builds and actively manages product displays by categories.

- *Spacevues.*   A software program which designs product placement to maximize use of space.

## Information Technology Service

Our information technology group provides various advisory services such as information technology strategic planning, development, store automation, and evaluation, selection, integration and training support. In 2002, we launched eBusiness Exchange. eBusiness Exchange is an internet based application that provides a number of generic applications and certain customized applications that can be tailored for specific customers. eBusiness Exchange permits our customers to track the products that they have purchased from us over the prior two years. Providing our customers' access to their purchasing history permits them to leverage their purchasing history in order to make real time purchasing decisions intelligently.

## Sales, Products and Suppliers

The following table summarizes our cigarette and other product sales over the past five years as a percent of our net sales:

|  | 2004[1] | 2003[1] | 2002[1] | 2001[1] | 2000[1] |
|---|---|---|---|---|---|
| **Cigarettes** | | | | | |
| Net sales (in millions) . . . . . . . . . . . | $3,048.2 | $3,049.8 | $3,368.4 | $2,473.1 | $2,174.7 |
| Gross Profit (in millions)[2][3] .. | $   87.3 | $  106.7 | $  129.3 | $   82.6 | $   71.3 |
| % of Total Sales . . . . . . . . . . . . | 72% | 71% | 72% | 72% | 72% |
| % of Gross Profit . . . . . . . . . . . | 36% | 40% | 42% | 39% | 37% |
| **All other products** | | | | | |
| Net sales (in millions) . . . . . . . . . . . | $1,174.2 | $1,274.5 | $1,293.7 | $  951.9 | $  860.7 |
| % of Total Sales . . . . . . . . . . . . | 28% | 29% | 28% | 28% | 28% |
| % of Gross Profit . . . . . . . . . . . | 64% | 60% | 58% | 61% | 63% |
| **Total Net Sales (in millions)** . . . . . . | $4,222.4 | $4,324.3 | $4,662.1 | $3,425.0 | $3,035.4 |
| **Gross Profit (in millions)** . . . . . . . . | $  240.2 | $  269.4 | $  308.3 | $  213.8 | $  195.1 |

(1)   The years 2004, 2003 and 2002 include the results of the Atlanta, Georgia, Leitchfield, Kentucky and Minneapolis, Minnesota convenience distribution centers previously operated by Fleming. The data for 2000 and 2001, during which time we did not operate these distribution centers, is not available. The information provided for the periods prior to August 23, 2004 relates to the Predecessor Company, while the information after August 23, 2004 is that of the Successor Company. We have combined the Predecessor Company and Successor Company periods in 2004 for convenience of discussion (See Selected Financial Information contained in this registration statement for further discussion). *(See Note 3—Fresh-Start Accounting to the consolidated financial statements).*

21

Exhibt H

**Background**

Core-Mark Holding Company, Inc. was incorporated on August 20, 2004 as the ultimate parent company for Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., and Core-Mark International's wholly owned subsidiaries pursuant to a plan of reorganization, the Plan, following a bankruptcy petition as described below.

In June 2002, Fleming Companies, Inc., or Fleming, acquired Core-Mark International. After the acquisition, Core-Mark International's management continued to operate Core-Mark International's distribution business and began integrating Fleming's convenience distribution centers into Core-Mark International's operations.

On April 1, 2003 Fleming filed for protection under Chapter 11 of the U.S. Bankruptcy Code. The debtor-in-possession entities comprising Core-Mark were included in the Chapter 11 proceedings as Core-Mark had guaranteed Fleming's debt. The Plan, which became effective on August 23, 2004, provided for the reorganization of the debtors around Core-Mark. Fleming's other assets and liabilities were transferred to two special-purpose trusts, and its remaining direct and indirect subsidiaries have been dissolved or are in the process of being dissolved.

On August 23, 2004, Core-Mark emerged from the Fleming bankruptcy and reflected the terms of the Plan in its consolidated financial statements, applying the terms of the American Institute of Certified Public Accountants Statement of Position 90-7 (SOP 90-7), *Financial Reporting by Entities in Reorganization under the Bankruptcy Code* with respect to financial reporting upon emergence from bankruptcy (fresh-start accounting).

Pursuant to fresh-start accounting rules, a new reporting entity, which we refer to as the Successor Company, was deemed to be created and the recorded amounts of assets and liabilities were adjusted to reflect their estimated fair values at the time of emergence from bankruptcy and are based on management's assessments which considered independent valuations where applicable. The effective date of Core-Mark's emergence from bankruptcy was August 23, 2004. All financial information prior to August 23, 2004 is identified as relating to the Predecessor Company. All financial information after August 22, 2004 relates to the Successor Company.

