# EXHIBIT H

1

```
 1                THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3

 4   WAYNE BERRY, A HAWAII CITIZEN,  ) CIVIL NO. 03-00385SOM
                                     )
 5                  Plaintiff,       )
                                     )
 6        vs.                        )
                                     )
 7   HAWAII EXPRESS SERVICE, INC.,   ) - VOLUME 6 -
     a CALIFORNIA CORPORATION, et al.,)
 8                                   )
                    Defendants.      )
 9   _____)

10

11                  TRANSCRIPT OF PROCEEDINGS

12        The above-entitled matter came on for hearing on

13   Tuesday, March 7, 2006, at 9:05 a.m., at Honolulu, Hawaii,

14   BEFORE:          THE HONORABLE SUSAN OKI MOLLWAY
                      United States District Judge
15
     REPORTED BY:     STEPHEN B. PLATT, RMR, CRR
16                    Official U.S. District Court Reporter

17   APPEARANCES:     TIMOTHY J. HOGAN, ESQ.
                      WESLEY W. ICHIDA, ESQ.
18                    Lynch Ichida Thompson Kim & Hirota
                      1132 Bishop Street, Suite 1405
19                    Honolulu, Hawaii  96813

20
                                   Attorneys for the Plaintiff
21
                      MICHAEL E. BAUMANN, ESQ.
22                    DAMIAN D. CAPOZZOLA, ESQ.
                      Kirkland & Ellis, LLP
23                    777 South Figueroa Street
                      Los Angeles, California  90017
24
                                   Attorneys for Defendant
25                                   Post-Confirmation Trust
```

1            I will tell you that if you do have a question, it's

2     often the case that we cannot answer instantaneously.  I have

3     to contact the attorneys.  I or they may be involved in some

4     other proceeding that would have to be interrupted, and it may

5     take us some time to get back to you.

6            So don't think we are ignoring your question if

7     there should be a gap between when you send out a question and

8     you get a response.

9            THE CLERK:  All rise.

10           (The jury retired to commence

11           their deliberations at 9:30 a.m.)

12           (The following proceedings were held in

13           Open court, outside the presence of the jury:)

14           THE COURT:  Okay, you can be seated.

15           We're going to move to the motion for preliminary

16    injunction -- I'm sorry, permanent injunction.

17           (Mr. Smith joined defense counsel

18            at defense counsel table.)

19           THE COURT:  I see we have Mr. Smith back.  I take it

20    he's all excited about arguing this motion.

21           MR. SMITH:  Thank you, Your Honor.

22           THE COURT:  Okay, so he's joined us in this hearing.

23           And I will turn to Mr. Hogan.  I'll tell you what I

24    am -- I'm probably going to take this under advisement, but

25    let me go ahead and invite you.

19

1              MR. HOGAN:  Thank you, Your Honor.

2              MR. ICHIDA:  Your Honor, may I excuse myself for

3      this portion of the trial?

4              THE COURT:  I think you are essential to every

5      aspect of this case...

6              (Laughter in the courtroom.)

7              THE COURT:  And if you leave, we will not be able to

8      proceed, I'm certain...

9              MR. ICHIDA:  Thank you.

10             THE COURT:  I will see you later.

11             (Mr. Ichida was excused at 9:32 a.m.)

12             MR. HOGAN:  Thank you, Your Honor.  I'm sorry for

13     the interlude.

14             This case -- these infringements, Your Honor, have

15     been going on up until June 9th for a period of nearly four

16     years, Your Honor.  We have already obtained -- the court has

17     already signed an injunction regarding the Hawaiian Express.

18     Who have stipulated essentially to a consent decree.  So as to

19     whether there is an injunction in the case, that's already

20     passed, and we are down the road, Your Honor.  And we have a

21     final permanent injunction in regard to Hawaiian Express.

22             THE COURT:  That was by stipulation.

23             MR. HOGAN:  By stipulation.  But it still maintains

24     jurisdiction in this court regarding the conduct of some of

25     the players in the case.

