about the time his attorney Lex Smith who at the time also represented C&S, informed Mr. Berry

that C&S, his concurrent client had commenced using his works.   Prior to that time C&S had

claimed that it was not using any Berry works in numerous filings in the district court and in the

Delaware Bankruptcy court.

80.    The Lenders, C&S and Fleming's PCT have entered into an agreement to

continue agree to commit overt acts to further a conspiracy to commit willful infringement of the

Berry works for financial gain and the PCT and the Lenders agreed to commit to spend over $6

million in litigation fees to hold Mr. Berry at bay while the Lenders, C&S, Core-Mark and others

yet unknown to Mr. Berry reap millions of dollars in proceeds of a criminal enterprise (the

"Enterprise).

81.    With the specific intent to commit willful infringement and the overt acts of

willful infringement for financial gain, the defendants agreed upon a desperate scheme to seek to

file Mr. Berry's involuntary bankruptcy to obtain control over his copyrights.  These schemes

include encouraging a Hawaii divorce proceeding, attempting to force Mr. Berry to file

bankruptcy and a scheme to corruptly coopt Mr. Berry's attorneys.

82.    The PCT through Kors and C&S through it agents including Smith who was also

the PCT's attorney planned seek to file an involuntary bankruptcy against Mr. Berry and thereby

obtain control of his copyrights.  When Mr. Berry's attorney learned of the plan, he informed the

PCT's counsel that the Copyright Act 17 USC § 201(e) prohibited the taking of a copyright

through such a devise and they changed course.

83.    Unable to cease the infringement for financial gain because the Lenders

demanded their loans paid, and now recognizing that their plan to file Mr. Berry's involuntary

bankruptcy could not succeed, to facilitate the transfer of his copyrights to the criminal

infringers, the co-conspirators changed their plan to one of threat and intimidation directed to

Mr. Berry and sought to employ members of his family.

84.     With specific intent to cause injury to Mr. Berry Fleming and C&S through their

concurrent counsel approached Mr. Berry's estranged spouse and in violation of the spousal

privilege and common human decency and for the purpose of furthering the commission of a

felony as the result of the ongoing criminal infringement, upon information and belief, C&S' and

the PCT's concurrent attorneys made financial inducements to Mr. Berry's estranged spouse and

upon information and belief to her attorney to cause his estranged spouse to agree to commence

proceedings in the State of Hawaii that upon information and belief, were commenced to permit

C&S, the Lenders and the PCT to further profit from the knowing ongoing and willful

infringement of Mr. Berry's works.

85.     The plan was to purchase Mr. Berry's spouse' interest if any in Mr. Berry's

works that would be divided pursuant to an equitable division of property in the Hawaii family

court.

86.     In addition, the defendants devised a plan to purport to obtain ownership of the

Berry works through acts of intimidation that were intended to put Mr. Berry in fear for his

personal safety and to avoid harassment to his friends and to his customer and direct horizontal

C&S competitor in the restaurant supply market  that jeopardized his ability to continue to

operate his business.  These acts were committed with the specific intent to terrorize Mr. Berry

into relinquishing his copyrights to the Enterprise.

87.     Upon information and belief, agents of Kors, C&S and the Lenders, acting under their authority, having obtained Mr. Berry's home address in the August 13, 2007 deposition under the pretext of Smith's conducting a deposition, on or about August 14, 2007, traveled to Florida and while having entered the West Palm Beach airport for the purpose of furthering the commission of a felony, identified Mr. Berry to a purported process server who followed Mr. Berry from the airport to his home and then from his home to a public restaurant.   And while in the presence of friends the alleged process server approached Mr. Berry  in an attempt to make service of the divorce complaint that was initiated by Lex Smith to further the criminal infringement.

88.     At the time this purported act to make personal service was accomplished, the defendants knew or should have known,  that the divorce complaint had been dismissed.  Their causing the service of this dismissed complaint was for the purpose of malicious injury and harassment and to advance what these actors knew was ongoing criminal infringement.

89.     Upon information and belief, Lex Smith, associated with both the Fleming-Logistics and other Hawaii based racketeering enterprises is a public official, namely an Ethics Commissioner of the City and County of Honolulu, and  has engaged in acts of racketeering and has been engaged in enforcing a vendetta against Mr. Berry for Mr. Berry's actions to assist federal prosecutors in criminal investigations related to politically powerful persons in the state of Hawaii under the protection of the other Hawaii based racketeering enterprises the composition of which will be explored in discovery.

90.     Fleming and now C&S have chosen Smith as their Hawaii based counsel upon information and belief  because of Smith's role on the ethics commission that provides him the

ability to assert pressure on public officials, including law enforcement, and to monitor whistle blowers who seek to expose corruption in Hawaii including, but not limited to,  the racketeering conduct of Fleming and C&S.

