223.    The PCT Kors AND C&S through their authorized agents had knowledge of the conversion. Other defendants' agents may have also participated in these acts and these defendants will be identified hereafter.

224.    The defendants provided and continue to provide substantial assistance to Lynch Ichida Thompson Kim & Hirota to aid them in concealing the conversion and thereby causing injury to Mr. Berry.

225.    Mr. Berry has made demand for the return of his funds but they have not been delivered to Mr. Berry.

226.    Mr. Berry has been injured in amounts to be determined at trial but in any event no less than the jurisdictional threshold of this court as direct, foreseeable an proximate result of the of the actions of the defendants to aid and abet the conversion of client funds.

227.    The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

## CLAIM X
## ABUSE OF PROCESS
## PCT, KORS AND C&S

228.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

229.    Commencing on or about January 2006, Defendants devised a scheme to further the criminal infringement of Plaintiff's works by agreeing to cause the issuance of process in a Hawaii family court proceeding directed against Mr. Berry.

230.    The purpose of this proceeding was not to advance the legitimate issues related to the parties to the proceeding but to advance the purposes of the criminal infringers of Berry's

48

works.

231.    On or about August, the defendants caused process to issue that required Mr. Berry to travel interstate to attend a deposition.

232.    The purpose of that process was to cause Mr. Berry to divulge his home address for the purpose of intimidating him and causing him to fear for his personal safety.

233.    In addition, the Defendants knowingly and willfully caused purported process to be served upon Mr. Berry regarding a complaint that had already been dismissed.

234.    The Defendants and each of them acting through their agents whom they authorized to so act, caused  regularly issued civil process to issue regarding Plaintiff.

235.    The defendants had the specific intent to do harm to Mr. Berry and were without excuse or justification.

236.    The process was issued and used in a  perverted manner to obtain a collateral objective of further criminal conduct and to cause injury to the person and business of the Plaintiff.

237.    As the direct, foreseeable and proximate result of the defendants acts Mr. Berry has been damaged in amounts to be determined at trial but in any event no less than the jurisdiction threshold of this court.

238.    The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

### CLAIM XI
### CONVERSION OR ALTERNATIVELY TRESPASS TO  MATERIAL OBJECTS C&S AND CORE-MARK

239.     Plaintiff restates the prior paragraphs that are incorporated by this reference.

240.     The Copyright Act makes a distinction between a copyright and the material object.   Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied and actions to recover such material objects are based on exclusive rights under the Copyright.

241.     C&S and Core-Mark may claim that they received material objects from Fleming in regard to the APA in C&S case and the confirmation order in Core-Mark's case.

242.     Fleming was under the protection of the automatic stay that protected certain property rights.

243.     C&S's rights if any to possess the material objects that embody the Berry works was terminated as to all such claims on December 17, 2007.  By terminating C&S's rights the PCT conceded that Core-Mark also has no rights in Berry works.

244.     Mr. Berry has made demand from C&S and Core-Mark for return of his works.

245.     C&S and Core-Mark have obtained possession of Berry works as material objects through wrongful transfers, acquisition and have damaged and destroyed the works and misused them.

246.     C&S's has intentionally continued assertion of  right to possess these material objects constitutes conversion under Hawaii law or alternatively should they agree to turn them over immediately a trespass to chattel.

247.     Core-Mark's continued possession of Berry works is conversion under the law of the state of Hawaii or alternatively should they agree to turn them over immediately a trespass to chattel.

248.   Mr. Berry is the person with the lawful right to possess these material objects.

249.   The continued possession of these material objects destroys Mr. Berry's right to gainfully employ these works for other customers. The intentional and continued possess of these material objects is serious in nature to require in addition to other remedies require the defendants to pay the full value of the chattel.

250.   As the direct, foreseeable and proximate result of the defendants acts Mr. Berry has been damaged in amounts to be determined at trial but in any event no less than the jurisdiction threshold of this court.

251.   The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

252.   Mr. Berry hereby seeks in addition to his damages a writ of replevin to enter upon the property of C&S and Core-Mark and without breach of the peace remove the material objects and restore them to Mr. Berry, the rightful owner and possessor.

## CLAIM XII
## RICO
## ALL DEFENDANTS

253.   Plaintiff restates the prior paragraphs that are incorporated by this reference.

254.   All named defendants, are defendants under the RICO 18 U.S.C. § 1962 (a)(b)(c) & (d) and RICO Persons. The conduct of the defendants' agents was authorized by defendants.

