# Exhibit 2

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4   WAYNE BERRY, a Hawaii Citizen,  ) CIVIL NO. 03-00385SOM
                                    )
5                  Plaintiff,       )
                                    )
6          vs.                      )
                                    )
7   HAWAII EXPRESS SERVICE, INC.,   )  - VOLUME 4 -
    et al.,                         )
8                                   )
                   Defendants.      )
9   _____)

10

11                  TRANSCRIPT OF PROCEEDINGS

12         The above-entitled matter came on for hearing on

13   Thursday, March 2, 2006, at 9:24 a.m., at Honolulu, Hawaii,

14   BEFORE:          THE HONORABLE SUSAN OKI MOLLWAY
                      United States District Judge
15
     REPORTED BY:     STEPHEN B. PLATT, RMR, CRR
16                    Official U.S. District Court Reporter

17   APPEARANCES:     TIMOTHY J. HOGAN, ESQ.
                      WESLEY W. ICHIDA, ESQ.
18                    Lynch Ichida Thompson Kim & Hirota
                      1032 Bishop Street, Suite 1405
19                    Honolulu, Hawaii  96813

20                                  Attorneys for the Plaintiffs

21                    MICHAEL E. BAUMANN, ESQ.
                      DAMIAN D. CAPOZZOLA, ESQ.
22                    Kirkland & Ellis LLP
                      777 South Figueroa Street
23                    Los Angeles, CA  90017

