# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| WAYNE BERRY, | : | 01:07 CV 7634 WHP |
| Plaintiff, | : | Judge William H. Pauley III |
| vs. | : | ECF Case |
| DEUTSCHE BANK TRUST COMPANY | : | |
| AMERICAS (f.a. BANKERS TRUST COMPANY) | : | **SECOND AMENDED** |
| and JP MORGAN CHASE BANK, in their separate | | **COMPLAINT AND JURY** |
| capacities and as agents for the pre- and post- | : | **DEMAND; EXHIBITS "A" TO** |
| petition lenders of Fleming Companies, Inc.; | | **"R"** |
| GENERAL ELECTRIC CAPITAL | : | |
| CORPORATION; C&S WHOLESALE GROCERS, | : | |
| INC.; THE POST-CONFIRMATION TRUST OF | | |
| FLEMING COMPANIES, INC.; ROBERT KORS; | : | |
| CORE-MARK HOLDINGS INC. and DOES 1 to | : | |
| 200. | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>SECOND AMENDED COMPLAINT</u>

i

# Table of Contents

## (Submitted for Convenience and Not to Limit Any Claim or Allegation)

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Ii**

**Parties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Jurisdiction and Venue** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

      **Basis of Copyright Jurisdiction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Prior Litigation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

      **The First Hawaii Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

      **The Second Hawaii Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

**The Lenders Join the Enterprise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**GECC Agrees to Join the Enterprise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Claim I Direct Copyright Infringement C&S, Core-mark and Doe Defendants** . . . . . . . . . **34**

**Claim II Contributory and Vicarious Copyright Infringement Chase, Deutsche Bank and**
      **GECC** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

**Claim III Contributory And/Or Vicarious Copyright Infringement Core-Mark, C&S** . . **41**

**Claim IV Unjust  Enrichment and Quantum Meruit the Lenders** . . . . . . . . . . . . . . . . . **42**

**Claim V Breach of Contract for Damages and  Specific Performance Kors and the PCT** **43**

**Claim VI Tortious Inducement of Breach of Fiduciary Duty PCT, Kors and C&S** . . . . . . 43

**Claim VII Aiding and Abetting Breach of Fiduciary Duty PCT, Kors and C&S** . . . . . . . . 45

**Claim VIII Tortious Interference with Contractual Relations PCT, Kors and C&S** . . . . . 46

**Claim IX Aiding and Abetting Conversion of Client Funds PCT, Kors and C&S** . . . . . . 47

**Claim X Abuse of Process PCT, Kors and C&S** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**Claim XI Conversion or Alternatively Trespass to Material Objects C&S, Core-Mark** . 49

**Claim XII RICO All Defendants** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    **The 18 U.S.C. § 1962(c) Enterprise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    **Pattern of Racketeering** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        **Under Rico 18 U.S.C. § 1961(1)(A)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        **Under Rico 18 U.S.C. § 1961(1)(B)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    **RICO Offenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Additional RICO Predicates and Doe Defendants** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Prayer for Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

COMES NOW, Plaintiff Wayne Berry ("Plaintiff"), by and through his undersigned counsel, and hereby complains of the above-named Defendants and alleges acts occurring up to the filing of this Second Amend Complaint as follows:

## PARTIES

1.      Plaintiff is an independent software developer and inventor who at  times relevant to the matters complained of herein was a citizen and domiciliary of the State of Hawaii and presently resides in the State of Florida.  Mr. Berry has overseen logistics operations that have shipped well more than one billion dollars of commodities in interstate commerce.

2.      Upon information and belief, Defendant Deutsche Bank Trust Company Americas ("Deutsche Bank") formerly known as Bankers Trust Company  is a New York chartered bank with its principal place of business in New York.

3.      Upon information and belief, JP Morgan Chase Bank ("Chase") is a Delaware corporation with its principal place of business in the state of New York.

4.      Together Chase and Deutsche Bank served as the lead agents of those certain credit facilities for a syndicate of lenders of the former debtor Fleming Companies, Inc. and its subsidiaries dated June 18, 2002 and twice amended.

5.      Defendant General Electric Capital Corporation ("GECC") was also a pre-bankruptcy lender to the former Fleming Companies, Inc. under the June 18, 2002 credit facility and is presently lender to two additional borrowers, defendants C&S Wholesale Grocers, Inc. ("C&S") and defendant Core-Mark Holdings, Inc. ("Core-Mark").

6.      Chase, Deutsche Bank and GECC and the other Doe participants in the syndication of the June 18, 2002 loans are hereinafter referred to collectively as the "Pre-Petition

1

Lenders" or the "Lenders."

7.  Upon information and belief, Core-Mark is a Delaware corporation with its principal place of business in the State of California.  Core-Mark transacts business in several states and Canada, and purports to be a lawful wholesale distributor of cigarettes in Hawaii.

8.  Defendant C&S is, upon information and belief, a Vermont Corporation with its principal place of business in New Hampshire and Vermont and is doing business interstate and competes with Mr. Berry in the business of ocean freight logistics and is engaged in interstate commerce and claims to be the nation's second largest wholesale grocer with sales reported of over $14 billion annually.

9.  C&S is the sole wholesale grocery distributor with a full line grocery warehouse located in the State of Hawaii.

10.  Defendant Robert Kors, upon information and belief, is a citizen and domiciliary of the state of California and is the principal of an unincorporated association known as the Post-Confirmation Trust of Fleming Companies, Inc. ("PCT").  Upon information and belief the PCT was intended to be a grantor trust created under the law of the State of Delaware but, upon information and belief, the purported trust instrument was drafted with no termination and therefore may be void *ab initio* under the Rule Against Perpetuities applicable to grantor trusts created under Delaware law.

11.  Does 1 through 200 are defendants whose identities and liability are not yet fully known to Plaintiff who has after diligent review of the records and documents been unable to properly identify.  When their identities are made known to Plaintiff these defendants shall be identified as Does as set forth herein.

2

12.     The actions of the corporate and/or other institutional defendants alleged herein whether directly or through their agents was authorized and/or ratified by the corporation or other institutional defendant.

## JURISDICTION AND VENUE

13.     This Honorable Court has federal subject matter jurisdiction pursuant to the Federal Copyright Act 17 U.S.C. §§ 101, et seq. and 28 U.S.C. § 1338 (a) and pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962.  In addition, no defendant is a citizen of Hawaii or Florida and the amount in controversy exceeds $75,000 exclusive of interest and costs and therefore this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  State law claims are also proper under pendent jurisdiction.

14.     Mr. Berry concedes that venue is presently laid in the Southern District of New York and the transfer from Hawaii is not appealable as an interlocutory order.  He preserves his right to appeal upon entry of final judgment by respectfully stating that venue is should not be laid in Southern District pursuant to 28 U.S.C. §§ 1391and 1400 because the wrongs that are the subject of this complaint occurred in the State of Hawaii or were directed against one of its citizens.  Each of the Defendants named herein have had sufficient minimum contacts with the state of Hawaii to be amenable to service of process by a Hawaii court.

15.     Mr. Berry has no purposeful contact with the state of New York. All of the tortious wrong and contracts alleged herein relate to events occurring in Hawaii or Florida directed  to a citizen of Hawaii.  Because this case involves the sole full line grocery wholesaler located in Hawaii that state has a greater interest in the instant case than any other state.

16.     Venue is proper in the District of Hawaii or may be proper in New York pursuant

3

to §1965(a) of RICO, 18 U.S.C. §1965(a) because each of the defendants resides and/or is found

to have an agent and/or transact their affairs in this district.  As to foreign defendants, in

accordance with §1965(b) of RICO, the ends of justice require that all defendants be brought

before this Court.

## BASIS OF COPYRIGHT JURISDICTION

17.     Plaintiff is copyright owner of numerous works including, but not limited to,

Freight Control System running as "FCS Logistics Data.MDB" (hereinafter "FCS").

18.     FCS is a software literary work Plaintiff wrote in Microsoft Access® and Visual

Basic® using both the Visual Development Environment and hand-coding.   FCS primarily

consists of a database designed to control and monitor consolidation and containerization of

freight.  This work and its numerous illegal derivatives may also be run in the Microsoft SQL

Server® environment.  Among the names given to the illegal derivatives of the Berry FCS is

FHL Data.mdb, FCS Logistics Data.mdb,  FCS Logistics Screens.mdb, Original Logisitics

Data.mdb, Original Logistics Database.mdb, API Database.mdb, FCS Logistics Data

Original.mdb, Original Logisitcs Screens.mdb, FHL Data.mdb, FHL Data Screens.mdb, FHL

Forms.mdb, Utilities.mdb, PO Line Items.mdb, Auxillary Logistics Data.mdb, Auxillary

Logistics Database.mdb.

19.     FCS is a one of a kind system for handling ocean freight and maximizing freight

efficiencies unique to containerized ocean freight.

20.     FCS contains database tables, queries, screens and macros that handle Accounts

Receivable, Accounts Payable, Job Costing, Logistic Scheduling and Real-Time Shipment

Tracking.  The principle unique feature of the database is the ability for a user of this system to

4

control a large number of purchase orders and annotate shipping information to the records for billing and tracking purposes along with planning and scheduling efficiencies that translate directly to lower freight costs. The user can then "build" containers, which contain these individual Purchase Orders. The user can enter costs for both individual purchase orders and for entire containers. The system will allocate container costs to the individual purchase orders. Finally, the "Bill To" party can be invoiced for the shipment and a profitability derived from the billed amount less the allocated costs.

21.    The subject software work contains substantial amounts of original expression and are copyright able under the laws of the United States of America and was authored in the United States of America.

22.    Plaintiff complied with the statutory formalities for registering his copyright in FCS and the other related works that are the subject of this case, by fully complying with Federal laws and regulations by depositing with the Copyright Office, two copies of the best version of the FCS source code, filing the application and paying the required fees.

23.    Plaintiff received a filed registration for FCS and each of the works that are the subject of this case, from the Copyright Office. The date, class, registration number and title on the certificate received from the Registrar of Copyrights is as follows:

A.    Registration Date of 10/19/1999, Class: Literary Work (computer programs and databases), Registration Number: TX5-079-445, Titled: "Freight Control System", attached as Exhibit "A".

B.    Registration Date of 10/19/1999, Class: Literary Work (computer programs and databases), Registration Number: TX5-079-439, Titled: "FlemingPO.exe",

5

attached as Exhibit "B".

C.      Registration Date of 5/21/2001, Class: Literary Work (computer programs and
        databases), Registration Number: TX5-268-865, Titled: "Prepaid Vendor Invoice
        Definition for Crystal Reports **V6.0", attached as Exhibit "C".

D       Registration Date of 5/24/2006, Class: Literary Work (computer programs and
        databases), Registration Number: TXu1-227-726, Titled: "FCS1993 SQL
        EXPORT QUERIES (USED TO EXPORT AND TRANSLATE FREIGHT
        CONTROL SYSTEM DATA, DATABASE STRUCTURES AND DATA
        ORGANIZATION TO TEXT, CSV, XLS AND MDB FILE FORMATS)",
        attached as Exhibit "D".

E.      Registration Date of 5/3/2006, Class: Literary Work (computer programs and
        databases), Registration Number: TXu1-302-622, Titled: "FCS1993 – Terminal
        Reporting System – Version 1.0", attached as Exhibit "E".

F.      Registration Date of 5/3/2006, Class: Literary Work (computer programs and
        databases), Registration Number: TXu1-302-623, Titled: "FCS1993 Crystal
        Report – Pallet Tags – Version 1.0", attached as Exhibit "F".

G.      Registration Date of 5/3/2006, Class: Literary Work (computer programs and
        databases), Registration Number: TXu1-302-624, Titled: "FCS1993 Crystal
        Report – Receiving Report – Version 1.0", attached as Exhibit "G".

H.      Registration Date of 5/3/2006, Class: Literary Work (computer programs and
        databases), Registration Number: TXu1-302-625, Titled: "FCS1993 Crystal

6

Report – Profitability Report – Version 1.0", attached as Exhibit "H".

I.    Registration Date of 5/3/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-302-626, Titled: "FCS1993 EDI 875 PO Database Program – Version 1.0", attached as Exhibit "I".

J.    Registration Date of 5/3/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-302-627, Titled: "FCS1993 Container Inventory Database Program – Version 1.0", attached as Exhibit "J".

K.    Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-295, Titled: "FCS1993 Crystal Report Daily Transportation Schedule Version 1.0", attached as Exhibit "K".

L.    Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-296, Titled: "FCS1993 Crystal Report Sailing Chart Version 1.0", attached as Exhibit "L".

M.    Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-297, Titled: "FCS1993 Crystal Report Trucking (FTL) Version 1.0", attached as Exhibit "M".

N.    Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-298, Titled: "FCS1993 Crystal Report Trucking (LTL) Version 1.0", attached as Exhibit "N".

O.    Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-299, Titled: "FCS1993 Crystal

Report Load Plan Version 1.0", attached as Exhibit "O".

P.     Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-300, Titled: "FCS1993 Crystal Report Equipment Planning Version 1.0", attached as Exhibit "P".

Q.     Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-301, Titled: "FCS1993 Crystal Report Inbound Container Dock Schedule Version 1.0", attached as Exhibit "Q".

