# Exhibit 6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Objection Deadline: October 28, 2003 at 4:00 p.m. prevailing Eastern time |
| | | Hearing Date: November 4, 2003 at 2:00 p.m. prevailing Eastern time |

## JOINT MOTION OF DEBTORS AND PRE-PETITION AGENTS FOR AUTHORIZATION, PURSUANT TO SECTIONS 363 AND 105 OF THE BANKRUPTCY CODE, TO PAY AMOUNTS TO THE PRE-PETITION AGENTS ON BEHALF OF THE PRE-PETITION LENDERS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), Deutsche Bank Trust Company Americas ("Deutsche Bank"), in its capacity as Administrative Agent (in such capacity, the "Administrative Agent") and Collateral Agent ("Collateral Agent") and JPMorgan Chase Bank ("JPMorgan Chase"), in its capacity as Syndication Agent (in such capacity, the "Syndication Agent" and, together with the Administrative Agent and Collateral Agent, the "Pre-Petition Agents"), on behalf of themselves and on behalf of those certain pre-petition secured lenders (the "Pre-Petition Lenders"), by and through their undersigned counsel, hereby submit this Motion requesting authorization, pursuant to Sections 363(b) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), to pay $325 million of the approximately $575.1 million in funds now held by the Debtors to the

---

[1] The Debtors are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

Pre-Petition Agents for the benefit of the Pre-Petition Lenders (the "<u>Motion</u>")[2], and in order to save the Estates approximately $1.2 million in monthly interest costs, and respectfully represent as follows:

## Jurisdiction

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). The statutory predicates for this Motion are Sections 105(a) and 363(b) of the Bankruptcy Code.

## Background

2. On April 1, 2003 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code (Case No. 03-10944 through 10972 (MFW)) (the "<u>Chapter 11 Cases</u>"). The Debtors are authorized to continue to operate their respective businesses and to manage their respective properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered. On April 10, 2003, the Office of the United States Trustee formed an Official Committee of Unsecured Creditors (the "<u>Committee</u>") in the Chapter 11 Cases. No trustee or examiner has been appointed in the Chapter 11 Cases, nor has a request for the appointment of a trustee or examiner been made.

---

[2] Dunigan Fuels, Inc. ("<u>Dunigan Fuels</u>"), one of the Debtors, is excluded from this Motion.

28587-001\DOCS_DE:80621.

**The Pre-Petition Loans**

4.  The Pre-Petition Lenders are party to that certain Credit Agreement, dated as of June 18, 2002, among, Fleming Companies, Inc., a Debtor ("Fleming"), Deutsche Bank, as Administrative Agent, and JPMorgan Chase and Citicorp North America, Inc., as Syndication Agents, Lehman Commercial Paper Inc. and Wachovia Bank, National Association, as Documentation Agents, Deutsche Bank and JPMorgan Chase, as Joint Book Managers, Deutsche Bank, JPMorgan and Solomon Smith Barney Inc., as Joint Lead Arrangers, and the lenders party thereto (the "Pre-Petition Credit Agreement" and, collectively with all ancillary documents executed in connection therewith, the "Pre-Petition Loan Documents"), pursuant to which the lenders, inter alia, made loans and advances to Fleming and issued or caused to be issued letters of credit on Fleming's behalf (collectively, the "Pre-Petition Loans"). All of the Debtors, other than Fleming, executed guarantees of the Pre-Petition Loans in favor of the Pre-Petition Lenders.

5.  The Pre-Petition Loans were secured by first-priority security interests and liens (the "Pre-Petition Financing Liens") on all or substantially all of the Debtors' then existing and after-acquired assets set forth in Section 1.1 of the Security Agreement (as defined in the Pre-Petition Credit Agreement) and Section 3.1 of the Pledge Agreement (as defined in the Pre-

Petition Credit Agreement)[3] and all proceeds and products of any and all such assets (the "Pre-Petition Collateral").[4]

6.  As of the Petition Date, Fleming was indebted to the Pre-Petition Lenders under the Pre-Petition Credit Agreement in the aggregate principal amount of $604 million (including outstanding letters of credit and fees associated therewith of approximately $146 million), in addition to pre-petition interest accrued thereon, plus costs, fees and expenses pursuant to Section 9.03 of the Pre-Petition Credit Agreement, as well as obligations incurred in connection with Treasury Services not to exceed $50 million (collectively, the "Pre-Petition Indebtedness"). Furthermore, there was an automatic $5 million step-up in one of the pre-petition letters of credit such that the overall exposure of the Pre-Petition Lenders grew to $609 million.

