# EXHIBIT O

## POST CONFIRMATION TRUST AGREEMENT

This AGREEMENT is made this 19th day of August, 2004, by and among Fleming Companies, Inc. and its subsidiaries and affiliates who are chapter 11 debtors (collectively, the "Debtors")[1], the Official Committee of Unsecured Creditors (the "Committee") and Castellammare Advisors, LLC, a Delaware Limited Liability Company (together with any successors, the "PCT Representative").

### RECITALS:

A.    On April 1, 2003 each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

B.    By order dated July 26, 2004, the Bankruptcy Court confirmed the Debtors' and the Official Committee of Unsecured Creditors' Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and Its Filing Subsidiaries Under Chapter 11 of the Bankruptcy Code (as the same may be amended, the "Plan"); and

C.    In accordance with the Plan, a trust (the "PCT") is being established hereby for the primary purpose of liquidating the assets transferred to it under the Plan (the "PCT Assets") for the benefit of the Beneficiaries (as defined herein), subject to the liabilities of the PCT as specified herein; and

D.    The Plan provides for, among other things, the distribution to the Beneficiaries of, in the aggregate, one hundred percent (100%) of the beneficial interests in the PCT; and

E.    The PCT is created on behalf of, and for the sole benefit of, the Beneficiaries subject to the liabilities of the PCT as specified herein; and

F.    The PCT is established as a liquidating trust, in accordance with Treasury Regulation Section 301.770 1-4(d) with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the PCT; and

G.    The PCT is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as the grantors and owners of the trust; and

---

[1]    The Debtors are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

H.    Capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Plan; and

I.    In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan shall govern.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the Debtors, the Committee and the PCT Representative agree as follows:

## ARTICLE I

## POST CONFIRMATION REPRESENTATIVE

1.1    <u>Appointment</u>.  The Debtors and the Committee hereby appoint Castellammare Advisors, LLC, a Delaware Limited Liability Company to serve as the initial PCT Representative under the Plan, and Castellammare Advisors, LLC hereby accepts such appointment and agrees to serve in such capacity, in each case effective upon the Effective Date of the Plan.  If the PCT Representative is removed or resigns pursuant to this Agreement or otherwise vacates the position, a successor PCT Representative shall be appointed by the PCT Board (as defined herein) and, if not so appointed, shall be appointed by the Bankruptcy Court.

1.2    <u>Generally</u>.  The PCT Representative's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the PCT and not otherwise, except that the PCT Representative may deal with the PCT Assets as permitted by the provisions of Section 1.4 hereof.  The PCT Representative shall have the authority to bind the PCT but shall for all purposes hereunder be acting in the capacity as PCT Representative and not individually.  Notwithstanding anything to the contrary contained herein or in the Plan, the PCT Representative shall not be required to take any action or omit to take any action if, the PCT Representative believes such action or omission is not consistent with the PCT Representative's fiduciary duties to the Beneficiaries.

1.3    <u>Powers</u>.

(a)    The powers of the PCT Representative shall, without any further Bankruptcy Court approval, include (i) the power to invest and withdraw funds, make distributions and pay taxes and other obligations owed by the PCT from the PCT Assets in accordance with this Agreement and the Plan, (ii) the power to engage employees (including the power to hire and terminate employees) independent contractors, service providers and professional persons to assist the PCT and/or the PCT Representative with respect to its or his responsibilities, (iii) the power to sponsor, maintain and administer employee benefit plans as necessary to further the goals of the PCT, (iv) the power to compromise and settle claims and Causes of Action on behalf of or against the PCT within the parameters outlined by the PCT Board as contemplated in Section 2.5(b) herein and (v) such other powers as may be vested in or assumed by the PCT or the PCT Representative pursuant to the Plan, Bankruptcy Court order or as may be necessary or proper to carry out the provisions of this Agreement and the Plan.  Except as expressly set forth herein and subject to the parameters outlined pursuant to Section 2.5(b) herein,

2

the PCT Representative shall have absolute discretion to pursue or not to pursue any and all claims, rights, and Causes of Action as he determines is consistent with the purposes of the PCT and shall have no liability for the outcome of his decision. The PCT Representative may incur any reasonable and necessary expenses in liquidating and converting the PCT Assets to cash.

(b)    In connection with the administration of the PCT, except as otherwise set forth in this Agreement or the Plan, the PCT Representative is authorized to perform any and all acts necessary or desirable to accomplish the purposes of the PCT. Without limiting, but subject to, the foregoing, the PCT Representative shall be expressly authorized, but shall not be required, to:

(i)    hold legal title to the PCT Assets and any and all rights of the Beneficiaries in or arising from the PCT Assets, including, but not limited to, the right to vote any claim or interest held by the PCT Assets in a case under the Bankruptcy Code and receive any distribution therein;

(ii)    protect and enforce the rights to the PCT Assets vested in the PCT by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(iii)    invest any moneys held as part of the PCT Assets in accordance with the terms of Section 1.10 hereof.

(iv)    liquidate the PCT Assets and calculate and effect the distribution of the net proceeds thereof to the Beneficiaries, subject to the liabilities of the PCT as specified herein, in accordance with the provisions of the Plan;

(v)    compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle Claims in favor of or against the PCT according to the parameters outlined by the PCT Board as outlined pursuant to section 2.5(b) herein;

(vi)    determine and satisfy any and all liabilities created, incurred or assumed by the PCT;

(vii)    file, if necessary, any and all tax and information returns with respect to the PCT, pay taxes properly payable by the PCT, if any, and furnish to the Beneficiaries all necessary tax forms;

(viii)    pay all Expenses (as defined herein) and make all other payments relating to the PCT Assets, provided that the PCT Representative shall be required to make disbursements out of the PCT Assets to pay Expenses as provided in Section 2.5(g);

(ix)    obtain insurance coverage with respect to the liabilities and obligations of the PCT Representative, the PCT Board members and any other

3

Indemnitees (as defined herein) for the benefit of such persons (in the form of an errors and omissions policy, fiduciary policy or otherwise);

(x)    obtain insurance coverage with respect to real and personal property which may be or may become PCT Assets, if any;

(xi)    retain and pay law firms as counsel to the PCT to aid in the prosecution of any claims that constitute the PCT Assets and to perform such other functions as may be appropriate. The PCT Representative may commit the PCT to, and the PCT shall, pay such law firms' compensation for services rendered and expenses incurred;

(xii)    retain and pay a public accounting firm to perform such reviews and/or audits of the financial books and records of the PCT as may be appropriate. The PCT Representative may commit the PCT to, and the PCT shall, pay such accounting firm's reasonable compensation for services rendered and expenses incurred;

(xiii)    retain and pay such third parties as the PCT Representative may deem necessary or appropriate to assist the PCT Representative in carrying out his powers and duties under this Agreement and in accordance with the Plan. The PCT Representative may commit the PCT to, and the PCT shall, pay all such person's or entity's compensation for services rendered and expenses incurred, as well as commit the PCT to indemnify any such parties in connection with the performance of services;

(xiv)    engage in any transaction material to the foregoing, including, but not limited to, opening bank accounts in the name of the PCT and entering into contracts and leases on behalf of the PCT;

(xv)    provide periodic reporting to the Bankruptcy Court and parties in interest of the status of the Claims resolution process, distributions to the Beneficiaries and prosecution of Causes of Action;

(xvi)    amend, modify, terminate, cancel and/or alter the coverage under or with respect to any employee benefit plan sponsored by the PCT; and

(xvii)    assume such other powers as may be vested in or assumed by the PCT pursuant to the Plan or Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of this Agreement or of the Plan.

1.4    Authority. Except as otherwise set forth in this Agreement or in the Plan, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the PCT Representative may control and exercise authority over the PCT Assets and over the protection, conservation and disposition thereof. No person dealing with the PCT shall be obligated to inquire into the authority of the PCT Representative in connection with the protection, conservation or disposition of the PCT Assets.

4

1.5     Cooperation with Reclamation Creditors' Trust ("RCT"). To facilitate the Claims reconciliation process and asset liquidation, the PCT and the RCT shall enter into a transition services agreement ("TSA"), substantially in the form attached hereto as Exhibit A, whereby the PCT shall provide resources to the RCT related to effecting the reconciliation of claims by and against the RCT under the terms and conditions outlined in the TSA.

1.6     Coordination Between PCT and RCT. The PCT Board, through the PCT Representative and otherwise, shall exercise reasonable efforts to coordinate with the RCT by (a) reporting to the RCT on a regular basis concerning the status and activities of the PCT; and (b) responding to reasonable informational requests from the RCT concerning the status and activities of the PCT.

1.7     Other Activities. The PCT Representative shall be entitled to perform services for and be employed by third parties; provided, however, that such performance or employment affords the PCT Representative sufficient time to carry out his responsibilities as PCT Representative. The PCT Representative may delegate the performance of services and the fulfillment of responsibilities to other persons. Such persons shall be entitled to be compensated for their services and to be reimbursed for out-of-pocket disbursements in the same manner as the PCT Representative or as otherwise agreed to by the PCT Board.

1.8     Limitation of PCT Representative's Authority.

(a)     The PCT Representative shall have no power or authority except as set forth in this Agreement or in the Plan.

(b)     The specific parameters of the PCT Representative's power and authority shall be determined by the PCT Board (as defined herein).

(c)     The PCT Representative shall not, and shall not be authorized to, engage in any trade or business with respect to the PCT Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the PCT and shall take such actions consistent with the prompt orderly liquidation of the PCT Assets as are required by applicable law and consistent with the treatment of the PCT as a liquidating trust under Treasury Regulation Section 301.770 1-4(d), and such actions permitted herein.

1.9     Limitation of Liability of PCT, PCT Representative and Professionals. In no event shall the PCT Representative, the PCT Representative's employees, the PCT's employees or any of the respective present and future affiliates, employees, directors, officers, agents, attorneys, representatives, successors, assigns and professionals of each of the foregoing (collectively, the "Protected Parties") be held personally liable for any Claim asserted against the Protected Parties. Specifically, the Protected Parties shall not be liable for any negligence or any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith or for any breach of fiduciary duty, except to the extent that the action taken or omitted to be taken by the Protected Party is determined by a Final Order to be due to their own respective gross negligence or willful misconduct.

5

1.10   <u>Reliance by PCT Representative</u>.   Except as otherwise provided in Section 1.8 hereof:

(a)   the PCT Representative may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by him to be genuine and to have been signed or presented by the proper party or parties;

(b)   the PCT Representative may consult with legal counsel, financial or accounting advisors and other professionals to be selected by him, and the PCT Representative shall not be liable for any action taken or omitted to be taken by him in accordance with the advice thereof; and

(c)   persons dealing with the PCT Representative shall look only to the PCT Assets to satisfy any liability incurred by the PCT Representative to such person in carrying out the terms of this Agreement and the Plan, and the PCT Representative shall have no personal obligation to satisfy any such liability.

