UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

WAYNE BERRY,                                                    :    01:07 CV 7634 WHP

                     Plaintiff,                      :    Judge William H. Pauley III

                                :    ECF Case

           vs.                                          :

                                :

DEUTSCHE BANK TRUST COMPANY                     :
AMERICAS (f.k.a. BANKERS TRUST COMPANY)          :    AFFIDAVIT OF WAYNE
and JP MORGAN CHASE BANK, in their separate       :    BERRY; EXHIBITS "1" TO
capacities and as agents for the pre- and post-petition    :    "13"
lenders of Fleming Companies, Inc.; GENERAL         :
ELECTRIC CAPITAL CORPORATION: C&S          :
WHOLESALE GROCERS, INC.; THE POST-          :
CONFIRMATION TRUST OF FLEMING            :
COMPANIES, INC.; ROBERT KORS; CORE-MARK     :
HOLDINGS INC. and DOES 1 to 200.                    :

                                :

                                :

                                :

                                :

                                :

                                :

                    Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

TIMOTHY J. HOGAN (Hawaii Bar No. 5312)
Attorney for Plaintiff WAYNE BERRY
Admitted *Pro Hac Vice*

1050 Bishop Street, Number 433
Honolulu, Hawaii 96813
Tel.  (808) 382-3698
Fax.  (808) 356-1682
Email tjh@timhogan.com

AFFIDAVIT OF WAYNE BERRY

STATE OF FLORIDA        )
                               )    SS:
PALM BEACH COUNTY    )

WAYNE BERRY, being first duly sworn on oath, deposes and says:

I, Wayne Berry, am the Plaintiff in the above entitled case, and hereby declare under penalty of perjury that the following is true and accurate to the best of my knowledge and belief. If called upon to testify regarding the matters contained herein, I am competent and willing to do so.

1.     For over 20 years, I have been an independent Software Designer and Developer. I authored the works that are the subject of this copyright infringement action. I wrote "Freight Control System" (FCS) in 1993. Since 1993, I have written additional freight related works. I am competent in several programming languages including, but not limited to, C, C+, C++, C#, Visual Basis and Assembly. My software is not elegant but is time tested. If it was obsolete as suggested by defendants, then I can't understand why is C&S and the PCT still using it and resisting my requests for an injunction.

2.     My freight software has been used to transport freight for many companies including but not limited to Fleming Companies ("Fleming"), C&S Wholesale Grocers, Inc., Kmart, Sears, Pillsbury, Hawaiian Grocery Store, Foodland, Sack N Save, Sure Save, Hansen, H&W, Hawaiian Express Services, the United States Defense Commissary Agency and hundreds of other companies and government agencies. My software has likely been involved in the shipment of well over $1 billion in food and restaurant supplies since 1995. In addition to my

2

background as a software developer, I have many years of experience in the freight business in particular the ocean freight business as it relates to Hawaii.

3.      In 1999 I was permitting Atlantic Pacific International, Inc. ("API")  a closely held Hawaii freight logistics company to use a copy of my works that was resident on my home servers located on Oahu's North Shore. From about 1994 to 1999 API had performed freight logistics services for Fleming Companies, Inc.'s Hawaii Division, then generally known to me at the time as "Fleming Foods."

4.      Starting in 1999 Fleming's Hawaii Division President, Ralph Stussi informed me that they had engaged consultants, CapGemini - Ernst & Young, to address many issues, related to Fleming's profitability.

5.      In or about the Summer of  1999, Fleming's Hawaii Division President, Ralph Stussi informed me that Fleming would no longer out source its logistics needs to API, and told me that Fleming had selected Manugistics Group, Inc. to optimize inbound shipments from more than 5000 suppliers to its 36 nationwide distribution centers including Kapolei, Hawaii and bring their logistics work for Hawaii "in house".

6.      At the time that Fleming and API were about to cut their relationship, Ralph Stussi informed me that the new Manugistics / F1 Technology Project was not ready to be implemented. As the result, Fleming needed a temporary, interim software solution for it and its employees to use.  Mr. Stussi  asked and I agreed to temporarily loan my freight software to Fleming as that temporary, interim software solution until the new Manugistics / F1 Technology Project  software was available.  Mr. Stussi told me that Fleming anticipated that they would need to use my software for no more than the next six months to a year.

