UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
WAYNE BERRY,                             :   01:07 CV 7634 WHP
                    Plaintiff,           :   Judge William H. Pauley III
                                         :   ECF Case
        vs.                              :
                                         :
DEUTSCHE BANK TRUST COMPANY              :
AMERICAS (f.k.a. BANKERS TRUST COMPANY)  :
and JP MORGAN CHASE BANK, in their separate :  AFFIDAVIT OF TIMOTHY J.
capacities and as agents for the pre- and post-petition : HOGAN;  EXHIBITS "1" TO
lenders of Fleming Companies, Inc.; GENERAL :  "20"
ELECTRIC CAPITAL CORPORATION; C&S        :
WHOLESALE GROCERS, INC.; THE POST-       :
CONFIRMATION TRUST OF FLEMING            :
COMPANIES, INC.; ROBERT KORS; CORE-MARK  :
HOLDINGS INC. and DOES 1 to 200.         :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :
                    Defendants.          :
----------------------------------------x

TIMOTHY J. HOGAN (Hawaii Bar No. 5312)
Attorney for Plaintiff WAYNE BERRY
Admitted *Pro Hac Vice*

1050 Bishop Street, Number 433
Honolulu, Hawaii 96813
Tel.  (808) 382-3698
Fax.  (808) 356-1682
Email tjh@timhogan.com

AFFIDAVIT OF TIMOTHY J. HOGAN

STATE OF HAWAII            )
                           )    SS:
CITY AND COUNTY OF HONOLULU )

      TIMOTHY J. HOGAN, being first duly sworn on oath, deposes and says:

      I, Timothy J. Hogan, an am attorney licensed to practice before all the courts of the state of Hawaii, the United States Court of Appeals for the Ninth Circuit and am admitted to practice before this Honorable Court, *pro hac vice*, and hereby declare under penalty of perjury that the following is true and accurate to the best of my knowledge and belief. If called upon to testify regarding the matters contained herein, I am competent and willing to do so.

      1.    I have represented Mr. Berry in *In re Fleming Companies, Inc.*, Bk. No. 03-10945 MFW (Bankr. Del.) (the "Fleming Bankruptcy Case") since the spring of 2003, and receive service of all documents filed in the case. Attached hereto as Exhibit "1" is a true and correct one page excerpt of the Confirmation Order, page 25, filed in Fleming Bankruptcy Case. This excerpt was extracted from Request for Judicial Notice 2, Ex. B (Confirmation Order) filed Defendants the Fleming PCT and Robert Kors. I have underlined Mr. Kors' name for the Court's convenience.

      2.    Attached hereto as Exhibit "2" is a true and correct copy of an excerpt from the Plan Supplement Filed by Fleming Companies, Inc. in the Fleming Bankruptcy Case on July 16, 2004. The Court is requested to take judicial notice of the Plan Supplement that appears as docket entry 8875. I have put a box around Mr. Kors' name for the Court's convenience.

      3.    Attached hereto as Exhibit "3" is a true and correct copy of an excerpt of the Transcript of Proceedings before the Honorable Mary F. Walrath, United States Bankruptcy Judge, *In re Fleming Companies, Inc.*, Bk. No. 03-10945 MFW (Bankr. Del.) regarding the Plan Confirmation Hearing held on July 24, 2003, in Fleming Bankruptcy Case. I have put a box around the relevant lines for the Court's convenience.

      4.    I have reviewed the docket of the Fleming case and have found no evidence that

the Fleming Plan Confirmation Order was revoked or modified, nor have I found any evidence that Mr. Kors was removed or resigned his appointment as provided for in the PCT Agreement regarding his personal appointment as the PCT Representative although I am aware that he claims now only to be an employee of Castellamare Advisors, LLC.

5. Attached hereto as Exhibit "4" is a true and correct copy of an excerpt of the Fleming Companies, Inc. Form 8-K filed with the Securities and Exchange Commission ("SEC) on August 6, 2004, that names Robert Kors as the PCT representative. The Court is requested to take judicial notice of this document available on the SEC Website at: http://www.sec.gov/Archives/edgar/data/352949/000095013404011599/0000950134-04-011599-index.htm. I have underlined Mr. Kors' name for the Court's convenience.

