UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

WAYNE BERRY,                                                    :    01:07 CV 7634 WHP

                  Plaintiff,          :    Judge William H. Pauley III

          vs.                                     :    ECF Case

DEUTSCHE BANK TRUST COMPANY                  :
AMERICAS (f.k.a. BANKERS TRUST COMPANY)
and JP MORGAN CHASE BANK, in their separate        :
capacities and as agents for the pre- and post-petition
lenders of Fleming Companies, Inc.; GENERAL           :
ELECTRIC CAPITAL CORPORATION; C&S
WHOLESALE GROCERS, INC.; THE POST-              :
CONFIRMATION TRUST OF FLEMING
COMPANIES, INC.; ROBERT KORS; CORE-MARK       :
HOLDINGS INC. and DOES 1 to 200.
                                       :

                                       :

                    Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

PLAINTIFF WAYNE BERRY'S MEMORANDUM IN OPPOSITION TO THE POST
CONFIRMATION TRUST'S AND ROBERT KORS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

TIMOTHY J. HOGAN (Hawaii Bar No. 5312)
Attorney for Plaintiff WAYNE BERRY
Admitted *Pro Hac Vice*

1050 Bishop Street, Number 433
Honolulu, Hawaii 96813
Tel.  (808) 382-3698
Fax.  (808) 356-1682
Email tjh@timhogan.com

## Table of Contents

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ii**

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii**

**I.       INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**II.      FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

    **A.**     **The Breach of Contract Claim.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

    **B.**     **The "Lynch Ichida" Fiduciary Duty Claims VI, VII, VIII & IX.** . . . . . . . . **5**

    **C.**      **Abuse of Process  PCT, Kors Claim X.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

    **D.**     **The RICO Claims.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

**III.     ARGUMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

    **A.**     **The PCT and Kors Assumed Liability under the EULA.** . . . . . . . . . . . . . . **19**

    **B.**     **Kors and the PCT Are Liable for Inducing the Lynch Ichida Breaches of
Duty and Contract** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

    **C.**     **By Causing Berry's Attorneys to Breach their Duty the PCT and Kors
Committed Tortious Interference With Contract.** . . . . . . . . . . . . . . . . . . . . **23**

    **D.**     **The Defendants Engaged in Abuse of Process** . . . . . . . . . . . . . . . . . . . . . . . **23**

    **E.**     **Kors and the PCT have agreed to violate  RICO** . . . . . . . . . . . . . . . . . . . . . **24**

**IV.      CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

## Table of Authorities

**CASES**

*Berry v. Fleming Companies, Inc.*, 243 Fed. Appx. 260, 262, n.2, WL 1062946 (9th Cir. (July 5, 2007, Hawaii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Board of Education of Farmingdale v. Farmingdale Classroom Teachers Association,* 38 N.Y.2d 397, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Clark Oil Trading Co. v. Amerada Hess Trading Co., A Div. of Amerada*, 1993 WL 300039 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cline v. Flagler Sales Corp.,* 207 So.2d 709 (Fla. 3d DCA 1968) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984) . . . . . . . . . . . 24

*Grogan v. Garner,* 498 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hogg v. Walker*, 622 A.2d 648 (Del.,1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Fleming Companies, Inc*., 308 B.R. 689 (Bankr. Del.,2004) . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In the Matter of the Disciplinary Board of the Hawai'I Supreme Court and the Office Of Disciplinary Counsel*, 91 Hawai'i 363, 984 P.2d 688 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*King Prods., Inc. v. Douglas,* 742 F. Supp. 741 (S.D.N.Y.1990) . . . . . . . . . . . . . . . . . . . . . . . . 23

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor*, 262 F.Supp.2d 251 (S.D.N.Y.,2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iii

*S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir.,1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*See Lorraine v. Markel American Ins. Co.*,  241 F.R.D. 534 (D.Md.,2007)  . . . . . . . . . . . . . . . 9

*Societe Generale v. U.S. Bank National Ass'n* ,325 F.Supp.2d 435  (S.D.N.Y.,2004) . . . . . . . . 19

*Television Events & Marketing, Inc. v. Amcon Distributing Co.*, 488 F.Supp.2d 1071
(D.Hawaii,2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wantanabe Realty Corp. v. City of New York*, No. 01 Civ.10137(LAK), WL 188088  (S.D.N.Y.,
February 02, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATUTES

Hawaii Rev. Stat. §708-880 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

RICO 18 U.S.C. § 1961(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

RICO 18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Section 3581 of the Delaware Code  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

The Hobbs Act, 18 U.S.C. §1951  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## RULES

Fed. R. Civ. P. 56(f)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 23

Rules of the Supreme Court of Hawaii 2.10  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rules of the Supreme Court of Hawaii 2.7(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**OTHER AUTHORITIES**

*A. Scott & W. Fratcher, The Law of Trusts* § 326.3, at 304-306 (4th ed. 1989)  . . . . . . . . . . . . 20

Black's Law Dictionary 976, 1097 (5th ed. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I.    INTRODUCTION.

Mr. Berry's Statement of Material Facts (the "BSOMF") is filed concurrently and tracks the paragraph numbers of the Post-Confirmation Trust's  ("PCT") and Robert Kors' Statement of Material Facts (the SOMF"). The BSOMF  is supported by the Affidavits of Timothy J. Hogan Exhibits "1" to "20"  (the "Hogan Aff.") and the Affidavit of Wayne Berry Exhibits "1" to "13" (the "Berry Aff.").

## II.    FACTUAL BACKGROUND.

### A.    The Breach of Contract Claim.

Robert Kors and the Fleming Companies, Inc. ("Fleming") Post-Confirmation Trust ("PCT") argue that Mr. Kors has no liability for anything related to Berry regardless of his active roll in agreeing to facilitate C&S Wholesale Grocers, Inc.'s continuing unauthorized use of the Berry works.  The PCT-Kors' argument is that the Berry End User License Agreement (the "EULA") and his exclusive rights under the Copyright Act were all extinguished with Fleming Plan Confirmation, Kors and the PCT are free to do what every they like in regard to the Berry works.  Applying this logic to another software developer's works, when PCT received copies of Microsoft Windows®© from Fleming after confirmation, Microsoft's® licenses and copyrights were stripped off leaving Mr. Kors and the PCT free to market copies of Windows unrestricted by Microsoft's® intellectual property rights.

