# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen,<br><br>        Plaintiff,<br><br>    v.<br><br>HAWAIIAN EXPRESS SERVICE,<br>INC., et al.<br><br>        Defendants. | CIVIL NO. CV03-00385 SOM-LEK<br>(Copyright)<br><br>AFFIDAVIT OF MARK DILLON |

### AFFIDAVIT OF MARK DILLON

STATE OF HAWAII          )
                                      ) SS.
CITY AND COUNTY OF HONOLULU  )

      MARK DILLON, being first duly sworn under oath deposes and says as follows:

      1.   I am a Defendant in this case. I am a salaried employee that works as the Local Area Network ("LAN") Administrator in the logistics department of C&S Wholesale Grocers, Inc.'s Hawaii Division ("C&S") in Kapolei, Hawaii.

      2.   In the logistics department, our responsibility is to arrange for the transportation of the groceries that C&S brings into the State. I am responsible to make sure that the computers used by the employees in the department are functioning, to maintain the spreadsheets we use, including updating them with new PO data each day, and to create any reports required to publish our data.

3. I was employed by Atlantic Pacific International, Inc. ("API") in February 1997, where I worked directly under Mr. Wayne Berry. At API, I performed programming, created and modified various Crystal Reports, created and maintained minor databases (separate from Mr. Berry's Access database), replicated (synchronized) Mr. Berry's access database according to his instructions, installed software, provided user support, maintained document images, and maintained the network when Mr. Berry was unavailable.

4. In 1999, Fleming Companies, Inc. ("Fleming") purchased certain specific assets from API and hired API's employees (except for Wayne Berry and Jack Borja). I was employed by Fleming on October 1, 1999 to maintain the Logistics network and database and to perform any required programming.

5. I am thoroughly familiar with all of the freight tracking logistics that has gone on in the computers of API, Fleming and C&S.

6. I am aware that Plaintiff filed copyright registrations for three pieces of software he claimed he developed before he worked at API: 1) Freight Control System (access database); 2) FlemingPO.exe; and 3) "Prepaid Vendor Invoice Definition for Crystal Reports". The Freight Control System consisted of a Microsoft Access Database in which we recorded data regarding logistics arrangements and costs. The

"Prepaid Vendor Invoice Definition for Crystal Reports" was one of numerous different reports created using Crystal Reports and used by Fleming to display the data.

7. At the time that the transition from API to Fleming took place, I believed that we had permission from Plaintiff to use the software because Plaintiff came to the logistics department and saw and approved all of the employees continuing to use the same computer software before, during and after the purchase of assets by Fleming from API. Plaintiff expressly said to me and other employees in a group that operations, including the use of software, would continue as they had with API.

8. In the summer of 2001, I became aware that Plaintiff filed a lawsuit against Fleming claiming that we had created illegal derivatives of the Plaintiff's Access database, Fleming PO.exe, and a certain Crystal Report entitled "Prepaid Vendor Invoice."

9. The matter proceeded to a jury trial. I was not a party to that lawsuit. I testified as a witness.

10. On March 6, 2003, the Special Verdict Form was filed. The jury determined that Fleming had a valid license for the use of the Plaintiff's software. It also found that Fleming made unauthorized changes to the system and awarded Plaintiff $98,250 in damages. It found no infringement or unauthorized

changes by Fleming with regard to Crystal Reports or the FlemingPO.exe software.

11.  I intended to do anything required to comply with the Jury Verdict.  As a company, Fleming immediately took steps to comply with the jury's verdict.  Immediately after the verdict, Fleming instructed me to revert to the original licensed version of the Freight Control software.  We did so prior to April 1, 2003.

12.  Since the jury determined that we had a license to use the software, but that we were not authorized to make changes, Fleming instructed me to go back to using the software as it existed when Mr. Berry licensed it to us on October 1, 1999.

13.  The oldest copy of the software that we had in our possession was archived in June of 2000.  The June 2000 version was identical to the October 1999 original, except for a feature I had added to compensate for a Y2K failure of Mr. Berry's database update program, and a field scratch name added to the name - company table, and possibly two label changes, field name, voucher name and voucher ID.

14.  I removed the feature I had added to revert to the database in the form under which Mr. Berry had licensed it to Fleming.

4

15. The use of Plaintiff's outdated software made it very difficult on operations because operations had changed, and Plaintiff's original database no longer had a place for a lot of the data items being used. We had to squeeze them into places in Plaintiff's software where data items we did not use were represented and we used those places, mislabeled, sometimes with the wrong data type, all over the page, not in the right tab order. The access database was also very slow. The version of Access under which Mr. Berry's database was created, Access 97, does not run well on Windows 2000.

16. Fleming operated using Plaintiff's original version from the end of March 2003 to June 9, 2003.

17. After further and various complaints from Plaintiff about using his software, Fleming instructed me to get completely away from Plaintiff's software by taking Fleming's data out of Plaintiff's software and putting into Excel spreadsheets (a Microsoft owned computer program).

