# Exhibit 5

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Objection Deadline:** December 15, 2006 |
| | ) | **Hearing Date:** December 22, 2006 at 10:30 a.m. EDT |

## REPLY IN SUPPORT OF THE PCT'S MOTION FOR
## AN ORDER IN AID OF IMPLEMENTATION OF THE PLAN

The issue before the Court is whether the PCT Board is exercising its reasonable business judgment in making a $57 million cash distribution to the thousands of Fleming unsecured creditors who have yet to receive any cash distributions required under the Plan.[2] Mr. Berry objects to the distribution, arguing that it will prevent the PCT from satisfying his asserted $250 million administrative claim.[3] This Court previously estimated that claim at $100,000 and, after a week long jury trial in the United States District Court of Hawaii, Mr. Berry was awarded just $57,537 based on the Debtors' unintentional post-petition infringement of his free software license for 69 days. This award itself will be subject to setoff if the District Court adopts the

---

[1] The former Debtors whose cases are still open are Core-Mark International, Inc. and Fleming Companies, Inc.

[2] All terms not otherwise defined herein are as defined in the PCT's motion.

[3] The PCT has extended C&S' deadline to respond to the motion until Wednesday, December 20, 2006. C&S shared a draft brief with the PCT at close of business December 19. Based on this draft, the PCT anticipates that any objection C&S files will be based on a potential indemnity claim it may have against the PCT if Mr. Berry prevails on appeal in the Hawaii litigation. The PCT has taken this potential indemnity claim into account -- a claim that even C&S would admit is unlikely given C&S' resoundingly victory against Mr. Berry on summary judgment -- when determining the appropriate reserves to maintain. Accordingly, the arguments set forth in this reply addressing Mr. Berry's objections will equally apply to any objection C&S may file. The PCT had hoped to receive C&S brief in advance of filing this reply, but also wanted to ensure that the Court received the reply in enough time to consider the arguments set forth herein. Accordingly, this reply is being filed in advance of C&S' objection.

Magistrate Judge's recent recommendation that Mr. Berry be required to pay the PCT $83,051.30 in attorney's fees, and pay the other parties that he sued an additional $163,923.30.[4] Notwithstanding, Mr. Berry argues that a cash distribution will prevent the PCT from satisfying his claim.

The fact is, this is not a normal dispute between a post confirmation trust or estate and a creditor. Instead, this is just another part of Mr. Berry's crusade to have someone, anyone, pay an exorbitant amount of money to avoid his continued demands and multiplicity of litigation. As the Hawaii Magistrate Judge has recognized, "the instant case is part of a long line of legal and administrative actions that Plaintiff has instituted against Fleming. This indicates that, although Plaintiff did raise some meritorious claims, this action was likely motivated, at least in part, by improper purpose." Ex. A at 34-35. The Hawaii Magistrate also remarked that "that Plaintiff's claimed damages, which at some point were upward of $200 million, were frivolous and objectively unreasonable." *Id.* at 34. Mr. Berry epitomizes the term vexatious litigant.[5]

The PCT respectfully requests that this Court not allow Mr. Berry's frivolous and objectively unreasonable assertions about his administrative claim to prevent the distribution of funds to thousands of creditors with allowed claims, and that the Court grant the PCT's distribution motion.

---

[4] Mr. Berry also received an award of costs in the amount of $19,986.42, which he may set off against the PCT's award.

[5] In fact, he has now begun to threaten Fleming's former lenders, who were paid in full more than two years ago, with a brand new lawsuit, alleging that they were in control of Fleming during the postpetition period and orchestrated the inadvertent infringement of the free software license he granted to Fleming.

**Argument**

I.  **The PCT Is Exercising Its Reasonable Business Judgment In Making The Cash Distribution**

1.  Mr. Berry argues that the PCT cannot make a cash distribution if there is "*any possibility*" that his $250 million administrative claim will be validated on appeal. [6] In essence, he argues that because *he* values his claims at $250 million, so must the PCT and this Court, and the PCT must reserve $250 million (or whichever number he asserted) to pay him until he has exhausted every potential avenue for recovery. The Seventh Circuit was faced with -- and rejected -- a similar argument in *In re Forty-Eight Insulations, Inc.* 115 F.3d 1394 (7th Cir. 1997). There, certain claimants with disallowed claims pending appeal moved to stay a bankruptcy court order permitting the trustee to make an interim distribution calculated by reserving for less than 100% for their claims. The claimants argued that because their claims were subject to appeal, the trustee was required by both the plan and state law to reserve an amount that would satisfy their claims in full. The court refused to enter a stay – thereby

