# EXHIBIT M



61 F.Supp.2d 1102                                                                                   Page 1
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

**H**Sea-Land Service, Inc. v. Atlantic Pacific Intern., Inc.
D.Hawai'i,1999.

United States District Court, D. Hawai'i.
SEA-LAND SERVICE, INC., Plaintiff,
v.
ATLANTIC PACIFIC INTERNATIONAL, INC.; A & A Consolidators, Inc. **Fleming** Companies, Inc.; John Does 1-25, Defendants.
and**Fleming** Companies, Inc., Defendant/Third-Party Plaintiff,
v.
Jack Borja and Heidi L. Borja, Third-Party Defendants,
andAtlantic Pacific International, Inc., Defendant/Third-Party Plaintiff,
v.
Matson Navigation Services, Inc., a Hawaii corporation; Costco Wholesale Corporation, a Washington corporation; Wal-Mart Stores, Inc. dba Sam's Club, a Delaware corporation; TAG/ICIB Services, Inc., a Delaware corporation, Third-Party Defendants,
andSea-Land Service, Inc., Plaintiff/Fourth-Party Plaintiff,
v.
Jack Borja and Heidi L. Borja, Fourth-Party Defendants.
**No. 98-00369 DAE.**

July 12, 1999.

Shipper, being sued to recover unpaid ocean freight charges, filed counterclaim against carrier, alleging antitrust, Racketeer Influenced and Corrupt Organizations Act (RICO), and maritime lien claims. On carrier's motion for summary judgment, the District Court, David Alan Ezra, Chief Judge, held that: (1) fact issue existed as to whether carrier engaged in illegal tying arrangement; (2) carrier did not conspire with competitor to impair competition; (3) alleged predicate acts of cargo theft did not constitute "pattern of racketeering activity"; and (4) shipper was not entitled to maritime lien.

Motion granted in part and denied in part.

West Headnotes

**[1] Action 13 ☰☰☰ 3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most Cited Cases
        (Formerly 382k864 Trade Regulation)

**Antitrust and Trade Regulation 29T ☰☰☰ 290**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)1 In General
                29Tk287 Persons Entitled to Sue or Seek Remedy
                    29Tk290 k. Private Entities or Individuals. Most Cited Cases
                    (Formerly 382k864 Trade Regulation)
There is no private cause of action for violations of Federal Trade Commission Act (FTCA). Federal Trade Commission Act, § 5, 15 U.S.C.A. § 45.

**[2] Antitrust and Trade Regulation 29T ☰☰☰ 569**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk568 Tying Agreements
                29Tk569 k. In General. Most Cited Cases
                (Formerly 265k17.5(7))

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Antitrust and Trade Regulation 29T**

 570

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other
Misconduct
           29Tk568 Tying Agreements
              29Tk570 k. Separate or Distinct
Products. Most Cited Cases
    (Formerly 265k17.5(7))

**Antitrust and Trade Regulation 29T**

 571

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other
Misconduct
           29Tk568 Tying Agreements
              29Tk571 k. Economic Power. Most
Cited Cases
    (Formerly 265k17.5(7))
To establish tying arrangement that is illegal per se,
plaintiff must show (1) tying of two products; (2) that
defendant had sufficient economic power in tying
product market to affect tied product market; and (3)
effect on substantial volume of commerce in tied
product market. Sherman Act, § 1, as amended, 15
U.S.C.A. § 1.

**[3] Antitrust and Trade Regulation 29T**

 569

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other
Misconduct
           29Tk568 Tying Agreements
              29Tk569 k. In General. Most Cited
Cases
    (Formerly 265k17.5(2))
"Tying arrangement" exists when seller refuses to
sell one product (tying product) unless purchaser
agrees to purchase another product (tied product).
Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[4] Federal Civil Procedure 170A**

 2484

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
           170AXVII(C)2 Particular Cases
              170Ak2484 k. Antitrust and Price
Discrimination Cases. Most Cited Cases
Issues of material fact as to whether carriage service
and containers were separate products, and whether
carrier had significant market share, precluded
summary judgment dismissing shipper's claim that
carrier was illegally tying purchase of its shipping
services to purchase of its containers. Sherman Act, §
1, as amended, 15 U.S.C.A. § 1.

**[5] Antitrust and Trade Regulation 29T**

 606

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(E) Particular Industries or Businesses
           29Tk606 k. Transportation. Most Cited
Cases
    (Formerly 265k17.5(5))
Fact that carrier offered carriage service for same
price, regardless of whether shipper used carrier's
containers, did not mean that shippers were not being
forced to purchase containers, for purpose of tying
arrangement claim under Hawai'i law; carrier charge
one price, which included both products, and did not
offer products separately. Sherman Act, § 1, as
amended, 15 U.S.C.A. § 1.

**[6] Antitrust and Trade Regulation 29T**

 569

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other
Misconduct
           29Tk568 Tying Agreements
              29Tk569 k. In General. Most Cited
Cases
    (Formerly 265k17.5(4))

61 F.Supp.2d 1102                                                                              Page 3
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

Seller of tying product only needs to have economic interest in sale of tied product when tied product is sold by separate company. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[7]  Antitrust  and  Trade  Regulation  29T**

 606

29T Antitrust and Trade Regulation
   29TVI Antitrust Regulation in General
      29TVI(E) Particular Industries or Businesses
         29Tk606 k. Transportation. Most Cited Cases
   (Formerly 265k17(2.2))
Ocean cargo carrier's reservation of right to require shippers to use its containers if shippers' containers did not meet certain size and construction specifications did not constitute refusal to deal. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[8]  Antitrust  and  Trade  Regulation  29T**

896

29T Antitrust and Trade Regulation
   29TX Antitrust and Prices
      29TX(G) Particular Industries or Businesses
         29Tk896 k. Transportation. Most Cited Cases
   (Formerly 265k17(1.10))
Ocean cargo carrier did not engage in price-fixing conspiracy with cargo inspection company; company was independent contractor which had no involvement in development of freight rates and did not gain any benefit from level of freight rates established in carrier's tariff. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[9]  Antitrust  and  Trade  Regulation  29T**

896

29T Antitrust and Trade Regulation
   29TX Antitrust and Prices
      29TX(G) Particular Industries or Businesses
         29Tk896 k. Transportation. Most Cited Cases
   (Formerly 382k914 Trade Regulation)

Ocean cargo carrier's alleged rate discrimination among shippers did not violate Robinson-Patman prohibition against price discrimination, which applied only to sale of commodities, and not to services such as transportation. Clayton Act, § 2, as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13.



**[10] Carriers 70** 189

70 Carriers
   70II Carriage of Goods
      70II(J) Charges
         70k189 k. Rates of Freight. Most Cited Cases

**Carriers 70** 199

70 Carriers
   70II Carriage of Goods
      70II(M) Discrimination and Overcharge
         70k199 k. Unlawful Discrimination. Most Cited Cases
Surface Transportation Board had primary jurisdiction over claim that ocean cargo carrier's rates were unreasonable or discriminatory. 49 U.S.C.A. §§ 13701(c), 13702(b)(6).

**[11]  Antitrust  and  Trade  Regulation  29T**

644

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(C) Market Power; Market Share
         29Tk643 Relevant Market
            29Tk644 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
"Monopoly power" is power to control prices or exclude competition in relevant market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[12]  Antitrust  and  Trade  Regulation  29T**

701

Case 1:07-cv-07634-WHP    Document 94-18    Filed 04/07/2008    Page 5 of 21

61 F.Supp.2d 1102                                                      Page 4
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(E) Particular Industries or Businesses
            29Tk701 k. Transportation. Most Cited Cases
    (Formerly 265k12(1.3))
Ocean cargo carrier, which had only one-third share in Hawai'i-Mainland market, did not have "monopoly power," for purpose of establishing restraint of trade claim, as matter of law. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[13] Antitrust and Trade Regulation 29T**

    701

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(E) Particular Industries or Businesses
            29Tk701 k. Transportation. Most Cited Cases
    (Formerly 265k12(2), 265k12(1.3))
Carrier of ocean cargo between Hawai'i and mainland did not act in concert with competitor to impair competition, for purpose of determining whether it had monopoly power, absent showing that their joint policy of providing containers for customers was against carrier's self-interest, or that they communicated in regards to their parallel actions. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[14] Racketeer Influenced and Corrupt Organizations 319H**

    3

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk3 k. Elements of Violation in General. Most Cited Cases
Elements of Racketeer Influenced and Corrupt Organizations Act (RICO) claim are (1) conduct (2) of enterprise (3) through pattern (4) of racketeering activity. 18 U.S.C.A. § 1961 et seq.

