# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WAYNE BERRY, a Hawaii citizen; | ) | Civ. No. CV03 00385 SOM-LEK |
| | ) | (Copyright) |
| Plaintiff, | ) | |
| | ) | DECLARATION OF WAYNE |
| vs. | ) | BERRY; EXHIBITS "A" THROUGH |
| | ) | "F" |
| HAWAIIAN EXPRESS SERVICE, | ) | |
| INC., a California corporation; et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>DECLARATION OF WAYNE BERRY</u>

I, WAYNE BERRY, am the plaintiff in this case and I make this declaration

under the penalty of perjury.  All the statements herein are true and correct to the

best of my knowledge, information and belief.  If called upon to testify regarding

the matters herein, I am competent and willing to do so.

1.    Attached hereto as Exhibit "A" is a true and correct copy of a print

out from a report I generated from the Guidance Software CD from the after

acquired images showing that Fleming had been using my Z tables and C&S and

its employees continue to have access to my Z tables.  This CD Rom was

authenticated in the Declaration of Timothy J. Hogan filed on May 18, 2004, at ¶

16. Z Tables are my original expression to effect the normalization of data in

preparation for performing complex queries for reports from my databases. I never gave Dillon or Fleming any permission to modify my Z Tables or to write any derivative programs to run my Z Tables. This report shows they did both and that C&S has these works.

2.    Mark Dillon and Teresa Noa were both employees of Atlantic Pacific International, Inc. and have had access to my software prior to working for Fleming. In 1999 I told them no one had the right to make changes in my copyrighted works and never gave them and/or Brian Christensen permission to make, use or even to possess copies any derivatives copies of my original work or to use them for Fleming Companies, Inc., any of its subsidiaries or affiliates, Hawaii Express Service, Inc., or any of its subsidiaries or affiliates, C&S Wholesale Grocers, Inc. or any of its affiliates. A true and correct copy of my End User License Agreement for my Freight Control System is attached as Exhibit "B." I gave a copy of this Eula with one addendum to Mark Dillon and Teresa Noa and to Fleming Companies, Inc., dba Fleming Foods in November 1999. This document is kept by me in the regular course of my business. I have never given Fleming permission to transfer my copyrighted work to C&S.

3.    Based on my review of voluminous data in the Guidance CD, Dillon caused Gurzi in 2003 to copy over 2000 of my copyrighted programs and reports

back onto the what became the C&S computer system. I never gave Dillon, Noa or Christensen permission to cause these programs to be copied.

4.    Dillon left the Z Tables and related files on the system that he admits are my copyrighted software. The Guidance materials show he was modifying these right up to the date that Guidance arrived on the Kapolei system after Gurzi left. I did not give Dillon, Noa, Christensen or Fleming permission to modify my Z Tables or any related programs.

5.    Dillon, at paragraph 20 of the Concise statement is quoted as saying that he opened all of the Crystal Reports. This was not possible. I have run a report against the Guidance CD Rom, after acquired image, and there are 1,119 Crystal Reports on the after acquired image. I am very familiar with this software, because, based on my personal knowledge and the after acquired image, it is mostly my work. It would take about two to three minutes per report to do what Dillon says he did.  That would have taken over 34 hours without a break just to complete this one task.

6.    I never licensed any Hawaiian Express Service, Inc. or HES Transportation Service, Inc. or Hawaiian Transfer Company Limited employee to use my freight system. They are all direct competitors of mine and I find their access to my system a clear violation of my EULA and my copyrights generally.

3

7.    In or about 1993, certain individuals, including Jack Borja and Lokilani Lindsey, Marlene Lindsey and another yet to be identified shareholder, formed Atlantic Pacific International, Inc. ("API").   API was outwardly a freight logistics company assisting, primarily food and cigarette shippers, shipping to the State of Hawaii. I am presently President of API and its custodian of Records.

8.    In late 1994, I was renting a home on the North Shore of Oahu from Jack Borja who approached me and requested that I provide a proposal for automating the API logistics functions.   By late 1995, I had completed the installation of themy Freight Control System and put it on line in my home to be accessed by API.

9.    In or about December 1995, Fleming  transferred $200,000 to API for Jack Borja to use to buy the interests held by Lokelani and Marlene Lindsey to insure the continued flow of untaxed cigarettes and the false documentation that Fleming used to facilitate its food overcharge scheme.   Attached hereto as Exhibit "C" is a true and correct copy of the Bank of Hawaii deposit for that transfer including the copy of the API check register showing the money came from an advance from Fleming.   These documents were kept by me as custodian of API's business records maintained by me in the regular course of API's business.   It is the custom and practice of API to maintain such records in the regular course of its

4

business.

10.    Attached hereto as Exhibit "D" is a true and correct copy of hand written records maintained by API evidencing the agreement to keep the fact of the payment from the Bankruptcy Trustee. These record also discuss the fact of the Cigarette trafficking.

11.    I am informed and believe that at the time of the transfer, Marlene Lindsey was a chapter 7 Bankrupt Debtor in the District of Hawaii. Attached hereto as Exhibit "D" is a true and correct copy of the agreement between Jack Borja, Marlene Lindsey and Lokilani Lindsey where they agreed to conceal the payment to Marlene from her Bankruptcy Trustee. This document was kept by me as custodian of API's business records maintained by me in the regular course of API's business. It is the custom and practice of API to maintain such records in the regular course of its business.

