# Exhibit
# 9 B-2

(c)     Between the date hereof and the Initial Closing, Sellers shall (i) afford any such Third Party Purchaser and its authorized representatives reasonable access to all offices and other facilities, all books and records and all employees and personnel of Sellers relating to the Business, (B) permit such Third Party Purchaser and its authorized representatives to make such inspections and to make copies of such books and records relating to the Business as they may reasonably require and (C) furnish such Third Party Purchaser and its authorized representatives with such financial and operating data and other information and other information concerning the Business as they may from time to time reasonably request.  Sellers will direct their employees to render any assistance which such Third Party Purchaser may reasonably request in examining or utilizing records referred to in this Section 2.6(c).

(d)     Any Third Party Purchaser and its authorized representatives (including its designated engineers or consultants) may, upon reasonable notice during normal business hours, enter into and upon any PSC or any portion of the Owned Real Property (unless such PSC or portion of Owned Real Property is no longer an Acquired Asset pursuant to this Agreement) in order to assess the environmental condition of such properties or the business conducted thereat. Notwithstanding the foregoing, no soil and surface or ground water sampling, monitoring, borings or testing and any other invasive tests or investigations relating to environmental conditions or at such properties shall be conducted (i) without Sellers' consent, which consent shall not be unreasonably withheld; (ii) without permitting Sellers the opportunity to participate therein; and (iii) such Third Party Purchaser agrees to repair any damage to any applicable PSC or portion of the Owned Real Property due to such investigation and to indemnify and hold Sellers harmless of and from any claim for physical damages or physical injuries arising from such Third Party Purchaser's investigation of such PSC or portion of the Owned Real Property, and notwithstanding anything to the contrary in this Agreement, such indemnity shall survive the transfer, assignment and delivery of such PSC or portion of Owned Real Property pursuant to this Agreement for a period of one year after such transfer or, if such sale is not consummated, either the termination of this Agreement or the one year anniversary of the Initial Closing. Sellers shall cooperate with such Third Party Purchaser and its authorized representatives in conducting such assessment, and shall allow such Third Party Purchaser and its authorized representatives reasonable access to their properties and businesses.

(e)     Notwithstanding anything herein to the contrary, including paragraphs (c) and (d) above, (i) Purchaser shall provide written notification to Seller of the identity of any prospective Third Party Purchaser concurrently with or prior to Purchaser's execution of a confidentiality agreement relating to any of the transactions contemplated by this Agreement with such Third Party Purchaser (with copies of such confidentiality agreements to be provided to Sellers promptly upon execution thereof), and Purchaser shall cause Sellers to be third party beneficiaries to all such confidentiality agreements and (ii) to the extent any such Third Party Purchaser is given physical access to any facilities of the Business, Purchaser shall cause such Third Party Purchaser to be accompanied by one or more employees or representatives of Purchaser.

(f)     In order to facilitate the acquisition of Acquired Assets by one or more Third Party Purchasers, Sellers shall, if requested by Purchaser, execute one or more necessary transfer documents or amendments to this Agreement (each in a form reasonably acceptable to Sellers) making such Third Party Purchasers parties hereto in respect of a portion of the

24

Acquired Assets and permitting such Third Party Purchasers to assume all rights, obligations and interests of Purchaser under this Agreement in respect of such Acquired Assets, all subject to any further required order of the Bankruptcy Court. Purchaser and Parent shall, if necessary, execute such documents and/or otherwise cause such documents to be executed by such Third Party Purchaser (which shall in any event be consistent with the terms hereof and on terms no less favorable to Sellers as this Agreement). Notwithstanding the foregoing, to the extent Purchaser enters into agreements with Third Party Purchasers incorporating or otherwise containing any representations and warranties of such Third Party Purchaser, Purchaser agrees that Sellers shall be included as third party beneficiaries to such agreements or, to the extent not so included as third party beneficiaries, shall have direct recourse against Purchaser for breach of the representations and warranties set forth therein by such Third Party Purchaser. Notwithstanding anything herein to the contrary, Sellers shall not be responsible for and Purchaser shall otherwise reimburse Sellers for all filings fees associated with notifications and filings under the HSR Act which may be required in respect of transactions with any Third Party Purchasers.

(g)    Subject to terms of this Agreement, including Section 2.5, on the Assignment Deadline, all Acquired Assets (excluding Acquired Contracts, which shall not be transferred to Purchaser) not theretofore assigned or transferred to a Third Party Purchaser or Purchaser or designated for transfer to a Third Party Purchaser in a timely delivered Third Party Purchaser Notice shall be transferred to Purchaser.

(h)    Subject to Section 14.11, nothing in this Section 2.6 shall relieve Purchaser of its obligations hereunder with respect to the payment of the Purchase Price or its obligations with respect to any Acquired Assets or Assumed Liabilities that are not transferred to Third Party Purchasers.

(i)    Notwithstanding anything herein to the contrary, Purchaser may exercise its Designation Rights to designate Third Party Purchasers pre-Initial Closing that Purchaser intends will purchase designated Acquired Assets directly from Sellers concurrently with the Initial Closing of the Acquired Assets by Purchaser, but only to the extent such transactions with the Third Party Purchasers are able to close and do close concurrently with the Initial Closing of the Acquired Assets by Purchaser. In the event any of such proposed transactions with any of the Third Party Purchasers for the purchase of any portion of the Acquired Assets (the "Non-Concurrent Portion") are unable to close concurrently with the Initial Closing of the Acquired Assets by Purchaser, Purchaser shall not delay the Initial Closing on account of the Non-Concurrent Portion and shall be responsible for the entire Purchase Price.

2.7    Collection of Receivables and Notes.

(a)    In the event that after the Initial Closing, Purchaser receives any payment at any PSC or otherwise in respect of any accounts or trade receivables that accrued prior to the Initial Closing Date, Purchaser shall segregate such payment from its own assets and shall, within five (5) Business Days of receipt of funds by Purchaser, remit the same to Sellers. Any such payment shall at all times remain the property of Sellers, and Purchaser acknowledges that it has no rights or interests with respect thereto.

(b)    Notwithstanding anything herein to the contrary, Sellers shall retain and control all accounts and trade receivables, and any security interests or guarantees related thereto (subject to Section 2.11), that accrued prior to the Initial Closing Date; provided, that nothing herein shall be construed as prohibiting Sellers from seeking any legal recourse available to them against any customers for the collection of such accounts and trade receivables.

(c)    With respect to promissory notes, forgiveness notes, facility standby agreement notes and facility standby agreement accounts receivable:

(i)    to the extent such notes relate to the Operating PSCs, Sellers shall not, in attempting to collect upon any amounts due thereon (whether or not in arrears), reduce the principal amount of any such notes or otherwise extend the maturity date, reduce the interest rate or extend any amortization or interest payment (collectively "compromise such notes") without the prior written consent of Purchaser; and

(ii)    to the extent such notes relate to the Non-Operating PSCs, Sellers shall not, in attempting to collect any amounts due thereon (whether or not in arrears), reduce that portion of the principal amount that would otherwise be payable on and after the Initial Closing Date in respect of such notes or otherwise compromise such notes, unless Sellers remit to Purchaser by the close of business on the Initial Closing Date (the "Purchaser Collection Amount") a portion of any amounts collected as a result of such reduction (the "Collection Amount"), with Sellers entitled to retain an amount equal to the Collection Amount multiplied by a fraction, (x) the numerator of which shall be the amount of all regularly scheduled principal due and owing (and any interest thereon) from Third Parties through the Initial Closing Date and (y) the denominator of which shall be (A) the amount of the numerator plus (B) the principal due after the Initial Closing Date, and Purchaser is entitled to the remainder of the Collection Amount; provided, however, that without the prior consent of Purchaser, Sellers shall not agree to or effect any reduction with respect to any such note if such note is with a customer (or Affiliate of such customer) that also then has obligations under a promissory note, forgiveness note or facility standby agreement note relating to an Operating PSC.  At the election of Purchaser, Purchaser may deduct from the Purchase Price it delivers to Sellers at the Initial Closing an amount of funds equal to the sum of all Purchaser Collection Amounts owed to Purchaser pursuant to this Section 2.7.

(d)    Notwithstanding anything to the contrary contained in this Section 2.7, on and after the Initial Closing, Sellers will not reduce or otherwise compromise the principal amount of any promissory notes, forgiveness notes, facility standby agreement notes and facility standby agreement accounts receivable which are not Excluded Assets.

(e)    To the extent requested by Sellers, Purchaser shall reasonably assist Sellers in the collection of such accounts and trade receivables from customers that are being supplied by Purchaser, provided that any such assistance shall not unreasonably interfere with Purchaser's supply relationship with such customer.  To the extent requested by Purchaser, Sellers shall reasonably assist Purchaser in the collection of amounts due and owing from Third Parties following the Initial Closing Date in respect of Acquired Contracts, including customer forgiveness notes and customer promissory notes.

26

(f)    In the event that after the Initial Closing, Sellers receive any payment in respect of any accounts or trade receivables that accrued after the Initial Closing Date with respect to any Acquired Assets leased by or otherwise used for the benefit of Purchaser pursuant to the Transition Services Agreement or any Acquired Assets which have been assigned, transferred and delivered pursuant to this Agreement, Sellers shall segregate such payment from their own assets and shall, within five (5) Business Days of receipt of funds by Sellers, remit the same to Purchaser within a reasonable period of time after the receipt thereof without. Any such payment shall at all times remain the property of Purchaser, and Sellers acknowledge that they have no rights or interests with respect thereto.

2.8    Deemed Consents and Cures. For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), subject to Section 2.10, Sellers shall be deemed to have obtained all required consents, as applicable, in respect of the assignment of any Acquired Contract and to have cured all defaults thereunder if, and to the extent that, pursuant to the Sale Order or another Order of the Bankruptcy Court, Sellers are authorized to assume and assign any such Acquired Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code; provided, however, nothing in this Section 2.8 shall relieve Sellers of their obligations to pay Cure Costs in accordance with Section 2.9 below.

