# Exhibit 9 B-3

6.10  <u>Confidentiality</u>.  Subject to Section 12.10, the Confidentiality Agreement and the actions contemplated by the Bidding Procedures, each of Purchaser and Sellers agree that, without the prior written consent of the other party hereto, neither Purchaser nor Sellers shall disclose or permit to be disclosed to any Person, or utilize for their own account or permit to be utilized by any Person, at any time, any Confidential Information with respect to any applicable Acquired Asset from the date hereof through the Applicable Closing Date; provided, however, nothing contained herein shall prohibit Sellers from disclosing Confidential Information to a bona fide prospective Qualified Bidder in connection with the sale process described in the Bidding Procedures Order. Each of Purchaser and Sellers shall take all appropriate steps to safeguard all such Confidential Information with respect to any applicable Acquired Asset through the Applicable Closing Date and to protect it against disclosure, misuse, espionage, loss and theft. In the event any Purchaser, Seller or any Affiliate thereof is required to disclose any such Confidential Information with respect to any applicable Acquired Asset prior to the Applicable Closing Date pursuant to applicable law, Purchaser or Sellers, as applicable, shall promptly notify the other party hereto in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the other party hereto to preserve the confidentiality of such information consistent with applicable law.

6.11  <u>Estoppel Certificates</u>.  With respect to each Lease that pertains to an Operating PSC, beginning on the date that Purchaser notifies Sellers pursuant to Section 2.5 that it elects to purchase and assume such Lease until the Applicable Closing Date applicable to such Lease, Seller shall request an estoppel certificate from the landlord under each Lease certifying that each such Lease is in full force and effect, that there are no defaults thereunder or any conditions that with the passage of time or the giving of notice, or both, would constitute a default thereunder (including, that all current rent and additional rent thereunder has been paid), or an estoppel certificate in the form so provided for under any such Lease and shall use commercially reasonable efforts to obtain such estoppel certificate, <u>provided</u>, that if any landlord does not provide such estoppel certificate in response to Sellers' request, Sellers shall be under no further obligation to obtain such consent.

6.12  <u>Updated Financial Information</u>.  Sellers shall deliver to Purchaser the financial statements, materials, reports and other information required to be delivered under Sections 5.01(a)-(n), (p) (q) and (s) of the DIP Credit Agreement, as in effect on the date hereof, as and when delivered to the DIP Credit Agreement Administrative Agent, as well as any other notices provided to the DIP Credit Agreement Administrative Agent under the DIP Credit Agreement or otherwise regarding events of default under the DIP Credit Facility or the condition (financial or otherwise), business or affairs of Sellers, as and when delivered to the DIP Credit Agreement Administrative Agent. Sellers shall also deliver to Purchaser promptly but in any event within two Business Days, notice of Sellers' inability to access its cash balances or extensions of credit under the terms of the DIP Credit Agreement.

6.13  **[Intentionally Deleted.]**

6.14  <u>Board Appeal</u>.  The Board of Directors of Fleming shall not withdraw, modify or amend its resolution to recommend that the Bankruptcy Court approve this Agreement, Sellers' Ancillary Documents and the transactions contemplated hereby and thereby, unless required by

the Bankruptcy Court or such withdrawal, modification or amendment is consistent with the Bidding Procedures.

6.15    Material Acquired Contracts.  From the date hereof until the end of the Option Period, Sellers shall assist Purchaser in identifying those Acquired Contracts which may be Material Acquired Contracts.

## ARTICLE VII
## COVENANTS OF PURCHASER

7.1    Bonds, Letters of Credit, Etc.  With respect to each Acquired Contract to be assigned to, and assumed by, Purchaser, Purchaser shall take all necessary steps, and execute and deliver all necessary documents, to ensure that on the Applicable Closing Date applicable to such Acquired Contract Purchaser has in place the bonds, letters of credit, indemnity agreements and similar items necessary in connection with such Acquired Contract, if any, including such bonds, letters of credit, indemnity agreements and similar items, in each case as set forth on Schedule 7.1 or necessary to cause the release of Sellers from any and all obligations related to the foregoing.

7.2    Required Permit and License Applications.  With respect to each Operating PSC to be assigned, transferred and delivered to Purchaser at the Initial Closing, Purchaser shall timely make all filings necessary to obtain the transfer of, or replacement Permit for, each Required Permit related to such Operating PSC.  Purchaser agrees to use commercially reasonable efforts to timely obtain the Required Permits when necessary, and, prior to the Initial Closing Date applicable to such Received Permit, Purchaser agrees to provide Sellers an update with respect to the status of the Required Permits for each PSC, as may reasonably be requested by Sellers.

7.3    Intellectual Property.  Following notice by Sellers to Purchaser, Purchaser shall promptly return to Sellers and shall promptly cease using any Third Party Intellectual Property that is neither an Acquired Asset nor the subject of an Acquired Contract.

7.4    Further Assurances.  Purchaser shall execute such documents and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby.  Purchaser shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article IX of this Agreement.

7.5    Access.  Following consummation of the Initial Closing, so long as such access does not unreasonably interfere with Purchaser's business operations, Purchaser shall permit Sellers' counsel and any other professionals employed in the Chapter 11 Case reasonable access to Purchaser's employees and any books and records constituting a portion of the Acquired Assets and that relate to all or any portion of the Acquired Assets, the Assumed Liabilities or the Business (whether in documentary or data form) for the purpose of (i) the continuing administration of the Chapter 11 Case (including, without limitation, Sellers' pursuit of any Avoidance Action), (ii) the preparation of any Tax Returns required to be filed by Sellers, (iii) the defense of any audit, examination, administrative appeal or litigation of any Tax Return in which Sellers are included or (iv) responding to or defending against any investigations,

55

inquiries, actions or claims by the Securities Exchange Commission of or against the Sellers' financial, accounting, business or other practices, it being understood that Purchaser shall have no obligation to retain such books and records following the Option Period. Such access shall include the right of such professionals to copy, at Seller's expense, such documents and records as they may request in furtherance of the purposes described above. If Purchaser moves any such documents or records during the Option Period, Sellers shall have the right to require Purchaser to copy and deliver to Sellers or their professionals such documents and records as they may request, but only to the extent Sellers or any such professional (x) furnishes Purchaser with reasonably detailed written descriptions of materials to be so copied and (y) reimburses Purchaser for the costs and expenses thereof. During the Option Period, Purchaser shall retain and preserve all such documents and records so that Sellers may make copies of such documents and records at their own expense. Purchaser may discard or destroy any such books or records, provided that Purchaser shall so notify Sellers and allow Sellers, within 30 days of such notification, to elect to take possession of such documents and records. The parties acknowledge that Sellers shall have the right to retain any documents and records provided pursuant to this Section 7.5.

    7.6    <u>Financing</u>.

    (a)    Purchaser shall use its commercially reasonable efforts to obtain, by no later than July 16, 2003, financing commitments from its lenders to fund at least $325,000,000 of the Purchase Price on the Initial Closing Date.

    (b)    Prior to the Initial Closing Date and upon Sellers' reasonable request, Purchaser shall promptly make available to Sellers such information that provides Sellers and their advisors reasonably adequate assurance of Purchaser's financial wherewithal and ability to perform its obligations under each of the Acquired Contracts from and after the date such Acquired Contract is assumed and assigned to Purchaser.

    7.7    <u>Leases of Operating PSCs</u>. On and after the Initial Closing Date, Purchaser shall not take any action or omit to take any action that would cause a breach or default under any Material Acquired Contract which is a real property Lease relating to an Operating PSC.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

    The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction of the following conditions precedent on or before the Initial Closing Date.

    8.1    <u>Warranties True as of Both Present Date and Initial Closing Date; Covenants</u>.

    (a)    Each of the representations and warranties of Sellers contained herein shall be true and correct in all material respects on and as of the Initial Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all material respects) with the same force and effect as though made on and as of the Initial Closing Date; provided, however, that each of the representations and warranties of Sellers contained herein that are qualified by materiality, Material Adverse Effect or words of similar import shall be true and correct in all respects on and as of the Initial Closing Date

56

(except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all respects) with the same force and effect as though made on and as of the Initial Closing Date.

       (b)    Sellers shall have performed and complied, in all material respects, with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Initial Closing Date.

       (c)    Purchaser shall have been furnished a certificate (dated the Initial Closing Date and in form and substance reasonably satisfactory to Purchaser) executed by a duly authorized officer of each of the Sellers certifying as to the fulfillment of the conditions set forth in this Section 8.1; provided that the representations and warranties in such certificate shall not survive the Initial Closing.

    8.2    Sale Order. The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude Purchaser from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order. No notice of such waiver of this or any other condition to the Initial Closing need be given except to Sellers, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order becoming a Final Order.

