# Exhibit 12

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al., | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Related to Docket No. 11977 |

**Objection Deadline:  January 19, 2006**
**Hearing Date:  January 26, 2006 at 10:30 a.m. ET**

## THE PCT'S MOTION FOR ORDER REQUIRING C&S TO ASSUME <u>CERTAIN EXECUTORY CONTRACTS</u>

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB, P.C.
Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
James E. O'Neill, III (Bar No. 4042)
919 North Market Street, 16th Floor
Post Office Box 8705
Wilmington, Delaware  19899-8705 (Courier No. 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400


and

KIRKLAND & ELLIS LLP
Eric C. Liebeler (CA Bar No. 149504)
G. Seth Beal (CA Bar No. 205183)
777 South Figueroa Street
Los Angeles, California  90017
Telephone: (213) 680-8400
Facsimile: (213) 680-8500
Co-Counsel for the Post Confirmation Trust


Dated: December 7, 2005

## TABLE OF CONTENTS

**Page No(s).**

INTRODUCTION..................................................................................................1

FACTUAL BACKGROUND...............................................................................2
I.    General Background.....................................................................................2

II.   The Sale.........................................................................................................3

III.  The Option Period........................................................................................4

IV.   C&S' Shift In Position and the Parties' Dispute.......................................6

ARGUMENT........................................................................................................8
I.    Basic Principles of Contract Interpretation Support the PCT's Position that
      the Option Period Lasted for Six Months..................................................8
          A.   The Language of the APA Allows Extension of the Option
               Period Beyond Six Months Only for the Court's Entry of
               Supplemental Sales Orders .......................................................9
          B.   C&S' Interpretation of the Contract Leads to Absurd
               Results.........................................................................................13
          C.   C&S' Interpretation of the APA Is Inconsistent with the
               Language of the Transition Services Agreement......................15
          D.   It Is Inequitable to Require the PCT to Bear the Expense of
               New Rejection Claims After the PCT Relied on C&S'
               Commitment to Assume Contracts ............................................16
II.   The Parties Have Been Acting for Nearly Two Years As if the Option Period
      Was Closed ..................................................................................................18

CONCLUSION ...................................................................................................21

## TABLE OF AUTHORITIES

Page No(s).

Cases

Arawak Aviation, Inc. v. Indem. Ins. Co. of N. Am.,
    285 F.3d 954 (11th Cir. 2002) .................................................................. 14

Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola, Inc.,
    668 F. Supp. 906 (D. Del. 1987) ............................................................. 19

Comrie v. Enterasys Networks, Inc.,
    837 A.2d 1 (Del. Ch. 2003) ..................................................................... 11

Fed. United Corp. v. Havender,
    11 A.2d 331 (Del. 1940) .......................................................................... 20

Holland v. Nat'l Auto. Fibres,
    194 A. 124 (Del. Ch. 1937) ...................................................................... 14

Honeywell Int'l. Inc. v. Air Prods. & Chems., Inc.,
    872 A.2d 944 (Del. 2005) .......................................................................... 8

In re IBP, Inc. S'holders Litigation,
    789 A.2d 14 (Del. Ch. 2001) .................................................................... 19

In re Northwestern Corp.,
    313 B.R. 595 (Bankr. D. Del. 2004) ........................................................ 13

New Wrinkle, Inc. v. John L. Armitage & Co.,
    238 F.2d 753 (3d Cir. 1956) ..................................................................... 10

Pauley Petroleum, Inc. v. Cont'l Oil Co.,
    231 A.2d 450 (Del. Ch. 1967) .................................................................. 15

Quick v. N.L.R.B.,
    245 F.3d 231 (3d Cir. 2001) ..................................................................... 18

Rankin v. Interstate Equities Corp.,
    180 A. 541 (Del. Ch. 1935) ...................................................................... 20

Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.,
    198 F.3d 415 (3d Cir. 1999) ...................................................................... 9

Sonitrol Holding Co. v. Marceau Investissements,
    607 A.2d 1177 (Del. 1992) ........................................................... 9, 10, 13, 20

USH Ventures v. Global Telesystems Group, Inc.,
    796 A.2d 7 (Del. 2000) .................................................................. 9

Westfield Ins. Group v. J.P.'s Wharf, Ltd.,
    859 A.2d 74 (Del. 2004) .............................................................. 11

**Other Authorities**

17A Am. Jur. 2d Contracts § 344 ....................................................... 13

Restatement (Second) of Contracts §  202(2) .................................. 15

Restatement (Second) of Contracts § 202(4)) .................................. 18

## INTRODUCTION

On August 23, 2003, the Court approved the Debtors' sale of substantially all of their wholesale distribution assets to C&S pursuant to the terms set forth in the July 7, 2003 Asset Purchase Agreement (APA) between the parties. As part of the APA, C&S and related Third Party Purchasers (collectively, C&S) were given a period of six months -- or until February 23, 2004 -- to conduct diligence on thousands of contracts and to decide which of them it wished to acquire as part of the sale. While the APA did not require C&S to acquire any set number of contracts, it did require C&S to pay all cure costs related to the contracts it did elect to acquire.