In applying fresh-start accounting to our August 23, 2004 consolidated financial statements, adjustments to reflect the fair value of assets and liabilities amounted to $5.8 million in reorganization items, net. The adjustment was primarily attributable to ascribing value to intangible internally developed software of $6.0 million, an adjustment to our deferred rent accrual of $3.8 million, offset by charges for the re-valuation of other balance sheet items totaling $4.0 million, including inventory and accounts receivables. The restructuring of our capital structure and resulting discharge of pre-petition debt resulted in a net gain of $66.1 million. The charge for the revaluation of our assets and liabilities and the net gain on the discharge of pre-petition debt are recorded in reorganization items, net in the consolidated statements of operations *(See Note 10—Reorganization Items, Net to the consolidated financial statements).*

*Trust Guarantees.* Pursuant to the Plan, two special purpose trusts were established, the Post-Confirmation Trust, or PCT, and the Reclamation Creditors' Trust, or RCT, which we refer to collectively as the Trusts *(See Off-Balance Sheet Arrangements in this Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 1—Summary Company Information and Emergence from Bankruptcy to the consolidated financial statements).* We guaranteed payment obligations of the Trusts based on certain thresholds, in the event of the Trusts' inability to pay eligible settlements. FASB Interpretation No. 45 (FIN 45), *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others,* requires that an entity issuing a guarantee must recognize, at the inception of the guarantee, a liability equal to the fair value of the guarantee. Based on the estimates provided by the Trusts and our analysis prepared in accordance with FIN 45, we believe that (i) the guaranteed claims of the PCT are substantially below the guarantee threshold, and (ii) the assets of the RCT will be sufficient to satisfy the Trade Lien Vendor (TLV) and Non-Trade Lien Vendor (non-TLV) claims against it. Therefore, no liability is believed

34

CORE-MARK HOLDING COMPANY, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

companies (accelerated filers) to report on the company's internal control over financial reporting for years ended on or after November 15, 2004. Other public companies (non-accelerated filers) must begin to comply with the new requirements related to internal control over financial reporting for their first year ending on or after July 15, 2006 under the latest extension granted by the SEC. CMI is a non-accelerated filer and therefore expects to comply with Section 404 of the Sarbanes-Oxley Act for the year ended December 31, 2006.

### 3. Fresh-Start Accounting

In connection with the emergence from bankruptcy, Core-Mark adopted American Institute of Certified Public Accountants (AICPA) Statement of Position 90-7 (SOP 90-7) *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code*. Pursuant to the fresh-start accounting rules, a new reporting entity, the Successor Company, was deemed to be created and the recorded amounts of assets and liabilities were adjusted to reflect their estimated fair values at the time of emergence from bankruptcy and were based on independent valuations where applicable. The effective date of Core-Mark's emergence from bankruptcy was August 23, 2004 when the refinancing of the Company's debts as contemplated under the Plan was completed. All financial information prior to August 23, 2004 is identified as relating to the Predecessor Company. All financial information after August 23, 2004 relates to the Successor Company. Consequently, after giving effect to the reorganization and fresh-start accounting as required by SOP 90-7, the financial statements of the Successor Company are not comparable to those of the Predecessor Company.

A set of financial projections was developed which were filed with the bankruptcy court as part of the Plan of Reorganization. Based on these financial projections, an enterprise value was determined in March 2004 by an independent valuation firm using various valuation methods, including (i) a review and analysis of several recent transactions of companies in similar industries as the Company, and (ii) a calculation of the present value of future operating cash flows. The estimated enterprise value is highly dependent upon the Company achieving its future financial results set forth in the projections as well as the realization of certain other assumptions, which are not guaranteed. The estimated enterprise value of the Company was calculated to be approximately $265 million to $310 million. The midpoint of the range, $290 million, was selected as the Company's estimated enterprise value for purposes of the Plan.

Given the passage of time and the change in the Company's balance sheet just prior to emergence from bankruptcy, the Company engaged another independent valuation firm in June 2005 in connection with the application of fresh-start accounting at emergence. This independent valuation firm utilized generally accepted valuation techniques, considering estimated discounted cash flows based on the same financial projections as filed in the Plan, and a balance sheet that was more reflective of the balance sheet at the date of emergence to determine the estimated fair value of the assets at August 23, 2004. In connection with this valuation, at emergence, the carrying amount of the Company's assets and liabilities were adjusted to fair value, resulting in a net revaluation adjustment of $5.8 million included in reorganization items, net. *(See Note 10—Reorganization Items, net to the consolidated financial statements.)* The net revaluation increase to the Company's assets and liabilities was primarily attributable to ascribing value to intangible internally developed software of $6.0 million, an adjustment to our deferred rent accrual of $3.8 million, offset by charges for the revaluation of other balance sheet items totaling $4.0 million.