20

1           My fervent hope is, Your Honor, this is the last of

2      the Berry litigation.  What I fear is, Your Honor, is that

3      there was, I think, a belief that developed throughout the

4      time that the employees worked for API, translated over to

5      Fleming, and my fear is, during C & S, that they have an

6      entitlement to the Berry technology; that they are allowed to

7      use it because they were there when it was either put in the

8      API computers, or something of that sort, Your Honor.  And the

9      fear is that at some point someone will not understand the

10     severity of continued use, or the attempt to recreate the

11     software, and once again begin to use it -- either recreate it

12     or find a copy, or something of that sort, Your Honor, and

13     thereby expose not only Mr. Berry to the injuries that we have

14     already seen what that is all about in this trial that we have

15     just completed, Your Honor, but also, the other employees.

16           And I think the court -- I think, looking at it --

17     and the court balances things at this stage, I believe.  You

18     know, it's an equitable remedy.  The court has almost the

19     ecclesiastic powers that the court is sitting with now, as to

20     what is the right thing to do.

21           And, clearly, the discretion that's been given to

22     the court in these areas is rarely overturned, and it really

23     comes down to what is -- we know, for Mr. Berry, he's made the

24     prayer that he get the injunction.

25           Turning to the other side, I can't imagine that any

21

1    of the line employees would want to be in a world in which

2    Mark Dillon is recreating Mr. Berry's software again and

3    putting it on their computers without their knowledge.  The

4    court has already ruled that inadvertent is still an

5    infringement.  So unless Mr. Dillon is finally convinced that

6    he cannot -- he has no rights in any of this software,

7    personally.  He has no ability to recreate it.

8           If I were to put Mr. Dillon on the stand,

9    Your Honor, I would proffer this:  That he has testified in

10   deposition that he can recreate it in a week.  And I would put

11   him on briefly and make that proffer, Your Honor.

12          In that world, Your Honor -- and the idea of

13   subliminal copyright infringement, and all the things there,

14   that there really has to be, I think, from the court -- if the

15   court doesn't say, you can't do that anymore, that will send

16   the message "you can."

17          And I would also state, Your Honor, that I would put

18   Mr. Berry on and proffer that his market, presently -- he is

19   developing software that creates tremendous efficiencies in

20   this area, and that he should never have to compete with his

21   own work through an unlicensed user.  And that his work will

22   be shared with anyone who wants to license it?  It's out there

23   now running in a small company that is moving along and going

24   forward.  He's working with the ocean carrier.  And the

25   idea -- I know everyone's saying, well, Mr. Hogan and

22

1    Mr. Berry will create mischief, Your Honor.  The major player,

2    market participant with Mr. Berry, is that same company we

3    sued -- or we were counter claimed against in the 1998.  It's

4    now Horizon Lines.  Mr. Berry, if he were to testify, would

5    proffer that he would get on the stand and say that he is on

6    line with their developers working out the next generation of

7    Homeland Security-related freight logistics software that will

8    be available to everyone.

9          If his market is impeded because copies remain in

10   the wild -- even if they don't put it on line.  We have seen a

11   copy, a wild copy, not covered by any order that has popped up

12   in this case.  There's so many copies out there, the fear is

13   they will continue to pop up.

14         I put in the record, Your Honor, the idea that in

15   this bankruptcy context, where is the software?  I think I put

16   in the record evidence that under the plan of reorganization,

17   it was given to Core-Mark.  Core-Mark is operating.  Core-Mark

18   is advertising logistics services.  And Core-Mark threatens

19   Mr. Berry 's copyright if they have a copy, or if they can

20   pull one out, if they can get -- when the Guidance materials

21   are one day released, I think as a matter of law they will go

22   to Core-Mark as the recipient of all the debtors' property

23   that wasn't otherwise given back to secured creditors or

24   otherwise disposed of.

25         So we have asked for two remedies, Your Honor, the

23

1    first being an injunction against any further infringements.

2    This would be -- I believe there's evidence that he's still

3    threatened by the potential use of his software, by Mr. Dillon

4    being able to recreate it, by the numerous copies. And I

5    brought a copy of Mr. Walker's declaration that was filed

6    earlier, supplement of his supplemental reports, listing 800

7    or more copies of databases that were in the Guidance

8    materials.