91.     Under the direction of the principals of a racketeering enterprise, Lex Smith has knowingly, with the intent to retaliate against Mr. Berry, taken actions harmful to Mr. Berry including, but not limited to,  interference with the lawful employment and  livelihood, as retaliation for providing to a law enforcement officers truthful information relating to the commission or possible commission of Federal offenses.

92.     Smith has for a period of several years sought to learn the location of Mr. Berry's business records that he has held at the request of law enforcement including the ATF, IRS CID and SEC.  Upon information and belief, Smith's reasons for seeking this information is to permit persons associated with certain criminal enterprises to obtain control over these records for the purpose of impeding ongoing investigations.

93.     In furtherance of the racketeering enterprise, Fleming, the Lenders and C&S through their agents, including their attorneys, have agreed to retaliate, taken actions harmful to Mr. Berry  including interference with the lawful employment and  livelihood, for providing to a law enforcement officer truthful information relating to the commission or possible commission of  Federal offenses.

94.     At the time the Lenders approved the filing of the Fleming Bankruptcy Petition, the EULA and Second Addendum and at least one published opinion of the Honorable Mary F. Walrath, United States Bankruptcy Judge for the District of Delaware presiding over the Fleming

24

Bankruptcy made the lawful transfer of Berry Technology to C&S or any other purchaser of Fleming's wholesale operation without Mr. Berry's consent a legal impossibility.

95.    Rather than pay a license fee to Mr. Berry for the lawful use of his works, and in furtherance of the Racketeering Enterprises that sought retaliation against Mr. Berry for assisting Federal law enforcement, Fleming and its Lenders through the planning and execution of attorneys associated with Smith including attorneys associated with Kirkland & Ellis, to facilitate the unlawful transfer of Berry Technology to C&S for the purpose of financial gain, together agreed to sue Mr. Berry in a frivolous Delaware Bankruptcy adversary proceeding while Berry's works were being staged for the eventual transfer to C&S.

96.    In that Adversary Proceeding, Fleming made allegations that Mr. Berry was engaged in harassment against Fleming by attempting to protect his intellectual property rights from an adjudicated infringer and sought specifically through force contempt sanctions to prevent him from reporting ongoing criminal conduct to law enforcement and extortionately claimed that they were entitled to sanctions against Mr. Berry and his attorneys should Mr. Berry continue to protect his copyrights. The Bankruptcy Court the Honorable Mary F. Walrath *sua sponte* denied Fleming's injunctive relief and the Adversary Proceeding was subsequently dismissed.

97.    On or about August 13, 2007, Lex Smith knowing that he had concealed his own knowledge and/or complicity in an act of violence directed at Mr. Berry's family member occupying his home on Thanksgiving weekend 2001, and knowing that Mr. Berry feared for his personal safety, and in an attempt to establish the location of Mr. Berry's present home. Smith sought to locate place where Mr. Berry stores business records that implicate Fleming and other

of its criminal associates in a variety of unlawful schemes including, but not limited to the

schemes related to the Bishop Estate, the most powerful entity in the State of Hawaii whose

trustee, Lokilani Lindsey was convicted of a count constituting a racketeering predicate acts

directly related to Smith's client Fleming.  With the specific intent to intimidate Mr. Berry who

has feared for his personal safety, Smith, the Lenders, Kors and others who are yet unknown to

Plaintiff directed the commission of acts of threat and intimidation to further the conspiracy to

commit future acts of willful infringement for financial gain.

## THE LENDERS JOIN THE ENTERPRISE

98.    On April 1, 2003, Fleming owed the Pre-Petition Lenders approximately

$604,000,000 under the Pre-Petition Credit Agreement as of the Petition Date. $219,000,000 of

that is owed under the revolving loan facility; $239,000,000 was owed on account of a term loan

and $146,000,000 was committed to back outstanding letters of credit.

99.    Upon the filing of the Fleming Bankruptcy petition on April 1, 2003, the Pre-

Petition Lenders chose to cease lending under the Pre-Petition Credit Agreement.

100.    At the time of the filing of the Voluntary Petition on April 1, 2003, Fleming

balance sheet showed liabilities far exceeding assets. Fleming possessed approximately

$300,000,000 in inventory that was subject to claims under the Perishable Agricultural

Commodities Act ("PACA") and the claims of creditors exercising reclamation rights under state

law that were both senior to the rights of the Pre-Petition Lenders.  Fleming possessed certain

contract rights under Facilities Standby Agreements ("FSA") with retail grocers but without

additional product and the ability to service the FSA's Fleming's few marketable assets were in

imminent risk of becoming virtually worthless.

26

101.    Despite having touted state of the art supply chain software, in a program that was publically disclosed as the Fleming "F-1" program, Fleming's actual interest in such technology was as a willful infringer of a work entitled Freight Control System and over one hundred subsidiary unpublished works that were and remain all owned by Wayne Berry as the author and copyright owner.   From 2002 to the de-listing of the Fleming securities, the Lenders and Fleming continued to market securities with the knowledge that Fleming's assets were fictitious and derived from proceeds of ongoing criminal infringement.   Chase and GECC continue to facilitate the  marketing of Core-Mark securities knowing that Core-Mark is operating with infringing technology.