## The 18 U.S.C. § 1962(c) Enterprise

255.   In or about 1993, certain individuals, including Jack Borja and Lokilani Lindsey formed Atlantic Pacific International, Inc. ("API"). API was formed by these individuals

51

ostensibly as a legitimate business engaged in providing logistics services for ocean freight customers primarily groceries and restaurant supplies.   Over time API and its associates repeatedly engaged in two primary criminal practices.   The first was to facilitate Fleming's scheme to conduct false billing overcharges for food shipments into the state of Hawaii.  The second practice was to facilitate Fleming's trafficking of untaxed cigarettes.

256.    By late 1995, Lokilani Lindsey then a trustee of the Bishop Estate Hawaii's most powerful entity and the Nation's largest purported charitable trust,  began to distrust their API co-owner, Jack Borja whom she and her sister Marlene believed was engaged in a fraud on them. The details of other misconduct of the Bishop Estate trustees during this period  has been documented by the Honorable Samuel P. King the district judge who presided over the First Hawaii Case in, King and Roth: Broken Trust: Greed, Mismanagement, And Political Manipulation at America's Largest Charitable Trust, University of Hawaii Press ISBN-10: 082483044X (March 2006).

257.    To continue the operation of the enterprise engaged in cigarette trafficking and overcharges, in or about December 1995, Fleming transferred $200,000 to API for Jack Borja to use to buy the API shareholder interests held by Lokelani and Marlene Lindsey to insure the continued flow of untaxed cigarettes and the false documentation that Fleming used to facilitate its overcharge scheme.

258.    Fleming overcharges included, but were not necessarily limited to two known variants.   The first scheme required a trucker or freight company to change Fleming an inflated amount for trucking services.  Fleming would pay the inflated amount and then the trucker and Fleming would share in the overcharge through what the had come to term the "Freight

Reconciliation Account." Fleming then passed the inflated invoice on to its cost-plus customers including grocery retailers and the United States of America. The trucker then paid Fleming its share through a Cost Recovery Saving ("CRS") payments also termed a "Back-Haul Allowance." The money that was being paid to Fleming was at times $60,000 per week in these payments. This scheme was used to inflate the charges to cost-plus customers of Fleming who paid a set percentage mark up on their purchases depending on the commodity ranging from 6% to 10 %. Fleming's gross margins if run without such schemes would be 6% to 10 %.

259.    Another overcharge scheme involved the use of the Fleming mainframe computer that was programmed to create billing anomalies that could escape detection. The result of these anomalies were an approximately 2 to 5% overcharge of Fleming's grocery customers. The number of transactions and Fleming's net 7 day terms made the process of auditing Fleming's bills a virtual of impossibility. Upon information and belief Fleming had a means to produce items during an audit that would show that had been underpaid. The customer that had taken the time and effort to review the mountains of paper invoices for the source of the overcharge were repeatedly presented with another higher bill rather than receiving a refund for the suspected overcharges.

260.    At the time of the transfer of Fleming's funds to Marlene and Lokilani Lindsey, Marlene Lindsey was a Chapter 7 debtor in a case in the District of Hawaii. In a written contract entered into and signed by Jack Borja, Marlene and Lokilani Lindsey the three agreed to conceal the payment from Fleming to Marlene Lindsey from her bankruptcy trustee. Some years later, based on evidence produced by Mr. Berry, including the agreement set forth above, Marlene and Lokilani Lindsey were convicted in Federal court of counts including bankruptcy fraud and

53

money laundering in regard to their activities related to API and Fleming.

261.    In or about 1994, with the Lindseys out of the way Fleming continued to operate its freight company engaged in false invoices that set forth freight charges that were used to establish Fleming's costs in certain cost-plus contracts and, upon information and belief, continued to engage in cigarette smuggling.

262.    At the time API had an ostensible legitimate business purpose of proving logistics services to reduce ocean freight costs.  The volume of freight that Jack Borja and API  was able to handle through API's ostensible legitimate activities was, however, limited by the lack of automation to approximately one forty foot ocean container per employee 40 hour week.

263.    In late 1994, Jack Borja approached Wayne Berry who had been his tenant on the North Shore of Oahu, and requested that Mr. Berry, a computer programmer,  provide a proposal for automating the API logistics functions.   At that time API with approximately 25 employees was able to perform the logistics cost savings function on approximately 25 containers a week.

264.    By late 1995, Mr. Berry had completed the integration of the Berry Freight Control System and put it on line in his home to be accessed by API solely over the Internet.