24                                  Attorneys for Defendant
                                    Post Confirmation trust
25                                  for Fleming companies, Inc.

```
 1   APPEARANCES (Continued):

 2

 3

 4                    LYLE S. HOSODA, ESQ.
                      RAINA P.B. MEAD, ESQ.
 5                    Lyle S. Hosoda & Associates, LLC
                      345 Queen Street, Suite 804
 6                    Honolulu, Hawaii  96813

 7                                   Attorneys for Defendants
                                     Mark Dillon, Teresa Noa,
 8                                   Melvin Ponce, Sonia Purdy,
                                     Justin Fukumoto, Alfredda
 9                                   Waiolama and Jacqueline Rio

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    AFTERNOON SESSION                                    1:05 P.M.

2                           - - -

3            (The following proceedings were held in open

4             court, outside the presence of the jury:)

5            THE COURT:  Okay, so I have this memo, and I have

6    some questions -- well, let me let Mr. Hogan speak first, I

7    guess.

8            MR. HOGAN:  Thank you, Your Honor.

9            This has been going on for so long, Your Honor.

10   There have been things filed, if I could just make my factual

11   foundation for this.

12           In September -- or, in July, Mr. Capozzola wrote to

13   me and said he had gotten the Guidance image materials and was

14   going to turn it over to the expert.  I wrote back that day

15   and said, you do at your peril if you're going to claim

16   privilege.  He did it anyway.

17           They gave it to their expert, who in varying degrees

18   has said he looked at it and said that these weren't

19   privileged or at least made some determination of the

20   privilege.  And now he's saying he's looking through the files

21   somehow and can determine whether or not they may contain

22   something that might be privileged.

23           The bottom line is, it wasn't inadvertent.  I showed

24   them the inadvertent cases.  I made it clear that giving it to

25   a named trial witness would be claimed a waiver.

1        They did it.

2        All right, they held on to it through July.  I

3   finally get it in September.  And when I got it, the same --

4   they took some things out, but if they didn't take 'em all

5   out, they knowingly gave it to me.  They had it for two months

6   that they could have been reviewing it and gave it to me.

7        I did not agree that giving it to me was not a

8   waiver, and I don't agree that that turnover was not a waiver.

9        The document that I'm trying to deal with, which is

10  103 -- the rest of these are not in play in this case, and I'm

11  not intending to introduce them, Your Honor.

12       103 has a lawyer from White & Case on it.  This was

13  during a period of time in which Fleming and White & Case were

14  adversaries by law.

15       Now, it's quite a surprise to me today to find out

16  that the lenders even knew who Mr. Berry was, really, and that

17  they cared that -- who he was.  But I always understood that

18  this joint defense is -- you're actually being sued by

19  somebody, or threatened with a suit, and you get together --

20  and I've done 'em before -- you do 'em underwriting, and

21  everybody agrees how it's going to be handled, and you enter

22  into a joint defense.  That's number one.

23       THE COURT:  I am assuming they had no such explicit

24  agreement; correct?

25       MR. BAUMANN:  I don't know the answer to that,

1    Your Honor.  I just don't know the answer to that.

2           But I do believe it's an incorrect statement of law

3    that you're required to have a written agreement.

4           THE COURT:  Not my question.

5           I am assuming if you had such an agreement, you

6    would have it with you today.  Because the issue is here now,

7    and if you had it, I'm assuming you would be putting it in

8    front of me and saying, look, we had an agreement that, you

9    know, we had a common interest to fend off creditors who

10   would --

11          MR. BAUMANN:  Sure.

12          THE COURT:  -- eat up whatever funds -- what few

13   funds we had here for the bankruptcy court to take care of,

14   and here's the agreement, and so we had a common interest in

15   this.

16          I'm assuming that since you were prepared enough to

17   give me a memo claiming that all these people had common

18   interests, that if you had such a document, you would be

19   giving it to me now.

20          I think that's a pretty fair assumption.

21          MR. BAUMANN:  I think it is, but what I can tell you

22   is, the timing of when this brief was created and prepared --

23   that may not be an accurate assumption.  I don't think people

24   made an effort to go see if there was one.

25          But I think for the purposes of the motion, it's

1    absolutely fair for you to assume that there is no written

2    joint defense agreement.

3            THE COURT:  And Mr. Capozzola is not here because he

4    doesn't want to answer questions about it?

5            MR. BAUMANN:  No, he's not here because he's

6    actually getting the next set of witnesses ready to testify.