R.     Registration Date of 5/24/2006, Class: Literary Work (computer programs and databases), Registration Number: TXu1-340-302, Titled: "FCS1993 Crystal Report Arrival Notice Version 1.0", attached as Exhibit "R".

24.     Additional works, too numerous to name, are also Berry works that are being infringed by persons under the control of the former Fleming Lenders who, through their attorneys and other agents actively engage in conduct in violation of Mr. Berry's exclusive rights. All of these works, including any derivatives of these works are unpublished Berry authored original works, and may include works then in development ordered turned over in litigation under protective orders regarding which there has been and no license or grant of any interest that authorized the use by Core-Mark and/or C&S and the use constitutes acts of willful infringement for financial gain and criminal contempt of court.

25.     The money derived from the use of these works received by the Lenders including GECC and constitutes the proceeds of a specified unlawful activity ("SUA") and is a violation of RICO and this Court has the jurisdictional power to sanction use and restrain further use pursuant to RICO regardless of whether the works are registered under the Court's broad

8

jurisdiction to punish and terminate Racketeering Enterprises pursuant to RICO and the Court's general equitable powers.

26.     After FCS's registration, in the Fall of 1999, Mr. Berry loaned a copy of FCS along with copies of the hundreds of subsidiary unpublished, unregistered original works to Fleming to allow Fleming to continue to operate as a temporary measure at no charge.  Mr. Berry installed the software and delivered his End User License Agreement ("EULA"), at Fleming's request, to Fleming and his former employees who had been hired to start up the Fleming Logistics department.  This EULA initially included one addendum.

27.     The EULA reserved to Mr. Berry all rights to the work including, but not limited to, the right to recast and make derivative works.

28.     About three weeks after Mr. Berry had delivered the requested EULA and addendum, Fleming's Hawaii Division President Ralph Stussi, contacted Mr. Berry to obtain permission for Fleming to make changes to certain of Mr. Berry's works that were used in conjunction with FCS.

29.      Fleming claimed that Fleming's need for Mr. Berry's works was temporary.  Mr. Berry agreed to one additional addendum (the "Second Addendum") that permitted Fleming to develop new works and derivatives of Berry's freight control related works other than FCS regarding which Mr. Berry reserved all rights.

30.     On or about November 26, 1999, in consideration for Mr. Berry's agreement to permit development of FCS related recast and/or derivative works, Fleming agreed that any and all Fleming modified and/or created copies of any Berry works, including any new derivative works, remained forever Mr. Berry's intellectual property and subject to his rights as the

9

copyright owner.   The transfer of these rights occurs upon their creation when any expression related to these works is first fixed in any tangible media.

31.    The final executed Second Addendum was drafted by Fleming on Fleming letterhead.

32.    Fleming has repeatedly asserted its own and its employees' lawful right to the use of Berry works is derived from the EULA and Second Addendum.

33.    In the Second Addendum, Fleming proposed and Mr. Berry agreed as follows:

"We understand that this product is licensed not sold and all title and intellectual property right in and to the software product and any copies we make are owned by you."

34.    In addition, under the terms of the EULA, Fleming agreed to disposition of all Berry works upon Mr. Berry's unilateral right to terminate the EULA and addenda as follows:

"Termination. Without prejudice to any other rights, Wayne Berry may terminate this EULA if you fail to comply with the terms and conditions of this EULA. In such event, you must destroy all copies of the SOFTWARE PRODUCT and all of its component parts."

35.    Commencing sometime in or about January 2000 and continuing to no earlier than June 9, 2003, then recommencing on or about September 2005 and continuing without end and with knowledge that its actions presently constitute acts of criminal infringement, Fleming under the direction of its attorneys in particular, Carlos Hernandez and Lex Smith ("Smith"), and then C&S, also under the direction of Smith and other attorneys, committed, directed, facilitated and encouraged,  repeated acts of copyright infringement including acts of willful infringement

10

for financial gain.   The number of instances of willful infringement likely number in the

hundreds of thousands and constitute an ongoing pattern of criminal conduct to satisfy the

requirement of RICO.   These acts of willful infringement for financial gain are sufficient to

show the kind of threat to continuity to support a claim under RICO of a pattern of Racketeering

with a real threat of repeated acts.

36.     Despite having the means to reject the obligations of the Berry EULA and Second

Addendum and be free of its burdens imposed upon C&S, Core-Mark and the Fleming,

including those works transferred upon their creation to Berry through the operation of  the

Second Addendum, Fleming, its PCT,  its Lenders and C&S have not sought such rejection

through the executory contract rejection mechanisms of the Bankruptcy Code.  Each of these

entities remain bound by the obligations of the Berry EULA and Addenda and remain both

infringers and the developers of new Berry owned original works.

37.     Though having the ability to act to relieve the PCT, Core-Mark or C&S and its

unlicensed employee users from the obligations and duties imposed by the Berry EULA Second

Addendum by requiring C&S to return all Berry works to the PCT for its destruction and to

cease unauthorized use, Kors for financial gain has acted to assist the ongoing infringement by

providing money and other material support to advance what Kors knows to be ongoing willful

infringement for financial gain.

38.     In the Fleming-C&S Asset Purchase Agreement ("APA") entered into between

Fleming and C&S, Fleming recognized its lawful obligation to recover works transferred to C&S

in violation of the copyright owners' rights.  The PCT and Kors through obligations imposed

upon them as Fleming's successors have assumed the duty to prevent unauthorized infringement

11

of Berry Technology.  Specifically, the APA paragraph 7.3 entitled "Intellectual Property" made applicable to Kors and the PCT through their voluntary ratification of the PCT Agreement, delegates the duty to cause the end of infringing use of Berry Technology  as follows:

> Following notice by Sellers to Purchaser, Purchaser shall promptly return to Sellers and shall promptly cease using any Third Party Intellectual Property that is neither an Acquired Asset nor the subject of an Acquired Contract.

39.     On or about December 17, 2007, after years of willful infringement, Kors and the PCT sent a notice to C&S to return all of Berry's works.

# Prior Litigation

40.     Plaintiff has already twice litigated the issues of ownership and copyrightability of his freight control system software including FCS and two of the subsidiary works.  In both prior cases Mr. Berry was determined to be the owner of works that are now the subject of this case and has prevailed and received two final judgments on his claims of copyright infringement including willful infringement in Wayne Berry v. Fleming Companies, Inc., Civ. No. 01-0446 (SPK-LEK) (D. Hawaii) and infringement including vicarious and direct infringement against Fleming and direct infringement against several of its employees in Wayne Berry v. Hawaiian Express Service, Inc. et al., Civ. No. 03-00385 (SOM-LEK) (D. Hawaii) in which Mr. Berry has obtained a permanent injunction against Hawaiian Express Service, Inc, C&S' present  freight forwarder who, upon information and belief continues to infringe Mr. Berry's works with Kors, the Lenders and C&S' knowledge and material assistance, the permanent injunction notwithstanding.

12

41.     Mr. Berry's rights as copyright owner to the works that are the subject of this case, was established by the United States Court of Appeals for the Ninth Circuit's Memorandum Opinion dated July 5, 2007 (9th Cir. Docket Number 05-15223), in *Wayne Berry v. Fleming Companies, Inc*., 01-CV-446 SPK LEK (D. Hawaii) and the subsequent issuance of the Writ of Mandate by the United Stats Court of Appeals for the Ninth Circuit.   To further establish Mr. Berry's indisputable rights to the works that are the subject of this case, on or about October 26, 2007, the District Court in Hawaii issued its notice to the Copyright Office that the issue of Mr. Berry's ownership in these works is finally decided.  This issue may not be lawfully challenged herein nor need Mr. Berry litigate it for a third time.

42.     Fleming, Core-Mark and C&S and anyone claiming to use FCS and its subsidiary works from them are bound by the judgments in the prior cases that regarding these issues are final and not appealable.

## The First Hawaii Case

43.     In 2000, Mr. Berry obtained information evidencing that Fleming had infringed upon his copyright in FCS Logistics Data.mdb and certain subsidiary works.  Lex Smith who responded to Mr. Berry's infringement warning falsely claimed in written communication to Mr. Berry that Fleming was not engaged in infringement.

44.     On July 3, 2001, Mr. Berry filed suit commencing  *Wayne Berry v. Fleming Companies, Inc*., 01-CV-446 SPK LEK (D. Hawaii) in the United States District Court for the District of Hawaii for the infringements that had occurred up to that date.  The complaint alleged ownership, copyrightability and infringement of his freight control system software FCS, as well as two of the subsidiary works.

13

45.     Fleming contested all issues including ownership, copyrightability and infringement of all three works which issues were all tried on the merits to the jury.

46.     Fleming, under the direction of its attorneys, including Lex Smith ("Smith"), continued to falsely deny that Fleming was infringing in particular presented false evidence through Fleming's employee Mark Dillon that no modifications had been made to FCS to create derivatives related to Kmart.  In fact, Fleming and Kmart had commenced a multibillion dollar supply agreement that utilized protected Berry works to facilitate that agreement.

47.     Fleming failed to prevail in its defense seeking to establish its ownership interest in the works that were created by Fleming under the Second Addendum.  The claim of ownership over the works that were the subject of that case is identical to the claim of ownership if any that might be raised in this case and the works and the facts related to any such defense are derived from the same transaction or occurrence and may not be again litigated.

48.     Jury trial commenced in *Wayne Berry v. Fleming Companies, Inc*., 01-CV-446 (SPK LEK) (D. Hawaii) in February 2003.  Mr Berry elected statutory damages at trial before judgment for the infringements that occurred prior to the filing of the complaint.

49.     As to the issues of ownership and copyrightability, despite Fleming's vigorous litigation strategy to defeat Mr. Berry's claim of copyright ownership, attacking his copyright deposit, and claiming that the works were works done for hire,  the jury found that Mr. Berry is the owner of a valid copyright in his works, including, but not limited to, FCS and the two subsidiary works that were the subject of that litigation.  These works are among the several works that are the subject of this case.

50.     Two of the works that were the subject of the First Hawaii Case were actually Fleming created derivatives that Fleming defended pursuant to the Second Addendum.  The Jury found Mr. Berry the owner of the copyright to these works establishing the issue of Mr. Berry's ownership over all Fleming created works derived or created in conjunction with the Berry FCS as arising out of the same transaction or occurrence.

51.     In regard to the infringement of FCS, Fleming vigorously litigated and lost on the 17 U.S.C. § 117 issue that required proving it was an owner of a copy to FCS and the Fleming created derivative works.  In the Special Jury Verdict filed on March 6, 2003, the jury awarded Mr. Berry $98,250.00 for Fleming's willful infringement related to its willful infringement of FCS.

52.     The principals of res judicata prevent the re-litigation of issues regarding the ownership of the copyrights of the works that are the subject of this case and the jury further has found that Fleming owns no copies of Berry works.

53.     Fleming was found in two cases to be at best a licensee and owned no Berry works' copyrights or material objects related to the works and can pass no rights to anyone as to the Copyrights or rights to the material objects.

54.     In regard to the works that are the subject of this case,  the issues of copyright ownership and ownership of the material objects were already decided and C&S having alleged to accidentally received delivery of Mr. Berry's property from Fleming is in privity with Fleming as to the issue of ownership of Berry works.  Any copy derived from the works C&S received from Fleming or created in conjunction with the use of such works, is as a matter of the final judgments of previous litigation owned by Mr. Berry both as to the material object and the

15

copyrights.  Fleming's failure to prevail on the defenses related to ownership and its failure to assert a counter-claim to establish ownership prevent Fleming or any other person deriving rights from Fleming from challenging Mr. Berry's ownership.

55.     Prior to the District Court deciding the post-trial motions in the First Hawaii Case, and prior to the entry of permanent injunction, and for the purpose of being able to continue to infringe under court protection, on April 1, 2003, Fleming, after obtaining permission from the instant Lenders and receiving assurances of continued material support from the Lenders, Fleming filed voluntary Chapter 11 petitions for it and its subsidiaries in the District of Delaware commencing In re Fleming Companies, Inc., Bk. No. 03-10945 (MFW) (Ch. 11 DE).

56.     Despite seeking the equity of the Bankruptcy court, Fleming, with unclean hands continued to infringe Berry works thus protecting the Lenders' continuing source of income derived from the continued infringement of Berry works.

57.     The automatic stay was eventually modified regarding the pre-petition infringement action the First Hawaii Case and final judgment entered against Fleming on January 20, 2005.

58.     Despite claiming that it had ceased operating, Fleming filed and prosecuted an appeal of the verdict and final judgment to the Court of Appeals for the Ninth Circuit to protect the ongoing operation of freight logistics operations for a variety of unlicensed users.  In complete control over the aspects of Fleming related to the ongoing infringement of Berry works, the Lenders authorized the expenditure of the millions of dollars to continue to fight Berry's copyright claims and directed the daily actions of the litigation strategy to protect the income being generated through the daily acts of criminal infringement.

16

59.    In regard to the First Hawaii Case, Fleming appealed the judgment regarding fair use, ownership and the validity of the registration and other issues.  The Jury Verdict and final judgment in the First Hawaii Case were affirmed on all issues including ownership, copyrightability of all works, willful infringement of FCS, and Fleming's status only as a licensee by the United States Court of Appeals for the Ninth Circuit's Memorandum Opinion dated July 5, 2007 (9th Cir. Docket Number 05-15223).