7.  On May 7, 2003, this Court entered its Final Order Authorizing (i) Post-Petition Financing Pursuant to 11 U.S.C. § 364 and Bankruptcy Rule 4001(c); (ii) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 4001(b) and (d); (iii) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363; and (iv) Approving Secured Inventory Trade Credit Program and Granting of Subordinate Liens, Pursuant to 11 U.S.C. §§

---

[3]  Pursuant to Section 1.1 of the Security Agreement and Section 3.1 of the Pledge Agreement, such assets included accounts receivable, inventory, instruments and chattel paper evidencing accounts receivable or into which any accounts receivable have been, or thereafter were, converted, securities, limited liability company interests, partnership interests, security entitlements, financial assets and investment property, and all proceeds and products of any all of the foregoing. The Pre-Petition Financing Liens did not cover the Debtors' real estate assets.

[4]  Pursuant to paragraph 48 of the Final DIP Order, the deadline by which parties may challenge the Pre-Petition Lenders' liens and claims has passed. Other than a challenge by a so-called "Unofficial Committee of Unsecured Creditors of Dunigan Fuels, Inc.", which the Debtors and the Pre-Petition Agents submit should not affect the relief requested herein, no parties challenged the Pre-Petition Lenders' liens and claims. Accordingly, such liens and claims are now valid and unavoidable.

28587-001\DOCS_DE:80621.

105 and 364(c)(3) and Rule 4001(c) (the "Final DIP Order"),[5] pursuant to which, inter alia, this Court authorized the Debtors to use the Pre-Petition Lenders' Cash Collateral, on the terms and subject to the conditions set forth therein and in the Post-Petition Loan Documents. See Final DIP Order ¶ 3. One of the conditions of the use of Cash Collateral is that it be used in strict compliance with an approved budget. Another condition to the use of Cash Collateral is that there must be sufficient availability under the Borrowing Base as more fully set forth in the Post-Petition Loan Documents. See Post-Petition Loan Agreement § 4.03.

        8.     Under the Final DIP Order, the Pre-Petition Lenders and Pre-Petition Agents were provided with adequate protection against any diminution in value of the Pre-Petition Lenders' and the Pre-Petition Agents' interest in the Pre-Petition Collateral "resulting from, inter alia, the granting of the Liens and the carve-out provided for in the Bridge Financing Order, the priming of the Pre-Petition Financing Liens, the imposition of the automatic stay, and the use, sale or lease or other disposition of the Pre-Petition Collateral". Final DIP Order ¶ I. Among other things, the Pre-Petition Lenders and Pre-Petition Agents were granted first priority liens and security interests on substantially all unencumbered assets of the Debtors (whether acquired prior thereto or thereafter) and junior liens on all assets encumbered by Senior Liens (subject to the Carve-Out and the Post-Petition Financing Liens) (collectively, the "Pre-Petition Lender Replacement Liens"). See Final DIP Order ¶ 8. The Pre-Petition Lender Replacement Liens are deemed perfected as of the Petition Date and may not be subject to or pari passu with

---

[5] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Final DIP Order.

28587-001\DOCS_DE:80621.

any lien or security interest existing as of the Petition Date, other than the Senior Liens. See Final DIP Order ¶ 9. In addition, to the extent of any Diminution Claim, the Pre-Petition Agents and the Pre-Petition Lenders were also granted, effective as of the Petition Date, allowed super-priority administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code (the "Pre-Petition Lender Superpriority Claims"), subject only to the Carve-Out and the Post-Petition Lender Superpriority Claims. See Final DIP Order ¶ 10.

9. Pursuant to the Final DIP Order, the Debtors are authorized to, among other things, use the Cash Collateral to "make adequate protection payments to the Pre-Petition Agents and Pre-Petition Lenders". Final DIP Order ¶ 5.