1.11   <u>Investment and Safekeeping of PCT Assets</u>.   All PCT Assets shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Beneficiaries. The PCT Representative shall have no liability for interest or producing income on any moneys received by the PCT hereunder and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received by the PCT.  Investments of any moneys held by the PCT shall be administered in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs; provided, however, that the right and power of the PCT Representative to invest the PCT Assets, the proceeds thereof, or any income earned by the PCT, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 4.4 hereof) in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as Treasury bills; and, provided, further, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.770 1-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

1.12   <u>Authorization to Expend PCT Assets</u>.   Subject to the Post-Effective Date Budget ("Budget") to be prepared by the PCT Representative on the Effective Date or as soon thereafter as reasonably practicable and approved by the PCT Board or as otherwise ordered by the Bankruptcy Court, the PCT Representative may expend the PCT Assets  (i) as necessary to meet contingent liabilities and to maintain the value of the PCT Assets, (ii) to pay expenses of the PCT (including, but not limited to, any taxes imposed on the PCT or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the PCT (or to which the PCT Assets are otherwise subject) in accordance with this Agreement or the Plan including fees and expenses incurred in performing services for the RCT as outlined in the TSA. Consistent with Section 2.5(b) herein, the PCT Board shall establish appropriate parameters of variance from the Budget by which the PCT Representative may expend PCT Assets without the

need for further PCT Board approval. The PCT Representative may, as required, also seek permission from the PCT Board to expend additional funds not in the Budget or within the variance outlined herein or authority to borrow additional funds if supported and necessary to exercise the duties of the PCT Representative consistent with this Agreement and the Plan.

1.13    Compensation of the PCT Representative.

(a)    The PCT shall reimburse the PCT Representative for the actual and reasonable out-of-pocket expenses incurred by the PCT Representative, including, without limitation, necessary travel, lodging, postage, telephone and facsimile charges upon receipt of periodic billings. The PCT Representative and employees of the PCT and the PCT Representative who perform services for the PCT shall be entitled to receive compensation for services rendered to the PCT as outlined in the Engagement Letter attached hereto as Exhibit B or as agreed to by the PCT Representative and the PCT Board.

(b)    The PCT Assets shall be subject to the claims of the PCT Representative, and the PCT Representative shall be entitled to reimburse himself out of any available cash in the PCT for his actual and reasonable out-of-pocket expenses and against and from any and all loss, liability, expense, or damage which the PCT Representative may sustain in good faith and without willful misconduct, gross negligence, or fraud in the exercise and performance of any of the powers and duties of the PCT Representative.

(c)    All compensation and other amounts payable to the PCT Representative shall be paid from the assets of the PCT. If the cash in the PCT shall be insufficient to compensate and reimburse the PCT Representative for any amounts to which he is entitled hereunder, then the PCT Representative is hereby authorized to reduce to cash that portion of the PCT Assets necessary to effect such compensation and reimbursement.

1.14    Exculpation and Indemnification.

(a)    Exculpation. The Protected Parties shall be and hereby are exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Protected Parties by the Plan, this Agreement or any Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, this Agreement, applicable law or otherwise, except only for actions or omissions to act, only to the extent determined by a Final Order to be due to their own respective gross negligence or willful misconduct. No holder of a Claim or other party in interest will have or be permitted to pursue any claim or cause of action against the Protected Parties for making payments which the Protected Parties believe in good faith to be in accordance with the Plan or this Agreement or for making a decision or taking any action which the Protected Parties believe in good faith to be in furtherance of implementing the provisions of the Plan or this Agreement.

(b)    Indemnification. The PCT shall indemnify, defend and hold harmless the Protected Parties or former Protected Parties (in such capacity) from and against any and

7

all claims, causes of action, liabilities, obligations, losses, damages or expenses (including attorneys' fees of reasonably retained counsel, and which attorneys fees of such reasonably retained counsel shall include the fees and costs of counsel to any Protected Party or former Protected Party who retains separate counsel) ("Expenses") (other than those determined by a Final Order to be due to their own respective gross negligence or willful misconduct after the Effective Date and solely to the extent so attributable) to the fullest extent permitted by applicable law. Any action taken or omitted to be taken with the approval of the Bankruptcy Court or the PCT Board will conclusively be deemed not to constitute fraud, gross negligence or willful misconduct or otherwise constitute breach of any duty under applicable law, the Plan or this Agreement. Notwithstanding any provisions of this Agreement to the contrary, the PCT shall be obligated to advance any and all reasonable Expenses incurred by the Protected Parties in connection with any proceeding within 30 days after the receipt by the PCT of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any proceeding. Such advances (i) shall be unsecured and interest free; (ii) shall be made without regard to the Protected Parties' ability to repay the advances and without regard to the Protected Parties ultimate entitlement to indemnification under the other provisions of this Agreement; and (iii) shall include any and all reasonable Expenses incurred pursuing an action to enforce this right of advancement, including preparing and forwarding statements to the PCT to support the advances claimed. The Protected Parties shall be liable to repay any Expenses so advanced only if and to the extent the applicable underlying liability is determined not to be an indemnified liability under this Agreement or the Plan.

(c)  Insurance.  In the event that the errors and omission/directors and officers insurance procured for the benefit of the PCT Representative as of the formation of the PCT is not renewed on or before its expiration or renewal date on substantially comparable terms as that in place as of the date hereof (or as of the date a PCT Representative has assumed office), the PCT Representative (including any former PCT Representative) shall have the right to request the PCT to purchase a "tail" with respect to the expired or non-renewed policy, covering the entire period of such individual's service and extending for up to 6 years following the termination date of the policy, and the PCT shall be required to comply with any such request. The cost of acquiring such tail coverage shall be entitled to priority as a cost and expense of the PCT under the first paragraph of Section 4.4. If adjudged reasonably necessary by such requesting PCT Representative (or former PCT Representative) in order to comply with any deadline for the purchase of such tail coverage, the PCT Representative (or any institution employing such individual) may advance the cost of acquiring such coverage, and the PCT shall be obligated to reimburse any such expense within 10 days of demand therefore. Such reimbursement obligation shall constitute an "Expense", for purposes of the first paragraph of Section 4.4; provided, that during any period that any such request for reimbursement of the cost of securing tail coverage remains outstanding and is unpaid, no amounts shall be distributed by the PCT with respect to any claim of lesser priority under Section 4.4.

1.15  Termination.  The duties, responsibilities and powers of the PCT Representative will terminate on the date the PCT is dissolved under applicable law in accordance with this

Agreement or the Plan, or by an Order of the Bankruptcy Court or entry of a final decree closing the Chapter 11 Cases; provided that Sections 1.9, 1.10, 1.13 and 1.14 above shall survive such termination, dissolution and entry.

1.16   <u>No Bond</u>.  The PCT Representative shall serve without bond.

1.17   <u>Confidentiality</u>.  The PCT Representative shall, during the period that he serves as PCT Representative under this Agreement, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the PCT Assets relate or of which he has become aware in his capacity as PCT Representative.

## ARTICLE II

## ESTABLISHMENT OF THE PCT

2.1   <u>Transfer of Assets to the PCT</u>.  Pursuant to the Plan, on the Effective Date or as soon as practicable thereafter, the Debtors, the Reorganized Debtors and Core-Mark Newco, as applicable, shall transfer, assign and deliver to the PCT, free and clear of all liens but subject to the liabilities in the next sentence, title to all PCT Assets for the benefit of the Holders of Allowed Class 6 Claims (collectively, the "Beneficiaries").  The PCT will also make payments to Holders of Allowed Administrative Claims, Priority Tax Claims, Other Priority Non-Tax Claims, Property Tax Claims, Other Secured Claims, PACA/PASA Claims, and Convenience Claims solely in satisfaction of liabilities assumed by the PCT and such Claim Holders shall not be treated as beneficiaries of the PCT for any purpose.  The PCT will also make payments to Core-Mark Newco and the RCT as provided in Section 4.4 hereof.  Upon the transfer of the PCT Assets to the PCT, the Debtors shall have no interest in or with respect to the PCT Assets.  The PCT Assets do not include any RCT Assets.  Subject to the preceding exclusion of all RCT Assets, the PCT Assets shall consist of all of the following assets of the Debtors:

(a)   cash balances sufficient to pay the estimated Allowed Administrative Claims that are the responsibility of the PCT;

(b)   non-reclamation trade accounts receivable including, but not limited to, credits for post-petition deductions, other than the pre-petition and post petition trade accounts receivable and post-petition deductions of Fleming Convenience;

(c)   royalty payments owing to the Debtors related to the sale of the Fleming wholesale operations;

(d)   Litigation Claims which consist primarily of vendor-related receivables, primarily for uncollected promotional allowances (e.g. rebates, discounts, price reductions), unreimbursed funds related to military receivables and funds wired in advance for inventory for which invoices were not processed and inventory not shipped, but not including vendor deductions incurred in the ordinary course of business of Fleming Convenience, which shall remain with Core-Mark Newco;

(e)   Avoidance Actions, especially preference actions as outlined in section 547 of the Bankruptcy Code;

9

(f)      restricted cash, including the PACA account, the FSA Reserves and the Professional Fee Escrow Account but not including any Insurance Security or other deposits posted as security for insurance obligations which Insurance Security and deposits shall be transferred to Core-Mark Newco;

(g)      any and all other Claims and Causes of Action of the Debtors, including but not limited to those outlined in Article VI of the Plan, Exhibit A to the Plan and Article VII of the Disclosure Statement, other than Causes of Action related to the fire loss at the Denver warehouse occurring in December, 2002 and Causes of Action against Ace related to Insurance Security and Ace's draw of letter's of credit related thereto which shall be transferred to Core-Mark Newco, and other than claims and Causes of Action waived, exculpated or released in accordance with the provisions of the Plan;

(h)      any assets of the RCT referred or assigned to the PCT, whether vendor deductions, preference claims or otherwise (on terms that have been mutually agreed upon by the RCT and the PCT);

(i)      any cash proceeds of settlements for customer accounts receivables, vendor deductions, over-wires and preferences (exclusive of those related to either Fleming Convenience or the RCT Assets) in excess of $9 million which were collected by the Debtors from April 1, 2004 to the Effective Date which are being held in an escrow account;

(j)      $3.0 million in cash for administration of the PCT;

(k)      any distributions from the RCT in accordance with Section VII.E of the Revised Term Sheet; and

(l)      all of the remaining assets of the Debtors, other than the assets of the Reorganized Debtors and the assets of Fleming Convenience which will have been transferred to Core-Mark Newco and the Reorganized Debtors.

The PCT Assets do not include:  (1) any of the RCT Assets; (2) any of the assets of Fleming Convenience which are to be transferred to Core-Mark Newco and the Reorganized Debtors; or (3) the stock of Core-Mark Newco and the stock of the Reorganized Debtors.

The PCT Assets shall be held by the PCT in trust for the Beneficiaries, subject to the terms and conditions of the Plan and this Agreement.

The PCT shall administer the directors and officers insurance policies maintained pursuant to section XII.D. of the Plan and all proceeds of such policies shall benefit the D&O Releasees and the prepetition directors and officers of the Debtors who are covered by the directors and officers insurance policies, as well as the PCT to the extent the PCT or other party has a valid Claim against a D&O Releasee or a prepetition director or officer of the Debtors who is covered by the directors and officers insurance policies.