3

7.      I loaned Fleming my software, for no charge,  under the terms and conditions of a limited End User License Agreement and addendum (the "EULA"). A true and correct copy of the EULA that I personally delivered to Mr. Stussi and several of Fleming's employees, including API's former employees, Teresa Noa and Mark Dillon, is attached as Exhibit "1." It contains the addendum that I wrote.    This document is maintained in the regular course of my business and has been admitted in litigation by Fleming and the PCT in the past and been the subject of a Ninth Circuit appeal as to the enforcement of EULA as to the Fleming PCT.  I received no payments only certain promises from Fleming including the promise to keep the API employees for at least one year and the promise not to infringe.

8.      After Ralph Stussi, Fleming's Hawaii Division President requested permission to make changes in certain of the business forms developed in the Crystal Reports environment, like invoices, I agreed to a second addendum a true and correct copy of which is attached as Exhibit "2."  This document is maintained in the regular course of my business and has been admitted in litigation by Fleming and the PCT in the past.

9.      My EULA and the Copyright Act generally reserved to me the right to recast and make derivatives of my works, except as permitted by the EULA or any addenda.  That was how I was going to feed my family after Fleming stopped dealing with API.  I knew that Fleming would have to make changes to my works if they didn't stop using them as they had stated was their intention.

10.      I engaged the firm of Lynch Ichida Thompson Kim & Hirota ("Lynch Ichida" or the "Firm") in 2001 under a contingency fee agreement  to address what appeared to be a case of willful infringement committed by Fleming.  Despite the reservation of right to make derivatives,

Fleming made them and didn't inform me or pay me for them.

11.    I sent an infringement warning to Fleming and Lex Smith responded on behalf of Fleming and denied the infringement. Instead, and in the face of the documentary evidence including the second addendum to the EULA, that was drafted by Fleming, admitting that all Fleming was receiving was a license to use my works as an interim measure Fleming, through Lex Smith, claimed to own the copyrights to my works. That was one of the principal issues addressed in the First Hawaii Case.

12.    The jury saw through Smith's and Fleming's fraudulent claim of ownership and found Fleming a willful infringer by a special verdict filed on March 6, 2003. Before the District Court could enter a permanent injunction, Fleming filed bankruptcy on April 1, 2003.

13.    There has been no authorization for the Lynch Ichida firm to disclose confidences or secrets related to the filing of this case or any other matter related to me. The violation of the privilege evident in Mr. Ichida's affidavit and his obvious discussion about my case with Mr. Kors' and the Lenders' attorneys, Kirkland & Ellis, was unauthorized. I have also seen evidence that Mr. Ichida began his communications with the Kirkland & Ellis firm prior to the date that Mr. Hogan informed the Office of Disciplinary Counsel that Mr. Ichida had told Mr. Hogan that Ichida believed that he could obtain money from my case without telling me. I had a continency fee agreement with Lynch Ichida and he had agreed to share anything he obtained regarding my matters with me.

14.    Mr. Hogan informed me he had left the Lynch Ichida firm for good on July 25, 2007. Prior to that time, I had become concerned that Mr. Ichida has sold me out to Lex Smith. Mr. Hogan took longer to be convinced, and by my understanding, he became convinced of this

5

on July 25, 2007. For instance, I had agreed to pay money, as proposed by Mr. Ichida, to pay prior in-house costs, so that Mr. Ichida would approve the filing of the Lender case. After I had made the payment per Mr. Ichida's offer, Mr. Hogan informed me that Mr. Ichida has changed the deal and now wanted an approximate additional $15,000. Ichida pronounced this after I had made the payment. Attached hereto as Exhibit "3" is a true and correct copy of my email to Wes Ichida dated July 26, 2007 where I specifically direct him to limit his discussion of me to obtaining a continuance in order to then seek to withdraw as my counsel.

15.    Attached hereto as Exhibit "4" is a true and correct copy of Wes Ichida's email to me dated July 27, 2007, where Mr. Ichida, passes on what Smith had just earlier said to him, specifically that Smith was getting his directions from "L.A." I am familiar with C&S' operations and locations that they C&S publish on their website, CSWG.com and as a competitor generally, and C&S does not have any presence in Los Angeles. Robert Kors and his attorneys Kirkland & Ellis are in Los Angeles.

16.    Attached hereto as Exhibit "5" is a true and correct copy of an email thread between me and Wes Ichida dated July 27, 2007, where he admits to continuing to discuss with Lex Smith, matters I had told him not to discuss including the draft agreement with Mr. Hogan that had already been rejected. These same emails are attached to the Affidavit of Lex Smith filed in support of the Motion for Summary Judgment.