6. Attached hereto as Exhibit "5" is a true and correct copy of the PCT Agreement that was included in the Fleming Plan Supplement, filed on July 16, 2004 in the Fleming Bankruptcy Case. The Court is requested to take judicial notice of the Plan Supplement that appears as docket entry 8875. I have put boxes around the relevant portions for the Court's convenience.

7. Attached hereto as Exhibit "6" is a true and correct excerpt page from the Fleming Third Amended Plan of Reorganization , Exhibit A-4, filed on May 28, 2004, entitled "Retained Causes of Action" that was served upon me in the Fleming Bankruptcy Case. I have put boxes around the relevant portions for the Courts's convenience. The Court is requested to take judicial notice of the Third Amended Plan of Reorganization that appears as docket entry 8269.

8. Attached hereto as Exhibit "7" is a true and correct copy of the Fleming-C&S indemnity agreement dated August 23, 2003, that was personally served upon me in the Delaware Bankruptcy Court by Fleming's counsel on July 24, 2004 at the Fleming Confirmation Hearing and was admitted at the confirmation hearing.

9. Attached hereto as Exhibit "8" is a true and correct copy of C&S Wholesale Grocers, Inc.'s Response and Reservation of Rights with Respect to Motion for Order in Aid of Plan, filed by Defendant C&S in the Fleming Bankruptcy on or about January 18, 2007. The Court is requested to take judicial notice of this document that appears as docket entry 13406.

10. Attached hereto as Exhibit "9" is a true and correct copy of the December 27,

2004 Order Denying Fleming's Renewed Motion for Judgment as a Matter of Law Pursuant to 17 U.S.C. 117, filed on March 20, 2003; Fleming's Renewed Motion for Judgment as a Matter of Law that the 'End User License Agreement' is Unenforceable Against Fleming, filed on March 20, 2003; Berry's Motion for Entry of Permanent Injunction, filed March 20, 2003 all renewed on September 17, 2004 filed in *Wayne Berry v. Fleming Companies, Inc.*, 01-CV-00446 SPK LEK (D.Hawaii) (the First Hawaii Case).

11. I had made repeated requests of Mr. Kors' through his attorneys to have him return the Berry works as required by the Berry EULA. Finally, on December 17, 2007, Richard Wynne, on behalf of the PCT trustee wrote to C&S confirming Mr. Berry's requests but refusing to do anything consistent with Kors' duty under the EULA to cause C&S to actually return the works thus avoiding triggering the indemnity. A true and correct copy of that letter that was sent to me by Mr. Wynne is attached hereto as Exhibit "10."

12. During the trial in the Second Hawaii Case, in March 2006, Michael Baumann, then representing Kors, the trustee of the PCT, admitted certain emails and argued at trial that the Lenders, and Fleming, the adjudicated willful infringer, shared a common attorney-client privilege based on their concerted actions related to Mr. Berry. Though I knew Fleming had lenders, I was until that time unaware of the admitted combination of the Lenders with Fleming the willful infringer, and immediately negotiated a tolling agreement with the Lenders through their counsel. That agreement would toll the three years of infringement up to March 30, 2007.

13. In the days prior to the tolling agreement expiring, it appeared that the Lynch Ichida firm would not represent Mr. Berry in another contingency case, this time against the Lenders. I had passed the firm's position on to Mr. Berry who was considering his options. As the end of the tolling period approached, Mr. Ichida requested, and I provided him, a copy of the draft complaint that I had prepared and copies of the principal relevant cases that supported the liability of Lenders for contributory/vicarious infringement particularly in light of Mr. Baumann's admissions and the filing of a document that contained evidence that the infringers were acting at the direction and under the direct control of the Lenders regarding the infringement.

14. On March 29, 2007, the day before the tolling agreement expired, Wesley Ichida,

the only attorney at the Lynch Ichida firm whom I dealt with regarding the Berry litigation, other than to speak in passing, authorized the filing of the law suit against the Lenders. I had no authority to file a law suit without the firm's approval that required that a principal of the firm sign the check to pay the filing fee. Mr. Ichida's affidavit at ¶ 1 is patently false and I can think of no purpose for it other than to cause Mr. Berry harm by casting the facts surrounding these decision in a false light. I did not tell Mr. Ichida that he had the right to breach Mr. Berry's confidences and secrets regarding the decisions that went into filing the of the complaint. I have no reason to believe that Mr. Berry has authorized Mr. Ichida or to make false statements regarding his case. I had never been told by Mr. Ichida or the members of the firm that I had acted without their authority as to any matter and never did. Mr. Ichida's affidavit is false in that regard.