The evidentiary basis for the PCT and Kors' immunity is set forth in the SOMF ¶¶ 1 to 9. Mr. Berry has provided evidence clarifying SOMF ¶ 3 & 4 and disputes SOMF ¶¶ 7 and 9. Contrary to the SOMF ¶ 7, the Fleming Confirmation Order that Mr. Kors filed in support of his frivolous motion named **Robert Kors** as the PCT Representative.  *See* BSOMF ¶¶ 3, 4, 7 & 9 and Excerpt of the Fleming Plan Confirmation Order, Affidavit of Timothy J. Hogan, ("Hogan

Aff.") at ¶ 1 and Exhibit "1."   The Delaware Bankruptcy Court approved the PCT Agreement

that was submitted in the Fleming Plan Supplement that was filed on July 16, 2004.  The Plan

Supplement likewise named **Robert Kors** as the PCT Representative.  Hogan Aff. Exhibit "2."

During the Plan Confirmation Hearing, Kirkland & Ellis' lead Bankruptcy Counsel James

Sprayregen, admitted to the Bankruptcy Court that the documents that the court was approving

were in the ones in the July 16, 2004 Plan Supplement.  *See* excerpt of the Transcript of

Proceedings taken on July 24, 2003, before the Honorable Mary F. Walrath United States

Bankruptcy Judge in *In re Fleming Companies, Inc*. Bk. No.03-10945 MFW (Bankr. Del.) at pg.

11:11-21.  Hogan Aff. Exhibit "3." BSOMF ¶ 3.   The Plan Supplement named **Robert Kors** as

an individual as the PCT Representative to hold legal title to the Debtor's rights in Berry's

works.  Hogan Aff. at ¶ 2 and Exhibit "2."   The Confirmation Order that named Kors and the

PCT representative was not modified, Kors was not removed and did not resign and more

than180 days have passed since July 26, 2004 and the Plan may not now be modified.  Hogan

Aff. ¶ 4.   Finally, as proof that Mr. Berry's claim is not "far-fetched" as Mr. Kors and the PCT

claim and that the instant motion is frivolous, on August 6, 2004, in its Form 8-K, the PCT

informed the Securities and Exchange Commission ("SEC") of **Kors**' individual appointment as

the PCT Representative. Hogan Aff.  ¶ 4 and Exhibit "4."  Mr. Berry requests that the Court take

notice of this filing that is on the SEC website at http://www.sec.gov as set forth in the Hogan

Aff. ¶ 5.  A material issue of fact prevents the grant of summary judgment on Mr. Kors' status

and personal liability.  BSOMF ¶¶ 3, 4, 7 & 9.

When Mr. Kors became the PCT Representative, he became the trustee of a grantor trust

under Delaware law and voluntarily assumed legal title to all PCT assets.  *See* PCT Agreement

date July 16, 2004, Hogan Aff. ¶ 6 and Exhibit "5" at pages 3 & 9. This same agreement also provides for personal liability for acts or omissions due to gross negligence or willful misconduct. *Id.* at pages 7-8, ¶ 1.14 (a). The false claim to own the Berry Software was a Fleming asset, title to which transferred to Kors. *See* Retained Causes of Action excerpted from the Fleming Plan of Reorganization, Exhibit A-4. Hogan Aff. ¶ 7 and Exhibit "6." Upon his appointment, Mr. Kors chose to advance the same false claim of ownership. As PCT representative, Mr. Kors' had the discretion to avoid the PCT's and his own personal liability by choosing to waive any claim of ownership to the Berry works in the retained litigation under the Plan. Kors personally sought to complete the sale and transfer of these works to C&S by voluntarily becoming the plaintiff and prosecuting two cases of ongoing *Berry v. Fleming* litigation. Kors, providing material support to C&S, ratified and authorized the ongoing unlicensed use the these works under the terms of an indemnity agreement that was signed on August 23, 2003. Hogan Aff. ¶ 8 and Exhibit "7." This agreement is the equivalent of a sub-license of the Berry works commencing over a year prior to any alleged rejection that the PCT and Kors admit could have happened no earlier than August 23, 2004, the Fleming Plan's effective date. Kors, as the trustee of the PCT, lost to Berry on his personally asserted false claim of ownership over the works but the sale had already closed one year prior to any possible rejection. Kors continues to provide material support to C&S pursuant to the August 23, 2003 indemnity agreement and does so as of this writing due to C&S's extortionate threats against the PCT and arguably against him personally. *See* C&S Response and Reservation of Rights with Respect to Motion or Order in Aid of Plan, filed in the Fleming Bankruptcy on or about January 18, 2007. Hogan Aff. Exhibit "8"at ¶¶ 9 & 10. C&S boldly threatens the PCT and arguably

3

Kors personally to require their continued agreement to commit overt acts in furtherance of

C&S's criminal infringement in violation of RICO 18 U.S.C. §1962(d) and they have obliged.

The Court of Appeals has ruled against Kors' false claim of ownership and  ruled that the

greatest right Kors holds is the Berry EULA, affirming the District Court's finding that the

EULA was the operative agreement even absent a manifestation of assent.  *See* December 27,

2004 Order Denying Fleming's Renewed Motion for Judgment as a Matter of Law, etc., filed in

the First Hawaii Case.  Hogan Aff. Exhibit "9" at pg. 5.   *See also Berry v. Fleming Companies,*

*Inc.*, 243 Fed. Appx. 260, 262, n.2, WL 1062946 (9th Cir.  (July 5, 2007, Hawaii) (affirming the

district court on the enforceability of the EULA).

Despite the mandate of the Court of Appeals and the copyrights owner's repeated

demands, Kors refused to take action to force C&S to return the works as required under the

EULA apparently because of C&S's extortionate threats directed against him.  Though

continuing to honor the illegal agreement to facilitate C&S' infringement under the C&S

indemnity, Kors manifested his own belief that he has duties under the EULA by sending a

letter, via his attorneys, to C&S that asserted Berry's claim under the EULA.  Hogan Aff.

Exhibits "10" and "19."   BSOMF ¶ 9.  By continuing to unlawfully allow and facilitate the

illegal use of the Berry works by C&S, Kors and the PCT are liable to Berry as unauthorized

sub-licensors of the Berry works.  Kors cannot, after conducting over 3 years of litigation where

he falsely claimed to own Berry's works, and has permits and facilitates their use by unlicensed

third-parties, now pretend to be a stranger to the Berry EULA.  There is no law or doctrine that

grants Kors or the PCT immunity for their willful misconduct.  Kors is not the King.