18. This was an arduous task because I had to create the spreadsheets from scratch using Microsoft Excel. I used a program called MS Query to request Fleming's data from Plaintiff's database and insert the data into the spreadsheets.

19. Fleming operated without using any of Plaintiff's software by using the Excel Spreadsheets.

20. The switch to Excel Spreadsheets enabled operations to continue without using any of Plaintiff's software. But the transition, again, caused great hardship on operations.

21. Since June 9, 2003, neither I nor any employee of Fleming or C&S has used Plaintiff's software.

22. In July, 2003, in a further effort to comply with the jury's findings and the continued complaints of the Plaintiff, Fleming hired Guidance Software, LLC. ("Guidance"), a computer company to come to Hawaii to review and inspect all of the computer files and software being used by Fleming, and to remove any software belonging to Plaintiff.

23. Mr. Gurzi was the representative of Guidance who came to Hawaii, and who worked directly with me.

24. On account of the constant problems resulting from our move to spreadsheets, and on account of a delay in deciding on the exact strategy to be used by Guidance Software to remove Mr. Berry's software from the network, I had insufficient time to prepare for Mr. Gurzi's arrival. I assisted Mr. Gurzi while attempting to minimize the downtime and interruption of staff and operations.

25. I worked approximately 75 hours mostly over the July 4th, 2003 weekend with Mr. Gurzi. Mr. Gurzi took his second, final image within the first 10 days of July, 2003 before

he left. The purpose of the second image was to keep a record of what was left on the network.

26. With Mr. Gurzi's knowledge and approval, I restored certain software back onto the system; these were off the shelf applications such as Microsoft office, Crystal Reports, Adobe Acrobat, etc. I never intended to restore any of Plaintiff's software.

27. As part of this process, I needed to retain approximately 20,000 user files on the network to be restored to their appropriate locations at the end of the entire process. These had been collected in a certain location, and purged of any software created by Mr. Berry. Due to an error, some of these files were missing when time came to restore them to their proper locations. I requested that Mr. Gurzi replace certain folders from the first image he acquired, then proceeded to purge those replaced files of any software created by Mr. Berry. Again, I did not intend to restore any of Plaintiff's files in the process.

28. During this purge of the replaced files, I had to search for and open any Crystal Reports to verify whether any of those files contained on the computer were created by Plaintiff, in an effort to remove all Berry software from the network.

29. After Mr. Gurzi left, I never opened or used any software of the Plaintiff as it was my, and every other employee

of Fleming or C&S's, intent not to have anything to do with Plaintiff or any of his software.

30. In June, 2004, I became aware by discussing the motion for preliminary injunction for the first time that Plaintiff was claiming that I had somehow violated his rights because 16 copies of the file **fcs logistics data.mdb** purportedly remained on the system after Guidance left.

31. After I learned about this allegation, I went back to look for the files on the network. I conducted a search of all of the computers at the company. For each hard drive on each computer on the network, I entered the following command to see whether any files bearing Plaintiff's identifiers remained on the system: "dir [drive letter]:\FCS*.mdb /a:-d /o /t:caw /s". No other files matching those identifiers were found on the system.

32. By looking at the identifiers and sizes of the 16 files being questioned, my recollection is that these were files that were maintained in my computer and were the form of Plaintiff's software without any data. These were prepared at Fleming's counsel's direction for the first lawsuit filed against Fleming by Plaintiff to comply with Plaintiff's discovery request. I suspect that they eluded my purge of the Plaintiff's software from my files because they were located in a place where I do not usually keep software files.

8

33. I never used any Plaintiff authored software after June 9, 2003. To my knowledge, none of my co-workers use any software created by Mr. Berry.

34. I believe that a forensic computer individual could go into the computer and determine whether or not these files were ever used, and I would like for the same to occur to vindicate me from this frivolous allegation.

35. I have no specific recollection of deleting the 16 copies of the Access database mentioned above.

36. While Fleming did not have a regular purge system, I do recall at some point after Guidance left and well before I became aware of this allegation in June of 2004, that I did delete certain files just because I recognized the Plaintiff's identifier on the files. I deleted them without using them in any way.

37. If these files that the Plaintiff is claiming were actually on the system after Guidance left, or they were inadvertently restored to the system by me, it was pure inadvertence and unintentional. I want nothing to do with Plaintiff or his software.

38. It is my understanding that Plaintiff is now claiming that another entity: Manugistics pirated Plaintiff's software on Fleming's behalf. Plaintiff bases his allegation in this regard upon a file identifier or notation with the number

"151", and claims that Manugistics reverse engineered Plaintiff's software for Fleming.

39. I have never worked with anyone from a company called Manugistics and to my knowledge, nobody from Manugistics has ever had access to, or attempted to reverse engineer or otherwise copy Plaintiff's software.

FURTHER AFFIANT SAYETH NAUGHT.

MARK DILLON

Subscribed and sworn to before me this 30th day of September 2004.

Notary Public, State of Hawaii
My Commission Expires: 4-9-2008
Print Name: Richard W. Hosoda

LS

10