---

[6] Mr. Berry does not cite any cases to support his proposition that the PCT cannot make a distribution where there is "any possibility" that he may prevail on appeal. He does, however, cite two cases that purportedly support his objection. Both are inapplicable. The first, *In re Contempri Homes, Inc.*, 247 B.R. 135 (Bankr. M.D. Pa. 2000), is cited for the proposition that the Plan is *res judicata* and the PCT cannot now adjust its *projections*, made at the time it confirmed the plan, of the anticipated value of Administrative Claims. *Id.* (involving a United States Trustee, who did not object to a plan, who moved to compel payment of quarterly fees in a manner different than that mandated by the plan). This case is distinguishable on many levels, but most notably because (i) the PCT's revised projections of Allowed Administrative Claims does not interfere with the *res judicata* effect of the confirmation order and (ii) the PCT is not seeking to modify or change the Plan, but is rather seeking authority to act in furtherance of the Plan. The second case Mr. Berry cites to is *In re Montgomery Ward Holding Corp., Inc.* 306 B.R. 489 (Bankr. D. Del. 2004). Mr. Berry cites this case for the proposition that the PCT cannot disburse funds to unsecured creditors that are earmarked for administrative creditors. That case involved an administrative creditor who was attempting to recover, after the debtor's second bankruptcy, from an *escrow account* set up under the first plan specifically earmarked for certain unsecured creditors. The court found that the plan in that case specifically provided that administrative claimants could not be paid out of funds escrowed for unsecured creditors. The Debtors' Plan and PCT Agreement, however, do not call for any escrow accounts and, more importantly, specifically contemplate that the PCT *should* make annual cash distributions after setting aside reasonable reserves. *See* Plan Art. X.3.A; PCT Agreement § 4.5.

3

permitting the proposed distribution – on the bases that (i) the trustee had discretion under the governing trust agreement to establish any reserves it deemed useful and (ii) the trustee did not abuse its discretion under the trustee agreement or state law when it elected to reserve less than 100% on the disputed claims.

2.   When assessing the trustee's authority to establish reserves, the court focused on the plain language of the governing trust agreement, which provided: "the Trustee shall have the power to take any and all actions as in the judgment of the Trustee are necessary or convenient to effectuate the purposes of the Trustee including . . . the power to . . . establish reserves . . . deemed by the Trustee to be useful in carrying out the purpose of the Trust." *Id.* at 1302. In analyzing this language, the court reasoned that the trust agreement entrusted reserve issues to the trustee's judgment, necessarily implying that the trustee had discretionary decision-making authority with respect to establishing reserves. *Id.* As such, the trustee could not be required, as a rule, to reserve 100% for all disputed claims. *Id.* (reasoning that "[i]f the Trustee were, as Claimants suggest, required to reserve money for *all* initially disallowed claims, the Trustee would have no decision-making role; reserves would be mandatory if even one claim was disallowed") (emphasis in original); *see also In re Upland Partners*, 2005 WL 3964428 at *1, 2 (Bankr. D. Hi. 2005) (finding that "[t]he establishment of a reserve for the remaining disputed claims is appropriate").

3.   The court next addressed the issue of whether the trustee had abused its discretion in establishing the proposed reserve in an amount insufficient to pay 100% of the disputed claims. To analyze this issue, the court applied applicable state law regarding the exercise of a trustee's discretion, which required that the trustee "exercise . . . reasonable care, skill and caution," framing the issue as follows:

4

> Whether the $1.8 million reserve was an abuse of discretion rests on whether a reasonable person would agree that the reserve was sufficient given the number and relative merit of the disputed claims. Therefore, to establish that a stay was warranted on the argument that the $1.8 million reserve was an abuse of discretion, the Claimants need to show that not including enough money in the reserve to pay 100 percent of their disputed claims was unreasonable because the Trustee misjudged the likelihood that the Claimants would succeed in proving their [claims]. *Id.* at 1303.

4. In reviewing the record, the court found that the trustee had carefully reviewed all of the evidence at his disposal and had reasonably determined that the claimants were unlikely to succeed on their claims. *Id.* Consequently, the court found that the trustee was within his discretion not to reserve 100% on account of the claimants' disputed claims. Accordingly, the court denied the claimants' motion for stay. *Id.* at 1303-04.