**[15] Racketeer Influenced and Corrupt Organizations 319H**

    28

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319Hk24 Pattern of Activity
            319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
To "prove pattern of racketeering activity," Racketeer Influenced and Corrupt Organizations Act (RICO) plaintiff or prosecutor must show that racketeering predicates are related, and that they amount to or pose threat of continued criminal activity. 18 U.S.C.A. § 1961(5).

**[16] Robbery 342**

    6

342 Robbery
    342k6 k. Force. Most Cited Cases

**Robbery 342**

    9

342 Robbery
    342k9 k. Taking from Person or Presence of Another. Most Cited Cases
Cargo inspector's alleged theft of cargo was not "robbery," within meaning of Hobbs Act; property was not taken from person or in presence of another, and was not taken by means of actual or threatened force, violence or fear. 18 U.S.C.A. § 1951(b)(1).

**[17] Extortion and Threats 165**

    25.1

165 Extortion and Threats
    165II Threats
        165k25 Nature and Elements of Offenses
            165k25.1 k. In General. Most Cited Cases
Cargo inspector's alleged theft of cargo without consent of owner was not "extortion," within meaning of Hobbs Act; owner's extorted consent was necessary element of claim. 18 U.S.C.A. § 1951(b)(2).

**[18] Racketeer Influenced and Corrupt Organizations 319H**

    7

61 F.Supp.2d 1102                                                                    Page 5
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk7 k. Particular Acts. Most Cited
Cases
Only felonious violations of statute prohibiting
carrier's theft from interstate shipments constitute
"racketeering activity" under Racketeer Influenced
and Corrupt Organizations Act (RICO). 18 U.S.C.A.
§§ 659, 1961(1)(A).

**[19]**    **Racketeer    Influenced    and    Corrupt**

**Organizations 319H**  **29**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk29 k. Time and Duration. Most
Cited Cases
Ten-week period in which alleged cargo thefts
occurred was not "substantial period of time," and
thus did not establish closed-ended continuity, for
purpose of determining whether they constituted
"pattern of racketeering activity." 18 U.S.C.A. §
1961(5).

**[20]**    **Racketeer    Influenced    and    Corrupt**

**Organizations 319H**  **29**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk24 Pattern of Activity
                319Hk29 k. Time and Duration. Most
Cited Cases
Cargo inspection company's alleged thefts, over ten-
week period more than eight months before filing of
Racketeer Influenced and Corrupt Organizations Act
(RICO) claim, did not constitute "pattern of
racketeering activity," under theory of open-ended
continuity; neither nature of conduct nor company's
business itself suggested continuing threat of thefts,

and there was no external basis for believing that
thefts would continue. 18 U.S.C.A. § 1961(5).

**[21]**    **Racketeer    Influenced    and    Corrupt**

**Organizations 319H**  **49**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk49 k. Nexus Between Enterprise and
Acts. Most Cited Cases
Mere allegation that Racketeer Influenced and
Corrupt Organizations Act (RICO) defendant
"benefitted" from predicate act thefts was insufficient
to state claim for use of proceeds of racketeering acts
to acquire, establish or operate enterprise. 18
U.S.C.A. § 1962(a).

**[22]**    **Racketeer    Influenced    and    Corrupt**

**Organizations 319H**  **49**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk49 k. Nexus Between Enterprise and
Acts. Most Cited Cases
Even if cargo inspection company's alleged thefts of
cargo constituted pattern of racketeering activity,
company did not engage in activity to acquire or
maintain interest in or control of enterprise; there was
no specific nexus between control of enterprise and
racketeering activity. 18 U.S.C.A. § 1962(b).

**[23]**    **Racketeer    Influenced    and    Corrupt**

**Organizations 319H**  **39**

319H    Racketeer    Influenced    and    Corrupt
Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk33 Enterprise
                319Hk39 k. Particular Enterprises.
Most Cited Cases
Cargo inspection company, which allegedly stole

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                                                    Page 6
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

cargo, could not be both Racketeer Influenced and Corrupt Organizations Act (RICO) person and RICO enterprise. 18 U.S.C.A. § 1962(c).

**[24]     Federal     Civil     Procedure     170A**

 **1935.1**

170A Federal Civil Procedure
    170AXIV Pre-Trial Conference
        170Ak1935 Order
            170Ak1935.1 k. In General. Most Cited Cases
Good cause needed to justify modification of scheduling order turns primarily on diligence of party seeking amendment. Fed.Rules Civ.Proc.Rule 16, 28 U.S.C.A.

**[25] Federal Civil Procedure 170A   840**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment.
Most Cited Cases
Motion to amend deficient Racketeer Influenced and Corrupt Organizations Act (RICO) claim would not be allowed; claimant had not been diligent in seeking amendment, when opponent's summary judgment motion first identified deficiencies, and opponent would be prejudiced by allowance of late amendment. 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 16, 28 U.S.C.A.

**[26] Maritime Liens 252   9**

252 Maritime Liens
    252I Nature, Grounds, and Subject-Matter in General
        252I(A) Under Maritime Law
            252k9 k. Maritime Services in General.
Most Cited Cases
Even if shipper's stuffing and drayage of containers constituted "necessaries," within meaning of maritime lien statute, its services were not maritime in nature, and so it acquired no lien; stuffing occurred

far from maritime terminals and shipper did not act as stevedore. 46 U.S.C.A. § 31342.

**\*1105** Gregory W. Kugle, Damon Key Bocken Leong & Kupchak, Honolulu, HI, Deborah E. Barack, Carlsmith Ball Wichman Case & Ichiki, Honolulu, HI, for Sea-Land Service, Inc., plaintiff.
Timothy J. Hogan, Lynch Ichida Thompson & Kim, Honolulu, HI, for Atlantic Pacific International Inc., A & A Consolidators, Inc., defendants.
Craig K. Shikuma, Kobayashi Sugita & Goda, Honolulu, HI, for Fleming Companies, Inc., defendant.
David C. Farmer, Paul B. Shimomoto, Ashford & Wriston, Honolulu, Hi, for Jack Borja, Heidi L. Borja, third-party defendants.
Lisa W. Munger, Lindalee K. Farm, Goodsill Anderson Quinn & Stifel, Honolulu, HI, for Costco Wholesale Corporation, Matson Navigation Services, Inc., third-party defendants.
Bruce C. Bigelow, Case Bigelow & Lombardi, Honolulu, HI, for Wal-Mart Stores, Inc., a Delaware Corporation dba Sam's Club, third-party defendant.
Kenneth A. Remson, Jones Day Reavis & Pogue, Los Angeles, CA, Jeffrey S. Portnoy, Cades Schutte Fleming & Wright, Honolulu, HI, for TAG/ICIB Services, Inc., a Delaware Corporation, third-party defendant.

*ORDER GRANTING IN PART AND DENYING IN PART SEA-LAND SERVICE, INC.'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT ON ATLANTIC PACIFIC INTERNATIONAL, INC. AND A & A CONSOLIDATORS, INC.'S FIRST AMENDED COUNTERCLAIM*

DAVID ALAN EZRA, Chief Judge.