12.    In or about 1998, I was informed by a temporary API employee, Mauro Edwards (who admitted in his personal bankruptcy that he was a private investigator) that he had overheard one of Jack Borja's relatives, who was an API employee, discussing the shipment of machine guns with silencers in Fleming controlled ocean containers. I immediately contacted the Alcohol Tobacco and Firearms ("ATF") to report this information.

13. In a subsequent meeting with ATF agents, Tracy Elder and Jordan Lowe, at the ATF offices, after briefly discussing the machine guns, I was asked by Jordan Lowe if I knew anything about cigarette smuggling through Fleming at that time I did not.

14. Later, after API was requested to produce certain corporate records in litigation, I discovered certain records of Fleming related companies that appeared to be engaged in cigarette diversions or trafficking. These companies including UPAC (controlled by John Ault, Fleming's manager), and WC Distributing. I reported this to the ATF that immediately sent an investigator from the mainland to review the records.

15. After further investigation, I discovered documents dating back to 1993 detailing the agreement by the Lindsey's and Mr. Borja using the Fleming money to facilitate the trafficking of untaxed cigarettes. These documents were obtained by the United States pursuant to grand jury subpoena and, upon information and belief, were the government's principal evidence against Marlene and Lokelani Lindsey who were convicted of the predicate offenses of Money Laundering and Bankruptcy Fraud.

16. Further, after discovering that my intellectual property was being used by Fleming to commit the overcharges , I was quoted by the Honolulu

Advertiser that ran a series of articles detailing the manner in which vendor allowances and credits that should have been passed on the consumer but were instead taken by Fleming.

17.    Subsequently, I was approached by Foodland to allegedly assist in determining the extent of the food Food overcharges.  After extensive review of Fleming and Foodland data, I discovered an additional overcharge scheme that permitted Fleming to overcharge approximately 3% through a false invoicing scheme.

18.    After meeting with Foodland and reviewing the Fleming data, I provided Foodland with a detailed proposal showing how, with the use of my software, Foodland could begin to cut its costs by operating what are commonly known as Direct Store Shipments and Stop-in-Transit shipments that would allow Foodland to use my system and  to avoid the need to use the Fleming warehouse and avoid the overcharges.   This would allow me to directly compete with Fleming in the market for Wholesale Groceries.

19.    With full knowledge of my claim that Fleming was an infringer, Foodland agreed to continue accepting the overcharges from Fleming in exchange for a portion of the proceeds to be passed back to it in the form of rebates known as the "Team Score."

20.    My Freight Control System and the derivatives have been improperly used to facilitate the Food overcharges, cigarette trafficking and practices known as "diversions." Upon information and belief, C&S has been engaged in diversions in other markets. Upon information and belief, C&S has maintained to two California divisions that, in coordination with the Hawaii Division, can facilitate the Diversion practices.

21.    Diversions allow a shipper to obtain preferential pricing and/or a freight subsidy for a shipment intended to go a specific location to ease some of the costs to make pricing more geographically uniform. This money that Congress has, in a sense of the Congress, stated should go to the consumer, is instead taken by the wholesaler and, contrary to the sense of congress, not passed on to the consumer.

22.    Diversions are facilitated bymy system. Because of the secrecy imposed on the data in my system, the customer is never apprized that the there was a subsidy for the shipment and the price to the Hawaii consumer remains artifiicially high. The goods are shipped to one of the HEX/HEST cross-docking facilities and then, instead of going to Hawaii, diverted to other Mainland locations with Fleming and C&S pocketing the Hawaii subsidy.

23.    The Berry Freight Control System tracks the freight allowance and

8

the payment.

24.    Other affiliated Hawaii businesses have had similar histories to API including its connection to the Bishop Estate.   These companies, upon information and belief, form a interconnected network and have persons associated with these companies that are attorneys related to these proceedings.

25.    Among these companies, Alven Corporation aka Hawaii Logistics Service is an affiliate of North Shore Associates, Inc.  These entities share and/or shared common ownership and, upon information and belief, operate its business through a pattern of unlicenced use of my Freight Control System for the purpose of financial gain.

26.    A present, and or, former, North Shore Associates, Inc. director is currently an attorney representing C&S in this case.   One of C&S' attorneys is also a Fleming employee and listed as such on the Bankruptcy schedules.

27.    I am aware that Fleming wanted to cause me to suffer financially for cooperating with Federal authorities.  I have not done anything to C&S to cause them to harm me.  I can only infer that C&S has taken over the Fleming illegal enterprise.  I believe that their agreement to commit the infringement of my software shows that C&S and its principal is engaged in the same pattern of conduct that Fleming was engaged in and I see no reason why all of Fleming's

victims cannot now look to C&S as the liable principal participant in the ongoing

RICO Enterprise.

28.    Attached hereto as Exhibit "E" is a true and correct copy of an email

that I received from Teresa Noa dated August 25, 1999. This document was and is

kept by me in the ordinary course of my work as a software developer.   The email

is the first time I learned of the existence of two sets of "books" at Fleming.  This

email is directly related to the type of illegal and improper accounting practices

that the independent investigators and the SEC have been investigating 2003 when

Guidance scrubbed the computers removing any evidence of deletions.

29.  Attached hereto as Exhibit "F" is a true and correct copy of my filed

copyright registered for my Freight Control System Access Database that was

licensed to Fleming Companies, Inc. in 1999 but immediately infringed.

Dated, Honolulu, Hawaii _____12/30/2004_____

WAYNE BERRY