2.9    Cure Costs.

(a)    To the extent that any Acquired Contract is subject to a cure (pursuant to section 365 of the Bankruptcy Code and described in the Sale Order or any Order of the Bankruptcy Court relating to such cure Liability), Sellers shall be responsible for any such cure (in the aggregate the "Cure Costs"); provided, however, Sellers shall not be responsible for any material Cure Costs associated with Acquired Contracts that are not essential to the Business and are readily replicated with other Third Parties. In addition, from the date hereof until July 16, 2003, with the consent of Purchaser, Sellers may designate Acquired Contracts which are not necessary for the on-going operations of the Business, for which Sellers shall not be responsible for any Cure Costs.

(b)    On the Initial Closing Date, Purchaser, on behalf of the Sellers, shall deposit into escrow (the "Cure Escrow") the Cure Escrow Amount. Subject to paragraph (a) above, with respect to each Acquired Contract, Sellers shall pay, as soon as practicable following the Initial Closing Date or applicable Subsequent Closing Date, as the case may be, all Cure Costs that are required to be paid with respect to such Acquired Contract pursuant to section 365 of the Bankruptcy Code and described in the Sale Order or any Order of the Bankruptcy Court relating to such cure Liability; provided, however, that Cure Costs that are the subject of a bona fide dispute shall be paid within five Business Days of the effectiveness of a settlement or Final Order of the Bankruptcy Court resolving such disputes, as the case may be. Such Cure Costs shall be payable from the Cure Escrow upon written instructions from Sellers to the applicable escrow agent, with Purchaser to join and acknowledge such written instructions. The Purchaser shall not be permitted to direct the Cure Escrow Agent to make any cure payment and shall not be permitted to deduct from the Purchase Price payable at the Initial Closing any Cure Costs.

2.10    Required Consents. Sellers shall use commercially reasonable efforts to obtain all consents required from any Third Party or Governmental entity in connection with this

27

Agreement or the transactions contemplated hereby. Purchaser shall cooperate with Sellers' effort to obtain any such required consents.

2.11    Security Interest and Guarantee Allocation.    Notwithstanding anything in this Agreement to the contrary, to the extent any security interest or guarantee relates to both promissory notes which are Acquired Assets and accounts and trade receivables which are Excluded Assets, the parties agree that as between Sellers and Purchaser, the party (the "Collecting Party") with the related assets which have a greater outstanding balance shall be entitled to control and exercise collection remedies against such security interest and/or guarantee; provided, however, the Collecting Party shall, with respect to any amounts collected from such security interest and/or guarantee, retain its pro rata portion of such collection, with such pro rata amount determined by multiplying the collection amount by a fraction, the numerator of which shall be the outstanding balance of such party's promissory notes or accounts and trade receivables, as the case may be, and the denominator shall be the sum of the outstanding balances of such promissory notes and accounts and trade receivables, and the Collecting Party shall remit to the other party the remainder of the collection amount. Notwithstanding anything herein to the contrary, for purposes of determining such security interest and/or guarantee allocation, the parties shall not include any forgiveness notes or facility standby agreements and amounts due thereon. To the extent the Collecting Party is not the "secured party" (as defined in the Uniform Commercial Code) in respect of any security interest and/or guarantee, the other party shall provide such authorizations reasonably necessary in order to permit the Collecting Party to exercise remedies in accordance with this Section 2.11.

## ARTICLE III
## PURCHASE PRICE AND PAYMENT

3.1    Consideration.

(a)    The total cash consideration to be paid by Purchaser to Sellers for the Acquired Assets (the "Purchase Price") shall be equal to (i) seventy-five million dollars ($75,000,000), plus (ii) an amount equal to the Inventory Amount, plus (iii) an amount equal to the Royalty Amount.

(b)    As further consideration for the Acquired Assets, Purchaser shall assume the Assumed Liabilities.

(c)    The Purchase Price shall be payable by wire transfer as follows:

(i)    (x) An initial earnest money deposit in the amount of five million dollars ($5,000,000) in cash (the "Initial Deposit") to be paid by Purchaser promptly following the date hereof, but no later than one (1) Business Day following the execution of the Deposit Escrow Agreement by all parties thereto, (y) an additional deposit in the amount of five million dollars ($5,000,000) in cash (the "Second Deposit") to be paid by Purchaser on July 16, 2003 and (z) a final deposit (the "Final Deposit", and together with the Initial and Second Deposits and any interest and earnings thereon, the "Deposit"), in the amount of eight million dollars ($8,000,000) in cash to be paid by Purchaser on the Business Day immediately preceding the time any Third

28

Party bidder is required to deliver deposits pursuant to the Bidding Procedures Order. The Deposit shall be deposited into escrow pursuant to the Deposit Escrow Agreement.

(ii)     Seventy-five million dollars ($75,000,000) (the "Fixed Component of Purchase Price") minus the Deposit of which the Cure Escrow Amount shall be paid directly to the Cure Escrow Agent, and the remainder of which shall be paid by Purchaser at the Initial Closing and subject to the adjustment provisions set forth in Sections 2.7(c), 3.4 and 3.7, in immediately available funds to an account designated in writing by Sellers at least two Business Days prior to the Initial Closing.

(iii)     The Inventory Amount to be paid by Purchaser at the Initial Closing in immediately available funds to an account designated by Sellers; provided, however, to the extent the Inventory Amount payable at the Initial Closing is in excess of $250,000,000, the amount of such excess shall be payable within 30 days following the Initial Closing Date.

(iv)     The Initial Estimate Payment of the Royalty Amount to be paid by Purchaser at the Initial Closing in immediately available funds to an account designated by Sellers.

(v)     The Second Estimate Payment of the Royalty Amount and the remainder of the Royalty Amount to be paid by Purchaser in accordance with and subject to Section 3.3.

3.2     Computation of the Inventory Amount.

(a)     Sale of Inventory.

(i)     The legal title to the Inventory, except for any Excluded Inventory, shall be transferred to Purchaser at the Initial Closing pursuant to the Bill of Sale in a form mutually agreed to by the Parties.

(ii)     Notwithstanding anything herein to the contrary, on or prior to the date which is three Business Days prior to the Initial Closing Date, Sellers may, in their discretion, exclude (by written notice to Purchaser) any Inventory as an Acquired Asset, whereupon such Inventory shall cease to be "Acquired Assets" hereunder and shall become "Excluded Inventory" and "Excluded Assets." In such event, such Inventory shall not be counted in determining the Inventory Amount and such Inventory shall be removed from the Operating PSCs by Sellers within thirty (30) days following the Initial Closing Date.

(b)     Inventory Amount. The "Inventory Amount" shall be the net landed cost of the Inventory sold to Purchaser determined in accordance with Emerging Issues Task Force statement no. 02-16, which will therefore be net of any and all promotional, prompt pay and other allowances and discounts; provided, that all such Inventory shall be in saleable condition; provided, further, that with respect to Inventory that Sellers have held over ninety (90) days prior to the Initial Closing Date or Inventory that is not in saleable condition, the Inventory Amount shall be reduced by mutual agreement in accordance with the procedures set forth on Schedule 3.2. For purposes of this Agreement, Inventory shall be in "saleable condition" if it can be sold

29

without discount, is not out of code, is not damaged and can be delivered to a customer with a customary and adequate shelf life.

(c)    Inventory Count.    A physical count of the Inventory (other than the Excluded Inventory) shall be made mutually by Purchaser and Sellers. The parties shall make a physical accounting of the Inventory (the "Inventory Count") at each Operating PSC on the date which is ten Business Days prior to the Initial Closing Date or such other time period mutually agreeable to Purchaser and Sellers (the "Inventory Date"), in accordance with mutually agreed upon instructions consistent with the inventory procedures set forth on Schedule 3.2. The parties may have representatives present and available during the Inventory Count, with such representatives to assist in the Inventory Count, including documentation thereof. These representatives will attempt, in good faith, to resolve any disputes respecting quantity or pricing which may arise during the Inventory Count. To the extent that the parties or such representatives are unable to resolve any such disputes, within three (3) Business Days following any such dispute, the parties shall mutually select an independent accounting firm to make final, binding determinations with respect to any such disputes within five (5) Business Days following such selection. The cost of such mutually selected independent accounting firm shall be borne equally by the parties. With respect to any Operating PSC for which the Inventory Date precedes the close of business on the day before the Initial Closing Date, the portion of the Inventory Amount related to such Operating PSC shall be determined on the basis of the value of the Inventory (determined in accordance with Schedule 3.2 to be mutually agreed upon by the parties hereto prior to July 14, 2003), adjusted for sales and purchases of inventory between the Inventory Date and the Initial Closing Date based on purchase and sales records of the Sellers, as mutually agreed between Purchaser and Sellers.

(d)    Inventory Amount Documentation.    The representatives shall provide to the applicable party a report that lists the inventory information of the type set forth on Schedule 3.2(d) (which schedule will be mutually agreed upon by the parties hereto prior to July 14, 2003) for each Operating PSC at the conclusion of the Inventory Count for a particular Operating PSC, which documentation shall be used by the parties to calculate the Inventory Amount. The Inventory Amount shall be payable in accordance with Section 3.1(c).

(e)    Other Inventory Matters.

(i)    Inventory at Excluded Operating PSC.    In the event that, prior to the Sale Hearing, Purchaser elects to exclude an Operating PSC as an Acquired Asset pursuant to Section 2.5, Sellers shall cooperate with Purchaser to minimize the amount of Inventory located at, or ordered with respect to, such Operating PSC, on the Initial Closing Date.

(ii)    Purchase Orders.    In the event Purchaser is determined to have the Successful Bid at the Auction, or in the event there is no Auction, at any time immediately following the date of the Bid Deadline, Sellers shall, at the written request of Purchaser, provide copies of any "in process" purchaser orders for Inventory and/or cancel purchase orders for Inventory ordered with respect to such Operating PSC, so long as such purchase orders are cancelable without cost to Seller.