    8.3    HSR Act and Other Approvals. Any waiting period (and any extension thereof) under the HSR Act applicable to the consummation of the purchase of the Acquired Assets shall have expired or been terminated. All authorizations, consents, filings and approvals necessary to permit Sellers to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed by any Governmental Entity necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

    8.4    Litigation. There shall not be pending (or, in the case of the exercise of police or regulatory powers, threatened) any suit, action or proceeding by any Governmental Entity (a) seeking to prohibit or impose any material limitations on Purchaser's ownership or operation (or that of any of its Affiliates) of all or a material portion of the Acquired Assets, or to compel Purchaser or any of its Affiliates to dispose of or hold separate any portion of the Acquired Assets or the business or assets of Purchaser or any of its Affiliates as a result of Purchaser's acquisition of the Acquired Assets, (b) seeking to restrain or prohibit the consummation of the Initial Closing or the performance of any of the other material transactions contemplated hereby, or seeking to obtain from Purchaser or any of its Affiliates any damages that are material, (c) seeking to impose material limitations on the ability of Purchaser, or rendering Purchaser unable, to accept for payment or pay for or purchase a material portion of the Acquired Assets or otherwise to consummate the Initial Closing, (d) seeking to impose material limitations on the

ability of Purchaser effectively to exercise full rights of ownership of the Acquired Assets, or (e) which otherwise is reasonably likely to have a Material Adverse Effect.

8.5     <u>Sellers' Deliveries</u>.  Sellers shall have executed and delivered to Purchaser the Sellers' Ancillary Documents and other documents referred to in Section 10.2 hereof.

8.6     <u>Statutes; Orders</u>.  No statute, rule or regulation shall have enacted by any Governmental Entity which prohibits the consummation of the Initial Closing, and there shall be no Order of a Governmental Entity in effect precluding the consummation of the Initial Closing.

8.7     <u>Title Commitments</u>.  Sellers shall deliver to Purchaser, at Purchaser's sole cost and expense, commitments from Chicago Title Insurance Company with respect to each parcel of Owned Real Property to be transferred, assigned and delivered to Purchaser at the Initial Closing pursuant to which title policies may be issued at such Closing insuring title thereto vested in Purchaser subject only to Permitted Encumbrances.

8.8     <u>Survey</u>.  Sellers shall deliver to Purchaser, at Purchaser's sole cost and expense, a current as-built survey of the Owned Real Property to be transferred, assigned and delivered to Purchaser at the Initial Closing prepared in accordance with the ALTA/ACSM Land Title Survey Requirements of 1992, certified to the Purchaser, the Purchaser's lender and Chicago Title Insurance Company selected by Purchaser by a registered public surveyor or registered professional engineer disclosing only Permitted Encumbrances and otherwise reasonably satisfactory to the Purchaser and its lender in all respects.

8.9     <u>Debt Liens</u>.  Purchaser shall have received evidence reasonably satisfactory to it that (a) the Debt Liens (related to Acquired Assets that will be transferred to Purchaser on the Initial Closing Date) have been released by the holders thereof, (b) the holders of Debt Liens (related to Acquired Assets that may be transferred pursuant to a Subsequent Closing) conditionally agree to release such Debt Liens upon such Subsequent Closing in accordance with the terms of the Sale Order and (c) the holders of Debt Liens acknowledge and agree that such holders' Liens shall not attach to any property relating to the Business first coming into any Seller's possession on or after the Initial Closing Date.

8.10    <u>Sales Material Adverse Effect</u>.  The Business shall not have suffered a Sales Material Adverse Effect.

8.11    <u>Transfer of All Assets</u>.  Substantially all of the Acquired Assets shall be transferable to Purchaser, it being understood that Purchaser shall have no obligation to effect the Initial Closing unless substantially all the Acquired Assets shall be transferable to Purchaser as of the Initial Closing or, pursuant to the terms hereof, one or more Purchaser Assignees or Third Party Purchasers; <u>provided, however</u>, that Purchaser shall not be required to close, if any of the Acquired Assets listed on <u>Schedule 8.11</u> of the Disclosure Schedule are not capable of being transferred and assigned to Purchaser as of the Initial Closing unless any such Acquired Asset is not capable of being transferred and assigned to Purchaser because of Purchaser's inability to provide adequate assurance of future performance with respect to such Acquired Asset.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers under this Agreement are, at the option of Sellers, subject to the satisfaction of the following conditions precedent on or before the Initial Closing Date.

9.1     <u>Warranties True as of Both Present Date and Initial Closing Date; Covenants</u>.

(a)     The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Initial Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all material respects) with the same force and effect as though made by Purchaser on and as of the Initial Closing Date.

(b)     Purchaser shall have performed and complied, in all material respects, with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Initial Closing Date.

(c)     Sellers shall have been furnished a certificate (dated the Initial Closing Date and in form and substance reasonably satisfactory to Sellers) executed by a duly authorized officer of Purchaser certifying as to the fulfillment of the conditions set forth in this Section 9.1; <u>provided</u> that the representations and warranties in such certificate shall not survive the Initial Closing.

9.2     <u>HSR Act and Other Approvals</u>.  Any waiting period (and any extension thereof) under the HSR Act applicable to the consummation of the purchase of the Acquired Assets shall have expired or been terminated. All authorizations, consents, filings and approvals necessary to permit Purchaser to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Sellers, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed by any Governmental Entity necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

9.3     <u>Bankruptcy Condition</u>.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude Sellers from consummating the transactions contemplated herein if Sellers, in their sole discretion, waive the requirement that the Sale Order shall have become a Final Order.  No notice of such waiver of this or any other condition to the Initial Closing need be given except to Purchaser, it being the intention of the parties hereto that Sellers shall be entitled to, and are not waiving, the mootness doctrine and any similar statute or body of law if the Initial Closing occurs in the absence of the Sale Order becoming a Final Order.

9.4     <u>Payment</u>.  Purchaser shall have paid the Purchase Price in accordance with Article III hereof, subject to adjustment of the Purchaser Price as provided in Section 3.1(c).

59

9.5    Assumption and Assignment.  The Sale Order shall approve and authorize the assumption and assignment of the Acquired Contracts to the Purchaser.

9.6    Litigation.  There shall not be pending (or, in the case of the exercise of police or regulatory powers, threatened) any suit, action or proceeding by any Governmental Entity, seeking to restrain or prohibit the consummation of the Initial Closing or the performance of any of the other transactions contemplated hereby, and there shall not be any other action taken by any Governmental Entity that is reasonably likely to result, directly or indirectly, in any of such consequences.

9.7    Purchaser's Deliveries.  Purchaser shall have executed and delivered to Sellers the Purchaser Ancillary Documents and other documents referred to in Section 10.3 hereof.

9.8    Statutes; Orders.  No statute, rule or regulation shall have enacted by any Governmental Entity which prohibits the consummation of the Initial Closing, and there shall be no Order of a Governmental Entity in effect precluding the consummation of the Initial Closing.

## ARTICLE X
## CLOSING

10.1    Initial Closing.  Provided that the Sale Order shall have been entered and no stay with respect thereto shall be in effect, and that all other conditions to the parties' obligations to consummate the Initial Closing hereunder shall have been satisfied or waived, the Initial Closing shall take place at the offices of Kirkland & Ellis, Citigroup Center, 153 East 53rd Street, New York, New York 10022 and on a date and time (the "Initial Closing Date") to be mutually agreed upon by Purchaser and Sellers, with the intent being that the Closing shall occur no later than 10 days after the Sale Order shall have been entered.

10.2    Deliveries by Sellers.  At the Initial Closing, Sellers will deliver the following to Purchaser:

(a)    a Bill of Sale (mutually and reasonably acceptable to the parties hereto) duly executed by Sellers;

(b)    an Assignment and Assumption of the Acquired Contracts on the terms set forth in the Sale Order, in form and content mutually satisfactory to Purchaser and Sellers (the "Assignment and Assumption") duly executed by Sellers;

(c)    duly executed limited warranty deeds in recordable form for all Owned Real Property to be assigned, transferred and delivered to Purchaser at the Initial Closing, without covenants against grantor's acts;

(d)    [Intentionally Deleted.]

(e)    each estoppel certificate, if any, received from the landlord pursuant to Section 6.11 hereof, it being understood that receipt of such estoppel certificates shall not be a condition to the Initial Closing;

I:\Fleming\CPAK\C&S r-apa.v.12.doc

(f)    a Transition Services Agreement duly executed by Sellers;

(g)    a certificate of non-foreign status from each Seller, dated as of the Initial Closing Date and in the form and manner which complies with requirements of Section 1445 of the Code and the Treasury Regulations promulgated thereunder;

(h)    each of the Material Consents, in a form which is valid and binding upon the Third Party giving such consent;

(i)    the Cure Escrow Agreement duly executed by Sellers and the Indemnity Escrow Agreement duly executed by Sellers; and

(j)    such other documents and instruments reasonably requested by Purchaser in order to effectuate the transactions contemplated hereby, including instruments of assignment, transfer and conveyance in order to vest in Purchaser good and marketable title to all of the Company Owned Intellectual Property to be assigned, transferred and delivered to Purchaser at the Initial Closing.