By February 9, 2004, C&S had designated hundreds of agreements for assumption and assignment. C&S' election to accept responsibility for these contracts became non-revocable on February 23, 2004. Nevertheless, C&S now argues that the APA should be read to give it an infinite time to revoke its decision to assume these contracts and, therefore, that the PCT should be required to reject some or all of the remaining agreements (and incur the rejection damages for the same). C&S may be making this argument because the cure costs of certain contracts are higher than expected. It may also be making this argument because it has all but exhausted the funds it previously set aside to pay cure costs arising from these agreements. But in any event, C&S' interpretation does not comport with the plain meaning of the APA or the parties' intent in entering into and carrying out the agreement.

A plain reading of the APA and related sale documents shows that C&S had a firm deadline by which to decide whether to acquire and cure the Debtors' executory contracts -- February 23, 2004. First, the plain language of the contract makes clear that if the APA extends the option period past February 23, 2004 at all, it does so only to give C&S time to seek confirmation of the assumption in the form of supplemental sales orders. C&S' interpretation of the APA renders the six-month option period a nullity, a result not supported by the plain

1

language of the contract or the parties' intent. Second, C&S' interpretation leads to absurd and

inequitable results such that its interpretation is not reasonable. Third, C&S' interpretation

clashes with language found in the Transition Services Agreement (TSA). And finally, C&S'

late decision to reject these contracts, now that it must pay cure costs out of its own pocket, is

inequitable to the PCT, having put the PCT in a position to assume liability for potentially

millions in unsecured claims.

  In addition to the reasons listed above, C&S' current position is particularly surprising

given its pre-dispute stance. For several months, C&S failed to object to the PCT's description

of the option period as limited to "six months." In fact, it affirmatively joined one such filing.

The pre-litigation construction the parties give to an agreement is evidence of the parties' true

intent and should be given force by this Court. C&S' failure, at a critical time in these

proceedings, to assert its current position establishes that both parties believed the option period

to be over.

  Accordingly, the PCT requests that the Court compel C&S to comply with the APA and

acquire and cure the remaining executory contracts. In the alternative, should the Court allow

C&S to change its mind, the PCT requests that the Court require C&S to indemnify it for any

claims arising under the contracts -- including any rejection damages or administrative claims.

## FACTUAL BACKGROUND

### I. General Background

  1.  On April 1, 2003, the Debtors filed their voluntary petitions for relief under

Chapter 11 of the United States Bankruptcy Code.

  2.  On July 27, 2004, this Court entered an order confirming the Debtors' and

Official Committee of Unsecured Creditors' Third Amended and Revised Joint Plan of

Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries under Chapter 11 of the

United States Bankruptcy Code [the Plan], which became effective on August 23, 2004.
Pursuant to Article X.A of the Plan, the PCT became responsible for satisfying certain claims of
the Debtors' creditors.

3.      Before the bankruptcy filing, Debtors operated a distribution business with
operation centers at approximately 40 locations nationwide. The Debtors' wholesale grocery
store distribution business supplied a full line of products to grocery stores, discount stores,
supercenters, and specialty retailers. The Debtors' convenience store distribution supplied
products to traditional convenience retailers, mass merchandisers and other stores that carried
convenience packaged goods.

## II.    The Sale

4.      Shortly after the Debtors filed for bankruptcy, they began soliciting offers for the
business. C&S made an offer to Debtors, and the parties began to negotiate the terms of the
proposed sale. Furthermore, C&S reached agreements with several follow-up purchasers to spin
off purchased assets after C&S acquired them. The follow-up purchasers include Associated
Wholesale Grocers (AWG) and Supervalu, also grocery wholesalers.

5.      On July 7, 2003, Debtors and C&S entered into the Asset Purchase Agreement
(APA), setting forth certain conditions under which C&S would purchase certain assets. Ex. A.
Included within the APA were procedures by which C&S could elect to assume and assign
various executory contracts from Fleming. Id. at § 2.6(a).

6.      The APA is governed by the U.S. Bankruptcy Code, and to the extent not
inconsistent with the Bankruptcy Code, the laws of the state of Delaware. Id. at § 14.8.

7.      On July 14, 2003, Debtors and C&S entered into a Transition Services Agreement
(TSA). The TSA set forth certain conditions under which the Debtors would provide certain

services to C&S to ease the transition of key assets from Debtors to C&S. The TSA provided that Fleming would continue to operate the business prior to the initial closing date. See Ex. B.