The restructuring of the Company's capital structure and the resulting discharge of pre-petition debt resulted in a net gain of $66.1 million. The income resulting from the gain from the discharge of pre-petition debt was recorded in reorganization items, net, in the consolidated statement of operations *(See Note 10—Reorganization Items, Net to the consolidated financial statements).*

Exhibt H

CORE-MARK HOLDING COMPANY, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**5.  Other Balance Sheet Accounts Detail**

**Other Receivables, Net**

Other receivables, net consist of the following (in millions):

| | Successor Company | | Predecessor Company |
| --- | --- | --- | --- |
| | December 31, 2004 | August 23, 2004 | December 31, 2003 |
| Vendor receivables, net | $27.6 | $50.3 | $62.1 |
| Insurance recoverables, current | 2.5 | 3.1 | — |
| Other | 4.7 | 0.5 | 0.4 |
| Total | $34.8 | $53.9 | $62.5 |

**Deposits and Prepayments**

Deposits and prepayments consist of the following (in millions):

| | Successor Company | | Predecessor Company |
| --- | --- | --- | --- |
| | December 31, 2004 | August 23, 2004 | December 31, 2003 |
| Deposits | $21.1 | $24.5 | $ 7.0 |
| Prepayments | 17.6 | 27.9 | 22.3 |
| Total | $38.7 | $52.4 | $29.3 |

**Other Non-Current Assets, Net**

Other non-current assets, net consist of the following (in millions):

| | Successor Company | | Predecessor Company |
| --- | --- | --- | --- |
| | December 31, 2004 | August 23, 2004 | December 31, 2003 |
| Internally developed and other software, net | $ 6.2 | $ 6.0 | $— |
| Insurance recoverables, net of current portion | 20.7 | 20.9 | — |
| Debt issuance costs, net | 3.3 | 3.8 | — |
| Other non-current assets | 1.6 | 2.1 | 1.4 |
| Total | $31.8 | $32.8 | $ 1.4 |

*Intangible Assets.* As a result of Core-Mark's then parent company Fleming filing for Chapter 11 bankruptcy on April 1, 2003, the Company performed a test for impairment on its acquired intangibles and long-lived assets based on third-party valuations. The test measured the value of those assets based on an income approach using the net present value of expected future cash flows generated by the reporting units or asset groupings, as applicable. As a result of the impairment testing performed, the acquired intangible assets were determined to be impaired, but property and equipment were not impaired based on third-party valuations. As a result, the Company recorded an impairment charge of $45.8 million to write-down the purchased intangibles and certain other long-lived intangible assets to their fair value as of April 1, 2003. This non-cash impairment charge is included in the accompanying consolidated statement of operations for the year ended December 31, 2003.

Exhibt H

CORE-MARK HOLDING COMPANY, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Amortization expense related to intangible assets was $1.7 million and $3.5 million for the years ended December 31, 2003 and 2002, respectively.

In accordance with Fresh-Start accounting under SOP 90-7, Management initiated an independent third-party valuation analysis which determined the fair value of the Company's internally developed software to be $6.0 million at August 23, 2004. As of December 31, 2004, internally developed software with an eight-year life was $5.7 million, net of accumulated amortization. In addition, other non-current assets included other purchased software with an average life of one to three years which amounted to $0.5 million as of December 31, 2004.

*Goodwill.* Upon adoption of SFAS No. 142 on January 1, 2002, the Company ceased amortizing the remaining balances of goodwill existing at that time. For goodwill arising after January 1, 2002, no amortization was required in accordance with SFAS No. 142. The Company completed the transitional goodwill impairment test in January 2002 upon adoption of SFAS No. 142 and completed an annual test for impairment in December 2002. In each case, the Company determined that the carrying amount of goodwill was not impaired.

On April 1, 2003, Core-Mark's then parent company Fleming filed for Chapter 11 bankruptcy, which was deemed an event or change in circumstances under SFAS No. 142 requiring impairment testing. As of the date of bankruptcy filing, the Company performed an impairment test on goodwill for each of its reporting units, or operating divisions, using the two-step approach. For each of its reporting units, the Company had determined that the carrying value of each division exceeded its estimated fair value, which indicated potential goodwill impairment. The Company then completed the second step of the goodwill impairment test by measuring the fair value of each operating division against the estimated fair value of the underlying assets and liabilities, excluding goodwill, to estimate an implied fair value of that division's goodwill. As a result of this analysis, the Company recorded a goodwill impairment charge of $245.6 million on April 1, 2003, which represented 100% of the Company's then total goodwill balance. This non-cash impairment charge is included in goodwill and asset impairment charges on the accompanying consolidated statement of operations for the year ended December 31, 2003.