9            In my understanding of the rights that Fleming had,

10   even if they didn't infringe, they never had a right to make

11   800 copies of databases. And that massive amount of wild

12   copies of this work, a vertical work -- not just copies of

13   Windows that Microsoft could say, well, at least they don't

14   threaten my market that much because everybody needs a copy of

15   Windows. Mr. Berry's is vertical, which means that any

16   company that gets it could give it to their developer, reverse

17   engineer it, and then come out with their own work. That's a

18   significant threat to a single individual person. He's not a

19   big company, he is just a guy who works on his own. To have

20   something that's valuable -- we have seen the testimony: They

21   couldn't turn off the light; they couldn't go down and kill

22   it. That level -- we don't want to put anyone in a position

23   where someday they say, well, gee, I don't think anybody would

24   really mind if we just looked at Berry's work and maybe run a

25   couple reports off of it. Maybe we do something that helps us

24

1    get by today.

2            If they have been enjoined, and if all copies have

3    been accounted for and gathered up and given back to Mr. Berry

4    or disposed of, as the court would order, his market is then

5    secure, it is protected by this court.  And I talked about in

6    my closing the protections.  You know, the jury is now out

7    doing their functions.  This is as much a part of it.  And

8    there were times, Your Honor, where this is what, really, all

9    we were after in this case, is to stop the infringement.

10           And what we really don't ever want to do is have to

11   come back to this court again, and -- it's very burdensome,

12   not only on Mr. Berry and on me, but on this court, on this

13   system here, on the District of Hawaii.  I look in my office,

14   I can't imagine how much work has gone into this case from

15   Your Honor, your staff.  Just focus it now to say, let's not

16   do that again.

17           And if there is a problem, Your Honor is absolutely

18   the most -- you have taken this case in, you are knowledgeable

19   with it.  If there is an issue, the manner in which we treated

20   HEx -- run into court right away -- it's essentially -- let's

21   talk.  Let's do 30 days before anybody does anything.

22           I think that's the way to go in a case like this.

23   If there is any evidence that, say, you know, there is a

24   belief that there may be a violation, rather than run into

25   court and gin up the machine again, that we have a mechanism.

25

1    And I think it's appropriate in Hawaii for people to try to

2    work it out.

3            I think the alternative dispute resolution things

4    that are now part of our lives in federal court, Your Honor,

5    can work in an injunction, that we don't have to burden the

6    court right away.  And that's how we did it with HEx.

7            I mean, we didn't do anything to HEx since they

8    agreed to that.  We agreed that we would work together.  We

9    are hoping to resolve it entirely at this point, Your Honor,

10   not piecemeal.

11           The number of works that have been created of

12   Mr. Berry's is mind-numbing.  There's only one licensed copy

13   that ever existed, and it died sometime in January of 2000.

14   And from that point on, hundreds and hundreds of copies were

15   created without any care or concern for the violations of the

16   Copyright Act.

17           We use the term piracy.  They are not selling it at

18   the swap meet, but in some ways it's even more -- it's more

19   serious, because it's a business.  Instead of deciding to

20   either take Mr. Berry and become a partner with him -- which

21   is what I think the law says you should -- or get somebody way

22   away from this thing to recreate the database -- the court has

23   ruled the spreadsheets do not violate the copyright, and

24   that's the law of this case when it's ended, Your Honor.  They

25   can operate that, and that will be it.

1           But what we fear is that these wild copies of the

2    database will reappear, either through Mr. Dillon's recreation

3    of them -- and as I said, I can proffer that and put that

4    forward -- or otherwise.  Copies that were left at home.

5    Copies we have seen, even attorneys who are large law firms

6    who have, I believe, very sophisticated litigation indexing

7    systems didn't remember that there was a copy of the software

8    somewhere in Chicago.