102.    Despite the touting of the F-1 program as a valuable asset, there is no record of the disposition of this Fleming asset in any of the materials filed in the Fleming Bankruptcy case. The Lenders joined the criminal enterprise for the purpose of concealing their own complicity and liability for the ongoing acts of racketeering related to the infringement of FCS.

103.    From on or about January 1, 2000 to the time of the filing of the voluntary Chapter 11 Bankruptcy petition on April 1, 2003, Fleming's Hawaii division was operating a freight logistics company using an illegal derivative of the Plaintiff's original work.  C&S has operated a freight logistics company using illegal copies of the Plaintiff's original works from on or about September 25, 2005 to the present.

104.    The Hawaii division along with feeder warehouses in California were the only parts of the Fleming wholesale operation that interested C&S, the only party willing to purchase the Fleming wholesale operations.  The Hawaii division was entirely dependant on the use of illegal copies of Berry's works from and afer the filing of the Petition..

27

105.    To avoid an imminent shutdown of its operations and to further the Pre-Petition Lenders goal of repayment of the Pre-Petition Credit Agreement, Fleming sought and obtained fresh working capital to fund on-going post-petition operations including the new acts of infringement of Plaintiff's works.  To that end, upon information and belief, certain of the Pre-Petition Lenders including the Defendants named herein agreed to fund Flemings's wholesale operations with an emergency $50,000,000 in financing (the "Bridge Financing") to save Fleming's operations from an imminent shut down.

106.    The Lenders, for the purpose of financial gain agreed to the commission of numerous acts of criminal copyright infringement and to the operating of a racketeering enterprise as a principal to insure their loans would be repaid with interest.

## GECC AGREES TO JOIN THE ENTERPRISE

107.    Upon information and belief, prior to September 2005, GECC's role in Fleming related matters was limited to being one of the dozens of participating lenders in the Fleming and later Core-Mark loan facilities.

108.    Fleming's Chapter 11 Plan was confirmed on or about July 24, 2004.  On August 20, 2004, Core-Mark, Fleming's reorganized debtor, granted a security interest in all its intellectual property to GECC under a loan facility that replaced the Lenders' post-petition Fleming loans.  This transfer was filed with US Copyright Office.

109.    In or about September 2005, Plaintiff was informed by C&S', and Fleming's concurrent counsel, Lex Smith that contrary to what had been previously represented to him and the Hawaii district court, C&S was using Mr. Berry's works.

110.    On September 9, 2005, Core-Mark filed an SEC Registration Form 10 to obtain authority for Core-Mark to begin public trading of its securities.   GECC was identified as lead arranger for loans that supported Core-Mark's operations as set forth in Exhibits to the Core-Mark Form 10.

111.    On October 21, 2005, Core-Mark filed a SEC Registration Form 10 Amendment Number 1.   Amendment Number 1 again named GECC as lead arranger for the Core-Mark loans.

112.    In the documents filed in support of GECC's borrower's Form 10 filing, Core-Mark disclosed what it termed as a "proprietary logistics system"that had no apparent development costs and a book value of over $6 million.   Core-Mark's Form 10 stated that evidence of this work was contained in an exhibit that was not available on line.

113.    When Mr. Berry inquired of SEC to obtain a copy of the exhibit, upon information and belief, Core-Mark created a false revised Form 10 that contained an exhibit that instead of identifying the "proprietary logistics system" contained a description of certain former Fleming owned copyrights that were transferred under the APA to C&S in 2003 and registered in the Copyright Office as C&S' intellectual property.

114.    On or about Friday, November 4, 2005, Mr. Berry through his counsel, wrote to GECC's parent to demand that they investigate and cease any material support for ongoing infringement related to C&S and Core-Mark.   In that letter to Brackett B. Denniston, III, Esq. General Counsel of Defendant GECC's parent company General Electric Corporation Mr. Berry Mr. Berry informed GE of facts that supported the claim that GE was providing material support to advance the ongoing infringement of Berry works through use by Core-Mark and C&S.

29

115.    Rather than conduct an investigation and take actions to cause GECC to cease its material support for the ongoing infringement, to further the goals and purpose of the Enterprise, and for financial gain, GECC instead chose to join the conspiracy and entered into an agreement with Defendant Chase and Core-Mark whereby Chase agreed to take the lead role in the on-going infringement of Berry works in exchange for GECC's agreement to not expose the racketeering enterprise.  Upon information and belief, Chase and GE together created a fraudulent back dated agreement between Chase and GE to conceal GE's involvement in the criminal conspiracy to infringe.