265.    During the time after November 1995,  Jack Borja informed Mr. Berry of other business affiliations that he was developing including several related to the securitization of mortgage instruments in the Philippines.  Upon information and belief these activities were funded by Fleming and included certain other violations of RICO including money laundering that was being effected by the issuance of credit cards drawn on overseas banks in the name of the RICO participants who were able to obtain money derived from the SUA's without reporting it as income to the IRS and the failure of certain Fleming related individuals to register as

foreign agents.

266.    In or about 1998, Mr. Berry, then acting at Jack Borja's request as president of API and up to that time unaware of anything improper occurring at Fleming and having been told by Fleming's top management that the CRS payments were being shared with Fleming customers, was informed by a temporary API employee, Mauro Edwards, that he had overheard one of Jack Borja's relatives, who was an API employee, discussing the shipment of machine guns with silencers in Fleming controlled ocean containers. Fearing that Jack Borja might be implicated, that same day, Mr. Berry, without informing Mr. Borja, caused this information to be communicated to agents of the Bureau of Alcohol Tobacco and Firearms ("ATF").

267.    In a meeting shortly thereafter with Tracy Elder and Jordon Lowe, ATF Special Agents, in ATF offices in Honolulu, and after a brief discussion of the machine guns that the agents were already aware of, Mr. Berry was asked by the agents if he knew anything about cigarette smuggling being conducted by Fleming. Mr. Berry was supervised but Mr. Berry agreed to report anything suspicious he discovered.

268.    Later, after being requested to produce certain corporate records in litigation, while reviewing a large amount of historical API records, Mr. Berry discovered certain Fleming records of a Fleming related company that appeared to be engaged in cigarette trafficking. These records included detailed transactions and customer lists. These companies including UPAC (controlled by John Ault, Fleming's former manager), and WC Distributing the apparent cigarette delivery service along with Borja and the Lindseys evidenced a mature and ongoing criminal enterprise. Mr. Berry reported this to the ATF that immediately sent an investigator from Seattle to Honolulu to review the records.

269.    After further investigation, Mr. Berry discovered documents dating back to 1993 detailing the Fleming-API criminal enterprise. These documents were obtained by the United States 1999 pursuant to grand jury subpoena and, upon information and belief, were the government's principal evidence against Marlene and Lokelani Lindsey who, in or about 2000, were indicted on the of the predicate offenses of Money Laundering and/or Bankruptcy Fraud in regard to their involvement in the Fleming-API enterprise. The were both later convicted of these offenses 2002.

270.    In November 2001, in order to force Mr. Berry to relinquish his copyright claim in the First Hawaii Case and to give up his copyrights to the Fleming enterprise, employed by Fleming traveled to the State of Hawaii upon information and belief, in a private aircraft, for the ostensible purpose of closing a sale of a grocery retail chain to a former Fleming associate. While in Hawaii, persons associated with Fleming upon information and belief among them Thomas Dahlen, entered in the nighttime property rented by Mr. Berry and assaulted a member of Mr. Berry's family on his property seeking to extract Mr. Berry's whereabouts. This act was done in furtherance of the Fleming-Logistics enterprise that replace The Fleming-API enterprise on or about October 1999. The facts of this assault were confirmed the following week when by police officers who had knowledge of the incident.

271.    At this time and continuing, Fleming required the use of the Berry FCS to continue another fraudulent practice. Fleming and upon information and belief its successor C&S engage in the practice of "diversions" where freight subsidies to offset the higher cost of shipping to Hawaii are fraudulently obtained from vendors for shipments it claimed were destined to be consumed by Hawaii consumers while instead are "diverted" to Mainland

distribution centers. Fleming and now C&S then retain the substantial freight subsidy. The Berry FCS was and remains a system that tracks freight subsidies and upon information and belief constitutes a source of revenue for the Fleming-Logistics enterprise, that despite Fleming's claim to have ceased all operations still continues to due business to assist the members including C&S in concealing its operations.

272.    When Fleming filed bankruptcy the only valuable asset that it had were the three warehouses related to the use of the Berry FCS and the diversions. The one in Hawaii and two on in California were positioned to effect the diversions. These are the only Fleming warehouses that C&S kept to operate after it purchased the over 30 Fleming warehouse operations that were either closed or sold to other wholesalers.

273.    After Fleming exposed the diversion scheme and upon information and belief the Berry freight control system to C&S in or about May to June 2003, C&S agreed to purchase Fleming's wholesale business.