7    But if -- I mean, we can ask him -- Your Honor, I think -- as

8    I said, I don't know what else to say.

9            I can't represent to the court that there isn't a

10    written agreement, because I don't know -- I don't know if

11    Mr. Capozzola knows.  I think for purposes of the argument, as

12    you said, I think it's fair for you to assume that there

13    isn't.  It's not in front of you.  I think that's fair.

14            THE COURT:  Okay.

15            MR. HOGAN:  So we're at a period of time,

16    Your Honor, where this was not kept with -- that's one level

17    of waiver.  I think I've talked about two.

18            I'll go to the third level:

19            This document was given to a lower member of the

20    group under Upjohn -- I'm not sure, Your Honor.  I know the

21    court does this a lot more than I do, and I didn't have much

22    time trying to eat lunch and trying to review this.

23            But you can't give out your privileged

24    communications to everybody at work.  And, clearly, they did

25    that.

1          So I think on three levels, Your Honor, there's been

2     a waiver.  One, I don't think it was ever privileged.  If it

3     were privileged, it was waived.

4          And that's my position, Your Honor.

5          THE COURT:  Okay.

6          MR. BAUMANN:  Your Honor, I think with respect to

7     it, if you follow through the sequence, I do believe it's

8     clearly privileged.

9          And the issue and the argument is, does it -- its

10    appearance in Guidance images that were provided to

11    Mr. Walker, does that constitute a waiver of the privilege?

12         THE COURT:  Okay, I'm actually not persuaded that

13    the privilege was waived in that manner.

14         MR. BAUMANN:  Okay.

15         THE COURT:  But I am more concerned about the

16    inclusion of the White & Case attorney, and -- you know, I can

17    easily understand how counsel representing a client in

18    bankruptcy may develop a cooperative relationship with -- is

19    this a creditor's committee council?  Is that who it is?

20         MR. HOGAN:  This is the bond holder, the top dog,

21    secured creditor, the enemy of any debtor.

22         THE COURT:  I see.  This is not the creditor's

23    committee attorney --

24         MR. HOGAN:  This is the foreclosing creditor that

25    arguably would have precipitated the bankruptcy.

1          THE COURT:  Okay.

2          But, in any event, I can understand how, if you're

3    representing somebody who has gone into bankruptcy, you may

4    want to keep people who look like they are your adversaries

5    because they are creditors informed and on board, and appear

6    to be cooperating with them.  And you may have a common

7    interest in not letting outsiders come in and create even more

8    of a financial mess.

9          But the nature of this e-mail doesn't strike me as

10   one in which Mr. Capozzola was saying, look, a common enemy;

11   we are working together to fend him off.

12         Because, instead, this e-mail seems to say, I think

13   this is Mr. Berry's theory.  I'll spin it out, as I've thought

14   about it, and we're likely to be sued on this theory.

15         As opposed to, let's put our heads together to come

16   up with a mutually agreeable way to fend this off.

17         It doesn't seem to be in that nature.

18         So, you know, I'm kind of inclined to say that, you

19   know, while it may be all well and good to have this

20   cooperative feeling with some creditor's attorney, that this

21   isn't a common defense kind of analysis -- this e-mail.

22         MR. BAUMANN:  Well, think of it as it actually plays

23   out in the e-mail, Your Honor.

24         The first sequence in the e-mail is a description of

25   a potential threat:  Can a claim be made by Mr. Berry?

1          Now, who is the claim going to go against?  It's

2     going to go against the estate in bankruptcy.

3          Who has an interest in the assets in the estate in

4     bankruptcy?  The debtor, the creditors.  And they are adverse

5     to the claim that Mr. Berry is asserting.

6          That seems, to me, to be transparently true in this,

7     so that they are saying, what is it that this threat that

8     exists to the estate, what can it do?  And what is this

9     theory?

10          And, in that, there clearly was, and is, a shared

11     interest among all those parties, because he was adverse to

12     all of them in the bankruptcy.

13          THE COURT:  But just because you have some kind of a

14     common interest for some purposes doesn't mean that everything

15     that you communicate with that person is privileged.

16          I mean, you know, by that analysis, Mr. Capozzola

17     could have written a letter solely to this White & Case

18     attorney and claimed that it was privileged, and that wouldn't

19     necessarily be the case.

20          That's why I'm looking at the content of this, and

21     kind of skeptical that even if they had common interests in

22     not wanting somebody else to get their hands on limited

23     monies, that this falls under some kind of privilege.

24          MR. BAUMANN:  Let's take your hypothetical,

25     Your Honor.