60.    Mr. Berry's ownership in FCS and the derivative works now used by C&S is already decided and by virtue of the jury verdict, final judgment and Ninth Circuit writ of mandate and is *res judicata* as to Fleming and as to Core-Mark and C&S, unlicensed users of Berry works (hereinafter "Berry Technology"). The rights of these defendants, if any, derive only from Fleming an adjudicated willful infringer.

## The Second Hawaii Case

61.     Because the automatic stay limited the scope of the  second case (the "Second Hawaii Case") to only claims against Fleming arising after April 1, 2003, Mr. Berry was not permitted and has never litigated the infringements nor received or sought any damages for infringement that occurred after July 3, 2001 when the First Hawaii Case was filed to the period ending April 1, 2003 when Fleming filed Bankruptcy, against anyone including, but not limited to, the Lenders who fraudulently concealed their involvement in the Berry infringement.

62.    By orders of the Hawaii district court in the Second Hawaii Case, Mr. Berry's claims in the Second Hawaii Case were limited to infringements that occurred prior to June 10, 2003.

17

63.     At the time Fleming filed for Bankruptcy protection on April 1, 2003,  Fleming

and its Lenders were the subject of a formal Securities and Exchange Commission ("SEC")

investigation.

64.     At the time of the filing, Fleming's suppliers had place a credit freeze on Fleming

purchases and its wholesale business was moving towards Chapter 7 liquidation.

65.     To continue to operate the Hawaii division, Fleming's most profitable division,

Fleming's Lenders had to protect and advance the continued use of the infringing derivative of

Berry FCS the finding of willful infringement notwithstanding.

66.     Fleming's management, despite knowing that Fleming had been found a willful

infringer, under the direct control of the Lenders through their counsel and other attorneys

associated with the White & Case firm, directly controlled the daily operation of Fleming's

infringement to insure that Fleming continued to operate Fleming's logistics department with

what they have termed "Berry Technology".

67.     At the time, the Lenders knew that Fleming was operating its business through a

pattern of racketeering and agreed to participate as a principal in the operation of this enterprise.

68.      Though certain of Fleming unsophisticated employees claimed to have been

unaware that the continued use of Berry Technology was infringement, White & Case's

attorneys were sophisticated intellectual property attorneys and knew, or who were willfully

blind to the fact, that the conduct was infringement.  Based on their position of control they were

able to direct the continued infringement for financial gain.

69.      The conduct of the Lenders' agents is  imputed to them through the acts of their

agents and have been ratified through acts including but not limited to their failure withdraw

18

from their agreement to aid and abet the infringement and join Mr Berry against the infringers and thereby evidence their unwillingness to withdraw from the RICO conspiracy as of the filing of this Second Amended Complaint.

70.     In the period after April 1, 2003, rather than cease infringement, Fleming under the direct control of the Lenders continued to infringe FCS.  The Lenders concealed their actions until Fleming's attorneys during trial in the Second Hawaii Case in March 2006, when Fleming's PCT admitted documents and on the record admitted facts that evidence that the Lenders had engaged in overt acts in furtherance of a racketeering conspiracy.  The District Court in the Second Hawaii Case denied the PCT' motion to exclude these materials that the PCT claimed were covered by the attorney client privilege.  Until that time, Mr. Berry had been unaware of the Lenders' role in the infringement despite diligent attempt to investigate the lenders' who falsely and fraudulently claimed innocence.

71.     Final judgment was entered against Fleming's PCT and six of its former employees as direct infringers for the period of April 1, 2003 through June 9, 2003 and the judgment was not appealed and is a final judgment on the merits and the issue of direct infringement as to the lenders need is decided.

72.     At the time that Mr. Berry commenced the Second Hawaii Case, Fleming was a permitted user of the FCS subsidiary works that are the subject of this case and Mr. Berry could not have lawfully brought an infringement claim against Fleming at that time.

73.     At the time that Mr. Berry commenced the Second Hawaii Case, he had already prevailed at trial on the issues of ownership of FCS and all of the subsidiary works.

74.     At the time that Mr. Berry commenced the Second Hawaii Case, Fleming had not closed its sale of assets to C&S and no actionable transfer in violation of Mr. Berry's exclusive rights under the Copyright Act had occurred.  The only claim that was alleged in the Second Hawaii Case related to works other than FCS, was related to Fleming's act of exposing Berry Technology to C&S that occurred in June 2003 and was alleged to have constituted trade secret misappropriation.

75.     Had Mr. Berry sued for copyright infringement of works other than the derivative infringement of FCS for conduct that had occurred when the Second Hawaii Case was commenced, Mr. Berry and/or his counsel could have been subject to sanctions under Fed. R. Civ. P. Rule 11.

76.     As a result of the automatic stay, Mr. Berry was prohibited by Federal law from terminating the EULA and the Second Addendum under which Fleming was a permitted albeit unwelcome user.

77.      In the Second Hawaii Case, despite defending a claim of trade secret misappropriation both Fleming and C&S failed to make any claim ownership over any Berry works which was conceded and the defendants are estopped  from now re-litigating this issue.

78.     Fleming and C&S' failure to prevail on this issue or to assert an affirmative claim for ownership constitute an adjudication of ownership on the merits and C&S may not again litigate the issue that was already decided in favor of Mr. Berry as to the ownership of these works.

79.     Upon information and belief, the Fleming PCT under the direction of Robert Kors effected the illegal transfer of copies of the Berry works sometime in September 2005 on or

about the time his attorney Lex Smith who at the time also represented C&S, informed Mr. Berry that C&S, his concurrent client had commenced using his works.   Prior to that time C&S had claimed that it was not using any Berry works in numerous filings in the district court and in the Delaware Bankruptcy court.

80.     The Lenders, C&S and Fleming's PCT have entered into an agreement to continue agree to commit overt acts to further a conspiracy to commit willful infringement of the Berry works for financial gain and the PCT and the Lenders agreed to commit to spend over $6 million in litigation fees to hold Mr. Berry at bay while the Lenders, C&S, Core-Mark and others yet unknown to Mr. Berry reap millions of dollars in proceeds of a criminal enterprise (the "Enterprise).

81.     With the specific intent to commit willful infringement and the overt acts of willful infringement for financial gain, the defendants agreed upon a desperate scheme to seek to file Mr. Berry's involuntary bankruptcy to obtain control over his copyrights.   These schemes include encouraging a Hawaii divorce proceeding, attempting to force Mr. Berry to file bankruptcy and a scheme to corruptly coopt Mr. Berry's attorneys.

82.     The PCT through Kors and C&S through it agents including Smith who was also the PCT's attorney planned seek to file an involuntary bankruptcy against Mr. Berry and thereby obtain control of his copyrights.   When Mr. Berry's attorney learned of the plan, he informed the PCT's counsel that the Copyright Act 17 USC § 201(e) prohibited the taking of a copyright through such a devise and they changed course.

83.     Unable to cease the infringement for financial gain because the Lenders demanded their loans paid, and now recognizing that their plan to file Mr. Berry's involuntary

bankruptcy could not succeed, to facilitate the transfer of his copyrights to the criminal

infringers, the co-conspirators changed their plan to one of threat and intimidation directed to

Mr. Berry and sought to employ members of his family.

84.     With specific intent to cause injury to Mr. Berry Fleming and C&S through their

concurrent counsel approached Mr. Berry's estranged spouse and in violation of the spousal

privilege and common human decency and for the purpose of furthering the commission of a

felony as the result of the ongoing criminal infringement, upon information and belief, C&S' and

the PCT's concurrent attorneys made financial inducements to Mr. Berry's estranged spouse and

upon information and belief to her attorney to cause his estranged spouse to agree to commence

proceedings in the State of Hawaii that upon information and belief, were commenced to permit

C&S, the Lenders and the PCT to further profit from the knowing ongoing and willful

infringement of Mr. Berry's works.

85.     The plan was to purchase Mr. Berry's spouse' interest if any in Mr. Berry's

works that would be divided pursuant to an equitable division of property in the Hawaii family

court.

86.     In addition, the defendants devised a plan to purport to obtain ownership of the

Berry works through acts of intimidation that were intended to put Mr. Berry in fear for his

personal safety and to avoid harassment to his friends and to his customer and direct horizontal

C&S competitor in the restaurant supply market  that jeopardized his ability to continue to

operate his business.  These acts were committed with the specific intent to terrorize Mr. Berry

into relinquishing his copyrights to the Enterprise.

87.     Upon information and belief, agents of Kors, C&S and the Lenders, acting under their authority, having obtained Mr. Berry's home address in the August 13, 2007 deposition under the pretext of Smith's conducting a deposition, on or about August 14, 2007,  traveled to Florida and while having entered the West Palm Beach airport for the purpose of furthering the commission of a felony, identified Mr. Berry to a purported process server who followed Mr. Berry from the airport to his home and then from his home to a public restaurant.   And while in the presence of friends the alleged process server approached Mr. Berry  in an attempt to make service of the divorce complaint that was initiated by Lex Smith to further the criminal infringement.

88.     At the time this purported act to make personal service was accomplished, the defendants knew or should have known,  that the divorce complaint had been dismissed.  Their causing the service of this dismissed complaint was for the purpose of malicious injury and harassment and to advance what these actors knew was ongoing criminal infringement.

89.     Upon information and belief, Lex Smith, associated with both the Fleming-Logistics and other Hawaii based racketeering enterprises is a public official, namely an Ethics Commissioner of the City and County of Honolulu, and  has engaged in acts of racketeering and has been engaged in enforcing a vendetta against Mr. Berry for Mr. Berry's actions to assist federal prosecutors in criminal investigations related to politically powerful persons in the state of Hawaii under the protection of the other Hawaii based racketeering enterprises the composition of which will be explored in discovery.

90.     Fleming and now C&S have chosen Smith as their Hawaii based counsel upon information and belief  because of Smith's role on the ethics commission that provides him the

ability to assert pressure on public officials, including law enforcement, and to monitor whistle blowers who seek to expose corruption in Hawaii including, but not limited to,  the racketeering conduct of Fleming and C&S.

91.     Under the direction of the principals of a racketeering enterprise, Lex Smith has knowingly, with the intent to retaliate against Mr. Berry, taken actions harmful to Mr. Berry including, but not limited to,  interference with the lawful employment and  livelihood, as retaliation for providing to a law enforcement officers truthful information relating to the commission or possible commission of Federal offenses.

92.     Smith has for a period of several years sought to learn the location of Mr. Berry's business records that he has held at the request of law enforcement including the ATF, IRS CID and SEC.  Upon information and belief, Smith's reasons for seeking this information is to permit persons associated with certain criminal enterprises to obtain control over these records for the purpose of impeding ongoing investigations.

93.     In furtherance of the racketeering enterprise, Fleming, the Lenders and C&S through their agents, including their attorneys, have agreed to retaliate, taken actions harmful to Mr. Berry  including interference with the lawful employment and  livelihood, for providing to a law enforcement officer truthful information relating to the commission or possible commission of  Federal offenses.

94.     At the time the Lenders approved the filing of the Fleming Bankruptcy Petition, the EULA and Second Addendum and at least one published opinion of the Honorable Mary F. Walrath, United States Bankruptcy Judge for the District of Delaware presiding over the Fleming

24

Bankruptcy made the lawful transfer of Berry Technology to C&S or any other purchaser of Fleming's wholesale operation without Mr. Berry's consent a legal impossibility.

95.     Rather than pay a license fee to Mr. Berry for the lawful use of his works, and in furtherance of the Racketeering Enterprises that sought retaliation against Mr. Berry for assisting Federal law enforcement,  Fleming and its Lenders through the planning and execution of attorneys associated with Smith including attorneys associated with Kirkland & Ellis, to facilitate the unlawful transfer of Berry Technology to C&S for the purpose of financial gain, together agreed to sue Mr. Berry in a frivolous Delaware Bankruptcy adversary proceeding while Berry's  works were being staged for the eventual transfer to C&S.

96.     In that Adversary Proceeding, Fleming made allegations that Mr. Berry was engaged in harassment against Fleming by attempting to protect his intellectual property rights from an adjudicated infringer and sought specifically through force contempt sanctions to prevent  him from reporting ongoing criminal conduct to law enforcement and extortionately claimed that they were entitled to sanctions against Mr. Berry and his attorneys should Mr. Berry continue to protect his copyrights.  The Bankruptcy Court the Honorable Mary F. Walrath *sua sponte* denied Fleming's injunctive relief and the Adversary Proceeding was subsequently dismissed.

97.     On or about August 13, 2007,  Lex Smith knowing that he had concealed his own knowledge and/or complicity in an act of violence directed at Mr. Berry's family member occupying his home on Thanksgiving weekend 2001, and knowing that Mr. Berry feared for his personal safety, and in an attempt to establish the location of Mr. Berry's present home.  Smith sought to locate place where Mr. Berry stores business records that implicate Fleming and other

of its criminal associates in a variety of unlawful schemes including, but not limited to the schemes related to the Bishop Estate, the most powerful entity in the State of Hawaii whose trustee, Lokilani Lindsey was convicted of a count constituting a racketeering predicate acts directly related to Smith's client Fleming.  With the specific intent to intimidate Mr. Berry who has feared for his personal safety, Smith, the Lenders, Kors and others who are yet unknown to Plaintiff directed the commission of acts of threat and intimidation to further the conspiracy to commit future acts of willful infringement for financial gain.