10. Pursuant to sections 2.07(b) and 2.09(e) of the Post-Petition Loan Agreement, respectively, by virtue of asset sales undertaken by the Debtors subsequent to the Petition Date, there is no availability under the DIP Facility and all outstanding post-petition letters of credit will be cash collateralized.[6]

### The Debtors' Cash Position

11. On August 15, 2003, this Court approved the Debtors' sale of their wholesale distribution business to C&S Acquisition LLC (the "C&S Sale"). The C&S Sale closed on or about August 23, 2003, and, on account thereof, the Debtors received approximately $255.8 million in cash at the closing (net of all deductions and escrows).[7] The Debtors now hold

---

[6] The post-petition letters of credit are in the amount of $18.3 million.

[7] The total purchase price paid at closing included $75 million for all assets other than inventory and $12 million for royalty payments; the remaining proceeds received were for the inventory actually purchased. In addition, approximately $27 million of the purchase price received at closing is currently held in escrow pending resolution of certain issues in connection with the C&S Sale (some of which may be returnable to the Debtors). The C&S Sale also contemplates the payment of future royalty amounts to Fleming which were not included in the $255.8 million set forth above.

a total of approximately $575.1 million in cash[8], all or substantially all of which constitutes the Pre-Petition Lenders' Cash Collateral.

12. However, as stated above, the Debtors cannot use the Cash Collateral except in strict compliance with an approved budget and subject to availability under the Borrowing Base. Moreover, the Debtors do not require the full $575.1 million in order to run their remaining businesses.[9] Specifically, the Debtors forecast a negative cash flow of approximately $5.0 million during the period from now through the end of the year. Thereafter, the Debtors expect that their average monthly cash flow from operations will be positive, but total cash flow, due to the administrative expenses related to the bankruptcy cases, will be a negative $3 million to $5 million. Accordingly, for the reasons set forth below, the Debtors submit that, in the exercise of their reasonable business judgment, the Court should authorize the Debtors to pay $325 million to the Pre-Petition Agents (for further distribution to the Pre-Petition Lenders pursuant to the terms of the Pre-Petition Security Agreement) to satisfy a portion of the Pre-Petition Indebtedness.

## Relief Requested

13. The Debtors and the Pre-Petition Agents respectfully request that this Court enter an order authorizing the Debtors to transfer $325 million to the Pre-Petition Agents for the benefit of the Pre-Petition Lenders in partial satisfaction of the Pre-Petition Indebtedness,

---

[8] This amount excludes the PACA/PASA, DSD, sale related and other escrows set up by the Debtors throughout the cases.

[9] As will be discussed in more detail below, the amount left behind in the estates assuming this Motion is granted is also sufficient to reserve against the potential claims of other constituents, including, inter alia, parties asserting PACA claims.

7

28587-001\DOCS_DE:80621.

with the balance to be retained by the Debtors subject to the current restrictions governing the use of such Cash Collateral.

### Basis for Relief

14. Section 363(b)(1) of the Bankruptcy Code permits a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The standard for approval of a motion made pursuant to Section 363(b)(1) is the reasonable business judgment test. See The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) (noting that courts apply a business judgment test in evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b)); In re Global Crossing Ltd., 295 B.R. 726, 742-737 (Bankr. S.D.N.Y. 2003) (analyzing case law from the Second and Third Circuits, to come to conclusion that business judgment test applies when evaluating motions to use, sell or lease property under Section 363(b)). In this instance, as will be discussed below, the Debtors submit that the payment requested is reasonable.

15. In addition, Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [title 11]". 11 U.S.C. § 105(a). U.S. v. Energy Resources Co., Inc., 495 U.S. 545, 549 (1990); Southern Railway Co. v. Johnson Bronze Co., 758 F.2d 137 (3d Cir. 1985). Accordingly, the Debtors and the Pre-Petition Agents submit that this Court may enter an order authorizing the requested transfer.