2.2      Title to Assets.  For all federal income tax purposes, all parties (including, without limitation, the Debtors, the PCT, the PCT Representative, and the Beneficiaries) shall treat the transfer of

10

the PCT Assets by the Debtors to the PCT, as set forth in section 2.1, as a transfer to the Beneficiaries followed by a transfer by the Beneficiaries to the PCT. Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

2.3    <u>Assignment and Assumption of Liabilities</u>.  In accordance with the provisions of Section 2.1 hereof, the Debtors hereby transfer and assign, and the PCT hereby assumes and agrees that all PCT Assets will be transferred to the PCT for the benefit of the Beneficiaries but subject to the payment of the Claims set forth in the second sentence of Section 2.1.

2.4    <u>Valuation of Assets</u>.  As soon as practicable after the Effective Date, the PCT Representative shall apprise the Beneficiaries of the value of the PCT Assets by filing such valuation with the Bankruptcy Court in form and substance reasonably acceptable to the PCT Board and by sending to the Beneficiaries notice of their applicable shares of such value as soon as practicable.  The valuation shall be used consistently by all parties (including the Debtors, the PCT Representative and the Beneficiaries) for federal income tax purposes only.  The Limitation of Liability provision of Article 1.9 herein and Exculpation and Indemnification provisions of Article 1.14 herein shall specifically apply to such valuation without the need for fully setting forth such provisions herein.

2.5    <u>Post-Confirmation Trust Advisory Board</u>.

(a)    <u>Board Members</u>.  The PCT Advisory Board ("the PCT Board") shall be formed on the Effective Date of the Plan or as soon as practicable thereafter and shall consist of the following initial four members <u>plus</u> the PCT Representative:

(i)    Two members to be designated by Core-Mark Newco (the "Core-Mark Members"), each of whom shall (1) be a member of the Board of Directors of Core-Mark Newco, (2) not be or have been an officer or employee of the Debtors or Core-Mark Newco, and (3) not be a Holder (or an employee, agent or representative of a Holder) of a Claim against the Debtors;

(ii)    One member to be designated by the members of the Committee other than the trade members and the PBGC (the "Bondholder Member), who shall be a Bondholder (or representative of a Bondholder) that (i) received or shall be entitled to receive equity securities in Core-Mark Newco as a result of distributions or anticipated distributions of such equity securities to Holders of Class 6(A) Claims under the Plan, (ii) when designated, holds in excess of 3.5% or greater of the total outstanding equity securities of Core-Mark Newco, and (iii); thereafter does not hold less than 2% of the total outstanding equity securities of Core-Mark Newco; and

(iii)    One member to be designated by the trade members of the Committee and the OCRC (the "Trade Creditor Member"), who, when designated and thereafter, shall be a Holder (or a representative of a Holder) (i) of a Class 6(A) Claim other than with respect to the Old Notes, (ii) against which there is not pending (or against which the Debtors, the RCT or the PCT do not reasonably

11

contemplate bringing) a Cause of Action other than in connection with an RCT Asset or resolution of a Reclamation Claim.

(b)     Delegation to the PCT Representative.  The PCT Board shall establish the scope and parameters of discretion of the PCT Representative.  The PCT Representative shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction to which the PCT Board has consented or which is within the scope and parameters of the authority delegated to the PCT Representative hereunder.

(c)     Reliance by the PCT Board.

(i)     the PCT Board may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties;

(ii)     the PCT Board may consult with legal counsel, financial or accounting advisors and other professionals to be selected by them and the PCT Board shall not be liable for any action taken or omitted to be taken by them in accordance with the advice thereof; and

(iii)     persons dealing with the PCT Board shall look only to the PCT Assets to satisfy any liability incurred by the PCT Board to such person in carrying out the terms of this Agreement or the Plan and the PCT Board shall have no personal obligation to satisfy any such liability.

(d)     PCT Board Bylaws.  The PCT Board shall adopt its own bylaws, provided that such bylaws shall contain the following provisions and other provisions not inconsistent with this Agreement:

(i)     If, for any reason, a Core-Mark Member of the PCT Board resigns from, or ceases to be qualified to be a member of, the PCT Board or dies, Core-Mark Newco shall select a successor to that Core-Mark Member meeting the requirements in (a)(i) above.

(ii)     If for any reason the Bondholder Member resigns from, or ceases to be qualified to be a member of, the PCT Board or dies, a new Bondholder Member meeting the requirements of (a)(ii) above shall be selected by the remaining members of the PCT Board as the successor to the Bondholder Member.

(iii)     If for any reason the Trade Creditor Member resigns from, or ceases to be qualified to be a member of, the PCT Board or dies, a new Trade Creditor Member shall be selected by the remaining members of the PCT Board and as agreed to by the RCT Board as the successor to the Trade Creditor Member.

(e)  Requisite Vote. The PCT Representative shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction to which the PCT Board has consented. The PCT Board shall be deemed to have consented to a proposed action or inaction by the PCT Representative if the majority of the PCT Board members provide their written consent. With respect to any litigation directly or indirectly (including, but not limited to, by way of employment) involving any member of the PCT Board, such PCT Board member(s) shall recuse himself from any decision affecting such litigation. For purposes of this Agreement, the PCT Board is conclusively deemed to have consented to any action or inaction taken by the PCT Representative within the scope and parameters of the authority delegated to the PCT Representative as outlined in section 2.5(b) herein.

(f)  Reporting. The PCT Representative shall submit such reports to the PCT Board as the PCT Board deems reasonable , including, without limitation, reports on the commencement and prosecution of Causes of Action and the proceeds of liquidation of the PCT Assets. The PCT Representative upon reasonable request, shall also provide a copy of any report it submits to the PCT Board to the RCT Board.

(g)  Compensation and Expense Reimbursement. The PCT shall compensate each member of the PCT Board (other than the PCT Representative, whose compensation is governed by section 1.13) for the time spent by the member on the business of the PCT, at rates to be determined from time-to-time by the PCT Board; provided that, if the members of the PCT Board who are members of the Board of Directors of Core-Mark Newco are paid for their services on the PCT Board by Core-Mark Newco, they shall not also be paid by the PCT. In addition, the PCT shall reimburse each member of the PCT Board for the actual out-of-pocket expenses related to the PCT Board activities incurred by such member, including without limitation, necessary travel, lodging, postage, telephone and facsimile charges upon receipt of periodic billings.

(h)  All amounts payable pursuant to the above paragraph (g) shall be paid from the PCT Assets. If the cash in the PCT shall be insufficient to effect such reimbursement, then the PCT Representative is hereby authorized to reduce to cash that portion of the PCT Assets necessary to effect such reimbursement.

(i)  Exculpation. From and after the Effective Date, the PCT Board members and their professionals and representatives (or their designees) (in such capacities) shall be and hereby are exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such members by the Plan or any Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except only for actions or omissions to act only to the extent determined by a Final Order to be due to their own respective gross negligence or willful misconduct after the Effective Date. No holder of a Claim or other party in interest will have or be permitted to pursue any claim or cause of action against the PCT Board members or their respective professionals or representatives (in such capacities) for making a decision, casting a vote or taking an

13

action which they believe in good faith to be consistent with implementing the provisions of this Agreement or the Plan.

(j)    Indemnification. The PCT shall indemnify, defend and hold harmless the PCT Board members and former PCT Board members (in such capacities) and their professionals and representatives, including those engaged on behalf of the PCT (the "Indemnitees"), from and against any and all claims, causes of action, liabilities, obligations, losses, damages or reasonable expenses (including attorneys' fees of reasonably retained counsel, and which attorneys fees of such reasonably retained counsel shall include the fees and costs of counsel to any individual PCT Board member or former PCT Board member who retains separate counsel)(the "Expenses") (other than those determined by a Final Order to be due their own respective fraud, gross negligence or willful misconduct after the Effective Date and solely to the extent so attributable) to the fullest extent permitted by applicable law. Any action taken or omitted to be taken with the approval of the Bankruptcy Court will conclusively be deemed not to constitute fraud, gross negligence or willful misconduct or otherwise to constitute breach of any duty under applicable law or this Agreement. Notwithstanding any provision of this Agreement to the contrary, the PCT shall be obligated to advance any and all reasonable Expenses incurred by the Indemnitees in connection with any proceeding within 30 days after the receipt by the PCT of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any proceeding. Such advances (i) shall be unsecured and interest free; (ii) shall be made without regard to the Indemnitee's ability to repay the advances and without regard to the Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement; and (iii) shall include any and all reasonable Expenses incurred pursuing an action to enforce this right of advancement, including preparing and forwarding statements to the PCT to support the advances claimed. The Indemnities shall be liable to repay any Expenses so advanced only if and to the extent the applicable underlying liability is determined not to be an indemnified liability under this Agreement.

(k)    Insurance. In the event that the errors and omission/directors and officers insurance procured for the benefit of, inter alia, the PCT Board members as of the formation of the PCT is not renewed on or before its expiration or renewal date on substantially comparable terms as that in place as of the date hereof (or as of the date such PCT Board member assumed office), each PCT Board member (including any former PCT Board member) shall have the right to request the PCT to purchase a "tail" with respect to the expired or non-renewed policy, covering the entire period of such individual's board membership and extending for up to 6 years following the termination date of the policy, and the PCT shall be required to comply with any such request. The cost of acquiring such tail coverage shall be entitled to priority as a cost and expense of the PCT under the first paragraph of Section 4.4. If adjudged reasonably necessary by such requesting PCT Board member (or former PCT Board member) in order to comply with any deadline for the purchase of such tail coverage, the applicable requesting PCT Board member (or any institution employing such individual) may advance the cost of acquiring such coverage, and the PCT shall be obligated to reimburse any such expense within 10 days of demand therefore. Such reimbursement obligation shall constitute an "Expense", for purposes of the first paragraph of Section 4.4; provided, that during any

14

period that any such request for reimbursement of the cost of securing tail coverage remains outstanding and is unpaid, no amounts shall be distributed by the PCT with respect to any claim of lesser priority under Section 4.4.

## ARTICLE III

### BENEFICIARIES

3.1    Identification of Beneficiaries.  In order to determine the actual names, addresses and tax identification numbers of the Beneficiaries, the PCT shall be entitled to conclusively rely on the names, addresses and tax identification numbers set forth in the Debtors' Schedules, filed proofs of claim or ballots cast with respect to the Plan.  To the extent tax identification numbers of Beneficiaries are unknown, the PCT shall take whatever action is reasonably necessary to contact the Beneficiaries in order to obtain such tax identification numbers.  Each Beneficiary's right to distribution from the PCT, which is dependent upon such Beneficiary's classification under the Plan, shall be that accorded to such Beneficiary under the Plan.  Each distribution by the PCT to the Beneficiaries shall be made in accordance with the terms set forth herein.

## ARTICLE IV

### PURPOSE, AUTHORITY, LIMITATIONS, AND DISTRIBUTIONS

4.1    Purpose of the PCT.  The PCT shall be established for the primary purpose of liquidating its assets, in accordance with Treasury Regulation Section 301.770 1-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the PCT.  Accordingly, the PCT shall, in an expeditious but orderly manner, liquidate and convert to cash the PCT Assets, make timely distributions and not unduly prolong the duration of the PCT.  The liquidation of the PCT Assets may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise.

4.2    Resolution of PCT Assets by the PCT Representative.

(a)    The PCT Representative shall be empowered to and may take all appropriate action with respect to the prosecution, settlement or other resolution of the PCT Assets consistent with the Plan, this Agreement and section 2.5(b) herein.  The PCT Representative shall deal with all collections and settlements within the normal course of his duties.