17.    On Monday August 13, 2007, in an action related to the second infringement case, I was called back to Hawaii for a deposition. This was a 58 hour round trip from Florida to Hawaii and back. In this deposition Lex Smith, Fleming and C&S's concurrent attorney asked an unusual number of questions about what sort of guns I own and where I keep them. I was never

asked any questions about the guns' values. I thought Smith was filling out some sort a "murder for hire" questionnaire about me and my ability to defend myself. I was very concerned about my personal safety after Smith's bizarre series of questions about my firearms. I immediately left Hawaii that same night and arrived back in Florida on the following night, Tuesday night. At the West Palm Beach airport, I saw one of Fleming's attorneys, Michael Baumann of Kirkland and Ellis waiting at the bottom of the stairs at the approach to the baggage carousels at the West Palm Beach Airport. Mr. Baumann is based at Kirkland & Ellis in Los Angeles and was the lead trial counsel in the Second Hawaii Case. I am certain I saw him. After the bizarre series of questions by Lex Smith about my guns the day before, I was alarmed to see Mr. Baumann at the West Palm Airport. I did not know why Mr. Baumann was in the West Palm Airport so I did not know what to expect next. In fear for my life, I exited the airport without further incident. I was picked up by Sally Apgar. It was getting dark and it was starting to rain. We proceeded to pick up her son and then went to a local restaurant, Duffy's, for dinner. While seated at Duffy's, without any hesitation, a woman walked directly up to me and placed some papers on our table, and said, "sorry Mr. Berry" and backed away from my table slowly before turning and quickly exiting the restaurant. The woman did not identify herself nor did she attempt to ask me any questions including any attempt on her part to confirm my identity. The woman was wearing a coat and kept one of her hands in her coat pocket. My thoughts flashed back to the deposition with Lex Smith, just a day earlier and all the bizarre and alarming question that Lex Smith had asked me about my guns. I am certain that this woman was holding a gun in her pocket. If she wasn't she was sending the international signal for "I've got a gun in my pocket." I now understood why Michael Baumann had been standing at the foot of the stairs at the West Palm Airport. Mr.

Baumann was there to identify me to this woman. The papers the woman left on the table was a tattered copy of an expired and dismissed divorce complaint that had been filed in Hawaii by my wife. After I looked at it, I thought the woman must have been some sort of process server. The woman did not identify who she was and she did not identify herself on the document which I understand is required by Florida law. The document I was served with had been unstapled and re-stapled many times. Some pages had two holes punched in the top, others did not. There was even a post-it note on one of the internal pages with some handwriting on it. To me, the document that the woman left on the table appeared to be some sort of composite of various documents out of someone's work file and not a pristine document that you might expect a process server to deliver. My wife and I have been separated since 1999 and my wife actively works with the willful infringers in violation of spousal privilege as I have noted from Lex Smith's time records one of which is attached to his Affidavit. I perceived the service of the dismissed complaint as much more of a threat, either to say, "we know where you are now" or a failed attempt on my life rather than a service of process. Lucky for me, Duffy's is frequented by members of the Jupiter Florida police department. It was a frightening and stressful incident for all three of us.

      18.    On behalf of my freight system customer, I receive regular business correspondence sent to me by Unicold, a company operating a public cold storage warehouse in Honolulu. Unicold also performs shipping services for companies, in Hawaii, mostly in the area of food shipments and was used by Fleming and is presently used by C&S. These correspondences include critical updates regarding things as port closures that are communicated to a group of large Unicold customers, by a Unicold employee whose job includes giving this type of

notification. We deal with perishable commodities that must move on schedule. I have been in the food shipping business in Hawaii since 1995, and the maintenance of updated email addresses is critically important in a business that relies so heavily on email to communicate critical time sensitive infromation.

19.    Attached hereto as Exhibit "6" is a true and correct copy of an email with an attachment dated March 3, 2008 from Alida DeCosta at Unicold that was received by me at or about the time it was transmitted and stored in the regular course of my work as a freight logistics software developer and consultant. If is my regular practice to receive and store such emails in the regular course of my freight related business activities.   This email evidences the sending of an email to one of my former employees, Teresa Noa, whose address is highlighted with an arrow that I added for the Court's convenience, who, on March 3, 2008,  evidences is still maintaining an email address at "Fleming-Logistics.com" to receive these important emails.