15. Because time was running out on the tolling agreement, when Mr. Ichida told me the firm would authorized the filing, I sent an email to Mr. Berry reporting to him that the reason that the Firm had been hesitant to file the case was due to unpaid costs from the second case. Mr. Ichida told me that if Mr. Berry would agreement to pay down the costs he would authorize the filing. Mr. Berry agreed and the complaint was filed under Mr. Ichida's authority and direction, his affidavit notwithstanding. Attached hereto as Exhibit "11" is a redacted copy of the email that I sent to Mr. Berry where Mr. Berry responds to my informing him of Mr. Ichida's decision and authority to proceed in exchange for a payment on the costs. Mr. Ichida later reneged on his agreement with Mr. Berry as to the amount of the costs.

16. There has been no authorization for the Lynch Ichida firm to disclose confidences related to the filing of this case. The violation of the privilege was, as to Mr. Berry, inadvertent. I requested that the Lenders/PCT/Kors' counsel withdraw these facts but they have refused to even respond to my request.

17. During the period from March 2003 to March 2007, with Mr. Ichida serving as my second chair, I had won two judgments against Fleming for infringement. After the first jury verdict, entry of the judgment in the First Hawaii Case was delayed when Fleming filed bankruptcy. That judgment has finally been affirmed. The money that was due the Firm from Fleming has not been paid due to Fleming's insolvency.

18. Later in 2007, Paul Lynch, one of the principals of the firm, decided to leave the practice of law. During the entire period from the firm's formation in 1994, I had declined requests to become a partner/shareholder. I agreed, instead, to be paid a salary with a percentage addition to salary based on collections.

19. My completion of a large case that had, for years, been a major source of income for the Firm, combined with the difficulties in collecting the Fleming judgment, this resulted in a serious financial problems for the Firm.

20. The Second Hawaii Case was proceeding before the Court of Appeals for the Ninth Circuit, when, in or about July 16, 2007, and during the briefing of the 9th Circuit appeal, the Lynch Ichida firm determined that the earlier arrangement with me had to be modified because the firm was experiencing financial difficulties. The following Monday, I tendered my resignation.

21. Immediately, Paul Lynch became overtly hostile and told me in a meeting with Mr. Ichida and Mr. Hogan in Mr. Hogan's office that same morning that he wanted me out immediately. Later that same day, as I was preparing to exit, Mr. Ichida came to my office. He pretended that Paul Lynch had not stated that I should leave immediately and asked me to stay until the end of the month. The change in the Firm's outward demeanor towards me was striking. For the period of over a week, Mr. Ichida encouraged me to enter into an agreement with the Firm that would provide the Firm with a share in any judgment or settlement that I might obtain regarding the Berry Fleming matters in exchange for my agreement to complete the 9th Circuit Appeal in the Second Case and continue to pursue Fleming and C&S with an equal share in the contingency fee going to me.

22. During this time, Mr. Ichida was in constant contact with Mr. Smith who, prior to that, dealt exclusively with me on Berry matters unless I was on vacation in a location that I could not be reached.

23. I had required that all the Lynch Ichida shareholder/partners provide an estoppel before I would move forward to consider the agreement. When one of the firm members balked I became suspicious and refused to agree. When it appeared I wouldn't sign, Mr. Ichida became hostile and directed me to perfect the firm's lien, including a claimed lien on the Lender case.

Attached hereto as Exhibit "12" is a true and correct email thread of emails from Mr. Ichida to me trying to get me to sign and, if not, directing me to perfect the Firm's alleged liens including in the Lender Case. Late in the work day on July 25, 2007, after a heated discussion with Mr. Ichida and another shareholder, Mr. Kim, who, in a heat of anger blurted out, in effect, that everything I was doing regarding the Berry agreement was being done "as the firm's agent," it became clear to me that the firm was trying to induce me to sign the agreement to later claim that I had signed as the Firm's agent. As a result, I terminated my employment on the spot on July 25, 2007 and took my personal belongings home.