**B.    The "Lynch Ichida" Fiduciary Duty Claims VI, VII, VIII & IX.**

Mr. Berry, who for over twenty years has been an independent software developer, engaged the firm of Lynch Ichida Thompson Kim & Hirota ("Lynch Ichida" or the "Firm") in 2001 to address what appeared to be a case of willful infringement committed by Fleming Companies, Inc.  Berry Aff. ¶¶ 1 -9.  Fleming lost on the ownership claim and a jury found Fleming a willful infringer by verdict filed on March 6, 2003.  Fleming then filed bankruptcy on April 1, 2003.  Berry Aff. ¶¶ 10 - 11.   Rather than stop infringing, Fleming infringed again. This resulted in another judgment against Fleming and two of its employees for infringement of one of Mr. Berry's works in the Second Hawaii Case.

In March 2006, during the trial in the Second Hawaii Case, Michael Baumann, then representing the PCT, admitted certain emails in open court and then sought to exclude them because he claimed that the instant Lender defendants, and Fleming, the adjudicated willful infringer, shared a common attorney-client privilege based on their concerted actions related to Mr. Berry.   Mr. Berry's counsel, previously unaware of the admitted combination of the Lenders with Fleming the willful infringer, immediately negotiated a tolling agreement with the Lenders. That agreement would toll the three years of infringement up to March 30, 2007.  Hogan Aff. ¶12.

Initially, Wesley  Ichida had not wanted to commence another contingency fee based Berry case.  On March 29, 2007, the day before the tolling agreement expired, Mr. Ichida, the only attorney at Lynch Ichida Thompson Kim & Hirota ("Lynch Ichida" or the "Firm") that Mr. Hogan substantively dealt with regarding the Berry litigation, after reviewing the draft complaint and supporting legal authority specifically authorized the filing of the law suit against the

Lenders.  Hogan Aff. ¶¶ 13 & 14.  BSOMF ¶ 11.  On March 29, 2007,  just before the tolling agreement would expire Mr. Hogan communicated Mr. Ichida's decision to Mr. Berry in an email that qualifies as a present sense impression.  Hogan Aff. ¶15 and Exhibit "11."   This email and the Hogan Aff. describes that Mr. Ichida was conducting a review of the cases and draft complaint and had approved the filing and proves that the Ichida Affidavit at ¶ 1, that was obviously procured by Kors and the PCT and likely the Lenders, is materially false, but moreover, evidences that the instant defendants have induced Mr. Ichida to commit a breach of duty by providing false testimony in his Affidavit.  To assist the PCT and Kors, and the Lenders he falsely claims that Mr. Hogan disregarded his superiors and filed the instant case without authority.  Mr. Ichida and the defendants intend to convey to the Court that  Mr. Hogan had ensnared the Firm in litigation that the Firm had not decided  to pursue thus casting a negative light on the Firm's view of their own client's case before this Court.  The Hogan Aff. ¶¶ 13 - 15 and Exhibit "11" evidences that this affidavit is false.  Moreover, by obtaining the false Ichida Affidavit, the PCT and Kors induced the disclosure of matters that, if true, related to Mr. Ichida's and the Firm's view of their client's litigation, that would be clearly privileged.  That act alone is sufficient proof to deny the motion.  The Hogan Aff. evidences that these defendants have induced Ichida to breach his duty to Mr. Berry and have refused to correct what is clearly an inadvertent disclosure as to Mr. Berry.  Berry Aff. ¶ 14 and Hogan Aff. ¶ 16.  BSOMF ¶¶ 11 - 30.

During the period from March 2003 to March 2007, with Mr. Ichida serving as Mr. Hogan's second chair, Mr. Hogan won two judgments against Fleming for infringement.  After the first jury verdict entry of the judgment was delayed when Fleming filed bankruptcy. That

judgment has been affirmed. The money that was due the Firm from Fleming has not been paid due to Fleming's insolvency. Hogan Aff. ¶ 17. Later in 2007, Paul Lynch, one of the principals of the Firm, decided to leave the practice of law. During the entire period from the Firm's formation in 1994, Mr. Hogan had declined requests to become a partner/shareholder and agreed, instead, to be paid a salary with a percentage addition to salary based on collections. Hogan Aff. ¶ 18. The completion of a large case that had, for years, been a major source of income for the Firm derived from Mr. Hogan's efforts, combined with the difficulties in collecting the Fleming judgment, and the departure of one of the directors, caused the Firm to suffer financial problems. Hogan Aff. ¶¶ 18 & 19.

The Second Hawaii Case was proceeding before the Court of Appeals for the Ninth Circuit, when, in or about July 16, 2007, and during the briefing of the 9th Circuit appeal, the Firm determined that the earlier arrangement with Mr. Hogan had to be modified because the Firm was experiencing financial difficulties. The following Monday, Mr. Hogan tendered his resignation. Hogan Aff. ¶ 20.

Immediately, Paul Lynch became overtly hostile and told Mr. Hogan in a meeting with Mr. Ichida and Mr. Hogan in Mr. Hogan's office that he wanted Hogan out immediately. Later that same day, as Mr Hogan was preparing to exit, Mr. Ichida came to Mr. Hogan's office. He pretended that Paul Lynch had not stated that Hogan should leave immediately and asked Mr. Hogan to stay until the end of the month. The change in the firm's demeanor towards Mr. Hogan was striking. For the period of over a week, Mr. Ichida encouraged Mr. Hogan to enter into an agreement with the Firm that would provide the Firm with a share in any judgment or settlement that Mr. Hogan might obtain regarding the Berry Fleming matters in exchange for Mr.

Hogan's agreement to complete the 9th Circuit Appeal in the Second Case and continue to pursue Fleming and C&S with an equal share in the contingency fee going to Mr. Hogan.  Hogan Aff. ¶ 21.

      After Mr. Hogan tendered his resignation, Mr. Ichida was in constant contact with Mr. Smith who, prior to that time, had dealt almost exclusively with Mr. Hogan on Berry matters. Hogan Aff. ¶ 22.  On July 26, 2007, after Mr. Hogan had resigned for good,  Mr. Berry directed Mr. Ichida,  to limit his communications with opposing counsel to the task of obtaining a continuance and preparing to withdraw.  Berry Aff. ¶ 14 and Exhibit "3."  Mr. Ichida wrote to Mr. Berry communicating with him regarding the debtor examination purportedly sought on behalf of C&S.  Contrary to the claim that the examination was sought for C&S, Lex Smith told Ichida that Smith was getting his orders from "L.A." that would mean Kors and the PCT and not C&S that is not in Los Angeles.  Berry Aff. ¶ 15 and Exhibit "4" that qualifies as an admission (as to C&S and PCT via Smith their agent Smith Aff. ¶ 1) and present sense impression or co-conspirator admission or  (as to Ichida). BSOMF ¶¶ 13 & 14. This email was also admitted by the defendants in the Smith Aff. at Exhibit "C."