5. Applying the Seventh Circuit's analysis to the issue before this Court, it is apparent that the Court is well within its authority to approve the PCT's proposed cash distribution. The Plan provides that "[i]n the event there are Disputed Claims requiring adjudication and resolution . . . the PCT . . . shall establish *appropriate* reserves for potential payment of such Claims." *See* Plan Art. X.A.3 (emphasis added). The PCT Agreement further provides that "the PCT shall make [cash] distributions no less frequently than on an annual basis, except that the PCT may retain an amount of net cash proceeds or net cash income *reasonably necessary* to maintain the value of the PCT Assets or to meet claims and contingent liabilities (including Disputed Claims). *See* PCT Agreement § 4.5 (emphasis added). This language unequivocally establishes that the PCT has *discretionary decision-making authority* to determine the necessary and appropriate reserves for Disputed Claims and, therefore, in its reasonable discretion need not reserve for 100% of all Disputed Claims.

6. That leaves the question, then, of whether the PCT has abused its discretion in reserving less than the full amount of Mr. Berry's potential claim. The answer to that question is

5

most certainly no. The Plan and PCT Agreement are both governed by Delaware law, which requires the PCT to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use . . .." 12 Del. C. § 3302. The PCT Board has reviewed substantial evidence regarding Mr. Berry's claims, including (but not limited to):

- This Court's decision estimating Mr. Berry's then-$50 million administrative claim against the Debtors at $100,000 for purposes of confirmation;

- The Hawaii District Court's summary judgment ruling against Mr. Berry, which disposed of all but two of his six causes of action against the PCT; and

- The course of the Hawaii trial and the $57,534 verdict (which notably the PCT Representative attended so he could personally assessed the validity of Mr. Berry's claims).

The PCT Board has also reviewed the Magistrate Judge's recent fee report and recommendation, in which the Magistrate specifically found:[7]

- "[T]he instant case is part of a long line of legal and administrative actions that Plaintiff has instituted against Fleming. This indicates that, although Plaintiff did raise some meritorious claims, this action was likely motivated, at least in part, by improper purpose." Ex. A at 34-35.

- "The Court notes . . . that Plaintiff's claimed damages, which at some point were upward of $200 million, were frivolous and objectively unreasonable." *Id.* at 34.

- "Further, although he claims millions of dollars in damages, the jury only awarded him $57,534.00. Plaintiff's limited success weighs against any award of attorney's fees. *Id.* at 36

---

[7] The Magistrate's report and recommendation is that Mr. Berry pay the PCT $83,051.30 in attorney's fees, and pay the other parties that he sued an additional $163,923.30 (some of which will be used to reimburse the PCT for advances of legal fees). In making these determinations, the Magistrate also found that Mr. Berry's claims against C&S were *improperly motivated* and *objectively unreasonable*. Ex. B at 26-27. Mr. Berry did receive an award of costs for prevailing on his infringement claims in the amount of $19,986.42 (although he was denied attorneys' fees in light of his limited success and the apparent improper motive for his claims). He will therefore owe a total of $246,975.28 to the various defendants he sued, and a net of $169,454.86 to these parties after setting off his jury verdict. Therefore, Mr. Berry could will end up being a net *debtor* to the PCT if the District Court approves the Magistrate's recommendation.

6

- "This Court finds that Plaintiff's trade secrets claim against Fleming was objectively specious because there was a complete lack of evidence supporting his claim." *Id.* at 45.

- "Further, this Court will infer subjective misconduct from the speciousness of Plaintiff's claim and from his conduct during the litigation. Plaintiff's failure to present any evidence . . . indicates that he knew or should have known that his claim had no merit. Further, as stated previously, this action is part of a long history of legal and administrative actions by Plaintiff against Fleming. This Court therefore finds that Plaintiff made the misappropriation of trade secrets claim against Fleming in bad faith and that [Fleming] is entitled to fees incurred defending against that claim." *Id.*

7. After reviewing this and other evidence, the PCT Board determined, in its reasonable and prudent business judgment, that there is no realistic scenario under which Mr. Berry would prevail on appeal against the PCT.[8] All evidence points to the fact that Mr. Berry's claims against the PCT are nominal (where not outright frivolous). And if the Hawaii District Court affirms the magistrate's fee recommendations, the adjudicated value of his claims will be far less than the cumulative value of the various defendants' fee awards. Accordingly, the PCT Board is well within its discretion to make the proposed cash distribution – which maintains a $22 million reserve – notwithstanding Mr. Berry's pending appeal. With respect to Mr. Berry's claims, a reserve of $22 million is, quite likely, $22 million too much.