    The court heard Sea-Land's motion on May 18, 1999. Gary G. Grimmer, Esq., **\*1106** and Deborah E. Barack, Esq., appeared at the hearing on behalf of Sea-Land Service, Inc.; Timothy J. Hogan, Esq., appeared at the hearing on behalf of Defendants Atlantic Pacific International, Inc. and A & A Consolidators, Inc. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS in part and DENIES in part Sea-Land Service, Inc.'s Motion to Dismiss and/or for Summary Judgment on Atlantic Pacific International, Inc. and A & A Consolidators, Inc.'s First Amended Counterclaim.

## BACKGROUND

On May 7, 1998, Plaintiff Sea-Land Service, Inc. ("Sea-Land") filed a Complaint against Defendants Atlantic Pacific International, Inc. ("API"), A & A Consolidators, Inc. ("A & A"), and Fleming Companies, Inc. ("Fleming") (collectively "Defendants"), seeking to recover unpaid ocean freight charges. In response, API and A & A (hereinafter "API") asserted a counterclaim against Sea-Land, alleging (1) federal antitrust violations; (2) violation of the federal racketeering statute ("RICO"); (3) the existence of maritime liens on Sea-Land's vessels; (4) conversion of API's property; and (5) breach of contract.

API, a freight consolidator, arranged with Sea-Land, a common carrier, to ship cargo from the West Coast to Hawaii on behalf of Fleming, a wholesale food marketer and distributor. Sea-Land provides transportation services based on rates contained in tariffs. These tariffs are published and filed with the Surface Transportation Board ("STB"). While Sea-Land does not assess a separate charge for the use of its cargo containers during transportation, the cost of the containers is reflected in the shipping rates. Once the cargo reaches its destination, Sea-Land charges an additional detention fee for continued use of the containers after the period of time ("free time") allowed by the tariff. Essentially, customers have a specified period of time in which to unload their cargo and return the containers to Sea-Land before Sea-Land will impose the detention fee.

Rule 884 of Freight Tariff No. 486 allows shippers to transport goods on Sea-Land's vessels in shipper-owned or leased containers, provided that such containers meet Sea-Land's construction and size specifications. At least two of Sea-Land's customers regularly use shipper-owned containers. Sea-Land charges the same shipping rates regardless of whether a customer employs shipper-owned containers or uses Sea-Land's containers.

TAG/ICIB Services, Inc. ("TAG") is an independent contractor which inspects cargo on behalf of carriers to ensure tariff compliance. TAG obtains information from the carriers that customers furnish regarding their cargo. TAG may open and examine the contents of shipments to verify the accuracy of that information. If TAG determines that the cargo has been misdeclared by the customer, TAG will rebill the customer the difference, if any, between the freight charges for the actual type, origin and quantity of the commodity shipped, and the freight charges for the type, origin and quantity declared by the customer. TAG may also bill the customer a misdeclaration charge provided by the tariff. If the customer owes any charges, TAG will impound the shipment until the charges are paid. When cargo containers are detained by the customer beyond the free time authorized by Sea-Land's tariff, TAG will bill and collect the detention charges according to the tariff.

On January 20, 1999, Sea-Land filed the instant Motion to Dismiss and/or for Summary Judgment on API's First Amended Counterclaim. Because both Sea-Land and API ask the court to consider materials outside the pleadings, the court addresses this motion as one for summary judgment, pursuant to Federal Rule of Civil Procedure 12(b).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if *1107 the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1050 (9th Cir.1995). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir.1982). The substantive law defines which facts are material. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact requires more than some "metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over outcome determinative facts under the applicable substantive law will preclude the entry of summary judgment. Id. If the factual context makes the respondent's claim

implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Metro Indus., Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.), *cert. denied,* 519 U.S. 868, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *Keenan v. Allan,* 91 F.3d 1275, 1278 (9th Cir.1996).

The Supreme Court cases cited above establish that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## DISCUSSION

Although, as noted above, API's First Amended Counterclaim (hereinafter "counterclaim") asserts five causes of action, Sea-Land's summary judgment motion addresses only three: antitrust, RICO, and maritime liens. The court examines each in turn.[FN1]

> FN1. The court notes that, for lack of good cause shown, API's request for a Rule 56(f) continuance was denied during the May 18, 1999 hearing.

## I. *Antitrust Claims*

[1] API purports to state claims against Sea-Land under Sections 1 and 2 of the Sherman Act (15

U.S.C. §§ 1 and 2), the Clayton Act (alleged as 15 U.S.C. § 15), and Section 5 of the Federal Trade Commission Act ("FTCA") (15 U.S.C. § 45). This last claim fails from the start, as there is no private cause of action for violations of the FTCA. *Carlson v. Coca-Cola Co.,* 483 F.2d 279 (9th Cir.1973); *Morrison v. Back Yard Burgers, Inc.,* 91 F.3d 1184, 1187 (8th Cir.1996); *Fulton v. Hecht,* 580 F.2d 1243, 1248 n. 2 (5th Cir.1978).

Specifically, API alleges that Sea-Land and Matson Navigation Services, Inc. ("Matson"), another common carrier, conspired *1108 and created an unlawful cartel which controlled the ocean transportation of goods between Hawaii and the Mainland.[FN2] This cartel allegedly:

> FN2. Although Matson was originally named as a third-party defendant in API's third-party complaint, all claims against it were dismissed without prejudice.

(1) Tied the provision of its transportation services to the "purchase of the use of carrier-owned containers" in which the cargo is carried on Sea-Land's vessels;
(2) Refused to deal with shippers who wished to provide their own containers;
(3) Conspired with TAG to fix the price of shipping in the Hawaii-Mainland market;
(4) Provided Costco and Sam's Club with preferential and discriminatory shipping rates, not available to API; and
(5) Violated § 2 of the Sherman Act.

Because these allegations require individual analysis, the court discusses each separately.

## 1. *Tying Claim*

[2][3]Section 1 of the Sherman Act declares illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Tying arrangements have long been considered per se unlawful under Section 1. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). To establish a tying arrangement that is illegal per se, the plaintiff must show (1) the tying of two products; (2) that defendant had sufficient economic power in the tying product market to affect the tied product market, and (3) an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                                                           Page 9
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

effect on a substantial volume of commerce in the tied product market. *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1411 (9th Cir.1991). A tying arrangement exists when a seller refuses to sell one product (the tying product) unless the purchaser agrees to purchase another product (the tied product). *Northern Pacific,* 356 U.S. at 5, 78 S.Ct. 514;*Bhan,* 929 F.2d at 1411.

In this case, API alleges that Sea-Land tied the purchase of its shipping services (the tying product) to the purchase of the use of Sea-Land's containers (the tied product). API contends that it only wanted to purchase Sea-Land's shipping services. Because, however, Sea-Land's shipping rates include the cost of the containers, API maintains that it was also forced to purchase the use of Sea-Land's containers. Although the record clearly demonstrates that Rule 884 of Tariff 486 did not require API or any other shipper to *use* Sea-Land's containers, Sea-Land charged the same rate regardless of whether the customer used Sea-Land's or its own containers.

a. *Separate Tied Product*

[4] To prevail on a tying claim, a plaintiff must first show that the scheme involves two separate products. *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 462, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 18-25, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Sea-Land argues that the use of containers is a functional part of the ocean transportation of goods, rather than a separate product. In developing an approach to determine if two products are separate for tying purposes, the United States Supreme Court rejected a test based upon the functional relationship between the products. *Jefferson Parish,* 466 U.S. at 21, 104 S.Ct. 1551 ("We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."). In *Jefferson Parish,* the Supreme Court concluded that products are separate if "two distinguishable product markets [are] involved." *Id.* Subsequently, the Court refined this approach in *Eastman Kodak Company v. Image Technical Services, Inc.:* "[T]o be considered two distinct products, there must be sufficient consumer**\*1109** demand so that it is efficient for a firm to provide [one product] separately from [the other]." *Kodak,*

504 U.S. at 462, 112 S.Ct. 2072.

Thus, under *Jefferson Parish* and *Kodak,* API must show that there is "sufficient consumer demand" in the Hawaii-Mainland ocean transportation market to make it efficient for carriers to offer a lease of containers as a service separate from the carriage. API has adduced evidence that shows at least two of Sea-Land's Hawaii-Mainland customers regularly use their own containers, and that other shippers may do so sporadically. Evidence also demonstrates that containers are interchangeable with other forms of transportation, including motor and rail transport, and that they can be used solely as a means to store goods. In addition, API clearly demanded separate services, as demonstrated by its attempts to negotiate with Sea-Land for reduced rates that would reflect the cost of shipping without the cost of using Sea-Land's containers. Simply because Sea-Land refused to sever the cost of the services does not mean that demand for separate services did not exist.