30

(iii)    Inventory In Transit.  With respect to Inventory for a particular Operating PSC which is not received at such Operating PSC on or prior to the Initial Closing Date ("Inventory In Transit"), Purchaser agrees to accept such Inventory In Transit.  Purchaser shall reimburse Seller for any prepaid amounts in respect of such Inventory In Transit that is received at any Operating PSC.  With respect to any remaining amounts owed to any vendor relating to any Inventory In Transit, Purchaser shall negotiate with such vendor for the direct payment by Purchaser to such vendor of such remaining amounts.  To the extent that Sellers retain any Liability in respect of the Inventory In Transit, Purchaser shall reimburse Sellers for the net landed cost of such .Inventory In Transit.  The payment obligations of Purchaser described in this paragraph shall be on an order-by-order basis on or prior to the due date for payment specified in the vendor's invoice.

3.3    Computation of the Royalty Amount.

(a)    Royalty Amount.  Sellers shall be entitled to a "Royalty Amount" for the customers and customer agreements transferred to Purchaser pursuant to this Agreement in an amount equal to one percent (1%) of the Sales to such customers for the Royalty Period.

(b)    Pre-Payment of Royalty Amount.

(i)    At the Initial Closing, subject only to an upward adjustment pursuant to clause (ii) below, Purchaser shall pay fifty percent (50%) of the initial estimate of the Royalty Amount due for the first year of the Royalty Period (the "Initial Estimate Payment"). For purposes of the Initial Closing, Purchaser and Sellers shall make a good-faith estimate of the Initial Estimate Payment based upon the annualized run rate of Sales over the 30-day period immediately preceding and ending on the date which is three (3) Business Days prior to the Initial Closing Date.

(ii)    Seventy-five days following the Initial Closing Date, Purchaser shall make an additional payment, if any, by which (x) seventy-five percent (75%) of a second estimate of the Royalty Amount due for the first year of the Royalty Period exceeds (y) the Initial Estimate (the "Second Estimate Payment", and together with the Initial Estimate Payment, the "Royalty Pre-Payment").  For purposes of the Second Estimate Payment, Purchaser and Sellers shall make a good-faith estimate of the Second Estimate Payment based upon the annualized run rate of Sales over the 60-day period immediately following the Initial Closing Date).

(iii)    The remainder of the Royalty Amount due for the first year of the Royalty Period shall be paid promptly following final determination of the actual Sales for the first year of the Royalty Period pursuant to Section 3.3(d) and in no event later than three (3) Business Days following such determination.

(c)    Remainder of the Royalty Amount.  In each of the four (4) subsequent years of the Royalty Period, the Royalty Amount shall be paid promptly following final determination of the actual Sales for each quarter in such year and in no event later than three (3) Business Days following such determination. For purposes of this Section 3.3, "year" shall mean

31

each of the subsequent 12-month periods following the Initial Closing and shall not refer to calendar or fiscal years.

(d)    Final Determination of Royalty Amount.  Within thirty (30) days after the end of the first year of the Royalty Period or each quarter following the end of the first year of the Royalty Period, as the case may be, Purchaser shall calculate actual Sales for the customer relationships and customer agreements transferred to Purchaser pursuant to this Agreement and deliver a statement of such Sales to Sellers along with related work papers (the "Sales Statement").  Purchaser shall make available to Sellers, at Purchaser's applicable office or offices, the books and records of Purchaser and personnel of Purchaser which Sellers and their accountants reasonably require and take such other action reasonably necessary in order to allow Sellers to review and confirm the accuracy of each Sales Statement.  Purchaser shall not charge Sellers for granting access to such books, records and personnel and shall not charge Sellers for the provision of copies of any such information.  Each Sales Statement, as prepared by Purchaser, shall be conclusive and binding upon the parties unless Sellers shall deliver written notice of a dispute (a "Dispute Notice") to Purchaser within ten (10) days following receipt by Sellers of the applicable Sales Statement.  Purchaser and Sellers shall, within five (5) days following receipt by Purchaser of such Dispute Notice, attempt to resolve such dispute and agree upon the actual Sales for the applicable period.  In the event the parties are unable to resolve any such dispute within such five (5) day period, the parties shall, within the subsequent five (5) day period, mutually select a nationally recognized accounting firm to make a final determination of the actual Sales for the applicable period, which determination shall be binding upon the parties. Such mutually selected accounting firm shall make a final determination with respect to any such dispute within thirty (30) days following such subsequent five (5) day period.  The costs of such firm shall be borne equally between the parties.

(e)    Royalty Payment for Transferred Customer Agreements.

(i)    To the extent that any customer relationships or customer agreements are sold or transferred to Third Parties pursuant to Section 2.6 or otherwise, Purchaser shall pay to Sellers a Royalty Amount for each such customer, with such Royalty Amount to be determined, at Purchaser's discretion, pursuant to one of the methods specified in clauses (x) and (y) below (with such determination to be made by Purchaser pursuant to a written notice to Sellers at least fifteen (15) days prior to the consummation of such sale or transfer; provided, however, to the extent any customer relationships or customer agreements are to be sold or transferred to any Third Party Purchaser at the Initial Closing by the exercise of Purchaser's Designation Rights prior to the Initial Closing, such written notice shall be provided by Purchaser no later than the first Business Day following the Auction):

(x)    Pre-Payment.  On the date following forty-five (45) days after the consummation of such sale or transfer, Purchaser shall pay to Sellers a Royalty Amount for each such customer equal to the net present value (using a discount rate of 10%) of one percent (1%) of the estimate of the Sales to such customer over the remaining Royalty Period (such estimate to be based upon Average Actual Sales annualized for the remaining Royalty Period).  For purposes of this section, "Average Actual Sales" shall mean the average actual Sales for the sixty (60) day period ending thirty (30) days after the consummation of the sale or transfer of the applicable customer relationships or agreements for Active Customers; provided,

32

that "Active Customers" shall mean those customers that continue to order products on a regular basis (other than Sales during a wind-down period for such customer) during the two weeks preceding the thirtieth (30th) day after the consummation of the applicable sales or transfers; provided, further, that Sales attributable to the thirty (30) day period beginning after the sale or transfer of the applicable customer relationships or agreements shall be multiplied by a fraction, the numerator of which shall be the average actual Sales by Sellers to the applicable customer for the thirty (30) day period immediately preceding the date of the consummation of such sale or transfer of the applicable customer account and the denominator shall be the average actual Sales by both the Third Party transferee and Sellers of products carried by Sellers with respect to the Business to the applicable customer for the thirty (30) day period immediately preceding the date of the consummation of such sale or transfer of the applicable customer account. Notwithstanding anything herein to the contrary, calculations of any applicable Royalty Amounts may be made pursuant to this Section 3.3(e)(i)(x) only to the extent that the applicable sale or transfer of customer accounts occur during the 180 day period immediately following the Initial Closing. Royalty Amounts for Sales following such 180 day period shall be calculated pursuant to paragraph 3.3(e)(i)(y) below.

(y)    Actual Sales.  The applicable Third Party transferee shall pay to Sellers a Royalty Amount for each such customer equal to one percent (1%) of the Sales to such customer for the Royalty Period following the Initial Closing determined in accordance with the preceding provisions of this Section 3.3, other than paragraph (e)(i)(x); provided, however, to the extent the Third Party transferee of such customer accounts is, prior to such sale or transfer, also selling to such customer, for purposes of calculating any Royalty Amount applicable to such customer, Sales to such customer shall be the product of (1) actual Sales by Sellers to such customer for the applicable period and (2) a fraction, the numerator of which shall be the average actual Sales by Sellers to the applicable customer for the sixty (60) day period immediately preceding the date of the consummation of such sale or transfer of the applicable customer account and the denominator shall be the average actual Sales by both the Third Party transferee and Sellers to the applicable customer for the sixty (60) day period immediately preceding the date of the consummation of such sale or transfer of the applicable customer account.

(ii)    Prior to the sale or transfer to any such Third Party, such Third Party Purchaser shall provide Seller with reasonable adequate assurance of future performance with regards to servicing and maintaining customer accounts based on any such Third Party's financial wherewithal and operating capabilities.

(iii)    To the extent any such sale or transfer of customer accounts occurs prior to the time that the Royalty Pre-Payment has been earned in full, any such Royalty Amount payable pursuant to this Section 3.3(e) shall be decreased by the portion of the Royalty Pre-Payment attributable to such Customers to the extent such Royalty Pre-Payment has not been earned in full.

33

3.4    Prorations Relating to Certain Prepaid Expenses; Other Prepaid Expenses and Deposits.

(a)    Preliminary Proration for the Initial Closing.  Sellers' Prepaid Expenses relating to Acquired Assets to be assigned, transferred and delivered to Purchaser at the Initial Closing applicable to periods both prior to and after the Initial Closing shall be apportioned between Sellers and Purchaser as of 12:00:01 a.m. on the Initial Closing Date.  Purchaser and Sellers shall, at least five Business Days prior to the Initial Closing Date, estimate all such prorations and such Sellers' Prepaid Expenses.  The estimated amount of such proration shall be added to the Purchase Price if Sellers are entitled to a credit therefor.

(b)    Final Proration for the Initial Closing.  Within thirty (30) days after the Initial Closing Date, Sellers shall calculate all prorations and the Sellers' Prepaid Expenses relating to Acquired Assets to be assigned, transferred and delivered to Purchaser at the Initial Closing and deliver a statement of such calculations along with related work papers to Purchaser. Sellers shall make available to Purchaser, without cost or expense to Purchaser, the books and records of Sellers (and their accountants) and personnel of Sellers which Purchaser and its accountants reasonably require and take such other action reasonably necessary in order to allow Purchaser to review and confirm the accuracy of such statement.  Such statement, as prepared by Sellers, shall be conclusive and binding upon the parties unless Purchaser shall deliver a written notice of a dispute to Sellers within fifteen days following receipt by Purchaser of such statement.  Purchaser and Sellers shall, within five days following receipt by Sellers of such dispute notice, attempt to resolve such dispute and agree upon the prorations and the Sellers' Prepaid Expenses.  Upon final determination of such proration, the applicable party shall remit to the other party the amount of the difference between such final determination and estimate of the proration amount.  The applicable party shall remit any such amount no later than thirty (30) days following such final determination; provided, however, the applicable party shall remit the applicable portion of any such amounts which are not subject to dispute within five (5) Business Days following Purchaser's delivery of any dispute notice.  In the event that such proration cannot be agreed to by Purchaser and Sellers within such five day period, a final determination of such proration shall be referred to a nationally recognized accounting firm designated jointly by Purchaser and Sellers, whose determination shall be binding upon the parties.