10.3    <u>Deliveries by Purchaser</u>.  At the Initial Closing, Purchaser will deliver the following:

(a)    the portion of the Purchase Price payable at the Initial Closing pursuant to and in accordance with Section 3.1, less the Deposit which shall be delivered by the Escrow Agent,

(b)    the Assignment and Assumption duly executed by Purchaser,

(c)    a certificate executed on behalf of Purchaser by Purchaser's Secretary or Assistant Secretary certifying as to the incumbency, and authenticating the signatures of, officers executing this Agreement and certificates delivered hereunder on behalf of Purchaser, and certifying as to the adoption and continuing effect of appropriate resolutions authorizing Purchaser's execution, delivery and performance of this Agreement,

(d)    the Transition Services Agreement duly executed by Purchaser; and

(e)    the Cure Escrow Agreement duly executed by Purchaser and the Indemnity Escrow Agreement duly executed by Purchaser.

**ARTICLE XI**
**TERMINATION; TERMINATION PAYMENT**

11.1    <u>Termination</u>.  This Agreement may be terminated prior to the Initial Closing as follows:

(a)    by mutual written agreement of Purchaser and Sellers;

(b)    by either Purchaser or Sellers if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)    by Purchaser, if (x) the Bidding Procedures Motion shall not have been filed within two (2) Business Days following the execution hereof or (y) the Sale Motion shall not have been filed by July 11, 2003;

(d)    by Purchaser, if (x) the Bidding Procedures Order shall not have been entered on or prior to July 21, 2003; (y) following entry thereof, the Bidding Procedures Order is stayed, reversed, vacated or otherwise modified or (z) the Bidding Procedures Order shall not have become a Final Order on or prior to the date of the Auction;

(e)    by Sellers if, following entry thereof, the Bidding Procedures Order is stayed, reversed, vacated or otherwise modified;

(f)    **[Intentionally Deleted.]**;

(g)    by either Purchaser or Seller, if (x) any Sellers' chapter 11 case is converted to a case under chapter 7 or (y) there is appointed in any Sellers' chapter 11 case a trustee or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code;

(h)    by either Purchaser or Sellers (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if there shall have been a material breach of this Agreement on the part of the other party, which material breach is not cured within 10 days following written notice to the party committing such material breach or which material breach, by its nature, cannot be cured prior to the Initial Closing;

(i)    by either Purchaser or Sellers if Sellers select an Acquisition Proposal as the Successful Bid;

(j)    by either Purchaser or Sellers, if the Initial Closing shall not have been consummated on or prior to August 29, 2003 (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing, with the consent of the agents under the Pre-Petition Credit Agreement and the DIP Credit Agreement; provided that the terminating party is not then in material breach of its obligations hereunder; provided, further, in the event Purchaser does not terminate this Agreement pursuant to this paragraph until after September 15, 2003, Purchaser shall be entitled to Expense Reimbursement Payment in accordance with Section 11.2(b) below;

(k)    until 5:00 p.m. (prevailing Eastern time) on July 16, 2003, by Purchaser on written notice to Sellers if (i) Purchaser, in its absolute and sole discretion, is not reasonably satisfied with its ability to receive financing to fund all or a portion of the Purchase Price or (ii) Purchaser, in its absolute and sole discretion is not reasonably satisfied with the results of its review and due diligence investigations with respect to the Business and Acquired Assets;

(l)    **[Intentionally Deleted.]**;

(m)    by Purchaser if on or prior to July 14, 2003 the required lenders under the DIP Credit Agreement and the agents under the Pre-Petition Credit Agreement shall not have provided written consent to Sellers' execution, delivery and performance of this Agreement and the transactions contemplated hereby, subject to the lenders' ability to support an Alternative Transaction pursuant to the Bidding Procedures;

(n)    by either Purchaser or Sellers if the Transition Services Agreement shall not have been executed by both Purchaser and Fleming on or prior to July 14, 2003; and

(o)    by Sellers if Cure Costs are determined to be in excess of the Cure Cap.

11.2    Termination Payments.

(a)    Break-Up Fee. If the Bidding Procedures Order has been entered and this Agreement is terminated (i) pursuant to Section 11.1(i), (ii) by Purchaser pursuant to Section 11.1(h) or (iii) pursuant to Section 11.1(o), the Break-Up Fee shall be earned by Purchaser upon any such termination. If an Alternative Transaction(s) is consummated within 18 months of the date of this Agreement, then the Break-Up Fee once earned shall only be payable (x) if such Alternative Transaction is an Acquisition Proposal (or modification thereof) that was selected as a Successful Bid or back-up thereto, out of the proceeds of such Alternative Transaction upon consummation thereof or (y) if otherwise, out of the proceeds of any such Alternative Transaction to the extent any such proceeds therefrom (without deduction for Cure Costs) exceed the Estimated Purchase Price, as and when such proceeds are received. To the extent any Alternative Transaction is not consummated within 18 months of the date of this Agreement, Purchaser shall nonetheless retain an administrative claim for the Break-Up Fee pursuant to Section 11.2(c) below. Notwithstanding the foregoing and without duplication, any Break-Up Fee that has been earned and is payable shall be paid, in whole or in part, from any deposit associated with an Alternative Transaction that any Seller is entitled to unconditionally retain for its own account.

(b)    Expense Reimbursement. If the Bidding Procedures Order has been entered and this Agreement is terminated (i) (A) by Sellers pursuant to Section 11.1(j) or (B) by Purchaser pursuant to Section 11.1(j) which termination complies with the last proviso thereof, (ii) by Purchaser pursuant to Section 11.1(h), (iii) pursuant to Section 11.1(i) or (iv) pursuant to Section 11.1(o), Sellers shall upon termination of this Agreement pay to Purchaser the Expense Reimbursement Payment (immediately following the submission of the documentation therefor)

(c)    Priority of Termination Payments. The Break-Up Fee and Expense Reimbursement Payment and any obligation of Sellers to return the Deposit hereunder or under the Bidding Procedures Order, shall constitute administrative expenses of the kind specified in section 503(b)(1) of the Bankruptcy Code, shall constitute a carveout from Sellers' Debt Liens to the extent necessary to make the payments provided for in Sections 11.2(a) and 11.2(b), and shall not be subject to secured claims of any party, and, notwithstanding any other order of the Bankruptcy Court, including any cash collateral or debtor-in-possession financing order entered by the Bankruptcy Court, no deposit received by the Sellers from any party pursuant to the Bidding Procedures Order shall be subject to any lien of any creditor of the Sellers, and shall be

63

first applied to the payment in full of the Break-Up Fee and the Expense Reimbursement Payment.

11.3  Effect of Termination.  If this Agreement is terminated in accordance with Section 11.1 hereof, this Agreement shall become null and void and of no further force and effect and the parties shall be relieved of any further obligations hereunder, except (i) for this Section 11.3, (ii) for the provisions of Article XI, Sections 14.1, 14.2, 14.4, 14.7, 14.8, 14.9, 14.10, 14.11, 14.12, 14.13, 14.14 and 14.16 hereof, (iii) for the provisions of the Confidentiality Agreement relating to the obligation of Purchaser to keep confidential and not to use certain information and data obtained from Sellers and to return documents to Sellers and (iv) subject to Sections 11.4 and 14.2, that the termination of this Agreement for any cause shall not relieve any party hereto from any Liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; provided, however, Purchaser shall have no liability to Sellers and Sellers hereby waive any and all rights or claims against Parent, Purchaser or their Affiliates in the event Purchaser terminates this Agreement pursuant to Section 11.1(k) above.

11.4  Deposit.  Upon termination of this Agreement (other than by Sellers pursuant to Section 11.1(h)), the Escrow Agent shall be authorized to promptly (and in any event within two (2) Business Days of such termination) return the Deposit (together with all interest earned thereon) to Purchaser; provided, further, that in the event of termination by Purchaser under Section 11.1(k) Sellers shall have no right to contest or object to the return of the Deposit (together with all interest earned thereon) to Purchaser and Sellers waive any and all rights or claims that Sellers may have against the Purchaser or its Affiliates with respect to such termination; provided, further, that the Escrow Agent shall have no right to, and under no circumstances shall the Escrow Agent refuse to return the Deposit (together with all interest earned thereon) to Purchaser in the event that Purchaser is terminating this Agreement pursuant to Section 11.1(k).

11.5  Other Proposals.  In the event this Agreement is terminated by Purchaser pursuant to Section 11.1 or otherwise, to the extent Purchaser has entered into any agreements preventing other Third Parties to such agreements from reviewing, discussing, negotiating or submitting proposals for or otherwise preventing any transaction by such Third Parties for the acquisition of any portion of the Acquired Assets, Purchaser shall immediately terminate any and all such agreements or otherwise release such Third Parties from such prohibitions.

## ARTICLE XII
## ADDITIONAL COVENANTS

12.1  Employees.

    (a)  Business Employees.

        (i)  Until the applicable Determination Date, Sellers shall provide the services of the Business Employees and shall continue to provide wages, benefits and other terms and conditions of employment consistent with past practices, all pursuant to the Transition Services Agreement.  As of the applicable Determination Date, the applicable Business

64

Employees shall be terminated by Sellers and offered employment by Purchaser on terms and conditions to be determined by Purchaser in its sole discretion, consistent with the provisions of this Article XII. Following the Initial Closing, Purchaser shall provide written notice to Sellers at least thirty (30) days prior to determining the Determination Date for the applicable Business Employees, so that Sellers may terminate such Business Employees as of the date immediately preceding such Determination Date. Purchaser shall have no liability for and no obligation to assume or to adopt any of Sellers' collective bargaining agreements or other agreements with any labor unions or labor organizations, and, until validly terminated without any Liability, Sellers shall retain all such agreements and all obligations and liabilities arising therefrom, whenever arising or accruing.