8.     Despite their earlier agreements, the parties continued to negotiate over the specifics of the proposed sale. On August 4, 2003, the Debtors and C&S signed a letter agreement amending the APA to allow C&S, within the defined option period, to reject contracts it had already noticed for assumption. See Ex. C.

9.     On August 15, 2003, the Court entered an order approving the APA and authorizing the sale of the Debtors' assets. Furthermore, the Court approved the assumption and assignment of certain executory contracts, license agreements and unexpired leases associated with the wholesale distribution business. See D.I. 3142, 1906.

10.    On August 23, 2003, the Debtors and C&S executed the Cure Escrow Agreement. Ex. D. The Cure Escrow Agreement provided funds with which C&S could cure defaulted contracts as necessary to assume those contracts. C&S deposited $22 million of the purchase price into the escrow account for purposes of curing contract liabilities. Further, an $8 million fund of the Debtors' accounts receivable, forgivable by C&S, was added to the original amount, providing $30 million for the purpose of curing contracts. See Ex. A at § 2.9; Ex. D. C&S, in separate agreements with AWG and Supervalu, also set aside part of the escrow account to satisfy cure costs associated with contracts AWG and Supervalu would eventually assume as third party purchasers.

## III.     The Option Period

11.    Section 2.5(a) of the APA, amended, provides:

> Purchaser [C&S] shall have the right (the "Option Rights"), in its discretion, from the date hereof until the six (6) month anniversary of the Initial Closing (the "Option Period") to specifically include

4

or exclude those Acquired Assets (except Inventory) to be assigned to it as it shall specify in an Option Notice to Sellers. . . ."

12.    It further provides that:

[T]he Option Period shall continue for such time as is necessary to seek and obtain any necessary Supplemental Sales Orders with respect to the Acquired Assets identified in any such Option Notices, so long as and to the extent that the Purchaser remains obligated under the Transition Services Agreement for the Liabilities associated with any such identified Acquired Assets.

13.    Section 2.5(c) of the APA, amended, provides:

Notwithstanding anything to the contrary in Section 2.5, at one or more times during the Option Period, Purchaser may, by delivering a written notice to Sellers, (i) revoke its request in a Option Notice previously delivered hereunder to have an Acquired Asset transferred to Purchaser, a Purchaser Assignee or a Third Party Purchaser, (ii) change the identity of the Person who shall be the transferee of an Acquired Asset which is identified in an Option Notice previously delivered hereunder as an asset to be transferred pursuant to this Agreement, or (iii) extend the expected timing of the consummation of the purchase of an Acquired Asset (as such expected timing is set forth in an Option Notice or written notice previously delivered hereunder) to any date during the Option Period; provided, however, that with respect to any specific Acquired Asset, Purchaser may exercise its rights in clause (i) of this sentence one time only.

14.    Pursuant to Section 2.5(a) of the APA, C&S, upon written notice during the six months following the initial closing date (the option period), could require the Debtors to either assume and assign, or reject, any of the executory contracts on C&S' behalf. Ex. A at § 2.5(a). The closing date was August 23, 2003. The six month anniversary of the closing date was February 23, 2004. The APA required C&S to provide final instructions regarding the executory contracts fifteen days before the option period closed.[1]

---

[1] These instructions were required on February 9, 2004 since February 8, 2004 was a Sunday.

5

**IV.    C&S' Shift In Position and the Parties' Dispute**

15.    The parties' dispute arises from their divergent interpretations of the option period as defined in the APA. The PCT argues that C&S could elect to reject contracts already noticed for assumption only within the six-month option period. C&S argues that it retained the right to reject those contracts at any time up to the point that the Court approved the Supplemental Sales Order allowing the proposed assumption and assignment.

16.    C&S initially designated each of the contracts it now seeks to compel the PCT to reject (detailed at Ex. E) to be assumed and assigned by providing written notice to the Debtors within the option period.

17.    Months after the option period expired, C&S notified the PCT, through counsel, that it wished to reject certain executory contracts it had previously noticed for assumption and assignment. See, e.g., Ex. G (June 17, 2004 rejection notice). The PCT informed C&S that it would cooperate provided that the impact of rejecting the contracts was economically neutral to the PCT. Consistent with the PCT's fiduciary duty to its creditors, and in light of the time limitation set forth by the option period, the PCT refused to reject contracts that could give rise to new claims against the Debtors' estates.

18.    The PCT was ultimately assured, in certain cases, that the Debtors' estates would not suffer losses as a result of rejecting noticed contracts. Therefore, in good faith, the PCT honored C&S' requests to reject certain contracts despite the option period's elapse. However, the PCT declined to reject the remaining contracts out of a concern that the parties to the rejected contracts would bring additional claims against it. To date, the PCT continues to lack assurances from either C&S or the contract counter-parties that the PCT will not be liable for damages

arising from rejection. Upon receiving the proper assurances that creditors will be protected from new claims, the PCT would have no problem rejecting the executory contracts in question.