**Accrued Liabilities**

Accrued liabilities consist of the following (in millions):

|  | Successor Company | | Predecessor Company |
|---|---|---|---|
|  | December 31, 2004 | August 23, 2004 | December 31, 2003 |
| Accrued payroll, retirement, and other benefits | $15.7 | $18.6 | $12.6 |
| Auto, workers compensation, and medical claims, current | 18.8 | 16.6 | 9.1 |
| Other accrued expenses | 21.4 | 21.6 | 33.0 |
| Accrued customer incentives payable | 4.6 | 4.4 | 4.5 |
| Total | $60.5 | $61.2 | $59.2 |

F-25

Exhibt H

| Exhibit No. | Description |
|---|---|
| 10.10 | Registration Rights Agreement, dated August 20, 2004, among Core-Mark Holding Company. Inc. and the parties listed on Schedule I attached thereto. |
| 10.11* | Form of Note |
| 10.12 | Form of Common Stock Purchase Warrant |
| 10.13* | Security Agreement, dated as of August 20, 2004, among Core-Mark Holdings Company, Inc., Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., Core-Mark Midcontinent, Inc., Core-Mark Interrelated Companies, Inc., Head Distributing Company, Minter-Weisman Co. and Wells Fargo Bank, N.A. |
| 10.14* | Intellectual Property Security Agreement, dated as of August 20, 2004, among Core-Mark Holdings Company, Inc., Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., Core-Mark Midcontinent, Inc., Core-Mark Interrelated Companies, Inc., Head Distributing Company, Minter-Weisman Co. and Wells Fargo Bank, N.A. |
| 10.15* | Pledge Agreement, dated as of August 20, 2004, among Core-Mark Holdings Company, Inc., Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., Core-Mark Midcontinent, Inc., Core-Mark Interrelated Companies, Inc., Head Distributing Company, Minter-Weisman Co. and Wells Fargo Bank, N.A. |
| 10.16* | Security Agreement, dated as of August 20, 2004, between Core-Mark International, Inc. and Wells Fargo Bank, N.A. |
| 10.17* | Intellectual Property Security Agreement, dated as of August 20, 2004, between Core-Mark International, Inc. and Wells Fargo Bank, N.A. |
| 10.18* | Intercreditor Agreement, dated as of August 20, 2004, between General Electric Capital Corporation and Wells Fargo Bank, N.A. |
| 11.1 | Statement of Computation of Earnings Per Share (required information contained within this Form 10) |
| 16.1 | Letter from Burr, Pilger & Mayer LLP regarding change of certifying accountant. |
| 21.1 | List of Subsidiaries of Core-Mark Holding Company, Inc. |

* To be filed by amendment.

Exhibt H

| Exhibit No. | Description |
|---|---|
| 10.12 | Form of Common Stock Purchase Warrant |
| 10.13* | Security Agreement, dated as of August 20, 2004, among Core-Mark Holdings Company, Inc., Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., Core-Mark Midcontinent, Inc., Core-Mark Interrelated Companies, Inc., Head Distributing Company, Minter-Weisman Co. and Wells Fargo Bank, N.A. |
| 10.14* | Intellectual Property Security Agreement, dated as of August 20, 2004, among Core-Mark Holdings Company, Inc., Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., Core-Mark Midcontinent, Inc., Core-Mark Interrelated Companies, Inc., Head Distributing Company, Minter-Weisman Co. and Wells Fargo Bank, N.A. |
| 10.15* | Pledge Agreement, dated as of August 20, 2004, among Core-Mark Holdings Company, Inc., Core-Mark Holdings I, Inc., Core-Mark Holdings II, Inc., Core-Mark Holdings III, Inc., Core-Mark International, Inc., Core-Mark Midcontinent, Inc., Core-Mark Interrelated Companies, Inc., Head Distributing Company, Minter-Weisman Co. and Wells Fargo Bank, N.A. |
| 10.16* | Security Agreement, dated as of August 20, 2004, between Core-Mark International, Inc. and Wells Fargo Bank, N.A. |
| 10.17* | Intellectual Property Security Agreement, dated as of August 20, 2004, between Core-Mark International, Inc. and Wells Fargo Bank, N.A. |
| 10.18* | Intercreditor Agreement, dated as of August 20, 2004, between General Electric Capital Corporation and Wells Fargo Bank, N.A. |
| 11.1 | Statement of Computation of Earnings Per Share (required information contained within this Form 10) |
| 16.1 | Letter from Burr, Pilger & Mayer LLP regarding change of certifying accountant. |
| 21.1 | List of Subsidiaries of Core-Mark Holding Company, Inc. |

* To be filed by amendment.