9           I think when diligence -- an injunction is the

10   ultimate directive to be diligent.  And if the court were to

11   do that and caution that it's not intended to harm anybody --

12   the PCT claims they're out of business.  They can't claim any

13   harm from that.  The employees never had a right to have it

14   independently anyway.  And in a sense, the employees will be

15   benefited by an injunction, because it will put the onus on

16   their employer and anyone else who might seek to once again

17   pop out a copy of the Berry database, that they would be

18   violating this court's injunction, and that would be a bad

19   thing to do.

20          For Mr. Berry and for his market, Your Honor, he

21   should be allowed to move forward free of the competition from

22   an illegal copy of his own work.  I've put it all on the

23   record, Your Honor.  You have been very patient, and you have

24   listened, and I think you understand it.  I am hoping that

25   this is my last trip in here on this matter.  My fear is that

1    without an injunction, it's just going to be known as "Berry

2    Two."

3              THE COURT:  Okay, thank you.

4              MR. HOGAN:  Thank you.

5              THE COURT:  Who is going to argue for the defense?

6              MR. SMITH:  Your Honor, I would like to speak on

7    behalf of C & S.  Mr. Capozzola will speak for the PCT.  And

8    Mr. Hosoda, I think, has some things to say on behalf of the

9    employees, as well.

10             Your Honor, we are here in a courtroom.  We deal in

11   evidence.  There is no evidence that C & S ever possessed any

12   copy of 1993 FCS, or whatever it's called.  There isn't -- the

13   court's already ruled C & S did not infringe 1993 FCS.  The

14   court has ruled that the individual defendants did not

15   infringe at any time while they were C & S employees, which is

16   almost three years now.

17             We submit, Your Honor, that there is no basis for an

18   injunction, given the fact that there's not even any evidence

19   before the court that we even possess the work that Mr. Hogan

20   wants us enjoined from infringing.

21             We couldn't infringe it if we wanted to because we

22   do not have it.

23             What this case is really about, Your Honor, is --

24   you heard Mr. Hogan refer to "subliminal copyright

25   infringement."  What this is really about is, if Mark Dillon

28

1    creates his own work, somebody's going to claim -- or at least

2    wants the ability to claim that it infringes.  And -- because

3    he subliminally copied something that Mr. Berry authored

4    previously.  And what this really is about is unbalancing the

5    playing field so that we are here on the next proceeding, in a

6    contempt proceeding, rather than in a copyright infringement

7    action.

8            And I submit to you that the injunction motion is

9    not the proper way, in this case, on these facts, because

10    there simply is no -- there's no finding that we have

11    infringed in the past, and there's no indications or

12    potential -- no evidence of any potential for infringement in

13    the future.

14            Mr. Hogan makes reference to the Guidance images.

15    C & S has no claim to the Guidance images.  Those were sent to

16    Guidance specifically for the purpose of making sure that they

17    weren't in Fleming's possession.  And I assume that PCT will

18    tell you that whenever this case is concluded, there's no

19    problem having them destroyed.

20            The court has made rulings relating to fair use in

21    connection with defending oneself from litigation.  I

22    anticipate that there may -- the plaintiff may well appeal

23    this case, in which case we are going to need to hold on to

24    copies of certain things until the case is resolved.

25            THE COURT:  I don't know, we will see what the

1    verdict is.

2             MR. SMITH:  Well, at whatever point --

3             THE COURT:  Somebody may appeal.

4             MR. SMITH:  On behalf of C & S, let me just state

5    that we certainly have no problem with the Guidance images

6    being destroyed.  C & S does have concerns about its

7    proprietary data, or its predecessor's proprietary data

8    relating to the Hawaii operation being in the possession of

9    Mr. Berry and Mr. Hogan.  But we certainly don't have a

10   problem with them being destroyed.

11            And, as I say, it's in Guidance's possession

12   specifically because we are -- it was put there because we

13   didn't want the people in Kapolei to have Access to it.  So

14   that's the way that was treated.

15            To the extent that what's on the Guidance images is

16   somebody's concern, that's controlled, first by the protective

17   order, as far as what's been produced to the lawyers in this

18   case -- and even that, I think, is attorney eyes only, so the

19   clients have not been allowed to see it; and, secondly, by the

20   fact that it can be destroyed at the conclusion of the case.