116.    Also on November 4, 2005, Plaintiff telephoned the SEC to inquire about the Core-Mark Form 10.  In that call the SEC informed Mr. Berry that the Core-Mark Form 10 was done and approved.  The SEC employee then indicated concern about the apparent fraud related to the documents filed in the Copyright office that were listed as proving over $6 million in support for the Core-Mark public offering.  Mr. Berry demonstrated that the exhibits that should have listed Core-Mark's intellectual property were simply copied from the filing in regard to the C&S asset purchase agreement and recorded in the copyright office in 2003.  No transfer of these Copyrights was ever recorded from C&S to Core-Mark making this submission that resulted in the approval of the Core-Mark public offering likely a fraud in connection with the sale of a security.

117.    The SEC employee informed Mr. Berry that he was going to call Core-Mark and ask questions and possibly request they file another amendment.

118.    Upon information and belief, Core-Mark worked all that weekend after receiving a call from the SEC regarding what Plaintiff had found in their Form 10.

119.    On the following Monday, November 7, 2005 Core-Mark filed the Core-Mark

SEC Registration Form 10 Amendment Number 2 .  GECC remained lead arranger for the Core-

Mark loans. This Second Amendment addresses some of the issues Berry had raised with the

SEC and removed some of the materials that referenced the $6 million in support due to the

proprietary logistics system raised on the previous Friday to the SEC.

120.    Upon information and belief and as the direct and proximate result of the fraud on

the SEC, on or about November 7, 2005, the Core-Mark Form 10 was approved and Core-Mark

commenced public trading.

121.    On or about  November 21, 2005, Eric Bootsma, internal counsel for GE

Commercial Finance responded to Mr. Berry's November 4, 2005 letter on behalf of GE

informing Mr. Berry that he would review the matters stated in the November 4, 2005 letter and

respond shortly.

122.    On or about November 30, 2005 Core-Mark, GECC's borrower, filed its first

Form 10Q with SEC.  In this filing Chase was named as the lead arrange and discloses an

October 13, 2005 agreement between Chase and GECC where Chase agrees to replace the

original GECC loans with GECC remaining as one of participating lenders.  Upon information

and belief this is the first time the October 13, 2005 agreement is disclosed in SEC filings.  Upon

information and belief in furtherance of ongoing acts of criminal infringement and other

racketeering predicates, this document was back-dated to provide cover for GECC that had

agreed to the operation of an enterprise engaged in racketeering as a principal and to remove

GECC as collateral agent.  GECC has not withdrawn from the 18 U.S.C. § 1962(d) conspiracy.

123.    On December 15, 2005, after receiving no response from GECC, Mr. Berry,

31

through his attorney wrote to GECC.

124.    On December 16, 2005, after GECC had entered into the agreement with Chase, Eric Bootsma responded to Mr. Berry's November 4, 2005 letter by delivering a back-dated letter dated December 14, 2005 to Mr. Berry's counsel, admitting that GECC remained a lender under Core-Mark's facility but stating the lead agent role had passed to Chase and directed further inquiry to Chase in that regard.  In that letter, GECC did not deny its involvement in the infringement.

125.    GECC, despite having received infringement warnings regarding the infringement of Berry works, for the purpose of financial gain, continues to provide financial support to Core-Mark and C&S knowing that GECC is engaged in aiding and abetting infringement and agrees to conduct the affairs of an enterprise engaged in interstate commerce as a principal, with full knowledge of the daily acts of ongoing criminal infringement of Berry works.  The works that are being infringed include over one hundred separate works including numerous registered works of original authorship and derivatives thereof all owned by Wayne Berry as the Copyright owner.

126.    GECC received  knowledge that its loans were already at risk as the result of the infringement, and obtained an agreement to lessen its exposure that was passed to Chase for GECC's agreement not to expose the conspiracy.

127.    GECC and Core-Mark together  participated in a scheme and artifice directed at employees of the SEC to disguise its complicity in the Berry infringement and permit Core-Mark, GECC's borrower to successfully obtain permission to conduct an initial  public offering to market its securities to provide addition sources of funds to lessen the exposure on GECC.

128.    GECC and its participating lenders including Chase, have participated in a fraud on the SEC and falsely claimed asserted liens in the Core-Mark loan documents over this same intellectual property that had been sold in 2003 to C&S in the Fleming-C&S APA and recorded in the Library of congress to conceal the fraudulent lien they conspired to assert over the Berry works claimed as Core-Mark's alleged proprietary logistics system.

129.    By agreeing with the enterprise and by executing documents to pass the lead agent responsibilities to Chase, and agreeing to the falsification of the Core-Mark Form 10, GECC committed overt acts in furtherance of the unlawful purpose of the RICO enterprise. GECC continues to derive money from, and invest income in, a criminal enterprise engaged in racketeering and despite knowing of the enterprises criminal nature has not withdrawn.