274.    The only wholesale operation that C&S retained from the Fleming sale are the three that were tied to the Berry FCS. Mr. Berry sued Fleming and C&S prior to the sale closing.    275.    Prior to the closing Fleming sued Mr. Berry who ad a pending Hawaii District Court Case against Fleming's freight forwarder, Hawaiian Express Service, Inc.. The Hawaii case (the Second Hawaii Case) had been filed before the frivolous Delaware Adversary case and when Fleming attempted its first filed case in Delaware, Mr. Berry's counsel amended the first case and named Fleming and C&S as parties.

276.    As a condition to closing the sale, C&S required that Fleming and, upon information and belief, its Lenders who controlled Fleming, agreed to incur any amount

necessary to protect C&S and its turn to reap the money from the illegal practices from Mr.
Berry's attempts to be free from criminal infringement. The day after this Berry Technology
Indemnity agreement was signed memorializing the Lenders and Fleming's commitment to the
C&S operation of the Fleming-Logistics enterprise, but after Mr. Berry had commended his suit
against Fleming and C&S, the approximately $400 million sale to C&S sale closed. The vast
majority of proceeds were paid to the Lenders who had funded the ongoing operation of
Fleming-Logistics infringement from no later than 2002 to the present and authorized the
ongoing indemnity to C&S for its continued criminal infringement.

277.    C&S claimed in the Second Hawaii Case to not using any Berry works. Upon
information and belief, subsequent to the entry of summary judgment C&S commenced using the
Berry works that are the subject of this case, upon information and belief in the Fall of 2005.
C&S continues to use these works on a daily basis and the Lenders continue to offer material
support and aid and abet the ongoing criminal infringement for their own financial gain to
protect their interest in the pool of funds that is held by the PCT.

278.    An unincorporated entity commonly referred to as Fleming-Logistics also known
as Hawaii-Logistics is alleged to be one of perhaps many 18 U.S.C. § 1962 (c) enterprises
employed to facilitate the commission of certain predicate acts, including, but not limited to, the
ongoing infringement of Plaintiff's original works. Each of the defendants is a person who
either directly or through the acts of attorneys and agents participates in the conduct of the
affairs of the Fleming-Logistics enterprise as a principal.

279.    This Enterprise generates and launders the funds received from the criminal use
of Mr. Berry's intellectual property. To protect this Enterprise Mr. Berry has been the victim of

58

violations of the Hobbs Act and other acts as set forth herein as part of a pattern of connected, related predicate acts.

280.    The Lenders and C&S are alleged to have obtained money derived from the operation of a RICO enterprise in violation of 18 U.S.C. § 1962(a).

281.    Plaintiff is the principal victim of this conduct.  His rights and his business and property under the Copyright Act, 17 U.S.C. § 106 and under the Hobbs Act, 18 U.S.C. § 1951 have been repeatedly injured by the defendants and their agents.

## Pattern of Racketeering

282.    In Enterprise operates under a pattern of racketeering including but not necessarily limited to the following that are all related acts in furtherance of the enterprise committed against Mr. Berry as a victim:

### Under RICO 18 U.S.C. § 1961(1)(A)

283.    Violations of Hawaii Commercial Bribery Statute Hawaii  Rev. Stat. 708-880. The factual predicates are also alleged in Counts VI to IX above based on the same course of conduct.  Upon information and belief, on or about July 16, 2007,  Lex Smith as agent for C&S, the PCT and upon information and belief,  the Lenders offered valuable consideration in exchange for the breach of the ethical duties of members of Mr. Berry's former law firm, in particular Wesley Ichida. Upon information and belief the offer of valuable consideration of more than $1,000 for the violation of the duty to Mr. Berry by Mr. Berry's former attorneys. The act offering the compensation violates the Hawaii Commercial Bribery law.   Because the amount of money offered was in excess of $1,000 and constitutes felony bribery under Hawaii law made a RICO predicate act pursuant to RICO 18 U.S.C. § 1961(1)(A).

284.    Upon information and belief, C&S, Kors and the PCT through their agents have directed the commission of one or more acts of Commercial Bribery. Mr. Berry believes that others whose actions will be imputed to other defendants herein, in particular the Lender, will be proven to be participants in this predicate act.