```
 1              Let's say Mr. Capozzola had written to the White &
 2    Case lawyer and said, the estate and all of us are going to be
 3    sued by Mr. Berry.  What do you want to do about it?  Here's
 4    our plan.  And we will jointly pursue this defense against
 5    him.
 6              If it said that, it would solely be between the
 7    lawyers that you just identified -- and you would be reading
 8    it, and my guess is that you would say, clearly, that is
 9    evidence of a communication in pursuit of a common defense and
10    should be privileged --
11              THE COURT:  Not necessarily.  I might think, what is
12    Mr. Capozzola doing, communicating what should be privileged
13    information to somebody else?
14              I might well think that, frankly.
15              MR. BAUMANN:  You might, Your Honor, and that's
16    why --
17              THE COURT:  As opposed to saying, here it is,
18    privileged.
19              MR. BAUMANN:  Okay, but that's why, Your Honor --
20    that's why it's -- privilege is extended to a common defense,
21    a common interest.  That's the language of the law.
22              And I would point out that the owner of the
23    privilege is not the attorneys, it's not Mr. Capozzola.  And
24    if you want to argue a waiver as a result of a mistaken belief
25    or mistaken conclusion that it's okay to jointly defend
```

1　against claims by Mr. Berry among these entities, and

2　therefore, you're going to impute that waiver to the client

3　and waive the client's privilege, I think that's a very

4　serious thing.

5　　　　　And we're doing it, you know, for no purpose,

6　frankly.  Liability has been determined.  The --

7　　　　　THE COURT:  I know, but obviously, Mr. Hogan wants

8　to introduce this to rebut the argument by the defense that

9　Mr. Berry's program wasn't of much value.  You know, that they

10　could get along just fine without it.

11　　　　　I don't think this is all that critical a piece of

12　information for Mr. Hogan, but at the same time, I don't think

13　it's all that -- so confidential that Fleming has to get all

14　hot and bothered about it.

15　　　　　MR. BAUMANN:  Well --

16　　　　　THE COURT:  And I think things -- that relationships

17　between parties are not always 100 percent the same.

18　　　　　And, for some communications, it may well be that,

19　you know, it's pretty clear that there was some common

20　interest that justifies the privilege, and for some there may

21　not be.  And this one, it seems to me, is sort of more on the

22　side of not being privileged, and more sort of here, FYI, I'm

23　in the habit of kind of keeping, you know, everybody informed

24　about what's going on, so, well, here, I'll just include you

25　on the e-mail.

1          And I don't know that this is sort of a common

2     defense kind of e-mail, at all.  It doesn't really strike me

3     that way.

4          MR. BAUMANN:  I understand what your conclusion is.

5     I mean, privilege -- as to the substance, I don't think it's

6     particularly significant, but that's not the test.

7          The test is whether or not the client who is the

8     owner of the privilege can be said to have made a knowing and

9     voluntary relinquishment of that right through attorneys.

10         And the law is very clear that even if he was

11    mistaken in sending it to someone else, even if he should not

12    have sent it to someone else, the law would protect the

13    privilege in the hands of the client.

14         THE COURT:  No, no, no, no --

15         MR. HOGAN:  Can I be heard on that issue,

16    Your Honor?

17         MR. BAUMANN:  May I just finish?

18         Because, Your Honor, that's troubling to me, because

19    we actually have an ethical rule in the State of California,

20    and I understand you have a similar one in Hawaii, that if I

21    inadvertently send something to someone, I can request it

22    back, and it's the ethical obligation of the lawyer to give

23    it.

24         THE COURT:  That's not what my no, no, no, no went

25    to in the least.

1    MR. BAUMANN:  Okay.

2    THE COURT:  I agree with you that if there were a

3  mistake and something erroneously was faxed to Mr. Hogan, when

4  you intended to send it to Mr. Hosoda, that, yes, the

5  privilege would be preserved.

6    But my no, no, no, no comment was to the effect that

7  that has nothing to do with this particular situation.

8    I have no indication at all that Mr. Capozzola

9  erroneously sent this e-mail out --

10    MR. BAUMANN:  I'm not suggesting --

11    THE COURT:  -- to White & Case, all the while

12  thinking he was sending it to the Kobayashi law firm, or

13  something like that.  I have no reason to think that.

14    MR. BAUMANN:  And I'm not suggesting that,

15  Your Honor.