## THE LENDERS JOIN THE ENTERPRISE

98.     On April 1, 2003, Fleming owed the Pre-Petition Lenders approximately $604,000,000 under the Pre-Petition Credit Agreement as of the Petition Date. $219,000,000 of that is owed under the revolving loan facility; $239,000,000 was owed on account of a term loan and $146,000,000 was committed to back outstanding letters of credit.

99.     Upon the filing of the Fleming Bankruptcy petition on April 1, 2003, the Pre-Petition Lenders chose to cease lending under the Pre-Petition Credit Agreement.

100.    At the time of the filing of the Voluntary Petition on April 1, 2003, Fleming balance sheet showed liabilities far exceeding assets. Fleming possessed approximately $300,000,000 in inventory that was subject to claims under the Perishable Agricultural Commodities Act ("PACA") and the claims of creditors exercising reclamation rights under state law that were both senior to the rights of the Pre-Petition Lenders.  Fleming possessed certain contract rights under Facilities Standby Agreements ("FSA") with retail grocers but without additional product and the ability to service the FSA's Fleming's few marketable assets were in imminent risk of becoming virtually worthless.

26

101.    Despite having touted state of the art supply chain software, in a program that was publically disclosed as the Fleming "F-1" program, Fleming's actual interest in such technology was as a willful infringer of a work entitled Freight Control System and over one hundred subsidiary unpublished works that were and remain all owned by Wayne Berry as the author and copyright owner.   From 2002 to the de-listing of the Fleming securities, the Lenders and Fleming continued to market securities with the knowledge that Fleming's assets were fictitious and derived from proceeds of ongoing criminal infringement.  Chase and GECC continue to facilitate the  marketing of Core-Mark securities knowing that Core-Mark is operating with infringing technology.

102.    Despite the touting of the F-1 program as a valuable asset, there is no record of the disposition of this Fleming asset in any of the materials filed in the Fleming Bankruptcy case. The Lenders joined the criminal enterprise for the purpose of concealing their own complicity and liability for the ongoing acts of racketeering related to the infringement of FCS.

103.    From on or about January 1, 2000 to the time of the filing of the voluntary Chapter 11 Bankruptcy petition on April 1, 2003, Fleming's Hawaii division was operating a freight logistics company using an illegal derivative of the Plaintiff's original work.  C&S has operated a freight logistics company using illegal copies of the Plaintiff's original works from on or about September 25, 2005 to the present.

104.    The Hawaii division along with feeder warehouses in California were the only parts of the Fleming wholesale operation that interested C&S, the only party willing to purchase the Fleming wholesale operations.  The Hawaii division was entirely dependant on the use of illegal copies of Berry's works from and afer the filing of the Petition..

27

105.    To avoid an imminent shutdown of its operations and to further the Pre-Petition

Lenders goal of repayment of the Pre-Petition Credit Agreement, Fleming sought and obtained

fresh working capital to fund on-going post-petition operations including the new acts of

infringement of Plaintiff's works.  To that end, upon information and belief, certain of the Pre-

Petition Lenders including the Defendants named herein agreed to fund Flemings's wholesale

operations with an emergency $50,000,000 in financing (the "Bridge Financing") to save

Fleming's operations from an imminent shut down.

106.    The Lenders, for the purpose of financial gain agreed to the commission of

numerous acts of criminal copyright infringement and to the operating of a racketeering

enterprise as a principal to insure their loans would be repaid with interest.

## GECC AGREES TO JOIN THE ENTERPRISE

107.    Upon information and belief, prior to September 2005, GECC's role in Fleming

related matters was limited to being one of the dozens of participating lenders in the Fleming and

later Core-Mark loan facilities.

108.    Fleming's Chapter 11 Plan was confirmed on or about July 24, 2004.  On August

20, 2004, Core-Mark, Fleming's reorganized debtor, granted a security interest in all its

intellectual property to GECC under a loan facility that replaced the Lenders' post-petition

Fleming loans.  This transfer was filed with US Copyright Office.

109.    In or about September 2005, Plaintiff was informed by C&S', and Fleming's

concurrent counsel, Lex Smith that contrary to what had been previously represented to him and

the Hawaii district court, C&S was using Mr. Berry's works.

28

110.    On September 9, 2005, Core-Mark filed an SEC Registration Form10 to obtain

authority for Core-Mark to begin public trading of its securities.   GECC was identified as lead

arranger for loans that supported Core-Mark's operations as set forth in Exhibits to the Core-

Mark Form 10.

111.    On October 21, 2005, Core-Mark filed a SEC Registration Form 10 Amendment

Number 1.   Amendment Number 1 again named GECC as lead arranger for the Core-Mark

loans.

112.    In the documents filed in support of GECC's borrower's Form 10 filing, Core-

Mark disclosed what it termed as a "proprietary logistics system"that had no apparent

development costs and a book value of over $6 million.  Core-Mark's Form 10 stated that

evidence of this work was contained in an exhibit that was not available on line.

113.    When Mr. Berry inquired of SEC to obtain a copy of the exhibit, upon

information and belief, Core-Mark created a false revised Form 10 that contained an exhibit that

instead of identifying the "proprietary logistics system" contained a description of certain former

Fleming owned copyrights that were transferred under the APA to C&S in 2003 and registered

in the Copyright Office as C&S' intellectual property.

114.    On or about Friday, November 4, 2005, Mr. Berry through his counsel, wrote to

GECC's parent to demand that they investigate and cease any material support for ongoing

infringement related to C&S and Core-Mark.  In that letter to Brackett B. Denniston, III, Esq.

General Counsel of Defendant GECC's parent company General Electric Corporation Mr. Berry

Mr. Berry informed GE of facts that supported the claim that GE was providing material support

to advance the ongoing infringement of Berry works through use by Core-Mark and C&S.

115.     Rather than conduct an investigation and take actions to cause GECC to cease its material support for the ongoing infringement, to further the goals and purpose of the Enterprise, and for financial gain, GECC instead chose to  join the conspiracy and entered into an agreement with Defendant Chase and Core-Mark whereby Chase agreed to take the lead role in the on-going infringement of Berry works in exchange for GECC's agreement to not expose the racketeering enterprise.  Upon information and belief, Chase and GE together created a fraudulent back dated agreement between Chase and GE  to conceal GE's involvement in the criminal conspiracy to infringe.

116.     Also on November 4, 2005, Plaintiff telephoned the SEC to inquire about the Core-Mark Form 10.  In that call the SEC informed Mr. Berry that the Core-Mark Form 10 was done and approved.  The SEC employee then indicated concern about the apparent fraud related to the documents filed in the Copyright office that were listed as proving over $6 million in support for the Core-Mark public offering.  Mr. Berry demonstrated that the exhibits that should have listed Core-Mark's intellectual property were simply copied from the filing in regard to the C&S asset purchase agreement and recorded in the copyright office in 2003.  No transfer of these Copyrights was ever recorded from C&S to Core-Mark making this submission that resulted in the approval of the Core-Mark public offering likely a fraud in connection with the sale of a security.

117.      The SEC employee informed Mr. Berry that he was going to call Core-Mark and ask questions and possibly request they file another amendment.

118.     Upon information and belief, Core-Mark worked all that weekend after receiving a call from the SEC regarding what Plaintiff had found in their Form 10.

30

119.    On the following Monday, November 7, 2005 Core-Mark filed the Core-Mark

SEC Registration Form 10 Amendment Number 2 .   GECC remained lead arranger for the Core-

Mark loans. This Second Amendment addresses some of the issues Berry had raised with the

SEC and removed some of the materials that referenced the $6 million in support due to the

proprietary logistics system raised on the previous Friday to the SEC.

120.    Upon information and belief and as the direct and proximate result of the fraud on

the SEC, on or about November 7, 2005, the Core-Mark Form 10 was approved and Core-Mark

commenced public trading.

121.    On or about  November 21, 2005, Eric Bootsma, internal counsel for GE

Commercial Finance responded to Mr. Berry's November 4, 2005 letter on behalf of GE

informing Mr. Berry that he would review the matters stated in the November 4, 2005 letter and

respond shortly.

122.    On or about November 30, 2005 Core-Mark, GECC's borrower, filed its first

Form 10Q with SEC.  In this filing Chase was named as the lead arrange and discloses an

October 13, 2005 agreement between Chase and GECC where Chase agrees to replace the

original GECC loans with GECC remaining as one of participating lenders.  Upon information

and belief this is the first time the October 13, 2005 agreement is disclosed in SEC filings.  Upon

information and belief in furtherance of ongoing acts of criminal infringement and other

racketeering predicates, this document was back-dated to provide cover for GECC that had

agreed to the operation of an enterprise engaged in racketeering as a principal and to remove

GECC as collateral agent.  GECC has not withdrawn from the 18 U.S.C. § 1962(d) conspiracy.

123.    On December 15, 2005, after receiving no response from GECC, Mr. Berry,

through his attorney wrote to GECC.

124.    On December 16, 2005, after GECC had entered into the agreement with Chase, Eric Bootsma responded to Mr. Berry's November 4, 2005 letter by delivering a back-dated letter dated December 14, 2005 to Mr. Berry's counsel, admitting that GECC remained a lender under Core-Mark's facility but stating the lead agent role had passed to Chase and directed further inquiry to Chase in that regard.  In that letter, GECC did not deny its involvement in the infringement.

125.    GECC, despite having received infringement warnings regarding the infringement of Berry works, for the purpose of financial gain, continues to provide financial support to Core-Mark and C&S knowing that GECC is engaged in aiding and abetting infringement and agrees to conduct the affairs of an enterprise engaged in interstate commerce as a principal, with full knowledge of the daily acts of ongoing criminal infringement of Berry works.  The works that are being infringed include over one hundred separate works including numerous registered works of original authorship and derivatives thereof all owned by Wayne Berry as the Copyright owner.

126.    GECC received  knowledge that its loans were already at risk as the result of the infringement, and obtained an agreement to lessen its exposure that was passed to Chase for GECC's agreement not to expose the conspiracy.

127.    GECC and Core-Mark together  participated in a scheme and artifice directed at employees of the SEC to disguise its complicity in the Berry infringement and permit Core-Mark, GECC's borrower to successfully obtain permission to conduct an initial  public offering to market its securities to provide addition sources of funds to lessen the exposure on GECC.

128.     GECC and its participating lenders including Chase, have participated in a fraud

on the SEC and falsely claimed asserted liens in the Core-Mark loan documents over this same

intellectual property that had been sold in 2003 to C&S in the Fleming-C&S APA and recorded

in the Library of congress to conceal the fraudulent lien they conspired to assert over the Berry

works claimed as Core-Mark's alleged proprietary logistics system.

129.     By agreeing with the enterprise and by executing documents to pass the lead

agent responsibilities to Chase, and agreeing to the falsification of the Core-Mark Form 10,

GECC committed overt acts in furtherance of the unlawful purpose of the RICO enterprise.

GECC continues to derive money from, and invest income in, a criminal enterprise engaged in

racketeering and despite knowing of the enterprises criminal nature has not withdrawn.

130.     Upon information and belief the proprietary logistics system disclosed in the

Core-Mark form 10 is a copy of or derived from the Berry FCS and is an infringing work or

contains protectable elements of the Berry work and is an infringing work.

131.     Upon information and belief, pirated copies of Mr. Berry's software were

delivered to Core-Mark by agents of Fleming and the lenders, who had secreted  copies of the

Berry FCS to be delivered to Core-Mark.   These infringing copies were actually in possession of

Fleming and/or Core-Mark when the freight logistics system that was used to provide asset

support for the GECC loans was allegedly created.  Upon information and belief this work is

substantially  similar to and a copy of the Berry FCS and contains protectable expression and is a

derivative of FCS and is owned by Mr. Berry.   The transfer of a security interest purporting to

encumber the Berry works in favor of GECC was perfected in the Copyright Office falsely

claiming ownership over a work that constitutes fraud on the Copyright Office that in addition to

Mr. Berry is a victim of GECC's conduct.

132.    The Lenders' loan covenants related to the C&S and Core-Mark loans give the

Lenders the power to cause the borrower to cease its infringement or other violations of law.

133.    Receipt by the Lenders including GECC of money derived from the SUA of

Copyright Infringement for Financial Gain is a violation of RICO.

134.    GECC and Chase have both knowingly committed racketeering predicate acts of

mail and wire fraud and likely securities fraud in furtherance of the enterprise and its unlawful

purpose.

## CLAIM I
### DIRECT COPYRIGHT INFRINGEMENT
### C&S, CORE-MARK AND DOE DEFENDANTS

135.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

136.    In the fall of 2005, Plaintiff was informed by C&S', and Fleming's concurrent

counsel, Lex Smith that C&S had commenced infringing Mr. Berry's works.