16. In addition, the Debtors and the Pre-Petition Agents submit that, at least with respect to the $325 million which is proposed to be paid to the Pre-Petition Agents for the benefit of the Pre-Petition Lenders, the Debtors would not be able to use such portion of the Cash Collateral because the Debtors could not provide adequate protection of the Pre-Petition Lenders' interest therein under Section 363(e) of the Bankruptcy Code as a result of insufficient coverage in the Debtors' asset base. Accordingly, it is unclear whether the Debtors would be entitled to use such monies in any case.[10]

### Business Justification for Payment

17. First, as discussed above, the Debtors do not require the full $575.1 million in order to adequately operate their remaining business through a contemplated conclusion of the Chapter 11 cases (and to cover any potential claims raised by other parties which may be pari passu with or senior to the claims of the Pre-Petition Lenders). In addition, as noted above, such cash cannot be used except in compliance with an approved budget and subject to availability under the Borrowing Base.

18. Furthermore, as discussed above, the Pre-Petition Obligations are secured by valid and unavoidable first-priority liens and security interest as well as valid and enforceable replacement liens. Accordingly, as the Pre-Petition Lenders have the first right to the $325 million which is proposed to be paid to the Pre-Petition Agents, the Debtors submit that the

---

[10] Based on the foregoing, the Agents believe that Section 362(d) of the Bankruptcy Code also provides a sufficient basis for the relief requested herein; however, in light of the Debtors' consent hereto and the other bases for the relief requested, it was determined that the utilization of such section was unnecessary.

28587-001\DOCS_DE:80621.

payment thereof to the Pre-Petition Agents will not prejudice relevant parties in interest in the Chapter 11 cases.[11]

19. Second, in connection with the Pre-Petition Obligations, and in consideration for the right to continue to use the Pre-Petition Lenders' Cash Collateral, the Debtors are currently paying the Pre-Petition Lenders approximately $2.2 million in interest on a monthly basis, which amount is substantially greater than that earned by the Debtors on the principal amount. Accordingly, the Debtors are subject to negative arbitrage with respect thereto and submit that, in the reasonable exercise of their business judgment, it would be of great benefit to their estates to reduce this expense[12] and that the only manner in which to achieve such reduction is to reduce the amount of the Pre-Petition Obligations.

20. Third, as discussed above, the relief requested herein is also authorized pursuant to the Final DIP Order, which permits the Debtors to use their Cash Collateral to make adequate protection payments to the Pre-Petition Agents and Pre-Petition Lenders.

21. Finally, the Debtors submit that parties who have asserted claims which may be pari passu with or senior to the claims of the Pre-Petition Lenders will not be prejudiced by the relief requested herein as the Debtors will retain sufficient funds to cover any such amounts. The Debtors had escrowed $51.3 million for such asserted claims and have paid $43.9 million in reconciled PACA/PASA claims. $12.6 million remains in escrow to resolve any

---

[11] As mentioned above, and as will be described in more detail below, the Debtors will retain sufficient funds to cover any potential claims raised by other parties which may be pari passu with or senior to the claims of the Pre-Petition Lenders.

[12] For example, the Debtors estimate that if the Pre-Petition Obligations are reduced by $325 million, this would save the Debtors and their estates approximately $1.2 million per month in interest costs.

10

remaining disputed or unreconciled PACA/PASA claims. Likewise, the Debtors had escrowed $11.3 million for such asserted claims, and, of this $11.3 million, have paid $1.4 million, leaving an escrow of $9.9 million for unresolved DSD claims.

22. In connection with the C&S Sale, certain parties in interest have asserted setoff rights against up to $75 million of the C&S sale proceeds. To the extent necessary, sufficient funds will remain in the Debtors' estates to cover such amount.[13] Additionally, an Unofficial Committee of Unsecured Creditors has commenced a challenge against, among other things, the validity of the Lenders' liens and claims against Dunigan Fuels. The maximum amount sought by this challenge is no more than $10 million. To the extent necessary, sufficient funds will remain in the Debtors' estates to cover such amount. Finally, although the Debtors have not escrowed any funds on account of the tax claims not covered by surety bonds, to the extent necessary, sufficient funds will remain in the Debtors' estates to cover such amount.