(b)    Notwithstanding anything contained in this Agreement or the Plan to the contrary, the PCT Representative may, but is not required to, submit a proposed settlement to the Bankruptcy Court or such other court of competent jurisdiction for its approval.

4.3    Books and Records.  The PCT shall maintain books and records relating to the PCT Assets, the income of the PCT and the payment of expenses of, and liabilities of and claims against or assumed by the PCT in such detail and for such period of time as may be necessary to

15

enable it to make full and proper accounting in respect thereof in accordance with Article VII hereof and to comply with applicable provisions of law. Except as provided in Section 7.1 hereof, nothing in this Agreement requires the PCT to file any accounting or seek approval of any court with respect to the administration of the PCT, or as a condition for making any payment or distribution out of the PCT Assets. Beneficiaries or Core-Mark Newco shall have the right, upon thirty (30) days' prior written notice delivered to the PCT Representative, to inspect such books and records, provided that, if so requested, such Beneficiary or Core-Mark Newco shall have entered into a confidentiality agreement satisfactory in form and substance to the PCT Representative.

4.4    <u>Application of PCT Assets</u>.  The PCT shall apply all PCT Assets, and any proceeds therefrom, in the order and reflecting the priorities set forth below:

FIRST, to pay all the costs and expenses of the PCT including, without limitation, advancing reasonable Expenses of the Protected Parties and the PCT Representative in Section 1.14(b) and (c) and advancing the reasonable Expenses of Indemnitees as provided in Section 2.5(j) and (k); the compensation of the PCT Representative and reimbursement of the PCT Representative for any and all costs, expenses and liabilities incurred by him in connection with the performance of his duties under this PCT Agreement, as well as the costs of the PCT Board members as set forth herein;

SECOND, to the Holders of Allowed Administrative Claims, Priority Tax Claims, Class 1(A) Claims, Class 1(B) Claims, Class 3(A) Claims, Class 4 Claims and Class 7 Claims;

THIRD, to Core-Mark Newco, in the amount necessary to reimburse Core-Mark Newco for any payments made on the TLV Guaranty or Non-TLV Guaranty;

FOURTH, to the RCT, in the event all Allowed Reclamation Claims and interest thereon, as applicable, together with the Prepetition Non-TLV Reclamation Claim Reduction have not been paid in full by the RCT;

FIFTH, to Core-Mark Newco in the amount necessary to reimburse Core-Mark Newco for any payments made on the Administrative Claims Guaranty in the event the Allowed Reclamation Claims and the Prepetition Non-TLV Reclamation Claim Reduction have been paid in full by the RCT; and

SIXTH, to the extent there are any excess proceeds after the Claims and obligations specified in the SECOND through FIFTH paragraphs above have been satisfied in full, to the Holders of Allowed Class 6(A) Claims and Class 6(B) Claims, pro rata.

Notwithstanding anything to the contrary in this Section 4.4, prior to making any distribution pursuant to the SECOND through FIFTH clauses of the previous paragraph, the PCT Representative may retain such amounts (i) as are necessary to meet contingent liabilities and to maintain the value of the PCT Assets, (ii) to pay estimated expenses of administration (including

any taxes imposed on the PCT or in respect of the PCT Assets, and (iii) to satisfy other liabilities incurred or assumed by the PCT (or to which the assets are otherwise subject), all for the term of the PCT and in accordance with this Agreement or the Plan; provided, however, that, from the net amount distributable, the PCT Representative shall reserve, in accordance with the provisions of Section 6.1 hereof, such amounts as would be distributable in respect of Disputed Claims (treating such Claims for this purpose, as if they were Allowed Claims).

Until all Allowed Reclamation Claims as described in the FOURTH clause of the first paragraph of this Section 4.4 are satisfied, the PCT shall distribute to the RCT commencing June 30, 2005 and thereafter at the end of each January and June any cash held by the PCT in excess of (i) unpaid costs and expenses described in the FIRST clause of the first paragraph and reasonable reserves for future such costs and expenses, (ii) unpaid Allowed Claims described in the SECOND clause of the first paragraph and reasonable reserves for such Claims that are Disputed, and (iii) unpaid reimbursement to Core-Mark Newco described in the THIRD clause of the first paragraph.

The PCT hereby grants to the PCT Representative and the PCT Board a first-priority lien on and security interest in the PCT Assets to secure the payment of all amounts owed to, accrued or reserved on account of the PCT Representative or the PCT Board or to be retained by the PCT Representative hereunder or otherwise due hereunder. The PCT agrees to take such actions and execute such documents as the PCT Representative and the PCT Board deem appropriate to perfect the PCT Representative's and the PCT Board's liens and security interests hereunder. The PCT Representative is authorized to execute and deliver all documents on behalf of the PCT and the PCT Representative to accomplish the purposes of this Agreement and the Plan.

4.5    Distribution and Withholding.  Subject to the provisions of Section 4.4 hereof, the PCT shall distribute to the Beneficiaries all net cash income plus all net cash proceeds from the liquidation of the PCT Assets (including as cash for this purpose, all cash equivalents) at such time intervals as decided by the PCT Representative in accordance with the terms of the Plan, provided that the PCT shall make distributions no less frequently than on an annual basis, except that the PCT may retain an amount of net cash proceeds or net cash income reasonably necessary to maintain the value of the PCT Assets or to meet claims and contingent liabilities (including Disputed Claims).

4.6    Compliance with Laws.  Any and all distributions of PCT Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

## ARTICLE V

### SUCCESSOR PCT REPRESENTATIVE

5.1    Removal.  The PCT Representative may be removed by the PCT Board.

5.2    Resignation.  The PCT Representative may resign by giving not less than thirty (30) days' prior written notice thereof to the PCT Board.

5.3    Acceptance of Appointment by Successor PCT Representative.  Any successor PCT Representative shall be chosen by the PCT Board or, if the PCT Board fails to timely appoint such successor, the Bankruptcy Court.  Any successor PCT Representative appointed hereunder shall execute an instrument accepting such appointment and shall file such acceptance with the PCT records.  Thereupon, such successor PCT Representative shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of his predecessor in the PCT with like effect as if originally named herein; provided, however, that a removed or resigning PCT Representative shall, nevertheless, when requested in writing by the successor PCT Representative, execute and deliver an instrument or instruments conveying and transferring to such successor PCT Representative under the PCT all the estates, properties, rights, powers, and trusts of such predecessor PCT Representative.  Any Successor PCT Representative shall not be liable or responsible in any way for the acts or defaults of any predecessor PCT Representative, nor for any loss or expense occasioned by any act by or omission of a predecessor PCT Representative, and shall be liable only for his own acts and omissions with respect to the PCT Assets.

5.4    Survival of Rights.  In the event of the removal or resignation of the PCT Representative as outlined herein, the provisions of Sections 1.9, 1.10, 1.13 and 1.14 above shall remain applicable and survive such removal or resignation.

## ARTICLE VI

## DISPUTED CLAIM RESERVE

6.1    Disputed Claim Reserve.  The PCT Representative shall maintain, in accordance with the PCT Representative's powers and responsibilities under the Plan and this Agreement, a reserve for any distributable amounts required to be set aside on account of Disputed Claims.  Such amounts (net of any expenses, including any taxes, of the escrow relating thereto) shall be distributed, as provided herein and in the Plan and shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.   The PCT will pay taxes on the taxable net income or gain allocable to holders of Disputed Claims on behalf of such holders, if applicable, and, when the Disputed Claims are ultimately resolved, Holders whose Disputed Claims are determined to be Allowed Claims will receive distributions from the PCT net of taxes which the PCT had previously paid on their behalf.

18

## ARTICLE VII

## REPORTING

7.1     Annual Report.  To the extent required by applicable law or the Plan, as soon as practicable following the end of each calendar year, and as soon as practicable upon termination of the PCT, the PCT Representative shall submit to the Bankruptcy Court a written report including financial statements of the PCT at the end of such calendar year or period and the receipts and disbursements of the PCT for such period.

7.2     Federal Income Tax.

(a)     Grantor Trust Status.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the PCT of a private letter ruling if the PCT so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the PCT), the PCT Representative shall file returns for the PCT as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b)     Allocations of PCT Taxable Income.  Subject to the provisions of Section 7.2(a) hereof, allocations of PCT taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the PCT had distributed all of its other assets (valued for this purpose at their tax book value) to Beneficiaries (treating any holder of a Disputed Claim, for this purpose, as a current Beneficiary entitled to distributions), taking into account all prior and concurrent distributions from the PCT (including all distributions held in reserve pending the resolution of Disputed Claims).  Similarly, taxable losses of the PCT will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining PCT Assets.  The tax book value of the PCT Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the PCT, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

7.3     Other.  The PCT Representative shall also file (or cause to be filed) any other statements, returns or disclosures relating to the PCT that are required by any governmental unit and serve upon the Beneficiaries such forms as required by applicable law.

## ARTICLE VIII

## TRANSFER OF BENEFICIARY'S INTERESTS

8.1     Transfer of Beneficial Interests.  The interests of the Beneficiaries in the PCT, which are reflected only on the records of the PCT maintained by the PCT Representative, are not negotiable and shall be transferable after written notice to the PCT Representative only by operation of law.  The PCT Representative shall not be required to record any transfer in favor of

19

any transferee which, in the sole discretion of the PCT Representative, is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the PCT. Until a transfer is in fact recorded on the books and records maintained by the PCT Representative for the purpose of identifying Beneficiaries, the PCT Representative, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Beneficiaries, as though it has no notice of any such transfer, and in so doing the PCT Representative shall be fully protected and incur no liability to any purported transferee or any other Entity.

## ARTICLE IX

## TERMINATION OF PCT

9.1     <u>Termination of PCT</u>.  The PCT will terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, on or prior to the date six (6) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest (including the RCT), may extend the term of the PCT for a finite period if it is necessary to the liquidating purpose of the PCT. Multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least six (6) months prior to the expiration of each extended term; provided, however, that the PCT receives a favorable opinion of counsel or ruling from the IRS stating that any further extension would not adversely affect the status of the trust as a grantor trust for federal income tax purposes. The PCT Representative shall not unduly prolong the duration of the PCT and shall at all times endeavor to resolve, settle or otherwise dispose of any claims that constitute PCT Assets and to effect the distribution of the PCT Assets to the Beneficiaries in accordance with the terms hereof and terminate the PCT as soon as practicable consistent with the purposes of this Agreement. Prior to and upon termination of the PCT, the PCT Assets will be distributed to the Beneficiaries in accordance with their distribution rights under the Plan, subject to the provisions set forth herein. If any distributions of the PCT are not duly claimed, such distributions will be disposed of in accordance with the Plan. Notwithstanding anything contained herein to the contrary, if the value of the PCT Assets is less than $250,000 at any given time, the PCT Representative with the consent of the PCT Board may contribute such assets to the charity of his choosing.

## ARTICLE X

## PRESERVATION AND ASSERTION OF PRIVILEGE

10.1     <u>Preservation and Assertion of Privilege</u>.  In connection with the assets and liabilities of the PCT, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the PCT, shall vest in the PCT and its representatives, and the Debtors and the PCT Representative are authorized to take all necessary actions to effectuate the transfer of such privileges.