20.    As part of my day to day work I  maintain as part of my business records, materials that I gather from variety of publically available websites to research, authenticate and monitor traffic and security issues related to my copyrighted works. One of the sites that I have used for many years is NetworkSolutions.com. The "Whois" search service is considered to be an accurate and authoritative listing of the names and contact numbers related to internet domain name registration that contains information provided by the registrant. Attached hereto as Exhibit "7." is a true and correct print out of the domain registration Fleming-Logistics.com as of March 1, 2008.

21.    When I installed my software at Fleming's Hawaii facility in October 1999, I set the system to run on the "FlemingLogistics.com" domain that I owned.  Later, Fleming obtained

its own domain name "Fleming-Logistics.com" that it used to publish and transmit my works over the Internet without my permission.

22.    As part of my day to day work I maintain as part of my business records, a variety of publically available websites to research, authenticate and monitor public tariffs for freight rates, rules and regulations in a variety of trade lanes. One these websites is: https://matson.ratebase.net. This site is available on line at Maston Navigation's web site.   As Mr. Hogan was investigating the grounds for joining Mr. Kors and the PCT I began to research for evidence of the PCT's use of my freight system. I had terminated all licenses some time prior to this, so any use would be infringement.   Attached hereto as Exhibit "8" is a true and correct copy of a tariff search I made on the Matson website listed above on November 15, 2007 searching for the word "grocery" in filed tariffs.   This exhibit shows a commodity group entitled "Fleming Foods Grocery Commodities and Restaurant Supplies."   This site is generally considered to contain the prices and rules that are related to ocean freight shipments in the non-contiguous domestic trade serviced by Matson Navigation that are accurate and purport to conform with the tariff filing requirement of the United States Department of Transportation, Surface Transportation Board, a governmental agency.

23.    After Mr. Hogan had informed Mr. Kors' attorneys of the existence of this tariff, I watched to see if Kors took some action to change the tariff thus showing his ongoing activity in the ocean freight business. He didn't disappoint me. Attached hereto as Exhibits "9" is a true and correct copy of a tariff search I made on the Matson website listed above on December 1, 2007. This shows that five days after Mr. Hogan send Mr. Kors' attorneys the evidence of the continued existence of the Fleming Foods tariff, on November 20, 2007,  the tariff was changed and it was

set to expire on the following day, November 21, 2007. I have negotiated tariff changes in the past, even a simple one would be very difficult to change on such short notice. It usually takes weeks and sometimes months for a tariff change. Based on my experience with the ocean carriers, it is fair to assume that Mr. Kors must control a large volume of freight on Matson to get this kind of quick service from them.

24.    Fleming's Post-Confirmation Trust and its trustee Robert Kors have claimed under oath to not to be involved in "overseas shipping" but this is not "overseas" that I take to mean outside the US.

25.    In 2003, Fleming claimed to stop doing business having sold most of its operations to C&S that claimed to not be operating a copy of my database, FCSLogisticsData.mdb or any of the derivatives that are listed in the Second Amended Complaint. These databases had operated on the Fleming-Logistics.com web site on a machine that Mark Dillon named fhl136.

26.    I was in Mr. Hogan's office in the Fall of 2005, when Lex Smith had told him, over the speaker phone, that C&S was still using my works. He was representing both C&S and Fleming's PCT at the time. The District Court had allowed Fleming's former employees to keep copies of my works, now Smith candidly admitted they were using them again this time for C&S that never had any sort of licence, unlike Fleming Foods. After hearing Smith admit to the ongoing infringement, in the fall of 2005, I looked for evidence of continued use of the works.

27.    I was just curious whether the Fleming-Logistics.com domain had been abandoned and then, through NetworkSolutions.com and the "Whois" database, I discovered, as set forth in Exhibit "7" that Fleming-Logistics.com was being managed by Mark Dillon my former employee who retained copies of my works.

28.    To determine whether an internet domain is actually operating a web site is actually operating an active website, any developer would look to the online database "SenderBase" to determine site traffic as it relates to email internet packets. A packet is what is sent through the internet whether to run a web browser, send or receive email or to operate a database on line. The "header" of the packet tells computer what type of data the packet contains and who it is sent to and from, and allows the internet to move the traffic from one computer to another at near light speed. An email packet can be used to send update logs to allow the updating of a database especially in Microsoft SQL®© . I have done this in the past and it works very well. The copy of my database that I loaned to Fleming Foods was written in Microsoft Access®© but can also be run by through a relatively simple conversion to Microsoft SQL®©.