24. Even though both I and Mr. Berry had declined to sign any agreement, and I had clearly terminated my employment, Mr. Ichida persisted on trying to establish the factual predicate for his scheme to cause me to be Smith's servant. Attached hereto as Exhibit "13" is a true and correct copy of an email sent to me by Wes Ichida on June 26, 2007, after I had terminated the prior evening.

25. In November, Richard Wynne, in a letter that was written purportedly addressing our offer to attempt to settle the case, alerted me to the possible fact that the defense attorneys were having discussions with someone at Lynch Ichida, likely Mr. Ichida, that included facts, some of them outrageous and bazaar, that if true, would be covered by the attorney-client privilege. This occurred before I was required to write the letter to the Office of Disciplinary Counsel.

26. While I was preparing to file the Second Amended Complaint, contrary to the PCT, I investigated each claim and the legal basis for bring them. In regard to Lex Smith's offer to buy the Firm's lien, I first confirmed that this was a chargeable offense . I then sought to verify that the only claim that Mr. Berry had regarding the Smith offer to buy the Firm's lien was limited to that once instance, where the offer was made, confident that Ichida's plan had been abandoned.

27. On Friday, December 14, 2007, I wrote an email to Mr. Ichida to simply have him confirm that the Firm retained its rights to what ever it claimed regarding Mr. Berry and confirm no such transfer of rights had occurred. I expected a simple "that's correct" from Mr. Ichida. Exhibit "14" is a true and correct copy of an email thread maintained by me in the regular course

of my work as an attorney containing the correspondence with Wes Ichida that began on December 14, 2007 and concluded on December 17, 2007.

28. On Monday, December 17, 2007, Mr. Ichida wrote back asking for clarification regarding which case this involved and stated that Mr. Hogan had "misstated the facts."

29. That same day I wrote back explaining what "claim" I was referring to and explaining that I was trying to confirm that the Firm had not in fact sold its "claim" to anyone.

30. In response Mr. Ichida inexplicably said that he "cannot and will not confirm that Lex Smith made an offer to purchase the purported lien rights." I wrote back stating that he didn't need to have Ichida confirm the offer because he already had the proof, I was just trying to find out of the sale had occurred reducing the question to a simple yes or no, "did you assign your rights to anyone. That is a simple yes or no question. If the answer is yes, did you get paid?"

31. Ichida's answer was that, "Mr. Berry is still responsible for the unreimbursed costs advanced by this firm."

32. Because the firm had claimed a 50% contingency fee agreement I was surprised that they now only claimed costs. I pressed him, and asked "Was there any assignment of the Firm's right to be paid as the result of their contingency fee agreement?" To this Ichida replied, in part, "Tim, Whether or not we have assigned Berry's or any other client's account receivable is a firm matter."

33. Prior to this time, when ever the issue came up, the Firm had consistently claimed its entitlement to a share in any settlement of the Berry matters based a purported lien arising from the contingent fee agreement. Mr. Ichida, in December 2007, now only claimed that Berry still owed firm for unpaid costs. Up to that date, Ichida had claimed a 50% share of any settlement of the Berry litigation.

34. In regard to the issue of whether money was actually paid to his attorneys, Mr. Berry seeks to obtain the bank records of the Lynch Ichida Thompson Kim & Hirota law firm for the period after July 16, 2007 to January 31, 2008. This is relevant to the claims relevant to breaches of fiduciary duty and RICO. They will be obtained via a subpoena *duces tecum* under the cover of an authenticating declaration. I have flied a Rule 56(f) application that is incorporated by this reference. A true and correct copy of my Rule 56(f) application is attached

as Exhibit "15."

35. As to Mr. Baumann's claim to have no involvement in the Berry divorce, I have raised the issue earlier in 2007, with Mr. Baumann, and asked him directly, "aren't you concerned about becoming involved in the Berry divorce case?" In response Mr. Baumann quipped, "Don't tell my wife." I have had discussion with Mrs. Berry's divorce counsel who has informed me that Lex Smith has had direct telephone contact with Mr. Berry.