      At 8:30 pm Florida time, Mr. Ichida wrote: "Mr. Berry: I forgot. <u>Lex asked me if we will consider selling/assigning our lien to them</u> (assuming we withdraw and perfect our lien). Wes." Berry Aff. ¶ 16  Exhibit "5" page 2 of 7 (emphasis added).  At 9:45 pm Florida time, Mr. Berry wrote, "What leins [SIC} are you talking about?  What day and time did Smith ask you this and what dis you tell him in response." *Id.* at page 1 of 7.  Then, at 11:09 pm Florida time, Mr. Ichida wrote, . . "during out first morning conversation.  I think it was about 9:00 or so.  I told him that the Firm has not withdrawn yet, nor have we researched and reviewed the **<u>ethics of such an</u>**

**assignment**, and whether it would be a **breach of our fiduciary duty**.  I told him that in any

event, I thought that the Agreement Tim drafted would be signed by you." *Id.* at page 1 of 7

(emphasis added).   Mr. Smith's statement to Mr. Ichida is an admission of a party opponent's

agent and are either not hearsay or are covered by an exception including present sense

impression and verbal act (I.E. an offer). *See Lorraine v. Markel American Ins. Co.*,  241 F.R.D.

534, 567 n.50 (D.Md.,2007) (verbal acts not hearsay merely shown that was actually made).  It is

offered for Ichida's state of mind and not to prove that the offer was unethical, just that the offer

was made and is disproves the Ichida and Smith sworn affidavits that say it wasn't made at all.

    When Mr. Ichida wrote to Mr. Berry, as Mr Ichida's own Affidavit shows,  he now

admits that misrepresented his state of mind to Mr. Berry about having concerns for what he said

was Smith's offer and its apparent ethical problems because he now admits that the sale was as

much his idea as Smith's.  Mr. Ichida admits under oath that his concerns for the ethics of the

Smith proposal was simply false because he had the same idea.  A reasonable juror could find

that the falsehood was intended to conceal Ichida's complicity with Smith to further Smith's plan

to obtain some interest in the Berry cases.  Mr. Ichida now admits he misrepresented the actual

circumstances of the offer and confirms the facts that go back to the day Mr. Hogan resigned that

the Lynch Ichida firm was secretly seeking some device to snare Mr. Hogan to their client's

injury.  The discussion with Smith regarding the attempt to sign Mr. Hogan up under an

agreement (that the firm would later claim to own) is also disclosed in this email as Ichida's

apparent *Freudian Slip*.  *See* Berry Aff. Exhibit "5" at page 1 of 7.    Moreover, Mr. Ichida had

been directed by Mr. Berry prior to this, not to engage in any discussion of his affairs other than

to obtain a continuance and withdraw.  Berry Aff. Exhibit "3." Just talking about this with Smith

9

about such matters was breach of duty by Mr. Ichida indued by Mr. Smith.  BSOMF ¶¶ 11-13.

The Affidavits filed in support of the Motion, all claim that the Lynch Ichida firm did not sell **its own lien** to Mr. Smith.  What the affidavits fail to address is what was actually reported to the Office of Disciplinary Counsel ("ODC") *See* Smith Affidavit Exhibit "B."   This was to engage in deceit keeping from Mr. Berry the plan to induce Mr. Hogan, who was then a firm employee, into signing an agreement that the firm would later claim was signed as the Firm's agent.  Thus, when they swear that they didn't take part in the sale of the Firms's alleged lien or rights, they simply mean that they sold Mr. Hogan's services, as the Firm's indentured servant, to Mr. Smith as a Firm "receivable."   Once the deal was struck,  Lex Smith only needed to present the contract that he purchased and Mr. Berry's attorney would have no financial reason to continue the litigation.  None of the Affidavits could serve to rebut the facts of this scheme that is what was described in the letter written to the ODC admitted by the PCT and Kors attached to the Smith Affidavit.  Contrary to the recent additional request for judicial notice contained in the letter to chambers from C&S' counsel, dated March 16, 2008, the decision to put any investigation in abeyance is evidence of nothing and counsel should be admonished form attempting to make these matters part of a civil proceeding at all. *See In the Matter of the Disciplinary Board of the Hawaii Supreme Court and the Office Of Disciplinary Counsel*,  91 Hawaii 363,370, 984 P.2d 688, 695 (1999) (disciplinary proceedings are confidential and not relevant to civil or criminal proceedings).  Even if such materials had evidentiary value the standard that counsel was unsure of is, as suspected, a higher standard than is applied to the instant civil claims and therefore would not give rise to collateral estoppel.  *See* Rules of the Supreme Court of Hawaii 2.7(c) (standard applied to formal proceedings is clear and

10

convincing); *Grogan v. Garner,* 498 U.S. 279, 284-5 (1991) (standard of proof must be same or lower to apply collateral estoppel). In addition, the letter does not exonerate anyone. The ODC has discretion to hold investigations in abeyance. *See* Rules of the Supreme Court of Hawaii 2.10 due to pending "criminal or civil litigation."

Leaving aside the obvious fact that the agreement with Lex Smith and the Firm was intended to restrict Mr. Hogan's ability to practice law and a likely violation of law and public policy and the practice of such deceit against anyone is unethical, the plan was intentionally and knowingly **concealed from Mr. Berry**. The attorney (Ichida) had a duty to inform the client that was conspiring with Smith to cause him harm regardless of what the effect was on Hogan. Instead, to lull Mr. Berry, Ichida falsely claimed that he thought Smith's offer might be unethical and a breach of fiduciary duty. Mr. Ichida now admits, under oath, that what he said was an unethical idea was as much his as it was Smith's. Fortunately, Mr. Hogan had required that all the Lynch Ichida shareholder/partners provide an estoppel before he would move forward to consider the deal. When one of the firm members balked, Mr. Hogan became suspicious and refused to sign. Hogan Aff. ¶ 23 and Exhibit "12." Even though Mr. Hogan and Mr. Berry had declined to sign the agreement, Mr. Ichida persisted on claiming both Mr. Berry and Hogan were, by the negotiations alone, bound to perform the agreement. Hogan Aff. Exhibit "13."