## II. The PCT Is Exercising Its Reasonable Business Judgment in Canceling The Administrative Guaranty

8. Although it is unclear, Mr. Berry's objection also appears to argue that the PCT does not have authority to cancel the Administrative Guaranty or that the cancellation is an

---

[8] As stated in the Motion, the PCT Board also relied upon the information set forth in the Second Status Report, attached as Exhibit C.

7

improper plan modification.[9] This is incorrect. The PCT Agreement specifically provides the PCT Representative with the authority to control and dispose of estate assets, which assets include the Administrative Guaranty. *See* PCT Agreement § 1.4 ("the PCT Representative may control and exercise authority over the PCT assets and over the protection, conservation and disposition thereof"); *see also* Plan Art. V.G.2 (stating that the PCT's powers shall be governed by the PCT Agreement). And while the PCT is not required to obtain court approval before disposing of assets, including the Administrative Guaranty, it has decided to do so here out of an abundance of caution. *See* PCT Agreement § 1.4 (noting that the PCT Representative need not obtain court approval to dispose of estate assets); *see also Order Granting Joint Motion of Reclamation Creditors' Trust And Post-Confirmation Trust To Approve Agreement Concerning Winddown And Dissolution of The Reclamation Creditors' Trust* (Docket 13244, 08/25/06) (order approving motion to cancel Core-Mark's guaranty of certain reclamation liabilities, as set forth in the Plan, in light of the fact that they were no longer necessary).

9. In light of the PCT's authority to cancel the Administrative Guaranty, the question before the Court is whether the PCT has abused its authority in deciding to do so. This decision (as with its decision to make a cash distribution) is governed by Delaware law, which requires the PCT to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use . . .." 12 Del. C. § 3302. Under the circumstances, the PCT believes it has acted prudently and reasonably in deciding to cancel the guaranty.

---

[9] Mr. Berry also appears to object that the PCT has not reserved for his claim as a general unsecured claim. Without addressing the merits of whether his administrative claim is unsecured, the PCT believe it has an ample Disputed Reserve to address all potential unsecured claims.

8

10. Before filing its distribution motion, the PCT informed Core-Mark of its intent to make a cash distribution. As stated in its papers filed with the Court, Core-Mark believes that the PCT cannot make a cash distribution under the Plan if the PCT can later call the Administrative Guaranty. Based on this belief, Core-Mark stated it would object to the cash distribution if the Administrative Guaranty remained in place. The PCT carefully weighed (i) the likelihood that it would be required to call the Administrative Guaranty; (ii) the cost and risk of litigating a cash distribution with Core-Mark; and (iii) the PCT's costs associated with maintaining the Administrative Guaranty. In doing so, and as described more fully in the motion, the PCT concluded that there was no realistically foreseeable scenario in which it would be required to call the Administrative Guaranty. It also determined that the cost and risk of litigating the cash distribution with Core-Mark, in light of the fact that the Administrative Guaranty is unnecessary to satisfy creditors, would be wasteful and unnecessary. Mr. Berry was likely to object no matter what the PCT did or did not do; however the PCT has attempted to eliminate unnecessary litigation with Core-Mark. Finally, the PCT recognized that maintaining the Administrative Guaranty, particularly going forward, increases the administrative burden on the PCT in that the PCT invests resources providing Core-Mark with ongoing updates regarding the PCT's financial status, including updating both Core-Mark's finance staff as well as Core-Mark's outside auditors. Given the circumstances, therefore, the PCT believes it is reasonable and appropriate to cancel the Administrative Guaranty in conjunction with the cash distribution.[10]

---

[10] The PCT is not seeking to modify the Plan. Rather, it is seeking approval of its decision to cancel the Administrative Guaranty in light of the current circumstances, just as it has discretionary authority to deal with its other assets.

**Conclusion**

11.  By bringing the present motion, the PCT is simply asking the Court to find that its evaluation of Mr. Berry's likelihood of success in his continued appeals – and the corresponding reserves – is reasonable and prudent based on the evidence available to it.  The PCT believes that, based on the overwhelming evidence, it is.  Accordingly, the PCT requests that the Court grant its motion.

Dated:  December 20, 2006

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

/s/ Scotta E. McFarland
Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
James E. O'Neill, III (Bar No. 4042)
919 North Market Street, 16th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705
(Courier No. 19801)
Telephone:  (302) 652-4100
Facsimile:  (312) 652-4400

and

KIRKLAND & ELLIS LLP
Richard L. Wynne (CA Bar No. 149504)
Erin N. Brady (CA Bar. No. 215038)
777 South Figueroa Street
Los Angeles, California  90017
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500

Co-Counsel for the Post Confirmation Trust