Nonetheless, as "evidence" of lack of demand, Sea-Land points to the fact that even shippers who use their own containers pay the same rate as customers who elect to use containers provided by Sea-Land. Rather than establish an absence of consumer demand, this fact merely bolsters API's claim that shippers who choose to use their own containers are still forced to pay for services that they do not want or need.

The court concludes that a genuine issue of material fact exists as to whether there is "sufficient consumer demand" for separate transportation and container services. Enough doubt is cast on Sea-Land's claim of a unified market that it should be resolved by the trier of fact. Before denying Sea-Land's Motion for Summary Judgment, however, the court must examine the other elements of a tying claim.

b. *Sale of the Tied Product/Coercion*

[5] Before concluding that a link between two products constitutes a tying arrangement, a plaintiff must show that the buyer is required to purchase or lease the unwanted product. *Kellam Energy, Inc. v. Duncan,* 668 F.Supp. 861, 881 (D.Del.1987). Sea-Land argues that because it does not assess a separate

61 F.Supp.2d 1102                                                                                    Page 10
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

charge for the use of its containers, API was not forced to purchase anything. Sea-Land characterizes the use of its containers as a free service provided to its customers. Other courts, however, have rejected similar contentions, holding that to do otherwise would permit escape from antitrust laws prohibiting illegal tie-ins, by the simple device of offering both products as a unit at a single price, while claiming that one of the two is a "free giveaway." *See Hill v. A-T-O, Inc.,* 535 F.2d 1349 (2nd Cir.1976). This court agrees. Thus, Sea-Land's inclusion of the cost of containers in its shipping rates belies its claim that there was no sale of container services.

Moreover, Sea-Land's pricing scheme may also establish the requirement of "coercion." "When a buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Northern Pacific Ry.,* 356 U.S. at 5-6, 78 S.Ct. 514. In this case, however, Sea-Land does not offer the products separately. Because Sea-Land charges one price, which includes both products, there is evidence customers may be coerced through their purchase of the first product to also purchase the second unwanted product.

*c. Market Power*

Tying arrangements are per se illegal where the seller has market power. *Jefferson Parish,* 466 U.S. at 14, 104 S.Ct. 1551. "Market power is the ability 'to force a purchaser to do something that he would not do in a competitive market.' " *Kodak,* 504 U.S. at 464, 112 S.Ct. 2072 (quoting **\*1110***Jefferson Parish,* 466 U.S. at 14, 104 S.Ct. 1551). Market definition is the first step in the assessment of market power. *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468 (3rd Cir.), *cert. denied,*506 U.S. 868, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992) (relevant market was all automobiles, not just Chrysler automobiles). Both Sea-Land and API apparently agree that the relevant market in this case is Hawaii-Mainland ocean carriage of goods in containers.

The Supreme Court has identified three sources of market power. First, when the government has granted the seller "a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power."*Jefferson Parish,* 466 U.S. at 16, 104 S.Ct. 1551 (citing *United States v. Loew's, Inc.,* 371 U.S. 38, 45-47, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962)). The second is when "the seller's share of the market is high." *Id.* (citing *Times-Picayune Publ'g Co. v. United States,* 345 U.S. 594, 611-13, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)). The third is when "the seller offers a unique product that competitors are not able to offer." *Id.*

Sea-Land contends that its share of this market is 33%, while Matson controls the other 66%. Sea-Land argues that its 33% market share is insufficient, as a matter of law, to constitute "market power." In *Jefferson Parish,* the Supreme Court held that a 30% market share did not give rise to the inference of market power necessary for application of the per se rule against tying. *Id.* at 27, 104 S.Ct. 1551. Lower courts have subsequently used the 30% market share as a minimum threshold for showing market power. *See Virtual Maintenance, Inc. v. Prime Computer, Inc.,* 11 F.3d 660 (6th Cir.1993) (11% market share cannot confer market power); *A.I. Root Co. v. Computer/Dynamics,* 806 F.2d 673 (6th Cir.1986) (2-4% insufficient); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665 (7th Cir.1985) ("pygmy among large, national firms" had no market power), *cert. denied,*475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986); *M. Leff Radio Parts, Inc. v. Mattel Inc.,* 706 F.Supp. 387 (W.D.Pa.1988) (30% market share of home video games sufficient to demonstrate market power).

In this case, API disputes Sea-Land's calculation of its market share. Evidence proffered by API shows that Sea-Land operates seven vessels in the Hawaii-Guam market and that, as of January 1999, Matson had reduced its Hawaii-Mainland fleet to six ships. The record is unclear as to whether the number of Sea-Land ships in the Hawaii-Guam market is the same as those in the Hawaii-Mainland market. The court need not pursue this mystery further, however, as the evidence relied upon by API is inadmissible pursuant to Federal Rule of Civil Procedure 56(e). The information regarding Matson was apparently taken from Matson's website. Although incorporated into API's counsel's affidavit, counsel does not purport to have any personal knowledge of the underlying facts. Moreover, this evidence would be inadmissible as hearsay.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102

61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757

**(Cite as: 61 F.Supp.2d 1102)**

Nevertheless, the court finds that Sea-Land's now undisputed 33% market share, coupled with the unique factors that 1) the market consists of only two participants, and 2) the Jones Act may prevent entry of new competitors into the market, renders the existence of Sea-Land's market power a question of material fact for the jury.

### d. *Economic Interest*

[6] Sea-Land argues that no tying arrangement exists because it does not have an economic interest in the tied product market, that is, the container market. Relying on *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.,* 491 F.Supp. 1199, 1209 (D.Haw.1980), *aff'd,*732 F.2d 1403 (9th Cir.1984), Sea-Land maintains that API must show that Sea-Land "participates for profit" in the tied product market. Sea-Land's reliance on *Robert's* is misplaced. The *Robert's* decision made it clear that the defendant's economic interest is sufficient where, as here, the seller of the tying product is also the seller of the tied product. Only when the tied **\*1111** product is sold by a separate company must the seller of the tying product have an economic interest in the sale of the tied product. *Robert's,* 732 F.2d at 1407-08. Thus, API need not demonstrate that Sea-Land has an economic interest in the container market.

### e. *Effect on Commerce*

The final requirement in a per se tying violation is that a "not insubstantial" amount of commerce in the tied product market must be affected by the tie. "The 'not insubstantial' requirement can be satisfied by the foreclosure of a single purchaser, so long as the purchaser represents a 'not insubstantial' dollar-volume of sales." *Datagate, Inc. v. Hewlett Packard Co.,* 60 F.3d 1421 (9th Cir.1995), *cert. denied,*517 U.S. 1115, 116 S.Ct. 1344, 134 L.Ed.2d 492 (1996). In this case, API has established that approximately $3.4 million dollars worth of containers were not purchased as a result of Sea-Land's alleged tying arrangement. Clearly, this arrangement has more than an insubstantial effect on commerce.

Because the court concludes that genuine issues of material fact exist with respect to 1) whether there is "sufficient consumer demand" in the market for separate transportation and container services, and 2) whether Sea-Land has "market power," Sea-Land's

Motion for Summary Judgment on the tying claim is DENIED.