(c)    Subsequent Proration.  Sellers Prepaid Expenses relating to Acquired Assets to be assigned, transferred and delivered to Purchaser at each Subsequent Closing applicable to periods both prior to and after such Subsequent Closing shall be apportioned between Seller and Purchaser as of 12:00:01 a.m. on such Subsequent Closing Date.

(i)    Preliminary Proration for Each Subsequent Closing.  Sellers' Prepaid Expenses relating to Acquired Assets to be assigned, transferred and delivered to Purchaser at each Subsequent Closing applicable to periods both prior to and after such Subsequent Closing shall be prorated as of 12:00:01 a.m. on such Subsequent Closing Date. Purchaser and Sellers shall, at least five Business Days prior to such Subsequent Closing Date, estimate all such prorations and such Sellers' Prepaid Expenses.  As appropriate, on the Subsequent Closing Date, the appropriate party shall remit to the other party all funds, if any, owed in conjunction with the determination of such preliminary proration provided, however,

34

that Purchaser shall have the right to set off any amount owed to it by Sellers hereunder against any amounts owed to Sellers pursuant to Section 3.3.

(ii)    Final Proration for Each Subsequent Closing.  Within thirty (30) days after such Subsequent Closing Date, Sellers shall calculate and remit all prorations and the Sellers' Prepaid Expenses relating to Acquired Assets to be assigned, transferred and delivered to Purchaser at such Subsequent Closing and deliver a statement of such calculations along with related work papers to Purchaser.  Sellers shall make available to Purchaser, without cost or expense to Purchaser, the books and records of Sellers (and their accountants) and personnel of Sellers which Purchaser and its accountants reasonably require and take such other action reasonably necessary in order to allow Purchaser to review and confirm the accuracy of such statement.  Such statement, as prepared by Sellers, shall be conclusive and binding upon the parties unless Purchaser shall deliver a written notice of a dispute to Sellers within fifteen days following receipt by Purchaser of such statement.  Purchaser and Sellers shall, within five days following receipt by Sellers of such dispute notice, attempt to resolve such dispute and agree upon the prorations and the Sellers' Prepaid Expenses.  Upon final determination of such proration, the applicable party shall remit to the other party the amount of the difference between such final determination and estimate of the proration amount.  The applicable party shall remit any such amount no later than thirty (30) days following such final determination; provided, however, the applicable party shall remit the portion of any such amounts which are not subject to dispute within five (5) Business days following Purchaser's delivery of any dispute notice.  In the event that such proration cannot be agreed to by Purchaser and Sellers within such five day period, a final determination of such proration shall be referred to a nationally recognized accounting firm designated jointly by Purchaser and Sellers, whose determination shall be binding upon the parties.

3.5    Allocation of Cash Payments.  Prior to the expiration of the Option Period, the Purchaser shall prepare and deliver to the Seller an allocation of the appropriate portions of the Purchase Price, Assumed Liabilities and other relevant items among the Acquired Assets, including goodwill and other assets, in accordance with Code Section 1060 and the Treasury regulations promulgated thereunder and any comparable provisions of state or local law, as appropriate (the "Allocation"), which Allocation shall be binding upon the parties and which will be attached to this Agreement as Schedule 3.5.  Purchaser and Sellers and their respective Affiliates shall report, act and file Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Allocation.  Each party shall furnish the other party with such cooperation and existing information as is reasonably requested by the other party in connection with the preparation of the Allocation described in this Section 3.5.  Purchaser and Sellers covenant and agree that neither Purchaser nor Sellers will take any position before any Governmental Entity, in any judicial proceeding, or in any Tax Return that is in any way inconsistent with such Allocation unless otherwise required by Law.  In the event that the Allocation is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify and consult with the other party and keep them apprised of material developments concerning resolution of such dispute.

3.6    Further Assurances.  From time to time after the Closing and without further consideration, (i) Sellers, upon the reasonable request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably

request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder; provided that Sellers shall not be required to execute or deliver any document or instrument pursuant to this Section 3.6 that includes any provision(s) that imposes obligations upon Sellers that are different or greater than those imposed upon Sellers under the other provisions of this Agreement or the documents executed pursuant hereto, and (ii) Purchaser, upon the request of Sellers, shall execute and deliver such documents and instruments of contract or lease assumption as Sellers may reasonably request in order to confirm Purchaser's liability for the obligations assumed hereunder or otherwise more fully consummate the transactions contemplated by this Agreement, provided that Purchaser shall not be required to execute or deliver any document or instrument pursuant to this Section 3.6 that includes any provision(s) that imposes obligations upon Purchaser that are different or greater than those imposed upon Purchaser under the other provisions of this Agreement or the documents executed pursuant hereto.

3.7    Allocation of Certain Sales Proceeds.

(a)    The parties hereto acknowledge that Sellers have entered into and are parties to purchase agreements (the "Unrelated Purchase Agreements") for sales (the "Unrelated Sales") by Sellers of distribution centers located in Oklahoma City, Oklahoma, Salem, Virginia, and York, Pennsylvania and assets related to such distribution centers (collectively the "Unrelated Assets").

(b)    Sellers shall use commercially reasonable efforts to consummate the transactions contemplated by the Unrelated Purchase Agreements. If the Unrelated Sales are not sold pursuant to the Unrelated Purchase Agreements or such Unrelated Purchase Agreements are otherwise terminated, Sellers shall use their commercially reasonable efforts to promptly sell such Unrelated Assets to other Third Parties.

(c)    If Seller is unable to sell any Unrelated Assets prior to the expiration of the Option Period, upon Sellers' written notice to Purchaser prior to the expiration of the Option Period, Sellers shall have up to an additional six (6) months (the "Seller Extension Period") following the end of the Option Period to sell such Unrelated Assets.

(d)    Purchaser shall provide written notice to Seller prior to the end of the Option Period (or prior to the end of the Seller Extension Period, if applicable) in accordance with Section 2.6 indicating whether Purchaser intends to accept and/or reject any Unrelated Asset if such Unrelated Asset is not sold by Sellers. If no such written notice is provided in accordance with Section 2.6, then any Unrelated Asset which is not sold by Seller during the Option Period (or during the Seller Extension Period, if applicable) shall be an Acquired Asset which shall be transferred to Purchaser and title shall pass in accordance with this Agreement at the end of the Option Period (or at the end of the Seller Extension Period) in accordance with Section 2.5(b)(v).

(e)    Purchaser and Sellers agree to treat the payment of the portion of the Unrelated Proceeds to be received by Purchaser as a reduction of the Purchase Price for all Tax

36

purposes. Notwithstanding anything herein to the contrary, Sellers shall determine, in their sole discretion, the purchasers for and the terms of sale for such Unrelated Assets.

(f)     Each of Sellers and Purchaser shall be entitled to one-half of the pre-tax proceeds, net of transaction costs, from the Unrelated Sales or from any other sale, transfer, lease, assignment or other transaction involving the Unrelated Assets, whether effected by Sellers or Purchaser (the "Unrelated Proceeds"). To the extent that any such Unrelated Sales are consummated on or prior to the Initial Closing, one-half of the Unrelated Proceeds associated therewith shall reduce the Purchase Price due at the Initial Closing, and Sellers shall be entitled to retain the remainder of the Unrelated Proceeds. To the extent that any such Unrelated Sales occur after the Initial Closing Date, Sellers shall remit one-half of the Unrelated Proceeds associated therewith to Purchaser immediately upon consummation of the applicable Unrelated Sales and shall retain the remainder of the Unrelated Proceeds. To the extent any sale, transfer, lease, assignment or other transaction involving the Unrelated Assets is effected by Purchaser, (i) Purchaser shall remit one-half of the Unrelated Proceeds to Sellers immediately upon consummation of such transaction and shall retain the remainder of the Unrelated Proceeds and (ii) Purchaser shall determine, in its sole discretion, the purchasers for and the terms of sale for such Unrelated Assets.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as specifically set forth in the Disclosure Schedule prepared and signed by Sellers and delivered to Purchaser simultaneously with the execution hereof, Sellers represent and warrant to Purchaser that all of the statements contained in this Article IV are true and complete as of the date of this Agreement and the Initial Closing Date (or, if made as of a specified date, as of such date). Each exception set forth in the Disclosure Schedule and each other response to this Agreement set forth in the Disclosure Schedule is identified by reference to, or has been grouped under a heading referring to, a specific individual Section of this Agreement and, except as otherwise specifically stated with respect to such exception, relates only to such Section.

4.1     Organization, Standing and Power. Except as a result of the commencement of the Chapter 11 Case, each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation. Sellers have heretofore made available to Purchaser complete and correct copies of the certificates of incorporation and by-laws or similar organizational documents of each Seller. Sellers have the requisite power and authority to own, lease and operate their properties, including the Acquired Assets, and to conduct the Business conducted by the PSCs as currently conducted.

4.2     Authority; Binding Agreement.

(a)     Subject to the entry of the Sale Order, Sellers have all corporate power and authority necessary to execute and deliver this Agreement and the Ancillary Documents to which they are or will be a party (the "Sellers' Ancillary Documents") and to consummate the transactions contemplated thereby and by this Agreement. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Sellers have been duly authorized by all necessary corporate action, and the execution and performance of the

37

Sellers' Ancillary Documents by Sellers will be authorized by all necessary corporate action prior to the Initial Closing. This Agreement has been duly executed by Sellers. Subject to entry of the Bidding Procedures Order or Sale Order, as applicable, this Agreement constitutes, and upon execution of each of the Sellers Ancillary Documents such agreements will constitute, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms except the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought. The Board of Directors of Fleming has resolved to recommend that the Bankruptcy Court approve this Agreement, Sellers' Ancillary Documents and the transactions contemplated hereby and thereby.