(ii)     All Liabilities to the current Employees of the Business (the "Business Employees") arising or accruing on or prior to the Determination Date, including wages, earned vacations, workers' compensation, employee benefits, Liabilities under any collective bargaining agreement, WARN Act Liabilities, workers compensation Liabilities, COBRA Liabilities, severance and bonus payments, withholding and reporting obligations, all laws relating to the employment of labor and the employer's share of payroll or other employment taxes and other obligations (collectively, the "Employee Obligations"), shall be the obligation of Sellers ("Sellers' Employee Obligations"), and all such Employee Obligations arising or accruing on and after the New Hire Date and thereafter to those Business Employees who are hired by Purchaser (the "New Employees"), and which relate to such Business Employees' employment with Purchaser, and liability for any unlawful discriminatory conduct on the part of the Purchaser in the hiring or non-hiring of Business Employees before or after the Determination Date, shall be the obligation of Purchaser ("Purchaser's Employee Obligations"). Except for the Purchaser's Employee Obligations, all obligations and liabilities, including, without limitation, pension and benefit plan liabilities (including multiemployer plan withdrawal liabilities), liabilities under or relating to any collective bargaining agreement, discrimination liabilities, severance and bonus pay obligations, worker's compensation, WARN Act liabilities, accrued vacation time and COBRA liabilities, relating to current or former employees (and their dependents) of the Sellers or the Business shall, whenever arising or accruing, remain the sole obligation of Sellers ("Sellers' Employment Obligations"). On or after the date hereof, Purchaser's representatives shall be permitted to meet and speak with the Business Employees for purposes of discussing potential job opportunities with Purchaser; provided, however, Purchaser shall not meet and speak with such Business Employees or otherwise contact such Business Employees other than through a designee of Sellers, and only after coordinating and consulting with such designee. Sellers hereby specifically agree not to transfer any of the Business Employees (including, without limitation, the Business Employees who manage the operations of the PSCs) to any other locations of Sellers not comprising the PSCs until the expiration of the Option Period. Purchaser shall deliver to Sellers within ten (10) Business Days after the Determination Date a complete list of all Business Employees to whom Purchaser has offered employment as of such applicable Determination Date.

(b)     [Intentionally Deleted.]

(c)     No Third Party Beneficiaries. The obligations of Sellers and Purchaser hereunder to the New Employees are for the sole benefit of either Sellers or Purchaser, and no inference should be drawn that any New Employee is a beneficiary of any of the terms,

65

provisions and obligations hereunder. The ability to enforce the obligations of Sellers and/or Purchaser hereunder with respect to such New Employees shall be the right of either Sellers or Purchaser, as applicable, but not any New Employee.

(d)    Agreement to Cooperate. Subject to any restrictions that would limit Sellers' participation or disclosure of material, Sellers agree to cooperate with Purchaser prior to the Initial Closing Date to the extent reasonably necessary for Purchaser to evaluate Sellers' Benefit Plans in connection with Purchaser's evaluation of which Business Employees it wishes to offer employment to.

12.2    Benefit Plans.

(a)    Sellers' 401(k) Plan. Sellers sponsor a defined contribution plan which provides, in part, deferrals of compensation under Section 401(k) of the Code entitled "Fleming Companies, Inc. Matching 401(k) Plan" (the "Sellers 401(k) Plan"). All Business Employees will be deemed 100% vested and nonforfeitable in their respective benefits in Sellers 401(k) Plan as of the Determination Date. Effective as of the Determination Date, Sellers shall cause all accruals of benefits in respect of the Business Employees under Sellers 401(k) Plan to cease.

(b)    Sellers' Pension Plans. Sellers sponsor pension plans for the Business Employees ("Sellers' Pension Plans"). To the extent permitted by Law, all Business Employees will be deemed 100% vested and nonforfeitable (to the extent funded) in their respective benefits in Sellers' Pension Plans as of the date of termination of employment of such Business Employee. Effective as of the date of termination of employment of such Business Employee, all New Employees shall be deemed, for all purposes in applying Sellers' Pension Plans, to have terminated their service with Sellers on that date. Benefits earned under Sellers' Pension Plans as of the date of termination of employment of such Business Employee shall be paid and distributed in accordance with the terms of Sellers' Pension Plans. No further benefits shall accrue under Sellers' Pension Plans with respect to the New Employees after the Determination Date, and Purchaser shall have no obligation under, or relating to Sellers' Pension Plans (including with respect to any withdrawal liability under such plan) or any obligation to New Employees to provide a pension plan.

(c)    Benefit Plans. The Business Employees shall cease active participation in the Sellers' Benefit Plans as of the applicable Determination Date on which such Business Employee becomes a New Employee. Sellers shall provide adequate prior notice of such termination of participation in Sellers' Benefit Plans to Business Employees to permit such Business Employees to submit any claims prior to the applicable Determination Date.

12.3    Intellectual Property.

(a)    Except as set forth in Section 12.3(c) below or in the Transition Services Agreement, as of the Applicable Closing Date with respect to the applicable Company Owned Intellectual Property, Sellers will not use, register or authorize others to use or register Company Owned Intellectual Property or any other intellectual property substantially or confusingly similar thereto and will not challenge Purchaser's right to use or register the Company Owned Intellectual Property.

66

(b)    It is expressly agreed that Purchaser is purchasing, acquiring or otherwise obtaining all of Sellers' and their Affiliates' right, title or interest in and to the name "Fleming," or any Trademarks related thereto owned by Sellers (collectively, "Fleming Trademarks and Logos").

(c)    For the period from the Initial Closing Date until the closing of the Chapter 11 Case (the "Bankruptcy Period"), Purchaser hereby grants to Sellers and their Affiliates ("Licensees"), effective upon the Initial Closing Date, a non-transferable, non-exclusive, royalty free worldwide transitional right and license to use the Fleming Trademarks and Logos as they exist as of the Initial Closing and are contained on any websites, business cards, schedules, stationery, displays, signs, promotional materials, manuals, forms, computer software and other material used in Sellers' business or are otherwise currently being used in the conduct of the Business (the "Marks"), without any obligation on the part of Sellers to pay royalties or similar fees to Purchaser during the Bankruptcy Period.  This transitional license shall permit use of the Marks solely for the purposes set forth in this Section 12.3.  The transitional license shall permit Sellers to use the Marks solely as follows (the "Transitional License"): for administrative, corporate and legal use during the Bankruptcy Period except to the extent reasonably necessary for compliance with the notice or other requirements of the Bankruptcy Code or compliance with other applicable Law.  No other use of the Marks shall be made by Licensees during the Bankruptcy Period without Purchaser's express written consent, such consent not to be unreasonably withheld or delayed.  Any and all rights and goodwill arising from the use of the Marks by Licensees pursuant to this Transitional License shall inure solely to Purchaser's benefit.  Licensees agree that neither Sellers, nor any of their Affiliates, shall use, directly or indirectly, the Marks in any other way that suggests that there is a relation or affiliation between Licensees and Purchaser or any of Purchaser's Affiliates other than that as created by this Agreement, or as a trademark, service mark or trade name for Licensees.  Nothing in this Agreement or in the performance thereof, or that might otherwise be implied by law, shall operate to grant Licensees any right, title or interest in and to the Marks.  Licensees shall assign to Purchaser, and do hereby assign to Purchaser, any rights they may acquire, if any, by the operation of law or otherwise, in the Marks pursuant to this Transitional License.  As between the parties, Purchaser shall have the sole right, and in its sole discretion, may commence, prosecute, defend and control any action concerning the Marks.   Sellers agree that: (i) immediately upon termination of the Bankruptcy Period, Sellers shall cease and desist, and cause all Affiliates and licensees of Sellers and their Affiliates to cease and desist, from all further use of the Fleming Trademarks and Logos and will adopt new Trademarks related thereto which are not confusingly similar to the Fleming Trademarks and Logos; (ii) immediately upon termination of the Bankruptcy Period, Sellers shall make appropriate filings with any and all applicable registry(ies) changing their corporate names and any d/b/a to a name that does not include any of the Fleming Trademarks and Logos or words confusingly similar thereto; and (iii) except as set forth in this Section, neither Sellers nor any of Sellers' Affiliates shall make any use of the Fleming Trademarks and Logos.  Notwithstanding anything herein to the contrary, to the extent there are any inconsistencies between the provisions of this Section 12.3 and the Transition Services Agreement, the Transition Services Agreement shall control.

I:\Fleming\CPAK\C&S r-apa.v.12.doc

12.4    Infringement.

(a)    Notwithstanding anything in this Agreement to the contrary, Sellers shall have no obligation to defend, indemnify or hold harmless Purchaser or any of its Affiliates from damages, costs or expenses resulting from any obligation, suit or proceeding based upon any claim that any activity subsequent to the Closing Date engaged in by Purchaser, a customer of Purchaser's or anyone claiming under Purchaser constitutes direct or contributory infringement, misuse or misappropriation of or inducement to infringe any Third Party Intellectual Property.