19.    Throughout the bankruptcy process, the PCT's position (and the Debtors' position before the PCT came into being) has been that C&S' power to reject previously noticed contracts ended with the option period. See, e.g., D.I. 1906 (describing the option period). Furthermore, the PCT believed that this was C&S' position. The PCT (and Debtors) filed numerous motions before the court describing the option period as lasting for "six months." C&S failed to contest the PCT's consistent explanation of the option period in no fewer than 12 pleadings over a period of several months. See, e.g., D.I. 3597, 5036. Furthermore, C&S joined at least one pleading wherein the PCT explained that the option period lasted only six months from the initial closing date. See D. I. 3647, 3640.

20.    Despite its earlier stance, on July 8, 2004, C&S filed a motion with the Court arguing that the PCT had breached the APA by refusing to act on C&S' requests, after the option period ended, to exclude several executory contracts. See D.I. 8723.

21.    In a status report provided to the Court on September 23, 2005, C&S again claimed that the APA, as amended, gave it the right to revoke its written assumption notices regardless of the length of the option period. See D.I. 11765 at ex. A.

22.    On September 27, 2005, the parties' counsel appeared before the Court for an omnibus hearing. At that time, the PCT's counsel raised the issue of assumption and assignment of the relevant acquired contracts. C&S' counsel asked for more time to resolve the issue without resort to litigation. See Ex. F at 5-10 (9/27 Trans.).

23.    C&S' change of position has put the PCT in a difficult position. If the PCT allows C&S to reject these contracts, the PCT (and its creditors) could suffer significant liability

7

based on already outstanding claims related to the contracts at issue. Not only have C&S and Supervalu noticed the 28 contracts directly at issue for rejection, but there are 65 additional contracts that remain open. See Ex. E.

24.     Therefore, the PCT and C&S have been unable to agree on an interpretation of the APA or the ultimate disposition of the executory contracts in question.

## ARGUMENT

25.     The APA's plain language and the conduct of the parties show that the option period lasted six months, with the only exception being for the parties to pursue the supplemental sales orders from the court necessary to complete the process.

## I.    Basic Principles of Contract Interpretation Support the PCT's Position that the Option Period Lasted for Six Months

26.     The basic maxims of interpretation that should govern the court's analysis lead to the conclusion that the PCT's interpretation of the APA is the correct one. Here, the contractual dispute between the parties is not whether C&S had the right to reject contracts it had previously assumed. The PCT concedes that the parties negotiated such a right in the August 4, 2003 Letter Agreement amending the APA. See Ex. C. The only dispute is the length of the option period as defined in the APA. In Delaware, contract interpretation is a question of law. Honeywell Int'l. Inc. v. Air Prods. & Chems., Inc., 872 A.2d 944, 950 (Del. 2005) ("To the extent those issues involve the interpretation of contract language, they are questions of law that this Court reviews de novo for legal error.").

27.     There are several reasons why the Court should find in favor of the PCT's interpretation of the APA. First, the plain language of the APA dictated a six-month option period. The only exception to the option period was for the parties to give the Court time to enter the supplemental sales orders necessary to ratify C&S' previous decision to assume the

contracts in question. Second, C&S' interpretation of the contract leads to absurd results. Third, C&S' interpretation of the APA is inconsistent with similar language found in the APA's sister agreement, the TSA. Finally, it would be inequitable for the Court to adopt C&S' interpretation of the option period where C&S' failure to assert that interpretation for several months prejudiced the PCT, exposing it to rejection claims it would not otherwise have suffered.

A.    The Language of the APA Allows Extension of the Option Period Beyond Six Months Only for the Court's Entry of Supplemental Sales Orders

28.    The APA should be given its "plain and unambiguous meaning" as "corroborated by the parties' intentions." Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1182 (Del. 1992); see also Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999) ("In determining whether a contract is ambiguous, the court assumes the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement."); USH Ventures v. Global Telesystems Group, Inc., 796 A.2d 7, 23-24 (Del. 2000) ("In Delaware, all written contracts, as well as legislative acts, are to be read, understood and interpreted according to the plain and ordinary meaning and import of the language employed in them."). The APA provides for a six-month option period and the parties intended to create a six-month option period. The only exception to the six-month period is a window for seeking necessary supplemental sales orders from the Court to ratify C&S' decision to assume the contracts in question.