Exhibt H

**SIGNATURES**

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized.

CORE-MARK HOLDING COMPANY, INC.

Date: September 2, 2005

By: _____ /s/   J. MICHAEL WALSH _____
Name:         J. Michael Walsh
Title:        President and Chief Executive Officer

S-1

Exhibt H

## Teresa Noa

**From:** Mark Dillon [MarkD@fleming-logistics.com]
**Sent:** Tuesday, August 05, 2003 4:25 PM
**To:** Teresa Noa
**Subject:** Re: Freight Balance report

Teresa, Ron,

In reponse to the Teresa's email (See below).

RE: "In him trying to enhance the report - it is slowing down our ability to work on this side. Isn't it possible for the developer/programmer to be operating off a complete different system than the users? This way we don't feel the impact and then the changes can be transferred to the user system - tested and go from there?"

   I will henceforth use a test set of spreadsheets and queries. I have done this in the past, but did not for this report because it takes time to set up and update such a    system, and time to change reports developed under a test system to operate with the production system. I did not have much time and I was attempting to recreate a complex report from scratch within the limitations the spreadsheets impose.

RE: "Then - who owns the Z tables?"

   The "Z Tables" are part of the Berry database, and as such are copyrighted.

RE: "Do we have to rely on Crystal reports?"

   Crystal Reports are the leading report engine for the Windows environment. I am open to alternatives, but last time I looked, Crystal was the best thing going. Also,       this type of software is expensive, complicated (there's a risk involved in switching) and to replace it would require a learning curve from everyone. I have been hoping for several weeks to begin running Crystal Reports from within Visual Basic, since tests show that we can prevent reports from locking the spreadsheet in this              manner. It should also give us greater versatility in querying, which should allow us to create a faster query without the Z tables. This requires programming, however,    and I haven't had time for it.

RE: "This is being made to sound harder than it really is."

   I told you the facts. Are you saying that you know better?

RE: "questions that I had in regards to why costing is not showing up right - and why some reports are not identifying SIT etc"

   What are these?

Mark

> ----- Original Message -----
> **From:** Teresa Noa
> **To:** Mark Dillon ; Ron Hatch
> **Sent:** Tuesday, August 05, 2003 12:58 PM
> **Subject:** Re: Freight Balance report
>
> Mark created a report for me to replace the Freight Profit/Loss report that we had. It is limited so I asked for changes. He advises below his concerns and why the report can not be revised without causing mayhem in the office.

D00305

8/9/2004

In him trying to enhance the report - it is slowing down our ability to work on this side. Isn't it possible for the developer/programmer to be operating off a complete different system than the users? This way we don't feel the impact and then the changes can be transferred to the user system - tested and go from there?

Then - who owns the Z tables? Isn't there some other type of reporting program out there that can link to the spreadshets (outside of Crystal Reports) - to eliminate this problem? Do we have to rely on Crystal reports?

Mark - I don't want the report to search the whole database. Right now you have the criteria - locked up to where I can't change the search criteria. Example - usually we go to Select expert - and add any field in the selection criteria.

Right now with the report the way it currently is - I don't have that option. I have to click on refresh - and then there's some prompt that comes up - with sail dates - and you have to click on two different fields to input the dates. I want to be able to change the search from sail date to any other way I want to search - and receive the correct info.

This is being made to sound harder than it really is. As I advised - never mind trying to enhance this report - I will work on it and figure it out. I think there are some other reports that are needed - and questions that I had in regards to why costing is not showing up right - and why some reports are not identifying SIT etc. I would rather you work on that and I will work on the Freight Balance report.

Thanks.

----- Original Message -----
**From:** Mark Dillon
**To:** Teresa Noa
**Sent:** Tuesday, August 05, 2003 12:51 PM
**Subject:** Freight Balance report

Teresa,

You can base a report on a query AND use the select expert and specify any criteria you wish if the underlying query accesses all records in the database. The problem is that accessing all record in the database uses too many resources the way it is currently designed. I am in the process on trying to reconfigure the query to run faster. Part of the problem is that the original Freight Profit-Loss reports used the Z tables. I am reluctant to recreate these, since doing so will make our spreadsheets look more like the Berry database. This is what Berry and Hogan are now saying: that the spreadsheets are essentially Berry's database.

Mark

D00306