21            Mr. Hogan made reference to "wild copies."  Once

22   again, Your Honor, I ask you to consider the evidence in the

23   record.  There is no evidence that C & S has any "wild copy"

24   of anything.  Certainly not of anything that's the subject of

25   this case.

1          Mr. Hogan refers to "multiple works."  The copyright

2     law requires that the plaintiff register a copyright as a

3     prerequisite to filing a lawsuit.  I don't know what these

4     other multiple works are, but the only registered work that's

5     the subject of this complaint is the 1993 FCS.  So whatever

6     other multiple works are being discussed here certainly are

7     not properly before this court.

8          For all of those reasons, Your Honor, we submit that

9     C & S should not be subjected to any injunction, nor should

10    its employees.

11          THE COURT:  Thank you.

12          MR. CAPOZZOLA:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. CAPOZZOLA:  Damian Capozzola for the PCT.

15          Keep in mind that permanent injunction is a harsh

16    and drastic remedy, and the plaintiff has to show a threat of

17    continuing violations.  In this case, the parties are

18    adjudicated inadvertent infringers.  So the presumption should

19    be, from the beginning, that nobody is going to intend to or

20    try to continue to infringe on Mr. Berry's software.

21          I'll get to the substance in a minute, but on the --

22    just on the process, if this court is inclined to do anything

23    other than deny the motion, the PCT would request additional

24    briefing, because in his reply, Mr. Berry has popped up with a

25    brand new motion against the PCT.  His moving papers were all

31

1    about the idea that the PCT is still in business, there are

2    milk cartons with Fleming information on them, etc., etc.

3            We destroyed that in our opposition.  And in his

4    reply, he didn't really even make much of a token effort to

5    defend that.  Instead, he comes forward with a whole bunch of

6    new allegations against Core-Mark and, as I will show you in a

7    second, misinterpretations of the bankruptcy plan and how

8    things are operating.  So, just on that process alone, we feel

9    like we are entitled to additional briefing if you are going

10   to do anything other than deny.

11           On the substance of it, quite frankly, Your Honor,

12   Mr. Hogan just has it wrong.  And I've got documents here, if

13   you want to get into it, I've got excerpts from the

14   confirmation order, the plan, and the disclosure statement

15   that he' just wrong about what PCT's liabilities are and what

16   Core-Mark's assets are.  And, additionally, the idea that

17   Core-Mark is getting the Guidance Software has no basis in

18   evidence or in reason, and the court should ignore it.

19           I'll also tell the court that Mr. Hogan did not give

20   you the whole story when he showed you his July 26, 2004,

21   order.  That order was modified by a stipulation that was then

22   entered by an order in August by the bankruptcy court,

23   basically making clear that all Mr. Hogan has is an order

24   permitting him to prosecute his pre-petition case to some sort

25   of monetary amount and then take it back to the bankruptcy

32

1    court, and the parties will argue whether that's an unsecured

2    claim or not.

3            The idea that he somehow gets to turn that into

4    chasing Core-Mark defies logic and reason, and it's not

5    supported.  And, again, this is just not the proper way to tee

6    up the complicated bankruptcy plan issues that he's raised.

7    If he wants to move against or sue Core-Mark, then do that.

8    Until such time there is no basis to grant an injunction

9    against the PCT, based upon whatever Core-Mark's liability may

10   or may not be.

11           And I would note that the fact that he hasn't moved

12   against Core-Mark or sued Core-Mark suggests he knows he has

13   no jurisdiction over Core-Mark, at least in connection with

14   this case -- bolstering our position that Core-Mark and the

15   PCT are separate.

16           I would also point out that he is just flat wrong in

17   his reply at Page Four, saying Core-Mark is wholesale.

18    Core-Mark does convenience.  Wholesale being produce,

19   convenience being cigarettes, by way of example.  Core-Mark

20   and Fleming were completely different animals, which is part

21   of the reason why Core-Mark came out of the reorganization the

22   way it did.