130.    Upon information and belief the proprietary logistics system disclosed in the Core-Mark form 10 is a copy of or derived from the Berry FCS and is an infringing work or contains protectable elements of the Berry work and is an infringing work.

131.    Upon information and belief, pirated copies of Mr. Berry's software were delivered to Core-Mark by agents of Fleming and the lenders, who had secreted copies of the Berry FCS to be delivered to Core-Mark.  These infringing copies were actually in possession of Fleming and/or Core-Mark when the freight logistics system that was used to provide asset support for the GECC loans was allegedly created.  Upon information and belief this work is substantially similar to and a copy of the Berry FCS and contains protectable expression and is a derivative of FCS and owned by Mr. Berry.   The transfer of a security interest purporting to encumber the Berry works in favor of GECC was perfected in the Copyright Office falsely claiming ownership over a work that constitutes fraud on the Copyright Office that in addition to

33

Mr. Berry is a victim of GECC's conduct.

132.    The Lenders' loan covenants related to the C&S and Core-Mark loans give the Lenders the power to cause the borrower to cease its infringement or other violations of law.

133.    Receipt by the Lenders including GECC of money derived from the SUA of Copyright Infringement for Financial Gain is a violation of RICO.

134.    GECC and Chase have both knowingly committed racketeering predicate acts of mail and wire fraud and likely securities fraud in furtherance of the enterprise and its unlawful purpose.

## CLAIM I
### DIRECT COPYRIGHT INFRINGEMENT
### C&S, CORE-MARK AND DOE DEFENDANTS

135.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

136.    In the fall of 2005, Plaintiff was informed by C&S', and Fleming's concurrent counsel, Lex Smith that C&S had commenced infringing Mr. Berry's works.

137.    Upon information and belief, C&S continues to create unlicensed derivative works of Berry original works that did not exist prior to the filing of the Complaint commencing this case and that could not have been the subject of any prior litigation because these infringing works did not yet exist. All such derivative works pursuant to the Berry EULA and the Second Addendum remain Mr. Berry's original works and subject to his rights as the copyright owner to such works that are not licensed to C&S or its employees and/or agents and the daily use of these works is infringement.

138.    Mr. Berry does not know the identity of the Doe Defendants that are C&S and Core-Mark employees who are presently using his works without a license and upon their

34

identification by C&S and Core-Mark they will be identified as defendants herein.

139.    Upon in formation and belief, no later than September 2005, C&S and Core-Mark used Berry Technology by making daily copies of his works that are loaded in random access memory of computer owned and operated by C&S and Core-Mark which use constitutes direct copyright infringement.

140.    Upon information and belief, in period of November 1, 2007 to December 21, 2007, and under the direction and control of Chase and GECC, C&S created new derivatives of certain of Berry works including but not limited to certain of the works developed in the Crystal Reports environment to conceal the ongoing activities of Fleming-Logistics aka Fleming Foods. All of these works are derived from the works that were subject to the EULA, and the Second Addendum and pursuant to the finding in the prior litigation are Mr. Berry's copyrighted works.

141.    Core-Mark and C&S knew and know that its unlicenced use of Berry Technology constitutes willful infringement for financial gain.

142.    From September 2005 to the filing of the complaint in this case, Core-Mark, C&S and their employees and agents have committed thousands of act of willful infringement for financial gain.

**CLAIM II**
**CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT**
**CHASE, DEUTSCHE BANK AND GECC**

143.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

144.    Based on the final judgments in both the First and Second Hawaii Cases, direct infringement is established and cannot be disputed for the period of January 2000 to July 3, 2001 and April 1, to June 9, 2003.

145.    During the period beginning in July 4, 2001, Fleming infringed Plaintiff's work by continuing to use and make illegal derivative copies of FCS and causing the use of these unlicensed works in Fleming's wholesale business. The number of infringing acts number in the thousands and are not subject to a legitimate dispute.

146.    Starting in the Spring of 2002, Defendants Deutsche Bank Trust Company Americas and JP Morgan Chase Bank in their separate capacities and as agents for the secured lenders of Fleming Companies, Inc., including GECC, had reason to know that Fleming might be engaged in criminal infringing activities but because the Lenders enjoyed a direct financial benefit from the continued use of the Berry FCS they continued to provide funding and to exercise control over Fleming to cause Fleming to continue to infringe plaintiff's work. The infringement of Mr. Berry's work from after the Fall of 2002 when the Lenders were given infringement warning letters and became aware of Mr. Berry's right to be paid for infringing use of his work that continued until no earlier than June 9, 2003, the Lenders received significant sums of money derived from the infringing activities. The knowledge of the infringement is imputed to other Fleming Lender's whose role in the infringement is not yet fully known to Plaintiff and who will be named as Doe Defendants upon their identification through discovery.