285.    Violations of Hawaii's Anti Bribery Statute. Hawaii Rev. Stat. §710-1040. The PCT and C&S have conferred, or offered or agreed to confer, directly or indirectly, a pecuniary benefit upon Lex Smith defined by Hawaii Rev. State. § 710-1000(15) as a "public servant" with the intent to influence the public servant's vote, opinion, judgment, exercise of discretion, or other action in the public servant's official capacity in particular Smith's ability to retaliate against Honolulu law enforcement officers who might investigate Fleming and C&S' ongoing criminal conduct. Upon information and belief, through Smith's intervention, C&S has been able to operate in violation of Hawaii's computer crime statute that it violates each time an illegal copy of a Berry work its used.

## Under RICO 18 U.S.C. § 1961(1)(B)

1. Criminal Copyright Infringement. 18 U.S.C. § 2319 (relating to criminal infringement of a copyright) the number of these instances of violations of Title 18 are too numerous to be stated herein but include the daily booting up of computers that load, without any license, pirated copies of Mr. Berry's software each day the infringement continues. The first act of criminal infringement was committed in 2000 and continues as of this writing and are all related to the revenue derived from mis-declaration of freight and diversions. Fleming has been adjudicated by jury verdict as a willful i.e. criminal infringer for acts committed in 2000 to July 3, 2001. The finding of willful infringement has been affirmed by the 9th Circuit Court of

60

Appeals on July 5, 2007. Fleming and certain C&S employees were adjudicated infringers by judgment entered on March 9, 2006. That judgment has not been appealed but the district Court finding that the infringement was not willful is on appeal. The Lenders and C&S are fully aware that the use of Berry's works by C&S and Core-Mark constitutes willful infringement for financial gain and is criminal infringement.

2. The Hobbs Act 18 U.S.C. § 1951. Threats and intimidation against Mr. Berry and his family. These acts include the intentional and knowing threat and intimidation directed against Mr. Berry's family as set forth above, and against Mr. Berry in a deposition taken on August 13, 2007, where the questioner, Lex Smith, who upon information and belief has concealed his knowledge and complicity in regard to earlier acts of violence, all for the purpose of causing Mr. Berry to give his copyrights to the enterprise. Mr. Smith, under direction of Michael Baumann, knew of Mr. Berry's claim that he and/or his family had been the target of unlawful acts of violence and directed questioning to Mr. Berry with the specific intent that Mr. Berry be put in fear for his personal safety and/or the safety of his property. The first of these acts occurred in 2001 and the last one occurred in August 2007. Because Smith has power over the careers of law enforcement officers in the State of Hawaii he feels immune from any criminal liability for his unlawful acts.

3. Witness Retaliation, 18 U.S.C. § 1513 (e). With the intent to retaliate, Lex Smith, Kirkland & Ellis and the Lenders took action to harm Mr. Berry including action to interfere with his livelihood for Mr. Berry's providing to a law enforcement officer truthful information relating to the commission or possible commission of Federal offenses. These acts began in 2001 and again in the spring of 2003 and the last one was committed in August 2007.

61

4. Money Laundering. 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity ("SUA") i.e. Copyright Infringement for financial gain and commercial bribery. The money derived from the unlicensed use of the Berry system is money derived from an SUA and occurs on a regular basis from 2002 to the present. The money paid to Mr. Berry's former attorneys in exchange for their active participation in acts against their client constitute proceeds of an SUA. Marlene and Lokilani Lindsey, two previous members of the Fleming-Logistics criminal enterprise have been convicted for conduct related to the ongoing RICO enterprise on the charge of Money Laundering. The Lenders, PCT, Kors, Core-Mark and C&S have engaged in numerous related acts of Money Laundering related to income derived from criminal infringement.

5. Bankruptcy Fraud. 18 U.S.C. § 152. The affidavit of Michel Gurzi dated on or about July 23, 2003 and false testimony of Brian Christensen in the fall of 2004 and spring 2006 are all acts of Bankruptcy Fraud. Marlene Lindsey, previous member of the Fleming-Logistics criminal enterprise have been convicted on the charge of Bankruptcy Fraud.

286. The software is used by the members of the enterprise and their principals the identity is known to the members but currently unknown to the Plaintiff to facilitate various unlawful practices associated with the shipment of goods interstate and that conduct continues such that there is a real threat of future predicate acts.

287. From the time that the reader began reading this Second Amended Complaint, more likely than not, a member of the Enterprise committed at least one additional predicate act. These practices include, but are not necessarily limited to, the transportation of contraband

62

cigarettes, mis-declaration of freight in violation of federal shipping laws, obtaining unearned and fraudulently reported discounts through the practice of freight diversions that is facilitated by the daily acts criminal infringement of the Berry FCS and the predicate acts identified herein committed against Mr. Berry.