16    But what I am saying is that, if he operated under

17  the mistaken belief that he was free to communicate with his

18  fellow adversaries to Mr. Berry -- and you now conclude that

19  he was mistaken in that -- the privilege that you are waiving,

20  the privilege that you are taking away, belongs to the client.

21    And that's why I'm -- you know, I'm --

22    THE COURT:  That's where I think that you're

23  stretching the idea of inadvertent waiver way beyond

24  recognition.

25    I mean, attorneys do these things sometimes, and

1   they darned well have consequences for the client.

2          If Mr. Capozzola had sat in a meeting with

3   Mr. Hogan and said to Mr. Hogan, you know, I shouldn't tell

4   you this, but, you know, my client, like, actually knew and

5   just still went ahead against my advice and did these horrible

6   things... just because it was the attorney who said it, I

7   hardly think that Fleming could rise up and say, we told that

8   to our attorney in privilege, and Mr. Hogan can't use it.

9   They may well have a claim against Mr. Capozzola, but they

10  can't then bar Mr. Hogan from using it on the ground that it

11  was a privilege communication, and they had not waived the

12  privilege.

13          MR. BAUMANN:  Fair enough.

14          And if, Your Honor, that's your inclination to rule,

15  I would just say that it is a serious issue with respect to

16  attorney-client privilege.  And we've objected, and we've

17  stated for the record what our objections are --

18          THE COURT:  Okay.

19          MR. BAUMANN:  -- and appreciate your effort.

20          MR. HOSODA:  Are we done with that issue,

21  Your Honor?  I have another one to raise.

22          THE COURT:  Okay, so I am going to overrule the

23  objection, and Exhibit 103 can be used.

24          MR. HOSODA:  Your Honor, very important for my

25  clients' is time, as you have just looked at the clock.

1    Yesterday you announced that the plaintiffs have been charged

2    with 249 --

3           THE COURT:  Well, right now, Mr. Hogan has used 298

4    minutes.  He has one hour and two minutes left.

5           The plaintiffs have used 171 minutes, and they have

6    two hours and 51 minutes left.  Did I do that right?

7           MR. BAUMANN:  No, you reversed it.

8           THE COURT:  Okay.

9           Mr. Hogan has used 298.  He has an hour and two

10   minutes left.

11          Defense, combined, I think, have used -- wait... 189

12   minutes, I'm sorry.  You have used 189 minutes.  You have 171

13   minutes left -- two hours and 51 minutes left for the defense.

14          MR. HOSODA:  And then how does that work if, for

15   example, the plaintiff runs out of minutes?

16          THE COURT:  Then he can't stand up anymore.

17          MR. HOSODA:  And the court is going to just let him

18   know -- or, how is that going to be addressed in front of the

19   jury?

20          THE COURT:  Well, I am assuming he is keeping his

21   own little tally sheet.

22          You have an hour and two minutes left, Mr. Hogan.

23   If you run out of time, then you have to sit down until the

24   evidence closes.

25          And the defense has two hours and 51 minutes left.

1           THE COURT:  Yes.

2           THE COURT:  So you want Mr. Christensen back on the

3     stand, just to ask him about Exhibit 103?

4           MR. HOGAN:  Just to ask him about it.

5           THE COURT:  Okay.

6           Can you send him back on up, and we'll go get the

7     jury.

8           (Mr. Christensen resumed the witness stand.)

9           THE COURT:  I will say, you know this Exhibit 103?

10    I don't think it's anything like my hypothetical thing where

11    Mr. Capozzola spilled his guts to Mr. Hogan, because here

12    we've got Fleming people right in on the very e-mail, aware

13    that Mr. Capozzola was communicating to White & Case.  And,

14    presumably, if it bothered them, they would have said

15    something.

16          THE CLERK:  All rise.

17          (Jury escorted into the courtroom at 1:29 p.m.)

18          (The following proceedings were held in

19          open court, in the presence of the jury:)

20          THE CLERK:  Please be seated.

21                    RECROSS-EXAMINATION

22    BY MR. HOGAN:

23    Q.  Mr. Christensen, you have before you a document that has

24    been marked and admitted as Exhibit 103.

25          Do you have that, sir?

1  A.  Yes, I do.

2  Q.  I'm going to try the Elmo, courtesy of defense counsel,

3  and see how it works.  My computer's... this document, marked

4  103, purports to be an e-mail dated --

5       THE COURT:  You can't move it around that much.  We

6  all get sea sick.  I've done -- I know what you're doing.

7  I've used the Elmo myself, when I was counsel, and I realize