137.    Upon information and belief, C&S continues to create unlicensed derivative

works of Berry original works that did not exist prior to the filing of the Complaint commencing

this case and that could not have been the subject of any prior litigation because these infringing

works did not yet exist. All such derivative works pursuant to the Berry EULA and the Second

Addendum remain Mr. Berry's original works and subject to his rights as the copyright owner to

such works that are not licensed to C&S or its employees and/or agents and the daily use of these

works is infringement.

138.    Mr. Berry does not know the identity of the Doe Defendants that are C&S and

Core-Mark employees who are presently using his works without a license and upon their

identification by C&S and Core-Mark they will be identified as defendants herein.

139.    Upon in formation and belief, no later than September 2005, C&S and Core-Mark used Berry Technology by making daily copies of his works that are loaded in random access memory of computer owned and operated by C&S and Core-Mark which use constitutes direct copyright infringement.

140.    Upon information and belief, in period of November 1, 2007 to December 21, 2007, and under the direction and control of Chase and GECC, C&S created new derivatives of certain of Berry works including but not limited to certain of the works developed in the Crystal Reports environment to conceal the ongoing activities of Fleming-Logistics aka Fleming Foods. All of these works are derived from the works that were subject to the EULA, and the Second Addendum and pursuant to the finding in the prior litigation are Mr. Berry's copyrighted works.

141.    Core-Mark and C&S knew and know that its unlicenced use of Berry Technology constitutes willful infringement for financial gain.

142.    From September 2005 to the filing of the complaint in this case, Core-Mark, C&S and their employees and agents have committed thousands of act of willful infringement for financial gain.

## CLAIM II
### CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT
### CHASE, DEUTSCHE BANK AND GECC

143.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

144.    Based on the final judgments in both the First and Second Hawaii Cases, direct infringement is established and cannot be disputed for the period of January 2000 to July 3, 2001 and April 1, to June 9, 2003.

35

145.    During the period beginning in July 4, 2001, Fleming infringed Plaintiff's work by continuing to use and make illegal derivative copies of FCS and causing the use of these unlicensed works in Fleming's wholesale business.  The number of infringing acts number in the thousands and are not subject to a legitimate dispute.

146.    Starting in the Spring of 2002, Defendants Deutsche Bank Trust Company Americas and  JP Morgan Chase Bank in their separate capacities and as agents for the secured lenders of Fleming Companies, Inc., including GECC,  had reason to know that Fleming might be engaged in criminal infringing activities but because the Lenders enjoyed a direct financial benefit from the continued use of the Berry FCS they continued to provide funding and to exercise control over Fleming to cause Fleming to continue to infringe plaintiff's work.  The infringement of Mr. Berry's work from after the Fall of 2002 when the Lenders were given infringement warning letters and became aware of Mr. Berry's right to be paid for infringing use of his work that continued until no earlier than June 9, 2003, the Lenders received significant sums of money derived from the infringing activities.   The knowledge of the infringement is imputed to other Fleming Lender's whose role in the infringement is not yet fully known to Plaintiff and who will be named as Doe Defendants upon their identification through discovery.

147.    The Lenders that responded to the Berry infringement warning letters all denied any infringement.  It was not until March 2006 that Mr. Berry learned that these denials were false.  Because the denials were made by publically traded and regulated financial institutions regarding whom false statements made regarding willful infringement would amount to misprision of a felony, and evidence a lack of institutional soundness, it was reasonable that Mr. Berry  relied on their denials and therefore his discovery of the true extent of their complicity

was actively concealed from him and during the time of the infringement the statute of limitations was tolled by fraudulent concealment.

148.    To preserve his claims against the Lenders, Mr. Berry and the Lenders have entered into a tolling agreement that tolled the statute of limitations for copyright infringements related to this action.

149.    At the time of this jury verdict Fleming's lack of creditworthiness combined with the ongoing SEC formal investigation caused certain of the Lenders to be Fleming's only available source of operating capital.  Based on the then existing loan covenants and the fact that Fleming had no post-petition financing in place, the Lenders held control over Fleming's infringement related operations and exercised that control to cause Fleming to continue to infringe Plaintiff's works after it filed for Chapter 11 protection.

150.    Despite the knowledge that Fleming was an adjudicated willful infringer the Lenders caused Fleming to continue to infringe so that the Lenders could be paid on their loan obligations.

151.    In order to realize the Lenders' objective to sell the Fleming wholesale division it was necessary to keep the infringing Fleming freight business in operation to preserve the value of the Fleming loans owed to the Lenders that, but for the use of the Berry FCS, could not be repaid.

152.    Because the March 6, 2003 willful infringement jury verdict meant that a permanent injunction might be issued any time, Fleming filed its chapter 11 petition despite the fact that it had no proper Debtor-in-Possession financing in place.  The Lenders, though aware that Fleming was going to continue to infringe in the period after the jury verdict or, in the

37

alternative, having knowledge of facts that would have put a reasonable lender on notice of ongoing infringement, directed Fleming to use another unauthorized derivative of the Berry FCS so that Fleming would continue to have the ability to pay the Lenders' loans from money derived from infringement post-petition.

153. The Lenders, undeterred by the potential for infringement liability believing that they could secretly control Fleming free from detection, directed Fleming to continue to operate the Fleming Freight logistics business using infringing software.

154. Starting no later than January 1, 2000 and continuing to no earlier than June 9, 2003, Fleming Companies, Inc. and its employees engaged in thousands of separate act of direct infringement.

155. The Lenders aided, facilitated, and enabled thousands of separate acts of FCS infringement from and after 2002.

156. The Lenders required Fleming to agree to the Lenders' control over the ability of their borrower to commit act of copyright infringement specifically related to the Berry works the FCS database. As result of this and other factors, the Lenders starting in 2002 and continuing have right and ability to supervise infringing copyright and seek and obtain a direct financial interest in such activities are not shielded from liability even if they had no actual knowledge of the infringement.

157. During the Fleming Bankruptcy, the Lenders knew that they were engaged in criminal conduct against Mr. Berry and sought to obtain a discharge for such conduct through the Fleming Plan of Reorganization.  As proof of their intent and premeditation in regard to their agreement to engage in willful infringing conduct, after the language that was intend by the

38

Debtor's attorneys in furtherance of the Lenders's continued agreement to fund the ongoing infringement was called to the Bankruptcy Court's attention, the Bankruptcy Court orally ruled and the Plan's confirmation order was specifically  modified to make clear that no discharge for the conduct complained of herein either before or after confirmation was effective to relieved the Lenders or anyone from any obligation imposed upon them by law or otherwise.  The inclusion of this exculpatory language buried in hundreds of pages of documents filed in the Fleming bankruptcy is evidence of the criminal agreement,  planning and intent of intentional willful criminal conduct.  The Plan is a final judgment and res judicata prevents the lender from claiming such a discharge that would likely be beyond the subject matter jurisdiction of the Bankruptcy court to grant.

158.    In any event, Mr. Berry sought and obtained exemption from all of the discharge provisions of the Fleming Plan of Reorganization.  Even if other creditors were bound by the Plan, Mr. Berry, by not filing a claim and by order of the Delaware Bankruptcy Court and receiving an explicit exemption from the plan discharge was not so bound.

159.    The Lenders' attorneys' knowledge is imputed to the Lenders who authorized and/or ratified their conduct.

160.    The Lenders knew Fleming was an infringer and know that Core-Mark and C&S are infringers of Berry works..

161.    The Lenders have induced, caused and/or materially contributed to the infringing conduct of Fleming, C&S and Core-Mark.

162.    Upon information and belief, the Lenders have assisted other infringers of Berry works who are not yet known to Mr. Berry who use Berry works without a license and are

infringers.  These additional infringers may include, Haliburton and its spin off entity KBR and its successor to the LOGCAPS no-bid government contract,  Fluor, Inc., who has hired one of the architects of the Berry criminal infringement, Carlos Hernandez, Fleming's former General Counsel who made the first fraudulent claim of ownership over the Berry works, to serve as Fluor's  general counsel.

163.    The Lenders engaged in substantial participation in the infringing activities including providing finances that were specifically intended to advance the infringement and knowingly received money generated from the infringement.

164.    Even if the Lenders did not have actual knowledge of the infringing activity they had  reason to know of the third party's direct infringement and had the power and ability to stop it and are liable for contributory infringement.

165.    The Lenders had the power to control the infringement and materially contributed to the infringement and aided and abetted the infringement.

166.    The Lenders had a direct financial interest in the continuation of Fleming's Hawaii logistics operation as the one asset of value securing the Lenders' loans.

167.    But for the continued infringement the Lenders would have received little or nothing on their secured loans and are liable to Plaintiff as vicarious infringers.

168.    Starting in August of 2003, GECC, with full knowledge of the infringement of Berry's works began to support C&S and Core-Mark in their acts of infringement that continue as of this date.

169.    With knowledge of the infringing activity, the Lenders induced, caused, or materially contributed to the infringing conduct of another and are liable as contributory

40

infringers.

170.   The Lenders at all relevant times had the right and ability to supervise copyright infringing conduct and a direct financial interest in such activities are liable for vicarious infringement even if  they have no actual knowledge of the infringement.

### CLAIM III
### CONTRIBUTORY AND/OR VICARIOUS COPYRIGHT INFRINGEMENT
### CORE-MARK AND C&S

171.   Plaintiff restates the prior paragraphs that are incorporated by this reference.

172.   Core-Mark and C&S employees and agents are unlicensed users of Berry's works.

173.   Core-Mark and C&S engaged in substantial participation in the infringing activities including advancing the infringement and knowingly received money generated from the infringement.

174.   Core-Mark and C&S had the power to control the infringement and materially contributed to the infringement and aided and abetted the infringement.

175.   But for the continued infringement Core-Mark and C&S would have to have licensed the works from Mr. Berry.

176.   With knowledge of the infringing activity, Core-Mark and C&S induced, caused, or materially contributed to the infringing conduct of another and are liable as contributory infringers.

177.   Core-Mark and C&S at all relevant times had the right and ability to supervise copyright infringing conduct and a direct financial interest in such activities are liable for vicarious infringement even if  they have no actual knowledge of the infringement.

41

## CLAIM IV
## UNJUST  ENRICHMENT AND QUANTUM MERUIT
## THE LENDERS

178.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

179.    As a separate and distinct claim from the claims under the Copyright Act, and recognizing that the law in the Ninth Circuit where the case was field that was intend as the law applicable to this claim is at odds with the law in the Second Circuit that should adopt the Ninth Circuit view, and because the contract was pursuant to Hawaii law, starting in 2002, the Lenders knew that Mr. Berry had not licensed the use of any derivative copy of his work.  The Lenders knew that if Fleming infringed Berry expected to be paid for the use of his work.

180.    In the period after April 1, 2003, the Lenders directed Fleming to risk continued infringement so that the Lender's loans would be paid.  But for the use of Plaintiff's work, the Lenders would have received little in the break up of Fleming's wholesale business.

181.    Both the Lenders and Berry had an expectation that Berry would receive compensation for any unlicensed use of his works.

182.    The Lenders received a substantial financial benefit conferred upon them by Mr. Berry and it would be unconscionable to permit them to retain the full amount of that benefit that was obtained with the knowledge that Berry would have to be paid if Fleming continued to infringe.

183.    The Lenders are indebted to Mr. Berry in an amount to be determined at trial based upon the Lenders' implied promise to pay the reasonable value of the material infringed from which they derived a substantial benefit.

## CLAIM V
## BREACH OF CONTRACT FOR DAMAGES AND

42

## SPECIFIC PERFORMANCE
## KORS AND THE PCT

184.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

185.    The PCT is presently the assignee of all rights and has assumed all duties under the Berry EULA, Addendum and Second Addendum.

186.    The Berry EULA requires that the PCT destroy all Berry works upon the termination of its license.

187.    Berry has terminated the license and under the terms applicable to the PCT is contractually obligated to destroy all copies of Berry works.

188.    Berry works include all copies regardless of who presently possesses such copies.

189.    If the PCT cannot destroy the works, the EULA provided for liquidated damages in the amount of $2 million.

190.    Mr. Berry seeks specific performance from the PCT to destroy all Berry works.

191.    In the alternative, Mr. Berry seeks liquidated damages based on the EULA of $2 million.

192.    The right to compel destruction of a work is not an exclusive right of the Copyright Act.

## CLAIM VI
## TORTIOUS INDUCEMENT OF BREACH OF FIDUCIARY DUTY
## PCT, KORS AND C&S

193.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

194.    On or about July 2007, Mr. Berry had a fiduciary relationship with the Hawaii law firm of Lynch Ichida Thompson Kim & Hirota including Wesley Ichida his attorney of record in First and Second Hawaii Case and a former attorney in this case.

43

195.    Upon information and belief, commencing on July 16, 2007, Wesley Ichida committed numerous violations of his fiduciary duties, including, breach of the duty of loyalty, the duty to communicate information relevant to the representation, the duty to refrain from commingling and conversion of client funds and the duty not to practice deceit directed to his client.

196.    These violations continue through the continued material support of the defendants.

197.    Lex Smith as agent for C&S,  Kors, the PCT and upon information and belief, certain Doe Defendants and other defendants' agents presently unknown to Mr. Berry, upon information and belief, offered Mr. Berry's attorney, Wesley Ichida money in exchange for his agreement to the breach of the fiduciary duties owed to Mr. Berry.  Upon information and belief, the agreement required that the money that was money paid in partial settlement of the First and Second Hawaii Cases would not be disclosed to Mr. Berry.