23. In addition to the specific items referenced above for escrows and other contingencies, the Debtors will still be left with a very substantial cash cushion in order to cover operating expenses and any unidentified claims which may be pari passu with or senior to the claims of the Pre-Petition Lenders. The use of this cash cushion will be subject to the terms and conditions set forth in the Final DIP Order and the Post-Petition Loan Agreement.

---

[13] As set forth in the Debtors' Motion for Order Establishing Amount of Adequate Protection Pursuant to the Sale Order [Docket No. 3667], however, the Debtors submit that the maximum potential amount of any such setoff rights should be $35 million, not $75 million as set forth in the order approving the C&S sale, and have sought an order of this Court to that end. This Motion is currently scheduled to be heard at the October 20, 2003 hearing.

24. The Debtors and the Agents submit, in addition, that the existence of the presently asserted reclamation claims should not impact the relief requested herein since, regardless of whether the Pre-Petition Lenders are ultimately determined to be undersecured or oversecured as to the Debtors' inventory, any such reclamation claims are subject to the prior valid liens of the Pre-Petition Lenders and are junior thereto.

25. Section 2-702(3) of the UCC as codified and adopted in most states provides that a "seller's right to reclaim under subdivision (2) is *subject to* the rights of a buyer in ordinary course or other good faith purchaser under this subdivision." U.C.C. § 2-702(3) (emphasis added). It is well settled law, including holdings by this Court, that a secured creditor with a floating blanket lien constitutes a "good faith purchaser" under Section 2-702(3). See In re Primary Health Systems, Inc., 258 B.R. 111, 114-15 (Bankr. D. Del. 2001) (noting that "it is well-established that . . . a creditor with a prior perfected security interest in inventory which contains an after-acquired property clause is a good faith purchaser under the UCC"); In re Victory Markets Inc., 212 B.R. 738, 742 (Bankr. N.D.N.Y. 1997) (absent a "showing of bad faith, a holder of a prior perfected, floating lien on inventory will be treated as a good faith purchaser with rights superior to those of a reclaiming seller."); In re Leeds Building Products, Inc., 141 B.R. 265, 268 (Bankr. N.D. Ga. 1992). Thus, as the Pre-Petition Lenders hold valid, prepetition floating liens on all of the Debtors' inventory, such liens clearly have priority over any reclamation rights that a reclamation claimant may have pursuant to Section 2-702(3), regardless of whether the Pre-Petition Lenders are ultimately determined to be oversecured or undersecured and, as such, the Pre-Petition Lenders are entitled to be paid now on their claims.

### Notice

26.  Notice of this Motion has been given to (a) the Office of the United States Trustee, (b) counsel for the Committee, (c) counsel for the Debtors' post-petition lenders, (d) those parties who have asserted PACA/PASA and other similar claims, (e) those parties who have asserted reclamation claims, (f) counsel of record for those parties who have asserted DSD or other similar claims, (g) those parties who have asserted setoff claims in connection with the C&S Sale, (h) those parties to whom the Debtors agreed to provide notice of this Motion pursuant to the order approving the sale of the wholesale business to C&S, and (i) those parties who requested notice in these Chapter 11 Cases pursuant to Fed. R. Bankr. P. 2002.

WHEREFORE, the Debtors and the Pre-Petition Agents request that the Court enter an order, substantially in the form attached hereto, granting the relief requested herein, and such other and further relief as this Court may deem just and proper.

Dated: October 10, 2003

Respectfully submitted,

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C. (ARDC No. 6190206)
Richard L. Wynne (CA Bar No. 120349)
Geoffrey A. Richards (ARDC No. 6230120)
Shirley S. Cho (CA Bar No, 192616)
777 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
Ira D. Kharasch (CA Bar No. 109084)
Scotta E. McFarland (Bar No. 4184)
Christopher J. Lhulier (Bar No. 3850)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier Zip Code 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

GREENBERG TRAURIG, LLP

Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
(302) 661-7000

and

WHITE & CASE, LLP
Andrew P. DeNatale, Esquire
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

Counsel for Deutsche Bank Trust Company Americas, as Administrative Agent and JPMorgan Chase Bank, as Collateral Agent and Syndication Agent