10.2     <u>Joint Prosecution and Defense Privilege Between RCT and PCT</u>.  The RCT and the PCT share a mutuality of interest in the reconciliation and determination of the assets of each entity and in the satisfaction of the obligations of each entity as outlined in the Plan, this

20

Agreement, the PCT Agreement, the RCT Agreement and the TSA. In various circumstances, the RCT and the PCT through their Representatives and agents may jointly investigate, develop facts and coordinate legal strategies with respect to the pursuit of their own respective Causes of Action in order to perform and satisfy their respective obligations. These common interests will be advanced by the exchange of information between the RCT and the PCT and by, in certain circumstances, sharing privileged information and materials and attorney-work product including information shared with the PCT Representative from the date of execution of the Engagement Letter (the "Privileged Information"). Both the RCT and the PCT have mutual interests in protecting the confidentiality of the Privileged Information shared between them.

(a)     The RCT and the PCT intend to preserve protections afforded the Privileged Information and to avoid any waiver or suggestion that there has been a waiver of such protection by virtue of any exchange of the Privileged Information between them.

(b)     The RCT and the PCT believe that such exchanges of information are within the scope of applicable attorney-client privilege and work product doctrines including the common-interest attorney-client privilege.

(c)     Accordingly, the RCT and the PCT agree that they and their respective counsel may share Privileged Information on the understanding and agreement that:

(i)     Privileged Information contains confidential and privileged communications,

(ii)     Privileged Information contains work product and investigation materials which are privileged, and

(iii)     In accordance with applicable legal standards, certain exchanges may be made of Privileged Information concerning issues about which the exchanging parties believe they share a common interest.

(d)     By entering into this arrangement, the PCT, based on a reciprocal commitment by the RCT in the RCT Agreement, agrees to waive any right to contest the designation of any Privileged Information provided to it and designated as such by the RCT.

(e)     It is the intention and understanding of the RCT and the PCT that the exchange of such Privileged Information will not constitute a waiver of any applicable privilege or protection from disclosure.

(f)     The PCT agrees it shall not provide any Privileged Information furnished from the RCT to any other person without the prior consent of the RCT.

(g)     If any third party or entity requests or demands, by subpoena or otherwise, any Privileged Information provided by the RCT, the PCT will immediately notify the RCT.

(h)    The PCT agrees to undertake all necessary and/or appropriate actions to assert all applicable rights and privileges with respect to the Privileged Information provided by the RCT and, in the event that production is requested by a third party, to give reasonable notice to the RCT to afford it an opportunity to object to such disclosure.

(i)    Nothing herein precludes the PCT from pursuing independently any such matter, including such as reflected in the Privileged Information, or disclosing at its discretion to a third party, information which is developed independently of Privileged Information provided by the RCT.

(j)    Nothing herein is intended to or shall be deemed to create an attorney-client relationship between counsel for the RCT and the PCT or vice versa.

10.3    The RCT or the PCT may withdraw from this arrangement for Privileged Information on ten days' prior written notice but any such withdrawal will be on a prospective basis and any Privileged Information made available by the RCT prior to such withdrawal shall be continued to be governed by the terms herein.

## ARTICLE XI

## AMENDMENT AND WAIVER

11.1    Amendment and Waiver.  Any provision of this Agreement may be amended or waived without the approval of the Bankruptcy Court so long as such amendment or waiver is not inconsistent with the purpose and intent of the Plan and is agreed to by the PCT Board, provided, however, that no change shall be made to this Agreement that would adversely affect the federal income tax status of the PCT as a "grantor trust" (in accordance with Section 7.2 hereof); and provided, further that no amendment to Section 4.4 or 2.5 that adversely affects any former PCT Board member (including by expanding the claims entitled to priority or pai passu treatment with the indemnification and Expense reimbursement claims of such persons) shall be effected without the consent of such individual.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    Intention of Parties to Establish Grantor Trust.  This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

12.2    Cooperation.  The Debtors shall provide the PCT Representative with copies of such of their books and records as the PCT Representative shall reasonably require for the purpose of performing his duties and exercising his powers hereunder.

12.3    Prevailing Party.  If the PCT is the prevailing party in a dispute regarding the provisions of this Agreement or the enforcement thereof, the PCT shall be entitled to collect any and all costs, expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

12.4    Laws as to Construction.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of Law.

12.5    Severability.   If any provision of this Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

12.6    Notices.   Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended at such address as set forth below or such other address as filed with the Bankruptcy Court:

If to the Debtors, the Committee, the PCT or the PCT Representative:

Castellammare Advisors, LLC
232 Quadro Vecchio Drive
Pacific Palisades, CA  90272
Attention:     Robert Kors
Fax:    310-459-4592
Telephonic Confirmation:     310-454-6867

and

AlixPartners
2100 McKinney Ave
Suite 800
Dallas, TX 75201
Attn: Michael Scott
Facsimile: (214) 647-7501

With a copy to:

| | |
|---|---|
| KIRKLAND & ELLIS LLP | MILBANK TWEED HADLEY & |
| James H. M. Sprayregen, P.C. | MCCLOY LLP |
| Janet S. Baer | Paul S. Aronzon |
| 200 East Randolph Drive | Dennis F. Dunne |
| Chicago, IL 60601-6436 | One Chase Manhattan Plaza |
| Telephone:  (312) 861-2000 | New York, NY  10005 |
| Facsimile:  (312) 861-2200 | (212) 530-5000 |
| | |
| and | and |

23

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones
Christopher H. Lhulier
Ira D. Kharasch
919 North Market Street,
Sixteenth Floor, P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier No. 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

PEPPER HAMILTON LLP
I. William Cohen
Robert S. Hertzberg
100 Renaissance Center
Suite 3600
Detroit, MI 48243-1157
(313) 259-7110

Co-Counsel for the Official Committee of Unsecured Creditors

12.7    Notices to a Beneficiary.  Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended to the name and address set forth on the Debtors' Schedules or such Beneficiary's proof of Claim, such other notice filed with the Bankruptcy Court and the PCT or such other means reasonably calculated to apprise the Beneficiary.

12.8    Headings.  The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

24

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers as of the date first above written.

Fleming Companies, Inc.

By: _____

      Michael Scott
      Acting Treasurer


Official Committee of Unsecured Creditors

By: _____
Title: _____


Post Confirmation Trust Representative

By: _____

      Robert A. Kors
      Principal
      Castellammare Advisors, LLC

24

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers as of the date first above written.

Fleming Companies, Inc.

By:_____
          Michael Scott
          Acting Treasurer


Official Committee of Unsecured Creditors

By:_____
Title: Co - Chairperson


Post Confirmation Trust Representative

By:_____
          Robert A. Kors
          Principal
          Castellammare Advisors, LLC

**EXHIBIT A**

**TRANSITION SERVICES AGREEMENT**

**TRANSITION SERVICES AGREEMENT**

**between**

**the PCT**

**and**

**the RCT**

**Dated as of August 19, 2004**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (the "Agreement") dated as of August 19, 2004 is entered into between the PCT[1] and the RCT.

### WITNESSETH

A.     Fleming Companies, Inc. and certain of its subsidiaries (the "Debtors"), the Official Committee of Reclamation Creditors (the "OCRC") and the Official Committee of Unsecured Creditors (the "OCUC") have entered into that certain Revised Term Sheet dated as of May 3, 2004, to settle the outstanding issues among the parties with respect to the Debtors' and Official Committee of Unsecured Creditors' Third Amended and Revised Joint Chapter 11 Plan of Fleming Companies, Inc. and Its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code (the "Plan") and the treatment of Reclamation Claims under the Plan.

B.     Pursuant to the Plan, (i) the Debtors and the OCUC formed the PCT, (ii) the Debtors, the OCUC and the PCT Representative entered into the PCT Agreement, (iii) the Debtors, the OCUC and OCRC formed the RCT and (iv) the OCRC, the RCT Representative and the Debtors entered into the RCT Agreement.

C.     In order to facilitate the claims reconciliation process and collection of assets, the PCT and the RCT have agreed to enter into this Agreement whereby the PCT shall provide resources and services to the RCT and the parties will cooperate with each other in the provision of such resources and services.

D.     The PCT will hire or lease a number of employees including certain employees of the Debtors (collectively, the "Employees") in order to assist the PCT and the RCT in the performance of their respective duties.  Such Employees may be entitled now to certain compensation pursuant to the Fleming Wholesale Stay Program ("Existing Stay Pay") and may be offered by the PCT participation in an additional "stay pay program" (consisting of an additional stay bonus and may include additional severance vesting after the Effective Date) for work subsequent to the Effective Date of the Plan ("Post Effective Date Stay Pay").  In addition, the PCT will engage certain professionals (the "PCT Professionals") who shall perform certain services for the PCT and also manage and supervise the Employees in connection with the performance of their duties.

E.     The PCT and the RCT recognize that the necessary transition services and resources may be provided effectively to the RCT by the designation of certain Employees to perform the transition services and to use the employee expense of the Employees engaged in providing such transition services as a basis to allocate both direct costs and indirect costs of the PCT between the RCT and the PCT as appropriate in connection with actual work being performed by the Employees.  Furthermore, such designation provides an effective means for the

---

[1] Capitalized terms that are not defined in this Agreement that are defined in the Plan shall have the meanings given them in the Plan.

RCT to be able to coordinate the performance of the transition services to the RCT directly with those Employees engaged in providing such transition services.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## SERVICES AND RESOURCES TO BE PROVIDED

Section 1.1    Services and Resources.  During the Term (as defined in Section 5.1), the PCT shall make the PCT Professionals, the Employees, computer systems, data bases and other relevant information available to the RCT in order to provide the services and resources set forth on Exhibit A attached hereto, and such modified or additional services as may be agreed upon by the RCT and the PCT from time to time and set forth in written amendments to Exhibit A (collectively, the "Services") in accordance with the terms and conditions set forth in this Agreement.

Section 1.2    Identification of Employees Dedicated to Performance of Services.  All of the Employees projected to be hired or leased by the PCT are set forth on Exhibit B.  The PCT and RCT have agreed on an initial list of Employees (the "Dedicated Employees") who are anticipated to be dedicated to the performance of the Services as described on Exhibit B, hereto which identifies all projected Employees by name, location, work group, annual salary, the percentage of the Employee's work to be devoted to performance of the Services (the "Agreed Percentage") and certain other related information.  The RCT and PCT shall in good faith cooperate with each other to make adjustments in the identity of Employees and allocations set forth in Exhibit B as reasonable and appropriate for the completion of the duties of the RCT and the PCT.  The percentage of any Employee's work to be dedicated to the RCT cannot be changed except by RCT and PCT agreement.  Nevertheless, upon thirty (30) days' written notice, for any reason, and without the consent of the PCT, the RCT may direct that any Employee shall no longer serve as a Dedicated Employee and which shall terminate any RCT responsibility for such Employee's salary once the thirty (30) days' written notice has elapsed, except to the extent on the date of such notice the PCT is obligated to pay the Employee's salary for a longer period, in which case the RCT shall be responsible for the Agreed Percentage of such Employee's salary for such longer period.  In any case, upon a termination of any such Employee, the RCT shall be responsible for its Agreed Percentage of any Post Effective Date Stay Pay.  The parties agree that the employment agreements to be provided to the Employees who perform Services for the RCT shall not contain any longer than a 60-day termination notice prior to elimination of the Employee's salary.  The RCT shall have direct access, interaction and involvement with the Dedicated Employees as appropriate for the reasonable and efficient completion of the Services with the understanding that there shall be direct communication between the RCT Representatives and the Dedicated Employees.