29.    SenderBase may be found at its website at http://www.senderbase.org. The site describes its function as follows:

> IronPort SenderBase(r) Network is the world's first, biggest and best traffic monitoring network. SenderBase measures more than 25 percent of the world's messaging traffic - receiving over five billion queries per day. IronPort appliances are deployed at eight of the ten largest ISPs in the world, as well as more than 40 percent of the Global 100 (the 100 largest corporations in the world). Having access to this type of traffic is a key differentiator for both SenderBase and IronPort. SenderBase is unique in that it even collects data from the networks of organizations that are not IronPort customers. IronPort shares data with other large ISPs in a data peering relationship. Currently, over 100,000 organizations participate in IronPort's SenderBase Network, making it the industry's most accurate reputation system.

30.    SenderBase looks at all the internet email traffic in the world and determines, based on a logarithmic scale, the size of a site based on its daily traffic. The data is provided by the website and SenderBase just logs daily it through its automated "IronPort appliances." A score of 10, would be all of the internet email traffic for the whole world. A 9 is one tenth of

12

world, etc. As a good example, the US Courts website generated on February 15, 2008 a value of 4.9. A true and correct copy of the USCourts Senderbase for that day is attached as Exhibit "10." The ocean carrier Matson that handles a large amount of C&S' shipments and many other customers shipping to Hawaii and elsewhere generated a 3.3 on February 15, 2008. A true and correct copy of the C&S' website CSWG.com Sender Base report for that day is attached as Exhibit "11." The data that Senderbase reports is provided by the network that is sending the email traffic and Senderbase using automation with no human input reports what the site is telling the world.

31.    To assist Mr. Hogan in his investigation of Mr. Kors' and others' ongoing infringement activity, I collected the SenderBase reports for Fleming-Logistics.com starting on the day that Mr. Hogan notified Kirkland & Ellis of the continued activity on the Fleming-Logistics.com site. Knowing Mark Dillon as I do (my former employee), I predicted that he would be scrambling to move his clandestine web site after Kors and his attorneys tipped him off that we had discovered it. I have prepared a summary of the reports that I have generated from the Senderbase reports that I collect the same time each day, these I collected after Mr. Hogan sent his warning to the PCT's attorneys and I have included three C&S reports related to their CSWG.com domain for a Magnitude comparison during this same period. C&S claims to be the second largest grocery wholesaler in the United. States. As the Court may see, during Mark Dillon's apparent move of his database after Kors would have alerted him off, he generated more internet packets than all of C&S operations combined. Exhibit "12 (A)-(N) is a true and correct collection first page excerpts of the SenderBase reports for Fleming-Logistics.com with noted comparisons to CSWG.com for the period after the email alerted Kors that his clandestine web

site and had been detected.

| Date | | Fleming-Logistics | CSWG | | |
|---|---|---|---|---|---|
| Date | Exhibit | Magnitude | Magnitude | Exhibit | Comment |
| 11/15/07 | 12 A | 0.00 | 3.30 | 12 B | Hogan email to K&E re tariff |
| 11/16/07 | 12 C | 1.80 | | | |
| 11/17/07 | 12 D | 0.00 | | | |
| 11/18/07 | 12 E | 2.00 | 2.80 | 12 F | |
| 11/19/07 | 12 G | 1.90 | | | |
| 11/20/07 | 12 H | 0.00 | | | Matson cancels tariff |
| 11/21/07 | 12 I | 0.00 | | | |
| 11/22/07 | 12 J | 2.20 | | | Thanksgiving |
| 11/23/07 | 12 K | 2.50 | 1.90 | 12 L | Magnitude greater than CSWG |
| 11/24/07 | 12 M | 1.90 | | | |
| 11/25/07 | 12 N | 0.00 | | | |

32.    Exhibit "13" is a true and correct complete copy of the Fleming-Logistics.com
Senderbase for February 15, 2008 that does not show any traffic. It does however at page 3
show the active server address of "fhl136" that was the name of the server that Mark Dillon had
installed copies of my works found to be infringing.

So sworn under penalty of perjury in the County of Palm Beach, Florida  on March 19,
2008.

Wayne Berry

14

STATE OF FLORIDA

COUNTY OF PALM BEACH

      The foregoing instrument was acknowledged before me this _19_ day of March,

2008 by Wayne Berry.  He is personally known to me or has produced _HAWAII  DL._

_____ as identification.

_____

Notary Public, State of Florida

My Commission Expires: _05|02|2012_



ATTILA KOVENDI
Notary Public - State of Florida
My Commission Expires Mar 2, 2012
Commission # DD 763879
Bonded Through National Notary Assn.