36. Attached hereto as Exhibit "16" is a true and correct copy of an excerpt of the Transcript of the Examination of Wayne Berry taken in *Wayne Berry v. Hawaiian Express Service, Inc.*, Civ. No. 03-0385 SOM-LEK, taken on August 13, 2007 where Mr. Smith admits to discussion with Mrs. Berry's divorce attorney. I have put a box around the relevant lines for the Court's convenience.

37. After the examination was over, I telephoned one of the attorneys who attended on behalf of defendant Guidance Software, Inc., Margery Bronster, the former Attorney General of the State of Hawaii, and upon information and belief, admitted to this Court, who told me in response to my inquiry that she could not explain why Lex Smith was asking so many questions about Mr. Berry's guns. I know I felt it was intended to threaten Mr. Berry and I understand it did.

38. On or about August 14, 2007, Mr. Berry called me and told me he had been served with the then dismissed divorce complaint minutes after seeing Michael Baumann in the West Palm Beach airport. He sounded extremely distraught. I have on repeated occasions, vetted his story and it has remained the same in every detail.

39. In 2007, I attended one of the many failed meditations of the Berry matters, and in a discussion, then covered by Rule 408, Mr. Kors admitted to me that he knew that C&S was continuing to use the Berry works but he could not bring himself to pay anything to cure the infringement because he had no way to establish what the works were worth. I thought to myself, "they're worth 3 to 5 years."

40. Attached hereto as Exhibit "17" is a true and correct excerpt from the Declaration of Wade Ackerman, Mr. Kors, the Lenders and the PCT's counsel where he admits a copy of correspondence related to Mr. Kors' admission that was previously inadmissable. I contacted

Kirkland & Ellis to inform them so that they could strike the exhibit, but they didn't respond. I believe in light of this and the fact that the defendants are making claims that Mr. Berry is involved in delay and harassment I am privilege to admit this evidence.

41.  Attached hereto as Exhibit "18" is a an excerpt from the Notice of Filing of Schedules in Connection with the Asset Purchase Agreement in Support of Motion for Order (A) Approving Asset Purchase Agreement with C&S Wholesale Grocers, Inc. and C&S Acquisition LLC filed on July 23, 2003 in the Fleming Bankruptcy Case. The Court is requested to take notice of this document that may be found at docket entry 2085. This schedule lists the web addresses (domain names) that were sold to C&S.

42.  In the period prior to filing the Second Amended Complaint, I continued to investigate certain matters related to ongoing operations under Fleming-Logistics.com. After Mr. Berry discovered a tariff that continued to permit shipments of "Fleming Foods" as the commodity long after Fleming was supposed to be out of business, I recalled that the Berry EULA was granted to "Fleming Foods." Mr. Berry then began to observe the online activities of Fleming-Logistics.com using one of his developer sites.

43.  On November 15, 2007, I sent an email with a copy of the relevant Matson Navigation tariff to Richard Wynne, counsel for Fleming, the PCT, Kors and the Lenders to raise our concerns that the PCT was continuing to operate a freight business. A true and correct copy of that email with a copy of the tariff report is attached as Exhibit "19." We also wondered whether Mr. Kors had some relationship with the ongoing Fleming-Logistics.com activity and the shipment of goods via ocean freight that C&S facilitates with unlicensed copies of the Berry works. If he did we believed that it would result in activity on the Fleming-Logistics.com web site.

44.  Attached hereto as Exhibit "20" is a true and correct copy of the PCT's tax status that is reported by the State of Hawaii on its public website at http://pahoehoe.ehawaii.gov. The Court is requested to take judicial notice of this filing that may be found on the official government site that also accepts on-line tax filings. Contrary to the PCT and Kors, they hold this entity out as the Post-Confirmation Trust of Fleming Co.. The Court may note that the status is "open" and the date that this withholding began was August 23, 2004, the effective date of the

Fleming Plan or Reorganization when Fleming was supposed to have been completely out of the freight business and the very day that Kors and the PCT took over.

So sworn under penalty of perjury in the City and County of Honolulu, Hawaii on this the 19th day of March, 2008.

_____
Timothy J. Hogan

Subscribed and sworn to before me this
19th day of March, 2008.
Name: _Sy R Jn_  _Sherry R Nago_
Notary Public, State of Hawaii
My commission expires: _March 5, 2010_