In December 2007, while Mr. Hogan was preparing to file the Second Amended Complaint, he sought to verify that the only claim that Mr. Berry had regarding the Smith offer to buy the lien was limited to that once instance, where the offer was made, under the belief that Ichida's claim to have ensnared both he and Berry had been abandoned. This was also, in part, due to the suspicion that Mr. Hogan had that Mr. Ichida was discussing matters with opposing

11

counsel, that if true, would be privileged.   Hogan Aff. ¶¶ 25 - 26.  BSOMF ¶ 19.

On Friday, December 14, 2007, Mr. Hogan wrote an email to Mr. Ichida to simply have him confirm that the Firm retained its rights to what ever it claimed regarding Mr. Berry and no such transfer of rights had occurred.  Mr. Hogan expected a simple "that's correct" from Mr. Ichida. Hogan Aff. ¶ 27 and Exhibit "14."  On Monday,  December 17, 2007, after Mr. Ichida would have had time to check with "L.A.", Mr. Ichida wrote back asking for clarification regarding which case this involved and stated that Mr. Hogan had "misstated the facts."  Hogan Aff. Exhibit "14" at page 5 of 6.  That same day Mr. Hogan wrote back explaining what "claim" he was referring to and explaining that he was trying to confirm that the Firm had not sold its "claim" to anyone that the Smith "offer" was all that had transpired.  Hogan Aff. Exhibit "14" at page 4 of 6.  In response, despite his earlier emails to Mr. Berry where he discusses the offer, Mr. Ichida inexplicably said that he "cannot and will not confirm that Lex Smith made an offer to purchase the purported lien rights."  Hogan Aff. Exhibit "14" at page 4 of 6. Mr. Hogan wrote back stating that he didn't need to have Ichida confirm the offer because he already had the proof, he was just trying to find out of the **sale** had occurred reducing the question to a simple yes or no, "did you assign your rights to anyone. That is a simple yes or no question. If the answer is yes, did you get paid?"  Hogan Aff. Exhibit "14" at page 3 of 6. Ichida's answer was "Mr. Berry is still responsible for the unreimbursed costs advanced by this firm."  Hogan Aff. Exhibit "14" at page 3 of 6.  Hogan pressed on. "Was there any assignment of the Firm's right to be paid as the result of their contingency fee agreement?" Hogan Aff. Exhibit "14" at page 2 of 6. To this Ichida replied, in part, "Tim, **Whether or not we have assigned Berry's or any other client's account receivable is a firm matter**."  Hogan Aff. Exhibit "14" at page 2 of 6

(emphasis added).

Had they structured their deal to avoid having to concede they sold their own alleged lien to the opposing party, the "receivable" that Mr. Ichida refers to would be generated by Mr. Hogan's efforts as Mr. Smith and his clients' unwitting servant. Despite Mr. Hogan's attempts to pin Ichida down on whether he had received a payment or entered into the agreement, all questions resulted with Mr. Ichida pointing to his earlier email stating that its was a "firm matter." Hogan Aff. Exhibit "14"at page 1 of 6.  BSOMF ¶¶ 11, 12, 13, 15 & 19.

The Affidavits that were submitted when read to verify if they addressed the actual scheme all fail to support a grant of summary judgment. In regard to the Ichida Affidavit, if Lex Smith was purporting to act on his own account and paid the money from his own personal funds, then Mr. Ichida's Affidavit might be true but fraudulently deceptive. Likewise, if Mr. Smith was purporting to act on his own account, or on C&S's account, and buying a rights to Mr. Hogan and not the Lynch Ichida lien, his Affidavit might be outwardly true but also fraudulently deceptive and not addressed to the cental question raised in the Second Amended Complaint or the letter to the ODC.

As further evidence that a sale had occurred, despite his earlier claims to a right to a share in any settlement of the Berry matters based a purported lien, Mr. Ichida, in the December 2007 email chain only claimed that Berry still owed firm for unpaid costs. *See* Hogan Aff. Exhibit "14." Up to that date, Ichida had claimed a 50% share of any settlement of the Berry litigation. Hogan Aff. ¶ 33. What caused Ichida to waive the Firm's contingency fee claim? A reasonable juror could find that Ichida's responses evidence that he received or had agreed to some payoff for the transfer of a purported interest in his client's matter, or just to assist the other side in

13

defeating his client's case as evidenced by the false statements in his Affidavit.   The Ichida Affidavit serves only to prove that he has been assisting the adverse counsel against his own client.  That is all Mr. Berry need prove in regard to the breach of duty claims interference with contract and summary judgment must be denied.  Mr. Berry has no need to prove any money changed hands or was even contemplated.   The failure to offer blanket denials regarding getting anything delivered or promised or offered by the opposing parties including their counsel dooms the motion that serves only testament to the breach of duty and the act of inducement.

As to imputing this to the PCT and Kors, Smith is a dual agent regarding Berry as set forth in the Smith Affidavit, ¶ 1.   Smith's claim to be working only for C&S in regard to these discussion is also proven false by Mr. Ichida's email where he passes on what Smith said (Ichida's present sense impression) specifically that Smith was getting his directions from "L.A." Berry Aff. Exhibit "4." That means Kirkland & Ellis, I.E. Mike Baumann and the PCT, Kors and the Lenders, who through counsel were directing this sordid affair from Los Angeles.

By now denying the offer was made, Ichida and Smith now admit in their own affidavits to have combined to deceive Mr. Berry regarding the offer to sell the lien. See *Clark Oil Trading Co. v. Amerada Hess Trading Co., A Div. of Amerada*, 1993 WL 300039, *6 (S.D.N.Y.) (Black's Law Dictionary defines "an offer" as "a proposal to do a thing" and "proposal" as "an offer." *Citing* Black's Law Dictionary 976, 1097 (5th ed. 1979).  Ichida earlier email admits that Smith made an offer.  Under  Hawaii Rev. Stat. §708-880, and offer of over $1,000 made to an attorney to breach a duty is a Class C felony and a RICO predicate under RICO 18 U.S.C. § 1961(1)(A).