### 2. *Refusal to Deal*

[7] API's claim that Sea-Land refused to deal with shippers who wish to ship cargo in their own containers does not survive summary judgment. Although API states that "the evidence shows that Sea-Land refused to allow shipper-owned containers under any circumstances," API has not proffered any of this evidence. In fact, the evidence is clearly to the contrary. Rule 884 of Tariff 486 allows shippers to use their own or leased containers. Moreover, Daniel Downes testified in his deposition that both Agmark and Frito-Lay regularly use shipper-owned containers and that other shippers may use them sporadically. While Rule 884 allows the use of shipper-owned containers, it reserves to Sea-Land the right to furnish containers if certain size and construction specifications are not met. The court finds that this reservation of rights does not create a genuine issue of material fact, as it does not demonstrate a refusal to deal, but merely precludes the use of non-conforming containers. Quite simply, API has failed to meet its burden on this issue. Accordingly, Sea-Land's Motion for Summary Judgment as to the refusal to deal claim is GRANTED.

### 3. *Price-fixing Conspiracy*

[8] API alleges that Sea-Land conspired with TAG to fix the price of shipping in the Hawaii-Mainland market. Although API makes numerous allegations and insinuations regarding the "dark side" of TAG, it has offered no evidence to support its claim of price-fixing. In particular, API has not provided support for its statement that TAG acts as a "joint agent" of Sea-Land and Matson and that its knowledge of pricing is "by law, shared by both carriers."

Sea-Land, on the other hand, has offered affidavits demonstrating that TAG is an independent contractor in the performance of its duties, except as to billing and collection of tariff charges, in which respect it acts as an agent of the carrier. While Sea-Land and Matson both employ TAG, they do so separately, not jointly. Sea-Land's affidavits also establish that TAG has no involvement in the development of freight rates and does not gain any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                                        Page 12
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

benefit from the level of freight rates established in Sea-Land's tariff. Moreover, Sea-Land submitted deposition testimony that expressly contradicts API's contention that TAG obtained financial information from Sea-Land regarding Fleming.

API does not dispute that TAG repeatedly caught it misdeclaring the type, quantity and/or origin of goods shipped in containers on board Sea-Land's vessels. *1112 TAG billed API and/or Fleming for the difference between the actual cargo and that declared by API. TAG detained the shipments involved until the rebilled charges were paid. API is attempting to make a price-fixing conspiracy out of those charges.

Similar complaints by shippers unhappy with TAG were soundly rejected in *Caribbean Shippers Association v. Surface Transportation Board,* 145 F.3d 1362 (D.C.Cir.1998). There, Caribbean Shippers' Association ("CSA"), an association of non-vessel operating common carriers, claimed that the water carriers that jointly controlled 90% of the transportation market in question used TAG to purposefully delay CSA members' shipments, in order to force customers to deal directly with water carriers. However, the court refused to infer concerted action by the water carriers from the fact that TAG was inspecting cargo on behalf of each of those carriers. *Id.* at 1363.

In fact, the *Caribbean Shippers* Court noted that it appeared:

[Petitioner's real concern is that so long as TAG performs the inspection service for all three carriers it is more difficult for petitioner to play one against the other. If a shipper is unhappy about the manner in which TAG categorizes its merchandise, for example, it is hard for that shipper to gain more favorable treatment elsewhere because each of the major carriers in the market uses TAG. But competition in inspection efficiency, or more accurately inefficiency, is hardly the sort of competition the statute is designed to protect.]

*Id.* at 1364-65.

API argues that *Caribbean Shippers* is distinguishable because there was no evidence presented in that case that TAG was sharing pricing information or involved in actual coercion and

collusion with the carrier. API is unable to distinguish *Caribbean Shippers* on that basis as it has not presented any such evidence in this case, either. Thus, because the court again concludes that API has failed to meet its burden, Sea-Land's Motion for Summary Judgment on the price-fixing claim is GRANTED.

### 4. *Preferential/Discriminatory Shipping Rates*

[9] API alleges that Sea-Land's tariff includes special freight rates for Costco and Sam's Club that are more favorable than Sea-Land's general tariff, and that Sea-Land has refused to extend comparable tariff treatment to API. Even assuming, *arguendo,* that Sea-Land's tariff favors those shippers, API has not specified any statutory provision that Sea-Land has allegedly violated.

The federal statute that generally prohibits price discrimination, that is, § 2 of the Clayton Act, as amended by § 1 of the Robinson-Patman Act, 15 U.S.C. § 13, applies only to the sale of commodities, and not to services such as transportation. *See, e.g., Alliance Shippers, Inc. v. Southern Pac. Transp. Co.,* 673 F.Supp. 1005, 1008 (C.D.Cal.1986), *aff'd,* 858 F.2d 567 (9th Cir.1988) ("The Robinson-Patman prohibition against price discrimination between similarly situated purchasers of like commodities does not apply to transportation since transportation is not a commodity.").

In fact, federal legislation that governs water carriers such as Sea-Land in the non-contiguous domestic trade does not expressly prohibit rate discrimination; to the contrary, it allows carriers to engage in price discrimination under certain circumstances. For example, water carriers can discriminate among shippers based on the volume of cargo offered over time. 49 U.S.C. § 13702(b)(4).

[10] Moreover, to the extent that API argues that Sea-Land's rates are unreasonable, such arguments are subject to the primary jurisdiction of the Surface Transportation Board ("STB"), formerly the Interstate Commerce Commission. The ICC Termination Act, 49 U.S.C. §§ 13701(c) and 13702(b)(6), provides expressly that a *1113 shipper "may" bring claims regarding the reasonableness of rates before the STB. Under the "primary jurisdiction" doctrine, the issue of reasonableness

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                                                               Page 13
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

requires preliminary resort to the STB. *Hargrave v. Freight Distrib. Serv., Inc.,* 53 F.3d 1019, 1021 (9th Cir.1995) (citing *Great N. Ry. Co. v. Merchants' Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943 (1922)).

Rate reasonableness is one area where uniformity and agency knowledge are essential to a proper result. *Hargrave,* 53 F.3d at 1021;*RTC Transp., Inc. v. Conagra Poultry Co.,* 971 F.2d 368 (9th Cir.1992); *Milne Truck Lines, Inc. v. Makita U.S.A., Inc.,* 970 F.2d 564 (9th Cir.1992). Thus, district courts should refrain from deciding issues related to the reasonableness or claimed discriminatory effect of a filed rate when the STB has primary jurisdiction to do so. *See DeBruce Grain, Inc. v. Union Pac. R.R. Co.,* 149 F.3d 787 (8th Cir.1998); *Baltimore & Ohio Chicago Terminal R.R. Co. v. Wisconsin Cent. Ltd.,* 154 F.3d 404 (7th Cir.1998), *cert. denied,*526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999).

Because API has failed to show a statutory violation with respect to its allegations of price discrimination, Sea-Land's Motion for Summary Judgment on this claim is GRANTED.

5. *Section 2 of the Sherman Act*

API invokes § 2 of the Sherman Act as one of the bases for its counterclaim:
Defendants unreasonably restrain trade and interstate commerce in violation of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

This conclusory allegation is clearly insufficient to state a claim under § 2. The Ninth Circuit has described the requirements of § 2, as follows:Section 2 claims tend to encompass a narrower range of anticompetitive behavior specifically defined as monopolization and attempts to monopolize. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize ... trade shall be guilty" of an antitrust violation. 15 U.S.C. § 2. Claims for violation of Section 2 must allege two key elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power. *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).... To

establish a Sherman Act Section 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power"; and (4) causal antitrust injury. *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1432-33 (9th Cir.1995) (citing *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811 (9th Cir.1988)).

*Amarel v. Connell,* 102 F.3d 1494, 1521 (9th Cir.1996) (as amended Jan. 15, 1997).