(b)     Notwithstanding anything to the contrary contained herein, no provision of this Agreement or any Ancillary Document is binding upon Sellers unless and until this Agreement is approved by the Bankruptcy Court.

4.3     **[Intentionally Deleted.]**

4.4     No Breach or Conflict.  Except as set forth on Schedule 4.4 (the "Material Consents"), except as a result of the filing of or in connection with the pendency of the Chapter 11 Case, except to the extent rendered inapplicable by order of the Bankruptcy Court, or except for the filings, Permits, authorizations, consents and approvals as may be required under, and other applicable requirements of, the HSR Act and subject to obtaining the approval of the Bankruptcy Court pursuant to the entry of the Sale Order, none of the execution, delivery or performance of this Agreement or the Sellers' Ancillary Documents by Sellers, the consummation by Sellers of the transactions contemplated hereby or thereby or compliance by Sellers with any of the provisions hereof or thereof will (i) conflict with or result in any breach of any provision of the certificate of incorporation, the by-laws or similar organizational documents of any Seller or any Subsidiary of any Seller, (ii) require any filing with, or Permit, authorization, consent or approval of, any Governmental Entity or other Person, or (iii) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Business, any of the Acquired Assets, any Seller, any Subsidiary of any Seller or any of their properties or assets.

4.5     Title to Assets; Liens.

(a)     Personal Property.  Seller owns, leases or licenses the Acquired Assets that are personal property and, by the execution and delivery on the Applicable Closing Date of the instruments of transfer provided for herein and such other documents as may reasonably be requested by Purchaser or its counsel, Purchaser will be vested with good, valid and marketable title to, a valid leasehold interest in, or a valid and enforceable license to use each of the Acquired Assets that is personal property, free and clear of all Liens, other than Permitted Encumbrances, when such Acquired Asset is assigned, transferred and delivered to Purchaser pursuant to this Agreement.

(b)     Leased Real Property.  Schedule 4.5(b)(i) contains a list of all Leases used in connection with the operation of the Business or otherwise included in the Acquired Assets; Schedule 4.5(b)(ii) contains a list of all Subleases used in connection with the operation of the Business or otherwise included in the Acquired Assets; and Schedule 4.5(b)(iii) contains a list of

all Owned Real Property Leases used in connection with the operation of the Business or otherwise included in the Acquired Assets.  Subject to the entry of the Sale Order or a Supplemental Sale Order, as applicable, each of the Leases relating to the Operating PSCs is a valid and subsisting leasehold interest of the applicable Seller free of subtenancies and other occupancy rights and Liens (other than Permitted Encumbrances) and  is a binding obligation of the applicable Seller, enforceable against the applicable Seller in accordance with its terms, and is in full force and effect.  Subject to the entry of the Sale Order or a Supplemental Sale Order, as applicable, each of the Leases (other than the Leases relating to Operating PSCs and referenced in the foregoing sentence) is a valid and subsisting leasehold interest of the applicable Seller free of subtenancies and other occupancy rights and Liens (other than Permitted Encumbrances (provided, however, that for purposes of this sentence, items (h) and (i) of the definition of Permitted Encumbrances shall only include the Subleases and Owned Real Property Leases listed in Schedules 4.5(b)(ii) and 4.5(b)(iii) respectively)), and each of the Leases (other than Leases relating to Operating PSCs), Subleases and Owned Real Property Leases is a binding obligation of the applicable Seller, enforceable against the applicable Seller in accordance with its terms, and is in full force and effect, except, in each case as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    <u>Owned Real Property</u>.  As of the Applicable Closing Date, subject to the entry of the Sale Order and the provisions of Section 3.7, Seller shall have good, valid and marketable fee simple title to each parcel of the Owned Real Property and the distribution centers located in Oklahoma City, Oklahoma, Salem, Virginia and York, Pennsylvania, free and clear of any Liens, except Permitted Encumbrances.

4.6    <u>Real Property</u>.

(a)    No Seller or any Affiliate thereof has granted to any Person (other than pursuant to this Agreement) any right to occupy or possess or otherwise encumber any portion of the Real Property other than the Subleases and Owned Real Property Leases.  Sellers' interests with respect to the Leases have not been assigned or pledged and are not subject to any Liens other than Permitted Encumbrances.  No Seller or any Affiliate thereof has surrendered or agreed to surrender all or any portion of any Leased Real Property on which there is an Operating PSC.

(b)    No Seller or any Affiliate thereof has received any written notice of any pending, threatened or contemplated condemnation proceeding affecting any material part of the Real Property or of any sale or other disposition of any material part of the Real Property in lieu of condemnation.

(c)    No Seller or any Affiliate thereof has received any written notices from any Governmental Entity stating or alleging that any improvements located on the Owned Real Property have not been constructed in compliance with applicable Laws or are being operated in violation of applicable Laws, except to the extent that such non-compliance or violation would not have, individually or in the aggregate, a Material Adverse Effect.

(d)    No Seller or any Affiliate thereof has received any written notices from any Governmental Entity requiring or advising as to the need for any repair, alteration, restoration or improvement in connection with the Owned Real Property, except to the extent

39

such repair, alteration, restoration or improvement would not have, individually or in the aggregate, a Material Adverse Effect.

    (e)    With respect to the Leased Real Property:

    (i)    none of the Sellers' interest in any of the Leased Real Property has been pledged by any Seller or any Affiliate thereof or is subject to any Lien (other than pursuant to this Agreement and Permitted Encumbrances) that will not be removed or satisfied by the Sale Order, except those which would not reasonably, individually or in the aggregate, be expected to have a Material Adverse Effect; and

    (ii)    no Seller has given any notice to any landlord under any of the Leases indicating that it will not be exercising any extension or renewal options under the Leases, except such non-extension or non-renewal of such options that would not reasonably, individually or in the aggregate, be expected to have a Material Adverse Effect.

    (f)    **[Intentionally Deleted.]**

    (g)    To Sellers' knowledge, <u>Schedule 4.6</u> sets forth a summary of all construction allowances payable under the Leases and the amounts thereof which as, of the date hereof, have been drawn by Sellers.

    4.7    <u>**[Intentionally Deleted.]**</u>

    4.8    <u>Assets Necessary to the Business</u>.  Except for the Excluded Assets and except as set forth in <u>Schedule 4.8</u> of the Disclosure Schedule, the Acquired Assets constitute all of the assets, properties and services (real, personal, tangible and intangible) utilized to conduct the Business as presently conducted in all material respects.  No Affiliate of any Seller that is not a signatory to this Agreement owns or has a leasehold interest in any Acquired Asset.

    4.9    <u>Books and Records</u>.  Except with respect to books and records relating to (a) Sellers' accounting practices which are currently the subject of an investigation by the Securities and Exchange Commission and (b) Sellers' "Fixed Asset Registry," the books and records relating to the Acquired Assets are complete and accurate in all material respects.

    4.10    <u>Claims, Litigation and Disputes</u>.  Except (i) as set forth on <u>Schedule 4.10</u> or otherwise disclosed in writing to Purchaser and (ii) for suits and proceedings which, individually or in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect, there are no actions, suits or proceedings pending or, to the knowledge of Sellers, threatened, relating to the transactions contemplated hereby, the Business or any of the Acquired Assets, at law or in equity or before or by any Governmental Entity, nor any arbitration proceeding relating to the same.

    4.11    <u>Acquired Contracts</u>.

    (a)    Except as set forth on <u>Schedule 4.11(a)</u>, as of the date hereof, to Sellers' knowledge, Sellers have not received any written notice of the intention of any party to terminate

40

any Material Acquired Contract, except with respect to matters that will be cured by Sellers as contemplated by the Sale Order or any Supplemental Sales Order, as applicable.

(b)    Schedule 4.11(b) sets forth all written contracts, agreements and commitments that relate to the Business as contained in the Debtor's statements of financial affairs and schedules which were filed with the Bankruptcy Court on July 1, 2003. Included on Schedule 4.11(b) are all of the following contracts, agreements and commitments of Sellers that relate to the Business (the "Material Acquired Contracts"):

(i)    that materially or adversely affects or materially restricts the freedom of any Seller to compete in its lines of business or with any Person or in any geographical area, for any length of time, or otherwise to conduct the Business as presently conducted or materially and adversely affect or materially restrict, the business, operations, assets, properties or condition (financial or other) of the Business as currently conducted;

(ii)    involving future expenditures having a total value in excess of $400,000; or

(iii)    which is a Lease.

(c)    Seller has made available to Purchaser the complete and correct copies of all Material Acquired Contracts.

(d)    Except as set forth on Schedule 4.11(d), neither Sellers nor any other party to a Material Acquired Contract which is a real property Lease relating to any Operating PSC is in breach thereof or default thereunder.

4.12    Financial Information.

(a)    Sellers have provided to Purchaser unaudited sales data by product category for each of the Operating PSCs for each of the weeks in the 26 week period beginning December 30, 2002 which was prepared from the books and records of Sellers kept in the ordinary course of business. Such sales data (as modified by periodic consolidation entries) is accurate and complete in all material respects but was not prepared in accordance with GAAP.

(b)    Pursuant to that certain letter agreement between the parties dated as of the date hereof relating to certain financial information, Sellers have delivered the unaudited balance sheets as of the end of each of the six financial accounting periods for fiscal year 2003 relating solely to each Operating PSC, which was prepared from the books and records of Sellers kept in the ordinary course of business (as modified by periodic consolidation entries and except with respect to matters that relate to the pending Securities and Exchange Commission's investigation of Sellers) and which is accurate and complete in all material respects but was not prepared in accordance with GAAP.

4.13    Compliance With Laws; Permits and Licenses.

(a)    Except as disclosed on Schedule 4.13, Sellers are in compliance with all material Laws and Orders of all Governmental Entities applicable to the Business and the PSCs,

41

except in any such cases such failure to be in compliance has not had, and would not reasonably be likely to have a Material Adverse Effect. To Sellers' knowledge, Sellers have not received any written notice within the past 12 months relating to violations or alleged violations or defaults under any applicable Law or Order, where the failure to cure such alleged violations or defaults, individually or in the aggregate, has not had, and would not reasonably be likely to have, a Material Adverse Effect.