(b)    Purchaser shall defend, indemnify and hold harmless Sellers and any of its Affiliates from and against any and all Indemnifiable Losses resulting from any obligation, proceeding or suit based upon any claim alleging or asserting direct or contributory infringement, misuse or misappropriation of or inducement to infringe by, Sellers or any of their Affiliates of any Third Party Intellectual Property to the extent that such claim is based on, or would not have arisen but for, activity conducted or engaged in subsequent to the Initial Closing Date by Purchaser, a customer of Purchaser's or anyone claiming under Purchaser.

12.5    Filing of Tax Returns.    In connection with the preparation and filing of Tax Returns as of and after the Initial Closing Date, Purchaser and Sellers shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this Article XII.

12.6    Access to Books and Records for Taxes.    After the Initial Closing, upon reasonable notice, and subject to Section 6.10, each party will give to the representatives, employees, counsel and accountants of the other party, access, during normal business hours, to records pertaining to the Business, the PSCs or the Acquired Assets and relating to periods prior to or including the Initial Closing Date, and will permit such persons to examine and copy such records, in each case to the extent reasonably requested by the other party in connection with Tax and financial reporting matters, audits, legal proceedings, governmental investigations and other business purposes (including such financial information and any receipts evidencing payment of Taxes as may be requested by Sellers to substantiate any claim for Tax credits or refunds); provided, however, that nothing herein will obligate any party to take actions that would unreasonably disrupt the normal course of its business or violate the terms of any Contract to which it is a party or to which any of its assets is subject. Sellers and Purchaser will cooperate with each other in the conduct of any Tax audit or similar proceedings involving or otherwise relating to the Business, the Acquired Assets or the PSCs (or the income therefrom or assets thereof) with respect to any Tax and each will execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 12.6.

12.7    Transaction Taxes.    Purchaser and Sellers covenant and agree that they will use their best efforts to obtain an order from the Bankruptcy Court pursuant to Section 1146(c) of the Bankruptcy Code exempting, to the maximum extent possible, the transfer of the Acquired Assets from Sellers to Purchaser, or from Sellers to any Third Party Purchaser, from any and all Transaction Taxes as hereinafter defined. To the extent the transactions contemplated by this Agreement are not exempt under Section 1146(c) of the Bankruptcy Code, each party hereto shall bear and be responsible for paying fifty percent (50%) of any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar taxes (including related

68

penalties (civil or criminal), additions to tax and interest) imposed by any Governmental Entity with respect to the transfer of the operations of the Business, the PSCs and any Acquired Assets to Purchaser or any Third Party Purchaser ("Transaction Taxes"), regardless of whether the Tax authority seeks to collect such taxes from Sellers or Purchaser.   Sellers shall have the responsibility for preparing and delivering to the Purchaser or, as relevant, Third Party Purchaser a draft of any Transaction Tax Return ("Draft Transaction Tax Return") at least ten (10) Business Days prior to the Applicable Closing Date, or if later, the required filing date for the relevant Transaction Tax Return as prescribed by applicable Law.  Purchaser, or as relevant, Third Party Purchaser, shall have the opportunity to review any such Draft Transaction Tax Return and shall have five (5) Business Days therefrom to provide reasonable comments to the Sellers with respect to such Draft Transaction Tax Return.  The Sellers, acting in good faith, shall give due and adequate consideration to any such comments and shall reflect such comments in the final Transaction Tax Return to be filed to the extent that the Sellers, acting in good faith, determine is necessary in order to properly comply with the requirements of applicable Law.   At the Applicable Closing Date, or, if later, the required filing date as prescribed by applicable Law for the filing of the relevant Transaction Tax Return, (x) Purchaser or, as relevant, Third Party Purchaser shall provide the Sellers with a certified check or checks, made out to the applicable Governmental Entity, for the Purchaser's share of the Transaction Taxes shown as due on the applicable final Transaction Tax Return and (y) Sellers shall provide Purchaser or as relevant, Third Party Purchaser, a copy of the applicable duly and properly completed and executed final Transaction Tax Return, together with proof of payment of any Transaction Taxes shown as due on such final Transaction Tax Return.  Sellers shall be responsible for defending or pursuing any proceedings related to such Transaction Taxes, and each party hereto shall pay fifty percent (50%) of any expenses related thereto.  Purchaser shall give prompt written notice to the other party hereto of any proposed adjustment or assessment of any Transaction Taxes with respect to the transactions contemplated hereby and in the Ancillary Documents.  In any proceedings, whether formal or informal, Sellers shall permit Purchaser to participate in the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation and Sellers shall not settle any such proceedings without Purchaser's consent which consent shall not be unreasonably withheld.

      12.8    Tax Prorations for Periodic Taxes.   As to any Acquired Asset acquired by Purchaser, Sellers and Purchaser shall apportion the liability for real and personal property taxes, ad valorem taxes, and similar taxes ("Periodic Taxes") for all Tax periods including but not beginning or ending on the Applicable Closing Date applicable to such Acquired Asset (all such periods of time being hereinafter called "Proration Periods").  The Periodic Taxes described in this Section 12.8 shall be apportioned between Sellers and Purchaser as of the Applicable Closing Date, with Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the applicable Proration Period after the Applicable Closing Date, and the denominator of which is the total number of days covered by such Proration Period. Sellers shall be liable for that portion of the Periodic Taxes for a Proration Period for which Purchaser is not liable under the preceding sentence.  Purchaser and Sellers shall pay or be reimbursed for real and personal property taxes (including instances in which such property taxes have been paid before the Applicable Closing Date) on this prorated basis.  If a payment on a tax bill is due after the Applicable Closing, the party that is legally required to make such payment shall make such payment and promptly forward an invoice to the other party for its pro rata share, if any.  If the

other party does not pay the invoice within 30 calendar days of receipt, the amount of such payment shall bear interest at the rate of 6% per annum. The party responsible under applicable Law for paying a Tax described in this Section 12.8 shall be responsible for administering the payment of (and any reimbursement for) such Tax. For purposes of this Section 12.8, the Proration Period for ad valorem taxes and real and personal property taxes shall be the fiscal period for which such taxes were assessed by the Tax jurisdiction.

12.9     Tax RefundsAny Tax refunds (including any interest related thereto) received by Purchaser, its Affiliates or successors relating to Tax periods (or portions thereof) ending on or before the Applicable Closing Date (with respect to the relevant Acquired Asset) shall be for the account of Sellers, and Purchaser shall pay over to Sellers any such amount (net of any Taxes payable by Purchaser or its owners as a result of receiving such Tax refunds, plus the net present value using the Purchaser's applicable cost of borrowing as of the date of the determination of any Tax benefit, all as reasonably determined by Purchaser, by reason of deduction, credit or otherwise, realized by the Purchaser as a result of the payment or obligation to pay Sellers under Section 12.9) within five (5) Business Days of receipt thereof. Purchaser shall include with its remittance to Sellers copies of any correspondence, documents, or other materials received or transmitted by Purchaser with respect to the Tax refund and, if the amount of the remittance is less than the amount of the refund, an explanation as to how Purchaser determined the amount of the remittance to Sellers. Sellers shall be entitled to request that Purchaser, at Sellers' expense, file for and obtain any Tax refunds with respect to Tax periods or portions thereof ending on or before the Applicable Closing Date (with respect to the relevant Acquired Asset). Purchaser's consent to such request shall not be unreasonably withheld.

12.10   Tax Disclosure.   Notwithstanding anything herein to the contrary, or in the Confidentiality Agreement, each party to the transactions contemplated herein (and each Affiliate and Person acting on behalf of any such party) agrees that each party (and each employee, representative and other agent of such party) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and Tax structure of the transaction and all materials of any kind (including opinions or other Tax analyses) that are provided to such party or such Person relating to such Tax treatment and Tax structure, except to the extent necessary to comply with any applicable federal or state securities laws; provided, however, that such disclosure may not be made until the earlier of the date of any public announcement of discussions relating to the transactions, the date of any public announcement of the transactions, or the date of the execution of this Agreement. This authorization shall not permit disclosure of any other information including (without limitation) (a) any portion of any materials to the extent not related to the Tax treatment or Tax structure of the transactions, (b) the identities of participants or potential participants in the transactions, (c) the existence or status of any negotiations, (d) any pricing or financial information (except to the extent such pricing or financial information is related to the Tax treatment or Tax structure of the transactions), or (e) any other term or detail not relevant to the Tax treatment or the Tax structure of the transactions contemplated by this Agreement.

12.11   Ownership of Acquired Assets for Tax Purposes. Purchaser and Sellers shall treat the applicable Seller as the owner of each Acquired Asset for all Tax purposes until the Applicable Closing Date with respect to such Acquired Asset.