29.    In a previous filing, C&S has argued, incorrectly, that the APA's amended language "gave Purchaser the right to revoke *at any time* its request to have an Acquired Asset assumed and assigned to Purchaser . . . by delivering a written notice to the Selling Debtors." D.I. 11977 (emphasis in original). It does not. In fact, the APA, as amended, requires C&S to

9

reject contracts it had once assumed *only* within the option period. There is no exception that exists within the APA for rejecting contracts after the option period's deadline; the only exception that exists requires the parties to seek the supplemental sales orders necessary to ratify C&S' decision to assume the contracts.

30.    The contract's language makes quite clear that the only exception to the option period exists for one reason. And even then, the period remains open only "so long as and to the extent that the Purchaser remains obligated under the Transition Services Agreement for the Liabilities associated with any such identified Acquired Assets." Ex. A at § 2.5(a). Permitting C&S to escape liabilities it is bound to acquire, through late rejection of executory contracts, violates this provision of the APA and renders it prospectively meaningless.

31.    C&S' argument, in fact, turns the APA's plain meaning on its head. C&S argues, first, that the option period remains open for any purpose, ignoring the APA's explicit six-month limitation. Then C&S argues that it should be able to extend the option period in order to reject contracts, thereby disclaiming their attendant liability, even though it is only their liability for the contracts in question that ostensibly extends the option period in the first place. This is a clear example of an attempt to negate clear contract language.

32.    The Court must give force to the provision defining the six-month option period, or it will have rendered that provision moot. The Court must give effect to all provisions of the contract. Sonitrol Holding, 607 A.2d at 1184 ("The cardinal rule of contract construction is that, where possible, a court should give effect to all contract provisions.") (citation omitted); see also, e.g., New Wrinkle, Inc. v. John L. Armitage & Co., 238 F.2d 753, 757 (3d Cir. 1956) ("It is elementary that a written contract is to be construed so as to give effect to all of its parts. . . ."). But analyzing C&S' proposed interpretation, one is left to wonder why there is any mention of

an "option period" at all. The parties could have simply provided, through the contract's language, that the option period would extend indefinitely, without reference to a six-month period or the attendant limitations on the option period's extension.

33.     C&S' interpretation of the option period also renders meaningless the APA's requirement that, after the Court enters its approval of the proposed assumption, the PCT use "commercially reasonable efforts to consummate such purchase . . . by no later than the end of the expiration of the Option Period . . . ." See Ex. A at § 2.5(d). If the Court adopts C&S' position, the option period would officially end when the Court issues a supplemental sales order.[2] Under this interpretation, there would be no time at all between the Court's entry of an assumption order and the end of the option period for a specific contract -- rendering this provision a nullity. The parties could not possibly have meant to give this provision such a meaning.

34.     For the reasons stated above, the six-month option period, and the limited exception to that option period, are unambiguous and certainly not "reasonably susceptible of different interpretations." Westfield Ins. Group v. J.P.'s Wharf, Ltd., 859 A.2d 74, 76 (Del. 2004) (citation omitted). Therefore, the Court must give those terms the interpretation demanded by their plain meaning. Id.

35.     The PCT's understanding of the APA also comports with the reasonable shared expectations of the parties when they negotiated the APA. See Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13 (Del. Ch. 2003) ("The primary goal of contract interpretation is to 'attempt

[2] Furthermore, C&S has referred to the PCT's alleged "breach" of the APA by refusing to file motions to reject the contracts at issue. See D.I. 8723 at sec. H. Regardless of what interpretation of the contract the court adopts, Fleming is not in breach of the contract. Adopting C&S' position inexorably means that the option period has not ended, and consequently, that the PCT has not breached the APA. On the other hand, if the Court adopts the PCT's interpretation, it is C&S that would be in breach of the APA, because the APA binds C&S to assume the executory contracts in question, subject to receiving the Court's approval for doing so.

11

to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted.'"). The option period's purpose was to facilitate C&S' due diligence on thousands of executory contracts involved in the original transaction. See D.I. 3647, 1906. Therefore, the parties negotiated at arms' length a fair and comprehensive plan for dealing with the complex problem of analyzing thousands of open contracts in the context of the purchase agreement. The parties agreed that six months was a reasonable amount of time to determine the outstanding assets, liabilities, and risks of each contract. Id. In return, the Debtors sought a reasonable time frame to consummate their agreements, maximize their value on behalf of the estate, and achieve reasonable certainty as to their future contract liabilities. See D.I. 1906 at ¶ 15-16 (describing the need to consummate the sale of the contracts by early August 2003); D.I. 3647. Since the parties reached an agreement fulfilling these important goals, it would be unjust for the Court to now adopt C&S' unfair interpretation of the APA.