23           I would echo Mr. Smith's comments that the orders

24   that are in place are already adequate.  There is already a

25   protective order governing the disposition of Mr. Berry's

1    software.  There is already an order governing the Guidance

2    materials and how those are supposed to be basically covered

3    by the protective order.  The law doesn't do useless things,

4    and there are already orders in place protecting Mr. Berry.

5         Additionally, I would also urge the court to note

6    that any injunction at this point to return software would be

7    premature, unless and until this case is absolutely over.  We

8    may need access to these materials to defend ourselves, or for

9    other purposes consistent with fair use until the day comes

10   when this is finally over.

11        Finally, I would just echo Mr. Smith's comments that

12   an injunction would be very prejudicial to the PCT, and to all

13   the defendants.  We should not have to appear before you the

14   next time these guys get a wild idea in their head that

15   somebody's done something wrong with our backs up against the

16   wall for contempt sanctions.  There is no basis for doing

17   that, and I would urge the court to deny the injunction

18   motion.

19             THE COURT:  Okay.

20             MR. HOSODA:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MR. HOSODA:  It actually appears to me that we are

23   in agreement, at least with respect to what the law is on this

24   permanent injunction.  And it's given by the MAI Systems Corp

25   case.  And it's that in order to find or rule that there is a

34

1    permanent injunction, that the Ninth Circuit requires, one, a

2    showing of viability -- that liable's been established -- and

3    two, that there is a continuing -- there is a threat of

4    continuing violations.

5         Well, as of February 24th of this year, Melvin

6    Ponce, my -- one of my defendants, is no longer with C & S.

7    He has a child that's -- has challenges, and he cannot work.

8    His family needs him.  So he is not in the logistics business.

9    There is no threat at all of him -- he's not even doing any

10   work for anybody, at all.

11        Sonia Purdy, as you heard her testimony, Your Honor,

12   is with Cardinal, and they don't do freight logistics.  She is

13   not in the freight logistics department.  She has been with

14   them a number of years now.  So there's no continuing threat

15   of her being involved at all with freight logistics, or

16   anything to do with Mr. Berry's software.  Justin Fukumoto is

17   with a CPA firm, Your Honor.  He also has nothing to do with

18   the freight logistics or the system.

19        So, with respect to those individuals, there is no

20   threat of continuing violations.

21        I would like to go back to where the court was with

22   the motions for summary judgment, because many of the

23   arguments that were incorporated into this motion were made

24   and previously defeated.  As you will recall, Mark Dillon

25   testified before Your Honor, and it was upon his testimony --

1    and you have said it many times, that -- he testified before

2    you, his testimony was trustworthy, you found him credible.

3    And as a result of that, it was found and determined to be an

4    inadvertent, unintentional infringement.

5          Your Honor, you have seen these employees.  They

6    don't -- Mr. Hogan said that Mr. Dillon has no right to

7    Mr. Berry's copyrighted software.  Mr. Dillon knows that.

8    Quite frankly, neither Mr. Dillon nor any of the rest of the

9    former employees want anything to do with in any way

10   Mr. Berry's software.  I can't make it more clear.  As of the

11   time that they understood that the jury verdict came back in

12   the previous hearing, they wanted nothing to do with

13   Mr. Berry.

14         All of the attempts that you heard about from

15   Mr. Dillon were to get off of Mr. Berry's system and to get

16   away from it.  And that's why Your Honor found inadvertence.

17   And I would incorporate Mr. Capozzola's comments with respect

18   to the finding of inadvertence shows exactly why a permanent

19   injunction should not be issued here.

20         I heard from Mr. Hogan, also, plaintiff's counsel,

21   that "all we wanted was an injunction from the beginning."

22   Your Honor, that's not correct, and that's not what the record

23   says.  If you go and look at the first complaint that he

24   signed, if you look at the second -- the first amended

25   complaint, the second amended complaint, I mean, we've come a

36

1    long way.  But the thing has been pared down from Al Qaeda,

2    weapons, cigarettes, Lokelani Lindsey.  $866 million at one

3    point.  I had the pleasure of flying to Delaware, Your Honor,

4    and at that point it was $60 million.  It has never been just

5    an injunction.  And that really isn't even the point, either.