147.    The Lenders that responded to the Berry infringement warning letters all denied any infringement. It was not until March 2006 that Mr. Berry learned that these denials were false. Because the denials were made by publically traded and regulated financial institutions regarding whom false statements made regarding willful infringement would amount to misprision of a felony, and evidence a lack of institutional soundness, it was reasonable that Mr. Berry relied on their denials and therefore his discovery of the true extent of their complicity

36

was actively concealed from him and during the time of the infringement the statute of limitations was tolled by fraudulent concealment.

148.    To preserve his claims against the Lenders, Mr. Berry and the Lenders have entered into a tolling agreement that tolled the statute of limitations for copyright infringements related to this action.

149.    At the time of this jury verdict Fleming's lack of creditworthiness combined with the ongoing SEC formal investigation caused certain of the Lenders to be Fleming's only available source of operating capital.  Based on the then existing loan covenants and the fact that Fleming had no post-petition financing in place, the Lenders held control over Fleming's infringement related operations and exercised that control to cause Fleming to continue to infringe Plaintiff's works after it filed for Chapter 11 protection.

150.    Despite the knowledge that Fleming was an adjudicated willful infringer the Lenders caused Fleming to continue to infringe so that the Lenders could be paid on their loan obligations.

151.    In order to realize the Lenders' objective to sell the Fleming wholesale division it was necessary to keep the infringing Fleming freight business in operation to preserve the value of the Fleming loans owed to the Lenders that, but for the use of the Berry FCS, could not be repaid.

152.    Because the March 6, 2003 willful infringement jury verdict meant that a permanent injunction might be issued any time, Fleming filed its chapter 11 petition despite the fact that it had no proper Debtor-in-Possession financing in place.  The Lenders, though aware that Fleming was going to continue to infringe in the period after the jury verdict or, in the

alternative, having knowledge of facts that would have put a reasonable lender on notice of ongoing infringement, directed Fleming to use another unauthorized derivative of the Berry FCS so that Fleming would continue to have the ability to pay the Lenders' loans from money derived from infringement post-petition.

153.    The Lenders, undeterred by the potential for infringement liability believing that they could secretly control Fleming free from detection, directed Fleming to continue to operate the Fleming Freight logistics business using infringing software.

154.    Starting no later than January 1, 2000 and continuing to no earlier than June 9, 2003, Fleming Companies, Inc. and its employees engaged in thousands of separate act of direct infringement.

155.    The Lenders aided, facilitated, and enabled thousands of separate acts of FCS infringement from and after 2002.

156.    The Lenders required Fleming to agree to the Lenders' control over the ability of their borrower to commit act of copyright infringement specifically related to the Berry works the FCS database. As result of this and other factors, the Lenders starting in 2002 and continuing have right and ability to supervise infringing copyright and seek and obtain a direct financial interest in such activities are not shielded from liability even if they had no actual knowledge of the infringement.

157.    During the Fleming Bankruptcy, the Lenders knew that they were engaged in criminal conduct against Mr. Berry and sought to obtain a discharge for such conduct through the Fleming Plan of Reorganization. As proof of their intent and premeditation in regard to their agreement to engage in willful infringing conduct, after the language that was intend by the

Debtor's attorneys in furtherance of the Lenders's continued agreement to fund the ongoing infringement was called to the Bankruptcy Court's attention, the Bankruptcy Court orally ruled and the Plan's confirmation order was specifically  modified to make clear that no discharge for the conduct complained of herein either before or after confirmation was effective to relieved the Lenders or anyone from any obligation imposed upon them by law or otherwise.  The inclusion of this exculpatory language buried in hundreds of pages of documents filed in the Fleming bankruptcy is evidence of the criminal agreement,  planning and intent of intentional willful criminal conduct.  The Plan is a final judgment and res judicata prevents the lender from claiming such a discharge that would likely be beyond the subject matter jurisdiction of the Bankruptcy court to grant.

158.    In any event, Mr. Berry sought and obtained exemption from all of the discharge provisions of the Fleming Plan of Reorganization.  Even if other creditors were bound by the Plan, Mr. Berry, by not filing a claim and by order of the Delaware Bankruptcy Court and receiving an explicit exemption from the plan discharge was not so bound.

159.    The Lenders' attorneys' knowledge is imputed to the Lenders who authorized and/or ratified their conduct.

160.    The Lenders knew Fleming was an infringer and know that Core-Mark and C&S are infringers of Berry works..

161.    The Lenders have induced, caused and/or materially contributed to the infringing conduct of Fleming, C&S and Core-Mark.

162.    Upon information and belief, the Lenders have assisted other infringers of Berry works who are not yet known to Mr. Berry who use Berry works without a license and are

39

infringers.  These additional infringers may include, Haliburton and its spin off entity KBR and its successor to the LOGCAPS no-bid government contract,  Fluor, Inc., who has hired one of the architects of the Berry criminal infringement, Carlos Hernandez, Fleming's former General Counsel who made the first fraudulent claim of ownership over the Berry works, to serve as Fluor's  general counsel.