288.    These acts are related and the members of the enterprise all share the common purpose to engage in criminal infringement, shipment of contraband, the facilitating of diversions and the overcharges of the United States are some of the elements of the common plan and the reason that the PCT, Lenders and C&S and upon information and belief Core-Mark, have directed agents to commit Hobbs Act violations and commercial bribery is to protect its profits being derived from the Enterprise.

289.    Each of the members of the Enterprise is a separate person that maintains an identity separate from the enterprise.   The persons associated with the enterprise share a common purpose and the enterprise exits to facilitate several criminal schemes including the ongoing criminal use of Plaintiff's intellectual property and to permit the members of the enterprise earn money from the multiple commission of predicate acts.

290.    Fleming was and now C&S is outwardly legitimate wholesale enterprises. Fleming-Logistics was originally API and has changed ostensible ownership but continues in regard to it criminal practices unabated despite the changes in ostensible ownership.  The maintenance of the Government contract overcharges, the shipment of contraband are all facilitated by the illegal use of Mr. Berry's property in violation of Title 18 U.S.C. that is infringed to further the enterprise.

291.    Each time any Berry work is loaded in a computer, that occurs over ten times a

day, a criminal act of infringement occurs. These illegal acts are further compounded by the use of this system to create false freight charges that are transmitted to the United State of America as costs. The true costs are maintained in the data contained in the Berry freight control system. government contractors doing business with the Defense Commissary Agency ("DeCA") are required to submit to extensive audits. Upon information and belief, Fleming and now C&S have concealed the Berry freight control system from the Government to hide the extent and nature of the fraud and overcharge.

292.    Millions of dollars in profits that, but for the commission of the predicate acts, could not have been obtained by the participants.

293.    By violating Mr. Berry's rights as an owner of intellectual property, and by threatening his person and property in violation of the Hobbs Act, the Defendants impede the development of new innovative alternatives to the current logistics methods used to ship over $1 billion in goods yearly to Hawaii and Guam.

## RICO OFFENSES

294.    In violation of RICO 18 U.S.C. § 1962(a), all Defendants have received the income derived from the pattern of racketeering activity. The Lenders, C&S, Core-Mark and Kors have obtained payment from the proceeds of SUA's.

295.    In violation of RICO 18 U.S.C. § 1962(b), all the Defendants are persons who, through a pattern of racketeering activity, acquired and maintain, directly or indirectly, an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. The use of mechanisms that include bribery and extortion have permitted the Defendants to maintain, directly or indirectly an interest in or control of the

64

enterprise.

296.    In violation of RICO 18 U.S.C. I § 1962(c), all defendants are persons employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

297.    By the agreements and overt acts set forth above, all defendants have conspired to violate RICO 18 U.S.C. § 1962 (a)(b) & (c) and have violated RICO 18 U.S.C. § 1962 (d).

298.    Mr. Berry has been injured in his business and property by the willful violation of his exclusive rights under the Copyright Act, 17 U.S.C. § 106 have been violated thousands of times and that violation continues unabated and will seek damages in the amounts to be proven at trial times three under RICO.

299.    In addition, by threatening Berry during a deposition, and by agents of the defendants traveling to West Palm Beach Airport immediately thereafter to confront Berry after the deposition and to put him in fear for his personal safety, the Lenders, PCT and C&S, though their shared agents including Lex Smith intended to cause Berry to give up his rights to his property thereby allowing C&S to continue to commit criminal acts of infringement with proceeds would be shared with the Lenders with no fear that Berry would seek to be compensated or report the infringement to law enforcement.

300.    But for the violation of RICO i.e. infringement, Mr. Berry would have an ability to license the defendants for the use of his software for valuable compensation.

301.    Mr. Berry's lost license fees and profits are all damages related to the infringement of his works.

302.    The acts continue as of this writing and because of the amount of money generated by the Berry system, it will likely not be impeded through any civil remedy but Mr. Berry will seek the imposition of an injunction.  The participants in this enterprise seek to hold themselves out as upstanding members of society, but to a person refuse to accept the simple fact that Copyright infringement for financial gain is a serious federal crime.