8  it's tempting to just play with it, but you make everybody

9  sick.

10      MR. HOGAN:  I didn't realize it was going to do

11  that, Your Honor.

12  BY MR. HOGAN:

13  Q.  Mr. Christensen, this is an e-mail dated May 9th, 2003.

14  It's from, I believe, you to one of the people in your Fleming

15  Hawaii; is that correct, sir?

16  A.  Yes.

17  Q.  And what are you doing in this e-mail?  I'm going to --

18  what I don't understand, sir, you have it sent to what looks

19  like Teresa Noa here; is that right, sir?

20  A.  Yes.

21  Q.  But it says:  FYI, Mark, did we do the attached or

22  reinstall the original?

23  A.  Yeah, I don't understand that, either.

24  Q.  Okay?

25      THE COURT:  (Laughing.)

1          MR. HOGAN:  I'm sorry, I thought you said something

2     to me, Your Honor.  I don't know if I'm hearing voices or

3     not... could be.

4     BY MR. HOGAN:

5     Q.    Now, was that e-mail a forward of the second page of this

6     exhibit, sir?  Were you forwarding an e-mail?

7     A.    It looks like it.

8     Q.    And, this e-mail, sir, is from, I believe, Mr. Capozzola,

9     and it's to several people.

10          Do you know who C. Birchette is?  Would that be

11    Craig Birchette?

12    A.    Yes.

13    Q.    And what is Mr. Birchette's job, if you know?

14    A.    I think he worked in the legal department of Fleming.

15    Q.    In Fleming's corporate offices?

16    A.    Yes.

17    Q.    For their main headquarters?  Would that be your

18    understanding, sir?

19    A.    Yes.

20    Q.    Now, in this e-mail, there's discussions of Mr. Berry's

21    software among various people.

22          And you, apparently, were copied on this, sir?  Is

23    says right here, B. C-H-R-I-S-T.

24          Is that you, sir?

25    A.    Correct.

1   Q.   And this was May.  We're looking back in time.  It's

2   April.  The system doesn't really do that much.  It's helpful,

3   but -- we think we're licensed, but people are still talking

4   about it.

5           At that point, sir, if this system was totally of no

6   value, wouldn't you have just shut it off then, sir, on May

7   9th with this discussion going on among all these people?

8   A.   (No response.)

9   Q.   I'll give you an example, sir:

10          If there is a light in your house that's flickering

11  and driving you nuts, and you don't even need to go down into

12  the basement or anything, you would just turn it off; correct?

13  A.   Correct.

14  Q.   But why didn't you just turn off Mr. Berry's software on

15  that day, with all this noise... flickering?

16  A.   I don't think that's a good analogy between a light bulb

17  and the data that we have to deal with.

18  Q.   You needed to use it; is that a fair statement?  At that

19  day, on that moment, you just couldn't go down to the basement

20  and turn out the light?

21  A.   Well, like I said earlier, we had a right to use it.  And

22  that's what we were doing.  Until I'm told that, yes, turn it

23  off, then I feel that we're doing the right thing.

24          Nobody told me to turn it off; that you're doing the

25  wrong thing.

1   Q.   But -- I understand that, sir, and I'm not making any

2   claim that they did.  Okay?  I want to make sure that's clear.

3           But all I'm saying is, if it was totally worthless

4   and didn't have any value -- which is, I think, what we have

5   been hearing -- wouldn't you just go down to the basement and

6   turn off the flickering light?

7   A.   No, because the data that resides in there -- I need the

8   data.

9   Q.   Right.

10  A.   I still need the data.  So until I have to abandon it,

11  then the data's still useful for me.

12  Q.   For you?

13  A.   Sure it is.

14  Q.   As the head of the division?

15  A.   For our operation.

16  Q.   Thank you, sir.

17  A.   Okay.

18           MR. HOGAN:  Nothing further, Your Honor.

19           MR. BAUMANN:  No questions, Your Honor.

20           MR. HOSODA:  No further questions, Your Honor.

21           THE COURT:  Okay, then the witness can step down.

22           (Mr. Christensen was excused at 1:34 p.m.)

23           THE COURT:  And who is your next witness?

24           MR. HOSODA:  Teresa Noa, Your Honor.

25           (Ms. Noa approached the witness stand.)

248

1

2

3

4

5

6

7                                    -ooOoo-

8          I, Stephen B. Platt, Official Court Reporter,

9    United States District Court, District of Hawaii, do hereby

10   certify that the foregoing is a true and correct transcript of

11   proceedings before the Honorable Susan Oki Mollway, United

12   States District Judge.

13

14

15

16

17

18

19

20                              /s/ Stephen B. Platt

21   THURSDAY, APRIL 27, 2006      STEPHEN B. PLATT, CSR NO. 248

22

23

24

25