198.    Smith and his principals knew they were inducing a breach of fiduciary duty but to further the ability of unlicensed users of Berry's system to commit acts of criminal infringement they acted under the authority and with the knowledge of their clients to induce the breaches of fiduciary duty as set forth herein.

199.    The defendants knowingly induced and substantially assisted in the breach and continue to provide assistance to Mr. Berry's former attorneys to assist them in concealing their breach including, but not limited to, their conversion of client funds and breach of duty of loyalty and the duty to maintain confidences and secrets.

200.    Upon information and belief, the defendants further induced Mr. Berry's attorney

44

to grant a fictitious interests in Mr. Berry's works that they along with the attorneys continue to conceal.

201.    Mr. Berry has been injured in an amount to be determined at trial greater than the jurisdiction threshold of this court.

202.    The conduct of the defendant's agents was authorized by defendants and has been, intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

**CLAIM VII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**PCT, KORS AND C&S**

203.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

204.    On or about July 2007, Mr. Berry had a fiduciary relationship with the Hawaii law firm of Lynch Ichida Thompson Kim & Hirota including Wesley Ichida his attorneys of record in First and Second Hawaii Case and the former attorneys in this case.

205.    Upon information and belief, commencing on July 16, 2007, Wesley Ichida committed numerous violations of his fiduciary duties, including, breach of the duty of loyally, the duty to communicate information relevant to the representation, the duty to refrain from commingling and conversion of client funds and the duty not to practice deceit directed to his client.

206.    These violations continue through the continued material support of the defendants.

207.    Lex Smith as agent for C&S,  Kors, the PCT  and upon information and belief, certain Doe Defendants or agents of other defendants presently unknown to Mr. Berry, offered

45

Mr. Berry's attorney, Wesley Ichida money in exchange for his agreement to the breach of the fiduciary duties owed to Mr. Berry. The agreement required that the money that was money paid in partial settlement of the First and Second Hawaii Cases would not be disclosed to Mr. Berry.

208. Smith and his principals knew they were aiding and abetting a breach of fiduciary duty but to further the ability of unlicensed users of Berry's system to commit acts of criminal infringement they acted under the authority and with the knowledge of their clients to aid and abet the breaches of fiduciary duty as set forth herein.

209. The defendants knowingly induced and substantially assisted in the breach and continue to provide assistance to Mr. Berry's former attorneys to assist them in concealing their breach including, but not limited to, their conversion of client funds and breach of duty of loyalty.

210. Upon information and belief the Defendants have continued to provide material support to the persons who have committed the breaches of fiduciary duty of a substantial nature and agreed to assist in concealing the breaches from Mr. Berry.

211. Mr. Berry has been injured in an amount to be determined at trial greater than the jurisdiction threshold of this court.

212. The conduct of the defendant's agents was authorized by defendants and has been, intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

## CLAIM VIII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## PCT, KORS AND C&S

213.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

214.    On or about July 16, 2007 Mr. Berry was party to an attorney-client retainer agreement between Mr. Berry and the Hawaii law firm of Lynch Ichida Thompson Kim & Hirota.

215.    The PCT, Kors and C&S and other defendants had knowledge of the contract.

216.    These defendant's intentionally induced Lynch Ichida Thompson Kim & Hirota to breach the contract. Other defendants' agents may have also participated in these acts and these defendants will be identified hereafter.

217.    The conduct that induced the breach constituted criminal conduct under Hawaii law and in any event the defendants had no justification for their acts.

218.    As the direct, foreseeable and proximate result of the defendants acts Lynch Ichida Thompson Kim & Hirota breached their contract with Mr. Berry.

219.    Mr. Berry has been damaged in amounts to be determined at trial but in any event no less than the jurisdiction threshold of this court.

220.    The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

## CLAIM IX
## AIDING AND ABETTING CONVERSION OF CLIENT FUNDS
## PCT, KORS AND C&S

221.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

222.    Sometime after July 16, 2007, Lynch Ichida Thompson Kim & Hirota converted client funds owned by Mr. Berry.

223.    The PCT Kors AND C&S through their authorized agents had knowledge of the conversion.  Other defendants' agents may have also participated in these acts and these defendants will be identified hereafter.

224.    The defendants provided and continue to provide substantial assistance to Lynch Ichida Thompson Kim & Hirota to aid them in concealing the conversion and thereby causing injury to Mr. Berry.

225.    Mr. Berry has made demand for the return of his funds but they have not been delivered to Mr. Berry.

226.    Mr. Berry has been injured in amounts to be determined at trial but in any event no less than the jurisdictional threshold of this court as direct, foreseeable an proximate result of the of the actions of the defendants to aid and abet the conversion of client funds.

227.    The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

## CLAIM X
## ABUSE OF PROCESS
## PCT, KORS AND C&S

228.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

229.    Commencing on or about January 2006,  Defendants devised a scheme to further the criminal infringement of Plaintiff's works by agreeing to cause the issuance of process in a Hawaii family court proceeding directed against Mr. Berry.

230.    The purpose of this proceeding was not to advance the legitimate issues related to the parties to the proceeding but to advance the purposes of the criminal infringers of Berry's

works.

231.    On or about August, the defendants caused process to issue that required Mr. Berry to travel interstate to attend a deposition.

232.    The purpose of that process was to cause Mr. Berry to divulge his home address for the purpose of intimidating him and causing him to fear for his personal safety.

233.    In addition, the Defendants knowingly and willfully caused purported process to be served upon Mr. Berry regarding a complaint that had already been dismissed.

234.    The Defendants and each of them acting through their agents whom they authorized to so act, caused  regularly issued civil process to issue regarding Plaintiff.

235.    The defendants had the specific intent to do harm to Mr. Berry and were without excuse or justification.

236.    The process was issued and used in a  perverted manner to obtain a collateral objective of further criminal conduct and to cause injury to the person and business of the Plaintiff.

237.    As the direct, foreseeable and proximate result of the defendants acts Mr. Berry has been damaged in amounts to be determined at trial but in any event no less than the jurisdiction threshold of this court.

238.    The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

### CLAIM XI
### CONVERSION OR ALTERNATIVELY TRESPASS TO  MATERIAL OBJECTS
### C&S AND CORE-MARK

239.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

240.    The Copyright Act makes a distinction between a copyright and the material object.   Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied and actions to recover such material objects are based on exclusive rights under the Copyright.

241.    C&S and Core-Mark may claim that they received material objects from Fleming in regard to the APA in C&S case and the confirmation order in Core-Mark's case.

242.    Fleming was under the protection of the automatic stay that protected certain property rights.

243.    C&S's rights if any to possess the material objects that embody the Berry works was terminated as to all such claims on December 17, 2007.  By terminating C&S's rights the PCT conceded that Core-Mark also has no rights in Berry works.

244.    Mr. Berry has made demand from C&S and Core-Mark for return of his works.

245.    C&S and Core-Mark have obtained possession of Berry works as material objects through wrongful transfers, acquisition and have damaged and destroyed the works and misused them.

246.    C&S's has intentionally continued assertion of  right to possess these material objects constitutes conversion under Hawaii law or alternatively should they agree to turn them over immediately a trespass to chattel.

247.     Core-Mark's continued possession of Berry works is conversion under the law of the state of Hawaii or alternatively should they agree to turn them over immediately a trespass to chattel.

248.    Mr. Berry is the person with the lawful right to possess these material objects.

249.    The continued possession of these material objects destroys Mr. Berry's right to gainfully employ these works for other customers.  The intentional and continued possess of these material objects is serious in nature to require in addition to other remedies require the defendants to pay the full value of the chattel.

250.    As the direct, foreseeable and proximate result of the defendants acts Mr. Berry has been damaged in amounts to be determined at trial but in any event no less than the jurisdiction threshold of this court.

251.    The conduct of the defendants' agents was authorized by defendants and was intentional, knowing, willful and done out of malice and so extreme, outrageous and without any justification that punitive damages must be awarded.

252.    Mr. Berry hereby seeks in addition to his damages a writ of replevin to enter upon the property of C&S and Core-Mark and without breach of the peace remove the material objects and restore them to Mr. Berry, the rightful owner and possessor.

## CLAIM XII
## RICO
## ALL DEFENDANTS

253.    Plaintiff restates the prior paragraphs that are incorporated by this reference.

254.    All named defendants, are defendants under the RICO 18 U.S.C. § 1962 (a)(b)(c) & (d) and RICO Persons.  The conduct of the defendants' agents was authorized by defendants.

## The 18 U.S.C. § 1962(c) Enterprise

255.    In or about 1993, certain individuals, including Jack Borja and Lokilani Lindsey formed Atlantic Pacific International, Inc. ("API").   API was formed by these individuals

ostensibly as a legitimate business engaged in providing logistics services for ocean freight

customers primarily groceries and restaurant supplies.   Over time API and its associates

repeatedly engaged in two primary criminal practices.   The first was to facilitate Fleming's

scheme to conduct false billing overcharges for food shipments into the state of Hawaii.  The

second practice was to facilitate Fleming's trafficking of untaxed cigarettes.

256.     By late 1995, Lokilani Lindsey then a trustee of the Bishop Estate Hawaii's most

powerful entity and the Nation's largest purported charitable trust,  began to distrust their API

co-owner, Jack Borja whom she and her sister Marlene believed was engaged in a fraud on them.

The details of other misconduct of the Bishop Estate trustees during this period  has been

documented by the Honorable Samuel P. King the district judge who presided over the First

Hawaii Case in, King and Roth: Broken Trust: Greed, Mismanagement, And Political

Manipulation at America's Largest Charitable Trust, University of Hawaii Press ISBN-10:

082483044X (March 2006).

257.     To continue the operation of the enterprise engaged in cigarette trafficking and

overcharges, in or about December 1995, Fleming transferred $200,000 to API for Jack Borja to

use to buy the API shareholder interests held by Lokelani and Marlene Lindsey to insure the

continued flow of untaxed cigarettes and the false documentation that Fleming used to facilitate

its overcharge scheme.

258.     Fleming overcharges included, but were not necessarily limited to two known

variants.   The first scheme required a trucker or freight company to change Fleming an inflated

amount for trucking services.  Fleming would pay the inflated amount and then the trucker and

Fleming would share in the overcharge through what the had come to term the "Freight

Reconciliation Account."  Fleming then passed the inflated invoice on to its cost-plus customers including grocery retailers and the United States of America. The trucker then paid Fleming its share through a Cost Recovery Saving ("CRS") payments also termed a "Back-Haul Allowance." The money that was being paid to Fleming was at times $60,000 per week in these payments. This scheme was used to inflate the charges to cost-plus customers of Fleming who paid a set percentage mark up on their purchases depending on the commodity ranging from 6% to 10 %. Fleming's gross margins if run without such schemes would be 6% to10 %.

259.    Another overcharge scheme involved the use of the Fleming mainframe computer that was programmed to create billing anomalies that could escape detection.  The result of these anomalies were an approximately 2 to 5% overcharge of Fleming's grocery customers.  The number of transactions and Fleming's net 7 day terms made the process of auditing Fleming's bills a virtual of impossibility.  Upon information and belief Fleming had a means to produce items during an audit that would show that had been underpaid. The customer that had taken the time and effort to review the mountains of paper invoices for the source of the overcharge were repeatedly presented with another higher bill rather than receiving a refund for the suspected overcharges.

260.    At the time of the transfer of Fleming's funds to Marlene and Lokilani Lindsey, Marlene Lindsey was a Chapter 7 debtor in a case in the District of Hawaii.  In a written contract entered into and signed by Jack Borja, Marlene and Lokilani Lindsey the three agreed to conceal the payment from Fleming to Marlene Lindsey from her bankruptcy trustee.  Some years later, based on evidence produced by Mr. Berry, including the agreement set forth above, Marlene and Lokilani Lindsey were convicted in Federal court of counts including bankruptcy fraud and

money laundering in regard to their activities related to API and Fleming.

261.    In or about 1994, with the Lindseys out of the way Fleming continued to operate its freight company engaged in false invoices that set forth freight charges that were used to establish Fleming's costs in certain cost-plus contracts and, upon information and belief, continued to engage in cigarette smuggling.

262.    At the time API had an ostensible legitimate business purpose of proving logistics services to reduce ocean freight costs.  The volume of freight that Jack Borja and API  was able to handle through API's ostensible legitimate activities was, however, limited by the lack of automation to approximately one forty foot ocean container per employee 40 hour week.

263.    In late 1994, Jack Borja approached Wayne Berry who had been his tenant on the North Shore of Oahu, and requested that Mr. Berry, a computer programmer,  provide a proposal for automating the API logistics functions.   At that time API with approximately 25 employees was able to perform the logistics cost savings function on approximately 25 containers a week.

264.    By late 1995, Mr. Berry had completed the integration of the Berry Freight Control System and put it on line in his home to be accessed by API solely over the Internet.