2

## ARTICLE 2

## PERFORMANCE STANDARDS

Section 2.1    Performance and Quality.    The PCT shall cause the Services to be provided in a reasonable manner generally consistent with the manner and level of care with which similar services are provided by the Employees for the benefit of the PCT.  The parties recognize that the PCT does not provide any representations or warranties with respect to the services provided.  In the event the RCT is not reasonably satisfied with the Services performed by the PCT, the RCT shall have the option of terminating the Services as outlined in this Agreement.  In the event the Services are terminated due to a failure by the PCT to provide Services consistent with the first sentence of this Section 2.1, the RCT's damages shall be limited solely to the actual increase in costs the RCT reasonably incurs to have the Services performed by parties other than the PCT.  The RCT shall not be entitled any consequential or other damages resulting from such failure of the PCT to perform the Services.

## ARTICLE 3

## COST OF SERVICES

Section 3.1    Allocation of Costs.    The RCT shall reimburse the PCT for all costs outlined herein, solely as a pass-through of expense without any additional charges of any kind by the PCT.  The RCT shall be charged by the PCT for the Direct Costs and Indirect Costs as outlined below.  The Direct Costs and Indirect Costs are described as follows:

Section 3.2

(a)    Direct Costs

Employee expense:  The Agreed Percentage of actual expenses of the PCT for Dedicated Employees include salary, bonuses, the Post Effective Date Stay Pay (but not the Existing Stay Pay), benefits, taxes and other employee expenses incurred by the PCT in order to provide the Services to the RCT.  The Existing Stay Pay and the Post Effective Date Stay Pay are described on Exhibit C.

(b)    Indirect Costs

Indirect expenses incurred by the PCT in providing the Services include technology costs, rent, utilities, phones, document storage fees, and other similar indirect expenses including fees for PCT Professionals for work performed for management, supervision and/or coordination of Services by the Dedicated Employees (the "PCT Professional Supervision").  Such indirect costs shall be allocated as between the PCT and the RCT in identical proportion to the number of full time Employee equivalents providing Services to the PCT and RCT and not based on the cost of each such Employee's Services.  The RCT shall pay 30% of these indirect costs, calculated on a monthly basis, between the Effective Date and February 28, 2005.  If there is a material change in the PCT's or RCT's circumstances, the PCT and RCT shall work in good faith to adjust these charges as appropriate.  For payments of indirect costs after February 28, 2005, the PCT and RCT shall work together in good faith to agree on appropriate payments for

3

such indirect costs consistent with the methodology used to determine payments prior to that date.

Section 3.3    Services at No Charge.  Notwithstanding the foregoing, the RCT shall have no obligation to reimburse the PCT (a) for Indirect Costs for the first 3 months after the Effective Date of the Plan, and (b) up to an aggregate cap of $1 million, for (i) Direct Costs for the first six months after the Effective Date and (ii) Indirect Costs for months 4-6 after the Effective Date.  In addition, on the Effective Date, the Debtors and the OCUC shall, at their option, either: (i) have the Debtors provide to the RCT an additional $1 million for administrative expenses of the RCT or (ii) have the PCT provide the RCT with additional Direct Costs and Indirect Costs at no charge up to an additional cap of $1 million (collectively the "RCT Credit").  At the end of the first 3 months, the PCT and the RCT shall, on a good faith basis, negotiate what charges, if any, the RCT shall pay the PCT for PCT Professional Supervision based on the extent of PCT Professional Supervision expected after the first 3 months.

Section 3.4    Service Fees.  The prices charged by the PCT for the Services shall be the amount of Direct Costs and Indirect Costs in excess of the RCT Credit accrued by the PCT on a monthly basis.  Any charges for PCT Professionals (other than for PCT Professional Supervision) shall be made only if a specific request is issued by the RCT to the PCT for Services by the PCT Professionals.  The PCT shall render invoices to the RCT on a monthly basis outlining the costs of all Services.  An invoice shall be sent by the PCT for each month, including those months to which the RCT Credit applies.  Each invoice shall provide reasonable detail respecting the various components of the Direct Costs and Indirect Costs.  Each invoice shall be sent to the address provided in Section 7.6.  Any Service Fees billed by the PCT to the RCT in excess of the RCT Credit as outlined in Section 3.2 shall be paid promptly by the RCT.

Section 3.5    Suspension of Services for Non-Payment.  In addition to any other rights available to it at law or in equity, upon five (5) days' written notice to the RCT, the PCT may suspend the provision of all Services if the RCT has failed to pay an invoice for Service Fees in full within twenty (20) days of the invoice date.

Section 3.6    Payment Received.  The acceptance of payments by the PCT in an amount less than indicated on an invoice shall not be construed as an acceptance or agreement with the amount received.  The PCT may recover from the RCT the amount of any underpayment.  In addition, the PCT may supplement any invoice it renders for less than the full amount due with respect to Services.

Section 3.7    Sales Taxes.  The Service Fees may, if required by law, include any taxes including, without limitation, sales, use, excise, occupation, privilege, value-added or similar taxes ("Taxes").  The gross amount of any present or future Taxes arising in connection with the PCT's provisions of the Services to the RCT shall be included in calculating the amount of Service Fees, and the PCT shall indicate the amount of any Taxes on the applicable invoice.

## ARTICLE 4

## RELATIONSHIP OF THE PARTIES; COOPERATION

Section 4.1    Relationship of the Parties.  Nothing contained in this Agreement shall be construed to create any relationship of partnership or joint venture between the PCT and the RCT, and none of the parties shall represent to any third party that any relationship other than as described in this Agreement exists.  All Dedicated Employees and any PCT Professionals engaged in providing the Services to the RCT shall be regarded as direct, leased or engaged employees and professionals, as applicable, of the PCT (for purposes of all compensation and employee benefits if direct employees) and shall not be considered employees or professionals, as applicable, of the RCT.  To the extent such employees and professionals are direct or leased employees or engaged professionals of the PCT, they shall be under the direction, control and supervision of the PCT, and the PCT (as distinguished from the RCT) shall have the sole right and obligation to exercise all authority with respect to the employment and representation (including termination of employment or representation), assignment and compensation of such employees and professionals.  The PCT shall use reasonable efforts to have its employees and professionals reasonably cooperate and interact with the RCT and its representatives and agents as appropriate for the performance of the Services.  Notwithstanding the foregoing, it is understood that the RCT shall have direct access, interaction and involvement with the Dedicated Employees as appropriate for the reasonable and efficient completion of the Services with the understanding that there shall be direct communication between the RCT representatives and the Dedicated Employees.

Section 4.2    Cooperation.  Each of the parties shall in good faith cooperate with and provide assistance to the other consistent with the terms and conditions hereof to enable (i) the full performance of all obligations hereunder, (ii) the review and audit of books and administrative records as they relate to the provision of Services, and (iii) the RCT, or any of its affiliates or third party service providers, to assume the performance of any and all Services upon termination hereof (subject to the provisions of Section 5.2); such cooperation and assistance to include, without limitation, providing the other party, its representatives and its agents (including, without limitation, its outside auditors) with reasonable access, during normal business hours and upon reasonable advance notice, to its employees, representatives and agents and its books, administrative records, offices and properties relating to the Services.  The parties shall govern themselves using a reasonableness standard at all times.  Except as may be provided by Exhibit B for the Dedicated Employees, the PCT shall have no obligation to dedicate 100% of any or all of its Employees to RCT activities at any time, especially when PCT activities also require any or all of such Employees' services.  Instead the PCT shall provide the RCT with a reasonable level of service pursuant to the standards set forth in the first sentence of Section 2.1 consistent with also performing the tasks necessary to complete the necessary PCT activities.  Prior to the PCT changing the work location of any of the Dedicated Employees the PCT shall first notify the RCT.

Section 4.3    Retention of Employees; Use by RCT of PCT Professionals.  The PCT shall have no obligation to retain any specific Employee or professional for the purpose of performing the Services.  However, the PCT shall reasonably cooperate with the RCT in order for the PCT to retain the Dedicated Employees.  The PCT shall cooperate with the RCT in

providing adequate Employee support to provide these Services and an opportunity for the RCT to employ any such Employee after such Employee's services are no longer needed by the PCT, if such Employee chooses to be employed by the RCT. The RCT shall not be entitled to directly hire any of the PCT Professionals so long as such PCT Professionals are still performing work for the PCT. However, as outlined in Section 3.3 above, the RCT may request of the PCT that the PCT Professionals perform certain services for the RCT.

Section 4.4    PCT Administrative Records.    The PCT shall keep books and records regarding the provision of Services using substantially the same standards used by the PCT in keeping its own books and records. Following the cessation of the PCT's provision of any Services to the RCT and upon the RCT's request, the PCT shall retain such records regarding the provision of Services for a period of 12 months. The RCT, its agents and representatives shall have reasonable access during normal business hours and upon reasonable advance notice to such records from the date hereof through the end of the period for retaining such records pursuant to this Section. Any costs incurred by the PCT with respect to such record retention and with respect to providing the RCT such access, including Employee costs, shall be borne by the RCT.

Section 4.5    General Document Retention.    Subject to Section 4.4 herein, the PCT shall have the exclusive right to set document retention policies with respect to all documents held by the PCT consistent with any relevant bankruptcy court orders. In the event the PCT decides in its discretion to destroy any documents that may relate in any way to the RCT, the RCT Assets or the RCT Liabilities, it shall first notify the RCT and provide the RCT with an opportunity to take possession and control of such documents and maintain such documents, all at the RCT's expense.

Section 4.6    Access to Employee Testimony.    The PCT shall cooperate with the RCT in making the Employees and PCT Professionals available to the RCT, at the RCT's expense for the purpose of providing fact affidavits or testimony in connection with the RCT reconciliation process, collection of RCT Assets, and defense of RCT Liabilities. Neither the Employees nor the PCT Professionals, however, shall have any obligation to testify as experts on behalf of the RCT or to testify as to matters wherein the PCT and the RCT may have a dispute or conflict of interest with respect to such reconciliation, collection, or defense or the value of any assets or liabilities.

## ARTICLE 5

## TERM; TERMINATION OF SERVICES

Section 5.1    Term.

(a)    The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue for one year unless such Term is modified by mutual agreement of the parties or terminated pursuant to Section 5.2; provided that the PCT's obligation to provide any specific Service shall terminate when the PCT ceases providing that Service for itself or no longer retains or engages the Employees or PCT Professionals capable of providing the Services.

However, the PCT may not discontinue any Service to the extent provided by a Designated Employee devoting all of his or her work to the RCT.

(b)    Notwithstanding anything to the contrary in this Agreement, the provisions of Articles 6 and Sections 7.1, 7.2, 7.6, 7.7 and 7.9 shall survive any termination of this Agreement or the provision of Services hereunder.