In regard to the proof that money was paid to the Lynch Ichida firm, first Ichida said that if they got paid, that was firm business.  Mr. Berry believes that a reasonable juror could find

14

that Mr. Ichida's refusal to simply say we did not get paid anything at all, under these circumstances where he has a duty to disclose to his client, would be sufficient to find that the payment was made.   Mr. Berry has submitted a Fed. R. Civ. P. 56(f) application that sought additional time to obtain records related to certain matters, including, the receipt of funds by the Lynch Ichida firm. Mr. Berry believes that the Motion should be denied in its entirety and the discovery permitted to obtain these records.  Hogan Aff. Exhibit "15."

In regard to the Claim for Inducement of Breach of Contract, the PCT and Kors know that there was an agreement between Mr. Berry and his attorney that even if not reduced to writing (and it was) is implied by the attorney-client relationship.  Smith asked if he could buy an interest in the fee agreement. Ichida n, to assist the defense, now says the offer was never made.  By inducing the breach of duty they also induced the breach of contract and are liable for it as set for in the SAC.

**C.    Abuse of Process  PCT, Kors Claim X.**

Despite being charged in an ODC complaint with engaging in Champetry related to the Berry Divorce, Lex Smith chose to remain silent other than to admit, but not explain, why he has had contact with Mrs. Berry starting in 2005 and why he is in repeated contact with Mrs. Berry's divorce attorney.  He also chose to remain totally silent on the ODC charge that he had facilitated criminal infringement.  It is important to note that the complaint against Smith was made after the ODC asked counsel to respond.  Smith's adoptive admissions are imputed to his many masters, in this case that Kors, the PCT and C&S.  *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor*,  262 F.Supp.2d 251, 259  (S.D.N.Y.,2003) (adoptive admission is manifestation of belief in the truth of a statement that may occur by silence, that is a

15

failure to respond when natural to do so).

As to Mr. Baumann's claim to have no involvement in the Berry divorce, Mr. Hogan earlier asked Mr. Baumann, "aren't you concerned about becoming involved in the Berry divorce case?" In response Mr. Baumann quipped, "Don't tell my wife." Hogan Aff. ¶ 35. At no time did he ever deny his involvement when the issue was raised that had first been evidence by Lex Smith's time records that were attached to the Smith Affidavit. The fact that Mr. Baumann traveled to West Palm Beach to effect service of a dismissed divorce complaint raises a triable issue to defeat summary judgment. Berry Aff. ¶ 17.

All of the evidence that was produced, including the Affidavits of two alibi witnesses and a uncorroborated parking receipt are rebutted by the Berry Affidavit where Mr. Berry testifies that he saw Mr. Baumann in the West Palm Beach, FL airport less than an hour before the dismissed divorce complaint was served. Berry Aff. ¶ 17. The Rule 56(f) Application filed on March 3, 2008, Hogan Aff. Exhibit "15" sets forth the facts related to the three Florida private detectives that also evidences Mr. Baumann's involvement. The Baumann Aff. does confirm that Mr. Baumann and Mr. Berry were in two airports at the same time on August 13 (Honolulu catching the red eye) and 14th (Los Angeles landing from Honolulu). Mr. Baumann admits that he was not at his office for nearly three days in a work week choosing to stay home. Berry's Affidavit rebuts the showing of the alibi witnesses and raises an issue of fact and establishes that he was put in fear for his life by the deliberate actions of these defendants. Berry Aff. ¶ 17. As set forth in the Rule 56(f) application filed on March 3, 2008, and incorporated herein, Mr. Berry has been prevented from obtaining discovery regarding the PCT-Baumann role in the divorce proceeding and the Court should deny the motion and allow the discovery to proceed.

16

As to the claims related to initiation of the divorce proceeding in the State of Hawaii in 2006, Lex Smith failure to respond to the ODC complaint that attached a copy of one of his firm's time records that showed the discussions with Mrs. Berry prior to the fling of the divorce serve as an adoptive admission of Smith's role in the divorce. He admitted to having discussion with Mrs. Berry's attorney before the examination, Hogan Aff. Exhibit 16 at page 116:17-25. and though charged with Champetry related to the Berry divorce, Smith, the Chairperson of the City Ethics Commission chose to remain silent. A reasonable innocent person would have denied the charge. Smith admitted it by his silence. That admission is imputed to his several masters. BSOMF ¶¶ 36 - 46.

### D.     The RICO Claims.

The Kors and PCT memorandum and SOMF don't even attempt to deny that C&S is engaged in criminal infringement or that Kors and the PCT have not agreed to the commission of these predicate acts. Kors admitted that he knew of C&S' ongoing infringement of Berry works to Mr. Hogan about a year ago. Hogan Aff. ¶¶ 39 & 40 and Exhibit "17. Smith also admitted it to Mr. Hogan. Berry Aff. ¶ 26. The SOMF focuses, with a few exceptions, on the factual premise that Lex Smith is not paid to exert pressure on other public officials. *See* SOMF ¶¶ 47 to 54. The PCT/Kors Memorandum and SOMF appear to claim that this is a key material issue. It is not even mentioned as a RICO predicate act in the Second Amended Complaint.

The only other evidence offered is the SOMF ¶¶ 55 to 59 that claim that the PCT and Kors do not engage in "operations" or "overseas shipping" and does not use any freight control software. First, the PCT and Kors miss the point. They have agreed to C&S using the Berry works in furtherance of a Racketeering enterprise. That Agreement and the overt acts committed

17

in furtherance of it is a violation of RICO that the PCT and Kors have conceded.  The Indemnity

Letter Hogan Aff. Exhibit "7" and the C&S Response, Hogan Aff. Exhibit "8" along with Kors'

admission evidence the agreement that Kors and the PCT choose to honor despite the fact that

the agreement contemplates the commission of predicate acts in violation of RICO.  *See* Hogan

Aff. ¶¶ 39 & 40 and  Exhibit "17."  Even without this evidence, there is compelling evidence that

PCT and Kors continue to operate **Fleming-Logistics.com** to historic depository of the

infringing Berry works.  Berry Aff. ¶ 21.   BSOMF ¶¶ 55 - 59.

When Fleming sold its wholesale business to C&S it sold several internet web addresses

known as "domain names."  *See* excerpt of the Fleming-C&S Asset Purchase Agreement, Hogan

Aff. ¶ 41 and  Exhibit "18."  Former Fleming employees continue to work for Fleming-Logistics

as evidenced by business records that Mr. Berry receives in the regular course of his business

that continues to list his former employee's address under the Fleming-Logistics.com domain

name.   Berry Aff. ¶¶ 18 - 21 and Exhibit "6."