[11][12] API does not allege that Sea-Land has "monopoly power." Monopoly power is the "power to control prices or exclude competition" in the relevant market. *High Tech. Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir.1993). Because Sea-Land has only a 1/3 share in the Hawaii-Mainland market, it cannot have "monopoly power," as a matter of law. *Forro Precision, Inc. v. Int'l Bus. Mach. Corp.,* 673 F.2d 1045, 1058 (9th Cir.1982) (35% market share insufficient); *Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. 649, 655 (S.D.N.Y.1980), *aff'd,*697 F.2d 495 (2nd Cir.1983) (33% market share insufficient); *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2nd Cir.1945) (Learned Hand, J.) ("it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three is not").

[13] While API tries to lump Sea-Land's and Matson's market shares together, it cannot do so because API has *1114 failed to show concerted action by Sea-Land and Matson. API relies solely on two documents to demonstrate concerted action: 1) a Space Sharing Agreement between the two carriers, and 2) the State of Hawaii's Comments in Response to the U.S. Department of Transportation's Request for Public Comment on Competition in the Noncontiguous Domestic Offshore Trades (the "State Comment"). Neither raises a genuine issue of material fact here.

Matson and Sea-Land's Space Sharing Agreement merely provides for emergency shipping of cargo on each other's vessels "in the event of a vessel casualty or severe operational problems unrelated to vessel casualty." This Agreement does

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                                                      Page 14
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

not implicate antitrust concerns as it does not affect the freight rate billed to the customer by the original carrier.[FN3]

> FN3. In fact, the Agreement is pro-competitive because it enables either carrier to compete with the other notwithstanding unexpected operational problems. For example, if a Sea-Land vessel were disabled, a prospective shipper would still have the option of shipping under Sea-Land's tariff and its Bill of Lading, although the cargo would actually be carried on board Matson's vessel. Without the Agreement, the shipper could only ship under Matson's terms.

The State Comment is a brief filed by certain State agencies, unsuccessfully advocating a return to a close regulation of the carriers' rates or at least a repeal of the "zone of reasonableness" provision in the ICC Termination Act, 49 U.S.C. § 13701(d), which established a presumption of validity of the carriers' rates so long as the upward annual increase of the rates did not exceed 7.5%. In that brief, the State agencies opine and argue that there is concerted action rather than competition between Sea-Land and Matson. Importantly, the State agencies' opinions regarding the alleged concerted action were not the result of any judicial or quasi-judicial administrative fact finding. Although incorporated in API's counsel's affidavit, counsel does not purport to have personal knowledge of its contents. Thus, because the brief does not meet the requirements of Federal Rule of Civil Procedure 56(e), it cannot be considered as evidence upon this motion. Fed.R.Civ.P. 56(e); *Kim v. United States,* 121 F.3d 1269, 1276-77 (9th Cir.1997); *Keenan v. Allan,* 91 F.3d 1275, 1278 (9th Cir.1996); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995).

Moreover, API's allegations of concerted action are conclusively contradicted by the undisputed testimony in the record. API's own officer testified at length that Sea-Land and Matson tried very hard to get API's business by undercutting and/or matching each other's tariff rates. In fact, he admitted that the two carriers were constantly competing against each other.

Furthermore, even if API had alleged "monopoly power," mere possession of monopoly power is not unlawful. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 273-98 (2nd Cir.1979) (Sherman Act § 2 "does not prohibit monopoly-simpliciter"). API must allege overt acts in furtherance of a monopolization scheme to establish a § 2 claim. API does not. Thus, API's § 2 claim fails. *See Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 735-36 (9th Cir.1987) (holding that plaintiff's conclusory allegations of specific intent and anticompetitive conduct were insufficient). Therefore, the court GRANTS summary judgment in favor of Sea-Land on the § 2 claim.

### II. *RICO Claims*

[14] API alleges that TAG has been stealing cargo from its interstate shipments during inspections and that Sea-Land should be held vicariously liable for these thefts under RICO. The elements of a RICO claim are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The failure to establish any of these elements is fatal *1115 to a RICO claim. *See Rae v. Union Bank,* 725 F.2d 478, 480-81 (9th Cir.1984) (affirming Rule 12(b) dismissal of RICO claim where plaintiff failed to meet the "enterprise" requirement).

[15] The court first examines whether API has adequately alleged a pattern of racketeering activity. RICO defines the term "pattern of racketeering activity" as requiring "at least two acts of racketeering activity ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Aside from the minimal requirement of showing two predicate acts existed, RICO nowhere addresses the meaning of the term "pattern" as used throughout the statute. In *H.J. Inc. v. Northwestern Bell Telephone Company,* the Supreme Court sought to develop a meaningful concept of that term. 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Drawing on dicta from a previous opinion in which the issue was considered, *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. 3275, the Supreme Court developed from RICO's legislative history a two-prong framework for analysis: "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                                                  Page 15
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
(Cite as: 61 F.Supp.2d 1102)

activity." *Northwestern Bell,* 492 U.S. at 239, 109 S.Ct. 2893. Thus, the determination of whether a RICO plaintiff is able to establish a pattern of racketeering activity necessarily entails an initial determination of whether the defendants committed two or more predicate acts within the meaning of the RICO statute and, if so, whether the predicate acts were related in a manner such that they created a threat of continued unlawful activity, *Northwestern Bell,* 492 U.S. at 239-43, 109 S.Ct. 2893.

### 1. *Predicate Acts*

Congress has enumerated the predicate acts which may form a basis for a RICO claim in 18 U.S.C. § 1961(1). Of these, API relies on (a) the Hobbs Act, 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion), and (b) 18 U.S.C. § 659 (relating to felonious theft from interstate shipment).

### a. *Hobbs Act*

The Hobbs Act makes it illegal to obstruct, delay or affect commerce by robbery or extortion; by an attempt or a conspiracy to rob or extort; or by committing or threatening physical violence to a person or property in furtherance of a plan to violate the statute. *See* 18 U.S.C. § 1951(a). API fails to state a cause of action for either robbery or extortion.

The Hobbs Act defines robbery as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property." 18 U.S.C. § 1951(b)(1). The use of actual or threatened force or violence is an essential element of robbery pursuant to the Hobbs Act. *United States v. Smith,* 156 F.3d 1046, 1056 (10th Cir.1998), *cert. denied,* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 699 (1999). Thus, the court in *United States v. Smith,* vacated a conviction for robbery under the Hobbs Act where there was no evidence either that the defendant brandished the guns he stole from the sporting goods store, or that he threatened the store's employees in any way. *Id.*

[16] API fails to allege facts to support a claim of robbery as defined by § 1951. In fact, API's allegations contradict such a claim. API does not allege that TAG took property from the person or in the presence of another. Nor does API allege that TAG took property by means of actual or threatened force, violence or fear. Rather, API alleges that TAG took property "under the guise of conducting a neutral body inspection of the cargo." Thus, the court concludes that the clandestine activity described by API does not constitute robbery within the meaning of the Hobbs Act.

**\*1116** [17] Extortion is defined by the Hobbs Act as "the obtaining of personal property from another, *with his consent,* induced by wrongful use of actual or threatened force, violence or fear, or under color of right." 18 U.S.C. § 1951(b)(2) (emphasis added). A plaintiff cannot state a claim of extortion pursuant to the Hobbs Act unless it shows that it parted with property with its consent. *Camelio v. American Federation,* 137 F.3d 666, 671 (1st Cir.1998). API's counterclaim expressly states that TAG removed its property "without consent and unlawfully." Thus, while API's counterclaim alleges reprehensible acts, it does not allege a cause of action for extortion under the Hobbs Act.

### b. *Section 659*

[18] Section 659 prohibits theft from interstate shipments by carrier. 18 U.S.C. § 659. Only felonious violations of § 659 constitute "racketeering activity" under RICO. *See* 18 U.S.C. § 1961(1)(A). Theft under § 659 is a felony only if the amount or value of the stolen goods exceeds $1,000. Thus, while API alleges 20 specific violations of § 659, only four involve the theft of goods valued at over $1,000.