(b)    Sellers have in effect all Permits necessary to conduct the Business as it is currently being conducted in accordance with the Laws of any Governmental Entity having jurisdiction over its properties or activities. Schedule 4.13(b) sets forth a general description of each category of Permits required to conduct the operations at each Operating PSC (the "Required Permits").

4.14    Taxes. Except as disclosed on Schedule 4.14:

(a)    To the extent that under applicable Law the failure of this representation to be true or correct could result in a Lien upon or claim against the Acquired Assets or in a claim against Purchaser as transferee or owner of the Acquired Assets: (i) Sellers have filed or have caused to be filed on a timely basis all Tax Returns that are or were required to be filed with respect to the Acquired Assets and the operation of the PSCs; (ii) all such Tax Returns accurately reflect all Liabilities required to be reflected thereon; and (iii) all Taxes due and payable by Sellers with respect to the Acquired Assets and the operation of the PSCs shown in such Tax Returns have been paid, other than those Taxes which have been stayed by the Chapter 11 Case.

(b)    To the extent that under applicable Law the failure of this representation to be true or correct could result in a Lien upon or claim against the Acquired Assets or in a claim against Purchaser as transferee or owner of the Acquired Assets: (i) Sellers have not requested or consented to extend to a date later than the Initial Closing Date the time in which any Tax may be assessed or collected by any Governmental Entity with respect to the Acquired Assets and the operation of the PSCs; (ii) no deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any Governmental Entity against Sellers with respect to the Acquired Assets and the operation of the PSCs and there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the knowledge of Sellers, threatened against or with respect to Sellers with respect thereto; (iii) there are no Liens for Taxes (other than for current Taxes not yet due and payable) upon the Acquired Assets; and (iv) Sellers are not "foreign persons" as defined in Code Section 1445.

(c)    None of the Sellers is a party to any agreement, plan, contract or arrangement (whether oral or in writing) that would result, separately or in the aggregate, in the payment of any "excess parachute payments" within the meaning of Section 280G of the Code or any similar provisions of state, local or foreign law.

4.15    Compromise of Notes. Unless expressly permitted under Section 2.7, since the execution by Parent and Fleming of the Letter of Intent, no Seller or any Affiliate thereof has reduced the principal amount of or otherwise compromised any promissory note, forgiveness note, facility standby agreement note or facility standby agreement accounts receivable, without the prior written approval of Parent.

42

4.16    <u>Employees and Related Matters</u>.

(a)     <u>Schedule 4.16(a)</u> sets forth a complete and correct list of all Employee Benefit Plans maintained or contributed to by Sellers or any ERISA Affiliate in respect of or for the benefit of Employees (the "<u>Sellers' Benefit Plans</u>").

(b)     <u>Schedule 4.16(b)</u> sets forth a complete and correct list of all Employees at each Operating PSC, including their position, length of employment with Sellers and current salary or hourly rate.

(c)     Except as set forth on <u>Schedule 4.16(c)</u>, (i) none of the Employees are represented by a labor union or labor organization; (ii) Sellers are not subject and are not a party to any collective bargaining agreement or other agreement with a labor union or labor organization covering any Employee or the Business; (iii) there are no labor strikes, slowdowns, work stoppages or lockouts currently affecting or, to Sellers' knowledge, threatened against Sellers with respect to any Employees or the Business; (iv) to Sellers' knowledge, during the two years preceding the date of this Agreement, there have not been any labor union organizational campaigns by or directed at any Employees or the Business; (v) there is no unfair labor practice charge or complaint pending against Sellers with respect to any Employees or the Business or, to Sellers' knowledge, threatened before the National Labor Relations Board or any other Governmental Entity; and (vi) there is no material grievance or arbitration proceeding pending against or involving Sellers with respect to any Employees or the Business.

(d)     **[Intentionally Deleted.]**

(e)     Except as set forth on <u>Schedule 4.16(e)</u>, the consummation of the transaction contemplated by the Agreement will not, either alone or in combination with another event, (i) entitle any Business Employee to severance pay, unemployment compensation or any other payment for which the Purchaser will be liable or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Business Employee which in each case Purchaser will be liable.

4.17    <u>Environmental Matters</u>.    Except as set forth on <u>Schedule 4.17</u>, the operations conducted by Sellers at their PSCs are currently being conducted under all environmental, health and safety Permits and other authorizations required under all applicable Environmental Laws to operate the PSCs as they are being operated, except for such Permits and other authorizations, the failure of which to obtain, individually or in the aggregate, has not had and would not reasonably be expected to have, a Material Adverse Effect. All such Permits and authorizations are in full force and effect. To Sellers' knowledge within the last 12 months: (i) no written notice, notification, demand, request for information, citation, summons or order has been issued to Sellers or any Affiliates thereof with respect to any such properties, (ii) no written complaint has been filed against Sellers or any Affiliates thereof, (iii) no material penalty has been assessed and (iv) no investigation or review is pending or threatened by any Governmental Entity with respect to any alleged failure by Sellers to comply with any Environmental Law or to have any material environmental, health or safety permit, license or other authorization required under any applicable Environmental Law in connection with the operation of the PSCs. To Sellers' knowledge, there are no past or present facts, circumstances or conditions, including the Release

of any Materials of Environmental Concern, that could reasonably be expected to result in a material claim under the Environmental Laws against any Seller or Affiliate of any Seller. Sellers have made available to Purchaser prior to the execution of this Agreement all environmental audits, assessments and documentation regarding environmental matters pertaining to, or the environmental condition of, the Acquired Assets or the compliance (or non-compliance) by Sellers or any of their Affiliates, with any Environmental Laws with respect to the Business or the Acquired Assets, to the extent such audits, assessments and documentation are in Sellers' possession.

4.18    **[Intentionally Deleted.]**

4.19    Intellectual Property.

(a)    Schedule 4.19(a) sets forth, for all of the following included in Company Owned Intellectual Property, a complete list of all United States, foreign, international and state: (i) Patents and Patent applications; (ii) Trademark registrations, applications and material unregistered Trademarks; (iii) Domain Names; and (iv) Copyright registrations, applications and material unregistered Copyrights.

(b)    Schedule 4.19(b) sets forth a complete list of all IP Agreements (other than standard form employee agreements that contain assignment of inventions provisions, assignments of Intellectual Property that have already been consummated, and licenses for Software commercially available having fees, whether up-front or annual, in the aggregate, of less than $100,000 or that are solely subject to "shrink-wrap" or "click-through" license agreements). The listing of IP Agreements shall include for each agreement the title, the parties and the date executed.

(c)    There is no pending or, to Sellers' knowledge, threatened Claim against any Seller involving Company Owned Intellectual Property or Company Used Intellectual Property, (1) alleging Infringement of Intellectual Property rights of any Person, or (2) challenging any Seller's or any Affiliate's ownership or use of, or the validity, enforceability or registrability of any such Intellectual Property.

(d)    No Seller or any Affiliate thereof has brought or, to Sellers' knowledge, threatened a Claim against any Person (1) alleging Infringement of Company Owned Intellectual Property or Company Used Intellectual Property rights or (2) challenging any Person's ownership or use of, or the validity, enforceability or registrability of any Company Owned Intellectual Property or Company Used Intellectual Property.

(e)    Sellers own all Company Owned Intellectual Property and have the valid and enforceable right to use all Company Used Intellectual Property, free and clear of all Liens except for Permitted Encumbrances.

(f)    Except as would not have, individually or in the aggregate, a Material Adverse Effect, the Company Owned Intellectual Property (i) has been duly maintained, (ii) is subsisting, in full force and effect, (iii) has not been cancelled, expired or abandoned, and (iv) is valid and enforceable.

44

4.20    Debt Liens.  Schedule 4.20 sets forth a list of Liens (the "Debt Liens") created under any of the collateral or ancillary documents related to any indebtedness for borrowed money of Sellers and their Affiliates.

4.21    Brokerage Fees.  Except for The Blackstone Group, whose fee will be paid by Sellers pursuant to a separate agreement, no Person acting on behalf of Sellers is entitled to any brokerage or finder's fee or commission in connection with the transactions contemplated by this Agreement.

4.22    Disclaimer.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT AND THE ANCILLARY DOCUMENTS, NEITHER SELLERS NOR ANY OF THEIR AFFILIATES MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE PSCS, THE ACQUIRED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY ACQUIRED ASSET), THE BUSINESS OR OTHERWISE WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER, WHETHER ON BEHALF OF SELLERS OR THEIR AFFILIATES, INCLUDING AS TO (A) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, (B) THE OPERATION OF THE PSCS OR THE BUSINESS BY PURCHASER AFTER THE INITIAL CLOSING IN ANY MANNER, OR (C) THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE ACQUIRED ASSETS BY PURCHASER AFTER THE INITIAL CLOSING.  Sellers make no representations or warranties with respect to any verbal or written estimates, projections, forecasts or forward-looking information provided to Purchaser.  There is no assurance that any estimated, projected or forecasted results will be achieved.

As used herein, the term "Sellers' knowledge" and similar terms shall mean and refer only to matters actually known as of the date of this Agreement to the persons listed on Schedule 4.22 (and with respect to the matters listed on Schedule 4.22), and on and after July 16, 2003, shall mean the knowledge of all Division Presidents and all officers of the Sellers having a title of Vice President and above.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES
## OF PURCHASER AND PARENT

Each of Purchaser and Parent represents and warrants to Sellers as of the date of this Agreement, the Initial Closing Date (except where such representation or warranty is made as of a specific date), as follows:

5.1    Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and Parent is a Vermont corporation duly organized, validly existing and in good standing under the laws of the State of Vermont.

5.2    Authority; Binding Agreement.  Each of Purchaser and Parent has all corporate power and authority necessary to execute and deliver this Agreement and the Ancillary Documents to which it is or will be a party (the "Purchaser Ancillary Documents") and to

45

consummate the transactions contemplated thereby and by this Agreement. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by Purchaser's sole member and by Parent's board of directors, and no other corporate action is necessary to authorize the execution and delivery of the Purchaser Ancillary Documents or the consummation by the Purchaser or the Parent of the transactions contemplated hereby and thereby. This Agreement has been duly executed by Purchaser and Parent. This Agreement constitutes, and upon execution each of the Purchaser Ancillary Documents will constitute, valid and binding obligations of Purchaser and Parent, enforceable against Purchaser and Parent, as applicable, in accordance with their respective terms, such enforcement subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting creditors' rights and the application of general principles of equity and except the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought.