I:\Fleming\CPAK\C&S r-apa.v.12.doc

12.12  Hart-Scott-Rodino.  With respect to the transactions contemplated by this Agreement, each party hereto shall file or cause to be filed, promptly but in no event later than the Business Day immediately following the entry of the Bidding Procedures Order, (a) any notifications required to be filed under the HSR Act with the United States Federal Trade Commission ("FTC") and the Department of Justice ("DOJ"), and request early termination of the waiting period under the HSR Act; and (b) any pre-acquisition filings required by any foreign countries.  Purchaser shall be responsible for and pay all filing fees associated with such notifications and filings.

12.13  Compliance with Antitrust Laws and Government Requests.  Subject to the terms and conditions herein, the parties agree to use their reasonable best efforts to take, or cause to be taken, all actions necessary to expeditiously consummate the transactions contemplated by this Agreement, including using reasonable best efforts to respond promptly to government requests for information, and obtain all necessary governmental, judicial or regulatory actions or non-actions, orders, waivers, consents, clearances, extensions and approvals.  In addition to and without limiting the agreements of the parties contained above, Sellers and Purchaser shall (a) comply at the earliest practicable date with any request for additional information or documentary material received by Sellers or Purchaser or any of their Affiliates from the FTC or the DOJ pursuant to the HSR Act or from any other Governmental Entity in connection with antitrust matters, (b) cooperate with each other in connection with any filing under the HSR Act and in connection with resolving any investigation or other inquiry concerning the transactions contemplated hereby commenced by the FTC, DOJ or any other Governmental Entity, and (c) use commercially reasonable efforts to resolve such objections, if any, as may be asserted with respect to the transactions contemplated hereby under any antitrust law.  Notwithstanding the foregoing or any other covenant herein contained, nothing in this Agreement shall be deemed to require Purchaser or Sellers (i) to commence any litigation against any Person in order to facilitate the consummation of any of the transactions contemplated hereby, (ii) to take or agree to take any other action or agree to any limitation that could reasonably be expected to have a Material Adverse Effect on the business, assets, condition (financial or otherwise), results of operations or prospects of Purchaser on the one hand, or the Business, on the other hand, (iii) to defend against any litigation brought by any Governmental Entity seeking to prevent the consummation of, or impose limitations on, any of the transactions contemplated hereby, or (iv) to divest or hold separate or in trust (or the imposition of any other material condition or restriction with respect to) any assets or operations of Purchaser and its Affiliates or the Business or the Acquired Assets.

12.14  Certain Ancillary Documents.  Without limiting the generality of Sections 6.6 and 7.4, each party shall use its best efforts to mutually agree upon the form of the Transition Services Agreement, Cure Escrow Agreement, Deposit Escrow Agreement and Indemnity Escrow Agreement on or before July 14, 2003 and to finalize Schedules 3.2, 3.2(d) and 8.11 on or prior to such date.

## ARTICLE XIII
## INDEMNIFICATION

13.1    Survival of Representations, Warranties, Covenants and Agreements.  Except as set forth below, each of the representations and warranties contained herein shall terminate,

I:\Fleming\CPAK\C&S r-apa.v.12.doc

without further action, on the Initial Closing Date; provided, however, each of the representations and warranties in the following sections shall survive the Initial Closing Date for the periods indicated below: (a) Section 4.5(a) (Title to Assets; Liens - Personal Property) (18 months following the Initial Closing Date); (b) Section 4.5(b) (Title to Assets; Liens - Leased Real Property) (until the Applicable Closing Date); (c) Section 4.5(c) (Title to Assets; Liens - Owned Real Property) (until the Applicable Closing Date); (d) Section 4.8 (Assets Necessary to the Business) (18 months following the Initial Closing Date); (e) Section 4.11(d) (Acquired Contracts) (12 months following the Initial Closing Date) (f) Section 4.12 (Financial Information) (12 months following the Initial Closing Date); (g) Section 4.13 (Compliance with Laws; Permits and Licenses) (12 months following the Initial Closing Date); (h) Section 4.15 (Compromise of Notes) (9 months following the Initial Closing Date); (i) Section 4.17 (Environmental Matters) (18 months following the Initial Closing Date); and (j) Section 4.19 (Intellectual Property) (18 months following the Initial Closing Date). The time through which any representation or warranty survives as provided above is referred to herein as the "Expiration Date". All covenants and agreements of the parties contained in this Agreement shall survive in accordance with their terms.

      13.2   Indemnification.

      (a)    Following the Initial Closing and subject to the other sections of this Article XIII, Sellers will jointly and severally indemnify, defend and hold harmless Purchaser and its Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all losses, liabilities, damages, costs and/or expenses (including reasonable out-of-pocket attorneys' fees and expenses) actually incurred by Purchaser and its Affiliates and their respective directors, officers, employees, advisors, representatives and agents, including in connection with any actions, suits, demands, assessments, judgments and settlements, in any such case reduced by the amount of insurance proceeds recovered from any Person or entity with respect thereto ("Indemnifiable Losses") relating to, resulting from or arising out of:

      (i)    any inaccuracy in any of the representations and warranties made by any Seller in this Agreement;

      (ii)    a breach by any Seller of any covenant or agreement of any Seller contained in this Agreement or any of Sellers' Ancillary Documents;

      (iii)    any Transaction Taxes the payment of which is the responsibility of Sellers pursuant to Section 12.7;

      (iv)    any Cure Costs; and

      (v)    any of the Excluded Liabilities.

      (b)    Following the Initial Closing and subject to the other sections of this Article XIII, Purchaser will indemnify, defend and hold harmless Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all Indemnifiable Losses relating to, resulting from or arising out of:

72

        (i)     any inaccuracy in any of the representations or warranties made by Purchaser in this Agreement;

        (ii)    a breach by Purchaser of any covenant or agreement of such entity contained in this Agreement or any Purchaser Ancillary Document;

        (iii)   any Transaction Taxes the payment of which is the responsibility of Purchaser pursuant to Section 12.7; and

        (iv)   any of the Assumed Liabilities.

        (c)    Payments made under this Section 13.2 shall be treated by Purchaser and Sellers as purchase price adjustments, and Purchaser and Sellers shall file all Tax Returns consistent with such treatment.

    13.3    <u>Limitations on Liability</u>.

        (a)    Notwithstanding any other provision of this Agreement or of any applicable Law, no Person entitled to indemnity hereunder (each, an "<u>Indemnitee</u>") will be entitled to make a claim against a party required to provide indemnification under this Agreement (an "<u>Indemnifying Party</u>") for Indemnifiable Losses arising out of or relating to any inaccuracy of representations or warranties under Sections 13.2(a)(i) or 13.2(b)(i) until the aggregate amount of Indemnifiable Losses exceeds an amount equal to $500,000 (the "<u>Indemnification Threshold</u>"). In the event and to the extent the aggregate amount of Indemnifiable Losses against an Indemnifying Party exceeds the Indemnification Threshold, such party shall be responsible for all Indemnifiable Losses from the first dollar of such Losses, but subject to the Indemnification Cap.

        (b)    Notwithstanding any other provision of this Agreement, the indemnification obligations of Sellers under Section 13.2(a)(i) or the indemnification obligation of Purchaser under Section 13.2(b)(i) will not exceed an amount equal to $15,000,000 (the "<u>Indemnification Cap</u>"), respectively.

        (c)    The obligation of Sellers to indemnify under Section 13.2(a)(i) and the obligation of Purchaser to indemnify under Section 13.2(b)(i) shall expire, with respect to any representation or warranty of the respective party, on the date on which the survival of such representation or warranty shall expire in accordance with Section 13.1; provided that such representation or warranty shall survive the time it would otherwise terminate with respect to a specific claim if notice of the inaccuracy or breach thereof giving rise to the right of indemnification shall have been given to the Indemnifying Party prior to the time such representation or warranty would otherwise terminate.

        (d)    No Indemnifying Party shall be liable to or obligated to indemnify any Indemnitee hereunder for any consequential, punitive or exemplary damages; <u>provided, however,</u> to the extent that an Indemnitee is seeking indemnification hereunder for any Third Party Claim (other than any Third Party Claim brought by any Third Party Purchaser), the Indemnifying Party shall only be liable for consequential, punitive or exemplary damages to the extent that the

73

Third Party asserting such Third Party Claim seeks and recovers consequential, punitive or exemplary damages from the Indemnitee.

(e)    The parties shall cooperate with each other with respect to resolving any claim or liability with respect to which one party is obligated to indemnify the other party hereunder, including by making commercially reasonable efforts to mitigate or resolve any such claim or liability.

(f)    Notwithstanding anything to the contrary herein, Purchaser's right to indemnification with respect to Indemnifiable Losses relating to, resulting from or arising out of matters described in clause (i) of Section 13.2(a) shall be satisfied exclusively from the Indemnity Escrow Amount and Purchaser shall have no right of set-off against any amounts due to Sellers under this Agreement or any Ancillary Documents as a result of any such Indemnifiable Losses. Purchaser acknowledges that its sole and exclusive remedy with respect to the matters described in clause (i) of Section 13.2(a) shall be pursuant to this Article XIII. Notwithstanding anything to the contrary herein, Purchaser may exercise a right of set-off as a result of any Indemnifiable Losses relating to, resulting from or arising out of matters described in clauses (ii) through (v) of Section 13.2(a); provided, however, that Purchaser shall only be permitted to exercise such right of set-off only to the extent Purchaser first seeks recourse against the Indemnity Escrow Amount and has exhausted such Indemnity Escrow Amount in full.