36.     To determine the meaning of a contract provision, the Court may consider, among other factors, "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Sanford Inv. Co., 198 F.3d at 421. Here, the Court's consideration of why it must issue supplemental sales orders should lead it to adopt the PCT's interpretation of the APA. Upon notice that C&S wants to assume and assign an executory contract, the Court must hold a hearing to determine whether such assumption is in the best interests of the estate and whether the assuming party can adequately assure future performance. It does this analysis to ensure that assumption is in the best interests of the estate. The exception, therefore, merely recognized the reality that the Court would need time to complete its duties; it did not give C&S any additional rights past the expiration of the option period.

37.    In conclusion, the APA requires C&S to revoke its assumption requests during the six-month option period. The only, limited, exception extended the option period so long as "the Purchaser remains obligated under the Transition Services Agreement for the Liabilities associated with any such identified Acquired Assets." C&S' interpretation of the APA, unsurprisingly from its perspective, upsets the balance intended by the parties in C&S' favor. The parties did not mean, and in fact, it is an absurd interpretation of the APA's terms, that C&S should carry the disputed contracts' liabilities through the option period, only to let C&S pass the buck back to the PCT months or years later. Certainly, if the extended option period applies only as C&S remains obligated for the contracts' liabilities, C&S cannot turn around and disclaim the very liabilities that extended the period in the first place.

B.    C&S' Interpretation of the Contract Leads to Absurd Results

38.    C&S' proposed interpretation not only defies the contract's plain language, it would lead to absurd results. "A reasonable construction will be preferred to one which is unreasonable, and that interpretation should be adopted which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties." 17A Am. Jur. 2d Contracts § 344; see also Sonitrol Holding, 607 A.2d at 1182-83 (rejecting one party's proposed interpretation because it led to "wholly illogical results"); In re Northwestern Corp., 313 B.R. 595, 601 (Bankr. D. Del. 2004) ("An interpretation that leads to an absurd result is disfavored."). C&S' preferred interpretation renders the contract so inequitable that this Court *must* ask why Fleming would enter into such a one-sided negotiated agreement.

> Where the language of an agreement is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that the contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which

> makes it a rational and probable agreement must be preferred to
> that which makes it an unusual, unfair, or improbable contract.

Holland v. Nat'l Auto. Fibres, 194 A. 124 (Del. Ch. 1937). Even if, *arguendo*, the court believed

the option period clause to be obscure or ambiguous, it still must interpret the agreement to be a

"rational and probable agreement" between the parties. Here, C&S' interpretation of the APA is

both extreme and unfair.

39.     For instance, C&S' position would allow it to notice a contract, sit back, and

watch for several months to ensure that the contract's terms remained favorable. So C&S is

claiming the enviable position of cherry-picking those contracts favorable to it, then getting rid

of those that incur significant after-the-fact liability. The parties decided long ago how much of

the purchase price to set aside for cures; now C&S wants to rewrite the APA because it does not

want to pay cure costs. That C&S might, after the process played itself out, pay more than the

amount set aside for cures was an inherent part of the parties' agreement. That this has come to

pass is not sufficient reason to rewrite the APA in C&S' favor.

40.     Furthermore, C&S' position creates perverse incentives that would defeat the

APA's core purposes. See Arawak Aviation, Inc. v. Indem. Ins. Co. of N. Am., 285 F.3d 954,

957 (11th Cir. 2002) (holding that a party's proposed contractual interpretation was "absurd"

because it would create a perverse incentive for that party to act). Assuming that C&S' position

is correct, C&S could have put a contract on the assume list, kept the contract open as long as

possible, then used the extra time to negotiate a better deal than the existing contract with the

contract's counter-party. If C&S was successful, it could reject the contract, leaving Fleming

with the original contract's liabilities. If C&S was unsuccessful, it could then at least assume the

existing contract. That is not a reasonable result.

41.    The PCT's interpretation of the option period's length, on the other hand, comports with the contract's language, the parties' intent, and the bounds of reasonableness. The six-month option period gave C&S an opportunity to perform due diligence. But the parties recognized that once C&S made its decisions about whether to assume and assign contracts, the court would require time to undertake the necessary scrutiny required to ratify the assumption. Particularly, if C&S wanted to use the entire six-month option period to perform diligence and make its decisions it plainly needed time to complete the necessary legal process. History has borne this out; even two years later, some contracts remain open, awaiting completion of the legal process.

C.    C&S' Interpretation of the APA Is Inconsistent with the Language of the Transition Services Agreement

42.    C&S' proposed interpretation also contradicts language found in the APA's sister agreement, the Transition Services Agreement. "When an executed contract refers to another instrument and makes the conditions of the other instrument a part of it, the two will be interpreted together as the agreement of the parties." Pauley Petroleum, Inc. v. Cont'l Oil Co., 231 A.2d 450, 456 (Del. Ch. 1967); Restatement (Second) of Contracts § 202(2) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). Section 2.5(a) of the APA specifically references the TSA, contemplating that it would be part of the parties' overall agreement. The TSA sheds light on the option period's meaning, its purposes, and the parties' intent, making clear that Fleming's interpretation of the contract is the correct one.