6    The point is simply Mr. Hogan has told us in depositions and

7    when he's seen us, repeatedly, that he's going to continue to

8    sue; that litigation copyright infringement cases never end;

9    and that I'm going to continue to file wave after wave after

10   wave of lawsuits against you and your clients.

11         And it's in that context -- I want to let you know

12   that he says that openly.  So that when you are considering

13   whether or not to grant this permanent injunction or not, I

14   have to let you know that he has told that to us repeatedly.

15   And, quite frankly, my clients sit there, you know -- and when

16   they hear from me and I report to them about what's happened,

17   they want this to end.  They don't want any part of his

18   software.

19         I take you back to where I was at closing argument.

20   1993 is a long time ago.  That's over ten years ago,

21   Your Honor.  And that's when this software was supposedly

22   developed.  Y. Hata has the new and improved, much-improved,

23   version that we heard about that's involved.  The 93 -- it

24   wasn't even shown to the jury.  It's outdated.  Nobody wants

25   to use it.  Nobody wants to touch it.  Nobody wants a part of

37

1    it, Your Honor, so there's just no grounds for a permanent

2    injunction at this particular time.

3         So unless the court has questions, I think that

4    under the injunction standard established in MAI, and with

5    respect to permanent injunctions, that liability has not been

6    established, and there is no continuing threat of -- no threat

7    of continuing violations by the employees.  They simply do not

8    want to have anything to do with it, they don't want anything

9    further to do with Mr. Berry, and we are hopeful that, when

10    the jury comes back, that everything will end.

11         Thank you.

12         THE COURT:  Okay.

13         Mr. Hogan, I'll give you three minutes.

14         MR. HOGAN:  Thank you, Your Honor.

15         Your Honor, regarding my threats to go on and on

16    forever, I have sent formal offers to the PCT, before we sued

17    them, for an injunction.  That's all I was asking for.  And I

18    believe I sent a full drafted set of settlement documents to

19    Mr. Hosoda making the same offer.  I've never gotten a

20    response from anybody.

21         Whether they are using it, Your Honor, job I.D. is

22    in their e-mails.  It shouldn't be there.  It's there.  They

23    haven't even mentioned it.  And that one hangs them.  Because,

24    as I put in my moving papers, Your Honor, Mr. Dillon says, it

25    shouldn't be there, but it is.  And they are making reports

38

1    off of it.  So job I.D., which is Mr. Berry's database,

2    Mr. Dillon admits it's not in what he's created, is still

3    alive and well and living in Kapolei.

4            As to -- I asked Mr. Dillon a question in a

5    deposition.  I can put him on and do it again.  But there was

6    a question when he removed everything out of the FCS and made

7    original, and then he made auxiliary, he claims that auxiliary

8    is "proprietary to me," Your Honor.  It's not.  And that's the

9    problem.  He doesn't get it.  It's Mr. Berry's.

10           It was a derivative, maybe illegally, which means,

11   under Picket v Prince, he can never get ownership rights to

12   it.  If it was legal, he could remove his derivative and get

13   rid of Mr. Berry's, but he has a derivative.  But it was

14   illegal when it was put in there, he can never get proprietary

15   rights to it.  But he thinks he can.  And that's the fear.

16   That's why I'm saying, you can't leave it up to him.  He says

17   in his deposition, "I did not see myself as having the

18   competence to make decisions about how we could use the

19   software or not in a way that was legitimate in the eyes of

20   the court."

21           But what we have just heard is, we are going to

22   leave it to his discretion to determine whether or not he's

23   infringing.

24           That's not fair to these other employees.  To

25   Ms. Waiolama, who has never changed Mr. Berry's database --

1    unlike Ms. Noa or Ms. Rio.  Mr. Dillon has to be enjoined.

2    That's the problem.  And once Mr. Dillon is enjoined, this

3    will end.  He is the reason that it's continued to survive.

4    He is the reason why Mr. Berry was not requested to make the

5    changes, because they had Mr. Dillon on staff to do it.