163.    The Lenders engaged in substantial participation in the infringing activities including providing finances that were specifically intended to advance the infringement and knowingly received money generated from the infringement.

164.    Even if the Lenders did not have actual knowledge of the infringing activity they had  reason to know of the third party's direct infringement and had the power and ability to stop it and are liable for contributory infringement.

165.    The Lenders had the power to control the infringement and materially contributed to the infringement and aided and abetted the infringement.

166.    The Lenders had a direct financial interest in the continuation of Fleming's Hawaii logistics operation as the one asset of value securing the Lenders' loans.

167.    But for the continued infringement the Lenders would have received little or nothing on their secured loans and are liable to Plaintiff as vicarious infringers.

168.    Starting in August of 2003, GECC, with full knowledge of the infringement of Berry's works began to support C&S and Core-Mark in their acts of infringement that continue as of this date.

169.    With knowledge of the infringing activity, the Lenders induced, caused, or materially contributed to the infringing conduct of another and are liable as contributory

40

infringers.

170.    The Lenders at all relevant times had the right and ability to supervise copyright infringing conduct and a direct financial interest in such activities are liable for vicarious infringement even if they have no actual knowledge of the infringement.

### CLAIM III
### CONTRIBUTORY AND/OR VICARIOUS COPYRIGHT INFRINGEMENT
### CORE-MARK AND C&S

171.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

172.    Core-Mark and C&S employees and agents are unlicensed users of Berry's works.

173.    Core-Mark and C&S engaged in substantial participation in the infringing activities including advancing the infringement and knowingly received money generated from the infringement.

174.    Core-Mark and C&S had the power to control the infringement and materially contributed to the infringement and aided and abetted the infringement.

175.    But for the continued infringement Core-Mark and C&S would have to have licensed the works from Mr. Berry.

176.    With knowledge of the infringing activity, Core-Mark and C&S induced, caused, or materially contributed to the infringing conduct of another and are liable as contributory infringers.

177.    Core-Mark and C&S at all relevant times had the right and ability to supervise copyright infringing conduct and a direct financial interest in such activities are liable for vicarious infringement even if they have no actual knowledge of the infringement.

41

## CLAIM IV
## UNJUST ENRICHMENT AND QUANTUM MERUIT
## THE LENDERS

178.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

179.    As a separate and distinct claim from the claims under the Copyright Act, and recognizing that the law in the Ninth Circuit where the case was field that was intend as the law applicable to this claim is at odds with the law in the Second Circuit that should adopt the Ninth Circuit view, and because the contract was pursuant to Hawaii law, starting in 2002, the Lenders knew that Mr. Berry had not licensed the use of any derivative copy of his work.  The Lenders knew that if Fleming infringed Berry expected to be paid for the use of his work.

180.    In the period after April 1, 2003, the Lenders directed Fleming to risk continued infringement so that the Lender's loans would be paid.  But for the use of Plaintiff's work, the Lenders would have received little in the break up of Fleming's wholesale business.

181.    Both the Lenders and Berry had an expectation that Berry would receive compensation for any unlicensed use of his works.

182.    The Lenders received a substantial financial benefit conferred upon them by Mr. Berry and it would be unconscionable to permit them to retain the full amount of that benefit that was obtained with the knowledge that Berry would have to be paid if Fleming continued to infringe.

183.    The Lenders are indebted to Mr. Berry in an amount to be determined at trial based upon the Lenders' implied promise to pay the reasonable value of the material infringed from which they derived a substantial benefit.

## CLAIM V
## BREACH OF CONTRACT FOR DAMAGES AND

42

## SPECIFIC PERFORMANCE
## KORS AND THE PCT

184.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

185.    The PCT is presently the assignee of all rights and has assumed all duties under the Berry EULA, Addendum and Second Addendum.

186.    The Berry EULA requires that the PCT destroy all Berry works upon the termination of its license.

187.    Berry has terminated the license and under the terms applicable to the PCT is contractually obligated to destroy all copies of Berry works.

188.    Berry works include all copies regardless of who presently possesses such copies.

189.    If the PCT cannot destroy the works, the EULA provided for liquidated damages in the amount of $2 million.

190.    Mr. Berry seeks specific performance from the PCT to destroy all Berry works.

191.    In the alternative, Mr. Berry seeks liquidated damages based on the EULA of $2 million.

192.    The right to compel destruction of a work is not an exclusive right of the Copyright Act.

## CLAIM VI
## TORTIOUS INDUCEMENT OF BREACH OF FIDUCIARY DUTY
## PCT, KORS AND C&S

193.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

194.    On or about July 2007, Mr. Berry had a fiduciary relationship with the Hawaii law firm of Lynch Ichida Thompson Kim & Hirota including Wesley Ichida his attorney of record in First and Second Hawaii Case and a former attorney in this case.