303.    Each RICO defendant is a person as defined by RICO and as a principals of such enterprise has agreed, participated as a Principal in the operation of an enterprise, agreed to the commission and committed overt acts and  received money derived from specified unlawful activities in violation of RICO 18 U.S.C. § 1962(a), (c) and (d).  The predicate acts that first gave rise to liability in RICO involve acts of Criminal Copyright Infringement in violation of 18 U.S.C. § 2319 (relating to criminal infringement of a copyright) the number of these instances of violations of Title 18 are too numerous to be stated herein but include the daily booting up of computers that load, without any license, pirated copies of Mr. Berry's software each day the infringement continues.  Additional predicate acts are derived form violations of the Hobbs Act and other Federal Criminal statutes.  These predicate acts continue as of this writing.

304.    Money knowingly derived from Criminal Copyright Infringement is then received by the Lenders including GECC in violation of 18 U.S.C. § 1962(a) and is not reported to the United States as money derived from a specified unlawful activity and constitutes money laundering as provided by Title 18 U.S.C. and constitutes additional predicate acts of money laundering.

305.    The RICO enterprise operates in interstate commerce and  has existed for no less than two years and will continue to exists unless the Court acts to order that it cease existence

and commission of acts that constitute RICO predicate acts.

306.    Mr. Berry continues to be injured by the RICO enterprise because the market for lawful copies of his original works is destroyed by the pirated copies that C&S and Core-Mark use and he is subject to direct and indirect acts of threat to his person and property by the members of the Enterprise.

307.    The Lenders, C&S, their agents, attorneys, including their attorneys in this case, officers and directors have all agreed and committed overt acts in furtherance of the objectives of the RICO Enterprise, including committing acts of physical threat and intimidation against Mr. Berry in violation of the Hobbs Act 18 U.S.C. § 1951 and are co-conspirators in violation of RICO 18 U.S.C. § 1962(d).

308.    The Defendants including the RICO person C&S though its attorneys have attempted to induce Mr. Berry to give up his rights to his works through acts of deceit, physical threat and threat to his property and by tortious acts directed at Mr. Berry and his spouse. The most recent occurring on Monday August 13, 2007.  By asking repeated irrelevant questions regarding Mr. Berry's ability to protect himself with licensed firearms, from criminal assault, in a deposition Lex Smith ("Smith") C&S and Fleming's PCT's attorney acting under the direction of the PCT, and other defendants, all RICO persons, did commit acts intended to induce or attempt to induce Mr. Berry a criminal victim to give up property or property rights through acts of threat of violence and/or physical intimidation to his person and/or property.

309.    On Monday August 13, 2007, and at earlier times,  Smith, and the Lenders' C&S's, Core-Mark's agents, used and/or attempt to use Plaintiff's reasonable fear of physical injury or economic harm in order to induce Mr. Berry to consent to give up his intellectual

property rights. This conduct along with repeated and ongoing threats directed at Mr. Berry and/or a Berry customer actually or potentially obstruct, delay, or affect interstate or foreign commerce by preventing any competitor in the Hawaii Mainland USA ocean freight logistics market for food and restaurant supplies from competing with C&S that presently possesses the vast majority of the Hawaii market share.

## Additional RICO Predicates and DOE Defendants

310.    In addition to the claims herein alleged, upon information and belief, a copy of Mr. Berry's work was by fraud obtained from the Copyright office on or about April 2002 and is being used to facilitate another criminal enterprise that upon information and belief may be related to the operation of a military procurement fraud currently under investigation by Congressman Henry Waxman which fraud, upon information and belief, may also employ persons associated with the Fleming-Logistics Enterprise who from time to time are physically present in the Rock Island Arsenal in Illinois.   Mr. Berry has sought information through FOIA requests but has been unable to learn facts sufficient to form a basis for a claim prior to filing of this Second Amended Complaint.

311.    Upon information and belief this copy of FCS was obtained by Smith and Roger Fulghum, a partner at the Baker Botts law firm in Houston, who at the time Haliburton, Inc.'s subsidiary Kellogg Brown & Root.  Upon information and belief, Haliburton used the illegally obtained copy to facilitate Haliburton's qualification for the no-bid government contract known as LOGCAPS III that required the contractor to have a freight control database to facilitate contract performance.  Upon information and belief a copy of this work is used by Haliburton and/or its spin off of Kellogg Brown and Root now known as KBR, Inc. ("KBR")  to facilitate a

68

fraud upon the United States in amounts exceeding several billion dollars. KBR has resisted efforts of the congressional committee investigating the IRAQ procurement fraud to obtain a copy of the Access® database or databases that is/are being used in regard to KBR's Logisitcs services under LOGCAPS III. Upon information and belief the concealed KBR Access database is a copy derived from the misappropriated copy of FCS that was obtained by fraud from the Copyright Office in 2002..