265.    During the time after November 1995,  Jack Borja informed Mr. Berry of other business affiliations that he was developing including several related to the securitization of mortgage instruments in the Philippines.  Upon information and belief these activities were funded by Fleming and included certain other violations of RICO including money laundering that was being effected by the issuance of credit cards drawn on overseas banks in the name of the RICO participants who were able to obtain money derived from the SUA's without reporting it as income to the IRS and the failure of certain Fleming related individuals to register as

54

foreign agents.

266.     In or about 1998, Mr. Berry, then acting at Jack Borja's request as president of API and up to that time unaware of anything improper occurring at Fleming and having been told by Fleming's top management that the CRS payments were being shared with Fleming customers,  was informed by a temporary API employee, Mauro Edwards, that he had overheard one of Jack Borja's relatives, who was an API employee, discussing the shipment of machine guns with silencers in Fleming controlled ocean containers.  Fearing that Jack Borja might be implicated, that same day, Mr. Berry, without informing Mr. Borja, caused this information to be communicated to agents of the Bureau of Alcohol Tobacco and Firearms ("ATF").

267.     In a meeting shortly thereafter with Tracy Elder and Jordon Lowe,  ATF Special Agents, in ATF offices in Honolulu, and after a brief discussion of the machine guns that the agents were already aware of, Mr. Berry was asked by the agents if he knew anything about cigarette smuggling being conducted by Fleming.  Mr. Berry was supervised but Mr. Berry agreed to report anything suspicious he discovered.

268.     Later, after being requested to produce certain corporate records in litigation, while reviewing a large amount of historical API records, Mr. Berry discovered certain Fleming records of a Fleming related company that appeared to be engaged in cigarette trafficking. These records included detailed transactions and customer lists.  These companies including UPAC (controlled by John Ault, Fleming's former manager), and WC Distributing the apparent cigarette delivery service along with Borja and the Lindseys evidenced a mature and ongoing criminal enterprise.  Mr. Berry reported this to the ATF that immediately sent an investigator from Seattle to Honolulu to review the records.

269.    After further investigation, Mr. Berry discovered documents dating back to 1993 detailing the Fleming-API criminal enterprise.  These documents were obtained by the United States 1999 pursuant to grand jury subpoena and, upon information and belief, were the government's principal evidence against Marlene and Lokelani Lindsey who, in or about 2000, were indicted on the of the predicate offenses of Money Laundering and/or Bankruptcy Fraud in regard to their involvement in the Fleming-API enterprise.  The were both later convicted of these offenses 2002.

270.    In November 2001, in order to force Mr. Berry to relinquish his copyright claim in the First Hawaii Case and to give up his copyrights to the Fleming enterprise, employed by Fleming traveled to the State of Hawaii upon information and belief, in a private aircraft,  for the ostensible purpose of closing a sale of a grocery retail chain to a former Fleming associate. While in Hawaii,  persons associated with Fleming upon information and belief among them Thomas Dahlen, entered in the nighttime property rented by Mr. Berry and assaulted a member of Mr. Berry's family on his property seeking to extract Mr. Berry's whereabouts. This act was done in furtherance of the Fleming-Logistics enterprise that replace The Fleming-API enterprise on or about October 1999.  The facts of this assault were confirmed the following week when by police officers who had knowledge of the incident.

271.    At this time and continuing, Fleming required the use of the Berry FCS to continue another fraudulent practice.  Fleming and upon information and belief its successor C&S engage in the practice of "diversions" where freight subsidies to offset the higher cost of shipping to Hawaii are fraudulently obtained from vendors for shipments it claimed were destined to be consumed by Hawaii consumers while instead are "diverted" to Mainland

distribution centers. Fleming and now C&S then retain the substantial freight subsidy.  The

Berry FCS was and remains a system that tracks freight subsidies and upon information and

belief constitutes a source of revenue for the Fleming-Logistics enterprise, that despite Fleming's

claim to have ceased all operations still continues to due business to assist the members

including C&S in concealing its operations.

272.     When Fleming filed bankruptcy the only valuable asset that it had were the three

warehouses related to the use of the Berry FCS and the diversions.  The one in Hawaii and two

on in California were positioned to effect the diversions.   These are the only Fleming

warehouses that C&S kept to operate after it purchased the over 30 Fleming warehouse

operations that were either closed or sold to other wholesalers.

273.     After Fleming exposed the diversion scheme and upon information and belief the

Berry freight control system to C&S in or about May to June 2003, C&S agreed to purchase

Fleming's wholesale business.

274.     The only wholesale operation that C&S retained from the Fleming sale are the

three that were tied to the Berry FCS.  Mr. Berry sued Fleming and C&S prior to the sale

closing.      275.     Prior to the closing Fleming sued Mr. Berry who ad a pending Hawaii

District Court Case against Fleming's freight forwarder, Hawaiian Express Service, Inc..  The

Hawaii case (the Second Hawaii Case) had been filed before the frivolous Delaware Adversary

case and when Fleming attempted its first filed case in Delaware, Mr. Berry's counsel amended

the first case and named Fleming and C&S as parties.

276.     As a condition to closing the sale, C&S required that Fleming and, upon

information and belief, its Lenders who controlled Fleming, agreed to incur any amount

57

necessary to protect C&S and its turn to reap the money from the illegal practices from Mr. Berry's attempts to be free from criminal infringement.  The day after this Berry Technology Indemnity agreement was signed memorializing the Lenders and Fleming's commitment to the C&S operation of the Fleming-Logistics enterprise, but after Mr. Berry had commended his suit against Fleming and C&S,  the approximately $400 million sale to C&S sale closed.  The vast majority of proceeds were paid to the Lenders who had funded the ongoing operation of Fleming-Logistics infringement from no later than 2002 to the present and authorized the ongoing indemnity to C&S for its continued criminal infringement.

277.    C&S claimed in the Second Hawaii Case to not using any Berry works.  Upon information and belief, subsequent to the entry of summary judgment C&S commenced using the Berry works that are the subject of this case, upon information and belief in the Fall of 2005. C&S continues to use these works on a daily basis and the Lenders continue to offer material support and aid and abet the ongoing criminal infringement for their own financial gain to protect their interest in the pool of funds that is held by the PCT.

278.    An unincorporated entity commonly referred to as Fleming-Logistics also known as Hawaii-Logistics is alleged to be one of perhaps many 18 U.S.C. § 1962 (c) enterprises employed to facilitate the commission of certain predicate acts, including, but not limited to, the ongoing infringement of Plaintiff's original works.  Each of the defendants is a person who either directly or through the acts of attorneys and agents participates in the conduct of the affairs of the Fleming-Logistics enterprise as a principal.

279.    This Enterprise generates and launders the funds received from the criminal use of Mr. Berry's intellectual property. To protect this Enterprise Mr. Berry has been the victim of

58

violations of the Hobbs Act and other acts as set forth herein as part of a pattern of connected, related predicate acts.

280.    The Lenders and C&S are alleged to have obtained money derived from the operation of a RICO enterprise in violation of 18 U.S.C. § 1962(a).

281.    Plaintiff is the principal victim of this conduct.  His rights and his business and property under the Copyright Act, 17 U.S.C. § 106 and under the Hobbs Act, 18 U.S.C. § 1951 have been repeatedly injured by the defendants and their agents.

## Pattern of Racketeering

282.    In Enterprise operates under a pattern of racketeering including but not necessarily limited to the following that are all related acts in furtherance of the enterprise committed against Mr. Berry as a victim:

### Under RICO 18 U.S.C. § 1961(1)(A)

283.     Violations of Hawaii Commercial Bribery Statute Hawaii  Rev. Stat. 708-880. The factual predicates are also alleged in Counts VI to IX above based on the same course of conduct.  Upon information and belief, on or about July 16, 2007,  Lex Smith as agent for C&S, the PCT and upon information and belief,  the Lenders offered valuable consideration in exchange for the breach of the ethical duties of members of Mr. Berry's former law firm, in particular Wesley Ichida. Upon information and belief the offer of valuable consideration of more than $1,000 for the violation of the duty to Mr. Berry by Mr. Berry's former attorneys. The act offering the compensation violates the Hawaii Commercial Bribery law.   Because the amount of money offered was in excess of $1,000 and constitutes felony bribery under Hawaii law made a RICO predicate act pursuant to RICO 18 U.S.C. § 1961(1)(A).

59

284.    Upon information and belief, C&S, Kors and the PCT through their agents have directed the commission of one or more acts of Commercial Bribery.  Mr. Berry believes that others whose actions will be imputed to other defendants herein, in particular the Lender, will be proven to be participants in this predicate act.

285.    Violations of Hawaii's Anti Bribery Statute. Hawaii Rev. Stat. §710-1040.  The PCT and C&S have conferred, or offered or agreed to confer, directly or indirectly, a pecuniary benefit upon Lex Smith defined by Hawaii Rev. State. § 710-1000(15) as a "public servant" with the intent to influence the public servant's vote, opinion, judgment, exercise of discretion, or other action in the public servant's official capacity in particular Smith's ability to retaliate against Honolulu law enforcement officers who might investigate Fleming and C&S' ongoing criminal conduct.  Upon information and belief, through Smith's intervention, C&S has been able to operate in violation of Hawaii's computer crime statute that it violates each time an illegal copy of a Berry work its used.

### Under RICO 18 U.S.C. § 1961(1)(B)

1. Criminal Copyright Infringement. 18 U.S.C. § 2319 (relating to criminal infringement of a copyright) the number of these instances of violations of Title 18 are too numerous to be stated herein but include the daily booting up of computers that load, without any license, pirated copies of Mr. Berry's software each day the infringement continues.  The first act of criminal infringement was committed in 2000 and continues as of this writing and are all related to the revenue derived from mis-declaration of freight and diversions. Fleming has been adjudicated by jury verdict  as a willful i.e. criminal infringer for acts committed in 2000 to July 3, 2001.  The finding of willful infringement has been affirmed by the 9th Circuit Court of

60

Appeals on July 5, 2007. Fleming and certain C&S employees were adjudicated infringers by judgment entered on March 9, 2006. That judgment has not been appealed but the district Court finding that the infringement was not willful is on appeal. The Lenders and C&S are fully aware that the use of Berry's works by C&S and Core-Mark constitutes willful infringement for financial gain and is criminal infringement.

2. The Hobbs Act 18 U.S.C. § 1951. Threats and intimidation against Mr. Berry and his family. These acts include the intentional and knowing threat and intimidation directed against Mr. Berry's family as set forth above, and against Mr. Berry in a deposition taken on August 13, 2007, where the questioner, Lex Smith, who upon information and belief has concealed his knowledge and complicity in regard to earlier acts of violence, all for the purpose of causing Mr. Berry to give his copyrights to the enterprise. Mr. Smith, under direction of Michael Baumann, knew of Mr. Berry's claim that he and/or his family had been the target of unlawful acts of violence and directed questioning to Mr. Berry with the specific intent that Mr. Berry be put in fear for his personal safety and/or the safety of his property. The first of these acts occurred in 2001 and the last one occurred in August 2007. Because Smith has power over the careers of law enforcement officers in the State of Hawaii he feels immune from any criminal liability for his unlawful acts.

3. Witness Retaliation, 18 U.S.C. § 1513 (e). With the intent to retaliate, Lex Smith, Kirkland & Ellis and the Lenders took action to harm Mr. Berry including action to interfere with his livelihood for Mr. Berry's providing to a law enforcement officer truthful information relating to the commission or possible commission of Federal offenses. These acts began in 2001 and again in the spring of 2003 and the last one was committed in August 2007.

61

4.  Money Laundering. 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity ("SUA") i.e. Copyright Infringement for financial gain and commercial bribery.  The money derived from the unlicensed use of the Berry system is money derived from an SUA and occurs on a regular basis from 2002 to the present.  The money paid to Mr. Berry's former attorneys in exchange for their active participation in acts against their client constitute proceeds of an SUA.  Marlene and Lokilani Lindsey, two previous members of the Fleming-Logistics criminal enterprise have been convicted for conduct related to the ongoing RICO enterprise on the charge of Money Laundering.  The Lenders, PCT, Kors, Core-Mark and C&S have engaged in numerous related acts of Money Laundering related to income derived from criminal infringement.

5.  Bankruptcy Fraud.  18 U.S.C. § 152.  The affidavit of Michel Gurzi dated on or about July 23, 2003 and false testimony of Brian Christensen in the fall of 2004 and spring 2006 are all acts of Bankruptcy Fraud.  Marlene Lindsey, previous member of the Fleming-Logistics criminal enterprise have been convicted on the charge of  Bankruptcy Fraud.

286.    The software is used by the members of the enterprise and their principals the identity is known to the members but currently unknown to the Plaintiff to facilitate various unlawful practices associated with the shipment of goods interstate and that conduct continues such that there is a real threat of future predicate acts.

287.    From the time that the reader began reading this Second Amended Complaint, more likely than not, a member of the Enterprise committed at least one additional predicate act. These practices include, but are not necessarily limited to, the transportation of contraband

cigarettes, mis-declaration of freight in violation of federal shipping laws, obtaining unearned and fraudulently reported discounts through the practice of freight diversions that is facilitated by the daily acts criminal infringement of the Berry FCS and the predicate acts identified herein committed against Mr. Berry.