Section 5.2    Termination of Services.    In addition to the right of the RCT to discontinue use of any Dedicated Employee as provided in Section 1.2 of this Agreement, the RCT, may at any time, upon one month's irrevocable written notice to the PCT, terminate all the Services; provided, however, that the RCT shall be obligated to continue to pay for its Agreed Percentage of the Direct Costs pursuant to Sections 1.2 and 3.2(a) and its share of the Indirect Costs pursuant to Section 3.2(b)(including those costs that extend beyond February 28, 2005) and the PCT shall use its reasonable efforts to terminate all costs to the RCT as soon as possible consistent with the provisions of Sections 1.2 and 3.2(a) and 3.2(b).    The provision of each Service pursuant hereto shall in any event terminate at the expiration of the Term unless the parties mutually agree to extend the Term, which extension request shall be made in writing at least one month prior to the expiration of the Term.    Upon termination of any Service, all administrative records relating to that Service as such records relate solely to the RCT, which have not already been transferred to the sole possession of the RCT, shall be so transferred, it being understood that the PCT may retain copies of such records.

## ARTICLE 6

## CONFIDENTIALITY

Section 6.1    Confidentiality.    The RCT and the PCT realize that some information received by one party from the other pursuant to this Agreement may be confidential ("Confidential Information"); provided that Confidential Information as to PCT Assets and Liabilities shall be Confidential Information of the PCT, not the RCT and Confidential Information as to RCT Assets and Liabilities shall be Confidential Information of the RCT, not the PCT.    It is therefore agreed that any such Confidential Information of a party received from it by the other party shall not be disclosed by the receiving party to any third party and shall not be used by the receiving party for any purposes other than those contemplated by this Agreement during the Term and for a period of three (3) years from and after the termination of this Agreement, unless the other party consents in advance in writing to such disclosure and/or use. The receiving party shall use the same degree of care with respect to the disclosing party's Confidential Information that it uses with respect to its own information which it intends to maintain proprietary and confidential.    The sharing of all Confidential Information shall be subject to the rights and duties of each of the RCT and PCT pursuant to Article 10.2 of the RCT Agreement and of the PCT Agreement, respectively, entitled Joint Prosecution and Defense Privilege Between RCT and PCT.    Nothing in this Agreement shall prevent the receiving party from exercising any legal rights to disclose, use, duplicate, or publish any information which, in each case as evidenced by written records:

(a)    was in the public domain at the time of the disclosure to the receiving party, or which thereafter fell into the public domain without any fault of the receiving party;

7

(b)    the receiving party rightly had in its possession prior to any disclosure by the disclosing party;

(c)    the receiving party lawfully obtained without restriction from a third party without breach of any confidentiality obligations of such third party; or

(d)    is independently developed by the receiving party without the benefit of any information disclosed by the disclosing party.

Either party may disclose Confidential Information provided by the other party hereto to the extent such disclosure is required by applicable law; provided that reasonable efforts to secure confidential treatment of such information shall be made prior to such disclosure and, provided further, that the disclosing party notifies in writing the other party hereto of such disclosure and uses commercially reasonable efforts to notify such other party prior to such disclosure. In addition, either Party may disclose Confidential Information provided by the other Party hereto to employees, agents and representatives of either party and any of their affiliates who need to know such information for purposes of this Agreement or to carry out any obligation of such party with respect to this Agreement. Either party may disclose the existence of this Agreement and that it generally relates to the provision of the Services, but not the terms of this Agreement.

## ARTICLE 7

## MISCELLANEOUS

Section 7.1    No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their respective successors and permitted assigns.

Section 7.2    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the parties hereto and supersedes any prior understandings, agreements, or representations by or between the parties hereto, written or oral, to the extent they have related in any way to the subject matter hereof.

Section 7.3    Assignability.  This Agreement shall inure to the benefit of and shall be binding on the permitted successors and assigns of either party.

Section 7.4    Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Any signature page delivered by facsimile or telecopy shall be binding to the same extent as an original signature page, with regard to any agreement subject to the terms hereof or any amendment thereto.  Any party who delivers such a signature page agrees to later deliver an original counterpart to any party who requests it.

Section 7.5    Force Majeure.  If either party fails to fulfill its obligations hereunder when such failure is due to an act of God, other action such as fire, flood, civil commotion, riot, war (declared or undeclared), revolution, action by government including delays in obtaining

government approvals, embargoes (collectively, "Force Majeure"), said failure shall be excused for the duration of said event.

      Section 7.6    Notices.  All notices, demands, requests, consents, approvals or other communications required or permitted to be given with respect to this Agreement shall be in writing and shall be delivered, charges prepaid, receipt confirmed or return receipt requested (if available) by hand, by internationally and nationally recognized air courier service or by facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Notice shall be deemed given and effective (i) if delivered by hand or by internationally or nationally recognized courier service, when delivered at the address specified in this Section 7.6 (or in accordance with the latest unrevoked written direction from such party) or (ii) if given by facsimile when such facsimile is transmitted to the facsimile number specified in this Section 7.6 (or in accordance with the latest unrevoked written direction from such party), provided, that, appropriate confirmation is received and that any such facsimile is promptly followed by delivery of written notice delivered by hand or by internationally or nationally recognized air courier service.

<table>
<tr><td><em>If to the PCT</em>:</td><td><em>Copy to</em>:</td></tr>
<tr><td>Castellammare Advisors, LLC</td><td>Richard L. Wynne</td></tr>
<tr><td>232 Quadro Vecchio Drive</td><td>Janet S. Baer</td></tr>
<tr><td>Pacific Palisades, CA 90272</td><td>Kirkland & Ellis</td></tr>
<tr><td>Attn: Robert A. Kors</td><td>200 E. Randolph Drive</td></tr>
<tr><td></td><td>Chicago, IL 60601</td></tr>
<tr><td>and</td><td></td></tr>
<tr><td></td><td>Paul S. Aronzon</td></tr>
<tr><td>AlixPartners</td><td>Dennis F. Dunne</td></tr>
<tr><td>2100 McKinney Ave</td><td>Milbank Tweed Hadley & McCloy LLP</td></tr>
<tr><td>Suite 800</td><td>One Chase Manhattan Plaza</td></tr>
<tr><td>Dallas, TX 75201</td><td>New York, NY 10005</td></tr>
<tr><td>Attn: Michael Scott</td><td>(212) 530-5000</td></tr>
<tr><td>Facsimile: (214) 647-7501</td><td></td></tr>
<tr><td></td><td>I. William Cohen</td></tr>
<tr><td></td><td>Robert S. Hertzberg</td></tr>
<tr><td></td><td>Pepper Hamilton LLP</td></tr>
<tr><td></td><td>100 Renaissance Center</td></tr>
<tr><td></td><td>Suite 3600</td></tr>
<tr><td></td><td>Detroit, MI 48243-1157</td></tr>
</table>

*If to the RCT*:
Bernard A. Katz
J.H. Cohn LLP
333 Thornall Street
6th Floor
Edison, NJ  08837

*Copy to*:
Mark J. Friedman
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, MD  21209-3600

Janice Duban
Piper Rudnick LLP
203 N. LaSalle Street
Suite 1800
Chicago, IL 60601-1293

    Section 7.7   <u>Governing Law; Severability</u>. This Agreement is deemed to have been executed in and shall be governed by and construed according to the laws of the State of Delaware without regard to conflict of laws provisions, and venue for resolution of any dispute between the parties arising from this Agreement shall be exclusively in the State of Delaware. If particular portions of this Agreement are ruled unenforceable, such portions shall be deleted and all other terms and conditions of this Agreement shall remain in full force and effect.

    Section 7.8   <u>Amendments and Waivers</u>.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the PCT and the RCT. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

    Section 7.9   <u>Dispute Resolution</u>.   The RCT and the PCT agree that the United States Bankruptcy Court for the District of Delaware shall have exclusive jurisdiction over all disputes and other matters relating to the interpretation and enforcement of this Agreement or any document related thereto.   The parties agree that no court shall have the power to award consequential, indirect or punitive damages (including lost profits) unless the applicable court determines that this limitation, under the circumstances, violates public policy. In the event that the Chapter 11 Cases are closed, the District Court for the District of Delaware shall have jurisdiction with respect to the matter set forth in this Agreement.

[Signature Page to Follow]

10

IN WITNESS WHEREOF, the parties have each caused this Agreement to be executed by its duly authorized representative as of the day and year first above written.

PCT REPRESENTATIVE

By: _____

Name: Robert A. Kors
Title:  Principal
        Castellammare Advisors, LLC


RCT REPRESENTATIVE

By: _____

Name: Bernard A. Katz

Title:  JH Cohn LLP

IN WITNESS WHEREOF, the parties have each caused this Agreement to be executed by its duly authorized representative as of the day and year first above written.

PCT REPRESENTATIVE

By:    _____
       Name:  Robert A. Kors
       Title:  Principal
               Castellammare Advisors, LLC


RCT REPRESENTATIVE

By:    _____
       Name:  Bernard A. Katz

Title:   JH Cohn LLP

**Exhibit A**

**Schedule of Services**

**Services to be provided under the Transition Services Agreement**

The PCT shall make services available to the RCT to assist in the reconciliation of Reclamation Liabilities and reconciliation and collection of RCT Assets. The scope of services that may be requested and provided include:

- Reconciliation of Reclamation Claims and General Unsecured Claims against the Debtors' books and records. Reconciliation procedures may include:
  - o Reconciling the Reclamation Claims against the Debtors' records with respect to receipt of product and related charges for product.
  - o Validating claimed date of product receipt to determine if product was received during the reclamation window.
  - o Review of the Debtors' records to determine if invoices remain unpaid.
  - o Review of the Debtors' records to assess existence of any setoffs against the Reclamation Claims.
  - o Provision of testimony, as required, to support RCT efforts to object to the Reclamation Claims.
  - o Other tasks necessary to validate the Reclamation Claims and the General Unsecured Claims of Reclamation Creditors.

- Supporting the RCT's efforts to collect from Reclamation Creditors monies owed the Debtors in connection with promotional activities ("Deduction Assets"). Support may include the following:
  - o Research of the Debtors' books and records to identify supporting documentation demonstrating the Debtors' performance of their obligations related to Deduction Assets.
  - o Research of the Debtors' books and records to obtain contracts and other documentation identifying the terms of agreement between the Debtors and the Reclamation Creditors relating to Deduction Assets.
  - o Research of the Debtors' books and records for evidence of the Debtors' and Reclamation Creditors' course of dealing and performance relating to Deduction Assets.
  - o Analysis of the Debtors' books and records to identify any payments made by the Reclamation Creditors relating to Deduction Assets.
  - o Provision of testimony, as required, to support RCT efforts to pursue collection of Deduction Assets.
  - o Other tasks necessary to support the collection efforts related to Deduction Assets.

- Supporting the RCT's efforts to reconcile overwire claims against Reclamation Creditors. Reconciliation efforts may include the following:
  - o Research of the Debtors' banking records to validate funds paid to Reclamation Creditors and funds received from the Reclamation Creditors.

- o  Research of the Debtors' books and records to reconcile product receipt information against claims of the Reclamation Creditors.
- o  Reconciliation of the Debtors' banking data and receiving data compared against amounts recorded in the centralized accounts payable system.
- o  Reconciling cash application per the Reclamation Creditors' records against the Debtors' centralized accounts payable system.
- o  Provision of testimony, as required, to support collection efforts against Reclamation Creditors that received unreimbursed funds in excess of product provided to the Debtors.
- o  Other tasks necessary to support the reconciliation and pursuit of overwire claims against Reclamation Creditors.