In addition, in 2007, Mr. Berry discovered that Matson Navigation was maintaining an

ocean freight tariff that contained a commodity group for "Fleming Foods."  Berry Aff. ¶ 22 and

Exhibit "8."  After Mr. Kors and the PCT's attorneys were informed the tariff was changed in a

matter of days.  Hogan Aff. ¶¶ 42-43 and Exhibit "19" and Berry Aff. ¶ 23 and Exhibit "9."   Mr.

Berry, who has negotiated several tariff modifications with Matson and Horizon Lines, has never

seen a tariff changed so fast.  Berry Aff. ¶ 23.  The tariff is admissible under Fed. R. Evid. 803

(17).  *See Wantanabe Realty Corp. v. City of New York*, No. 01 Civ.10137(LAK), WL 188088,

*2 (S.D.N.Y., February 02, 2004).

A reasonable juror could conclude that the PCT and Kors' continue to do business as

18

Fleming-Logistics as evidence by the continued domain name registration and by the apparent ability to cause the tariff to be changed on such short notice, done to conceal their ongoing freight related activities.  Moreover, the Fleming-Logistics.com web site, that was never officially transferred to C&S in the APA,  has ongoing online activities consistent with the transmission of internet data that is consistent with database related data.  Berry Aff. ¶¶ 24 - 31 and Exhibits "7" to "12 ."   Kors says he's not using the Berry works, but the evidence says he is. At a minimum, he is engaged in permitting the ongoing use of Fleming-Logistics that on the Senderbase report is running from the same server address as the former infringing copies of the Berry work. Berry Aff. ¶ 32.  Perhaps in the Reply Mr. Kors can explain why, if he is not engaged in freight work, he continues to maintain a withholding tax license in the State of Hawaii that he obtained on August 23, 2004, the effective date of the Fleming Plan, they day Fleming died.  Hogan Aff. Exhibit "20."

## III.    ARGUMENT.

### A.    The PCT and Kors Assumed Liability under the EULA.

The Berry Software was an asset that Kors as the trustee of the PCT, through his power to conduct litigation, assumed as a PCT asset under the terms of the Plan, Order Confirming the Plan and the PCT Agreement. When Kors agreed to be the PCT representative,  a Trustee under the Delaware grantor trust, he voluntarily assumed personal liability for conduct of the continuing actions related to the false claim to own the Berry works.  *Hogg v. Walker*, 622 A.2d 648, 653 (Del.,1993) (trustee's liability is personal and trust estate is not a separate legal entity that can immunize the trustee for the consequences of misconduct).  Section 3581 of the Delaware Code, provides Mr. Berry with several remedies that would include the equitable

remedy of specific performance or damages.  Likewise, New York law creates a presumption

that a trustee is personally liable.  *Societe Generale v. U.S. Bank National Ass'n* ,325 F.Supp.2d

435, 437 (S.D.N.Y.,2004).

      Mr. Berry's request was simple and imposed no direct financial burden on the PCT or

Kors.  He was asked to simply require C&S to return the property that Kors attempted to procure

for C&S.  Because he failed to prevail on the debtor's and then his own false claim of ownership,

equity and Delaware law require that he act to restore Mr Berry's property he falsely claim to

own.  He refused, so Mr. Berry has a right to specific performance and/or damages.  The

remedies in the EULA, that the District Court in the First Hawaii Case ruled controls, and the

Court of Appeals affirmed, could have been avoided by Kors had he done no further harm and

not pretended to own the works.  He, however, chose to assume his own personal liability by

continuing the Debtor's now proven false claim of ownership and by refusing to restore Mr.

Berry's property when he had exhausted all his and C&S' legal defenses.

      Kors' last argument is that he is only an employee of the PCT Trustee, his own shell

corporation, and therefore, he owes no duty to Mr. Berry or anyone presumably.  Delaware law

imposes liability even where the trustee, like Kors, hides behind a shell entity.  "…. The directors

and officers are in a fiduciary relation not merely to the [corporation] … but to the beneficiaries

of the trust administered by the [corporation]."  *In re USACafes, L.P. Litigation*, 600 A.2d 43, 49

(Del. Ch.1991) *citing A. Scott & W. Fratcher, The Law of Trusts* § 326.3, at 304-306 (4th ed.

1989).    Kors, simply, has no place to hide.

      The PCT and Kors make an argument that the alleged rejection under the Plan

confirmation order wiped out Mr. Berry's rights.  But Kors continued to perform under a

contract with C&S that required he assist C&S in committing infringement of Berry works by doing so, Kors voluntarily assumed his own liability under the EULA.  The defendants submitted Mr. Berry's rejection damages claim that only serves to concede that Mr. Berry is a PCT beneficiary (I.E. holder of general unsecured claim).  Kors and his attorneys know full well that their position is frivolous.

In another instance in the very same Fleming case, the Bankruptcy court addressed what happens if the debtor sells an asset (like the Berry works) that are covered by a contract (like the Berry EULA)  that would otherwise be susceptible of rejection upon confirmation or earlier. The PCT was represented by the same Kirkland & Ellis attorneys.  The Bankruptcy Court in the Fleming Bankruptcy Case held that, if the sale that triggers the remedies occurs prior to rejection (in this case the C&S Sale was 8/23/03, and Plan Effective date causing automatic rejection was on 8/23/04) but after 60 days after the filing of the voluntary petition (in this case 4/1/03) no subsequent claimed rejection can relieve the PCT of liability.  *See In re Fleming Companies, Inc. (PCT-Northstar Refrigeration)*, 308 B.R. 689, 692 (Bankr. Del.,2004).  More to the point, the Bankruptcy Court specifically held that, under these circumstances assumption is not a condition precedent to the PCT's liability.  "However, under section 365(d)(10) assumption of the contract is not required for the enforcement of a lease obligation triggered by the Debtors' post-petition conduct."  *Id*. *Northstar* involved a simple contract case.   Here, Kors as the PCT trustee, wasn't trying to avoid  paying for a refrigeration system, like in *Northstar*, he was and is facilitating ongoing criminal conduct.

### B.    Kors and the PCT Are Liable for Inducing the Lynch Ichida Breaches of Duty and Contract.

To prevail on a claim of inducement of breach of fiduciary duty,  Mr. Berry need only

prove the "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or **participated** in the breach, and (3) that the plaintiff suffered damages as a result of the breach." S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-8, note 3 (2d Cir.,1987) (emphasis added).   The evidence shows that Mr. Ichida has turned against his own client at the obvious behest of the defendants in this case. The damage is obvious.  Wes Ichida admits in his Affidavit that he misrepresented his state of mind to Mr. Berry when he claimed that he rebuffed Lex Smith's offer as possibly unethical.  When the truth was kept from Berry that was a breach of the duty to disclose relevant facts to the client.   Smith, who holds himself out as the judge of others' ethics,  should have told Ichida it was unethical but in any event, Smith can't deny he "**participated**" in the breach because he admits that he and Ichida were discussing it and a juror could find offering each other encouragement for this act of disloyalty "participated" in the breach and that is all that Mr. Berry need prove.   Contrary to the Memorandum of Points and Authorities, Hawaii courts like New York,  find the conduct in this case actionable. *See Television Events & Marketing, Inc. v. Amcon Distributing Co.*, 488 F.Supp.2d 1071, 1083 (D.Hawaii,2006) (assisting or colluding sufficient).  Both Smith and Ichida admit to collusion in their Affidavits.

Lex Smith admits he is an agent for C&S,  Kors, the PCT.  The Smith and Ichida Affidavits both evidence that Smith offered Mr. Berry's attorney, Wesley Ichida,  money in exchange for his agreement to the breach of the fiduciary duties owed to Mr. Berry. That offer alone is actionable under Hawaii Criminal statutes.

When Kirkland & Ellis began to obtain confidential  information from Ichida, they knew they were inducing a breach of fiduciary duty.  Any claim to not have intentionally engaged in

22

this conduct is rebutted by their failure to correct the damage done to Mr. Berry who never authorized Mr. Ichida to make such statements to anyone let alone apposing counsel.

Mr. Berry has filed a Fed. R. Civ. P.56(f) Application to address the issue of the proof that money was paid to Lynch Ichida. The Second Amended Complaint however, makes no allegation that this is the sole basis for the Court imposing liability. Based solely on the proof submitted by the PCT and Kors, the Court could enter judgment against the defendants as there is no issue of material fact that the breaches of duty occurred and the PCT trustee's agents induced and/or contributed to them. By filing the Ichida Affidavit, the PCT and Kors have substantially assisted Mr. Ichida in again breaching his duty to Mr. Berry regarding the duty of loyalty, not practice deceit and the duty to maintain confidences and secrets.

### C.    By Causing Berry's Attorneys to Breach their Duty the PCT and Kors Committed Tortious Interference With Contract.

A plaintiff must establish that a defendant had knowledge of the contract at issue. *Don King Prods., Inc. v. Douglas,* 742 F. Supp. 741, 775-76 (S.D.N.Y.1990). A plaintiff, however, need not prove that a defendant had "perfect or precise knowledge of the terms and conditions of the contract in issue." *Id.* In this case, Smith made the offer to buy the "lien." Smith is an attorney. A lien only derives from a contractual right. He tempted Ichida by encouraging a breach of duty, a duty that is implied in any attorney-client agreement. Ichida's providing false facts, which if true, would be privileged, evidences the interference with the attorney-client contract.

### D.    The Defendants Engaged in Abuse of Process.

There remains a triable issue of fact regarding whether the PCT and its attorneys caused the service of a dismissed divorce complaint to advance the ongoing criminal infringement.

23

First, the complaint was dismissed. The PCT/Kors Request for Judicial Notice evidences on the first page that the court's own status shows dismissed and shows the termination date. See Request for Judicial Notice "E". Mr. Berry's Affidavit evidences that Mr. Baumann was at the West Palm Beach airport minutes before service, and is directly contrary to all three Baumann offered Affidavits. This evidence cannot be reconciled and the motion must be denied.

Under New York law, Mr. Berry must prove "(1) regularly issued process (civil or criminal); (2) an intent to do harm without excuse or justification; and (3) use of the process in a perverted manner to obtain a collateral objective. *Board of Education of Farmingdale v. Farmingdale Classroom Teachers Association,* 38 N.Y.2d 397, 403, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975); *Curiano v. Suozzi,* 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984). Likewise, Florida provides for liability where the service is for a "collateral purpose." *See Cline v. Flagler Sales Corp.,* 207 So.2d 709, 711 (Fla. 3d DCA 1968).

Kors and the PCT claim that, even if Mr. Baumann had been involved in serving the dismissed divorce complaint, serving a complaint is not an abuse of process. The distinction is that the service of the divorce complaint was not to advance the divorce but to terrorize Mr. Berry and facilitate the ongoing criminal infringement. When process, otherwise proper, is used to advance an improper purpose, that is abuse of process whether it occurs in New York or Florida.

### E.    Kors and the PCT have agreed to violate RICO.

Other than the several paragraphs of Lex Smith's character bolstering, in what appears to be an afterthought, the PCT and Kors make a simple claim not to be engaged in shipping freight so even if engaged in agreeing to the commission of criminal infringement, violations of the

24

Hobbs Act, money laundering and the other RICO violations alleged, Kors and the PCT are immune. The defendants have not met the most basic burden to shift to Mr. Berry the need to even respond. In any event, Kors and the PCT have filed in this Court a communication that had been protected by Rule 408 in support of their motion for a bond. Hogan Aff. at ¶¶ 39 - 40 and. Hogan Aff. Exhibit "17." This email describes and the Hogan Aff. confirms that Kors admitted that he has knowledge of the ongoing infringement at C&S but would not pay anything to license C&S's use because he could not determine what the works were worth. So Kors and the PCT agree to honor the Berry Technology Indemnity that permits C&S "future use" of unlicensed Berry works while Kors and his agents continue to assault Mr. Berry, the rightful owner of the works, through a variety of schemes, including criminal infringement, commercial bribery, physical intimidation not to mention involvement in his most sensitive family matters. BSOMF ¶¶ 55 - 59.

## IV.    CONCLUSION.

For the reasons stated, the Motion should be denied.

Respectfully Submitted: Honolulu, Hawaii, March 20, 2008.

/S/Timothy J. Hogan
TIMOTHY J. HOGAN (Hawaii Bar No. 5312)
Attorney for Plaintiff WAYNE BERRY
Admitted *Pro Hac Vice*

1050 Bishop Street, Number 433
Honolulu, Hawaii 96813
Tel.  (808) 382-3698
Fax.  (808) 356-1682
Email tjh@timhogan.com