### 2. *Continuity*

Because the court concludes that API has alleged four predicate acts, that is, four felonious violations of § 659, it must next determine whether these violations constitute a pattern within the meaning of RICO. According to *Northwestern Bell,* "[t]o establish a RICO pattern it must ... be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." 492 U.S. at 240, 109 S.Ct. 2893. The *Northwestern Bell* Court also explained that there are two alternative ways to satisfy the continuity prong: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.Supp.2d 1102                                                    Page 16
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**

period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893.

a. *Closed-Ended Continuity*

[19] "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Northwestern Bell*, 492 U.S. at 241, 109 S.Ct. 2893. This formulation raises the question of how long a substantial period of time is. The Supreme Court has declined to draw a bright line of "substantiality." *Id.* at 243, 109 S.Ct. 2893. The Supreme Court did state, however, that "a few weeks or months" is not enough. *Id.* at 242, 109 S.Ct. 2893. The Ninth Circuit is in accord:

We have found no case in which a court has held the requirement to be satisfied by a pattern of activity lasting less than a year. A pattern of activity lasting only a few months does not reflect the "long term criminal conduct" to which RICO was intended to apply.

*Religious Tech. Center v. Wollersheim*, 971 F.2d 364, 366-67 & n. 7 (9th Cir.1992) (collecting cases). Because the alleged predicate acts occurred over only a ten-week period of time, between February 17, 1998 and April 25, 1998, they do not, as a matter of law, constitute acts "extending over a substantial period of time." Thus, the court concludes that API has not established closed-ended continuity.

b. *Open-Ended Continuity*

Continuity may also be demonstrated if the predicate acts "constitute a threat of continuing racketeering activity": "past conduct that by its nature projects into the future with a threat of repetition." *Northwestern Bell*, 492 U.S. at 240-41, 109 S.Ct. 2893. This enables a RICO plaintiff to establish a pattern in instances in which the action is brought before the racketeering activity has extended over a period long enough to constitute closed-ended continuity. "In such cases, liability depends on whether the threat of continuity is demonstrated." *Id.* at 242, 109 S.Ct. 2893.

In assessing whether a threat of continuity exists, courts have looked first to the *1117 nature of the predicate acts alleged or to the nature of the

enterprise at whose behest the predicate acts were performed. *See, e.g., GICC Capital Corp. v. Tech. Finance Group, Inc.*, 67 F.3d 463, 466 (2nd Cir.1995). Thus, an inherently unlawful act performed at the behest of an enterprise whose business is racketeering activity would automatically give rise to the requisite threat of continuity. *Id.* Where the nature or conduct of the enterprise does not by itself suggest that the racketeering acts will continue, a plaintiff must point to other external factors. *Id.*

[20] In this case, although API alleges that "the acts of these Defendants are a continuing course of criminal conduct and racketeering," it does not identify any external factors to support this conclusion. Although API maintains that TAG has engaged in unlawful activities, TAG also engages in legitimate business activities. Thus, because neither the nature of the conduct nor the enterprise itself suggests a continuing threat, API must allege some external basis for believing that the racketeering acts will continue. API has not done so.

Moreover, the four acts that constitute the alleged pattern took place during a ten-week period. More than eight months elapsed between the last alleged predicate act and the filing of the RICO counterclaim. This is a strong indication that the alleged racketeering activity has come to an end. If the racketeering activity has ended, API cannot show open-ended continuity. *Religious Tech. Ctr.*, 971 F.2d at 366-67.

Because the court concludes that API has not established the requisite continuity of the predicate acts, it cannot maintain a claim under RICO. Even if API had alleged sufficient continuity, its RICO contains additional deficiencies. Not only must a RICO plaintiff plead a pattern of racketeering activity, but it must also plead a violation of one of the prohibited RICO activities, as defined by 18 U.S.C. § 1962, and an injury to business or property by reason of such violation. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3rd Cir.1993). Again, API has not done so.

3. *RICO Activities*

a. *Section 1962(a)*

[21]Section 1962(a) prohibits not the engagement in racketeering acts to conduct an enterprise affecting interstate commerce, but rather the use or investment of the proceeds of racketeering acts to acquire, establish or operate such an enterprise.FN4 *United States v. Robertson,* 73 F.3d 249, 251 (9th Cir.1996). Therefore, a § 1962(a) claim must include allegations of injury from the use and investment of racketeering proceeds, not merely injury from the predicate acts of racketeering themselves. *Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.,* 981 F.2d 429, 437 (9th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993). API alleges only that "[m]oneys derived from TAG's unlawful conduct has [sic] been received by Sea-Land and Matson." API's RICO Case Statement asserts further that "[b]oth Sea-Land and Matson as well as TAG receive benefits from the pattern of racketeering," and they "both receive a tangible benefit." These allegations do not describe what, if any, benefits were received, much less "the use or investment of the proceeds of racketeering acts to acquire, establish, or operate" a racketeering enterprise.FN5 Thus, the *1118 court concludes that API has failed to state a § 1962(a) claim.

> FN4.Section 1962(a) provides, in relevant part:
> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of [18 U.S.C. § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> FN5. API has also failed to "describe the use or the investment of [racketeering] income" as required in the second part of item 11 of the RICO case statement mandated by Local Rule 9.1. Per LR 9.2, noncompliance with LR 9.1 is an independent ground for dismissal of a RICO claim.

b. *Section 1962(b)*

[22]Section 1962(b) "prohibits engaging in a racketeering activity to acquire or maintain an interest in or control of an enterprise." *Schreiber Distrib. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1398 (9th Cir.1986). Thus, it requires a specific nexus between the control of the enterprise and the racketeering activity. No such nexus has been alleged.FN6

> FN6. Notably, API failed to "describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise" as required by item 12 of the RICO case statement.

Moreover, API's § 1962(b) claim cannot be based on the alleged predicate acts of interstate theft in violation of 18 U.S.C. § 659 because API never alleges that Sea-Land controlled TAG with respect to violations of 18 U.S.C. § 659. Instead, API simply seeks to hold Sea-Land vicariously liable for TAG's alleged conduct as Sea-Land's alleged agent. That is not sufficient to raise a RICO claim based on § 1962(b). Thus, the court concludes that API's § 1962(b) claim fails.

c. *Section 1962(c)*

Section 1962(c) renders unlawful the direct or indirect conducting of or participation in a RICO 'enterprise's affairs through a pattern of racketeering activity' by any person employed by or associated with any enterprise engaged in interstate commerce. *United Energy Owners Comm., Inc. v. U.S. Energy Management Sys., Inc.,* 837 F.2d 356, 359 n. 5 (9th Cir.1988). This section of RICO contains strict pleading requirements:

> For the purposes of section 1962(c), RICO plaintiffs must allege a defendant-the "person" or "persons"-who is distinct from the "enterprise" whose business the defendant is conducting. Under RICO, an "enterprise" is a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit. Therefore, for purposes of a single action, a corporate defendant cannot be both the RICO person and the RICO enterprise under section 1962(c).

> *Sever v. Alaska Pulp Corp.,* 978 F.2d 1529, 1533-34 (9th Cir.1992) (citations omitted). Thus, in order to state a claim under § 1962(c), a plaintiff must allege an "enterprise" that is distinct and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

separate from the "person." *Rae v. Union Bank,* 725 F.2d 478, 481 (9th Cir.1984).

[23] In this case, API has alleged that TAG is both the RICO enterprise and the RICO person. This allegation is evident in API's RICO Case Statement. Item 13 of the court's RICO case statement requires a response to the following inquiry:

If the complaint alleges a violation of 18 U.S.C. § 1962(c), state who is employed by or associated with the alleged enterprise, and state whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).

API's response provides: API does not know the names or identities of the individuals employed or associated by TAG but believes that these entities are liable as person and enterprises under 1962(c).

API further states that TAG conducted or participated in the racketeering activity with "certain of its employees (and others acting in concert with them)." Similarly, API alleges that "[f]urther agents of TAG and individuals employed by TAG or under TAG's control have committed predicate acts as further set forth in the section below regarding the RICO claims and are together a racketeering enterprise as defined by RICO."The inclusion of additional unidentified entities does not save API's § 1962(c) claim. Ninth Circuit law is clear that a RICO person may not be held directly liable under § 1962(c), when it and the RICO enterprise are identical.

**\*1119** Furthermore, the Ninth Circuit has recognized that:

[I]t would be inconsistent with the language and purpose of section 1962(c) to allow plaintiffs to circumvent this rule by naming an employee of the enterprise as the person that conducts the affairs of the enterprise [who is also the employer] and then resorting to the doctrine of respondeat superior [to make his employer liable].

*Brady v. Dairy Fresh Prods. Co.,* 974 F.2d 1149, 1154 (9th Cir.1992). "[R]espondeat superior and agency liability is inappropriate when the person is the RICO enterprise." *Id.* Without a proper allegation of a RICO enterprise, none of API's RICO claims can survive. *Chang v. Chen,* 80 F.3d 1293, 1301 (9th Cir.1996).

d. *Section 1962(d)*

API's failure to allege the requisite substantive elements of a RICO claim under §§ 1962(a), (b) or (c), precludes its attempt to state a RICO conspiracy cause of action under § 1962(d). *Religious Tech. Ctr. v. Wollersheim,* 971 F.2d 364, 367 n. 8 (9th Cir.1992). API does not allege that Matson and Sea-Land are RICO persons; instead, it only alleges that they "are vicariously liable as co-conspirators and/or for nondelegable duties for all of the amounts of damages" caused by TAG. Because TAG is not liable under §§ 1962(a), (b) or (c), Matson and Sea-Land cannot be held vicariously liable or as alleged "co-conspirators" under § 1962(d).

e. *Amendment of RICO Claim*

[24] Apparently cognizant of the deficiencies in its RICO claim, API requests that "should the court consider in any way limiting API's ability to readdress these criminal violations in a RICO case that it [API] be allowed sufficient opportunity to file an amended RICO claim." The Scheduling Order in effect for this case provided a November 3, 1998 deadline for any motions to amend the pleadings. Pursuant to the Ninth Circuit's decision in *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604 (9th Cir.1992), a scheduling order shall not be modified except upon a showing of good cause. *Id.* at 607-08 (holding that standards of Fed.R.Civ.P. 16 apply). To determine if good cause exists, the court focuses primarily on the diligence of the party seeking amendment. *Id.* at 609.

[25] In this case, Sea-Land identified the failings of API's RICO claims in its January 20, 1999 summary judgment motion. Rather than respond to these deficiencies in its March 3, 1999 opposition to Sea-Land's motion, API merely reiterated its conclusory allegations. Not only does the court conclude that API has not been diligent in seeking to amend its RICO claim, the court recognizes that Sea-Land would be prejudiced were the court to allow such an amendment at this late stage. Therefore, the court denies API's request to amend its RICO claims.

Because the court concludes that API cannot maintain a claim under RICO, Sea-Land's Motion for Summary Judgment as to the RICO count is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GRANTED.

III. *Maritime Lien Claims*

API alleges that Sea-Land "repudiated its agreement to pay API for certain necessaries provided to certain of its ships". This breach of contract has given rise to a maritime liens [sic] pursuant to 46 U.S.C. § 31342. API contends that it stuffed (that is, placed) its or its customers' cargo in Sea-Land's containers in preparation for transportation on board Sea-Land's vessels. API also asserts that it performed some drayage of loaded containers. However, it is undisputed that:

1. API is not a stevedore. API never loaded containers on, or provided any stevedoring services to, any of Sea-Land's vessels.

2. API did not stuff any cargo into containers for loading onto any of Sea-Land's vessels in the vicinity of any of Sea-Land's vessels, or anywhere within marine terminals where Sea-Land's vessels were berthed.

*1120 3. API did not dray any containers within marine terminals to the piers where Sea-Land's vessels were berthed or otherwise assist or participate in the process of loading the containers on board those vessels.

[26] Assuming for purposes of this motion that stuffing and drayage of containers constitute "necessaries" within the meaning of the statute, the court must still determine whether API's services are maritime in nature. *See Inbesa America, Inc. v. M/V Anglia,* 134 F.3d 1035, 1036-37 n. 2 (11th Cir.1998). The *Anglia* Court summarized the governing legal principles as follows:

In order for a contract to fall within the federal admiralty jurisdiction, it must be wholly maritime in nature, or its non-maritime elements must be either insignificant or separable without prejudice to either party. To qualify as maritime, moreover, the elements of a contract must pertain directly to and be necessary for commerce or navigation upon navigable waters.

134 F.3d at 1036. *Accord Simon v. Intercontinental Transp. (ICT) B.V.,* 882 F.2d 1435, 1442 (9th Cir.1989). The court then cited the more specific rule that "contracts involving cargo are maritime only to the extent that cargo is on a ship or being loaded on or off a ship." *Anglia,* 134 F.3d at 1037.

Consistent with this rule, courts have repeatedly held that shoreside cargo handling, including trucking ("drayage") and container handling, is not of a "maritime" nature. *Luvi Trucking, Inc. v. Sea-Land Service, Inc.,* 650 F.2d 371, 373-74 (1st Cir.1981). The First Circuit, in *Luvi,* noted that the trucker never came in contact with the ship and that the drayage was entirely separable from the ocean part of the voyage.

Likewise, the Eleventh Circuit, in *Anglia,* discussed Inbesa's contention that its stuffing of cargo into containers to be carried on board the Anglia, as well as stripping cargo from containers carried on the vessel, should give it a maritime lien. Rejecting this contention, the Eleventh Circuit concluded:

Although such services by Inbesa were no doubt important for [the shipowner's] business, they were not "necessary" for the Anglia's operation. Indeed, all of Inbesa's cargo-handling services took place on land without regard to whether the Anglia was in port; Inbesa could have loaded, stuffed, and secured cargo from trucks into containers before the Anglia arrived, and then stripped cargo from containers into warehouses or onto trucks after the Anglia departed.... We see no reason to blur the line between stevedoring and shoreside cargo-handling that has long been a useful guide for the district courts in determining the scope of their admiralty jurisdiction.

*Anglia,* 134 F.3d at 1037-38.

Although one district court has recognized a maritime lien for container stuffing and stripping, in *Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff,* 913 F.Supp. 919, 928 (D.Md.1995), that court based its decision on the fact that the contract upon which the lien was based, was between the vessel charterer and a *stevedore,* and therefore was more than tangentially related to maritime affairs. In this case, API is not a stevedore and thus the court employs the analysis adopted by the court in *Anglia.*

Applying the maritime/non-maritime approach, the undisputed facts show that the facilities where API stuffed containers are about a thirty-minute drive from the marine terminals. Thus, the court concludes, as did the Eleventh Circuit in *Anglia,* that because API's labor was not "maritime" in nature, it does not give rise to a maritime lien. Accordingly, the court

61 F.Supp.2d 1102                                                                                      Page 20
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669, RICO Bus.Disp.Guide 9757
**(Cite as: 61 F.Supp.2d 1102)**


GRANTS summary judgment in favor of Sea-Land
on the maritime lien claims.

*CONCLUSION*

For the reasons stated above, the court GRANTS
in part and DENIES in part Sea-Land Service, Inc.'s
Motion to Dismiss and/or for Summary Judgment on
**\*1121** Atlantic Pacific International, Inc. and A & A
Consolidators, Inc.'s First Amended Counterclaim.
Sea-Land is entitled to summary judgment on the
maritime lien claims, the RICO claims, and all the
antitrust claims except the tying claim. This order
does not affect API's claims for breach of contract
and conversion.

IT IS SO ORDERED.

D.Hawai'i,1999.
Sea-Land Service, Inc. v. Atlantic Pacific Intern., Inc.
61 F.Supp.2d 1102, 1999-2 Trade Cases P 72,669,
RICO Bus.Disp.Guide 9757

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.