5.3    No Breach or Conflict. Except as disclosed on Schedule 5.3 and except for the filings, Permits, authorizations, consents and approvals as may be required under, and other applicable requirements of, the HSR Act and subject to obtaining the approval of the Bankruptcy Court pursuant to the entry of the Sale Order, none of the execution, delivery or performance of this Agreement or the Purchaser's Ancillary Documents by Purchaser and Parent, the consummation by Purchaser and Parent of the transactions contemplated hereby or thereby or compliance by Purchaser and Parent with any of the provisions hereof or thereof will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws of Purchaser or Parent, (ii) require any filing with, or Permit, authorization, consent or approval of, any Governmental Entity or other Person, (iii) require any consent, approval or notice under, or result in a violation or breach of, or constitute (with or without due notice or the passage of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, agreement, arrangement or understanding to which Purchaser or Parent is a party, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser or Parent (except to the extent any of the foregoing is rendered inapplicable by order of the Bankruptcy Court).

5.4    Third-Party Consents. Except as disclosed on Schedule 5.3 and subject to compliance with the HSR Act, including any filings, permits, authorizations, consents and approvals as may be required thereunder, each Person whose consent to the execution, delivery or performance of this Agreement and the Purchaser Ancillary Documents by Purchaser and Parent is legally or contractually required has been obtained.

5.5    Financing. As of the Initial Closing, Purchaser will have adequate cash resources to enable it to fulfill its obligations under this Agreement and the Purchaser Ancillary Documents. As of the Initial Closing Date, Purchaser has sufficient financial resources to operate the PSCs after the Initial Closing Date, including sufficient financial resources to (a) satisfy any applicable requirement relating to financial capacity or capital imposed by any Governmental Entity in any state in which the PSCs conduct their business and (b) perform its obligations under the Acquired Contracts from and after the date such Acquired Contract is assumed and assigned to Purchaser.

46

5.6    Brokers or Finders.  No agent, broker, investment banker, financial advisor or other firm, Person or other entity acting on behalf of Purchaser or Parent is entitled to any brokerage or finder's fee or commission in connection with the transactions contemplated by this Agreement or the Purchaser Ancillary Documents.

5.7    Purchaser's Investigation.  Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial and other advisors and hereby acknowledges that it has conducted an investigation of the Business, including the physical plants of the PSCs which investigation included evaluation of the condition and performance of the business and such physical plants.

## ARTICLE VI
## COVENANTS OF SELLERS

6.1    Access and Right of Inspection.  Sellers agree that, prior to the end of the Option Period, Purchaser and Purchaser's lenders shall, upon reasonable notice and so long as such access does not unreasonably interfere with Sellers' business operations, through their respective authorized officers, employees, agents and representatives (including, without limitation, their respective counsel and accountants), have reasonable access during normal business hours to all PSCs and all other Owned Real Property and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Sellers relating to the Business and such examination of the books, records and financial condition of Sellers relating to the Business as they reasonably request; provided that Purchaser and Purchaser's lenders shall be bound by and shall comply with the terms of the Confidentiality Agreement with respect to Purchaser's ability to use or disclose any such information; and provided further that no investigation pursuant to this Section 6.1 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.  Such investigation shall be conducted so as not to unreasonably interfere with the operations of the Business and the use of each PSC by Sellers.  In furtherance of the foregoing, Purchaser and its authorized representatives (including its designated engineers or consultants) may enter into and upon any PSC or any other portion of the Owned Real Property (unless such PSC or other portion of Owned Real Property is no longer an Acquired Asset pursuant to this Agreement) in order to assess the environmental condition of such properties or the business conducted thereat.  Notwithstanding the foregoing, no soil and surface or ground water sampling, monitoring, borings or testing and any other invasive tests or investigations relating to environmental conditions or at such properties shall be conducted (i) without Sellers' consent, which consent shall not be unreasonably withheld, (ii) without permitting Sellers the opportunity to participate therein, and (iii) Purchaser agrees to repair any damage to each PSC or other portion of the Owned Real Property due to such investigation and to indemnify and hold Sellers harmless of and from any claim for physical damages or physical injuries arising from Purchaser's investigation of each PSC or other portion of the Owned Real Property and notwithstanding anything to the contrary in this Agreement, such indemnity shall survive the transfer of such PSC or portion of Owned Real Property pursuant to this Agreement for a period of one year after such transfer or, if such sale is not consummated, either the termination of this Agreement or the one year anniversary of the Initial Closing.  This Section 6.1 shall be further subject to the limitations contained in Section 2.6.

47

6.2    Conduct of the Business Pending the Initial Closing. Subject to any obligations as debtors in possession under the Bankruptcy Code and except as otherwise expressly contemplated by this Agreement or any Orders of the Bankruptcy Court or except as described on Schedule 6.2 hereto, from the date hereof until the Initial Closing Date, Sellers shall conduct the Business substantially in the manner as conducted on the date of this Agreement. Without limiting the generality of the foregoing, subject to any obligations as debtors in possession under the Bankruptcy Code and except as otherwise expressly contemplated by this Agreement or any Orders of the Bankruptcy Court or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed) or except as described on Schedule 6.2 hereto, from the date hereof until the Initial Closing Date, Sellers shall:

(a)    use, preserve and maintain the Acquired Assets on a basis consistent with Sellers' practice as of the date of this Agreement and all Applicable Laws and not cause material damage to or destruction or loss of any of such Acquired Assets;

(b)    continue to maintain the insurance covering the Acquired Assets in effect as of the date of this Agreement;

(c)    pay all debts and obligations incurred by them in the operation of the PSCs and the Acquired Assets in the ordinary course of business consistent with Sellers' obligations under the Bankruptcy Code and their practice as of the date of this Agreement;

(d)    not commit any act or omit to do any act, nor permit any act or omission to act, which may cause a breach of any of the Material Acquired Contracts;

(e)    not take any action or omit to take any action whereby any Intellectual Property included in the Acquired Assets may lapse, become abandoned, dedicated to the public, or unenforceable except in the ordinary course of business;

(f)    not take any action which would downgrade or otherwise re-position its Trademarks; provided that Seller may abandon, cancel, not renew, cease use or otherwise not maintain any Trademark so long as such Trademark is not used or useful in the Business or is not otherwise material to the Business;

(g)    maintain its books, accounts and records with respect to such Acquired Assets and the PSCs in the usual manner and on a basis consistent with past practice;

(h)    not enter into any agreement or agreements for the sale of a material amount of any of the Acquired Assets or a material portion of any Operating PSC, except for sales of inventory in the ordinary course of business;

(i)    not create, assume or permit to exist any Lien, other than the Liens of Sellers' pre- and post-petition lenders under the Pre-Petition Credit Agreement and the DIP Credit Agreement, respectively, upon the Acquired Assets, except for Permitted Encumbrances;

(j)    take no action inconsistent with promoting an ordinary and smooth transition of the Operating PSCs and the Acquired Assets to a Purchaser;

48

(k)    not amend or terminate (i) any Material Acquired Contract or (ii) any other Acquired Contract, except, in the case of such other Acquired Contracts, in the ordinary course of business; provided, that Sellers shall provide reasonable notice of any renewal option under any Material Acquired Contract and, so long as and to the extent that Purchaser has expressly agreed to assume such Material Acquired Contract or to indemnify Sellers for any Liabilities resulting from such renewal, Sellers shall renew such Material Acquired Contract and, provided, further, that Sellers shall not be required to renew any Acquired Contract, unless and to the extent that Purchaser has expressly agreed to assume such Acquired Contract or to indemnify Sellers for any Liabilities resulting from such renewal;

(l)    not permit any insurance policy relating to the Business naming any Seller or any Affiliate thereof as a beneficiary or a loss payable payee to be cancelled or terminated without prior notice to Purchaser;

(m)    file with the Bankruptcy Court, or permit any controlled Affiliate to file with the Bankruptcy Court, any plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization that is inconsistent with the transactions contemplated by this Agreement;

(n)    not take, or agree to or commit to take, or permit any controlled Affiliate to take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions to the Initial Closing set forth in Article VIII not being satisfied, or that would materially impair the ability of Sellers or Purchaser to consummate the transactions contemplated by this Agreement in accordance with the terms hereof or materially delay such consummation;

(o)    Use commercially reasonable efforts to maintain the operations of Sellers and their Affiliates to enable Sellers to satisfy their obligations under the Transition Services Agreement after the Initial Closing provided that Purchaser acknowledges that Sellers are likely to lose employees as a result of the Chapter 11 Case and that Sellers shall not be obligated, except as otherwise provided under the Transition Services Agreement, to provide for any retention programs for employees;

(p)    not, without prior consent of Purchaser, grant any raises to Employees, except (i) in the ordinary course of business and in accordance with past practices, (ii) the raises or bonuses set forth on Schedule 6.2(p), or (iii) retention bonuses or severance payments; and

(q)    not enter into any contract or agreement that is inconsistent with any of the foregoing.

6.3    Commercially Reasonable Efforts.    Sellers will use commercially reasonable efforts to obtain the Bidding Procedures Order and the Sale Order required for the consummation of the transactions contemplated by this Agreement.

6.4    Bankruptcy Actions.

(a)    As promptly as practicable after the execution of this Agreement (and in no event later than two (2) Business Days thereafter), Sellers will file with the Bankruptcy Court

49

a motion to approve the Bidding Procedures and necessary supporting papers, in form and substance reasonably satisfactory to the Purchaser (the "Bidding Procedures Motion"), requesting, among other things, the entry of an order approving the Bidding Procedures (the "Bidding Procedures Order"). No later than July 11, 2003, Sellers will file with the Bankruptcy Court a motion and necessary supporting papers, in form and substance reasonably satisfactory to the Purchaser seeking the sale of the Acquired Assets (the "Sale Motion"). The Bidding Procedures Order shall:

(i)      fix the time, date and location of the Sale Hearing;

(ii)      fix the time and date of an auction, to be commenced not more than five Business Days prior to the Sale Hearing at the offices of Sellers' counsel or such other location as Sellers may designate for consideration of qualifying higher or better offers that may be presented to Sellers (the "Auction");

(iii)      approve the amount of the Break-Up Fee and the Expense Reimbursement Payment, and the payment thereof in accordance with the terms hereof;

(iv)      provide that Sellers shall not entertain or accept any bid unless such bid:

(A)      is submitted to Sellers on or prior to the Bid Deadline with a copy received by the Purchaser promptly thereafter,

(B)      is accompanied (A) by a cash deposit at least equal to the Deposit (or if such bid is for less than all of the Acquired Assets 5 1/2% of the cash purchase price payable at Closing), which deposit shall not be subject to any Liens created in favor of any Person, and (B) by a duly executed acquisition agreement that is marked to reflect variations from this Agreement,

(C)      is on terms no less favorable (and no more burdensome or conditional) to Sellers than the terms of this Agreement; provided that potential bidders shall be required to structure their purchase price in a manner consistent with this Agreement with all increases in the purchase price to be made as increases in the Fixed Component of Purchase Price and payable in cash,

(D)      remains open through ten (10) days after the Initial Closing,

(E)      does not include any contingency relating to due diligence or financing, or any other material conditions precedent to the bidder's obligation to close that exist as of the Auction and that are not otherwise contained in this Agreement,

(F)      designates the executory contracts and unexpired leases which the bidder may request Sellers to have assumed and assigned to the bidder and any other assets of Sellers that are subject to the bid,

50

(G)     is made by one or more bidders, each of which can demonstrate that, individually or in the aggregate, it is (or they are) financially able to consummate the transaction contemplated by such bid(s) on the terms contemplated therein, and

(H)     is for an aggregate purchase price at least equal to the Estimated Purchase Price plus $22,000,000, provided that for purposes of this requirement Sellers shall be permitted to aggregate up to three (3) bids (a bid which meets the foregoing requirements (A) – (H) is hereinafter referred to as a "Qualified Bid");

(v)     provide that if Sellers do not receive a Qualified Bid (other than this Agreement), the Debtors will report the same to this Court and will proceed with the Sale Hearing and no Auction shall be required or held;

(vi)     provide that if, and only if, the Sellers receive a Qualified Bid, the Auction will be commenced not more than five Business Days prior to the date of the Sale Hearing and such Auction shall be conducted in such a manner as to maximize the return to Sellers' estates and Sellers shall establish reasonable procedures ("Auction Procedures") at the commencement of the Auction for the conduct of the Auction so as to accomplish such goal, provided that the Auction Procedures shall, in any event, provide that: (A) unless otherwise ordered by the Bankruptcy Court, either prior or subsequent to the Auction for cause shown, any Person who has failed to provide a Qualified Bid by the Bid Deadline shall be disqualified from participation in the Auction; (B) at the commencement of the Auction, the Debtors will determine based on the nature of the Qualified Bids (the "Baseline Bid") the bid to serve as the lead bid in the Auction, which bid will at the commencement of the Auction be announced to all Qualified Bidders participating at the Auction; (C) participating bidders (including the Purchaser to the extent Purchaser so chooses) will be permitted to increase their bids and to agree to modifications to their bids in order to make their bids more favorable to the Debtors, provided, subject to the following clause (D), that each bid shall exceed the preceding bid by $500,000 or a multiple thereof; (D) solely for purposes of determining the Successful Bids, any overbid submitted by Purchaser shall be deemed to include the full amount of the Break-Up Fee and Expense Reimbursement Payment potentially payable; and (E) at the conclusion of the Auction, Sellers shall determine, considering factors such as the financial and contractual terms of each bid and factors affecting the speed, certainty of closing each bid and net proceeds to Sellers, the highest or otherwise best bid(s) (the "Successful Bid(s)" and the person(s) submitting the Successful Bid(s) referenced herein as the "Successful Bidder(s)") and submit such bid(s) for approval to the Bankruptcy Court.

(vii)     provide that if Purchaser or any Third Party Purchaser is not the proponent of the Successful Bid, this Agreement shall be deemed terminated without further action on the part of Sellers or the Purchaser, and as soon as practicable, but, in any event, within two Business Days, if this Agreement is terminated as a consequence of the Successful Bid in accordance with the terms of this Agreement, the Deposit together with interest accrued thereon, if any, shall be returned to Purchaser by wire transfer of immediately available funds;

(viii)     provide that the obligations of Sellers to return the Deposit and to pay the Break-Up Fee and the Expense Reimbursement Payment pursuant to the terms

51

Article XI of this Agreement and the Bidding Procedures Order shall constitute administrative expenses of the kind specified in Section 503(b)(1) of the Bankruptcy Code, shall constitute a carve out from Sellers' Debt Liens to the extent provided in Section 11.2(c) and shall not be subject to secured claims of any party, and, notwithstanding any other order of the Bankruptcy Court, including any cash collateral or debtor-in-possession financing order entered by the Bankruptcy Court, no deposit received by the Sellers from any party pursuant to the Bidding Procedures Order shall be subject to any lien of any creditor of the Sellers, and shall be first applied to the payment in full of the Break-Up Fee and the Expense Reimbursement Payment.

(b)    Except as to the Unrelated Assets, Sellers represent that, other than the transactions contemplated by this Agreement, Sellers are not a party to or bound by any agreement with respect to a possible merger, sale, restructuring, or other disposition of all or any part of the Acquired Assets. Except as permitted by this Agreement, no Seller shall, directly or indirectly, (i) solicit or negotiate or engage in discussion with respect to any Acquisition Proposal or provide Confidential Information to any Person, regardless of whether such offer was unsolicited, participate in any effort or attempt by any Person (other than Purchaser, its Affiliates and Third Party Purchasers) to do or seek to do any of the foregoing, (ii) execute an Acquisition Proposal, or (iii) except as provided in this Agreement, seek or support Bankruptcy Court approval of a motion or Order inconsistent in any way with the transactions contemplated in this Agreement, except that (x) following the filing of the Bidding Procedures Motion Sellers shall be entitled to provide due diligence materials in response to unsolicited requests therefor and provide the notices contemplated by such Motion and (y) following entry of the Bidding Procedures Order, take such acts with respect to Acquisition Proposals as shall be provided in the Bidding Procedures Order. From the date of the issuance of the Sale Order and until the Applicable Closing Date and provided that Purchaser is proceeding in good faith to consummate the transactions contemplated hereby in a timely manner, no Seller or any of its Affiliates shall negotiate or engage in discussion with respect to or consummate any transaction involving an Acquisition Proposal or provide Confidential Information to any Person, except, in each case, as to parties who have submitted Qualified Bids.

(c)    Sellers will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Sellers relating to this Agreement (including forms of Orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Case.

(d)    By execution of this Agreement, Purchaser agrees to be and shall be bound by the terms of the Bidding Procedures.

6.5    WARN Act.    Promptly following the date hereof, Sellers shall give such conditional notices, if any, required under the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar foreign, state or local law, regulation or ordinance (collectively, the "WARN Act").

6.6    Further Assurances.    Sellers shall execute such documents and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby. Sellers shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VIII of this Agreement.

52

6.7    Inventory. Prior to the Initial Closing, Sellers will use commercially reasonable efforts to minimize the amount of inventory that is damaged, unusable or unsaleable (absent discount), and inventory with less than a 30-day shelf life or that is more than four weeks on hand, provided that such reduction does not cause the inventories at any Operating PSC from falling below adequate levels.

6.8    Removal of Material Equipment.

(a)    Sellers agree that other than in the ordinary course of business, they will not remove, or allow the removal of, any Material Equipment from any PSC prior to the Applicable Closing Date applicable to such Material Equipment or prior to the date that Purchaser notifies Sellers pursuant to Section 2.5 that it will not purchase such piece of Material Equipment. For purposes of determining whether any Material Equipment has been removed, the parties shall conduct an Initial Equipment Count and Final Equipment Count in accordance with the paragraphs below. Notwithstanding anything herein to the contrary, the provisions of this Section 6.8 shall survive until the six (6) month anniversary of the Initial Closing Date.

(b)    Initial Equipment Count and Registry. A physical count of each item of equipment located at each Operating PSC and each operating facility located at any other Owned Real Property or Leased Real Property which has a net book value in excess of $2,000 (the "Material Equipment") shall be made mutually by Purchaser and Sellers. The parties shall together make a physical accounting of the Material Equipment (the "Initial Equipment Count", together with the Final Equipment Count (as defined below), the "Equipment Count") within five Business Days following the date hereof or such other time period mutually agreeable to Purchaser and Sellers, such Equipment Count to include the making of a videotape or other similar medium to confirm the existence of Material Equipment. The parties may have representatives present and available during the Equipment Count, with such representatives to assist in the Equipment Count, including documentation setting forth an agreed upon list of each piece of Material Equipment. These representatives will attempt, in good faith, to resolve any disputes in respect of the materiality of the Equipment which may arise during the Equipment Count. To the extent that the parties or such representatives are unable to resolve any such disputes, within three (3) Business Days following any such dispute, the parties shall mutually select an independent accounting firm to make final, binding determinations with respect to any such disputes within five (5) Business Days following such selection. The cost of such mutually selected independent accounting firm shall be borne equally by the parties.

(c)    Final Equipment Count. Concurrently with the Inventory Count as of Inventory Date, the parties shall make a final physical accounting of the Material Equipment (the "Final Equipment Count"), such Equipment Count to include the making of a videotape or other similar medium to confirm the existence of Material Equipment.

6.9    Landlord Waivers. Sellers shall request from the landlord at each Operating PSC which is leased by Sellers an executed form of consent, substantially in the form of Exhibit 6.9 attached hereto, prior to the Initial Closing, provided, that if any landlord does not provide such consent in response to Sellers' request, Sellers shall have no further obligation to obtain such consent.