(g)    Sellers shall have no obligation under Section 13.2(a) to indemnify any Indemnitee for Indemnifiable Losses relating to, resulting from or arising out of Excluded Liabilities to the extent (and only to the extent) the Indemnitee takes any identifiable action which directly causes the Excluded Liabilities to be a Liability of Purchaser. Moreover, Seller shall have no obligation under Section 13.2(a) for up to $500,000 in aggregate reasonable costs and expenses of the Indemnitee of defending a Third Party Claim or of otherwise resolving a Third Party Claim and the Indemnifiable Losses associated therewith, relating to, resulting from or arising out of Excluded Liabilities.

13.4    Defense of Claims.

(a)    If any Indemnitee receives notice of the assertion of any claim or of the commencement of any action or proceeding by any Person or Governmental Entity that is not a party to this Agreement (a "Third Party Claim") against such Indemnitee, with respect to which an Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 20 calendar days after receipt of notice of such Third Party Claim; provided, however, that the failure of the Indemnitee to notify the Indemnifying Party shall only relieve the Indemnifying Party from its obligation to indemnify the Indemnitee pursuant to this Article XIII to the extent that the Indemnifying Party is materially prejudiced by such failure (whether as a result of the forfeiture of substantive rights or defenses or otherwise). Upon receipt of notification of a Third Party Claim, the Indemnifying Party shall be entitled, upon written notice to the Indemnitee, to assume the investigation and defense thereof if such Indemnifying Party delivers a written agreement in form and substance satisfactory to the Indemnitee agreeing to indemnify the Indemnifying Party with respect to such Third Party Claim; provided that notwithstanding anything herein to the contrary, the Indemnifying Party

74

shall have no right to assume or continue the defense of any Third Party Claim (and the Indemnitee shall have the exclusive right to defend it) if (i) the Indemnitee reasonably determines that the Indemnifying Party does not have sufficient financial resources to defend or discharge such Third Party Claim, (ii) if a conflict of interest is presented for the Indemnifying Party from defense of the Third Party Claim, or (iii) the Indemnifying Party is not vigorously defending such Third Party Claim, as reasonably determined by the Indemnitee. Whether or not the Indemnifying Party elects to assume the investigation and defense of any Third Party Claim, the Indemnitee shall have the right to employ one separate counsel (plus one separate local counsel) and to participate in the investigation and defense thereof; provided, however, that the Indemnitee shall pay the reasonable fees and disbursements of such separate counsel. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim that would lead to liability or create any financial or other obligation on the part of the Indemnitee unless such settlement includes as an unconditional term thereof the release of the Indemnitee from all liability in respect of such Third Party Claim. If a settlement offer solely for money damages is made by the applicable third party claimant, and the Indemnifying Party notifies the Indemnitee in writing of the Indemnifying Party's willingness to accept the settlement offer and pay the amount called for by such offer without reservation of any rights or defenses against the Indemnitee, the Indemnitee may continue to contest such claim, free of any participation by the Indemnifying Party, and the amount of any ultimate liability with respect to such Third Party Claim that the Indemnifying Party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the Indemnitee declined to accept or (B) the aggregate Indemnifiable Losses of the Indemnitee with respect to such claim.

(b)     Any claim by an Indemnitee on account of an Indemnifiable Loss that does not result from a Third Party Claim will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof and the Indemnifying Party will have a period of 30 calendar days within which to respond in writing to such claim.

(c)     If, after the making of any Indemnification Payment, the amount of the Indemnifiable Loss to which such payment relates is reduced by recovery, settlement or otherwise under any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction (less any costs, expenses, premiums or Taxes incurred in connection therewith) will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any Indemnification Payment, the Indemnifying Party will, to the extent of such Indemnification Payment, be subrogated to all rights of the Indemnitee against any third party that is not an Affiliate of the Indemnitee in respect of the Indemnifiable Loss to which the Indemnification Payment relates; provided that (i) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss, and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, all claims of the Indemnifying Party against any such third party on account of said Indemnification Payment will be subrogated and subordinated in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision of this Article XIII each such Indemnitee and Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights.

75

13.5    Indemnity Escrow.

(a)    The parties acknowledge and agree that the Indemnity Escrow Amount shall be funded solely from the Royalty Amount as follows:

(i)    No amount of the Indemnity Escrow Amount shall be satisfied from the Initial Estimate Payment.

(ii)    25% of the Second Estimate Payment otherwise due and payable to Sellers shall be remitted by Purchaser into the Indemnity Escrow and thereafter, 25% of any Royalty Amount otherwise due and payable to Sellers shall be remitted by Purchaser into the Indemnity Escrow.

(iii)    25% of any Royalty Amount in respect of any customer accounts sold or transferred to Third Parties otherwise due and payable to Sellers pursuant to Section 3.3(e) shall be remitted by Purchaser into the Indemnity Escrow.

(b)    Notwithstanding anything herein to the contrary, in no event shall any Royalty Amounts be deposited into the Indemnity Escrow in an amount exceeding $15,000,000 in the aggregate (i.e., aggregating all Royalty Amounts deposited in the Indemnity Escrow, regardless of whether successful claims have been made against the Indemnity Escrow, thereby reducing the Indemnity Escrow below $15,000,000).

13.6    Indemnification Procedures.

(a)    An Indemnitee shall only be permitted to assert indemnification claims or set-off rights under this Agreement or any Ancillary Agreement by written notice (the "Claim Notice") to Indemnifying Party specifying (i) the matters set forth in Section 13.2(a) or Section 13.2(b), as the case may be, pursuant to which an Indemnitee is asserting its indemnification or set-off rights; (ii) a general description of the underlying facts relating thereto, and (iii) a reasonable estimate of the amount of the Indemnifiable Losses (if such Indemnifiable Losses can be reasonably estimated) or set-off rights, as applicable.

(b)    Indemnitee shall make available to Indemnifying Party, with the cost and expense thereof to Indemnifying Party, the books and records of Indemnitee and personnel of Indemnitee which Indemnifying Party and its representatives reasonably require and take such other action reasonably necessary in order to allow Indemnifying Party to review and confirm the accuracy of the Claim Notice.    Such notice, including Indemnitee's determination of Indemnifiable Losses or set-off shall be conclusive and binding upon the parties unless Indemnifying Party shall deliver a written notice (the "Claim Dispute Notice") of a dispute to Indemnitee within 30 days following receipt by Indemnifying Party of a Claim Notice. Indemnitee and Indemnifying Party shall, within 30 days following receipt by Indemnitee of such Claim Dispute Notice, attempt to resolve any such dispute, including Indemnitee's determination of the amount of the Indemnifiable Losses or set-off.  In the event the parties are unable to resolve any such dispute within such 30-day period, the validity of the claim and the amount of Indemnifiable Losses, if any, or set-off, if any, shall be determined in accordance with Section 14.8.

76

## ARTICLE XIV
## MISCELLANEOUS

14.1     Fees and Expenses, Transfer Taxes.

(a)     Except as otherwise expressly provided for elsewhere in this Agreement, each party hereto shall bear its own costs and expenses, with respect to this Agreement and the transactions contemplated hereby. Without limiting the generality of the foregoing, each of the parties shall bear its own attorneys' fees; provided, further, that the parties acknowledge and agree that (i) Purchaser's counsel shall prepare initial drafts of substantially all applicable filings, motions and other papers related to transactions with Third Party Purchasers which are required by the Bankruptcy Code and the Bankruptcy Court and (ii) Sellers' counsel shall prepare all such related notices to Third Parties.

(b)     To the extent provided in the Sale Order, in accordance with Section 1146(c) of the Bankruptcy Code, each instrument transferring any Acquired Assets to Purchaser shall contain the following endorsement:

> Because this instrument has been authorized pursuant to Order of the United States Bankruptcy Court for the District of Delaware relating to a chapter 11 plan of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(c)."

In addition, Sellers shall seek an order that provides that any transaction, consummated within six months from the Closing Date, whereby Purchaser transfers or assigns any of the Acquired Assets to a Third Party, shall be exempt from all Taxes within the scope of 11 U.S.C. §1146(c).

14.2     Liquidated Damages. In the event the Initial Closing is not consummated as a result of a breach by Purchaser, Sellers' exclusive remedy shall be limited to the amount of the Deposit at any point in time and such amount shall serve as liquidated damages, and the parties hereto agree that such liquidated damages are reasonable in proportion to the probable damages likely to be sustained in the event of any such breach in view of the uncertainty and difficulty of predicting the amount of any actual damages.

14.3     Amendment. This Agreement may not be amended, modified or supplemented in any respect except by a written instrument signed by all of the parties to this Agreement, expressly stating that such instrument intended to amend, modify or supplement this Agreement.

14.4     Notices. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy or other wire transmission (with answer back confirmation of such transmission), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

If to Sellers, addressed as follows:

Fleming Companies, Inc.
1945 Lakepointe Drive
Lewisville, Texas  75029
Attention:  General Counsel
Facsimile:  (972) 906-1860

With a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
777 South Figueroa Street
37th Floor
Los Angeles, California  90017
Attn:   Eva H. Davis, Esq.
         Charles C. Pak, Esq.
Facsimile:    (213) 680-8500

If to Purchaser, addressed as follows:

C&S Wholesale Grocers, Inc.
47 Old Ferry Road
Brattleboro, Vermont 05302
Attn:   General Counsel
Facsimile:    (802) 257-6620

with copies (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn:   Kenneth S. Ziman, Esq.
Facsimile:    (212) 455-2502

and

Skadden, Arps, Slate, Meagher &  Flom LLP
Four Times Square
New York, New York 10036
Attn:   Richard J. Grossman, Esq.
Facsimile:    (212) 735-2000

or to such other individual or address as a party hereto may designate for itself in writing by
notice given as herein provided.

Each notice or other communication given to any party hereto in accordance with the provisions
of this Agreement shall be deemed to have been received (a) on the day it is sent, if sent by

78

I:\Fleming\CPAK\C&S r-apa.v.12.doc

personal delivery, or by telex, telecopy or other wire transmission or (b) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (c) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt. The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 14.4, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

14.5    Waivers. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

14.6    Counterparts and Execution. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

14.7    Headings. The headings preceding the text of the Articles, Sections, paragraphs and other headings of this Agreement and the Schedules hereto are for convenience of reference only and shall not be deemed part of or in any way affect the meaning or interpretation of this Agreement.

14.8    APPLICABLE LAW AND JURISDICTION; DISPUTES AND ARBITRATION.

(a)    THIS AGREEMENT (AND ALL DOCUMENTS, INSTRUMENTS, AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF (COLLECTIVELY, THE "ANCILLARY DOCUMENTS")) SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION.    PURCHASER AND SELLERS FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT; AND/OR (B) THE ACQUIRED ASSETS AND/OR ASSUMED LIABILITIES, AND PURCHASER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.    SUBJECT TO SECTION 13.3(d), THE PARTIES AGREE THAT NO COURT SHALL HAVE THE POWER TO AWARD CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS) UNLESS THE APPLICABLE COURT DETERMINES THAT THIS LIMITATION, UNDER THE CIRCUMSTANCES, VIOLATES PUBLIC POLICY.

I:\Fleming\CPAK\C&S r-apa.v.12.doc

(b)    If the Bankruptcy Court does not have (or abstains from) jurisdiction with respect to any dispute, Purchaser and Sellers agree that, subject to the other provisions of this Agreement, any dispute between the parties relating to this Agreement or any Ancillary Agreement, shall be resolved by final binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), to be conducted in New York, New York. The arbitration shall be conducted by one arbitrator mutually agreed to by the parties hereto within 15 days of the written notification by one party to the other of a dispute under this Agreement. If the parties cannot reach mutual agreement within such 15 day period, each party shall have an additional 5 day period to provide written notification to the other party of an arbitrator selected by such party. Each arbitrator selected by each party shall have an additional 10-day period to select a third arbitrator who shall be the sole arbitrator to resolve such disputed claim. Each arbitrator shall be selected from the AAA with distribution industry experience. Notwithstanding the foregoing, three arbitrators shall be employed (one chosen by each party and a third chosen by the arbitrators chosen by each party) with respect to any dispute involving a claim in excess of $1,000,000. Absent a showing of good cause, the hearing shall be conducted within 90 days from the service of the statement of claim. All proceedings shall be governed by the Federal Arbitration Act. Each party shall bear the expense of their own attorneys, experts and out of pocket costs as well as fifty percent of the expense of administration and arbitrator fees. Notwithstanding anything herein to the contrary, if for any reason the provision of this Section 14.8(b) regarding arbitration of disputes should be determined to be unenforceable by a court of competent jurisdiction, the parties irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court so long as the Chapter 11 Case is proceeding pursuant to Section 14.8(a) above.

14.9    Binding Nature; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed) except (i) that Purchaser may assign any of its rights hereunder and delegate its obligations to one or more Third Party Purchasers in accordance with Section 2.6 or to any Affiliate or wholly owned Subsidiary (a "Purchaser Assignee"), (ii) that Purchaser may grant a security interest in its rights and interests hereunder to its lenders, (iii) that the rights and interests hereunder may be assigned to a trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code, (iv) that this Agreement may be assigned to any entity appointed as successor to Sellers pursuant to a confirmed chapter 11 plan, and (v) as otherwise provided in this Agreement. In order to effect the provisions of the preceding sentence, Sellers shall, if requested by Purchaser, execute one or more necessary documents or amendments to this Agreement making Third Party Purchasers parties hereto. Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

14.10    No Third Party Beneficiaries. This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon Third Parties any rights, remedies, claims, or causes of action other than a Third Party Purchaser.

14.11    Parent Guarantee. In consideration of the transactions contemplated by this Agreement, Parent hereby unconditionally guarantees to Sellers that Purchaser will duly and

80

punctually pay and/or perform, as the case may be, all obligations and undertakings of Purchaser or Purchaser Assignee under this Agreement, including, without limitation, all obligations and undertakings of Purchaser under Section 3.1. Under this guarantee, Sellers shall be entitled to seek recourse directly from the Parent, without first seeking any available recourse from Purchaser or Purchaser Assignee.

14.12 <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

14.13 <u>Public Announcements</u>. Except as required by Law or in connection with the Chapter 11 Case, subject to Section 12.10 prior to the Initial Closing, neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld or delayed. Prior to making any public disclosure required by applicable law, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same.

14.14 <u>Entire Understanding</u>. This Agreement, the annexes, the exhibits, the Disclosure Schedule and other schedules hereto, the Confidentiality Agreement and the Supply Agreement, dated June 27, 2003, between Purchaser and Fleming (the "Supply Agreement"), the Bidding Procedures Order and the Sale Order set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby, and this Agreement, the annexes, exhibits, the Disclosure Schedule and the other schedules hereto, hereto supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person other than the parties hereto any rights and annexes remedies, claims or courses of action hereunder. There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in this Agreement, and annexes, the exhibits, the Disclosure Schedule and the other schedules hereto.

14.15 <u>Bulk Sales Laws</u>. Purchaser and Sellers waive compliance with applicable Laws under any version of Article 6 of the Uniform Commercial Code adopted by any state or any similar law relating to the sale of inventory, equipment or other assets in bulk in connection with the sale of the Business, the Acquired Assets or the operation of the PSCs.

14.16 <u>Severability</u>. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to

81

replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

14.17    Election of Remedies.  Except for Indemnifiable Losses relating to, resulting from or arising out of the maters described in Section 13.2(a)(i) whose remedies shall be limited as set forth in Article XIII and except as provided in Section 13.3(f) for all other Indemnifiable Losses, neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit an party hereto in any manner in the enforcement of any other remedies that may be available to it, whether at law or in equity.  The right to indemnification or other remedies based on any representation, warranty, covenant or obligation of Sellers contained in or made pursuant to this Agreement shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) by Purchaser at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or obligation.   The parties acknowledge that monetary damages would not be sufficient to remedy any breach of Section 2.5, and each party shall be entitled to specific performance of any breach of such Section 2.5.

\*    \*    \*    \*    \*    \*

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

PURCHASER:

C&S Acquisition LLC

By: _____

    Name: Mark Gross
    Title: Executive Vice President

PARENT:

For purposes of Article V, and Sections 14.8 and 14.11 only,

C&S Wholesale Grocers, Inc.

By: _____

    Name: Mark Gross
    Title: Executive Vice President

SELLERS:

Fleming Companies, Inc.

By: _____

    Name: Ted Stenger
    Title: Chief Restructuring Officer

Fleming Transportation Service, Inc.

By: _____

    Name:
    Title:

Piggly Wiggly Company

By: _____

    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

PURCHASER:

C&S Acquisition LLC

By:_____
        Name:  Mark Gross
        Title:  Executive Vice President

PARENT:

For purposes of Article V, and Sections 14.8 and 14.11 only,

C&S Wholesale Grocers, Inc.

By:_____
        Name:  Mark Gross
        Title:  Executive Vice President

SELLERS:

Fleming Companies, Inc.

By:_____
        Name:
        Title:

√ Fleming Transportation Service, Inc.

By:_____
        Name: WilliAm E. MAY, Jr.
        Title: President

√ Piggly Wiggly Company

By:_____
        Name: Jimmy D. Garrison
        Title: President

1

✓ RFS Marketing Services, Inc.

By: _____

Name: William E. May, Jr.

Title: President


✓ Fleming International Ltd.

By: _____

Name: William E. May, Jr.

Title: President


✓ Fleming Foods of Texas L.P.
By Fleming Companies, Inc.
Its General Partner

By: _____

Name: William E. May, Jr.

Title: Executive Vice President


✓ Fleming Foods Management Co., L.L.C.
By Fleming Companies, Inc.
Its Sole Member

By: _____

Name: William E. May, Jr.

Title: Executive Vice President


Fleming Foreign Sales Corporation

By: _____

Name: William E May, Jr.

Title: Executive Vice President


2