43.    The TSA, adopted just one week after the APA, was an integral part of the agreement between the Debtors and C&S, ensuring a smooth transition of assets from the Debtors to C&S (and its follow-on purchasers). In the TSA, the parties defined the option period

15

and made reference to "such additional time period as is necessary to seek and obtain any necessary Supplemental Sales Order with respect to the Acquired Assets identified in any such Option Notice. . . ." See Ex. B at 2. By its plain language, the TSA appears to contemplate that the "additional time period" may not even be part of the original option period, but an entirely different animal altogether; an administrative period created in deference to the fact that the parties would need time to complete the legal process. At the very least, the TSA's language supports the PCT's contention that the exception to the six-month option period was indeed limited.

44.    If, in fact, the parties had desired to create an open-ended option period, the TSA does not suggest it. For instance, the TSA required C&S to deliver its last notice of assumption "prior to the 15[th] day immediately proceeding the expiration date of the Option Period." See Ex. B at 2. Using C&S' explanation of the option period, it is hard to know what 15 days before the expiration date of the option period would be, or why this clause would be relevant or necessary.[3] The TSA then provides for the "additional time period" discussed above. The plain language betrays the parties' intent: regardless of whether this time period was an "extension" of the option period or an additional (and separate) time period, it existed to complete the formal process of assignment and assumption. If the parties are not pursuing those orders, then it follows that there is no additional time period.

D.    It Is Inequitable to Require the PCT to Bear the Expense of New Rejection Claims After the PCT Relied on C&S' Commitment to Assume Contracts

45.    The PCT has a fiduciary duty to preserve the estate for the benefit of creditors. But if the Court grants C&S' motion, thereby requiring the PCT to reject the outstanding

---

[3] Of course, at the time, C&S certainly treated the closing of the six-month period as a deadline; it delivered its last notices of assumption 15 days before that date.

16

contracts, the PCT could be subject to unsecured claims exceeding millions of dollars.[4]  Indeed, several counterparties of the contracts at issue have already lodged unsecured claims totaling more than $2 million.  See, e.g., Ex. H (various claims for unsecured and rejection damages). These are liabilities that the PCT would not have to incur but for C&S' refusal to accept, and abide by, the terms of the APA.

46.    In another instance, the parties are currently in a dispute over an administrative claim for $379,662.15 filed by Munafo's, one of the counterparties to one of the open contracts. See D.I. 12114; see also Ex. I (Award of Arbitrator).  As the situation currently stands, the PCT must assume the Munafo's contract and assign the contract to AWG Acquisition, a third-party purchaser.  In turn, AWG will be required to indemnify the PCT for curing the costs of the contract's breach.  If the Court now allows C&S to renege on its prior agreement to assume the contract, the PCT may be required to satisfy Munafo's rejection damages.

47.    The Munafo's example provides a perfect example for why the parties structured the APA as they did.  After the six-month option period, as part of an agreement with Munafo's, the PCT agreed to lift the automatic stay to facilitate the arbitration of certain claims Munafo's and the PCT held against one another.  The PCT agreed to these steps because it believed that AWG could not reject the Munafo's contracts after the six-month option period ended.  Had the PCT believed (or been given notice that AWG believed) that AWG could reject assignment of the contract, the Debtors may not have agreed to lift the stay.  Now C&S' insistence on rejection puts the estate, and therefore the creditors' recovery, at risk.

48.    With the cure accounts now empty, C&S faces the unpleasant prospect of paying hundreds of thousands of dollars in cure costs out of its own pocket.  Not surprisingly, C&S

---

4  The PCT reserves all defenses to such claims, including the Administrative Bar Date.

would prefer to avoid these costs and advances its novel interpretation of the option period to achieve this result. If the Court adopts C&S' interpretation, it will do so to the detriment of the creditors who relied upon provisions set forth in the APA -- and the pleadings submitted to the Court explaining the terms of that agreement -- in considering and voting to approve the Debtors' Plan. If the PCT must satisfy even one rejection claim on account of C&S' failure to live up to its promises in the APA (i.e., the Munafo's claim), each creditor's recovery will be diluted. And the more substantial the rejection claims, the more injury that will result. This is an inequitable result when C&S clearly intended to assume these contracts, and is only now reneging on that deal because of the cure accounts' depletion.

## II.    The Parties Have Been Acting for Nearly Two Years As if the Option Period Was Closed

49.    C&S' dealings, both with the PCT and the Court, show that it believed the option period had closed. The PCT has repeatedly, without objection from C&S, taken the position that the option period ran for only six months. C&S even joined a filing, without adverse comment, in which the PCT took that position. It is unfair to the PCT that C&S now argues a point to which it previously acquiesced. Furthermore, to the extent that C&S has any rights under its preferred contractual position, it has slept on those rights in a way that is prejudicial to the PCT. As a result, C&S should be barred from making the argument at this time.

50.    Evidence of the parties' pre-dispute contract interpretation is given great weight in this Circuit and the common law: "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Quick v. N.L.R.B., 245 F.3d 231, 247 (3d Cir. 2001) (quoting Restatement (Second) of Contracts § 202(4)); see also

Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola, Inc., 668 F. Supp. 906, 917 (D.

Del. 1987)) ("Course of performance evidence may be given great weight in interpreting a

contract where the parties know of the particular acts and either accept or acquiesce without

objection to the performance."). C&S has indicated its agreement with the PCT's contract

construction through its behavior between the APA's signing in July 2003 and the time this

dispute arose. See In re IBP, Inc. S'holders Litig., 789 A.2d 14, 55 (Del. Ch. 2001) ("Where one

of the parties, however, expresses its beliefs to the other side during the negotiation process or in

the course of dealing after consummation, such expressions may be probative of the meaning

that the parties attached to the contractual language in dispute."). C&S joined one pleading filed

by the PCT explicitly stating that the option period lasted only six months after the initial closing

date:

> The order approving the Debtors' sale (the "Sale") of their wholesale business assets (the "Wholesale Assets") to *inter alia,* C&S Acquisition, LLC ("C&S") *provided for a six (6) month period of time to assume and assign or reject executory contracts and unexpired leases (the "Six Month Period")* in recognition of, among other things, C&S' extremely short due diligence period regarding the Sale.

See D. I. 3640, 3647 (emphasis added).

     51.    Furthermore, in that motion, the PCT set forth the length and purposes of the

option period.

> The Debtors needed to sell the Wholesale Assets, which include thousands of contracts and leases, quickly in order to maintain their sale value because the Wholesale Assets were rapidly depreciating in value. C&S agreed to the quick Sale on the condition that its short due diligence period be redressed by the Six Month Period. Thus, during the additional time, the Debtors were able to maximize the value of the Wholesale Assets while at the same time obtaining an exit strategy within six (6) months for the assumption or rejection of the thousands or leases and contracts. See D.I. 3640.

52.    Not only did C&S join the above-quoted language regarding the option period, it also failed to object to similar statements in no fewer than 12 pleadings filed by the PCT over a seven-month period. See, e.g., D.I. 6709.

53.    Though C&S could have objected and clarified its position at any time during that period, it did not do so, indicating its assent to the reasonable contract construction proposed by the PCT. See Sonitrol Holding, 607 A.2d at 1182 ("Sonitrol's interpretation is belied by its very own actions. Until litigation became likely, Sonitrol never interpreted Section 4.7 in any way other than as it is interpreted by this Court. . . ."). Therefore, C&S' change of position is precluded.

54.    Courts have consistently found that equity will not allow a party to sleep on its rights, at least when such slumber is prejudicial to other parties. Fed. United Corp. v. Havender, 11 A.2d 331, 345 (Del. 1940) ("A court of equity moves upon considerations of conscience, good faith and reasonable diligence."). Having slept on its rights for several months after the option period's conclusion, the Court should not allow C&S to surprise the PCT by asserting them now. See Rankin v. Interstate Equities Corp., 180 A. 541, 541-43 (Del. Ch. 1935) (holding that two months sufficient to support a claim of laches). The PCT (and its beneficiaries -- the Debtor's creditors) has been prejudiced because it has been exposed to rejection damages and, potentially, administrative priority claims from non-debtor counterparties that were not taken into account as part of the Plan. In particular, the PCT would not likely be in a position to incur liability for Munafo's potential administrative claim had C&S been upfront with its current interpretation of the option period's length.

## CONCLUSION

55.    Wherefore, the PCT requests that the court order C&S to assume the contracts in question as originally intended, or alternatively, order C&S to indemnify the PCT for any claims brought against it as a result of the rejection of these contracts.

Dated: December 7, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

*Scotta McFarland*

Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
James E. O'Neill, III (Bar No. 4042)
919 North Market Street, 16th Floor
Post Office Box 8705
Wilmington, Delaware  19899-8705
(Courier No. 19801)
Telephone:  (302) 652-4100
Facsimile:  (312) 652-4400

and

KIRKLAND & ELLIS LLP
Eric Liebeler (CA Bar No. 149504)
G. Seth Beal (CA Bar No. 205183)
777 South Figueroa Street
Los Angeles, California  90017
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500
Co-Counsel for the Post Confirmation Trust