6              As to the prejudice to the PCT, I guess, Your Honor,

7    is having to come back to this court.  And, yes, the court has

8    said that as to my prepetition claims and the things that I

9    got relief from stay with, Your Honor, which was prepetition

10   and post-petition, because I had to go prepetition to get

11   Judge King's order finaled, and I attempted to collect on

12   that, and she said, no.  But she said, that doesn't apply to

13   the post-petition one.  That's a different world, because it's

14   administrative.

15             And not only under the plan of reorganization --

16   Mr. Capozzola's got it all wrong.  Regardless of my orders, if

17   there isn't enough money in the PCT, every creditor goes after

18   Core-Mark, not just Mr. Berry.  The only way they got the plan

19   through was to say, all the leftovers -- and we have got the

20   PCT representative here, we could put her on -- but all the

21   leftover goes to Core-Mark.

22             As to who gets the property when it's over?  I have

23   to admit, Your Honor, you'll read it.  And I have been a

24   bankruptcy lawyer since the day I got out of law school, and I

25   -- you know, if they are saying somebody other than Core-Mark

40

1    gets these assets when the PCT is dissolved, I am just curious

2    who that is, because we don't know that entity yet.  And if it

3    isn't Core-Mark, and -- for instance, the copy that

4    Mr. Capozzola had in Chicago, put this on the bankruptcy --

5    you know, the certification exam.  Who would own that at the

6    end of the day?  Well, does the attorney own the client's

7    property that they have in their files?  I don't think any

8    attorney would claim that.  So at some point it goes to the

9    client.

10          The client was reorganized and gone -- that's

11   Fleming.  The only thing that survived were these entities.

12   And it's Core-Mark and a few others that still linger.  One of

13   those is going to get that file that was in Mr. Capozzola's

14   office in Chicago.  That's not right.  You can't let 'em do

15   that.

16          The fact is, they have fought this case, Your Honor,

17   from day one.  This has been an enormous case for a little

18   copyright developer in Hawaii.  It's because the software

19   makes a lot of money.  You heard Mr. Christensen say it was

20   necessary -- we couldn't turn it off.  You heard their own

21   witness say that it was a necessity.

22          All we want is to have the market back, Your Honor.

23   I understand I've got to wrap it up, Your Honor.

24          I understand I've got to wrap it up, Your Honor.

25          As to prejudice, C & S -- if you don't enjoin C & S,

41

1   enjoin Mr. Miller and Ms. Noa.  If you don't want to enjoin

2   the other employees, you know, frankly, don't.  But as to

3   Mr. Dillon and Ms. Noa, enter the injunction today.  If it's

4   binding on C & S, it will be binding because it's binding on

5   them.  You don't need to separately enjoin C & S to have it

6   become effective.

7               THE COURT:  Okay, thank you.

8               MR. HOGAN:  Thank you, Your Honor.

9               THE COURT:  Okay, I am going to take this under

10  advisement.  I am assuming that my courtroom manager has

11  contact information for all of you.  The way I normally do

12  this, unless there's some objection from someone, is that if I

13  get a question from the jury, I will have it faxed to wherever

14  you are, and then we will have a telephone conference call.

15  And if on the telephone we can come to an agreement about a

16  written answer to be sent back to the jury, then we'll put

17  that agreement on the record.  I'll then send the written

18  answer to the jury, and I'll fax you copies of the written

19  answer that was sent to the jury that we have all agreed to.

20              If something requires us all to come into court

21  because the jury has to come back in, or whatever it is that

22  has to be in the courtroom, then, if you can stay as close to

23  the courthouse as will allow you to do that, that would be

24  appreciated.

25              Okay, so is there any objection to the procedure

52

1

2

3

4

5

6

7                                    -ooOoo-

8            I, Stephen B. Platt, Official Court Reporter,

9    United States District Court, District of Hawaii, do hereby

10   certify that the foregoing is a true and correct transcript of

11   proceedings before the Honorable Susan Oki Mollway, United

12   States District Judge.

13

14

15

16

17

18

19

20                             /s/   Stephen B. Platt

21   FRIDAY, APRIL 28, 2006        STEPHEN B. PLATT, CSR NO. 248

22

23

24

25