43

195.    Upon information and belief, commencing on July 16, 2007, Wesley Ichida committed numerous violations of his fiduciary duties, including, breach of the duty of loyalty, the duty to communicate information relevant to the representation, the duty to refrain from commingling and conversion of client funds and the duty not to practice deceit directed to his client.

196.    These violations continue through the continued material support of the defendants.

197.    Lex Smith as agent for C&S, Kors, the PCT and upon information and belief, certain Doe Defendants and other defendants' agents presently unknown to Mr. Berry, upon information and belief, offered Mr. Berry's attorney, Wesley Ichida money in exchange for his agreement to the breach of the fiduciary duties owed to Mr. Berry. Upon information and belief, the agreement required that the money that was money paid in partial settlement of the First and Second Hawaii Cases would not be disclosed to Mr. Berry.

198.    Smith and his principals knew they were inducing a breach of fiduciary duty but to further the ability of unlicensed users of Berry's system to commit acts of criminal infringement they acted under the authority and with the knowledge of their clients to induce the breaches of fiduciary duty as set forth herein.

199.    The defendants knowingly induced and substantially assisted in the breach and continue to provide assistance to Mr. Berry's former attorneys to assist them in concealing their breach including, but not limited to, their conversion of client funds and breach of duty of loyalty and the duty to maintain confidences and secrets.

200.    Upon information and belief, the defendants further induced Mr. Berry's attorney

44

to grant a fictitious interests in Mr. Berry's works that they along with the attorneys continue to conceal.

201.    Mr. Berry has been injured in an amount to be determined at trial greater than the jurisdiction threshold of this court.

202.    The conduct of the defendant's agents was authorized by defendants and has been, intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

## CLAIM VII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## PCT, KORS AND C&S

203.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

204.    On or about July 2007, Mr. Berry had a fiduciary relationship with the Hawaii law firm of Lynch Ichida Thompson Kim & Hirota including Wesley Ichida his attorneys of record in First and Second Hawaii Case and the former attorneys in this case.

205.    Upon information and belief, commencing on July 16, 2007, Wesley Ichida committed numerous violations of his fiduciary duties, including, breach of the duty of loyalty, the duty to communicate information relevant to the representation, the duty to refrain from commingling and conversion of client funds and the duty not to practice deceit directed to his client.

206.    These violations continue through the continued material support of the defendants.

207.    Lex Smith as agent for C&S, Kors, the PCT and upon information and belief, certain Doe Defendants or agents of other defendants presently unknown to Mr. Berry, offered

45

Mr. Berry's attorney, Wesley Ichida money in exchange for his agreement to the breach of the fiduciary duties owed to Mr. Berry.   The agreement required that the money that was money paid in partial settlement of the First and Second Hawaii Cases would not be disclosed to Mr. Berry.

208.    Smith and his principals knew they were aiding and abetting a breach of fiduciary duty but to further the ability of unlicensed users of Berry's system to commit acts of criminal infringement they acted under the authority and with the knowledge of their clients to aid and abet the breaches of fiduciary duty as set forth herein.

209.    The defendants knowingly induced and substantially assisted in the breach and continue to provide assistance to Mr. Berry's former attorneys to assist them in concealing their breach including, but not limited to, their conversion of client funds and breach of duty of loyalty.

210.    Upon information and belief the Defendants have continued to provide material support to the persons who have committed the breaches of fiduciary duty of a substantial nature and agreed to assist in concealing the breaches from Mr. Berry.

211.    Mr. Berry has been injured in an amount to be determined at trial greater than the jurisdiction threshold of this court.

212.    The conduct of the defendant's agents was authorized by defendants and  has been, intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

## CLAIM VIII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## PCT, KORS AND C&S

46

213.     Plaintiff restates the prior paragraphs that are incorporated by this reference.

214.     On or about July 16, 2007 Mr. Berry was party to an attorney-client retainer agreement between Mr. Berry and the Hawaii law firm of Lynch Ichida Thompson Kim & Hirota.

215.     The PCT, Kors and C&S and other defendants had  knowledge of the contract.

216.     These defendant's intentionally induced Lynch Ichida Thompson Kim & Hirota to breach the contract.  Other defendants' agents may have also participated in these acts and these defendants will be identified hereafter.

217.     The conduct that induced the breach constituted criminal conduct under Hawaii law and in any event the defendants had no justification for their acts.

218.     As the direct, foreseeable and proximate result of the defendants acts Lynch Ichida Thompson Kim & Hirota breached their contract with Mr. Berry.

219.     Mr. Berry has been damaged in amounts to be determined at trial but in any event no less than the jurisdiction threshold of this court.

220.     The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

### CLAIM IX
### AIDING AND ABETTING CONVERSION OF CLIENT FUNDS
### PCT, KORS AND C&S

221.     Plaintiff restates the prior paragraphs that are incorporated by this reference.

222.     Sometime after July 16, 2007, Lynch Ichida Thompson Kim & Hirota converted client funds owned by Mr. Berry.

47