312.    Because KBR and Haliburton are the subject of numerous investigations, and due to the outcry against such no-bid contracts the LOGCAPS contract has been transferred to other sub-contracting parties including, but not limited to, Fluor, Inc. another Texas based corporate entity.

313.    As further evidence of the continuity of these related enterprises, Fluor, Inc. has within the past few weeks, hired Fleming's former general counsel, and the person who first made false claims of ownership over FCS in 2001, Carlos Hernandez, as Fluor's General Counsel. It is now established by the First Infringement Case that Mr. Hernandez as the infringer's chief legal officer, oversaw over three years of criminal infringement related to FCS. Mr. Berry will conduct discover regarding these additional predicates and parties and identify additional defendants if warranted.

314.    Mr. Berry also believes and continues to investigate, the continued use of his work by former Fleming customers, including, but not necessarily limited to, Kmart.

**WHEREFORE PLAINTIFF PRAYS FOR:**

A.    As to JP Morgan Chase Bank, Deutsche Bank, and GECC, damages for infringement of the copyright from and after 2000 to the present  as provided by the Copyright

Act without limitation to include actual damages and accounting for all gains and profits derived by each of these defendants through the willful infringement of Plaintiff's copyright or Plaintiff's right to statutory damages for willful infringement if elected with all amounts times three pursuant to RICO;

       B.     As to Robert Kors and the PCT an order directing the specific performance under the EULA to cause the destruction of all Berry Technology that is in possession the PCT, Core-Mark and/or C&S and, if not possible, then liquidated damages pursuant to the EULA in the amount of $2 million times three pursuant to RICO;

       C.     As to C&S and Core-Mark damages for direct infringing use and/or vicarious and/or contributory infringement beginning no later than September 1, 2005 to the present as provided by the Copyright Act without limitation including actual damages and accounting for all gains and profits derived by defendants through infringement of Plaintiff's copyright or Plaintiff's right to statutory damages if elected with all amounts times three pursuant to RICO and damages for conversion including punitive damages times three pursuant to RICO and the issuance of a writ of replevin to recover the material objects owned by Plaintiff;

       D.     Damages to be determined at trial for the value of the benefit that the Lenders received with the expectation that Berry would receive payment for the unauthorized use of his work based on an implied promise under quantum meruit times three pursuant to RICO;

       E.     Plaintiff reserves the right to elect statutory damages any time prior to entry of judgment which could occur after the jury renders verdict;

       F.     Damages for intentional torts against all intentional tort defendants as set forth herein in amounts to be proven at trial which amounts are times three under RICO ;

70

G.    Punitive damages against all intentional tort defendants as set forth herein found liable for the intentional torts set forth herein, in amounts sufficient to punish and deter future acts times three under RICO;

H.    Payment of the full costs of the action and reasonable attorney's fees at rates paid to the attorney for the opposing parties pursuant to RICO, the Copyright Act and Hawaii law;

I.    A declaratory judgment declaring that any interest that the Defendants alleged to have obtained through the inducement, or aiding and abetting of a breach of fiduciary duty was void *ab initio*;

J.    A temporary restraining order, preliminary and permanent injunction against all defendants and anyone with knowledge of the injunction to prohibit any further acts that assist, finance or otherwise facilitate the ongoing acts of infringement and threats of violence or intimidation regarding the Plaintiff, his family and/or his works that are the subject of this action, and requiring the return and/or destruction of all Berry works other than those necessary to preserve for litigation purposes under appropriate protections;

K.    Should the Lenders persist in their support for criminal infringers, and for persons violating the Hobbs Act, and breaches of fiduciary duty, Mr. Berry shall seek the imposition of a receiver or other Court appointed officer to take control of the defendants who continue to commit acts of willful infringement for financial gain or provide material support to infringers and/or direct other criminal acts,  as provided by law;

L.    Such other and further relief as may be just.

71

Respectfully Submitted: Honolulu, Hawaii, December 21, 2007.

<u>S/Timothy J. Hogan</u>
TIMOTHY J. HOGAN (Hawaii Bar No. 5312)
Attorney for Plaintiff WAYNE BERRY
Admitted *Pro Hac Vice*

1050 Bishop Street, Number 433
Honolulu, Hawaii 96813
Tel.  (808) 382-3698
Fax.  (808) 356-1682
Email tjh@timhogan.com