288.    These acts are related and the members of the enterprise all share the common purpose to engage in criminal infringement,  shipment of contraband, the facilitating of diversions and the overcharges of the United States are some of the elements of the common plan and the reason that the PCT, Lenders and C&S and upon information and belief Core-Mark, have directed agents to commit Hobbs Act violations and commercial bribery is to protect its profits being derived from the Enterprise.

289.    Each of the members of the Enterprise is a separate person that maintains an identity separate from the enterprise.   The persons associated with the enterprise share a common purpose and the enterprise exits to facilitate several criminal schemes including the ongoing criminal use of Plaintiff's intellectual property and to permit the members of the enterprise earn money from the multiple commission of predicate acts.

290.    Fleming was and now C&S is outwardly legitimate wholesale enterprises. Fleming-Logistics was originally API and has changed ostensible ownership but continues in regard to it criminal practices unabated despite the changes in ostensible ownership.  The maintenance of the Government contract overcharges, the shipment of contraband are all facilitated by the illegal use of Mr. Berry's property in violation of Title 18 U.S.C. that is infringed to further the enterprise.

291.    Each time any Berry work is loaded in a computer, that occurs over ten times a

day, a criminal act of infringement occurs.  These illegal acts are further compounded by the use

of this system to create false freight charges that are transmitted to the United State of America

as costs. The true costs are maintained in the data contained in the Berry freight control system.

government contractors doing business with the Defense Commissary Agency ("DeCA") are

required to submit to extensive audits. Upon information and belief, Fleming and now C&S have

concealed the Berry freight control system from the Government to hide the extent and nature of

the fraud and overcharge.

292.    Millions of dollars in profits that, but for the commission of the predicate acts,

could not have been obtained by the participants.

293.    By violating Mr. Berry's rights as an owner of intellectual property, and by

threatening his person and property in violation of the Hobbs Act, the Defendants impede the

development of new innovative alternatives to the current logistics methods used to ship over $1

billion in goods yearly to Hawaii and Guam.

## RICO OFFENSES

294.    In violation of RICO 18 U.S.C. § 1962(a), all Defendants have received the

income derived from the pattern of racketeering activity.   The Lenders, C&S, Core-Mark and

Kors have obtained payment from the proceeds of SUA's.

295.    In violation of RICO 18 U.S.C. § 1962(b), all the Defendants are persons who,

through a pattern of racketeering activity,  acquired and maintain, directly or indirectly, an

interest in or control of an enterprise which is engaged in, or the activities of which affect,

interstate or foreign commerce.  The use of mechanisms that include bribery and extortion have

permitted the Defendants to maintain, directly or indirectly an interest in or control of the

enterprise.

296.     In violation of RICO 18 U.S.C. I § 1962(c), all defendants are persons employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

297.     By the agreements and overt acts set forth above, all defendants have conspired to violate RICO 18 U.S.C. § 1962 (a)(b) & (c) and have violated RICO 18 U.S.C. § 1962 (d).

298.     Mr. Berry has been injured in his business and property by the willful violation of his exclusive rights under the Copyright Act, 17 U.S.C. § 106 have been violated thousands of times and that violation continues unabated and will seek damages in the amounts to be proven at trial times three under RICO.

299.     In addition, by threatening Berry during a deposition, and by agents of the defendants traveling to West Palm Beach Airport immediately thereafter to confront Berry after the deposition and to put him in fear for his personal safety, the Lenders, PCT and C&S, though their shared agents including Lex Smith intended to cause Berry to give up his rights to his property thereby allowing C&S to continue to commit criminal acts of infringement with proceeds would be shared with the Lenders with no fear that Berry would seek to be compensated or report the infringement to law enforcement.

300.     But for the violation of RICO i.e. infringement, Mr. Berry would have an ability to license the defendants for the use of his software for valuable compensation.

301.     Mr. Berry's lost license fees and profits are all damages related to the infringement of his works.

65

302.    The acts continue as of this writing and because of the amount of money generated by the Berry system, it will likely not be impeded through any civil remedy but Mr. Berry will seek the imposition of an injunction.  The participants in this enterprise seek to hold themselves out as upstanding members of society, but to a person refuse to accept the simple fact that Copyright infringement for financial gain is a serious federal crime.

303.    Each RICO defendant is a person as defined by RICO and as a principals of such enterprise has agreed, participated as a Principal in the operation of an enterprise, agreed to the commission and committed overt acts and  received money derived from specified unlawful activities in violation of RICO 18 U.S.C. § 1962(a), (c) and (d).  The predicate acts that first gave rise to liability in RICO involve acts of Criminal Copyright Infringement in violation of 18 U.S.C. § 2319 (relating to criminal infringement of a copyright) the number of these instances of violations of Title 18 are too numerous to be stated herein but include the daily booting up of computers that load, without any license, pirated copies of Mr. Berry's software each day the infringement continues.  Additional predicate acts are derived form violations of the Hobbs Act and other Federal Criminal statutes.  These predicate acts continue as of this writing.

304.    Money knowingly derived from Criminal Copyright Infringement is then received by the Lenders including GECC in violation of 18 U.S.C. § 1962(a) and is not reported to the United States as money derived from a specified unlawful activity and constitutes money laundering as provided by Title 18 U.S.C. and constitutes additional predicate acts of money laundering.

305.    The RICO enterprise operates in interstate commerce and  has existed for no less than two years and will continue to exists unless the Court acts to order that it cease existence

66

and commission of acts that constitute RICO predicate acts.

306.    Mr. Berry continues to be injured by the RICO enterprise because the market for lawful copies of his original works is destroyed by the pirated copies that C&S and Core-Mark use and he is subject to direct and indirect acts of threat to his person and property by the members of the Enterprise.

307.    The Lenders, C&S, their agents, attorneys, including their attorneys in this case, officers and directors have all agreed and committed overt acts in furtherance of the objectives of the RICO Enterprise, including committing acts of physical threat and intimidation against Mr. Berry in violation of the Hobbs Act 18 U.S.C. § 1951 and are co-conspirators in violation of RICO 18 U.S.C. § 1962(d).

308.    The Defendants including the RICO person C&S though its attorneys have attempted to induce Mr. Berry to give up his rights to his works through acts of deceit, physical threat and threat to his property and by tortious acts directed at Mr. Berry and his spouse. The most recent occurring on Monday August 13, 2007.  By asking repeated irrelevant questions regarding Mr. Berry's ability to protect himself with licensed firearms, from criminal assault, in a deposition Lex Smith ("Smith") C&S and Fleming's PCT's attorney acting under the direction of the PCT, and other defendants, all RICO persons, did commit acts intended to induce or attempt to induce Mr. Berry a criminal victim to give up property or property rights through acts of threat of violence and/or physical intimidation to his person and/or property.

309.    On Monday August 13, 2007, and at earlier times,  Smith, and the Lenders' C&S's, Core-Mark's agents, used and/or attempt to use Plaintiff's reasonable fear of physical injury or economic harm in order to induce Mr. Berry to consent to give up his intellectual

property rights.  This conduct along with repeated and ongoing threats directed at Mr. Berry

and/or a Berry customer actually or potentially obstruct, delay, or affect interstate or foreign

commerce by preventing any competitor in the Hawaii Mainland USA ocean freight logistics

market for food and restaurant supplies from competing with C&S that presently possesses the

vast majority of the Hawaii market share.

## Additional RICO Predicates and DOE Defendants

310.    In addition to the claims herein alleged, upon information and belief, a copy of

Mr. Berry's work was by fraud obtained from the Copyright office on or about April 2002 and is

being used to facilitate another criminal enterprise that upon information and belief may be

related to the operation of a military procurement fraud currently under investigation by

Congressman Henry Waxman which fraud, upon information and belief, may also employ

persons associated with the Fleming-Logistics Enterprise who from time to time are physically

present in the Rock Island Arsenal in Illinois.   Mr. Berry has sought information through FOIA

requests but has been unable to learn facts sufficient to form a basis for a claim prior to filing of

this Second Amended Complaint.

311.    Upon information and belief this copy of FCS was obtained by Smith and Roger

Fulghum, a partner at the Baker Botts law firm in Houston, who at the time Haliburton, Inc.'s

subsidiary Kellogg Brown & Root.  Upon information and belief, Haliburton used the illegally

obtained copy to facilitate Haliburton's qualification for the no-bid government contract known

as LOGCAPS III that required the contractor to have a freight control database to facilitate

contract performance.  Upon information and belief a copy of this work is used by Haliburton

and/or its spin off of  Kellogg Brown and Root now known as KBR, Inc. ("KBR")  to facilitate a

fraud upon the United States in amounts exceeding several billion dollars.  KBR has resisted

efforts of the congressional committee investigating the IRAQ procurement fraud to obtain a

copy of the Access® database or databases that is/are being used in regard to KBR's Logisitcs

services under LOGCAPS III.  Upon information and belief the concealed KBR Access database

is a copy derived from the misappropriated copy of FCS that was obtained by fraud from the

Copyright Office in 2002..

312.    Because KBR and Haliburton are the subject of numerous investigations, and due

to the outcry against such no-bid contracts the LOGCAPS contract has been transferred to other

sub-contracting parties including, but not limited to, Fluor, Inc. another Texas based corporate

entity.

313.    As further evidence of the continuity of these related enterprises, Fluor, Inc. has

within the past few weeks, hired Fleming's former general counsel, and the person who first

made false claims of ownership over FCS in 2001, Carlos Hernandez, as Fluor's General

Counsel.  It is now established by the First Infringement Case that Mr. Hernandez as the

infringer's chief legal officer, oversaw over three years of criminal infringement related to FCS.

Mr. Berry will conduct discover regarding these additional predicates and parties and identify

additional defendants if warranted.

314.    Mr. Berry also believes and continues to investigate, the continued use of his

work  by former Fleming customers, including, but not necessarily limited to, Kmart.

**WHEREFORE PLAINTIFF PRAYS FOR**:

A.      As to JP Morgan Chase Bank, Deutsche Bank, and GECC, damages for

infringement of the copyright from and after 2000 to the present  as provided by the Copyright

69

Act without limitation to include actual damages and accounting for all gains and profits derived

by each of these defendants through the willful infringement of Plaintiff's copyright or Plaintiff's

right to statutory damages for willful infringement if elected with all amounts times three

pursuant to RICO;

B.     As to Robert Kors and the PCT an order directing the specific performance under

the EULA to cause the destruction of all Berry Technology that is in possession the PCT, Core-

Mark and/or C&S  and, if not possible, then liquidated damages pursuant to the EULA in the

amount of $2 million times three pursuant to RICO;

C.     As to C&S and Core-Mark damages for direct  infringing use and/or vicarious

and/or contributory infringement beginning no later than September 1, 2005 to the present as

provided by the Copyright Act without limitation including actual damages and accounting for

all gains and profits derived by defendants through infringement of Plaintiff's copyright or

Plaintiff's right to statutory damages if elected  with all amounts times three pursuant to RICO

and damages for conversion including punitive damages times three pursuant to RICO and the

issuance of a writ of replevin to recover the material objects owned by Plaintiff;

D.     Damages to be determined at trial for the value of the benefit that the Lenders

received with the expectation that Berry would receive payment for the unauthorized use of his

work based on an implied promise under quantum meruit times three pursuant to RICO;

E.     Plaintiff reserves the right to elect statutory damages any time prior to entry of

judgment which could occur after the jury renders verdict;

F.     Damages for intentional torts against all intentional tort defendants as set forth

herein in amounts to be proven at trial which amounts are times three under RICO ;

G.      Punitive damages against all intentional tort defendants as set forth herein found liable for the intentional torts set forth herein, in amounts sufficient to punish and deter future acts times three under RICO;

H.      Payment of the full costs of the action and reasonable attorney's fees at rates paid to the attorney for the opposing parties pursuant to RICO, the Copyright Act and Hawaii law;

I.      A declaratory judgment declaring that any interest that the Defendants alleged to have obtained through the inducement, or aiding and abetting of a breach of fiduciary duty was void *ab initio*;

J.      A temporary restraining order, preliminary and permanent injunction against all defendants and anyone with knowledge of the injunction to prohibit any further acts that assist, finance or otherwise facilitate the ongoing acts of infringement and threats of violence or intimidation regarding the Plaintiff, his family and/or his works that are the subject of this action, and requiring the return and/or destruction of all Berry works other than those necessary to preserve for litigation purposes under appropriate protections;

K.      Should the Lenders persist in their support for criminal infringers, and for persons violating the Hobbs Act, and breaches of fiduciary duty, Mr. Berry shall seek the imposition of a receiver or other Court appointed officer to take control of the defendants who continue to commit acts of willful infringement for financial gain or provide material support to infringers and/or direct other criminal acts,  as provided by law;

L.      Such other and further relief as may be just.

Respectfully Submitted: Honolulu, Hawaii, December 21, 2007.

<u>S/Timothy J. Hogan</u>
TIMOTHY J. HOGAN (Hawaii Bar No. 5312)
Attorney for Plaintiff WAYNE BERRY
Admitted *Pro Hac Vice*

1050 Bishop Street, Number 433
Honolulu, Hawaii 96813
Tel.  (808) 382-3698
Fax.  (808) 356-1682
Email tjh@timhogan.com