- Supporting the RCT's efforts to prosecute preference actions against Reclamation Creditors.  Such activities may include:
  - o  Review of the Debtors' banking records to identify payments made to Reclamation Creditors during the 90 day preference period.
  - o  Review of the Debtors' books and records to determine viability of ordinary course defenses that may be raised by Reclamation Creditors in defending against preference actions.
  - o  Review of the Debtors' books and records to determine viability of new value defenses that may be raised by Reclamation Creditors in defending against preference actions.
  - o  Review of the Debtors' books and records to obtain evidence of actions taken by Reclamation Creditors during the 90 day preference period.
  - o  Provision of testimony, as required, to support prosecution of preference actions against Reclamation Creditors receiving payments during the 90 day preference period.
  - o  Other tasks necessary to support the prosecution of preference actions against Reclamation Creditors.

- Supporting the RCT's efforts to pursue other litigation against Reclamation Creditors that may include, but not be limited to any of the following:
  - o  Pursuit of defenses to reclamation claims in the event of litigation.
  - o  Pursuit of litigation against trade lien Reclamation Creditors that did not comply with the terms of the Debtors' Trade Lien Program.
  - o  Pursuit of litigation to collect funds held by Reclamation Creditors in connection with military agreements.

**Resources provided by the PCT**

In connection with the services to be provided under the Transition Services Agreement and under the terms and conditions outlined in the Transition Services Agreement, the PCT will make available to the RCT the following resources:

- Utilization of personnel hired by the PCT.

- Utilization of services of professionals engaged by the PCT Representative, which may include financial and legal advisors.

- Access to the Debtors' books and records that are maintained by the PCT.

- Access to the Debtors' electronic records and databases.

### Exhibit B
**Post Confirmation Trust of Fleming Companies, Inc.**
**STAFFING PROJECTION FOR PCT AND RCT**

| Last name | First name | RCT? | Time Allocation To The RCT |
|---|---|---|---|
| Bickford | Charles | No | |
| Bishop | Sarah | No | |
| Eldredge | Vicki | No | |
| Johnson | Sharon | No | |
| Pace | Mark | No | |
| Paul | Shani | No | |
| White | Walter | No | |
| Ayres | Karen | No | |
| Beard | Sandra | Yes | 100% |
| Beckwith | Michael | Yes | 50% |
| Brown | Rachquel | No | |
| Cheek | Kelley | Yes | 100% |
| Cooper | Bernard | No | |
| DeLaRosa | Anna | No | |
| Didier | Debbie | No | |
| Dumas | Janetta | No | |
| Eaton | Steve | No | |
| Falck | Debbie | No | |
| Frink | Bradley | No | |
| Gage | Thomas | No | |
| Gonzalez | Jessica | Yes | 100% |
| Hall | Kim | No | |
| Halstead | Velinda | No | |
| Hawkins | Stella | Yes | 100% |
| Holland | Misti | Yes | 75% |
| Jackson | Lora | No | |
| Kitelinger | Frank | No | |
| Kline | Gregory | Yes | 100% |
| Lafave | Robert | Yes | 50% |
| McReynolds | James | Yes | 50% |
| Montgomery | Josephine | No | |
| Perez | Joseph | No | |
| Porter | Kristin | Yes | 100% |
| Price | Renee | Yes | 100% |
| Rivera | Trevor | No | |
| Rochford | Robert | No | |
| Sawyer | Kathy | No | |
| Terbush | Stewart | Yes | 50% |
| Thompson | Leslie | No | |
| Tillotson | Tilden | No | |
| Tucker | Steven | No | |
| White | Sarah | No | |
| Zaragoza | Carmalleta | No | |
| Blease | Jennifer | No | |
| Emert | Susan | No | |

| | | | |
|---|---|---|---|
| Farley | Mary | No | |
| Goddard | Christian | No | |
| Lee | Vickie | No | |
| Sawaya | Elie | No | |
| Carter | Sherryl | No | |
| Baylor | Christopher | No | |
| Cotter | Jeanne | Yes | 25% |
| Ferguson | Bryan | Yes | 25% |
| Mcardle | Shirley | No | |
| Ore | Sheryl | Yes | 25% |
| Sever | Kathy | Yes | 25% |
| Turley | Rhonda | Yes | 25% |
| Woodward | Warren | No | |
| Birchette | Gerald | No | |
| Carter | Sherryl | No | |
| Apodaca | Daniel | No | |
| Hall | Barbara | No | |
| Stegmann | David | No | |
| Centala | John | No | |
| Dawson | Michael | Yes | 100% |
| Edstrom | Brent | Yes | 100% |
| Kyle | Gregg | Yes | 50% |
| Oldham | Leland | Yes | 100% |
| Skinner | Julie | Yes | 100% |

<u>Exhibit C</u>

# Fleming Post Confirmation Trust
# Employee Staffing and Retention Program

### <u>Staffing Summary</u>

- At the effective date, the PCT will have 67 employees
- 18 of the 66 employees will have already received 60 days notice of employment termination. These 18 individuals will be terminated on or around October 18.
- As of November 1, the PCT is projected to have 49 employees at a monthly cost of $300 thousand (raw salaries/before benefits)
- Approximately 15 FTE employees will be allocated to the RCT at a monthly cost of approximately $83 thousand (raw salaries/before benefits)
- Net PCT headcount and cost at November 1 expected to be 34 FTE's and $217 thousand (raw salaries/before benefits), respectively
- Projected headcounts and costs as of November 1 expected to remain constant through February 28, 2005
- Decisions as to post February staffing requirements expected to be made in the October/November timeframe

### <u>Salaries and Benefits</u>

- All employees will receive a 10% raise effective September 1
- The PCT will continue the current Fleming benefit program through December 31, 2004
- The PCT will evaluate benefits options for 2005 and will make a decision in the October/November timeframe

### <u>Retention Program</u>

- Balances due under current Fleming retention program expected to be paid on or about August 31
- New PCT retention program to be offered to all employees projected to work through February 28, 2005
- PCT retention bonus to be set at 25% of annual salary as of September 1, 2004
- Participation in PCT retention program requires commitment by employee through February 28, 2005. Unless mutually agreeable, resignation by PCT employee prior February 28, 2005 will result in employee's forfeiture of PCT retention bonus. Unless terminated for cause, termination of the PCT employee by the PCT prior to February 28, 2005 will result in the employee's receipt of the full 25% bonus. All bonuses earned during the September 1 – February 28 timeframe will be payable on or about February 28, 2005

Exhibit C

- Employees who are identified as being critical to the PCT beyond February 28, 2005 will be offered an additional incentive to extend their employment. Decisions on who will be required and the appropriate retention pay %'s are expected to be made in the October/November timeframe

Severance

- The PCT will honor Fleming's court-approved severance program for all PCT employees with a severance eligible termination.
- A severance eligible termination will occur at such point in time when the PCT eliminates the PCT employee's position and does not offer continuing employment with the Trust for a comparable position at comparable pay.
- If prior to January 15, 2005 an employee is offered continuing employment beyond February 28, 2005 and the PCT employee rejects the offer, he/she will be considered as having resigned effective February 28, 2005 and will not be eligible for severance.
- Conversely, if on or after January 15, 2005 an employee is offered continuing employment beyond February 28, 2005 and the PCT employee rejects the offer, he/she will be eligible for severance.

## EXHIBIT B

## ENGAGEMENT LETTER

**Castellammare Advisors, LLC**
**232 Quadro Vecchio Drive**
**Pacific Palisades, CA 90272**
**rakors@verizon.net; 310-454-6867**

July 23, 2004

Fleming Companies, Inc. and its
Subsidiaries and affiliates who are
Chapter 11 debtors (collectively, "Debtors")

The Official Committee of Unsecured
Creditors (the "Committee")

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth the terms and conditions under which Castellammare Advisors, LLC ("Castellammare") will be employed as Post Confirmation Trust Representative ("PCT Representative") as contemplated by the Third Amended Joint Plan of Reorganization of Fleming Companies, Inc. and Its Filing Subsidiaries Under Chapter 11 of the Bankruptcy Code (as the same may be amended, the "Plan").

The Debtors and the Committee agree to appoint Castellammare as the initial PCT Representative under the Plan; and Castellammare agrees to accept that appointment. The rights, duties and responsibilities of the PCT Representative, as well as all of the other terms and conditions pertaining to the PCT Representative, will be as set forth in the final, executed version of the Post Confirmation Trust Agreement, which shall be incorporated into this Agreement as if fully set forth. A draft of the Post Confirmation Trust Agreement is included as an Exhibit to the Plan and is also incorporated in this Agreement as if fully set forth until replaced by execution and delivery of the final version of the Post Confirmation Trust Agreement. Capitalized terms used herein without definition shall have the meanings assigned thereto in that draft Post Confirmation Trust Agreement.

9. Castellammare will bill the PCT for the services of its principal, Robert Kors, at a rate of $395.00 per hour ("Base Compensation") on a periodic basis. In the event that other principals, employees or independent contractors retained by Castellammare perform services on behalf of the PCT, Castellammare will bill the PCT for such additional services, as additional Base Compensation, at rates to be agreed upon between Castellammare and the PCT Board. In addition to the Base Compensation, the PCT shall reimburse Castellammare for reasonable travel and other out-of-pocket expenses (including costs, fees, disbursements and other reasonable charges of any other professionals, consultants and advisors retained by Castellammare with the prior written consent of the PCT Board), incurred pursuant to this engagement, as well as a reasonable allocation of indirect expenses. Further, Castellammare will be eligible for additional, bonus compensation at the sole, absolute and exclusive discretion of the PCT Board.

Fleming Companies, Inc.
July 23, 2004
Page 2

In the event that the Plan is not confirmed or the PCT is not formed, the Debtor agrees to use its best efforts to obtain bankruptcy court approval to pay Castellammare, as an Administrative Expense, for time expended and expenses incurred pursuant to this agreement in anticipation of the formation of the PCT, up to a maximum of $50,000.

Notices given pursuant to any of the provisions of this Agreement shall be in writing and shall be deemed to be given upon actual receipt. Notices to the PCT shall be delivered to an address to be provided by the PCT to Castellammare in writing following formation of the PCT. Notices to Castellammare shall be delivered to 232 Quadro Vecchio Drive, Pacific Palisades 90272, Telecopier (310) 459-4592.

h. If we have any dispute arising between us, including any dispute with respect to this Agreement, its interpretation, performance or breach, and are unable to agree on a mutually satisfactory resolution within 30 days, either party may require the matter to be settled by binding arbitration pursuant to the rules of the American Arbitration Association.

The parties to this Agreement expressly acknowledge that the delivery of confidential non-public or privileged information to Castellammare, at any time, in connection with this Agreement shall not result in or be deemed a waiver of any such confidentiality or privilege.

I am delighted to accept this appointment and look forward to working with the PCT Board on behalf of the beneficiaries of the PCT.

Castellammare Advisors, LLC

By: _____
Robert A. Kors, Managing Member

ACCEPTED AND AGREED TO:

**Fleming Companies, Inc. and its
Subsidiaries and affiliates who are
Chapter 11 debtors (collectively, "Debtors")**

By: _____
Name:
Title:

**The Official Committee of Unsecured
Creditors (the "Committee")**

By: _____
Name:
Title: